IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

        Plaintiff,

   and

CHEYENNE RIVER SIOUX TRIBE,

        Plaintiff-Intervenor,

  v.

U.S. ARMY CORPS OF ENGINEERS,

        Defendant-Cross
        Defendant,

   and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-
        Cross Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796
and 17-cv-267)

**SUPPLEMENT TO JOINT APPENDIX**

**VOLUME 11**

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

# JOINT APPENDIX OF
# REMAND ADMINISTRATIVE RECORD

## VOLUME 11

| JOINT APPENDIX OF ADMINISTRATIVE RECORD CITATIONS ||
|---|---|
| **DESCRIPTION** | **PAGE NOS.** |
| Dakota Access Pipeline (DAPL) Easement DACW45-2-16-8059 (Redacted). (Excerpts) | USACE_ESMT000001-000042 |
| OASA(CW) Letter to Federal Register Notice of Withdrawal of NOI to Prepare an EIS. | USACE_ESMT000103-000104 |
| DAPL Technical and Legal Review (Redacted). (Excerpt) | USACE_ESMT000224-000240 |
| Presidential Memorandum, Fed Reg Notice, 82 Fed Reg 8661 | USACE_ESMT000430-000431 |
| Notice of Intent (NOI) to Prepare an Environmental Impact Statement. | USACE_ESMT000467-000468 |
| Email string discussing OST consultation request | USACE_ESMT000474-000499 |
| Email string discussing follow-up DAPL questions (Redacted) (Excerpts) | USACE_ESMT000544-000546; USACE_ESMT000556-000559 |
| DOI Sol Memo M-37038 Subject Tribal Treaty and Environmental Statutory Implications of DAPL. | USACE_ESMT000565-000601 |
| ASA(CW) DAPL Memo. | USACE_ESMT000602-000605 |
| OST letter to ASA(CW) re DAPL easement (Excerpts) | USACE_ESMT000611; USACE_ESMT000624-000642 |
| NWO DAPL Easement Recommendation. | USACE_ESMT000652-000700 |
| ASA(CW) letter to CRST and DAPL discussing review of previous DAPL decisions | USACE_ESMT001000-001001 |
| SRST letter to ASA(CW) discussing the Final Environmental Assessment. (Excerpt) | USACE_ESMT001073-001082 |
| Memo for ASA(CW) Subject Dakota Access Pipeline Crossing at Lake Oahe ND (Redacted) (Excerpts) | USACE_ESMT001095-001097; USACE_ESMT001123 |
| Email string discussing DAPL and possible permit conditions to consider | USACE_ESMT001173-001190 |

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

| JOINT APPENDIX OF ADMINISTRATIVE RECORD CITATIONS | |
| --- | --- |
| **DESCRIPTION** | **PAGE NOS.** |
| USACE memo to ASA(CW) discussing review of key issues and decisions (Redacted) | USACE_ESMT001213-001249 |
| PHMSA Data, Incidents per mile | USACE_ESMT001255-001256 |
| PHMSA, Serious Incidents-HL template | USACE_ESMT001257-001258 |
| PHMSA Miles by Commodity - AR HL 2010 and forward | USACE_ESMT001259-001259 |
| Sierra Club letter to USACE requesting additional review under NEPA | USACE_ESMT001262-001292 |
| OST letter to POTUS, AG, SOI, SA discussing decision to halt DAPL construction. | USACE_ESMT001353-001367 |
| Advisory Council on Historic Preservation (ACHP) letter to ASA(CW) concerning DAPL determinations | USACE_ESMT001498-001499 |
| DAPL ND PSC wetland report (Excerpt) | USACE_ESMT002911-002918 |
| PHMSA Leak Detection Study (Excerpt) | USACE_ESMT003680-003764 |
| Meeting attendees Niobrara Feb. 18-19, 2016 | USFWS_DAPL0001974-0001976 |
| Meeting notification to people who attended the January 27, 2016 | USFWS_DAPL0001977-0001978 |
| DA letter dated October 21, 2014 to Corps regarding request for pipeline easement and temporary construction license for the proposed DAPL project at Lake Oahe. (Excerpt) | OAHE0000034-OAHE0000036 |

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

DACW45-2-16-8059

# DEPARTMENT OF THE ARMY
## EASEMENT FOR FUEL CARRYING PIPELINE RIGHT-OF-WAY
## LOCATED ON
## LAKE OAHE PROJECT
## MORTON AND EMMONS COUNTIES, NORTH DAKOTA

This Easement is made on behalf of **THE UNITED STATES OF AMERICA** (the "United States"), between **THE SECRETARY OF THE ARMY**, acting by and through the Chief, Real Estate Division, U.S. Army Engineer District, Omaha, hereinafter referred to as the "Grantor," under and by virtue of the authority vested in Title 30, United States Code, Section 185, and **DAKOTA ACCESS, LLC, a Limited Liability Company, duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal office at 1300 Main, Houston, Texas 77002,** hereinafter referred to as the "Grantee."

**NOW THEREFORE:**

The Grantor, for good and valuable consideration set forth below, the receipt and sufficiency of all of which are hereby acknowledged, upon and subject to the terms, covenants and conditions set forth in this Easement for right-of-way, does hereby:

Grant and convey to Grantee, an easement for a fuel carrying pipeline right-of-way for the installation, construction, operation, maintenance, repair, replacement and termination of a **thirty-inch (30) diameter, horizontal directional drill (HDD) buried oil pipeline for the purpose of transporting crude oil,** and related facilities, hereinafter collectively referred to as the "Facilities," over, across, in and upon lands of the United States **at and under Lake Oahe and the Lake Oahe Project,** as identified in **Exhibits "A" and "B,"** hereinafter referred to as the "Premises," and which are attached hereto and made a part hereof; with the width of a right-of-way being fifty (50) feet plus the ground occupied by the pipeline (that is, the pipe and its related facilities);

Make no claim of title during the term of this Easement to any Facilities of whatever nature located, constructed, or placed on the Premises by the Grantee.

Version Dated 3 December 2016

USACE_ESMT000001

DACW45-2-16-8059

**THIS EASEMENT** is granted subject to the following conditions.

1.    **TERM**

This easement is hereby granted for a term of **Thirty Years**, beginning on the date of execution by the Grantor and ending thirty (30) years from the date of execution by the Grantor.

The Grantor shall renew this Easement in accordance with the provisions of 30 U.S.C. § 185, so long as the project is in commercial operation and is operated and maintained in accordance with all of the provisions of this Easement and applicable law. The Grantor prior to renewing this Easement must receive from the Grantee written notice of its intent to seek renewal or extension not less than one year prior to the Easement expiration or termination date and all plans, contracts, agreements, or other information or material which the Grantor deems necessary to determine whether a right-of-way shall be renewed and the terms and conditions which should be included in the right-of-way.

2.    **CONSIDERATION, MITIGATION, AND DAMAGES**

a.  As consideration for this Easement, the Grantee shall pay cash consideration in advance to the Grantor in the amount of **Eight Thousand Fifty and No/100 Dollars ($8,050.00), payable annually on or before the anniversary date of the beginning of this easement.**

b.  The Grantee will mitigate damages caused to the Premises, surrounding areas, or to the **Lake Oahe Project**, during initial installation and construction of the Facilities, and damages caused during operation, maintenance, or subsequent construction work, and complete all site restoration in accordance with the Mitigation/Restoration Plan submitted by Grantee on file in the U.S. Army Engineer District, **Omaha, specifically referenced in the Grantee's pipeline Environmental Assessment ("EA") in Section 3.3.2.5 "Clean-up and Restoration," and further outlined in the Stormwater Pollution Prevention Plan ("SWPPP") presented in Appendix A of the EA and the Environmental Construction Plan presented in Appendix G of the EA.**

c.  The Grantee shall reimburse the Grantor in advance for the costs incurred in monitoring the construction, operation, maintenance, and termination of the pipeline and related facilities on the Premises in the amount of **Seven Hundred Fifty and No/100 Dollars ($750.00) payable annually on or before the anniversary date of the beginning of the Easement.**

d.  Any checks or drafts payable to the Grantor will be made to the order of the **"FAO-USAED, OMAHA"**, and delivered to **USAED, Omaha, ATTN:  CENWO-RE, 1616 Capitol Avenue, Omaha, Nebraska  68102.**

e. Any payments due under the terms of this Easement must be paid on or before the date that they are due to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982, as amended (31 U.S.C. Section 3717). This statute requires the imposition of an interest charge for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due.

## 3.   NOTICES

All correspondence and notices to be given pursuant to this Easement shall be in writing and addressed, if to the Grantee, to **DAKOTA ACCESS LLC, 1300 Main Street, Houston, Texas 77002** and, if to the Grantor, to the **U. S. Army Engineer District, Omaha, Attention: Chief, Real Estate Division, 1616 Capitol Avenue, Omaha, Nebraska 68102,** or as may from time to time otherwise be directed by the parties. Notices shall be mailed by certified mail, postage prepaid, return receipt requested, addressed to the addresses above. The effective date of the notice shall be the earlier of the actual date of receipt or the date the addressee is notified of the attempted delivery of the certified mail, whether or not the addressee actually accepts delivery.

## 4.   AUTHORIZED REPRESENTATIVE

Except as otherwise specifically provided, any reference herein to "Grantor" or "Chief, Real Estate Division" shall include their duly authorized representatives. Any reference to "Grantee" shall include assignees, transferees and their duly authorized representatives.

## 5.   SUPERVISION BY THE GRANTOR

a. The installation and/or operation and maintenance of said pipeline shall be accomplished without cost or expense to the United States under the general supervision and subject to the approval of the Grantor's representative having immediate jurisdiction over the property, hereinafter designated as "said officer," and in such manner as not to endanger personnel or property of the United States on the said United States land or obstruct travel on any road thereon. The Grantee shall have the right of ingress and egress for such purposes, subject to approval of access by said officer.

b. The use and occupation of said Premises incident to the exercise of the privileges hereby granted shall be subject to such rules and regulations as the said officer may from time to time prescribe.

## 6.   APPLICABLE LAWS AND REGULATIONS

The Grantee shall construct, operate, maintain, and terminate the said pipeline in accordance applicable federal, state, county, and municipal laws, regulations, and ordinances. As required by 30 U.S.C. § 185, the Grantee shall construct, operate, and

USACE_ESMT000003

DACW45-2-16-8059

maintain the Facilities as common carriers.  The pipeline installation shall be in accordance with the U.S. Department of Transportation's Minimum Federal Safety Standards and any other applicable federal or state safety requirements.

## 7.    CONDITION OF PREMISES

The Grantee acknowledges that it has inspected the Premises, knows its condition, and understands that the same is granted without any representations or warranties whatsoever and without any obligation on the part of the United States.

## 8.    INSPECTION AND REPAIRS

a.  Upon completion of any phase of the pipeline project which causes damage to the Premises, the Grantee shall restore said damage immediately, at the Grantee's own expense, to the same condition in which they existed prior to the commencement of such work, to the satisfaction of the said officer.

b.  The Grantee shall supervise the said pipeline and cause it to be inspected at reasonable intervals, and shall immediately repair any defects or leaks found by such inspection, or when requested by the Grantor to repair any defects or leaks.

## 9.    PROTECTION OF GOVERNMENT PROPERTY

The Grantee shall be responsible for any damage that may be caused to the property of the United States by the activities of the Grantee under this Easement and shall exercise due diligence in the protection of all property located on the Premises against fire or damage from any and all other causes.  Any property of the United States damaged or destroyed by the Grantee incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Grantee to a condition satisfactory to the Grantor, or at the election of the Grantor, reimbursement made therefor by the Grantee in an amount to reimburse for the loss satisfactory to the Grantor.

## 10.    RIGHT TO ENTER

a.  The right is reserved to the Grantor, the United States, its officers, agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with government purposes, to make inspections, to remove timber or other material, except property of the Grantee, to flood the Premises, to manipulate the level of the lake or pool in any manner whatsoever and/or to make any other use of the lands as may be necessary in connection with government purposes, and the Grantee shall have no claim for damages on account thereof against the Grantor, the United States or any officer, agent, or employee thereof.

b.  If the entry will involve removal of timber or other material, or heavy equipment, the Grantor will provide reasonable notice to Grantee of any such entry or use so that Grantee may take any necessary measures to assure the safety of its pipeline and

USACE_ESMT000004

any personnel of the United States working in proximity to such pipeline. Grantee will ensure that Grantor has emergency contact information.

## 11.   TRANSFERS AND ASSIGNMENTS

Without prior written approval by the Grantor, the Grantee shall neither transfer nor assign this Easement or any part thereof nor grant any interest, privilege or license whatsoever in connection with this Easement. The provisions and conditions of this Easement shall extend to and be binding upon and shall inure to the benefit of the representatives, successors and assigns of the Grantee.

## 12.   INDEMNITY

a. The Grantee shall be strictly liable to the United States for damage or injury which may arise from or be incident to the activities of the Grantee under this Easement, or for damages to the property of the Grantee, or for damages to the property or injuries to the person of the Grantee's officers, agents, or employees or others who may be on the Premises at their invitation or the invitation of any one of them, and the Grantee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors. Grantee shall exercise due diligence in the protection of all property located on the Premises.

b. All owners of any interest in, and all affiliates or subsidiaries of the Grantee shall be liable to the United States in the event that a claim for damage or injury cannot be collected from the Grantee. Liability without fault hereunder shall be limited to **Ten Million and No/100 Dollars ($10,000,000.00)** for any one incident. Liability of such Grantee for damages in excess **Ten Million and No/100 Dollars ($10,000,000.00)** shall be in accord with ordinary rules of negligence. However, this condition shall not impose strict liability on the Grantee for damage or injury resulting from (a) an act of war or force majeure, or (b) negligence of the United States. In any case where liability without fault is imposed pursuant to this condition and the damage or injuries involved were caused by the negligence of a third party, the rules of subrogation shall apply in accordance with the law of the jurisdiction where the damage or injury occurred.

c. The Grantee does hereby accept liability, if any, imposed by Federal and state statutes to third parties for injuries incurred in connection with the use and occupancy of the pipeline right-of-way.

## 13.   SUBJECT TO EASEMENTS

a. This Easement is subject to all other existing easements, or those subsequently granted as well as established access routes for roadways and utilities located, or to be located, on the Premises.

b. To minimize adverse environmental impacts and the proliferation of separate rights-of-way across federal lands, the utilization of rights-of-way in common shall be

USACE_ESMT000005

DACW45-2-16-8059

required to the extent practical, and this Easement hereby reserves to the Grantor the right to grant additional rights-of-way or permits for compatible uses on or adjacent to the Premises.

c. Provided that the proposed grant of any new easement or route will be coordinated with the Grantee, and easements will not be granted which will, in the opinion of the Grantor, interfere with the use of the Premises by the Grantee.

## 14.   REQUIRED SERVICES

This condition was deleted.

## 15.   RELOCATION OF FACILITIES

In the event all or any portion of said Premises occupied by said Facilities shall be needed by the United States, or in the event the existence of said Facilities shall be considered detrimental to governmental activities, the Grantee shall, from time to time, upon notice to do so, and as often as so notified, promptly seek authorization from the Federal Energy Regulatory Commission, or other applicable entity, to remove said Facilities, or portion thereof, to such other location or locations on said Premises as may be designated by the Grantor. In the event said Facilities shall not be removed or relocated within ninety (90) days after any aforesaid notice, the Grantor, after receipt of required approvals, may cause the same to be done at the expense of the Grantee.

## 16.   SUSPENSION OR TERMINATION

a. Abandonment of the Easement herein granted or noncompliance with any provisions of this Easement or applicable provisions of 30 U.S.C. 185 may be grounds for suspension or termination of the right of way if (a) after due notice to the Grantee, (b) a reasonable opportunity to comply with this Easement or applicable provisions of 30 U.S.C. § 185, and (c) an appropriate administrative proceeding pursuant to 5 U.S.C. § 554, the Grantor determines that any such ground exists that suspension or termination is justified. No administrative proceeding shall be required where the Easement by its terms provides that it terminates on the occurrence of a fixed or agreed upon condition, event, or time.

b. If the Grantor determines that an immediate temporary suspension of activities within the Premises is necessary to protect public health or safety or the environment, the Grantor may abate such activities prior to an administrative proceeding.

c. Deliberate failure of the Grantee to use the Easement for the purpose for which it was granted or renewed for any continuous two-year period shall constitute a presumption of abandonment of the Easement; provided, that where the failure to use the right-of-way is due to circumstances not within the Grantee's control, the Grantor is not required to commence proceedings to suspend or terminate the right-of-way.

USACE_ESMT000006

DACW45-2-16-8059

## 17.   SOIL AND WATER CONSERVATION

The Grantee shall maintain, in a manner satisfactory to said officer, all soil and water conservation structures that may be in existence upon said Premises at the beginning of or that may be constructed by the Grantee during the term of this Easement, and the Grantee shall take appropriate measures to prevent or control soil erosion within the right-of-way herein granted.  Any soil erosion occurring outside the Premises resulting from the activities of the Grantee shall be corrected by the Grantee as directed by said officer.

## 18.   ENVIRONMENTAL PROTECTION

a.  Within the limits of their respective legal powers, the parties hereto shall protect the Premises against pollution of its air, ground, and water.  The Grantee shall promptly comply with any laws, regulations, conditions, or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any federal, state, interstate, or local governmental agency having jurisdiction to abate or prevent pollution.  The disposal of any toxic or hazardous materials within the Premises is strictly prohibited.  Such regulations, conditions, or instructions in effect or prescribed by the said Environmental Protection Agency or any federal, state, interstate, or local governmental agency are hereby made a condition of this Easement.  The Grantee shall not discharge waste or effluent from the Premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

b.  The use of any pesticides or herbicides within the Premises shall be in conformance with all applicable federal, state, and local laws and regulations.  The Grantee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the Premises.

c.  The Grantee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs arising from the Grantee's activities, the Grantee shall be liable to restore the damaged resources.

## 19.   ENVIRONMENTAL CONDITION OF PROPERTY

An Environmental Condition of Property (ECP) documenting the known history of the property with regard to the storage, release, or disposal of hazardous substances thereon, is attached hereto and made a part hereof as **Exhibit "C."**  Upon expiration, revocation, or termination of this Easement, another ECP shall be prepared which will document the environmental condition of the property at that time.  A comparison of the two studies will assist the said officer in determining any environmental restoration requirements.  Any such requirements will be completed by the Grantee in accordance with the condition on **RESTORATION**.

USACE_ESMT000007

## 20.    HISTORIC PRESERVATION

The Grantee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, vestiges, remains or objects of antiquity.  In the event such items are discovered on the Premises, the Grantee shall immediately notify the Grantor, and the site and the material shall be protected by the Grantee from further disturbance until the Grantor gives clearance to proceed.

## 21.    NON-DISCRIMINATION

The Grantee shall not discriminate against any person or persons or exclude them from participation in the Grantee's operations, programs or activities conducted on the Premises because of race, color, religion, sex, sexual orientation, gender identity, age, handicap, or national origin, pursuant to Executive Order 13672, 21 July 2014.  The Grantee will comply with the Americans with Disabilities Act and attendant Americans with Disabilities Act Accessibility Guidelines (ADAAG) published by the Architectural and Transportation Barriers Compliance Board.  The Grantee shall comply with Department of Justice rules on non-discrimination.

## 22.    HAZARDOUS WASTE MANAGEMENT

The Grantee will not store or dispose of non-DoD hazardous materials on the premises unless authorized under 10 U.S.C. § 2692, *Storage, Treatment, and Disposal of Non-Defense Toxic and Hazardous Materials*.  The Grantee shall strictly comply with the hazardous waste management requirements under the Resource Conservation and Recovery Act and the applicable state hazardous waste management rules, including proper hazardous waste characterization, labeling, storage, disposal and documentation requirements.  Except as specifically authorized by the Grantor in writing, the Grantee must provide, at its own expense such hazardous waste management facilities as needed to maintain compliance with all laws and regulations.  Army hazardous waste management facilities will not be available to the Grantee.

## 23.    HAZARDOUS WASTE OR FUEL SPILL

The Grantee shall submit to the Grantor and maintain, thereafter, a plan for responding to hazardous water, fuel, and other chemical spills prior to commencement of use of the Premises.  Such plan shall be independent of the Government's spill contingency plan and, except for initial fire response and/or spill containment, shall not rely on use of project personnel or equipment.  Should the Grantor provide any personnel or equipment, whether for initial fire response and/or spill containment, or otherwise on request of the Grantee or because the Grantee was not, in the opinion of the said officer, conducting timely clean-up actions, the Grantee agrees to reimburse the Grantor for its costs.

Version Dated 3 December 2016

USACE_ESMT000008

DACW45-2-16-8059

## 24.   RESTORATION

On or before the expiration or termination of this Easement, the Grantee shall, without expense to the United States, and within such time as the Grantor may indicate, remove said Facilities and restore the Premises to the satisfaction of the Grantor.  In the event the Grantee shall fail, neglect or refuse to remove said Facilities and restore the Premises, the Grantor shall have the option to take over said Facilities without compensation, or to remove said Facilities and perform the restoration at the expense of the Grantee, and the Grantee shall have no claim for damages against the United States or its officers or agents for such action.  This provision is subject to all regulatory requirements and approvals covering any of the activities described in this condition.

## 25.   DISCLAIMER

It is understood that this instrument is effective only insofar as the rights of the United States in the said property are concerned, and that the Grantee shall obtain such permission as may be necessary on account of any other existing rights.  It is also understood that the granting of this Easement does not eliminate the necessity of obtaining any Department of the Army permit that may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344), or any other permit or license which may be required by federal, state or local statute in connection with the use of the Premises.  The grant of this Easement pursuant to 30 U.S.C. § 185 shall grant no immunity from the operation of the federal antitrust laws.

## 26.   OTHER AGENCY AGREEMENTS

It is understood that the provision of the Easement shall not abrogate or interfere with any agreements or commitments made or entered into between the Grantee and any other agency of the United States with regard to financial aid to the Grantee in connection with the installation, operation, or maintenance of said pipeline.

## 27.   CONSTRUCTION, OPERATION AND REHABILITATION PLAN

In compliance with 30 U.S.C. § 185, the Grantee will follow the plan(s) of construction, operation, and rehabilitation submitted to the Grantor prior to the execution of this Easement, on file in the **U.S. Army Engineer District, Omaha District. Restoration will be in accordance with Section 3.3.2.5 of the EA "Clean-up and Restoration" and further outlined in the SWPPP and the Environmental Construction Plan presented in Appendices "A" and "G," respectively, of the EA. Ground disturbing activities will not occur on Corps-managed lands; therefore, reseeding is not anticipated in those areas.  However, if reseeding were to become necessary on Corps-managed lands, all activities shall be conducted in accordance with applicable Lake Oahe revegetation guidelines.**

Version Dated 3 December 2016

USACE_ESMT000009

## 28.    FEDERAL ENERGY REGULATORY COMMISSION ORDER ISSUING CERTIFICATES

The Grantee shall comply with the conditions set forth in the Federal Energy Regulatory Commission's Order Issuing Certificate **dated December 24, 2014, as applicable, to Docket No. OR14-42-00, Dakota Access LLC.**

## 29.    SPECIAL CONDITIONS

See attached **Exhibit "D"** for the Special Conditions for this Easement.

## 30.    EXECUTIVE ORDER 13658

a.  Any reference in this section to "prime contractor" or "contractor" shall mean the Grantee and any reference to "contract" shall refer to the Easement.

b.  It has been determined that this contract is not subject to Executive Order 13658 or the regulations issued by the Secretary of Labor in 29 CFR part 10 pursuant to the Executive Order.

c.  If a duly authorized representative of the United States discovers or determines whether before or subsequent to executing this contract, that an erroneous determination regarding the applicability of Executive Order 13658 was made, contractor, to the extent permitted by law, agrees to indemnify and hold harmless the Unites States, its officers, agents, and employees, for and from any and all liabilities, losses, claims, expenses, suits, fines, penalties, judgments, demands or actions, costs, fees, and damages directly or indirectly arising out of, caused by, related to, resulting from or in any way predicated upon, in whole or in part, the erroneous Executive Order 13658 determination.  This includes contractor releasing any claim or entitlement it would otherwise have to an equitable adjustment to the contract and indemnifying and holding harmless the United States form the claims of subcontractors and contractor employees.

USACE_ESMT000010

DACW45-2-16-8059

**IN WITNESS WHEREOF,** I have hereunto set my hand to this Easement by authority of the Secretary of the Army, this _8ᵗʰ_ day of _February_ 2017.

**DAVID V. CHIPMAN**
Chief, Real Estate Division, Omaha District
Real Estate Contracting Officer

## ACKNOWLEDGMENT

STATE OF ___Nebraska___ )
) ss:
COUNTY OF ___Douglas___ )

    **PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for said County and State, within my jurisdiction, the within named **David V. Chipman,** who acknowledged that he is the Chief of Real Estate Division, U.S. Army Engineer District, Omaha, and that in said capacity he executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way** by authority of the Secretary of the Army for the purposes therein expressed and as the act and deed of the United States of America.

    **GIVEN UNDER MY HAND AND SEAL,** this _8ᵗʰ_ day of _February_ , **2017.**

(SEAL)

General Notary - State of Nebraska
JOSHUA D. ANDREWS
My Comm. Exp. Aug. 27, 2018.

NOTARY PUBLIC

My Commission Expires:

_August 27 2018_

DACW45-2-16-8059

**THIS EASEMENT** is also executed by the Grantee this ⟨8th⟩ day of FEBRUARY, 2017.

DAKOTA ACCESS LLC

Robert Rose
Vice President, Land and Right of Way

## ACKNOWLEDGMENT

STATE OF  Texas       )
                      ) ss:
COUNTY OF  Harris     )

    **PERSONALLY APPEARED BEFORE ME**, the undersigned authority in and for the county and state, on this ⟨8th⟩ day of ⟨February⟩, 2017, within my jurisdiction, the within named **Robert Rose**, who acknowledged that he is **Vice President, Land and Right of Way, DAKOTA ACCESS LLC** a Delaware Limited Liability Company, and that for and on behalf of the said company, and as its act and deed he executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way**, having been duly authorized by said company so to do.

(SEAL)

> DONNA WALTERS
> Notary Public, State of Texas
> Comm. Expires 03 04 2020
> Notary ID 2342771

NOTARY PUBLIC

My Commission Expires:

3|4|20

## SPECIAL CONDITIONS
## LAKE OAHE EASEMENT NO DACW45-2-16-8059

| Condition | |
|---|---|
| 1. | **Procedures and Specifications:** For the pipeline segments crossing Lake Oahe and its "could affect" High Consequence Areas ("could affect" HCAs) (as defined in 49 CFR § 195.450). Grantee must meet the U.S. Army Corp of Engineers easement special conditions by developing, implementing, and maintaining for the duration of the easement all easement special conditions in specifications and procedures for the design, construction, testing, operation and maintenance specifications and procedures as required in 49 CFR §§ 195.100, 195.202, 195.302, and 195.402 and this easement. |
| | For the purposes of these special conditions, "pipeline segment" is defined as Lake Oahe and the "could affect" HCAs noted in EA for the vicinity of Lake Oahe. |
| 2. | Grantee will conduct all HDD work according to the HDD Construction Plan [August 18, 2015] (Final EA, Appendix B) that it has prepared, and implement the HDD Contingency Plan [March 11, 2011] (Appendix B) in the event of an inadvertent release. |
| 3. | Grantee is not authorized to discharge hydrostatic test water under this easement. |
| 4. | Grantee will follow response, containment, mitigation measures, and cleanup measures described in SPCC, SWPPP, and ECP. |
| 5. | Grantee will use temporary sediment control measures, such as silt fence, to minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| 6. | Grantee will return all surface drainage contours and vegetation to preconstruction conditions as much as practical. |
| 7. | Grantee will avoid groundwater contamination by implementing the protective measures set forth in the Project specific spill prevention, control and Countermeasures prepared by the contractor and in the Spill Prevention, Control and Countermeasure Plan [December 2014] (Final EA, Appendix A). |
| | **Documentation Conditions** |
| 8. | The Grantee will submit the Facility Response Plan to the Oahe OPM for review prior to the operation of the pipeline. |
| 9. | The Grantee will submit all plans not final at the time this easement is granted to the Oahe OPM for review and the incorporation of U.S. Army Corps of Engineers comments prior to the Grantee's submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:<br>   a.   Geographical Response Plan,<br>   b.   Operations and Maintenance Manual,<br>   c.   Risk Assessment (Integrity Management Plan), and<br>   d.   Spill Models (Using the National Hydrography Dataset by the U.S. Geological Survey) |
| 10. | The Grantee must send any updated plans in the Facility Response Plan to the Oahe OPM for review by the U.S. Army Corps of Engineers Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update. |

**EXHIBIT "D"**
**DACW45-2-16-8059**
USACE_ESMT000037

| | |
|---|---|
| 11. | The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction. |
| 12. | All records demonstrating compliance with these easement conditions herein must be maintained for the duration of the easement. |
| | |
| | **Pipeline Safety Conditions (Construction)** |
| 13. | **Pipeline Design Factor – Pipelines:** Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. |
| 14. | **Pipe Girth Weld – Nondestructive Tests:** Grantee must nondestructively test all girth welds in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. |
| 15. | **Pressure Test Level:** The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.25 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. |
| 16. | **Assessment of Test Failures:** Any pipe failure occurring during the pre-in-service hydrostatic test must undergo a root cause failure analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the Operations Project Manager at the Oahe Project Office (Oahe OPM) within 60 days of the failure. |
| 17. | **Coatings for Trenchless Installation:** Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. |
| 18. | **Pipe Coating:** Pipe coatings must be non-shielding to cathodic protection (CP). Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion. The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program. The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair. |
| 19. | **Field Coating:** Field joint coatings must be non-shielding to CP. Grantee must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality. Field coating applicators must use valid qualified coating procedures and be trained to use these procedures. |
| 20. | **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG). The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBμV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment. |
| 21. | **Mainline Valve(s) with Remote Control or Automatic Shutdown:** |

EXHIBIT "D"
DACW45-2-16-8059
USACE_ESMT000038

a. Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valves(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions.

b. Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast a closure.

c. Mainline valves must be remotely controlled and actuated or automatic shutdown, and the Supervisory Control and Data Acquisition (SCADA) system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure. Remote power backup is required to ensure communications are maintained during inclement weather. Mainline valves must be capable of closure at all times. If it is impracticable to install a remote controlled valve, Grantee must submit a valve design and installation plan to the appropriate Oahe OPM to confirm the alternative approach provides an equivalent level of safety.

d. Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified.

e. For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification.

22. **Supervisory Control and Data Acquisition (SCADA) System:** Grantee must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements.

23. **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection. The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments). If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the Oahe OPM for "no objection" prior to being implemented by Grantee.

24. Grantee will minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's Spill Prevention Control and Countermeasure Plan [December 2014] (SPCC), Storm water Pollution Prevention Plan[July 2015] (SWPPP), and Environmental Construction Plan [April 2015 (ECP) as well as requirements of applicable state and federal permits.

| | **Pipeline Safety Conditions (Operation)** |
|---|---|
| 25. | **Overpressure Protection Control:** Grantee must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b).  Before commencing operation. Grantee must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions.  Grantee shall equip the pipeline with field devices to prevent overpressure conditions.  Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (intentional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected.  Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed to ensure that an overpressure situation does not occur.  Sufficient pressure sensors must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. |
| 26. | **Cathodic Protection:**  The initial Cathodic Protection system must be operational within six (6) months of placing a pipeline segment in service. Cathodic Protection will be operated and maintained per applicable codes and the Grantee's Operations and Maintenance Manual.  Wall thickness testing will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Operations Project Manager at the Oahe Project Office (hereinafter the Oahe OPM)." |
| 27. | **Interference Current Surveys:**  Interference surveys must be performed over the entire  pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version. since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and NACE SP 0177) for interference current levels.  If interference currents are found, Grantee must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.<br><br>The interference current mitigation program for the pipeline segment must include:<br>1) As frequently as needed, including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline, but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected;<br>2) Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and<br>3) a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current.<br>4) Implement remedial actions to protect the pipeline segment from detrimental interference currents.  Remedial actions must be completed promptly, but no later than one year after completion of the survey, or as soon as practicable after obtaining necessary permits.  Remedial action means the implementation of measures including, but not limited to. |

EXHIBIT "D"<br>DACW45-2-16-8059<br>USACE_ESMT000040

| | additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required. |
|---|---|
| | a) AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above. |
| | b) AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required. |
| | c) AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2. |
| **28.** | **Corrosion Surveys:** Grantee must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007. The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177. At least one (1) CP test station must be located within each "could affect" HCA with a maximum spacing between test stations of one-half mile. |
| **29.** | **Initial Inline Inspection (ILI):** Within three (3) years of placing a pipeline segment in service, Grantee must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each. |
| **30.** | **ILI Deformation Tool:** Grantee must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service. Grantee must remediate pipe in accordance with 49 CFR Part 195 and Subpart O. All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this guideline. |
| **31.** | **Future ILI:** Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each. ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions. |
| | 1) Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3). Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe. |
| | 2) CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals. CIS findings must be integrated into ILI Tool findings. |
| **32.** | **Internal Corrosion:** Grantee must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to A in the annual report. Grantee must report upset conditions causing BS&W level excursions above the limit on the annual report. |

| | |
|---|---|
| | 1) Grantee must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas with the greatest internal corrosion threat and other internal corrosion threats. At a minimum in the succeeding years following the first year Grantee must run cleaning pigs every five years unless analysis necessitates earlier action.<br><br>2) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results.<br><br>3) Grantee shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents. |
| 33. | **Pipeline Patrolling:** Grantee must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment. |
| 34. | The Grantee shall conduct the following training exercises:<br><br>1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe the following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.<br><br>2) To facilitate USACE staff involvement, the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises. The Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises. |
| 35. | Within 1 month following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe. The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water. The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing. |
| | **Overall Condition from EA** |
| 36. | Grantee is generally responsible for commitments made and mitigation measures in the Final Environmental Assessment, Grantee Pipeline Project Crossing of Flowage Easements and Federal Lands (July 2016), including all Plans within Appendices thereof, even if they are not specifically made as a condition to this easement. |

EXHIBIT "D"<br>DACW45-2-16-8059<br>USACE_ESMT000042



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
CIVIL WORKS
108 ARMY PENTAGON
WASHINGTON DC 20310-0108

FEB - 7 2017

Director
Office of the Federal Register
National Archives and Records Administration
800 North Capitol Street, N.W.
Washington, D.C. 20408

Dear Mr. Director:

I am forwarding for publication in the Federal Register a Notice of Termination of the Intent to Prepare an Environmental Impact Statement in Connection with Dakota Access, LLC's Request for an Easement to Cross Lake Oahe, North Dakota. Three originals of the Memorandum are enclosed. I have also enclosed an electronic file that contains the text of the notice in a MS Word document. I certify that the information on the disk is identical to that in the signed originals. Please contact Mr. Gib Owen at (703) 695-4641 if assistance is required.

Sincerely,

Douglas W. Lamont, P.E.
Senior Official Preforming the Duties of the
Assistant Secretary of the Army
(Civil Works)

Enclosure

Printed on Recycled Paper

**BILLING CODE: 5001-03**

**DEPARTMENT OF THE ARMY**

**Notice of Termination of the Intent to Prepare an Environmental Impact Statement in Connection with Dakota Access, LLC's Request for an Easement to Cross Lake Oahe, North Dakota**

**AGENCY**: Department of the Army, DoD.

**ACTION**: Notice.

**NOTICE**: In light of the President's memorandum to the Secretary of the Army dated January 24, 2017, published in the Federal Register on January 30, 2017 (82 FR 8661), this notice advises the public that the Department of the Army (Army), as lead agency, effective immediately, no longer intends to prepare an environmental impact statement (EIS) in connection with the Dakota Access, LLC's request to grant an easement to cross Lake Oahe, which is on the Missouri River and owned by the US Army Corps of Engineers (Corps). Therefore, the Notice of Intent announced in the Federal Register on January 18, 2017 (82 FR 5543) is terminated.

**AUTHORITY**: This notice is published in accordance with sections 1503.1 and 1506.6 of the CEQ's Regulations (40 CFR parts 1500-1508) implementing the procedural requirements of NEPA, as amended (42 USC 4321 *et seq*.), and the Army and Corps' NEPA implementation policies (32 CFR part 651 and 33 CFR part 230), and exercises the authority delegated to the Assistant Secretary of the Army (Civil Works) by General Orders No. 2017-1, January 5, 2017.

Brenda S. Bowen
Army Federal Register Liaison Officer

USACE_ESMT000104



**DEPARTMENT OF THE ARMY**
**U.S. ARMY CORPS OF ENGINEERS**
**441 G STREET, NW**
**WASHINGTON, DC 20314-1000**

REPLY TO
ATTENTION OF

CECG

3 February 2017

MEMORANDUM FOR Mr. Doug Lamont, Office of the Assistant Secretary of Army for Civil Works, 108 Army Pentagon, Washington DC 20310-0108

SUBJECT: Dakota Access Pipeline; USACE Technical and Legal Review for the Department of the Army

1. The purpose of this memorandum is to comply with the Presidential Memorandum (PM) to the Secretary of the Army dated January 24, 2017, and the Acting Secretary of the Army's Memorandum to the Assistant Secretary of the Army for Civil Works and the Chief of Engineers/Commanding General of the U.S. Army Corps of Engineers, dated January 31, 2017.

2. I have attached a technical and legal review for the Department of the Army, in accordance with the U.S. Army Corps of Engineers' obligations set forth in Section 2.(a)(i) through 2.(a)(v) of the PM. The Corps of Engineers recommends that the Deputy Assistant Secretary of the Army for Installations, Housing, and Partnerships make the required notification to the appropriate Congressional committees of the Corps' intent to grant the easement at Lake Oahe, North Dakota to Dakota Access, LLC. The Corps will grant the easement only after the Congressional notification has been completed and in accordance with Corps regulations. The Corps also recommends that the Office of the Assistant Secretary of the Army for Civil Works publish a notice in the Federal Register withdrawing the January 18, 2017 notice of intent to prepare an Environmental Impact Statement for the Lake Oahe pipeline crossing.

3. My points of contact for any questions regarding this memorandum and the enclosed technical and legal review are MG Ed Jackson, Deputy Commanding General for Civil Works and Emergency Operations, and Mr. David Cooper, Chief Counsel, U.S. Army Corps of Engineers.

TODD T. SEMONITE
Lieutenant General, USA
Commanding

Encl


Printed on Recycled Paper

### DAKOTA ACCESS PIPELINE
### TECHNICAL AND LEGAL REVIEW
### AND RECOMMENDATION TO THE DEPARTMENT OF THE ARMY

## A. Background

The approximately 1,168-mile Dakota Access Pipeline (DAPL) will connect the Bakken and Three Forks oil production region in North Dakota to an existing crude oil market hub near Patoka, Illinois. The pipeline crosses three U.S. Army Corps of Engineers (Corps or USACE) districts: Omaha, Rock Island, and St. Louis. The Corps was required to consider three categories of requests submitted by Dakota Access, LLC (Dakota Access) for: (1) individual verifications that activities at more than 200 locations along the DAPL route satisfied the terms and conditions of Nationwide Permit (NWP) 12 (under the Clean Water Act, 33 U.S.C. § 1344, or the Rivers and Harbors Act of 1899, 33 U.S.C. § 403), which authorizes activities required for the construction of utility lines in federally regulated waters; (2) permissions to cross or lay the pipeline in seven locations used by the Corps for navigation or flood control under section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (section 408); and (3) consent to cross flowage easements in Illinois and at Lake Sakakawea in North Dakota, and a real estate easement to lay the pipeline under a Corps-managed lake (Lake Oahe) and adjacent Corps-managed property in North Dakota. Of the total length of the pipeline, only approximately three percent of its route is subject to Corps jurisdiction. The Corps granted all of the requested NWP 12 verifications for the water crossings associated with the pipeline, granted the permissions for the pipeline to alter, occupy, or use Corps projects under Section 408, and issued consent to cross Corps-held flowage easements at several locations. The only remaining action is for the Corps to determine whether to grant an easement for the pipeline to cross Corps-managed federal lands at Lake Oahe.

The pipeline would cross Lake Oahe at approximately one-half mile upstream of the northern boundary of the Standing Rock Sioux Tribe's (SRST's) reservation. Dakota Access would use a technique called horizontal directional drilling (HDD) to place the pipeline approximately 92 feet below the lakebed. The Corps would need to provide Dakota Access with three separate permissions for this specific crossing. Dakota Access required and received verification that the crossing meets the terms and conditions of NWP 12. Because the pipeline would cross Corps-managed property, section 408 required the Corps to "grant permission for the alteration or permanent occupation or use of [the project] when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408. Finally, the Corps would need to grant Dakota Access an easement (*i.e.*, a "right-of-way") because the pipeline would cross Corps-managed federal property. 30 U.S.C. § 185(a).

The Corps' consideration of whether to grant the easement for the pipeline to cross under Lake Oahe has been the subject of a robust administrative process. This document describes the various steps and considerations in that process. The most recent consideration is the issuance of a Presidential Memorandum to the Secretary of the Army on January 24, 2017. Presidential Documents, Memorandum of January 24, 2017, Construction of the Dakota Access Pipeline, 82 Fed. Reg. 8661 (Jan. 30, 2017). The Presidential Memorandum requires the Secretary of the



USACE_ESMT000225

Army to instruct the Assistant Secretary of the Army for Civil Works (ASA(CW)) and USACE, including the Commanding General and Chief of Engineers, "to take all actions necessary and appropriate to . . . review and approve in an expedited manner, to the extent permitted by law and as warranted, and with such conditions as are necessary or appropriate, requests for approvals to construct and operate the DAPL . . ." *Id.* at Sec. 2(a)(i). The Presidential Memorandum also required the Army to perform certain other tasks that are addressed in this technical and legal review.

**B. USACE Has Taken All Necessary and Appropriate Actions Concerning the DAPL, Except for Granting the Easement at Lake Oahe, North Dakota**

**1. USACE issued verifications in July and August 2016 that water crossings associated with the DAPL met the terms of Nationwide Permit 12 and were authorized under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act.**

The Clean Water Act (CWA) is designed to "restor[e] and main[tain] [the] chemical, physical and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge of any "pollutant," including dredged or fill material, into "navigable waters" without a permit. *See Id.* §§ 1311(a), 1344(a). "[N]avigable waters" means "the waters of the United States," which include, by regulation, certain tributaries and wetlands. *Id.* § 1362(7); 33 C.F.R. § 328.3(a). Under Section 404 of the CWA, the Corps authorizes discharges of dredged or fill material into waters of the United States through individual and general permits. 33 U.S.C. § 1344(a), (e).

Section 10 of the Rivers and Harbors Act of 1899 (RHA) forbids certain activities within the "navigable water of the United States" without the permission of the Corps. 33 U.S.C. § 403; *see also* 33 C.F.R. § 322.3(a) (permits required under Section 10 for "structures and/or work in or affecting navigable waters of the United States"). For purposes of Section 10 of the RHA, Corps regulations define navigable waters as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 C.F.R. § 329.4. The Corps also issues individual or general Section 10 permits.

Congress authorized the Corps to issue general permits for categories of activities to eliminate unnecessary delay and administrative burdens on the public. 33 U.S.C. § 1344(e). The CWA authorizes general permits "for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment." 33 U.S.C. § 1344(e)(1). Any such permit shall "set forth the requirements and standards which shall apply to any activity authorized by such general permit." *Id.* Nationwide permits are general permits and "regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. §§ 330.2(b) & 330.1(b). The Nationwide Permit program addressing CWA Section 404 also authorizes RHA Section 10 activities.

2/16 TS

USACE_ESMT000226

The Corps conducts the environmental analysis required for the NWPs when the permits are issued to determine whether the individual and cumulative adverse environmental impacts of the activities authorized are no more than "minimal." 33 U.S.C. § 1344(e). At this stage, the Corps prepares the necessary documentation to satisfy the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) (NEPA), and imposes guidelines governing compliance with Section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108 (NHPA), and other laws, including the Endangered Species Act 16 U.S.C. § 1536. The Corps further imposes additional terms through "General Conditions" that are applicable to all nationwide permits. Before issuing or reissuing a nationwide permit, CWA Section 404(e) and the Corps' regulations require "an opportunity for public notice and comment." 33 C.F.R. §§ 330.1(b) and 330.5(a)(2); 33 U.S.C. § 1344(e). The Corps memorializes its NEPA analysis and other environmental analyses in a decision document for each NWP. NWPs are valid for five years. On February 16, 2011, the Corps released for public comment draft decision documents containing the NEPA and CWA analysis supporting its proposal to reissue the NWPs. *See* Proposal to Reissue and Modify Nationwide Permits, 76 Fed. Reg. 9174 (Feb. 16, 2011). On February 21, 2012, after reviewing public comments, the Corps published a final rule reissuing NWPs. Reissuance of Nationwide Permits, 77 Fed. Reg. 10,184 (Feb. 21, 2012). The Corps also prepared a decision document for each NWP after evaluating public comments on the proposal.

If a proposed activity meets the terms and conditions of an NWP, including any applicable regional conditions, a potential discharger can assume the activity is authorized by the NWP and may proceed with the activity unless the NWP requires advance approval through a pre-construction notification (PCN). When the Corps receives a PCN, the District Engineer evaluates the proposed activities to ensure compliance with all terms and conditions of the NWP, including compliance with the NHPA. The District Engineer reviews the notification and may add specific conditions to ensure compliance with the NWP and that the activity's adverse impacts are no more than minimal. 33 C.F.R. §§ 330.1(e)(2), (3), and 330.6(a)(3)(i).

With respect to the DAPL, NWP 12 authorizes "[a]ctivities required for the construction, maintenance, repair, and removal of utility lines and associated facilities in waters of the United States, provided the activity does not result in the loss of greater than 1/2-acre of waters of the United States for each single and complete project." 77 Fed. Reg. at 10,271. A "utility line" is "any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and radio and television communication." *Id.* at 10,271-72. Work that falls within the parameters of NWP 12 can begin without any further contact with the Corps, unless certain exceptions come into play. The presence of historic and cultural properties is one such exception. Specifically, "[i]n cases where the district engineer determines that the activity may affect properties listed, or eligible for listing, in the National Register of Historic Places, the activity is not authorized, until the requirements of Section 106 of the National Historic Preservation Act (NHPA) have been satisfied." *Id.* at 10,284.

In late December 2014, Dakota Access submitted its initial PCN packages to the Corps and then submitted additional documentation over the next few months to complete the packages. On July 25, 2016, the Corps' Omaha District verified that 12 water crossing requiring PCNs for the pipeline route in North Dakota and South Dakota met the terms and conditions of

3/16 JJS

NWP 12. *See* Letter, Corps Omaha District to Dakota Access Pipeline, LLC (July 25, 2016)(S.D. Verifications); Letter, Corps Omaha District to Dakota Access Pipeline, LLC, NWO-214-2177-BIS, (July 25, 2016)(N.D. Verifications). On that same date, the Corps' Rock Island District verified that 107 water crossings requiring PCNs for the route in Illinois and Iowa also met the terms and conditions of NWP 12. *See* Letter, Corps Rock Island District to Dakota Access Pipeline, LLC, Subject: CEMVR-OD-P-2014-1313-a (July 25, 2016)(Iowa Verifications);Letter, Corps Rock Island District to Dakota Access Pipeline, LLC, Subject: CEMVR-OD-P-2014-1313 (July 25, 2016)(Illinois Verifications). On July 25, 2016 and August 5, 2016, the Corps' St. Louis District verified that 78 water crossings requiring PCNs in Illinois met the terms and conditions of NWP 12. *See* Letter, Corps Saint Louis District to Dakota Access Pipeline, LLC, File Number: MVS-2014-797 (July 25, 2016)(76 Illinois Verifications); Letter, Corps Saint Louis District to Dakota Access Pipeline, LLC, File Number: MVS-2014-797 (August 5, 2016)(two Illinois verifications). These actions represented all of the NWP 12 verifications for PCNs that Dakota Access required for water crossings associated with the pipeline in accordance with the CWA and RHA.

**2.   USACE granted the required permissions under the Section 14 of the RHA, 33 U.S.C. § 408 (the Section 408 permissions).**

The RHA provides for the "construction, completion, repair, and preservation of" public works. 30 Stat. 1152. Section 14 of the Act, codified in Title 33 of the U.S. Code, addresses navigation and navigable waters. 33 U.S.C. § 408. Section 408, consistent with Congress's goal of preserving navigation, focuses on two factors relevant to navigation. Section 408 generally prohibits taking possession of, using, or impairing Corps-managed projects. It allows the Secretary of the Army to "grant permission for the alteration or permanent occupation or use of . . . public works when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408.

**a.   Section 408 Permission to Cross the Mississippi River Channel**

Dakota Access requested permission from the Corps' Rock Island District under Section 408 use HDD to route the pipeline approximately 72 feet below the Mississippi River navigation channel. The Rock Island District prepared environmental documentation under NEPA to consider the required Section 408 permission to alter, occupy, or use the Mississippi River channel. The Corps prepared a record of consideration that documented that the crossing was eligible for a categorical exclusion from further NEPA consideration under Corps regulations. *See* NEPA Checklist for Record of Environmental Consideration (May 10, 2016)(finding that categorical exclusion at Engineering Regulation 200-2-2, para. 9.h.2.(March 4, 1988) applied (categorical exclusion also published at 33 C.F.R. § 230.9(i)(2)). The Rock Island District granted the Section 408 permission to Dakota Access to impact the Mississippi Channel on July 25, 2016. *See* Letter, Corps Rock Island District to Dakota Access (July 25, 2016)(granting permission under Section 408).

USACE_ESMT000228

**b. Section 408 Permission Concerning Certain Corps Projects and Flowage Easements in Illinois**

Dakota Access requested permission under Section 408 from the Corps' St. Louis District to cross Corps-projects or Corps-held flowage easements in Illinois. The St. Louis District prepared environmental documentation under NEPA to consider the required Section 408 permission to alter, occupy, or use the projects and easement in Illinois. The Corps issued a public notice and solicited public comment on the proposed Corps actions from January 5, 2016 to February 5, 2016. The Corps published a final Environmental Assessment (EA) and Finding of No Significant Impact (FONSI) on August 3, 2016. The St. Louis District granted Dakota Access permission under Section 408 to impact Coon Run Drainage and Levee District, McGee Creek Drainage and Levee District, Illinois River Navigation Channel, and the Carlyle Lake Flowage Easement, Illinois on August 3, 2016. *See* Memorandum, Summary of Finding, Dakota Access Pipeline Section 408 Permission Request (Aug. 3, 2016).

**c. Section 408 Permission Concerning Lake Sakakawea in North Dakota**

Dakota Access requested permission from the Corps' Omaha District to cross a Corps-held flowage easement at the Corps project at Lake Sakakawea. The Omaha District prepared environmental documentation under NEPA to consider the required Section 408 permission to cross the flowage easements. The Corps published a draft EA on December 8, 2015, and made it available for public comment. After reviewing the comments received, the Corps published the final EA and FONSI for the Lake Sakakawea crossing on July 25, 2016. The EA focused on the two determinations required by Section 408, concluding that "the Proposed Action is not injurious to the public interest and will not impair the usefulness of the federal projects." Final EA at 1. The Corps relied on that determination to support its grant of the Section 408 permission. FONSI at 2. The Omaha District Commander formally approved the Section 408 decision document on July 21, 2016. Memorandum, Subject: Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project (Easement) (June 10, 2016) (approval signed by District Commander on July 21, 2016). The "approval under Section 408 does not grant any property rights" and the Corps would still need to issue a consent to cross Corps-held flowage easements to allow the crossing at Lake Sakakawea. Engineering Circular 1165-2-216 at ¶ 6(b) (Sept. 30, 2015).

**d. Section 408 Permission Concerning Lake Oahe in North Dakota**

Dakota Access requested permission from the Corps' Omaha District to cross a Corps-managed project at Lake Oahe. For this crossing, Dakota Access would again use the HDD technology and place the pipeline approximately 92 feet below the lakebed. The Omaha District prepared environmental documentation under NEPA to consider the required Section 408 permission to cross Lake Oahe. The Corps published a draft EA on December 8, 2015, and circulated it for public comment. After reviewing the comments received, the Corps published the final EA and FONSI for the Lake Oahe crossing on July 25, 2016. This EA focused on the two determinations required by Section 408, concluding that "the Proposed Action is not injurious to the public interest and will not impair the usefulness of the federal projects." Final EA at 1. The Corps relied on that determination to support granting the Section 408 permission.

5/16 TTS

USACE_ESMT000229

FONSI at 2. The Omaha District Commander formally approved the Section 408 decision document on July 21, 2016. Memorandum, Subject: Dakota Access Pipeline Project, Garrison Project (Consent Flowage Easements), Oahe Project (Easement) (June 10, 2016) (approval signed by District Commander on July 21, 2016). The "approval under Section 408 does not grant any property rights" and the Corps would still need to issue an easement to allow the crossing at Lake Oahe. Engineering Circular 1165-2-216 at ¶ 6(b) (Sept. 30, 2015).

### 3. Real Estate Actions.

#### a. Consent to Cross Corps-held Flowage Easement at Carlyle Lake, Illinois

In addition to granting permission under Section 408 at Carlyle Lake, the Corps would need to grant formally its consent to cross Corps-held easements to Dakota Access. The Corps' St. Louis District issued Dakota Access the consent to cross a Corp-held flowage easement at Carlyle Lake, Illinois on May 26, 2016. *See* Department of the Army, Consent to Cross U. S. Government Easement at Carlyle Lake Fayette County, Illinois, DACW43-3-16-28 (May 26, 2016).

#### b. Consent to Cross Corps-held Flowage Easements at Lake Sakakawea Dakota

In addition to granting permission under Section 408 at Lake Sakakawea, the Corps would need to grant formally its consent to cross Corps-held easements to Dakota Access. The Corps' Omaha District granted Dakota Access this consent on August 2, 2016. *See* Department of the Army, Corps of Engineers, Omaha District, Consent to Easement Structures, DACW45-9-16-8071 (Aug. 2, 2016).

#### c. Pending Easement to Cross Corps-managed Federal Lands at Lake Oahe

In addition to granting permission under Section 408 at Lake Oahe, the Corps would need to grant Dakota Access an easement (*i.e.*, a "right-of-way") because the pipeline would cross Corps-managed federal property at the site. 30 U.S.C. § 185(a). Additionally, because of the diameter of the pipeline that would cross federally-owned land, the congressional notification requirements of the Mineral Leasing Act also apply to the DAPL crossing at Lake Oahe. *See* 30 U.S.C. § 185(w)(2). The Corps has reached the point in the administrative process for considering the Dakota Access easement application where the Corps can decide whether to grant the easement and, if so, to provide the required congressional notification.

Since early September 2016, the ASA(CW), with input from other federal executive offices, engaged in further consideration of Dakota Access' request for an easement to cross Lake Oahe. That engagement is described in detail in the following pages. At the same time, the SRST has engaged in litigation challenging the Corps' decisions related to the DAPL. In August 2016, the SRST sought a court order to enjoin preliminarily the U.S. Army Corps of Engineers to withdraw Nationwide Permit 12 as applied to the DAPL, and to withdraw verifications issued on July 25, 2016 for the DAPL to discharge in federally regulated waters at 204 sites along the pipeline route. On September 9, 2016, the court denied the SRST's request. *Standing Rock*

6/16-115

USACE_ESMT000230

*Sioux Tribe v. U.S. Army Corps of Eng'rs.* No. 16-cv-01534, Memorandum Opinion Denying Plaintiff's Request for Preliminary Injunction, Docket No. 39 (D.C. Dist. Sept. 9, 2016).

Immediately after the federal district court issued its decision denying the SRST's request for an injunction, the Departments of the Army, Interior and Justice issued a joint statement stating that "[t]he Army will not authorize constructing the Dakota Access pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other federal laws." Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (September 9, 2016). The Department of the Army's resulting review to determine whether it will need to reconsider any of its previous decisions regarding the DAPL's crossing at Lake Oahe focused on six issues. Those issues were:

(1) Evaluate the North Bismarck route, the basis for selecting the Lake Oahe route as the preferred alternative, and the basis for establishing a 0.5-mile buffer between the northern boundary of the SRST reservation and the pipeline route.

(2) Evaluate the Fort Laramie Treaties of 1851 and 1868, and other federal laws, and whether the finding in the EA that there are no impacts to treaty fishing or hunting rights is supported. This evaluation would include consideration of any reserved water rights of the SRST.

(3) Evaluate whether the discussion in the EA of impacts to water intake structures for drinking and irrigation purposes is adequate and consider what role the possible downstream move of the SRST's water intake structure will have in the analysis.

(4) Evaluate whether the environmental justice discussion in the EA of issues related to the SRST is adequate.

(5) Determine whether there are any NHPA Section 110 issues that are not before the court already and any other cultural resource issues identified more recently within the area of federal jurisdiction.

(6) Evaluate the implications of the provision of the 1889 Sioux Act, 25 Stat. 888, which provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River . . . down said center of the main channel."

During September and October 2016, representatives of the Corps met with Dakota Access, the SRST, and other tribes, and addressed the information provided in those meetings in its review. Corps headquarters conducted an in-depth 36-page analysis of the issues and determined that the Omaha District adequately considered and disclosed the environmental, cultural, and other potential impacts of its actions, and that its decisions were not arbitrary or capricious with respect to issues one (1) through four (4) and six (6) listed above. *See* Memorandum, Subject Dakota Access Pipeline Crossing at Lake Oahe, North Dakota, (October

7/16 rs

USACE_ESMT000231

20, 2016).  Additionally, with respect to those issues, the Corps did not identify any new information indicating that actions by the Department of the Army will affect the quality of the human environment to a significant extent not already considered. *Id.* at 36.  Finally, the Corps recommended that additional investigation and analysis be undertaken to determine whether the pipeline was in violation of the CWA and NHPA in certain areas near the Lake Oahe crossing to address issue five. *Id.*  The Corps performed a site inspection of those areas on October 20, 2016, with SRST and other interested parties in attendance, and did not find any CWA jurisdiction (and, hence, no CWA violation).  Periodic Inspection Report, Permit No. NWO-2014-2177-BIS at 2 (October 26, 2016).  Without CWA jurisdiction over those areas, the Corps had no further role with respect to compliance with Section 110(k) of the NHPA, 54 U.S.C. § 306113 (requiring agencies to determine the appropriateness of issuing a related permit if it appears that an applicant has engaged in anticipatory demolition of historic resources with the intent to avoid the requirements of section 106 of the NHPA).

During October 2016, Corps headquarters also prepared a memorandum providing sample easement conditions to enhance protection from any perceived risks associated with the DAPL crossing at Lake Oahe.  Memorandum, Subject:  Draft Proposed Additional Conditions for an Easement for the Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (October 31, 2016) (October 31 Memorandum).  The October 31 Memorandum also addressed the risks of a potential pipeline mishap, concluding that the risks are minimal and that other federal agency findings supported this determination. *Id.* at 1-2 (referencing Department of Interior's BakkenLink Dry Creek to Beaver Lodge Pipeline EA, Risk Assessment and Environmental Consequences Analysis).

On November 14, 2016, the ASA(CW) alerted representatives of the DAPL and the SRST that the Army had completed the review contemplated in the September 9 Joint Statement and had concluded "that its previous decisions comported with legal requirements."  Letter from Assistant Secretary of the Army for Civil Works to Energy Transfer Partners, Dakota Access LLC, and the Standing Rock Sioux Tribe (November 14, 2016).  The letter also called for "additional discussion" with the SRST on three topics:

> (1) Potential conditions in an easement for the pipeline crossing, which would further reduce the risk of a spill or rupture, hasten detection and response, or otherwise enhance the protection of Lake Oahe, the Tribe's water supplies, and its treaty rights;
>
> (2) With such conditions, the risk to the Tribe of a spill from the pipeline crossing Lake Oahe at the proposed location; and
>
> (3) In light of such conditions, whether to grant an easement for the pipeline to cross Lake Oahe at the location currently proposed.

*Id.* at 2.

Following this direction from the ASA(CW), on December 2, 2016, representatives of the Corps' Omaha District, Dakota Access, and the SRST met for five hours in Bismarck, ND to

8/16 ﬞ

discuss the issues identified by the ASA(CW) and to address additional requests for information from the SRST. The following day, December 3, 2016, the Corps' Omaha District Commander submitted a memorandum, through Corps headquarters to the ASA(CW), recommending that the Army provide the notice to Congress, required by the Mineral Leasing Act, that the Corps intends to grant the easement for the crossing at Lake Oahe. Memorandum, Subject: Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota (December 3, 2016), at at pp. 6 and 9 (December 3 Memorandum); *see* Mineral Leasing Act, 30 U.S.C. § 185(w)(2) (requiring congressional "notice of intention to grant the right-of-way" before the right-of-way can be granted). The December 3 Memorandum made specific findings that Dakota Access' application for an easement to cross Lake Oahe complied with Corps policy and statutory requirements. *Id.* The unexecuted easement, which included 36 special conditions on the construction and operation of the DAPL, accompanied the December 3 Memorandum. *Id.*, Exhibit D.

Additionally, on the evening of December 2, 2016, the Corps received ▇▇▇▇▇ ▇▇▇▇ a draft memorandum prepared by the Solicitor's Office of the Department of Interior (DOI). The DOI memorandum addressed many of the same issues that the Corps considered in its October 20, 2016 memorandum, and made certain assertions about the law under NEPA and about the government's trust relationship with the SRST and other tribes, among other things. After reviewing the DOI memorandum, ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇ determined that the Corps addressed the concerns expressed in the DOI memorandum with respect to the proposed DAPL crossing at Lake Oahe in the NEPA documents and additional easement conditions summarized above and attached to this technical and legal review. Moreover, concerns were raised about whether much of the DOI memorandum is legally supportable.

On December 4, 2016, the ASA(CW) issued another memorandum stating, among other things, that "the Army will not grant an easement to cross Lake Oahe at the proposed location based on the current record." Memorandum, Subject: Proposed Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (December 4, 2016), at p. 3. This memorandum also directed the Corps to engage in additional review and analysis concerning the following subjects:

- A robust consideration and discussion of alternative locations for the pipeline crossing the Missouri River, including, but not limited to, more detailed information on the alternative crossing that was considered roughly ten miles north of Bismarck.

- Detailed discussion of potential risk of an oil spill, and potential impacts to Lake Oahe, the Standing Rock Sioux Tribe's water intakes, and the Tribe's water rights as well as treaty fishing and hunting rights; and

- Additional information on the extent and location of the Tribe's treaty rights in Lake Oahe.

*Id.*

9/16 ฅ ㅠˢ

In the memorandum dated December 4, 2016, the ASA(CW) also stated that the Corps' analysis would be "best accomplished, in my judgment, by preparing an Environmental Impact Statement." *Id.* The memorandum also stated "that this decision does not alter the Army's position that the Corps' prior reviews and actions have comported with legal requirements." *Id.* at 4.

On January 18, 2017, the ASA(CW) published in the Federal Register a notice of intent to prepare an EIS for the DAPL crossing under Lake Oahe. Notice of Intent to Prepare an Environmental Impact Statement in Connection with Dakota Access, LLC's Request for an Easement to Cross Lake Oahe, North Dakota, 82 Fed. Reg. 5,543 (Jan. 18, 2017) (NOI). The NOI sought public input on three "scoping concerns," which essentially restated the three subjects identified for additional review and analysis in the ASA(CW)'s memorandum dated December 4, 2016: There were: (1) input on alternative locations for the pipeline crossing the Missouri River; (2) input on "[p]otential risks and impacts of an oil spill, and potential impacts to Lake Oahe, the Standing Rock Sioux Tribe's water intakes, and the Tribe's water, treaty fishing, and hunting rights" and (3) "[i]nformation on the extent and location of the [Standing Rock Sioux] Tribe's treaty rights in Lake Oahe." *Id.* The NOI also mentioned that the Corps was developing a plan to implement the December 4, 2016 memorandum and stated that the "notice of public scoping should be integrated into the Corps' plan of action." *Id.*

The Corps previously evaluated the Lake Oahe crossing in an EA that the Corps completed in July 2016. *See* Environmental Assessment, Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands (July 25, 2016) (Final EA). The Final EA's scope was "limited to the crossings of Corps-owned lands and flowage easements." Final EA at 3. The Corps "use[d] the information in the EA to make a final determination whether to grant the required 408 permissions" for the Lake Oahe crossing. *Id.* at 4; *see also* Mitigated Finding of No Significant Impact, Dakota Access Pipeline Project, Williams, Morton, And Emmons Counties, North Dakota at p. 2 (July 25, 2016) (FONSI).

## C. USACE Determinations and Findings

The Corps has determined that the Final EA and FONSI, completed in July 2016, also satisfy the NEPA requirements for evaluating the easement required for the DAPL to cross Corps-managed federal lands at Lake Oahe. The EA and FONSI both recognized that a real estate outgrant or an easement would be a required federal action if the pipeline were to be built in the proposed location. Final EA at 3 ("proposed crossings of Corps-owned lands . . . would require the Corps to grant . . . Section 408 permissions as well as real estate outgrants"); FONSI at p. 2 (pipeline would require "real estate actions and Section 10 permits and Section 408 permissions"). The Final EA fully informed decision makers and the public of the environmental effects of the proposed crossing and those of reasonable alternatives, including informing the decision on whether to grant an easement under the Mineral Leasing Act.

Further, the Final EA and FONSI prepared in connection with the DAPL crossing at Lake Oahe are consistent with Corps policy for NEPA documentation supporting a decision to grant an easement for non-recreational purposes, such as an easement granted under the Mineral Leasing Act. *See* Engineering Regulation 1130-2-550, Project Operations and Maintenance,

10/16 TTS

Guidance and Procedures, Chap. 17, Non-Recreation Outgrant Policy, at para. 17-2 and Appendix F, National Environmental Policy Act Guidance, at para. F-3 (September 30, 2013). Moreover, Corps policy specific to easements granted under the Mineral Leasing Act contemplates relying on public comments and participation from previous NEPA procedures related to the proposal. *See* Engineering Regulation 405-1-12, Real Estate Handbook, Chap. 8-182, Easements for Fuel Pipelines and Related Facilities, at para. c.8 (September 30, 1994).

After reviewing the record in its entirety and giving further consideration to the input received over the past four months, including additional review and analyses of the subjects identified by the ASA(CW), other federal executive offices, and the SRST, the Corps finds that the Final EA concerning the crossing of the DAPL at Lake Oahe is sufficient and does not need further supplementation. The Council for Environmental Quality (CEQ) NEPA regulations require agencies to supplement an EIS or EA when there are "substantial changes in the proposed action that are relevant to environmental concerns," or when "significant new circumstances or information relevant to environmental concerns" comes to light after an EIS or EA is final. 40 C.F.R. § 1502.9(c)(1)(i) and (ii); *see also Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1152 (9th Cir. 1998) (standard for supplementing an EA is the same as for an EIS). In determining whether to prepare a supplemental EIS or EA, an agency is to apply the "rule of reason" based on a consideration of the "value of the new information to the still pending decisionmaking process." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373-374 (1989). If a major federal action is to occur and if new information shows that the remaining action will affect the quality of the human environment to a significant extent not already considered, a supplemental EIS must be prepared. *Id.* at 374.

With regard to the proposed crossing of the DAPL underneath Lake Oahe, there are no "substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1)(i). The proposed action described in the Final EA has not changed. *See* Final EA at 17 and December 3, 2016 Memorandum at 2. Dakota Access is still proposing to use HDD to place the DAPL at least 92 feet below the Lake Oahe lakebed at the same location in North Dakota. *Id.*

Further, there are no new significant circumstances or information relevant to environmental concerns. 40 C.F.R. § 1502.9(c)(1)(ii). As explained above, the Corps reviewed and analyzed six issues identified by representatives of federal executive offices after the issuance of the September 9 Joint Statement. *See* October 20, 2016 Memorandum, at p. 2 (listing the six issues). Five of those issues raised possible issues about information addressed in the Final EA and FONSI. *Id.* at 2 (issues 1, 2, 3, 4, and 6 related to NEPA and issue 5 related to Section 110 of the NHPA). After carefully reviewing and analyzing each of the five issues, the Corps concluded, and the ASA(CW) confirmed in writing, that formal reconsideration or the preparation of supplemental NEPA document was not required. November 14, 2016 Letter at 1; December 4, 2016 Memorandum at 4.

Additionally, in a series of letters received by the ASA(CW) and the Corps, from September 2016 to December 2016, the SRST raised questions about the proposed crossing of the DAPL at Lake Oahe and the Final EA and FONSI, including issues concerning the federal trust relationship to the Tribe. *See* Letter, SRST to ASA(CW), at p. 2-3 (September 22, 2016).

11/16

The SRST also raised these questions in its comments on the Draft EA, which the Corps noted in the Final EA. *See* Letter, SRST to Corps, at pp. 12-13 (January 8, 2016); Letter, SRST to Corps, at pp. 6-11 (March 24, 2016); Final EA, App. J at pp. 9, 16, and 19 (addressing SRST comments related to the trust relationship). Further, the Corps specifically addressed the government's trust relationship with the Tribe in the October 20, 2016 Memorandum, finding that the Corps had complied with any legal obligation under treaties or the trust relationship. *See* October 20, 2016 Memorandum at pp. 14-15.

Based upon a comprehensive and thorough review and analysis of the record, including information provided to the ASA(CW) and to the Corps by the SRST and other interested parties, the questions raised about the trust relationship between the government and the Tribe have not presented new circumstances or information that would require supplemental NEPA documentation. The Corps and the ASA(CW) already considered these questions.

The letters submitted by the SRST also raised questions about the Corps' analysis of alternatives. *See* Letter, SRST to ASA(CW), at pp. 10-11 (September 22, 2016); Letter, SRST to ASA(CW) at pp. 1-3 (October 3, 2016). The SRST faulted the Corps' alternative analysis in comments on the Draft EA. *See* Letter SRST to Corps at pp. 1-2 (January 8, 2016); Letter, SRST to Corps at p. 11 (March 24, 2016). The Final EA acknowledged the SRST's comments on alternatives, as well as general comments received by other parties regarding alternatives, and provided responses to those comments. Final EA, App. J at pp. 10, 15, & 16. The Corps also addressed the alternatives analysis in the Final EA in the October 20, 2016 Memorandum and found that the analysis was legally sufficient. *See* October 20, 2016 Memorandum at p. 10. The SRST's issues concerning the alternatives analysis do not raise significant new circumstances or information that would require supplemental NEPA documentation. The issues were considered by the Corps and by the ASA(CW).

Finally, in its letters to the ASA(CW) and the Corps, the SRST raised concerns about risks from oil spills that could occur during pipeline operations. *See* Letter, SRST to ASA(CW) at pp. 7-8 and 11-12 (September 22, 2016); Letter, SRST to ASA(CW) at pp. 5-7 (October 3, 2016); Letter, SRST to ASA(CW) (October 28, 2016) (including a report from SRST consultant addressing risk of oil spill). Further, the Tribe also raised concerns about how a pipeline spill could impact treaty fishing, hunting or reserved water rights, as well as the Tribe's water intakes from Lake Oahe. *See, e.g.,* Letter, SRST to ASA(CW) at p. 7 (September 22, 2016); Letter, SRST to ASA(CW) (December 2, 2016).

The SRST raised essentially the same concerns about risks from oil spills in its comments on the draft EA, and the Corps addressed those concerns and comments in the Final EA. *See* Final EA, App. J, at pp. 8, 9, and 17. The Corps also reviewed the treaty fishing, hunting or reserved water rights, as well as the Tribe's water intakes issues in the Final EA and in the October 20, 2016 Memorandum. *See* October 20, 2016 Memorandum at pp. 10-15 (addressing treaty fishing and hunting rights and reserved water rights) and pp. 16-21(addressing water intakes). The Corps addressed the risks of oil spills in the Final EA and in the October 20, 2016 Memorandum, as well. *See* Final EA at 87 and October 20, 2016 Memorandum at p. 27. Finally, the Corps also address the risks of an oil spill in the October 31, 2016 Memorandum. *See* October 31, 2016 Memorandum at p. 2 (noting that the finding of low risk is consistent with

12/16 *TTS*

other federal agency findings). In expressing its concerns about the risks of oil spills and the potential impacts on treaty fishing, hunting or reserved water rights, as well as the Tribe's water intakes, the SRST has not raised significant new circumstances or presented any new information that would require supplemental NEPA documentation. The Corps and the ASA(CW) considered all of these issues.

The Corps addressed issues raised by the SRST in addition to the formal NEPA process. The Corps developed a possible range of easement conditions that would add to and clarify the draft easement conditions outlined in the FONSI. *See* FONSI at 3-5 (listing easement conditions); *See* October 31, 2016 Memorandum at p. 2 and Attachment 2, Proposed Additional Draft Easement Conditions. These proposed draft easement conditions would further mitigate any risks to the Tribe from any oil spill. Moreover, at the request of the ASA(CW), the Tribe, the Corps, and Dakota Access met face-to-face in Bismarck on December 2, 2016 and discussed the possible range of easement conditions that might allay the SRST's concerns. The Corps has adopted a set of 36 special conditions for the Lake Oahe easement that add to and clarify the original nine special conditions in the easement that were described in the FONSI. *See* FONSI at 3-4. The 36 special conditions were based on the October 31, 2016 proposed draft conditions and the Corps has made them part of the easement prepared for the Lake Oahe crossing. *See* December 3, 2016 Memorandum and Unexecuted Easement, para. 29 (incorporating special conditions in Exhibit D into the easement).

Moreover, the December 2, 2016 draft DOI memorandum mentioned above, which was issued as a final legal opinion from the DOI Office of the Solicitor on December 4, 2016, and subsequently published on the DOI website (*see* M-37038), addresses a series of issues rooted in the perceived risk that the DAPL would leak into Lake Oahe. As explained in the Final EA and the October 20, 2016 Memorandum, that risk is low. That low risk was further mitigated by the easement conditions described in the October 31, 2016 Memorandum, restated in the December 3, 2016 Memorandum, and incorporated in the unexecuted easement accompanying the December 3, 2016 Memorandum. The December 3, 2016 Memorandum and accompanying unexecuted easement were publicly filed with the District Court for the District of Columbia on January 6, 2017. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.* No. 16-cv-01534, U.S. Army Corps of Engineers Motion to Dismiss, Exhibit 14, Docket No. 73-14 (D.C. Dist. filed Jan. 6, 2017). The DOI Solicitor's opinion does not address the additional conditions included in the easement. Pursuant to the review directed by the January 24, 2017 Presidential Memorandum, the Corps has concluded that the additional easement conditions address the concerns set forth in the DOI opinion by mitigating the already low risk of an oil spill into Lake Oahe.

Based on the foregoing determinations and findings, the Corps recommends that the Army, acting through the Office of the ASA(CW), find that all of the prior reviews and determinations by the Corps, including the EA and FONSI issued in July 2016, satisfy all applicable requirements of NEPA, and any other applicable provisions of law. *See* Presidential Document, Memorandum of January 24, 2017, Construction of the Dakota Access Pipeline, Sec. 2(a)(iii), 82 Fed. Reg. 8,661 (January 30, 2017).

13/16 *ns*

**D. The Army Does Not Need to Rescind or Modify the December 4, 2016 Memorandum, but Should Publish in the Federal Register a Notice of Withdrawal of the NOI to Prepare an EIS**

The ASA(CW)'s December 4, 2016 Memorandum includes a discretionary policy determination based on a particular view of Dakota Access' application for an easement to cross under Lake Oahe. *Id.* at p. 4 (stating "[m]y decision acknowledges and addresses that a more robust analysis of alternatives *can* be done and *should* be done, under these circumstances, before an easement is granted for the Dakota Access Pipeline to cross the Missouri River on Corps land"[emphasis added]). The December 4, 2016 Memorandum did not result in any final agency action with regard to the easement application, however. In fact, the December 4, 2016 Memorandum specifically contemplated further administrative consideration and processing of Dakota Access' easement application.

The ASA(CW)'s policy determination in the December 4, 2016 Memorandum, while within her discretion, was not compelled by the law. Moreover, the ASA(CW) did not identify any legal reason to require the "heightened analysis" described in the December 4, 2016 Memorandum. The record of reviews, analyses, and determinations conducted and made during the last four months and summarized in this technical and legal review, and in the documents referenced herein, fully supports issuing the easement for the pipeline crossing at Lake Oahe at this time without additional study because the Corps found that the proposed action did not have a significant effect on the human environment that would require the preparation of an EIS. *See* FONSI at 6 and October 20, 2016 Memorandum at 36. Further, the CEQ's NEPA regulations support relying on the Final EA and FONSI. 40 C.F.R. § 1500.5(l)("Agencies shall reduce delay by . . . [u]sing a [FONSI] when an action . . . will not have a significant effect on the human environment . . . and is therefore exempt from requirements to prepare an [EIS]").

Because the determinations made in the December 4, 2016 Memorandum reflect the exercise of the former ASA(CW)'s policy discretion, and that Memorandum was not a final agency action, the Army has the authority to make a different decision based on an evaluation of the record before it and the requirements of NEPA and any other applicable laws. Moreover, because the December 4, 2016 Memorandum is not a final agency action, the Army would not need to rescind or modify it. A decision to approve the granting of the easement to Dakota Access would reflect the Army's intent to not be bound by the policy determination in the December 4, 2016 Memorandum and would serve to conclude the administrative process.

However, the Corps does recommend that the Army issue a notice in the Federal Register withdrawing the notice of intent to prepare an EIS. Withdrawing a notice of intent when an agency no longer plans to complete an EIS is contemplated under NEPA and is not unusual. *See, e.g.,* Withdrawal of Notice of Intent for the Environmental Impact Statement Process for the Delta Wetlands Project in San Joaquin and Contra Costa, Counties, California, 82 Fed. Reg. 8,827 (January 31, 2017); Withdrawal of Notice of Intent To Prepare an Environmental Impact Statement for the Proposed Lower Passaic River Ecosystem Restoration Project, Essex, Hudson, Passaic, and Bergen Counties, NJ: Feasibility Phase, 81 Fed. Reg. 85,944 (November 29, 2016). The withdrawal notice contains brief background information and brief statement explaining the reason for the withdrawal. *Id.* We have attached a draft withdrawal notice to this memorandum.

<sup>14</sup>/16 TTS

**E. USACE Recommends that the Army Notify Congress of the Intent to Grant the Easement at Lake Oahe, and that USACE Waives Part of the Post-Notification Waiting Period**

The Mineral Leasing Act prohibits an agency from granting an easement through federal lands for pipeline purposes until "a notice of intention to grant the right-of-way" together with the agency's detailed findings as to the terms and conditions the agency "proposes to impose, has been submitted" to the Committee on Natural Resources of the United States House of Representatives and the Committee on Energy and Natural Resources of the United States Senate. 30 U.S.C. § 185(w)(2). For the reasons set forth in the December 3, 2016 Memorandum, the Corps finds that the issuance of the easement attached to that Memorandum to Dakota Access complies with the requirements of the Mineral Leasing Act. Accordingly, the Corps recommends that the Deputy Assistant Secretary of the Army for Installations, Housing, and Partnerships make the required notification to the appropriate Congressional committees of the Army's intent to grant the easement at Lake Oahe. A draft notification package is forthcoming.

Corps policy is to wait 14 days following notification of the appropriate Congressional committees of an intent to grant an easement under the Mineral Leasing Act, unless the committees provide an "affirmative response." Memorandum, Subject: Real Estate Policy Guidance Letter No. 27 - Official U.S. Army Corps of Engineers Real Estate Policy, at p. 1 (October 29, 2008) (PGL 27). The 14-day notice period is not a requirement of the Mineral Leasing Act, or of any other federal law, but is purely an internal Corps policy. Thus, the Corps has the discretion to waive this post-notification waiting period.

On July 28, 2016, Dakota Access requested that the Corps waive the post-notification waiting period. To date, the Corps has not made a decision on whether to grant Dakota Access' waiver request because the Corps had not received approval from the Army to grant the easement and the Corps had not made a decision on whether to grant the easement. Given the unique visibility of this matter, the fact that the Corps' recommendation to notify Congress of the proposed easement and the proposed easement itself have been publicly available since January 6, 2017, and, particularly, the directives in the Presidential Memorandum published in the Federal Register on January 30, 2017 (*see* Sec. 2.(a)(iv) of the Presidential Memorandum), the Corps finds that a shorter post-notification waiting period would be permitted by law, policy, and warranted. Therefore, once the Army has completed the required Congressional notification, the Corps intends to grant in part Dakota Access' request for a waiver of the 14-day post-notification waiting period. Thereafter, the Omaha District may execute the easement with Dakota Access at a time that is mutually convenient for the signatories to the easement.

**F. Attachments (incorporated by reference)**

1. Memorandum, Subject: Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (October 20, 2016).
2. Memorandum, Subject: Draft Proposed Additional Conditions for an Easement for the Dakota Access Pipeline Crossing at Lake Oahe, North Dakota (October 31, 2016).

15/16 TS

USACE_ESMT000239

3.  Memorandum, Subject: Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota (December 3, 2016).
4.  Draft Federal Register Withdrawal of Notice of Intent.

16/16 TTS

USACE_ESMT000240

Federal Register / Vol. 82, No. 18 / Monday, January 30, 2017 / Presidential Documents      **8661**

# Presidential Documents

Memorandum of January 24, 2017

## Construction of the Dakota Access Pipeline

Memorandum for the Secretary of the Army

**Section 1**. *Policy*. The Dakota Access Pipeline (DAPL) under development by Dakota Access, LLC, represents a substantial, multi-billion-dollar private investment in our Nation's energy infrastructure. This approximately 1,100-mile pipeline is designed to carry approximately 500,000 barrels per day of crude oil from the Bakken and Three Forks oil production areas in North Dakota to oil markets in the United States. At this time, the DAPL is more than 90% complete across its entire route. Only a limited portion remains to be constructed.

I believe that construction and operation of lawfully permitted pipeline infrastructure serve the national interest.

Accordingly, pursuant to the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby direct as follows:

**Sec. 2**. *Directives*. (a) *Pipeline Approval Review*. The Secretary of the Army shall instruct the Assistant Secretary of the Army for Civil Works and the U.S. Army Corps of Engineers (USACE), including the Commanding General and Chief of Engineers, to take all actions necessary and appropriate to:

(i) review and approve in an expedited manner, to the extent permitted by law and as warranted, and with such conditions as are necessary or appropriate, requests for approvals to construct and operate the DAPL, including easements or rights-of-way to cross Federal areas under section 28 of the Mineral Leasing Act, as amended, 30 U.S.C. 185; permits or approvals under section 404 of the Clean Water Act, 33 U.S.C. 1344; permits or approvals under section 14 of the Rivers and Harbors Act, 33 U.S.C. 408; and such other Federal approvals as may be necessary;

(ii) consider, to the extent permitted by law and as warranted, whether to rescind or modify the memorandum by the Assistant Secretary of the Army for Civil Works dated December 4, 2016 (Proposed Dakota Access Pipeline Crossing at Lake Oahe, North Dakota), and whether to withdraw the Notice of Intent to Prepare an Environmental Impact Statement in Connection with Dakota Access, LLC's Request for an Easement to Cross Lake Oahe, North Dakota, dated January 18, 2017, and published at 82 *Fed. Reg.* 5543;

(iii) consider, to the extent permitted by law and as warranted, prior reviews and determinations, including the Environmental Assessment issued in July of 2016 for the DAPL, as satisfying all applicable requirements of the National Environmental Policy Act, as amended, 42 U.S.C. 4321 *et seq.*, and any other provision of law that requires executive agency consultation or review (including the consultation or review required under section 7(a) of the Endangered Species Act of 1973, 16 U.S.C. 1536(a));

(iv) review and grant, to the extent permitted by law and as warranted, requests for waivers of notice periods arising from or related to USACE real estate policies and regulations; and

(v) issue, to the extent permitted by law and as warranted, any approved easements or rights-of-way immediately after notice is provided to Congress

USACE_ESMT000430

**8662**   Federal Register / Vol. 82, No. 18 / Monday, January 30, 2017 / Presidential Documents

pursuant to section 28(w) of the Mineral Leasing Act, as amended, 30 U.S.C. 185(w).

(b) *Publication.* A copy of this memorandum shall be provided immediately to the Speaker of the House of Representatives, the President Pro Tempore of the Senate, the Majority Leader of the Senate, and the Governors of each State located along the Dakota Access Pipeline route. This memorandum shall also be published in the *Federal Register.*

(c) *Private Property.* Nothing in this memorandum alters any Federal, State, or local process or condition in effect on the date of this memorandum that is necessary to secure access from an owner of private property to construct the pipeline and facilities described herein. Land or an interest in land for the pipeline and facilities described herein may only be acquired consistently with the Constitution and applicable State laws.

**Sec. 3.** *General Provisions.* (a) Nothing in this memorandum shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This memorandum shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*Washington, January 24, 2017*

[FR Doc. 2017–02032
Filed 1–27–17; 8:45 am]
Billing code 5001–03–P

USACE_ESMT000431


○ Mechanisms to identify potential conflicts of interest posed for supervisory personnel who are covered by incentives but also are responsible for monitoring the quality of customer treatment and customer satisfaction; and

○ Fair and independent processes for investigating reported issues of suspected improper behavior.

• *Training:* Implementing comprehensive training that addresses:

○ Expectations for incentives, including standards of ethical behavior;

○ Common risky behaviors for employees and service providers to foster greater awareness of primary risk areas;

○ Terms and conditions of the institution's products and services so that they can be effectively described to consumers; and

○ Regulatory and business requirements for obtaining and maintaining evidence of consumer consent.

• *Monitoring:* Designing overall compliance monitoring programs that track key metrics—and outliers—that may indicate incentives are leading to improper behavior by employees or service providers. Examples of possible monitoring metrics include, but are not limited to:

○ Overall product penetration rates by consumer and household;

○ Specific penetration rates for products and services (such as overdraft, add-on products, and online banking), as well as penetration rates by consumer segment;

○ Employee turnover and employee satisfaction or complaint rates;

○ Spikes and trends in sales (both completed and failed sales) by specific individuals and by units;

○ Financial incentive payouts; and

○ Account opening/product enrollment and account closure/product cancellation statistics, including by specific individuals and by units, taking into account the terms of the incentive programs (*i.e.,* requirements that accounts be open for a period of time or funded in order for employees to obtain credit under the program).

• *Corrective Action:* Promptly implementing corrective actions to address any incentive issues identified by monitoring reviews as areas of weakness:

○ Corrective actions should include the termination of employees, service providers, and managers, as necessary, and these termination statistics should be analyzed for trends and root cause(s);

○ Corrective actions should include changes to the structure of incentives, training on these programs, and return of funds to all affected consumers as

appropriate in light of failed sales or heightened levels of customer dissatisfaction;

○ All corrective actions should ensure that the root causes of deficiencies are identified and resolved; and

○ Findings should be escalated to management and the board, particularly where they appear to pose significant risks to consumers.

• *Consumer complaint management program:* Collecting and analyzing consumer complaints for indications that incentives are leading to violations of law or harm to consumers in order to identify and resolve the root causes of any such issues; and

• *Independent compliance audit:* Scheduling audits to address incentives and consumer outcomes across all products or services to which they apply, ensuring audits are conducted independently of both the compliance program and the business functions, and ensuring that all necessary corrective actions are promptly implemented.

For more information pertaining to the oversight of incentive programs, please review the CFPB's Supervision and Examination Manual.[4] Specific modules referencing these programs include: Compliance Management Review, Unfair, Deceptive, and Abusive Acts or Practices, Debt Collection, Credit Card Account Management, Consumer Reporting, Mortgage Origination, Short-Term Small Dollar Lending, and the Equal Credit Opportunity Act. Other relevant Bureau guidance includes: CFPB Bulletin 2012–06 (Marketing of Credit Card Add-on Products),[5] and CFPB Bulletin 2016–02 (Service Providers, amending and reissuing CFPB Bulletin 2012–03).[6]

## 2. Regulatory Requirements

This Compliance Bulletin is a non-binding general statement of policy articulating considerations relevant to the Bureau's exercise of its supervisory and enforcement authority. It is therefore exempt from notice and comment rulemaking requirements under the Administrative Procedure Act pursuant to 5 U.S.C. 553(b). Because no notice of proposed rulemaking is required, the Regulatory Flexibility Act does not require an initial or final

regulatory flexibility analysis. 5 U.S.C. 603(a), 604(a). The Bureau has determined that this Compliance Bulletin does not impose any new or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring OMB approval under the Paperwork Reduction Act, 44 U.S.C. 3501, *et seq.*

Dated: January 5, 2017.

**Richard Cordray,**
*Director, Bureau of Consumer Financial Protection.*

[FR Doc. 2017–01021 Filed 1–17–17; 8:45 am]
**BILLING CODE 4810–AM–P**

## DEPARTMENT OF THE ARMY

### Notice of Intent To Prepare an Environmental Impact Statement in Connection With Dakota Access, LLC's Request for an Easement To Cross Lake Oahe, North Dakota

**AGENCY:** Department of the Army, DoD.
**ACTION:** Notice.

**SUMMARY:** This notice advises the public that the Department of the Army (Army), as lead agency, is gathering information necessary to prepare an environmental impact statement (EIS) in connection with Dakota Access, LLC's request to grant an easement to cross Lake Oahe, which is on the Missouri River and owned by the US Army Corps of Engineers (Corps). This notice opens the public scoping phase and invites interested parties to identify potential issues, concerns, and reasonable alternatives that should be considered in an EIS.

**DATES:** To ensure consideration during the development of an EIS, written comments on the scope of an EIS should be sent no later than February 20, 2017. The date of all public scoping meetings will be announced at least 15 days in advance through a notice to be published in the local North Dakota newspaper (The Bismarck Tribune) and online at *https://www.army.mil/asacw.*

**ADDRESSES:** You may mail or hand deliver written comments to Mr. Gib Owen, Office of the Assistant Secretary of the Army for Civil Works, 108 Army Pentagon, Washington, DC 20310–0108. Advance arrangements will need to be made to hand deliver comments. Please include your name, return address, and "NOI Comments, Dakota Access Pipeline Crossing" on the first page of your written comments. Comments may also be submitted via email to Mr. Gib Owen, at *gib.a.owen.civ@mail.mil.* If

---

[4] CFPB Supervision and Examination Manual, available at *http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf.*

[5] CFPB Bulletin 2012–06, available at *http://files.consumerfinance.gov/f/201207_cfpb_marketing_of_credit_card_addon_products.pdf.*

[6] CFPB Bulletin 2016–02, available at *http://www.consumerfinance.gov/documents/1385/102016_cfpb_OfficialGuidanceServiceProvider Bulletin.pdf.*

emailing comments, please use "NOI Comments, Dakota Access Pipeline Crossing" as the subject of your email.

The location of all public scoping meetings will be announced at least 15 days in advance through a notice to be published in the local North Dakota newspaper (The Bismarck Tribune) and online at *https://www.army.mil/asacw*.

**FOR FURTHER INFORMATION CONTACT:** Mr. Gib Owen, Water Resources Policy and Legislation, Office of the Assistant Secretary of the Army for Civil Works, Washington, DC 20310–0108; telephone: (703) 695–6791; email: *gib.a.owen.civ@mail.mil*.

**SUPPLEMENTARY INFORMATION:** The proposed crossing of Lake Oahe by Dakota Access, LLC is approximately 0.5 miles upstream of the northern boundary of the Standing Rock Sioux Tribe's reservation. The Tribe protests the crossing primarily because it relies on Lake Oahe for water for a variety of purposes, the Tribe's reservation boundaries encompass portions of Lake Oahe downstream from the proposed crossing, and the Tribe retains water, treaty fishing, and hunting rights in the Lake.

The proposed crossing of Corps property requires the granting of a right-of-way (easement) under the Mineral Leasing Act (MLA), 30 U.S.C. 185. To date, the Army has not made a final decision on whether to grant the easement pursuant to the MLA. The Army intends to prepare an EIS to consider any potential impacts to the human environment that the grant of an easement may cause.

Specifically, input is desired on the following three scoping concerns:

(1) Alternative locations for the pipeline crossing the Missouri River;

(2) Potential risks and impacts of an oil spill, and potential impacts to Lake Oahe, the Standing Rock Sioux Tribe's water intakes, and the Tribe's water, treaty fishing, and hunting rights; and

(3) Information on the extent and location of the Tribe's treaty rights in Lake Oahe.

On July 25, 2016, the Corps granted permission to applicant Dakota Access, LLC, under Section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. 408 (408 permission), for a proposed pipeline crossing of Lake Oahe. Lake Oahe is on the Missouri River and owned by the Corps. The approximate 1,172-mile pipeline connects the Bakken and Three Forks oil production areas in North Dakota to an existing crude oil market near Patoka, Illinois. The pipeline is 30 inches in diameter and is projected to transport approximately 570,000 barrels per day.

The 408 permission was accompanied by a Finding of No Significant Impact based on an Environmental Assessment (EA), as contemplated under the National Environmental Policy Act (NEPA). The EA included a brief description and characterization of factors used in evaluating a potential alternative crossing location that was considered and eliminated during the analysis phase. The alternative route, which was eliminated, would cross the Missouri River approximately 10 miles north of Bismarck, ND.

On December 4, 2016, the Army determined that a decision on whether to authorize the pipeline to cross Lake Oahe at the proposed location merits additional analysis, more rigorous exploration and evaluation of reasonable siting alternatives, and greater public and tribal participation and comments as contemplated in the Council on Environmental Quality's (CEQ's) NEPA implementing regulations, 40 CFR 1502.14 and 1503.1. Currently, the Corps is developing a plan to implement the Army's December 4, 2016 direction. This notice of public scoping should be integrated into the Corps' plan of action.

Consistent with CEQ's NEPA implementing regulations, an EIS will analyze, at a minimum:

(1) Alternative locations for the pipeline crossing the Missouri River;

(2) Potential risks and impacts of an oil spill, and potential impacts to Lake Oahe, the Standing Rock Sioux Tribe's water intakes, and the Tribe's water, treaty fishing, and hunting rights; and

(3) Information on the extent and location of the Tribe's treaty rights in Lake Oahe.

The range of issues, alternatives, and potential impacts may be expanded based on comments received in response to this notice and at public scoping meetings.

*Public Comment Availability:* Before including your address, telephone number, email address, or other personal identifying information in your comment, you should be aware that your entire comment—including your personal identifying information—may be made publicly available at any time. While you can ask in your comment that your personal identifying information be withheld from public review, the Army cannot guarantee that this will occur.

*Authority:* This notice is published in accordance with sections 1503.1 and 1506.6 of the CEQ's Regulations (40 CFR parts 1500–1508) implementing the procedural requirements of NEPA, as amended (42 U.S.C. 4321 *et seq.*), and the Army and Corps' NEPA

implementation policies (32 CFR part 651 and 33 CFR part 230), and exercises the authority delegated to the Assistant Secretary of the Army (Civil Works) by General Orders No. 2017–1, January 5, 2017.

**Brenda S. Bowen,**

*Army Federal Register Liaison Officer.*

[FR Doc. 2017–00937 Filed 1–17–17; 8:45 am]

**BILLING CODE 5001–03–P**

# DEPARTMENT OF DEFENSE

## Office of the Secretary

## Defense Science Board; Notice of Federal Advisory Committee Meetings

**AGENCY:** Department of Defense.

**ACTION:** Notice of Federal Advisory Committee Meetings.

**SUMMARY:** The 2017 Defense Science Board (DSB) Summer Study Task Force on Nuclear Deterrence in the 21st Century's Multi-Polar, Multi-Threat Strategic Environment ("the Nuclear Deterrence Summer Study Task Force") will meet in closed session on Tuesday, January 24, 2017, from 8:15 a.m. to 12:00 p.m. and 12:30 p.m. to 6:00 p.m. at the Virginia Tech Advanced Research Center, 900 Glebe Road, 7th Floor, Arlington, VA and Wednesday, January 25, 2017, from 8:00 a.m. to 3:00 p.m. at the Executive Conference Center, 4075 Wilson Blvd., Suite 350, Arlington, VA.

**DATES:** Tuesday, January 24, 2017, from 8:15 a.m. to 6:00 p.m.; and Wednesday, January 25, 2017, from 8:00 a.m. to 3:00 p.m.

**ADDRESSES:** Virginia Tech Advanced Research Center, 900 Glebe Road, 7th Floor, Arlington, VA (January 24, 2017); and Executive Conference Center, 4075 Wilson Blvd., Suite 350, Arlington, VA (January 25, 2017).

**FOR FURTHER INFORMATION CONTACT:** Ms. Debra Rose, Executive Officer, Defense Science Board, 3140 Defense Pentagon, Room 3B888A, Washington, DC 20301–3140, via email at *debra.a.rose20.civ@mail.mil*, or via phone at (703) 571–0084 or the Defense Science Board Designated Federal Officer (DFO) Ms. Karen D.H. Saunders, Executive Director, Defense Science Board, 3140 Defense Pentagon, Room 3B888A, Washington, DC 20301, via email at *karen.d.saunders.civ@mail.mil* or via phone at (703) 571–0079.

**SUPPLEMENTARY INFORMATION:** Due to circumstances beyond the control of the Designated Federal Officer and the Department of Defense, the 2017 Defense Science Board Summer Study Task Force on Nuclear Deterrence in the

## Leavy, Jacqueline

| | |
|---|---|
| **From:** | Leavy, Jacqueline |
| **Sent:** | Friday, January 06, 2017 3:50 PM |
| **To:** | CMS.OEX |
| **Subject:** | FW: Oglala Sioux Tribe: Consultation Request on DAPL- January 17th |
| **Attachments:** | 10617.OST.FederalAgencies.ConsultationLetter.pdf; RES 16-128 - DAPL (002).pdf; ORDINANCE NO. 11-10.pdf |

**From:** Jennifer P. Hughes [mailto:JHughes@hobbsstraus.com]
**Sent:** Friday, January 06, 2017 3:48 PM
**To:** sally_jewel@ios.doi.gov; tommy_beaudreau@ios.doi.gov; usarmy.pentagon.hqda-oce.mbx.daen-zc@mail.mil;
usarmy.pentagon.hqda-oaa.mbx.oaa-communications-poc@mail.mil; stephen.j.platt4.mil@mail.mil;
Joellen.darcy@us.army.mil; Price, Michael James COL USARMY HQDA ASA CW (US) <michael.j.price34.mil@mail.mil>;
chip.smith@us.army.mil; lowry.a.crook.civ@mail.mil; Loretta.lynch@usdoj.gov; Toulou, Tracy (OTJ) (JMD)
<Tracy.Toulou2@usdoj.gov>; Meadows, Bessie L (OAG) <Bessie.L.Meadows@usdoj.gov>; Mccarthy, Gina
<McCarthy.Gina@epa.gov>; Beauvais, Joel <Beauvais.Joel@epa.gov>; Emerson, Michael <Emerson.Michael@epa.gov>;
lawrence.roberts@bia.gov; elopez@usbr.gov; crice@usbr.gov; MRyan@usbr.gov; dan_ashe@fws.gov;
charisa_morris@fws.gov; roslyn_sellars@fws.gov; lawrence_roberts@ios.doi.gov; sarah_walters@ios.doi.gov;
Cleve.HerManyHorses@bia.gov
**Cc:** tsweston@gwtc.net; jamescross0810 (jamescross0810@hotmail.com) <jamescross0810@hotmail.com>; Kevin
Steele <Kevin@oglala.org>; popemeans@ostrw.com; ron.mniwiconi@midconetwork.com; Donna Solomon
<DonnaS@oglala.org>; William.kindle@rst-nsn.gov; haroldcfrazier@yahoo.com; acordova@standingrock.org;
BrandonSazue@hotmail.com; rtrudell@santeedakota.org; Chairman@lbst.org; president@fsst.org;
robertflyinghawk@gmail.com; gnzlaw@aol.com; Mark Van norman (mcvnconsulting@gmail.com)
<mcvnconsulting@gmail.com>; Elliott A. Milhollin <EMilhollin@hobbsstraus.com>
**Subject:** Oglala Sioux Tribe: Consultation Request on DAPL- January 17th

All:

I am forwarding the attached letter and its accompanying documents on behalf of the Oglala Sioux Tribe. It requests
government-to-government consultation with the Tribe on the Dakota Access Pipeline issue. The consultation session is
scheduled for January 17th in Fort Pierre, S.D.. The Tribe respectfully requests your agency's participation.

Please let us know who from your agency will participate. Thank you.

**Jennifer P. Hughes,** *Partner*
T 202.822.8282 | F 202.296.8834

**HOBBS STRAUS DEAN & WALKER, LLP**
2120 L Street NW, Suite 700, Washington, DC 20037

**HOBBSSTRAUS.COM**

### Hobbs, Straus, Dean and Walker, LLP. Confidentiality Statement

This message is intended only for the use of the individuals to which this e-mail is addressed, and may contain information that is
privileged, confidential and exempt from disclosure under applicable laws. If you are not the intended recipient of this e-mail, you are
hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this e-
mail in error, please notify the sender immediately and delete this e-mail from both your "mailbox" and your "trash." Thank you.

USACE_ESMT000474




# Oglala Sioux Tribe
### PINE RIDGE INDIAN RESERVATION
P.O. Box #2070
Pine Ridge, South Dakota 57770
1(605) 867-5821 Ext. 8420 (O) / 1(605) 867-6076 (F)



President Troy "Scott" Weston

January 6, 2017

The Honorable Sally Jewell
Secretary of the Interior
Department of the Interior
1849 C Street, N.W.
Washington DC 20240

The Honorable Loretta Lynch
Attorney General
United States Dept. of Justice
950 Pennsylvania Avenue, NW.
Washington, DC 20530

Administrator Gina McCarthy
Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, D.C. 20004

Lawrence Roberts
Assistant Secretary – Indian Affairs
U.S. Department of the Interior
1849 C Street, NW, MS- 4141
Washington, D.C. 20240

Director Daniel Ashe
U.S. Fish and Wildlife Service
U.S. Department of the Interior
1849 C Street, N.W., Room 3359
Washington, D.C. 20009

The Honorable Eric Fanning
Secretary of the Army
101 Army Pentagon
Washington, DC 20301-1000

Lt. General Todd T. Semonite
Commanding General and Chief of Engineers
U.S. Army Corps of Engineers
2600 Army Pentagon
Washington, D.C. 20310

Jo-Ellen Darcy
Assistant Secretary of the Army for Civil Works
U.S. Army Corps of Engineers
108 Army Pentagon, Room 3E446
Washington, DC 20310-0108

Commissioner Estevan Lopez
Bureau of Reclamation
U.S. Department of the Interior
1849 C Street, N.W., Room 7657
Washington, D.C. 20009

Dear Sir or Madam:

Please find enclosed herein Oglala Sioux Tribal Council Resolution No. 16-128 requesting a government-to-government consultation with your agency on the Dakota Access Oil Pipeline in North Dakota ("DAPL"). The topics for discussion (agenda items) are contained in the resolution. Also enclosed is a copy of the Oglala Sioux Tribal Ordinance No. 11-10 that establishes a tribal consultation policy for government-to-government consultations with federal agencies.

Please be advised that Resolution No. 16-128 requested a consultation with your agency by January 27, 2017. The Tribal Council has scheduled the consultation for **January 17, 2017, from 10am-5pm (CST) at the Oglala Sioux Rural Water Supply System (OSRWSS) Treatment Plant Conference Room in Fort Pierre, SD.**

We request your agency's participation in this consultation session.

If you have any questions, please call Troy Scott Weston @ (605) 867-8487or James Cross @ (605) 454-4693, who will be the tribal contact person for the consultations.

Sincerely,

Troy Scott Weston
President
Oglala Sioux Tribe

Enclosures

cc:    OST Council Members
       OST Executive Committee Members
       Frank Means, OSRWSS Director
       Ron Blacksmith, OSRWSS Core Line Director
       Cleve Her Many Horses, Pine Ridge Agency Superintendent
       William Kindle, Chairman, Rosebud Sioux Tribe
       Harold Frazier, Chairman, Cheyenne River Sioux Tribe
       Dave Archambault, II, Chairman, Standing Rock Sioux Tribe
       Brandon Sazue, Chairman, Crow Creek Sioux Tribe
       Roger Trudell, Chairman, Santee Sioux Tribe
       Boyd Gourneau, Chairman, Lower Brule Sioux Tribe
       Anthony Reider, Chairman, Flandreau Sioux Tribe
       Robert Flying Hawk, Chairman, Yankton Sioux Tribe

USACE_ESMT000477

ORDINANCE NO. 11-10

ORDINANCE OF THE OGLALA SIOUX TRIBAL COUNCIL
OF THE OGLALA SIOUX TRIBE
(An Unincorporated Tribe)

ORDINANCE OF THE OGLALA SIOUX TRIBAL COUNCIL ESTABLISHING PROCEDURES FOR GOVERNMENT-TO-GOVERNMENT CONSULTATION BETWEEN THE OGLALA SIOUX TRIBE AND THE UNITED STATES GOVERNMENT, AND OTHER GOVERNMENTS.

WHEREAS, the Government-to-Government relationship between the Oglala Sioux Tribe was established in the United States Constitution, Article 6 (Supremacy Clause); the Treaty of July 2, 1825, United States-Oglala Band of Sioux Nation, 7 Stat. 252; Rev. Stat. § 2116, 25 U.S.C. § 177 (*codifying* section 12 of the Trade and Intercourse Act of June 30, 1834, ch. 161, 4 Stat. 730); the Treaty of September 17, 1851, United States-Teton Division of Sioux Nation, *et al.*, 11 Stat. 749; the Treaty of April 29, 1868, United States-Sioux Nation, 15 Stat. 635; Rev. Stat. § 2079, 25 U.S.C. § 71 (*codifying* the Act of March 3, 1871, ch. 120, § 1, 16 Stat. 566), the Indian Reorganization Act of June 18, 1934, ch. 476, 48 Stat. 984, 25 U.S.C. § 461 *et seq.*, the Indian Self-Determination and Education Assistance Act of January 4, 1975, P.L. 93-638, 88 Stat. 2203, 25 U.S.C. § 450, *et seq.*, and other Congressional enactments, and

WHEREAS, the 1851 Treaty recognized title in the Oglala Band to 60 million acres of territory currently in the States of North Dakota, South Dakota, Nebraska, Montana and Wyoming for the Oglala Sioux Tribe and other Sioux tribes, and

WHEREAS, a permanent homeland was established within the 1851 Treaty territory for the "absolute and undisturbed use and occupation" of the Oglala Sioux Band and other Sioux bands, which homeland has been referred to as the "Great Sioux Reservation" and comprises substantially all of present day South Dakota west of the east bank of the Missouri River, and

WHEREAS, the Indian Claims Commission also found that the Oglala Band and other Sioux bands held aboriginal (non-treaty) title to 14 million acres east of the Missouri River in the States of North Dakota and South Dakota, and

WHEREAS, uncontested encroachments on the 1851 Treaty territory by the United States and its citizens resulted in the Powder River War of 1866-1868 between the United States and the Oglala band and other bands of Sioux Indians. as a result of which, peace was concluded between the United States and the Oglala Band and other Sioux bands by treaty on April 29, 1868, 15 Stat. 635 ("1868 Fort Laramie Treaty," which treaty was duly ratified by the United States on February 16, 1869 and proclaimed by the President on February 24, 1869, and

USACE_ESMT000478

ORDINANCE NO. 11-10
PAGE TWO

WHEREAS, the 1868 Treaty provided for a mutual demobilization of the United States and Oglala Band and other Sioux bands without terms of surrender on either side, and as a result thereof, the Oglala Band and other Sioux bands were never militarily conquered by the United States, and the Oglala Band has abided by the 1868 Treaty and resided on its reservation in accordance of the terms of the treaty since 1868, except for incidences in Montana in 1876 where the Oglala Band and other Sioux bands were legally exercising its 1868 Treaty, Article 11, hunting rights and yet had to defend themselves from attack by the United States Cavalry in violation of Articles 1 and 11 of the 1868 Treaty, and

WHEREAS, subsequent to ratification of the 1868 Treaty, no aboriginal or treaty territory of the Oglala Band was ever acquired by the United States in accordance with 25 U.S.C. § 177 or Article 12 of the 1868 Treaty, and all acquisitions of Oglala Band's territory was either confiscated by the United States or acquired with the requisite consent of the Band, and

WHEREAS, the "Oglala Band" reorganized in 1936 as the "Oglala Sioux Tribe of the Pine Ridge Indian Reservation" under Section 16 of the 1934 Indian Reorganization Act of June 18, 1934, ch. 576, 48 Stat. 987, 25 U.S.C. § 476, by adopting a constitution and bylaws approved by the Secretary of the Interior, and presently enjoys all of the rights and privileges guaranteed under its existing treaties with the United States in accordance with 25 U.S.C. § 478b

WHEREAS, as a result of its unique government-to-government relationship with the United States, and because the Oglala Band (now Oglala Sioux Tribe) is one of the few militarily unconquered Sioux tribes in the United States and all of its territory now in the possession of the United States was acquired without its consent, the Oglala Sioux Tribe still possesses very strong aboriginal rights within all the territory that comprised its aboriginal homeland, and as a result thereof, the Tribe has both a domestic and international rights to government-to-government consultations with the United States on the formulation of federal policies, or on all federal actions or undertakings that adversely affect its aboriginal and treaty territories, and

WHEREAS, the Executive Branch of the united States Government has recognized the right of government-to-government consultations with Indian Tribes in:

a. President Clinton's Memorandum of April 29, 1994, which, among other things, directed agencies to:

USACE_ESMT000479

ORDINANCE NO. 11-10
PAGE THREE

      (i)   "ensure that the department or agency operates within a government-to-government relationship with Federally-recognized Trial government,"

     (ii)   "consult, to the greatest extent practicable ad to the extent permitted by law with Tribal governments prior to taking actions that affect Federally recognized tribes, to be open and candid so that all interested parties may evaluate for themselves the potential impact of relevant proposals," and

   (iii)   "assess the impacts of Federal government plans, projects, programs, and activities on tribal trust resources to assure that Tribal government rights and concerns are considered during the development of such plans, projects, and activities."

b. President Clinton's Executive Order No. 13084 of May 19, 1998, which directed federal agencies to respect tribal self-government and sovereignty, tribal rights, and tribal responsibilities whenever they develop policies "significantly affecting Indian tribal governments,"

c. President Clinton's Executive Order No. 13175 of November 6, 2000, which directed all federal agencies to establish consultation and collaboration with tribal officials in the development of federal policies that have tribal implications, and

d. President Barak Obama Memorandum of November 5, 2009, to the heads of the Executive Department and federal agencies to submit plans of actions that the agencies will take to implement the policies and directives of President Clinton's Executive Order 13175,

and

    WHEREAS, Congress has also mandated government-to-government consultation with Indian tribes, which have been implemented in statutes, orders, regulations, rules, policies, manuals, protocols and guidance, most of which are described in a document issued by the White House- Indian Affairs Executive Working Group (WH-IAEWG), dated January, 2009, and entitled "List of Federal Tribal Consultation Statutes, Orders, Regulations, rules, Policies, Manuals, protocols and guidance," and

USACE_ESMT000480

ORDINANCE NO. 11-10
PAGE FOUR

WHEREAS, the Oglala Sioux Tribe has never enacted legislation (ordinances) establishing procedures for government-to-government consultation between the Tribe and the United States, and believes that such procedures are necessary to establish a clear process for documenting the nature and results of consultations between the Tribe and the United States and its agencies, now

THEREFORE BE IT ORDAINED, that the following sections relating to government-to-government consultations are hereby adopted for the Oglala Sioux Tribe.

**Section 1.**   **Title.**   This ordinance shall be known and referred to as the Oglala Sioux Tribe  Consultation and Coordination Ordinance of 2001.

**Section 2.**   **Definitions.**   The following words and phrases used in this Election Code shall have the following meanings:

"Consultation" and/or "government-to-government" consultation shall mean the formal process of cooperation, negotiation, and mutual decision making between the Oglala Sioux Tribe and the United States Government, and other governments. It is the process through which sovereign governments develop a common understanding of technical and legal issues and use this understanding to formulate mutually agreeable decisions.

**Section 3.**   **Scope.**   This ordinance is intended to extend to:
  a. All of the aboriginal homeland of the Oglala Sioux Tribe, including, the 60 million acre territory Sioux territory described in Article 5 of the 1851 Ft. Laramie Treaty; the territory and the expanded hunting rights territory described in Articles 2, 11 and 16 of the 1868 Ft. Laramie Treaty;

  b. All of the aboriginal title (non-treaty) Sioux territory comprising 14 million acres located east of the Missouri River in the present states of North Dakota and South Dakota; and

  c. All undertakings and actions that adversely affect the Oglala Sioux Tribe's aboriginal, treaty or statutorily recognized rights and interests within its aboriginal and treaty recognized territories.

USACE_ESMT000481

ORDINANCE NO. 11-10
PAGE FIVE

**Section 4.** **Purpose.** The primary purpose and intent of this ordinance is to:

    a. Establish a clear process for documenting the nature and results of government-to-government consultations between the Oglala Sioux Tribe and Federal Government and its agencies;

    b. Provide a consistent, orderly process to government-to-government consultation to make and ensure that government-to-government consultations are meaningful and effective, and

    c. Be applicable, to the fullest extent possible, for documenting the nature and results of government-to-government consultations between the Oglala Sioux Tribe and other Indian tribes, inter-tribal organizations and state governments and agencies.

**Section 5.** **Authority.** This ordinance is adopted pursuant to the Oglala Sioux Tribe's inherent sovereignty and Article IV, Section 1 (a) of the Amended Constitution of the Oglala Sioux Tribe, which empowers the Tribal Council "(a) To negotiate with the Federal, State, and local governments, on behalf of the tribe, and to advise and consult with representatives of the Interior Department on all activities of the Department that may affect the Pine Ridge Indian Reservation."

**Section 6.** **Principles and guidelines.** All government-to-government consultations between the Oglala Sioux Tribe and the Federal Government, and State or other tribal governments, shall be conducted with the Oglala Sioux Tribe under the following principles and guidelines:

    a. The Oglala Sioux Tribe is a sovereign government with attendant powers;

    b. All treaties between the Oglala Sioux Tribe and the United States must be honored and enforced to the fullest extent possible;

    c. The Oglala Sioux Tribe has never been militarily conquered by the United States, and has existed in a peaceful relationship with the United States since 1868, pursuant to Article I of the 1868 Ft. Laramie Treaty; and

ORDINANCE NO. 11-10
PAGE SIX

    d. The Oglala Sioux Tribe and its territories are not
       possessions of the United States.

**Section 7.** **Procedures.** All consultation between the Oglala Sioux
Tribe and the Federal Government, and State or other tribal
governments, must:

### WHEN CONSULTATION IS REQUESTED BY
### THE FEDERAL GOVERNMENT OR OTHER GOVERNMENTS

    a. Occur through a formal meeting with the Oglala Sioux
       Tribal Council. Neither the Executive Committee nor any
       Executive Committee member or staff member of the Tribe
       shall be authorized to engage in government-to-government
       consultations with any government or governmental agency;

    b. Accomplish the goals and objectives described in Section
       8.

    c. Be initiated by serving a formal written request for
       government-to-government consultation with the Secretary
       of the Oglala Sioux Tribe. The request for consultation
       should describe the impending, proposed project or
       activity that may or may not affect the Oglala Sioux
       Tribe's interests in its aboriginal or treaty territory
       and/or rights or interests therein. This include the
       Tribes aboriginal and treaty territory both within and
       outside the exterior boundaries of the Pine Ridge Indian
       Reservation;

    d. It shall be the duty of the Tribal Secretary to
       immediately notify all members of the Executive Committee
       and Tribal Council of each request for consultation;

    e. Upon receipt of a request for consultation, the Tribal
       President, or council members under established
       procedures, shall call a special council meeting for the
       purpose of responding to the request for consultation.
       The Tribal Council shall:

         (i) Request by resolution a policy-level
            meeting, initiating government-to-
            government consultations;

ORDINANCE NO. 11-10
PAGE SEVEN

    (ii) Authorize the Tribe's technical staff (and when appropriate the Tribe's attorneys) to meet with the responding government's technical staff to discern and define the issues that are subject to the request for consultation including how the proposed governmental undertaking or activity affects the tribe's aboriginal, treaty, statutory or other interests;

    (iii) Schedule a special council meeting in which the Tribe's technical staff (and when appropriate the Tribe's attorneys) can fully brief the Tribal council on the issues that are subject to consultation, with recommendations and opinions;

    (iv) Schedule a follow-up special council meeting in which the Tribe through the Tribal council shall engage in formal government-to-government consultation based on the recommendations and opinions of its staff (and attorneys); and

    (v) Pass a resolution fully articulating the Tribe's formal decision, which decision shall be consistent with the provisions of this ordinance.

## WHEN CONSULTATION IS REQUESTED BY THE OGLALA SIOUX TRIBE

a. Be initiated by passing a tribal council resolution requesting government -to-government consultation, which resolution shall be executed and sent by the Tribal President to appropriate official of the Federal Government or tribal or state government with which consultation is desired;

b. Follow the procedure described in Subsections 7.e. (i) through (v) above; and

c. Accomplish the same objectives described in Section 8.

USACE_ESMT000484

ORDINANCE NO. 11-10
PAGE EIGHT

**Section 8.  Objectives.**  All government-to-government consultations should ensure the following results:

a. Tribal officers and officials proceed in a dignified, orderly manner, keeping in mind that the Oglala Sioux Tribe is engaging in the consultations as a sovereign government that maintains government-to-government relations with the United States Government and other governments.  Tribal officials engaging in consultation should dress in appropriate attire during the consultation proceedings, and conduct themselves in a professional, dignified, and diplomatic manner;

b. Tribal officers and officials fully understand the issues to be discussed prior to engaging in and consultation proceeding; this includes an understanding of tribal history, federal treaties and federal statutes, regulations and rules, that will be discussed at each consultation;

c. Ensure that the Tribe's interest are fully protected, including interests in all tracts of land located within the Tribe's aboriginal and treaty territories, and interests therein, as well as tribal cultural resources, human remains, and any other tribal patrimony;

d. Ensure compliance with federal treaties, statutes, regulations and rules and tribal policies (e.g., policy that the Black Hills Are Not For Sale and tribal land claims must include restoration of federally held lands to the Tribe);

**Section 9.  Documentation.**  Following any governmental-to-government consultation between the Oglala Sioux Tribe and the Federal government, or other governments, the Tribal Council shall:

a. Achieve a bi-lateral decision between the Tribe and the United States, or other government;

b. Adopt a resolution documenting the nature and results of the consultation and bilateral decision;

c. Direct the Tribal Secretary to file a copy of the resolution and all backup documentation with the Tribal Records Department.

ORDINANCE NO. 11-10
PAGE NINE

**Section 10.   Representations.**   Neither the Federal Government nor any agency thereof, nor any other government, shall legitimately represent to any other government or governmental entity, nor to any third party, that they have consulted with the Oglala Sioux Tribe unless they fully comply with the terms and conditions of this ordinance.

**Section 11.   Effective Date.**   This ordinance shall become effective immediately.

**Section 12.   Repeal of inconsistent ordinances.** All previously enacted ordinances are hereby repealed to the extent that they are inconsistent with this ordinance.

C-E-R-T-I-F-I-C-A-T-I-O-N

I, as undersigned Secretary of the Oglala Sioux Tribal Council of the

Oglala Sioux Tribe, hereby certify that this Ordinance was adopted by

a vote of: 13 For; 1 Against; 0 Abstain; and 0 Not Voting, during a

SPECIAL SESSION held on the 7th day of JUNE, 2011.

RHONDA J. TWO EAGLE
Secretary
Oglala Sioux Tribe

A-T-T-E-S-T:

JOHN W. YELLOW BIRD-STEELE
President
Oglala Sioux Tribe

USACE_ESMT000486

USACE_ESMT000487

RESOLUTION NO. 16-128

RESOLUTION OF THE OGLALA SIOUX TRIBAL COUNCIL
OF THE OGLALA SIOUX TRIBE
(An Unincorporated Tribe)

RESOLUTION OF THE OGLALA SIOUX TRIBAL COUNCIL OF THE OGLALA SIOUX TRIBE REQUESTING GOVERNMENT-TO-GOVERNMENT CONSULTATION BY THE ARMY CORPS OF ENGINEERS, THE DEPARTMENT OF JUSTICE, THE DEPARMENT OF THE INTERIOR (BIA, BOR, USFWL), EPA CONCERNING THE DAKOTA ACCESS OIL PIPELINE IN NORTH DAKOTA AND SOUTH DAKOTA.

WHEREAS, the Oglala Sioux Tribe is a sovereign Indian tribe with attendant powers that maintain government-to-government relations with the United States pursuant to its Federal treaties and agreements, and federal statutes, including the 1934 Indian Reorganization Act (25 U.S.C. Secs. 461 et seq.), and

WHEREAS, the Tribe adopted a Constitution and By-Laws pursuant to Section 16 of the Indian Reorganization Act of 1934 (25 U.S.C. sec. 476), and

WHEREAS, Article III, Section 1 of the Tribal Constitution provides that the governing body of the Oglala Sioux Tribe is the Oglala Sioux Tribal Council, and

WHEREAS, Article IV, Section 1(a) of the Tribal Constitution empowers the Tribal Council "(a) To negotiate with the Federal, State, and local government on behalf of the Tribe, and to advise representatives of the Interior Department on all activities of the Department that may affect the Pine Ridge Indian Reservation", and

WHEREAS, the Oceti Sakowin (Sioux Nation) is comprised of the following seven divisions:

- Mdewakanton;
- Sisseton;
- Wahpakoota;
- Wahpeton;
- Yankton;
- Yanktonai; and
- Teton,

*Sioux Nation v. United States*, 24 Ind. Cl. Comm. 147, 162 (1970), and

USACE_ESMT000488

RESOLUTION NO. 16-128
Page Two

WHEREAS, the Teton Division of the Oceti Sakowin is comprised of the following seven distinct, sovereign bands:

- Blackfeet,
- Brule,
- Hunkpapa,
- Minnecoujou,
- No Bows,
- Oglala, and
- Two Kettle; and

WHEREAS, the Oglala Sioux Band was a signatory party to the Treaty of September 17, 1851 (11 Stat. 749(, which described in Article 5 that the territory of the Teton and Yankton divisions of the Oceti Sakowin is as follows:

**ARTICLE 5.**

The aforesaid Indian nations do hereby recognize and acknowledge the following tracts of country, included within the metes and boundaries hereinafter designated, as their respective territories, viz: The territory of the Sioux or Dahcotah Nation, commencing the mouth of the White Earth River, on the Missouri River: thence in a southwesterly direction to the forks of the Platte River: thence up the north fork of the Platte River to a point known as the Red Butte, or where the road leaves the river; thence along the range of mountains known as the Black Hills, **to the head-waters of Heart River; thence down Heart River to its mouth;** and thence down the Missouri River to the place of beginning.

It is, however, understood that, in making this recognition and acknowledgement, the aforesaid Indian nations do not hereby abandon or prejudice any rights or claims they may have to other lands; **and further, that they do not surrender the privilege of hunting, fishing, or passing over any of the tracts of country heretofore described**

, and

USACE_ESMT000489

RESOLUTION NO. 16-128
Page Three

WHEREAS, the Indian Claims Commission judicially established the aboriginal title territory described in Article 5 of the 1851 Treaty as the territory of the Teton and Yankton Sioux, see Sioux Tribe v. United States, 15 Ind. Cl. Comm. 577 (1965) (1851 treaty recognized title in the "Sioux or Dahcotah Nation" to approximately 60 million acres of territory situated west of the Missouri River in what is now the states of North Dakota, South Dakota, Nebraska, Wyoming, and Montana); Sioux Nation v. United States, 24 Ind. Cl. Comm. 147 (1970) (The "Sioux or Dahcotah Nation" with which the United States negotiated at Fort Laramie and in which title was recognized by the Treaty of September 17 1851, included the Teton and Yankton divisions of the Sioux. Neither the Yanktonais division, nor any of the four eastern divisions were included in the term "Sioux or Dahcotah Nation"), and

WHEREAS, the Indian Claims Commission also judicially established a 14 million acre, non-treaty territory, between the James and Missouri Rivers, as the aboriginal territory of the Teton and Yanktonai Sioux, see Sioux Nation v. United States, 23 Ind. Cl. Comm. (1970); Sioux Nation v. United States, 23 Ind. Cl. Comm. 419 (1970) (The boundary of the aboriginal title area is described at 23 Ind. Cl. Comm. at 424-25); and

WHEREAS, Native American Graves Protection and Repatriation Act of November 16, 1990 (25 U.S.C. Secs. 3001 et seq.) (NAGPRA) provides in part as follows:

For purposes of this chapter, the term—

(1) "burial site" means any natural or prepared physical location, whether originally below, on, or above the surface of the earth, into which as a part of the death rite or ceremony of a culture, individual human remains are deposited…

(3) "cultural items" means human remains and—
    (A) "associated funerary objects" …
    (B) "unassociated funerary objects" …
    (C) "sacred objects" …
    (D) "cultural patrimony" …

(4) "Federal agency" means any department, agency, or instrumentality of the United States…

(5) "Federal lands" means any land other than tribal lands which are controlled or owned by the United States…

USACE_ESMT000490

RESOLUTION NO. 16-128
Page Four

(7) "Indian tribe" means any tribe, band, nation, or other
organized group or community of Indians…

(14) "Secretary" means the Secretary of the Interior.

(15) "tribal land" means—

(A) all lands within the exterior boundaries of any Indian
reservation…

25 U.S.Code Sec. 3002—Ownership

**Native American human remains and objects.**

The ownership or control of Native American cultural items which are
excavated or discovered on Federal or tribal lands after November 16,
1990, shall be (with priority given in the order listed)—

(1) in the case of Native American human remains and associated
funerary objects, in the lineal descendants of the Native
American; or

(2) in any case in which such lineal descendants cannot be
ascertained, and in the case of unassociated funerary objects,
sacred objects, and objects of cultural patrimony—

(A) in the Indian tribe … on whose tribal land such objects
or remains were discovered;

(B) in the Indian tribe … which has the closest cultural
affiliation with such remains or objects and which, upon
notice, states a claim for such remains or objects; or

(C) if the cultural affiliation of the objects cannot be
reasonably ascertained and if the objects were discovered
on Federal land that is recognized by a final judgment of
the Indian Claims Commission or the United States Court of
Claims as the aboriginal land of some Indian tribe—

(1) in the Indian tribe that is recognized as aboriginally
occupying the area in which the objects were discovered, if
upon notice, such tribe states a claim for such remains or
objects, or

, and

RESOLUTION NO. 16-128
Page Five

WHEREAS, all the bands of the Teton Division and Yankton Division have ownership rights to all cultural items located on federal lands within the aboriginal territory recognized in Article 5 of the 1851 Treaty as well as rights to fish on and pass over the Corps' lands within such territory under Article 5 of the treaty, which includes the territory between the Cannon Ball River and Heart River in North Dakota, and

WHEREAS, all bands of the Teton Division and Yankton Division have ownership rights to all cultural items located on federal lands in the 14 million acre aboriginal title territory located between the Missouri River and the James River, and

WHEREAS, the Oglala Sioux Tribe also has reserved water rights in the Missouri River under the Winter's Doctrine, and the Tribe moreover is the beneficial owner of *Mni Wiconi*, the Oglala Sioux Rural Water Supply System, a water pipeline related and related facilities that supplies drinking water to villages and towns located on the Pine Ridge Indian Reservations, and

WHEREAS, the Dakota Access LLC, a subsidiary of Energy Transfer Partners, LP, of Dallas, Texas ("Dakota Access, LLC) is now constructing an oil pipeline across the Oglala Sioux Tribe's 1851 Treaty territory between the Cannon Ball and Heart River west of the Missouri River in North Dakota, and will cross under the Oahe Reservoir on the Missouri River and be routed eastward between the Missouri River and the James River across the Tribe's aboriginal title area, as judicially established by the Indian Claims Commission, and

WHEREAS, the United States Department of the Army, through the Army Corps of Engineers, is still in the process of approving a permit (a major federal action and undertaking) to allow the Dakota Access, LLC oil pipeline to cross federally held lands held by the Corps within the Oglala Sioux Tribe's judicially established treaty and aboriginal title territories in North Dakota as described above, but Corps has never fulfilled its legal trust responsibilities and obligations:

1) To consult with the Tribe as trustee on a government-to-government basis pursuant to Oglala Sioux Tribal Council Ordinance No. 11-10 regarding the impact the issuance of a permit for the Dakota Access LLC oil pipeline will have on its Winter's Doctrine water rights in the Missouri River, and on the Oglala Sioux Rural Water Supply; and

USACE_ESMT000492

RESOLUTION NO. 16-128
Page Six

2) To consult with the Tribe as trustee on a government-to-government basis pursuant to Ordinance No. 11-10 regarding the impact the issuance of a permit for the Dakota Access, LLC oil pipeline will have on its Winter's Doctrine water rights in the Missouri River and its tributaries, and on the Oglala Sioux Rural Water Supply System; and

3) To consult with the Tribe as trustee on a government-to-government basis pursuant to Ordinance No. 11-10 regarding the impact the issuance of a permit for the Dakota Access LLC oil pipeline will have on rights to fish on and pass over the Corps' lands within the Tribe's 1851 Treaty territory, which includes the territory between the Cannon Ball River and Heart River in North Dakota; and

4) To consult with the Tribe on a government-to-government basis pursuant to President Clinton's Executive Order 13175 and President Obama's Memorandum of November 5, 2009 to fully implement the Executive Order 13175, or Ordinance No. 11-10, regarding the full "Environmental Impact Statement" conducted, or to be conducted, on the issuance of the permit or the rerouted pipeline easement will have on the Tribe's cultural items and burial sites under NAGPRA, the Tribe's Winter's Doctrine water rights in the Missouri River and its tributaries, and the Oglala Sioux Rural Water Supply System and the Section 106 review process of the National Historic Preservation Act of October 15, 1996, P.L. 89-965, Sec. 106, 80 Stat. 915, as amended, and 36 C.F.R. Sec. 800.2; and

WHEREAS, the Sioux Tribes have a right to a government-to-government joint consultation with the Department of the Army, the Army Corps of Engineers, the Department of Justice, the Department of the Interior (BIA, BOR, USFWL), and EPA pursuant to the United States' trust responsibility to the Oglala Sioux Tribe, Art. IV, Sec. 1(a) of the Oglala Sioux Tribe Constitution and By-Laws; President Clinton's Executive Order 13175 and President Obama's Memorandum of November 5, 2009 to fully implement Executive Order 13175, and the Section 106 review process of the National Historic Preservation Act, now

THEREFORE BE IT RESOLVED that the Oglala Sioux Tribe express its thanks, Wopila Tanka, to President Obama, Attorney General Lynch, Secretary Jewell, Army Secretary Fanning and Assistant Secretary Darcy for denying the easement across the Missouri River at the existing Oceti Sakowin camp site and for requiring an EIS for any other oil pipeline route, with due regard for Sioux Nation treaty rights, and

USACE_ESMT000493

RESOLUTION NO. 16-128
Page Seven

BE IT FURTHER RESOLVED, that the Oglala Sioux Tribe calls upon the United States of America to maintain Assistant Secretary Darcy's decision to deny the easement across the Missouri River to DAPL pipeline at the existing route as the final Federal Government action on the current pipeline route, and

BE IT FURTHER RESOLVED, that the Oglala Sioux Tribe, as a Great Sioux Nation tribe and signatory to the 1868 Sioux Nation Treaty and the 1851 Treaty with the Sioux, demands to be consulted on the FULL pipeline EIS (which must be complete and comprehensive in its approach to the protection of treaty rights, water rights, sacred sites, cultural patrimony, hunting and fishing rights, agriculture, and the tribal economy), any future or alternative proposed DAPL oil pipeline and any issue that may potentially affect Great Sioux Nation treaty lands, aboriginal title lands, Missouri River waters, treaty rights, including hunting and fishing, fish and wildlife, agriculture and economic development, sacred sites, cultural properties and burial grounds, and

BE IT FURTHER RESOLVED, that the Oglala Sioux Tribe calls upon the United States of America to honor the 1851 Treaty with the Sioux and the 1868 Sioux Nation Treaty and to avoid any governmental action that will impact our treaty rights, and calls upon the Army Corps of Engineers to clarify that the rule of decision in the DAPL case is that because DAPL will have more than a de minimis impact on Sioux Nation treaty rights, the Corps must deny the application and direct the applicant to seek Sioux Nation approval in accordance with its May 16, 2016 decision in the Lummi Nation opposition to the International Coal Terminal in the Puget Sound, and

BE IT FURTHER RESOLVED, that the Oglala Sioux Tribe calls upon the United States to return all Federal land within the aboriginal and historical Sioux Nation treaty land in the Lake Oahe/Missouri River corridor to the *Oceti Sakowin* or in English, Great Sioux Nation and supports legislation to do so, and

BE IT FURTHER RESOLVED, that pursuant to 25 U.S.C. sec. 3002(a)(2)(C)(1), the Oglala Sioux Tribe puts the United States and its departments and agencies on notice that the Tribe claims joint ownership, along with other Teton, Yanktonai, and Yankton bands of the Sioux Indians, to all the cultural items and burial sites located within its judicially established treaty and aboriginal territory as described in this resolution, and as described on the map attached hereto and incorporated herein by reference as "Exhibit A;", and

RESOLUTION NO. 16-128
Page Eight

BE IT FURTHER RESOLVED, that the Oglala Sioux Tribe hereby petitions the United States acting through the Department of the Army, the Army Corps of Engineers, the Department of Justice, the Department of the Interior (BIA, BOR, USFWL), and EPA to enter into government-to-government consultations with the Oglala Sioux Tribe pursuant to the United States' trust responsibility to the Oglala Sioux Tribe, Art. IV, Sec. 1(a) of the Oglala Sioux Tribe Constitution and By-Laws; President Clinton's Executive Order 13175 and President Obama's Memorandum of November 5, 2009 to fully implement Executive Order 13175, and the Section 106 review process of the National Historic Preservation Act for the following purposes:

1) Recognize the Tribe's judicially established treaty and aboriginal territories in west of the Missouri River, and between the Cannon Ball and Heart Rivers, in the State of North Dakota, where the current planned route of the Dakota Access, LLC oil pipeline will cross; and

2) Recognize the Tribe's judicially established aboriginal territories in east of the Missouri River in the States of North Dakota and South Dakota, where the current planned route of the Dakota Access, LLC oil pipeline will cross; and

3) Recognize that the Tribe has ownership rights to cultural items and burial sites within its judicially established treaty and aboriginal territories both west and east of the Missouri, where the current route of the Dakota Access, LLC oil pipeline will cross; and

4) Recognize that the Tribe has Winter's Doctrine Water Rights in the Missouri River and its tributaries, and that the Missouri River currently supplies potable water to the Pine Ridge Indian Reservation though the *Mni Wiconi*, Oglala Sioux Rural Water Supply System; and

5) Recognize that the Tribe has a treaty right to fish on Corps lands on the Missouri River and its tributaries, and pass over such lands under Article 5 of the 1851 Treaty territory; and

6) Recognize that any alternative route of the Dakota Access, LLC oil pipeline will cross the Tribe's judicially established treaty and aboriginal title territories in North Dakota and South Dakota, as described on the map attached as Exhibit "A;" and

RESOLUTION NO. 16-128
Page Nine

7) Determine exactly what federal lands, beside the Corps held
lands, that exist within the Tribe's judicially established
treaty and aboriginal territories in North Dakota and South
Dakota that will be affected by any easement or permit for a
rerouted Dakota Access LLC pipeline in the Missouri River region;
and

8) Any mitigation plans for breakage of the Dakota Access LLC oil
pipeline exactly how any breakage would be contained to protect
the water, the public health and environment, fish and wildlife,
and the Tribe's cultural items, sacred sites, and burial sites;
and

9) Determine the trust responsibilities the United States and its
agencies have to protect the Tribe's unabandoned cultural items
and burial sites on privately held lands acquired by Dakota
Access LLC for its oil pipeline, which privately held lands are
located within the Tribe's judicially established treaty and
aboriginal territories; and whether a trust responsibility exists
to protect such cultural items and burial sites under the legal
principles established in *Charrier v. Bell*, 496 So.2d 601
(La.App. 1 Cir. 1986) cert denied, 498 So.2d 753 (La. 1986); and

10) Determine to what extent any approval of any future permit to
Dakota Access LLC pipeline will impact the Tribe's treaty
rights, water rights, and rights to make recommendations to
Congress to prevent terrestrial losses, including but not
limited to, losses of cultural and spiritual sites and cultural
resources on lands held by the U.S. Army Corps of Engineers
along both banks of the Missouri River, prior to the full
implementation of Section 6(b) of the Mni Wiconi Act (PL 100-
516; 102 Stat. 2566), as amended in 1994 (108 Stat. 4526), which
provides as follows:

1)   **OAHE AND BIG BEND DAMS AND RESERVOIRS—**

The Secretary, in cooperation with the State of South Dakota,
all Indian tribes residing on reservations within the State of
South Dakota and all other Federal agencies, shall develop and
submit recommendations to the Congress for financing and
implementing mitigation plans for fish and wildlife and
terrestrial losses incurred as a result of the construction and
operation of the Oahe Dam Reservoir and Big Bend Dam and
Reservoir. Such recommendations shall incorporated the proposal

USACE_ESMT000496

RESOLUTION NO. 16-128
Page Ten

of the United States Army Chief of Engineers as outlined in
Design Memorandum M (Gen)-19 of December 1987 for improved
management of existing Federal lands, and purchase of single-
purpose mitigation lands such as the Olson and Muddon Ranches,
from willing sellers.

**The Indian tribes shall be afforded an opportunity to review and
concur with any recommendations affecting their reservations
before they are submitted to Congress;**

11) Allow the Tribe (and other invited Sioux tribes) to voice any
objections that they may have to issuance of the alternative
permit or easement to Dakota Access LLC for any alternative route
for the oil pipeline; and

12) Explain what measures the Corps and the U.S. Department of
Justice has formulated to protect Oglala Sioux tribal members
(water protectors) occupying 1851 Treaty lands claimed by the
Corps north of the Standing Rock Sioux Indian Reservation and
within the Tribe's 1851 Treaty territory from the militarized
attacks by North Dakota law enforcement officers; and

13) Identify any ancillary facts and issues regarding the Dakota
Access LLC oil pipeline that the federal agencies, as the Tribe's
trustee, should disclose and discuss; and

BE IT FURTHER RESOLVED, that the government-to-government
consultation be held by January 27, 2017, and

BE IT FURTHER RESOLVED, that the Department of the Army, the Army
Corps of Engineers, the Department of Justice, the Department of the
Interior (BIA, BOR, USFWL), and EPA in Rapid City, SD on December 14,
2016, and

BE IT FURTHER RESOLVED, that the following tribes are invited and
requested to attend the meeting set forth in this resolution:

1) Cheyenne River Sioux Tribe;
2) Crow Creek Sioux Tribe;
3) Fort Peck Sioux Tribe;
4) Lower Brule Sioux Tribe;
5) Rosebud Sioux Tribe;
6) Santee Sioux Tribe;
7) Standing Rock Sioux Tribe;
8) Yankton Sioux Tribe; and
9) Three Affiliated Tribes of the MHA Nation;

, and

USACE_ESMT000497

RESOLUTION NO. 16-128
Page Eleven

BE IT FURTHER RESOLVED, that the Superintendent of the BIA for the Pine Ridge Agency should assist and attend in setting up a series of government-to-government consultations, and

BE IT FURTHER RESOLVED, that the President of the Oglala Sioux Tribe shall:

1) Coordinate with the Superintendent and the invited tribes in setting up the government-to-government consultation;

2) Providing the invited federal agencies and tribes with a copy of this resolution in accordance with Sections 7 and Ordinance 11-10;

3) Establishing an agenda for the government-to-government consultations;

4) Coordinating with the Tribal Secretary and the Tribal Treasurer in obtaining meeting rooms and providing refreshments for the government-to-government consultations;

BE IT FURTHER RESOLVED, that nothing in this resolution shall be construed as an acceptance of the Docket 148-78 and Docket 74 land claims awards by the Oglala Sioux Tribe or any other Sioux tribe, and

BE IT FURTHER RESOLVED, that Jennifer Hughes, Esq., Hobbes Strauss shall continue to prepare policy and expert materials in support of the Army Corps of Engineers denial of the DAPL pipeline easement in preparation for litigation, in consultation with President Weston, the Tribal Council, Mario Gonzales, Esq. and Mark Van Norman, Esq., which may be necessary if the United States were to change or amend its decision on the denial of said easement, and

I, as the undersigned Secretary of the Oglala Sioux Tribal Council, of the Oglala Sioux Tribe hereby certify that this Resolution was adopted by a vote of: 20 For; 0 Against; 0 Abstain; and 0 Not Voting; during a SPECIAL SESSION held on the 6TH day of DECEMBER, 2016.

RESOLUTION NO. <u>16-128</u>
Page Twelve

DONNA M. SALOMON
Secretary
Oglala Sioux Tribe

A-T-T-E-S-T:

TROY "SCOTT" WESTON
President
Oglala Sioux Tribe

| | |
|---|---|
| **From:** | Tracy, Thomas J CIV USARMY CENWO (US) |
| **To:** | Boyd, Milton W CIV USARMY CEHQ (US); Casner, Melanie L CIV USARMY CEHQ (US); Cooper, David R SES USARMY CEHQ (US); Flachs, Patrick N CIV USARMY USACE (US); Derosa, Jason R CIV USARMY CENWD (US) |
| **Subject:** | FW: [EXTERNAL] Follow-Up ?'s |
| **Date:** | Thursday, December 08, 2016 2:58:18 PM |
| **Attachments:** | P-P Questions .docx |
| | 50 Questions for QRA Study.docx |
| | Questions for Colonel.docx |

Wanted to provide you this request from SRST that grew out of the meeting last Friday. The "P-P Questions" document are the PowerPoint slides used last Friday by the Tribe. ███████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████

Tom
Thomas J. Tracy
District Counsel
U.S. Army Corps of Engineers, Omaha District


PRIVILEGED COMMUNICATION
ATTORNEY-CLIENT
ATTORNEY WORK PRODUCT
DO NOT COPY, FORWARD, OR RELEASE UNDER FOIA



-----Original Message-----
From: Cossette, Brent J CIV USARMY CENWO (US)
Sent: Thursday, December 08, 2016 7:50 AM
To: Tracy, Thomas J CIV USARMY CENWO (US) <Thomas.J.Tracy@usace.army.mil>
Cc: Henderson, John W COL USARMY CENWO (US) <John.W.Henderson@usace.army.mil>; Chipman, David V CIV USARMY CENWO (US) <David.V.Chipman@usace.army.mil>; Mellema, Gregory J CIV USARMY CENWO (US) <Gregory.J.Mellema@usace.army.mil>
Subject: FW: [EXTERNAL] Follow-Up ?'s

Tom:

I am going to start working on the "50 questions" document. ███████████████████████████
███████████████████████████████

Brent Cossette

Natural Resource Specialist
Environmental Stewardship
CENWO-OD-TN
Omaha District
1616 Capitol Avenue Suite 9000
Omaha, NE 68102
Work: 402-995-2712
Cell: 402-709-6446

USACE_ESMT000544

-----Original Message-----
From: Henderson, John W COL USARMY CENWO (US)
Sent: Wednesday, December 07, 2016 1:13 PM
To: Cossette, Brent J CIV USARMY CENWO (US) <Brent.J.Cossette@usace.army.mil>; Tracy, Thomas J CIV
USARMY CENWO (US) <Thomas.J.Tracy@usace.army.mil>
Cc: Chipman, David V CIV USARMY CENWO (US) <David.V.Chipman@usace.army.mil>; Mellema, Gregory J
CIV USARMY CENWO (US) <Gregory.J.Mellema@usace.army.mil>
Subject: FW: [EXTERNAL] Follow-Up ?'s

Brent,

As we discussed; let's put a cogent and comprehensive response together for this myriad of questions/concerns.  If
we can't provide an answer, let's just state the reason why and maybe point them in the right direction.

Let's try to have an initial response drafted within the next 2 weeks.

Thanks,
v/r
COL H

-----Original Message-----
From: Dave Archambault [mailto:joebuckinghorse@gmail.com]
Sent: Wednesday, December 07, 2016 7:32 AM
To: Henderson, John W COL USARMY CENWO (US) <John.W.Henderson@usace.army.mil>
Subject: [EXTERNAL] Follow-Up ?'s

John

First let me say i thank u personnally to no end for the decision that came to not give the easement.  Lots of people
crying is how wonderful it was and can be described.

I tried to send this earlier but i think the sending the whole P/P wudn't go, so i'm resending again.

But u and i know it ain't over.  So the Tribe has to continue its factual quest against the pipeline.  In saying this, I
wud please ask that u follow up on some points that were offered by DAPL's Joey Mahmood.

1. Ask DAPL for a mtg. to discuss how we can get out on site.  He said two inspector w. appropriate credentials.
We want to do this and do it w. 6 or 2 every 8 hrs to monitor for a full day and that we keep it going.  Not just one
day in other words.

2. Need the PHMAS daily report that advises that there is no drilling going on now that there is no easement.
DAPL has stated they are drilling anyway.

We have to be assured that everything has stopped or else our Protectors will stay around and Dave II wants them to
go home.

3. It was mentioned by u and DAPL that we wud be able to see reports on the Pipeline which are not part of the
private info.  Can u give more detail because we wanted to see the design plans but never got them.  Please see
questions which eludes to this.

4. I send u the pages of the P/P that the questions that we asked specifically.  Please look them over and respond
asap or have DAPL respond if they know the answer.

5  I will send u 50 QRA questions that we have and i advised u of.

6. During the mtg. i asked repeatedly for the welding spec that was used by DAPL.

Finally, we got a gentleman to say the pipeline welding was the Section 1104.  The elderly gentleman's name was Eric Anderson or David Johnson.  Can u find out his name for sure.

dave a., sr

USACE_ESMT000546

# Qualitative Risk Assessment Study

### Submitted by SRST

**Overview:** The questions listed below are offered to begin a technical discussion of the "Functional Safety, Risk Based" design review of the DAPL pipeline river-crossing segment. And it should be noted these questions would and should apply to any path of re-route that may ensue because of the recent Decision.

The questions listed begin framing a rigorous application of the methods developed for identifying hazards and for quantifying the consequences of failures together with third party verification which the Tribe would love to perform as an Independent investigator for the safety of the DAPL pipeline.

These questions are meant to complement the Environmental Assessment report with a technical review under the leadership of a tribal government certified, Independent Third Party (I3P) to facilitate a comprehensive, Quantitative Risk Assessment (QRA) study.

The QRA scope shall include a detailed and thorough review of the river crossing inherent risk, selection and design of Independent Protection Layers, Fault Tree Analysis, Failure Mode & Effect Analysis, Common Cause Failure Assessment, and a review of the Safety Management Plan that ensures all safety critical systems are tested and maintained properly over their installed life. The QRA should include a Hazard Identification Study (HAZID), dispersion analysis of various leak scenarios, Verification of IPL Risk Reduction capabilities, a "What If" study and a Hazard Operation Study (HAZOP).

Although not required by law, this detailed review is recommended to demonstrate that the Tribe has done all that is reasonably practicable to move forward with a safe design. To ignore such a study might now be seen as a failure to show "due diligence" given the qualitative nature of the EA report treatment of risk, public concern with the pipeline river crossing, the designation of the river crossing as a High Consequence Area and the uncertainty surrounding the likelihood of crude oil pipeline leaks and ruptures.

**Questions/areas of concern:**

1) Describe the process used to assess the inherent risk the crude pipeline creates if routed under the river crossing as proposed. Please describe the risk in terms of both likelihood and consequence. Was a qualitative "risk matrix used" or was risk defined using quantitative methods?
2) Clarify the criteria used to define the likelihood of a pipeline leak or rupture. Were recent crude oil pipeline leaks and ruptures considered and analyzed to support the likelihood component of risk?

USACE_ESMT000556

3) Specify the quantity of crude oil that may be released from the pipeline before being considered a "leak." What was the minimum acceptable release adopted to carry out the risk analysis? Was the isolation provided by the EIV's on each side of the river considered to reduce the "worst case" crude inventory that could be released?

4) Was the geo-tech survey of the geologic strata that overlays the pipeline considered to define the migration potential for the oil to rise to the water level? What was the software used to model the dispersion of crude oil?

5) Define the allowable level of residual risk accepted as the baseline "tolerable" risk once credit is taken for all reasonable risk prevention and mitigation measures.

6) Outline for us the process used to define the demand rate applied during the risk assessment. How were the safety demand initiators identified and quantified?

7) Identify the "risk gap" that the Independent Protection Layers were required to meet or exceed. What was the total risk reduction target (inherent risk – allowable residual risk)?

8) What risk reduction measures were discussed? How many were rejected and on what basis?

9) What risk reduction measures were accepted?

10) Describe the process used to assign risk reduction targets to each of the Independent Protection Layers. How were the risk targets used during the design of the IPL's to ensure the safety integrity targets were met?

11) Outline for us the approach adopted for the design of the IPL's to address safety integrity targets both quantitatively and qualitatively.

12) How were the frequency of hardware failures within the pipeline and the IPL's predicted?

13) Describe for us the distinction of "safety-critical" and "safety-related" failures considered in the failure analysis.

14) How were systematic failures addressed for each of the IPL's.

15) How were both hardware failures and systematic failures minimized within the IPL designs? What design improvements were considered? What assessment was made as to whether the failures were "as low as reasonably practicable (ALARP)?

16) Were past "random hardware failure" rates considered to model the proposed systems?

17) How were systematic failures considered that are unique to a given system and the "environment" (artic cold in winter, high temperature in summer).

18) Elaborate on the mechanical design of the pipeline segment that crosses under the river given the pipeline diameter, operating pressure, flow rate, crude oil composition and temperature.

19) Provide detail for how the pipeline segment under the river will be inspected for the effects of corrosion and erosion. At what frequency will the pipeline segment be inspected?

20) Discuss the survey for third party underground pipeline and power cables crossing the river. If applicable, what are the minimum distances that

USACE_ESMT000557

separate the DAPL crude oil pipeline and other non-DAPL pipelines/power lines that cross the river?

21) Provide detail of where the change in the pipeline higher strength ASME location class used for the pipeline section that is under the river transitions to a lower location class. Does the change in ASME location class design occur at the Emergency Isolation Valve (EIV) on each side of the river?

22) Explain the philosophy of operation regarding the Emergency Isolation Valves (EIV's) on each side of the river crossing. What is the EIV "fail-safe" state?

23) The EA report stated that the EIV's will be operated from a remote control room. Describe the EIV's communication (hardware and software) with the remote control room in terms of redundancy and fault tolerance provided to ensure the safety function will be carried out.

24) Differentiate between the EIV "remote" controls and the "local" controls. How was the need for training of operators to ensure fast response addressed given the remote location of the EIV's?

25) Were environmentally controlled enclosures provided for the EIV actuators and controls to offer access to the valves for functional testing, maintenance and operations during severe weather?

26) Was an emergency "stop" button function provided for the tribal chairman? Since demands on the system shall be infrequent, failures within the remote communications with the control room may be dormant and persist during the test interval.

27) Describe the EIV actuators. Are they electric motor driven actuators or are they hydraulically operated or are they a hybrid design? What provisions were considered for back-up power supplies, accumulators, etc.?

28) Describe the components of each EIV including the details of valve body design and supplier, actuator design and supplier, peripheral control elements and suppliers. What safety factor was applied to size each EIV actuator? Who verified this was met?

29) Were the EIV's "certified" as suited for a safety critical function?

30) The EA study defined the stroke time for the EIV's as "less than 3 minutes." What requirement drove the stroke time limit of 3 minutes (Process Safety Time)? Was the EIV stroke time considered during the Surge Relief Valve transient flow analysis?

31) Provide a description of the functional testing procedure for each EIV. Identify the prescribed test interval required to meet the risk gap. Was Partial Stroke Testing considered?

32) What was the diagnostic coverage factor used for EIV testing in the Probability of Failure on Demand (PFD) calculations?

33) What measures were taken to reduce the potential for systematic faults within the EIV controls?

34) Clarify for us the process used to select the EIV suppliers. Was consideration given to the track record in similar installations, availability of spare parts and for technical support?

35) Justify the claim within the EA that instrumentation and controls will reduce the risk of pipeline overpressure.

36) What was the basis for conventional pressure relief systems (static conditions)?

37) Given the pipeline carries crude oil, explain the approach taken to reduce the risk of surge during normal operations when pumps are started and stopped and when valves open and close.

38) What control interlocks were designed to ensure the process is operated to reduce surge (EIV's, Surge Relief skids, pump start/stop controls)?

39) Were the interlocks considered high integrity safety interlocks?

40) Given the sensitivity of the river crossing pipeline segment and the provision for automated EIV closure, was transient flow analysis carried out for the purpose of sizing surge relief systems?

41) What was the basis for sizing the surge relief valves (SRV's)? Who was the supplier? Did the supplier validate the SRV sizing?

42) Where were the SRV's located? Will there be Surge Relief Skids on each side of the river to protect the pipeline segment that crosses the river from dangerous surge pressure waves (can exceed 10X the pressure rating of the pipeline)?

43) Was redundancy provided to allow functional testing and maintenance of the SRV's and the control pilots including holding tanks for crude oil discharge?

44) Elaborate on the provision offered and the procedures to allow functional testing of the SRV's while the pipeline is in service.

45) Identify the supplier of the Leak Detection System (LDS).

46) What was the evaluation criteria used to select the LDS technology? Was diverse sensor technology deployed?

47) Clarify if the LDS performance was verified in a similar service and environment. What were the results of the technology evaluation?

48) Was the selected LDS technology "proven-in-use" or does the LDS carry a third party certification for use in safety critical applications?

49) The EA described a process of testing and calibration of the LDS computer models during commissioning of the pipeline. Outline the process to "re-calibrate" the LDS given changes to the crude oil flow rate, quality, and pipeline characteristics over time. Will permanent "testing provisions" be installed within the pipeline river crossing segment that allow removal of crude oil during normal operations for the purpose of Leak Detection System performance verification?

50) Considering the need to revalidate all the independent safety layers continuously over the installed life of the pipeline, and the remote location of the pipeline river crossing, what steps were taken to develop the "local" talent pool to monitor, test, maintain and report IPL performance?

USACE_ESMT000559



United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

DEC 0 4 2016

IN REPLY REFER TO

M-37038

Memorandum

To:        Secretary

From:      Solicitor

Subject:   Tribal Treaty and Environmental Statutory Implications of the Dakota Access
           Pipeline

        The United States Army Corps of Engineers (Corps) is conducting ongoing review of
legal authorizations necessary for the Dakota Access Pipeline (DAPL) project to cross the
Missouri River underneath Lake Oahe pursuant to Section 14 of the Rivers and Harbors Act of
1899 (Section 408).[1] Section 185 of the Mineral Leasing Act (MLA), and tenets of federal Indian
law.[2] The Department of the Interior has special expertise concerning the government-to-
government relationship between the United States and Indian tribes, the MLA's requirements
for granting pipeline right-of-ways. and related environmental and land use statutes.  The Corps
has solicited the Department's opinion on the extent to which tribal treaty rights of the Standing
Rock Sioux Tribes and Cheyenne River Sioux Tribes (Tribes) weigh in favor of or against
authorizations needed for the Lake Oahe crossing, as well as any related considerations under the
MLA and other applicable authorities.[3] At the request of the Secretary of the Interior to analyze
federal law relevant to the Corps' determination, this Memorandum responds to that request.

## I.  Introduction.

        DAPL is an approximately 1,100-mile long crude oil pipeline beginning near Stanley,
North Dakota and ending at Patoka, Illinois.[4] In July 2016, the Corps released an Environmental

---

[1] 33 U.S.C. § 408.

[2] 30 U.S.C. § 185.

[3] The MLA authorizes the Secretary of the Interior to grant or renew rights-of-way or other permits for oil and gas
pipelines crossing the surface of Federal lands that are "administered by the Secretary" or "by two or more Federal
agencies." 30 U.S.C. § 185(c)(2).  The Secretary's authority is generally exercised by the Bureau of Land
Management, which has promulgated detailed regulations relating to rights-of-way under the Mineral Leasing Act.
*See* 43 C.F.R. pt. 2880.

[4] *See generally* U.S. ARMY CORPS OF ENGINEERS, ENVIRONMENTAL ASSESSMENT, DAKOTA ACCESS PIPELINE
PROJECT, CROSSINGS OF FLOWAGE EASEMENTS AND FEDERAL LANDS 3 (July 2016) [hereinafter cited as "Final
EA"].

1

USACE_ESMT000565

Assessment (EA) that evaluated a proposed Section 408 permit that would allow the DAPL pipeline to cross a federal flood control project.[5] In the EA, the Corps considered a pipeline route that would cross Lake Oahe, a manmade lake on the Missouri River, at a site approximately 0.55 miles upstream from the Standing Rock Sioux Reservation[6] and seventy miles upstream from the Cheyenne River Sioux Reservation.[7] The Corps ultimately issued the Section 408 permit for that crossing. In addition, in order for the pipeline to cross federal property, the Corps would have to issue a right-of-way under the MLA. To date, it has not done so.

On September 9, 2016, the Corps issued a statement in conjunction with the Department of Justice and the Department of the Interior concerning the DAPL project. The Corps stated that it would "not authorize constructing the Dakota Access pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other federal laws."[8]

On November 14, 2016, the Corps issued a letter to the Standing Rock Sioux Tribe, Energy Transfer Partners, L.P., and Dakota Access LLC, informing the parties that the Corps had completed the review initiated pursuant to the September 9 joint statement.[9] The Corps concluded that prior to authorizing further work on the DAPL project, and per the Corps' discretionary authority to place conditions on pipeline rights-of-ways crossing federal lands,[10] the Corps was moving to a "second phase" of DAPL review.

---

[5] *See generally id.* Section 408 authorizes the Corps to permit the crossing so long as it would neither injure the public interest nor impair the usefulness of the project.
[6] *Id.* at 75.
[7] Intervenor-Plaintiff Cheyenne River Sioux Tribe's First Amended Complaint for Declaratory and Injunctive Relief, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, Case No. 1:16-cv-1534-JEB (Sept. 8, 2016) 28 [hereinafter "Cheyenne River Brief"]. Lake Oahe serves as part of the eastern border of both the Standing Rock Sioux and the Cheyenne River Sioux Reservations.
[8] Joint Statement from the Department of Justice, the Department of the Army, and the Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, *available at* https://www.justice.gov/opa/pr/joint-statement-department-justice-department-army-and-department-interior-regarding-standing (Sept. 9, 2016).
[9] Letter from Jo-Ellen Darcy, Assistant Sec'y of the Army (Civil Works) to the Honorable Dave Archambault II, Chairman, Standing Rock Sioux Tribe, Kelcy Warren, Chairman and CEO, Energy Transfer Partners, L.P., and Joey Mahmoud, Executive Vice President, Dakota Access LLC (Nov. 14, 2016).
[10] *See generally* 30 U.S.C. § 185. When authorizing pipeline rights-of-way under the MLA, the authorizing federal agency "shall require" appropriate environmental protections, including to control or prevent "damage to the environment," *id.* § 185(h)(2)(C)(i), and "to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes." *Id.* § 185(h)(2)(D).

USACE_ESMT000566

This second phase would include a closer evaluation of the risk of a spill at the Lake Oahe pipeline crossing, and would explore potential conditions on an easement for the Lake Oahe pipeline crossing that could reduce the risk of a spill or rupture, hasten detection and response to any possible spill, or otherwise enhance the protection of Lake Oahe and relevant tribal water supplies and treaty rights. The Corps would also consider whether granting an easement at the Lake Oahe crossing would be appropriate.[11] In the meantime, the Corps stated that "construction on or under Corps land bordering Lake Oahe cannot occur because the Army has not made a final decision on whether to grant an easement."[12] The Corps explained that this second round of additional analysis was "warranted in light of the history of the Great Sioux Nation's dispossessions of lands, the importance of Lake Oahe to the Tribe, the government-to-government relationship, and the statute governing easements through government property."[13]

As noted, the Secretary of Interior requested that I issue this Memorandum analyzing federal environmental statutes and federal Indian law relevant to the Corps' ongoing analysis of the DAPL project. In brief, multiple federal court cases demonstrate that: (1) the statutes that created Lake Oahe did not diminish either the Cheyenne River or Standing Rock Sioux Reservations; (2) portions of the land taken to create Lake Oahe are within the boundaries of both reservations; and (3) Congress explicitly recognized and preserved Sioux treaty hunting and fishing rights in the Lake Oahe statutes. In addition, the Tribes retain reserved water rights under federal law. Although these rights have not yet been adjudicated or quantified through a congressionally authorized settlement, on-reservation Lake Oahe is an obvious storage location for such rights. Since the Tribes retain rights associated with Lake Oahe, the Corps must consider the possible impacts of its DAPL permitting decisions on these reserved hunting, fishing, and water rights. In addition, federal laws like NEPA[14] contain separate safeguards through which agencies must evaluate impacts to tribal treaty rights and interests prior to authorizing projects like the DAPL.

The Corps enjoys broad discretion under the MLA to decline a requested use of an interest in federal land.[15] The exercise of this discretionary authority certainly can include additional analysis, beyond what was considered in the existing EA for the Section 408 decision,

---

[11] United States Army Corps of Engineers, Statement Regarding the Dakota Access Pipeline, *available at* http://www.usace.army.mil/Media/News-Releases/News-Release-Article-View/Article/1003593/statement-regarding-the-dakota-access-pipeline/ (Nov. 14, 2016).

[12] *Id.*

[13] *Id.*

[14] 42 U.S.C. § 4321 *et seq.*

[15] *See, e.g., Udall v. Tallman*, 380 U.S. 1, 4 (1965) (noting that the MLA "gave the Secretary of the Interior broad power to issue oil and gas leases on public lands" and "left the Secretary discretion to refuse to issue any lease at all on a given tract"); *W. Energy All. v. Salazar*, No. 10-cv-0226, 2011 U.S. Dist. LEXIS 98380, at *16 (D. Wyo. June 29, 2011) (noting the "longstanding recognition of the legal principle of broad Secretarial discretion under the MLA").

USACE_ESMT000567

of the DAPL's potential social, cultural, and environmental impacts on protected treaty rights and senior Indian water rights. This is especially true in light of the United States' role as trustee to the Standing Rock and Cheyenne River Sioux Tribes.

For the reasons articulated below, I believe that the Corps has ample legal justification to decline to issue the proposed Lake Oahe easement on the current record. The Corps would be equally justified in suspending or revoking the existing Section 408 permit as it relates to the Lake Oahe crossing. In the alternative, a decision to issue the easement should not be made pending the Corps taking the following actions:

    (1) Engage in government-to-government consultation with the Tribes on the proposal to locate the pipeline upstream and within 0.5 miles of the Standing Rock Sioux Reservation in order to determine whether the location or any other aspect of the pipeline project would infringe upon the Tribes' rights. The Corps' November 14th letter prioritizes tribal consultation and input, and the Corps should follow through with these goals and promptly engage with the Tribes to determine a consultation schedule and to discuss the Tribes' role in the determination moving forward. Based on the Department of the Interior's experience, I do not believe that this can be effectively carried out in an artificially constrained time frame.

    (2) Conduct additional NEPA analysis that adequately evaluates the existence of and potential impacts to tribal rights and interests. This should be done through an Environmental Impact Statement (EIS) that will allow for robust tribal and public engagement. As part of this analysis, the Corps should consider a broader range of alternative pipeline routes, evaluate in detail the originally-considered route ten miles north of Bismarck, North Dakota, and consider how the Corps' original rationales for rejecting that alternative route do not apply with equal force to the pipeline route that passes within a half mile from tribal lands (for example, concern for drinking water impacts, Environmental Justice concerns, protecting wildlife and wetlands, etc.). The Corps also should include in this additional NEPA review a catastrophic spill analysis prepared by an independent expert that evaluates the risk of a rupture in the underground portion of the pipeline and in close proximity thereof; and

    (3) Assess the DAPL's impact on tribal rights, lands, and resources, including the socio-economic impacts to the Tribes, in a more comprehensive manner under the "public interest" evaluation required as part of the Section 408 process in light of the fact that the reservation is a permanent homeland for the Tribes, as well as other federal obligations towards the Tribes.

USACE_ESMT000568

Based on my review of documents to date, it appears that the permit applicant believes that the existing analysis considers all potential environmental impacts and mitigates for all risk even if that consideration is not based on express recognition of the tribal interests discussed herein. As explained below, however, these latter concerns are not a matter of mere semantics. The government-to-government relationship between the United States and the Tribes calls for enhanced engagement and sensitivity to the Tribes' concerns. The Corps is accordingly justified should it choose to deny the proposed easement, suspend or revoke the existing Section 408 permit, or both.

## II. Discussion.

This Memorandum proceeds in several parts. First, I provide a detailed analysis that concludes that portions of Lake Oahe are located on both the Standing Rock and Cheyenne River Sioux Reservations, and that the Tribes retain treaty hunting, fishing, and reserved water rights in the Lake. Second, I discuss how the nature and scope of the United States' trust relationship with the Tribes warrants additional review here. Third, I evaluate additional considerations related to the DAPL's potential environmental impacts on the Tribes' guaranteed hunting, fishing, and water rights, as well as on other tribal interests, necessitated by NEPA. Fourth, I discuss ongoing public interest issues that further counsel the Corps' broader consideration of tribal rights and interests. Finally, I raise additional factual and procedural clarifications relevant to the Corps' determination.

### 1.  Sioux treaty rights in Lake Oahe.

#### i.  Applicable law.

The Fort Laramie Treaties of 1851[16] and 1868[17] established the original boundaries of the Great Sioux Reservation. In relevant part, these Treaties set the eastern boundary of the reservation as "commencing on the east bank of the Missouri River . . . thence along low-water mark down said east bank."[18] The Treaties also guaranteed the Sioux "the privilege of hunting, fishing, or passing over any of the tracts of country" ceded to the United States.[19]

---

[16] 11 Stat. 749 (1851).
[17] 15 Stat. 635 (1868).
[18] 15 Stat. 636. *Accord* 11 Stat. 750 (delineating eastern border as "commencing the mouth of the White Earth River, on the Missouri River," and ultimately ending "thence down the Missouri River to the place of beginning").
[19] 11 Stat. 750. *Accord* 15 Stat.639 (although the signatory tribes "stipulate that they will relinquish all right to occupy permanently the territory outside their reservation as herein defined," they nevertheless "reserve the right to hunt on any lands north of North Platte, and on the Republican Fork of the Smoky Hill River").

USACE_ESMT000569

Congress subsequently passed numerous statutes affecting the Great Sioux Reservation. Relevant here, the Act of March 2, 1889[20] (1889 Act) removed a substantial amount of land from the Reservation and divided the remaining territory into several smaller reservations for various Sioux bands, including Cheyenne River, Standing Rock, and Lower Brule.[21]  The 1889 Act preserved all provisions of the Fort Laramie Treaties that were "not in conflict" with the newly enacted statute,[22] but did not specifically address hunting and fishing rights.  The Act also set the eastern border of the Cheyenne River, Standing Rock, and Lower Brule Sioux[23] Reservations as being "the center of the main channel" of the Missouri River.[24]

In 1944, Congress enacted the Flood Control Act,[25] which, in relevant part, authorized a comprehensive flood control plan for the Missouri River called the "Missouri River Basin Project."  As the United States Court of Appeals for the Eighth Circuit explained:

> The 1944 Act did not authorize the acquisition of Indian property, but seven
> subsequent statutes authorized limited takings of Indian lands for specific
> hydroelectric and flood control dams on the Missouri River in North and South
> Dakota.  These dams created huge lake-like reservoirs to control the Missouri
> River's seasonal flooding and to end the periodic devastation caused
> downstream.[26]

Four such "takings" statutes applied to the Standing Rock, Cheyenne River, and Lower Brule Reservations.[27]  Among other things, all four Acts recognize the Tribes' right to "hunt and fish in and on the aforesaid shoreline and reservoir [created by the Acts], subject, however, to regulations governing the corresponding use by other citizens of the United States,"[28] and state that payment for the lands at issue would be "in settlement of all claims, rights, and demands" of the Tribe and individual Indians associated with the Act.[29]  Three of the four Acts (the Oahe Acts and Big Bend) also included variations of a clause taking "title to any interest Indians may have

---

[20] 25 Stat. 888.

[21] *See South Dakota v. Bourland*, 508 U.S. 679, 682 (1993).

[22] *Id.* at 682 (citing 25 Stat. 896).

[23] While this Memorandum does not consider the interests of the Lower Brule Tribe with regard to the DAPL project, federal court decisions interpreting the Lower Brule statutes are nevertheless instructive.

[24] 25 Stat. 889.

[25] Pub. L. No. 78-534, 58 Stat. 887 (1944).

[26] *Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809, 813 (8th Cir. 1983).

[27] *See* Big Bend Act, Pub. L. No. 87-734, 76 Stat. 698 (1962); Fort Randall Dam and Reservoir Act, Pub. L. No. 85-923, 72 Stat. 1773 (1958); Standing Rock Oahe Act, Pub. L. No. 85-915, 72 Stat. 1762 (1958); Cheyenne River Oahe Act, Pub. L. No. 81-776, 68 Stat. 1191 (1954).  For ease of reference, and where applicable, I will refer to the Standing Rock Oahe Act and Cheyenne River Oahe Act collectively as the "Oahe Acts," and to the Fort Randall and Big Bend Acts, which affected the Lower Brule Reservation, collectively as the "Lower Brule Acts."

[28] 76 Stat. 701; 72 Stat. 1774; 72 Stat. 1764; 68 Stat. 1193.

[29] 72 Stat. 1173; 68 Stat. 1191.

USACE_ESMT000570

in the bed of the Missouri River so far as it is within the boundaries" of the reservation at issue.[30] Three of the four Acts (the Oahe Acts and Fort Randall) further authorize the Secretary of the Interior to purchase land for displaced Indians and state that the "land selected by and purchased for individual Indians may be either inside or outside the boundaries of the [reservation] as diminished."[31]

### ii. Lands taken to create Lake Oahe remain on-reservation.

As noted above, the 1889 Act set the eastern boundaries of the Standing Rock and Cheyenne River Reservations as the "center of the main channel" of the Missouri River. When adjudicating boundary disputes, the United States Supreme Court has held that statutory phrases "middle of the" river, "middle of the main channel" of the river, and "the center of the main channel of that river" all synonymously refer to the middle of the main channel of a river.[32] Numerous other courts have similarly held that boundaries demarcated as the "center" of a river extend to the center point of the main navigable channel, rather than, for example, at the riverbank or the deepest point the waterway,[33] including in a case specific to the Sioux bands covered by the 1889 Act.[34] Absent an Act of Congress adjusting the reservation boundary, and subject to a determination of the precise location of the main channel of the Missouri River in relation to Lake Oahe, these cases establish that a significant portion of Lake Oahe remains within the outer boundary of the Standing Rock and Cheyenne River Sioux Reservations.

Evaluating exactly this issue, courts have recognized that the Flood Control Act takings statutes did not diminish their associated reservations.[35] For example, in *Lower Brule*, the Eighth Circuit expressly concluded that neither of the Lower Brule Acts disestablished the boundaries of

---

[30] *See* 76 Stat. 698 (taking title to "any interest the tribe or Indians may have within the bed of the Missouri River so far as it is within the boundaries of the [Lower Brule] reservation"); 72 Stat 1762 (taking title to "any interest Indians may have in the bed of the Missouri River so far as it is within the boundaries of the Standing Rock Reservation"); 68 Stat. 1191 (taking title to "the bed of the Missouri River so far as it is the eastern boundary of said Cheyenne River Reservation").

[31] 76 Stat. 698; 72 Stat. 1764; 72 Stat. 1764; 68 Stat. 1193.

[32] *Iowa v. Illinois*, 147 U.S. 1, 10-11 (1893).

[33] *See, e.g., Arkansas v. Tennessee*, 246 U.S. 158, 177 (1918) (when treaty boundary was "a line drawn along the middle of the River Mississippi," boundary remained in former middle channel even if subsequently affected by avulsion); *Uhlhorn v. U.S. Gypsum Co.*, 366 F.2d 211, 217 (8th Cir. 1966) (holding that "where a navigable river is the boundary between states the true line is the middle or thread of the main channel of the river."); *State v. Wetzel*, 756 N.W.2d 775, 778 (N.D. 2008) (rejecting argument that "center" language ended reservation at riverbank).

[34] *See United States v. Big Eagle*, 684 F. Supp. 241, 243-44 (D.S.D. 1988) (holding that the "center of the main channel of the Missouri River" clause in the 1889 Act created a definable boundary for the purposes of tribal criminal jurisdiction).

[35] In addition, the United States Supreme Court held that the 1908 Cheyenne River Act, Act of May 29, 1908, ch. 218, 35 Stat. 460 *et seq.*, which opened both Reservations to homesteading, did not diminish the Cheyenne River Sioux Reservation. *Solem v. Bartlett*, 465 U.S. 463 (1984).

USACE_ESMT000571

the Lower Brule Reservation. Noting that Congress must "unequivocally express[] intent to disestablish a reservation's boundaries" and that such intent "can be found only if there is operative statutory language that is 'precisely suited' to the purpose of disestablishment and this purpose is confirmed by the Act's legislative history and surrounding circumstances,"[36] the court ruled that language stating that the United States was taking "the entire interest . . . [and] any interest the tribe or Indians may have within the bed of the Missouri River" and was settling "all claims, rights, and demands of the tribe" did not demonstrate congressional intent to diminish the reservation.[37] The court further held that statutory authorization for the United States to purchase and sell certain lands "either inside or outside the [reservation] boundaries as diminished" was ambiguous at best, as a reservation "may be diminished in land size by sale of portions thereof to non-Indians without changing the reservation's boundaries."[38]

In the same fashion, *Lower Brule* strongly suggests that neither of the Oahe Acts diminished the Standing Rock or Cheyenne River Reservation boundaries. Congress passed the Oahe Acts pursuant to the Flood Control Act, the same authorizing legislation as the Lower Brule Acts. As the Oahe Acts were enacted for identical purposes, and with nearly verbatim language in the relevant clauses, the *Lower Brule* court expressly rejected the State of South Dakota's argument that minor wording distinctions between the Acts were of legal significance. Rather, and citing the Standing Rock Oahe Act, the court held that variations in phrasing should be attributed to "the different format" of the Acts, "coupled with a simple difference in drafting style," rather than to congressional intent to delineate different rights for the different tribes.[39] As such, the *Lower Brule* court's analysis as to why the Lower Brule Acts did not diminish the Lower Brule Reservation is equally applicable as to why the Oahe Acts did not diminish the Standing Rock or Cheyenne River Sioux Reservations.[40] Lake Oahe accordingly remains, at least in part, within the Standing Rock and Cheyenne River Sioux Reservations.[41]

The United States Supreme Court's decision in *Bourland* affirms this reading of the Oahe Acts. In *Bourland*, the Court examined whether the Cheyenne River Oahe Act abrogated the Cheyenne River Sioux Tribe's authority to regulate non-Indian hunting and fishing in the lands

---

[36] *Lower Brule*, 771 F.2d at 817.

[37] *Id.* at 816-17

[38] *Id.* at 819-20 (citing *United States ex rel. Condon v. Erickson*, 478 F.2d 684 (8th Cir. 1973)).

[39] *Id.* at 821 n.13.

[40] *See also South Dakota v. Ducheneaux*, Civ. No. 88-3049, 1990 U.S. Dist. LEXIS 20834, at *35 (D.S.D. Aug. 21, 1990) (rejecting the State's argument that the Cheyenne River Oahe Act disestablished the reservation in part because "a conveyance to the United States of all of the Tribe's interests in the project lands is not a clear expression of disestablishment of the reservation boundaries when followed by a litany of reserved rights and privileges").

[41] *Id.* at *36 ("The [Cheyenne River Oahe] Act's legislative history does not evince a congressional intention to alter reservation boundaries.").

USACE_ESMT000572

taken under the Act.[42]   There, the Supreme Court ultimately concluded that the Flood Control Act and the Cheyenne River Oahe Act abrogated the Tribe's right to assert such regulatory jurisdiction over non-Indians within the taken territory.[43]   In doing so, the Court applied two earlier decisions, *Montana v. United States*[44] and *Brendale v. Confederated Tribes and Bands of Yakima Nation*,[45] which established rules for when Indian tribes retain regulatory jurisdiction over *on-reservation land* that is owned by non-Indians.[46]   As the Court noted, "*[l]ike this case, Montana* concerned an Indian Tribe's power to regulate non-Indian hunting and fishing *on lands located within a reservation* but no longer owned by the Tribe or its members."[47]

But importantly, that passage underscores the fact that the Court did not frame *Bourland* as a dispute over whether the abrogation of tribal jurisdiction was the result of the Cheyenne River Oahe Act's diminishment of the Cheyenne River Reservation – a question that the Court has considered on multiple occasions and clearly understands how to analyze.[48]   Rather, the Court acknowledged that while the Cheyenne River Oahe Act may have altered the Tribe's on-reservation *jurisdiction* over non-Indian activity, it did not alter the *boundaries* of the Cheyenne River Sioux Reservation.[49]   The question was about the Tribe's authority over such on-reservation lands, thus demonstrating that the Cheyenne River Sioux territory taken to create Lake Oahe remains on-reservation.[50]

As the *Lower Brule* court noted, though, the fact that the Flood Control Act taking statutes did not disestablish their associated reservations does not necessarily mean that tribal

---

[42] Specifically, the Court was considering the "104,420 acres of its trust lands, including roughly 2,000 acres of land underlying the Missouri River." *Bourland*, 508 U.S. at 683.

[43] As discussed *infra*, the Court nevertheless concluded that even if the acts had extinguished the Tribe's regulatory jurisdiction over non-Indians, it had not extinguished the Tribe's retained treaty hunting and fishing rights.

[44] 450 U.S. 544 (1981).

[45] 492 U.S. 408 (1989).

[46] *Bourland*, 508 U.S. at 688-89.

[47] *Id.* at 688 (emphasis added); *accord Ducheneaux*, 1990 U.S. Dist. LEXIS 20834 at *45-52 (determining that *Montana* was the relevant analysis for the purposes of adjudicating regulatory jurisdiction over non-member hunting and fishing in lands taken under the Cheyenne River Oahe Act).

[48] *See, e.g., Nebraska v. Parker*, 136 S. Ct. 1072 (2016) (reservation had not been diminished and tribe retained jurisdiction to apply liquor ordinance to on-reservation vendors); *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998) (reservation had been diminished and state environmental regulations applied); *Hagen v. Utah*, 510 U.S. 399 (1994) (reservation had been diminished and criminal defendant was thus subject to state jurisdiction).

[49] *See also Bourland*, 508 U.S. at 698, 698 n.1 (Blackmun, J., dissenting) (noting that the lower courts had determined that the Cheyenne River Sioux Act did not diminish the Cheyenne River Reservation and that the State had not appealed that point).

[50] While *Bourland* only addressed the Cheyenne River Oahe Act, as noted *supra*, the Standing Rock Oahe Act contained nearly (if not exactly) verbatim language to the relevant clauses in the Cheyenne River Oahe Act.  As the Supreme Court has held, it is implausible that the United States would treat two signatories to the same treaty differently when subsequently addressing their rights over the same territory (here, Lake Oahe).  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 199 (1999).

USACE_ESMT000573

treaty hunting and fishing rights survive in the taken lands.[51]  But in accordance with the *Bourland* and *Lower Brule* courts, I conclude that the Standing Rock and Cheyenne River Sioux Tribes retain their preexisting on-reservation hunting and fishing rights in the land used to create Lake Oahe.

### iii.  The Oahe Acts recognize Standing Rock and Cheyenne River Sioux treaty hunting and fishing rights in Lake Oahe.

As a general rule, Indian tribal members enjoy on-reservation hunting and fishing rights unless such rights were clearly relinquished by treaty or act of Congress.[52]  Because the Treaties of Fort Laramie explicitly guarantee on-reservation Sioux hunting and fishing rights,[53] those rights exist with regard to Lake Oahe absent "'clear evidence that Congress actually considered a conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'"[54]

As the Supreme Court held in *Bourland*, there is no evidence that Congress sought to extinguish Standing Rock and Cheyenne River on-reservation hunting and fishing rights via the Oahe Acts (or any other statute).[55]  Rather, the Court explicitly held that "[t]he Cheyenne River Act reserved some of the Tribe's original treaty rights in the former trust lands (including the right to hunt and fish). . . ."[56]  Specifically, the Court ruled that the clause in the Cheyenne River Oahe Act (also found verbatim in the Standing Rock Oahe Act) confirming the Tribes' right to "hunt and fish in and on the aforesaid shoreline and reservoir [of Lake Oahe]"[57] was "an explicit statutory command" that the Cheyenne River Sioux retained the treaty right to hunt and fish in the land taken under the Oahe Act.[58]

---

[51] *Lower Brule*, 771 F.2d at 821.

[52] *United States v. Dion*, 476 U.S. 734, 738 (1986).

[53] *See, e.g., Lower Brule*, 771 F.2d at 821 ("When Congress established the Lower Brule Reservation in the 1868 Fort Laramie Treaty, the Lower Brule Sioux acquired the right to hunt and fish on the reservation free of state law."); *Bourland*, 508 U.S. at 688.

[54] *United States v. Brown*, 777 F.3d 1025, 1034 (8th Cir. 2015) (quoting *Dion*, 476 U.S. at 750).  As noted, the 1889 Act was entirely silent as to hunting and fishing and thus cannot demonstrate "clear evidence" to diminish those rights.

[55] I note that the U.S. District Court for the District of Columbia has held, and the D.C. Circuit affirmed, that the 1889 Act extinguished Sioux interests in Great Sioux Reservation lands that were not included in the six reservations created by that Act. *Oglala Sioux Tribe v. U.S. Army Corps of Eng'rs*, 537 F. Supp. 2d 161 (D.D.C. 2008), *aff'd, Oglala Sioux Tribe of the Pine Ridge Indian Reservation v. U.S. Army Corps of Eng'rs*, 570 F.3d 327 (D.C. Cir. 2009).  Because this holding only applied to off-reservation rights, it is inapposite to the current analysis.

[56] *Bourland*, 508 U.S. at 697.

[57] 72 Stat. 1764; 68 Stat. 1193.

[58] *Bourland*, 508 U.S. at 690.  The court contrasted the explicit retention of hunting and fishing rights to regulatory jurisdiction over non-Indian hunting and fishing, for which there was no explicit retention clause, and held that the former survived while the latter did not. *See also United States v. Aanerud*, 893 F.2d 956, 961 (8th Cir. 1990) (upholding a U.S. Fish and Wildlife Service policy allowing tribal members, but not other members of the public, to

USACE_ESMT000574

The *Lower Brule* court similarly ruled that the Lower Brule Acts preserved Lower Brule treaty hunting and fishing rights. The court rejected the State's contention that the statutory relinquishment of the Lower Brule Tribe's "entire interest" in the taken territory extinguished hunting and fishing rights, reasoning instead that "the Tribe's treaty hunting and fishing rights are severable from their treaty rights to exclusively own, occupy and utilize the land granted to them as a reservation."[59] The court further rejected the State's same argument concerning the statutory qualification of Lower Brule hunting and fishing rights as "subject . . . to regulations governing the corresponding use by other citizens of the United States," noting that congressional intent evidenced that that language and its associated legislative history was at best ambiguous.[60] The court accordingly concluded that the Lower Brule Acts had not "abrogated the treaty right of the Lower Brule Sioux to hunt and fish free of state regulation within the Fort Randall and Big Bend taking areas. . . ."[61]

These cases establish that neither the Oahe Acts nor the Flood Control Act extinguished Sioux tribal hunting and fishing rights over the taken territory. As the *Lower Brule* court held:

> The Fort Randall and Big Bend projects, *as well as the other dam and reservoir projects in the Missouri River Basin Project*, were developed under the general authority created by Congress in the Flood Control Act of 1944. Pub. L. No. 78-534, 58 Stat. at 887 (codified as amended at 16 U.S.C. § 460d (1976)). The Act created a general scheme of federal, not state, regulation of the flood control projects it authorized. The Act, enacted in response to national needs, contemplated that the United States would pay for the acquisition of land for the projects and would pay for construction of the dams, authorized the Army Corps of Engineers and Secretary of the Army (then Secretary of War) to operate the projects, and provided that the Secretary of the Army should enact and enforce regulations to safeguard the projects. Such a system of federal regulation is inconsistent with an abrogation of the Indians' treaty rights to hunt and fish on their reservations free of state regulation, and the 1944 Act reveals no congressional intent to abrogate those rights.[62]

---

harvest natural resources on refuge lands located within the tribe's reservation based on implied tribal hunting and gathering rights).

[59] *Lower Brule*, 771 F.2d at 823. The court also distinguished a previous case in which "entire interest" statutory cessions were interpreted as a blanket termination of rights by noting that in those cases, the statutes at issue had also diminished the reservation over the land in context. *Id.* at 822-24 (citing *Red Lake Band of Chippewa Indians v. Minnesota*, 614 F.2d 1161 (8th Cir. 1980)). As discussed *supra*, the Oahe Acts did not diminish either the Standing Rock or Cheyenne River Reservations and *Red Lake Band* is equally inapposite here.

[60] *Id.* at 824.

[61] *Id.* at 827.

[62] *Id.* at 824-26 (emphasis added).

11

USACE_ESMT000575

Legislative history specific to the Oahe Acts similarly does not demonstrate any intent to abrogate treaty hunting and fishing rights. Congress noted that the financial remuneration clauses in the Standing Rock Oahe Act were intended to compensate the Tribe for the "disruption of the Indian economy and way of life, and reduction in subsistence in terms of the permanent loss of timber, wildlife, and natural products."[63] As revealed in the corresponding House Report, in order to make up for this loss of wildlife, the hunting and fishing clause in the Standing Rock Oahe Act (contained verbatim in the Cheyenne River Oahe Act) preserved the *"treaty right to hunt and fish in and on the taking area and the reservoir."*[64] While the Standing Rock Sioux, Department of the Interior, and the Corps all disagreed with one another as to the scope of that hunting and fishing right,[65] both *Bourland* and *Lower Brule* affirmed that the Standing Rock Oahe Act preserved the tribal right to hunt and fish free of state jurisdiction on the lands used to create Lake Oahe.

Similarly, the Cheyenne River Oahe Act's legislative history notes that Congress required that the final bill "contain provisions . . . for protecting Indian treaty rights in relation to hunting, fishing, and trapping, and . . . for giving the Indians access below the actual taking line of the Oahe Reservoir," and further provide for the "preservation of any treaty rights of the tribe in regard to fishing, hunting, and trapping. . . ."[66] At best, and particularly interpreted in light of *Bourland* and *Lower Brule*, this legislative history demonstrates congressional intent to maintain tribal treaty hunting and fishing rights in the taken territory. And at worst, the legislative history is ambiguous, which, as discussed *infra*, must be interpreted in favor of the Sioux.

The lack of any specific language in the Oahe Acts that would abrogate tribal treaty hunting and fishing rights is significant, as Congress has explicitly extinguished Sioux treaty hunting rights in the past. For example, the Act of February 28, 1877,[67] which ceded over seven million acres of territory in the western Great Sioux Reservation to the United States, provided that the Sioux "do hereby relinquish and cede to the United States all the territory lying outside the said reservation, as herein modified and described, *including all privileges of hunting. . . .*"[68]

---

[63] 85 CONG. REC. 15,019 (1958) (statement of Rep. Berry).

[64] H.R. REP. NO. 85-1888, at 12 (1958) (emphasis added). While the House Report noted that the Corps opposed the Indians' "free and exclusive access" to the shoreline and recommended that the State have jurisdiction over treaty hunting and fishing in the taken territory, *id.* at 20, the *Lower Brule* court considered identical language in the legislative history of the Lower Brule Acts as at best ambiguous and rejected its use as evidence of the extinguishment of tribal hunting and fishing rights. *Lower Brule*, 771 F.2d at 824 n.20.

[65] H.R. REP. NO. 85-1888 at 29-32.

[66] H.R. REP. NO. 81-1047, at 2, 6, 8 (1949).

[67] 19 Stat. 254.

[68] 19 Stat. 255 (emphasis added). *See also generally United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980) (describing detailed congressional policies and intent to abrogate Sioux treaty hunting rights through this legislation).

USACE_ESMT000576

But Congress did not include any comparable language in either of the Oahe Acts or the Lower Brule Acts, instead recognizing that Sioux treaty hunting rights survived in the taken territory. All four Acts include the same hunting and fishing clauses that the Supreme Court and Eighth Circuit found to have preserved tribal treaty rights. As was the case with the reservation diminishment inquiry, the *Bourland* and *Lower Brule* courts' reasoning with regard to the Cheyenne River Oahe Act and Lower Brule Acts applies equally to both Oahe Acts. Standing Rock and Cheyenne River Sioux treaty hunting and fishing rights survive in Lake Oahe.

And finally, while the eastern boundary of the Standing Rock and Cheyenne River Sioux Reservations may end at "the center of the main channel" of the Missouri River within Lake Oahe, activity even on off-reservation portions of the Lake may still implicate treaty hunting and fishing rights. For example, in *United States v. Washington*,[69] the Ninth Circuit Court of Appeals held that the State of Washington could not maintain certain culverts over off-reservation waterways that diminished salmon runs to the point that Washington tribes could not exercise their treaty fishing rights.[70] Further, the United States District Court for the District of Oregon ruled that the Corps could not proceed with construction of a dam on a tributary to the Columbia River without specific congressional authority because it would impede off-reservation treaty fishing rights.[71] Based on this analysis, activities even in the off-reservation portions of Lake Oahe may infringe upon Sioux treaty rights if the activities negatively impact on-reservation hunting and fishing.[72]

### iv. The Indian canons of construction require ambiguities in the Oahe Acts to be resolved in favor of the Tribes.

The cases and legislative history discussed above settle that the Oahe Acts (1) did not diminish either the Standing Rock or Cheyenne River Reservations; and (2) preserved tribal treaty hunting and fishing rights in the land taken to create Lake Oahe.[73] To the extent one would argue that the Treaties of Fort Laramie or the Oahe Acts remain ambiguous on either point (again, premises rejected by both *Bourland* and *Lower Brule*), the Indian canons of construction require interpreting the Acts in the light most favorable to the Tribes.

---

[69] 827 F.3d 836 (9th Cir. 2016). The State's petition for rehearing en banc is currently pending.

[70] *Id.* at 851-53.

[71] *Confederated Tribes of the Umatilla Indian Reservation v. Sec'y of the Army*, 440 F. Supp. 553, 556 (D. Or. 1977).

[72] *See, e.g., Colville Confederated Tribes v. Walton*, 647 F.2d 42, 48 (9th Cir. 1981) ("The right to water to establish and maintain the Omak Lake Fishery includes the right to sufficient water to permit natural spawning of the trout."); *Minnesota v. Clark*, 282 N.W.2d 902, 909 (Minn. 1979) (noting that "it would be incongruous to construe the treaty as denying the Indians their very means of existence while purporting to grant them a home").

[73] As discussed *infra*, the Tribes also have reserved water rights in addition to (and in concert with) these treaty hunting and fishing rights.

13

USACE_ESMT000577

The Indian canons "require that treaties, agreements, statutes and executive orders be liberally construed in favor of the Indians. In addition, to the extent that federal Indian law is ambiguous, any ambiguity is construed liberally in favor of the Indians."[74] The *Lower Brule* court applied this doctrine in its examination of the Cheyenne River Oahe Act,[75] ultimately concluding that while there were ambiguities in the relevant statutory clauses and legislative history (for example, reconciling the "entire interest" cession with the "retained hunting and fishing rights" clause), this ambiguity necessitated an interpretation in favor of maintaining tribal rights.[76] Numerous other courts have similarly held that ambiguity over the existence or scope of Indian hunting and fishing rights must be read in the manner most beneficial to tribal interests.[77] This well-established doctrine should foreclose an attempt to reinterpret the Oahe Acts or otherwise challenge their preservation of tribal treaty rights.

### v. The Tribes retain water usage rights in Lake Oahe.

In addition to their treaty hunting and fishing rights, the Tribes enjoy a right to water to support their reservation homeland. "For over a century, the Supreme Court has held that when the United States 'withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation.'"[78] These rights are referred to as "*Winters* rights" after a foundational case, *Winters v. United States*,[79] in which the Court held that although the treaty creating the Fort Belknap Reservation was silent as to water rights, it had to be read as implicitly maintaining the Tribe's access to water sufficient to support the purpose

---

[74] *White Earth Band of Chippewa Indians v. County of Mahnomen*, 605 F. Supp. 2d 1034, 1046 (D. Minn. 2009) (citations omitted); *see also, e.g., Cty. of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 269 (1992) ("When we are faced with . . . two possible constructions, our choice between them must be dictated by a principle deeply rooted in this Court's Indian jurisprudence: 'Statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.' Montana v. Blackfeet Tribe, 471 U.S. at 766.").

[75] *Lower Brule*, 771 F.2d at 815-16.

[76] *Id.* at 824.

[77] *See, e.g., Mille Lacs*, 526 U.S. at 200 ("At the very least, the historical record refutes the State's assertion that the 1855 Treaty 'unambiguously' abrogated the 1837 hunting, fishing, and gathering privileges. Given this plausible ambiguity, we cannot agree with the State that the 1855 Treaty abrogated Chippewa usufructuary rights."); *Washington v. Wash. St. Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 677-79 (1979) (treaty giving tribes right to take fish "in common with" state citizens interpreted to give priority to tribal take); *People v. Le Blanc*, 248 N.W.2d 199, 211 (Mich. 1976) ("There is not the slightest indication in this portion of the negotiations, or in the minutes of the negotiations in their entirety, that the Treaty of 1855 would affect hunting or fishing rights reserved under the Treaty of 1836.").

[78] *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, No. EDCV 13-883-JGB, 2015 U.S. Dist. LEXIS 49998, at *12 (C.D. Cal. Mar. 20, 2015) (quoting *Cappaert v. United States*, 426 U.S. 128, 138 (1976)). This case was appealed and oral arguments were held before the Ninth Circuit Court of Appeals on October 18, 2016.

[79] 207 U.S. 564 (1908).

14

USACE_ESMT000578

of the reservation (in that case, farming).[80]  Courts applying the *Winters* doctrine recognize that absent such implied rights, tribes would lose their water via upstream appropriation or degradation by non-Indians under state law.[81]

The Corps has recognized that it must operate its facilities in the Missouri River Basin in a way that is consistent with tribal *Winters* rights.[82]  For example, as the Corps has noted with regard to the Sioux Tribes:

> The message of the Winters Doctrine is that we have an obligation to ensure that tribal reservations have water rights from a given source, in this particular case, the Missouri. So when you take a look at that, we, the Federal Government, have trust responsibilities for tribal reservations. So we take this very seriously, to make sure that whatever document we have includes that particular doctrine.[83]

Here, the Tribes' federal reserved water rights have not been specifically adjudicated or otherwise quantified through a congressionally authorized Indian water settlement.  However, Lake Oahe, which was created out of the Missouri River that the Treaties of Fort Laramie established as the eastern border of the Standing Rock and Cheyenne River Sioux Reservations, is an obvious source.[84]  Congress has authorized the construction of a rural water system to serve the Standing Rock Sioux Reservation under the authority of the Garrison Diversion Unit Reformulation Act of 1986.[85]  The system, which was built through P.L. 93-638 contracts between the U.S. Bureau of Reclamation and the Standing Rock Sioux Tribe, includes several water intakes on Lake Oahe, which the Tribe uses for drinking water and irrigation purposes.

---

[80] *Id.* at 577.  In addition, in recognition of the fact that specific purposes of an Indian reservation were often unarticulated in treaty, statute, or executive order, a "general purpose, to provide a home for the Indians, is a broad one and must be liberally construed." *Colville Confederated Tribes*, 647 F.2d at 46; *Agua Caliente*, 2015 U.S. Dist. LEXIS 49998 at *18.

[81] *Colville Confederated Tribes*, 647 F.2d at 46.

[82] *See Impact Suffered by the Tribes in the Upper Basin of the Missouri River: Hearing Before the Comm. on Indian Affairs of the United States Senate*, 108th Cong. 53 (2003) (statement of George Dunlop, Deputy Assistant Sec'y of the Army on Civil Works) ("I would like to emphasize that the Corps fully recognizes the principles of Tribal sovereignty and the Federal Government's trust responsibility to the Tribes.  The Corps will continue to engage in Government-to-Government consultation in order to take into account the quantified water rights of the Tribes in the operation of the Mainstem Reservoir System."); *accord id.* (noting that even when tribal water rights are not quantified, the "Corps recognizes . . . that the Tribes have claims to reserved water rights, and will, to the extent permissible by law, continue to operate the Mainstem Reservoir System in a way that does not preclude such claims").

[83] *Id.* at 9 (statement of Brig. Gen. William T. Grisoli, U.S. Army, Commander, Nw. Div., U.S. Army Corps of Eng'rs).

[84] It is further possible that other sources for the Tribes' federal reserved water rights would be identified through an anticipated process to eventually get a decree for these water rights.  This Memorandum does not suggest that the Tribes lack any other treaty or *Winters* guaranteed rights.

[85] Pub. L. No. 106-554, App. D. Title IV, *reprinted in* 114 Stat. 2763A-282.

15

USACE_ESMT000579

Furthermore, water is reserved to protect tribal treaty rights to hunt and fish, so one aspect of an eventual water rights decree would almost certainly be water in Lake Oahe to support the Tribes' retained hunting and fishing rights discussed above.[86]  As discussed below, these water rights require equal consideration as part of the DAPL permitting process as the Tribes' hunting and fishing rights.

### 2. Further consideration of the potential impacts to treaty-protected hunting, fishing, and water rights is warranted.

The Supreme Court has repeatedly recognized and emphasized the "'distinctive obligation of trust incumbent upon the Government in its dealings'" with Indian tribes.[87]  Here, the applicable statutory framework under the MLA and Section 408 requires consideration of the public interest, which necessarily includes impacts on tribal nations and tribal trust resources. Even assuming that the Corps' Section 408 permit decision meets NEPA's minimum requirements,[88] the federal government's trust relationship counsels that the Corps' conduct will be reviewed pursuant to "the most exacting fiduciary standards."[89]  In this regard, the courts have recognized that "special regard be given to the procedural rights of Indians by federal administrative agencies."[90]

Under this standard, before the Corps makes a decision on the right-of-way under the MLA, it should conduct additional government-to-government consultation and analyze in detail how the right-of-way will potentially affect the Tribes' treaty-protected hunting, fishing, and water rights.[91]  Even if the Corps ultimately determines that it is appropriate for the DAPL to proceed, the additional consultation and analysis might help the Corps and the project proponent

---

[86] *United States v. Adair*, 723 F.2d 1394, 1409-11 (9th Cir. 1983).

[87] *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942)).

[88] Courts have held that even if an agency complies with NEPA, a permitting action may still be impermissible if it unduly burdens tribal treaty rights in violation of the trust responsibility. *See, e.g., No Oilport! v. Carter*, 520 F. Supp. 334, 371 (W.D. Wash. 1981) (even when a federal agency had satisfied NEPA, there was still a genuine issue of material fact sufficient to defeat summary judgment as to whether agency had violated trust responsibility by failing "to use the highest degree of care to ensure that Indian interests are fully protected").

[89] *Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942)).

[90] *HRI, Inc. v. EPA*, 198 F.3d 1224, 1245 (10th Cir. 2000) (quoting FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 225 (1982 ed.)).

[91] *See* Letter from the Honorable Dave Archambault II, Chairman, Standing Rock Sioux Tribe, to the Honorable Jo-Ellen Darcy, Assistant Sec'y of the Army (Civil Works) 3 (Dec. 2, 2016) ("An oil spill in Lake Oahe also threatens trust lands. The vast majority of the lands that lie immediately adjacent to those held by the Corps for the Oahe Project are held by the United States in trust for the benefit of the Tribe and tribal members. For example, near to Fort Yates there are low-lying trust lands that are susceptible to floods. An oil spill could contaminate trust lands in the Fort Yates area including an Indian housing development known locally as Sioux Village.") [hereinafter "December 2 Letter"].

16

USACE_ESMT000580

to identify appropriate mitigation measures to protect important resources and ensure tribal treaty and water rights are not adversely impacted. Regardless of the Corps' eventual decision, further consideration the DAPL's potential impact on tribal rights and interests would help ensure that the applicable fiduciary standard has been met.[92]

To illustrate, the Corps itself has denied permit applications that would have a more than *de minimis* interference with tribal access to a usual and accustomed fishery.[93] Given the potential magnitude associated with oil pipeline spills into a waterway with treaty-protected hunting, fishing, and water rights, a closer examination of Sioux rights potentially affected by the DAPL project as a matter of the exercise of the Corps' discretion is consistent with the fiduciary standards. If the agency develops information pursuant to this review that "forecasts deleterious impacts, the [agency] must consider and implement measures to mitigate these impacts if possible."[94]   This approach has been put into practice by many executive agencies.[95]

---

[92] The Corps has repeatedly reaffirmed this responsibility. For example, the Corps' Tribal Consultation Policy states that there are "responsibilities to Tribes resulting from the Federal Trust Doctrine, as well as from Treaties, statutes, regulations, Executive Orders, and agreements between the United States government and tribal governments." U.S. ARMY CORPS OF ENGINEERS, TRIBAL CONSULTATION POLICY AND RELATED DOCUMENTS 2 (2013). And in 2004, the Corps entered into a *Final Programmatic Agreement for the Operation and Management of the Missouri River Main Stem System for Compliance with the National Historic Preservation Act* (FPA) with numerous tribal signatories, including both the Standing Rock and Cheyenne River Sioux Tribes. The FPA establishes Corps policy concerning the National Historic Preservation Act in terms of tribal consultation, managing tribal trust resources, maintaining the trust responsibility, and other issues, and notes that Corps actions "in the Missouri River Basin, directly or indirectly affect trust land, and some of the lands managed by the Corps are within reservation boundaries established by treaties where the Tribes and their members continue to have treaty-based rights even though lands have been taken out of trust status." *Id.* at P-3.

[93] *See, e.g., Northwest Sea Farms*, 931 F. Supp. at 1519-22 (rejecting Administrative Procedure Act challenge to Corps' citation to *de minimis* impacts test in rejecting a permit); U.S. Army Corps of Eng'rs, Administrative Appeal Decision, *Osterman Appeal* 11 (Seattle Div. Dec. 3, 2013) (upholding District Engineer's rationale for permit denial that the "proposed structures would have more than a de minimis impact to the Suquamish Tribe's access to its U&A fishing grounds for shellfish and finfish harvesting"); U.S. ARMY CORPS OF ENG'RS, MEMORANDUM FOR RECORD APPLICATION: NWS-2008-260 PACIFIC INTERNATIONAL HOLDINGS LLC: GATEWAY PACIFIC TERMINAL PROJECT AND LUMMI NATION'S USUAL AND ACCUSTOMED TREATY FISHING RIGHTS AT CHERRY POINT, WHATCOM COUNTY 1 (May 9, 2016) (rejecting marine terminal permit that would interfere with tribal treaty fishing); *United States v. Washington (In re: Shellfish)*, Case No.: C70-9213, Stipulation and Order Amending Shellfish Implementation Plan (Apr. 8, 2002) (acknowledging Department of Justice instruction applying the *de minimis* impacts test).

[94] *Okanogan Highlands All. v. Williams*, Civil No. 97-806-JE, 1999 U.S. Dist. LEXIS 4068, at *47 (D. Or. Jan. 12, 1999) (citation omitted) [hereinafter "*Okanogan I*"].

[95] For example, the Department of Defense is a recent signatory to a federal Memorandum of Understanding that affirms agency "commitment to protect tribal treaty rights and similar tribal rights relating to natural resources through consideration of such rights in agency decision-making processes and enhanced interagency coordination and collaboration." MEMORANDUM OF UNDERSTANDING REGARDING INTERAGENCY COORDINATION AND COLLABORATION FOR THE PROTECTION OF TRIBAL TREATY RIGHTS 1 (Nov. 9, 2016). With that in mind, this discussion is not to suggest that the trust responsibility requires a full analysis of tribal rights prior to virtually any federal action in which a tribe might take an interest for whatever reason, or that any NEPA review involving a tribe

17

Pursuant to this framework, it is critical to recognize that the Tribes retain hunting, fishing, and water rights in and around Lake Oahe. And as the Corps notes in the EA, the Standing Rock Sioux Tribe raised numerous concerns about potential degradation to tribal rights, as well as concerns over the lack of government-to-government consultation on certain issues.[96] But while the EA acknowledges the Standing Rock Sioux Reservation's geographical location in relation to the pipeline,[97] the Corps ultimately concludes that:

- "No impacts to treaty fishing and hunting rights are anticipated due to construction within the Project Area or Connected Actions."[98]

- "Direct and Indirect impacts from the Proposed and Connected Actions will not affect members of the Standing Rock Sioux Tribe or the Tribal reservation."[99]

- "[T]here will be no direct or indirect effects to the Standing Rock Sioux tribe. This includes a lack of impact to its lands, cultural artifacts, water quality or quantity, treaty hunting and fishing rights, environmental quality, or socio-economic status."[100]

- "Although the history of the [Standing Rock Sioux Tribe] and treaty rights is beyond the scope of the EA, no impact to tribal treaty rights are anticipated due to construction or operation of the pipeline within the Project Area or

---

automatically requires an EIS or a tribal-specific EA. Nor does it purport to proffer a bright line standard concerning when tribal interests are significant enough such that the trust responsibility mandates additional federal review, or the depth or nature of any such review. And it also does not address those cases where tribes claim protectable off-reservation interests that are not guaranteed by statute or treaty. Rather, I only address the unique facts at hand: a pipeline crossing beneath a waterway (1) that serves as the boundary of multiple Indian reservations; (2) in which several tribes unquestionably retain some level of treaty-guaranteed hunting, fishing, and water rights; (3) when the proposed crossing is close enough to the reservations so as to amplify the potential impacts of an oil spill on reserved treaty rights; and (4) where, as I believe is the case here, the agency relied on the applicant's assessment of risk without direct consideration of the Tribes' treaty rights.

[96] *See* Summary of Comments Received Environmental Assessment Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands at 4, 7-10, 12-19 [hereinafter "Comments Summary"]; *see also* Letter from Dave Archambault II, Chairman, Standing Rock Sioux Tribe of Indians, to The Honorably Jo-Ellen Darcy, Assistant Sec. of the Army (Civil Works) (Sept. 22, 2016) (chronicling Standing Rock concerns with the DAPL project) [hereinafter "September 22 Letter"].

[97] Final EA at 2, 38, 75. Nevertheless, the draft EA failed to even identify the reservation on its maps and incorrectly said the Standing Rock Sioux Tribe had no issue with the project.

[98] *Id.* at 58.

[99] *Id.* at 85.

[100] *Id.* at 86.

18

USACE_ESMT000582

Connected Actions."[101]

- "No treaty rights have been identified that would be adversely affected by project permitting, construction or operation."[102]

These general statements about treaty rights require a more robust analysis in light of the settled, geographically relevant nature of the Tribes' rights with regard to Lake Oahe. For example, the existing record does not: identify on-reservation lands where the Tribes may retain hunting and fishing rights or where reservation boundaries exist within Lake Oahe; analyze whether tribal members consume a higher amount of treaty-guaranteed fish or game that might be affected by pipeline construction or a potential spill; identify relevant statutes, treaties, or court cases; discuss proactive mitigation efforts that could protect tribal lands (specifically, and as opposed to any relevant non-treaty protected lands); compare the Tribes' on and off-reservation rights, etc. Similarly, the current record consists of a physical description of the Standing Rock Sioux Reservation and the general assurances quotes above that the DAPL project will not affect tribal rights.[103] In fact, the Tribes and their members use Corps lands, tribal lands, and allotted lands abutting Lake Oahe for hunting, fishing and gathering. The Tribes rely on the waters of Lake Oahe to provide habitat for fish, wildlife and plants that the Tribe depends on for subsistence and cultural and religious practices.[104] And as the Standing Rock Sioux further explained, "[t]he entire Reservation shoreline along the Missouri is a vital habitat for fish and wildlife – upon which Tribal members rely for subsistence as well as cultural and religious practices."[105]

Nor does anything in the current record recognize that the Standing Rock Oahe Act reserved the Tribe's "title to the . . . interest in oil, gas, and all other minerals of any nature whatsoever" in the taken territory.[106] Given the *Bourland* Court's emphasis on the fact that the Cheyenne River Oahe Act's explicit reservation of tribal hunting and fishing rights preserved such rights on the taken territory, this language in the Standing Rock Oahe Act should equally

---

[101] Comments Summary at 17.

[102] *Id.*

[103] *Id.* at 8; *accord* Final EA at 58, 75. There is no mention of the potentially similar rights of the Cheyenne River Sioux Tribe, discussed *inter alia* in this Memorandum.

[104] *See* Letter from the Honorable Dave Archambault II, Chairman, Standing Rock Sioux Tribe, to Lowry Crook, Principal Assistant Deputy Sec'y of the Army (Civil Works) (Mar. 24, 2016); *accord* December 2 Letter at 3 ("On the Reservation, jobs are scarce and poverty levels are high, so for many Tribal members, fishing is necessary to provide enough to eat for their families. For many other Tribal members, fishing provides an important supplemental source of food and nutrition.") (citations and internal quotations omitted).

[105] Letter from the Honorable Dave Archambault II, Chairman, Standing Rock Sioux Tribe, to the Honorable Sally Jewell, Sec'y, U.S. Dep't of the Interior (Feb. 9, 2016). *See also* attached map (location of tribal and allotted lands relative to pipeline crossing).

[106] 72 Stat. 1762.

USACE_ESMT000583

preserve Standing Rock Sioux treaty mineral rights in Lake Oahe.[107]  Instead, the EA generally concludes that the pipeline will include technology designed to prevent leaks,[108] notes that the DAPL route "expressly and intentionally does not cross the Standing Rock Sioux Reservation,"[109] and says that the pipeline is co-located with existing infrastructure.[110]

These circumstances warrant a more searching consideration of the effect of a federal project on tribal treaty rights.[111]  For example, the Interior Board of Land Appeals (IBLA) found that the Bureau of Land Management (BLM) had not satisfied the trust responsibility precisely because BLM's discussion of treaty rights in an EIS were limited to "asserting that [the trust responsibility] was not implicated because Tribal lands are not part of the permitted area and in concluding that its trust responsibility was satisfied by complying with Federal laws and regulations."[112]  The IBLA held that BLM's unsupported statement that there would be "no impacts to trust resources" due to the BLM having analyzed "the potential impacts that will occur to all aspects of the human environment both on and off the Fort Belknap Reservation"[113] did not itself demonstrate that BLM had validated the United States' "trust responsibility to consider and protect Tribal resources."[114]  The IBLA remanded the EIS with instructions for BLM "to consult with the Tribes and to identify, protect, and conserve trust resources, trust assets, and Tribal health and safety in making its . . . decisions."[115]

Similarly, in *No Oilport!*, the U.S. District Court for the Western District of Washington denied the federal defendants' motion to dismiss tribal plaintiffs' claim that authorizing an oil pipeline undermined tribal treaty rights in violation of the trust responsibility (even after finding that the United States had satisfied all applicable NEPA requirements).  Notably, the court relied on affidavits from the tribes arguing that pipeline sedimentation could adversely affect spawning beds for treaty-protected fish,[116] as well as a federal finding that although "it is unlikely that any reduction (in fish) would be noticed in . . . Indian fisheries . . . *if impacts are substantial,*

---

[107] While my analysis focuses on the discussion of hunting and fishing rights given the comparatively more robust case law about Sioux rights in these areas, as well as the more direct threat that the DAPL project poses to those rights as compared to mineral rights, the Corps' lack of any consideration of tribal mineral rights itself warrants further analysis here.

[108] Final EA at 85-86.

[109] *Id.* at 86.

[110] *Id.*

[111] I further note that the EA focuses primarily on the risks associated with the drilling area itself rather than associated risks to tribal treaty rights.

[112] *Island Mountain Protectors, National Wildlife Federation, Assiniboine and Gros Ventre Tribes, and Fort Belknap Community Council*, 144 IBLA 168, 183 (1998).

[113] *Id.* at 185.

[114] *Id.* at 184.

[115] *Id.* at 185.

[116] *No Oilport*, 520 F. Supp. at 372.

20

USACE_ESMT000584

reductions *might* be detected. . . ."[117]  Because the demonstrated possibility of such impacts on tribal treaty rights was enough to defeat the defendants' summary judgment motion, the court held that the trust responsibility "unquestionably . . . place[s] substantial duties upon the United States" to protect treaty fishing rights.[118]  Here, as the Standing Rock Sioux Tribe has provided the Corps with a detailed technical review of the risks and potentially significant consequences of a DAPL leak,[119] there is a similarly demonstrated possibility of impacts on tribal treaty rights that warrant additional review.  In this regard, the Corps has a valid rationale to expand its NEPA review and authorize independent experts to opine on the potential for a catastrophic spill at the proposed location.[120]

By comparison, in the *Okanogan* cases,[121] the courts rejected the Confederated Tribes of the Colville Reservation's (CCT's) claim that the United States Forest Service (USFS) had failed to adequately consider CCT treaty hunting and fishing rights prior to authorizing a gold mine.[122]  Both courts found that the USFS specifically identified CCT hunting, fishing, and tribal cultural properties,[123] discussed the scope of those specific rights as well as CCT's water rights, made specific findings as to potential impacts on tribal treaty rights and potential reclamation and mitigation alternatives, and ultimately concluded based on a full evaluation of the evidence that the mine would not unduly affect those rights.[124]  The *Okanogan I* court further set out how the USFS had "attempted to obtain information from the [Tribes] about cultural, historic and religious concerns for determining how potential impacts--including those to fish, wildlife and water--would affect tribal members,"[125] identified specific sites for mitigating wetland habitats needed to protect tribal rights, and conditioned the permit on guarantees that the mine would maintain minimum water flow necessary to preserve tribal water rights.[126]

---

[117] *Id.* at 373 (emphasis added).

[118] *Id.*

[119] *See* Letter from the Honorable Dave Archambault II, Chairman, Standing Rock Sioux Tribe, to the Honorable Jo-Ellen Darcy, Assistant Sec'y of the Army (Civil Works) (Oct. 28, 2016); Memorandum from Richard B. Kuprewicz, President, Accufacts Inc., to Jan Hasselman, Staff Attorney, Earthjustice, Inc. (Oct. 28, 2016).

[120] While the applicant prepared a non-public spill analysis, the analysis has not been subject to public review, consultation with the Tribes, and independent review by federal experts. As trustee, the Corps has an obligation to ensure that any risks to treaty rights are eliminated through an open and independent process. Furthermore, that spill analysis does not examine the environmental impacts of a catastrophic event.

[121] *Okanogan I*, discussed *infra*, was subsequently affirmed in *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468 (9th Cir. 2000) ("*Okanogan II*").

[122] While the CCT alleged violations of both the procedural trust responsibility and NEPA in the context of an EIS, both the district and circuit courts evaluated these allegations as distinct causes of action. Thus, although the courts were examining an EIS, they did so in the context of considering the USFS's compliance with the trust responsibility as well as with NEPA.

[123] *See, e.g., Okanogan II*, 236 F.3d at 479 (finding that "a key issue addressed in the EIS is the Project's 'potential to affect cultural resources, reserved rights, trust issues, and responsibilities'").

[124] *Id.* at 478-80; *accord Okanogan I*, 1999 U.S. Dist. LEXIS 4068 at *56-57.

[125] *Okanogan I*, 1999 U.S. Dist. LEXIS 4068 at *57.

[126] *Id.* at *60-62.

21

USACE_ESMT000585

Although adjudicated on a case-by-case basis, the common theme of these decisions is that the United States' fulfillment of the exacting standard of a fiduciary requires more than conclusory statements that there will be no impact on tribal rights, a dismissive note that a project is situated off-reservation, argument that a private corporation complied with environmental laws, or citation to general pipeline safety technology. Particularly in light of the Tribes' settled treaty rights in Lake Oahe and the close proximity between the proposed Lake Oahe crossing and the Tribes' reservations, the trust relationship requires a deeper consideration of tribal issues.

### i. Off-reservation activity must not impair the Tribes' senior water rights.

The EA notes that the "Standing Rock Sioux Reservation boundary is over 0.5 miles south of the Lake Oahe Project Area crossing,"[127] the "pipeline route expressly and intentionally does not cross the Standing Rock Sioux Reservation,"[128] and that "linear projects typically use a 0.5 mile buffer area." The Corps concludes that because the "pipeline will be located under Lake Oahe, and Dakota Access has developed response and action plans, and will include several monitoring systems, shut-off valves and other safety features to minimize the risk of spills and reduce or remediate any potential damages,"[129] "[n]o impacts to SRST reserved water rights are anticipated."[130]

But the DAPL project requires a more thorough discussion as to how these off-reservation authorizations will not impact the Tribes' reserved water rights and usage of Lake Oahe discussed *supra*.[131] It is well established that "Indian reserved water rights are vested property rights for which the United States …[holds] legal title… in trust for the benefit of the Indians."[132] For example, courts (including *Winters* itself) have held that the *Winters* doctrine may impact off-reservation actions that affect water quality and quantity in order to preserve on-reservation reserved tribal rights.[133] In *United States v. Gila Valley Irrigation District*,[134] farmers with a more junior right whose properties were located upstream from a reservation were

---

[127] Final EA at 86.

[128] *Id.*

[129] *Id.* at 2.

[130] Comments Summary at 8.

[131] Final EA at 87.

[132] *Criteria and Procedures for the Participation of the Federal Government in Negotiations for the Settlement of Indian Water Rights Claims*, 55 Fed. Reg. 9,223, 9,223 (Mar. 12, 1990).

[133] *See, e.g., Winters*, 207 U.S. at 577; *Gila River Pima-Maricopa Indian Cmty. v. United States*, No. 236-C, 1981 U.S. Ct. Cl. LEXIS 1314 (Ct. Cl. Jan. 7, 1981) (United States was required to take reasonable action to end the loss of the water or to provide an equivalent supply once upstream diversions began to restrict the tribe's on-reservation agriculture).

[134] 920 F. Supp. 1444 (D. Ariz. 1996), *aff'd*, 117 F.3d 425 (9th Cir. 1997).

22

required to take steps to decrease the salinity of the Gila River Indian Community's water so that "the Tribe receives water sufficient for cultivating moderately salt-sensitive crops."[135]  Similarly, in *United States v. Anderson*,[136] the court determined that the Spokane Tribe of Indians was entitled to sufficient water flow to maintain an appropriate temperature for the tribe's fishery.[137] Other courts have held that guaranteed treaty hunting and fishing rights (which, as discussed *supra*, the Tribes retain in Lake Oahe) could be a basis for decreeing a water right to benefit a tribe.[138]  And still others have noted that in some situations, protecting water quality is fundamental to the tribal right of self-determination.[139]  These cases establish that there is a legal basis for the Corps to consider potential effects to tribal water rights (as well as water quality issues affecting the Tribes' treaty hunting and fishing rights) as part of its environmental review. The Corps has sufficient grounds to reevaluate any specific threats to tribal water rights and consider the implication for the DAPL project moving forward.

### 3. Under NEPA, the Corps should further evaluate the DAPL's potential impacts on tribal rights and interests.

The MLA provides the Corps with the discretion as to whether or not it should grant the DAPL applicant a right-of-way across federal lands.  In addition, the MLA expressly contemplates an applicant's NEPA compliance prior to such a decision.  But in this case, the Corps' existing EA pertains only to the Section 408 permit.  And as explained below, the Corps should consider a number of NEPA requirements prior to granting an easement under the MLA. This recommendation is supported by case law in addition to that concerning the tribal interests discussed above, and is consistent with the Department of Interior's own approach to MLA decisions.

---

[135] *Id.* at 1454-56.

[136] 591 F. Supp. 1 (E.D. Wash. 1982), *aff'd in part and rev'd in part on other grounds*, 736 F.2d 1358 (9th Cir. 1984).

[137] *Id.* at 5-6; *accord Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist.*, 763 F.2d 1032 (9th Cir. 1985) (tribe's fishing right could be protected by enjoining water withdrawals that would destroy salmon eggs before they could hatch).

[138] *Adair*, 723 F.2d at 1409-11 (tribe's treaty hunting and fishing rights implicitly reserved sufficient waters to "secure to the Tribe a continuation of its traditional hunting and fishing lifestyle").

[139] *See Bugenig v. Hoopa Valley Tribe*, 229 F.3d 1210, 1222 (9th Cir. 2000) ("[I]t is difficult to imagine how serious threats to water quality could not have profound implications for tribal self-government."); *City of Albuquerque v. Browner*, 97 F.3d. 415, 423 (10th Cir. 1996) (upholding tribal water quality standards that were more stringent than federal standards and observing that the authority to establish such high standards "is in accord with powers inherent in Indian tribal sovereignty").

23

USACE_ESMT000587

### i. NEPA standards.

NEPA, the "basic national charter for the protection of the environment,"[140] requires federal agencies to consider "every significant aspect of the environmental impact of a proposed action and inform the public that it has indeed considered environmental concerns in its decisionmaking process."[141]  The agency must take a "'hard look' at the environmental consequences' of a major federal action before taking that action,"[142] which ensures that in making its decision, the agency "will have available, and will carefully consider, detailed information concerning significant environmental impacts."[143]  "Effects" or "impacts" to be considered include "ecological . . . aesthetic, historic, cultural, economic, social or health, whether direct, indirect, or cumulative."[144]  Cumulative impacts result from "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."[145]  "Accordingly, the administrative record must disclose 'a reasonably thorough discussion of the significant aspects of the probable environmental consequences.'"[146]

In addition, "NEPA requires that federal agencies include a detailed statement of 'alternatives to the proposed action' in any recommendation or report on actions significantly affecting the quality of the human environment."[147]  The agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[148]  "The consideration of alternatives requirement . . . guarantee[s] that agency decisionmakers have before them and take into proper account all possible approaches to a particular project

---

[140] 40 C.F.R. § 1055.1(a).

[141] *Baltimore Gas & Elec. Co. v. NRDC, Inc.*, 462 U.S. 87, 97 (1983); *accord Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1153-54 (9th Cir. 2006) (internal quotation marks and citation omitted); *Friends of the Norbeck v. U.S. Forest Serv.*, 780 F. Supp. 2d 975, 982-83 (D.S.D. 2011).

[142] *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 533 (8th Cir. 2003) (quoting *Baltimore Gas & Electric*, 462 U.S. at 97).

[143] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also* 42 U.S.C. § 4370m; 40 C.F.R. §§ 1500.3, 1500.4(q), 1500.5(*l*), 1508.9, 1508.11, 1508.13.

[144] 40 C.F.R. § 1508.8.

[145] *Sierra Club v. U.S. Army Corps of Eng'rs*, 494 F. Supp. 2d 1090, 1095 (W.D. Mo. 2007) (citing 40 C.F.R. § 1508.7 and 33 C.F.R. § 320.4(a)(1), and collecting cases).

[146] *Sierra Club v. Bosworth*, 352 F. Supp. 2d 909, 925 (D. Minn. 2005) (quoting *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343-44 (9th Cir. 1996)).

[147] *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006), *remanded and rev'd in part on other grounds, Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1073 (9th Cir. 2010) (quoting 42 U.S.C. § 4332(2)(C)(iii)).

[148] 42 U.S.C. § 4332(2)(E).

USACE_ESMT000588

(*including total abandonment of the project*) which would alter the environmental impact and the cost-benefit balance."[149]

This environmental review can include consideration of tribal treaty rights as well as impacts on tribal interests.[150]  The Corps therefore should analyze tribal treaty and water rights, and impacts to tribal interests, not only with regard to the contours of the trust responsibility as set out by case law, but as independently required by NEPA.[151]

### ii.  Further analysis of route alternatives.

NEPA requires federal agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives" to its preferred course of action.[152]  Reasonable alternatives include those "'that are technically and economically practical or feasible and meet the purpose and need of the proposed action.'"[153]  Although NEPA "does not require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective, it does require the development of information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned."[154]

Here, the Corps considered two potential routes for the DAPL pipeline.  The first passed approximately ten miles north of Bismarck, North Dakota (Bismarck route).  The second, which the Corps ultimately approved, runs 0.55 miles from the border of the Standing Rock Sioux Reservation (Lake Oahe route).[155]  But the Corps' reasons for rejecting the Bismarck route also largely apply to concerns regarding tribal treaty rights associated with the Lake Oahe route.  As

---

[149] *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) (emphasis in original).
[150] *See, e.g.*, *Humane Soc'y of the United States v. Bryson*, 924 F. Supp. 2d 1228, 1240 (D. Or. 2013) (noting that an EA concerning fishing activities "considered both Treaty Indian fishing, which refers to the fishing rights of Indian tribes that are reserved in treaties between the tribes and the federal government, and non-Indian fishing, which encompasses both commercial and sport fishing"); *Okanogan I*, 1999 U.S. Dist. LEXIS 4068 at *63-64; *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504, 1507 (W.D. Wash. 1988) (ultimately enjoining project that infringed upon treaty rights even though the "permit included special permit conditions ('SPCs') to mitigate some impacts of the Marina on the Tribes' treaty fishing rights" based on information developed during the EIS process).
[151] Although compliance with NEPA will not guarantee compliance with the trust responsibility, courts have also held that violations of environmental statutes such as NEPA result in a per se violation of the fiduciary duty associated with the trust responsibility. *See, e.g.*, *Pit River Tribe*, 469 F.3d at 788; *Island Mountain Protectors*, 144 IBLA at 185.
[152] 40 C.F.R. § 1502.14(a)).
[153] *Union Neighbors United, Inc. v. Jewell*, No. 15-5147, 2016 U.S. App. LEXIS 14377, at *20-21 (D.C. Cir. Aug. 5, 2016) (quoting 43 C.F.R. § 46.420(b)).
[154] *Richardson*, 565 F.3d at 703 (citation omitted).
[155] Final EA at 8-9.  The EA mentions that the Corps also considered a "cursory route evaluation to attempt crossing the Missouri River at a location that does not contain flowage easements" but ultimately rejected it early in the evaluation process. *Id.* at 8.

25

USACE_ESMT000589

such, if the Bismarck route is impermissible, the Lake Oahe route should be equally impermissible. This merits consideration of a reasonable alternative to both routes.

In the EA, the Corps ultimately rejected the Bismarck route due in large part to its proximity to a central municipality and to "multiple conservation easements, habitat management areas, National Wildlife Refuges, state trust lands, waterfowl production areas, and private tribal lands."[156] The Corps also noted that the Bismarck route crossed or was in close proximity to "several wellhead source water protection areas," and thus determined that the agency should avoid that route so as "to protect areas that contribute water to municipal water supply wells."[157] The Corps further sought to "minimize[] impacts on sensitive resources (e.g., piping plover critical habitat, eagle nests, etc.),"[158] as well as to completely avoid "high risk features" such as national parks.[159] But while the Corps determined that these concerns rendered the Bismarck alternative non-viable, and thus chose not to analyze their decision in detail in the EA, the EA minimizes identical considerations with respect to the Lake Oahe route's threat to on-reservation tribal hunting, fishing, and water rights.

First, although the Corps cited concerns over the safety of the Bismarck water supply as partial justification for its decision not to analyze the Bismarck route in detail, the rationale for putting the pipeline at Lake Oahe is based on representations from the applicant with no input from the Tribes. The Corps reasoned that because of "the engineering design, proposed installation methodology, quality of material selected, operations measures and response plans the risk of an inadvertent release in, or reaching, Lake Oahe is extremely low."[160] The Corps further concludes that because the "siting and construction of oil pipelines upstream of drinking water intakes is not uncommon throughout the United States," in the "unlikely event of a release, sufficient time exists to close the nearest intake valve to avoid human impact."[161] This appears to be based on the belief that "tribal drinking water supplies are obtained from a combination of wells and surface water."[162] This is inaccurate – the majority of the approximately 4,300 Standing Rock Sioux Reservation residents are served by a Municipal, Rural, and Industrial water system with its intake on Lake Oahe.[163] A pipeline spill would thus pose the same risk[164]

---

[156] *Id.*

[157] *Id.*

[158] *Id.* at 14.

[159] *Id.* at 7.

[160] *Id.* at 87.

[161] *Id.*

[162] *Id.*

[163] September 22 Letter at 5. *See also* Cheyenne River Brief at 28 ("The public water supply for the Tribe, which provides drinking water for thousands of people, is located directly downstream of the proposed pipeline crossing route.").

[164] In fact, a spill in Lake Oahe would likely pose a greater threat to tribal water, as the Lake Oahe route passes only 0.5 miles from the Standing Rock Sioux Reservation, as opposed to the ten-mile distance from Bismarck under the Bismarck route.

USACE_ESMT000590

to tribal water (which, unlike Bismarck water, carries associated treaty and *Winters* rights) that the Corps found to be impermissible for Bismarck water, and yet the threat to tribal water was considered mitigated by the same pipeline technology that the Corps found would not protect Bismarck residents.[165]  The EA does not explain why, if existing safeguards are inadequate to mitigate spill risk from a pipeline running ten miles from a city, they nevertheless protect federally reserved tribal waters less than one mile from an Indian reservation.[166]  Focusing solely on the distance between the intake structures and pipeline crossing also fails to consider the presence of treaty protected rights and reservation land immediately adjacent and within Lake Oahe.

Second, while the risks to wetlands and sensitive wildlife resources in the Bismarck area are relevant, the Corps must afford comparable weight to the risks the DAPL poses to the federally-guaranteed rights of tribal members, treaty protected rights, and reservation lands and resources.  As set out above, the United States has guaranteed the Tribes hunting and fishing rights on their reservations, rights which the Supreme Court has held to apply to the land taken to create Lake Oahe.  If the protection of wildlife counsels against the Bismarck route, treaty hunting and fishing rights also should counsel against the Lake Oahe route.  Additional review is warranted to address these inconsistencies.

Third, although the Corps designated certain areas as high-risk in order that they be avoided altogether on the pipeline route, there was no comparable deference given to federally-designated Indian reservations.  Rather, the only protection for tribal lands was a 0.5-mile buffer between the pipeline and the Standing Rock Sioux Reservation boundary.  The EA did not explain why the Reservation was not equally considered an area of high risk considering the pipeline's proximity to and potential effects on downstream reservations, treaty rights, or water supplies.[167]

Fourth, the dataset modeling provided by the applicant used to evaluate options for different routes was not tailored to address areas in close proximity to an Indian reservation with its associated rights and trust responsibilities.[168]  While preference was given for development in areas that had existing infrastructure, that presumption did not factor in whether such a location exposed treaty rights, reservation lands, tribal cultural, historic, societal interests, and trust assets to risk.  Similarly, the Corps places weight on the 500-foot residential buffer requirement and the

---

[165] The EA also does not discuss the project's potential impact to the Tribes' irrigation intake valve, which is situated seven miles south of the pipeline. September 22 Letter at 5.

[166] The EA further fails to recognize that unlike Bismarck, the Standing Rock and Cheyenne River Sioux Reservations have been guaranteed to the Tribes as a permanent homeland within their ancestral territory via treaty and Act of Congress.

[167] Final EA at 84–87.

[168] As noted above, the mere exclusion of tribal lands alone does not constitute adequate consideration and protection of treaty rights and trust assets. *Island Mountain*, 144 IBLA at 183.

USACE_ESMT000591

Pipeline and Hazardous Materials Safety Administration (PHMSA)[169] high consequence areas as bases to reject the Bismarck route, but approved the Lake Oahe route based on an inaccurate conclusion that the area immediately south of the Lake Oahe crossing is not heavily inhabited.[170]

In sum, additional analysis is necessary to address the fact that the reasons for rejecting the Bismarck route are equally (if not more) applicable to the Lake Oahe route. If the Corps cannot distinguish between the existence and gravity of environmental threats to the two routes, while also weighing the unique tribal property interests at issue here, the Lake Oahe route should not be deemed a reasonable alternative to the Bismarck route. The Corps must develop enough information to permit a reasoned choice of alternatives given the current unanalyzed issues with the Lake Oahe location.

### iii. Consideration of catastrophic consequences of low risk spills is warranted.

While I understand that the applicant conducted spill modeling for the DAPL project, it appears to have been summarized in a confidential evaluation that was not shared with the Tribes or the public. But review of the spill model indicates that it does not correlate with the majority of actual releases that occur during operation of an oil pipeline. Further, the spill model assumes that the pipeline is aboveground rather than considering the actual pathway of a buried pipeline and its potential catastrophic release. Similarly, and perhaps most importantly, the Tribes were not afforded the opportunity to consider and independently analyze any of the information that led to the Corps' conclusion as part of its 408 permitting evaluation that the DAPL project poses almost no risk to water. These failings provide an adequate foundation conduct additional NEPA review – both because the Corps has not considered relevant issues as required by NEPA, and because of the United States' obligation to engage in government-to-government consultations with the Tribes.

NEPA requires the consideration of "reasonably foreseeable impacts" of the proposed action, but does not require consideration of "remote and speculative impacts." In this instance, potential leaks and spills from the pipeline are "reasonably foreseeable." PHMSA tracks incidents of "significant pipeline incidents," which is defined as those resulting in (1) fatality or injury requiring in-patient hospitalization; (2) $50,000 or more in total costs, measured in 1984 dollars; (3) highly volatile liquid releases of five barrels or more or other liquid releases of fifty barrels or more; or (4) liquid releases resulting in an unintentional fire or explosion. Their data indicates that since 1996, there has been an average of over 283 such incidents per year, with

---

[169] PHMSA is responsible for developing and enforcing regulations for the safe, reliable, and environmentally sound operation of pipelines in the United States. *See* Norman Y. Mineta Research and Special Programs Improvement Act, Pub. L. No. 108-426, 118 Stat. 2423 (2004).

[170] Final EA at 84-87.

28

USACE_ESMT000592

total annual incidents trending upward since 2013.[171]  With hundreds of "significant" pipeline incidents per year, and with even comparatively "insignificant" spills still able to affect tribal treaty rights, it is difficult to assume that the risk of such incidents in the DAPL context would not be reasonably foreseeable.

And yet, the EA concludes that the pipeline's detection and emergency measures make any potential leak so unlikely that analysis of impacts is unwarranted.[172]  But Council on Environmental Quality (CEQ) guidance,[173] PHMSA guidance, case law, and current events support a more thorough consideration of the potential impacts of a spill or leak, even if low probability.  The fact that a spill is perhaps unlikely does not relieve the Corps of the obligation to consider impacts in detail, particularly in the context of known treaty and tribal rights.  For example, after the Deepwater Horizon oil spill, CEQ directed the Department of Interior to consider impacts of a catastrophic spill even if such an event is unlikely in any given circumstance.  CEQ said that the agency must attempt to identify and analyze foreseeable consequences even if mitigation ultimately can address the risk.  If information related to consequences is unknown, the NEPA regulations dictate how to assess the issues of inadequate information.[174]  While CEQ articulated this guidance specifically in response to Deepwater Horizon, CEQ expressly noted more generally that agencies "retain[] the duty to describe the consequences of a remote, but potentially severe impact, but grounds the duty in evaluation of scientific opinion rather than the framework of a conjectural worst case analysis. . . ."  The CEQ bases its analysis on regulations and case law that apply equally in this situation.[175]

---

[171] U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration, "Pipeline Incident 20 Year Trends," *available at* http://www.phmsa.dot.gov/pipeline/library/data-stats/pipelineincidenttrends (last visited Dec. 2, 2016).  These statistics do not differentiate between incidents involving gas, oil, or other specific types of pipeline.

[172] Final EA at 12, 64, 66-69, 94, 101 (generally acknowledging that spill could be problematic in various contexts but asserting with little evidence that a spill would be so unlikely as to mitigate the risk of such impacts); *see also* UNITED STATES ARMY CORPS OF ENGINEERS, MITIGATED FINDING OF NO SIGNIFICANT IMPACT, ENVIRONMENTAL ASSESSMENT, DAKOTA ACCESS PIPELINE PROJECT, WILLIAMS, MORTON, AND EMMONS COUNTIES, NORTH DAKOTA 2 (July 25, 2016) (arguing against the potential for significant impact because "the pipeline will be located under Lake Oahe, and Dakota Access has developed response and action plans, and will include several monitoring systems, shut-off valves and other safety features to minimize the risk of spills and reduce or remediate any potential damages") [hereinafter "FONSI"].

[173] CEQ was established as part of NEPA and coordinates federal efforts in the development of environmental policies and initiatives. *See* 40 C.F.R. § 1500.3.

[174] *See* 40 C.F.R. § 1502.22.

[175] *See generally* COUNCIL ON ENVIRONMENTAL QUALITY, REPORT REGARDING THE MINERALS MANAGEMENT SERVICE'S NATIONAL ENVIRONMENTAL POLICY ACT POLICIES, PRACTICES, AND PROCEDURES AS THEY RELATE TO OUTER CONTINENTAL SHELF OIL AND GAS EXPLORATION AND DEVELOPMENT (Aug. 16, 2010), *available at* https://ceq.doe.gov/current_developments/docs/CEQ_Report_Reviewing_MMS_OCS_NEPA_Implementation.pdf; *see also Sierra Club v. Sigler*, 695 F.2d 957, 975 (5th Cir. 1983) (holding that the probable remoteness of an impact does not excuse an agency from an evaluation of those impacts when there is a body of data with which an evaluation can be made which is not unreasonably speculative); *accord San Luis Obispo Mothers for Peace v. NRC*,

29

USACE_ESMT000593

Further, PHMSA requires operators to "determine which segments of their pipeline could affect HCAs in the event of a release. This determination must be made *assuming that a release could occur at any point, even though the likelihood of a release at any point is very small.*"[176] In other words, PHMSA does not excuse operators from considering a worst-case scenario.[177] Pipelines across the country routinely leak and rupture,[178] further underscoring the importance of preemptive preparation for these types of scenarios. This experience should inform the Corps' obligation to consider what actually would happen if (if not when) the DAPL pipeline leaks or spills into Lake Oahe or the immediately surrounding area.

The Standing Rock and Cheyenne River Sioux Reservations are the permanent and irreplaceable homelands for the Tribes. Their core identity and livelihood depend upon their relationship to the land and environment – unlike a resident of Bismarck, who could simply relocate if the DAPL pipeline fouled the municipal water supply, Tribal members do not have the luxury of moving away from an environmental disaster without also leaving their ancestral territory. This underscores the far-reaching effects of a DAPL spill's potential environmental impacts on the Tribes' historic, cultural, social, and economic interests. Further, the planned emergency response actions appear to assume that oil will be present in Lake Oahe. There does not appear to be any comparable consideration of response actions to address ground water contamination or a slow leak underground. Absent that information, the Corps, the Tribes, and the public simply cannot make an informed assessment as to the adequacy of the applicant's proposed response plans and other mitigation measures, particularly in light of the need to protect tribal treaty and trust assets. Thus, I believe that an analysis of the impact of a catastrophic event is warranted, despite its allegedly low probability.[179] This determination supports a more exacting analysis through additional NEPA review.

---

449 F.3d 1016, 1031 (9th Cir. 2006) ("[C]onsidering the policy goals of NEPA and the rule of reasonableness that governs its application, the possibility of terrorist attack is not so "remote and highly speculative" as to be beyond NEPA's requirements.").

[176] United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration, Fact Sheet: High Consequence Areas (HCA) (Dec. 1, 2011), *available at*

https://primis.phmsa.dot.gov/comm/FactSheets/FSHCA.htm (emphasis added).

[177] *See also* 49 C.F.R. § 194.103 (significant and substantial harm; operator's statement); 49 C.F.R. § 194.105 (worst case discharge).

[178] *See, e.g.,* Reuters, *UPDATE 2-Sunoco pipeline spills gasoline near Pennsylvania river,* THE INQUIRER DAILY NEWS, Oct 21, 2016, *available at*

http://www.philly.com/philly/business/energy/20161021_Reuters_L1N1CR1QD_UPDATE_2_Sunoco_pipeline_spi lls_gasoline_near_Pennsylvania_river.html.

[179] For an example of an EA that includes this more robust analysis involving another pipeline in North Dakota, *see* UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT, BAKKENLINK DRY CREEK TO BEAVER LODGE PIPELINE PROJECT ENVIRONMENTAL ASSESSMENT (Jan. 2015), *available at*

https://www.blm.gov/style/medialib/blm/mt/field_offices/north_dakota/bakkenlink_drycreek.Par.63202.File.dat/EA %20Text.pdf. Its appendix provides a spill risk assessment. *See* UNITED STATES DEPARTMENT OF THE INTERIOR,

30

USACE_ESMT000594

### iv. The Tribe's expert report and the company's response warrant careful review.

On October 28, 2016, the Standing Rock Sioux Tribe submitted a "Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline" (the AccuFacts Report), which raised a number of concerns regarding potential impacts from the DAPL project.  On November 30, 2016, the applicant provided a response to the Corps that, while it was not shared with either the Tribes or the public, contained clearly relevant information such as a memo entitled "Route Comparison and Environmental Justice Considerations."  The government-to-government relationship between the United States and the Tribes warrants provision of this type of information to the Tribes so that they can fully assess the potential implications of the proposed government action and engage meaningfully in consultation.

### 4. The Corps' "public interest" determination under Section 408 did not specifically address tribal treaty rights and interests.

While the FONSI for the Section 408 decision indicates that the Corps found the project to be in the "public interest," there is no separate written explanation for that conclusion.  Before making a decision to issue a right-of-way under Lake Oahe, we recommend that the Corps expressly conduct this analysis in such a way so as to maximize transparency and underscore the issues raised above.[180]

---

BUREAU OF LAND MANAGEMENT, APPENDIX A BAKKENLINK RISK ASSESSMENT AND ENVIRONMENTAL CONSEQUENCES ANALYSIS (May 2016), *available at* https://www.blm.gov/style/medialib/blm/mt/field_offices/north_dakota/bakkenlink_drycreek.Par.55619.File.dat/Bak kenLink-FINAL_EA_Appendices.pdf.

[180] Prior to issuing a permit under Section 408 (required here), the Corps must ensure that the proposed action is not "injurious to the public interest. . . ." 33 U.S.C. § 408 (authorizing the Corps to grant permission for the alteration or permanent occupation of a federal project only when "such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work").  Corps regulations similarly require a "public interest" review for projects in which the proponent seeks to discharge dredged or fill material into navigable waters of the United States. 33 C.F.R. § 320.4(a); *accord* 36 C.F.R. § 327.1 (setting out Corps policy with respect to water resource development projects as being "[t]o manage the natural, cultural, and developed resources of each project in the public interest, providing the public with safe and healthful recreational opportunities while protecting and enhancing those resources").  While the Corps references a recent Circular that attempts to distinguish this regulatory determination from the statutory determination for Section 408 permits, it is questionable that a Circular can supersede a regulation that expressly applies to all Department of the Army permits, including Section 408 in its list of permits. EC 1165-2-216 (September 30, 2105).  As part of this review, the Corps must consider the probable impacts of its proposal, weigh "all those factors which become relevant," and balance the benefits "which reasonably may be expected to accrue" from the project against any "reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1).

31

USACE_ESMT000595

In doing so, relevant factors may include the public and private interests in and need for the proposal, as well as, among other things, "conservation, economic development, historic properties, cultural resources, environmental impacts, water supply, water quality, flood hazards, floodplains, residual risk, induced damages, navigation, shore erosion or accretion, and recreation. This evaluation should consider information received from the interested parties, including tribes, agencies, and the public," as well as unresolved conflicts concerning resource use.[181]  And, implementing regulations specifically require that "[a]ction on permit applications should, insofar as possible, be consistent with, and avoid significant adverse effects on the values or purposes for which [certain] classifications, controls, or policies were established."[182]  This list specifically includes "Indian religious or cultural sites, and such other areas as may be established under federal or state law for similar and related purposes."[183]

These requirements focus on an individualized agency consideration of the public interest, including subsistence taking (such as tribal treaty hunting and fishing) and environmental concerns associated with water quality and environmental protection, including Indian religious and cultural sites.  In this case, the DAPL public interest adjudication certainly should include an evaluation of the myriad tribal interests and rights directly and indirectly threatened by the pipeline, as well as an explanation why dismissal of these concerns would the public interest.  For example, given that the Lake Oahe pipeline route passes adjacent to the Tribes' Reservations rather than Bismarck, the Tribes and their treaty-protected rights and assets will bear the brunt of a spill.  The "public interest analysis" should consider the undisputed facts that the Tribes lost aboriginal territory in the area in question to homesteading and other uses, followed by flooding and alteration of their environment for a massive federal reservoir and flood control project, followed by placement of infrastructure in close proximity to their permanent homelands, and concluding with the most recent proposal to install the DAPL pipeline in their midst.

As courts have held, "the enforcement of rights that are reserved by treaty to the Tribes is an important public interest, and it is vital that the courts honor those rights."[184]  The current record does not indicate that the Corps has weighed these issues.[185]  The lack of a particularized

---

[181] U.S. ARMY CORPS OF ENGINEERS, WATER RESOURCES POLICIES AND AUTHORITIES, POLICY AND PROCEDURAL GUIDANCE FOR PROCESSING REQUESTS TO ALTER ARMY CORPS OF ENGINEERS CIVIL WORKS PROJECTS PURSUANT TO 33 U.S.C. 408 14 (July 31, 2014).

[182] 33 C.F.R. § 320.4(e).

[183] *Id.* Relatedly, the MLA mandates consideration of potential impacts and the imposition of stipulations for any permit that "protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes." 30 U.S.C. § 185(h)(2).

[184] *Muckleshoot Indian Tribe*, 698 F. Supp. at 1516.

[185] UNITED STATES ARMY CORPS OF ENGINEERS, MITIGATED FINDING OF NO SIGNIFICANT IMPACT, ENVIRONMENTAL ASSESSMENT, DAKOTA ACCESS PIPELINE PROJECT, WILLIAMS, MORTON, AND EMMONS COUNTIES, NORTH DAKOTA 6 (July 25, 2016).  For the same reasons discussed *infra* in this subsection, the same considerations counsel

32

USACE_ESMT000596

analysis of tribal rights under a public interest lens requires correction to ensure there is an adequate record to support the Corps' decision making. For this reason, as well as the need for supplemental NEPA review discussed above, there is legal justification to suspend the Section 408 permit to allow for a more thorough public interest review.

### 5. Additional considerations concerning tribal rights.

Finally, I note several other considerations that support additional review.

First, it appears from the record that the Corps did not specifically consult with the Tribes when it changed the proposed pipeline location from the original Bismarck route to the Lake Oahe route, which, as discussed above, could potentially impact tribal treaty and water rights. This abrupt shift did not comply with either the Corps' own tribal consultation policy or that of the United States Department of Defense.[186] Consistent with the trust relationship, proactive tribal consultation is important to, among other things, allowing tribes to raise the types of concerns addressed in this Memorandum prior to the commencement of federal action, thus avoiding the need to reconsider issues or halt ongoing projects and ultimately conserving federal, state, tribal, and private resources.[187]

Second, the EA relied on census data that used county-based demographic assessments that compared general population averages[188] and ultimately concluded that if it was "determined

---

reconsideration under the Environmental Justice analysis required under Executive Order 12898, which mandates that "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States." 59 Fed. Reg. 7,629, 7,629 (Feb. 11, 1994). The Corps discusses Environmental Justice at pages 84-87 of the EA, but there are additional tribal-specific concerns that must be addressed.

[186] U.S. DEPARTMENT OF DEFENSE, AMERICAN INDIAN AND ALASKA NATIVE POLICY 1, 1 n.3 (Oct. 20, 1998) (requiring that "tribal concerns, past, present, and future . . . should be addressed prior to reaching decisions on matters that may have the potential to significantly affect protected tribal resources, tribal rights, or Indian lands," including, but not limited to, "natural resources and properties of traditional or customary religious or cultural importance, either on or off Indian lands, retained by, or reserved by or for, Indian tribes through treaties, statutes, judicial decisions, or executive orders, including tribal trust resources" and "[t]hose rights legally accruing to a tribe or tribes by virtue of inherent sovereign authority, unextinguished aboriginal title, treaty, statute, judicial decisions, executive order or agreement, and that give rise to legally enforceable remedies").

[187] Notably, neither the Standing Rock Sioux, nor any other tribe or tribal organization, was on the extensive list of state, federal, and private entities that received a scoping letter from Dakota Access, LLC, informing them of the DAPL proposal and soliciting comment. *See* DAKOTA ACCESS, LLC, SOLICITED COMMENTS ON DAKOTA ACCESS PIPELINE PROJECT PROPOSED CROSSING OF FLOWAGE EASEMENTS NEAR UPPER END OF LAKE SAKAKAWEA AND FEDERAL LANDS AT LAKE OAHE IN NORTH DAKOTA (May 2015). *Cf. Navajo Nation v. United States Forest Serv.*, 408 F. Supp. 2d 866, 885 (D. Ariz. 2006) (USFS NEPA scoping notice sent "to hundreds of community residents, interested individuals, *Indian tribes*, public agencies, and other organizations") (emphasis added).

[188] Final EA at 80-87.

33

USACE_ESMT000597

that there would be some effects to the Standing Rock Sioux Tribe as a low income, minority population, it would not disproportionately or predominantly bear impacts from the Proposed Actions (the impacts will actually disproportionately affect private lands, non-low income populations and non-minority populations)."[189]  This conclusion fails to consider impacts specific to the Tribes' population as a whole (as opposed to mixing them in as part of an overall population average), which faces serious threats to tribal hunting and fishing and water rights not shared by the general population among whom they were considered.

Third, the EA provides an incomplete view of the impacts to the reservation community based solely on an evaluation of the population located in the small federal footprint at the Lake Oahe crossing, and not downstream.[190]  This approach excludes impacts of a spill on tribal members, as well as other citizens living in the Reservation area.

Fourth, the applicant appears to have prepared a memorandum entitled "DAPL – Route Comparison and Environmental Justice Considerations" in response to the AccuFacts Report. However, that report was considered "confidential" and was not provided to the Tribes.  The United States cannot fulfill its trust responsibility if it makes decisions with such potentially significant impacts on tribal treaty rights based on confidential, adversarial analysis that the opposing tribe cannot independently review.

## III. Conclusion.

Both the Standing Rock and Cheyenne River Sioux Tribes have treaty hunting and fishing rights in Lake Oahe, which is located (at least in part) within the boundaries of both Reservations.  The Tribes additionally retain some proportion of water rights in Lake Oahe.  And both Tribes maintain a meaningful historic and cultural connection to the land that was flooded to create the federal floodplains project.

The Corps' EA as currently completed for the Section 408 permit decision acknowledges the Standing Rock Sioux's concerns with the DAPL pipeline (although not those of Cheyenne River Sioux).  However, the EA concludes that it is unlikely that a pipeline running underneath the main source of Reservation water will have any effect on either Tribe's Reservation or their residents.  This fails to consider the government-to-government relationship with the Tribes and other issues raised above concerning the various environmental statutes applicable to this project.  Nor did the Corps' conclusion take into account the Tribes' full assessment of the risks since at least two of the key analyses, the spill analysis and the Environmental Justice analysis, were considered confidential by the applicant and were never provided to the Tribes for review.

---

[189] *Id.* at 86.
[190] *Id.* at 85-87.

34

USACE_ESMT000598

In light of these considerations, I do not believe that the DAPL is one of "those obvious circumstances where no effect on the environment is possible."[191] or that the Corps' determination that there are minimal threats to tribal rights is "close to self-evident and would not require an extended document incorporating other studies."[192]  Instead, there is ample legal justification for the Corps to exercise its discretion to suspend or revoke the existing Section 408 permit and/or postpone a decision on the proposed easement conditional on additional analysis and government-to-government consultation concerning the tribal-specific issues discussed in this Memorandum, and to ultimately issue an EIS addressing these topics.  If the Corps ultimately does decide to authorize the easement, additional tribal consultation is necessary to develop conditions for the authorization that will protect the Tribes' rights and interests in and around Lake Oahe.

Hilary C. Tompkins

---

[191] *Duvall*, 777 F. Supp. at 1538.
[192] *Id.*

35

USACE_ESMT000599



## Lands in Trust and Fish & Wildlife Easements In Relation To DAPL

Prepared by Great Plains Region, Land Titles & Records Office 3/29/2016

### Legend

- Tribally Owned
- Allotted Owned
- Government Owned
- Pipeline
- FHA Easement
- Grassland Easement
- Refuge Easement
- Wetlands Easement
- 6 Mile Buffer

Miles
0 0.5 1   2   3   4

USACE_ESMT000600



## Lands in Trust and Fish & Wildlife Easements In Relation To DAPL

Prepared by Great Plains Region, Land Titles & Records Office, 5/23/2016

### Legend

- Tribally Owned
- Allotted Owned
- Government Owned
- Pipeline
- FHA Easement
- Grassland Easement
- Refuge Easement
- Wetlands Easement
- 6 Mile Buffer

USACE_ESMT000601



**DEPARTMENT OF THE ARMY**
**OFFICE OF THE ASSISTANT SECRETARY**
**CIVIL WORKS**
**108 ARMY PENTAGON**
**WASHINGTON DC 20310-0108**

⌐ DEC 2016

MEMORANDUM FOR Commander, U.S. Army Corps of Engineers

SUBJECT: Proposed Dakota Access Pipeline Crossing at Lake Oahe, North Dakota

1. On July 25, 2016, the U.S. Army Corps of Engineers (Corps) granted a permission to applicant Dakota Access, L.L.C., under Section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (Section 408 permission), for a proposed crossing of Lake Oahe, a Corps project on the Missouri River, by the Dakota Access Pipeline, an approximately 1,172 mile pipeline that would connect the Bakken and Three Forks oil production areas in North Dakota to an existing crude oil market near Patoka, Illinois. The pipeline is 30 inches in diameter and is projected to transport approximately 470,000 barrels of oil per day, with a capacity as high as 570,000 barrels per day. Total North Dakota field production of crude oil, as of September 2016, was 962,000 barrels per day.

2. The Section 408 permission was accompanied by an Environmental Assessment, as contemplated under the National Environmental Policy Act (NEPA), 42 U.S.C. §4321-4335, and its implementing regulations. The Environmental Assessment was prepared and evaluated in accordance with Section 1506.5 of the Council on Environmental Quality regulations for implementing NEPA, 40 C.F.R. §1506.5, which allow an applicant to prepare an environmental assessment if the Federal agency independently evaluates and verifies its information and analysis. The Environmental Assessment included a finding that granting the Section 408 permission for the proposed crossing of Lake Oahe did not constitute a major Federal action that would have significant environmental impacts.

3. The proposed crossing of Lake Oahe is approximately 0.5 miles upstream of the northern boundary of the Standing Rock Sioux Tribe's reservation. The Tribe relies on Lake Oahe for drinking water and irrigation, portions of Lake Oahe downstream from the proposed crossing remain within the Tribe's reservation boundaries, and the Tribe retains water, hunting and fishing rights in the lake.

4. The Environmental Assessment included a brief description and characterization of factors used in evaluating a potential alternative route and crossing location that it said was considered and eliminated "early in the routing phase." The alternative route would cross the Missouri River approximately 10 miles north of Bismarck, ND.

5. Because of security concerns and sensitivities, several documents supporting the Environmental Assessment were marked confidential and were withheld from the public or representatives and experts of the Standing Rock Sioux Tribe. These documents include a North Dakota Lake Oahe Crossing Spill Model Discussion prepared by the


Printed on Recycled Paper

Wood Group Mustang, the Lake Oahe HDD Risk Analysis Report, and the DAPL – Route Comparison and Environmental Justice Considerations Memorandum.

6.  In addition to the Section 408 permission, the proposed crossing of Corps property requires the granting of a right-of-way (easement) under the Mineral Leasing Act, 30 U.S.C. §185.  To date, the Army has not made a final decision on whether to grant the easement pursuant to this section.

7.  On September 9, 2016, the Army, along with the Departments of Interior and Justice, issued a joint statement noting that there were "important issues raised by the Standing Rock Sioux Tribe and other tribal nations and their members regarding the Dakota Access pipeline," and that it "will not authorize constructing the Dakota Access pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other federal laws."

8.  After completing that review of its previous decisions, as well as information received from Tribes and the applicant, the Army concluded on November 14, 2016 that, although its previous decisions comported with legal requirements, additional discussion with the Standing Rock Sioux Tribe and analysis were warranted in light of the history of the Great Sioux Nation's dispossessions of lands; the importance of Lake Oahe to the Tribe; our government-to-government relationship; and the Mineral Leasing Act's direction to protect the environment, those who rely on fish and wildlife in the area for subsistence, and the public. See, for example, 30 U.S.C. §185(h)(2).

9.  On November 22, 2016, the Omaha District Commander requested the Standing Rock Sioux Tribe to meet in order to engage in additional discussion and analysis during the week of November 28, 2016.  On November 23, 2016, the Chairman of the Standing Rock Sioux Tribe responded that he was willing to engage in discussions, but that the Tribe needed additional detailed information for a full assessment of oil spill risk.

10.  On December 2, 2016, the Omaha District Commander convened representatives of the Standing Rock Sioux Tribe, the applicant, and Omaha District staff.  The express purpose of the meeting was to review the Tribe's concerns that were expressed in its October 29, 2016 letter.  The group also discussed over 30 additional terms and conditions that could further reduce the risk of a spill or pipeline rupture. For example, the additional terms and conditions discussed include enhanced documentation (plans, drawings and records), and numerous pipeline safety enhancements, for example, a Supervisory Control and Data (SCADA) System, Computational Pipeline Monitoring (CPM) Leak Detection, Overpressure Protection Control, Interference and Corrosion Surveys, High Resolution Deformation Analysis, and Pipeline Patrolling.  While the 5-hour long meeting did not produce any definitive mutual agreements, the technical discussions produced a meaningful exchange of information.

USACE_ESMT000603

11. NEPA requires that Federal agencies consider reasonable alternatives to recommended actions whenever those actions "involve[ ] unresolved conflicts concerning alternative uses of available resources." See 42 U.S.C. §4332(2)(E). The Council on Environmental Quality's (CEQ) has advised that in some circumstances, including in some cases where environmental effects on Tribal resources are at stake, agencies "should heighten agency attention to alternatives (including alternative sites), mitigation strategies, monitoring needs, and preferences expressed by the affected community or population." See CEQ, "Environmental Justice Under the National Environmental Policy Act" at p. 10 (1997).

12. This more heighted analysis, in my judgment, is appropriate in the circumstances present here. Thus, after careful review and consideration, to include the revised proposed easement furnished to me on December 3, 2016, I have concluded that a decision on whether to authorize the Dakota Access Pipeline to cross Lake Oahe at the proposed location merits additional analysis, more rigorous exploration and evaluation of reasonable siting alternatives, and greater public and tribal participation and comments as contemplated in the CEQ's National Environmental Protection Act (NEPA) implementing regulations, 40 C.F.R. §1502.14 and §1503.1. Accordingly, the Army will not grant an easement to cross Lake Oahe at the proposed location based on the current record. The robust consideration of reasonable alternatives that I am directing, together with analysis of potential spill risk and impacts, and treaty rights, is best accomplished, in my judgment, by preparing an Environmental Impact Statement (EIS) that satisfies the accompanying procedures for broad public input and analysis. See, for example, 40 C.F.R. §1502 et seq.

13. Consistent with 40 C.F.R. §1500.2(e), the Corps shall engage in the following additional review and analysis (at a minimum):

- A robust consideration and discussion of alternative locations for the pipeline crossing the Missouri River, including, but not limited to, more detailed information on the alternative crossing that was considered roughly ten miles north of Bismarck;

- Detailed discussion of potential risk of an oil spill, and potential impacts to Lake Oahe, the Standing Rock Sioux Tribe's water intakes, and the Tribe's water rights as well as treaty fishing and hunting rights; and

- Additional information on the extent and location of the Tribe's treaty rights in Lake Oahe.

14. The Corps is encouraged to allow, with appropriate safeguards (including redaction), tribal government leaders and their representatives or experts, as well as relevant Federal agencies, the ability to review and respond to all analyses that are central to the concerns raised by the Standing Rock Sioux Tribe and other Tribal Nations, including the Lake Oahe Spill Model Discussion Report, the Lake Oahe HDD

-3-

USACE_ESMT000604

Risk Analysis Report, and the DAPL – Route Comparison and Environmental Justice Considerations Memorandum.

15. This policy decision is based on the totality of circumstances in this case, more specifically, the specific mandates of the Mineral Leasing Act (30 U.S.C. §185), the involvement of historic tribal homelands, the close proximity to reservation lands that extend into the potentially affected waters, and the potential impacts on treaty hunting and fishing rights. I want to be clear that this decision does not alter the Army's position that the Corps' prior reviews and actions have comported with legal requirements. Rather, my decision acknowledges and addresses that a more robust analysis of alternatives can be done and should be done, *under these circumstances*, before an easement is granted for the Dakota Access Pipeline to cross the Missouri River on Corps land.

16. The Corps, and particularly the Omaha District and Northwestern Division, have performed with remarkable diligence and professionalism in responding to a demanding situation that has galvanized tribal communities across the nation, and presented difficult and unique challenges in protecting public safety, First Amendment rights, property rights, and law enforcement.

Jo-Ellen Darcy
Assistant Secretary of the Army
(Civil Works)

-4-

USACE_ESMT000605



# Oglala Sioux Tribe
## Office of the President
PO Box 2070
Pine Ridge, SD 57770
Phone: 605.867.5821
Fax 605.867.6076



1868

1851

December 3, 2016

Jo-Ellen Darcy
Assistant Secretary of the Army for Civil Works
U.S. Army Corps of Engineers
108 Army Pentagon, Room 3E446
Washington, D.C. 20310-0108

      Re: Easement for Dakota Access Pipeline

Dear Assistant Secretary Darcy:

      On behalf of the Oglala Sioux Tribe (Tribe), I am writing to you to in response to your November 14, 2016 letter to Standing Rock Sioux Tribe (SRST), Energy Transfer Partners, L.P. and Dakota Access, LLC. In that letter, you clearly stated that the Army is mindful of the history of the Great Sioux Nation's repeated dispossessions and that respect and great caution are required in considering the concerns raised by the Standing Rock Sioux Tribe regarding the proposed crossing of Lake Oahe by the Dakota Access Pipeline (DAPL). We appreciate your statements and that the Army has determined that additional discussion and analysis is warranted on this most important topic. As previously conveyed the invitation to provide input must extend to all tribes of the Oceti Sakowin (Seven Council Fires or Great Sioux Nation). We, therefore, hereby submit input from our Tribe, a part of the Oceti Sakowin. As the Corps' timeline for any decision on the easement remains unclear, we submit this letter at this time as preliminary input which we reserve the right to supplement as discussions with the Corps per its November 14th letter continue.

      The Great Plains Tribal Chairman's Association voted unanimously on November 17, 2016, to call upon the President, the Secretary of the Army, and the Secretary of the Interior to deny an easement for the DAPL to cross the Missouri River at Lake Oahe. We point out the continuing bold and disrespectful behavior of Dakota Access, LLC. Not only has it refused to heed the calls of the United States to voluntarily halt construction near the Lake Oahe site, it has now filed suit against the United States—the very entity from which it requires an easement— asserting that it has free reign to move forward. As discussed below, the risk of a spill that could result from the issuance of an easement to the treaty and statutory rights of the Tribe is so great that it cannot reasonably be mitigated. This letter sets forth why a denial of the easement is warranted and the right path for the Army Corps of Engineers to take.

1

**EarthFax Engineering Group, LLC**
7324 South Union Park Avenue, Suite 100, Midvale, Utah 84047 • 801.561.1555 • FAX 801.561.1861



December 2, 2016

President John Yellow Bird Steele and Members of the Tribal Council
Oglala Sioux Tribe
P.O. Box 2070
Pine Ridge, S.D. 57770

Subject:   Review of the Dakota Access Pipeline Project
           Environmental Assessment Related to
           Crossings of Flow Easements and Federal Lands

Dear Mr. Steele and Members of the Tribal Council:

Pursuant to your request, I have reviewed the Environmental Assessment ("EA") concerning crossings of flow easements and Federal lands by the Dakota Access Pipeline Project. This EA was prepared on behalf of the U.S. Army Corps of Engineers, Omaha District and issued in July 2016. My review focused on the EA's discussion of issues related to the occurrence and potential impacts of spills as well as proposed measures presented in the EA to mitigate the impacts of those spills. My comments regarding the EA are outlined below.

**SPILL VOLUME ESTIMATES**

According to Section 3.2.2.2 of the EA, spill volumes of 4, 100, 1,000, and 10,000 barrels ("bbl") were evaluated. The EA notes that 50% of the incidents during their period of review (2002 through 2015) consisted of spills with a volume of 4 bbl or less. This was based on a review of a database maintained by the U.S. Pipeline and Hazardous Materials Safety Administration ("PHMSA").

I did not conduct an extensive independent review of the PHMSA database. However, I did review a summary published as part of the Keystone XL Project[1], which examined onshore crude oil spill data for the period of January 2002 through July 2012. The Keystone summary reached the following conclusions:

- Spill volumes from mainline pipelines tend to be larger than spills from discrete elements, other than tanks;
- Spill volumes from mainline pipeline incidents for 16-inch and larger diameter pipes tend to be larger than spills from smaller diameter pipes and similar to spill volumes from pipeline tanks; and

---

[1] https://keystonepipeline-xl.state.gov/documents/organization/205578.pdf

- The dominant causes of spills from mainline pipeline elements are corrosion, manufacturing or construction defects, and outside forces (i.e., third-party damage cause from excavation activities around the buried pipe or from agricultural practices such as deep tilling or drainage tile installation).

The Keystone summary verified that the median (50%) spill volume for all pipeline incidents during the period of interest was small (3 bbl). However, for incidents where the pipeline diameter was reported, the median spill volume during the period of interest was 30 bbl. Furthermore, when evaluating spills only from pipelines with a diameter of 16 inches or larger (i.e., the size class proposed by Dakota Access ("DA") Pipeline for crossing the Missouri River and Oahe Reservoir), the Keystone summary indicated that the median spill volume during the period of interest was 100 bbl, with an average incident volume of 1,116 bbl.

The EA indicates that the pipeline is designed to convey 570,000 bbl of crude oil per day. This converts to a throughput of approximately 400 bbl/minute, assuming constant flow. The median spill volume presented in the Keystone summary for pipelines with a diameter of 16 inches or larger (100 bbl) represents the amount of oil that will flow through the DA Pipeline in 15 seconds. The average spill volume from large diameter pipeline incidents (1,116 bbl) represents less than 3 minutes of planned operational flow for the DA Pipeline.

The spacing of block valves influences spill volumes, since properly operating valves can isolate the defective pipeline location from the remainder of the pipeline. This generally limits the discharge of oil from a spill to those pipeline sections between a block valve and the point of failure. The DA Pipeline Facility Response Plan ("FRP") presented in Appendix L of the EA provides estimates of potential spill volumes, but those estimates were redacted from the FRP. Since I could not find information in the EA regarding planned block valve spacing, I prepared planning-level estimates of potential spill volumes at the Missouri River and Oahe Reservoir crossings as follows:

- Assume that block valves are placed at the entry and exit points for the horizontal directional drills. According to Sovereign Lands Permits for the project provided in Appendix M of the EA, that would place block valves at the following locations;
  - 280 feet from the right bank of the Missouri River (24-inch pipeline),
  - 1,520 feet from the left bank of the Missouri River (24-inch pipeline),
  - 960 feet from the east bank of the full-pool shoreline of Oahe Reservoir (30-inch pipeline), and
  - 1,170 feet from the west bank of the full-pool shoreline of Oahe Reservoir (30-inch pipeline).
- Assume that pipeline failure occurs between the block valves and the river/reservoir bank.
- Assume that all oil is released only from the section of pipe between the valve and the bank. Since the lowest point on the bore will be at an elevation that is several feet below the block valve, this condition assumes that insufficient pressure will exist in the section of pipe on the water-side of the river bank to force oil to the surface. Since the

pipeline will be pressurized, this assumption likely results in a spill estimate that will be smaller than may occur in reality.

Based on these assumptions, the following spill volumes could occur at the indicated locations:

- Missouri River, right bank = 157 bbl
- Missouri River, left bank = 850 bbl
- Oahe Reservoir, east bank = 839 bbl
- Oahe Reservoir, west bank = 1,023 bbl

These values are within the range of crude oil spills that I have responded to. Therefore, I do not consider them to be excessively large.

It could be argued that the pipeline will be buried and that some of the crude that leaks would be absorbed by the soil thereby not reaching the water. While this is true, it is important to remember that the pipeline will be under pressure. As a result, there is a reasonable potential that leaks of even small quantities will result in crude oil reaching the surface above a buried pipeline.

This analysis does not account for discharge from the pipeline sections that are below water in the Missouri River and Oahe Reservoir. It also does not account for failures of the block valves or failures upstream from the block valves that result in spills that reach the water bodies. Although the Keystone summary indicates that equipment malfunction is rare, such failures should not be considered inconsequential. In fact, I have been involved in two crude oil spills that were the direct result of equipment failure.

The Keystone summary indicates that mainline valves are typically spaced on intervals of approximately 20 miles. Assuming that the pipelines or their components fail upstream from the closest block valve but in a location that could drain to the Missouri River or Oahe Reservoir, and that topographic conditions and valve spacing allows only 1 mile of pipeline to drain to the water body, the following spill volumes could result:

- 24-inch pipe (i.e., Missouri River crossing) = 2,950 bbl
- 30-inch pipe (i.e., Oahe Reservoir crossing) = 4,620 bbl

Obviously, if the length of pipeline that drains to the water is longer, the spill volume impacting the river or reservoir could be substantially higher.

The above information makes it clear that a spill volume of 4 bbl should not be considered typical. Given the large diameter of the DA Pipelines at the Missouri River and Oahe Reservoir crossings as well as the above data and calculations, the EA should have considered spill volumes well in excess of 100 bbl as a reasonable incident scenario rather than implying that a 4 bbl spill is the norm.

**RIVER FLOW RATE**

The spill impact analysis summarized in Table 3-7 of the EA was based on a number of conservative assumptions that are listed on page 46 of the EA. However, the effects of dilution in the water were based on average annual discharge rates of the Missouri River at nearby gaging stations rather than relying on conservatively lower discharge rates. At a minimum, the lowest mean daily discharge rates for the periods of record at the nearby gaging stations should have been used in the analysis. These discharge rates are provided below, based on data obtained from the U.S. Geological Survey web site[2]:

| River Crossing | Discharge Rate (cfs) | | Percent Difference |
|---|---|---|---|
| | Mean Annual | Mean Daily Minimum | |
| Missouri River | 20,374 | 9,290 | -54.4 |
| Oahe Reservoir | 22,484 | 19,100 | -15.1 |

Using these more conservative discharge rates, the estimated benzene concentrations provided in Table 3-7 of the EA would have been substantially higher at each crossing than indicated (up to approximately twice as high as presented for the Missouri River crossing).

**CONSTITUENTS OF CONCERN**

The evaluation presented in Section 3.2.2.2 of the EA focused on benzene which, as stated therein, "is commonly considered to pose the greatest toxicity threat from crude oil spills." While this is "commonly considered" to be the case, data presented by Benville and Korn[3] indicate that ethylbenzene and p-xylene are generally more toxic than benzene to the organisms tested. These authors also indicate that toxicity of toluene is similar to that of benzene.

Moles et al.[4] found that bulk crude oil was more toxic to the tested organisms than benzene (i.e., median mortality to the tested fishes occurred at crude oil concentrations that were only 10 to 40 percent of the benzene concentrations that caused the same mortality rates). This increased toxicity may be due to the presence of multiple polycyclic aromatic hydrocarbon ("PAH") compounds in crude oil. The National Research Council[5] reports that individual PAH compounds occur in crude oil at concentrations that are generally one-fifth to two-thirds of the magnitude of the benzene concentration. However, a review of data provided by the Savanah

---

[2] http://waterdata.usgs.gov/nwis/dvstat/?referred_module=sw
[3] Benville, P.E., Jr. and S. Korn. 1977. The Acute Toxicity of Six Monocyclic Aromatic Crude Oil Components to Striped Bass (*Morone saxatilis*) and Bay Shrimp (*Crago franciscorum*). Journal of California Fish and Game. Vol. 63, No. 4, pp. 204-209.
[4] Moles, A., S.D. Rice, and S. Korn. 1979. Sensitivity of Alaskan Freshwater and Anadromous Fishes to Prudhoe Bay Crude Oil and Benzene. Transactions of the American Fisheries Society. Vol. 108, No. 4, pp. 408-414.
[5] National Research Council. 1985. Oil in the Sea: Inputs, Fates, and Effects. National Academy Press. Washington, D.C.

River National Laboratory[6] and the U.S. Environmental Protection Agency[7] indicates that many of these PAH compounds are substantially more toxic than benzene.

Although crude oil composition varies widely between sources and few toxicity tests have been conducted with crude oil, the EA should have acknowledged that focusing on benzene would not necessarily provide the most conservative impact scenario. Quantitative assessments of individual crude-oil constituents should have also been performed to ensure that benzene was the appropriate compound on which to focus.

## COMPARATIVE CONCENTRATION LIMITS

According to Section 3.2.2.2 of the EA, the spill impact assessment was based on comparisons with two concentration limits for benzene:

- A drinking water maximum contaminant level of 0.005 mg/L and
- An aquatic organism acute toxicity level of 7.4 mg/L

Neither of these is the appropriate point of comparison for benzene for this project. Regulations contained in Section 33-16-02.1 of the North Dakota Administrative Code establish a benzene limit of 2.2 µg/L (0.0022 mg/L) for Class I waters (the classification for, among other water bodies, the Missouri River, including Lake Sakakawea and Oahe Reservoir). This limit is less than half of the concentration used for comparison in the EA analysis.

The EA states that the value of 7.4 mg/L used for ecological impacts was the "lowest acute toxicity threshold for aquatic organisms" listed in EPA's ECOTOX database. However, it does not provide other details regarding this value (i.e., what organism was tested, the type and length of the test, etc.). Based on my independent review of the ECOTOX database, I assume that the 7.4 mg/L value represents an LC50 concentration. An LC50 value is the concentration that is lethal to 50% of the organisms evaluated within the duration of a test. I should note that the lowest LC50 for benzene in my recent search of the ECOTOX database was 5.3 mg/L for a 4-day, flowing-water test performed on Rainbow trout (*Oncorhynchus mykiss*). This difference may have been due to updates to the database in the intervening review times.

Notwithstanding the lower LC50 value from my search of the ECOTOX database, an LC50 value is not usually the appropriate standard against which comparisons should be made when evaluating ecological impacts. The standard approach for an ecological risk assessment is to use a concentration known as the No Observed Adverse Effect Level ("NOAEL"). This is the concentration of a particular pollutant which test results indicate would produce no adverse effects on the tested organism. In the absence of this value, the concentration known as the

---

[6] Friday, G.P. 2005. Ecological Screening Values for Surface Water, Sediment, and Soil: 2005 Update. SRC-TR-2004-00227. Savanah River National Laboratory. Aiken, South Carolina.

[7] Regional Screening Levels (RSLs) - Generic Tables (May 2016). Downloaded from https://www.epa.gov/risk/regional-screening-levels-rsls-generic-tables-may-2016

Lowest Observed Adverse Effect Level ("LOAEL") is used in ecological risk assessments. This is the lowest concentration of a pollutant which test results indicate causes some kind of adverse effect (i.e., morphology, growth, development, etc.) on the test organism. The NOAEL and LOAEL concentrations are generally much lower than the LC50, which (as noted above) is based on a 50% organism mortality rate during the test.

Los Alamos National Laboratory maintains a database of screening levels used in ecological risk assessments based on contaminants in air, sediment, soil and water[8]. For benzene (the constituent upon which the EA focused), this database recommends a "No Effect" ecological screening level of 46 μg/L in water and a "Low Effect" ecological screening level of 460 μg/L in water. The compendium published by the Savanah River National Laboratory cited above recommends an ecological screening value of 46 μg/L in surface water. The National Oceanic and Atmospheric Administration has also produced a database of screening-level concentrations for contaminants in sediment, soil, groundwater, and surface water (fresh and marine). The NOAA-recommended ecological screening level for benzene in fresh surface water provided in this database is an acute concentration of 2,300 μg/L and a chronic concentration of 46 μg/L.

Based on the above summary, it is clear that the reference values used in the EA are inappropriate. Assuming that benzene is the appropriate contaminant of concern, more appropriate comparative limits are:

- Drinking water: 2.2 μg/L (based on the North Dakota surface water statute)
- Aquatic organisms: 46 μg/L (based on the Los Alamos NOAEL, the Savanah River screening value, and the NOAA chronic concentration)

It should be noted that the comparative concentrations provided above do not account for the effects of water temperature on ecological risk. Korn et al.[9] found that marine species may be more susceptible to oil spills in colder water due to increased persistence of the pollutants (i.e., reduced evaporation and biodegradation rates) and potential temperature-induced stress that may act synergistically with oil-induced stress. It is reasonable to assume that similar effects would be experienced by fresh-water species. Thus, spills during winter months may reduce the concentration at which impacts occur to aquatic organisms.

Since drinking water intakes occur downstream from the Missouri River and Oahe Reservoir crossings, the critical standard against which potential impacts should be compared is the lower of the above concentrations (i.e., 2.2 μg/L). Assuming that the results presented in Table 3-7 of the EA are correct, this concentration would result from a crude oil spill of approximately 12 to 13 bbl. As indicated above, crude oil spill volumes well in excess of this amount should be

---

[8] http://www.lanl.gov/environment/protection/eco-risk-assessment.php

[9] Korn, S., D.A. Moles, and S.D. Rice. 1979. Effects of Temperature on the Median Tolerance Limit of Pink Salmon and Shrimp Exposed to Toluene, Naphthalene, and Cook Inlet Crude Oil. Bulletin of Environmental Contamination and Toxicology. Vol. 21, pp. 521-525.

considered as reasonable incident scenarios for pipelines with diameters similar to those planned at the Missouri River and Oahe Reservoir crossings.

Section 3.2.2.2 of the EA minimizes the potential impacts of a spill by indicating that "the most probable spill volume (4 barrels or less) does not yield benzene concentrations that exceed the drinking water criteria even with the ultra conservative mixing assumptions." Even though this statement is correct, the calculated benzene concentrations provided in Table 3-7 of the EA for spills with a magnitude of 100 bbl and larger are substantially higher than the drinking water maximum contaminant level for benzene. This obvious conclusion is ignored in the EA narrative. The estimated benzene concentrations provided in Table 3-7 of the EA exceed the benzene maximum contaminant level by factors of more than 3 and nearly 4 at the Oahe Reservoir and Missouri River crossings, respectively, for a 100 bbl spill (a spill volume which, as noted above, is well within the potential for occurrence in the event of an incident). These exceedance factors increase exponential for the 1,000 and 10,000 bbl spills. The degree to which water quality standards are exceeded would have been even greater if the comparative concentration is the North Dakota Class I standard rather than the drinking water standard.

The purpose of a conservative analysis is to determine if a more detailed evaluation is needed. If impacts are not apparent under a conservative set of assumptions, a more comprehensive assessment is not necessary. However, in this case, the conservative assessment indicted that unacceptable impacts could occur under reasonable impact scenarios, especially when considering the spill volume data presented above. Therefore, a more detailed evaluation should have been conducted and/or detailed plans should have been presented to provide a greater assurance that impacts would be mitigated. Neither the more detailed evaluation nor the detailed mitigation plans was provided in the EA.

**SEASONAL CONSIDERATIONS**

Section 3.2.1.2 acknowledges that subfreezing temperatures during winter months will affect emergency response conditions during cleanup of a spill. My experience with multiple oil spill emergency response operations is that winter conditions create significant difficulties that are not present during other periods. Safe operations require that workers be much more careful in cold weather in order to avoid accidents. As a result, workers require more breaks and move slower due to the bundling of clothing that is protective of both cold temperatures and pollutants, daylight hours are shorter, slip-trip-fall risk increases significantly, etc. The EA should have quantified the effect of these factors on response time and the subsequent impacts to human health and the environment.

The EA further states that "pockets of oil naturally contained by the ice can be drilled to and removed using vacuum trucks." This is an oversimplification of oil recovery operations beneath ice. Working on ice presents multiple safety concerns. The trapped oil may move. It will be difficult to determine where the largest pockets of oil occur. Ice will naturally break both on the river and on the reservoir, shifting recovery locations and increasing safety hazards. River discharge rates are generally lower during the winter (resulting in less dilution of the spill) and

the time required to recover the oil will be increased (due to entrapment beneath the ice, safety considerations, access difficulties, etc.). These conditions will increase the extent to which the oil dissolves into the water, thereby increasing the downstream impacts to human health and the environment. Thus, a winter spill likely represents the worst-case scenario.

The EA minimizing the consequences of a winter-condition spill by stating that the "ice itself often serves as a natural barrier to the spread of oil." The paper cited in the EA[10] indicates that ice conditions can both benefit and hinder spill response, depending on the timing and type of release. The EA also indicates that winter conditions will be to the advantage of emergency response actions by stating in Section 3.2.2.2 that "winter releases are predicted to have lower impacts . . . as compared to releases occurring during the warmer seasons." Given the added difficulties of working in winter conditions, the unpredictability of ice conditions, the potential for increased contact between water and crude oil trapped beneath the ice, and other factors, it is equally likely that a winter release will have larger impacts compared to a release during other seasons of the year. Therefore, the EA should have presented a more serious, quantitative evaluation of the winter spill scenario to ensure that the adverse impacts of a spill under on those conditions were properly evaluated.

**RELIABILITY AND SAFETY**

Section 3.11 of the EA presents a discussion of pipeline reliability and safety, including an analysis of the risk associated with several threat categories. In the case of each category, the EA ranks the risk as low without a quantitative evaluation.

The Keystone summary cited previously provides data from the PHMSA database regarding pipeline spills during the period of January 2002 through July 2012. A comparison of the conclusions of the EA and data from the Keystone summary based on a review of 71 incidents during the indicated period of record involving mainline pipelines with diameters of 16 inches or larger is provided below:

| Incident Category | EA Risk Rank | Keystone Incident Summary | |
|---|---|---|---|
| | | Number | Percent of Total |
| Third Party Damage | Low | 18 | 25.4 |
| External Corrosion | Low | 11 | 15.5 |
| Internal Corrosion | Low | 18 | 25.4 |
| Pipe Manufacturing Defects | Low | 15 | 21.1 |
| Construction-Related Defects | Low | | |
| Incorrect Operations | Low | 1 | 1.4 |
| Equipment Failure | Low | 0 | 0.0 |
| Natural Forces | Low | 6 | 8.5 |

---

[10] Dickens, D. 2011. Behavior of Spills in Ice and Implications for Arctic Spill Response. OTC Technology Conference.

The EA minimizes the risk of system integrity threats by stating that procedures will be implemented to minimize those threats. However, the above data clearly indicate that substantial potential exists for spills to occur in categories that were considered by the EA to be low risk. This is particularly the case for those categories highlighted in yellow. Thus, a quantitative analysis of the risk associated with failure of system components should have been provided in the EA.

Section 3.11 of the EA also states that the impact of a release will be minimized through the use of "motor operated isolation and/or check valves . . . installed on either side of the Missouri River above Lake Sakakawea and Lake Oahe which can be actuated to close as soon as a leak is detected." It is inappropriate for the EA to imply that these valves will close immediately. For several reasons, three of which are stated below, emergency block vales do not close instantaneously upon the occurrence of a leak.

1. Pressure fluctuations are common in crude-oil pipelines. Therefore, supervisory control and data acquisition ("SCADA") systems, which (according to the EA) will be used to monitor operations on the DA Pipeline, generally accept pressure fluctuations within a pre-defined range without reaching an alarm threshold. Hence, if a spill occurs from a pinhole and not as a result of a catastrophic failure, it has been my experience that the incident could go undetected for several days without being detected by the SCADA system. Such an incident is often identified on after a visual inspection of the area r through the use of internal inspection tools. If such a pinhole occurs and results in a leak of 1 gallon per minute, 1,440 gallons (34 bbl) of crude oil would be lost in 1 day. If this spill occurs to the Missouri River or Oahe Reservoir, interpolation data provided in Table 3-7 indicates that the result would be a benzene concentration of approximately 6 µg/L (i.e., exceeding both the maximum drinking water contaminant level and the North Dakota Class I water quality standard). If such a leak occurs for a period of two weeks between visual inspections, the loss would be 480 bbl. Interpolation of data provided in Table 3-7 of the EA indicates that such a spill would result in a benzene concentration of approximately 80 µg/L in the Missouri River and Oahe Reservoir. This concentration is substantially higher than both the maximum contaminant level and the 2.2 µg/L critical concentration for these water bodies (based on North Dakota Class I water quality standard). As presented above, these spill volumes are well within the range of reasonably-possible scenarios.

2. Once a SCADA system sends an alarm, the system is not automatically shut down. Rather, an operator must evaluate the cause of the alarm and determine if a condition exists that warrants shutdown of the pipeline. Such an evaluation takes time. The American Petroleum Institute and the Association of Oil Pipe Lines[11] indicate that "prompt" rupture detection and response "means the alarm can be verified confidently in minutes versus seconds." Based on a throughput of 400 bbl/ minute, 800 bbl of oil

---

[11] American Petroleum Institute and Association of Oil Pipe Lines. 2014. Liquid Petroleum Rupture Recognition and Response. Document downloaded from http://www.aopl.org/wp-content/uploads/2014/09/Pipeline-Rupture-Recognition-and-Response-Final-w-Abstract-August-2014.pdf

will spill if a response is instituted 2 minutes after a pipeline rupture. Data provided in Table 3-7 of the EA indicate that the benzene maximum contaminant level and Class I water-quality standard would be substantially exceeded in this time frame.

3. The probable initial response action for a rupture would be to close the motor-operated block valve. These valves do not close instantaneously. Global Asset Protection Services[12] indicates that emergency shutdown valves close within 1.0 to 1.5 seconds per inch of diameter. Assuming a high-speed valve that closes within 1.0 second per inch of diameter, the valves on the DA Pipeline segments valuated in the EA would require 24 to 30 seconds to close (depending on the location and assuming the valves are the same diameter as the pipelines at those locations). The flow through the valve will gradually decrease and the valve shuts. Thus, based on a throughput of 400 bbl/min, 80 bbl of oil will spill from a 24-inch diameter valve and 100 bbl will spill from a 30-inch diameter valve as the valves close. Data provided in Table 3-7 of the EA indicate that the benzene maximum contaminant level and the Class I water-quality standard would be substantially exceeded in this time frame.

**IMPACT MITIGATION PLANS**

Table 8-2 of the EA states that "in the event of a leak, Dakota Access would work aggressively to isolate the source through the use of remote-controlled shut-off valves, initiate cleanup activities, and contact appropriate federal and state authorities to coordinate leak containment and cleanup." These actions are necessary but are not sufficient to mitigate impacts associated with oil spills of magnitudes that are well within the range of likely volumes if a spill from the DA Pipeline occurs into the Missouri River or Oahe Reservoir.

Section 3.2.1.2 of the EA indicates that "protection and mitigation measures will be implemented in cooperation with intake operators" to minimize the potential impacts of spills at the locations of those intakes. However, the EA does not present a discussion of the "protection and mitigation measures" that are planned. Since the Finding of No Significant Impact is preceded by the word "Mitigated", these mitigation plans should have been detailed in the EA. Instead, the EA presents only general mitigation concepts.

Based on the planning-level spill volumes presented previously and the data provided in Table 3-7 of the EA, it is reasonable to assume that adverse impacts will occur to the quality of water at downstream intakes. Therefore, it is important that plans be developed and mitigation measures be in place to protect water intakes <u>before</u> the DA Pipeline is operated in areas that may impact the Missouri River or Oahe Reservoir.

**MISCELLANEOUS CONCERNS**

I also noted the following miscellaneous concerns during my review of the EA:

---

[12] Global Asset Protection Services, LLC. 2015. Emergency Block Valves. GAPS Guidelines No. GAP.8.0.1.3. Hartford, Connecticut.

- Section 2.3.2.4 notes that the pipeline trench will be backfilled with the "previously excavated material". No mention is made of pipe bedding (typically a uniform sand or fine gravel). This material is standardly placed around underground piping to provide a uniform fill and minimize the potential for corrosion and physical damage to the pipe during installation and operation. If bedding material is not placed around the pipe, the potential for spill incidents is increased.

- Section 2.3.2.6 of the EA summarizes scour analyses that were performed to support decisions regarding the planned depth of installation of the pipeline beneath the beds of the Missouri River and Oahe Reservoir. The conclusion is reached from these analyses that the Oahe Reservoir crossing is at low risk of scour because deposition of sediment is much more likely than scour of the lake bed due to the ponded water condition of the reservoir. This is true only if the reservoir dam functions properly. Since a 500-year discharge event was used for the scour analyses, the potential extent of scour at this location should have been evaluated assuming that the dam is breached.

- Estimates presented in Section 2.3.2.6 of the EA indicate that the combination of bend scour and contraction scour will result in 32 to 34 feet of scour at the Missouri River crossing. This section also states that the planned depth of the pipeline below the Missouri River at this crossing is 36 feet. Hence, the estimated scour is nearly sufficient to expose the pipeline, which would increase the potential for pipeline failure. The potential for this scour scenario (bend plus contraction scour occurring at the crossing) was quantified by comparing the results of multiple calculation methods and arriving at a factor of safety against exposure of 1.4 to 2.3. However, I could not locate the calculations in the EA that served as the basis for these calculations. Therefore, it is unknown if this approach was appropriate or if these calculations took into account the relative errors of the various equations, which errors would affect the interpretation of the results. Given the potential depth of scour versus the planned depth of pipeline installation, the calculations should have been presented to allow independent review of the risk by the Corps of Engineers.

- Section 3.1.3.1 provides a discussion of landslide potential in the area of concern. This potential is qualitatively described as ranging from moderate to high. The probable depth of the landslide failure surface relative to the depth of the pipeline is also not discussed. Without this information, the potential impact of landslides on the pipeline cannot be properly quantified and assessed.

- Section 3.1.3.2 of the EA indicates that erosion control measures will be implemented "during construction in these areas with slopes greater than 25%." No mention is made of erosion control practices that will be implemented where the ground slope is less than 25%. With the pipeline buried generally at a depth of 36 inches, erosion could be a significant factor in exposure of the pipeline, which in turn would increase the potential for corrosion and physical damage of the pipe. This in turn would increase the potential for failure of the pipeline. Thus, it is important that erosion control measures be implemented in all areas disturbed by pipeline construction, regardless of the ground slope at those locations.

- As part of a discussion about erosion control methods to be implemented, Section 3.1.3.2 of the EA indicates that "construction and operation of the Proposed Action facilities . . . would not be expected to increase the potential for significant landslide or slip events". The implication of this statement is that the control of surface erosion will also control landslides. This is an inappropriate conclusion. Surface erosion is a shallow process that typically occurs in the upper few inches of the soil profile. Landslides are generally deep-seated, with failure surfaces that are a few to several feet below the ground surface.
- Section 3.1.3.2 of the EA also states that "the strength and ductility of a properly designed pipeline would allow it to span a considerable distance without compromising its integrity in the event of a landslide or other ground movement, such as subsidence." This statement is true only if the pipeline was designed for such a span. Friction from adjacent soil can place substantial added forces on a pipeline during a landslide, whether those forces are caused by abrupt movements or slow movements.
- Section 3.1.5.2 of the EA indicates that topsoil will be segregated from excavated materials "in agricultural land, and if applicable, other areas where soil productivity is an important consideration." In order to properly revegetate the disturbed area and minimize long-term erosion, it is critical that surficial soil be segregated and replaced throughout the length of the pipeline disturbance, whether the area has agricultural significance or not. My experience with the design of plans to reclaim land that has been disturbed by mining operations has shown that even poor quality surficial soils can be effectively revegetated if properly handled.
- Section 3.2.1.2 of the EA states that hydrostatic testing of the pipeline segments will be conducted prior to installation. While this is important, no mention is made of such testing after the pipeline is installed. Given the length of the bores and the bends that will be necessary to install the pipe beneath the Missouri River and Oahe Reservoir, it would be appropriate to hydrostatically test the pipeline after it is installed and before it is put into operation.
- Section 3.2.2.2 of the EA states that "dispersion, evaporation, dissolution, sorption, photodegradation, biodegradation, and natural attenuation would allow a return to preexisting conditions in both soil and groundwater" if a spill occurs and no active groundwater remediation occurs. While this statement is technically true, the time frame require for "preexisting conditions" to return to the area would likely be at least several decades unless active remediation occurs. Therefore, relying solely on these natural attenuation factors to remediate groundwater that is contaminated with a crude-oil spill would be inappropriate under most conditions.
- Section 4.2 of the EA states that operational spill-related impacts "would be avoided or greatly reduced . . . by requiring immediate cleanup should a spill or leak occur." This statement oversimplifies efforts and minimizes the impacts that a spill could occur. As noted previously in this letter, even in the event of an "immediate" action, potential spill volumes may be in the range of hundreds to thousands of barrels. My experience has been that cleanup of the impacts associated with crude oil spills of this magnitude will require at least several months or years. Furthermore, the larger the water body, the

more difficult the cleanup effort. I was involved in the cleanup of an 800 bbl crude-oil spill into a mountain stream with a pond at the downstream end. A period of several months was required to reach a point where active remediation efforts were no longer required, even though the stream was small enough and the flow low enough that pressure washing of individual rocks in the bed and banks of the creek was performed. Furthermore, it was more than six years after the spill event before further monitoring and related actions was not required by the State. Therefore, the EA should have provided a more comprehensive quantitative evaluation of spill impacts rather than implying that a goal of "immediate cleanup" should be sufficient to resolve those concerns.

Please let me know if you have any questions regarding this matter.

Sincerely,

Richard B. White

Richard B. White, P.E.
Consulting Civil and Environmental Engineer
EarthFax Engineering Group, LLC

## Richard B. White, P.E.

### EDUCATION

| | |
|---|---|
| MS, CIVIL AND ENVIRONMENTAL ENGINEERING | 1977 |
| *Utah State University* | *Logan, Utah* |
| | |
| BS, WATERSHED SCIENCE | 1976 |
| *Utah State University* | *Logan, Utah* |
| | |
| SAFETY AT HAZARDOUS MATERIALS SITES | 1986 |
| *EarthFax Engineering, Inc.* | *Midvale, Utah* |

### EXPERIENCE

| | |
|---|---|
| CONSULTING CIVIL AND ENVIRONMENTAL ENGINEER | 2016-PRESENT |
| PRESIDENT | 1982-2016 |
| *EarthFax Engineering Group, LLC* | *Midvale, Utah* |

Mr. White serves as lead engineer on many EarthFax projects, ranging from civil engineering design to environmental assessment and remediation to slope stabilization projects. He provides quality assurance/quality control and internal peer review on many of the company's projects. His core areas of expertise include:

- Assessment and mitigation of environmental impacts resulting from land development
- Design of disturbed-land reclamation plans
- Design of runoff- and sediment-control plans
- Design of stream channel stabilization plans
- Rapid engineering response to oil spills and other environmental emergencies
- Preparation of plans to remediate soil and groundwater contamination
- Interaction with regulatory agencies

Representative projects on which Mr. White has worked are summarized below.

**Oil Spill Response**

Mr. White has served as chief consulting environmental engineer on over 25 oil spills (crude, gasoline, and diesel) in the Intermountain/Rocky Mountain regions of the U.S. In this capacity, he has provided oversight or direct involvement in assessing the extent and magnitude of impacts, designed methods to remediate those impacts, sampled impacted media to confirm the efficacy of remediation efforts, and interacted with regulatory agencies on behalf of the clients. Selected projects are summarized below.

- Served as part of the client's team in in response to a release of diesel fuel to a fresh-water reservoir in northern Utah. A cracked seam in an 8-inch diameter refined products pipeline released approximately 500 barrels of diesel into a stream channel and pond system that conveys storm water to Willard Bay, a man-made fresh-water reservoir situated along the east shore of the Great Salt Lake. Provided technical and engineering expertise during initial delineation of the spill boundaries; responsible for assessing impacts to groundwater; designed groundwater remediation methods; provided input on the design of several water control structures; reviewed mass balance calculations of

released and recovered product; and interacted with State regulatory personnel and their subcontractors on behalf of the client.

- Served on the client's emergency response team on a crude oil spill in the metropolitan area of Salt Lake City, Utah. The 800-barrel release originated from an 8-inch diameter pipeline that transports crude oil from western Colorado to refineries in the Salt Lake City area. The event occurred during a series of late spring thunderstorms in Salt Lake City that resulted in short-circuiting of an adjacent high voltage terminal, causing the pipeline to become a receptor of the electrical surge which melted a hole in the line. By the time the release was discovered and controls emplaced, the oil had traveled approximately 10 miles through Salt Lake City toward the Great Salt Lake before it was contained. Responsible for technical input on all EarthFax activities throughout the project, including design of initial response efforts, site assessments, design of remediation methods, and post-event sampling. Specific tasks performed by Mr. White included:

  - o   Provided technical engineering and environmental expertise to the client and other subcontractors under the Unified Command system during the emergency response and remediation phases of the project.
  - o   Conducted multiple Shoreline Cleanup and Assessment Technique surveys along the affected waterways to uniformly grade the magnitude of contamination and prioritize future cleanup activities.
  - o   Provided and reviewed design and construction inspection services for the restoration of the spill site, the impacted waterways, and adjacent properties.
  - o   Performed confirmation sampling during active remediation efforts and for approximately 5 years after the release to verify that human health and ecological risks in the affected area had been adequately mitigated.

- Served as part of the client's emergency response team on a second crude oil spill in the metropolitan area of Salt Lake City, Utah. This 550-barrel spill occurred approximately 6 months after the above-noted release when a nearby block valve froze during extreme winter temperatures. Approximately 4 acres of land in an adjacent arboretum and amphitheater were affected. Responsible for overseeing initial assessments to delineate the extent of contamination; for designing controls to isolate the contamination during snowmelt; for verification sampling following excavation of the impacted soil; for providing technical advice on environmental, regulatory, and waste disposal matters; for directing excavation efforts; and for providing engineering support during restoration or replacement of impacted structures.

- Served as chief engineer to assess and remediate soil contamination due to leakage from a refined product pipeline in a remote location on the western Snake River Plain in south-central Idaho. Supervised assessment efforts, calculated the quantity of spilled hydrocarbons in the soil to compare with the client's estimate of spilled product based on pipeline flow records, and designed a soil vapor extraction remediation system using multiple vertical vapor extraction points. Calculations confirmed that benzene emissions from the blowers would be below the Idaho Department of Environmental Quality emission rate standard, thus eliminating the need for surface treatment of the emissions. Supervised monitoring efforts during the cleanup process.

- Served as part of the client's emergency response team on the release of diesel fuel to a wetland area adjacent to the north shore of the Great Salt Lake. An estimated 100 barrels of diesel fuel were released through a pin-hole leak in an 8-inch diameter pipeline that conveys refined fuel products from Salt Lake City, Utah to Spokane, Washington, resulting in 22 acres of wetland and upland area being affected. Mr. White provided technical oversight or direct input on this project, including implementation of containment measures, delineating the extent and magnitude of contamination, evaluating remediation alternatives, managing remediation activities, documenting the work, and providing agency liaison. Two unique aspects of the project included responding to the release using low-impact methods (pack mules) to deploy containment booms in the sensitive wetlands and transitional wetland zones, and implementing controlled-burn activities as an acceptable remediation technology. Following completion of the controlled burn, Mr. White designed an approach to enhance bioremediation of the remaining hydrocarbon-impacted upland soil. Subsequent analyses confirmed that this approach was successful.

- Provided technical oversight during assessment and remediation of soil impacted by the release of crude oil from a 3-inch diameter underground lateral crude line that ruptured in a remote area of eastern Utah. Released traveled down an ephemeral drainage for approximately 0.5 mile toward a regionally-important river. Supervised the design of methods to contain the release before it could impact the river. Designed a passive-aeration bioremediation cell, using wind-operated turbines, to remediate approximately 9,200 cubic yards of excavated soils in this remote area. Provided oversight during sampling activities and in the interpretation of the resulting data.

- Served as chief consulting environmental engineer at the site of a crude oil spill located near an important drinking-water reservoir in northern Utah. The release occurred when a contractor for a residential development company ripped through the pipeline with a dozer, breaking the line and releasing 700 barrels of oil onto the ground before the line was shut down. Provided oversight during delineation of the spill site boundary; identification of potential above- and below-ground receptors of concern; collection of numerous soil samples from the spill site as well as background water quality samples from the nearby reservoir; and performance of a geologic study to better understand potential subsurface pathways of migration and how they might affect response activities undertaken to protect surface and groundwater resources. Assisted in the design of a permitted temporary impacted-soil storage area at the base of the spill site.

- Evaluated soil and groundwater contamination near the Trans Niger Pipeline in the Ogoniland region of Rivers State, Nigeria. Spills from these facilities (occurring from deteriorated infrastructure as well as sabotage and crude-oil theft) had created significant environmental impacts in the region. This project included a review of soil and groundwater data collected by others from 9 areas that had been previously remediated. It also included an evaluation of 133 groundwater samples collected from private wells used for domestic purposes near the pipeline. These results of these analyses were compared with risk screening levels established by the Nigerian Department of Petroleum Resources. Prepared reports summarizing the results of the above comparison and provided recommendations for future efforts.

**Mine Site Assessment, Design, and Reclamation**

Mr. White has developed reclamation plans for several areas disturbed by coal and mineral mining operations. Using site-specific topographic data, he has designed drainage alignments, profiles, and channel sections to efficiently convey runoff from the reclaimed slopes. He has also developed reclamation grading plans that balanced earthwork volumes, designed post-mining runoff- and sediment-control structures, developed topsoil and substitute topsoil redistribution plans, and developed revegetation plans to restore the areas to productive post-mining land uses. He has submitted this information to the appropriate regulatory agencies on behalf of his clients, and provided construction oversight during field implementation of the plans. Representative projects are summarized below.

- Designed a surface-roughening technique applicable to the semi-arid areas of the western United States referred to as "deep gouging." This method results in a variably roughened surface that retains precipitation on the immediate slope, thereby enhancing revegetation success and substantially reducing erosion potentials. Using established hydrologic calculation methods, demonstrated that sediment yields from areas reclaimed with this method are significantly reduced when compared with the same areas prior to disturbance. Using this reclamation technique, the client received the 2003 Excellence in Surface Coal Mining and Reclamation National Award, presented by the U.S. Department of Interior, Office of Surface Mining. They were cited "for outstanding performance in developing and implementing exemplary mining and reclamation methods that maintained sound environmental conditions."

- Developed a plan to reclaim land affected by molybdenum mine and mill located at an elevation of over 10,000 feet in Colorado. Expansion of the mining operation was projected to result in an affected area of over 6,400 acres, including the open-pit mine, tailings impoundments, a waste-rock disposal site, the mill site, and several ancillary facilities. Critical issues affecting the design of the reclamation plan included the high-altitude location in montane and alpine ecological zones, dealing with a short growing season and an average annual snowfall of over 20 feet, the control of acid-mine drainage, the location of the site on the continental divide at the headwaters of three major drainages, and the fact that much of the surface water from the site discharged into watersheds that provided a portion of the drinking-water supply for Denver, Colorado. Evaluated areas to be affected by the expansion project and developed topsoil salvaging plans for those areas that had not yet been disturbed. Designed reclamation channels to safely convey the peak flow from the probable maximum precipitation event around and across the tailings in a non-erosive manner. Designed a cover system for the tailings impoundments that would shed runoff in a controlled manner and minimize the potential for long-term seepage of acidic water from the tailings. The reclamation plan included demolition of site structures, placement of the demolition debris in the tailings impoundments, construction of the cover system for the tailings, recontouring of selected areas, incorporation of lime into the surface of acid-generating material, placement of topsoil, and site revegetation.

- Evaluated alternatives for reducing, controlling, and recycling waste rock at a coal mine located on Sakhalin Island in the Russian Far East. Evaluated alternatives for minimizing environmental pollution resulting from existing mine waste dumps and increasing opportunities to recycle this waste; developed a program to control and beneficially reuse solid wastes generated by the mine; and prepared a project report that outlined the

feasibility of solid-waste control and recycling at the facility. Also evaluated alternative underground mining methods to minimize the production of waste rock and assessed the coal burning efficiency of the town boiler to minimize ash production. This project was subsequently designated by the Eurasian-American Partnership for Environmentally Sustainable Economies as a Best Practice. The citation indicated that the project demonstrated "environmentally sound and economically efficient solutions to environmental problems in Central and Eastern Europe and Eurasia."

- Conducted a hydrogeologic investigation at a surface coal mine located north of Vladivostok in the Russian Far East. Large quantities of groundwater were flowing uncontrolled into the mine, creating safety hazards due to instability of pit walls and spoil piles. Furthermore, water being discharged from the mine had the potential of adversely impacting the quality of water in Khanka Lake, an important ecological preserve located downstream from the mine. Evaluated data collected at the site by the Russian Academy of Sciences, conducted field investigations, and interviewed mine personnel familiar with the local hydrogeology. Designed dewatering wells to intercept the groundwater before it could flow into the mine, thereby eliminating the safety and environmental concerns. Recommended that water pumped from the dewatering wells be delivered to nearby communities for their domestic use and that the heat from the pumped groundwater be recovered to heat mine buildings and nearby residences.

- Prepared reclamation plans for an existing uranium mine and mill in southeastern Utah. The project included the design of a suitable cover for the tailings, giving consideration to radon attenuation, and erosion control. Designed a capillary break that was installed between the tailings and the cover to minimize the potential for moisture (and accompanying contaminants) to migrate in the vadose zone between the tailings and the cover. In accordance with the requirements of the U.S. Nuclear Regulatory Commission, designed a reclamation channel to convey surface runoff resulting from the probable maximum precipitation event across the site without damaging the reclaimed tailings piles.

- Prepared a plan to reclaim land affected by waste from silver and gold mining operations near Park City, Utah. The 4,800-acre area was planned for residential, commercial, and recreational development. Over a 100-year period, large quantities of waste rock and tailings contaminated primarily with arsenic and lead had been left in diverse locations throughout the property. Since sufficient topsoil was not available to cover the exposed waste, the cover system design for the waste rock involved incorporation of mulch into the waste rock and direct revegetation of the mulched surface. Final reclamation plans also included demolition of remaining structures, construction of diversions to control runoff, and fertilizing and revegetating the reclaimed waste rock and tailings. The plan was developed to provide long-term protection of the environment under the assumed future scenarios consisting of residential, commercial, and recreational land uses.

- Designed numerous surface-runoff and sediment control facilities for surface and underground coal mines, active and inactive uranium mills, and hazardous-waste management operations. Facilities have included sedimentation ponds, diversion channels, riprapped channels, land reclamation, check dams, and culverts. State-of-the-art models have been used to determine peak design flows and to aid in design of the structures. Design considerations have included selection of the appropriate design storm, avoidance of maximum permissible flow velocities, cost-effective erosion

control, and water-surface profile analyses.  Served as a liaison between the clients and the appropriate regulatory agencies.

- Conducted an investigation at the site of an active uranium mill in southeastern Utah to determine appropriate remedial actions to prevent future groundwater contamination after a plume had developed due to seepage from tailings ponds. Performed surface geophysical investigations (electrical resistivity and very-low-frequency electromagnetic) to determine the extent of contamination, bedrock lithology, and the location of major groundwater-conducting fractures. Utilized water-level and quality data from over 140 previously existing and new monitor wells to aid in defining the extent of groundwater contamination. Conducted long-term pumping tests to determine the anisotropic nature of the groundwater hydraulic system. Modeled the fractured aquifer to determine the rate of contaminant migration and the effectiveness of the proposed remedial action. Designed a remedial-action plan consisting of hydrodynamic control of contaminant migration through the operation of several groundwater recovery wells and pumping this groundwater to evaporation ponds for disposal.

- Conducted groundwater, surface water, and soil investigations at the site of an abandoned copper/lead smelter in Utah which was being considered for addition to EPA's National Priorities List.  Installed multiple monitoring wells to assess groundwater hydraulic and quality conditions. Delineated and sampled areas of smelter wastes, including slag, calcine, baghouse dust, and miscellaneous waste which had accumulated during operation and demolition of the smelter. Data received from the laboratories were interpreted using geochemical and hydrologic models to determine the need for future remedial actions and the effectiveness of natural soils at attenuating the migration of inorganic contaminants from the waste sources. Developed a conceptual remedial-action plan together with work plans for remedial design. Information was also provided in support of the client's pursuit of Innocent Purchaser Defense rules.

- Designed methods to stabilize a steep-slope area of approximately 40,000 square feet that had been affected by a coal outcrop fire.  The fire had originated in an adjacent abandoned underground coal mine and had resulted in denuding of the area and mass failure of several portions of the slope, including multiple rotational failure cracks with depths in excess of 25 feet and top widths in excess of 10 feet. The design consisted of creating a uniform slope in areas that had been subject to mass failure, installing gabions and anchoring the gabions to the slope using rock bolts, filling the gabions with road-base material and topsoil, and revegetating the area. Provided construction oversight and survey control during implementation of the project.

- Developed a conceptual dewatering plan for a proposed lead/zinc/silver mine that was projected to encounter significant quantities of hot saline groundwater.  Previous dewatering operations in the region had pumped water to percolation ponds on an alluvial fan that was situated above a valley that relied on groundwater for irrigation of agricultural fields.  Performed investigations to determine the potential of future dewatering operations to impact the valley's groundwater resources.  Reviewed data from local water-supply wells to determine whether or not past impacts had occurred.  Evaluated alternatives for mine-water disposal and designed a monitoring program to assess future impacts.  Served as a liaison between the mining company, regulatory agencies, and legal counsel.



**DEPARTMENT OF THE ARMY**
CORPS OF ENGINEERS, OMAHA DISTRICT
1616 CAPITOL AVENUE
OMAHA NE 68102-4901

REPLY TO
ATTENTION OF

CENWO

MEMORANDUM FOR RECORD

SUBJECT: Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

1. <u>References</u>.

   a. 30 U.S.C. § 185, Rights-of-way for Pipelines through Federal Lands.

   b. 33 U.S.C. § 408, Taking Possession of, Use of, or Injury to Harbor or River Improvements.

   c. Engineering Regulation 405-1-12, Real Estate Handbook, September 30, 1994.

   d. Engineering Regulation 1130-2-550, Recreation Operations and Maintenance Policies, September 30, 2013.

   e. Engineering Circular 1165-2-216, Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Engineers Civil Works Projects Pursuant to 33 U.S.C. 408, June 21, 2016.

   f. CEMP-CR/CECC-R, Memorandum, Subject: Real Estate Guidance Letter No. 27 – Official U.S. Army Corps of Engineers Real Estate Policy, October 29, 2008.

   g. Notice of Availability, Dakota Access Lake Oahe Crossing, December 03, 2016.

2. <u>Purpose</u>. The purpose of this memorandum is to document the U.S. Army Corps of Engineers (Corps) decision on the Dakota Access, LLC (Dakota Access) application for an easement to cross Corps-managed federal lands at Lake Oahe, North Dakota. See the attached Unexecuted Easement, Exhibit A, for a map of the area that would be covered by the easement.

3. <u>Authority</u>. Congress authorized "appropriate agency head[s]" to grant rights-of-way or easements through federal lands for oil pipelines in the Mineral Leasing Act. 30 U.S.C. § 185(a). Congress outlined how agencies were to exercise their discretion under this authority -- before granting a right-of-way, agencies must impose conditions, including requirements to control or prevent damage to the environment, public or private property, hazards to public health and safety, and measures to protect the interests of individuals living in the general area who rely on certain natural resources in the area for subsistence. 30 U.S.C. § 185(h)(2). Further,



CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of
Engineers-Managed Federal Land at Lake Oahe, North Dakota

section 185 requires agencies to impose requirements for the operation of pipelines that "protect
the public from sudden ruptures and slow degradation of the pipeline." 30 U.S.C. § 185(g).

4. <u>Background</u>.  The Corps received an application for an easement on October 21, 2014 from
Dakota Access.  Specifically, the application requested an easement for a 30-inch diameter light
crude oil pipeline.  The approximately 1,168 mile Dakota Access Pipeline (DAPL) will connect
the Bakken and Three Forks oil production region in North Dakota to an existing crude oil
market hub near Patoka, Illinois.  The pipeline crosses three Corps districts: Omaha, Rock Island
and St. Louis.  The Corps was required to consider three categories of requests submitted by
Dakota Access for: (1) individual verifications that activities at more than 200 locations along
the DAPL route satisfied the terms and conditions of Nationwide Permit (NWP) 12 (under the
Clean Water Act, 33 U.S.C. § 1344, or the Rivers and Harbors Act of 1899, 33 U.S.C. § 403),
which authorizes activities required for the construction of utility lines in federally-regulated
waters; (2) a real estate easement to lay the pipeline under a Corps-managed lake (Lake Oahe)
and adjacent Corps-managed property; and (3) permissions to cross or lay the pipeline in seven
locations used by the Corps for navigation or flood control under section 14 of the Rivers and
Harbors Act of 1899, 33 U.S.C. § 408 (section 408).  Of the total length of the pipeline, only
approximately three percent of the route is subject to Corps jurisdiction.

The pipeline would cross Lake Oahe at approximately one-half mile upstream of the northern
boundary of the Standing Rock Sioux Tribe's (SRST's) reservation.  Dakota Access would use a
technique called horizontal directional drilling (HDD) to place the pipeline approximately 92 feet
below the lake bed.  The Corps would need to provide Dakota Access with three separate
permissions for this specific crossing.  Dakota Access required and received verification that the
crossing meets the terms and conditions of NWP 12.  Because the pipeline would cross Corps-
managed property, section 408 required the Corps to "grant permission for the alteration or
permanent occupation or use of [the project] when in the judgment of the Secretary such
occupation or use will not be injurious to the public interest and will not impair the usefulness of
such work." 33 U.S.C. § 408.  Finally, the Corps would need to grant Dakota Access an
easement (*i.e.,* a "right-of-way") because the pipeline would cross Corps-managed federal
property. 30 U.S.C. § 185(a).

The Omaha District prepared environmental documentation under NEPA to support the required
section 408 permission to cross Lake Oahe.  The District published a draft EA on December 8,
2015, which was circulated for public comment.  See 40 C.F.R. § 1508.9 (defining EAs).  After
reviewing the comments received, the Corps published the final EA and a Finding of No
Significant Impact (FONSI) for the crossing on July 25, 2016.  See 40 C.F.R. § 1508.13
(defining FONSIs).  The Corps must now take action on the application for an easement by
Dakota Access.

5. <u>General Policy Evaluation</u>.  The Corps evaluated the Dakota Access application as a policy
matter under the Non-Recreational Outgrant Policy at ER 1130-2-550, Chapter 17.

USACE_ESMT000653

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

   a.  ER 1130-2-550 requires that the Corps determine that "[t]he impact associated with an individual action or the accumulated impact of a series of actions must not adversely impact the capability of the project to generate the benefits for which the project was congressionally authorized, constructed, and is operated" before granting an easement.  ER 1130-2-550, paras. 17-3 and 17-9.b.(1) (2013).

The Lake Oahe project was authorized by the Flood Control Act of 1944, Public Law 78-534, along with four other Missouri River main stem projects.  The five reservoirs are elements of a plan for the development of the Missouri River main stem.  The main stem plan is a component of the comprehensive river basin development program in the Missouri River Basin, the Pick-Sloan Plan.  Formed from separate proposals recommended by the Bureau of Reclamation and the Corps, the Pick-Sloan Plan was one of the first plans nationwide that recognized the role of tributary basins and the importance of comprehensive planning in flood control.  The Congressionally-authorized purposes of the Lake Oahe project include flood control, navigation, hydropower, recreation, water supply, and water quality.

The Omaha District found that the proposed DAPL crossing at Lake Oahe "will not impair the usefulness" of the Lake Oahe project when the District granted permission to impact the project under 33 U.S.C. 408.  FONSI at p. 6 (July 25, 2016) and District Commander's Approval of Section 408 Decision Document (July 21, 2016).  This finding is supported by the Final EA that was issued on July 25, 2016 and various memoranda supporting the District Commander's Section 408 approval.  The analysis supporting the grant of permission under 33 U.S.C. 408 is adopted in support of the Corps finding that granting an easement for the pipeline to cross Lake Oahe will not adversely impact the capability of the project to generate the benefits for which the project was Congressionally authorized.

   b.  Corps policy is to evaluate whether the proposed easement would be "[c]onsistent with complete land use classifications and resource objectives identified in the approved project master plan."  ER 1130-2-550, para. 17-9 b.(3).  The Corps has reviewed the proposed easement and has determined that it is consistent with the Final Oahe Dam/Lake Oahe Master Plan (September 2010).

   c.  Corps policy is to evaluate whether there is no viable alternative to utilization of public lands and waters.  ER 1130-2-550, para. 17-9 b.(2).  Corps policy specifically lists pipelines as examples of instances where there is no viable alternative.  Here, that policy is supported by the alternatives analysis in the Final EA.  See Final EA at Section 2.0, Alternatives.  Accordingly, the Corps finds here that there is no viable alternative to utilization of Corps-managed public lands at Lake Oahe.

   d.  Corps policy requires that the grant of the easement must be consistent with the applicable appendices to ER 1130-2-550.  ER 1130-2-550, para. 17-9b.(4).  The applicable appendices are Appendix E, General Outgrant Application Information, Appendix F, National Environmental Policy Act (NEPA) Guidance, Appendix G, Mitigation Guidance, and Appendix H, Additional Guidance for Specific Outgrant Applications.  The applicant submitted the materials that are

3

USACE_ESMT000654

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

required in Appendix E.  The Corps' evaluation of the proposed pipeline crossing at Lake Oahe complied with NEPA requirements upon the completion of the Final EA and FONSI, thereby meeting the requirements of ER 1130-2-550, Appendix F.  The easement will also comply with the mitigation guidance in Appendix G.  The Final EA outlined the various mitigation measures that the applicant will undertake.  Final EA at Table 8-2.  Further, various mitigation measures are conditions in Unexecuted Easement.  *See* Unexecuted Easement para. 2 b. and Exhibit "D," Special Conditions.  The applicant complied with the portion of Appendix H relevant to oil pipelines.  Appendix H, para. f, requires the applicant to make certain disclosures of ownership. The applicant made the ownership disclosures in its application and has provided updated information to the Corps as recently as December 2, 2016.  *See* Dakota Access, LLC, Standard Form 299, Application for Transportation and Utility Systems and Facilities on Federal Lands, Attachment, Section I, at pp.1-2 (submitted June 29, 2015).

    e.  Corps policy is to grant an easement when it is in the public interest.  ER 1130-2-550, para. 17-9b.(5).  The Omaha District found that the proposed DAPL crossing of the Corps project at Lake Oahe "will not be injurious to the public interest" when the District granted permission to impact the project under 33 U.S.C. 408.  FONSI at p. 6 and District Commander's Approval of Section 408 Decision Document (July 21, 2016).  This finding is supported by the Final EA that was issued on July 25, 2016 and various memoranda supporting the District Commander's Section 408 approval.  The analysis of the public interest supporting the grant of permission under 33 U.S.C. 408 is adopted in support of the Corps finding that granting an easement for the pipeline to cross Lake Oahe is in the public interest.

    f.  Corps policy is to determine whether the applicant has a demonstrated need for the project. ER 1130-2-550, at para. 17-9b.(6).  As described in the Dakota Access application, the overall project purpose or need is to move a supply of crude oil from the Bakken and Three Forks production region in North Dakota to a crude oil market hub located near Patoka, Illinois. Dakota Access, LLC, Standard Form 299, Application for Transportation and Utility Systems and Facilities on Federal Lands, at p. 6 (submitted June 29, 2015).  The overall pipeline project will improve overall safety to the public and the environment by reducing crude oil shipped by truck and by rail and significantly increase the amount shipped by pipeline.  As stated above, Dakota Access has shown that there is no viable alternative to crossing the federal project.  The Corps finds that the applicant has a demonstrated need for the project.

    g.  Corps policy is determine whether the applicant has the technical and financial capabilities to comply with the easement's consideration, mitigation and administrative expenses.  ER 1130-2-550, at para. 17-9b.(7)&(8).  The applicant's parent company, Energy Transfer, has completed more than 30 capital projects over $50 million.  Energy Transfer Capital Projects in Excess of US$ 50 million, 2006-2014 (provided Dec, 2, 2016).  Many of these projects were pipelines of 30 inches or more in diameter.  *Id.*  The Corps finds that the parent company's completion of those projects demonstrates that the applicant possess the technical and financial capabilities to comply with the easement.

USACE_ESMT000655

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of Engineers-Managed Federal Land at Lake Oahe, North Dakota

    h.  Corps policy is that it will coordinate and consult with federally-recognized Native American tribes when reservation lands are involved.  ER 1130-2-550, para. 17-3.  The proposed DAPL crossing at Lake Oahe is not on reservation lands; therefore, by policy there is no requirement to coordinate with any federally-recognized tribe.  However, the Corps reached out to the SRST to coordinate and consult on the DAPL project.  As established in the analyses set forth in the Final EA, the Corps attempted to engage in meaningful discussions with the SRST on numerous occasions about the nature of the project, cultural resources, and the Lake Oahe crossing beginning in October 2014 and continuing through March 2016.  Final EA at 85; see also *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*.  No. 16-cv-01534, Memorandum Opinion Denying Plaintiff's Request for Preliminary Injunction, Docket No. 39 at 48 (D.C. Dist. Sept. 9, 2016)(finding that, on the preliminary injunction record, the Corps exceeded its NHPA obligations at many sites).

The Department of the Army also invited the SRST to engage in additional discussions about whether to grant this easement.  See Letter from The Honorable Jo-Ellen Darcy, Assistant Secretary of the Army (Civil Works) to The Honorable Dave Archambault II, Chairman, Standing Rock Sioux Tribe, dated November 14, 2016.  Specifically, the Army invited the SRST to engage in discussion with the Corps concerning the following topics:

    • Potential conditions in an easement for the pipeline crossing, which would further reduce the risk of a spill or rupture, hasten detection and response, or otherwise enhance the protection of Lake Oahe, the Tribe's water supplies, and its treaty rights;
    • With such conditions, the risk to the Tribe of a spill from the pipeline crossing Lake Oahe at the proposed location; and
    • In light of such conditions, whether to grant an easement for the pipeline to cross Lake Oahe at the location currently proposed.

On November 22, 2016, the Corps extended an offer to the SRST to discuss those topics and to seek conditions that would address the Tribe's concerns.  Letter from COL John W. Henderson, District Commander, to Mr. Dave Archambault II, Chairman, SRST, dated November 22, 2016.  The SRST responded the following day, November 23, 2016, stating that "[t]he Tribe's fundamental position remains clear -- the easement to cross Lake Oahe at the Tribe's doorstep must be denied," but added that, "I am willing to talk further with you, including on issues relating to pipeline safety.  But for such discussions to be productive, it is my view that they must take place in the context of the Tribe's basic position regarding the pipeline and the Lake Oahe crossing."  Letter from Mr. Dave Archambault II, Chairman, SRST, to COL John W. Henderson, District Commander, dated November 23, 2016.  In this letter, the Tribe requested that the Corps:

    . . . [P]rovide the Tribe with the information sought in our expert's October 28, 2016 report.  The information provided should be sure to include: 1) Comprehensive construction and design documentation that includes piping, instrumentation, control system and electrical design; 2) Documentation that lists the industry codes, standards and recommended practices that have been adopted and applied to the design,

5

USACE_ESMT000656

CENWO

SUBJECT: Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of
Engineers-Managed Federal Land at Lake Oahe, North Dakota

    construction and operation of the Dakota Access Pipeline project. Include both codes
and standards required by regulation and recommended practices applicable to the
project adopted and applied voluntarily; 3) Material specifications including analysis
of selected grade of pipe, wall thickness, pipe yield strength, corrosion allowance,
ductility, pipe and weld coating systems and stress induced by installation of the pipe;
and 4) Data and source materials underlying and relied on in any risk analysis. We
are continuing to consult with pipeline experts who may have additional questions,
but our experts cannot proceed without the fundamental baseline.

Letter from Mr. Dave Archambault II, Chairman, SRST, to COL John W. Henderson, District
Commander, dated November 23, 2016.

On December 2, 2016, representatives of the SRST, Dakota Access, and the Corps met to discuss
the Tribe's request, along with potential terms and conditions that could be placed in the
easement.

Accordingly, the Corps finds that it provided more than adequate coordination and consultation
with the federally-recognized SRST, in accordance with ER 1130-2-550, para. 17-3, despite the
fact that SRST reservation lands are not involved and the SRST reservation would not be directly
impacted by the easement.

    i. The Corps finds that granting Dakota Access an easement for the pipeline to cross Lake
Oahe would be consistent with the Corps policy on non-recreational outgrants, ER 1130-2-550,
Chapter 17, and Omaha District policy.

6. <u>Specific Statutory Findings</u>. An easement must meet the statutory requirements of 30 U.S.C.
§ 185. Additionally, the grant of an easement must be consistent with Corps policy
implementing that statute. See Reference 1.c., ER 405-1-12, 8-182 (1994).

    a. The Corps must determine that the proposed easement will not be inconsistent with the
authorized purposes of the federal project. 30 U.S.C. § 185(b)(1). As discussed above, at para.
5.a., pp.2-3, the proposed easement would not be inconsistent with the authorized purposes of the
Lake Oahe project.

    b. The Corps cannot grant an easement if the width of the easement exceeds 50 feet plus the
ground occupied by the pipeline and related facilities, unless it is determined that a wider right
of-way is necessary for operation and maintenance after construction, for protection of the
environment, or for public safety. The width of the requested easement will not exceed 50 feet,
plus the ground occupied by the pipeline. See attached Unexecuted Easement at p.1 (stating
width of a right-of-way being 50 feet plus the ground occupied by the pipeline (that is, the pipe
and its related facilities).

USACE_ESMT000657

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of
Engineers-Managed Federal Land at Lake Oahe, North Dakota

    c.  Any special requirements for safe operation of the pipeline or related facilities should be
imposed.  See Exhibit D to the Unexecuted Easement containing special conditions addressed
during discussions on December 2, 2016.

    d.  The Corps is required to impose necessary stipulations to prevent or control damage to the
environment, including fish and wildlife habitat, damage to public or private property, and
hazards to public health and safety; and require restoration, revegetation, and curtailment of
erosion of the surface of the land when deemed appropriate.  See 30 U.S.C. § 185(h)(2); ER
1130-2-550, para. 17-5, Mitigation, and App. G, Mitigation Guidance (2013).  The proposed
easement requires mitigation and has added special conditions to the easement to mitigate any
impacts to the environment.  See Unexecuted Easement, at para. 2.b., and Exhibit D to the
Unexecuted Easement, Special Conditions.

    e.  The Corps is required by statute to obtain ownership information from the applicant.  30
U.S.C. § 185(i).  The applicant made these disclosures in its application and has provided
updated information to the Corps as recently as December 2, 2016.  *See* Dakota Access, LLC,
Standard Form 299, Application for Transportation and Utility Systems and Facilities on Federal
Lands, Attachment, Section I, at pp.1-2 (submitted June 29, 2015).

    f.  The Corps is required by statute to determine whether applicant has the technical and
financial capability to construct, operate, maintain, and terminate the project for which the permit
or right-of-way is requested, in accordance with this law.  30 U.S.C. § 185(j).  As discussed
previously in this memorandum, the Corps is satisfied that the applicant has the required
technical and financial capability.

    g.  The statute requires the Corps to provide federal, state, and local governments, as well as
the public, the opportunity to comment on the easement application.  30 U.S.C. § 185(k).  Corps
policy is that no further comment periods are necessary if the pipeline proposal and related
aspects have previously been scrutinized through NEPA procedures.  ER 405-1-12, para. 8-
182c.(8) (1994).  The Corps provided a public comment period for the NEPA process that
evaluated the DAPL crossing at Lake Oahe.  Thus, this process satisfied the public comment
requirement in 30 U.S.C. § 185(k).  See Final EA, App. J.

    h.  The Corps must also include certain other conditions required by statute and policy.  The
grantee must pay all costs of environmental assessment and monitoring.  ER 405-1-12, para. 8-
182c.(5) (1994).  This is included in the attached Unexecuted Easement at para. 2.c and in the
Special Conditions in Exhibit D.  The Corps must also be reimbursed for costs and be paid
consideration for the easement.  30 U.S.C. § 185(l).  This requirement is included in the attached
Unexecuted Easement at para. 2.a. and 2.c.  The easement cannot be for a term of more than 30
years.  30 U.S.C. § 185(n).  The attached Unexecuted Easement is limited to a term of 30 years.
*See* Unexecuted Easement at para. 1.  The easement must also contain certain language about
suspension or termination of the easement.  30 U.S.C. § 185(o).  This requirement is included in
the attached Unexecuted Easement at para. 16.  The easement must also contain a condition that
allows for the joint use of the easement area for other easements granted under 30 U.S.C. § 185.

USACE_ESMT000658

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of
Engineers-Managed Federal Land at Lake Oahe, North Dakota

30 U.S.C. § 185(p).  This requirement is included in the attached Unexecuted Easement at para.
13.  The easement must also contain certain common carrier requirements.  30 U.S.C. § 185(r).
Those requirements are satisfied in the attached Unexecuted Easement at para. 6.  The easement
is also required to address matters concerning liability.  30 U.S.C. § 185(x); ER 405-1-12, para.
8-182c.(16).  Those matters are addressed in the attached Unexecuted Easement at para. 12.

   i.  The District Engineer may require the holder of a license or right-of-way to furnish a
satisfactory bond or other security for all or any of the obligations imposed by terms and
conditions of the license, right-of-way, or regulations.  This requirement is discretionary.  The
attached Unexecuted Easement does not include the requirement to furnish a bond or other
security.

   j.  The Corps is required by statute and policy to consider state standards for pipeline
construction where the right-of-way crosses federal and non-federal lands, and where the state
standards for pipeline construction are more stringent than federal standards, the former will be
required.  30 U.S.C. § 185(v); ER 405-1-12, para. 8-182c.(8)  The Corps has considered the
relevant state standards.  *See*, for example, Final EA at 8 (discussing North Dakota residential
buffer requirements) and App. M, State of North Dakota Sovereign Land Permit for the Lake
Oahe Crossing, S-1951.

   k.  The Corps is required to utilize easements in common with other pipelines to the extent
practical.  30 U.S.C. § 185(p).  This proposed DAPL crossing at Lake Oahe is co-located with an
existing natural gas pipeline crossing, as depicted on the following map:



Final EA at 1008.

   l.  Based on the foregoing information, and after reviewing the attached Unexecuted
Easement, including the special conditions discussed by the applicant, Dakota Access, and
representatives of the SRST, and included in Exhibit D to the Unexecuted Easement, I have
determined that that issuance of the attached Unexecuted Easement to Dakota Access would be
consistent with the statutory requirements at 30 U.S.C. § 185.

USACE_ESMT000659

CENWO

SUBJECT:  Application for an Easement for an Oil Pipeline to Cross U.S. Army Corps of
Engineers-Managed Federal Land at Lake Oahe, North Dakota

7.  The Corps of Engineers, through the Department of the Army, is required by statute to notify
Congress when an application is received and when the Corps is going to grant an easement for a
pipeline that is greater than 24 inches in diameter.  30 U.S.C. § 185(w).  The Army notified
Congress of the application on September 13, 2015.  In accordance with this memorandum, I
recommend that the Army notify Congress that the Corps intends to grant the attached easement
to Dakota Access.

8.  After notification to Congress, the Omaha District intends to execute and issue the easement
to Dakota Access.

Encl

JOHN W. HENDERSON, P.E.
Colonel, Engineer
Omaha District Commander

USACE_ESMT000660

DACW45-2-16-8059

# DEPARTMENT OF THE ARMY
## EASEMENT FOR FUEL CARRYING PIPELINE RIGHT-OF-WAY
### LOCATED ON
### LAKE OAHE PROJECT
### MORTON AND EMMONS COUNTIES, NORTH DAKOTA

This Easement is made on behalf of **THE UNITED STATES OF AMERICA** (the "United States"), between **THE SECRETARY OF THE ARMY**, acting by and through the Chief, Real Estate Division, U.S. Army Engineer District, Omaha, hereinafter referred to as the "Grantor," under and by virtue of the authority vested in Title 30, United States Code, Section 185, and **DAKOTA ACCESS, LLC, a Limited Liability Company, duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal office at 1300 Main, Houston, Texas 77002,** hereinafter referred to as the "Grantee."

**NOW THEREFORE:**

The Grantor, for good and valuable consideration set forth below, the receipt and sufficiency of all of which are hereby acknowledged, upon and subject to the terms, covenants and conditions set forth in this Easement for right-of-way, does hereby:

Grant and convey to Grantee, an easement for a fuel carrying pipeline right-of-way for the installation, construction, operation, maintenance, repair, replacement and termination of a **thirty-inch (30) diameter, horizontal directional drill (HDD) buried oil pipeline for the purpose of transporting crude oil**, and related facilities, hereinafter collectively referred to as the "Facilities," over, across, in and upon lands of the United States **at and under Lake Oahe and the Lake Oahe Project**, as identified in **EXHIBITS "A" and "B,"** hereinafter referred to as the "Premises," and which is attached hereto and made a part hereof; with the width of a right-of-way being fifty (50) feet plus the ground occupied by the pipeline (that is, the pipe and its related facilities);

Make no claim of title during the term of this Easement to any Facilities of whatever nature located, constructed, or placed on the Premises by the Grantee.

DACW45-2-16-8059

THIS EASEMENT is granted subject to the following conditions.

## 1. TERM

This easement is hereby granted for a term of **Thirty Years**, beginning on the date of execution by the Grantor and ending thirty (30) years from the date of execution by the Grantor.

The Grantor shall renew this Easement in accordance with the provisions of 30 U.S.C. § 185, so long as the project is in commercial operation and is operated and maintained in accordance with all of the provisions of this Easement and applicable law. The Grantor prior to renewing this Easement must receive from the Grantee written notice of its intent to seek renewal or extension not less than one year prior to the Easement expiration or termination date and all plans, contracts, agreements, or other information or material which the Grantor deems necessary to determine whether a right-of-way shall be renewed and the terms and conditions which should be included in the right-of-way.

## 2. CONSIDERATION, MITIGATION, AND DAMAGES

a. As consideration for this Easement, the Grantee shall pay cash consideration in advance to the Grantor in the amount of **Eight Thousand Fifty and No/100 Dollars ($8,050.00), payable annually on or before the anniversary date of the beginning of this easement**.

b. The Grantee will mitigate damages caused to the Premises, surrounding areas, or to the **Lake Oahe Project**, during initial installation and construction of the Facilities, and damages caused during operation, maintenance, or subsequent construction work, and complete all site restoration in accordance with the Mitigation/Restoration Plan submitted by Grantee on file in the U.S. Army Engineer District, **Omaha, specifically referenced in the Grantee's pipeline Environmental Assessment ("EA") in Section 3.3.2.5 "Clean-up and Restoration," and further outlined in the Stormwater Pollution Prevention Plan ("SWPPP") presented in Appendix A of the EA and the Environmental Construction Plan presented in Appendix G of the EA**.

c. The Grantee shall reimburse the Grantor in advance for the costs incurred in monitoring the construction, operation, maintenance, and termination of the pipeline and related facilities on the Premises in the amount of **Seven Hundred Fifty and No/100 Dollars ($750.00) payable annually on or before the anniversary date of the beginning of the Easement**.

d. Any checks or drafts payable to the Grantor will be made to the order of the **"FAO-USAED, OMAHA"**, and delivered to **USAED, Omaha, ATTN:  CENWO-RE, 1616 Capitol Avenue, Omaha, Nebraska  68102**.

e. Any payments due under the terms of this Easement must be paid on or before the date that they are due to avoid the mandatory sanctions imposed by the Debt Collection Act of 1982, as amended (31 U.S.C. Section 3717). This statute requires the imposition of an interest charge for the late payment of debts owed to the United States; an administrative charge to cover the costs of processing and handling delinquent debts; and the assessment of an additional penalty charge on any portion of a debt that is more than 90 days past due.

## 3.   NOTICES

All correspondence and notices to be given pursuant to this Easement shall be in writing and addressed, if to the Grantee, to **DAKOTA ACCESS LLC**, **1300 Main Street, Houston, Texas 77002** and, if to the Grantor, to the **U. S. Army Engineer District, Omaha, Attention: Chief, Real Estate Division, 1616 Capitol Avenue, Omaha, Nebraska 68102,** or as may from time to time otherwise be directed by the parties. Notices shall be mailed by certified mail, postage prepaid, return receipt requested, addressed to the addresses above. The effective date of the notice shall be the earlier of the actual date of receipt or the date the addressee is notified of the attempted delivery of the certified mail, whether or not the addressee actually accepts delivery.

## 4.   AUTHORIZED REPRESENTATIVE

Except as otherwise specifically provided, any reference herein to "Grantor" or "Chief, Real Estate Division" shall include their duly authorized representatives. Any reference to "Grantee" shall include assignees, transferees and their duly authorized representatives.

## 5.   SUPERVISION BY THE GRANTOR

a. The installation and/or operation and maintenance of said pipeline shall be accomplished without cost or expense to the United States under the general supervision and subject to the approval of the Grantor's representative having immediate jurisdiction over the property, hereinafter designated as "said officer," and in such manner as not to endanger personnel or property of the United States on the said United States land or obstruct travel on any road thereon. The Grantee shall have the right of ingress and egress for such purposes, subject to approval of access by said officer.

b. The use and occupation of said Premises incident to the exercise of the privileges hereby granted shall be subject to such rules and regulations as the said officer may from time to time prescribe.

## 6.   APPLICABLE LAWS AND REGULATIONS

The Grantee shall construct, operate, maintain, and terminate the said pipeline in accordance applicable federal, state, county, and municipal laws, regulations, and ordinances. As required by 30 U.S.C. § 185, the Grantee shall construct, operate, and

maintain the Facilities as common carriers.  The pipeline installation shall be in accordance with the U.S. Department of Transportation's Minimum Federal Safety Standards and any other applicable federal or state safety requirements.

## 7.    CONDITION OF PREMISES

The Grantee acknowledges that it has inspected the Premises, knows its condition, and understands that the same is granted without any representations or warranties whatsoever and without any obligation on the part of the United States.

## 8.    INSPECTION AND REPAIRS

a.  Upon completion of any phase of the pipeline project which causes damage to the Premises, the Grantee shall restore said damage immediately, at the Grantee's own expense, to the same condition in which they existed prior to the commencement of such work, to the satisfaction of the said officer.

b.  The Grantee shall supervise the said pipeline and cause it to be inspected at reasonable intervals, and shall immediately repair any defects or leaks found by such inspection, or when requested by the Grantor to repair any defects or leaks.

## 9.    PROTECTION OF GOVERNMENT PROPERTY

The Grantee shall be responsible for any damage that may be caused to the property of the United States by the activities of the Grantee under this Easement and shall exercise due diligence in the protection of all property located on the Premises against fire or damage from any and all other causes.  Any property of the United States damaged or destroyed by the Grantee incident to the exercise of the privileges herein granted shall be promptly repaired or replaced by the Grantee to a condition satisfactory to the Grantor, or at the election of the Grantor, reimbursement made therefor by the Grantee in an amount to reimburse for the loss satisfactory to the Grantor.

## 10.    RIGHT TO ENTER

a.  The right is reserved to the Grantor, the United States, its officers, agents, and employees to enter upon the premises at any time and for any purpose necessary or convenient in connection with government purposes, to make inspections, to remove timber or other material, except property of the Grantee, to flood the Premises, to manipulate the level of the lake or pool in any manner whatsoever and/or to make any other use of the lands as may be necessary in connection with government purposes, and the Grantee shall have no claim for damages on account thereof against the Grantor, the United States or any officer, agent, or employee thereof.

b.  If the entry will involve removal of timber or other material, or heavy equipment, the Grantor will provide reasonable notice to Grantee of any such entry or use so that Grantee may take any necessary measures to assure the safety of its pipeline and

any personnel of the United States working in proximity to such pipeline.  Grantee will ensure that Grantor has emergency contact information.

## 11.    TRANSFERS AND ASSIGNMENTS

Without prior written approval by the Grantor, the Grantee shall neither transfer nor assign this Easement or any part thereof nor grant any interest, privilege or license whatsoever in connection with this Easement.  The provisions and conditions of this Easement shall extend to and be binding upon and shall inure to the benefit of the representatives, successors and assigns of the Grantee.

## 12.    INDEMNITY

a.  The Grantee shall be strictly liable to the United States for damage or injury which may arise from or be incident to the activities of the Grantee under this Easement, or for damages to the property of the Grantee, or for damages to the property or injuries to the person of the Grantee's officers, agents, or employees or others who may be on the Premises at their invitation or the invitation of any one of them, and the Grantee shall hold the United States harmless from any and all such claims not including damages due to the fault or negligence of the United States or its contractors.  Grantee shall exercise due diligence in the protection of all property located on the Premises.

b.  All owners of any interest in, and all affiliates or subsidiaries of the Grantee shall be liable to the United States in the event that a claim for damage or injury cannot be collected from the Grantee.  Liability without fault hereunder shall be limited to **Ten Million and No/100 Dollars ($10,000,000.00)** for any one incident.  Liability of such Grantee for damages in excess **Ten Million and No/100 Dollars ($10,000,000.00)** shall be in accord with ordinary rules of negligence.  However, this condition shall not impose strict liability on the Grantee for damage or injury resulting from (a) an act of war or force majeure, or (b) negligence of the United States.  In any case where liability without fault is imposed pursuant to this condition and the damage or injuries involved were caused by the negligence of a third party, the rules of subrogation shall apply in accordance with the law of the jurisdiction where the damage or injury occurred.

c.  The Grantee does hereby accept liability, if any, imposed by Federal and state statutes to third parties for injuries incurred in connection with the use and occupancy of the pipeline right-of-way.

## 13.    SUBJECT TO EASEMENTS

a.  This Easement is subject to all other existing easements, or those subsequently granted as well as established access routes for roadways and utilities located, or to be located, on the Premises.

b.  To minimize adverse environmental impacts and the proliferation of separate rights-of-way across federal lands, the utilization of rights-of-way in common shall be

required to the extent practical, and this Easement hereby reserves to the Grantor the right to grant additional rights-of-way or permits for compatible uses on or adjacent to the Premises.

c. Provided that the proposed grant of any new easement or route will be coordinated with the Grantee, and easements will not be granted which will, in the opinion of the Grantor, interfere with the use of the Premises by the Grantee.

## 14.   REQUIRED SERVICES

This condition was deleted.

## 15.   RELOCATION OF FACILITIES

In the event all or any portion of said Premises occupied by said Facilities shall be needed by the United States, or in the event the existence of said Facilities shall be considered detrimental to governmental activities, the Grantee shall, from time to time, upon notice to do so, and as often as so notified, promptly seek authorization from the Federal Energy Regulatory Commission, or other applicable entity, to remove said Facilities, or portion thereof, to such other location or locations on said Premises as may be designated by the Grantor. In the event said Facilities shall not be removed or relocated within ninety (90) days after any aforesaid notice, the Grantor, after receipt of required approvals, may cause the same to be done at the expense of the Grantee.

## 16.   SUSPENSION OR TERMINATION

a. Abandonment of the Easement herein granted or noncompliance with any provisions of this Easement or applicable provisions of 30 U.S.C. 185 may be grounds for suspension or termination of the right of way if (a) after due notice to the Grantee, (b) a reasonable opportunity to comply with this Easement or applicable provisions of 30 U.S.C. § 185, and (c) an appropriate administrative proceeding pursuant to 5 U.S.C. § 554, the Grantor determines that any such ground exists that suspension or termination is justified. No administrative proceeding shall be required where the Easement by its terms provides that it terminates on the occurrence of a fixed or agreed upon condition, event, or time.

b. If the Grantor determines that an immediate temporary suspension of activities within the Premises is necessary to protect public health or safety or the environment, the Grantor may abate such activities prior to an administrative proceeding.

c. Deliberate failure of the Grantee to use the Easement for the purpose for which it was granted or renewed for any continuous two-year period shall constitute a presumption of abandonment of the Easement; provided, that where the failure to use the right-of-way is due to circumstances not within the Grantee's control, the Grantor is not required to commence proceedings to suspend or terminate the right-of-way.

17.   **SOIL AND WATER CONSERVATION**

The Grantee shall maintain, in a manner satisfactory to said officer, all soil and water conservation structures that may be in existence upon said Premises at the beginning of or that may be constructed by the Grantee during the term of this Easement, and the Grantee shall take appropriate measures to prevent or control soil erosion within the right-of-way herein granted.  Any soil erosion occurring outside the Premises resulting from the activities of the Grantee shall be corrected by the Grantee as directed by said officer.

18.   **ENVIRONMENTAL PROTECTION**

a.  Within the limits of their respective legal powers, the parties hereto shall protect the Premises against pollution of its air, ground, and water.  The Grantee shall promptly comply with any laws, regulations, conditions, or instructions affecting the activity hereby authorized if and when issued by the Environmental Protection Agency, or any federal, state, interstate, or local governmental agency having jurisdiction to abate or prevent pollution.  The disposal of any toxic or hazardous materials within the Premises is strictly prohibited.  Such regulations, conditions, or instructions in effect or prescribed by the said Environmental Protection Agency or any federal, state, interstate, or local governmental agency are hereby made a condition of this Easement.  The Grantee shall not discharge waste or effluent from the Premises in such a manner that the discharge will contaminate streams or other bodies of water or otherwise become a public nuisance.

b.  The use of any pesticides or herbicides within the Premises shall be in conformance with all applicable federal, state, and local laws and regulations.  The Grantee must obtain approval in writing from said officer before any pesticides or herbicides are applied to the Premises.

c.  The Grantee will use all reasonable means available to protect the environment and natural resources, and where damage nonetheless occurs arising from the Grantee's activities, the Grantee shall be liable to restore the damaged resources.

19.   **ENVIRONMENTAL CONDITION OF PROPERTY**

An Environmental Condition of Property (ECP) documenting the known history of the property with regard to the storage, release, or disposal of hazardous substances thereon, is attached hereto and made a part hereof as **Exhibit "C."**  Upon expiration, revocation, or termination of this Easement, another ECP shall be prepared which will document the environmental condition of the property at that time.  A comparison of the two studies will assist the said officer in determining any environmental restoration requirements.  Any such requirements will be completed by the Grantee in accordance with the condition on **RESTORATION**.

### 20.   HISTORIC PRESERVATION

The Grantee shall not remove or disturb, or cause or permit to be removed or disturbed, any historical, archeological, architectural or other cultural artifacts, relics, vestiges, remains or objects of antiquity.  In the event such items are discovered on the Premises, the Grantee shall immediately notify the Grantor, and the site and the material shall be protected by the Grantee from further disturbance until the Grantor gives clearance to proceed.

### 21.   NON-DISCRIMINATION

The Grantee shall not discriminate against any person or persons or exclude them from participation in the Grantee's operations, programs or activities conducted on the Premises because of race, color, religion, sex, sexual orientation, gender identity, age, handicap, or national origin, pursuant to Executive Order 13672, 21 July 2014.  The Grantee will comply with the Americans with Disabilities Act and attendant Americans with Disabilities Act Accessibility Guidelines (ADAAG) published by the Architectural and Transportation Barriers Compliance Board.  The Grantee shall comply with Department of Justice rules on non-discrimination.

### 22.   HAZARDOUS WASTE MANAGEMENT

The Grantee will not store or dispose of non-DoD hazardous materials on the premises unless authorized under 10 U.S.C. § 2692, *Storage, Treatment, and Disposal of Non-Defense Toxic and Hazardous Materials*.  The Grantee shall strictly comply with the hazardous waste management requirements under the Resource Conservation and Recovery Act and the applicable state hazardous waste management rules, including proper hazardous waste characterization, labeling, storage, disposal and documentation requirements.  Except as specifically authorized by the Grantor in writing, the Grantee must provide, at its own expense such hazardous waste management facilities as needed to maintain compliance with all laws and regulations.  Army hazardous waste management facilities will not be available to the Grantee.

### 23.   HAZARDOUS WASTE OR FUEL SPILL

The Grantee shall submit to the Grantor and maintain, thereafter, a plan for responding to hazardous water, fuel, and other chemical spills prior to commencement of use of the Premises.  Such plan shall be independent of the Government's spill contingency plan and, except for initial fire response and/or spill containment, shall not rely on use of project personnel or equipment.  Should the Grantor provide any personnel or equipment, whether for initial fire response and/or spill containment, or otherwise on request of the Grantee or because the Grantee was not, in the opinion of the said officer, conducting timely clean-up actions, the Grantee agrees to reimburse the Grantor for its costs.

## 24.   RESTORATION

On or before the expiration or termination of this Easement, the Grantee shall, without expense to the United States, and within such time as the Grantor may indicate, remove said Facilities and restore the Premises to the satisfaction of the Grantor.  In the event the Grantee shall fail, neglect or refuse to remove said Facilities and restore the Premises, the Grantor shall have the option to take over said Facilities without compensation, or to remove said Facilities and perform the restoration at the expense of the Grantee, and the Grantee shall have no claim for damages against the United States or its officers or agents for such action.  This provision is subject to all regulatory requirements and approvals covering any of the activities described in this condition.

## 25.   DISCLAIMER

It is understood that this instrument is effective only insofar as the rights of the United States in the said property are concerned, and that the Grantee shall obtain such permission as may be necessary on account of any other existing rights.  It is also understood that the granting of this Easement does not eliminate the necessity of obtaining any Department of the Army permit that may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of March 3, 1899 (30 Stat. 1151; 33 U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344), or any other permit or license which may be required by federal, state or local statute in connection with the use of the Premises.  The grant of this Easement pursuant to 30 U.S.C. § 185 shall grant no immunity from the operation of the federal antitrust laws.

## 26.   OTHER AGENCY AGREEMENTS

It is understood that the provision of the Easement shall not abrogate or interfere with any agreements or commitments made or entered into between the Grantee and any other agency of the United States with regard to financial aid to the Grantee in connection with the installation, operation, or maintenance of said pipeline.

## 27.   CONSTRUCTION, OPERATION AND REHABILITATION PLAN

In compliance with 30 U.S.C. § 185, the Grantee will follow the plan(s) of construction, operation, and rehabilitation submitted to the Grantor prior to the execution of this Easement, on file in the **U.S. Army Engineer District, Omaha District. Restoration will be in accordance with Section 3.3.2.5 of the EA "Clean-up and Restoration" and further outlined in the SWPPP and the Environmental Construction Plan presented in Appendices "A" and "G," respectively, of the EA. Ground disturbing activities will not occur on Corps-managed lands; therefore, reseeding is not anticipated in those areas.  However, if reseeding were to become necessary on Corps-managed lands, all activities shall be conducted in accordance with applicable Lake Oahe revegatation guidelines.**

**28.    FEDERAL ENERGY REGULATORY COMMISSION ORDER ISSUING CERTIFICATES**

The Grantee shall comply with the conditions set forth in the Federal Energy Regulatory Commission's Order Issuing Certificate **dated December 24, 2014, as applicable, to Docket No. OR14-42-00, Dakota Access LLC.**

**29.    SPECIAL CONDITIONS**

See **Exhibit "D"** for the Special Conditions for this Easement.

**30.    EXECUTIVE ORDER 13658**

a.  Any reference in this section to "prime contractor" or "contractor" shall mean the Grantee and any reference to "contract" shall refer to the Easement.

b.  It has been determined that this contract is not subject to Executive Order 13658 or the regulations issued by the Secretary of Labor in 29 CFR part 10 pursuant to the Executive Order.

c.  If a duly authorized representative of the United States discovers or determines whether before or subsequent to executing this contract, that an erroneous determination regarding the applicability of Executive Order 13658 was made, contractor, to the extent permitted by law, agrees to indemnify and hold harmless the Unites States, its officers, agents, and employees, for and from any and all liabilities, losses, claims, expenses, suits, fines, penalties, judgments, demands or actions, costs, fees, and damages directly or indirectly arising out of, caused by, related to, resulting from or in any way predicated upon, in whole or in part, the erroneous Executive Order 13658 determination.  This includes contractor releasing any claim or entitlement it would otherwise have to an equitable adjustment to the contract and indemnifying and holding harmless the United States form the claims of subcontractors and contractor employees.

DACW45-2-16-8059

**IN WITNESS WHEREOF,** I have hereunto set my hand to this Easement by authority of the Secretary of the Army, this _____ day of _____ 2016.

_____
**DAVID V. CHIPMAN**
Chief, Real Estate Division, Omaha District
Real Estate Contracting Officer

**ACKNOWLEDGMENT**

STATE OF NEBRASKA   )
                    ) ss:
COUNTY OF DOUGLAS   )

**PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for said County and State, within my jurisdiction, the within named **David V. Chipman,** who acknowledged that he is the Chief of Real Estate Division, U.S. Army Engineer District, Omaha, and that in said capacity he executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way** by authority of the Secretary of the Army for the purposes therein expressed and as the act and deed of the United States of America.

**GIVEN UNDER MY HAND AND SEAL,** this _____ day of _____ , **2016**.

(SEAL)

_____
NOTARY PUBLIC

My Commission Expires:

_____

DACW45-2-16-8059

**THIS EASEMENT** is also executed by the Grantee this_____ day of _____, 2016.

**DAKOTA ACCESS LLC**

_____

**Robert Rose**
Vice President, Land and Right of Way

## ACKNOWLEDGMENT

STATE OF   _____   )
                            ) ss:
COUNTY OF   _____   )

    **PERSONALLY APPEARED BEFORE ME,** the undersigned authority in and for the county and state, on this _____ day of _____, 2016, within my jurisdiction, the within named **Robert Rose**, who acknowledged that he is **Vice President, Land and Right of Way, DAKOTA ACCESS LLC** a Delaware Limited Liability Company, and that for and on behalf of the said company, and as its act and deed he executed the above and foregoing **Department of the Army Easement for Fuel Carrying Pipeline Right-Of-Way,** having been duly authorized by said company so to do.

(SEAL)

_____
NOTARY PUBLIC

My Commission Expires:

_____



# OAHE DAM AND RESERVOIR



Date: 28-May-2015

0    600   1,200          2,400
Feet

Disclaimer: The Government furnishes this data and the recipient accepts and uses it with the express understanding that the United States Government makes no warranties, expressed or implied, concerning the accuracy, completeness, reliability, usability, or suitability for any particular purpose of the information and data furnished. The United States shall be under no liability whatsoever to any person by reason of any use made thereof. Data displayed on this map are approximations derived from GIS layers and should NOT be used in place of survey data or legal land descriptions.

Path: (regsi1)\re2\jesse\bob_incontro\Oahe\DAPL_Easement\DAPL_Easement.mxd

### Legend

■■■ Project Boundary (Fee)
     50' Wide Proposed Easement (±7.37 Acres)
☐ Tracts
☐ Sections
☐ Counties

EXHBIT "A" ATTACHED TO AND
MADE A PART OF DACW45-2-16-8059

USACE ESMT0006/3

## METES AND BOUNDS DESCRIPTION
## CENTERLINE 50' WIDE PERMANENT EASEMENT

Being a centerline description located in the Section 10, Township 134 North, Range 79 West of the 5th P.M., in Morton and Emmons County, North Dakota and Section 11, Township 134 North, Range 79 West of the 5th P.M., in Emmons County, North Dakota, and crossing the following tracts of land and described as follows:

Basis of Bearing:
Bearing are based on UTM Zone 14 Grid North.

Tracts of land:
Tract 1: Portion of Lot 4 and Lot 7; Book 125, Page 395; Deed Records, Morton County.
Tract 2: Lake Oahe.
Tract 3: Portion of the N1/2 of Section 11; Civil Case No. 406; Probate Records, Emmons County.

**COMMENCING** at a 3/8-inch iron rod found for the Northwest corner of said Section 10;

**THENCE**, crossing said Section 10, South 46 degrees 08 minutes 26 seconds East a distance of 3,664.72 feet to the west line of said United States of America Tract 1 for the **POINT OF BEGINNING** of this centerline description;

**THENCE**, crossing the United States of America tracts and through said Section 10 and said Section 11, North 83 degrees 59 minutes 34 seconds East a distance of 6,420.72 feet to the east line of said United States of America Tract 3 for the **TERMINAL POINT** of this centerline description, from which a 1-inch USGS monument found on said east line bears South 01 degrees 17 minutes 30 seconds West a distance of 296.68 feet. Said centerline having a length of 6,420.72 feet, 389.14 rods, and said fifty foot (50') wide.

Permanent Easement containing 7.37 acres of land.

Wood Group Mustang, Inc.
17325 Park Row
Houston, Texas 77084
(832) 809-8000
April 23, 2015
Job No. 103957

**Exhibit "B"**
**DACW45-2-16-8059**

USACE_ESMT000674

## ENVIRONMENTAL CONDITION OF PROPERTY
Helpful instructions for ECP are located at:
https://w3.nwo.usace.army.mil/intranet/od-tn/policypage/policies/RE/ECQ%20Instructions.pdf

This form covers Purpose, Site Location, Current Use of Property and adjacent property, Historical Use of Property and Adjacent Property, User provided Information, Site Reconnaissance, and Records Search and Interviews.  Specific Records Search and Interview information will be provided in sections 4.0 and 5.0. Pictures, Maps, Record and Interview information are appendices.

| Project Name: | DACW#: | Address/location: |
|---|---|---|
| Dakota Access Pipeline Project | Pending | Lake Oahe, Morton and Emmons Counties, North Dakota, Approx. 3.5 miles North of Cannonball, North Dakota. |

### 1.0 Purpose

Construct, install and operate an approximate 1,100 mile long crude oil pipeline from near Stanley, North Dakota to Patoka, Illinois.  The main trunk line of 30 inch diameter pipe will cross government fee owned property at the Oahe Reservoir.  The pipeline will transfer crude oil from the Bakken oil production area in North Dakota to a crude oil transportation terminal in Illinois.

### 2.0 Site Description

### 2.1 Property Legal Description and Site Address:

NE 1/4 Section 10, T134 N, R79 W, Morton County, North Dakota-Lat 46.43783, Long 100.59806 and NE 1/4 Section 11, T134 N, R79 W, Emmons County, North Dakota- Lat. 46.439908, Long. 100.576745

### 2.2 Site and Vicinity General Characteristics:

The proposed DAPL pipeline will cross the Oahe Reservoir and lies within the Missouri River corridor and flood plane.  The pipeline and corresponding easement band of 30 to 50 feet wide for construction and subsequent operation and maintenance will occur on gently rolling hills and in significant elevation relief in the transition zones of upland to river bed.  Land use on the west side of the reservoir is primarily native grasses and legumes with minimal amount of herbaceous and shrub vegetation, while on the east side is native grasses and minor amounts of tillage and farming with scattered herbaceous vegetation.  More specific information on land features, vegetation, geology, and environmental features are addressed in the current Draft Environmental Assessment.  The proposed pipeline is to be installed by horizontal directional boring (HDD) will be underground below Lake Oahe, with the boring entrance and exit located in the uplands on the west side and east side respectively.  The pipeline crossing will occur in a corridor that currently has an existing overhead 500 KV power line crossing administered by Basin Electric Cooperative and an underground 42 inch diameter natural gas line crossing administered by Northern Border Pipeline.

### 3.0 General Site Setting

| Yes answers must be documented.  Records and interviews must be documented. | | | |
|---|---|---|---|
| **a. Current and Past use of Property:** | | | |
| (1)(a)  Is the property used for industrial use? | | | |
| Record Search and/or Interview: | ☐ Yes | ☑ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☑ No | |
| (1)(b)  Is any adjoining property used for an industrial use?  For the purposes of this inquiry, adjoining | | | |

EXHIBIT "C"
USACE_ESMT000675
DACW45-2-16-8059

**ENVIRONMENTAL CONDITION OF PROPERTY, CON'T**

| | | | | |
|---|---|---|---|---|
| | property is considered to be property located within a quarter mile of the subject property and individual properties located within a mile of the subject property that exhibit a potential for environmental concern. | | | |
| | Record Search and/or Interview: Existing easements for overhead power line and underground gas line. | ■ Yes | ☐ No | ☐ Unk |
| | Observed during site visit: Existing power line observed. | ■ Yes | ☐ No | |
| | (2)(a) Did you observe evidence or do you have any prior knowledge that the property has been used for an industrial use in the past? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (2)(b) Did you observe evidence or do you have any prior knowledge that any adjoining property has been used for an industrial use in the past? | | | |
| | Record Search and/or Interview: Existing easements for overhead power line and underground gas line. | ■ Yes | ☐ No | ☐ Unk |
| | Observed during site visit: Existing power line observed. | ■ Yes | ☐ No | |
| | (3)(a) Is the property used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (3)(b) Is any adjoining property used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (4)(a) Did you observe evidence or do you have any prior knowledge that the property has been used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (4)(b) Did you observe evidence or do you have any prior knowledge that any adjoining property has been used as a gasoline station, motor repair facility, dry cleaners, photo developing laboratory, junkyard, or landfill, or as a waste treatment, storage, disposal, processing, or recycling facility (if applicable, identify which)? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| **b. Specific Property Conditions/Exterior Observations** | | | | |
| | (5)(a) Are there currently any damaged or discarded automotive or industrial batteries, pesticides, paints, or other chemicals, hazardous substances or petroleum products in individual containers of >5 gal (19 L) in volume or 50 gal (190 L) in the aggregate, stored on or used at the property or at the facility? | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| | (5)(b) Did you observe evidence or do you have any prior knowledge that there been previously any damaged or discarded automotive or industrial batteries, pesticides, paints, or other chemicals, hazardous substances or petroleum products in individual containers of >5 gal (19 L) in volume or 50 gal (190 L) in the aggregate, stored on or used at the property or at the facility? | | | |

USACE_ESMT000676

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(6)(a)  Are there currently any industrial drums (typically 55 gal (208 L)) or sacks of chemicals located on the property or facility?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(6)(b)  Did you observe evidence or do you have any prior knowledge that there been previously any industrial drums (typically 55 gal (208 L)) or sacks of chemicals located on the property or facility?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(7)(a)  Did you observe evidence or do you have any prior knowledge that fill dirt has been brought onto the property that originated from a contaminated site?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(8)(a)  Are there currently any pits, ponds, or lagoons located on the property in connection with waste treatment or waste disposal?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(8)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any pits, ponds, or lagoons located on the property in connection with waste treatment or waste disposal?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(9)(a)  Is there currently any stained soil on the property?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(9)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any stained soil on the property?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(10)(a)  Are there currently any registered or unregistered storage tanks (above or underground) located on the property?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(10)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any registered or unregistered storage tanks (above or underground) located on the property?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(11)(a)  Are there currently any vent pipes, fill pipes, or access ways indicating a fill pipe protruding from the ground on the property or adjacent to any structure located on the property?**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ◼ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ◼ No | |

**(11)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously,**

USACE_ESMT000677

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | | |
|---|---|---|---|---|---|
| any vent pipes, fill pipes, or access ways indicating a fill pipe protruding from the ground on the property or adjacent to any structure located on the property? | | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☑ No | | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ☑ No | | |
| (12)(a)  Are there currently any strong, pungent, or noxious odors located on the property? | | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☑ No | | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ☑ No | | |
| (12)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any strong, pungent, or noxious odors located on the property? | | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☑ No | | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ☑ No | | |
| (13)(a)  Are there currently any standing surface water, pools or sumps containing liquids likely to be hazardous substances or petroleum products, located on the property? | | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☑ No | | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ☑ No | | |
| (13)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously, any standing surface water, pools or sumps containing liquids likely to be hazardous substances or petroleum products located on the property? | | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☑ No | | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ☑ No | | |

**c.  Facility Conditions or Interior Observations**

| | | | | | |
|---|---|---|---|---|---|
| (c.)(1) Are there facilities currently on site?   See comments below, no enclosed struct. | ☑ Yes | ☐ No | | ☐ Unk |
| (c.)(2) Is there evidence or prior knowledge of facilities previously on site? | ☐ Yes | ☑ No | | ☐ Unk |
| If answers (c.)(1) and (c.)(2) are No, than questions 14-16 are | | | | ☐ N/A |

| | | | | | |
|---|---|---|---|---|---|
| (14)(a)  Is there currently evidence of leaks, releases or staining by substances other than water, or foul odors, associated with any flooring, drains, walls, ceilings, or exposed grounds on the property? | | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☑ No | | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ☑ No | | |
| (14)(b)  Did you observe evidence or do you have any prior knowledge that there have been previously any leaks, releases or staining by substances other than water, or foul odors, associated with any flooring, drains, walls, ceilings, or exposed grounds on the property, infrastructure Conditions | | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☑ No | | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ☑ No | | |
| (15)  Describe the means of heating and cooling the buildings on the property, including the fuel source for heating and cooling. | | | | | |

The facility that is adjacent to the proposed pipeline site is an overhead high voltage power line and on the west and east side of the Oahe Reservoir there is a secured area of above ground piping, valves and controls for the underground gas line.  No enclosed buildings exist, or have existed, on the Government property under consideration for the proposed DAPL oil pipeline to my knowledge.

| | |
|---|---|
| (16)  Describe sumps or drains visually and/or physically observed or identified from the interviews that are present in the buildings on the property. |

N/A

**d.  Infrastructure Conditions**

| | |
|---|---|
| (17)  Identify the source of potable water for the property. |

USACE_ESMT000678

**ENVIRONMENTAL CONDITION OF PROPERTY, CON'T**

| N/A | | | | |
|---|---|---|---|---|
| | | | | |
| (18) Identify the sewage disposal for the property. | | | | |

| N/A | | | | |
|---|---|---|---|---|

| (19)(a) If the property is served by a private well or non-public water system, is there evidence or do you have prior knowledge that contaminants have been have been identified in the well or system that exceed guidelines applicable to the water system? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (19)(b) If the property is served by a private well or non-public water system is there evidence or do you have prior knowledge that the well has been designated as contaminated by any government environmental/health agency? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (19)(c) Does the property discharge waste water (not including sanitary waste or storm water) onto or adjacent to the property and/or into a storm water system? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (19)(d) Does the property discharge waste water (not including sanitary waste or storm water) onto or adjacent to the property and/or into a sanitary sewer system? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (20)(a) Has there been a discharge of any substance or material from the property that might contaminate the public water system? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (20)(b) Is the property known to be served by asbestos cement mains, lead containing lines, or piping that uses copper and/or lead solder? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (21)(a) Is the property served by a private/nonpublic water system that has been found to be contaminated in excess of drinking water guidelines or otherwise contaminated? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

**e. CERCLA and Related Liability**

| (22) Is there any knowledge of environmental remediation orders or agreements applicable to the property or any facility located on the property? | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| (23)(a) Is there information on the past existence of hazardous substances or petroleum products with respect to the property or any facility located on the property? | | | | |
|---|---|---|---|---|

USACE_ESMT000679

**ENVIRONMENTAL CONDITION OF PROPERTY, CON'T**

| | Yes | No | Unk |
|---|---|---|---|
| Record Search and/or Interview: Draft Env. Assess., | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (23)(b)  Is there information on the current existence of hazardous substances or petroleum products with respect to the property or any facility located on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (23)(c)  Is there information on the past existence of environmental violations with respect to the property or any facility located on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (23)(d)  Is there information on the current existence of environmental violations with respect to the property or any facility located on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (24)  Is there any knowledge of any environmental site assessment of the property or facility that indicated the presence of hazardous substances or petroleum products on, or contamination of, the property or recommended further assessment of the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (25)  Is there any knowledge of any past, threatened, or pending lawsuits or administrative proceedings concerning a release or threatened release of any hazardous substances or petroleum products involving the property by any owner or occupant of the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| (26)  Is there any prior knowledge that any hazardous substances or petroleum products, unidentified waste materials, tires, automotive or industrial batteries, or any other waste materials have been dumped above grade, buried and or burned on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

**3.1  TOXIC SUBSTANCES CONTROL ACT (TSCA):**

| | Yes | No | Unk |
|---|---|---|---|
| a. Is there a transformer, capacitor, or any hydraulic equipment known to contain or likely to contain polychlorinated biphenyls (PCBs) or any records indicating the presence of such? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

**3.2  ASBESTOS ABATEMENT AND INSPECTION:**

| | Yes | No | Unk |
|---|---|---|---|
| | If no facilities then ■ N/A | | |
| a.  Were any of the facilities located on the property constructed prior to 1980? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |
| b.  Have all facilities on the property been inspected by a certified asbestos abatement team? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |

USACE_ESMT000680

**ENVIRONMENTAL CONDITION OF PROPERTY, CON'T**

| | Yes | No | Unk |
|---|---|---|---|
| c.  Is there any documented evidence of asbestos (e.g., tests, surveys, management plan) in any of the facilities on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |
| d.  Has all friable asbestos on the property or within facilities on the property been removed or become subject to an Operation and Maintenance (O&M) program so that it does not create the potential for human exposure? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |
| e.  Does the site survey of pre-1980 construction identify potential asbestos containing materials (e.g., boiler insulation, floor tiles, building siding, shingles, roofing felt, wall and ceiling insulation, acoustical ceiling tiles, window putty, fuse boxes, heat reflectors, air duct lining)? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |

**3.3  LEAD-BASED PAINT ABATEMENT AND INSPECTION:**

If there were never structures then ■ N/A

| | Yes | No | Unk |
|---|---|---|---|
| a.  Were any structures or facilities on the property constructed prior to 1979? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |
| b.  Has a screening test been conducted on the property for lead-based paint? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |
| c.  Did the results of the screening tests identify lead-based paint? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |
| d.  Is any of the on-site paint peeling or chipped? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ☐ No | |

**3.4  FEDERAL INSECTICIDE, FUNGICIDE, AND RODENTICIDE ACT (FIFRA):**

| | Yes | No | Unk |
|---|---|---|---|
| a.  Are there or has there been any pesticides, fungicides, or herbicides used on the property? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b.  In greater than household quantities? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| c.  Applied not in accordance with the manufacturers recommendations? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| d.  Are there or has there been any pesticides, fungicides, or herbicides stored onsite? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

Page | 7

USACE_ESMT000681

**ENVIRONMENTAL CONDITION OF PROPERTY, CON'T**

| | | Yes | No | Unk |
|---|---|---|---|---|
| e. In greater than house-hold quantities? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| f. Have there been reports or evidence of a spill of any pesticides, fungicides, or herbicides on the property? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |

| **3.5 MEDICAL/BIOHAZARDOUS WASTE:** | | Yes | No | Unk |
|---|---|---|---|---|
| a. Has the property been used for chemical or biological testing? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| b. Has the property been used for burying medical or biohazardous waste? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |

**3.6 MUNITIONS AND EXPLOSIVES OF CONCERN** (MEC - i.e., military munitions that may pose unique explosives safety risks, including: (A) unexploded ordnance (UXO), as defined in 10 U.S.C. 2710(e)(9); (B) discarded military munitions (DMM), as defined in 10 U.S.C. 2710(e)(2); or (C) munitions constituents (e.g., TNT, RDX), as defined in 10 U.S.C. 2710(e)(3), present in high enough concentrations to pose an explosive hazard.)

| | | Yes | No | Unk |
|---|---|---|---|---|
| a. Have any citizen complaints or local law enforcement actions occurred regarding MEC on the property? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| b. Has the site served as a small arms test range or otherwise to service weapons? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| c. Are any ranges, berms, open burning/open detonation (OB/OD), training, or impact areas onsite? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |

| **3.7 RADIOLOGICAL SUBSTANCES:** | | Yes | No | Unk |
|---|---|---|---|---|
| a. Has the property ever been suspected to contain radioactive waste, including mixed waste? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| b. Have radiological substances ever been used or services provided on the property? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| c. Has the property been surveyed for radon? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| | Observed during site visit: | ☐ Yes | ■ No | |
| d. Did the radon survey indicate test results above 4 pCi/l (pico curies/liter)? | | | | |
| | Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |

Page | 8

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| Observed during site visit: | ☐ Yes | ■ No | |
| e. If a radon survey has not been conducted does the vicinity exhibit radon above 4 pCi/l (pico curies/liter)? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f. Do records indicate that nearby structures have elevated indoor levels of radon? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| 3.8 Clean Air Act | | | | |
|---|---|---|---|---|
| a. Does the facility emit air pollutants into the environment? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Is the facility a type for which new standards of performance (NSPS) have been promulgated? See 40 C.F.R. Part 60 for a list of new source categories and applicable standards. | | | |
| Record Search and/or Interview: Draft Env. Assess., EPA, SD Dept. Health | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| c. Is the facility in violation or has the facility been in violation of the NSPS or the permit? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| d. Is the facility located in a nonattainment area? | | | |
| Record Search and/or Interview: Draft Env. Assess., EPA. | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| e. Will the facility be subject to maximum attainable control technology (MACT)? | | | |
| Record Search and/or Interview: | ☐ Yes | ☐ No | ■ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f. Is the capital expenditure required to meet the requirements of emissions reductions in the new Clean Air Act, i.e., is the facility required to reduce emissions because it is a non-attainment area? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| g. Does the facility incinerate any wastes of any kind? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

| 3.9 ADDITIONAL ISSUES: | | | | |
|---|---|---|---|---|
| a. Does the property exhibit any stressed vegetation or diseased wildlife? | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| b. Does the property have erosion problems (i.e., gullies, arroyos, sediment loading during storms)? | | | |
| Record Search and/or Interview: Erosion along shoreline | ■ Yes | ☐ No | ☐ Unk |
| Observed during site visit: of the Oahe Reservoir. | ■ Yes | ☐ No | |
| c. Are there any floodplains or wetlands? | | | |

USACE_ESMT000683

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| | | | | |
|---|---|---|---|---|
| Record Search and/or Interview: Draft Env. Assess., not impacted. | ■ Yes | ☐ No | ☐ Unk |
| Observed during site visit: Wetland Map Attached, No impact, | ■ Yes | ☐ No | |
| d. Are there any sinkholes? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| e. Are there any valuable mineral resources? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |
| f. Is mold present in facilities on the property? | | | | |
| Record Search and/or Interview: | ☐ Yes | ■ No | ☐ Unk |
| Observed during site visit: | ☐ Yes | ■ No | |

### 3.10 OTHER CONDITIONS:

Are there any other conditions that exist on the property that should be considered in the decision to outgrant? Describe.

No other conditions on the property of the proposed installation-DAPL Pipeline.   However, the proposed project is in close proximity of two other approver crossings-1. Overhead Power Line, 2. Underground Gas Line.

### 3.11 ADDITIONAL COMMENTS:

The two existing utility lines have existing authorization and are regulated for installation, maintenance and operation.   Several of the answers in Section 3 and 4 were obtained from a record search of the DRAFT ENVIRONMENTAL ASSESSMENT and PROPOSED PLANS AND SPECIFICATIONS.  FINAL ANSWERS MAY BE CHANGED OR CONFIRMED UPON THE FINALIZATION OF THE DRAFT ENVIRONMENTAL ASSESSMENT, PLANS AND SPECIFICATIONS.

### 4.0 GOVERNMENT RECORDS/HISTORICAL RESOURCES INQUIRY

a. Do any of the following Federal Government record systems list the property or any property within the search distance noted below:

| Federal Government Source | Approximate Minimum Search Distance, miles (kilometers) | Response | |
|---|---|---|---|
| Federal NPL site list | 1.0 (1.6) | ☐ Yes | ■ No |
| Federal CERCLIS list | 0.5 (0.8) | ☐ Yes | ■ No |
| Federal CERCLIS NFRAP site list | property and adjoining properties | ☐ Yes | ■ No |
| Federal RCRA CORRACTS TSD facilities list | 1.0 (1.6) | ☐ Yes | ■ No |
| Federal RCRA non-CORRACTS TSD facilities list | 0.5 (0.8) | ☐ Yes | ■ No |
| Federal RCRA generators list | property and adjoining properties | ☐ Yes | ■ No |
| Federal ERNS list | property only | ☐ Yes | ■ No |

b. Do any of the following state record systems list the property or any property within the search distance noted below:

| State lists of hazardous waste sites identified for investigation or remediation | Approximate Minimum Search Distance, miles (kilometers) | Response | |
|---|---|---|---|
| State – Equivalent NPL | 1.0 (1.6) | ☐ Yes | ■ No |

Page | 10

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

| State – Equivalent CERCLIS | 0.5 (0.8) | ☐ Yes | ■ No |
|---|---|---|---|
| State landfill and/or solid waste disposal lists | 0.5 (0.8) | ☐ Yes | ■ No |
| State leaking UST lists | 0.5 (0.8) | ☐ Yes | ■ No |
| State registered UST lists | property and adjoining properties | ☐ Yes | ■ No |
| c. Based upon a review of fire insurance maps or consultation with the local fire department serving the property, are any buildings or other improvements on the property or on any adjoining property identified as having been used for industrial use or uses likely to lead to contamination of the property? Please state remarks below. | | ☐ Yes | ■ No |

Remarks: The two adjoining utilities, overhead power line and underground gas pipeline, are improvements that are associated with industrial use. These may have uses and operational equipment that could lead to contamination of the adjoining property. The respective utility companies would be responsible for any contamination of their leased property and for compliance with applicable environmental regulations.

**5.0 Interviews**

| | Name | Position |
|---|---|---|
| 1 | Phil Sheffield | Oahe Lake Manager, Operations Div., CENWO-OD-OA |
| 2 | Francis Kuhn | Riverdale Realty Specialist, Real Estate Div., CECO-C-RAQ |
| 3 | Brent Cossette | Natural Resources Specialist, Omaha District, CENWO-OD-TN |
| 4 | Richard Harnois | Archeologist, Operations Div., CENWO-OD-OA |
| 5 | | |
| 6 | | |

**6.0 Records**

| | |
|---|---|
| 1 | COE Oahe Project Real Estate Files and Records. |
| 2 | COE Omaha Distric Real Estate Files |
| 3 | DAPL Final Draft Environmental Assessment, 2016.05.10, with Appendices. |
| 4 | US Environmental Protection Agency Database |
| 5 | North Dakota Dept. of Health Database |
| 6 | |

**7.0** We have performed a Phase I Environmental Site Assessment in conformance with the scope and limitations of ASTM Practice E 1527 of Sections 10 & 11, T134 N, R79 W _____ the property. Any exceptions to, or deletions from this practice are described in Section N/A _____ of this report. This assessment has revealed no evidence of recognized environmental conditions in connection with the property.

Environmental Professional (Print) **William Harlon, RF**

| Environmental Professional's Signature HARLON.WILLIAM.D.III.12 58312887 | Digitally signed by HARLON.WILLIAM.D.III.12580312887 DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA, cn=HARLON.WILLIAM.D.III.12580312517 Date: 2016.05.20 09:58:01 -05'00' | Date **5/20/16** |
|---|---|---|

**8.0 CERTIFICATIONS:**

15.a. The Environmental Professional Completing this report:

| | |
|---|---|
| Name: William D. Harlon III | |
| Title: Environmental Compliance Coordinator | |
| Organization: US Army Corps of Engineers, Omaha District | |
| Address: 1616 Capitol Avenue, Omaha Nebraska 68102 | |
| Phone number: (402) 995-2500 | |
| Date: 5/20/16 | |
| Qualifications: B.S. Forest Science with 13+ years of environmental compliance experience | |

USACE_ESMT000685

## ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

"[I, We] declare that, to the best of [my our] professional knowledge and belief, [I, we] meet the definition of Environmental professional as defined in 312.10 of 40 CFR 312 and [I, We] have the specific qualifications based on education, training, and experience to assess a property of the nature, history and setting of the subject property. [I, We] have developed and performed the all appropriate inquiries in conformance with the standards and practices set forth in 40 CFR Part 312."

| 9.0 RECOMMENDATION: |
|---|
| ■ I recommend that the proposed real estate outgrant be approved and that the action proceed. |
| ☐ I do not recommend that the proposed real estate outgrant be approved and recommend that no further review and processing be done. |

| OPM/ECC Signature | STASCH.ERIC.D.1231345589 | Digitally signed by STASCH.ERIC.D.1231345589<br>DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=USA,<br>cn=STASCH.ERIC.D.1231345589<br>Date: 2016.05.13 14:01.06 -05'00' | Date 13 May 2016 |

USACE_ESMT000686

ENVIRONMENTAL CONDITION OF PROPERTY, CON'T

### Appendix A
### Aerial Photographs

| Aerial Photo Date | Flight Date | Source | Item or Feature Observed |
|---|---|---|---|
| Aug., 2015 | Unknown | Google Earth | Project Location, south central North Dakota |
| Unknown | | Map-Draft Env. Assess. | Detailed L. Oahe pipeline crossing map. |
| 09/28/2015 | #1 | On Site | Existing Condtions, West Side of Lake |
| 09/28/2015 | #2 | On Site | Existing Condtions, West Side of Lake |
| 09/28/2015 | #3 | On Site | Existing Conditions, East Side of Lake |
| 09/28/2015 | #4 | On Site | Existing Conditions, East Side of Lake |
| 09/28/2015 | #5 | On Site | Existing Conditions, East Side of Lake |
| Aug., 2014 | Unknown | Google Earth | Nat. Wetland Inventory Map |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

USACE_ESMT000687



## DAPL Pipe Line Crossing

Morton and Emmons County, North Dakota
Sec 10, R134N, R79W / Sec. 11, T134N, R79W







DAPL LAKE OAHE CROSSING



Pipeline HDD Crossing, West side of Lake Oahe, Photo-West to East.   # 1



Pipeline HDD Approximate Entrance Point, West side of Lake Oahe, Photo-West to East   # 2

USACE_ESMT000690

P. 16

DAPL LAKE OAHE CROSSING



Pipeline HDD Crossing, East Side of Lake Oahe, Photo East to West.   # 3 



Pipeline HDD Crossing, Approximate Exit Point, East Side of Lake Oahe, Photo East to West.   # 4

DAPL LAKE OAHE CROSSING



DAPL Pipeline Alignment to East, East Side of Lake Oahe, Photo West to East.   # 5

USACE_ESMT000692   P.18

**OAHE PROJECT, DAPL PIPELINE CROSSING**
**National Wetlands Inventory Map**

**Wetland Types**
Estuarine and Marine Deepwater
Estuarine and Marine Wetland
Freshwater Emergent Wetland
Freshwater Forested/Shrub Wetland
Freshwater Pond
Lake
Other
Riverine

OAHE DAPL ECP

RE-CERTIFICATION

This addendum to the Draft DAPL ECP of May, 2016 is to certify that the Environmental Conditions of the Property has been reviewed and updated within 180 days of the certification date of May 13, 2016.  Based upon recent visual assessments and review of the site, I certify that all conditions are unchanged from the date of the documentation.


Eric D. Stasch

Operations Project Manager


20 May 2016

Date

USACE_ESMT000694

## APPENDIX D
## SPECIAL CONDITIONS

| Condition | |
|---|---|
| 1. | **Procedures and Specifications:** For the pipeline segments crossing Lake Oahe and its "could affect" High Consequence Areas ("could affect" HCAs) (as defined in 49 CFR § 195.450). Grantee must meet the U.S. Army Corp of Engineers easement special conditions by developing, implementing, and maintaining for the duration of the easement all easement special conditions in specifications and procedures for the design, construction, testing, operation and maintenance specifications and procedures as required in 49 CFR §§ 195.100, 195.202, 195.302, and 195.402 and this easement. |
| | For the purposes of these special conditions, "pipeline segment" is defined as Lake Oahe and the "could affect" HCAs noted in EA for the vicinity of Lake Oahe. |
| 2. | Grantee will conduct all HDD work according to the HDD Construction Plan [August 18, 2015] (Final EA, Appendix B) that it has prepared, and implement the HDD Contingency Plan [March 11, 2011] (Appendix B) in the event of an inadvertent release. |
| 3. | Grantee is not authorized to discharge hydrostatic test water under this easement. |
| 4. | Grantee will follow response, containment, mitigation measures, and cleanup measures described in SPCC, SWPPP, and ECP. |
| 5. | Grantee will use temporary sediment control measures, such as silt fence, to minimize the introduction of sediment into waterbodies during construction and minimize the movement of spoil and sediment from surface runoff during and after construction. |
| 6. | Grantee will return all surface drainage contours and vegetation to preconstruction conditions as much as practical. |
| 7. | Grantee will avoid groundwater contamination by implementing the protective measures set forth in the Project specific spill prevention, control and Countermeasures prepared by the contractor and in the Spill Prevention, Control and Countermeasure Plan [December 2014] (Final EA, Appendix A). |
| | **Documentation Conditions** |
| 8. | The Grantee will submit the Facility Response Plan to the Oahe OPM for review prior to the operation of the pipeline. |
| 9. | The Grantee will submit all plans not final at the time this easement is granted to the Oahe OPM for review and the incorporation of U.S. Army Corps of Engineers comments prior to the Grantee's submittal to the Pipeline and Hazardous Management Safety Administration. These plans include, but are not limited to the following:<br>  a.  Geographical Response Plan.<br>  b.  Operations and Maintenance Manual.<br>  c.  Risk Assessment (Integrity Management Plan), and<br>  d.  Spill Models (Using the National Hydrography Dataset by the U.S. Geological Survey) |
| 10. | The Grantee must send any updated plans in the Facility Response Plan to the Oahe OPM for review by the U.S. Army Corps of Engineers Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office within one year of the update. |

**EXHIBIT "D"**
**DACW45-2-8059**
USACE_ESMT000695

| 11. | The Grantee shall provide as-built drawings for the crossing at Lake Oahe to the Oahe OPM within 6 months of the completion of pipeline construction. |
|---|---|
| 12. | All records demonstrating compliance with these easement conditions herein must be maintained for the duration of the easement. |
| | **Pipeline Safety Conditions (Construction)** |
| 13. | **Pipeline Design Factor - Pipelines:** Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. |
| 14. | **Pipe Girth Weld – Nondestructive Tests:** Grantee must nondestructively test all girth welds in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. |
| 15. | **Pressure Test Level:** The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.50 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. |
| 16. | **Assessment of Test Failures:** Any pipe failure occurring during the pre-in service hydrostatic test must undergo a root cause failure analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the Operations Project Manager at the Oahe Project Office (Oahe OPM) within 60 days of the failure. |
| 17. | **Coatings for Trenchless Installation:** Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. |
| 18. | **Pipe Coating:** Pipe coatings must be non-shielding to cathodic protection (CP). Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion. The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program. The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair. |
| 19. | **Field Coating:** Field joint coatings must be non-shielding to CP. Grantee must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality. Field coating applicators must use valid qualified coating procedures and be trained to use these procedures. |
| 20. | **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG). The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBμV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment. |
| 21. | **Mainline Valve(s) with Remote Control or Automatic Shutdown:** |

EXHIBIT "D"
DACW45-2-8059
USACE_ESMT000696

| | |
|---|---|
| a. | Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valve(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions. |
| b. | Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast of a closure. |
| c. | Mainline valves must be remotely controlled and actuated or automatic shutdown, and the Supervisory Control and Data Acquisition (SCADA) system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure.  Remote power backup is required to ensure communications are maintained during inclement weather.  Mainline valves must be capable of closure at all times.  If it is impracticable to install a remote controlled valve, Grantee must submit a valve design and installation plan to the appropriate Oahe OPM to confirm the alternative approach provides an equivalent level of safety. |
| d. | Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified. |
| e. | For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification. |
| 22. | **Supervisory Control and Data Acquisition (SCADA) System:**  Grantee must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements. |
| 23. | **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection.  The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments).  If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the Oahe OPM for "no objection" prior to being implemented by Grantee. |
| 24. | Grantee will minimize or avoid impacts on soils by implementing the mitigation measures described in the DAPL Project's Spill Prevention Control and Countermeasure Plan [December 2014] (SPCC), Storm water Pollution Prevention Plan[July 2015] (SWPPP), and Environmental Construction Plan (April 2015 (ECP) as well as requirements of applicable state and federal permits. |

**EXHIBIT "D"**
DACW45-2-8059
USACE_ESMT000697

| | **Pipeline Safety Conditions (Operation)** |
|---|---|
| 25. | **Overpressure Protection Control:** Grantee must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b). Before commencing operation, Grantee must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions. Grantee shall equip the pipeline with field devices to prevent overpressure conditions. Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (functional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected. Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed to ensure that an overpressure situation does not occur. Sufficient pressure sensors must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition. |
| 26. | **Cathodic Protection:** The initial Cathodic Protection system must be operational within six (6) months of placing a pipeline segment in service. Cathodic Protection will be operated and maintained per applicable codes and the Grantee's 'Operations and Maintenance Manual'. Wall thickness testing will be performed in-lieu of periodic hydro tests. The Grantee shall send the inspection reports to the Operations Project Manager at the Oahe Project Office (hereinafter the Oahe OPM)." |
| 27. | **Interference Current Surveys:** Interference surveys must be performed over the entire pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version. since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and NACE SP 0177) for interference current levels. If interference currents are found. Grantee must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.<br><br>The interference current mitigation program for the pipeline segment must include:<br><br>1) As frequently as needed. including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline. but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected;<br><br>2) Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and<br><br>3) a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current;<br><br>4) Implement remedial actions to protect the pipeline segment from detrimental interference currents. Remedial actions must be completed promptly. but no later than one year after completion of the survey. or as soon as practicable after obtaining necessary permits. Remedial action means the implementation of measures including, but not limited to. |

**EXHIBIT "D"**
**DACW45-2-8059**
USACE_ESMIT000698

additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required.

   a) AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above.

   b) AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required.

   c) AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2.

| 28. | **Corrosion Surveys:** Grantee must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007. The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177. At least one (1) CP test station must be located within each "could affect" HCA with a maximum spacing between test stations of one-half mile. |
| --- | --- |
| 29. | **Initial Inline Inspection (ILI):** Within three (3) years of placing a pipeline segment in service, Grantee must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each. |
| 30. | **ILI Deformation Tool:** Grantee must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service. Grantee must remediate pipe in accordance with 49 CFR Part 195 and Subpart O. All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this guideline. |
| 31. | **Future ILI:** Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each. ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions. |
|  | 1) Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3). Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe. |
|  | 2) CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals. |
|  | CIS findings must be integrated into ILI Tool findings. |
| 32. | **Internal Corrosion:** Grantee must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to Ain the annual report. Grantee must report upset conditions causing BS&W level excursions above the limit on the annual report. |

**EXHIBIT "D"**
DACW45-2-8059
USACE_ESMT000699

|     |     |
| --- | --- |
|     | 1) Grantee must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas with the greatest internal corrosion threat and other internal corrosion threats. At a minimum in the succeeding years following the first year Grantee must run cleaning pigs every five years unless analysis necessitates earlier action.<br><br>2) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results.<br><br>3) Grantee shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents. |
| 33. | **Pipeline Patrolling:** Grantee must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment. |
| 34. | The Grantee shall conduct the following training exercises:<br><br>1) A full scale open water and a full scale winter/ice exercises at Lake Sakakawea and Lake Oahe. A full scale exercise will occur once every 3 years (triennial cycle) with the location and type of exercise occurring on alternating schedules (e.g. open water exercise at Lake Oahe the first triennial cycle, followed by winter exercise at Lake Sakakawea the following triennial cycle, followed by a winter exercise at Lake Oahe following triennial cycle, etc.). The first exercise will occur within the first 3 years after the pipeline becomes operational.<br><br>2) To facilitate USACE staff involvement the Grantee shall notify the USACE Environmental Compliance Coordinators at the Omaha District Office and the Oahe Project Office at least ninety (90) days prior to initiation of the training exercises. The Grantee shall also solicit the participation of key stakeholders (federal, state, local, and Tribal) in these exercises. |
| 35. | Within 1 year following the pipeline becoming operational, the Grantee shall provide for an all-weather access and collection point downstream of the HDD crossing at Lake Oahe. The Grantee shall provide an equipment storage facility on non-federal lands that includes a fenced permanent storage area for winter and open water spill response equipment. The storage facility should be placed in a strategic location and near existing facilities that would support access to the water. The Grantee will coordinate with the USACE and any other applicable stakeholders to obtain all necessary permits and approvals prior to construction for any ground disturbing activities associated with these facilities. The storage facility should contain sufficient response equipment at a minimum to mitigate an unintended worst case release for this Lake crossing. |
|     | **Overall Condition from EA** |
| 36. | Grantee is generally responsible for commitments made and mitigation measures in the Final Environmental Assessment. Grantee Pipeline Project Crossing of Flowage Easements and Federal Lands (July 2016), including all Plans includes within Appendices thereof, even if they are not specifically made as a condition to this easement. |



**DEPARTMENT OF THE ARMY**
OFFICE OF THE ASSISTANT SECRETARY
CIVIL WORKS
108 ARMY PENTAGON
WASHINGTON DC 20310-0108

The Honorable Dave Archambault II
Chairman, Standing Rock Sioux Tribe
P.O. Box D
Fort Yates, North Dakota 58538

Kelcy Warren
Chairman and Chief Executive Officer
Energy Transfer Partners, L.P.
8111 Westchester Drive
Dallas, TX 75225

Joey Mahmoud
Executive Vice President
Dakota Access LLC
3738 Oak Lawn Avenue
Dallas, TX 75219

Dear Gentlemen:

I am writing regarding the review that the Department of the Army initiated in September regarding the proposed crossing of the Dakota Access Pipeline (DAPL) under Lake Oahe. As you know, on September 9, 2016, the Department of Justice, the Department of the Army, and the Department of the Interior stated that the Army would move expeditiously to determine whether it would need to reconsider any of its previous decisions regarding DAPL's proposed crossing at the Lake Oahe site. The Army has completed that review, accounting for information it has received from the Tribes and the pipeline company since September, and has concluded that its previous decisions comported with legal requirements.

The Army is mindful of the history of the Great Sioux Nation's repeated dispossessions, including those to support water-resources projects. This history compels great caution and respect in considering the concerns that the Standing Rock Sioux Tribe has raised regarding the proposed crossing of Lake Oahe north of its reservation. The Army recognizes that portions of Lake Oahe remain within the Standing Rock Sioux Tribe's reservation boundaries and the Tribe retains hunting and fishing rights in the lake. Additionally, the Army recognizes that the Tribe relies on Lake Oahe and the Missouri River for drinking water. We take seriously our government-to-government relationship with the Tribe. This history, the importance of Lake Oahe to the Tribe, and our government-to-government relationship call for caution, respect, and particular care regarding the proposed DAPL crossing at Lake Oahe.

As you are aware, the statute governing rights of way for pipelines through Federal lands mandates that the Army "impose requirements for the operation of the pipeline and related facilities in a manner that will protect the safety of workers and protect the public

USACE_ESMT001000

from sudden ruptures and slow degradation of the pipeline." 30 U.S.C. §185(g).  It also requires the Army to "protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes," 30 U.S.C. §185(h)(2)(D).  In addition, the statute authorizes the Army to subject a right-of-way to "terms and conditions" "regarding extent, duration, survey, location, construction, operation, maintenance, use, and termination," to protect the environment and public health and safety, 30 U.S.C. §185(k).

Accordingly, the Army has determined that additional discussion with the Standing Rock Sioux Tribe and analysis are warranted.  The Army invites the Standing Rock Sioux Tribe to engage in discussion concerning the following topics:

- Potential conditions in an easement for the pipeline crossing, which would further reduce the risk of a spill or rupture, hasten detection and response, or otherwise enhance the protection of Lake Oahe, the Tribe's water supplies, and its treaty rights;
- With such conditions, the risk to the Tribe of a spill from the pipeline crossing Lake Oahe at the proposed location; and
- In light of such conditions, whether to grant an easement for the pipeline to cross Lake Oahe at the location currently proposed.

The Army plans to provide a framing paper to facilitate this discussion with the Standing Rock Sioux Tribe regarding these topics.  While these topics are of particular interest to the Army, we welcome any input that the Tribe believes is relevant to the proposed pipeline crossing or easement.  The Army will work with the Tribe on a timeline that allows for robust discussion and analysis to be completed expeditiously.

While these discussions and analysis are ongoing, construction on or under Corps land bordering or under Lake Oahe cannot occur because the Army has not made a final decision on whether to grant an easement.

Respectfully,

Jo-Ellen Darcy
Assistant Secretary of the Army
(Civil Works)

# Accufacts Inc.

"Clear Knowledge in the Over Information Age"

8040 161st Ave NE, #435
Redmond, WA 98052
Ph (425) 802-1200
Fax (805) 980-4204
kuprewicz@comcast.net

**Date: October 28, 2016**

**To:   Jan Hasselman**
**Earthjustice**
**705 Second Avenue, Suite 203**
**Seattle, WA  98104**
**Via email: jhasselman#earthjustice.org**

**Re:  Accufacts Review of the U.S. Army Corps of Engineers (USACE) Environmental Assessment (EA) for the Dakota Access Pipeline ("DAPL")**

## I.   Summary

Accufacts Inc. ("Accufacts") was asked to perform a detailed pipeline technical review of the above EA for the DAPL proposal, including the USACE's mitigated finding of no significant impact.[1]  I have concluded that the EA is seriously deficient and cannot support the finding of no significant impact, even with the proposed mitigations.  The analysis is incomplete such that potential risks and impacts to the federal areas and waters have not been adequately presented nor evaluated.  Important details are missing in the EA.  As explained below, the EA understates the risks of pipeline failure and related oil release from this pipeline impacting Lake Oahe and the Missouri River.  Additional information, not provided in the EA, is needed to prudently assess this pipeline proposal, as well as to evaluate various key assumptions and claims that the USACE relies upon in their incomplete mitigation approaches and finding.

This EA specifically focused on two federal flowage easements: one near the upper end of Lake Sakakawea, in Williams County, North Dakota, and the other in federally-owned property at Lake Oahe in Morton and Emmons Counties, North Dakota.[2]  The USACE states that "The EA addresses the purpose and need of the pipeline, as well as the location and method of installation of the pipeline, but the analysis is limited to the effects of allowing the pipeline

---

[1] USACE Digital Library, " Environmental assessment: Dakota Access Pipeline Project, crossings of flowage easements and federal lands," prepared on behalf of U.S. Army Corp of Engineers – Omaha District, July 2016, at
http://cdm16021.contentdm.oclc.org/cdm/ref/collection/p16021coll7/id/2801, p. 1.
[2] *Ibid.*

Accufacts Inc. Final                                                                      Page 1 of 10

to cross federal flowage easements near the upper end of Lake Sakakawea, and federally owned lands at Lake Oahe in North Dakota."[3]

In analyzing the pipeline technical issues in the EA, Accufacts has determined there are at least four major areas of deficiency in the EA as they relate to potential DAPL future oil spill risks that could impact the above sensitive areas:

1.  The EA fails to properly evaluate the impact of the DAPL, including the risk of oil spills, on the federal easements and waters of the United States.

2.  The ability to timely remotely identify oil releases are overstated and unsubstantiated.

3.  The lack of specific information in the EA strongly suggests deficiencies in the worst case discharge determination that could affect the unusually sensitive areas, and related oil spill response planning.

4.  Nondestructive testing for girth weld inspection should clearly specify 100% radiographic testing.

Accufacts provides neutral technical evaluation on pipeline matters, based on over 40 years experience in the field and pipeline incident investigation (see Attachment 2, Kuprewicz CV). Accufacts' major findings and conclusions are discussed in further detail below:

## II.   The EA fails to properly evaluate the impact of the DAPL, including the risk of oil spills, on the federal easements and waters of the United States.

While the EA largely focuses on the above identified water crossing activities related to construction HDD, the USACE does not provide appropriate detailed analysis as to the oil spill risks to these sensitive waters, either from the specific crossings or from other sections of the pipeline that could release oil that could reach these High Consequence Areas, or HCAs (e.g., unusually sensitive areas, or USAs).[4]  For the DAPL segments that could affect these HCAs, the EA fails to provide sufficient detail to support the finding of low risk with the proposed mitigations.  The sources of risks are not prudently explained, and information is not provided in enough detail to permit an independent confirmation of USACE findings.  As a result, the level of risk is not adequately justified in the EA.  Given the lack of adequate detail and further

---

[3] *Ibid.*
[4] High Consequence Areas, 49CFR§195.450 Definitions.

Accufacts Inc. Final                                                                 Page 2 of 10

USACE_ESMT001074

explanation, especially given the number of pipeline ruptures following inline inspections coupled with the failure of remote and timely rupture detection by control center personnel in recent years, the EA findings cannot be supported.

For example, the EA mentions nearby areas of the pipeline route that are highly susceptible or have high incidence of landslide. While some of this landslide discussion is related to construction site locations for the water crossings, there appear to be other areas of the pipeline located in high landslide risk areas.[5] The North Dakota Geological Survey has noted for the DAPL "High concentrations of landslides have been mapped in many regions along the proposed route centerline shown in Figure 1 of your document."[6] According to the EA, some of these high risk areas are in close proximity to or could affect Lake Oahe. Further analysis and information as to the pipeline's location in such landslide areas and its potential impacts to the federal crossings and sensitive waterways, should the pipeline fail, must be clearly incorporated into the EA. The EA specifically states, "This strength and ductility effectively mitigates the effects of fault movement, landslides, and subsidence. Therefore, by implementing the mitigation measures presented here, impacts on the pipeline from geologic hazards are expected to be minimal."[7] But this conclusory statement is insufficient. Placing pipeline in areas with high risk of landslide is unwise, as even modern steel pipe cannot survive such high abnormal loading threat activity which usually results in pipeline rupture with high rate high volume oil spill releases. Steel tubes (pipelines) cannot bear the extreme loading forces that are associated with massive landslide movements. Statements/inferences in the EA that pipe design/steel/weld properties can mitigate the risks of landslide threat are very misleading, if not downright false. Landslide activity that could place such severe abnormal loading on pipeline segments where a release could affect the easements, especially the sensitive waterways, needs to be clearly delineated by threat type, prudently evaluated, and risk determinations communicated to permit an independent evaluation of such assertions to assure they are not biased. None of this was done in the EA.

Critical to the any determination of pipeline "low risk" is a proper evaluation and requirement to incorporate certain integrity management obligations, well in excess of minimum federal pipeline safety regulations, in mitigations to assure that the pipeline operator is wisely using assessment approaches such as In-line Inspection ("ILI") tools, or "smart pigs," in assessments

---

[5] USACE Digital Library, "Environmental assessment: Dakota Access Pipeline Project, crossings of flowage easements and federal lands," July 2016, pp. 26 & 27.
[6] North Dakota Geological Survey Joe Blockland Geologist April 16, 2015 letter to Monica Howard, Director of Environmental Sciences, on Dakota Access, LLC, included in EA.
[7] USACE Digital Library, "Environmental assessment: Dakota Access Pipeline Project, crossings of flowage easements and federal lands," July 2016, p. 28.

Accufacts Inc. Final                                          Page 3 of 10

to avoid pipe failure, especially rupture from various pipeline threats the ILI tools are intended to identify. The rash of pipeline rupture failures after ILI tool runs raises questions about major gaps in integrity management and related risk management approaches for pipelines, presently codified in federal minimum pipeline safety regulations, if ILI is relied upon to avoid oil release. Additional detail concerning the use of ILI on various threats including identifying action thresholds is warranted, as too much is left to the discretion of the pipeline operator. I have observed that it is not unusual for the pipeline industry to overstate ILI tool effectiveness in identifying certain types of threats to prevent pipeline failure, especially rupture. The EA fails to identify the use of ILI inspection tools and associated trigger parameters that might prevent pipeline failure and releases into sensitive waterways. Failure to incorporate such detail leaves the pipeline open to misuse of ILI tools from overconfident and misleading statements of ILI capabilities. While focused on gas transmission pipelines, but still highly applicable to liquid pipelines, a recent paper should prove helpful in recognizing some of the limitations of ILI tool applications on certain threats to pipelines.[8]

Additional information on those DAPL segments not on the easement, but that could affect the easements in the event of pipeline failure need to be included in any prudent risk analysis. Additional information beyond that provided in the EA, such as that identified in Section VI below, must be included in any risk evaluation/determination. A more complete and detailed analysis may determine that the current federal easement crossings and pipeline route entering/leaving these federal easements are inappropriate because of potential impacts from off easement locations that could have a much greater impact on the sensitive waterways. For example, since no pipeline can be designed to withstand massive landslide forces, if such a threat exists, the pipeline should be routed out of the landslide threat area.

## III. The ability to timely remotely identify oil releases are overstated and unsubstantiated.

The EA states that "The Operator would utilize a Computational Pipeline Monitoring System (CPM) to monitor the pipeline for leaks. The CPM is a state-of-the-art pipeline monitoring tool and features a real-time transient model that is based on pipeline pressure, flow, and temperature data, which is polled from various field instruments every 6 seconds and updates the model calculations to detect pipeline system variations every 30 seconds. After the system is tuned, this state-of-the-art CPM is capable of detecting leaks down to 1 percent or better of

---

[8] Richard B. Kuprewicz, president Accufacts Inc., "A Review, Analysis and Comment on Engineering Critical Assessment as proposed in PHMSA's Proposed Rule on Safety of Gas Transmission and Gathering Pipelines," prepared for the Pipeline Safety Trust, May 16, 2016.

USACE_ESMT001076

the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes."[9]  A study performed in 2012 reported that for hazardous liquid pipelines that utilized CPM and SCADA leak detections, "The pipeline controller/control room identified a release occurred around 17% of the time."[10]  This low success rate for control room remote identification of pipeline release, even ruptures, is consistent with Accufacts' many liquid pipeline failure investigations spanning more than 40 years, especially more recent investigations.  Remotely determining pipeline releases, even ruptures, particularly with respect to large rate releases, is difficult for various reasons.  This is especially true if the remote monitoring is generating a large number of false release alarms that tend to train control room operators to ignore a true release alarm.

Pipeline investigation history and PHMSA/NTSB investigation files are filled with pipeline ruptures that released for many hours before they were acknowledged by the control center and appropriate operation/response action taken.[11,12,13]  Given my many years of experience in this matter, I recommend that if remote detection via SCADA is incorporated, such detection and response should be primarily directed on rupture detection.  Leak detection, the smaller rate releases, may be warranted on selective segments of the pipeline, but such efforts complicate the efforts (i.e., generate excessive false alarms) to reliable remotely indicate pipeline release to control room operators.  Such a release approach should also clearly identify the measurement equipment, its precision and placement, and important transient analysis (i.e., changes in pipeline operating parameters such as crude oil variations and pump start up and shutdown impacts on parameters being monitored by the release detection system) that would indicate a rupture has most likely occurred.  Pressure loss is not the most likely timely indicator of pipeline rupture for the pipeline segment(s) that could impact the sensitive watersheds. Based on my years of experience evaluating pipeline safety and SCADA systems in particular, I find that the EA has failed to provide sufficient information that would support response time

---

[9] USACE Digital Library, "Environmental assessment: Dakota Access Pipeline Project, crossings of flowage easements and federal lands," July 2016, p. 90.

[10] Dr. David Shaw, Dr. Martin Phillips, Ron Baker, Eduardo Munoz, Hamood Rehman, Carol Gibson, Christine Mayernik, U.S. Department of Transportation Pipeline and Hazardous Material Safety Administration, "Final Report Leak Detection Study – DTPH56-11-D-000001," December 10, 2013, p. 2-10.

[11] NTSB/PAR-02/02 Pipeline Accident Report, "Pipeline Rupture and Subsequent Fire in Bellingham Washington, June 10, 1999," adopted October 8, 2002.

[12] NTSB/PAR-12/01 Accident Report, "Enbridge Incorporated Hazardous Liquid Pipeline Rupture and Release Marshall, Michigan July 25, 2010," adopted July 10, 2012.

[13] PHMSA Final Order Re: Case # CPF No. 5-2013-5007 to ExxonMobil Pipeline Company, "Concerning July 1, 2011 Silvertip Pipeline Rupture into the Yellowstone River," dated January 23, 2015.

USACE_ESMT001077

claims in the EA. I also place little confidence in efforts attempting to allow for further study for such remote rupture detection as the science and dynamics of such releases should be easy to verify. In fairness, the approach is specific to a particular pipeline, its design/location, the elevation and hydraulic profile, the hydrocarbon moved, and the pipeline operation. Additional information and analysis is needed that would permit an independent verification that the rapid identification mentioned in the EA is even possible for the particular pipeline segments that could release into the unusually sensitive areas. Even if the claimed release detection parameters are true, which is highly unlikely given the lack of more detailed information in the EA, a large volume of oil would still be released before the control room were to take appropriate action. Overstatement of remote response timing in an oil spill understates the risks associated with the pipeline. Section VI lists some of the information that should be included to assist in verifying if the release detection time claims are even reasonable or possible.

## IV. The lack of specific information in the EA strongly suggests deficiencies in the worst case discharge determination that could affect the unusually sensitive areas and related oil spill response planning.

Information concerning the worst case discharge barrels is not verifiable because the value that could reach or impact the federal easements and unusually sensitive areas has not been provided in the public documents associated with the EA. However, the lack of certain additional information, based on my experience, indicates that worst case discharge values are most likely understated.[14]

A detailed review of the water intake mitigation measures section in the EA, while incorporating some approaches in excess of minimum federal pipeline safety regulations, do not provide sufficient information to validate any possible worst case values, or the associated oil spill response plan's effectiveness. Basically, for pipelines, worst case release volume is usually driven in pipeline rupture by:

1) the type of oil,
2) pumping rate,
3) time to remotely recognize and react to a possible release,
4) elevation and hydraulic profiles between the upstream and downstream pump stations spanning the sensitive areas,
5) valve placement by milepost, type, and actuation,
6) control room shutdown and isolation procedures (can be dictated by pipeline design), and

---

[14] USACE Digital Library, "Environmental assessment: Dakota Access Pipeline Project, crossings of flowage easements and federal lands," July 2016, pp. 42 & 43.

Accufacts Inc. Final                                                          Page 6 of 10

7) land drainage and proximity to a High Consequence Area.

Many of the above key driving variables have not been included or adequately identified or detailed in the EA. While it is important to incorporate oil spill training exercises into any oil pipeline operation, such exercises can be ineffective, or provide an illusion of safety, if the fundamental information upon which the programs are based is incomplete or flawed. This is especially true in worst case determinations, as all too many recent failures have released oil well beyond the claimed pipeline worst case determinations.[15]

Section VI, below, identifies additional information needed to properly evaluate a worst case release, and gauge the associated facility response plan claimed effectiveness in the event of a release. In relation to the specific risk analysis presented in the EA, I have the following general observations based on many years of pipeline failure investigation:[16]

1) Corrosion threats should be based on actual measured in the field readings verifying ILI runs and not based on assumed "conservative" corrosion rates. Corrosion rates can vary considerably and should not be based on so-called industry averages that may be low for a specific pipeline operation. Such field confirmations will verify the effectiveness of external/internal corrosion efforts mentioned in the EA.

2) ILI cannot identify all construction and transportation (i.e. cracking) defects that can survive a 1.25 MAOP hydrotest. Given the nature of the product anticipated to be moved on the system, the operator should provide evidence that transportation cracking threats are not introduced that might survive a hydrotest but grow with time because of pressure cycling that may be associated with the crude oil operation.

3) Insufficient design detail has been provided in the EA to permit an evaluation as to the risks associated with incorrect operation and/or equipment failure on the segments that could affect the sensitive water crossings.

4) Additional information is needed concerning the type of fusion bonded epoxy, or FBE, coating and whether it is of the more recent generation or type that permits CP current pass-through should the FBE disbond (separate from the pipe wall). This threat potential should be an easy issue to resolve.

5) Natural forces threat appears to be driven by the landslide potential off the federal easements that could impact the waterways as discussed in detail in Section II of this report.

---

[15] 49CFR§194.105 Worst case discharge.
[16] USACE Digital Library, "Environmental assessment: Dakota Access Pipeline Project, crossings of flowage easements and federal lands," July 2016, pp. 92 - 95.

USACE_ESMT001079

6) The adequacy of the consequences section is driven by the timeliness and effectiveness of the release detection, the control room procedures to prudently respond and properly isolate a possible release that could affect the sensitive waters, and the corresponding oil spill response plan as discussed in Section III of this report. There appears to be considerable optimism in the EA in assuming a quick recognition and response by control room personnel.

The risk analysis is missing critical details to permit an independent evaluation of risk for the project that could affect the sensitive waterways including Lake Oahe.

## V.   Nondestructive testing for girth weld inspection should clearly specify 100% radiographic testing.

The two DAPL water crossings are proposed to be constructed via horizontal directional drilling, or HDD. HDD basically involves drilling a small pilot bore and proceeding with successive reaming passes to enlarge the hole diameter until the bore is significantly larger than the pipe that is eventually pulled through in a slurry of mud/bentonite to minimize forces and damage to the pipe.

The EA states that DAPL will perform "non-destructive testing of 100 percent of girth welds."[17] Nondestructive testing is not defined in federal pipeline safety regulations.[18] Nondestructive testing of 100 percent of girth welds should be clearly defined to mean radiological inspection (i.e., x-ray, gamma ray) of all girth welds that could impact the two crossings. Important to the soundness of the HDD crossings and to the pipeline segments that could affect the federal unusually sensitive waterways, is a clear commitment that all girth welds be radiologically inspected, a type of nondestructive testing that can produce clear, independently verifiable, traceable, and complete records of girth weld quality. I do not see such a clear requirement in the EA and API 1104 (a referenced industry standard providing guidance in pipeline welding) which affords too much room for misapplication.

It is worth noting that despite many attempts over the decades to develop and advance ILI technology, current ILI capabilities cannot accurately determine the quality of girth welds, especially as it relates to girth weld cracking. It is thus important that the quality of such girth welds be determined at the time of construction by radiographic inspection and assessment. I further advise that such radiological inspection records of all girth welds be maintained for the life of the pipeline. Such important quality assurance/quality control girth weld assessment records are like fingerprints, no two should ever be exactly alike. If such an

---

[17] *Ibid.,* p. 42.
[18] 49CFR§195.234 Welds: Nondestructive testing.

Accufacts Inc. Final                                                                          Page 8 of 10

inspected/radiographic test girth weld should ever fail, the radiographic record will assist in any subsequent forensic analysis. But it is important to bear in mind that even with 100% radiographic testing of girth welds, there is still a risk of pipeline leaks due to cracked girth welds, especially if the inspection is not coupled with a prudent Quality Administration/Quality Control, or QA/QC, program that captures and rejects girth weld assessments identified to be inappropriate during construction.

## VI.  Specific information is needed to perform a complete and prudent risk analysis.

Any analysis should include the following information to provide assurances that the pipeline route/design/operation/maintenance activities are complete to avoid failure, the risk analysis appropriate, and more importantly, that an oil spill response plan would likely be effective if ever needed. As too many oil spills have recently demonstrated, claims of complying with federal regulation 49CFR§194 (Response Plans for Onshore Oil Pipelines) do not assure that such plans will be effective in the event of an oil release. All too often worst case pipeline releases are under calculated as released volumes are seriously underreported, and response plans proven ineffective at recovering anywhere near the amount of oil eventually determined to have actually been released. Without more information a proper analysis of worst case discharge claims and associated oil spill response plan effectiveness on sensitive receptors cannot be properly evaluated. The following incorporates much of the information identified in a previous section, but in a presentation format that quickly allows for an independent verification of equipment placement/type, related operational procedures, and integrity management applications and effectiveness for a particular pipeline:

1. the pipeline elevation profile (approximate elevation vs milepost for the pipeline segments between the nearest upstream and downstream pump stations) spanning the sensitive easements,

2. on the elevation profile, a line indicating the Maximum Operating Pressure, or MOP,

3. on the elevation profile, a hydraulic profile at the design rate case (various additional rates may be included as well for large elevation changes),

4. location of mainline valves and their type of operation (e.g., manual, remote, automatic), as well as specific safety design if warranted,

5. general location/type of critical leak detection monitoring devices by milepost,

USACE_ESMT001081

6. identification by milepost range of High Consequence Areas, and

7. given the numerous pipeline failures following ILI tool runs, further requirements are warranted on the type of ILI tool to be run, its frequency, and tool limitations for the segments that could threaten and affect the federal waters.

Without such information an EA for a specific pipeline is incomplete.  In addition, lacking such additional important information, it is impossible to recommend additional changes to the pipeline design/operation/maintenance including enhancements in rupture detection, that would be effective in prudently assuring a low risk for this pipeline to the sensitive areas identified in the EA.

Richard B. Kuprewicz,
President,
Accufacts Inc.



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
441 G STREET, NW
WASHINGTON, DC 20314-1000

CECW-ZA

OCT 2 8 2016

MEMORANDUM FOR Assistant Secretary of the Army (Civil Works)

SUBJECT:  Dakota Access Pipeline Crossing at Lake Oahe, North Dakota

1.  The Corps has reviewed the information available to it for the purpose of enabling the Department of the Army to determine whether it will need to reconsider any of its previous decisions regarding the Dakota Access Pipeline (DAPL) crossing at Lake Oahe, North Dakota, as indicated in the "Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers," dated September 9, 2016.

2.  We have concluded that the Corps' Omaha District adequately considered and disclosed the environmental, cultural and other potential impacts of its actions and that its decisions were not arbitrary or capricious.  We have also concluded that supplementation of the Environmental Assessment is not required.  However, we recommended that additional investigation and analysis be undertaken to determine whether the DAPL is in violation of the Clean Water Act and National Historic Preservation Act in the areas identified in the Tribe's September 2, 2016 court filing (i.e., the NHPA Section 110(k) issue).  A site visit was completed on October 20, 2016, and the report of that visit is attached.

3.  We can assure you that we conducted a thorough and objective review and analysis of the issues set forth in the attached memorandum and accompanying technical and legal analysis, which were identified by our federal partners shortly after they issued the Joint Statement.

4.  The point of contact for this Memorandum is Mr. David Cooper, Chief Counsel, at 202-761-0018 or David.R.Cooper@usace.army.mil.

Encl

DONALD E. JACKSON, JR., P.E.
Major General, USA
Deputy Commanding General
        for Civil and Emergency Operations

USACE_ESMT001095



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
441 G STREET, NW
WASHINGTON, DC 20314-1000

REPLY TO
ATTENTION OF

CECC-ZA                                                                                  October 20, 2016

MEMORANDUM THRU Deputy Commanding General for Civil Works and Emergency Operations, U.S. Army Corps of Engineers

FOR Assistant Secretary of the Army for Civil Works

SUBJECT: Dakota Access Pipeline Crossing at Lake Oahe, North Dakota

1. The purpose of this memorandum and enclosure is to provide information to the Department of the Army to enable it to determine whether it will need to reconsider any of its previous decisions regarding the location of the Dakota Access Pipeline (DAPL) at the Lake Oahe site in North Dakota under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4231 *et seq.*, or other federal laws, as indicated in the "Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers," dated September 9, 2016 (Joint Statement).

2. Applying the "hard look" standard of review under NEPA, we have concluded that the Corps' Omaha District adequately considered and disclosed the environmental, cultural and other potential impacts of its actions and that its decisions were not arbitrary or capricious. We have also concluded that supplementation of the Environmental Assessment (EA) to address any new information is not required at this time. Applying the applicable law under NEPA, we have not identified any new information indicating that actions by the Department of the Army will affect the quality of the human environment to a significant extent not already considered. However, we recommend that additional investigation and analysis be undertaken to determine whether the DAPL is in violation of the Clean Water Act and National Historic Preservation Act in the areas identified in the Tribe's September 2, 2016 court filing.

3. If you have any questions about this memorandum or the enclosure, please contact Milton Boyd or me.

Encl

DAVID R. COOPER
Chief Counsel

Printed on ♻ Recycled Paper

USACE_ESMT001096

**TECHNICAL AND LEGAL ANALYSIS OF PREVIOUS CORPS DECISIONS
REGARDING THE DAPL CROSSING AT LAKE OAHE**

<u>INTRODUCTION AND BACKGROUND</u>

The approximately 1,168 mile DAPL will connect the Bakken and Three Forks oil production region in North Dakota to an existing crude oil market hub near Patoka, Illinois. The pipeline crosses three Corps districts: Omaha, Rock Island and St. Louis. The Corps was required to consider three categories of requests submitted by Dakota Access, LLC (Dakota Access) for: (1) individual verifications that activities at more than 200 locations along the DAPL route satisfied the terms and conditions of Nationwide Permit (NWP) 12 (under the Clean Water Act, 33 U.S.C. § 1344, or the Rivers and Harbors Act of 1899, 33 U.S.C. § 403), which authorizes activities required for the construction of utility lines in federally regulated waters; (2) a real estate easement to lay the pipeline under a Corps-managed lake (Lake Oahe) and adjacent Corps-managed property; and (3) permissions to cross or lay the pipeline in seven locations used by the Corps for navigation or flood control under section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (section 408). Of the total length of the pipeline, only approximately three percent of the pipeline route is subject to Corps jurisdiction.

The pipeline would cross Lake Oahe at approximately one-half mile upstream of the northern boundary of the Standing Rock Sioux Tribe's (SRST's) reservation. Dakota Access would use a technique called horizontal directional drilling (HDD) to place the pipeline approximately 92 feet below the lake bed. The Corps would need to provide Dakota Access with three separate permissions for this specific crossing. Dakota Access required and received verification that the crossing meets the terms and conditions of NWP 12. Because the pipeline would cross Corps-managed property, section 408 required the Corps to "grant permission for the alteration or permanent occupation or use of [the project] when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408. Finally, the Corps would need to grant Dakota Access an easement (*i.e.,* a "right-of-way") because the pipeline crosses Corps-managed federal property. 30 U.S.C. § 185(a).

The Omaha District prepared environmental documentation under NEPA to support the required section 408 permission to cross Lake Oahe. The District published a draft EA on December 8, 2015, which was circulated for public comment. *See* 40 C.F.R. § 1508.9 (defining EAs). After reviewing the comments received, the Corps published the final EA and a Finding of No Significant Impact (FONSI) for the crossing on July 25, 2016.[1] *See* 40 C.F.R. § 1508.13 (defining FONSIs)

The SRST initiated litigation in the U.S. District Court for the District of Columbia immediately after the Corps decision on the NWP 12 verifications and section

---

[1] This EA also included an analysis of the DAPL crossing of Corps flowage easements at Lake Sakakawea. There is a second EA and FONSI, completed in 2012, covering activities authorized under NWP 12. The EA and FONSI covering activities under NWP 12 are not at issue in this matter.

1

The EA addressed these considerations with respect to the SRST. The health effects were not above generally accepted norms because the pipeline would be located more than half a mile away from the reservation boundary and more than 1.5 miles from the closest residence on the reservation, the pipeline will be operated in accordance with PHMSA requirements and the risk of an inadvertent spill or leak reaching (or in) Lake Oahe would be low. Final EA at 87. The risk or rate of hazard exposure from the pipeline to the SRST would not be significant and would not appreciably exceed the risk or rate of hazard to the general population. Final EA at 86 -87. The risks of a pipeline rupture generally are minimal:

| Year | Reported Significant Incidents | Total Miles of Crude Oil Pipelines | Percentage of Incident/Mile Per Year |
|------|-------------------------------|-----------------------------------|--------------------------------------|
| 2015 | 77 | 72,562 | 0.106116% |
| 2014 | 74 | 66,813 | 0.110757% |
| 2013 | 78 | 61,086 | 0.127689% |
| 2012 | 63 | 57,462 | 0.109638% |
| 2011 | 56 | 56,100 | 0.099822% |
| 2010 | 49 | 54,630 | 0.089694% |

PHMSA, Data and Statistics (available at:
http://www.phmsa.dot.gov/pipeline/library/data-stats).

The various mitigation measures for pipeline operations and protections for the SRST water intakes also helped to minimize any cumulative impacts or multiple adverse exposures from environmental hazards. *See supra* Section 3 (discussing water intakes); Final EA at 107 (discussing environmental justice cumulative effects).

The CEQ Guidance also recommends that federal agencies "seek tribal representation in the process in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the federal government's trust responsibility to federally-recognized tribes, and any treaty rights." CEQ Guidance at 9. As established in the analyses throughout the EA, the Corps attempted to engage in meaningful discussions with the SRST on numerous occasions about the nature of the project, cultural resources and the Lake Oahe crossing beginning in October 2014 and continuing through March 2016. Final EA at 85; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.* No. 16-cv-01534, Memorandum Opinion Denying Plaintiff's Request for Preliminary Injunction, Docket No. 39 at 48 (D.C. Dist. Sept. 9, 2016)(finding that, on the preliminary injunction record, the Corps exceeded its NHPA obligations at many sites).

The cumulative impacts section on environmental justice in the EA did not substantiate how "the ascent [from Oil and Gas Development]" supported the statement that "there is no disproportionate impact to low-income, minority or tribal populations benefited by the Environmental Justice policy." Final EA at 107. Without attribution to supporting materials or any connection to the actual residents in the affected

27

| From: | Nanney, Steve (PHMSA) |
|---|---|
| To: | Crook, Lowry A SES USARMY HQDA ASA; Boyd, Milt HQ02; Cooper, David R SES HQ02; Weintraub, Merle E |
| Cc: | Covert, Alicia (PHMSA); Samaras, Amelia (PHMSA); Fred, Benjamin (PHMSA); Nanney, Steve (PHMSA) |
| Subject: | [EXTERNAL] Connecting Dakota Access Pipeline (UNCLASSIFIED) - possible permit conditions to consider |
| Date: | Tuesday, October 25, 2016 9:22:36 AM |
| Attachments: | Dakota Access Pipeline - Army Corp of Engineers land and Lake Oahe - draft conditions - 10-23-2016 - draft 1.docx |

Good Morning Lowry and Milt,

Pursuant to our conversation last week, I'm providing a detailed list of the pipeline safety measures that we discussed.  We believe that the cost of these measures would be very achievable for the operator and certainly beneficial to all if they allow the project to proceed.  The operators may already be complying with some of these measures, and many of these suggested conditions may become regulatory requirements in the coming years.

We are happy to discuss prioritization of these measures if you'd like, though we believe each is important.  Please keep in mind that any measure included in the operating procedures for the pipeline is enforceable by PHMSA. Therefore, the Corps would not need to have ongoing involvement if it chose not to.

Please let us know if you have any further questions or if we can help in any way.

Take care,

Steve Nanney

PHMSA

713-628-7479 Mob#

-----Original Message-----

From: Cooper, David R SES HQ02 [mailto:David.R.Cooper@usace.army.mil]

Sent: Thursday, October 20, 2016 8:53 AM

To: Fred, Benjamin (PHMSA); Weintraub, Merle E; Nanney, Steve (PHMSA)

Cc: Boyd, Milt HQ02; Covert, Alicia (PHMSA); Crook, Lowry A SES USARMY HQDA ASA; Samaras, Amelia (PHMSA)

Subject: RE: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Thanks everyone.  This was very helpful.  We appreciate it.

David Cooper

Chief Counsel

U.S. Army Corps of Engineers

441 G Street, NW

Washington, DC 20314

Office Tel.: 202-761-0018

Mobile Tel.: 202-494-2987

-----Original Message-----

From: Fred, Benjamin (PHMSA) [mailto:Benjamin.Fred@dot.gov]

Sent: Thursday, October 20, 2016 9:51 AM

To: Weintraub, Merle E <merle.e.weintraub.civ@mail.mil <mailto:merle.e.weintraub.civ@mail.mil> >; Nanney, Steve (PHMSA) <Steve.Nanney@dot.gov <mailto:Steve.Nanney@dot.gov> >

Cc: Boyd, Milt HQ02 <milt.boyd@usace.army.mil <mailto:milt.boyd@usace.army.mil> >; Cooper, David R SES HQ02 <David.R.Cooper@usace.army.mil <mailto:David.R.Cooper@usace.army.mil> >; Covert, Alicia (PHMSA) <alicia.covert@dot.gov <mailto:alicia.covert@dot.gov> >; Crook, Lowry A SES USARMY HQDA ASA <lowry.a.crook.civ@mail.mil <mailto:lowry.a.crook.civ@mail.mil> >; Samaras, Amelia (PHMSA) <amelia.samaras@dot.gov <mailto:amelia.samaras@dot.gov> >

Subject: [EXTERNAL] RE: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline

Thank you all for the very productive call.

I'm copying Steve who will be in touch early next week with the follow-up we discussed.

Best regards,

Ben Fred

Deputy Assistant Chief Counsel, PHMSA

U.S. Department of Transportation

202-366-4346

PRIVILEGED & CONFIDENTIAL:  This e-mail, including any attachments, is confidential, intended only for the named recipient(s) above and may contain information that is privileged, confidential, attorney work product or otherwise legally protected.  If you have received this message in error, or are not the named recipient(s), please immediately notify me and permanently delete this e-mail message and any attachments from your workstation and/or network mail system.

-----Original Message-----

From: Fred, Benjamin (PHMSA)

Sent: Wednesday, October 19, 2016 1:25 PM

To: Weintraub, Merle E CIV USARMY HQDA ASA CW (US)

Cc: Boyd, Milt HQ02; Cooper, David R SES HQ02; Covert, Alicia (PHMSA); Crook, Lowry A SES USARMY HQDA ASA CW (US); Samaras, Amelia (PHMSA)

Subject: RE: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline

Let's do Thursday at 9:00 am ET.

Please use the following conference call line:

Conference Call # - 877-336-1831

Participant Access Code - 4547224

Best regards,

Ben Fred

Deputy Assistant Chief Counsel, PHMSA

U.S. Department of Transportation

202-366-4346

PRIVILEGED & CONFIDENTIAL:  This e-mail, including any attachments, is confidential, intended only for the named recipient(s) above and may contain information that is privileged, confidential, attorney work product or otherwise legally protected.  If you have received this message in error, or are not the named recipient(s), please immediately notify me and permanently delete this e-mail message and any attachments from your workstation and/or network mail system.

-----Original Message-----

From: Weintraub, Merle E CIV USARMY HQDA ASA CW (US) [mailto:merle.e.weintraub.civ@mail.mil]

Sent: Wednesday, October 19, 2016 11:32 AM

To: Fred, Benjamin (PHMSA)

Cc: Boyd, Milt HQ02; Cooper, David R SES HQ02; Covert, Alicia (PHMSA); Crook, Lowry A SES USARMY HQDA ASA CW (US)

Subject: RE: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline

Sir,

Mr Crook is available tomorrow from 9 to 10, 1130 to 1230, 2pm to 3pm.  Also available on Friday from 2pm to 5 pm.  Let me know.  Thanks!

Very Respectfully,

Ms. Merle E. Weintraub

Executive Assistant

OASA (CW)

108 Army Pentagon (3E446)

Washington, DC  20310-0108

703.695.8853

-----Original Message-----

From: Crook, Lowry A SES USARMY HQDA ASA CW (US)

Sent: Wednesday, October 19, 2016 11:24 AM

To: Fred, Benjamin (PHMSA) <Benjamin.Fred@dot.gov <mailto:Benjamin.Fred@dot.gov> >

Cc: Boyd, Milt HQ02 <milt.boyd@usace.army.mil <mailto:milt.boyd@usace.army.mil> >; Cooper, David R SES HQ02 <David.R.Cooper@usace.army.mil <mailto:David.R.Cooper@usace.army.mil> >; Covert, Alicia (PHMSA) <alicia.covert@dot.gov <mailto:alicia.covert@dot.gov> >; Weintraub, Merle E CIV USARMY HQDA ASA CW (US) <merle.e.weintraub.civ@mail.mil <mailto:merle.e.weintraub.civ@mail.mil> >

Subject: Re: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline

Thanks Ben, when would work for you?

On Oct 19, 2016, at 9:41 AM, Fred, Benjamin (PHMSA) <Benjamin.Fred@dot.gov <mailto:Benjamin.Fred@dot.gov > > > wrote:

_____ All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

_____

_____

_____

_____ Mr. Crook,

Please let me know if you would like to chat this week.

Best regards,

Ben Fred

Deputy Assistant Chief Counsel, PHMSA

U.S. Department of Transportation

202-366-4346

PRIVILEGED & CONFIDENTIAL:  This e-mail, including any attachments, is confidential, intended only for the named recipient(s) above and may contain information that is privileged, confidential, attorney work product or otherwise legally protected.  If you have received this message in error, or are not the named recipient(s), please immediately notify me and permanently delete this e-mail message and any attachments from your workstation and/or network mail system.

From: Covert, Alicia (PHMSA)

Sent: Friday, October 14, 2016 10:25 AM

To: Crook, Lowry A SES USARMY HQDA ASA CW (US)

Cc: Boyd, Milt HQ02; Cooper, David R SES HQ02; Fred, Benjamin (PHMSA)

Subject: RE: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline

Unfortunately the latest time we could do today is 2pm. If that doesn't work for you, Ben Fred will be in touch sometime next week to schedule a call because I will be in an off-site training all next week. Thanks.

-Alicia

Alicia Covert

Attorney Advisor

PHMSA, Office of Chief Counsel

(202) 366-8201

PRIVILEGED & CONFIDENTIAL

From: Crook, Lowry A SES USARMY HQDA ASA CW (US) <lowry.a.crook.civ@mail.mil
<mailto:lowry.a.crook.civ@mail.mil > > < Caution-mailto:lowry.a.crook.civ@mail.mil > >

Sent: Friday, October 14, 2016 9:57:33 AM

To: Covert, Alicia (PHMSA)

Cc: Boyd, Milt HQ02; Cooper, David R SES HQ02; Fred, Benjamin (PHMSA)

Subject: Re: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline

Hi Alicia, we now have to be at DOJ at 11:45 for a meeting with the pipeline company. Is your team available toward the end of the day, say 4pm? Many thanks for your help with this.

> On Oct 13, 2016, at 3:58 PM, Covert, Alicia (PHMSA) <alicia.covert@dot.gov <mailto:alicia.covert@dot.gov >> < Caution-mailto:alicia.covert@dot.gov > > wrote:

>

> Mr. Crook,

> Artealia passed along the below email.  Would you still like to have a phone call? Is everyone available tomorrow at 11am?  If so I can provide a conference line.  Thanks.

>

> Alicia Covert

> Attorney Advisor

> PHMSA, Office of Chief Counsel

> (202) 366-8201

>

> PRIVILEGED & CONFIDENTIAL.

>

> -----Original Message-----

> From: Crook, Lowry A SES USARMY HQDA ASA CW (US) [Caution-mailto:lowry.a.crook.civ@mail.mil < Caution-mailto:lowry.a.crook.civ@mail.mil > ]

> Sent: Friday, October 07, 2016 1:43 PM

> To: Gilliard, Artealia (PHMSA)

> Cc: Boyd, Milt HQ02; Cooper, David R SES HQ02; Gonsalves, Teresa (PHMSA); Tsaganos, Vasiliki (PHMSA); Covert, Alicia (PHMSA); Fred, Benjamin (PHMSA)

USACE_ESMT001180

> Subject: RE: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline

>

> Many thanks Artealia, are folks available to hop on the phone this afternoon?  We are flexible as to timing.

>

> Best regards,

> Lowry

>

> Lowry A. Crook

> Principal Deputy Assistant Secretary of the Army (Civil Works) Pentagon 3E446

> Office: 703-695-1370

> Mobile: 202-321-7242

> lowry.a.crook.civ@mail.mil <mailto:lowry.a.crook.civ@mail.mil> <mailto:lowry.a.crook.civ@mail.mil> < Caution-mailto:lowry.a.crook.civ@mail.mil >

>

> -----Original Message-----

> From: Gilliard, Artealia (PHMSA) [Caution-mailto:artealia.gilliard@dot.gov < Caution-mailto:artealia.gilliard@dot.gov > ]

> Sent: Friday, October 07, 2016 12:41 PM

> To: Crook, Lowry A SES USARMY HQDA ASA CW (US) <lowry.a.crook.civ@mail.mil <mailto:lowry.a.crook.civ@mail.mil > > < Caution-mailto:lowry.a.crook.civ@mail.mil > >

> Cc: Boyd, Milt HQ02 <milt.boyd@usace.army.mil <mailto:milt.boyd@usace.army.mil > > < Caution-mailto:milt.boyd@usace.army.mil > >; Cooper, David R SES HQ02 <David.R.Cooper@usace.army.mil <mailto:David.R.Cooper@usace.army.mil > > < Caution-mailto:David.R.Cooper@usace.army.mil > >; Gonsalves, Teresa (PHMSA) <teresa.gonsalves@dot.gov <mailto:teresa.gonsalves@dot.gov > > < Caution-mailto:teresa.gonsalves@dot.gov > >; Tsaganos, Vasiliki (PHMSA) <vasiliki.tsaganos@dot.gov <mailto:vasiliki.tsaganos@dot.gov > > < Caution-mailto:vasiliki.tsaganos@dot.gov > >; Covert, Alicia (PHMSA) <alicia.covert@dot.gov <mailto:alicia.covert@dot.gov > > < Caution-mailto:alicia.covert@dot.gov > >; Fred, Benjamin (PHMSA) <Benjamin.Fred@dot.gov <mailto:Benjamin.Fred@dot.gov > > < Caution-mailto:Benjamin.Fred@dot.gov > >

> Subject: RE: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline

>

> Lowry and Milt - thank you so much for reaching out on this. I spoke to Teresa, and it looks like the best POC for PHMSA would be Ben Fred and Alicia Covert. Please let us know when we can connect for a meeting to discuss your questions.

>

> Artealia

>

>

> -----Original Message-----

> From: Boyd, Milt HQ02 [Caution-mailto:milt.boyd@usace.army.mil <
Caution-mailto:milt.boyd@usace.army.mil > ]

> Subject: FW: [Non-DoD Source] Re: Connecting on Dakota Access Pipeline

>

> Teresa-

>

> Would you have a few moments to talk this afternoon or tomorrow morning?  In particular, I'd like to talk about high consequence areas and how they factor into siting for an oil pipeline.  Also, I'd like to verify that PHMSA has identified the area around Bismarck, ND as a high consequence area.  I'd also like to verify that there is not a high consequence area in the northern most parts of the Standing Rock Sioux reservation.

>

> Thank you very much for any help!

>

> Best,

>

> Milton

> (202) 761-8546


CLASSIFICATION: UNCLASSIFIED

USACE_ESMT001182

**Suggested - pipeline criteria for Army Corp of Engineers to use at Lake Oahe in North Dakota**: 10/23/2016 – draft 1

**Dakota Access Pipeline on Army Corp of Engineers land bordering or under Lake Oahe:**

- Suggested design, construction, operational and maintenance requirements for the Lake Oahe pipeline crossing and the "could affect" high consequence areas (as defined in 49 CFR § 195.450) in the vicinity of Lake Oahe.
- "Pipeline segment" is defined as Lake Oahe and the "could affect" high consequence areas ("could affect" HCAs) (as defined in 49 CFR § 195.450) in the vicinity of Lake Oahe from **Mile Post XXX to Mile Post XXX**.
- If portions of the pipeline segment have already been constructed some of these items may not be able to be implemented.

1) **Procedures and Specifications:** <u>For the pipeline segments crossing Lake Oahe and its "could affect" HCA,</u> Operator <u>must meet the</u> **[Army Corp of Engineers]** "permit stipulations" by developing, implementing, and maintaining for the operating life of the pipeline all "permit stipulations" in specifications and procedures for the design, construction, testing, operation and maintenance specifications and procedures as required in 49 CFR §§ 195.100, 195.202, 195.302, and 195.402 and this permit.

2) **Pipeline Design Factor - Pipelines:** Pipe installed must comply with a design factor of 0.50 or lower in the Lake Oahe crossing and "could affect" HCAs. [A hazardous liquid pipeline normally has a 0.72 design factor in accordance with 49 CFR § 195.106, which allows lessor wall thickness or strength of pipe to be used. Army Corp of Engineers may want to not include "could affect" HCAs in the design factor requirement.]

3) **Pipe Girth Weld – Nondestructive Tests:** Operator must nondestructively test <u>all girth welds</u> in accordance with 49 CFR §§ 195.228, 195.230 and 195.234. [Without this requirement not all girth welds in the "could affect" HCAs might not be nondestructively tested.]

4) **Pressure Test Level:** The pre-in-service hydrostatic test for mainline pipe must be to a pressure producing a hoop stress of either: a minimum 100% specified minimum yield strength (SMYS) or a minimum of 1.50 times maximum operating pressure (MOP) for eight (8) continuous hours for pipeline segments using a design factor of 0.50 or less. [A hazardous liquid pipeline normally has an 8-hour pressure test, 1.25 times MOP pressure test for 4-hours and 1.1 times MOP for 4 hours, in accordance with 49 CFR § 195.106. Suggest considering use of a pressure test of 1.39 times MOP for pipeline segments with a design factor of 0.72.]

5) **Assessment of Test Failures:** Any pipe failure occurring during the pre-in service hydrostatic test must undergo a root cause failure analysis to include a metallurgical examination of the failed pipe. The results of this examination must preclude a systemic pipeline material issue and the results must be reported to the applicable **[Army Corp of Engineers District office]** within 60 days of the failure.

6) **Coatings for Trenchless Installation:** Coatings used for directional bore, slick bore and other trenchless installation methods must be capable of resisting abrasion and other damage that may occur due to rocks and other obstructions encountered in this installation technique. [This requirement would require an abrasive resistance coating over the main pipe external coating for directional drills.]

USACE_ESMT001183

**Suggested - pipeline criteria for Army Corp of Engineers to use at Lake Oahe in North Dakota:** 10/23/2016 – draft 1

7) **Pipe Coating:** Pipe coatings must be non-shielding to cathodic protection (CP). Coatings such as tape and shrink sleeves would be shielding coatings to CP that protects the pipe from external corrosion. The application of a corrosion resistant coating to the steel pipe must be performed according to a coating application quality control program. The program must address pipe surface cleanliness standards, blast cleaning, application temperature control, adhesion, cathodic disbondment, moisture permeation, bending, minimum coating thickness, coating imperfections and coating repair.

8) **Field Coating:** Field joint coatings must be non-shielding to CP. Operator must implement field girth weld joint coating application specification and quality standards to ensure pipe surface cleanliness, application temperature control, adhesion quality, cathodic disbondment, moisture permeation, bending, minimum coating thickness, holiday detection and repair quality. Field coating applicators must use valid qualified coating procedures and be trained to use these procedures.

9) **Construction Coating Survey after Installation:** Promptly after a ditch for the pipeline is backfilled, but not later than three months after placing the pipeline in service, the operator must perform an assessment to ensure integrity of the coating using direct current voltage gradient (DCVG) or alternating current voltage gradient (ACVG). The operator must repair any coating damage classified as moderate or severe (voltage drop greater than 35% for DCVG or 50 dBµV for ACVG) in accordance with section 4 and Appendix A of NACE SP0502-2008 (or latest edition referenced in 49 CFR § 195.3) within six months of the assessment.

10) **Mainline Valve(s) with Remote Control or Automatic Shutdown:** Mainline valves in the pipeline segment must be located in accordance with 49 CFR § 195.260 and by taking into consideration elevation, population, and environmentally sensitive locations, to minimize the consequences of a release from the pipeline. Mainline valves must be placed based on the analysis above or no more than fifteen (15) miles between mainline valves in "could affect" HCAs, whichever is smaller.

Mainline valves protecting "could affect" HCAs must be located as determined by the operator's risk process for identifying preventive and mitigative measures established in 49 CFR § 195.452(i) and by using a process, such as is set forth in Section I.B of Appendix C of Part 195, but with a maximum distance from the high consequence area segment endpoints that does not exceed 71⁄2 miles and a total mainline valve spacing of no more than fifteen (15) miles between mainline valves for isolation of "could affect" HCAs.

Mainline valves with remote control or automatic shutdown for water crossings and reservoirs must be installed on either side of the crossing and additional mainline valves(s) installed either upstream, downstream, or both to protect the water body from the "could affect" HCA on either side of the water crossing. Mainline valves must either be located outside of the flood plain or have valve actuators and other control equipment installed so as to not be impacted by flood conditions. [For Lake Oahe and its "could affect" HCA, would expect a mainline valve for either remote control or automatic shutdown to be located at the upstream (start) of the "could affect" HCA, near the upstream and downstream sides of Lake Oahe, and on the downstream side of the "could affect" HCA – minimum of a total of 4 mainline valves. Suggest Operator furnish to the Army Corp of Engineers a pipeline route and elevation map of the pipeline through the Lake Oahe

USACE_ESMT001184

**Suggested - pipeline criteria for Army Corp of Engineers to use at Lake Oahe in North Dakota:** 10/23/2016 – draft 1

and "could affect" HCAs showing the location of the mainline valves with either remote control or automatic shutdown controls.]

Mainline valves with remote control or automatic shutdown must contain transit inhibit switches that prevent the valves from shutting at a rate (and in conjunction with pumps being shutdown) so that no pressure surges can occur, or other damage caused by unintended valve closures or too fast of a closure.

Mainline valves must be remotely controlled and actuated or automatic shutdown, and the SCADA system must be capable of closing the valve and monitoring the valve position, upstream pressure and downstream pressure so as to minimize the response time in the case of a failure.  Remote power backup is required to ensure communications are maintained during inclement weather.  Mainline valves must be capable of closure at all times.  If it is impracticable to install a remote controlled valve, Operator must submit a valve design and installation plan to the appropriate [**Army Corps of Engineers District office**] to confirm the alternative approach provides an equivalent level of safety.  [For any valves that cannot be remotely actuated, Operator must document on a yearly basis, not to exceed fifteen (15) months that personnel response time to these valves will not take over 30-minutes.]

Mainline valves in the pipeline segment must have actuation capability (i.e., remote control shut-off, automatic shut-off, manual shut-off where personnel are in proximity, or alternative equivalent technology) to ensure pipeline ruptures are promptly mitigated based upon maximum valve shut-off times, location, and spacing specified.

For each mainline valve that is a remote-control shut-off or automatic shut-off valve, the operator must conduct a point-to-point verification between SCADA displays and the mainline valve, sensors, and communications equipment in accordance with 49 CFR § 195.446(c) and (e), or an equivalent verification.

11) **Supervisory Control and Data Acquisition (SCADA) System:**  Operator must develop, install, operate, and maintain a SCADA system to provide remote monitoring and control of the entire pipeline segment in accordance with 49 CFR Part 195 requirements.

12) **Computational Pipeline Monitoring (CPM) Leak Detection:** The pipeline segment must have a computational pipeline monitoring (CPM) leak detection system in accordance with 49 CFR § 195.134 and must have adequate pressure sensors at pump stations, laterals, mainline valves and liquid flow volume measurement along the pipeline at inflows, outflows and spaced along the pipeline to perform accurate leak detection.  The pipeline segment must be operated as a continuously pressurized pipeline (with no pressure, slack line pipeline segments).  If the pipeline segment is operated as a slack line pipeline segment, an operating plan must be developed, reviewed by a responsible third party independent expert engineering company and submitted to the [**Army Corps of Engineers District office**] for "no objection" prior to being implemented by Operator.

13) **Mainline Valve - remote control shut-off or automatic shut-off Timing:**  Operator must identify a rupture in the pipeline segment within 5 minutes of the initial notification to the operator, as defined below as being an actual rupture event or non-event in accordance with operating

USACE_ESMT001185

**Suggested - pipeline criteria for Army Corp of Engineers to use at Lake Oahe in North Dakota:** 10/23/2016 – draft 1

procedures, regardless of how the rupture is initially detected or observed.   After a "rupture" as defined below is identified, Operator must complete mainline valve shut-off (closure and rupture segment isolation) and pipeline segment isolation within a maximum time interval of 30 minutes after rupture identification.  Pipeline segment isolation would include shut-off of all laterals for commodity receipts or deliveries and any crossover connections.

*Rupture* means a significant breach of a pipeline segment that results in a large volume, uncontrolled release of hazardous liquid.  Operator must treat any of the following as ruptures unless and until determined otherwise:

   a) An unanticipated or unplanned flow rate change of 10 percent or greater or a pressure loss of 10 percent or greater (or both), which occurs within a time interval of 15 minutes or less, unless operator has documented in operating procedures the need for a higher flow rate change or higher pressure-change threshold in advance due to pipeline flow dynamics and terrain elevation changes;

   b) An unexplained flow rate change, pressure change, instrumentation indication or equipment function that in the operator's experience may be representative of a large-volume, uncontrolled release or failure; or

   c) An apparent large-volume, uncontrolled release or failure observed by either operator personnel, the public, or public authorities and that is reported to the operator.

14) **Overpressure Protection Control:**  Operator must limit mainline pipeline segment overpressure protection to a maximum of 110% maximum operating pressure (MOP) during surge events consistent with 49 CFR § 195.406(b).  Before commencing operation, Operator must perform a surge analysis showing how the pipeline segment will be operated to be consistent with these overpressure protection conditions.  Operator shall equip the pipeline with field devices to prevent overpressure conditions.  Remotely actuated valves or automatic shutoff valves should be fitted with devices that will stop the transit (intentional or uncommanded) of the mainline valve should an overpressure condition occur or an impending overpressure condition is expected.  Sufficient pressure sensors, on both the upstream and downside side of valves, must be installed to ensure that an overpressure situation does not occur.  Sufficient pressure sensors must be installed along the pipeline to conduct real time hydraulic modeling, and which can be used to conduct a surge analysis to determine whether pipeline segments have experienced an overpressure condition.

15) **Cathodic Protection:**  The initial CP system must be operational within six (6) months of placing a pipeline segment in service.

16) **Interference Current Surveys:**  Interference surveys must be performed over the entire pipeline segment within six months of placing the pipeline in service to ensure compliance with applicable NACE International Standard Practice 0169-2007 (2007 or the latest version incorporated by reference in § 195.3) and 0177 (2007 or the latest NACE standard version, since NACE SP 0177 is not incorporated by reference in 49 CFR § 195.3) (NACE SP 0169-2007 and NACE SP 0177) for interference current levels.  If interference currents are found, Operator must determine if there have been any adverse effects on the pipeline and mitigate such effects as necessary as required below.  [Note: if no high voltage power lines paralleling the pipeline, would not need to include this section.]

USACE_ESMT001186

**Suggested - pipeline criteria for Army Corp of Engineers to use at Lake Oahe in North Dakota**: 10/23/2016 – draft 1

The interference current mitigation program for the pipeline segment must include:

a) As frequently as needed, including when new or uprated high voltage alternating current power lines greater than or equal to 69 kVA or electrical substations are co-located near the pipeline, but not to exceed every seven years conduct an interference survey (at times when static or dynamic voltages are at the highest values for a time period of at least 24-hours) to detect the presence and level of any electrical current that could impact external corrosion where interference is suspected;

b) Analyze the results of the survey to identify locations where interference currents are greater than or equal to 20 Amps per meter squared; and

c) a remedial action plan and apply for any necessary permits within four months of completion of the inspection or testing that identified the presence of deleterious electrical stray current.

d) Implement remedial actions to protect the pipeline segment from detrimental interference currents. Remedial actions must be completed promptly, but no later than one year after completion of the survey, or as soon as practicable after obtaining necessary permits. Remedial action means the implementation of measures including, but not limited to, additional grounding along the pipeline to reduce interference currents below 20 Amps per meter squared. The following criteria shall be used to determine when remedial actions are required.

    i) AC-induced corrosion does not occur at AC densities less than 20 A/m2 (1.9 A/ft2). The operator shall monitor these locations per (a) above.

    ii) AC corrosion is unpredictable for AC densities between 20 to 100 A/m2 (1.9 to 9.3 A/ft2). These locations require an engineering assessment to determine if remediation is required.

    iii) AC corrosion occurs at current densities greater than 100 A/m2 (9.3 A/ft2). These areas require mitigation. Any location that is determined to require mitigation must be mitigated to reduce the AC current density to less than 20 A/m2.

17) **Corrosion Surveys:** Operator must complete corrosion surveys for the pipeline segment within six (6) months of placing the respective CP system(s) in operation to ensure adequate external corrosion protection per NACE RP 0169-2007. The survey shall also address the proper number and location of CP test stations as well as alternating current (AC) interference mitigation and AC grounding programs per NACE RP 0177. At least one (1) CP test station must be located within each "could affect" HCA with a maximum spacing between test stations of one-half mile.

18) **Initial Inline Inspection (ILI):** Within three (3) years of placing a pipeline segment in service, Operator must perform a baseline ILI using a high-resolution Magnetic Flux Leakage (HR-MFL) tool, high resolution (HR) deformation tool, and an ultrasonic crack detection tool or equivalent of each.

19) **ILI Deformation Tool:** Operator must perform a high resolution deformation tool run after completion of the hydrostatic strength test and backfill of the pipeline segment and prior to placing the pipeline segment in service. Operator must remediate pipe in accordance with 49 CFRR Part 195 and Subpart O. All expanded pipe must be remediated in accordance with PHMSA's "Interim Guidelines for Confirming Pipe Strength in Pipe Susceptible to Low Yield Strength for Liquid Pipeline" dated October 6, 2009 or any subsequent PHMSA update to this guideline.

USACE_ESMT001187

**Suggested - pipeline criteria for Army Corp of Engineers to use at Lake Oahe in North Dakota:** 10/23/2016 – draft 1

20) **Future ILI:** Future ILI inspections must be based upon pipeline segment integrity threats and must include as a minimum of a high-resolution Magnetic Flux Leakage (MFL) tool, high resolution deformation tool, and an ultrasonic crack detection tool or equivalent of each.  ILI inspections must be performed on the entire pipeline segment on a frequency consistent with 49 CFR § 195.452(j)(3) assessment intervals or on a frequency determined by fatigue studies or anomalies found that are indicative of actual operating conditions.

   a) Conduct periodic close interval surveys (CIS) along the entire pipeline segment with current interrupted to confirm voltage drops in association with periodic ILI assessments under § 195.452(j)(3).  Pipeline segments under Lake Oahe would not be able to CIS due to water segment and depth of directional drill across Lake Oahe.

   b) CIS must be conducted within three (3) months of running ILI surveys when using a five (5) year ILI frequency, not to exceed sixty-eight (68) months, in accordance with 49 CFR § 195.452 (j) (3) assessment intervals.

   c) CIS findings must be integrated into ILI Tool findings.

21) **Flaw Growth Assessment:** Two (2) years after the pipeline segment in-service date, Operator shall use all data gathered on pipeline section experiencing the most severe historical pressure cycling conditions to determine effect on flaw growth that passed manufacturing standards and installation specifications.  This study shall be performed by a third party independent expert engineering company agreed to upon by Operator and **[Army Corp of Engineers District office]**.

22) **Verification of Reassessment Interval:** Operator must conduct a new fatigue analysis to validate the pipeline reassessment interval annually for the first five (5) years after placing the pipeline segment into service.  The analysis must be performed on the segment experiencing the most severe historical pressure cycling conditions using actual pipeline pressure data.  This study shall be performed by a third party independent expert engineering company agreed to upon by Operator and **[Army Corp of Engineers District office]**.

23) **Anomaly Evaluation and Repair:** Anomaly evaluations and repairs must be performed based upon 49 CFR Part 195 or the following, whichever is the most conservative requirement:

   a) Immediate  Repair Conditions: Follow 49 CFR § 195.452(h)(4)(i) except designate the calculated remaining strength failure pressure ratio (FPR) ≤ 1.15 for anomaly repairs;

   b) 60-Day Conditions: Follow 49 CFR  § 195.452(h)(4)(ii) except designate a FPR ≤ 1.25 for anomaly repairs;

   c) 180-Day Conditions: Follow 49 CFR § 195.452(h)(4)(iii) with exceptions for the following conditions which must be scheduled for repair within 180 days:

      i) Calculated FPR = < 1.39;

      ii) Areas of corrosion with predicted metal loss greater than 40%;

      iii) Predicted metal loss is greater than 40%  of nominal wall that is located at a crossing of another pipeline; and

      iv) Gouge or groove greater than 8% of nominal wall.

24) **Internal Corrosion:** Operator must limit basic sediment and water (BS&W) to 0.5% by volume and report BS&W testing results to Ain the annual report.  Operator must report upset conditions causing BS&W level excursions above the limit on the annual report.

   a) Operator must run cleaning pigs twice in the first year and as necessary in succeeding years based on the analysis of oil constituents, liquid test results, weight loss coupons located in areas

**Suggested - pipeline criteria for Army Corp of Engineers to use at Lake Oahe in North Dakota**: 10/23/2016 – draft 1

    with the greatest internal corrosion threat and other internal corrosion threats.  At a minimum in the succeeding years following the first year Operator must run cleaning pigs once a year, with intervals not to exceed 15 months.

b) Liquids collected during cleaning pig runs, such as BS&W, must be sampled, analyzed and internal corrosion mitigation plans developed based upon lab test results.

c) Operator shall review the program at least quarterly based upon the crude oil quality and implement adjustments to monitor for, and mitigate the presence of, deleterious crude oil stream constituents.

25) **Pipeline Markers:** Operator must install and maintain line-of-sight markings on the pipeline segment except in agricultural areas or large water body crossings such as lakes where line of sight signage is not practical.  The marking of pipelines may also be subject to environmental permits and local restrictions.  Additional markers must be placed along the pipeline in areas where the pipeline is buried less than forty-eight (48) inches.  Operator must promptly replace removed or damaged line-of-sight markers found during pipeline patrols and maintenance on the right-of-way.

26) **Pipeline Patrolling:** Operator must patrol the pipeline segment right-of-way on a two (2) week interval but not exceeding three (3) weeks, for at least twenty-six (26) times each calendar year, to inspect for excavation activities, ground movement, unstable soil, wash outs, leakage, or other activities or conditions affecting the safe operation of the pipeline segment.

27) **Records:**  All records demonstrating compliance with these permit conditions herein must be maintained for the useful life of the pipeline segment.

28) **Third Party Independent Expert Engineering Annual Audit:** Operator and [**Army Corp of Engineers District office**] must jointly select a Third Party Independent Expert Engineering Company to review these conditions and to report on the implementation of these conditions by Operator and any other integrity threats that need to be implemented to maintain safety on the pipeline segment to the [**Army Corp of Engineers District office**].  Annual Third Party audits must be posted by the Operator by April 1 of the following year on the operator website.

29) **Annual Reporting:**  For the previous year operations in the pipeline segment, Operator must annually report by February 15th of the next year the following to the [**Army Corp of Engineers District office**] and post on an operator website for public review [Note: This would give public a way to monitor pipeline segment integrity.]:

a) The results of any ILI run or direct assessment results performed on the pipeline during the previous year;

b) The results of all internal corrosion management programs;

c) Any new integrity threats identified during the previous year;

d) Any encroachment in the right-of-way;

e) Any HCA changes during the previous year;

f) Any reportable incidents that occurred during the previous year;

g) Any leaks or ruptures on the pipeline that occurred during the previous year;

h) A list of all repairs on the pipeline made during the previous year;

i) On-going damage prevention initiatives on the pipeline and an evaluation of their success or failure;

USACE_ESMT001189

**Suggested - pipeline criteria for Army Corp of Engineers to use at Lake Oahe in North Dakota:** 10/23/2016 – draft 1

    j)   Any changes in procedures used to assess and monitor the pipeline; and

    k)   Any company mergers, acquisitions, transfers of assets, or other events affecting the management of the pipeline segment.

**30) Certification:** An Operator senior executive officer must certify in writing the following:

    a)   All of the permit conditions described herein have been or are being implemented;

    b)   That the written design, construction, and operating and maintenance (O&M) plans and procedures for the pipeline have been updated to include all additional requirements herein;

    c)   That reviewed and modified its damage prevention program relative to the pipeline segment to include any additional elements required herein.

- Operator must send a copy of the certification with the required senior executive signature and date of signature to the **[Army Corp of Engineers District]** at least 90 days prior to operating the pipeline.



**DEPARTMENT OF THE ARMY**
U.S. ARMY CORPS OF ENGINEERS
441 G STREET, NW
WASHINGTON, DC 20314-1000

REPLY TO
ATTENTION OF

CECC-ZA                                                        October 20, 2016

MEMORANDUM THRU Deputy Commanding General for Civil Works and Emergency Operations, U.S. Army Corps of Engineers

FOR Assistant Secretary of the Army for Civil Works

SUBJECT: Dakota Access Pipeline Crossing at Lake Oahe, North Dakota

1. The purpose of this memorandum and enclosure is to provide information to the Department of the Army to enable it to determine whether it will need to reconsider any of its previous decisions regarding the location of the Dakota Access Pipeline (DAPL) at the Lake Oahe site in North Dakota under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4231 *et seq.*, or other federal laws, as indicated in the "Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers," dated September 9, 2016 (Joint Statement).

2. Applying the "hard look" standard of review under NEPA, we have concluded that the Corps' Omaha District adequately considered and disclosed the environmental, cultural and other potential impacts of its actions and that its decisions were not arbitrary or capricious. We have also concluded that supplementation of the Environmental Assessment (EA) to address any new information is not required at this time. Applying the applicable law under NEPA, we have not identified any new information indicating that actions by the Department of the Army will affect the quality of the human environment to a significant extent not already considered. However, we recommend that additional investigation and analysis be undertaken to determine whether the DAPL is in violation of the Clean Water Act and National Historic Preservation Act in the areas identified in the Tribe's September 2, 2016 court filing.

3. If you have any questions about this memorandum or the enclosure, please contact Milton Boyd or me.

Encl                                           DAVID R. COOPER
                                               Chief Counsel

Printed on Recycled Paper

## TECHNICAL AND LEGAL ANALYSIS OF PREVIOUS CORPS DECISIONS REGARDING THE DAPL CROSSING AT LAKE OAHE

### INTRODUCTION AND BACKGROUND

The approximately 1,168 mile DAPL will connect the Bakken and Three Forks oil production region in North Dakota to an existing crude oil market hub near Patoka, Illinois. The pipeline crosses three Corps districts: Omaha, Rock Island and St. Louis. The Corps was required to consider three categories of requests submitted by Dakota Access, LLC (Dakota Access) for: (1) individual verifications that activities at more than 200 locations along the DAPL route satisfied the terms and conditions of Nationwide Permit (NWP) 12 (under the Clean Water Act, 33 U.S.C. § 1344, or the Rivers and Harbors Act of 1899, 33 U.S.C. § 403), which authorizes activities required for the construction of utility lines in federally regulated waters; (2) a real estate easement to lay the pipeline under a Corps-managed lake (Lake Oahe) and adjacent Corps-managed property; and (3) permissions to cross or lay the pipeline in seven locations used by the Corps for navigation or flood control under section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (section 408). Of the total length of the pipeline, only approximately three percent of the pipeline route is subject to Corps jurisdiction.

The pipeline would cross Lake Oahe at approximately one-half mile upstream of the northern boundary of the Standing Rock Sioux Tribe's (SRST's) reservation. Dakota Access would use a technique called horizontal directional drilling (HDD) to place the pipeline approximately 92 feet below the lake bed. The Corps would need to provide Dakota Access with three separate permissions for this specific crossing. Dakota Access required and received verification that the crossing meets the terms and conditions of NWP 12. Because the pipeline would cross Corps-managed property, section 408 required the Corps to "grant permission for the alteration or permanent occupation or use of [the project] when in the judgment of the Secretary such occupation or use will not be injurious to the public interest and will not impair the usefulness of such work." 33 U.S.C. § 408. Finally, the Corps would need to grant Dakota Access an easement (*i.e.,* a "right-of-way") because the pipeline crosses Corps-managed federal property. 30 U.S.C. § 185(a).

The Omaha District prepared environmental documentation under NEPA to support the required section 408 permission to cross Lake Oahe. The District published a draft EA on December 8, 2015, which was circulated for public comment. *See* 40 C.F.R. § 1508.9 (defining EAs). After reviewing the comments received, the Corps published the final EA and a Finding of No Significant Impact (FONSI) for the crossing on July 25, 2016.[1] *See* 40 C.F.R. § 1508.13 (defining FONSIs)

The SRST initiated litigation in the U.S. District Court for the District of Columbia immediately after the Corps decision on the NWP 12 verifications and section

---

[1] This EA also included an analysis of the DAPL crossing of Corps flowage easements at Lake Sakakawea. There is a second EA and FONSI, completed in 2012, covering activities authorized under NWP 12. The EA and FONSI covering activities under NWP 12 are not at issue in this matter.

1

408 Lake Oahe decision. The SRST sought a preliminary injunction suspending the Corps verifications that water crossings associated with the pipeline met the terms and conditions of NWP 12. The SRST's request focused on alleged failures by the Corps in consultations under section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108 (NHPA). The court denied the SRST's request on September 9, 2016. The SRST immediately appealed that decision to the U.S. Circuit Court of Appeals for the District of Columbia Circuit, where the matter is currently pending.

## ISSUES FOR PRELIMINARY CONSIDERATION

Immediately after the D.C. District Court issued its decision on the SRST's request for an injunction, the Departments of Justice, the Army, and the Interior issued the Joint Statement referenced in the memorandum above. The following week, representatives of those departments identified six issues for the Department of the Army to consider, preliminarily, to determine whether it will need to reconsider any of its previous decisions regarding DAPL's location at Lake Oahe. Those issues are:

1.  Evaluate the North Bismarck route, the basis for selecting the Lake Oahe route as the preferred alternative, and the basis for establishing a 0.5 mile buffer between the northern boundary of the SRST reservation and the pipeline route.

2.  Evaluate the Fort Laramie Treaties of 1851 and 1868, and other federal laws, and whether the finding in the EA that there are no impacts to treaty fishing or hunting rights is supported. This evaluation would include consideration of any reserved water rights of the SRST.

3.  Evaluate whether the discussion in the EA of impacts to water intake structures for drinking and irrigation purposes is adequate and consider what role the possible downstream move of the SRST's water intake structure will have in the analysis.

4.  Evaluate whether the environmental justice discussion in the EA of issues related to the SRST is adequate.

5.  Determine whether there are any NHPA Section 110 issues that are not before the court already and any other cultural resource issues identified more recently within the area of federal jurisdiction.

6.  Evaluate the implications of the provision of the 1889 Sioux Act, 25 Stat. 888, which provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River . . . down said center of the main channel."

## STANDARD OF REVIEW

In examining the issues identified above, we applied a standard of review that is used by the courts in evaluating federal actions under NEPA. Although an agency has discretion over whether to perform additional NEPA analysis, we have looked to the

2

courts for general guidance on exercising that discretion. NEPA requires the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions. *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004). As is well established, NEPA is "essentially procedural." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). It does not mandate "particular substantive environmental results;" rather, it "focus[es] Government and public attention on the environmental effects of proposed agency action." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). NEPA is intended to foster better decision making and informed public participation for actions that affect both people and the natural environment. *See* 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(a). The statute serves those purposes by requiring federal agencies to take a "hard look" at the environmental consequences of proposed actions in advance of deciding whether and how to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).

NEPA's "hard look" doctrine is designed "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004). Accordingly, the D.C. Circuit has consistently instructed that a reviewing court is not to "flyspeck an agency's environmental analysis" looking for any deficiency, no matter how minor. *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014) (internal quotation omitted); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011); *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006).

Under NEPA an agency is "only required to adequately assess the information that is available." *Fla. Coal. for Peace & Justice v. Bush*, CIV. A. No. 89-2682-OG, 1990 WL 157934, at *4 (D.D.C. Oct. 5, 1990). Thus, NEPA does not require that an agency "halt action in the face of uncertain information -- it just requires disclosure that such information is lacking, and commands the agency to provide as comprehensive an analysis as it can with the information available to it." *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 159-60 (D.D.C. 2014) (citing 40 C.F.R. § 1502.22).

If "significant new circumstances or information relevant to environmental concerns" comes to light after an EIS or EA is final, an agency should consider whether a supplemental EIS or EA is merited. 40 C.F.R. § 1502.9(c); *see also Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998) (standard for supplementing an EA is the same as for an EIS). When determining whether to prepare a supplemental EIS or EA an agency is to apply the "rule of reason" based on a consideration of the "value of the new information to the still pending decisionmaking process." *Marsh*, 490 U.S. at 373-374. If there is major federal action to occur and if new information shows that the remaining action will affect the quality of the human environment to a significant extent not already considered, a supplemental EIS must be prepared. *Id.* at 374. However, "a reduction in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact." *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218-19 (10th Cir. 1997); *see*

3

USACE_ESMT001216

*also Arkansas Wildlife Fed'n v. Corps*, 431 F.3d 1096, 1103 (8th Cir. 2005) (holding no supplemental EA was necessary where the Corps adequately considered the environmental impact of the proposed changes and reasonably concluded that they were not significant and that any environmental impact appears to be positive rather than negative).

<u>DISCUSSION</u>

<u>1. Evaluate the North Bismarck route, the basis for selecting the Lake Oahe route as the preferred alternative, and the basis for establishing a 0.5 mile buffer between the northern boundary of the SRST reservation and the pipeline route.</u>

A. EA Discussion



Route Alternative. North of Bismarck.
Source: Final EA. Figure 13.

The Corps limited its analysis in the EA to "pipeline placement on federal real property interests administered by the Corps." Final EA at 7. The Corps evaluated major route alternatives for the pipeline route as a whole. *Id.* Dakota Access began the route selection process using a "sophisticated and proprietary Geographic Information System (GIS)-based routing program." *Id.* This program took into account a number of variables, including, but not limited to, existing pipelines, environmental considerations and land use, to develop potential pipeline routes. *Id.* From this initial analysis, the Corps further evaluated two of the route alternatives. The first alternative was a route that would avoid crossing Corps-held flowage easements around Lake Sakakawea. *Id.* The second alternative was a route that took the pipeline crossing of the Missouri River 10 miles north of Bismarck, North Dakota. Final EA at 7-8. The Corps considered the North Bismarck crossing a viable alternative even though early in the pipeline planning process Dakota Access eliminated this alternative from consideration. *Id.*

The discussion of the North Bismarck route alternative was succinct:

4

USACE_ESMT001217

Early in the routing phase of the [pipeline] Project, Dakota Access considered but eliminated an alternative centerline that originated in Stanley, North Dakota, within Mountrail County, where it connected to customer receipt points and headed southwest through Williams County and crossed the Missouri River approximately 8.5 miles east of the Yellowstone River and Missouri River confluence (Figure 12). The centerline then headed southeast across the state and crossed Lake Oahe approximately 10 miles north of Bismarck (Figure 13), where it then headed south again and entered South Dakota approximately 35 miles east of Lake Oahe in McIntosh County. In addition to other evaluation criteria listed in Table 2.1, the route alternative was in proximity to and/or crossing multiple conservation easements, habitat management areas, National Wildlife Refuges, state trust lands, waterfowl production areas, and private tribal lands.

As a result of public input and comment during this EA process, additional desktop evaluation of the North Bismarck alternative portion of the early route (Figure 13) was undertaken. The comparison of this alternative to the preferred route is included in Tables 2-1 and 2-2 contained herein. As illustrated in the tables, the data substantiates eliminating this route as a viable alternative. While the alternative does avoid Corps fee owned land at Lake Oahe; therefore, would not require a Corps real estate outgrant or Corps EA review, approximately 11-miles of length would be added to the pipeline route, consisting of roughly 165 additional acres of impact, multiple additional road crossings, waterbody and wetland crossings, etc. In addition to the criteria shown in the tables, due to the proximity to Bismarck, the North Bismarck route alternative crossed through or in close proximity to several wellhead source water protection areas that are identified and avoided in order to protect areas that contribute water to municipal water supply wells. The route was also severely constrained by the North Dakota Public Service Commission's 500-ft residential buffer requirement at multiple locations. Furthermore, this route alternative crossed other populated PHMSA [Pipeline and Hazardous Materials Safety Administration] high consequence areas (HCAs) that are not present on the preferred route. Pipeline safety regulations use the concept of HCAs to identify specific locales where a release from a pipeline could have the most significant adverse consequences.

Final EA at 8.

USACE_ESMT001218

The EA contained two charts, both labeled as Table 2-1, which compared the North Bismarck route alternative to the Dakota Access preferred route alternative that crossed Corps-managed property at Lake Oahe.

| Table 2-1 Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| **Evaluation Factors** | **ALTERNATIVE ROUTE Crossing North of Bismarck** | **PREFERRED ROUTE Crossing at Lake Oahe** | **PREFERRED COMPARED TO ALTERNATIVE ROUTE** |
| Total Overall Route Mileage | | | |
| Total Mileage | 111.0 | 100.4 | -10.6 |
| Collocation | | | |
| Pipeline (mi) | 0.0 | 34.6 | +34.6 |
| Powerline (mi) | 2.9 | 6.1 | +3.2 |
| *Overall Corridor Collocation (%)* | 3% | 41% | +38% |
| Amount of Greenfield Crossed (non-collocated areas-mi) | 108.1 | 59.6 | -48.4 |
| Existing Pipeline Crossing (count) | | | |
| Crossing Count | 6 | 10 | +4 |
| Floodplain 100 Year | | | |
| Floodplain Crossings (Count) | 13 | 2 | -11 |
| Total Mileage | 1.4 | 0.2 | -1.2 |
| Land Cover Types (mi) | | | |
| Agriculture | 42.5 | 36.1 | -6.4 |
| Developed/Low Intensity | 0.2 | 0.1 | -0.1 |
| Developed/Open Space | 6.6 | 2.0 | -4.6 |
| Grass/Pasture | 59.3 | 60.7 | +1.4 |
| Land Ownership Potential Conflicts | | | |
| USACE Reservoirs - Lake Oahe | 0 | 1 | +1 |
| Flowlines - NHD* | | | |
| Waterbody Count | 149 | 116 | -33 |

Final EA at 9.

| Table 2-1 Alternatives Evaluation Matrix Between Preferred Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | |
|---|---|---|---|
| **Evaluation Factors** | **ALTERNATIVE ROUTE Crossing North of Bismarck** | **PREFERRED ROUTE Crossing at Lake Oahe** | **PREFERRED COMPARED TO ALTERNATIVE ROUTE** |
| Waterbodies–NHD* | | | |
| Perennial | 3 | 1 | -2 |
| Intermittent | 1 | 0 | -1 |
| NWI Wetland (count) | | | |
| Freshwater Emergent Wetland | 26 | 5 | -21 |
| Freshwater Forested/Shrub Wetland | 1 | 0 | -1 |
| Freshwater Pond | 2 | 0 | -2 |
| PHMSA Populated Areas Dissolved (mi) | | | |
| Ecological HCA | 2.6 | 2.6 | 0 |
| Highly Populated Areas | 0 | 0 | 0 |
| Other Populated Areas | 1.6 | 0 | -1.6 |
| Drinking Water HCA | 0 | 0 | 0 |
| Powerline Crossing | | | |
| Total Crossing Count | 14 | 13 | -1 |
| Transportation Crossing | | | |
| Total Crossing Count | 139 | 112 | -27 |

* Flowline and waterbody crossings from the U.S. Geological Survey (USGS) National Hydrography Dataset

6

USACE_ESMT001219

Final EA at 10.

The EA also contained a chart that compared costs between the North Bismarck route and the preferred route alternative:

| Table 2-2 Construction Cost Comparison Between Crossing at Lake Oahe and Alternative Crossing North of Bismarck | | | | |
|---|---|---|---|---|
| | ALTERNATIVE ROUTE Crossing North of Bismarck | | PREFERRED ROUTE Crossing at Lake Oahe | |
| Length of Segment | 111.0 | miles | 100.4 | miles |
| | 585,974 | feet | 530,112 | feet |
| Cost for Road/Railroad Bores | | | | |
| Number of Road/Railroad Bores | 139 | bores | 112 | bores |
| Total Cost for Road Bores (at $34,600/bore) | $ 4,809,400 | USD | $ 3,875,200 | |
| Cost of Installation for Non-HDD Areas | | | | |
| Length of Pipeline Non-HDD | 580,008 | feet | 522,312 | feet |
| Total Cost for Installation of Non-HDD Section | $ 201,262,915 | USD | $ 181,242,264 | USD |
| Horizontal Directional Drill (HDD) Across Mo River/Lake Oahe | | | | |
| Length of HDD | 5,966 | feet | 7,800 | feet |
| Total Cost of HDD Crossing | $ 7,696,140 | USD | $ 10,062,000 | USD |
| Cost of Geotechnical Investigation | | | | |
| | $ 140,000 | USD | $110,000 | USD |
| Aboveground Facility Costs | | | | |
| Mainline Valves Needed (one per each 10 mile segment) | 11 | valves | 10 | valves |
| Total Cost of Mainline Valves (at $450,000/valve location) | $ 4,995,000 | USD | $ 4,500,000 | USD |
| Right-of-Way Acquisition Costs (at $37/foot) | $ 21,681,053 | USD | $ 19,614,144 | USD |
| Additional Cost Including Engineering and Consultants (at $131,000/mile) | $ 14,538,380 | USD | $ 13,152,400 | USD |
| Total Cost of Alternative | $ 255,122,888 | USD | $ 232,556,008 | USD |

Final EA at 11.

B. Analysis

Although the discussion of the North Bismarck route was brief, it provided sufficient reasons for why Dakota Access chose the preferred alternative that crossed Lake Oahe north of the SRST reservation. The preferred route avoided tribal land, was co-located with an existing natural gas pipeline, complied with North Dakota rural residence avoidance requirements, had fewer water crossings and avoided HCAs as identified by PHMSA. The preferred route was also less expensive than the alternative, but cost was not identified as a reason for selecting the preferred route. *See* Final EA at 11, Table 2-2.

As noted above, the preferred route would cross Lake Oahe at approximately 0.5 miles north of the SRST reservation. The EA discussed the use of a 0.5 mile buffer in its environmental justice analysis. It stated that "linear projects typically use a 0.5 mile buffer area to examine Environmental Justice effects" and provided three docket numbers from natural gas pipeline projects evaluated by the Federal Energy Regulatory

USACE_ESMT001220

Commission to support this choice. Final EA at 84 and 87. The three docket numbers cited as support are actually tied to the same project. Final Environmental Impact Statement, Corpus Christi LNG Project (October 2014). However, there is additional support for this approach. *See, e.g.,* Julianna Maantay, Mapping Environmental Injustices: Pitfall and Potential of Geographic Information Systems in Assessing Environmental Health and Equity, 110 Environmental Health Perspectives 161, 164 (April 2002) (stating that "buffer zones are intended to act as surrogates for the areas of impact and are usually established as circles with a radius of one-half mile or 1 mile, or other appropriate distance, from the noxious land use"); David Forkenbrock, Jason Shelly, Effective Methods for Environmental Justice Assessment, 319 (2004) (providing example of a linear transportation project that used a half-mile buffer). Dakota Access used the 0.5 mile buffer in the routing software it applied for siting the pipeline and also used it to avoid certain types of land, such as tribal lands. Final EA at 7.

In any event, the actual location of the preferred Lake Oahe crossing focused more on co-locating the pipeline with an existing right-of-way for an existing natural gas pipeline than on any perceived requirement to maintain a 0.5-mile buffer from the SRST reservation or on whether risks were greater for the North Bismarck route than for the crossing near the SRST reservation. Table 2-1 shows that the preferred route is co-located with other pipelines or utility corridors along 41 percent of the route, while the North Bismarck alternative is only co-located with other pipelines or utility corridors along three percent of the route. The EA and FONSI both discussed how co-location of the pipeline with other established utility corridors helped to minimize direct and cumulative environmental impacts. FONSI at 6; Final EA at 86 and 98. Co-location helped to minimize impacts to sensitive environmental and cultural resources as this route would limit impacts to undisturbed areas. The following map from the EA shows the co-location of the proposed pipeline with an existing pipeline at Lake Oahe.



Final EA at 1008.

The preferred alternative also presented other advantages. North Dakota law requires pipelines to have an avoidance setback of 500 feet from inhabited rural residences. Final EA at 86 and North Dakota Energy Conversion and Transmission

USACE_ESMT001221

Facility Siting Act Exclusion and Avoidance Areas Criteria, N.D. Cent. Code Ann. § 49-22-05.1 (West). In the vicinity of the SRST reservation, the residence that is closest to the pipeline crossing at Lake Oahe is a rural residence located more than 1.5 miles away from the crossing. Final EA at 86. As noted above, the North Bismarck alternative was "severely constrained by the North Dakota Public Service Commission's 500-ft residential buffer requirement at multiple locations." Final EA at 7.

Table 2-1 also shows that the preferred route crosses five wetland features while the North Bismarck route crosses 28 water features. The total number of freshwater emergent wetland crossings increased from a total of 203 in the preferred route to a total of 224 in the North Bismarck route. This is an increase of approximately 10 percent. Dakota Access Pipeline Project Application to the North Dakota Public Service Commission, App. D at 8 and Final EA at Table 2-1. The first Table 2-1 listed only the raw number of crossings instead of giving the total amount of impacts measured as acreage or linear feet so that a more accurate comparison of the route could be made. The EA did not otherwise specify the acreage of impacts. Throughout the length of the pipeline most of the water impacts are temporary and small, averaging about a tenth of an acre for freshwater emergent wetlands impacts, for example. *Id.*, App. D at 8 (203 freshwater emergent wetlands (PEM) totaling 21.25 acres impacted by construction). Thus, it is likely that the five areas of impacts along the preferred route would be minimal.

The EA stated that the North Bismarck "route alternative crossed other populated PHMSA high consequence areas (HCAs) that are not present on the preferred route." Final EA at 7 and Table 2-1 (noting presence of "other populated areas on the North Bismarck route). Under PHMSA regulations, if an operator identifies an area as an HCA, it must take additional measures to prevent and mitigate the consequences of a pipeline failure. 49 C.F.R. § 195.452 (outlining "pipeline integrity management" requirements for pipeline in HCAs). For HCAs, pipeline operators must develop a program to manage pipeline integrity, take "prompt action to address all anomalous conditions" discovered in the pipeline, be able to "immediately repair" the pipeline and take measures to "prevent and mitigate the consequences of a pipeline failure." *Id.* at § 195.452(b), (h) & (i). HCAs include navigable waterways, high population areas (50,000 or more people, with a density of over 1,000 per square mile), other populated areas and "unusually sensitive areas," such as community water intakes. 49 C.F.R. §§ 195.450 & 195.6(a)(1).

While both routes would cross HCAs and therefore would require enhanced protections, the North Bismarck route would cross HCAs that the Lake Oahe route would not cross. The HCAs appear to be the Menoken and Harmon "other population areas," which are communities on either side of the Missouri River near Bismarck, but are not specifically named or addressed in the EA. *See* 49 C.F.R. § 195.450(3); PHMSA National Pipeline Mapping System, Public Map Viewer, Other Population Areas, available at: https://www.npms.phmsa.dot.gov/. The Lake Oahe route included HCAs and those areas were discussed elsewhere in the EA. Final EA at 94, App. J at 17. The crossing of additional HCAs for "other populated areas" on the North Bismarck route

USACE_ESMT001222

provided support for selecting the preferred alternative crossing at Lake Oahe; it would seem reasonable for a pipeline operator to locate a pipeline in such a way as to impact as few HCAs as possible.

C.  Conclusion

The analysis of the pipeline route alternatives in the EA was brief, but it is legally sufficient.  Aspects of the analysis that could have been expanded, such as the discussion of wetland impacts between the two alternatives, are not sufficient to require reconsideration of the EA and FONSI.  "NEPA permits agencies to eliminate alternatives from detailed analysis so long as they 'briefly discuss the reasons for their having been eliminated.'"  *Pac. Coast Fed'n. of Fishermen's Assn's. v. Blank*, 693 F.3d 1084, 1101 (9th Cir. 2012) (quoting 40 C.F.R. § 1502.14(a)); *see also Tongass Conservation Soc'y v. Cheney,* 924 F.2d 1137, 1141 (D.C. Cir. 1991) (stating "an agency need only 'briefly discuss the reasons' why rejected possibilities were not 'reasonable alternatives'" (quoting 40 C.F.R. § 1502.14(a)).  Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

2.  Evaluate the Fort Laramie Treaties of 1851 and 1868, and other federal laws, and whether the finding in the EA that there are no impacts to treaty fishing or hunting rights is supported.  This evaluation would include consideration of any reserved water rights of the SRST.

A.  EA Discussion

The EA did not directly discuss the Fort Laramie Treaties of 1851 and 1868.  It found that no impacts to treaty fishing, hunting or reserved water rights will occur as a result of the proposed action.  For example, the EA stated that "[n]o impacts to treaty fishing and hunting rights are anticipated due to construction within the Project Area or Connected Actions."  Final EA at 58.  In response to an SRST comment on the draft EA, the final EA also stated that "[a]s the pipeline will be installed under the river, the installation and operation of the pipeline will not have direct impacts to the waterway and there are no anticipated impacts to water rights."  Final EA at App. J at 8.  The EA statements on treaty fishing and hunting rights included off-reservation fishing and hunting rights held by the SRST within the reservation.

In the EA discussion of wildlife management areas near the proposed crossing, the Corps examined the extent of popular hunting grounds.  The EA noted that the closest wildlife management area was 14.5 miles north of the proposed crossing.  Final EA at 74.  The EA also discussed the SRST reservation as an area of special interest and specifically discussed hunting on the reservation.  Final EA at 75.  It stated that, "[b]ig game on the reservation includes white tail deer, mule deer and antelope, while small game includes jackrabbit, cottontail, and squirrel."  *Id.*  The EA acknowledged that there would be temporary impacts to hunting and related activities from project construction.  *Id.*  The EA also found that there would be no impact to lake recreation "[b]ecause the pipeline would

USACE_ESMT001223

cross underneath the river via the HDD method [and] there would be no disruption to the course or cross-current of the river. . ." *Id.* Specific to the SRST, the EA found that there would be no impacts to the Tribe's treaty hunting and fishing rights. Final EA at 85.

Turning to the consideration of water rights, the SRST's treaty-based water rights were addressed directly in the comment and response section of the EA, but were not discussed elsewhere. EA, App. J at 8-9 (addressing SRST comments 15-14, 15-15 and 15-18). The Corps found that the crossing had no anticipated impacts to SRST's reserved water rights. *Id.* (responding to comment 15-14). The Corps stated that "[a]s the pipeline will be installed under the river, the installation and operation of the pipeline will not have direct impacts to the waterway . . ." *Id.* (responding to comment 15-14). The Corps also referenced the discussion in the EA about precautions to prevent impacts to Lake Oahe during pipeline operations. *Id.* (responding to comment 15-14 and referencing section 3.2. Surface Water and section 3.11 Reliability and Safety in the EA).

The potential effects on surface and groundwater, along with the precautions taken by the Corps to address those potential effects, and their relationship to the SRST reservation, were addressed in the general discussion of potential effects to water resources. In the FONSI, the Corps stated:

> The Standing Rock Sioux Tribe (SRST) and other tribal governments object to the pipeline and its alignment because the proposed route crosses under Lake Oahe a few miles upstream of the SRST water intakes. Tribes are concerned that a leak or rupture would contaminate the river, including the SRST's drinking water. The tribes argue the District did not adequately consult on the DAPL pipeline alignment. The EA establishes that the District made a good faith effort to consult with the tribes and that it considered all tribal comments. In addition, the pipeline will be located under Lake Oahe, and Dakota Access has developed response and action plans, and will include several monitoring systems, shut-off valves and other safety features to minimize the risk of spills and reduce or remediate any potential damages.

FONSI at 2.

The precautions identified to address the SRST's concerns about potential impacts to water were addressed in a list of required terms and conditions placed on Dakota Access through the issuance of the Section 408 permission. FONSI at 3-5. Table 8-2 in the EA summarized all of the conditions required by the Corps for environmental protection, which encompasses 10 categories of effects, including water resources, wildlife resources and aquatic resources. Final EA at 117-125, Table 8-2. Each condition must be met as a term of the permission to cross under Lake Oahe pursuant to the Army's section 408 authority and will also be conditions in the required easement. FONSI at 4-5.

USACE_ESMT001224

B. Analysis

The EA addressed the SRST's fishing, hunting and reserved water rights in conjunction with the overall discussion of the environmental effects of the proposed Lake Oahe crossing. The question is whether the existence of those rights presented unique issues that the EA did not address sufficiently under the NEPA standard of review.

The Sioux Territory was first defined in the Fort Laramie Treaty of 1851, 11 Stat. 749. Under that treaty, the territory comprised what is now South Dakota and parts of Nebraska, Wyoming, North Dakota and Montana. The Sioux tribes also reserved "the privilege of hunting, fishing, or passing over" any of the lands described in the treaty. Fort Laramie Treaty of 1851, Art. 5, 11 Stat. 749 (text quoted from 1851 WL 7655 (Trty.)). The second Fort Laramie Treaty, in 1868, 15 Stat. 635, established the Great Sioux Reservation. The reservation covered much of what is now western South Dakota and part of North Dakota. The 1868 Treaty provided the "absolute and undisturbed use and occupation" of the reservation lands to the Sioux tribes. 1868 Treaty, Article II, 15 Stat. 636. The 1868 treaty reserved prior Sioux treaty rights, except provisions regarding the payment of annuities. *Id.*, Art. XVII, 15 Stat. 637. In 1889, Congress enacted a statute diminishing the Great Sioux Reservation and dividing the remaining territory into six smaller reservations, one of which is the Standing Rock Sioux Reservation. 1889 Sioux Act, 25 Stat. 888, March 2, 1889. The 1889 Act expressly preserved any rights under the 1868 treaty that were "not in conflict" with the Act. 1889 Act, § 19, 25 Stat. 896. The Fort Laramie treaties provided the tribes the right to hunt and fish on reservation lands and on specified off-reservation lands. *See South Dakota v. Bourland,* 508 U.S. 679, 696 (1993) (acknowledging treaty-based hunting and fishing rights for the Sioux Tribes under the Fort Laramie treaties).

Between 1949 and 1962, Congress enacted seven statutes to carry out the Missouri River project, which authorized takings of land within the six reservations created by the 1889 Act. *Bourland,* 508 U.S. at 684. Some of the largest of the legislative takings involved SRST lands for the impoundment of the Missouri River to create Lake Oahe. The relevant takings language for the Lake Oahe project established that the SRST retained "without cost, access to the shoreline of [Lake Oahe], including permission to hunt and fish in and on the aforesaid shoreline and [Lake], subject, how*ever, to regulations governing the corresponding use by other citizens* of the United States." Section 10, Public Law 85-915, 72 Stat. 1762, 1764, September 2, 1958 (the 1958 Act) (emphasis in original). This right extended between "the water level of the reservoir and the exterior boundary of the takings area," which would be just south of the proposed pipeline crossing. 1958 Act, 72 Stat. 1764. In the area taken, the 1958 Act reserved the SRST's fishing and hunting rights on the shoreline and reservoir of Lake Oahe within the boundaries of the reservation and did not diminish those rights in any relevant way.

The EA addressed temporary impacts to fishing and hunting activities as a result of the proposed action, but did not specifically address the treaty-based nature of those activities for the SRST. *See* Final EA at App. J, p. 8. Potential impacts on fishing and

12

hunting activities in general were addressed in the EA. Final EA at 75. The impacts would be temporary during construction of the crossing. *Id.* The SRST's comments on the EA did not assert that the fishing and hunting activities of its members in the area of the pipeline crossing would be restricted in any specific way, and the Corps' response to those comments and the analysis in the EA recognized the existence of the SRST's treaty-based rights. Final EA at 58, 86 and App. J at 8-9. The Corps found that there would be no impact to the SRST's treaty-based hunting and fishing rights. *Id.* The support for that conclusion was derived from the EA's overall analysis of the reliability of the pipeline, which addressed the low risk possibility of a rupture. Final EA at App. J. at 8. The EA outlined numerous environmental impact avoidance and mitigation measures relevant to protecting these resources relevant the SRST's hunting and fishing rights. *See, e.g.,* Final EA at 117-125, Table 8-2 (summarizing environmental avoidance and mitigation measures).

The EA also addressed potential impacts to water resources that were relevant to the SRST's hunting and fishing rights, in several sections of the document, and it addressed general concerns about water resources raised by the SRST. *See, e.g.,* Final EA at 35-51 (water resources); Final EA at 85-87 (SRST discussion).

The Corps response to a particular SRST comment on the draft EA warrants additional explanation. The SRST commented that "[t]he draft EA ignores vitally important facts about the Tribe . . . [it] ignored the Tribe's history -- including its Treaty history -- which must inform the Corps' decision-making." EA App. J at 17. The Corps responded to this comment by stating that "[a] discussion on the SRST has been added to the EA in Section 3.6.3. Although the history of the SRST and treaty rights is beyond the scope of the EA, no impact to tribal treaty rights are anticipated due to construction or operation of the pipeline within the Project Area or Connected Actions. No treaty rights have been identified that would be adversely affected by project permitting, construction or operation." EA App. J at 17. The statement that, "the history of the SRST and treaty rights is beyond the scope of this EA" means exactly what it says and should not be taken out of context. A section in the EA on the history of the SRST's treaty rights would not have added anything to the EA's analysis of the environmental impacts of the Lake Oahe crossing. The acknowledgement of the SRST's treaty rights in the final EA demonstrated that they were necessary considerations in the agency's decision-making. Final EA at 58, 86 and App. J at 8-9 (referencing the SRST's treaty hunting and fishing rights).

With regard to the SRST's reserved water rights, the EA addressed the Tribe's concerns about the risk of its water resources being impaired, both specifically for the Tribe and more generally in connection with the discussion of all water resource concerns. Final EA at 35-51; App. J at 8-9. Further, the EA considered the proximity of the SRST reservation to the proposed pipeline crossing throughout the EA and specifically addressed it in the context of potential impacts on water resources. Final EA at 35-36. The mitigation measures to address water resource concerns were listed in Table 8-2. Final EA at 117-125. Although the EA did not discuss the SRST's reserved water rights in a separate section of the document, the treatment of those rights in the EA was sufficient under NEPA standards.

13

USACE_ESMT001226

The SRST's reserved water rights are implied by law under the *Winters* Doctrine. *Winters v. United States*, 207 U.S. 564 (1908). In *Winters*, the Court recognized that the establishment of an Indian reservation under federal law includes an implied reservation of water necessary for the purposes of the reservation. *Winters,* 207 U.S. at 576-578; *see also* Robert T. Anderson, *Indian Water Rights, Practical Reasoning, and Negotiated Settlements*, 98 Cal. L. Rev., Vol. 1133 (2010). This legal status sets reserved water rights apart from other water rights, even in unappropriated water. *Cappaert v. United States*, 426 U.S. 128, 138 (1976).

The EA did not specifically address the legal status of the SRST's reserved water rights under the *Winters* Doctrine. However, the EA addressed all foreseeable potential impacts of the proposed action on water resources and the legal status of the SRST's reserved water rights did not present any unique environmental considerations that required separate discussion. In other words, the EA analyzed the potential environmental impacts of the proposed pipeline crossing under Lake Oahe on all water resources, including impacts that could implicate the reserved water rights of the SRST under the *Winters* Doctrine.

The Lake Oahe crossing does not pose a direct risk of impairment of the SRST's reserved *Winters* water rights. The construction and operation of the pipeline does not require any use of water from the lake, nor does the placement of the pipeline impair the Tribe's ability to withdraw water from Lake Oahe to meet the Tribe's needs. Final EA at 37 (stating that water needed for construction will not be obtained from Lake Oahe). However, the pipeline does increase the reservation's exposure to an oil spill in Lake Oahe in the unlikely event that the pipeline ruptures at the crossing. The EA determined that a spill in the worst-case scenario would likely temporarily impact the SRST's water resources. Final EA at 87, 88-94. The EA discussed mitigation measures that would limit any impact from a rupture. For example, the geographic and project-specific response plans developed by Dakota Access to address any spill that might adversely affect water rights by impacting drinking and irrigation intakes were considered a worst case scenario and were produced in accordance with the applicable guidance for submission to PHMSA. *See* 49 CFR § 194.105; Final EA at 88-94. The EA discussed water intakes and shut-off valves, containment scenarios and tribal participation in spill-response training events. Final EA at 88-94. While the risk is low, the consequences of such an event are high and could impact water resources downstream. Final EA at 92-94. The EA accounted for this possibility through discussion of various response and mitigation measures.

The construction of the pipeline would not diminish available water to the SRST reservation and would only impair water quality in the unlikely event of a worst-case scenario rupture. Thus, the SRST's *Winters*-based reserved water rights are not implicated by the construction of the pipeline at Lake Oahe.

Finally, the Corps fulfilled its legal obligations to the SRST under the government's trust relationship with the Tribe. The government's legal obligations to

14

USACE_ESMT001227

tribes must be based on and are defined exclusively by statutes and regulations. *United States v. Navajo Nation*, 537 U.S. 488 (2003); *United States v. Navajo Nation*, 129 S. Ct. 1547 (2009). Here, the Corps complied with the statutory requirements of 33 U.S.C. § 408 and its implementing guidance. *See* Engineering Circular 1165-2-216, Policy and Procedural Guidance for Processing Requests to alter US Army Corps of Engineers Civil Works Projects Pursuant to 33 USC 408 (July 31, 2014, updated Sept. 30, 2015); Policy and Procedural Guidance for Processing Requests to Alter U.S. Army Corps of Engineers Civil Works Projects, Notice, 79 Fed. Reg. 45,790 (Aug. 6, 2014). Under section 408 and supported by the Final EA, the Corps made the required findings that the pipeline crossing at Lake Oahe is not "injurious to the public interest" and will not "impair the usefulness of such work." FONSI at 6. Further, the Corps considered SRST's treaty-based hunting and fishing rights and also considered the Tribe's reserved water rights as described in this section. The Corps also investigated and considered impacts of the Lake Oahe pipeline crossing on the SRST through the NEPA documentation and mitigated the risk of any impacts to the Tribe. FONSI at 3-5; *Okanogan Highlands Alliance v. Williams*, 1999 U.S. Dist. LEXIS 4068 at *45-47 (D. Or. 1999) (stating that the trust relationship gives rise to a procedural requirement that the federal government "at the very least . . . investigate and consider the impact of its action upon a potentially affected Indian tribe" (citations omitted)). This analysis and findings met the Corps legal obligation under the trust relationship.

C. Conclusion

The EA addressed the potential impacts of the proposed pipeline crossing at Lake Oahe on fishing and hunting activities within the broader discussion of potential environmental impacts and concluded that the nature of those impacts would not violate the SRST's treaty-based rights. While a separate discussion in the EA of the SRST's treaty-based fishing and hunting rights, and reserved water rights, might have provided greater detail, the analysis of the overall environmental impacts that could affect the SRST's treaty-based hunting, fishing and reserved water rights met the NEPA "hard look" standard. *See* 40 C.F.R. § 1508.9(a)(1) (EA must only "provide sufficient analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact"). Discussion in the EA of the legal status of the SRST's fishing and hunting rights, or the reserved water rights under the *Winters* Doctrine, would not have resulted in additional disclosures of potential environmental impacts. *See Nevada v. Dep't of Energy*, 457 F.3d 78, 90-91 (D.C. Cir. 2006) (stating that under the harmless error standard a court would not order an agency to revise a NEPA document when it would be "a meaningless gesture"). Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

15

USACE_ESMT001228

3. Evaluate whether the discussion in the EA of impacts to water intake structures for drinking and irrigation purposes is adequate and consider what role the possible downstream move of the SRST's water intake structure will have in the analysis.

A. EA Discussion

The EA noted that while wells supply the water needs for certain residents on the SRST reservation, the Tribe also has intake structures in the river downstream of the Lake Oahe project area. Final EA at 38. The SRST has indicated that the EA's statement that a "majority" of residents on the reservation obtain their water from wells is inaccurate. The EA could have been more exact by using language from a report published by the SRST, which stated that "[m]any residents currently depend on poorly constructed or low-capacity individual wells or have water hauled to underground cisterns. . . . The Reservation communities of Little Eagle, Porcupine, Kenel, Bullhead and Cannonball each depend on one or more wells for their water supply. Fort Yates obtains its water from the Missouri River. Water for Wakpala is delivered by pipeline from a Missouri River source at a site some 5 miles distant. The non-Native communities of Keldron, McIntosh, Morristown, Thunder Hawk, Walker, Wataugua, Mahto, Solen, Selfridge, and McLaughlin depend on wells as their source of supply." Standing Rock Sioux Tribe Comprehensive Economic Development Strategy, 2013-2017.[2]

Nonetheless, the passing reference in the EA to the use of wells by residents of the SRST reservation was irrelevant to the EA's substantive analysis of the project's potential impacts to water intake structures. The EA did not consider the use of wells as a factor that would either increase or decrease the significance of possible impacts to drinking water supplied by water intake structures. In other words, the number of reservation residents who obtain their water from wells or use underground cisterns is wholly separate from the issue of impacts to water intakes. Thus, while the statement in the EA regarding the use of wells could have been more precise, any error was harmless in terms of the impact assessment in the EA for intake structures.

The EA disclosed that water intakes located downstream from the Lake Oahe crossing could potentially be at risk temporarily if there was an oil spill during pipeline operations that reached Lake Oahe in the vicinity of drinking water intake structures. The EA explained that in the event of a spill or leak, response measures would be taken in accordance with the Geographical Response Plan and Facility Response Plan submitted by Dakota Access as required by federal law and regulations. Those response plans evaluate the potential for a spill to compromise a potable water supply and address alternative water sources, such as shutting down certain intakes and utilizing others, or using bottled water. The EA provided a detailed, technical explanation of how accidental spills or leaks from the pipeline system during operations could migrate through the soil toward groundwater or surface water. Final EA at 44-45. In brief, the oil "would travel

---

[2] Available at
http://standingrock.org/data/upfiles/files/SRST%20CEDS%20For%20Community%20Re view%2012%207%2012.pdf (last viewed on September 22, 2016).

USACE_ESMT001229

along the path of least resistance both laterally and vertically at a rate determined by a number of factors including volume released, soil conditions (permeability, porosity, moisture, etc.), depth to groundwater, and the speed and effectiveness of response and remediation measures." Final EA at 45. Once the oil reached the water constituents could be dissolved in limited amounts. The EA continued by explaining that benzene is of most concern as it is the water soluble compound within oil that could be capable of exceeding the groundwater protection thresholds for drinking water.

A subsection within section 3.2.1.2 of the EA titled "Water Intake Mitigation Measures" provided additional detail on measures Dakota Access will take to minimize the risk of a pipeline leak and protect the users of downstream water intakes. Final EA at 42-43. This subsection identified more than a dozen specific design and operation measures that Dakota Access will take, including use of quality assurance measures for materials used to construct the pipeline, specific testing measures and extra monitoring commitments. These operation and design mitigation measures are in addition to risk-reduction and response measures described in the Facility Response Plan.

The Water Intake Mitigation Measures subsection also indicated that Dakota Access provided the Corps with the results of worst case risk analysis for spills at both the Missouri River and Lake Oahe crossings. The information provided by Dakota Access was not itself contained within the EA as it was protected from public disclosure as security sensitive documents. However, the EA explained that the documents used spill models that follow PHMSA modeling and included information on hypothetical worst case discharge volumes, intake locations and an analysis of the flow distance and the time that it would take for the first oil from an unabated release to travel downstream and reach water intakes. This information was used to design location-specific Geographic Response Plans to be used for training exercises and incident response, all of which was provided to the Corps as "privileged and confidential" materials.

The Water Intake Mitigation Measures subsection described other mitigation measures Dakota Access will undertake in addition to the operation and design mitigation measures and the spill response planning and exercise measures already discussed. Final EA at 42-43. Examples of additional mitigation measures included open water and ice scenario emergency response drills/exercises in accordance with the National Preparedness for Response Exercise Program (PREP) downstream of the crossings at Lake Oahe and the Missouri River. Dakota Access will also coordinate with the Corps and any other applicable stakeholders to establish an all-weather access boat ramp and collection point downstream of both the Missouri River crossing and the Lake Oahe crossing. Each location will be supported with a fenced equipment storage facility that includes a permanent storage area for winter and open water spill response equipment. Each storage facility will store sufficient response equipment to mitigate an unintended worst case release into the river at each crossing and will be constructed within one year after the pipeline becomes operational.

The EA provided an additional seven pages of detailed information about measures that Dakota Access will take to minimize the risk of a pipeline spill or leak and

17

protect the users of downstream intakes. Final EA at 88-94. The section also provided additional discussion of the worst case spill scenario and gave more information on the full-scale open water and winter/ice exercises that Dakota Access will conduct with stakeholder involvement. This section pointed out that while an oil spill "is considered unlikely and a high precaution to minimize the chances has been taken, it is still considered a low risk/high consequence event." Final EA at 92. Therefore, the EA closely examined nine things that could damage the pipeline (termed "pipeline integrity threat categories") and explained how Dakota Access will prevent such damage.

B. Analysis

The primary issue is whether the EA adequately addressed the potential impact of the pipeline crossing at Lake Oahe on downstream water intakes. In a similar situation, citizens of a small town in Maryland challenged FERC's approval of construction of a natural gas compressor station in their town, arguing that FERC's EA failed to take a "hard look" at quantifying the impacts of the project on nearby property values. The U.S. Court of Appeals for the District of Columbia explained that although the definition of "hard look" may be "imprecise," the agency has taken the required "hard look" at the "environmental impacts of a proposed action if the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and the agency's decision is fully informed and well-considered." *Myersville Citizens for a Rural Community, Inc. v. FERC*, 783 F.3d 1301, 1325 (D.C. Cir. 2015) (internal quotations omitted) (citing *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)). In *Myersville*, the D.C. Circuit concluded that FERC's EA took the requisite "hard look" at the station's potential effect on property values where FERC had noted that the station could depress property values for nearby land but concluded that the station would not significantly reduce property values because some of the property-value effects could be mitigated through noise and visual screening. *Myersville*, 783 F.3d at 1325.

The same is true here. The EA acknowledged the potential harm that may result from an oil spill in the vicinity of water intake structures and identified that, although the risk of an oil spill may be low, there could be significant consequences if a spill occurred. The EA then exhaustively addressed prevention and response measures that will be taken to reduce the risk that such harms could occur. Because the discussion of impacts of the Lake Oahe crossing on downstream water intakes acknowledged the potential harms, but concluded, after a well-considered examination, that such harm can be averted, the Corps met its obligation to take a "hard look" at the issue. Although some may disagree with the conclusion, "their disagreement does not mean that the [Corps] failed to consider the issue altogether." *Minisink*, 762 F.3d at 112.

It is of no consequence that the EA did not separately address drinking water intake structures and those used for irrigation purposes. All potential impacts to water intake structures would result from an oil spill and the effects of an oil spill on drinking water and irrigation water would make either unusable for its intended purpose. The risk of an oil spill was thoroughly detailed in the EA, along with precautionary measures that would prevent harm to water intakes for drinking water and irrigation alike. Thus, the

USACE_ESMT001231

EA met the goal of ensuring informed decision making and informed public comment on this topic, and it is unnecessary to "flyspeck" by making an unnecessary distinction between drinking water and irrigation. *See Nevada*, 457 F.3d at 93 (declining to give any significance to alleged deficiencies in a discussion of rail corridor impacts where the agency had fully assessed a wide array of environmental factors).

Though not stated in the EA, the Corps is aware that a new water intake structure is being constructed downstream of the existing water intake structure near Fort Yates. The Bureau of Reclamation in 2009 issued an EA addressing construction of a new SRST reservation-wide water project intended to fulfill the water needs of all communities in the reservation. According to the Bureau of Reclamation's Final Environmental Assessment for the Standing Rock Rural Water System - Phase 2 - Reservation-wide Water Project in North and South Dakota, DK-600-04-04, dated February 2009 (the "SRRWS EA"), the core facilities of the new reservation-wide system will include a deep water Lake Oahe intake (Indian Memorial Intake), a new raw water pipeline connecting the Indian Memorial Intake to a new Wakpala water treatment plant (WTP) and main transmission pipelines connecting the new Wakpala WTP to a five million gallon main storage reservoir. SRRWS EA p. 4. The new reservation-wide system is designed to have enough capacity to provide water for all existing communities located within the SRST reservation that express interest in being included in the system. *Id.* p. 5.

The Indian Memorial Intake is being constructed on the west bank of Lake Oahe in the southeast corner of the SRST reservation, about 13 miles south of Wakpala, South Dakota (near Mobridge, South Dakota). SRRWS EA p. 4. This new intake structure will be approximately 50 miles further downstream from the Dakota Access pipeline crossing, which is near Cannon Ball, North Dakota, than the existing water intake structure located near Fort Yates, North Dakota. The location is depicted on the following map:

19

USACE_ESMT001232



The new intake structure, combined with the new Wakpala WTP, is intended to provide for all of the SRST reservation's water needs.  Thus, the EA provided that once "the new Wakpala WTP becomes operational and connecting pipelines to the Reservation-wide system [are] completed, the existing WTPs at Fort Yates and Wakpala could be taken out of service." *Id.* at p. 4.

The Corps considered whether this information about construction of the Indian Memorial Intake and potential future closure of the Fort Yates water intake structure necessitated supplementing the existing EA.  *See* 40 C.F.R. § 1502.9(c) (supplementation required if there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"); *see also Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998) (standard for supplementing an EA is the same as for an EIS).  In determining whether to prepare a supplemental EIS or EA an agency is to apply the "rule of reason" based on a consideration of the "value of the new information to the still pending decisionmaking process." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373-374 (1989).  If there is major federal action to occur and if new information shows that the remaining action will affect the quality of the human environment to a significant extent not already considered, a supplemental EIS must be prepared.  *Id.* at 374.  However, "a reduction in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact." *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218-19 (10th Cir.1997).

USACE_ESMT001233

The EA fully considered potential impacts to the Fort Yates water intake. Impacts to the new Indian Memorial Intake will be similar to those for the Fort Yates water intake. However, one difference is that the new location will allow for more response time to prevent hydrocarbons from a pipeline spill at the Lake Oahe crossing from reaching the Indian Memorial Intake as compared to the Fort Yates intake structure. Therefore, it is likely there would be fewer or less significant environmental impacts or risks associated with a pipeline rupture with the construction of the new intake structure farther downstream.

The EA stated that the Geographic Response Plans and Facility Response Plans provided by Dakota Access consider "shutting down certain intakes and utilizing others" in the event that an oil spill compromises a potable water supply intake. Final EA at 38. The construction of the new Indian Memorial Intake downstream of Fort Yates will provide yet another option for utilizing other intakes if the Fort Yates intake remains in operation but must be shut down temporarily because it is compromised by an oil spill. Where, as here, the environmental impact of the new circumstances will not be significant and those environmental impacts are likely to be positive rather than negative, a supplemental EA is not required. *See Arkansas Wildlife Fed'n v. Corps*, 431 F.3d 1096, 1103 (8th Cir. 2005) (holding no supplemental EA was necessary for changes to a water project including substitution of pipelines for canals, reduction of natural stream use, and reduction of upland hardwood permanently impacted by the project because impacts related to the changes were not significant and any environmental impact would be beneficial).

C. Conclusion

The discussion in the EA of potential impacts to water intake structures was legally sufficient with respect to such structures for drinking and irrigation purposes. Further, supplementation of the EA to address new information about the construction of a new water intake structure farther downstream from the pipeline crossing is not required because this information does not result in greater environmental impacts and, in fact, likely reduces risks to the SRST's water intake in the event of a pipeline rupture. *See Friends of the Bow v. Thompson*, 124 F.3d 1210, 1218-19 (10th Cir. 1997) ("a reduction in the environmental impact is less likely to be considered a substantial change relevant to environmental concerns than would be an increase in the environmental impact"); *see also Arkansas Wildlife Fed'n v. Corps*, 431 F.3d 1096, 1103 (8th Cir. 2005) (holding no supplemental EA was necessary where the Corps adequately considered the environmental impact of the proposed changes and reasonably concluded that they were not significant and that any environmental impact appears to be positive rather than negative). Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

USACE_ESMT001234

4. Evaluate whether the environmental justice discussion in the EA of issues related to the SRST is adequate.

A. EA Discussion

A federal agency is required to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities in minority populations and low-income populations." Executive Order 12898, Federal Actions to Address Environmental Justice in Minority and Low-Income Populations, 59 Fed. Reg. 7,629, (Feb. 16, 1994). The EA addressed environmental justice issues by analyzing the affected environment and impacts to minority and low-income populations at the proposed action area at the Missouri River or Lake Oahe crossing, and it focused on the SRST reservation. Final EA at 84-87. The EA also evaluated the cumulative effects of the pipeline crossing at Lake Oahe with respect to environmental justice. Final EA at 107.

The Corps relied on Council on Environmental Quality (CEQ) guidance to identify minority populations as either: (a) the minority population percentage of the affected area that exceeds 50 percent; or (b) the minority population percentage of the affected area that is meaningfully greater than the minority population in the general population or other appropriate unit of geographic analysis. Final EA at 84; CEQ, Environmental Justice Guidance under the National Environmental Policy Act at 25 (December 10, 1997) (CEQ Guidance). The Corps also relied on the CEQ definition of "low-income populations" based on an annual statistical poverty threshold. Final EA at 84. The EA noted that "[i]n 2013, the poverty threshold for the 48 contiguous states for an individual under the age of 65 living alone was $12,119 (U.S. Census Bureau, 2014)." *Id.* The EA identified minority and low-income populations within census tracts crossed by the proposed action. *Id.* "The census tracts crossed by the Proposed Action encompass an area greater than 0.5 mile radius for the project; therefore additional census tracts were not evaluated." *Id.* Per the CEQ guidance, the selection of the appropriate unit of geographic analysis may be a governing body's jurisdiction, neighborhood, census tract or other similar unit that is to be chosen so as to not artificially dilute or inflate the affected minority population. CEQ Guidance at 26. The EA used census tracts for the unit of geographic analysis. Final EA at 85.

The EA used a 0.5 mile buffer area to examine the environmental justice effects of the proposed action. The buffer was based on industry practice for linear projects, such as transportation projects under the Federal Transit Administration and natural gas pipeline projects under the Federal Energy Regulatory Commission. Final EA at 84; *supra* at Section 1 (discussing route alternatives). The Lake Oahe crossing is centrally located within Emmons County on the east side of the lake and in southern most part of Morton County on the west side of the lake. Final EA at 84. Sioux County is south of Morton County and is outside the 0.5 miles buffer from Proposed Action. *Id.* Sioux County is adjacent to Lake Oahe and in close proximity to the crossing. Thus, the Corps designated Morton, Emmons and Sioux Counties as "counties in the general vicinity of

USACE_ESMT001235

the Lake Oahe crossing" and calculated the average of their demographic data to obtain the baseline area data set.

The EA evaluated environmental justice effects on the two census tracts located within 0.5 miles of the federal lands at the Lake Oahe crossing (CT204 and CT 9965) by comparing the average of the demographic data from the two census tracts to: (1) the average demographic data of the counties in the general vicinity of the Lake Oahe crossing; and (2) the average demographic data of the State of North Dakota.  Final EA at 84.

The EA showed that the average minority population of the three counties in the vicinity of the Lake Oahe crossing was greater than the state average.  Final EA at 85.  However, the average minority population of CT204 and CT 9965 "is much lower," 29 percent lower, than the average minority population of the three counties in the vicinity of the Lake Oahe crossing and the average minority population of CT 204 and CT9965 was nine percent lower than the state average.  *Id.*  Based on this analysis, the Corps determined that "the census tracts associated with the Proposed Action Area at Lake Oahe have a meaningfully lower minority percentage" than the average demographic data of Morton, Emmons and Sioux Counties and reasonably concluded that "[n]o appreciable minority or low-income populations exist within the census tracts directly affected by the Proposed Action" at the Lake Oahe crossing.  *Id.*

The EA environmental justice discussion included Table 3-15, summarizing the minority and low income population statistics for the federal lands project area.

| Table 3-15 Minority and Low Income Population Statistics for Federal Lands Project Area | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Geographic Area | Total Population | Percent | | | | | | | Total Minority Population | Persons Below the Poverty Level |
| | | White | Black or African Am. | Am. Indian and Alaska Native | Asian | Native Hawaiian and Other Pacific Islander | Some Other Race | Two or More Races | | |
| **State** | | | | | | | | | | |
| North Dakota | 704,925 | 89.20 | 1.53 | 5.25 | 1.15 | 0.04 | 0.73 | 2.10 | 10.80 | 11.9 |
| **Counties Within Baseline Analysis (Baseline Area)** | | | | | | | | | | |
| Morton | 27,439 | 93.98 | 0.50 | 3.70 | 0.20 | 0.00 | 0.50 | 1.30 | 6.20 | 8.7 |
| Emmons | 3,491 | 99.28 | 0.00 | 0.23 | 0.17 | 0.00 | 0.32 | | 0.72 | 13.5 |
| Sioux | 4,317 | 13.67 | 0.02 | 82.26 | 0.25 | 0.07 | 0.53 | 3.20 | 86.33 | 36.4 |
| Average | 15,465 | 68.98 | 0.17 | 28.73 | 0.21 | 0.02 | 0.34 | 1.60 | 31.08 | 58.6 |
| **Proposed Action Area** | | | | | | | | | | |
| CT204 | 3,143 | 96.5 | 0 | 1.4 | 0 | 0 | 0.8 | 1.3 | 3.5 | 4.4 |
| CT9665 | 3,491 | 99.3 | 0 | 0.2 | 0.2 | 0 | 0 | 0.3 | 0.7 | 13.5 |
| Average | 3,317 | 97.88 | 0.00 | 0.83 | 0.09 | 0.00 | 0.40 | 0.81 | 2.12 | 8.95 |
| **State Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -701,608 | 8.68 | -1.53 | -4.42 | -1.07 | -0.04 | -0.33 | -1.29 | -8.68 | 49.65 |
| **Baseline Area Comparison to Proposed Action Area** | | | | | | | | | | |
| Proposed Action | -12,148 | 28.90 | -0.17 | -27.90 | -0.12 | -0.02 | 0.05 | -0.79 | -28.96 | -2.95 |

Source: U.S. Census Bureau, American Community Survey (2010-2014 5-year estimates).
Note: totals may not sum across the table due to rounding used in data collection.

Final EA at 83.

23

USACE_ESMT001236

The table contained an error in the average of the counties within the baseline analysis area for persons below the poverty level. It stated that the average percentage of residents below the poverty level in Morton, Emmons and Sioux Counties was 58.6 percent. The number should be 19.54 percent.

The EA considered impacts to Sioux County and the SRST even though the county was slightly more than 0.5 miles from the crossing and out of the affected environment analysis area. The EA identified and addressed potential environmental justice impacts specific to the SRST because the Tribe "has a high population of minorities and low-income residents." EA page 85. Based on the analyses presented in other sections of the EA, the Corps determined that "[d]irect and indirect impacts from the Proposed and Connected Actions will not affect members of the Standing Rock Sioux Tribe or the Tribal reservation." EA page 85. This determination relied in part on the fact that "[t]he Lake Oahe crossing will be installed via HDD beneath the river from private lands adjacent to Corps owned lands to avoid impacts to environmental resources (e.g., water, soil, cultural resources, vegetation, etc.)." EA page 85. The EA also noted that "[t]he HDD drilling process is . . . itself . . . a mitigation measure with no anticipated effects to the environment including vibration or frac-out within or outside of the Proposed action for the short duration of the construction project." Final EA at 85-86 (referencing the EA at sections 2.3.2.6 and 3.1.1.2).

The Corps next considered whether there might be disproportionately high and adverse human health or environmental effects on the SRST as a result of the pipeline and, particularly, as a result of "an inadvertent release reaching intake structures on Lake Oahe." Final EA at 87. The EA considered engineering design, installation methodology, operations measures and response plans in concluding that not only is the risk of an inadvertent release low but also that in the event of an inadvertent release, private and/or non-tribal water intakes are closer to the Lake Oahe crossing than any water intakes owned by the tribe. *Id.*

Alignment alternatives to the proposed action all contained the required criteria that they avoid tribal reservations and federal lands, and "included a preference for co-locating the route with existing infrastructure." Final EA page 86. As such, the Proposed Action was co-located with existing power and pipe lines across Lake Oahe . . ." *Id.* Additionally, the EA noted that the pipeline would be placed using HDD below Lake Oahe and that Dakota Access developed response and action plans, to include several monitoring systems, shut-off valves and other safety features, to minimize the risk of spills and reduce or remediate any potential damages. Final EA at 85 and 87. The EA determined that "[a]s a result of this routing criteria, the nature of the action (construction associated with laying an underground oil pipeline), the short term duration of effects, construction and operation on private lands, the concurrent reclamation activities, state of the art construction techniques, use of high quality materials and standards that meet or exceed federal standards, there will be no direct or indirect effects to the Standing Rock Sioux Tribe . . . include[ing] a lack of impact to its lands, cultural artifacts, water quality or quantity, treaty hunting and fishing rights, environmental quality, or socio-economic

USACE_ESMT001237

status." EA page 86. As a result, the Corps concluded that "there is no resulting adverse or disproportionate impacts of the Proposed Action with respect to Environmental Justice considerations." EA page 86.

The cumulative impacts section of the EA assessing environmental justice issues relied on the environmental justice analysis outlined in Section 3.9. The discussion of environmental justice issues noted that the pipeline was co-located with existing utilities and that it avoided tribal reservation lands across its entire length. Final EA at 107. The Corps concluded that "[t]here are no reasonable past, present, or reasonably foreseeable actions that together with these Proposed Actions will have a cumulative significant adverse effect . . . or a disproportionate impact on low-income or minority populations, including the Standing Rock Sioux or other tribes in or around the Project." *Id.*

After that first finding, the EA added that "the holders of the mineral rights and landowners in the region, including particular tribes and tribal members, have witnessed a recent windfall from oil and gas development." Final EA at 107. The EA noted that private land owners provide permission for oil and gas development on their private land. *Id.* The EA stated that "[g]iven this ascent, there is no disproportionate impact to low income, minority or tribal populations benefited by the Environmental Justice policy." *Id.*

B. Analysis

The CEQ Guidance to assist federal agencies in identifying and addressing environmental justice concerns expressly acknowledges that neither Executive Order 12898 nor the Guidance prescribes "a standard formula for how environmental justice issues should be identified or addressed." CEQ Guidance at 8. However, it identifies several basic principles.

The CEQ Guidance recommended that federal agencies "consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes." CEQ Guidance at 9. The first guiding principle can be broken down into two parts: (1) agencies should determine whether minority populations, low-income populations or Native American tribes are present in the area affected by the proposed action; and (2) if such populations are present, then determine whether there may be disproportionately high and adverse human health or environmental effects on such populations. *Id.*

The Corps' determination of the affected environment, as outlined in section 3.9.1 of the EA, can be questioned here. Final EA at 84. The affected environment only included two census tracts that were within the 0.5 mile buffer of the centerline of the pipeline. *Id.* The two census tracts, 204 for Morton County and 9665 for Emmons County, did not include Sioux County, in which the SRST reservation is located. Sioux

25

USACE_ESMT001238

County is just outside the 0.5-mile pipeline buffer. *Id.* While the equally sized buffer on both sides of the pipeline seems reasonable along land areas, it is arguably less so at water areas because of the potential for water currents to carry a spill downstream. Sioux County is located just south and downstream of the pipeline. Thus, the SRST population present immediately outside of the proposed area or affected environment and downstream reasonably could have been within the area identified as the affected environment in the EA. If that area was included, the EA would then determine whether there might be a disproportionately high and adverse human health or environmental effect on the SRST. CEQ Guidance at 9 and 14.

The environmental justice discussion on impacts and mitigation, in section 3.9.2 of the EA, made findings that do not include consideration of the SRST. It concluded that "no appreciable minority or low-income populations exist within the Census tracts directly affected by the Proposed Action at [Lake Oahe]." Final EA at 85. However, the EA did include a separate discussion of the SRST, even though they were not part of the proposed area. The inclusion of this section would satisfy any environmental justice requirement to consider impacts to the SRST notwithstanding the earlier environmental justice discussion in the EA that did not include the Tribe.

Although the CEQ Guidance recommends methodologies to identify minority populations, the courts have suggested that to accomplish the purpose of an environmental justice analysis a federal agency "must compare the demographics of an affected population with demographics of a more general character (for instance, those of an entire state)." *Mid States Coalition for Environment v. FERC*, 345 F.3d 520, 541 (8th Cir. 2008). The EA did not directly make that comparison, but the information was there to do so. For example, 82.3 percent of Sioux County residents are Native American compared to 5.3 percent of the North Dakota population. Final EA at 83, Table 3-15. Further, 36.4 percent of Sioux County residents are below the poverty line compared with 11.9 percent statewide. *Id.* The information is in the EA to compare the demographic of an affected population, including the SRST, to the more general statewide demographics. CEQ Guidance at 8 (regarding not prescribing a standard formula for how environmental justice issues should be identified or addressed).

An agency should state clearly in its NEPA documentation "whether in light of all the facts and circumstances, a disproportionately high and adverse human health or environmental impact on minority-populations, low-income populations, or Indian tribes is likely to result" if a minority population, low-income population or Indian tribe is identified. CEQ Guidance at 9. To determine whether human health effects are disproportionately high and adverse, agencies consider to the extent practicable: (1) whether the health effects are significant or above generally accepted norms; (2) whether the risk or rate of hazard exposure is significant and appreciably exceeds or is likely to appreciable exceed the risk or rate to the general population or other baseline comparison group; and (3) whether health effects occur in the minority population, low-income population or Native American tribe affected by cumulative or multiple adverse exposures from environmental hazards. Executive Order 12898, Sec. 1-1.

USACE_ESMT001239

The EA addressed these considerations with respect to the SRST. The health effects were not above generally accepted norms because the pipeline would be located more than half a mile away from the reservation boundary and more than 1.5 miles from the closest residence on the reservation, the pipeline will be operated in accordance with PHMSA requirements and the risk of an inadvertent spill or leak reaching (or in) Lake Oahe would be low. Final EA at 87. The risk or rate of hazard exposure from the pipeline to the SRST would not be significant and would not appreciably exceed the risk or rate of hazard to the general population. Final EA at 86 -87. The risks of a pipeline rupture generally are minimal:

| Year | Reported Significant Incidents | Total Miles of Crude Oil Pipelines | Percentage of Incident/Mile Per Year |
|------|------|------|------|
| 2015 | 77 | 72,562 | 0.106116% |
| 2014 | 74 | 66,813 | 0.110757% |
| 2013 | 78 | 61,086 | 0.127689% |
| 2012 | 63 | 57,462 | 0.109638% |
| 2011 | 56 | 56,100 | 0.099822% |
| 2010 | 49 | 54,630 | 0.089694% |

PHMSA, Data and Statistics (available at:
http://www.phmsa.dot.gov/pipeline/library/data-stats).

The various mitigation measures for pipeline operations and protections for the SRST water intakes also helped to minimize any cumulative impacts or multiple adverse exposures from environmental hazards. *See supra* Section 3 (discussing water intakes); Final EA at 107 (discussing environmental justice cumulative effects).

The CEQ Guidance also recommends that federal agencies "seek tribal representation in the process in a manner that is consistent with the government-to-government relationship between the United States and tribal governments, the federal government's trust responsibility to federally-recognized tribes, and any treaty rights." CEQ Guidance at 9. As established in the analyses throughout the EA, the Corps attempted to engage in meaningful discussions with the SRST on numerous occasions about the nature of the project, cultural resources and the Lake Oahe crossing beginning in October 2014 and continuing through March 2016. Final EA at 85; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs.* No. 16-cv-01534, Memorandum Opinion Denying Plaintiff's Request for Preliminary Injunction, Docket No. 39 at 48 (D.C. Dist. Sept. 9, 2016)(finding that, on the preliminary injunction record, the Corps exceeded its NHPA obligations at many sites).

The cumulative impacts section on environmental justice in the EA did not substantiate how "the ascent [from Oil and Gas Development]" supported the statement that "there is no disproportionate impact to low-income, minority or tribal populations benefited by the Environmental Justice policy." Final EA at 107. Without attribution to supporting materials or any connection to the actual residents in the affected

27

environment, we have not given any weight to those statements or conclusions in this review. The EA appropriately found that "no reasonable past, present or reasonably foreseeable actions that together with these Proposed Actions will have a cumulative significant adverse effect on the environment or a disproportionate impact on low-income or minority populations, including the Standing Rock Sioux or other tribes in or around the Project." *Id.* This statement is supported by the finding in the section on environmental justice in the EA. Final EA at 84-87 (section 3.9).

Finally, the additional information about the movement of the SRST's water intake from Fort Yates to the Indian Memorial Intake downstream also provided evidence of reduced potential impacts to the SRST. *See supra* Section 3 (discussing impacts to water intakes). As discussed previously, the new intake location is about 50 miles farther downstream from the Fort Yates intake. *Id.* This distance reduces the risk of a spill from a pipeline rupture at the Lake Oahe crossing reaching the water intake structure and allows for additional time to respond to a spill.

C. Conclusion

The evaluation of environmental justice impacts in the EA ultimately meets the "hard look" standard of review under NEPA. The EA devoted an entire chapter to environmental justice impacts, including a full section on impacts on the SRST, and complied with the CEQ Guidance on environmental justice analysis. The EA "delineated a clear study area, defined the low-income and minority populations within this study area, and determined that the Project would not result in these populations bearing any disproportionate environmental burden." *Coalition for Healthy Ports v. U.S. Coast Guard*, 2015 U.S. Dist. LEXIS 159090, 159092 (S.D. N.Y. 2015); CEQ Guidance at 10-16.

The environmental justice analysis in the EA could have been organized differently to provide greater clarity and to avoid the appearance of not providing detailed discussion of the SRST in certain parts of the analysis. However, the analysis ultimately focused on the SRST and met the policy goals for an environmental justice analysis in accordance with NEPA standards and CEQ Guidance. The Corps complied with Executive Order 12898 by reasonably identifying minority populations and specifically addressing Native Americans and the SRST, particularly. The EA addressed whether these populations would be adversely or disproportionately impacted by potential environmental effects associated with the pipeline crossing under Lake Oahe. Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

USACE_ESMT001241

5.  Determine whether there are any NHPA section 110 issues that are not before the
court already and any other cultural resource issues identified more recently within the
area of federal jurisdiction.

The SRST filed a declaration by Mr. Tim Mentz, Sr., on September 2, 2016, with
the U.S. District Court for the District of Columbia in the Tribe's lawsuit against the
Corps. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, Case No. 16-cv-
01534, Plaintiff's Motion for Leave to File Supplemental Declaration, ECF No. 29 (Sept.
2, 2016)(Mentz Declaration).  The Mentz Declaration described site visits that Mr. Mentz
made on August 28, 30 and 31, and September 1, 2016, to an area west of Highway 1806
that is adjacent to the right-of-way for the pipeline.  Mentz Declaration, ECF 29-1 at 2
and 4.  The area is approximately 1.75 miles from the proposed Lake Oahe pipeline
crossing.  *Id.* at 3.  Mr. Mentz noted that, at the time of his declaration, the pipeline
corridor was already mowed and cleared of large vegetation although no construction
equipment was in sight.  *Id.*

Mr. Mentz observed a "significant number of stone features (82) and
archeological sites, including at least 27 burials" along the south side adjacent to the
pipeline right-of-way.  *Id.* at 4.  Mr. Mentz's conclusions about the burial sites that he
believed were located within the center of the pipeline corridor were based on the
presence of "rock cairns," which commonly mark burial sites.  Mr. Mentz described sites
of "very great cultural and historic significance," including stone features called
*Iyokaptan Tanka* (Big Dipper), *Chante Tinza Wapaha* (Strong Heart Society Staff), *Mato
Wapiya* (Bear Medicine Healer) stone effigy, *Itancha* (Chiefs Dreaming Pair with Staffs)
stone feature, and a Grave and Stone Arc.  *Id.* at 5-8.  Neither the Corps nor the North
Dakota State Historical Preservation Office participated in Mr. Mentz's site visit.

The day after the SRST filed the Mentz Declaration, Dakota Access construction
crews allegedly graded the entire portion of the pipeline corridor that contained the
features described by Mr. Mentz.  *Standing Rock Sioux Tribe v. U.S. Army Corps of
Engineers*, Case No. 16-cv-01534, Plaintiff's Motion for a Temporary Restraining Order,
ECF No. 30 at 4 (Sept. 4, 2016).  In a second declaration supporting the Tribe's request
for a restraining order, Mr. Mentz alleged that Dakota Access construction crews
intentionally graded much deeper than is normally required for such construction
projects.  Mentz Declaration II, ECF 30-1 at 3.  Mr. Mentz also stated that until his
declaration was filed, the nearest construction equipment was 20 miles west of Highway
1806.  *Id.* at 3.

Agencies must determine the appropriateness of issuing a permit if it appears that
an applicant has engaged in anticipatory demolition of historic resources with the intent
to avoid the requirements of section 106 of the NHPA.  54 USC § 306113.  Section
110(k) states:

> Each Federal agency shall ensure that the agency will not grant a loan, loan
> guarantee, permit, license, or other assistance to an applicant that, with
> intent to avoid the requirements of section 306108 of this title [54 USCS §

29

306108], has intentionally significantly adversely affected a historic
property to which the grant would relate, or having legal power to prevent
it, has allowed the significant adverse effect to occur, unless the agency,
after consultation with the Council, determines that circumstances justify
granting the assistance despite the adverse effect created or permitted by
the applicant.

54 U.S.C. § 306113.

Consultation under the NHPA ended and the Corps made its decision with respect
to NHPA compliance for the Lake Oahe crossing and easement. *See* Letter from Ms. Jo-
Ellen Darcy, Assistant Secretary of the Army (Civil Works) to Mr. Jim Fowler, Executive
Director, Advisory Council on Historic Preservation (July 25, 2016)(concluding the
NHPA process for the Lake Oahe crossing).  The activities described by Mr. Mentz in his
declarations occurred outside the review area for the crossing and are not connected to
the issuance of the easement.

Nevertheless, there could still be a potential Clean Water Act enforcement issue
based on the facts alleged by the SRST and supported by Mr. Mentz's declarations.  If
there are non-reporting NWP 12 authorizations in the areas where the alleged destruction
occurred, then there could be a violation of the terms and conditions of NWP 12.  NWP
General Conditions 20 and 21 cover NHPA compliance.  77 Fed. Reg. 10,284.  General
Condition 21 would cover the situation here where the pipeline construction possibly
encountered previously unknown remains and artifacts.  That condition requires:

> If you discover any previously unknown historic, cultural or archeological
> remains and artifacts while accomplishing the activity authorized by this
> permit, you must immediately notify the district engineer of what you have
> found, and to the maximum extent practicable, avoid construction activities
> that may affect the remains and artifacts until the required coordination has
> been completed.  The district engineer will initiate the Federal, Tribal and
> state coordination required to determine if the items or remains warrant a
> recovery effort or if the site is eligible for listing in the National Register of
> Historic Places.

77 Fed. Reg. 10,284.

If Dakota Access performed an activity that required authorization and
encountered previously unknown remains or artifacts in the area covered by the
authorization, then it would have been required to notify the Corps and avoid
construction that might affect the remains or artifacts.  If this requirement was triggered
and Dakota Access did not comply with General Condition 21, then it would be working
without the required Clean Water Act authorization and would need a permit from the
Corps.  The Corps potentially would be required to consider section 110(k) of the NHPA
in making that permit decision.

30

USACE_ESMT001243

The facts of what happened on September 2-3, 2016, and whether the identified sites are historical sites or burial sites are disputed. *See, e.g., Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, Case No. 16-cv-01534, Dakota Access, LLC Opposition to Plaintiff's Motion for a Temporary Restraining Order, ECF No. 34 (Sept. 6, 2016). The parties also dispute whether the sites were impacted by construction. *Id.* The Corps will have to reconcile this dispute to the extent it has jurisdiction in the area. Both Dakota Access and the SRST have also submitted additional information on this issue to the government. The additional information will need to be analyzed by appropriate experts in the Corps. A site visit will be necessary to determine whether the sites visited by Mr. Mentz were impacted by construction. The visit would also need to determine whether there are any jurisdictional areas that had discharges of dredged or fill material that were covered by non-reporting NWP 12 authorizations. Further, the Corps would need to determine whether there are any other facts necessary for the Corps to complete NHPA section 110(k) and NWP General Condition 20 or 21 reviews.

We recommend that this issue receive further investigation and evaluation, and understand that such investigation is already underway.

6. Evaluate the implications of the provision of the 1889 Sioux Act, 25 Stat. 888, which provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River ... down said center of the main channel."

A. EA Discussion

The EA did not discuss the 1889 Sioux Act.

B. Analysis

The 1889 Sioux Act, 25 Stat. 888, removed a substantial amount of land from the Great Reservation of the Sioux Nation, in the Dakota Territory, and divided the remainder into six separate "permanent reservations." Section three of the Act described the area assigned to the SRST:

> Beginning at a point in the center of the main channel of the Missouri River, opposite the mouth of Cannon Ball River; thence down said center of the main channel to a point ten miles north of the mouth of the Moreau River, including also within said reservation all island, if any, in said river; thence due west to the one hundred and second degree of west longitude from Greenwich; thence north along said meridian to its intersection with the South Branch of Cannon Ball River, also known as Cedar Creek; thence down said South Branch of Cannon Ball River to its intersection with the main Cannon Ball River, and down said main Cannon Ball River to the center of the main channel of the Missouri River at the place of beginning.

25 Stat. at 889.

USACE_ESMT001244



Section 28 of the Act provided that the statute would not become effective unless it was accepted and agreed to by the Sioux Nation as provided in Article 12 of the 1868 treaty, which required acceptance by three-fourths of the adult male Native Americans on the Great Sioux Reservation. 25 Stat. 899. If the president received "satisfactory proof" of the requisite acceptance, he was to proclaim the effectiveness of the 1889 Sioux Act; if, however, he did not receive and proclaim such proof within a year of the passage of the 1889 Sioux Act, the statute would not take effect. *Id.* President Benjamin Harrison issued the required proclamation within the year and the 1889 Sioux Act took effect. Proclamation of President Harrison, No. 9, 26 Stat. 1554 (1890); *see also Oglala Sioux Tribe of Pine Ridge Reservation v. U.S. Army Corps of Eng'rs,* 570 F.3d 327, 332-333 (D.C. Cir. 2009) (rejecting claim that 1889 Sioux Act was null and void).

The 1889 Sioux Act included a number of other provisions that are not relevant to this analysis (*e.g.,* descriptions of areas assigned to other tribes, the allotment of lands within such areas, treatment of lands outside of the separate, newly-created permanent reservations).

After major floods in the lower Missouri River basin in 1943 and 1944, Congress passed the Flood Control Act of 1944 that authorized the Corps to create a flood control

32

USACE_ESMT001245

plan along the Missouri River.  Flood Control Act of 1944, 58 Stat. 887 (1944).  The Missouri River forms the eastern border of the SRST reservation.  Between 1949 and 1962, Congress enacted seven laws that authorized limited takings of land within the six reservations created by the 1889 Sioux Act to carry out the Missouri River project.  *See Bourland,* 508 U.S. 679, at 684.  Some of the largest of these legislative takings involved Lake Oahe.

In 1958, Congress enacted Public Law 85-915, 72 Stat. 1762, which effected a legislative taking of nearly 56,000 acres of land within the area reserved for the SRST by the 1889 Sioux Act.  Specifically, "in furtherance of the Oahe Dam and Reservoir project as authorized by the Act of December 22, 1944," 58 Stat. 887 (the 1944 Flood Control Act), the 1958 Act stated:

> [T]itle to the entire interest, excluding the interest in oil, gas, and all other minerals of any nature whatsoever, in approximately 55,993.82 acres of land within the taking area described in this Act on the Standing Rock Reservation in South Dakota and North Dakota, in which Indians have a trust or restricted interest, and title to any interest Indians may have in the bed of the Missouri River so far as it is within the boundaries of the Standing Rock Reservation, are hereby taken by the United States for the Oahe project on the Missouri River and in consideration thereof the United States will pay to the Standing Rock Sioux Tribe and the individual Indian owners out of funds available for the Oahe Dam and Reservoir project:
> . . . (1) a sum aggregating $1,952,040 . . .; and
>     (2) the amount of $3,299,513, which shall be in settlement of all claims, rights, and demands of the tribe and individual Indians arising out of the taking under this Act . . . .

72 Stat. at 1762.

The legislative history to the 1958 Act is wholly consistent with the text of the statute, stating that the amount set forth in subsection (2) "includes approximately 22,000 acres of land in the bed of the Missouri River valued by the tribe at $132,000." S. Report No. 85-2374, at p. 5, (August 14, 1958).  The Senate Committee on Interior and Insular Affairs noted that "[t]he House deemed it in the overall interest that this acreage be removed from tribal ownership to prevent jurisdictional disputes and conflicts, which might arise, and the committee agrees that this should be done." *Id.*

Section three of the 1958 Act provided that "[t]he Secretary of the Army, out of funds appropriated for the construction of the Oahe project other than those authorized by this act, shall relocate and reestablish such Indian cemeteries, tribal monuments, and shrines with the area taken under this Act as the Standing Rock Tribal Council shall select and designate, with the approval of the Secretary of the Interior." 72 Stat. 1763.  The 1958 Act also provided for the relocation or reconstruction of facilities, such as schools hospitals, service buildings, etc., and an additional $6,960,000 for the purpose of "developing individual and family plans, relocating, reestablishing, and providing other

USACE_ESMT001246

assistance designed to help improve the economic and social conditions of all recognized members of the Standing Rock Sioux Tribe." *Id.*

Under section six of the Act, all minerals, including oil and gas, within the area taken by the Act were reserved to the SRST or individual Native American owners, but the exploration, exploitation and development of the minerals, including oil and gas, were made subject to all reasonable regulations imposed by the Secretary of the Army for the protection of the Oahe project. Finally, under section 10 of the Act, the Tribe and its members were given permission to graze livestock on the land between the water level of the reservoir and the exterior boundary of the taking area and the tribal council and the members of the Tribe were permitted to have, without cost, access to the shoreline of the reservoir, including permission to hunt and fish in and on the shoreline and reservoir, "subject, however, to regulations governing the corresponding use by other citizens of the United States." *Id.* at 1764.

Section 16 of the 1958 Act described the "taking area" referred to in the Act and the land for which the government paid compensation to the Tribe and individual Native Americans. *Id.* at 1765. Specifically, the taking area was "the land defined in report numbered 134, Missouri River Basin investigation project, and delimited on a map entitled "Map Showing Tribal and Individual Indian Restricted and Trust Land of the Standing Rock Sioux Reservation Acquired by the United States for the Oahe Project and Forming a Basis for the Agreed Sale Price of $1,952,040 Under an Agreement Dated March 24, 1958, Between the United States and the Standing Rock Sioux Tribe." *Id.*

Both the land assigned to the SRST by the 1889 Sioux Act and the land taken from the Tribe by the 1958 Act are located downstream from the point at which the DAPL would cross the Missouri River, which was impounded to create Lake Oahe. This pipeline crossing would involve the installation of 0.21 miles of a 30-inch diameter pipe 92 to 100 feet below the river bed, and would be co-located with existing pipelines and other linear facilities previously installed on the federal property.

Based on this information, there are no legal implications of the provision of the 1889 Sioux Act that provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River . . . down said center of the main channel" or of the land and river bed taken by the government under the authority of the 1958 Act. Normal installation and operation of the pipeline would not have any implications for the SRST's property interests.

If the issue was raised because of concerns about potential implications for the SRST downstream from the pipeline, such as environmental risks or potential damage to cultural and sacred resources from a rupture of the pipeline, which could contaminate the river, the EA addressed those risks in several sections. For example, section 3.2.1.2 of the EA provides in part:

> The primary impact that could occur as a result of an HDD [Horizontal Directional Drill] is an inadvertent release of drilling fluid directly or

34

USACE_ESMT001247

indirectly into the waterbody. Drilling fluid (also referred to as drilling mud) is primarily comprised of water. However, bentonite clay is added to the water to enhance lubricating, spoil transport and caking properties of the drilling fluid. Bentonite is a naturally occurring, non-toxic, inert substance that meets National Science Foundation (NSF)/American National Standards Institute (ANSI) Standard 60 Drinking Water Additives Standards and is frequently used for drilling potable water wells. The potential exists for drilling fluid to leak through previously unidentified fractures in the material underlying the river bed. Potential release sources of the drilling fluid include the drilling fluid entry/exit pit(s) and the directional borehole itself, which is maintained under pressure to keep it open. The probability of an inadvertent release is greatest when the drill bit is working near the surface (i.e., near the entry and exit points). To alleviate this concern, the HDD Contractor plans to install steel surface casing at both the entry and exit locations of the Lake Oahe crossing. Because the HDD entry and exit points would be set back from the banks of the Missouri River (approximately 1,400 feet north and 300 feet south) and Lake Oahe (approximately 900 feet east and 1,100 feet west) the potential for an inadvertent release to occur in the water would be minimized. Additionally, geotechnical investigations conducted by Dakota Access indicated that the drill path is not located in materials where there is a high probability of an inadvertent release of drilling fluids that would reach ground surface or enter Lake Oahe. Therefore, the potential for inadvertently released drilling fluids to enter any waterbody from below or from the shoreline is low. No downstream impacts to Sovereign Nations from inadvertent release of drilling fluid are anticipated.

Final EA at 36.

Additionally, as described in the "Summary of Environmental Impact" in the FONSI, Dakota Access developed response and action plans to address potential environmental risks from a potential spill, and will include several monitoring systems, shut-off valves and other safety features to minimize the risk of spills and reduce or remediate any potential damages should a leak or rupture occur. FONSI at 3-5. Additional mitigation measures are described in the EA/FONSI, as discussed above. *See also, supra,* Section 3, (discussing water intake structures). Finally, the easement required for the crossing at Lake Oahe will incorporate all environmental commitments outlined in the EA. FONSI at 3 -5.

C. Conclusion

Based upon the foregoing information, there are no legal or other implications of the provision of the 1889 Sioux Act, which provides that the eastern boundary of the Standing Rock Reservation is "the center of the main channel of the Missouri River . . . down said center of the main channel." Based on the "hard look" standard, it is reasonable to conclude that the Corps properly evaluated possible implications of the

USACE_ESMT001248

1889 Sioux Act when it evaluated anticipated environmental and cultural effects of the proposed crossing of the pipeline at Lake Oahe upstream from the lands reserved for the SRST. Accordingly, we have concluded that formal reconsideration of the EA/FONSI or preparation of supplemental NEPA documentation is not legally required with respect to this particular issue.

## CONCLUSION

We have reviewed the final EA and FONSI, as well as other information available to the Corps, for the purpose of enabling the Department of the Army to determine whether it will need to reconsider any of its previous decisions regarding the DAPL crossing at the Lake Oahe site under NEPA and other federal laws, as directed by the Joint Statement. Using the "hard look" standard under NEPA, we have concluded that the Corps' Omaha District adequately considered and disclosed the environmental, cultural and other potential impacts of its actions and that its decisions were not arbitrary or capricious. *See Nat'l Comm. for the New River*, 373 F.3d. at 1327, and *Oceana* 37 F. Supp. 3d. at 159-60.

We have also concluded that supplementation of the EA to address any new information is not legally required at this time. Applying the "rule of reason," we have not identified any new information showing that any actions by the Department of the Army will affect the quality of the human environment to a significant extent not already considered. *See Marsh*, 490 U.S. at 373-374.

However, we do recommend that additional investigation and evaluation be undertaken to determine whether Dakota Access may have violated the Clean Water Act and NHPA in the areas identified in the SRST's September 2, 2016 court filings, as explained in Section 5, *supra* (discussing the need to determine whether there are any NHPA section 110(k) issues that are not before the court already and any other cultural resource issues identified more recently within the area of federal jurisdiction).

USACE_ESMT001249

| Incidents | | Miles | Incident/mile |
|---|---|---|---|
| 2015 | 248 | 72562 | 0.003417767 |
| 2014 | 229 | 66813 | 0.003427477 |
| 2013 | 204 | 61086 | 0.003339554 |
| 2012 | 186 | 57462 | 0.003236922 |
| 2011 | 143 | 56100 | 0.00254902 |
| 2010 | 152 | 54630 | 0.002782354 |
| | | | 1/320 |

| Serious Incidents | | Miles | Incident/mile |
|---|---|---|---|
| 2015 | 0 | 72562 | 0.000000% |
| 2014 | 0 | 66813 | 0.000000% |
| 2013 | 3 | 61086 | 0.004911% |
| 2012 | 2 | 57462 | 0.003481% |
| 2011 | 0 | 56100 | 0.000000% |
| 2010 | 0 | 54630 | 0.000000% |
| | | | 0.001399% |

| Significant Incidents | | Miles | Incident/mile |
|---|---|---|---|
| 2015 | 77 | 72562 | 0.106116% |
| 2014 | 74 | 66813 | 0.110757% |
| 2013 | 78 | 61086 | 0.127689% |
| 2012 | 63 | 57462 | 0.109638% |
| 2011 | 56 | 56100 | 0.099822% |
| 2010 | 49 | 54630 | 0.089694% |
| | | | 0.107286% |

USACE_ESMT001255

Likelyhood of an incident per year per mile

USACE_ESMT001256

Pipeline Incidents by System Type: Significant
Date run: 10/17/2016

Portal - Data as of 10/17/2016
Data Source: US DOT Pipeline and Hazardous Materials Safety Administration

**PHMSA Pipeline Incidents: (1996-2015)**
Incident Type: Significant   System Type: HAZARDOUS LIQUID   State: ALL
Offshore Flag: ALL   Commodity: CRUDE OIL

| Calendar Year | Number | Fatalities | Injuries | Total Cost Current Year Dollars | Barrels Spilled | Net Barrels Lost |
|---|---|---|---|---|---|---|
| 1996 | 71 | 0 | 0 | $10,198,641 | 45,503 | 17,363 |
| 1997 | 77 | 0 | 0 | $28,951,487 | 82,288 | 32,809 |
| 1998 | 72 | 0 | 0 | $54,030,025 | 103,314 | 26,849 |
| 1999 | 71 | 0 | 5 | $21,393,699 | 103,277 | 57,422 |
| 2000 | 63 | 0 | 0 | $66,904,687 | 50,484 | 15,162 |
| 2001 | 50 | 0 | 6 | $14,332,751 | 18,614 | 4,597 |
| 2002 | 45 | 0 | 0 | $37,525,456 | 19,589 | 8,542 |
| 2003 | 48 | 0 | 4 | $22,874,902 | 28,312 | 13,878 |
| 2004 | 63 | 0 | 1 | $130,525,719 | 31,593 | 19,552 |
| 2005 | 56 | 0 | 1 | $301,390,345 | 102,388 | 19,057 |
| 2006 | 45 | 0 | 0 | $32,135,921 | 83,601 | 5,175 |
| 2007 | 42 | 2 | 0 | $21,852,824 | 19,216 | 3,383 |
| 2008 | 50 | 0 | 0 | $45,399,386 | 58,733 | 36,473 |
| 2009 | 41 | 1 | 3 | $44,188,092 | 24,937 | 9,462 |
| 2010 | 49 | 0 | 0 | $1,120,279,963 | 52,319 | 6,804 |
| 2011 | 56 | 0 | 0 | $195,771,599 | 34,920 | 16,188 |
| 2012 | 63 | 3 | 4 | $46,824,048 | 14,451 | 4,293 |
| 2013 | 78 | 0 | 6 | $196,050,931 | 42,505 | 17,849 |
| 2014 | 74 | 0 | 0 | $55,213,546 | 16,666 | 1,827 |
| 2015 | 77 | 0 | 0 | $194,564,582 | 20,005 | 4,727 |
| Grand Total | 1,191 | 6 | 31 | $2,640,408,583 | 952,714 | 321,193 |

**PHMSA Pipeline Incidents: Multi-Year Averages (1996-2015)**
Incident Type: Significant   System Type: HAZARDOUS LIQUID   State: ALL
Offshore Flag: ALL   Commodity: CRUDE OIL

| | Injuries | Total Cost | Barrels Spilled | Net Barrels Lost |
|---|---|---|---|---|
| 3 Year Average | 2 | $148,609,686 | 26,392 | 8,068 |
| 5 Year Average | 2 | $137,684,941 | 25,709 | 8,937 |
| 10 Year Average | 1 | $195,228,089 | 36,735 | 10,596 |
| 20 Year Average | 2 | $132,020,429 | 47,636 | 16,060 |

**PHMSA Pipeline Incidents: Count (1996-2015)**
Incident Type: Significant   System Type: HAZARDOUS LIQUID   State: ALL
Offshore Flag: ALL   Commodity: CRUDE OIL

| | Incident Count | | | Fatalities |
|---|---|---|---|---|
| 3 Year Average - (2013-2015) | 76 | 3 Year Average | | 0 |
| 5 Year Average - (2011-2015) | 70 | 5 Year Average | | 1 |
| 10 Year Average - (2006-2015) | 58 | 10 Year Average | | 1 |
| 20 Year Average - (1996-2015) | 60 | 20 Year Average | | 0 |

| 2016 Year-To-Date | |
|---|---|
| Incidents | 50 |
| Fatalities | 0 |
| Injuries | 0 |
| Total Cost | $45,028,623 |
| Barrels Spilled | 17,993 |
| Net Barrels Lost | 8,61 |





**PHMSA Pipeline Incidents: Barrels Spilled (1996-2015)**
Incident Type: Significant  System Type: HAZARDOUS LIQUID  State: ALL
Offshore Flag: ALL  Commodity: CRUDE OIL.

**PHMSA Pipeline Incidents: Net Barrels Lost (1996-2015)**
Incident Type: Significant  System Type: HAZARDOUS LIQUID  State: ALL
Offshore Flag: ALL  Commodity: CRUDE OIL.

Incident Type: Significant  System Type: HAZARDOUS LIQUID  State: ALL
Offshore Flag: ALL  Commodity: CRUDE OIL

**Hazardous Liquid Pipeline Miles and Tanks by Commodity**
Time run: 10/17/2016 3:12:05 PM

Data Source: US DOT Pipeline and Hazardous Materials Safety Administration
Portal Data as of 10/17/2016 12:38:41 AM

### State: ALL

| Commodity | Calendar Year | Interstate Miles | Intrastate Miles | Total Miles | Miles of Gathering | Breakout Tanks |
|---|---|---|---|---|---|---|
| BIOFUEL | 2015 | | 15.0 | 15.0 | 0.0 | 9 |
| | 2014 | | 16.1 | 16.1 | 0.0 | 9 |
| | 2013 | | 16.1 | 16.1 | 0.0 | 7 |
| | 2012 | | 15.9 | 15.9 | 0.0 | 6 |
| | 2011 | | 15.7 | 15.7 | 0.0 | 7 |
| | 2010 | | 16.1 | 16.1 | 0.0 | 10 |
| CO2 | 2015 | 4,005.2 | 1,227.6 | 5,232.8 | 0.0 | 0 |
| | 2014 | 4,043.6 | 1,232.0 | 5,275.6 | 0.0 | 0 |
| | 2013 | 3,990.7 | 1,199.3 | 5,190.0 | 0.0 | 0 |
| | 2012 | 3,643.0 | 1,197.3 | 4,840.3 | 0.0 | 0 |
| | 2011 | 3,622.9 | 1,112.4 | 4,735.3 | 0.0 | 0 |
| | 2010 | 3,459.3 | 1,100.7 | 4,560.0 | 22.0 | 0 |
| CRUDE OIL | 2015 | 50,278.6 | 22,284.1 | 72,562.7 | 3,736.0 | 2,643 |
| | 2014 | 46,999.6 | 19,813.6 | 66,813.3 | 3,745.2 | 2,421 |
| | 2013 | 42,408.5 | 18,678.2 | 61,086.7 | 3,666.7 | 2,325 |
| | 2012 | 39,482.0 | 17,980.8 | 57,462.8 | 3,086.7 | 2,129 |
| | 2011 | 38,401.5 | 17,698.6 | 56,100.2 | 2,908.4 | 1,904 |
| | 2010 | 37,938.8 | 16,691.7 | 54,630.5 | 2,513.6 | 1,812 |
| HVL FLAMM TOXIC | 2015 | 39,417.5 | 28,158.2 | 67,575.7 | 408.1 | 260 |
| | 2014 | 38,694.4 | 27,092.9 | 65,787.3 | 316.9 | 267 |
| | 2013 | 35,996.4 | 26,771.9 | 62,768.2 | 0.0 | 251 |
| | 2012 | 33,040.3 | 26,820.3 | 59,860.6 | 0.0 | 291 |
| | 2011 | 32,900.1 | 25,699.0 | 58,599.1 | 8.7 | 322 |
| | 2010 | 32,464.4 | 25,515.4 | 57,979.8 | 986.3 | 296 |
| REFINED PP | 2015 | 52,129.9 | 10,465.3 | 62,595.2 | 0.0 | 4,659 |
| | 2014 | 51,518.5 | 10,248.1 | 61,766.7 | 0.0 | 4,725 |
| | 2013 | 53,056.2 | 10,294.7 | 63,351.0 | 0.0 | 4,390 |
| | 2012 | 53,995.0 | 10,046.7 | 64,041.8 | 0.0 | 4,373 |
| | 2011 | 53,498.0 | 10,631.8 | 64,129.8 | 0.0 | 4,262 |
| | 2010 | 53,665.6 | 11,134.1 | 64,799.8 | 240.8 | 4,141 |

**Notes:**
**BIOFUEL** is distilled from biological feedstock, such as corn and sugar. Examples include ethanol and biodiesel.
**CO2** is carbon dioxide in the liquid state.
**HVL FLAMM TOXIC** includes Highly Volatile Liquids (HVL), flammable, and toxic liquids. HVL products form a
vapor cloud when released to the atmosphere. Flammable products are defined in 49 CFR 173.120. Toxic products
are defined in 49 CFR 173.132. Examples include propane, ethane, butylene, and anhydrous ammonia.
**REFINED PP** is petroleum products obtained by distilling and processing crude oil that are liquid at ambient
conditions. Examples include gasoline, diesel, jet fuel, kerosene, and fuel oil.

USACE_ESMT001259

# Honor the Earth * Sierra Club
# Indigenous Environmental Network

### October 10, 2016

Jo-Ellen Darcy
Assistant Secretary of the Army (Civil Works)
108 Army Pentagon
Washington, DC 20310-0108
Joellen.darcy@us.army.mil

Chip Smith
Assistant Secretary of the Army (Civil Works)
Assistant for Environment, Tribal and Regulatory Affairs
108 Army Pentagon
Washington, D.C. 20310-0108
charles.r.smith567.civ@mail.mil

Mr. Lowry Crook
Principal Deputy Assistant Secretary of the Army (Civil Works)
108 Army Pentagon
Washington, DC 20310-0108
lowry.a.crook.civ@mail.mil

Col. John W. Henderson
Commander and District Engineer
U.S. Army Corps of Engineers
Omaha District
1616 Capitol Avenue, Suite 9000
Omaha, NE 68102
john.w.henderson@usace.army.mil

**Via email and U.S. Mail**

> *Re:    Submission of New Information on the Environmental Impacts on the Proposed
> Dakota Access Pipeline Project; Request for Additional Review under the
> National Environmental Policy Act and Clean Water Act; and Request for Stay
> Pending Review*

1

USACE_ESMT001262

Dear Ms. Darcy, Mr. Smith, Mr. Crook, and Col. Henderson,

Sierra Club, Honor the Earth, and Indigenous Environmental Network commend the September 9, 2016 joint statement by the Army Corps of Engineers (Corps), Department of the Interior, and Department of Justice acknowledging important concerns the Standing Rock Sioux Tribe (Standing Rock) and other tribal nations raised over the streamlined approval of the Dakota Access Pipeline (DAPL). The statement indicated that the Corps would "not authorize constructing the Dakota Access Pipeline on Corps land bordering or under Lake Oahe until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other laws."[1]

The purpose of this letter is to provide new and previously unconsidered information on the project's environmental impacts and inadequacies with the approval process that have resulted in minimal opportunities for public involvement. Based on this information, we hereby makes the following requests: [2]

1.  The Corps investigate whether DAPL intentionally destroyed sacred and culturally-significant sites as prohibited by the National Historic Preservation Act.

2.  The Corps prepare an environmental impact statement (EIS) or supplemental EIS (SEIS) for the DAPL crossing of Lake Oahe and adjacent Corps property; and/or prepare an SEIS for NWP 12 as it applies to DAPL.

3.  The Corps revoke or suspend its authorizations of DAPL under NWP 12 and require an individual permit review under the Clean Water Act §404.

4.  The Corps and other federal agencies stay project construction in all federal jurisdictional areas pending completion of an EIS.

---

[1] Press Release: "Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers," September 9, 2016, *available at* https://www.justice.gov/opa/pr/joint-statement-department-justice-department-army-and-department-interior-regarding-standing.

[2] Sierra Club, Honor the Earth, and Indigenous Environmental Network agree that the interests of Standing Rock and other tribal nations should be paramount to any approval process going forward, not only for DAPL but for other infrastructure projects proposed to be built on Native American land. The Corps' subsequent announcement of September 23, 2016 provides some detail on forthcoming government-to-government consultations, but our understanding is that the agencies' consideration of an additional NEPA process will proceed on a separate track. As such, this letter will focus primarily on DAPL's environmental impacts and the review process going forward as required by the CWA and NEPA.

USACE_ESMT001263

I.      **New information requires the Corps to prepare an environmental impact statement and an individual CWA §404 permit**

        *A.      National Environmental Policy Act*

     The National Environmental Policy Act ("NEPA") dictates that "[a]gencies…[s]hall prepare supplements to either draft or final environmental impact statements if…[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." [3] Courts have recognized that the use of the word 'shall' indicates that supplemental EISs are mandatory. [4]

     An agency must take a "hard look" at any new information and evaluate whether or not the initial EIS and its findings should be revisited. [5] If the new information demonstrates that the agency action will "affect the quality of the human environment in a significant manner or to a significant extent not already considered"; *i.e.* that it "provides a seriously different picture of the environmental landscape" and the agency action has not yet occurred, then the agency must prepare a supplemental environmental impact statement. [6]

     As described in detail below, the Corps must prepare an EIS for DAPL due to "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" and because "the purposes of [NEPA] will be furthered by doing so." [7]

        *B.      The Clean Water Act.*

     The Clean Water requires the Corps to require an individual §404 permit for DAPL if new information shows that a project may result in more than minimal environmental impacts or that an individual §404 permit review would serve the public interest.

---

[3] 40 C.F.R. § 1502.9.

[4] *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 372 (1989) (recognizing the duty where there are significant new circumstances or information); *see also Dubois v. U.S. Dep't. of Agric.*, 102 F.3d 1273, 1292 (1st Cir. 1996) ("The use of the word 'shall' is mandatory, not precatory.").

[5] *Marsh*, 490 U.S. at 373-74 (1989).

[6] *State of Wis. v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984); *see also Natural Res. Def. Council v. Lujan*, 768 F. Supp. 870, 886 (D.D.C. 1991) (a new report that contained a substantially different estimate of the amount of oil expected to be found in Alaska required the preparation of an SEIS).

[7] 40 C.F.R. § 1502.9. While no federal agencies have yet prepared an EIS for DAPL, NEPA's implementing regulations apply to equally to situations where agencies have prepared an EA as the Corps did for DAPL. *See, e.g.*, 40 C.F.R. § 1500.3 ("These regulations, unlike the predecessor guidelines, are not confined to sec. 102(2)(C)(environmental impact statements). The regulations apply to the whole of section 102(2)").

USACE_ESMT001264

Section 404 of the CWA prohibits the discharge of any pollutant, including dredged spoil or other fill material, into navigable waters unless authorized by a permit issued by the Corps.[8] In evaluating an individual §404 permit for a project, Corps guidelines require it to evaluate the project's impacts, select the least damaging practicable alternative, ensure that the project would not cause or contribute to violations of state water quality standards, and ensure that all appropriate steps have been taken to minimize potential adverse impacts.[9] The Corps must also ensure that a project avoids wetlands destruction to the extent practicable.[10] In evaluating an individual §404 permit, the Corps must provide "notice and an opportunity for public hearings" and evaluate the project's impacts pursuant to NEPA.[11]

The Corps avoided this transparent review process for DAPL by approving each of the thousands of water crossings along the pipeline route under the fast-track Nationwide Permit 12 process.

The Corps issues nationwide §404 permits (NWPs) such as NWP 12 for categories of activities it determines "will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment."[12] Once the Corps issues a NWP, it can approve specific projects by simply verifying that they meet the terms and conditions of a NWP without going through the transparent process the individual §404 permit process requires (*e.g.*, a comprehensive, site-specific environmental and public interest review, an environmental impact statement, tribal consultation on the overall project pursuant to §106 of the National Historic Preservation Act).[13] The "verification" of a project under a NWP is done entirely behind closed doors—there is no public notice upon receipt of an application or even when a project is approved, no NEPA analysis, and no hearings or other opportunity for public involvement.

In 2012, the Corps issued Nationwide Permit 12 ("NWP 12") for minor pipeline projects that would result in up to 1/2-acre of loss of waters of the U.S.[14] However, the Corps has begun segmenting massive interstate pipelines like DAPL by artificially treating the thousands of water crossings as separate projects that each qualify separately under NWP 12. In this way, the Corps has approved the 1,168-mile DAPL crude oil pipeline under NWP 12 without any project-specific §404 review process.

---

[8] 33 U.S.C. § 1344.

[9] 33 C.F.R. § 230.10.

[10] *Id.* § 320.4(r)

[11] 33 U.S.C. § 1344(a).

[12] *Id.* § 1344(e)(1).

[13] 33 C.F.R. § 323.3(a).

[14] 77 Fed. Reg. 10,184, 10,271 (Feb.21, 2012).

4

USACE_ESMT001265

However, the Corps is prohibited from approving a pipeline under NWP 12 if it would have more than minimal environmental effects. When reviewing a "pre-construction notification" (PCN) for a pipeline under NWP 12, the Corps must measure the project's environmental effects to make sure it they would be only minimal.[15] In making that determination, the Corps must consider the cumulative effects of an overall pipeline.[16] If a project might have more than minimal environmental effects, the Corps must require an individual §404 permit for the pipeline.[17]

Even after the Corps has verified a project under NWP 12, the Corps must require an individual §404 permit if it finds a project would exceed the "minimal effects" threshold or would otherwise be contrary to the public interest. For example, Corps regulations give district and division engineers the authority to "suspend, modify, or revoke authorizations under an NWP... where they have concerns for the aquatic environment."[18] If a Corps engineer finds that a project "would have more than minimal individual or cumulative net adverse effects on the environment or otherwise may be contrary to the public interest, *he shall* modify the NWP authorization to reduce or eliminate those adverse effects, or he shall instruct the prospective permittee to apply for a regional general permit or an individual permit."[19]

In deciding whether to modify, suspend, or revoke a project's NWP 12 authorization, the Corps must consider several factors, including: "Changes in circumstances relating to the authorized activity since the NWP itself was issued or since the DE confirmed authorization under the NWP by written verification"; "any significant objections to the authorization not previously considered"; "cumulative adverse environmental effects resulting from activities occurring under the NWP"; "the extent of the permittee's compliance with the terms and conditions of the NWPs"; and "other concerns for the environment, including the aquatic

---

[15] *See, e.g.*, 33 U.S.C. § 1344(e)(1); 77 Fed. Reg. at 10,287 ("In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects or may be contrary to the public interest.").

[16] 77 Fed. Reg. 10287 ("In reviewing the PCN for the proposed activity, the district engineer will determine whether the activity authorized by the NWP will result in more than minimal individual or cumulative adverse environmental effects... For a linear project, this determination will include an evaluation of the individual crossings to determine whether they individually satisfy the terms and conditions of the NWP(s), *__as well as the cumulative effects caused by all of the crossings authorized by NWP__*")(emphasis added).

[17] *See, e.g.*, 77 Fed. Reg. 10240 ("In response to a [PCN], district engineers may exercise discretionary authority and require an individual permit if the proposed activity will result in more than minimal adverse effects on the aquatic environment). For example, where a pipeline proponent sought to use NWP 12 for a 149-mile oil pipeline in Ohio, the Corps district engineers determined that the impacts of the overall project would be more than minimal and declined to verify the project under NWP 12, requiring instead an individual §404 permit and a NEPA analysis that covered the entire pipeline. *Stop the Pipeline v. White*, 233 F. Supp. 2d 957, 961-63 (S.D. Ohio 2002).

[18] 33 C.F.R. § 330.1(d).

[19] *Id.* (emphasis added).

5

USACE_ESMT001266

environment under the section 404(b)(1) Guidelines, and other relevant factors of the public interest."[20]

As set forth below, many of these factors are met by DAPL, which indicates the verifications of the project under NWP 12 should be modified, revoked, or suspended and the Corps should require an individual §404 permit.

## II.   New Information regarding historic and cultural sites

New information provided to the Corps detailing historic sites require further NEPA and NHPA review as well as an investigation into whether DAPL intentionally destroyed any sites.

Section 106 of the National Historic Preservation Act (NHPA) regulates the obligation of federal agencies to consider the impacts to historic and culturally-significant sites and to ensure that prior to permitting or construction of a project there is identification of traditional cultural or historical properties and that through tribal consultation, these properties can be evaluated for qualification to the National Register of Historic Places or otherwise determined eligible for protection and conservation. In the case of DAPL, the Corps used a narrow interpretation of its §106 obligations to consult only on its claimed narrow jurisdictional areas and ignore the vast majority of the pipeline where historic sites and artifacts are likely located.

On Friday, September 2, Standing Rock submitted to the court detailed findings of its archaeologist and former Tribal Historic Preservation Officer (THPO) Tim Mentz, Sr., describing the construction area as unusually dense in rare cultural sites, which included human burial sites, stone prayer rings, and other sacred artifacts directly in the path of the proposed pipeline that he discovered through a survey.[21] These included five stone features that may have met criteria for National Register of Historic Places criteria and 27 grave sites within a concentrated area next to the proposed pipeline route. According to the Sacred Stone Camp, of the 380 archeological sites that face desecration along the entire pipeline route, from North Dakota to Illinois, 26 of them are located at the confluence of the Missouri and Cannonball Rivers. This area is a historic trading ground, a place held sacred not only by the Sioux Nations, but also the Arikara, the Mandan, and the Northern Cheyenne. Mr. Mentz described one of the sites as "one of the most significant archeological finds in North Dakota in many years."[22]

---

[20] *Id.* § 330.5(d); *See also Id.* § 330.4(2) ("a DE may assert discretionary authority by modifying, suspending, or revoking NWP authorization for a specific activity whenever he determines sufficient concerns for the environment or any other factor of the public interest so requires.").

[21] Plaintiff's Motion for Leave to File Supplemental Declaration (and attachements), Case No. 1:16-cv-1534-JEB (Sept. 2, 2016), *available at*
https://www.sierraclub.org/sites/www.sierraclub.org/files/blog/DAPL%20Legal%202.pdf.

[22] *Id.*

6

USACE_ESMT001267

This is significant new information that the Corps must consider in an EIS or SEIS and subsequent review process under the NHPA.

In addition, Section 110(k) of the NHPA actually *prohibits* the Corps from issuing the final permit/easement for DAPL at Lake Oahe if it determines that the company engaged in anticipatory demolition; that is, if DAPL intentionally destroyed or adversely affected potential historic sites along the pipeline's path.[23] The events described below suggest that DAPL's actions constitute anticipatory demolition and thus warrants an investigation by the Corps.

Standing Rock submitted its motion and accompanying Mentz declaration identifying specific sites on September 2, 2016, the Friday afternoon before the Labor Day weekend. Early the next morning, DAPL responded by bringing in construction crews and bulldozing the specific areas described by Standing Rock in their filing. When protectors of the site entered the construction area, private security guards attacked them with dogs and pepper spray. According to Standing Rock, most of the stone features described in the declaration and potentially undisturbed for centuries are now gone. "This demolition is devastating," Tribal Chairman David Archambault II said. "These grounds are the resting places of our ancestors. The ancient cairns and stone prayer rings there cannot be replaced. In one day, our sacred land has been turned into hollow ground." [24]

In light of these events, Standing Rock filed a motion for a temporary restraining order on Sunday, September 4, 2016, including details that suggest DAPL destroyed these sites intentionally.[25] For example, DAPL work crews arrived to raze the specific 2-mile area containing the sites the next morning immediately following their identification; the work crews did not ordinarily work on weekends or holiday weekends; while pipeline construction usually proceeds in a linear fashion, the destroyed sites were approximately 20 miles from where work crews had been working to date; the crews arrived with private security guards wielding attack dogs, pepper spray, and a helicopter hovering overhead, which suggests they anticipated some amount of controversy.

Thomas F. King, Ph.D., an archaeologist with extensive qualifications, wrote to the Corps on September 4, 2016 and further explained in a declaration September 9, 2016 that Mentz "possesses all the qualifications necessary to perform the studies that inform his declarations,"

---

[23] 54 U.S.C. § 306113 ("the agency will not grant a ... permit, license, or other assistance to an applicant that, with intent to avoid the requirements of section 306108 of this title, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the significant adverse effect to occur...").

[24] Press Release: "Standing Rock Sioux Tribe condemns destruction and desecration of burial grounds by Energy Transfer Partners," September 3, 2016, *available at*
http://standingrock.org/data/upfiles/media/Press%20Release_Standing%20Rock%20Sioux_%2009032016.pdf.

[25] Declaration of Tim Mentz, Sr. in Support of Temporary Restraining Order, Case No. 1:16-cv-1534-JEB (Sept 4, 2016), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/blog/Mentz%20Declaration.pdf.

7

USACE_ESMT001268

and that his observations were derived from knowledge only obtained from a lifelong immersion in the traditional culture of the Standing Rock Sioux Tribe.[26] King's declaration also corroborates Standing Rock's theory that the construction work done by DAPL, less than 24-hours after the Mentz declaration was filed, was a willful effort to destroy the recorded culturally significant sites in order to circumvent review under NHPA §106.

On October 4, 2016, the National Trust for Historic Preservation (the Trust) sent a "Notice of Possible Anticipatory Demolition Regarding Dakota Access Pipeline" to the Corps in regards to DAPL's destruction of culturally significant sites on the pipeline route and to urge the Corps to take action pursuant to §110 of the NHPA.[27] The Trust is a non-profit organization chartered by Congress in 1949 for the purpose of protecting significant historic sites and advocating for historic preservation through compliance with the NHPA. In its letter, the Trust discussed the declarations of Tim Mentz that describe the religious and cultural sites he discovered on the pipeline route just west of Lake Oahe and DAPL's immediate destruction of those specific areas the morning after their identification to the court. The Trust acknowledged Mr. Mentz's particular expertise in identifying Standing Rock historic sites, based on his 39 years of experience working in historic preservation with Standing Rock and his appointment as the country's first Tribal Historic Preservation Officer. The Trust expressed its opinion that "the Army Corps may be required by Section 110(k) of the NHPA to refrain from granting the [Lake Oahe] easements, or reauthorizing any permits relating to the Dakota Access Pipeline, because it appears that intentional actions may have been taken by the applicant to destroy cultural resources within the pipeline corridor. At the very least, it is imperative that the federal agencies conduct a thorough investigation of the facts alleged by the Tribes in order to determine whether the prohibitions of Section 110(k) have been triggered."[28]

In fact, this is not the first time DAPL has been accused of anticipatory demolition in its haste to build the pipeline. In a letter of May 6, 2016, the Advisory Council for Historic Preservation (ACHP) critiqued the Corps' §106 review process and recommended "further steps the Corps should take to adequately consider effects to historic properties" from DAPL.[29] In addition, ACHP explained that the Iowa Utility Board recently ruled that DAPL had violated a recent order "by engaging in prohibited activities prior to obtaining all its permits and approvals by engaging in activities within the ROW including tree clearing within the Corps' jurisdictional

---

[26] Letter of Thomas F. King, Ph.D, to Army Corps (September 4, 2016) and Declaration of Thomas F. King, Ph.D in Support of Plaintiff's Motion for Stay Pending Appeal, Case No. 1:16-cv-1534-JEB (Sept 9, 2016), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/blog/DAPL%20Legal.pdf.

[27] *Available at*
https://www.sierraclub.org/sites/www.sierraclub.org/files/blog/National%20Trust%20110%28k%29%20ltr%20to%20Army%20Corps%20re%20DAPL%20Oct%204%202016.pdf.

[28] *Id.*

[29] *Available at* https://turtletalk.files.wordpress.com/2016/05/achpdakota-access-pipeline-con-06may16.pdf.

8

USACE_ESMT001269

PCN's for the purpose of eliminating Indiana Brown bat habitat prior to the start of the April 1 breeding season."[30] ACHP concluded:

> Since this activity may have caused harm to, or precluded, the appropriate identification of historic properties in those locations, the Corps should investigate this issue and consult with the ACHP regarding the applicability of Section 110(k) before it proceeds with the Section 106 review.[31]

Therefore, the Corps must investigate these events before issuing any additional permits for DAPL. If it determines DAPL intentionally destroyed any sites, ***Section 110(k) prohibits it from approving the Lake Oahe crossing***.

Finally, in a letter released on September 21st, more than 1,400 archeologists, museum directors, anthropologists and historians appealed to President Obama, the Department of Justice, the Department of the Interior, and the Army Corps of Engineers asking for further study of land involved in the pipeline project, around the Missouri River near the border of South Dakota.[32] In the letter, they highlight that the burial desecration that occurred near the Standing Rock Sioux reservation was in direct conflict with the Native American Grave Protection and Repatriation Act, which was put in place to prevent burial desecration of this type. The Corps must prepare an EIS and/or an SEIS with a robust cultural resources survey and proper tribal consultation in order to better identify sacred cultural and historical sites and artifacts and take proper measures to preserve these areas in close consultation with the Standing Rock Sioux and other tribes in the region.

## III.   New and previously unconsidered information on oil spill impacts

Perhaps the most controversial issue surrounding DAPL is the potential for the pipeline to spill or leak crude oil and contaminate Lake Oahe, which provides drinking water for Standing Rock, as well as thousands of other waterways that the pipeline would cross.

Incredibly, neither the Corps nor any other agency has once ever analyzed the risks of oil spills or the potential impacts of a spill to waterways. In approving DAPL, the Corps and FWS prepared very limited environmental assessments (EAs) evaluating the impacts of project construction at discrete sites. The Corps prepared an EA that was limited to just three miles of

---

[30] *Id.* The Fish and Wildlife Service (FWS) has also raised concerns about actions by DAPL's premature destruction of bat habitat in a letter of May 2, 2016.

[31] *Id.*

[32] Archaeologists and Museums Denounce Destruction of Standing Rock Sioux Burial Grounds, September 21, 2016, *available at* http://thenaturalhistorymuseum.org/archaeologists-and-museums-respond-to-destruction-of-standing-rock-sioux-burial-grounds/.

9

Corps jurisdiction at Lake Oahe and ignored the other 1,168 miles of the pipeline.[33] The FWS also prepared an EA that was limited to its jurisdictional footprint. And as discussed below, the Corps approved the hundreds (most likely thousands) of DAPL water crossings under NWP 12 without any project-specific NEPA review (the 2012 EA for NWP 12 also failed to address oil spills).

None of these analyses ever mentioned the potential for DAPL to spill or leak into waterways, the potential impacts of a worst-case scenario discharge, whether there are adequate personnel and resources available to respond to a spill, or whether any route alternatives exist that would avoid sensitive waterways or drinking water supplies such as Lake Oahe. Given the frequency of crude oil pipeline spills in the US and the devastating impacts that often result, this omission is an alarming violation of the Corps' NEPA obligations.

### A.   Recent oil spills highlight the risks posed by DAPL and the insufficiency of federal oversight

A series of oil and hazardous liquid pipeline spills, including many new incidents that have occurred since the preparation of the Corps' EA for Lake Oahe, highlight the risks of DAPL that must be considered in an EIS pursuant to NEPA. Notably, many of these spills went undetected by pipeline operators until passersby reported the incidents.

On the morning of September 9, 2016, the same day the agencies announced they would reconsider whether to prepare additional NEPA analysis for DAPL, a 36-inch pipeline ruptured in Alabama spilling an estimated 336,000 gallons of gasoline.[34] The spill was not detected by the pipeline's leak detection system; rather, an inspector who happened to be on a monthly check of a nearby coal mine reported the leak after noticing a strong odor of gasoline and a sheen on the water surface.

In June of 2016, a resident in the city of Ventura, California first noticed crude oil flowing in an arroyo outside his home and notified emergency responders as well as the responsible pipeline company, Crimson Pipeline.[35] Nearly 30,000 gallons of crude oil were

---

[33] *See* U.S. Army Corps of Engineers, "Environmental assessment: Dakota Access Pipeline Project, crossings of flowage easements and federal lands," July 2016, *available at*
http://cdm16021.contentdm.oclc.org/cdm/ref/collection/p16021coll7/id/2801.
[34] Dennis Pillion, *Alabama pipeline leak: What we know so far about the spill, gas shortages and more*, September 18, 2016, *available at*
http://www.al.com/news/birmingham/index.ssf/2016/09/how_alabama_pipeline_leak_led.html.
[35] Matt Hamilton, Joseph Serna and Veronica Rocha, *Ventura oil spill misses the ocean, but damage on land is unclear*, June 23, 2016, *available at*
http://www.latimes.com/local/lanow/la-me-ln-ventura-county-oil-spill-20160623-snap-story.html.

10

USACE_ESMT001271

spilled from the pipeline and flowed half a mile down the arroyo, coating the riverbed, rocks, and plants.[36]

In May of 2016 and September of 2015, Shell's San Pablo Bay Pipeline ruptured along the same stretch of pipeline near Tracy, California.[37] Both spills released about 20,000 gallons of crude oil each.

In April of 2016, a passerby along the South Dakota section of the Keystone I Pipeline noticed a leak. TransCanada's spill detection system did not detect this leak, and the company initially reported that only 187 gallons of tar sands crude had spilled. Almost a week later, TransCanada reported that in fact nearly 17,000 gallons of diluted bitumen had spilled.[38]

In May of 2015, a pipeline owned by Plains All American Pipeline spilled 143,000 gallons of crude oil near Santa Barbara, California. The oil flowed down a culvert, onto Refugio State Beach, and into the Pacific Ocean.[39] The company has subsequently been indicted on 46 criminal counts including failure to provide timely notice of the leak to emergency officials. Three and a half hours passed between the time it shut down the line due to abnormalities and the time federal regulators were notified.[40]

In January of 2015, the Poplar Pipeline, a pipeline operated by Bridger Pipeline Co. that runs under the Yellowstone River in Montana (as DAPL is proposed to run under Lake Oahe) spilled approximately 50,000 gallons of crude oil into the frozen river.[41] The spill ended up contaminating the drinking water intake system for the city of Glendive.[42]

---

[36] Matt Hamilton, *Feeling duped, Ventura blasts company for restarting pipeline after oil spill*, July 6, 2016, *available at* http://www.latimes.com/local/lanow/la-me-ln-ventura-oil-spill-pipeline-criticism-20160705-snap-story.html.

[37] Ted Goldberg, *Pipeline at Center of Altamont Pass Oil Spill Also Ruptured Last September*, May 24, 2016, *available at* http://ww2.kqed.org/news/2016/05/24/pipeline-at-center-of-altamont-pass-oil-spill-also-ruptured-last-september.

[38] Alan Neuhauser, *Keystone Leak Worse Than Thought*, April 8, 2016, *available at* http://www.usnews.com/news/articles/2016-04-08/keystone-pipeline-leak-worse-than-thought.

[39] Joseph Serna, *Refugio oil spill may have been costlier, bigger than projected*, August 5, 2015, *available at* http://www.latimes.com/local/lanow/la-me-ln-refugio-oil-spill-projected-company-says-20150805-story.html.

[40] Doug Smith and Brittny Mejia, *Pipeline company indicted in 2015 Santa Barbara County oil spill*, May 17, 2016, *available at* http://www.latimes.com/local/lanow/la-me-ln-santa-barbara-county-oil-spill-20160517-snap-story.html.

[41] Holly Yan, *After oil spilled in Yellowstone River, residents told not to drink water*, January 20, 2015, *available at* http://www.cnn.com/2015/01/20/us/yellowstone-river-spill/.

[42] EPA Region 8 Press Release: "Bridger Pipeline Release," *available at* https://www.epa.gov/region8/bridger-pipeline-release.

USACE_ESMT001272

In May of 2014, a pipeline operated by Belle Fourche Pipeline Co. spilled 25,000 gallons of crude oil in the Powder River Basin in Montana. The oil flowed more than two miles down a gulley on BLM land and was burned as part of cleanup efforts.[43]

In September of 2013, a farmer discovered oil gurgling up from his farm in North Dakota and reported the incident, which originated from a Tesoro Logistics pipeline. The spill released more than 865,000 gallons of crude oil over several days without being detected by the company.[44]

In July of 2012, more than 50,000 gallons (1200 barrels) of crude oil spilled from Enbridge's Pipeline 14 on farmland in Grand Marsh, Wisconsin.[45]

In July of 2011, another ExxonMobil pipeline that runs under the Yellowstone River in Montana spilled 63,000 gallons of crude oil into the river and floodplain. The oil flowed 85 miles downstream and impacted 11,000 acres of shoreline with little of the oil recovered in the aftermath.[46] An investigation found that it took ExxonMobil 46 minutes to completely close the key valve after discovering the rupture on the Silvertip Pipeline.[47] ExxonMobil spent $135 million on cleanup efforts and was fined an additional $1 million by the Pipeline and Hazardous Materials Safety Administration (PHMSA) for four violations.[48] Flooding conditions not only exacerbated the impacts of the spill but hindered response efforts and contributed to the pipeline failure.

When constructed in 2009, TransCanada's Keystone I Pipeline was described as a state-of-the-art pipeline that would "meet or exceed world class safety and environmental standards."[49] Nonetheless, it leaked 14 times in the U.S. and 21 times in Canada during its first

---

[43] Mead Gruver, *Company: Corrosion caused Wyoming oil pipe spill*, July 18, 2014, *available at* http://www.washingtontimes.com/news/2014/jul/18/company-corrosion-caused-wyoming-oil-pipe-spill/.

[44] Dan Frosch, *Oil Spill in North Dakota Raises Detection Concerns*, October 23, 2013, *available at* http://www.nytimes.com/2013/10/24/us/oil-spill-in-north-dakota-raises-detection-concerns.html?_r=0.

[45] Pipeline and Hazardous Safety Materials Administration, Corrective Action Order, July 30, 2016, *available at* http://www.phmsa.dot.gov/staticfiles/PHMSA/DownloadableFiles/Files/Pipeline/Corrective_Action_Order_073012. pdf and David Hasemyer, *Witness Says Enbridge's Wisconsin Pipeline 'Blew Like an Oil Well,'* August 1, 2012, *available at* https://insideclimatenews.org/news/20120801/enbridge-oil-pipeline-wisconsin-phmsa-epa-water-fine-kalamazoo-dilbit-diluted-bitumen-safety.

[46] Montana Dept. of Justice Natural Resource Damage Program, *Yellowstone River Oil Spill (July 2011)*, August, 2016, *available at* https://dojmt.gov/lands/yellowstone-river-oil-spill/.

[47] The Associated Press, *Feds: Delayed response worsened Yellowstone oil spill*, January 2, 2013, *available at* http://www.usatoday.com/story/news/nation/2013/01/02/montana-exxon-oil-spill/1804579/.

[48] Keith Goldberg, *Exxon Fights $1M Oil Pipeline Spill Penalty*, February 23, 2015, *available at* http://www.law360.com/articles/623871/exxon-fights-1m-oil-pipeline-spill-penalty.

[49] TransCanada, Keystone Pipeline Starts Deliveries to U.S. Midwest, June 30, 2010, *available at* http://www.transcanada.com/5407.html.

USACE_ESMT001273

year of operation beginning in 2010.[50] This includes a 20,000 gallon spill in North Dakota in 2011 that was discovered by a rancher who observed a 60-foot geyser of oil spewing from the pipeline.[51] PHMSA subsequently issued a Corrective Action Order (CAO) temporarily shutting the pipeline down as an imminent threat to life, safety and the environment. This made Keystone I the newest pipeline in U.S. history to receive such an order.[52]

Perhaps the two most devastating oil pipeline spills in recent years occurred in Marshall, Michigan in 2010, and Mayflower, Arkansas in 2013. On July 26, 2010, Enbridge (the same company with a substantial control of DAPL) reported that its 30-inch diameter 6B Pipeline had ruptured and released an estimated 840,000 gallons of crude oil near Marshall, Michigan.[53] The oil flowed into Talmadge Creek and then the Kalamazoo River, ultimately contaminating about 35 miles of the river before being contained. After the spill, the River flooded and stranded oil on floodplains, wetlands, backwaters, and islands.

Enbridge failed to discover or address the rupture for *over 17 hours*, during which time additional oil was pumped into the pipeline during two startups. The total release was estimated to be over 1.2 million gallons (over 28,571 barrels) of crude oil.[54] The response to this spill is far from complete, and may never be complete.[55] Enbridge recently disclosed that the cleanup costs have exceeded $1.2 billion, making Kalamazoo by far the most expensive pipeline oil spill in U.S. history.[56]

---

[50] State Department, Keystone XL FEIS, August 2011, 3.13-12-14; Mike De Souza, *Feds recorded 100 pipeline spills and accidents in the last two years*, July 5, 2011, *available at* http://www.canada.com/business/Feds+recorded+pipeline+spills+accidents+last+years/5053005/story.html#ixzz2R6 4CUaXR.

[51] Elana Schor, *Who really discovered 2011 Keystone leak?*, August 9, 2013, *available at* http://www.eenews.net/stories/1059985826.

[52] Pipeline and Hazardous Safety Materials Administration, Corrective Action Order, June 3, 2011, *available at* http://blog.nwf.org/wildlifepromise/files/2011/06/320115006H_CAO_06032011.pdf; Anthony Swift, The Keystone tar sands pipeline becomes the newest hazardous liquid pipeline to be deemed an immediate threat to public safety by regulators, June 6, 2011, *available at* http://switchboard.nrdc.org/blogs/aswift/the_keystone_tar_sands_pipelin.html.

[53] National Transportation Safety Board (NTSB), 2012, *Enbridge Incorporated Hazardous Liquid Pipeline Rupture and Release, Marshall, Michigan*, July 25, 2010, *available at* http://www.ntsb.gov/doclib/reports/2012/par1201.pdf. Pipeline Accident Report NTSB/PAR-12/01, ("NTSB REPORT") at xii; U.S. House of Representatives, Committee on Transportation and Infrastructure, Staff Report for September 15, 2010, Hearing on Enbridge Pipeline Oil Spill in Marshall, Michigan, September 14, 2010 (House Staff Memo).

[54] Environmental Protection Agency, *EPA Response to Enbridge Spill in Michigan*, *available at* https://www.epa.gov/enbridge-spill-michigan.

[55] Sandy Smith, EHS Today, *EPA: More Work Needed to Clean up Enbridge Oil Spill in Kalamazoo River*, October 5, 2012, *available at* http://ehstoday.com/environment/epa-more-work-needed-clean-enbridge-oil-spill-kalamazoo-river.

[56] Carol Linnitt, *Official Price of the Enbridge Kalamazoo Spill, A Whopping $1,039,000,000*, August 26, 2013, *available at* http://desmog.ca/2013/08/26/official-price-enbridge-kalamazoo-spill-whopping-1-039-000-000.

13

USACE_ESMT001274

On March 29, 2013, ExxonMobil's Pegasus Pipeline ruptured in a neighborhood in Mayflower, Arkansas, spilling approximately 210,000 gallons of crude oil through the streets, into nearby wetlands and streams and may have contaminated portions of Lake Conway,[57] one of the state's most prized warm water fisheries. The incident forced twenty-two families from their homes and caused numerous health problems. As detailed in a piece in the *New Republic*, hundreds of residents experienced symptoms that included headaches of preternatural intensity, nosebleeds, hemorrhoids, rashes, severe weakness, drastic weight loss, respiratory disorders, nausea, and bowel issues.[58] Many of these symptoms were also reported after the Kalamazoo disaster.

The Kalamazoo and Mayflower spills highlight the inadequacies of federal pipeline oversight and the inability of pipeline companies to protect the public. A July 2012 report by the National Transportation Safety Board (NTSB) on the Kalamazoo spill was highly critical of Enbridge, the pipeline operator, and the existing federal regulatory framework. The NTSB found that "pervasive organizational failures by a pipeline operator along with weak federal regulations led to a pipeline rupture and subsequent oil spill in 2010."[59]

Similarly, in a November 6, 2013 letter, PHMSA found nine probable violations by Exxon that showed a long-standing problem with a seam of which Exxon should have been aware.[60] PHMSA stated that information available to Exxon prior to the spill "*provided more than adequate information for the pipe to be considered susceptible to seam failure.*"[61] The letter also detailed basic safety procedures Exxon failed to follow, many of which concern oversight of the seam that failed.[62] Testing from as far back as 1991 demonstrated the existence of the defect that eventually led to the spill twenty-four years later. Thus, the problem was left unaddressed by Exxon for almost a quarter century until the line burst. As a result of these probable violations,

---

[57] *See* Jacob Kauffman, *Tar Sands in Lake Conway*, KUAR Public Radio (Apr. 23, 2013), *available at* http://ualrpublicradio.org/post/tar-sands-oil-lake-conway. There is a dispute as to whether tests in the lake were adequate, as they focused on the water itself, rather than the bottom materials. Some have reported oil contamination in the lake. Indeed, the Arkansas Attorney General stated that because a cove of Lake was deemed contaminated, the lake was contaminated because "the cove is part of Lake Conway." http://insideclimatenews.org/news/20130410/cove-where-exxon-oil-has-been-found-part-lake-conway.

[58] Nora Caplan-Bricker, This Is What Happens When a Pipeline Bursts in Your Town: *Conflicted about Keystone? Consider the horrific impact of an oil spill in Arkansas,* New Republic (Nov. 18, 2013), *available at* http://www.newrepublic.com/article/115624/exxon-oil-spill-arkansas-2013-how-pipeline-burst-mayflower.

[59] NTSB Report, *supra* note 49.

[60] U.S. Dep't of Transportation, Pipeline and Hazardous Materials Safety Administration, Notice of Probable Violation and Proposed Compliance Order from R.M. Seely, Director, Southwest Region, Pipeline and Hazardous Materials Safety Administration to Mr. Gary W. Pruessing, President, ExxonMobil Pipeline Company, LLC (Nov. 6, 2013) at 2, *available at* http://phmsa.dot.gov/staticfiles/PHMSA/DownloadableFiles/Enforcement%20Notices/420135027_NOPV%20&%20PCO_11062013.pdf.

[61] *Id.* at 2 (emphasis added).

[62] See *id.*

14

USACE_ESMT001275

Exxon incurred just a $2.6 million fine from PHMSA for the incident, just .0003 percent of the company's $7.8 billion profit in just the third quarter of 2013.[63]

The NTSB account of the Kalamazoo spill is sobering and identifies key failures in the regulation of the pipeline that spilled. The NTSB cited "[i]nsufficient public awareness and education," "weak regulation" and "ineffective oversight of pipeline integrity management programs, control center procedures, and public awareness" as factors in the Kalamazoo disaster.[64] The NTSB specifically found that the regulatory oversight for the pipeline was "inadequate."[65] It also faulted "inadequate regulatory requirements for facility response plans," the inadequacy of the "facility response plan to ensure adequate training of the first responders and sufficient emergency response resources allocated to respond," and "inadequate review and approval of Enbridge's facility response plan that failed to verify that the plan content was accurate and timely" for the spill.[66] The NTSB also concludes that it is "improbable that PHMSA would be able to perform an adequate review of facility response plans or enforce Federal requirements that pipeline operators identify and ensure that adequate response resources are available to respond to worst-case discharges."[67] Put another way, PHMSA's response resource regulations are unenforceable. The NTSB also found that, "[e]ssentially, the regulations allow the pipeline industry to dictate the requirements of an adequate spill response and to determine whether those requirements have been met."[68]

The NTSB additionally found that PHMSA has only 1.5 full-time employees managing about 450 response plans,[69] and that PHMSA does "not perform on-site audits to verify the content and adequacy of plans before approving them."[70] This weak and inadequate regulatory structure – which is not currently being addressed or revised by PHMSA – is essentially all that serves to protect the people and places that will be impacted by the Dakota Access pipeline and a potentially major release of crude oil.

### B.     PHMSA data on oil spills and leak detection capabilities.

These reoccurring oil pipeline disasters demonstrates the frequency with which they occur and the inability of pipeline operators to adequately detect and respond to spills, making it all the more important that the Corps and other permitting agencies evaluate the potential impacts of an oil spill *prior to* permitting a pipeline.

---

[63] Caplan-Bricker, supra.

[64] NTSB Report, at xii.

[65] *Id.* at xiii.

[66] *Id.* at xiii-xiv.

[67] *Id.*

[68] *Id.* at 113.

[69] *Id.*

[70] *Id.*

15

USACE_ESMT001276

Incident data collected by the PHMSA provides further insight into the frequency, severity, and cost of oil pipeline spills. Examining the last ten years of PHMSA data on significant pipeline incidents[71] for onshore pipelines carrying crude oil suggests that DAPL could have more than minimal adverse environmental effects. Furthermore, the PHMSA data on all pipeline incidents, including those that do not meet the "significant" threshold, indicates that smaller oil spills occur frequently. Their impacts must be considered alongside larger volume oil spills and their cumulative effects captured by the Corps' analysis.

PHMSA Significant Pipeline Incidents (2006-2015)
For Onshore, Crude Oil Pipelines[72]

| Year | Number | Fatalities | Injuries | Total Cost | Barrels Spilled | Net Barrels Lost |
|------|--------|-----------|----------|-----------|----------------|-----------------|
| 2006 | 42 | 0 | 0 | $14,119,240 | 83,032 | 4,606 |
| 2007 | 40 | 2 | 0 | $20,973,629 | 19,205 | 3,363 |
| 2008 | 47 | 0 | 0 | $32,822,504 | 58,732 | 36,472 |
| 2009 | 38 | 1 | 3 | $32,189,080 | 23,437 | 8,238 |
| 2010 | 46 | 0 | 0 | $1,116,763,433 | 52,313 | 6,798 |
| 2011 | 53 | 0 | 0 | $190,118,945 | 34,841 | 16,188 |
| 2012 | 60 | 3 | 4 | $45,913,301 | 14,450 | 4,293 |
| 2013 | 77 | 0 | 6 | $195,870,868 | 42,505 | 17,649 |
| 2014 | 72 | 0 | 0 | $52,965,742 | 16,666 | 1,827 |
| 2015 | 74 | 0 | 0 | $190,519,773 | 19,779 | 4,507 |

PHMSA Pipeline Incidents (2006-2015)
For Onshore, Crude Oil Pipelines[73]

| Year | Number | Barrels Spilled | Net Barrels Lost |
|------|--------|----------------|-----------------|
| 2006 | 159 | 83,851 | 4,946 |
| 2007 | 160 | 19,787 | 3,530 |
| 2008 | 153 | 59,252 | 36,645 |
| 2009 | 154 | 24,183 | 8,555 |
| 2010 | 152 | 52,710 | 6,901 |

---

[71] Significant incidents are those including any of the following conditions: 1) Fatality or injury requiring in-patient hospitalization, 2) $50,000 or more in total costs, measured in 1984 dollars, 3) Highly volatile liquid releases of 5 barrels or more or other liquid releases of 50 barrels or more, 4) Liquid releases resulting in an unintentional fire or explosion. *See* http://www.phmsa.dot.gov/pipeline/library/data-stats/pipelineincidenttrends.

[72] Data *available at* http://www.phmsa.dot.gov/pipeline/library/data-stats/pipelineincidenttrends.

[73] *Id.*

16

USACE_ESMT001277

| 2011 | 144 | 35,279 | 16,318 |
| 2012 | 186 | 15,025 | 4,373 |
| 2013 | 204 | 43,048 | 17,830 |
| 2014 | 229 | 17,521 | 1,947 |
| 2015 | 248 | 20,668 | 4,632 |

On September 26, 2016, a Reuters analysis revealed that Sunoco Logistics Partners LP, the future operator of DAPL, is responsible for over 200 pipeline spills and leaks since 2010 alone, which means it spills crude oil more frequently than any of its competitors.[74]

On September 30, 2016, Reuters published another analysis revealing the inability of pipeline technology to detect spills and leaks. According to the Reuters analysis of PHMSA data, of the 466 pipeline leaks in the past six years, only 22% were detected by an advanced detection system, while 21% were discovered by the public. Additionally, a leak detection system to be used by DAPL, the Computational Pipeline Monitoring System, has detected leaks only 19% of the time in the past six years. Thus, "sensitive technology designed to pick up possible spills is about as successful as a random member of the public."[75]

The data discussed in the article was the result of a leak detection study PHSMA prepared in 2012 for hazardous liquid and natural gas pipelines in response to a request from Congress.[76] The Corps should consider in its analysis. The study included: 1) an assessment of past incidents to determine if additional LDS (leak detection system) may have helped to reduce the consequences of the incident; 2) a review of installed and currently available LDS technologies along with their benefits, drawbacks, and their retrofit applicability to existing pipelines; 3) a study of current LDS being used by the pipeline industry; 4) a cost benefit analysis of deploying LDS on existing and new pipelines; and 5) a study of existing LDS standards to determine what gaps exist and if additional standards are required to cover LDS over a larger range of pipeline categories.

In particular, the Corps should review the eleven hazardous liquid case studies. The Corps must also consider the study's compilation of methods of initial identification of incidents, which looked at 197 right-of-way incidents that occurred on hazardous liquids pipelines between 2010 and 2012. The summary tables are below.

---

[74] *Dakota Access operator Sunoco has terrible spill record*, September 26, 2016, *available at* http://www.eenews.net/greenwire/2016/09/26/stories/1060043413.

[75] Jarrett Renshaw and Davika Krishna Kumar, *Technology designed to detect U.S. energy pipeline leaks often fails*, September 30, 2016, *available at* whttp://www.reuters.com/article/us-usa-pipelines-colonial-analysis-idUSKCN1200FQ.

[76] Kiefner & Associates, Inc., *Final Report on Leak Detection Study to U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration*, December 10, 2012, *available at* http://www.phmsa.dot.gov/staticfiles/PHMSA/DownloadableFiles/Files/Press%20Release%20Files/Leak%20Detection%20Study.pdf.

USACE_ESMT001278

Method for Initial Accident Identification-Hazardous Liquid Pipelines[77]

| Identifier | # of Incidents | % of Incident Reports |
|---|---|---|
| Air Patrol | 10 | 5% |
| Controller | 10 | 5% |
| CPM Leak Detection System or SCADA-Based Information | 23 | 12% |
| Ground Patrol by Operator or Contractor | 4 | 2% |
| Local Operating Personnel | 38 | 19% |
| Notification from Emergency Responder | 14 | 7% |
| Notification from Public | 45 | 23% |
| Notification from 3rd Party that Caused Accident | 11 | 6% |
| Static Shut-In Test or Other Pressure or Leak Test | 2 | 1% |
| Other | 8 | 4% |
| Blank – No Data | 32 | 16% |

Of the 165 hazardous liquid spills for which an initial identifier was reported, only 12% were detected by a leak detection or SCADA system while the public was the first to report in 23% of the cases.

Furthermore, an analysis of PHMSA data from 2002 to July 2012 by InsideClimate News found an even greater disparity with remote sensors detecting 5% of pipeline spills versus the public reporting 22%.[78] The limitations and drawbacks of leak detection systems pointed out by the PHMSA study must be considered in the Corps' impact analysis for DAPL because it is clear that they are less reliable than pipeline operators would like to claim.

Finally, the Corps must acknowledge and address the potential for small leaks that are below the typical detection limits of the SCADA systems—around 2% of the pipeline flow rate.[79] While 2% may appear minor at first glance, DAPL will transport up to 570,000 bpd of crude oil at high pressures. That means up to 11,400 barrels, or 478,800 gallons, of crude oil could leak from DAPL every day without being detected by the SCADA system. The EPA raised this concern in a letter objecting to the Corps' approval of the Flanagan South Pipeline under

---

[77] *Id.* at 3-39.

[78] Lisa Song, *Few Oil Pipeline Spills Detected by Much-Touted Sensors*, September 19, 2012, *available at* http://www.bloomberg.com/news/articles/2012-09-19/oil-pipeline-spills-go-undetected-by-much-touted-sensors.

[79] EPA, *Comments on the Environmental Assessment for the Proposed Issuance of Easements for the Flanagan South Pipeline Crossing of the Mississippi River*, December 23, 2013, *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/blog/EPA%20Flanagan%20South%20comments.pdf.

USACE_ESMT001279

NWP 12, and recommended the Corps require DAPL to "establish a network of sentinel or monitoring well-s along the *entire length* of the pipeline, especially in sensitive or ecologically important areas, where water supply wells and intakes are located and at stream crossings."[80]

### C.    *NEPA requires the Corps to evaluate this information*

Courts have repeatedly held that NEPA requires the Corps to analyze the risks of oil spills in issuing § 404 permits, including the risks and impacts of worst-case scenario discharges. *See Stop The Pipeline v. White*, 233 F. Supp. 2d 957, 969 (S.D. Ohio 2002) (finding that the Corps' EA for a pipeline 404 permit satisfied NEPA because the Corps consulted with the Office of Pipeline Safety and analyzed the risks of worst cases spills from an oil pipeline); *Sierra Club v. Sigler*, 695 F.2d 957, 969-75 (5th Cir. 1983) (in issuing a 404 permit for a dock expansion, the Corps failed to analyze the worst-case spill scenarios that could result from the increased oil tanker traffic allowed by the new dock); *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 867 (9th Cir. 2005) (same).

*To be clear, the impacts from pipeline oil spills are not impacts that occur outside of the Corps' jurisdictional areas. DAPL has the potential to spill into Corps' jurisdictional waterways, including Lake Oahe.* Thus, potential oil spills into US waterways is something the Corps should consider as part of determining whether DAPL's impacts are certain to be minimal, and thus qualify for authorization under NWP 12, or whether the project should be evaluated under an individual §404 permit process.

In fact, the U.S. EPA Region 8 office sent a letter to the Corps on March 8, 2016, voicing its concern over the pipeline's close proximity to drinking water supplies and the potential for oil spills or leaks to contaminate them.[81] Specifically, EPA noted that the pipeline would be located immediately upstream of the drinking water intakes for the Fort Yates, Standing Rock Reservation water system, the main Standing Rock Reservation drinking water system, water intakes for a tribal irrigation project, as well as individual drinking water wells located along the Missouri River. EPA further stated that the Mobridge, South Dakota and Williston, North Dakota drinking water intakes are located less than 20 miles downstream, and that the Missouri River is used as the drinking water supply for much of western South Dakota and five Tribal Nations (the Cheyenne River, Crow Creek, Oglala, Rosebud and Lower Brule Sioux Tribes) as well as the Mni Wiconi Rural Water System that provides drinking water to the Pine Ridge, Rosebud, and Lower Brule Reservations and the West River/Lyman Jones Water District. The EPA was concerned that there would be too little time to determine whether a leak was occurring and to notify the water treatment facilities, and urged the Corps to prepare a revised NEPA analysis that

---

[80] *Id.* (emphasis added).

[81] *Available at*
https://www.sierraclub.org/sites/www.sierraclub.org/files/blog/Dakota%20Access%20pipeline%20DEA%20cmts%20%281-8-16%29%20%281%29.pdf.

USACE_ESMT001280

discussed potential impacts to downstream water supplies and include the water systems in emergency preparedness planning.

The multiple environmental impact statements prepared for the Keystone XL Pipeline should serve as a model for the Corps oil spill analysis for DAPL.[82] As a listed cooperating agency on these documents, the Corps should already be familiar with the large scope of a proper evaluation of potential pipeline releases from crude oil pipelines. The Corps' oil spill analysis for DAPL should include, but not be limited to, an assessment of historical pipeline incidents, potential spill impacts, the reliability of leak detection systems, and threats to pipeline integrity, and the potential impacts of worst-case scenario discharges as well as smaller leaks that may go undetected for long periods of time.

## IV.    New information on the climate impacts of DAPL

The Corps' EA failed to address the climate impacts of DAPL despite the urging of several commenters. Since the publication of the EA, new information has come to light that clarifies the importance of this omission.

On August 1, 2016, the Council on Environmental Quality (CEQ) released its long-anticipated Final Guidance on Greenhouse Gases and Climate Change (Guidance), which instructs agencies to take a comprehensive, big-picture approach in analyzing the climate impacts of federal actions.[83] The guidance interprets agencies' existing obligations to consider climate change impacts of proposed agency actions under NEPA. The Guidance recognizes "climate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview," and explains that the guidance "is intended to assist agencies in disclosing and considering the reasonably foreseeable effects of proposed actions that are relevant to their decision-making processes."[84]

For example, the Guidance states that federal agencies considering resource extraction projects must consider the effects of "using the resource" in addition to the environmental consequences of the extraction itself. In other words, the Guidance reiterated what court have already recognized— federal agencies must consider the downstream climate effects of burning the additional fossil fuels made available by an agency action.

The Guidance also recommends that federal agencies look beyond individual actions. For example, rather than considering the climate impacts of individual proposals in isolation, CEQ

---

[82] *Available at* https://keystonepipeline-xl.state.gov/archive/dos_docs/feis/.

[83] Council on Environmental Quality, *Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews*, August 1, 2016, *available at*
https://www.whitehouse.gov/sites/whitehouse.gov/files/documents/nepa_final_ghg_guidance.pdf.

[84] *Id.* at 2.

20

USACE_ESMT001281

recommends a "programmatic" approach to consideration cumulative climate impacts. Similarly, CEQ reiterated that existing regulations require agencies to look beyond the narrow confines of an individual proposal, instead including both "connected" actions and "actions that may occur as a predicate for a proposed agency action.

Overall, the Guidance instructs agencies to take a broad view in order to capture the full greenhouse gas emission impact of proposed actions, which in turn will allow for informed agency decision-making as NEPA requires.

Dakota Access would transport up to 570,000 barrels per day of crude oil from the Bakken region to refineries. If not for the DAPL's low-cost transportation option, much or all of the oil would not be capable of being developed and transported to refineries or burned. Thus, the lifecycle greenhouse gas emissions of oil transported to market from DAPL must be analyzed.

Instead, the Corps has taken the narrowest possible view of its jurisdiction over DAPL to ignore the greenhouse gas emissions altogether. The Corps EA limits its focus to the three-mile span of DAPL that crosses under Lake Oahe and adjoining Corps property, but completely ignores the other connected federal approvals. It fails to evaluate the thousands of other sections of the pipeline that cross Corps jurisdictional waterways, Corps properties, and FWS-managed properties, all of which are interdependent parts of the overall pipeline and necessary for the project to be completed (*see* section V, below). It fails to discuss the causal connection between the construction of DAPL and the 570,000 barrels per day of crude oil that will be extracted, transported to market, and consumed, for which DAPL is a predicate.

Incredibly, the only sentence in the EA in which the Corps even mentions greenhouse gas emissions or climate change impacts *at all* is: "The contribution of the Project to greenhouse gas emissions during construction would be considered a minor indirect impact to climate change."[85] The EA for the Corps' issuance of Nationwide Permit 12, which the Corps used to permit the thousands of individual water crossings along the pipeline route, contains not a single mention of the issue.[86]

Furthermore, a new analysis shows that building the pipeline would be inconsistent with the United States' climate goals. According to analysis by Oil Change International (OCI), the pipeline would lock in greenhouse gas emissions in an amount equivalent to the emissions of 30 coal plants.[87] By reducing shipping costs for large amounts of oil, particularly with current oil

---

[85] Corps' Lake Oahe EA, at 67.

[86] U.S. Army Corps of Engineers, "Decision Document Nationwide Permit 12," February 13, 2012, *available at* http://www.usace.army.mil/Portals/2/docs/civilworks/nwp/2012/NWP_12_2012.pdf.

[87] Oil Change International, *The Dakota Access Pipeline will lock-in the emissions from 30 coal plants*, September 12, 2016, *available at* http://priceofoil.org/2016/09/12/the-dakota-access-pipeline-will-lock-in-the-emissions-of-30-coal-plants/.

21

prices so low, building this pipeline would significantly increase the amount of crude oil getting to market. OCI calculated that, at typical utilization rates of 95% of capacity, total lifecycle emissions from producing, transporting, processing, and burning the products derived from the oil would amount to 101.4 million metric tons of CO2 per year. That level of emissions is equivalent to the greenhouse gas emissions from 29.5 typical U.S. coal plants or the average emissions of 21.4 million U.S. passenger vehicles.[88]

On October 4, 2016, the European Union voted to ratify the the Paris Agreement on climate change, which means the accord will formally go into effect in November.[89] The Agreement establishes the goal of "holding the increase in global average temperature to well below 2°C above preindustrial levels and pursuing efforts to limit the temperature increase to 1.5°C above preindustrial levels."[90] The current U.S. long-term climate target—which may not be enough to achieve the 'well below 2 degrees' goal set in Paris—is an emissions cut of 83 percent from 2005 levels by 2050.[91]

In fact, on September 26, 2016, Nature Climate Change published a study on the anticipated gap between existing U.S. federal policies and the emission reductions required to meet our Paris commitments that made clear current policies will be insufficient to achieve our reduction goals.[92] At stake is the attainment of U.S. climate goals. Locking in new fossil fuel pipeline infrastructure like DAPL with an economic lifespan of several decades would exceed the U.S. emissions budget.

An increasing body of scientific literature indicates that to avoid the worst consequences of climate change, the vast majority of fossil fuel reserves must stay in the ground. For example, a peer-reviewed article published in the journal *Nature* concluded that if we are to keep climate change below dangerous levels – 80 percent of global coal reserves, half of all gas reserves, and a third of oil reserves must stay in the ground through 2050.[93] For unconventional oil, closer to 90% of such fossil fuels must remain in the ground.

---

[88] *Id.*

[89] Chris Mooney and Brady Dennis, *The Paris climate agreement is entering into force. Now comes the hard part.* October 4, 2016, *available at* https://www.washingtonpost.com/news/energy-environment/wp/2016/10/04/the-paris-climate-agreement-is-entering-into-force-now-comes-the-hard-part/?utm_term=.3684f53292fa.

[90] United Nations Framework Convention on Climate Change (UNFCCC). Adoption of the Paris Agreement. December 12, 2015. *available at* https://unfccc.int/resource/ docs/2015/cop21/eng/l09r01.pdf.

[91] USA. Climate Action Tracker. September 4, 2015, *available at* http://climateactiontracker.org/countries/usa.html.

[92] Jeffery B. Greenblatt and Max Wei, *Assessment of the climate commitments and additional mitigation policies of the United States*, September 26, 2016, *available at* http://www.nature.com/nclimate/journal/vaop/ncurrent/full/nclimate3125.html.

[93] Christophe McGlade & Paul Ekins, *The Geographical Distribution of Fossil Fuels Unused When Limiting Global Warming to 2°C*, Nature Vol. 517, pp. 187-190, January 7, 2015, *available at* http://www.nature.com/nature/journal/v517/n7533/full/nature14016.html.

USACE_ESMT001283

In addition, more than 120 scientists have signed an open letter in the journal *Science* calling for a halt on DAPL construction until further environmental and cultural assessments are carried out, including an assessment of the project's climate impacts.[94] The scientists agree that the current impact assessments for DAPL failed to take into account Standing Rock's environmental and cultural concerns, and in light of the Paris Agreement, the scientists have called for the "federal government to give explicit consideration to how this and any such proposed national energy strategies trade off with public health, environmental justice and biodiversity conservation." The letter states: "We as scientists are concerned about the potential local and regional impacts from the DAPL, which is symptomatic of the United States' continued dependence on fossil fuels in the face of predicted broad scale social and ecological impacts from global climate change."

Given the new CEQ climate guidance and the report on DAPL's climate impacts, the Corps must prepare an EIS that analyzes the climate impacts associated with the extraction, processing, transportation, refining, and end-use combustion of the crude oil that will be transported by Dakota Access. The Obama Administration rejected the Keystone XL pipeline after finding it would not serve the national interest because of its contribution to climate pollution. A similar test must be used in deciding whether to approve Dakota Access.

## V.    The Corps and FWS should revoke and/or suspend already-issued permits in federal jurisdictional areas pending the preparation of an EIS and/or an individual §404 permit

As set forth above, new information regarding the impacts of DAPL, as well as glaring omissions in the Corps' EA for the Lake Oahe crossing, require Corps to prepare an EIS and/or an individual §404 permit. Furthermore, NEPA and its implementing regulations require the agencies to suspend all permits or approvals in federal jurisdictional areas along DAPL while that EIS is being prepared. Otherwise, all of the 1,168-miles of the pipeline will be constructed, except the final piece at Lake Oahe, before the Corps prepares its EIS, which will unduly prejudice the outcome and limit the choice among alternatives.

NEPA has numerous interrelated regulations that prohibit this segmented approach to project approval. First, NEPA requires federal agencies to analyze a project and all of its connected federal actions together in a single EA or EIS before the project is allowed to proceed. Connected actions are defined as actions that: "(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or (iii) Are interdependent parts of a larger action and depend on the larger action for their justification."[95]

---

[94] Stephanie Januchowski-Hartley, Anne Hilborn, Katherine Crocker and Asia Murphy, *Scientists support need for revised environmental and cultural impact assessments for the Dakota Access Pipeline Project*, October, 2016, *available at* https://www.dropbox.com/s/avwe4fspbpdqynt/DAPL_Scientist_SignOn_Letter.pdf
[95] 40 C.F.R. § 1508.25 (a)(1).

23

USACE_ESMT001284

"The justification for the rule against segmentation is obvious: it 'prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'"[96] The long-standing rule "was developed to insure that interrelated projects the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions."[97] Thus, agencies may analyze an individual component of an overall project in separate NEPA analysis only if it would have "independent utility."[98]

The agencies violated this long-standing rule in approving DAPL. There were several aspects of federal approval of DAPL that were improperly segmented and analyzed separately, including, but not limited to: (1) the Corps' St. Louis District Office granted a permit application under Section 14 of the Rivers and Harbors Act, 33 U.S.C. § 408 (commonly known as Section 408) for construction and burial of two segments of the pipeline beneath the Illinois River, Coon Run Levee, and McGee Creek Levee, and one segment beneath the Carlyle Lake flowage easement; (2) the Corps' Omaha Office is evaluating a separate §408 permit and related easement for the pipeline to cross lands that have federal flowage easements under management by the Corps at Lake Sakakawea and Lake Oahe in North Dakota; (3) the Corps' Omaha, Rock Island, and St. Louis districts each issued verifications under NWP 12 for the pipeline to cross hundreds of waterways along the 1,168-mile pipeline; (4) as part of the NWP 12 verification, the Corps consulted with the U.S. Fish and Wildlife Service ("FWS") pursuant to Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a); (5) the FWS issued a special use permit ("SUP") for the pipeline to be constructed and operate in grassland and wetland easements managed by FWS in North Dakota and South Dakota pursuant to the National Wildlife Refuge System Administration Act of 1966, as amended (16 U.S.C. § 668dd-668ee). None of these federal actions would have independent utility, and thus are connected actions that must be analyzed in a single EIS.

Similarly, if more than one federal agency is "involved in the same action" or are "involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity," the agencies must select a lead agency that "*shall* supervise the preparation of an environmental impact statement."[99] "[T]he potential lead

---

[96] *Delaware Riverkeeper Network v. F.E.R.C.*, 753 F.3d 1304, 1314 (D.C. Cir. 2014) (quoting *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988)).

[97] *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298-99 (D.C. Cir. 1987).

[98] *Delaware Riverkeeper Network*, 753 F.3d at 1308 (applying the independent utility test to a FERC EA for a 40-mile gas pipeline, and finding it was actually one of four "physically, functionally, and financially connected and interdependent" components of one project); *Hammond*, 370 F. Supp. 2d at 244 (applying the independent utility test and holding that an entire 480-mile oil pipeline must be analyzed in a single NEPA document); *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) (applying the independent utility test to a highway project).

[99] 40 C.F.R. § 1501.5(a)(emphasis added).

USACE_ESMT001285

agencies *shall* determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies."[100]

The Fixing America's Surface Transportation ("FAST") ACT of 2015 reinforces this requirement by requiring a higher degree of coordination in agency pipeline reviews. [101] Specifically, FAST requires the identification of a lead / facilitating agency to coordinate the NEPA review of pipeline projects. The lead agency must "identify all Federal and non-Federal agencies and governmental entities likely to have … environmental review, authorization, or other responsibilities with respect to the proposed project and invite them to become participating/cooperating agencies in the environmental review/authorization management process; post links to the applications and supporting documents, and a description of any Federal agency action taken or decision made that materially affects the status of a covered project; and consult with any coordinating/participating agencies to establish a concise plan for coordinating public and agency participation in, and completion of, any required Federal environmental review/authorization for the project.[102]

In this case, there were multiple federal agencies involved in permitting or approving the same interrelated project, yet the agencies failed to choose an agency to coordinate a transparent environmental review process, as NEPA and FAST require. Therefore, the Corps must coordinate with the other permitting agencies and select a lead agency to prepare an EIS.

Finally, NEPA prohibits agencies from approving parts of an interrelated project before it has an opportunity to complete its NEPA review, as piecemeal approval and construction would limit the choice among project alternatives and presuppose the approval of the project.

The purpose of NEPA is to "insure that … environmental amenities and values may be given appropriate consideration in decisionmaking …."[103] "NEPA requires an agency to evaluate the environmental effects of its action at the point of commitment…., [so] the appropriate time for preparing an EIS is *prior* to a decision, when the decisionmaker retains a maximum range of options."[104] Therefore, NEPA requires agencies to comply with NEPA when the "critical agency decision" is made which results in "irreversible and irretrievable commitments of resources" to an action which will affect the environment.[105]

---

[100] *Id.* § 1501.5(b)(emphasis added).

[101] *Available at* http://transportation.house.gov/uploadedfiles/fastact_xml.pdf.

[102] *Id.*

[103] 42 U.S.C. § 4332(2)(B).

[104] *Sierra Club v. Peterson,* 717 F.2d at 1414; 40 C.F.R. § 1501.2 ("Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values…").

[105] *Id. (citing Mobil Oil Corp. v. F.T.C.,* 562 F.2d 170, 173 (2d Cir.1977); *see also Fund for Animals v. Norton,* 281 F. Supp. 2d 209, 229 (D.D.C. 2003); *Scientists' Inst. for Public Information, Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1094 (D.C.Cir. 1973) (in determining *when* to prepare an EIS the agency must ascertain to what extent its decision embodies an "irretrievable commitment" of resources which precludes the exercise of future options);

25

USACE_ESMT001286

To that end, NEPA regulations prohibit any action on a proposal, until an agency issues a record of decision, that would either "[h]ave an adverse environmental impact" or "[l]imit the choice of reasonable alternatives."[106] If an agency becomes aware that a non-federal project applicant is about to take such action before the agency concludes its NEPA process, "the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved."[107]

In *Maryland Conservation Council, Inc. v. Gilchrist,* 808 F.2d 1039 (4th Cir. 1986), the court held that where a private highway project required federal approval to cross a park, no part of the highway could begin construction until the agency completed its NEPA analysis. The court explained that if the agencies allowed construction of a private highway all the way up to the border of the park prior to completion of the NEPA process, "the completed segments would stand like gun barrels pointing into the heartland of the park.... It is precisely this sort of influence on federal decision-making that NEPA is designed to prevent. Non-federal actors may not be permitted to evade NEPA by completing a project without an EIS and then presenting the responsible federal agency with a *fait accompli.*"[108]

Therefore, the Corps, FWS, and other federal agencies should suspend or revoke all permits or approvals of DAPL in federal jurisdictional areas, and notify DAPL that it cannot proceed with construction in those areas until the agencies can select a lead agency and prepare an EIS that encompasses all federal aspects of the connected project.

## VI.   New information on environmental justice issues

The Corps should prepare an EIS that evaluates environmental justice concerns, including whether the pipeline would disproportionately impact Native American communities along the pipeline route.

Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, requires all federal agencies to identify and address disproportionately high and adverse human health or environmental of their programs and policies on minority and low-income populations and communities.[109] The CEQ guidance suggests that an environmental justice population may be identified if "the minority population

---

*Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988) (an EIS must be prepared before any irreversible and irretrievable commitment of resources).

[106] 40 C.F.R. § 1506.1(a).

[107] *Id.* § 1506.1(b).

[108] *Id.* at 1042 (internal quotation marks and citation omitted).

[109] Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,* February 16, 1994, *available at* https://www.whitehouse.gov/administration/eop/ceq/initiatives/nepa/ghg-guidance.

USACE_ESMT001287

percentage of the affected area exceeds 50%, or if the minority population percentage of the affected area is meaningfully greater than the minority population in the general population or other appropriate unit of geographic analysis" (CEQ, 1997). The Corps' EA, prepared by DAPL, acknowledges the importance of environmental justice concerns but dismisses them by summarily concluding: "no disproportional impacts on minority or low-income populations would occur as a result of the Proposed Action."[110]

However, on August 18, 2016, the Bismarck Tribune revealed that DAPL had routed the pipeline through Standing Rock's ancestral lands and under its drinking water supply to avoid jeopardizing the drinking water supply of Bismarck, ND.[111] The articles reports that "early in the planning process, Dakota Access considered but eliminated an alternative that would have crossed the Missouri River about 10 miles north of Bismarck instead of the route currently under construction"; but rejected that option, in part, due to the costs associated with the "proximity to wellhead source water protection areas that are avoided to protect municipal water supply wells." It appears that the Bismarck route alternative would have crossed through what PHMSA considers to be a "high consequence area"; whereas the current route threatening the Standing Rock water supply is not considered to be a "high consequence area." The Corps' EA appears to corroborate this.[112]

The EA fails to explain how and why DAPL would be re-routed around the drinking water supplies of Bismarck communities, yet pass directly underneath Standing Rock's water supply and in close proximity to its drinking water intake; fails to discuss why Standing Rock's water supply is not deserving of the same "high consequence area" designation that Bismarck enjoys; and fails to discuss whether these distinctions comport with environmental justice guidelines.

Furthermore, on September 23, 2016, the United Nations special envoy for the rights of indigenous people, Victoria Tauli-Corpuz, called on the U.S. government to halt construction due to threats to the drinking water supplies and sacred sites of Standing Rock and other indigenous nations. [113] "I urge the U.S. government to undertake a thorough review of its compliance with international standards regarding the obligation to consult with indigenous peoples and obtain their free and informed consent," Tauli-Corpuz said.[114]

---

[110] Lake Oahe EA, at page 61.

[111] Amy Dalrymple, *Pipeline route plan first called for crossing north of Bismarck*, August 18, 2016, *available at* http://bismarcktribune.com/news/state-and-regional/pipeline-route-plan-first-called-for-crossing-north-of-bismarck/article_64d053e4-8a1a-5198-a1dd-498d386c933e.html.

[112] Lake Oahe EA, at page 6.

[113] Daniel J. Graeber, *U.N. steps into Dakota oil pipeline fight*, September 23, 2016, *available at* http://www.upi.com/UN-steps-into-Dakota-oil-pipeline-fight/2181474632946/.

[114] *Id.*

27

USACE_ESMT001288

## VII.   An EIS is the appropriate level of review for DAPL

Finally, NEPA regulations require the Corps to prepare an EIS for DAPL. In determining whether to prepare an EIS as opposed to an EA, the Corps must consider a range of factors to determine whether the impacts would be "significant" enough to warrant a full EIS rather than a limited EA.[115] Many of those factors are met here.

For example, the "degree to which the proposed action affects public health or safety" and the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks" are two factors that the Corps must consider.[116] As discussed above, oil pipelines such as DAPL routinely spill and leak, resulting in a long list of health problems in nearby residents and contaminating drinking water supplies.

The Corps must also consider "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial."[117] The DAPL and its potential impacts are clearly controversial, as demonstrated by the many thousands of people encamped near the Lake Oahe crossing at the "Sacred Stone Camp," including members of Standing Rock and over two hundred other tribal nations from around the country. There have also multiple lawsuits filed over the lack of environmental review and tribal consultation and the company's use of eminent domain, and the controversy has attracted worldwide media attention and public statements from President Obama.

Other "significance" factors are whether there are "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas"; and "[t]he degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources."[118]Among the most controversial aspects of DAPL is that it would cross through treaty lands of the Standing Rock Sioux Tribe and other nations and risk destroying sacred and culturally-significant sites. In fact, as described above, DAPL appears to have already destroyed some sacred and human burial sites near Lake Oahe that may have been eligible for listing on the National Register of Historic Places. Furthermore, the pipeline would cross through thousands of wetlands and waterways, major rivers such as the Missouri and Mississippi, and hundreds of miles of federally protected grasslands in North Dakota and South Dakota.

---

[115] 40 C.F.R. § 1508.27.

[116] *Id.* § 1508.27(b)(2), (5).

[117] *Id.* § 1508.27(b)(4)

[118] *Id.* § 1508.27(b)(3), (8).

USACE_ESMT001289

The Corps must also consider "[t]he degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration." The agencies' announcement of September 9 acknowledges that Standing Rock and others have raised important issues "regarding the Dakota Access pipeline specifically, and pipeline-related decision-making generally...," and that "this case has highlighted the need for a serious discussion on whether there should be nationwide reform with respect to considering tribes' views on these types of infrastructure projects." [119] Many of the problems with both the insufficient tribal consultation and lack of environmental review stem from the agencies' segmented approval of the overall project and the use of NWP 12 to avoid a comprehensive review under the CWA, NEPA, and NHPA. Preparing an EIS for the Lake Oahe site could discourage segmented approval of overall projects in the future and promote comprehensive NEPA reviews of pipeline going forward. ***By moving forward with construction on the majority of the pipeline prior to receiving all of its federal permits (e.g., the federal easement at lake Oahe), DAPL has assumed the risk that the pipeline might not be approved and completed as planned.***

Another "significance" factor is: "Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." [120] Here, the Corps has clearly broken the project down into small component parts to avoid considering the cumulative impacts of the overall project, or even the various aspects of federal approval. An EIS would allow the Corps to consider the cumulative environmental impacts of the federal and non-federal parts of the project, as NEPA requires.

Thus, for the reasons explained above, nearly all of the NEPA "significance" factors point to the preparation of an EIS for DAPL.

Furthermore, agencies "may also prepare supplements [to previous NEPA analyses] when the agency determines that the purposes of the Act will be furthered by doing so. [121] In addition to the new information presented above that warrants an EIS, NEPA's public participation goals would be furthered by the preparation of an SEIS for Lake Oahe crossing and/or for NWP 12, under which the verifications were issued. Upon undertaking this SEIS the Corps should stay its verifications of DAPL.

---

[119] Press Release: "Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior Regarding Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers," September 9, 2016, *available at* https://www.justice.gov/opa/pr/joint-statement-department-justice-department-army-and-department-interior-regarding-standing.

[120] 40 C.F.R. § 1508.27(b)(7).

[121] *Id.* § 1502.9 (1978).

29

USACE_ESMT001290

Public participation in the agency decision-making process is paramount to the NEPA process. One of the statute's goals is "insure that environmental information is available to public officials and citizens before decisions are made and actions are taken"; and to "help public officials make decisions that are based on [an] understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."[122] Thus, an EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."[123]

To that end, NEPA's implementing regulations require a give and take between an agency and members of the public. See 40 C.F.R. §§ 1500.1(b) (2010) ("public scrutiny [is] essential"), § 1500.2(d) (2010) (the agency must "encourage and facilitate public involvement"), § 1506.6 (2010) (the agency must "[m]ake diligent efforts to involve the public" in preparing environmental documents, give "public notice of ... the availability of environmental documents so as to inform those persons ... who may be interested or affected," and "solicit appropriate information from the public."). Federal agencies are required to to give the public as much information as is practicable, so that the public has a sufficient basis to address those areas that the agency must consider in preparing an EA or EIS.[124]

Similarly, public participation plays an important role in CWA permitting decisions. The CWA provides in its general policy section that "public participation in the development . . . of any . . . program established by the Administrator. . . under this chapter shall be provided for, encouraged, and assisted by the Administrator . . ."[125] Section 404 states: "The Secretary may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites."[126] The applicable Corps regulations state: "[A]ny person may request, in writing, ... that a public hearing be held .... Requests for a public hearing under this paragraph shall be granted, unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing."[127]

In this case, the only opportunity for the public to become involved in the Corps' approval of DAPL was to comment on the EA that covered a three-mile stretch of the 1,168-mile pipeline.[128] The Corps' preparation of an EIS for the Corps approval of DAPL at Lake Oahe,

---

[122] *Id.* § 1500.1(b)-(c).

[123] *Id.* § 1502.1.

[124] *Id.* § 1501.4 (2010).

[125] 33 U.S.C. § 1251(e).

[126] *Id.* § 1344(a).

[127] *Id.* § 327.4(b).

[128] The comment period on NWP 12 was more than five years ago, and no one impacted by DAPL could foresee at that time it would be applied to a project like DAPL. Major interstate oil pipelines requiring federal approval had consistently undergone full individual §404 permits and associated NEPA review.

30

USACE_ESMT001291

and/or the requirement of an individual §404 permit for DAPL with an attendant EIS, would further the purposes of NEPA and the CWA and would help address the lack of public participation that has occurred to date that is a main underlying cause of the massive and growing public opposition to this project.

## CONCLUSION

The Corps' streamlined approval of DAPL and other massive interstate oil pipelines under NWP 12, rather than the transparent individual §404 and NEPA process that these projects deserve, has attracted increasing and widespread and opposition. Chief among the concerns is that the Corps' segmented approach to approval under NWP 12 severely limits public participation, tribal consultation, and environmental review.

We thank the agencies for acknowledging the need for a serious discussion on pipeline-related decision-making, and hope that some of these concerns can be addressed in the ongoing NWP 12 reissuance process. In the meantime, we urge the Corps to prepare an EIS that evaluates all of the new and previously unconsidered information regarding the impacts of DAPL and to halt construction in federal jurisdictional areas until that EIS can be completed.

Respectfully submitted,

**_/s/ Douglas Hayes_**
Douglas Hayes
Staff Attorney
Sierra Club
1650 38th Street, Suite 102W
Boulder, CO 80301
T- (303) 449-5595 ext. 100
doug.hayes@sierraclub.org

Winona LaDuke
Executive Director
Honor the Earth

Dallas Goldtooth
Campaign Organizer
Indigenous Environmental Network

USACE_ESMT001292



3708695



# Oglala Sioux Tribe

### Office of the President

PO Box 2070
Pine Ridge, SD 57770
Phone: 605.867.5821
Fax 605.867.6076

1868

1851



September 25, 2016

The Honorable Barack Obama
President of the United States
The White House
1600 Pennsylvania Avenue, N.W.
Washington, DC 20050

The Honorable Loretta Lynch
Attorney General
U.S. Dept. of Justice
950 Pennsylvania Avenue, NW.
Washington, DC 20530

The Honorable Sally Jewell
Secretary of the Interior
Department of the Interior
1849 C Street, N.W.
Washington DC 20240

The Honorable Eric Fanning
Secretary of the Army
101 Army Pentagon
Washington, DC 20301-1000

**Re:**   **Administration's Decision to Halt Construction Activities of Dakota Access Pipeline and Issues Requiring Reconsideration of Army's Previous Decision Regarding Lake Oahe under NEPA and other laws**

Dear President Obama, Secretaries Jewell and Fanning, and Attorney General Lynch:

On behalf of the Oglala Sioux Tribe ("Tribe"), I sincerely thank you for your important decision on September 9, 2016 to halt construction activities of the Dakota Access Pipeline (DAPL) on land bordering or under Lake Oahe. Front and center among the Oglala Sioux Tribe's treaty rights with regard to the DAPL project is the Tribe's ownership rights to the water in the Missouri River. Together with our sister Sioux Tribes, we own the water in the Missouri River pursuant to our treaties and the *Winters* doctrine articulated in *Winters v. United States*, 207 U.S. 564 (1908). The essence of our 1868 Sioux Nation Treaty is the preservation of our "permanent" home as a livable homeland for our people, and we need clean drinking water.

We are truly grateful for your resolve and for the commitment your decision brings to the important issues at stake for Tribal Nations and others in the DAPL project. We also appreciate your request that Dakota Access, LLC voluntarily pause all construction activity within 20 miles east or west of Lake Oahe. We, and our sister Tribes, seek to protect our water, our history, our culture, our environment and our way of life. We ask you to keep this in mind as we move forward in this new administrative process concerning the DAPL that your September 9th decision has initiated.

Your September 9th statement says that the Army will not authorize constructing the DAPL on lands bordering or under Lake Oahe "until it can determine whether it will need to reconsider any of its previous decisions regarding the Lake Oahe site under the National

1

USACE_ESMT001353

Environmental Policy Act (NEPA) or other federal laws."[1]  It is clear that the Army must reconsider its previous decisions regarding Lake Oahe under the NEPA and other laws. The Army simply failed to analyze several impacts of the DAPL that it needs to analyze, including impacts on treaty rights, impacts on the Mni Wiconi Project, and impacts on certain wildlife. Reconsideration is necessary as the Environmental Assessment (EA) for the DAPL for Williams, Morton, and Emmons Counties, North Dakota is wholly inadequate; the use of and implementation of Nationwide Permit 12 (NWP-12) is defective for the DAPL; there was no meaningful consultation pursuant to Section 106 of the National Historic Preservation Act (NHPA); and the Army Corps of Engineers must comply with the right-of-way/permitting process requirements of the Mineral Leasing Act (MLA).  Three other agencies—the Department of Interior (DOI), the Environmental Protection Agency (EPA), and the Advisory Council on Historic Preservation (ACHP)—recognized the insufficiency of the Army Corps' previous determinations.  The United States has thus far failed to uphold its treaty obligations and trust responsibility to our Tribe in its handling of the DAPL project.

Your September 9th decision to halt construction activities on land near and under Lake Oahe and re-evaluate is an important step towards ensuring our treaties and your federal trust responsibility are adhered to going forward.  We also believe that upholding our treaty rights and fulfilling federal trust responsibilities is consistent with "develop[ing] a path forward that serves the broadest public interest."[2]  Thus, we appreciate the opportunity to submit comments herein for the administrative record.  These comments set forth issues that must be considered by the Corps, and the United States as a whole, in this new administrative process for reviewing the proposed DAPL.  We reserve the right to submit additional comments as discussions continue and the Army considers issues related to the DAPL.

## I.     The EA Is Inadequate: It Failed to Consider Major Issues, and Issuing a Finding of No Significant Impact (FONSI) Is Inappropriate

We adamantly object to the issuance of the EA and the FONSI for the DAPL.  An EA is wholly insufficient for a project of this magnitude.  The DAPL is an approximately 1100-mile crude oil pipeline project that would run from Stanley, North Dakota to Patoka, Illinois, traversing 50 counties in four states with a route that would cross the Great Sioux Nation's sacred Missouri River and ancestral lands.  We understand that the analysis in the EA is limited to the effects of allowing the DAPL to cross the Missouri River (and the flowage easements near the upper end of Lake Sakakawea).  The DAPL proposes to transport 570,000 barrels of crude oil per day.  Thus, each day 570,000 barrels of crude oil would travel under the Missouri River if the Corps grants the DAPL permission to cross the River.  Each day, those in the region, who depend on the Missouri River for drinking water, like our Tribe and our sister Tribes, would be presented with the risk of these 570,000 barrels of oil leaking into the environment and the water supply.

---

[1] Joint Statement from the Department of Justice, the Department of the Army and the Department of the Interior Regarding *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers* (Sept. 9, 2016) [hereinafter Joint Statement].
[2] *Id.*

USACE_ESMT001354

An EA for the DAPL is simply inadequate. NEPA was enacted to "prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. NEPA requires Federal agencies to prepare Environmental Impact Statements (EISs) for major Federal actions that are expected to result in significant environmental impacts. The DAPL is a massive oil transport project that presents grave risks to the environment and the public. At the very least, an EIS must be completed for the DAPL. Projects of a much smaller scale, without the high-stakes risks of transporting crude oil under a major national river and drinking water supply, are routinely the subject of EISs as opposed to EAs. For example, the Department of the Interior's current policy is to require EISs for land-into-trust applications for gaming submitted by tribes to the Department. Certainly, such tribal projects, which entail constructing a simple building, pose de minimus risk to the environment when compared to a 570,000 barrels per day crude oil pipeline crossing one of the United States' greatest rivers.

The DAPL must be subject to an EIS. The Department of the Interior called for an EIS for the DAPL to ensure a full evaluation of the potential impacts of the proposed DAPL on the Standing Rock Sioux Reservation.[3] The Corps, however, refused to heed its sister agency's request, which was reasonable and rational given the magnitude of the DAPL and its real potential consequences to the environment. Oil pipelines and projects leak. There is ample evidence to support this truth. We need not look further than the Kalamazoo River, the Gulf of Mexico, the San Juan River, or Alabama's Continental Gasoline Pipeline.

In addition to the EA being insufficient because an EIS is actually what must be conducted for the DAPL, the EA that was issued is inadequate as it failed to consider fundamental issues and potential impacts. Furthermore, the EA is too narrow.

### a. The EA Failed to Assess the DAPL's Impacts on the Tribe's Treaty Water Rights

The Tribe has rights under the Fort Laramie Treaty of 1851, 11 Stat. 749; the 1868 Sioux Nation Treaty, 15 Stat. 635; and the Act of March 2, 1889, 25 Stat. 888, which created the Pine Ridge Indian Reservation. The Corps entirely failed to assess the impacts of the DAPL on these rights in the EA.

Front and center among the Tribe's treaty rights with regard to the DAPL project is the Tribe's rights to the water in the Missouri River. Together with our sister Sioux Tribes, we own the water in the Missouri River pursuant to our treaties and the *Winters* doctrine articulated in *Winters v. United States*, 207 U.S. 564 (1908). In *Winters*, the United States Supreme Court established that the creation of an Indian reservation impliedly reserved water rights to the tribe or tribes occupying the territory; that those water rights are reserved to carry out the purposes for which the lands were set aside; and that the rights are paramount to water rights later perfected under state law. *Id.* at 564, 576–77.

---

[3] Letter from Lawrence S. Roberts, Acting Assistant Secretary – Indian Affairs, Department of Interior to Brent Cossette, U.S. Army Corps of Engineers, Omaha District 1 (Mar. 29, 2016) [hereinafter "DOI Letter"].

USACE_ESMT001355

Reserved water rights are property rights held by tribes and their citizens. Thus, the Tribe has a legally recognized property right in the waters of the Missouri River even though we have not quantified those rights. Our water rights are treaty rights and trust resources. As such, they are to be protected by the United States acting as our trustee. A crude oil spill from the DAPL into Lake Oahe would damage the ecology of the river basin and impair our treaty-protected property rights in the water. Yet, the EA failed to consider the impacts of the DAPL on our reserved water rights in Missouri River water.

The Corps failed to consider the risks that came to light in other recent pipeline spills and explain why the proposed alternative does not suffer the same risks. There are many recent examples of such spills, such as the spill that contaminated the Yellowstone River, the spill that devastated the Kalamazoo River, or the recent spill in Alabama that has caused widespread contamination and is causing gasoline supply disruptions up and down the East Coast. Tellingly, the only time the Corps cited past spills as evidence of present risk comes in the section of the FONSI where the Corps cites evidence of past spills from transporting oil by truck or rail in dismissing that alternative.[4]

The Corps fails to explain why its estimates of a spill are so conservative. In estimating the potential for benzene contamination from a spill, the Corps used a hypothetical 1 hour release.[5] That results in a theoretical spill of between 4 and 10,000 barrels of oil spilled. Yet the Corps fails to explain why its worst case scenario is capped at 10,000 barrels spilled. When fully operational, the pipeline would transport "at least" 570,000 barrels per day. In the event a leak is not detected within an hour, as was the case in many recent spills, the potential for contamination is significantly higher than 10,000 barrels of oil spilled.

In addition, it is not clear why the Corps compared the risk of benzene contamination at the Oahe river crossing against the Acute Toxicity Threshold for aquatic organisms of 7.4 ppm. The Corps estimated that even under its own worst case scenario, benzene levels at the Lake Oahe crossing would reach 1.7 ppm for benzene. Although that level is lower than the Acute Toxicity Level for Aquatic Organisms, it is still far higher than the EPA's maximum contaminant level (MCL) for benzene of 0.005 mg/L. As discussed above, the Tribe has reserved water rights in Lake Oahe and uses that water to provide drinking water for the Tribe and non-Indian users. Although the Corps' optimistic spill projections may not result in a level of benzene that would be acutely toxic to aquatic organisms, even those estimates result in water that is unsafe to drink. The Corps needs to reassess this aspect of the EA.

The Corps also failed to adequately explain why the risks posed to several wellhead source water protection areas in the North Bismarck route alternative caused the Corps to abandon that proposed route but not abandon the Lake Oahe crossing route that would pose risk to the reserved water rights of federally recognized tribes.[6] The Corps notes that the

---

[4] U.S. Army Corps of Engineers, Mitigated Finding of No Significant Impact: Environmental Assessment Dakota Access Pipeline Project Willi~~ams, Morton, and Emmons~~ Counties, North Dakota 7 (Jul. 25, 2016) [hereinafter "FONSI"].

[5] U.S. Army Corps of Engineers, Environmental Assessment: Dakota Access Pipeline Project Crossings of Flowage Easements and Federal Lands at 46 (Jul. 2016) [hereinafter "Environmental Assessment"].

[6] *Id.* at 8.

USACE_ESMT001356

North Bismarck route would have crossed several Pipeline and Hazardous Materials Safety Administration (PHMSA) high consequence areas (HCAs) but that there were no such HCAs on the preferred route. That is incorrect. The Department of Transportation identifies HCAs for hazardous liquid pipelines based on *populated areas, drinking water sources,* and *unusually sensitive ecological resources.* According to the Corps:

- *Populated areas* include both high population areas (called "urbanized areas" by the U.S. Census Bureau) and other populated areas (areas referred to by the Census Bureau as a "designated place").

- *Drinking water sources* include those supplied by surface water or wells where a secondary source of water supply is not available. The land area in which spilled hazardous liquid could affect the water supply is also treated as an HCA.

- *Unusually sensitive ecological areas* include locations where critically imperiled species can be found, areas where multiple examples of federally listed threatened and endangered species are found, and areas where migratory waterbirds concentrate.

In Table 2-1 of the EA, the Corps states that there are no drinking water HCAs on the preferred route crossing at Lake Oahe.[7] But Lake Oahe is the drinking water source for several federally recognized tribes, as well as the federally established Mni Wiconi Project that serves the Oglala Sioux Tribe, the Rosebud Sioux Tribe, and the Lower Brule Sioux Tribe and non-Indian West River/Lyman Jones Water District in South Dakota and should qualify as an HCA. On page 94 of the EA, the Corps notes that a worst case consequence scenario as a result of a spill would be ranked high "because several drinking water intake High Consequence Areas (HCAs) and multiple ecologically sensitive HCAs could be impacted."[8] But the Corps does not there state what those consequences might be. The EA is thus internally inconsistent and does not demonstrate that the Corps has taken the requisite hard look at the issue.

The DOI, in its March 29, 2016 letter to the Corps, specifically raised the issue of tribal reserved water rights and stated that "the potential impact on trust resources in this particular situation necessitates full analysis and disclosure of potential impacts through the preparation of the EIS."[9] The Corps, however, has not yet conducted an EIS, and it has not assessed the impact of the DAPL on our reserved water rights and the water rights of our sister Sioux Tribes in the Missouri River. Instead, it concluded that all comments have been addressed.[10]

### b. The EA failed to Assess the DAPL's Impacts on the Mni Wiconi Project

The EA similarly failed to assess the DAPL's impacts on the Mni Wiconi Project. The Mni Wiconi Project is a monumental engineering project that delivers Missouri River water to the Pine Ridge, Rosebud, and Lower Brule Reservations as well as the non-Indian West

---

[7] *Id.* at 10.
[8] *Id.* at 94.
[9] DOI Letter, *supra* note 5, at 1.
[10] FONSI, *supra* note 4, at 5.

USACE_ESMT001357

River/Lyman Jones Water District. The Project is authorized by the Mni Wiconi Project Act of 1988, which specifically states that "the United States has a trust responsibility to ensure that adequate and safe water supplies are available to meet the economic, environmental, water supply, and public health needs of the Pine Ridge Indian Reservation, the Lower Brule Sioux Reservation and the Rosebud Sioux Reservation."[11] The Mni Wiconi Project helps to carry out the United States' trust responsibility in this regard and assists us in protecting and using our treaty-protected water rights.

To adhere to this trust responsibility, the United States must act with the highest level of care, skill, and diligence with respect to projects that may impact the Mni Wiconi Project. It must protect not only the water supply and water quality for the aforementioned Indian reservations, it must also protect the Mni Wiconi Project, itself, as it is a trust resource of our Tribe. Per the Act, the title to Oglala Sioux Rural Water Supply System (OSRWSS) shall be held in trust by the United States for our Tribe, and it shall not be encumbered without a subsequent act of Congress.[12] The OSRWSS consists of several components, as outlined in the Act, including but not limited to the pumping and treatment facilities located along the Missouri River, pipelines extending from the Missouri River to our Reservation, and necessary property and property rights.[13] Similarly, the Rosebud Sioux Rural Water System and the Lower Brule Sioux Rural Water System, components of the Mni Wiconi Project, are held in trust by the United States for these tribes, respectively.[14]

The Mni Wiconi Project is the product of immense cooperation and effort among our Tribe, our sister Tribes, the United States, and our non-Indian partners. The Project has a service area of about 12,500 square miles and provides a reliable source of potable water to a population of approximately 52,000 people, many of whom live on some of the poorest Indian reservations in the United States. The Bureau of Reclamation of the DOI is the funding agency for the Project, but the Department of Agriculture has also funded related projects. Furthermore, the Department of Agriculture, the Environmental Protection Agency, the Indian Health Service, the Department of Housing and Urban Development, and the Bureau of Indian Affairs have all recently come together with the Bureau of Reclamation to work on completing remaining components of the Project. The federal government has invested more than $450 million in the Project to date and will continue to annually fund operations and maintenance costs. The Mni Wiconi Project is a substantial federal and tribal infrastructure investment that must be protected.

The DAPL seeks to cross Lake Oahe of the Missouri River. The Missouri River is the very source of our drinking water supply for our Mni Wiconi Project. The EA for the DAPL, however, fails to analyze let alone discuss potential impacts on the Mni Wiconi Project. The EPA specifically mentioned threats from the DAPL to the Mni Wiconi Project in its March 11, 2016 letter to the Corps.[15] It also stated that the revised draft EA should disclose potential

---

[11] Pub. L. No. 100-516, *as amended*, § 2(a)(5).
[12] *Id.* § 3(e).
[13] *Id.* § 3(a).
[14] *Id.* §§ 3A(3), 3B(e)
[15] Letter from Philip S. Strobel, Director, NEPA Compliance and Review Program, Environmental Protection Agency to U.S. Army Corps of Engineers, Omaha District 2 (Mar. 11, 2016).

USACE_ESMT001358

effects on downstream water supplies from leaks and spills as well as include water systems in its emergency preparedness planning.[16] The Corps, however, did not revise the EA to analyze impacts on the Project, nor did it include it in its emergency planning.

The DOI also expressed concern with the lack of the EA's analysis on tribal water systems, supply, quality, and rights. In its March 29, 2016 letter to the Corps, DOI raised the issue of the DAPL's impacts on the quantity and quality of tribal reserved waters and on trust resources.[17] DOI stated that an EIS is required to fully analyze and disclose DAPL's potential impacts on trust resources.[18] DOI also objected that the Corps had not adequately justified its conclusion that there would be no significant impacts on the surrounding environment and community.[19] The Corps failed to consider or adequately respond to those comments, and instead it simply concluded that "because all comments have been resolved, neither a supplemental nor a revised EA will be offered for further public review, and no further NEPA compliance actions are required prior to the District granting the Section 408 permission for the Proposed Action."[20]

Although the Corps did consider the risks to drinking water due to an inadvertent spill,[21] it relied on "site specific GRPs," (Geographic Response Plan) that were submitted to the Corps as "Privileged and Confidential" and therefore were not part of the public comment process. DOI, as trustee for the Mni Wiconi Project, as well as the Tribe, must be given the opportunity to have access to and review those documents as part of the consultation process. The only summary of such plans provided is in a separate section of the EA, in which the Corps states that in the event of a spill, Dakota Access would consider providing alternate sources of drinking water and/or shutting down intakes and using bottled water.[22] The Tribe and the Mni Wiconi Project have reserved rights to that water, and to the extent the Corps' mitigation plan relies on shutting down intakes and trucking bottled water to the affected tribes and non-Indian water users, it is both infeasible and unacceptable.

The failure of the Corps to analyze the impacts of the DAPL on the Mni Wiconi Project is in direct conflict with the Mni Wiconi Project Act and the United States' trust responsibility to our Tribe. This omission renders the EA inadequate and it does not meet the requirements of NEPA.

### c. The EA is Too Narrow

According to the Corps, the EA and FONSI "deal exclusively with granting the Section 408 permissions."[23] The EA does not encompass the real estate easement the Corps must still

---

[16] *Id.*
[17] DOI Letter, *supra* note 5, at 1.
[18] *Id.*
[19] *Id.*
[20] FONSI, *supra* note 4, at 5.
[21] Environmental Assessment, *supra* note 5, at 42.
[22] *Id.* at 38–39.
[23] *Id.* at 2.

7

USACE_ESMT001359

issue to grant permission for Dakota Access to drill under Lake Oahe pursuant to Section 185 of the Mineral Leasing Act. According to the Corps, no further NEPA compliance actions are required prior to the District granting the Section 408 permission for the Proposed Action."[24] Yet the issuance of an easement under Section 185 is itself a "major federal action," triggering NEPA review. *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 31 (D.D.C. 2013). As discussed below, Section 185 also imposes its own independent obligations on the Corps to consider the impact of a proposed easement on tribal and property rights, which the Corps has failed to do.

The EA also looks too narrowly at the impacts of the DAPL's construction at the HDD crossing site only. It fails to take into consideration the indirect effects of facilitating pipeline construction to, from, and through the horizontal directional drill (HDD) crossings. It does not analyze impacts to the environment from the DAPL construction outside the immediate confines of the HDD crossing site, including oil spill leaks and risks to waters or lands that are significant to our Tribe and our sister Sioux Tribes. Furthermore, the Corps has pursued the NEPA process for the DAPL by evaluating it in multiple separate segments. In a letter dated January 8, 2016, the EPA pointed out this issue to the Corps, stating that the EA lacked sufficient analysis of the direct and indirect impacts to water resources, lacked the information related to the operation of the DAPL, and is limited to small portions of the project and does not identify the related effects of the entire project segment. The NEPA review to date has not analyzed the DAPL project as a whole.

### d. The EA fails to Adequately Assess DAPL's Potential Impacts on Wildlife

The EA fails to adequately assess the DAPL's potential impacts on certain wildlife in the area. The EA admits that the DAPL will affect various species including the Interior Least Tern, the Whooping Crane, the Piping Plover, the Dakota Skipper, the Rufa Red Knot, and the Pallid Sturgeon. Nonetheless, the EA cursorily concludes that although the DAPL will affect these species it is not likely to adversely affect them.[25] However, the EA explains that the construction of the DAPL will displace the Whooping Crane, the Piping Plover, and the Rufa Red Knot. It states that "the noise and land disturbance from construction activities during the migration periods would likely cause birds to choose more suitable landing and overnight roosting locations away from construction activities,"[26] thus admitting that the DAPL will take suitable landing and roosting areas away from these species. The EA speculates that such displacement will be temporary. Further, the EA states that there may be indirect impacts on the Interior Least Tern, Piping Plover, and Rufa Red Knot from inadvertent release of bentonite mud into the water body or nesting habitat, but it simply states that the method of construction of the DAPL will minimize the likelihood of such a release and that it if occurs, DAPL will minimize impacts by quickly removing the mud.[27] Thus, the EA is internally inconsistent as it admits there may be adverse impacts to the species, but still made determinations for a number of these species as "May Affect, Not Likely to Adversely Affect." Certainly, none of these effects are positive to the species; they are only adverse.

---

[24] *Id.* at 5.
[25] *Id.* at 62.
[26] *Id.* at 63.
[27] *Id.* at 62, 65–66.

8

USACE_ESMT001360

Furthermore, and significantly, the DAPL does not assess the effects of a pipeline leak on these species. Certainly, an oil leak will have adverse and possibly devastating consequences to the species in the area and their habitats. The EA, however, gives summary analysis to the effects of an oil spill or pipeline leak on the wildlife and their habitats. Instead, the EA focuses primarily on the construction of the DAPL's crossing of Lake Oahe. As for the effects of an oil spill or leak during operation, the EA simply states that for a species "to be affected by a spill or leak during operation, an individual would have to be present when the leak or spill occurred or land in the spill itself." It then concludes that due to various factors, including the short timeframe that the species are present during migration, that "such occurrences are unlikely." The EA uses this rationale for the Whooping Crane and the Rufa Red Knot,[28] but it does not assess oil spill risks on other species named in the EA. Pipeline leaks and oil spills happen, and they do not do so on a schedule, especially a schedule that avoids migratory bird season. The EA gives little analysis to a major environmental concern: the impact of an oil spill on the species in the area and their habitats.

The EA also fails to address the critical habitat of the Poweshiek skipperling, which is an endangered species that has a designated critical habitat in its historic range of North and South Dakota. "Critical habitat" refers to a specially protected geographic area containing biological or geological features that are essential to a listed species' survival. Designation of critical habitat protects occupied and *unoccupied* territory and cannot lawfully be destroyed or adversely modified by proposed activities. The Final EA and Fish and Wildlife Service concurrence letter do not discuss the potential effects of the DAPL on the Poweshiek skipperling's critical habitat. Thus, the Corps failed to adequately consider the DAPL's potential effect on the Poweshiek skipperling's critical habitat.

Additionally, the EA fails to fully assess likely impacts on black-footed ferrets. The EA states that they have been recorded in Morton County and lists them as having the potential to occur within the project area and connected action in McKenzie and Morton Counties.[29] Nonetheless, the EA simply concludes no suitable habitat is present in the project area.[30] The EA also fails to adequately assess the effects on eagles in the area. We are concerned with the well-being of both eagles and black-footed ferrets as we have heard reports that Dakota Access has been poisoning prairie dogs to facilitate its construction activities. We have been informed that eagles are becoming sick from eating the poisoned prairie dogs, and ferrets may be affected as well.

## II.   Use and Implementation of NWP-12 is Defective

The Corps' use and implementation of NWP-12 for the DAPL is defective. The majority of the DAPL's impacts on federally protected waters moved forward under a Clean Water Act NWP, which pre-approved construction without any consultation on the DAPL's impacts on cultural and historic resources tribal sacred sites.

---

[28] *Id.* at 64, 67.
[29] *Id.* at 61 (Table 3-11), 64.
[30] *Id.* at 64.

USACE_ESMT001361

Under NWP-12, preconstruction notification (PCN) to the Corps by the non-federal project proponent, and verification from the Corps, is required if any one of several criteria is met. 77 Fed. Reg. 10184, 10272 (Feb. 21, 2012). If none of the criteria is met, the pipeline builder is authorized by NWP-12 to proceed with the work in regulated waters without any additional notification to, or approval from, the Corps. None of the criteria of NWP-12 concern historic or cultural preservation.

General Condition 20 (GC-20), however, applies to NWP-12. Thus, GC-20 requires a non-federal permittee to submit a PCN "if the authorized activity may have the potential to cause effects to any historic priorities listed on, determined to be eligible for listing on, or potentially eligible for listing on the National Register of Historic Places, including previously unidentified properties." *Id.* at 10284. If a PCN is provided, the Corps is supposed to comply with Section 106 of the NHPA before verifying that the NWP is applicable, and work cannot proceed until such verification is provided. If no PCN is submitted, no Section 106 process takes place. GC-20 places responsibility on the non-federal permittee (the pipeline company) to determine whether historic or culturally significant properties are present.

A fundamental problem with the use and implementation of NWP-12 for the DAPL is that Dakota Access, the very entity building the DAPL, was the entity that determined the DAPL's potential impacts on the sites described in GC-20. Under NWP-12, if the proponent determines for itself that the pipeline will not affect historic properties, the Corps is not notified and does not play a role, and no Section 106 process occurs. Yet, the Advisory Council on Historic Preservation regulations clearly state "it is the statutory obligation of the Federal agency to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance...." 36 C.F.R. § 800.2(a). Thus, with respect to the DAPL project, the Corps unlawfully abdicated its statutory responsibility to comply with Section 106 through NWP-12 and GC-20. In effect, NWP-12 unlawfully delegated the Corps' responsibility and obligations with respect to Section 106 to Dakota Access, the entity building the DAPL.

The DAPL traverses the Tribe's ancestral homelands: areas of tremendous cultural, historic, and spiritual importance to the Tribe. The use and implementation of NWP-12 resulted in no Section 106 consultation taking place for most of the DAPL.

### III.   No Meaningful Consultation Per Section 106 of the NHPA

Section 106 of the NHPA requires consultation with tribes on federal undertakings that potentially affect historic properties that are culturally significant to tribes. 36 C.F.R. § 800.2(c)(2). Consultation must occur regarding sites with "religious and cultural significance" even if they occur on ancestral or ceded land. *Id.* § 800.2(c)(2)(ii)(D); 54 U.S.C. § 302707.

The NHPA is clear that "undertaking" includes projects "in whole or in part under the direct or indirect jurisdiction of a federal agency." 54 U.S.C. § 300320; 26 C.F.R. § 800.16(y). Early in the NHPA process, an agency must determine the area of potential effects (APE) of a federal undertaking. 36 C.F.R. § 800.4(1)(1). The APE is defined as including the area "within which an undertaking may directly or indirectly cause alterations in the character or use of

10

historic properties.... The APE is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking." *Id.* § 800.16(d).

The Corps identified the APE narrowly to include only the small parcel surrounding the HDD pits on each side of the river and a narrow strip for an access road and stringing area on the west side of the crossing. It is unclear what the APE includes on the east side of the crossing. The bottom-line is that the APE is too narrow as it does not include the actual pipeline route entering and exiting the HDD boreholes, which we understand will involve a 100–150 yard swath. Thus, there was no Section 106 consultation outside the APE even though the areas are important and culturally significant to our Tribe and our sister Sioux Tribes.

The ACHP took issue with the Corps on this issue and formally objected to the Corps' determination that no historic properties were affected by the Lake Oahe crossing. The ACHP formally objected to the Corps' analyses in at least four separate letters. In its May 19, 2016 letter, the ACHP elaborated on objections it had voiced since February, stating that the Corps . failed to correctly define the undertaking and the APE, conducted inadequate tribal consultation, and engaged in other procedural flaws.[31]

We agree with the ACHP's positions as set forth in its May letter as well as those put forth by the Standing Rock Sioux Tribe and the Cheyenne River Sioux Tribe in their pending lawsuit. The Section 106 process for the DAPL was fundamentally flawed. A proper Section 106 process must occur to ensure that tribes are afforded the opportunity to consult on the proper scope of the undertaking. Given what is at stake—our culture, our history, our ancestors, and our way of life—that is the right thing to do.

## IV.   Corps Must Strictly Adhere to Right-of-Way/ Permitting Process of Mineral Leasing Act

The Corps must strictly adhere to the right-of-way/permitting process of 30 U.S.C. § 185, which codifies Section 28 of the Mineral Leasing Act and provides federal agencies with the authority to grant rights-of-way over federal lands for pipeline purposes, including for oil and natural gas pipelines. We understand that the Corps has not yet issued the right-of-way for the DAPL's crossing of Lake Oahe. The process the Corps is using for such right-of-way/permit has been more than opaque in contrast to the process set forth in the statutory language of Section 185 of the MLA, which is specific, transparent, and inclusive.

Section 185 requires an independent environmental review for the issuance of a right-of-way or permit. Section 185(h)(2) states that prior to the agency granting a right-of-way or permit, it shall require the applicant to submit a plan of construction, operation, and rehabilitation for such right-of-way or permit that complies with Section 185. Tribal governments have not been provided any notice of such a submission by Dakota Access, if one exists, despite the fact that Section 185(h)(2) is clearly intended to protect our interests.

---

[31] Letter from Reid J. Nelson, Director, Office of Federal Agency Programs, Advisory Council on Historic Preservation to Lt. General Thomas P. Bostick, U.S. Army Corps of Engineers 2–4 (May 19, 2016).

USACE_ESMT001363

Section 185(h)(2) requires the Secretary to

issue regulations or impose stipulations that shall include, but shall not be limited to: (A) requirements for restoration, revegetation, and curtailment of erosion of the surface of the land; (B) requirements to insure that activities in connection with the right-of-way or permit will not violate applicable air and water quality standards nor related facility siting standards established by or pursuant to law; (C) requirements designed to control or prevent (i) damage to the environment (including damage to fish and wildlife habitat), (ii) damage to public or private property, and (iii) hazards to public health and safety; and (D) requirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes.

The Secretary has not issued regulations pursuant to which the right-of-way or permit for the Lake Oahe crossing would issue. Further, the Secretary has not imposed stipulations that would insure that the DAPL would not violate water quality standards, would not damage our property right in the Missouri River water, would not present hazards to our health and safety given that the Missouri River is our drinking water source, and would not threaten the biotic resources of the area on which our citizens' interests rely for subsistence purposes.

The Corps' adherence to the Section 185 process with respect to the DAPL must be inclusive and transparent. In fact, Section 185(k) calls for the Corps by regulation to establish procedures, including public hearings where appropriate, to give Federal, State, and local government agencies and the public adequate notice and an opportunity to comment upon right-of-way applications. To date, the Corps has failed to conduct the required process of allowing government agencies and the public adequate notice and opportunity to comment on the DAPL's right-of-way application. Additionally, the Corps has not held public hearings pursuant to Section 185 on the Dakota Access's right-of-way application.

## V.   No Meaningful Consultation Pursuant to Executive Order 13175

An overarching concern is that there has been no consultation on the DAPL pursuant to Executive Order 13175. Regardless of consultation for specific purposes required under various statutes such as the NHPA, the Corps must also conduct consultation with tribes under Executive Order 13175. Per Executive Order 13175, any time an agency develops a new rule, policy, or directive, or takes any action that might impact tribes, the agency must consult with affected tribes early and often during the decision-making process.

The Corps has its own consultation policy, pursuant to the Executive Order. That policy states as one of its Tribal Policy Principles that "the trust responsibility will be honored and fulfilled."[32] The policy also states that the agency "will ensure it addresses Tribal concerns regarding protecting tribal resources, tribal rights (including treaty rights) and Indian lands."[33] Consultation per the Corps' consultation policy or Executive Order 13175 has not occurred with

---

[32] U.S. Army Corps of Engineers, Tribal Consultation § 5(b) (Oct. 4, 2012).
[33] *Id.* § 5(b)(3).

12

respect to the DAPL and its potential impacts to the Tribe's trust resources and treaty rights.

Additionally, President Obama endorsed the United Nations Declaration on the Rights of Indigenous Peoples on December 16, 2010. Article 19 of the Declaration calls for good faith consultation prior to adopting measures that may affect indigenous peoples, and Article 32(2) more specifically provides that "[s]tates shall consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free and informed consent prior to the approval of any project affecting their lands or territories and other resources, particularly in connection with the development, utilization or exploitation of mineral, water or other resources."

## VI.   Conclusion

The Oglala Sioux Tribe is adamantly opposed to the DAPL. The Corps' handling of the DAPL to date has not been in accordance with the United States' treaty obligations and trust responsibility to our Tribe.

The Administration's September 9th decision to halt construction until it can determine whether the Army will need "to reconsider any of its previous decisions regarding the Lake Oahe site under the National Environmental Policy Act (NEPA) or other federal laws"[34] is a step in the right direction. Our position is that the Army clearly needs to reconsider its previous decisions and that the Administration now has the opportunity to take the required actions to uphold its treaty obligations and trust responsibility to our Tribe.

We appreciate the opportunity to submit these comments on the aforementioned issues in this new administrative process on the DAPL. The issues underscore the need for reconsideration, meaningful consultation, and a broader and more accurate view of the impacts that the DAPL will have on our Tribe, our sister Sioux Tribes, the environment, and the United States as a whole.

We believe the United States should be a leader for the world in establishing energy policy, specifically leading the transition toward an economy in which most of our energy needs are met with renewable resources. Rejecting the DAPL would be a major step leading in the right direction.

Sincerely,

John Yellowbird Steele
President of the Oglala Sioux Tribe

---

[34] Joint Statement, *supra* note 1.

13

USACE_ESMT001365

USACE_ESMT001366



SS8290.039

DEPT OF JUSTICE ENRD
ENVIRONMENT DIVISION

16 OCT -7 AM 11:17

X-RAYED
SEP 30 2016

DOJ MAILROOM

INSPECTED 16

The Hon
Attorney
U.S. Dep
950 Pen
Washin

Rec'd in LPS
10/18/16

LAW OFFICES

HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L STREET, N.W., SUITE 700
WASHINGTON, D.C. 20037

7015 1520 0003 1866 0450

USACE_ESMT001367



Milford Wayne Donaldson, FAIA
Chairman

Teresa Leger de Fernandez
Vice Chairman

John M. Fowler
Executive Director

Preserving America's Heritage

**RECEIVED**

AUG 2 4 2016

Office of the ASA (CW)
Washington, DC

August 19, 2016

The Honorable Jo-Ellen Darcy
Assistant Secretary of the Army for Civil Works
108 Army Pentagon
Washington, DC 20310-0108

Ref:   *Dakota Access Pipeline Project*

Dear Secretary Darcy:

The Advisory Council on Historic Preservation (ACHP) has received the Corps of Engineers (Corps) letter dated July 25, 2016, in response to our letter of June 2, 2016, regarding the Corps' effects findings for the Dakota Access Pipeline Project (DAPL). The letter states that the Corps' determinations of eligibility as well as its "No Historic Properties Affected" and "No Adverse Effect" findings for portions of DAPL located in Iowa, Illinois, North Dakota, and South Dakota are appropriate and that its Section 106 review is completed. We were disappointed to learn of this decision and believe it reaffirms the importance of our agencies working to resolve the longstanding disagreement on appropriate measures for the consideration of historic properties for projects like DAPL.

The basis for our disagreement centers on the Corps' adherence to Appendix C - Procedures for the Protection of Historic Properties of 33 C.F.R. Part 325, Processing of Department of the Army Permits (Appendix C), which does not substitute for the Section 106 regulations at 36 C.F.R. Part 800 (Section 106 regulations) or provide equivalent consideration for the protection of historic properties as provided for in those regulations. The differences between the Section 106 regulations and Appendix C are substantial and continue to confuse consulting parties and complicate Section 106 reviews. Chief among these differences includes the Corps decision, on this case and others, to review each Pre-construction Notification crossing as a separate undertaking and thereby dismiss the potential for effects to historic properties that may be located within the broader project area of an undertaking when properly defined under the Section 106 regulations.

While we acknowledge the Corps' view that Appendix C provides appropriate measures for the identification and protection of historic properties, it remains fundamentally inconsistent with the government-wide Section 106 regulations and the standards applied by all other federal agencies in the protection of historic properties. We believe these inconsistencies too often leave the Corps unable to fully meet its legal obligations under Section 106.

For more than a year the ACHP has been engaged with Corps Headquarters staff in discussions about resolving the differences between Appendix C and the Section 106 regulations and developing a program alternative pursuant to 36 C.F.R. § 800.14 that is consistent with the Section 106 regulations. We share

ADVISORY COUNCIL ON HISTORIC PRESERVATION

401 F Street NW, Suite 308 • Washington, DC 20001-2637
Phone: 202-517-0200 • Fax: 202-517-6381 • achp@achp.gov • www.achp.gov

USACE_ESMT001498

2

the Corps' desire to resolve these differences while ensuring that its permit review process remains efficient, consistent, and transparent for its numerous applicants across the nation. As an outgrowth of those discussions, the ACHP has established a Working Group to discuss Small Federal Handles. The group includes the Corps and other federal agencies as well as non-federal stakeholders that are concerned about many of the same issues as the Corps. We are committed to using the Working Group to resolve long standing differences between the Corps' Appendix C procedures and the Section 106 regulations and appreciate your support of this effort.

In closing, we hope that the Corps will take the opportunity to work with the ACHP to resolve these systemic issues. Should you have any questions or wish to discuss this matter further, please feel free to contact me directly or Reid Nelson at 202-517-0206, or by e-mail at rnelson@achp.gov.

Sincerely,

John M. Fowler
Executive Director

# Dakota Access, LLC
# Dakota Access Pipeline Project (ND)

## Wetland and Waterbody Delineation Report

**May 15, 2015**

 DAKOTA ACCESS, LLC

USACE_ESMT002911

## RESULTS

*Uplands*

The majority of the Project area is upland and includes row crop, pasture and rangeland, native grassland communities and wooded communities. Much of the pasture and rangeland along the corridor is dominated by non-native grasses. Smooth brome (*Bromus inermis*), Kentucky bluegrass (*Poa pratensis*), and crested wheatgrass (*Agropyron cristatum*) are the most dominant species in these areas. The rangelands also have a strong presence of the invasive leafy spurge (*Euphorbia esula*) and Canada thistle (*Cirsium arvense*). The lower draws associated with these rangelands are often dominated by fireberry hawthorn (*Crataegus chrysocarpa*) and Sprengel's sedge (*Carex sprengelii*).

The native grasslands along the corridor are mostly areas utilized for grazing purposes but dominated by native graminoids. The dominant species in these areas include little bluestem (*Schizachyrium scoparium*), western wheatgrass (*Pascopyrum smithii*), green needlegrass (*Nassella viridula*), blue grama (*Bouteloua gracilis*), Flodman's thistle (*Cirsium flodmanii*), white sagebrush (*Artemisia ludoviciana*), prairie sagewort (*Artemisia frigida*), pussytoes (*Antennaria* spp.), creeping juniper (*Juniperus horizontalis*), and pasque flower (*Anemone patens*).

Wooded upland communities encountered are mostly dominated by bur oak (*Quercus macrocarpa*), quaking aspen (*Populus tremuloides*), Rocky Mountain juniper (*Juniperus scopulorum*), green ash (*Fraxinus pennsylvanica*), and choke cherry (*Prunus virginiana*).

*Wetlands*

As indicated, the survey corridor has a linear length of approximately 359 miles. In terms of acreage, the Project footprint equates to 17,827 acres, of which 16,399 acres have been evaluated in the field for wetlands and waterbodies. The remaining acreage has not been surveyed due to the lack of permission by those property owners. Impacts have been assessed and included herein for the entire right-of-way, with aerial interpretation and NWI data being utilized for tracts without access.

In general, the majority of wetlands documented within the Project footprint were of only one Cowardin class. In total, 509 wetlands have been documented thus far within the Project corridor. This includes 453 palustrine emergent (PEM) wetlands, one palustrine scrub-shrub (PSS) wetlands, four palustrine forested (PFO) wetlands, and 51 palustrine unconsolidated bottom (PUB) wetlands. **Table** includes the number of features based on Cowardin class that were documented by County during field surveys along with NWI tracts lacking survey coverage. A complete list of wetland features documented is provided in **Appendix B**, which sorts the features numerically based on milepost (separated by Mainline and Supply Line mileposts). Associated data forms are provided in **Appendix C**.

Dakota Access Pipeline Project (ND) - Wetland and Waterbody Delineation Report

| Table 1. Wetland Classifications Within Survey Corridor for Field Delineated and NWI Features | | | | |
|---|---|---|---|---|
| **COUNTY** | **PEM** | **PSS** | **PFO** | **PUB** |
| Dunn[1] | 38 | 0 | 3 | 2 |
| Emmons | 26 | 0 | 1 | 5 |
| McKenzie[2] | 57 | 0 | 0 | 7 |
| Mercer | 48 | 0 | 0 | 3 |
| Morton[3] | 111 | 1 | 0 | 11 |
| Mountrail[4] | 83 | 0 | 0 | 14 |
| Williams[5] | 103 | 0 | 0 | 12 |
| **Totals** | **466** | **1** | **4** | **54** |

[1] Dunn County calculations included 5 NWI features
[2] McKenzie County calculations included 2 NWI features
[3] Morton County calculations included 2 NWI features
[4] Mountrail County calculations included 1 NWI feature
[5] Williams County calculations included 6 NWI features

The majority of wetlands associated with the Project corridor are PEM features. The vegetation associated with PEM wetlands includes both graminoids and forbs with graminoids dominating most of the features. Dominant graminoids in emergent wetlands include water sedge (*Carex aquatilis*), smooth cone sedge (*Carex laeviconica*), woolly sedge (*Carex pellita*), plains oval sedge (*Carex brevior*), prairie cordgrass (*Spartina pectinata*). spike-rushes (including *Eleocharis acicularis*, *E. compressa*, *E. palustris*), American barnyard grass (*Echinochloa muricata*), quackgrass (*Elymus repens*), arctic rush (*Juncus arcticus*), and common three-square (*Schoenoplectus pungens*). In the alkaline and saline wetlands, salt grass (*Distichlis spicata*), foxtail barley (*Hordeum jubatum*), and Nuttall's alkali grass (*Puccinellia nuttalliana*) are the dominant species, but also includes saltmarsh bulrush (*Bolboschoenus maritimus*) and pursh seepweed (*Suaeda calceoliformis*). Common forbs in emergent wetland communities include dock species (*Rumex* spp.), water smartweed (*Persicaria amphibia*), common knotgrass (*Polygonum aviculare*), and white panicled aster (*Symphyotrichum lanceolatum*). The marsh systems are dominated by narrow-leaf cattail (*Typha angustifolia*), hybrid cattail (*Typha x glauca*), and northern water-plantain (*Alisma triviale*). Farmed wetlands include species such as barnyard grass (*Echinochloa crus-galli*), American barnyard grass, and foxtail barley.

PFO wetlands were extremely uncommon within the Project corridor, with only four features documented. These communities were found in moist ravines and often dominated by green ash and occasionally box elder (*Acer negundo*) with smooth cone sedge, clustered field sedge (*Carex praegracilis*), fowl bluegrass (*Poa palustris*), wild black currant (*Ribes americanum*) and stinging nettle (*Urtica dioica*) in the understory.

Only one PSS wetland was documented during survey efforts. This community is dominated by sandbar willow (*Salix interior*) and graminoids including reed canary grass (*Phalaris arundinacea*) and Canada bluejoint (*Calamagrostis canadensis*).

PUB waterbody features were fairly common along the Project corridor. These were generally excavated features lacking submergent vegetation and occasionally associated with PEM wetlands.

Dakota Access Pipeline Project (ND) - Wetland and Waterbody Delineation Report

Within the Project corridor 258.2 acres of field delineated wetlands and 3.6 acres of NWI mapped wetlands collectively total 261.8 acres of wetlands. Dakota Access has designed the pipeline in North Dakota to avoid permanent fill in wetlands. Temporary impacts to wetlands will be limited to the construction phase. Permanent PFO impacts will be limited to conversion of cover type from PFO to PEM within the maintained corridor centered on the pipeline. The anticipated temporary and permanent wetland impacts within the Project workspace including delineated and NWI desktop acreage amounts to 73.92 (**Table 2**).

| Feature Type | Temporary Impacts | Permanent Impacts |
|---|---|---|
| | Acreage | Acreage |
| PFO | 0 | 0.31* |
| PSS | 0.24 | 0 |
| PEM | 64.27 | 0 |
| PUB | 9.1 | 0 |
| **Total** | **73.61** | **0.31*** |

**Table 2.**
**Anticipated Wetland Impacts Within the Dakota Access Pipeline Project Workspace**

*The permanent PFO impact is a conversion of cover type to PEM within the maintained corridor, not a permanent loss.

*Waterbodies*

There were a total of 263 waterbodies documented within the Project corridor. **Table 3** indicates the number of features by class per county along with NHD features for those tracts lacking survey coverage. A complete list of documented waterbody features is provided in **Appendix D** and associated data forms are provided in **Appendix E**.

**Table 3.**
**Waterbody Classifications by County**

| COUNTY | Ditch | Ephemeral | Intermittent | Perennial | NHD |
|---|---|---|---|---|---|
| Dunn | 0 | 13 | 15 | 18 | 2 |
| Emmons | 0 | 11 | 8 | 12 | 0 |
| McKenzie | 1 | 13 | 14 | 15 | 11 |
| Mercer | 0 | 5 | 13 | 12 | 0 |
| Morton | 1 | 23 | 22 | 16 | 9 |
| Mountrail | 0 | 4 | 1 | 3 | 7 |
| Williams | 1 | 23 | 10 | 9 | 8 |
| **Total** | **3** | **92** | **83** | **85** | **37** |

U.S. Department of Transportation
Pipeline and Hazardous Materials Safety
Administration

Final Report No. 12-173

# Final Report

## Leak Detection Study – DTPH56-11-D-000001

Dr. David Shaw, Dr. Martin Phillips, Ron Baker, Eduardo Munoz,
Hamood Rehman, Carol Gibson, Christine Mayernik
December 10, 2012





*Kiefner & Associates, Inc.*
*585 Scherers Court*
*Worthington, Ohio 43085*

*(614) 888-8220*
*www.kiefner.com*

0339-1201

USACE_ESMT003680

Intentionally blank

USACE_ESMT003681

Final Report No. 12-173

**Final Report**

on

**LEAK DETECTION STUDY – DTPH56-11-D-000001**

to

**U.S. DEPARTMENT OF TRANSPORTATION**

**PIPELINE AND HAZARDOUS MATERIALS SAFETY ADMINISTRATION**

**December 10, 2012**

by

Dr. David Shaw, Dr. Martin Phillips, Ron Baker, Eduardo Munoz,
Hamood Rehman, Carol Gibson, Christine Mayernik

**Kiefner and Associates, Inc.**
**585 Scherers Court**
**Worthington, Ohio 43085**

0339-1201

USACE_ESMT003682

## DISCLAIMER

This document presents technical issues identified based on engineering services performed by employees of Kiefner and Associates, Inc. The work addressed herein has been performed according to the authors' knowledge, information, and belief in accordance with commonly accepted procedures consistent with applicable standards of practice, and is not a guaranty or warranty, either expressed or implied.

The analysis and technical issues identified in this report are for the sole use and benefit of the Client. No information or representations contained herein are for the use or benefit of any party other than the party contracting with KAI. The scope of use of the information presented herein is limited to the facts as presented and examined, as outlined within the body of this document. No additional representations are made as to matters not specifically addressed within this report. Any additional facts or circumstances in existence but not described or considered within this report may change the analysis, outcomes and representations made in this report.

The authors stand behind their work as performed and presented.   Conferring with industry associations as a whole was not included in the scope for this project, with the exception of input received during the public comment periods as part of the original scope of work, and for the draft report.  Some operators were also interviewed as part of the work.  It is understood there is a diversity of opinion about LDS that may reasonably exist among stakeholders within the industry.

USACE_ESMT003683

## TABLE OF CONTENTS

1.0    Introduction   1-1

  1.1   Study Background ............................................................................................ 1-2

Introduction Appendix A: Leak Detection Study Requirements ................................. 1-7

2.0    Summary     2-1

  2.1   Overall Summary of Work ............................................................................... 2-1

    Leak Detection Systems .................................................................................. 2-3

    Current Mainstream Practice ........................................................................... 2-3

    SCADA and LDS ............................................................................................ 2-4

    Types of Leak Detection ................................................................................. 2-5

    Incident Reports ............................................................................................. 2-5

    Internal and External Detection ...................................................................... 2-6

  2.2   Overall Summary ............................................................................................ 2-8

    Overall Summary for Task 3 - Review and Assess Previous Pipeline Incidents ............. 2-9

    Overall Summary for Task 4 - Technological Feasibility ............................. 2-12

    Overall Summary for Task 5 - Operational Feasibility ............................... 2-14

    Overall Summary for Task 6 - Economical Feasibility ............................... 2-15

    Overall Summary for Task 7 - Discuss Recommended Leak Detection Standards ...... 2-16

3.0    Task 3: Review and Assessment of Previous Pipeline Incidents ................................... 3-17

  3.1   Introduction .................................................................................................. 3-17

  3.2   Purpose of Task 3 .......................................................................................... 3-17

  3.3   Method .......................................................................................................... 3-18

  3.4   Leaks and Ruptures ....................................................................................... 3-19

  3.5   The Big Picture ............................................................................................. 3-20

  3.6   Specific Data Selected for ROW Assessments .............................................. 3-27

  3.7   Incident Reporting for the Hazardous Liquid Pipeline Industry on the ROW ......... 3-30

    3.7.1   Hazardous Liquid Incidents ............................................................ 3-30

    3.7.2   Above Average Hazardous Liquid Releases ................................... 3-43

    3.7.3   Hazardous Liquid Gathering Lines (Transportation-Related Flow Lines) ........ 3-53

    3.7.4   Hazardous Liquid Case Studies ...................................................... 3-63

  3.8   Incident Reporting for the Natural Gas and Other Gas Transmission and Gathering Industry ...................................................................................... 3-74

Leak Detection Study – DTPH56-11-D-000001                                    FINAL
                                                                            0339-1201

    3.8.1   Natural Gas and Other Gas Transmission and Gathering Lines Releases ......... 3-74

    3.8.2   Above Average Gas Transmission Releases ....................................................... 3-82

    3.8.3   Natural Gas and Other Gas Transmission Case Studies ..................................... 3-90

  3.9   Incident Reporting for the Natural Gas and Other Gas Distribution Industry ............ 3-97

    3.9.1   Natural Gas and Other Gas Distribution Incidents ............................................ 3-97

Task 3 Appendix A: Hazardous Liquid Case Studies Case Studies (11) ............................... 3-104

Task 3 Appendix B: Natural Gas and Other Gas Transmission Case Studies Case Studies
    (8) ......................................................................................................................... 3-123

4.0   Task 4: Technology Feasibility ................................................................................. 4-1

  4.1   Leak Detection Systems Technology ......................................................................... 4-1

    4.1.1   Background ................................................................................................... 4-1

    4.1.2   Objectives .................................................................................................... 4-2

  4.2   Previous Work ......................................................................................................... 4-2

  4.3   Current State-of-the-Art ........................................................................................... 4-4

    4.3.1   Introduction .................................................................................................. 4-4

    4.3.2   Industry Standards and Best Practices ............................................................ 4-4

    4.3.3   Impact of Regulation .................................................................................... 4-5

    4.3.4   Sources / Origins of Technologies ................................................................. 4-5

    4.3.5   Quantifying Performance .............................................................................. 4-7

    4.3.6   Leak Detection as Risk Management .............................................................. 4-7

    4.3.7   Performance Measures .................................................................................. 4-8

    4.3.8   General Issues .............................................................................................. 4-8

    4.3.9   Categorization of Solutions .......................................................................... 4-10

    4.3.10  Internal Systems ......................................................................................... 4-11

    4.3.11  External Systems ........................................................................................ 4-20

    4.3.12  Current External LDS Solutions ................................................................... 4-22

    4.3.13  General Descriptions ................................................................................... 4-23

    4.3.14  General Performance of LDS ....................................................................... 4-27

    4.3.15  Multiple Performance Objectives ................................................................. 4-30

    4.3.16  Other Performance Factors .......................................................................... 4-31

  4.4   Benefits and Drawbacks of LDS Methods ................................................................ 4-32

    4.4.1   Internal Systems ......................................................................................... 4-32

USACE_ESMT003685

| | 4.4.2 | External Systems | 4-35 |
|---|---|---|---|
| | 4.4.3 | Ability to Retrofit Legacy Systems | 4-38 |
| | 4.4.4 | Small/Intermittent Leaks | 4-39 |
| 4.5 | | Major Current Technology Gaps | 4-40 |
| 4.6 | | Operator and Developer Opinions and Current Practice | 4-42 |
| | 4.6.1 | Summary | 4-42 |
| | 4.6.2 | Technology Gaps | 4-44 |
| 4.7 | | Current Technology | 4-46 |
| | 4.7.1 | Hazardous Liquids Pipelines | 4-46 |
| | 4.7.2 | Gas Transmission Pipelines | 4-47 |
| | 4.7.3 | Gas Distribution Pipelines | 4-48 |
| | 4.7.4 | Technology Suppliers | 4-49 |
| 4.8 | | Performance and Technology Gaps | 4-50 |
| | 4.8.1 | Performance | 4-50 |
| | 4.8.2 | Technology Gaps | 4-51 |
| 4.9 | | Retrofit Capability and Improvement Plans | 4-56 |
| | 4.9.1 | Capability | 4-56 |
| | 4.9.2 | Improvement Plans | 4-56 |
| 5.0 | | Task 5: Operational Feasibility | 5-1 |
| 5.1 | | Objectives | 5-1 |
| 5.2 | | Leak Detection Operational Principles | 5-1 |
| | 5.2.1 | Applicable Operational Codes and Standards | 5-2 |
| | 5.2.2 | Internal Standards | 5-4 |
| | 5.2.3 | Risk Analysis | 5-4 |
| | 5.2.4 | Benefit and Performance Analysis | 5-5 |
| | 5.2.5 | Testing | 5-6 |
| | 5.2.6 | Maintenance | 5-7 |
| | 5.2.7 | Control Room Procedures | 5-7 |
| | 5.2.8 | Controller Training | 5-9 |
| | 5.2.9 | Continual Improvement | 5-10 |
| | 5.2.10 | Other General Issues | 5-10 |
| 5.3 | | Operator and Developer Opinions and Current Practice | 5-11 |

USACE_ESMT003686

5.3.1   Summary .................................................................................................. 5-12

5.3.2   Internal Standards .................................................................................. 5-13

5.3.3   Risk Analysis Processes ......................................................................... 5-13

5.3.4   Value Assessment ................................................................................... 5-14

5.3.5   Testing and Maintenance ....................................................................... 5-14

5.3.6   Controller Procedures and Training ...................................................... 5-15

5.3.7   Continual Improvement ......................................................................... 5-15

5.3.8   Responsibility, Empowerment ............................................................... 5-16

5.4   Technology Developers ................................................................................... 5-16

5.4.1   Value Assessment ................................................................................... 5-16

5.4.2   Maintenance Requirements ..................................................................... 5-17

5.4.3   Operator Adoption of New Technologies ............................................... 5-17

6.0   Task 6: Economic Feasibility ................................................................................. 6-1

6.1   Objectives ......................................................................................................... 6-1

6.2   Economic Principles ......................................................................................... 6-1

6.2.1   Risk Reduction ........................................................................................ 6-2

6.2.2   Risk Management ..................................................................................... 6-3

6.2.3   Cost-Benefit ............................................................................................ 6-3

6.2.4   Other Benefits ......................................................................................... 6-3

6.2.5   Observations ............................................................................................ 6-4

6.2.6   Practical Issues ........................................................................................ 6-4

6.2.7   New Installation vs. Existing Retrofits .................................................. 6-4

6.2.8   Impact of Regulation ............................................................................... 6-5

6.2.9   Safety-Related Systems ........................................................................... 6-5

6.3   Cost Elements of Leak Detection Systems ...................................................... 6-6

6.3.1   Approach .................................................................................................. 6-7

6.3.2   Intangible Costs ...................................................................................... 6-10

6.3.3   Unit Pricing ............................................................................................ 6-10

6.3.4   Conceptual Systems, Capital Cost ......................................................... 6-12

6.3.5   Operational Costs ................................................................................... 6-15

6.3.6   Cost-Benefit Analysis ............................................................................ 6-15

6.3.7   Observations ........................................................................................... 6-19

USACE_ESMT003687

6.4   Operator and Developer Opinions and Current Practice ........................................... 6-20

  6.4.1   Summary ................................................................................................... 6-20

  6.4.2   Leak Detection Budgets ............................................................................ 6-21

  6.4.3   Budget Cycles ........................................................................................... 6-22

  6.4.4   Cost-Benefit Approach .............................................................................. 6-23

  6.4.5   Risk Management ....................................................................................... 6-23

  6.4.6   Impact of Regulation ................................................................................. 6-24

7.0   Task 7: Analysis of Leak Detection Standards ........................................................... 7-1

  7.1   Leak Detection in Pipelines ................................................................................... 7-1

  7.2   Liquids Pipelines ................................................................................................... 7-1

    7.2.1   Leak Detection and Current Standards for Liquid Pipelines: .............................. 7-1

    7.2.2   API 1130 (*Computational Pipeline Monitoring (CPM) for Liquids*) ................. 7-2

    7.2.3   API 1149 (Pipeline Variable Uncertainties and their Effects on Leak
            Detectability) ........................................................................................... 7-13

    7.2.4   CSA Z662-2011 Annex E ......................................................................... 7-17

    7.2.5   TRFL (*Technical Rule for Pipeline Systems*) (Germany) ...................... 7-19

  7.3   Natural Gas Pipelines ......................................................................................... 7-20

    7.3.1   Leak Detection in Gas Pipelines .............................................................. 7-20

  7.4   Gaps in Liquids Standards .................................................................................. 7-21

  7.5   Gaps in Natural Gas Best Practices/ Standards ................................................... 7-24

  7.6   References ........................................................................................................... 7-25

## LIST OF FIGURES

Figure 3.1     ROW Releases by Commodity, 2010 to July 2012 ......................................... 3-31

Figure 3.2     ROW Releases, All Commodities, 2010 to July 2012 ..................................... 3-32

Figure 3.3     Hazardous Liquids Releases, SCADA Detail ................................................... 3-35

Figure 3.4     Hazardous Liquids Releases, CPM Detail ....................................................... 3-35

Figure 3.5     Hazardous Liquids Releases, Initial Identifier: SCADA, CPM, None .............. 3-37

Figure 3.6     Hazardous Liquids Releases, Initial Identifier ................................................ 3-39

Figure 3.7     Hazardous Liquids Releases, Response Times ................................................. 3-41

Figure 3.8     Hazardous Liquids Releases, Average Response Time: SCADA Detail .......... 3-42

Figure 3.9     Above Average Hazardous Liquids Releases, by Commodity ......................... 3-45

Figure 3.10    Above Average Hazardous Liquids Releases, All Commodities ..................... 3-46

Figure 3.11    Above Average Hazardous Liquids Releases, SCADA Detail .......................... 3-47

Figure 3.12    Above Average Hazardous Liquids Releases, CPM Detail .............................. 3-48

Figure 3.13    Above Average Hazardous Liquids Releases (Gallons), Initial Identifier ........ 3-49

Figure 3.14    Above Average Hazardous Liquids Releases (%), Initial Identifier ................. 3-50

Figure 3.15    Above Average Hazardous Liquids Releases, Response Time ........................ 3-52

Figure 3.16    Hazardous Liquid Gathering Lines Releases (Number), by Commodity .......... 3-55

Figure 3.17    Hazardous Liquid Gathering Lines Releases (Gallons) .................................... 3-56

Figure 3.18    Hazardous Liquid Gathering Lines Releases (Gallons), SCADA Detail .......... 3-58

Figure 3.19    Hazardous Liquid Gathering Lines Releases (Gallons), CPM Detail ............... 3-59

Figure 3.20    Hazardous Liquid Gathering Lines Releases, Initial Identifier SCADA, CPM  3-60

Figure 3.21    Hazardous Liquid Gathering Lines Releases, Initial Identifiers ...................... 3-61

Figure 3.22    Hazardous Liquid Gathering Lines Releases, Response Times ....................... 3-63

Figure 3.23    Natural Gas Transmission/Gathering Releases, January 2010 to July 2012 ..... 3-75

Figure 3.24    Natural Gas Transmission/Gathering Releases, SCADA Detail ...................... 3-77

Figure 3.25    Natural Gas Transmission/Gathering Releases, SCADA Initial Identifier ........ 3-77

Figure 3.26    Natural Gas Transmission/Gathering Releases, Initial Identifier ..................... 3-78

Figure 3.27    Natural Gas Transmission/Gathering Releases, Response Times .................... 3-80

Figure 3.28    Natural Gas Transmission/Gathering Releases, Response Times: SCADA
               Detail ........................................................................................................... 3-81

Figure 3.29    Above Average Gas Transmission/Gathering Releases, 2010 to July 2012 ...... 3-83

Figure 3.30    Above Average Gas Transmission/Gathering Releases, SCADA Detail .......... 3-85

USACE_ESMT003689

Leak Detection Study – DTPH56-11-D-000001

FINAL
0339-1201

| | | |
|---|---|---|
| Figure 3.31 | Above Average Gas Transmission/Gathering Releases, SCADA Initial Identifier | 3-86 |
| Figure 3.32 | Above Average Gas Transmission/Gathering Releases, Initial Identifier | 3-87 |
| Figure 3.33 | Above Average Gas Transmission/Gathering Releases, Response Time | 3-89 |
| Figure 3.34 | Gas Distribution Releases, January 2010 to July 2012 | 3-97 |
| Figure 3.35 | Gas Distribution Releases, SCADA Detail | 3-99 |
| Figure 3.36 | Gas Distribution Releases, SCADA Initial Identifier | 3-100 |
| Figure 3.37 | Gas Distribution Releases, Initial Identifier | 3-101 |
| Figure 3.38 | Gas Distribution Releases, Response Times | 3-102 |
| Figure 3.39 | Gas Distribution Releases, Response Times, SCADA Detail | 3-103 |
| Figure 4.1 | Users of "Advanced" CPM Techniques in Liquids Pipelines, from Sample | 4-43 |
| Figure 4.2 | Total Pipelines with LDS Installations by Technology, from Sample | 4-44 |
| Figure 4.3 | Retrofit Programs by Technology, from Sample | 4-46 |
| Figure 6.1 | Annual property damage, $ millions, 2001 – 2011 Liquids pipelines are the dashed line, and gas pipelines are the solid line | 6-8 |
| Figure 6.2 | Distribution of Budget Cycles | 6-22 |
| Figure 7.1 | Typical CPM System per API 1130 | 7-2 |
| Figure 7.2 | Infrastructure Supports for CPM provided by API 1130 | 7-10 |

## LIST OF TABLES

| | | |
|---|---|---|
| Table 2.1 | Summary, January 1, 2010 to July 7, 2012 | 2-10 |
| Table 3.1 | All Incidents, January 1, 2010 to July 7, 2012 | 3-27 |
| Table 3.2 | Pipeline Right-of-Way Incidents, January 1, 2010 to July 7, 2012 | 3-29 |
| Table 3.3 | ROW Releases, 2010 to July 2012: SCADA and CPM Detail | 3-33 |
| Table 3.4 | Hazardous Liquids Releases – Initial Identification | 3-39 |
| Table 3.5 | Above Average Hazardous Liquids Releases, Initial Identifier | 3-50 |
| Table 3.6 | Hazardous Liquid Gathering Lines Releases, SCADA, CPM Detail | 3-57 |
| Table 3.7 | Hazardous Liquid Gathering Lines Releases, Initial Identifier | 3-61 |
| Table 3.8 | Natural Gas Transmission/Gathering Releases, 2010 to July 2012, SCADA Detail | 3-76 |
| Table 3.9 | Natural Gas Transmission Releases, 2010 to July 2012, Initial Identifier | 3-79 |
| Table 3.10 | Above Average Gas Transmission/Gathering Releases, Initial Identifier | 3-87 |

USACE_ESMT003690

Table 3.11    Above Average Gas Transmission/Gathering Releases, Initial Identifier ......... 3-99

Table 4.1    Currently Available External Systems .............................................................. 4-22

Table 4.2    Benefits / Drawbacks of Internal Systems ....................................................... 4-34

Table 4.3    Benefits / Drawbacks of External Systems ...................................................... 4-36

Table 6.1    Indicative Unit Costs ....................................................................................... 6-11

Table 6.2 - System Capital Costs - Full Pipeline Coverage ................................................. 6-14

Table 6.3 - System Capital Costs - 10% HCA Coverage Only ............................................. 6-14

Table 6.4 - System Operating Costs ................................................................................... 6-15

Table 6.5 - ROI (Multiples) for Technical Scenario 1 .......................................................... 6-16

Table 6.6 - ROI (Multiples) for Technical Scenario 2 .......................................................... 6-17

USACE_ESMT003691

## LIST OF ACRONYMS

| | |
|---|---|
| **AC** | Alternating Current |
| **AGA** | American Gas Association |
| **ASV** | Automated Shut-off Valve |
| **ANPRM** | Advance Notice of Proposed Rule-Making |
| **AOPL** | Association of Oil Pipe Lines |
| **API** | American Petroleum Institute |
| **BBL** | Barrels of oil |
| **CAO** | Corrective Action Order |
| **CFR** | Code of Federal Regulations |
| **CPM** | Computational Pipeline Monitoring |
| **CRM** | Control Room Management |
| **CSA** | Canadian Standards Association |
| **DC** | Direct Current |
| **DOT** | Department of Transportation |
| **DSP** | Digital Signal Processing |
| **DTS** | Distributed Temperature Sensing |
| **EPA** | Environmental Protection Agency |
| **FIR** | Failure Investigation Report |
| **FLIR** | Forward-Looking Infrared |
| **FPU** | Field Processing Unit |
| **GTI** | Gas Technology Institute |
| **HCA** | High Consequence Area |
| **HVL** | Highly Volatile Liquid |
| **IMP** | Integrity Management Plan |
| **ISA** | Instrument Society of America |
| **ISO** | International Standards Organization |
| **LDS** | Leak Detection System |
| **LPG** | Liquefied Petroleum Gas |
| **LIDAR** | Light Detection And Ranging |
| **LSS** | Leak Sensitivity Study |

USACE_ESMT003692

| **MSCF** | Thousands of standard cubic feet of gas |
|---|---|
| **NGL** | Natural Gas Liquid |
| **NTSB** | National Transportation Safety Board |
| **OPS** | Office of Pipeline Safety |
| **PHMSA** | Pipeline and Hazardous Materials Safety Administration |
| **PIPES** | Pipeline Inspection, Protection, Enforcement, and Safety |
| **PPA** | Pressure Point Analysis |
| **PPM** | Parts Per Million |
| **PRCI** | Pipeline Research Council International |
| **ROW** | Right-of-way |
| **RTTM** | Real-Time Transient Model |
| **SCADA** | Supervisory Control and Data Acquisition |
| **SPRT** | Sequential Probability Ratio Test |
| **TRFL** | Technical Rule for Pipeline Systems (Germany) |

USACE_ESMT003693

# Leak Detection Study – DTPH56-11-D-000001

Dr. David Shaw, Dr. Martin Phillips, Ron Baker, Eduardo Munoz, Hamood Rehman, Christine Mayernik

## 1.0 INTRODUCTION

This report responds to a request from the Pipeline Hazardous Materials and Safety Administration (PHMSA) for a study of leak detection systems (LDS) for hazardous liquid and natural gas pipelines. The requirements of the study were provided by PHMSA and these are reproduced in Appendix A of this section of the report. This report is a report to PHMSA.

This report does not provide any conclusions or recommendations. The report Summary is a summary of the work presented in other sections of the report. Readers wishing to draw conclusions may do so but the authors did not set out to make conclusions. The authors were tasked only to report data and technical and cost aspects of LDS to PHMSA in the time available for the project.

This report covers Tasks 3 to 7 described in Introduction Appendix A (Tasks 1 and 2 of the contract addressed a kick-off meeting and attendance at the March public workshop). Briefly, these five Tasks cover the following:

1. **Task 3:** An assessment of past incidents to determine if additional LDS may have helped to reduce the consequences of the incident.

2. **Task 4:** A review of installed and currently available LDS technologies along with their benefits, drawbacks and their retrofit applicability to existing pipelines.

3. **Task 5:** A study of current LDS being used by the pipeline industry.

4. **Task 6:** A cost benefit analysis of deploying LDS on existing and new pipelines.

5. **Task 7:** A study of existing LDS Standards to determine what gaps exist and if additional Standards are required to cover LDS over a larger range of pipeline categories.

The structure of this study report (including this introduction) is:

1. Introduction and Study Background.

2. Summary.

3. Task 3 report.

4. Task 4 report.

5. Task 5 report.

USACE_ESMT003694

6. Task 6 report.

7. Task 7 report.

The intention with each Task report is to provide concise commentary on the purpose of the Task, the method used and the important technical issues identified. Each Task report will contain its own Appendices, as appropriate. This structure is intended to provide the reader with a systematic approach to the technical issues identified from this study.

This is a technical study and does not address regulatory issues, except briefly in Task 4 and Task 7. The study examines leak detection in the pipeline industry against a backdrop of recent past incidents, and through interviewing pipeline operators and vendors to the pipeline industry.

PHMSA held a Workshop on March 27, 2012, at which pipeline operators, industry trade associations and independent experts spoke to the topic of "Improving Pipeline Leak Detection System Effectiveness." Written comments were also received by PHMSA on this topic from interested parties. This report takes into account the presentations made at the workshop and the written comments.

The report focuses entirely on leak detection. It does not consider the causes of the leak. Neither does it consider the consequences of a leak or the mitigation of the consequences of a leak. There are small and large leaks. The industry divides the term "leak" into different categories depending on how the leak happened. LDS are therefore considered as covering all of these sub-categories, regardless of whether the industry may focus on the sub-categories separately. It is the detection of both small and large leaks that is considered within this report. The use of LDS for risk management is considered. Readers wishing to know more detail, particularly with regards to Task 3, can access the publically available data to obtain this information.

## 1.1    Study Background

Due to the vast mileage of pipelines throughout the nation, it is important that dependable leak detection systems are used to promptly identify when a leak has occurred so that appropriate response actions are initiated quickly. The swiftness of these actions can help reduce the consequences of accidents or incidents to the public, environment, and property.

Recognizing the importance of leak detection, the U.S. Department of Transportation (DOT), Pipeline and Hazardous Materials Safety Administration (PHMSA), Office of Pipeline Safety (OPS) has included leak detection provisions and considerations in several sections of 49 CFR parts 192 and 195. A brief discussion of all applicable sections can be found below:

- Section 192.706, *Transmission lines: Leakage surveys*, requires operators to conduct leakage surveys on all regulated transmission lines. Transmission lines that transport unodorized gas must utilize a leak detector when conducting surveys. Leakage survey intervals will vary depending on the class location of the line.

- Section 192.723, *Distribution systems: Leakage surveys*, requires operators to conduct periodic leakage surveys using leak detectors in several locations. Leakage survey intervals will vary depending on the location of the systems (inside or outside of a business district).

- Part 192 Subpart O, *Gas Transmission Pipeline Integrity Management*, requires operators to take additional measures beyond those already required to prevent and mitigate the consequences of a pipeline failure in a high consequence area (HCA). Additional measures may include, among other things, installing computerized monitoring and leak detection systems. Under the regulation, natural gas operators are required to analyze the need and use of leak detection systems within the pipeline.

- Part 192 Subpart P, *Gas Distribution Pipeline Integrity Management (IM)*, requires operators to have a leak management program. The objective of this plan is to get operators to survey their lines for leaks and have a process by which they will manage and repair leaks that are identified.

- Sections 192.631 and 195.446, *Control Room Management (CRM)*, have inherent requirements that help improve leak detection for operators subject to the CRM regulations.

- Section 195.134, *CPM Leak Detection*, applies to each hazardous liquid pipeline transporting liquid in single phase (without gas in the liquid). On such systems, each new computational pipeline monitoring (CPM) leak detection system and each replaced component of an existing CPM system must comply with section 4.2 of API 1130 in its design and with any other design criteria addressed in API 1130 for components of the CPM leak detection system.

- Section 195.444, *CPM Leak Detection*, requires each computational pipeline monitoring (CPM) leak detection system installed on a hazardous liquid pipeline transporting liquid in single phase (without gas in the liquid) to comply with API 1130 in operating, maintaining, testing, record keeping, and dispatcher training of the system.

- Section 195.412, *Inspection of rights-of-way and crossings under navigable waters*, requires operators to survey along the pipeline rights-of-way and navigable waterways to inspect for signs of leakage. Leakage survey intervals will vary.

- Section 195.452, *Pipeline integrity management in high consequence areas*, requires operators to have a capability to detect leaks in these high consequence areas and must perform any modifications as necessary to assure and improve this capability. Leak

USACE_ESMT003696

detection is included as one of the measures operators may take to prevent and mitigate the consequences of a pipeline failure to protect HCAs along their pipeline.

In addition to regulations, PHMSA also issued an Advisory Bulletin, ADB-10-01, issued on January 26, 2010. The advisory bulletin goal was to "advise and remind hazardous liquid pipeline operators of the importance of prompt and effective leak detection capability in protecting public safety and the environment." The bulletin reminded operators of the importance of leak detection and their responsibilities to determine whether a computer-based leak detection system was appropriate for their pipeline.

The Pipeline Inspection, Protection, Enforcement, and Safety (PIPES) Act of 2006 explicitly drew attention to leak detection as part of an overall Integrity Management and Safety Program of a Pipeline. Under Sec. 21, PHMSA was required to produce a periodic leak detection technology study.

PHMSA released a Leak Detection Technology Study for the PIPES Act H.R. 5782 on December 31, 2007. The study described the capabilities and limitations of current leak detection systems used by hazardous liquids operators; issues identified during inspections and enforcement actions, which identified issues with leak detection capabilities; and research and development efforts.

The Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011 (Public Law 112–90 - JAN. 3, 2012), was signed into law on January 3, 2012. Section 8 of this law mandates that PHMSA, through the Secretary of Transportation, submit a leak detection report to Congress. This report will study leak detection systems utilized by operators of hazardous liquid pipeline facilities and transportation-related flow lines. Included in the study shall be an analysis of the technical limitations of current leak detection systems, including the ability of the systems to detect ruptures and small leaks that are ongoing or intermittent, and what can be done to foster development of better technologies and an analysis of the practicality of establishing technically, operationally, and economically feasible standards for the capability of such systems to detect leaks. The actual language from the Act is as follows:

**Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011**

**SEC. 8. LEAK DETECTION.**

*(a) LEAK DETECTION REPORT.—*

*(1) IN GENERAL. — Not later than 1 year after the date of enactment of this Act, the Secretary of Transportation shall submit to the Committee on Commerce,*

*Science, and Transportation of the Senate and the Committee on Transportation
and Infrastructure and the Committee on Energy and Commerce of the House of
Representatives a report on leak detection systems utilized by operators of
hazardous liquid pipeline facilities and transportation-related flow lines.*

*(2) CONTENTS.—The report shall include—*

*(A) an analysis of the technical limitations of current leak detection systems,
including the ability of the systems to detect ruptures and small leaks that are
ongoing or intermittent, and what can be done to foster development of better
technologies; and*

*(B) an analysis of the practicability of establishing technically, operationally, and
economically feasible standards for the capability of such systems to detect leaks,
and the safety benefits and adverse consequences of requiring operators to use
leak detection systems.*

The National Transportation Safety Board (NTSB) issued the following safety recommendation
to PHMSA in their San Bruno Pipeline Accident Report, PAR-11-01:

**NTSB Recommendation P-11-10:**

*Require that all operators of natural gas transmission and distribution pipelines
equip their supervisory control and data acquisition systems with tools to assist in
recognizing and pinpointing the location of leaks, including line breaks; such
tools could include a real-time leak detection system and appropriately spaced
flow and pressure transmitters along covered transmission lines.*

For actions conducted to date, the new Control Room Management (CRM) rule addresses human
factors and other aspects of control room management for pipelines where pipelines use
supervisory control and data acquisition (SCADA) systems. Under this rule, affected pipeline
operators must define the roles and responsibilities of controllers and provide controllers with the
necessary information, training, and processes to fulfill these responsibilities. Operators must
also implement methods to prevent controller fatigue. The rule further requires operators to
manage SCADA alarms, assure control room considerations are taken into account when
changing pipeline equipment or configurations, and review reportable incidents or accidents to
determine whether control room actions contributed to the event.

In addition, on August 25, 2011, PHMSA published an Advance Notice of Proposed Rulemaking
(ANPRM), which requested comments regarding leak detection systems on natural gas pipelines.

USACE_ESMT003698

As part of a larger study on pipeline leak detection technology, PHMSA conducted a public workshop in March 2012 on leak detection effectiveness. PHMSA is looking for this study to, among other aspects, examine how enhancements to SCADA systems can improve recognition of pipeline leak locations.

PHMSA may use the output of the study and other related initiatives to consider what additional actions by PHMSA are needed to address the NTSB recommendation.

As a result of the aforementioned Congressional mandate and NTSB recommendation, PHMSA has issued this task order for a leak detection study that will cover natural gas and hazardous liquid lines.

USACE_ESMT003699

## INTRODUCTION APPENDIX A: LEAK DETECTION STUDY REQUIREMENTS

### Task 3 – Review and assess previous pipeline incidents

PHMSA will provide access to its pipeline incident data. The Contractor shall examine past pipeline incidents, including consideration of any non-PHMSA datasets that may provide useful insight and analysis to meet project objectives. Determinations shall be made to conclude whether implementation of further leak detection capabilities would have mitigated effects to the public and surrounding environment. Damage to surrounding environment/public must utilize standard fire science practices. The level of protection needed for adequate mitigation shall be determined.

### Task 4 – Technological Feasibility

The Contractor shall compare all methods and determine whether current systems (or multiple systems) are able to adequately protect the public and environment from pipeline leaks and incidents. Legacy equipment currently utilized by operators shall be discussed. Ability to retrofit aforementioned legacy systems shall be addressed. All benefits and drawbacks of methods shall be discussed. Special consideration to the method/systems ability to detect small/intermittent leaks shall be made. Any technology gaps shall be identified and thoroughly explained.

### Task 5 – Operational Feasibility

The Contractor shall analyze leak detection methods and systems that are currently being used throughout the industry. Leak detection methods and systems shall be defined and categorized. Methods shall range from visual inspection techniques, instrumented monitoring of internal pipeline conditions, and external instrumentation for detecting leaked hydrocarbons. A view of how many operators are adequately protecting their infrastructure with leak detection systems shall be portrayed. Operational aspects (i.e. procedures, protocols, best practices, workforce, etc.) shall be analyzed. Consideration of reliability, availability and maintainability system aspects shall be discussed. An analysis of how of further leak detection methods/system deployment would affect pipeline operations shall be conducted.

### Task 6 – Economical Feasibility

The Contractor shall perform a cost benefit analysis for deploying leak detection systems on new and existing pipeline systems. Cost benefit shall determine the lifetime operational cost of the system and shall take into account the benefit that may be seen by the public and surrounding environment. The analysis shall focus on the entire pipeline infrastructure and a separate analysis

USACE_ESMT003700

shall be conducted to include pipelines in HCAs only. Damage to surrounding environment/public must utilize standard fire science practices.

**Task 7– Discuss recommended leak detection standards**

Draw together the technology gaps, operational capabilities, and economic feasibility and analyze the practicability of establishing technically, operationally, and economically feasible standards to provide adequate protection to the Nation against pipeline leaks, if such standards don't already exist. Analysis should be specific to the type of pipeline (gas distribution, gas transmission, hazardous liquid, etc.). Analysis shall take into consideration pipeline locations (i.e. Class Locations, HCAs).

## 2.0  SUMMARY

### 2.1  Overall Summary of Work

This section of the Leak Detection Systems (LDS) study summarizes the study and lists what the study considers are the significant technical issues related to all five Tasks covered by the report. This study report focuses on technical and economic issues of LDS. This study report does not address regulations associated with LDS, except briefly in Task 4 on LDS technology and Task 7 in relation to Standards.

For the purposes of this report, transport-related flow lines are referred to as hazardous liquid gathering lines. The latter term is common to the industry whereas transportation-related flow lines are newer terminology that is not in such widespread use at this time.

For this study, LDS is defined as any technology or method that can be employed by a pipeline operator to detect the loss of fluid from a pipeline and/or its associated fittings.

This study used the following sources to obtain the summary:

1.  The PHMSA LDS Workshop and industry submissions (March 27, 2012)

2.  The PHMSA incident report database from January 1, 2010 to July 7, 2012

3.  PHMSA Corrective Action Orders (CAOs)

4.  PHMSA Failure Investigation Reports (FIRs)

5.  NTSB reports

6.  Interviews with pipeline operators

7.  Interviews and literature reviews for LDS vendors

8.  Published Standards on LDS

9.  Published Literature

The above information sources are not dealt with individually in the following report. They are used as sources in many different parts of the report.

The reporting covers five Tasks defined by PHMSA. The wording of these 5 Tasks can be found in Introduction Appendix A. Each Task forms a separate chapter and each chapter has its own tables, figures, and appendices, as appropriate. This report is a report to PHMSA.

The purpose of this report is to assess leak detection systems on pipelines. The report focuses entirely on leak detection. It does not consider the causes of the leak. Neither does it consider the

consequences of a leak or the mitigation of the consequences of a leak. In Task 3, the authors did not examine data for mitigating circumstances. The authors did not analyze where a loss of containment occurred. The only issue analyzed was how a loss of containment was detected. Readers wishing more detail on how, and where large and small releases took place can analyze the PHMSA databases further. The detection of both small and large leaks was considered, not the consequences or locations or reason for the size of a leak.

The authors fully understand that different failure mechanisms are involved in the loss of containment (a release). The report is not concerned with the failure mechanisms, only detection of the release. As explained later, failure of a pipeline can result in the sudden release of a large volume of fluid in a short period of time. However, other failure mechanisms can result in a buildup of large volumes over a period of time. Timely detection of smaller release volumes per unit time is important to limit the total volume that escapes. With large volume releases per unit time, timely detection is paramount.

The mechanism for large volume releases per unit time is often a rupture of a pipe body or a pipe seam. However, pipeline operator data in the PHMSA database indicates that operators can have large volume releases per unit time that are classified as leaks and not ruptures. In addition, PHMSA does not define a rupture for operators reporting an incident in a way that succinctly refers only to a pipe or weld material rupture. In addition, PHMSA provides other classifications for an operator to choose other than leak or rupture. Hence, the report uses the volume of reported releases as a primary means of examining incident reports filed by pipeline operators with PHMSA.

This study is accompanied by a parallel study by PHMSA on automatic and remotely controlled valves. This study on LDS does not address this issue of shut-off valves in regards to the mitigation effects of loss of containment. This LDS study focuses on how an operator can detect (know) that there is loss of fluid containment and that the controller of the relevant pipeline must respond. The study does not consider control room processes or procedures in any specific detail but it should be noted that such procedures are an essential part of an LDS. The study focuses on the information that is given to the control room.

The study found that the pipeline industry considers LDS differently depending on whether pipelines transport hazardous liquids or natural and other gas. The study infers that many hazardous liquid operators are deploying some form of LDS but the incident reports reviewed from the PHMSA incident database suggest this may not be the case. The study also infers that many natural and other gas operators rely on SCADA as an LDS.

## Leak Detection Systems

A leak detection system has no effect in reducing the likelihood of a leak occurring.

It is critical to remember that leak detection systems are *Systems* and can be usefully broken down into Personnel, Procedures and Technologies. Any implementation that focuses on less than all three of these components will not be optimal. The leak incidents that are studied in Task 3 include many where the response to the incident suffered from a weakness in just one of these areas, for example with excellent controllers and LDS technology, but poorly prepared procedures.

Also as a system, an LDS can be in several *States*. Integration using procedures is optimal when it is recognized that alarms from the technology are rarely black-and-white or on/off situations. Rather, at a minimum, there is a sequence: leak occurrence; followed by first detection; followed by validation or confirmation of a leak; followed by the initiation of a shutdown sequence. The length of time that this sequence should take depends on the reliability of the first detection and the severity of the consequences of the release. Procedures are critical to define this sequence carefully – with regard to the technology used, the personnel involved and the consequences – and carefully trained Personnel are needed who understand the overall system, including technologies and procedures.

We note that there is perhaps an over-emphasis of technology in LDS. A recurring theme is that of *false* alarms. The implication is that an LDS is expected to perform as an elementary industrial automation alarm, with an on/off state and six-sigma reliability. Any alarm that does not correspond to an actual leak is, with this thinking, an indicator of a failure of the LDS system. Instead, multiple technical studies confirm that far more thought is required in dealing with leak alarms. Most technologies infer the potential presence of a leak via a secondary physical effect, for example an abnormal pressure or a material imbalance. These can often be due to multiple other causes apart from a leak. The solution can be combination of technology – utilizing multiple redundant independent LDS, for example; procedures – specifying a check-list of other potential causes for the symptom, for example; or personnel – training controllers to understand the physical principles causing the alarm in more detail.

## Current Mainstream Practice

Leak detection technologies are available in many different forms, and some are very complex. However, they do represent a wide range of performance indicators and costs that cover a wide range of requirements in terms of sensitivity, accuracy and reliability. Nevertheless, operators have a strong preference for leak detection that utilizes field equipment that is already in place. This accounts for the dominance of leak detection by Pressure/Flow Monitoring and CPM on all

pipelines, since the monitoring is already provided by the SCADA system, and the CPM is a relatively inexpensive addition to an existing metering infrastructure. Where SCADA or metering systems are not already in place, they are rarely installed with the sole objective of leak detection.

It is acknowledged that Pressure/Flow Monitoring will catch, at best, large ruptures. Leak detection by CPM is limited by the accuracy of the metering and uncertainties in the line fill, both of which are a percentage of the pipeline flow rate. Therefore a high flow rate pipeline will be exposed quite naturally to large spills. This report explores why, despite the acknowledged shortcomings of these basic methods, they continue to dominate, and why there is general reluctance to upgrade to more complex methods.

## SCADA and LDS

The study draws a distinction between supervisory control and data acquisition (SCADA) systems and LDS. SCADA is about controlling the pipeline operating parameters in response to normal operational requirements and abnormal situations. LDS is separate from SCADA in that it focuses on determining if there is an unintentional loss of fluid containment that requires remedial action. The LDS may use SCADA instrumentation but it is not necessary for all types of LDS to use SCADA.

A further clarification is considered necessary. The pipeline industry refers to leaks and ruptures. Release incidents reported to PHMSA are classified this way. PHMSA advises operators that a rupture is a situation where the pipeline becomes inoperable. The study topic is leak detection and the authors wish to convey that, in general, a rupture of a pipeline, piping or other pressurized fluid[1] container is a situation that needs to be detected very rapidly and responded to and contained in the shortest possible time. A rupture is generally a crisis situation that needs to be brought under control. Volume released from a rupture per unit time is much greater than where a pipe or other pressurized fluid container is leaking without rupturing.

It became clear after study that these classifications do not necessarily reflect the volume released across all incidents in a way that makes sense to use these classifications as data filters. That is, incidents described as leaks can also have reported large release volumes. Hence, KAI decided to ignore rupture and leak classifications entirely. Instead, the data was managed by dividing them between incidents along the right-of-way (ROW) and those incidents on operator property. The data assessment then proceeded with those incidents associated with a ROW, regardless of whether an operator had classified the incident as a leak or a rupture. For incidents

---

[1] Fluid refers to both the liquid and gaseous state inside a pipeline.

USACE_ESMT003705

on operator property, it is considered that operators can monitor and maintain equipment more easily to prevent leaks or ruptures than on long lengths of buried pipeline.

## Types of Leak Detection

Leak detection systems are intended to detect all three: Leaks, Ruptures and small Seeps. Therefore, it is important to remember that different LDS are typically appropriate for each of these three categories of fluid loss. In principle, an LDS intended for rupture mitigation need not be very sensitive, but should be very fast. An LDS intended for leaks may take longer to detect a loss, but should be sensitive and reliable in its diagnosis. It should also try to provide information to assist with localization, since the release may not yet be visible to fly-over or walking patrols. LDS for small seeps may be performed using intermittent high-resolution inspection, perhaps using in-line tools or the newer fly-over technologies.

Leak detection systems are most valuable by providing continual monitoring between periodic over-line surveys, and where operators cannot easily inspect the actual pipe and fittings for leaks. These locations are mostly on long distances of buried pipe. Pipe, welds and appurtenances associated with the overall pipeline and its facilities that are above ground are locations that can be checked by operators frequently and much more easily than for buried pipe. Nevertheless, remote LDS is valuable at remote and un-manned surface facilities.

## Incident Reports

Task 3 reviews PHMSA incident reports. The volume of unintentional releases reported in the PHMSA incident reports vary over a large range. There are some large release volumes and a lot of small release volumes in the incident data studied. Generally, the large volumes are those that have the most impact on people, property and environment. The study has not defined a large release volume but instead has separated those incident reports with above-average release volumes from those below average release volumes on the pipeline ROW.

In all three categories of pipeline, hazardous liquids, natural and other gas transmission and gathering and natural and other gas distribution, ROW incidents and above- average release volume incidents on the ROW provide adequate numbers of incidents for the purpose of this study.

Task 3 of the report summarizes pipeline operator supplied data for all release volumes over the 30-month period from January 1, 2010 to July 7, 2012. Release volume was used as the primary means to sort the data. It was then further divided between ROW and operator property for reasons given in the section on Task 3. Pipeline operators report to PMHSA under three different categories: hazardous liquid pipeline systems, natural and other gas transmission and gathering

USACE_ESMT003706

pipeline systems, and gas distribution systems. These three reporting categories are used in Task 3.

While all release volumes are reported in all categories, a separate report is provided on large volume releases, regardless of the mechanism for the loss of containment or the location of the release. This separate reporting was to look more closely at the detection of large volume releases without including the much larger number of small volume releases.

The data supplied by pipeline operators to the PHMSA incident databases is not always complete. It is the pipeline operator's responsibility to ensure the completeness and accuracy of the data. Operators are allowed to file supplementary reports to both update and correct data. The authors in Task 3 of this report used incomplete filings as best they could. However, the authors did not have the resources to check the accuracy of the data used. Hence, the authors do not accept responsibility for any inaccurate or incomplete data supplied or not supplied by operators.

Task 3 also used PHMSA Corrective Action Orders and Failure Investigation Reports, which are publically available from the PHMSA website. The authors took this information at face value and did not have the resources to check this publically available information with specific operators. Therefore, the authors do not take responsibility that this information is accurate.

The reporting performed of operator data in Task 3 was intentionally simple. As previously stated, the purpose was to assess detection of loss of containment as reported by operators. The purpose was not to perform an in depth study of these databases to extract fine detail or cross reference different data types. A statistical or probabilistic analysis was not performed. That was not the intent. The data were ranked by release volumes and presented in both graphical and tabular format for communication to PHMSA. The number of incident reports in each operator category was considered adequate to represent what operators have reported for incidents over the 30 month period used. The results presented here are not considered to have misrepresented what operators have reported.

If additional detail is required by industry based on the PHMSA incident reporting databases, this can be performed but is outside the scope of this report.

## Internal and External Detection

Task 4 covers the summary of the limitations of current LDS technology. The objectives in Task 4 are:

- A technical study of the state-of-the-art and current industry practices.

- A comparison of LDS methods to determine whether current systems (or multiple systems) are able to adequately protect the public and environment from pipeline leaks and incidents:
- Legacy equipment currently utilized by operators
- Ability to retrofit legacy systems
- Benefits and drawbacks of LDS methods
- Ability to detect small/intermittent leaks
- Identification and explanation of current technology gaps

In particular, with regard to gas pipelines, we reviewed SCADA system tools to assist in recognizing and pinpointing the location of leaks, including line breaks; including real-time leak detection systems and appropriately spaced flow and pressure transmitters along covered transmission lines.

The approach to this technical review is two-fold. It covers the purely technical engineering analysis components of Task 4, including:

- An analysis of the current state-of-the-art and accepted best practices
- Ability to retrofit legacy systems, benefits and drawbacks of LDS methods, and ability to detect small/intermittent leaks, from a technical and theoretically practical point of view
- An identification of major current technology gaps

It also includes a study of actual operator technology choices and current industry practices, summarizing direct contacts with industry operators and technology suppliers.

This review covers both internal LDS and external LDS. Internal LDS is an LDS that uses the flow and pressure within the pipeline to detect a potential rupture or leak. External LDS is LDS that senses, by some means, that fluid is escaping from the pipeline from outside of the pipeline.

Task 4 also reports on interviews held with nine liquids pipeline companies – including two smaller crude oil and petroleum products pipelines; five gas transmission pipelines; and five gas distribution pipelines.

Interviews were also held with twelve technology suppliers covering Computational Pipeline Modeling (CPM, four suppliers); Acoustic and Pressure Wave Analysis (four suppliers); Fiber optic cables (two suppliers); Hydrocarbon sensors (two suppliers); and Thermal imaging (two suppliers). Note that two of these suppliers develop multiple technologies.

The technology part of the interviews covered three purely technical issues:

USACE_ESMT003708

1. Technology in place at present
2. Performance of current systems and current technology "gaps"
3. Retrofit capability, and plans for retrofitting and improving current technology

Task 5 reports on operational feasibility of LDS including the following objectives:

- A technical study of recommended best operational procedures and current industry practices
- Consideration of reliability, availability and maintainability
- Risk assessment and benefit assessment
- Testing, maintenance, training and qualification, and continual improvement

The approach to this technical review is two-fold. It covers the purely technical engineering analysis components of Task 5, including:

- An analysis of the current standards and accepted best practices
- Current operational regulations and guidelines

It also includes a study of actual operator choices and current industry practices, summarizing direct contacts with industry operators and technology suppliers.

Task 6 reports on the economic feasibility of LDS. The principles of cost benefit analysis for deploying leak detection systems on new and existing pipeline systems are covered. Typical cost elements for equipping a new, and retrofitting an existing, pipeline system are listed as a guideline – covering the technical options presented in Task 4 above but focusing on SCADA and CPM based leak detection, as is the norm today.

The cost benefit is based on the lifetime operational cost of the system. Variables including the benefits to the public and surrounding environment are assessed. These are markedly different for pipelines that are situated within HCAs.

Task 7 reviews and discusses current LDS standards. It draws together the technology gaps, operational capabilities, and economic feasibility and analyze the practicability of establishing technically, operationally, and economically feasible standards to provide adequate protection to the Nation against pipeline leaks, if such standards don't already exist.

## 2.2   Overall Summary

For simplicity, the overall summary is listed under each Task and its topic to assist the reader on where to look for additional information.

USACE_ESMT003709

## Overall Summary for Task 3 - Review and Assess Previous Pipeline Incidents

Table 2.1 summarizes some of the data reported for Task 3.

USACE_ESMT003710

### Table 2.1       Summary, January 1, 2010 to July 7, 2012

| Metric | Hazardous Liquids Pipelines | Natural Gas Transmission | Natural Gas Distribution | Total |
|---|---|---|---|---|
| # of Release Incidents | 766 | 295 | 276 | 1,337 |
| # of Ruptures | 21 | 41 | 13 | 75 |
| # of Leaks | 567 | 136 | 63 | 766 |
| # of Mechanical Punctures | 33 | 25 | 51 | 109 |
| # of Overfill or Overflow | 46 | 0 | 0 | 46 |
| # of Other Release Types | 99 | 93 | 149 | 341 |
| # Contained on operators property | 521 | 95 | 4 | 620 |
| # Started on operators property | 41 | 0 | 0 | 41 |
| Releases Located on right-of-way (ROW) | 197 | 141 | 42 | 381 |
| # of Ruptures | 12 | 33 | 13 | 58 |
| # of Leaks | 139 | 61 | 63 | 263 |
| # of Mechanical Punctures | 27 | 22 | 51 | 112 |
| # of Other Release Types | 19 | 25 | 0 | 44 |
| # of Pipe body release incidents on ROW | 119 | 86 | 30 | 205 |
| # of Pipe seam release incidents on ROW | 13 | 6 | - | 19 |
| # of valve release incidents on ROW | 17 | 6 | - | 23 |
| # of flange incidents on ROW | 5 | 1 | - | 6 |
| # of other reason incidents on ROW | 43 | 42 | - | 85 |
| Maximum release volume (gals or MSCF) | 843,444 gallons | 614,257 MSCF | 25,555 MSCF | - |
| First to Identify Release Incident on ROW | | | | 381 |
| Air Patrol | 10 | 5 | - | 15 |
| Pipeline Controller | 10 | 1 | - | 11 |
| CPM LDS or SCADA | 23 | 21 | 1 | 45 |
| Ground Patrols | 4 | 7 | 4 | 15 |
| Local Operating Personnel | 38 | 40 | 50 | 128 |
| Emergency Responder | 14 | 4 | 157 | 175 |
| Public | 45 | 38 | 19 | 102 |
| Pressure Test | 2 | - | - | 2 |
| Other | 8 | 10 | 13 | 31 |
| Third Party causing the release | - | 15 | 32 | 47 |

Observations from the work performed on Task 3, based on pipeline operator data submitted to PHMSA between January 1, 2010 and July 7, 2012 for hazardous liquid pipelines were:

1. The pipeline controller/control room identified a release occurred around 17% of the time.

USACE_ESMT003711

2. Air patrols, operator ground crew and contractors were more likely to identify a release than the pipeline controller/control room.

3. An emergency responder or a member of the public was more likely to identify a release than air patrols, operator ground crew and contractors.

4. A CPM LDS was the leak identifier in 17 (20%) out of 86 releases where a CPM system was functional at the time of the release.

5. SCADA was the leak identifier in 43 (28%) out of 152 releases where a SCADA was functional at the time of the release.

6. For hazardous liquid pipelines, SCADA or CPM systems by themselves did not appear to respond more often than personnel on the ROW or members of the public passing by the release incident.

7. It appeared that procedures may have allowed alarms to be ignored or to re-start pumps or open a valve by controllers in several of the larger volume releases, thus increasing the size of the release.

8. Large distances between block valves may also have been a contributory factor in the size of some releases.

9. In 132 incidents along the ROW where a leak/rupture occurred on a pipe body or pipe seam, there were 28 incidents above the average volume release and 104 below the average volume of 29,230 gallons

10. The chances of having an above-average release volume were around 1 in 5. That is a release volume greater than around 29,230 gallons.

11. For 32 out of 68 incidents the pipeline shut down time was between 1 and 14 minutes.

12. For 27 out of 68 incidents the pipeline shut down time was between 15 and 40 minutes.

13. For 8 out of 68 incidents the pipeline shut down time was between 1 hour and 44 hours and 30 minutes.

Observations from the work performed on Task 3, based on pipeline operator data submitted to PHMSA between January 1, 2010 and July 7, 2012 for natural gas transmission pipelines were:

1. The pipeline controller/control room identified a release occurred around 16% of the time.

2. Air patrols, operator ground crew and contractors were more likely to identify a release than the pipeline controller/control room.

3. An emergency responder or a member of the public was equally likely to identify a release as air patrols, operator ground crews or contractors.

4. SCADA was the leak identifier in 21 (15%) out of 141 releases where a SCADA was functional at the time of the release.

5. For gas transmission pipelines, SCADA did not appear to respond more often than personnel on the ROW or members of the public passing by the release incident.

6. Large distances between block valves may also have been a contributory factor in the size of some releases.

7. For 92 incidents along the ROW where a leak/rupture occurred in a pipe body or pipe seam, there were 22 incidents above the average volume release and 70 below the average volume of 23,078 MSCF.

8. The chances of having an above-average release volume were around 1 in 4. That is a release volume greater than around 23,078 MSCF.

9. For 40 out of 101 incidents the pipeline shut down time was between 5 minutes and 1 hour.

10. For 61 out of 101 incidents the pipeline shut down time was longer than 1 hour.

Observations from the work performed on Task 3, based on pipeline operator data submitted to PHMSA between January 1, 2010 and July 7, 2012 for gas distribution pipelines were:

1. The pipeline controller/control room identified a release occurred less than 1% of the time.

2. Operator ground crew and contractors were much more likely to identify a release than the pipeline controller/control room.

3. An emergency responder or a member of the public was around 3 to 4 times more likely to identify a release than operator ground crews or contractors.

4. People causing third party damage reported around 1 in 8 releases.

5. Based on the incident reports submitted to PHMSA by pipeline operators, releases on gas distribution lines were more likely to ignite and more likely to explode than releases on gas transmission and hazardous liquids pipelines. Hazardous liquids were the least likely to ignite and explode.

## Overall Summary for Task 4 - Technological Feasibility

The overall technical issues identified from the work performed on Task 4 were:

1. This report is an update to the Leak Detection Technology Study for the PIPES Act (H.R. 5782) published by the U.S. Department of Transportation on 31 December 2007. This update confirms the summary of the 2007 Study. It also aims for a definition of technical gaps, a more precise differentiation among forms of Internal LDS, and a simplified exposition of the forms of External LDS.

2. LDS are engineered systems. This means that precisely the same technology, applied to two different pipelines, can have very different results. Even simple technology, applied carefully, can yield very useful leak detection.

3. Recommended best practices for leak detection for gas pipelines are lacking, as are best practices for external sensor-based leak detection.

4. Many technologies have been adopted from other process industries that involve fluid movement, including storage, the chemical process industries, water distribution, and the nuclear industry.

5. Unlike most other subsystems used on a pipeline, LDS do not have nameplate or rated performance measures that can be used universally across all pipelines. This is particularly true of CPM where computer software, program configuration and parameter selection all contribute, in unpredictable ways, to overall performance.

6. Many performance measures present conflicting objectives. For example, leak detection systems that are highly sensitive to small amounts of lost hydrocarbons are naturally also prone to generating more false alarms.

7. The performance of a leak detection system depends critically on the quality of the engineering design, care with installation, continuing maintenance and periodic testing. Differences in any one of these factors can have a dramatic impact on the ultimate value of a leak detection system.

8. There is no technical reason why several different leak detection methods cannot be implemented at the same time. In fact, a basic engineering robustness principle calls for at least two methods that rely on entirely separate physical principles.

9. Practically all Internal LDS technologies applicable to liquids pipelines apply equally well to gas pipelines in principle also. Because of the much greater compressibility of gas, however, their practical implementation is usually far more complex and delicate. Because of these difficulties, most gas operators therefore avoid attempting their implementation.

10. Even though an internal technology may rely upon a relatively simple, basic principle like mass balance, it is a complex overall system. For a mass balance system to work it requires robust metering, robust SCADA and telecommunications, and a robust computer to perform the calculations. Each of these subsystems is individually complex.

11. Pressure/Flow Monitoring, while very widespread, has known limitations. For example:

USACE_ESMT003714

    a.  In gas systems, a downstream leak may have almost no effect on flow rate

    b.  With gas pipelines, only a relatively large fluid loss will cause a measurable pressure drop within normal error limits if the leak is far away from the pressure sensor.

    c.  Near the inlet and the outlet of the pipeline a leak leads to little or no change in pressure.

    d.  Flow rates and pressures near any form of pumping or compression will generally be insensitive to a downstream leak

12. External leak detection is both very simple – relying upon routinely installed external sensors that rely upon at most seven physical principles – and also confusing, since there is a wide range of packaging, installation options, and operational choices to be considered.

13. External leak detection sensors depend critically on the engineering design of their deployment and their installation.

14. External sensors have the potential to deliver sensitivity and time to detection far ahead of any internal system.

15. Most technologies can be retrofitted to existing pipelines. The few exceptions are noted in the Task 4 analysis. In general, the resistance to adopting external technologies is, nevertheless, that fieldwork on a legacy pipeline is relatively expensive.

16. The main identified technology gaps – including those identified by operators – include: reduction or management of false alarms; applicable technical standards and certifications; and value / performance indicators that can be applied across technologies and pipelines.

## Overall Summary for Task 5 - Operational Feasibility

The overall technical issues identified from the work performed on Task 5 were:

1.  In principle, a cost-benefit analysis of an LDS involves a risk reduction analysis, a performance analysis of the LDS, and an engineering design that includes a costing. Operators rarely evaluate the benefits, included in the first two items, in detail.

2.  Testing, Maintenance, Control Room Procedures, Training and Continual Improvement are the main operational issues that an operator must consider.

3.  Gas pipelines are given very little guidance with these issues, either by the industry associations or by regulations. Liquids pipelines have a complete statement of principles in the CFR. It is our opinion that a complete re-development of these operational guidelines is unnecessary, since the basic principles of responsible operations are very similar.

4. Additional, internal standards at pipeline companies are important since with leak detection "one size does not necessarily fit all".

5. Since flow metering is usually a central part of most internal leak detection systems, flow meter calibration is by far the most laborious part of an internal system's maintenance. Also, the central computer and software technology usually has maintenance requirements far greater than most industrial automation and need special attention.

6. A particular organizational difficulty with leak detection is identifying who "owns" the leak detection system on a pipeline. A technical manager or engineer in charge is typically appointed, but is rarely empowered with global budgetary, manpower or strategic responsibilities. Actual ownership of this business area falls variously to metering, instrumentation and control, or IT.

## Overall Summary for Task 6 - Economical Feasibility

The overall technical issues from the work performed on Task 6 were:

1. With a few notable exceptions, the benefit of leak detection is best understood as a reduction in risk exposure, or asset liability. This has a hard, economic definition and is understood by investors.

2. Leak detection systems have a very long lifetime. Over a total lifecycle, the cost-benefit approaches the reduction in asset liability caused by the system, divided by annual operational costs. Since the latter is small and the former usually quite large, cost-benefit for these systems is typically very good.

3. Nevertheless, operator practice is instead to budget over a $1 - 5$ year timeframe, not total lifecycle. In this case, the cost-benefit is closer to the reduction in asset liability divided by capital costs. Since the latter is rather greater than annual recurring costs, the cost-benefit accordingly appears rather worse.

4. Generally, overall full-lifecycle costs of an LDS are minor compared with other systems on the pipeline: automation and control, metering, inspection and maintenance, for example. The difficulty lies in convincing operators of their value so that they do not waste their investments.

5. Objectively, the largest cost element in any LDS is the investment in personnel who understand, manage, plan and improve leak detection within the pipeline company. Any leak detection beyond the simplest of technologies soon requires these experts.

6. Any form of regulation impacts budget processes. None of the operators we contacted assume the risk of non-compliance with binding standards.

## Overall Summary for Task 7 - Discuss Recommended Leak Detection Standards

The technical issues from the work performed on Task 7 were:

1. In our opinion the sections of API RP 1149 that describe the *principles* of how to assess the performance of a leak detection system on a liquids pipeline also apply well to gas pipelines.

2. Similarly, most recommended practices for internal LDS contain principles that are valuable for external systems as well. Equivalent standards for external systems would be very useful to the industry.

3. The Canadian CSA Z662 standard expands in several useful ways on the 49 CFR 195, including by setting measurable performance standards for leak detection.

4. Other potential overseas regulation that has been successful includes the German TRFL regulations and several derivatives in Europe, and the U.K. DTI regulations for safety of offshore pipelines.

# 3.0   TASK 3: REVIEW AND ASSESSMENT OF PREVIOUS PIPELINE INCIDENTS

## 3.1   Introduction

Task 3 is about assessing past leak incidents. The purpose of the task as given by PHMSA to KAI is repeated below under "Purpose of Task 3."

In responding to the task requirements, KAI decided to use mostly PHMSA material and base the assessment on incident reports between January 1, 2010 and July 7, 2012. The work presented here follows the way in which PHMSA incident reports are divided between hazardous liquids, gas transmission and gathering, and gas distribution. The results are presented in a top-down fashion, starting first with the big picture, and then looking at incidents along a right-of-way (ROW). These ROW of incidents are further separated into those involving only pipe and pipe seams, with above-average release volumes analyzed further. From the above-average release volume incidents, case studies were selected.

The detail of the method used is described followed by a short discussion on leak and rupture to assist the reader with the definition of these two terms as they relate to this report and leak detection systems. This review was not intended to be an exhaustive summary of the incident data provided by pipeline operators. This review does not provide conclusions or recommendations. It provides data based on a simple review of the data in the incident reports filed with PHMSA by pipeline operators. Where data in these incident reports is incorrect or flawed in some way, then these flaws carry through to the results presented here. The incident reporting process is not a one-time process. Pipeline operators can revise, correct and update filings on an incident as the details of an incident become clarified. Some incident reports are not complete. The authors have managed incomplete reporting as best they could with the resources and time available to perform this work.

Where operators may have updated incident reports after the cut-off date of July 7, 2012, then this updated data is not included in this analysis.

## 3.2   Purpose of Task 3

The purpose of Task 3 is the following:

> "*The Contractor shall examine past pipeline incidents, including consideration of any non-PHMSA datasets that may provide useful insight and analysis to meet project objectives. Determinations shall be made to conclude whether implementation of further leak detection capabilities would have mitigated effects*

*to the public and surrounding environment. Damage to surrounding
environment/public must utilize standard fire science practices. The level of
protection needed for adequate mitigation shall be determined."*

## 3.3   Method

To respond to Task 3, KAI used the following data sources:

1. PHMSA LDS Workshop and industry submissions (March 27, 2012)

2. PHMSA incident report database from January 1, 2010 to July 7, 2012

3. PHMSA Corrective Action Orders (CAOs)

4. PHMSA failure investigation reports (FIRs)

5. NTSB reports

6. Interviews with pipeline operators

7. Interviews and literature reviews for LDS vendors

8. Published Standards on LDS.

9. Published Literature

The above information sources are not dealt with individually in the following report on Task 3.
The following describes the methodology in more detail including the section titles that are used
in the remainder of this report.

This study is confined to incidents that have occurred on onshore pipelines. The categories of
pipeline that have been evaluated are:

1. Hazardous liquids, including crude oil, refined products and highly volatile liquids,
   known as HVLs, including gathering lines (transportation-related flow lines).

2. Natural gas transmission and gathering.

3. Natural gas distribution.

The study is not concerned with the cause of a leak or rupture, although references may be made
to the causes of a spill when discussing the data.

The detailed data review is confined to those incidents that have been reported between January
1, 2010 and July 7, 2012. This start date marks the introduction of the new format of PHMSA
incident reporting forms. These new forms request additional data relevant to this study whereas
the forms prior to 2010 where less detailed. The number of incidents studied is considered
sufficiently adequate to enable a satisfactory summary to be made with respect to Task 3.

The study of these data sources has yielded results that are described in following sections, namely:

1. Leaks and Ruptures

2. The Big Picture

3. Specific Data Selected for ROW Assessments

4. Incident Reporting for the Hazardous Liquid Pipeline Industry on the ROW

5. Above Average Hazardous Liquid Releases

6. Hazardous Liquid Gathering Lines (Transportation-Related Flow Lines)

7. Hazardous Liquid Case Studies

8. Incident Reporting for the Natural Gas and Other Gas Transmission and Gathering Industry

9. Natural Gas and Other Gas Transmission Case Studies

10. Incident Reporting for the natural gas and other gas distribution industry

11. Above Average Gas Transmission Releases

12. Natural Gas and Other Gas Transmission Case Studies

13. Incident Reporting for the Natural Gas and Other Gas Distribution Industry

## 3.4   Leaks and Ruptures

The pipeline industry refers to leaks and ruptures. A rupture is generally considered as a situation where the pipeline becomes inoperable. A leak is where operation of the pipeline and its facilities can continue operating as intended.

The study topic is leak detection and the authors wish to convey that, in general, a rupture of a pipeline, piping or other pressurized fluid[2] container is a situation that needs to be detected and contained in the shortest possible time. When a pipeline ruptures, the volume of escaped fluid escaping can be unavoidably large even if detection, response, and containment are performed very quickly.

If detection and shutdown is not acted on as soon as a rupture occurs the consequences can escalate. It is desirable not to have pipeline ruptures. Leaks and ruptures are not to the same scale in terms of fluid lost per unit time. Leaks and ruptures should not be considered a single class of pipeline failure because they are not.

---

[2] Fluid refers to both the liquid and gaseous state inside a pipeline.

Fluid volume released from a rupture per unit time is much greater than for a pipe or other pressurized fluid container that is leaking but has not ruptured. Hence, the extent of the consequences from a rupture can be greater than for a leak in relation to the time at which the fluid first started escaping from the pipeline system. However, leaks that continue for some time without detection can also have significant consequences because they are not detected.

Leak detection systems are principally about identifying leaks when you do not know where to look or cannot easily inspect the actual pipe and fittings for leaks. These locations are mostly on long distances of buried pipe. Pipe, welds, and appurtenances associated with the overall pipeline and its facilities that are above ground are locations that can be checked by operators frequently and much more easily than for buried pipe.

To provide meaningful answers from the chosen data sources, KAI considered how to address leak and rupture descriptions, as provided by operators in the PHMSA incident reports. It may seem obvious to filter the incident report database in this way because of the obvious differences between a rupture event and a leak event. It became obvious after study that these classifications do not necessarily reflect the volume released across all incidents in a way that makes sense to use these classifications as data filters. That is, incidents described as leaks can also have reported large release volumes. Some incidents described by operators as leaks are also large volume releases per unit time. In addition, leak and rupture are not the only classifications used in the incident reports to describe a release. Hence, KAI decided not to use rupture and leak classifications in this study because of the way the release classifications are reported in the PHMSA databases. This does not mean that rupture and leak classifications are equal or the distinction is not important. It means that classifying the data by volume released was more appropriate to this study in the time available and with the resources at hand.

If industry needs better resolution of performance on true ruptures of pipe or weld material then additional analyses of the PHMSA databases can be performed and published. But this study is about leak detection and not the mechanism that caused loss of containment.

The data were managed by dividing them between incidents along the right-of-way (ROW) and those incidents on operator property. The data assessment then proceeded with those incidents associated with a ROW, regardless of whether an operator had classified the incident as a leak or a rupture.

## 3.5   The Big Picture

Before focusing on incident data associated with ROW releases, this section provides some metrics for all release locations between January 1, 2010 and July 7, 2012. The purpose of looking at the entire data set from this period is to provide context for how many incidents were

reported to PHMSA over the 30-month period and how data was selected for evaluation required by Task 3.

Table 3.1, "All Incidents, January 1, 2010 to July 7, 2012," provides these metrics from this study covering the 2010 to 2012 incident data set.

In covering hazardous liquid, natural and other gas transmission and distribution pipelines, it is important to note that:

1. Hazardous liquid pipelines transport different types of fluid whereas the natural gas systems only transport natural gas.

2. Hazardous liquid pipelines transport:

   a. Crude oil
   b. Refined products
   c. Highly volatile liquids

3. Refined products are liquids such as:

   a. Gasoline
   b. Diesel
   c. Fuel oil
   d. Jet fuel
   e. Kerosene

4. Refined products are liquids inside the pipeline and usually remain liquids when released from the pipeline.

5. Highly volatile liquids are liquids inside the pipeline and gases when outside the pipeline at ambient conditions.

6. Highly volatile liquids are such liquids as:

   a. Liquefied petroleum gas (LPG)
   b. Natural gas liquid (NGL)
   c. Anhydrous ammonia
   d. Ethane
   e. Propane
   f. Butane
   g. ISO-butane
   h. Ethylene
   i. Propylene
   j. Butylene
   k. Mixtures

7. LPG is mostly propane and butane.

8.   NGL is mostly ethane, propane, butanes and higher order saturated hydrocarbons.

9.   The remaining liquids transported by pipeline are hydrogen and carbon dioxide.

Whether or not a fluid release ignites or results in an explosion is not covered in any detail by this study but it is mentioned for context. Neither does the study specifically cover injuries or fatalities but they are mentioned when considered appropriate. These consequences while highly undesirable are not needed by this study. However, ignition, explosion, fatalities and injuries may be mentioned to provide an indication of the severity of some incidents.

Table 3.1 needs explanation. The table is separated into 3 parts to assist with interpretation. The first section contains statistics based on the total number of incidents on the first row of the table totaling 1,337 reports. The second section starts with the total number of incidents recorded as on a ROW, of which there are 383. The totals on the ROW are then separated into different categories. For example, private or public property is a category used for gas distribution only. Hazardous liquids and gas transmission refer to ROW pipe and appurtenances. The final section of Table 3.1 relates to maximum and average release volumes for the three different industry categories, which are pipe on the ROW, a release not on the ROW, and for all onshore incidents assessed over the 30 month period.

Table 3.1 presents data where the rules for reporting data to PHMSA differ between hazardous liquids, gas transmission and gathering and gas distribution, respectively. For hazardous liquids, incident reporting to PHMSA is required for the following:

If the release is at least 5 gallons but is less than 5 barrels with no additional consequences (see below), complete only the fields indicated by light-grey shading. If the spill is to water as described in §195.52(a)(4) or is otherwise reportable under §195.50, then the entire Form PHMSA F 7000-1 must be completed.

The entire form must be completed for any release that:

• Involves death or personal injury requiring hospitalization; or
• Involves fire or explosion; or
• Is 5 barrels or more; or
• Has property damage greater than $50,000; or
• Results in pollution of a body of water; or
• In the judgment of the operator was significant even though it did not meet these criteria.

For gas transmission and gas distribution, incident reporting to PHMSA is required for the following:

(1) An event that involves a release of gas from a pipeline, or of liquefied natural gas, liquefied petroleum gas, refrigerant gas, or gas from an LNG facility, and that results in one or more of the following consequences:

> (i) A death, or personal injury necessitating in-patient hospitalization;

> (ii) Estimated property damage of $50,000 or more, including loss to the operator and others, or both, but excluding cost of gas lost.

> (iii) Unintentional estimated gas loss of three million cubic feet or more;

(2) An event that results in an emergency shutdown of an LNG facility. Activation of an emergency shutdown system for reasons other than an actual emergency does not constitute an incident.

(3) An event that is significant in the judgment of the operator, even though it did not meet the criteria of paragraphs (1) or (2) of this definition.

The 1,337 incident reports are divided as 766, 295, and 276 for hazardous liquids, gas transmission and gathering and gas distribution, respectively. In Table 3.1, each of these totals is broken down into the following categories:

1. Number of ruptures
2. Number of leaks
3. Number of mechanical punctures
4. Number of overfill or overflow releases (hazardous liquids only)
5. Number of other release types
6. Number offshore releases (not included in following numbers)
7. Releases contained on operators property
8. Releases started on operators property (hazardous liquids only)
9. Releases located on right-of-way (ROW)
10. Releases located on private property (gas distribution only)
11. Releases located on public property (gas distribution only)
12. Number of nil reports for locations of spill
13. Number of pipe body release incidents on ROW

14. Number of pipe seam release incidents on ROW

15. Number of valve release incidents on ROW

16. Number of flange release incidents on ROW

17. Number of other reason release incidents on ROW

18. Maximum release volume (gallons or MSCF3) from pipe on ROW

19. Maximum release volume (gallons or MSCF) not on ROW

20. Average release volume (gallons or MSCF) from pipe on ROW

21. Average release volume (gallons or MSCF) from pipe not on ROW

22. Average release volume (gallons or MSCF) for all onshore incidents

23. Number of onshore incidents greater than average release volume as a percentage of all onshore release incidents.

The 1,337 incident reports divided as 766, 295, and 276 for hazardous liquids, gas transmission and gathering and gas distribution, respectively, are further divided in Table 3.1 in to 21, 41, 13 ruptures respectively, and 567, 136, 63 leaks, respectively for each of these three pipeline categories. For mechanical punctures, hazardous liquids pipelines reported 33, gas transmission reported 25, and gas distribution reported 51. A mechanical puncture is a separate PHMSA release classification that is not reported as a leak or a rupture. Overfill or overflow releases are only applicable to hazardous liquids and in the case of the 766 incident reports, 46 incidents were reported by operators as attributable to this cause. Other release types (Other is a separate classification) accounted for 99 hazardous liquid releases, 93 gas transmission releases and 149 gas distribution releases. The number of releases contained on an operator's property was 521 for hazardous liquid operators, 95 for gas transmission operators and 4 for gas distribution operators.

Of the metrics in Table 3.1, the releases on the ROW are the metrics most important to this study. The ROW metrics are divided into releases from pipe body, pipe seam, valves, flanges, and other fittings. Because gas distribution is reported differently than hazardous liquids and gas transmission and gathering, gas distribution is not strictly comparable to these other two transmission pipeline categories. Hence, numbers are not given for gas distribution for pipe seam, valves, flanges and other causes.

The maximum, single hazardous liquid release volume on the ROW from pipe was 843,444 gallons. This was a crude oil spill. The maximum, single gas transmission release volume on the ROW from pipe was 614,257 MSCF. The maximum single release volumes from incidents not

---

[3] MSCF stands for thousands of standard cubic feet of gas. In energy terms, 1 MSCF is equal to approximately 7.7 gallons of crude oil.

USACE_ESMT003725

on the ROW and mostly associated with operators' property were less than those on the ROW but not significantly less. For hazardous liquids, the maximum release on operators' property was 576,156 gallons or 68% of the maximum release on a ROW. For gas transmission, the maximum release not on the ROW was 405,000 MSCF or 66% of the maximum release on the ROW. For gas distribution, the maximum release on the ROW was 11,339 MSCF and off the ROW it was 14,000 MSCF, or 55% of the maximum release on the ROW.

When average release volumes are considered in Table 3.1, it is obvious that the maximum release volumes are many times the average release volumes. For hazardous liquids, the average release volume on the ROW was 29,230 gallons making the maximum release 29 times the average release volume. For gas transmission, the average release volume on the ROW of 23,078 MSCF making the maximum release 26.6 times the average release volume. For gas distribution the maximum release volume on the ROW is 7.5 times the average release volume.

The ratios between the averages and the maximum release volumes demonstrate that large release volumes of hazardous liquids or gases are not the norm for the industry. When the total numbers of onshore incidents on or off the ROW and from all types of pipeline component are considered then the number of above-average release volume incidents by industry are 76 for hazardous liquids, 57 for gas transmission and 29 for gas distribution. As percentages of the total numbers of incidents, these numbers are 10% for hazardous liquids, 19.3% for gas transmission, and 10.5% for gas distribution. That is, over the 30-month period of this review, the numbers of very large release volumes is relatively small compared to the release volumes reported over all 1,337 incidents.

For 795 onshore hazardous liquid pipeline incident reports, SCADA was in place for 388 (51%), not in place for 90 (12%) and not reported for 281 (37%). For these same pipelines, CPM was reported as in place for 192 (25%), not in place for 286 (38%) and not reported for 281 (37%).

For 91 (12%) of the hazardous liquid incidents, SCADA is reported as detecting the release. The number for CPM systems is 28 (4%). While SCADA and/or CPM systems are reported as detecting releases they are not necessarily reported as the identifier of the incident. That is, who told the controller that a release was in progress? For the 91 SCADA detections, 49 (7% of the total 759) of the reports identify the SCADA as the initial identifier. For the 28 CPM system detections, 34 (4% of the total 759) of the reports identify CPM as the initial identifier.

When data on SCADA and CPM systems is evaluated together, that is both SCADA and CPM must be in place and functional at the time of the release, detection of the release by both systems was reported for 26 of the 759 incident reports. The SCADA/CPM systems were reported as the incident identifier for 16 of these 26 reports.

423 (56%) incidents from the 759 in total were reported as "could be in an HCA", the wording used in the incident reports. SCADA and CPM systems, that is, both systems at the same time, were reported as in place for 100 of the 423 incidents reported as "could be in an HCA". Both systems detected a release in 10 of these 100 incidents. Seven of these 10 incidents were reported as the incident identifier to the pipeline controller.

### Table 3.1      All Incidents, January 1, 2010 to July 7, 2012

| | Metric | Hazardous Liquids Pipelines | Natural Gas Transmission | Natural Gas Distribution | Total |
|---|---|---|---|---|---|
| | # of Incidents[4] | 766 | 295 | 276 | 1,337 |
| 1 | # of Ruptures | 21 | 41 | 13 | 75 |
| 2 | # of Leaks | 567 | 136 | 63 | 766 |
| 3 | # of Mechanical Punctures | 33 | 25 | 51 | 109 |
| 4 | # of Overfill or Overflow | 46 | 0 | 0 | 46 |
| 5 | # of Other Release Types | 99 | 93 | 149 | 341 |
| 6 | # offshore releases (not included in following numbers) | 7 | 56 | 0 | 63 |
| 7 | Contained on operators property | 521 | 95 | 4 | 620 |
| 8 | Started on operators property | 41 | 0 | 0 | 41 |
| 9 | Located on right-of-way (ROW) | 197 | 141 | 42 | 381 |
| 10 | Located on private property | - | - | 152 | 152 |
| 11 | Located on public property | - | - | 78 | 78 |
| 12 | # nil Reports for location of spill | 0 | 0 | 0 | 0 |
| 13 | # of Pipe body release incidents on ROW | 119 | 86 | 30 | 235 |
| 14 | # of Pipe seam release incidents on ROW | 13 | 6 | - | 19 |
| 15 | # of valve release incidents on ROW | 17 | 6 | - | 23 |
| 16 | # of flange incidents on ROW | 5 | 1 | - | 6 |
| 17 | # of other reason incidents on ROW | 43 | 42 | - | 85 |
| 18 | Maximum release volume (gals or MSCF) from pipe on ROW | 843,444 gallons | 614,257 MSCF | 25,555 MSCF | - |
| 19 | Maximum release volume (gals or MSCF) not on ROW | 576,156 gallons | 405,000 MSCF | 14,000 MSCF | - |
| 20 | Average release volume (gals or MSCF) from pipe on ROW | 29,230 gallons | 23,078 MSCF | 1,419 MSCF | - |
| 21 | Average release volume (gals or MSCF) from pipe not on ROW | 5,588 gallons | 57,657 MSCF | 324 MSCF | - |
| 22 | Average release volume (gals or MSCF) for all onshore incidents | 10,771 gallons | 19,902 MCSF | 975.5 MSCF | - |
| 23 | # of onshore incidents greater than average release volume | 76 out of 759 incidents (10%) | 57 out of 239 Incidents (24%) | 29 out of 276 Incidents (10.5%) | - |

## 3.6    Specific Data Selected for ROW Assessments

The purpose of this section of the report is to reiterate and to ensure that readers are familiar with the data selected for the evaluations presented in the remainder of this report. Not all of the data

---

[4] Data collected between January 1, 2010 and beginning of July 2012

available in the 1,337 PHMSA incident reports covering all three pipeline classifications were used in the analysis that follows. The following is the only data selected:

1. Onshore pipeline data. This was the primary filter.

2. Incident data identified as originating on the ROW. Used for an overview assessment.

3. Pipe or pipe seam releases for detailed assessment, excluding pipe body or seams at facilities along the ROW, and also used to determine the above-average release volumes.

Releases associated with fittings on the ROW are included in item 2 but not used for the final analysis in item 3 above. Sixty-five releases from valves, flanges, and other fittings on the ROW were removed before processing the data for item 3. Operators generally know where fittings are located, whether on the ROW or at facilities. They also know where pipe is located at facilities and pipe that is above ground along the ROW. These locations can be checked by an operator on a routine basis. For long lengths of buried pipe between block valves, there are many miles of pipe and pipe seam to check for leaks and an LDS, possibly of more than one type, is appropriate.

Table 3.2, "Pipeline Right-of-Way Incidents, January 1, 2010 to July 7, 2012," is a table similar in format to Table 3.1 except that it only describes statistics for ROW incidents, whereas as Table 3.1 provides data on all incidents and ROW incidents over the review period. Table 3.2 shows that 197 onshore hazardous incident reports were on a pipeline ROW, which included valves. For onshore gas transmission, the total on the ROW was 141, and for gas distribution the total was 42. It is these incidents that are discussed in the following sections of this report, with the exception of gas distribution where the analysis has been performed on all 276 incidents.

In all three categories of pipeline, hazardous liquids, natural and other gas transmission and gathering and natural and other gas distribution, the above-average release volume incidents provide an adequate number of incidents for the purpose of this study.

### Table 3.2    Pipeline Right-of-Way Incidents, January 1, 2010 to July 7, 2012

| Metric | Hazardous Liquids Pipelines | Natural Gas Transmission | Natural Gas Distribution | Total |
|---|---|---|---|---|
| # of Pipeline ROW Incidents | 197 | 141 | 42 | 380 |
| # of Ruptures | 12 | 33 | 13 | 58 |
| # of Leaks | 139 | 61 | 63 | 263 |
| # of Mechanical Punctures | 27 | 22 | 51 | 112 |
| # of Other Release Types | 19 | 25 | 0 | 44 |
| Located on private property | - | - | 149 | 149 |
| Located on public property | - | - | 78 | 78 |
| # of Pipe release incidents on ROW | 119 | 86 | 30 | 235 |
| # of Pipe seam release incidents on ROW | 13 | 6 | - | 19 |
| # of valve release incidents on ROW | 17 | 6 | - | 23 |
| # of flange release incidents on ROW | 5 | 1 | - | 6 |
| # of other reason release incidents on ROW | 43 | 42 | - | 85 |
| Maximum unintentional release volume (gals or MSCF) from pipe & pipe seam on ROW | 843,444 gallons | 614,257 MSCF | 25,555 MSCF | - |
| Maximum unintentional release volume (gals or MSCF) from all other reasons on ROW other than pipe and pipe seam | 556,122 gallons | 91,089 MSCF | 14,000 MSCF | - |
| Average unintentional release volume (gals or MSCF) from pipe & pipe seam on ROW | 29,230 gallons | 30,347 MSCF | 1,419 MSCF | - |
| Average unintentional release volume (gals or MSCF) from all other reasons on ROW other than pipe and pipe seam | 17,794 gallons | 10,766 MSCF | 324 MSCF | - |
| # of onshore incidents greater than average unintentional release volume from pipe & pipe seam on ROW | 28 out of 132 incidents (21%) | 22 out of 92 incidents (24%) | 20 out 160 incidents (12.5%) | - |
| # of onshore incidents greater than average unintentional release volume from all other reasons on ROW other than pipe and pipe seam | 5 out of 65 incidents (8%) | 9 out of 49 incidents (18%) | 5 out of 111 incidents (4.5%) | - |

## 3.7    Incident Reporting for the Hazardous Liquid Pipeline Industry on the ROW

### 3.7.1    Hazardous Liquid Incidents

For hazardous liquid incidents located on the ROW, 197 total releases are divided into 119 from pipe body, 13 from a pipe seam, 17 from valves, 5 from flanges, and 43 leaks from something other than pipe, such as a girth weld, repairs, instrumentation etc. The total release volume reported for the 197 incidents was 4,967,895 gallons. The 197 incident reports came from 60 different operators. Of these 197 releases, 12 were attributable to ruptures, 139 to leaks, 27 to mechanical punctures, and 19 to other types of release.

The largest release volume was 843,444 gallons and the smallest was 0.42 gallons.

The second largest hazardous liquid release volume is 556,122 gallons or 66% of the largest release volume. Together, these two release volumes add up to 1,399,566 gallons of hazardous liquid and make up 31% of the total above-average release volume of 4,544,358 gallons from 33 of the 197 incidents reviewed. That is, approximately 1 in 6 incidents produced a release volume between 25,476 gallons and 843,444 gallons of crude oil, refined product or highly volatile liquids (HVLs) based on this data.

Figure 3.1 shows a breakdown of the number of ROW releases by commodity transported by the hazardous liquid pipelines in the 30 month database. It shows that the releases are more or less evenly distributed between HVLs, crude oils, and refined products. When the gallons released by these three commodity categories are compared (Figure 3.2) it can be seen that that crude oil and HVL pipelines have released more volume over the 30 month period than refined product pipelines.

Figure 3.2 also shows that many of the reported release volumes for most of the incidents, in any of the three categories, do not show in Figure 3.2 because of the left-hand scale used for the maximum size of volume released. This theme that a large number of the releases on a ROW are of relatively small volume is repeated throughout the data presented in this report. Although the larger volume releases are significant, the reader should remember that the scale of reported ROW releases covers a range of 0.42 gallons to 843,444 gallons. This is a ratio of 1: 2,008,200

Five of these 197 reported releases ignited and two of the five exploded.

Hazardous liquids incident reports require operators to identify the status of not only the pipeline SCADA but also the computational pipeline monitoring (CPM) system. Both SCADA and CPM systems are seen as primary means within the control room for pipeline operating personnel to

detect releases[5] on hazardous liquid pipelines. The response data associated with SCADA and
CPM functionality was assessed for all 197 ROW releases.

| Commodity Released | # of Releases | % of Total Releases |
|---|---|---|
| HVL's | 68 | 34.5% |
| CRUDE OIL | 64 | 32.5% |
| REFINED PRODUCTS | 61 | 31.0% |
| CO2 | 4 | 2.0% |
| BIOFUEL/ALTERNATIVE FUEL | 0 | 0.0% |

| January 2010 to July 2012 |
|---|



**Figure 3.1      ROW Releases by Commodity, 2010 to July 2012**

---

[5] See Task 4 for descriptions of the capabilities of SCADA and CPM.



Figure 3.2          ROW Releases, All Commodities, 2010 to July 2012

Table 3.3 summarizes the data provided in the incident reports for whether:

1. A SCADA system was operational at the time of the incident.

2. The SCADA was functioning when the incident occurred.

3. The SCADA information assisted in the detection of the incident.

4. The SCADA information assisted in the confirmation of the incident.

5. A CPM system was in place.

6. The CPM system was operating at the time of the incident

7. The CPM system was functional at the time of the incident.

8. The CPM system assisted in the detection of the incident.

9. The CPM system assisted in the confirmation of the incident.

### Table 3.3  ROW Releases, 2010 to July 2012: SCADA and CPM Detail

|  | # of Reports | % of All 197 Reports |
|---|---|---|
| SCADA System Reported as in Place | 153 | 77.7% |
| SCADA System Reported as NOT in Place | 12 | 6.1% |
| SCADA System in Place BLANK-No Data | 32 | 16.2% |

|  | # of Reports | % of All 197 Reports | % of 153 Reports where SCADA was In Place |
|---|---|---|---|
| SCADA System Operating at Time of Accident | 151 | 76.6% | 98.7% |
| SCADA System Functional at Time of Accident | 152 | 77.2% | 99.3% |
| SCADA Information Assisted in Detection of Accident | 43 | 21.8% | 28.1% |
| SCADA Information Assisted in Confirmation of Accident | 47 | 23.9% | 30.7% |
| # of Reports with Both SCADA and CPM in Place | 87 | 44.2% | 56.9% |

|  | # of Reports | % of All 197 Reports |
|---|---|---|
| CPM System Reported as in Place | 87 | 44.2% |
| CPM System Reported as NOT in Place | 78 | 39.6% |
| CPM System in Place BLANK-NO Data | 32 | 16.2% |

|  | # of Reports | % of All 197 Reports | % of 87 Reports where CPM was In Place |
|---|---|---|---|
| CPM System Operating at Time of Accident | 85 | 43.1% | 97.7% |
| CPM System Functional at Time of Accident | 86 | 43.7% | 98.9% |
| CPM Information Assisted in Detection of Accident | 17 | 8.6% | 19.5% |
| CPM Information Assisted in Confirmation of Accident | 22 | 11.2% | 25.3% |

| January 2010 to July 2012 |
|---|

For the 197 incident reports, a SCADA system was in place for 153 (78%) of the incidents. Thirty-two (16%) of the incident reports did not respond to this question.

For the 197 incident reports, a CPM system was in place for 87 (44%) of the incidents. Eighty-six (86) of these CPM systems were reported as functional at the time of the incident. A CPM system was not in place at the time of an incident for 78 (40%) of the reports in the database. Thirty-two (16%) of the incident reports did not give an answer to this question as to whether a CPM was in place or not.

The number of incident reports where both SCADA and a CPM system was in place was 87 or 44% of all 197 reports.

The SCADA was reported as functional in 152 of the 197 reported incidents, which is 99.3% of the incidents where a SCADA was operational at the time of the incident. Forty-three (43) of the incident reports stated that SCADA assisted in the detection of the incident. This is 28% of the incident reports that stated a SCADA was operational at the time of the incident.

Seventeen (17) or 20% of the 86 incident reports where CPM was functional stated that CPM assisted in the detection of the incident. The largest release reported as not detected by SCADA was 843,444 gallons. The smallest release not detected by SCADA was 0.42 gallons.

The above statistics on SCADA and CPM are shown in Figure 3.3 and Figure 3.4 but related to gallons released into the environment. Figure 3.3 shows the gallons released where SCADA was either functional, not functional or where information on SCADA was not reported. Figure 3.4 show the gallons released where the CPM was either functional, not functional or where information on CPM was not reported.

Figure 3.3 shows that SCADA was functional for all the of the large volume releases. The one incident reported without SCADA being functional (red on Figure 3.3) occurs on the horizontal axis around incident number 97 with a release volume of 420 gallons. Some of the release volumes where no data on SCADA was reported by the operator (green on Figure 3.3) were as large as 6,300 and 9,030 gallons. As with all graphs of this type in the report, the large volumes were so much greater than the smaller volumes that the scale of the vertical axis causes around 50% of the data to display very close to zero on the horizontal axis.

Figure 3.4 on CPM shows a more complicated picture than for SCADA. A CPM was not functional (red on Figure 3.4) for the largest release volume of 843,444 gallons. This was a release of crude oil by Enbridge Energy Partnership. The green histogram columns on Figure 3.4 represent the releases where no data is provided on the PHMSA incident reports about CPM functionality. Of the 197 incidents being reviewed here, 110 gave no data on CPM functionality. The largest release volume where CPM functionality is not provided in the incident report is 190,848 gallons. This was reported by Enterprise Products Operating LLC.

Further comments on the reported ability of SCADA and CPM systems acting as the initial identifier of the release is given later when above-average ROW releases are evaluated.



**Figure 3.3      Hazardous Liquids Releases, SCADA Detail**



**Figure 3.4      Hazardous Liquids Releases, CPM Detail**

PHMSA does not require certain information to be submitted on an incident report when the release volume is at least 5 gallons and less than 42 gallons (5 barrels). However, there are overriding provisions that do require all information to be submitted if certain situations occur with the release. These reporting rules could influence the data presented in Figures 3.3 and 3.4. These rules would influence the number associated with gallons released where no data was provided (color green) in these charts.

For the 197 releases on the ROW being assessed here, there were 24 incidents between 5 gallons and 42 gallons. Only some of these satisfied the criteria for not reporting on SCADA and CPM functionality. Of these 24 incidents, 9 indicated that SCADA was functional but did not detect the release and 7 indicated that CPM was functional but did not detect the release.

The review now looks at how these 197 releases were initially detected. That is, how did the pipeline controller or the operator discover that fluid was escaping from the pipeline so that appropriate action could be taken? Figure 3.5 shows the gallons released per incident where the SCADA or CPM is the initial identifier of the release (color black). Twenty-three releases from the 197 were initially detected this way. A further 10 releases were initially identified by a controller. These are not shown on Figure 3.5.

Color red on Figure 3.5 shows the incidents and the gallons released where neither the SCADA nor the CPM was the initial identifier of the release. Thirty-two no data entries were counted. The first of these 32 occurrences is between incident number 127 and 133 on the horizontal axis of Figure 3.5. Hence, these no data entries are for small release volumes.

USACE_ESMT003737



**Figure 3.5     Hazardous Liquids Releases, Initial Identifier: SCADA, CPM, None**

Figure 3.6 presents a pie-chart showing the means by which a control room was notified of a release for 165 of 197 incidents. Data was not available for 32 of the incident reports. The different means of initial incident identification are tabulated in Table 3.4. That is, who discovered the release first? The range of different initial identifiers is broad. The following categories seem appropriate for grouping the data:

1. Pipeline control and non-control room personnel and contractors (44%).

2. The public (30%).

3. A third party on the ROW (6%).

4. Other (4%).

5. No data (16%).

A possible summary is that pipeline operators' or contractors to the pipeline operator discover half the releases on a pipeline ROW.

Within the 44% statistic for Pipeline control and non-control room personnel and contractors,
17% is attributable to the pipeline control room. In terms of managing a release, particularly a
rupture, a sequence of events might be described as:

1. Time to detection for the control room after the release, as it is the control room that has
   means to shut down the pipeline.
2. A period where fluid is still being pumped into the environment.
3. A period during which valves are closed, the section isolated and drain down occurs.

Where a release is detected by someone other than in the control room the time taken for the
control room to acknowledge a release and initiate further action is likely to be longer than when
the control room is the initial identifier. Hence, for the 44% described above, it is likely that 27%
of the incidents resulted in a longer detection period after the actual release from the pipeline.

When the public, including emergency responders, are the initial identifiers (30% in the above
statistics), the elapsed time before the control room is aware of a release may be longer than
when operator employees and contractors become aware of a release because of their better
knowledge and training on what to do. However, incident reports do not contain data to allow
this the different phases of a release to be evaluated.



**Figure 3.6      Hazardous Liquids Releases, Initial Identifier**

**Table 3.4      Hazardous Liquids Releases – Initial Identification**

| Identifer | # of Reported Incidents | % of 197 Incidents Reports |
|---|---|---|
| AIR PATROL | 10 | 5% |
| CONTROLLER | 10 | 5% |
| CPM LEAK DETECTION SYSTEM OR SCADA-BASED INFORMATION | 23 | 12% |
| GROUND PATROL BY OPERATOR OR ITS CONTRACTOR | 4 | 2% |
| LOCAL OPERATING PERSONNEL, INCLUDING CONTRACTORS | 38 | 19% |
| NOTIFICATION FROM EMERGENCY RESPONDER | 14 | 7% |
| NOTIFICATION FROM PUBLIC | 45 | 23% |
| NOTIFICATION FROM THIRD PARTY THAT CAUSED THE ACCIDENT | 11 | 6% |
| STATIC SHUT-IN TEST OR OTHER PRESSURE OR LEAK TEST | 2 | 1% |
| OTHER | 8 | 4% |
| BLANK - No Data Entry | 32 | 16% |
| # of Identifiers Reported | 165 | 84% |

| January 2010 to July 2012 |
|---|

USACE_ESMT003740

Once a release is detected there is a need to respond to the release. PHMSA incident reporting requires operators to provide the date and time the incident was identified by the operator. This is not necessarily the date and time that a release started from a pipe body or pipe seam. Other information provided is the date and time for operator personnel to arrive at the site of the release and the date and time the pipeline was shutdown.

There is not a requirement to report the date and time when the control room became aware of the incident. Nor is there a requirement to record how long the control room took to acknowledge a release had occurred and then to take action. The requirement is to report when an operator became aware of the incident. This date and time may well apply to operator employees and contracts out on the ROW or in a facility.

When an operator reports a date and time to arrive on site, the PHMSA instructions do not require this date and time to relate to the date and time the incident was initially identified. Where operator employees or contractors are the initial incident identifiers, then the time is identical for both the initial identification and the time to arrive on-site. The time to arrive on-site in this situation is zero.

The date on which the operator became aware of the release was not recorded for 30 (15%) of the 197 incident reports in this specific evaluation. These same incident reports also didn't identify the date and time on-site but 6 did provide the date and time of shutting down the pipeline.

It was possible to calculate the time to arrive on-site after the time of initial identification by the operator for 166 incident reports from the total of 197. Figure 3.7 shows this result. For 60 (36%) of these incidents the time was reported as less than 5 minutes. For 50 (30%) of these incidents the time to arrive on site was from one hour to 168 hours. For the maximum release volume of 843,444 gallons, the time to arrive on site was recorded as zero minutes. For the minimum release volume of 0.42 gallons, the time to arrive on-site was also reported as zero minutes. The arrival time recorded as 168 hours is for a release volume given as 11.34 gallons. The largest spill where the time to arrive on-site was over one hour was 316,596 gallons and the on-site arrival took 2 hours and 2 minutes.



**Figure 3.7       Hazardous Liquids Releases, Response Times**

The average time to arrive on-site with and without SCADA functional was determined and for the instances where no data about SCADA functionality was provided by the operator. This data is shown in Figure 3.8. The average time to respond was shorter for those incidents where SCADA was functional. The average time was 2.1 hours compared to 4 hours for the one case where the SCADA was not functional and 9 hours where no data on SCADA was provided. However, when volume released is compared for these three categories (Figure 3.8), the gallons released into the environment is considerably greater when the SCADA was functional even though the average respond time on-site was the shortest.

| | Average Response Time (hours) |
|---|---|
| Time to Respond with SCADA Functional | 2.1 hrs |
| Time to Respond without SCADA Functional | 4.0 hrs |
| Time to Respond BLANK-No Data on SCADA Function | 9.0 hrs |

| | Unintentional Gallons Released |
|---|---|
| Gallons Released with SCADA Functional | 4,488,000 |
| Gallons Released without SCADA Functional | 420 |
| Gallons Released BLANK-No Data on SCADA Function | 17,864 |



**Figure 3.8    Hazardous Liquids Releases, Average Response Time: SCADA Detail**

Time to shut down the pipeline is taken to mean that pumping has ceased and the upstream and downstream block valves have been shut to isolate the section of pipeline containing the release. The review of the incident data showed the following for 197 incident reports:

- For 12 (6%) shutdown date and times provided it was not possible to compute the time taken to shutdown because of the date and time values recorded.
- No shutdown time was reported for 66 (33%) of the incidents. Not all pipelines are shutdown as a result of a release.
- 47 (24%) of the incident reports had identical dates and times for the incident identification and the shutdown. This results in zero minutes to shutdown the pipeline.
- For 68 (34%) of the incident reports the elapsed time to shutdown could be calculated using the initial identification and the report shutdown.

- Ignoring zero minute shutdowns, the shortest shutdown time was 1 minute and the longest calculated shutdown time was 44 hours and 30 minutes.
- 8 of the 68 reports where a time to shutdown could be calculated had a shutdown time longer than 1 hour.
- 27 of the 68 reports had a shutdown time between 15 minutes and 40 minutes.
- 32 of the 68 reports had a shutdown time between 1 minute and 14 minutes.

## 3.7.2    Above Average Hazardous Liquid Releases

To respond to the requirements of Task 3, KAI decided to reduce the number of incidents and to report high volume hazardous liquid releases in more detail. To do this, the ROW releases discussed in the previous section were filtered so that 197 incidents were reduced to 132 ROW releases where the release origin was either the pipe body or the pipe seam. This catches a large number of the high volume releases on the ROW but not all of them. The intent was to identify a small set of high volume releases for further reporting as case studies.

The average release volume from these 132 incidents is 29,230 gallons. The median release volume was 1,004 gallons. The median value is the middle value of all the values used to calculate the average. The most common release volume (the mode) was 84 gallons. This value occurred 6 times in the 132 values used.

Twenty-eight (21%) of the 132 pipe body and pipe seam incidents had a release volume greater than this average release volume of 29,230 gallons and 104 (79%) incidents had below average release volumes. The total of all the releases above the average volume was 3,450,300 gallons. The total of all the below-average release volumes was 378,904 gallons or 11% of the total release volume for the 28 incidents above average. Put another way, around one in five hazardous liquid releases from pipe body or pipe seam on a ROW could have a release volume between 29,230 gallons and 843,444 gallons or thereabouts based on the 30 month period under review.

Release types reported for these above average release volumes were as follows:

1. 7 leaks

2. 6 ruptures

3. 10 mechanical punctures

4. 5 other

USACE_ESMT003744

These 28 above average release volume incidents were assessed in the same way as the 197 incidents on the ROW discussed previously.

The largest release volume is 843,444 gallons and the smallest is 29,400 gallons. The largest is the crude oil spill by Enbridge Energy Partnership LLC and the smallest is also a crude oil release by Plains Pipeline LP.

The second largest hazardous liquid release volume is 316,596 gallons or 38% of the largest release volume. Together, these two release volumes add up to 1,160,040 gallons of hazardous liquid and make up 34% of the total above average release volume of 3,450,300 gallons from the 28 incidents reviewed.

In the previous section on Task 3, the second largest release volume was 556,122 gallons. This incident is not included in the 28 being reviewed here because the origin of this release was a crack in a fillet weld and not from the pipe body or pipe seam. The fluid was LPG/NGL and the release was described as a leak by the operator.

Figure 3.9 shows a breakdown of the number of ROW releases by commodity transported by the hazardous liquid pipelines in the 30 month database. It shows that the releases are biased towards HVLs and crude oils with fewer releases from refined products. When the gallons released by these three commodity categories are compared (Figure 3.10) it can be seen that that crude oil and HVL pipelines have released more volume over the 30 month period than refined product pipelines incident reports in the database. This is the same pattern observed when all 197 ROW incidents were compared like this. There is no specific commodity trend for high volume

USACE_ESMT003745

releases.

| Commodity Released | # of Releases | % of Total Releases |
|---|---|---|
| HVL's | 10 | 35.7% |
| CRUDE OIL | 12 | 43% |
| REFINED PRODUCTS | 6 | 21% |
| CO2 | 0 | 0 |
| BIOFUEL/ALTERNATIVE FUEL | 0 | 0 |



**Figure 3.9      Above Average Hazardous Liquids Releases, by Commodity**

Task 3: Review and Assessment of Previous Pipeline Incidents

USACE_ESMT003746



**Figure 3.10        Above Average Hazardous Liquids Releases, All Commodities**

One of these 28 incidents ignited in an explosive manner. The other 27 incidents did not ignite or explode. The one incident that did explode resulted in the fatality of a member of the public and injury to a member of the public as well. The pipeline is operated by Dixie Pipeline Company LLC and 130,168 gallons of LPG/NGL was released as a result of a mechanical puncture of the pipeline. A mechanical puncture of a pipeline is not classed as a leak or rupture. It is a separate classification.

A SCADA system was in place for all 28 (100%) of the incidents. The SCADA was also functional at the time of the incident was recorded on all incidents and the SCADA system detected 19 (68%) of the incidents.

A CPM system was only in place for 17 (61%) of the 28 incidents. A CPM system assisted with the detection of 7 of the 16 incidents for which a CPM system was functional at the time of the incident. One of the 17 CPM systems was not functional at the time of the incident.

These statistics for SCADA and CPM functionality are shown in Figure 3.11 and Figure 3.12 but related to gallons released to the environment. Figure 3.11 shows the gallons released where SCADA was either functional, not functional or where information on SCADA was not reported and confirms that SCADA was functional for all 28 releases.



**Figure 3.11        Above Average Hazardous Liquids Releases, SCADA Detail**

Figure 3.12 shows the gallons released where the CPM was either functional (black), not functional (red) or where information on CPM was not reported (green). The largest release of 843,444 gallons was a release where CPM is reported as non-functional. The largest release where there was no CPM in place was 190,848 gallons. This was reported by Enterprise Products Operating LLC and was mentioned previously where lack of CPM functionality reporting was discussed for all 197 incidents on the ROW.



**Figure 3.12      Above Average Hazardous Liquids Releases, CPM Detail**

Figure 3.13 shows the gallons released per incident where the SCADA or CPM was the initial identifier of the release (color black). Color red on Figure 3.13 shows the incidents (17 in total) and the gallons released where neither the SCADA nor the CPM was the initial identifier of the release.



**Figure 3.13    Above Average Hazardous Liquids Releases (Gallons), Initial Identifier**

Figure 3.14 presents a pie-chart showing the means by which a control room was notified of a release for these 28 incidents. The different means of initial incident identification are tabulated in Table 3.5. That is, who discovered the release first? Seven different categories are initial identifiers. As with the 197 incidents discussed previously, the following categories seem appropriate for grouping the 28 above-average releases:

1. Pipeline control and non-control room personnel and contractors (71%)

2. The public (29%)

3. A third party on the ROW (0%)

4. Other (0%)

5. No data (0%)



**Figure 3.14       Above Average Hazardous Liquids Releases (%), Initial Identifier**

**Table 3.5  Above Average Hazardous Liquids Releases, Initial Identifier**

| | # of Incidents | % of Incidents |
|---|---|---|
| AIR PATROL | 1 | 4% |
| CONTROLLER | 2 | 7% |
| CPM LEAK DETECTION SYSTEM OR SCADA-BASED INFORMATION | 11 | 39% |
| GROUND PATROL BY OPERATOR OR ITS CONTRACTOR | 1 | 4% |
| LOCAL OPERATING PERSONNEL, INCLUDING CONTRACTORS | 5 | 18% |
| NOTIFICATION FROM EMERGENCY RESPONDER | 5 | 18% |
| NOTIFICATION FROM PUBLIC | 3 | 11% |
| NOTIFICATION FROM THIRD PARTY THAT CAUSED THE ACCIDENT | 0 | 0% |
| STATIC SHUT-IN TEST OR OTHER PRESSURE OR LEAK TEST | 0 | 0% |
| OTHER | 0 | 0% |
| BLANK - No Data Entry | 0 | 0% |

| January 2010 to July 2012 |
|---|

A possible summary is that pipeline operators' or contractors to the pipeline operator discover over two-thirds of the releases on a pipeline ROW for above average releases from a pipe body or pipe seam.

Within the 71% statistic for Pipeline control and non-control room personnel and contractors, 46% is attributable to the pipeline control room. This is larger than the percentage of 17% attributed to the pipeline control room for 197 incidents on the ROW considered in the prior section.  In terms of managing a release, particularly a rupture, a sequence of events might be described as:

1. Time to detection for the control room after the release as it is the control room that has means to shut down the pipeline.

2. A period where fluid is still being pumped into the environment.

3. A period during which valves are closed, the section isolated and drain down occurs.

Where a release is detected by someone other than in the control room the time taken for the control room to acknowledge a release and initiate further action could be longer than when the control room is the initial identifier. Hence, for the 71% described above, 25% of the incidents may have resulted in a longer detection period after the actual release from the pipeline.

When the public, including emergency responders, are the initial identifiers (29% in the above statistics), the elapsed time before the control room is aware of a release may be longer than when operator employees and contractors become aware of a release because of their better knowledge and training on what to do.

Once a release is detected there is a need to respond to the release. PHMSA incident reporting requires operators to provide the date and time the incident was identified by the operator. This is not necessarily the date and time that a release was initiated. Other information provided is the date and time for operator personnel to arrive at the site of the release and the date and time the pipeline was shutdown.

There is not a requirement to report the date and time when the control room became aware of the incident. Nor is there a requirement to record how long the control room took to acknowledge a release had occurred and then to take action. The requirement is to report when an operator became aware of the incident. This date and time may well apply to operator employees and contracts out on the ROW or in a facility.

When an operator reports a date and time to arrive on site, the PHMSA instructions do not require this date and time to relate to the date and time the incident was initially identified.

Where operator employees or contractors are the initial incident identifiers, then the time is identical for both the initial identification and the time to arrive on-site. The time to arrive on-site in this situation is zero.

The date on which the operator became aware of the release was recorded for all 28 above average release incidents.

It was possible to calculate the time to arrive on-site after the time of initial identification by the operator for 27 of the 28 incident reports. Figure 3.15 shows this result. For 15 (54%) of these 28 incidents the time was less than 1 hour. For 12 (43%) of these incidents the time to arrive on site was from one hour 14 minutes to 3 hours 40 minutes. For the maximum release volume of 843,444 gallons, the time to arrive on site is recorded as zero minutes. For the minimum release volume of 29,400 gallons in this data set, the time to arrive on-site was reported as 30 minutes.



**Figure 3.15    Above Average Hazardous Liquids Releases, Response Time**

The average time to respond and be on-site with SCADA functional, which was true for all 28 incidents, was 1.1 hours. One incident did not report times to allow this calculation to be made. The volume released into the environment for these 27 incidents with SCADA functional is 3,420,312 gallons.

Time to shut down the pipeline is taken to mean that pumping has ceased and the upstream and downstream block valves have been shut to isolate the section of pipeline with the release. The review of the incident data showed the following for 28 above-average release volume incident reports:

1.  Three of the 28 operators did not respond to the question on whether the pipeline was shut down as a result of the incident.

2.  In 4 of the 28 incidents the pipeline was shut down for reasons other than the incident or was shut down at the time of the incident.

3.  The largest release while a pipeline was shut down and not operating was 237,216 gallons of LPG/NGL liquids per the incident database description.

4.  The smallest release while a pipeline was shut down and not operating was 29,400 gallons of crude oil.

5.  A shutdown date and time was provided for 20 (71%) of the 28 above-average release volume incidents.

6.  It was possible to calculate the time to shut down the pipeline for 19 of the 28 incidents discussed here.

7.  The date and time to identify the incident and the date and time to shut down the pipeline was the same for 9 of the incidents. That is, the time taken was zero minutes.

8.  Where a time to shutdown could be calculated for 10 of the 28 incidents, the shutdown time ranged from 3 minutes to 30 minutes.

### 3.7.3    Hazardous Liquid Gathering Lines (Transportation-Related Flow Lines)

Total release volume reported for 22 incidents is 29,956 gallons. The 22 incident reports came from 13 operators. The largest release volume is 8,400 gallons whereas the smallest is 10.08 gallons. The second largest release volume is 8,358 gallons.

| Commodity Released | # of Releases | % of Total Releases |
|---|---|---|
| HVL's | 3 | 13.64% |
| CRUDE OIL | 19 | 86.36% |

| January 2010 to July 2012 |
|---|



Figure 3.16 shows a breakdown of the number of releases by commodity transported by the hazardous liquid gathering lines in the 30 month database. It shows the two commodities released; crude oil (19 or 86%) and HVLs (3 or 14%). Figure 3.17 shows reported release volumes in gallons.

None (0) of these 22 reported releases ignited and none (0) exploded.

| Commodity Released | # of Releases | % of Total Releases |
|---|---|---|
| HVL's | 3 | 13.64% |
| CRUDE OIL | 19 | 86.36% |

| January 2010 to July 2012 |
|---|



**Figure 3.16    Hazardous Liquid Gathering Lines Releases (Number), by Commodity**



**Figure 3.17    Hazardous Liquid Gathering Lines Releases (Gallons)**

Hazardous liquids incident reports require operators to identify the status of not only the pipeline SCADA but also the computational pipeline monitoring (CPM) system. Both SCADA and CPM systems are seen as primary means within the control room for pipeline operating personnel to detect releases[6] on hazardous liquid pipelines. The response data associated with SCADA and CPM functionality was assessed for all 22 releases. Table 3.6 summarizes the data provided in the incident reports for whether:

1. A SCADA system was operational at the time of the incident.

2. The SCADA was functioning when the incident occurred.

3. The SCADA information assisted in the detection of the incident.

---

[6] See Task 4 for descriptions of the capabilities of SCADA and CPM.

4. The SCADA information assisted in the confirmation of the incident.

5. A CPM system was in place.

6. The CPM system was operating at the time of the incident

7. The CPM system was functional at the time of the incident.

8. The CPM system assisted in the detection of the incident.

9. The CPM system assisted in the confirmation of the incident.

### Table 3.6  Hazardous Liquid Gathering Lines Releases, SCADA, CPM Detail

| | # of Reports | % of Total Reports |
|---|---|---|
| SCADA System in Place | 5 | 23% |
| SCADA System NOT in Place | 9 | 41% |
| SCADA System in Place BLANK-No Data | 8 | 36% |

| | # of Reports | % of Total Reports | % of Reports where SCADA was In Place |
|---|---|---|---|
| SCADA System Operating at Time of Accident | 5 | 23% | 100% |
| SCADA System Functional at Time of Accident | 5 | 23% | 100% |
| SCADA Assisted in Detection of Accident | 1 | 5% | 20% |
| SCADA Assisted in Confirmation of Accident | 1 | 5% | 20% |
| # of Reports with Both SCADA and CPM In Place | 1 | 5% | 20% |

| | # of Reports | % of Total Reports |
|---|---|---|
| CPM System in Place | 1 | 5% |
| CPM System NOT in Place | 13 | 59% |
| CPM System in Place BLANK-NO Data | 8 | 36% |

| | # of Reports | % of Total Reports | % of Reports where CPM was In Place |
|---|---|---|---|
| CPM System Operating at Time of Accident | 1 | 5% | 100% |
| CPM System Functional at Time of Accident | 1 | 5% | 100% |
| CPM Assisted in Detection of Accident | 0 | 0% | 0% |
| CPM Assisted in Confirmation of Accident | 0 | 0% | 0% |

| January 2010 to July 2012 |
|---|

For the 22 incident reports, a SCADA system was in place for 5 (23%) of the incidents. 8 (36%) of the incident reports did not respond to this question.

For the 22 incident reports, a CPM system was in place for 1 (5%) of the incidents. One CPM system was reported as functional at the time of the incident. A CPM system was not in place at the time of an incident for 13 (59%) of the reports in the database. Eight (36%) of the incident reports did not give an answer to this question as to whether a CPM was in place or not.

The number of incident reports where both SCADA and a CPM system was in place was 1, or 5% of all 22 reports.

The SCADA was reported as functional in 5 of the 22 reported incidents, which is 100% of the incidents where a SCADA was operational at the time of the incident. 1 (one) of the incident reports stated that SCADA assisted in the detection of the incident. This is 20% of the incident reports that stated a SCADA was operational at the time of the incident.

0% of the 22 incident reports where CPM was functional stated that CPM assisted in the detection of the incident.

The statistics on SCADA and CPM are shown in Figure 3.18 and Figure 3.19 but related to gallons released to the environment. Figure 3.18 shows the gallons released where SCADA was either functional, not functional or where information on SCADA was not reported. The SCADA was reported as functional in 5 out of 22 incidents. Figure 3.19 shows the gallons released where the CPM was either functional, not functional or where information on CPM was not reported. There was one reported incident (in black) when the CPM system was functional.



**Figure 3.18    Hazardous Liquid Gathering Lines Releases (Gallons), SCADA Detail**



**Figure 3.19    Hazardous Liquid Gathering Lines Releases (Gallons), CPM Detail**

The review now looks at how these releases were initially detected. That is, how did the pipeline controller in the control room discover that fluid was escaping from the pipeline so that appropriate action could be taken. Figure 3.20 shows the gallons released per incident where the SCADA or CPM is the initial identifier of the release, which is zero in this case. Color Red in Figure 3.20 shows the incidents and gallons released when neither the SCADA nor the CPM was the initial identifier of the release.



**Figure 3.20     Hazardous Liquid Gathering Lines Releases, Initial Identifier SCADA, CPM**

Figure 3.21 presents a pie-chart showing the means by which a control room was notified of a release for 14 out of 22 incidents. Data was not available for 8 of the incident reports. The different means of incident identification are tabulated in Table 3.7.

1.  The public (32%).

2.  Third party that caused accident (14%).

3.  Local operating personnel including contractors (9%).

4.  Air patrol (5%).

5.  Emergency responder (5%).

6.  Blank-no entry (36%).



**Figure 3.21     Hazardous Liquid Gathering Lines Releases, Initial Identifiers**

**Table 3.7     Hazardous Liquid Gathering Lines Releases, Initial Identifier**

| Methodology | # of Incidents | % of Incidents |
|---|---|---|
| AIR PATROL | 1 | 5% |
| CONTROLLER | 0 | 0% |
| CPM LEAK DETECTION SYSTEM OR SCADA-BASED INFORMATION | 0 | 0% |
| GROUND PATROL BY OPERATOR OR ITS CONTRACTOR | 0 | 0% |
| LOCAL OPERATING PERSONNEL, INCLUDING CONTRACTORS | 2 | 9% |
| NOTIFICATION FROM EMERGENCY RESPONDER | 1 | 5% |
| NOTIFICATION FROM PUBLIC | 7 | 32% |
| NOTIFICATION FROM THIRD PARTY THAT CAUSED THE ACCIDENT | 3 | 14% |
| STATIC SHUT-IN TEST OR OTHER PRESSURE OR LEAK TEST | 0 | 0% |
| OTHER | 0 | 0% |
| BLANK - No Data Entry | 8 | 36% |

| January 2010 to July 2012 |
|---|

When the public, including emergency responders, are the initial identifiers (37% in the above statistics), the elapsed time before the control room is aware of a release may be longer than when operator employees and contractors become aware of a release because of their better knowledge and training on what to do.

Once a release is detected there is a need to respond to the release. PHMSA incident reporting requires operators to provide the date and time the incident was identified by the operator. This is not necessarily the date and time that a release from a pipe body or pipe seam started. Other information provided is the date and time for operator personnel to arrive at the site of the release and the date and time the pipeline was shutdown.

There is not a requirement to report the date and time when the control room became aware of the incident. Nor is there a requirement to record how long the control room took to acknowledge a release had occurred and then to take action. The requirement is to report when an operator became aware of the incident. This date and time may well apply to operator employees and contracts out on the ROW or in a facility.

When an operator reports a date and time to arrive on site, the PHMSA instructions do not require this date and time to relate to the date and time the incident was initially identified. Where operator employees or contractors are the initial incident identifiers, then the time is identical for both the initial identification and the time to arrive on-site. The time to arrive on-site in this situation is zero.

It was possible to calculate the time to arrive on-site after the time of initial identification by the operator for 20 incidents reports from the total of 22. Figure 3.22 shows this result. For 3 incidents the time to arrive was zero. The longest time to arrive was one hour and 15 minutes and there were 2 incidents where the time to arrive was above 1 hour. For the maximum release volume of 8,400 gallons, the time to arrive was zero minutes whereas for the second largest release volume of 8,358 gallons, the time to arrive was 18 minutes.

USACE_ESMT003763



**Figure 3.22    Hazardous Liquid Gathering Lines Releases, Response Times**

Time to shut down the pipeline is taken to mean that pumping has ceased and the upstream and downstream block valves have been shut to isolate the section of pipeline with the release.  The review of the incident data showed the following for 22 incident reports:

1.  No shutdown time was reported for 8 (36%) of the incidents. Not all pipelines are shutdown as a result of a release.

2.  4 (18%) of the incident reports had identical dates and times for the incident identification and the shutdown. This results in zero minutes to shut down the pipeline.

3.  The shortest shutdown time was 0 minute and the longest calculated shutdown time was 1 hour and 15 minutes.

4.  5 of the 22 incidents reported had a shutdown time of 0 minutes.

5.  Only 1 of the 22 had a shutdown time longer than 1 hour.

6.  3 of the 22 had a shutdown time between 15 minutes and 30 minutes.

7.  5 of the 22 had a shutdown time between 1 minute and 15 minutes.

### 3.7.4    Hazardous Liquid Case Studies

From the 28 incidents described in the previous section, 11 incidents were selected as case studies.

# PONCA TRIBE OF NEBRASKA

## Dakota Access Pipe Line Meeting – PTN Niobrara Headquarters

### Sign in Sheet – February 18th, 2016

**NAME:**

| | |
|---|---|
| PAIGE COVEIA | pgoveja @ nei-yahw.com |
| Harris Hoistad | harris-hoistad@fws.gov |
| Meg Van Ness | Meg—VanNess @ fws.gov |
| SHANNON WRIGHT | swright@poncatribe-ne.org |
| Michelle Dippel | michelle.dippel@hdrinc.com |
| Kelly Morgan | Kmorgan@standingrock.org |
| Julie Sage | jsage @ poncatribe-ne.org |
| Rick Thomas | rick_thpo02@yahoo.com |
| Ben Rhodd | brhodd1@yahoo.com |
| Erich Longie | thpo@gonstc.com |
| Dr. ANDREA A. HUNTER | a-hunter@ osagenation-nsn.gov |
| Chris Boyd | tj-avs-y@yahoo.com |
| Martha Campbell | Martha.Campbell1951@yahoo |
| John Campbell | martha-Campbell1951 @ yahoo |
| MATT McCullon | matthew.T.McCullon @ usace.army.mil |
| STEVE VANCE (605) 964-7554 | Cheyenne River Sioux Tribe THPO |
| Joel Ames | USACE joel.c.c.ames@usace.army. |
| Martha S Chieply | USACE martha S Chieply@usace.army.mil |
| Ward Lenz | USACE gary.windz @ usace.army.mil |

# PONCA TRIBE OF NEBRASKA

## Dakota Access Pipe Line Meeting – PTN Niobrara Headquarters

### Sign in Sheet – February 18th, 2016

**NAME:**

| | | |
|---|---|---|
| Brent Villman | Voice Rock Island | Brent.J.Villman@army |
| Danny McClendon | US ACE St. Louis | danny.d.mcclendon@usace.army. |
| Jim Whitted | SWO THPO | JMSWhitted@Yahoo.com |
| Mark T. Marks Sr | SWO-THPO. | miretsr@gmail.com |
| LANCE FOSTER | THPO IOWATRIBE KS-NB | lfoster@iowas.org |
| Ron W. Debus | Archeologist CEMVR PDF TRIBAL LIASOW | RONALD.W.DEBUS@USACE.Army. A.L |
| Justin Thongfer | Standing Bull | jayde827@gmail.com |
| Trays Clark | CRST - Attorney | tclark@ndn law.com |
| Ronnie Fisher | Northern Cheyenne Tribe | 3firez@gmail.com |
| Brent Cosette | USACE | brent.j.cosette@usace.army.mil |

# PONCA TRIBE OF NEBRASKA

## Dakota Access Pipe Line Meeting – PTN Niobrara
## Headquarters

### Sign in Sheet – February 19th, 2016

**NAME:**

| Name | Affiliation |
|---|---|
| PAIGE GOVEIA | |
| LOUIS LaROSe | |
| Kelly Morgan | |
| Chris Boyd | |
| ANDREA A. HUNTER | |
| LANCE FOSTER | |
| Erich Longie | Spirit Lake |
| Vine T. MARKS, Sr. | SWO– |
| Tim Whitted | SWO THPO |
| Ben Rhodd | RST-HPO |
| Travis Clark | CRST – Attorney |
| SHANNON WRIGHT | PTN |
| Julia Sage | PTN |
| Kim Kulu | NC THPO |
| Alisha Bartling | Santee Sioux Nation |
| STEVE VANCE | CHEYENNE RIVER Sioux Tribe THPO |
| Brent Cosette | USACE |

**These are the people that received the January 27, 2016 e-mail from Randy Teboe notifying them of the February 18-19 DAPL meeting in Niobrara, Nebraska.**

**Addresses in blue are people we contacted in October 2015**
**Addresses in yellow indicate we contacted this tribe but maybe not this person**

| | |
|---|---|
| Osage Nation | Andrea Hunter |
| Osage Nation | JRodges@osagenation-nsn.go |
| Iowa? | lfoster@iowas.org; |
| Ponca | Shannon Wright; |
| Upper Sioux | sarac@uppersiouxcommunity-nsn.gov; |
| cultures@nemonte.net; | |
| Cheyenne River | Donnarae.petersen@crst-nsn.gov; |
| Cheyenne River | stevev.crstpres@outlook.com |
| Crow | ebullchief@crownations.net; |
| Flandreau Santee Sioux | carol.robertson@fsst.org; |
| Crow Creek Sioux | darrellzephier78@gmail.com; |
| Lower Brule Sioux | clairsgreen@yahoo.com; |
| Lower Sioux | lowersiouxthpo@gmail.com; |
| Northern Cheyenne | ncthpo@mail.cheyenne.net; |
| Prairie Island | mberger@piic.org; |
| Oglala | dennis@oglalathpo.org; |
| Rosebud Sioux | rstthpo@yahoo.com; |
| Omaha Tribe | tom.parker@omahatribe.com; |
| Winnebago Tribe of NE | rick_thpo02@yahoo.com; |
| Spirit Lake Tribe | thpo@gondtc.com; |
| Standing Rock | kmorgan@standingrock.org; |
| Three Affiliated | redhawk@mhanation.com; |
| Turtle Mt. Band of Chippewa | brucefnadeau@gmail.com; |
| Yankton Sioux | yst.thpo@gmail.com; |
| Rosebud | reaglebear@yahoo.com; |
| Absentee Shawnee of OK | llonghorn@astribe.com; |
| Blackfeet | jmflysdown@gmail.com; |
| Cherokee | bill-baker@cherokee.org; |
| Chippewa Cree | alvin@nei-yahw.com; |
| Eastern Shawnee Tribe of OK | rdushane@estoo.net; |
| Potawatomi | kelli.mosteller@potawatomi.org; |
| Potawatomi | melissa.cook@fcpotawatomi-nsn.gov; |
| Ho-Chunk Nation of WI | BQuackenbush@ho-chunk.com; |
| Miami Tribe of OK | gstack@miamination.com; |
| Northern Arapaho | yufnanathpo@gmail.com; |
| Cheyenne Nation | teanna.limpy@cheyennenation.com; |
| Nottawaseppi Huron Band of the Potawatomi | dgreen@nhbpi.com; |
| Pokagon Band of Potawatomi | marcus.winchester@pokagonband-nsn.gov; |
| Prairie Island Indian Community | kherdina@piic.org; (Kyle Herdina |
| Quapaw of OK | ebandy@quapawtribe.com; |
| Ponca Tribe of NE | thomaslp99@yahoo.com; |
| Eastern Shoshone | wjferrisiii@yahoo.com; |

Cc: Martha.S.Chieply@usace.army.mil; joel.o.ames@usace.army.mil; Harris_Hoistead@fws.gov;
Kelly_Hogan@fws.gov; meg_vanness@fws.gov
Subject: RE: Tribal Meeting



**VIA CERTIFIED MAIL and EMAIL**

October 21, 2014

Brent Cossette
Natural Resource Specialist
Environmental Stewardship
CENWO-OD-TN
United States Army Corps of Engineers, Omaha District
1616 Capital Avenue, Suite 9000
Omaha, NE 68102
Brent.J.Cossette@usace.army.mil

**Re:    Request for Pipeline Easement and Temporary Construction License for the Proposed Dakota Access Pipeline Project at Lake Oahe**

Dear Mr. Cossette:

Dakota Access, LLC, is proposing the Dakota Access Pipeline (DAPL) Project; an approximate 1,100 mile long, 30-inch diameter light crude oil pipeline project beginning near Stanley, North Dakota, and routing through South Dakota, Iowa and ending at Patoka, Illinois. DAPL is proposed to cross the Missouri River (Lake Oahe) on the boarder of Morton and Emmons Counties in North Dakota. Dakota Access understands that this crossing involves COE owned and controlled lands on both sides of this waterbody (**Figure 1**).

Dakota Access is currently securing access rights on private and COE lands to perform geotechnical analysis of the subsurface at this crossing to determine a feasible crossing method.  It is currently anticipated that the pipeline will cross Lake Oahe via Horizontal Directional Drill (HDD).  The proposed pipeline is routed across the Lake where two linear utilities already exist, an overhead powerline and a buried natural gas pipeline.

The purpose of this letter is to formally request the COE easement process be initiated as well as the process for DAPL to secure a temporary construction license.

**DAPL Project Crossing and Easement Information**
The proposed pipeline will cross Lake Oahe and COE lands on both the east and west side of the waterbody.  The proposed crossing is located in Section 10, Township 134 North, Range 79 West in Morton County, North Dakota, and Section 11, Township 134 North, Range 79 West in Emmons County, North Dakota (**Figure 1**).

OAHE0000034



**DAKOTA ACCESS, LLC**
An ENERGY TRANSFER Company

Dakota Access is securing a 50 foot wide permanent easement along the entire Project alignment that is generally centered on the pipeline (i.e. 25 feet on either side of the centerline). Dakota Access understands that the distance from the western boundary of COE owned lands to the eastern boundary of COE lands on both sides of the lake at the proposed crossing location is approximately 6,450 feet. The final length of the requested easement will be determined upon final design of the crossing subsequent to performing a geotechnical analysis.

A temporary construction license is also requested at this time due to the current uncertainty of the HDD layout and if any conventional pipeline installation will be required, if either or both the HDD entry/exit point would be located within COE lands, if access to the waterbody would be required for temporary water rights, etc. The proposed typical construction easement for the DAPL is 150 feet wide (and includes the 50 feet of permanent easement). HDD entry/exit points are typically 200 feet or 250 feet square. All dimensions will be firmed up in the Environmental Assessment to be prepared based on design that is currently ongoing.

We appreciate your assistance with this request for a permanent easement and temporary construction license at Lake Oahe. We understand this formal DAPL Project request for a pipeline easement and temporary construction license from the COE will officially initiate the COE easement process. Should you have any questions or comments, or require any other information for this request, please contact me at 713.989.7186, Monica.Howard@energytransfer.com, or at Dakota Access, LLC, c/o Monica Howard, 1300 Main Street Rm 14.030, Houston, TX 77002.

Sincerely,

**Dakota Access, LLC**

Monica Howard
Director Environmental Sciences

cc:     Phillip Sheffield, COE Natural Resource Manager Oahe Project

Enc.    Figure 1 – Preliminary Proposed Easement at Missouri River/Lake Oahe

OAHE0000035