IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE,

          Plaintiff,

and

CHEYENNE RIVER SIOUX TRIBE,

          Plaintiff-Intervenor,

v.

U.S. ARMY CORPS OF ENGINEERS,

          Defendant,

and

DAKOTA ACCESS, LLC,

          Defendant-Intervenor-Cross Claimant.

Case No. 1:16-cv-01534-JEB

**DAKOTA ACCESS, LLC'S RESPONSE TO
STANDING ROCK SIOUX TRIBE'S POST-HEARING NOTICE OF FILING**

Standing Rock waited until after the Court's hearing on the parties' motions for summary judgment to specify how any of its criticisms under the highly controversial topic fell within the remand's scope. *See* D.E. 456 at 13; D.E. 456-1, Ex. 1; D.E. 465 at 4-6. After failing to answer a direct question from the Court, Standing Rock now tries for the first time to show that Plaintiffs properly raised a single criticism, which relates to detection of slow leaks. Because this is the first time Standing Rock has made such an effort, the Court should consider Dakota Access's response below explaining why this criticism—like all of the others already identified in the briefing—still is not properly before this Court on remand.

Standing Rock's post-hearing filing cites eight statements in the RAR that postdate the Corps' July 25, 2016 decision to issue a permit for construction of the pipeline. D.E. 492 at 1-2. Five are from documents submitted to the Corps during the interim period between July 25, 2016 and February 3, 2017, when the Corps made its decision to deliver the easement without preparing an environmental impact statement. *See, e.g.*, RAR 1250; RAR 1260; RAR 1291; RAR 1339; RAR 1387. The other three postdate the interim period, *see* RAR 1421; RAR 1469; RAR 1856, and therefore are not within the scope of the remand for that reason alone, *see* D.E. 456 at 17-18.

More broadly, though, none of the eight statements is properly before the Court because Plaintiffs raised these same types of criticisms *before* July 25, 2016, and this Court passed on them in its prior summary judgment decision. In particular, Plaintiffs commented on the draft environmental assessment by telling the Corps on March 24, 2016 that DAPL's leak detection system "may not be effective in timely detecting . . . actual leaks," USACE_DAPL 66182, and stating on April 26, 2016 that a leak of "0.2% of the pipeline flow" would be "likely undetectable" and could result in "over 1,140 barrels (or 47,880 gallons) of crude [oil] *per day* being spilled without detection," USACE_DAPL 84807.

The Court responded to these criticisms, explaining that the "EA addressed" "'slow leaks,'" "failure rates of spill-detection systems," and detection of "'slow leak[s] until the oil sheen appears on the surface of the water.'" *Standing Rock Sioux Tribe v. United States Army Corps. of Eng'rs*, 255 F. Supp. 3d 101, 124-25 (D.D.C. 2017); *id.* at 127 (noting that the EA discussed *inter alia* "leak-detection systems," and holding that, "[t]o the extent the Tribes' experts disagree with the Corps' technical assessments or overall conclusion, such disagreements are 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" (citation omitted)). In assessing the highly controversial topic itself, this Court further concluded that "none

of the evidence before the Corps as of July 25, 2016—including Standing Rock's comments . . . and submissions from the EPA and the Department of the Interior . . . —suggested substantial methodological or data flaws in the Corps' analysis." *Id*. at 128-29.  Because supposed weaknesses in detecting slow leaks was evidence "before the Corps as of July 25, 2016," this Court's ruling—which Plaintiffs did not move the Court to reconsider—fully resolves the claim that leak detection was a highly controversial topic, especially where Plaintiffs identified no information in their later comments that was unavailable as of July 25, 2016.  As the D.C. Circuit confirmed in *Nat'l Parks Conservation Ass'n v. Semonite*, the mere fact that the parties themselves have echoed multiple criticisms does not make a matter highly controversial.  916 F.3d 1075, 1083 (D.C. Cir. 2019) (explaining that "'the fact that some people may be highly agitated and be willing to go to court over [a] matter'" is not enough to make matter highly controversial).  And, unlike in *Semonite*, none of these criticisms come from neutral "government agencies with 'special expertise'" conferred by law.  *Id.* at 1084.

While the Corps had no obligation to revisit detection of slow leaks on remand, it addressed the same statements that Standing Rock now identifies.  RAR 173 (addressing RAR 1260); RAR 184 (addressing RAR 1291); RAR 199 (addressing RAR 1339); RAR 214 (addressing RAR 1387); RAR 224 (addressing RAR 1421); RAR 238 (addressing RAR 1469); *see also* RAR 207 (addressing "several comments" about "the possibility of a pinhole leak").  And the only two statements the Corps did not address with a direct response, RAR 1250, RAR 1856, merely repeat the same arguments as the six statements that the Corps directly addressed.  The Corps explained that concerns about slow leaks are unwarranted because the pipeline's detection system is "capable of detecting leaks down to 1 percent or less," and "sensitive to smaller changes in flow rate and pressure" that would trigger a "detectable meter imbalance" and "alarm[s] to the Control Center"

for a leak below 1 percent. RAR 205-06; *see also* 255 F. Supp. 3d at 126 (Court cites same statement from page 90 of EA, about ability to detect leaks "down to 1 percent or better," in rejecting Plaintiffs' arguments as to risk of spill).

In any event, the possibility of a small or slow leak does not alter the worst-case discharge calculation. The Corps reasonably followed the methodology approved by PHMSA, which *requires* calculation of the worst-case discharge based on a guillotine break, not a slow leak. 49 C.F.R. § 194.105(b)(1). The only interim-period criticism that attempts to quantify the volume of a slow leak predicted a loss of 480 barrels of crude oil, RAR 1250, far below the worst-case discharge already analyzed by the Corps.

In short, Standing Rock's supplemental filing fails to raise an issue that is properly before the Court at this stage. And nothing in the expert criticisms that Standing Rock cites permits a conclusion that the Corps was required to base its finding of no significant impact on a larger worst-case discharge.

Dated: March 20, 2020                                                        Respectfully submitted,

 /s/ William S. Scherman
William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2020, I electronically filed the foregoing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

    /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*