UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Standing Rock Sioux Tribe; Yankton Sioux Tribe; Robert Flying Hawk; Oglala Sioux Tribe, | **Civil No. 1:16-cv-01534-JEB**<br>**(Consolidated Case Nos.**<br>**1:16-cv-01796 and 1:17-cv-00267)** |
| Plaintiffs, | |
| and | |
| Cheyenne River Sioux Tribe; Sara Jumping Eagle et al., | |
| Plaintiff-Intervenors, | |
| vs. | |
| U.S. Army Corps of Engineers, | |
| Defendant-Cross-Defendant, | |
| and | |
| Dakota Access, LLP, | |
| Defendant-Intervenor-Cross-Claimant. | |

---

**AMICUS BRIEF OF THE STATE OF NORTH DAKOTA IN SUPPORT
OF DEFENDANTS AND OPPOSING VACATUR OF EASEMENT**

---

Wayne Stenehjem
Attorney General of North Dakota
Matthew A. Sagsveen
Solicitor General
David R. Phillips
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
500 North 9th Street
Bismarck, ND  58501-4509
701-328-3640
Attorneys for the State of North Dakota

## CORPORATE DISCLOSURE STATEMENT

The State of North Dakota is a state government, not a corporation, and therefore, no corporate disclosure statement is required under LCvR 7(o)(5) or Fed. R. App. P. 29(a)(4)(A).

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................ i

Statement of Amicus Curiae and Introduction...................................................... 1

Argument............................................................................................................ 2

I.      A Court Ordered Shutdown Of DAPL Would Be Severely Disruptive
        To The State Of North Dakota................................................................... 2

        A.      Oil And Gas Production In North Dakota ...................................... 2

        B.      Oil Transportation In North Dakota ............................................... 3

        C.      North Dakota Derives A Major Portion Of Its Budget From
                The Taxation Of Oil And Gas......................................................... 4

        D.      Disruptive Effects In North Dakota If DAPL Is Shut Down .......... 8

Conclusion ........................................................................................................ 13

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                    **<u>Page</u>**

<u>Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,</u>
    988 F.2d 146 (D.C. Cir. 1993) ........................................................... 1, 2

<u>Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.,</u>
    920 F.2d 960 (D.C. Cir. 1990) ............................................................... 1

<u>Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers,</u>
    255 F. Supp. 3d 101 (D.D.C. 2017) ...................................................... 2


**<u>Statutes</u>**

LCvR 7(o)(1) ............................................................................................. 2

N.D. Cent. Code ch. 57-51 ...................................................................... 7

N.D. Cent. Code ch. 57-51.1 ................................................................... 7

## STATEMENT OF AMICUS CURIAE AND INTRODUCTION

In its March 25, 2020 Memorandum Opinion on Plaintiffs' Motions for Summary Judgment and Defendant U.S. Army Corps of Engineers' ("Corps") Cross-Motions for Summary Judgment, the Court remanded the matter to the Corps, ordering it to prepare an Environmental Impact Statement.  ECF No. 496, pp. 2, 35, 42.  However, the Court stopped short of vacating the easement for the Dakota Access Pipeline ("DAPL") that crosses the Missouri River.  Id. at p. 42.  The Court delayed its ruling on whether to vacate the easement, and ordered the litigants to submit briefs on the issue of whether the easement should be vacated during the remand.  Id.  Specifically, the Court requested that the parties address the two factors courts consider relative to the question of whether an easement should be vacated when a federal agency's National Environmental Policy Act analysis is remanded to the agency, in Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-151 (D.C. Cir. 1993).  ECF No. 496, p. 42.  As established in Allied Signal, "[t]he decision whether to vacate depends on '[1] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequence of an interim change that may itself be changed.'"  988 F.2d 146, at 150-151 (citing Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 967 (D.C. Cir. 1990)).

Court ordered vacatur, which would require DAPL to shutdown, would have significant disruptive consequences on North Dakota.  The State of North Dakota submits this brief as amicus curiae specifically to address the second Allied-Signal factor, in order to provide the Court with additional information on the disruptive consequences that will directly impact North Dakota if the Court orders vacatur.  North Dakota is the second highest oil and gas producing state, with a significant portion of its economy and tax revenue derived from the production of oil and gas.  A Court ordered shutdown of DAPL would result in a serious reduction in economic

1

output in North Dakota and corresponding loss of tax revenue to the state.

The State of North Dakota is authorized by LCvR 7(o)(1) to file an amicus brief without consent of the parties and without leave of Court.

## ARGUMENT

### I.   A Court Ordered Shutdown Of DAPL Would Be Severely Disruptive To The State Of North Dakota.

Under the second <u>Allied-Signal</u> factor, the Court should consider "the disruptive consequence of an interim change that may itself be changed.'"  988 F.2d at 150-151 (citing <u>Int'l Union</u>, 920 F.2d at 967).  As this Court recognized in its Memorandum Opinion, vacatur "would 'carry serious consequences that a court should not lightly impose . . . .'" ECF No. 496, p. 42 (quoting <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers</u>, 255 F. Supp. 3d 101, 147 (D.D.C. 2017)).

### A.   Oil And Gas Production In North Dakota.

North Dakota is a small state in terms of population and overall economic output. Declaration of Joe R. Morrissette, Jr.[1] ("Morrissette Decl."), Ex. A, ¶ 4.  Out of the 50 states, North Dakota ranks only 48th in population size and 46th for gross domestic product.  <u>Id.</u>  However, despite the small overall size of North Dakota's economy, North Dakota is a large producer of oil and natural gas.  <u>Id.</u>; Declaration of Lynn D. Helms[2] ("Helms Decl."), Ex. B, ¶ 6.  As a consequence of its abundant natural resources, a large portion of North Dakota's economy is based on oil and gas production, placing North Dakota second out of the fifty states in oil and gas production.  Morrissette Decl., Ex. A,

---

[1] Joe R. Morrissette, Jr. is the Director of the North Dakota Office of Management and Budget.  Morrissette Decl., Ex. A, ¶ 2.  The basis of his knowledge as to the matters within his Declaration (Ex. A) are contained in paragraphs 2-3 therein.

[2] Lynn D. Helms is the Director of the North Dakota Industrial Commission Department of Mineral Resources and serves as a member of the North Dakota Advisory Council on Revenue Forecasting.  Helms Decl., Ex. B, ¶¶ 2, 4.  The basis of his knowledge as to the matters within his Declaration (Ex. B) are contained in paragraphs 2-4, and 9 therein.

¶ 4; Helms Decl., Ex. B, ¶ 6.  The great majority of the oil and gas produced in North Dakota comes from the Williston Basin.  The Williston Basin is a large sedimentary basin located in the north-central United States and south-central Canada with multiple geologic formations currently producing oil and gas.  Declaration of Justin J. Kringstad [3] ("Kringstad Decl."), Ex. C, ¶ 5.  The United States portion of the Williston Basin contains oil producing fields in the states of Montana, North Dakota, and South Dakota.  Id.  North Dakota is the largest oil producing state in the United States portion of the Williston Basin.  Id.  February 2020 is the most recent month with complete data[4] available to the state, showing the following production and activity that month:

- Daily production of 1.451 million barrels of oil and 3.1 billion cubic feet of natural gas

- 54 active drilling rigs

- 16,118 active oil and gas wells

- 2,091 inactive wells

- 1,694 approved drilling permits

Helms Decl., Ex. B, ¶ 6.  At year-end 2019, oil production in the United States portion of the Williston Basin was estimated to be 1.53 million barrels per day, with North Dakota accounting for 1.4 million barrels per day.  Morrissette Decl., Ex. A, ¶ 4; Kringstad Decl., Ex. C, ¶ 6.  In total, approximately 524.2 million barrels of oil were produced in North Dakota in 2019.  Morrissette Decl., Ex. A, ¶ 4.

B.      Oil Transportation In North Dakota.

North Dakota accounts for approximately 12% of the crude oil produced in the United States.  Morrissette Decl., Ex. A, ¶ 9.  However, there is limited in-state capacity

_____

[3]Justin J. Kringstad is the Director of the North Dakota Industrial Commission Pipeline Authority and serves as a member of the North Dakota Advisory Council on Revenue Forecasting.  Kringstad Decl., Ex. C, ¶¶ 2, 4.  The basis of his knowledge as to the matters within his Declaration (Ex. C) are contained in paragraphs 2-4 therein.

[4] Based on current estimates, it is possible that in light of the current economic situation, as many as 5,000 wells may now be shut-in.  Helms Decl., Ex. B, ¶ 6.

for refining.  Id.  North Dakota has two oil refineries with a combined refining capacity of about 90,000 barrels of crude oil per calendar day, which is less than one-tenth of the state's daily oil production.  Id.  Consequently, continued oil production in North Dakota is dependent upon reasonable methods of transporting crude oil produced in the state to out-of-state refining facilities.  Id.  Oil production in the Williston Basin is transported through privately owned transportation systems to centers around the United States.  Kringstad Decl., Ex. C, ¶ 5.  Oil produced in North Dakota makes up the largest share of pipeline and rail transportation volumes from the region.  Id.  The most efficient and cost-effective method of transporting crude oil is through existing pipeline infrastructure, including DAPL.  Morrissette Decl., Ex. A, ¶ 9.  DAPL is the largest service provider in the region at just over 40% of regional egress capacity.  Kringstad Decl., Ex. C, ¶ 6; Morrissette Decl., Ex. A, ¶ 9.  Any reduction in pipeline capacity will increase costs of transporting North Dakota crude oil to refining facilities.  Morrissette Decl., Ex. A, ¶ 9.

In the month of February 2020, North Dakota Industrial Commission Pipeline Authority estimated that 66% of U.S. Williston Basin oil production was moved by pipeline to refineries outside of the region.  Kringstad Decl., Ex. C, ¶ 7.  An estimated 19% of oil production was moved by railcar to refineries outside of the region.  Id.  Additionally, an estimated 5% of production was refined locally in North Dakota and 10% was estimated to be moved by truck north into the Canadian Williston Basin for further transport by pipeline or rail.  Id.  Long distance transportation by truck to most refining centers is generally not considered an economically feasible alternative to pipelines or rail.  Id.

      C.      **North Dakota Derives A Major Portion Of Its Budget From The Taxation Of Oil And Gas.**

As a small state with a small population base and relatively small economy, North Dakota state government is extremely dependent upon revenues from its dominant industry, the extraction and production of oil and natural gas.  Morrissette Decl., Ex. A, ¶ 4.  This economic activity results in direct revenue of $4.9 billion over a two-year budget

period, based on the official forecast for the state's current two-year budget period (July 1, 2019 to June 30, 2021).  Id.  In comparison, the state expects to collect general fund revenues of $3.7 billion from sources other than oil and gas taxes.  Id.

The state legislature has attempted to insulate the state general fund from the impact of fluctuations in oil and gas tax revenue by limiting the amount of oil and gas tax revenue allocated to the state general fund.  Id. ¶ 5.  The legislature has created a series of designated special funds in which oil and gas taxes are deposited.  Id.  Each fund is established for a specific purpose or program or to provide distributions to different levels of political subdivisions or tribal governments.  Id.  For the 2019-21 biennium, based on the official revenue forecast adopted by the 2019 legislature, those allocations are estimated as follows:

- $661 million, or 14%, allocated to cities and counties in areas where oil and gas are produced.

- $525 million, or 11%, allocated to tribal governments based on a revenue sharing agreement for production within reservation boundaries.

- $1.3 billion, or 27%, to the Legacy Fund, a constitutional state endowment fund.

- $213 million, or 4%, to the Foundation Stabilization Fund to support state school aid in the event of a revenue shortfall.

- $213 million, or 4%, to the Common Schools Trust Fund to support the public schools.

- $433 million, or 9%, to the Resources Trust Fund, to support water supply and flood control projects in the state.

- $400 million, or 8%, to the state general fund, to support state government operations and services to citizens.

- $200 million, or 4%, to the Tax Relief Fund, to support social services programs previously funded by county levied property taxes.

- $75 million, or 2%, to the Budget Stabilization Fund, to build the state rainy day fund and support government services in the event of a revenue shortfall.

- $250 million, or 5%, to county, city, township, and airport infrastructure.

5

- $518 million, or 11%, to the state Strategic Investment and Improvements Fund to support state government operations and specific one-time projects.

- $65 million, or 1%, to various other funds including lignite coal research, outdoor recreation and conservation, oil well plugging and site reclamation, and energy research.

Id.

North Dakota's 2019-2021 general fund revenues are strongly correlated to oil and gas activity.  Id. ¶ 6.  Direct allocations of oil taxes represent only 8% of total expected general fund revenues.  Id.  However, oil taxes accumulated in the Strategic Investment and Improvements Fund are often transferred into the general fund as a budget balancing measure.  Id.  For the 2019-2021 biennium, transfers of accumulated oil and gas taxes represent 10% of total general fund revenues.  Id.  Considering the total of oil tax allocations and transfers, nearly one-fifth of all general fund revenues come directly from oil and gas taxes.  Id.  To support general government operations and essential programs, the state is heavily reliant on sales, use and motor vehicle excise tax revenue, which for 2019-21 is expected to be $2.1 billion, or 44%, of all general fund revenues.  Id.

In light of its heavy dependence on taxes generated from the oil and gas industry, an industry prone to fluctuations, North Dakota has taken additional steps to enable it to absorb short-term revenue shortfalls.  The North Dakota legislature has established a Budget Stabilization Fund to provide a means to continue essential government services in the event of a revenue shortfall.  Id. ¶ 7.  The budget stabilization fund receives funding through transfers from excess general fund balances (over $65 million) at the end of a biennium, as well as a biennial transfer of $75 million from oil and gas taxes.  Id.  The Budget Stabilization Fund balance can be accessed in the event of a revenue shortfall, but only after budget reductions ordered by the governor.  Id.  The maximum balance in the Budget Stabilization Fund is set at 15% of general fund appropriations.  Id.  Although the Budget Stabilization Fund positions North Dakota to absorb short-term fluctuations in revenues, the fund is not sufficient to absorb the effect of a significant, ongoing change

6

in the state's revenue structure.  Id.

North Dakota has a biennial budget process and is one of the few states with a biennial legislative session.  Id. ¶ 8.  The normal legislative session occurs from January to May of odd numbered years and is limited to a maximum of 80 days.  Id.  Significant reductions to the state's revenue outlook in the interim between regular legislative sessions is primarily addressed through executive authority to reduce spending authority and the ability to offset limited revenue reductions by accessing the Budget Stabilization Fund.  Id.  In exceptional circumstances, the legislature can convene in a special legislative session.  Id.

During the first thirty-two months in which DAPL began operations (June 19, 2017 through February, 2020), based on oil taxes imposed under N.D. Cent. Code chs. 57-51 and 57-51.1, North Dakota realized an estimated $317 million in additional Oil and Gas Gross Production Tax revenue due to the decreased shipping cost associated with oil transported by DAPL, and higher price received for oil on the Gulf Coast.  Declaration of Ryan Rauschenberger[5] ("Rauschenberger Decl."), Ex. D, ¶ 10.  If DAPL is shut down, these increased oil tax revenues will disappear as production is shut in or diverted to higher-cost modes of transport.  Id.  North Dakota oil producers deduct transportation costs from the value of oil when determining the taxable basis for the state's oil extraction and gross production taxes.  Id.  Any increase in transportation costs thus results in a direct reduction in tax revenues.  Id.

In addition to impacting the funding of the state government, DAPL and the oil and gas industry provide a substantial source of revenue to counties and Native American Tribes in North Dakota.  Certain North Dakota counties assess DAPL with an annual ad

---

[5]Ryan Rauschenberger is the Tax Commissioner for the State of North Dakota and serves as a member and Secretary of the Board of the State Board of Equalization. Rauschenberger Decl., Ex. D, ¶ 2.  Id. ¶¶ 2, 6.   The basis of his knowledge as to the matters within his Declaration (Ex. D) are contained in paragraphs 2-6 therein.

valorem property tax based upon the presence of the pipeline within the county.  The ad valorem property taxes assessed and collected by North Dakota counties from DAPL for 2018 are as follows:   Dunn County $653,673; Emmons County $748,831; McKenzie County $1,520,539; Mercer County $511,720; Morton County $1,264,394; Mountrail County $658,238; and Williams County $2,179,289; for a total of $7,536,684.  Id. ¶ 8. Similar amounts were paid by DAPL in 2019.  Id.  Further, a substantial portion of the oil produced in North Dakota is from development on Fort Berthold Indian Reservation and generates tax and royalty revenue for the Mandan, Hidatsa, and Arikara Nation, also known as the Three Affiliated Tribes and royalty revenue for individual tribal members as follows:

- Daily production of 364,642 barrels of oil (237,134 trust lands and 127,508 fee lands)

- 10 active drilling rigs (5 on trust lands and 5 on fee lands)

- 2,418 active oil and gas wells (1,797 on trust lands and 621 on fee lands)

- 326 approved drilling permits (258 on trust lands and 68 on fee lands)

- 4,134 potential future wells (2,991 on trust lands and 1,143 on fee lands)

Helms Decl., Ex. B, ¶ 7.

    **D.**    **Disruptive Effects In North Dakota If DAPL Is Shut Down.**

A Court ordered shutdown of DAPL, even if only temporary, would be highly disruptive in North Dakota and would have far-reaching consequences.  It would severely impact North Dakota's economy, as well as state, local, and Tribal government funding.

Currently, around 300,000 barrels of oil per day are being transported from North Dakota to coastal markets by railroad.  Helms Decl., Ex. B, ¶ 10.  In 2014, the railroads were able to transport a maximum of about 800,000 barrels per day.  Id.  Based on historical data it could take two years to divert 500,000 barrels of DAPL's daily flows to rail transport, resulting initially in the shut-in of an estimated 8,700 active oil and gas wells decreasing over time to a final loss of 70,000 barrels per day and an estimated 1,450 oil

wells shut in.  Id.  Each of those wells represents 1.6 full time jobs.  Id.  The estimated cost to return each well to production is $25,000 to $50,000 and can be as much as $400,000 in some circumstances.  Id.  Returning wells to production also requires three to six months planning and scheduling.  Id.  History shows that 50-80% of the wells that are shut down are permanently abandoned.  Id.

In addition, if DAPL is shut down, it is likely that a number of oil and gas operators in North Dakota will refocus their planned drilling activities from North Dakota to other areas, again assuming that the bulk of DAPL's flows can be diverted to rail transport.  Id. ¶ 11.  Ten of the top twenty operators in North Dakota have significant positions and activity in other unconventional plays that are closer to markets and have more stable pipeline capacity.  Id. ¶ 12.  Those ten operators currently operate 23 drilling rigs that generate approximately 3,450 full time jobs.  Id.  In 2012-2014 when pipelines were full and crude oil had to be shipped by rail, North Dakota drilling activity reduced 15% and moved to Texas, Colorado, and Wyoming.  Id.  In 2017 when DAPL started up, the operators increased North Dakota drilling activity 20%.  Id.  Shutting down DAPL is expected to result in loss of at least four to five drilling rigs and the associated loss of 600-750 full time jobs.  Id.  In addition, loss of those drilling rigs will result in seven to nine fewer new wells drilled per month and the associated loss of 11-14 new full-time jobs per month.  Id.  The job loss estimate was derived from a study done by the North Dakota Department of Mineral Resources in conjunction with North Dakota State University Department of Agribusiness and Applied Economics, and the Vision West project.  Id. ¶ 13.  This study looked at the average number of jobs per drilling rig and producing well in North Dakota.  Id.

It is likely that a significant portion of DAPL's flows could not be diverted to rail due to insufficient rail capacity and low oil prices resulting from the COVID-19 pandemic. Helms Decl., Ex. B, ¶ 14.  In that event, oil production in North Dakota would decrease even more sharply, and many more jobs would be lost.  Id.  North Dakota, however, has

not conducted a study examining the extent to which DAPL's flows can be diverted to rail under current economic conditions or otherwise.  Id.  Assuming, however, that only 300,000 barrels per day of DAPL's daily flows can be diverted to rail transport, shutting down DAPL could result in the shut in of an estimated 270,000 barrels or 5,600 active oil and gas wells.  Id.  Using the same study noted above, this would mean the temporary loss of around 8,950 full time jobs and permanent loss of 4,475 to 7,175 full time jobs.  Id.

Further, as the second highest volume oil producing state, North Dakota is reliant on continued oil production and the ongoing collection of oil and gas tax revenues to support critical state government programs, including public elementary and secondary education, higher education, and health and human services.  Morrissette Decl., Ex. A, ¶ 10.  If DAPL was shut down and that shut down resulted in a decrease in oil production equal to the amount currently transported by the pipeline, the reduction in state oil and gas tax revenues would be approximately $2 billion during a two-year budget period, based on the current official revenue forecast.  Id.  As a state with a part-time citizen legislature that meets on a biennial basis, there are few options available to deal with such a sudden, drastic change in the state's revenue.  Id. ¶ 11.  An across-the-board budget reduction can be implemented by the executive branch without legislative involvement, but it would have a direct negative impact on state employees, state programs, and services to citizens.  Id.  The Budget Stabilization Fund provides a mechanism to cushion the budget during a short-term fluctuation in state revenues but would be of little benefit in the event of a long-term change in oil production activity and state revenues.  Id.  A long-term, ongoing reduction in state revenues from oil and gas taxes would result in the need to significantly reduce state services or significantly increase taxes on citizens.  Id.  To offset a $2 billion reduction in state revenues, for example, would require a doubling of the state's general sales, use and motor vehicle excise tax rate from 5% to 10%, an unfeasible solution that would give North Dakota the highest sales and use tax rate of any state in the nation by a wide margin.  Id.

A scenario forcing DAPL to suddenly stop its oil shipping service would have immediate negative market and production consequences for a very large number of North Dakota stakeholders including, producers, royalty owners, and government entities. Kringstad Decl., Ex. C, ¶ 8.  The only feasible alternative transportation solution would include a significant increase in the use of rail tank cars to deliver North Dakota oil to market.  Id.  An increase in crude by rail volumes sufficient to offset current pipeline deliveries by DAPL would take an unknown amount of time to assemble the required tank cars, engines, and crews, and to ensure market destinations would be prepared for a surge in rail volume.  Id.  During the unknown length of time required to shift large volumes of oil to rail transportation, likely several months or longer, it can be reasonably assumed that the only option for numerous wells would be to be curtailed or shut-in.  Id.

The curtailment or shut-in of wells in North Dakota would have an immediate negative financial and operational impact on third party oil gathering companies and local natural gas gathering, processing, and transmission providers.  Id. ¶ 9.  Natural gas produced from the Bakken formation is produced together with the crude oil and cannot be produced independently if oil transportation options are constrained.  Id.  Attracting the necessary infrastructure investments to expand natural gas capture in North Dakota would become increasingly difficult if third party providers had additional uncertainty surrounding the ability of a producer to keep wells operating in the event of DAPL being required to cease operations.  Id.

Additionally, a Court ordered shutdown of DAPL would be harmful to North Dakota state government and other stakeholders in the state due to increased transportation costs.  North Dakota oil producers deduct transportation costs from the value of oil when determining the taxable basis for the state's oil extraction and gross production taxes. Morrissette Decl., Ex. A, ¶ 9.  Any increase in transportation costs results in a direct reduction in tax revenues.  Id.  North Dakota oil producers typically sell their product at a price that is discounted from key benchmark price indicators in order to account for

11

transportation costs associated with the great distances to major refining centers. Kringstad Decl., Ex. C, ¶ 10.  Price discounts have varied widely since increased oil development of the Bakken formation began in the mid-2000's.  Id. ¶ 9.  Price discounts in North Dakota are minimized when safe, reliable, low-cost transportation exists to move adequate volumes of oil to key marketing centers around the United States.  Id.  Pipeline transportation is generally considered to be the most reliable and lowest cost option for oil movement out of North Dakota.  Id.  If DAPL were to cease shipping service, even for a short duration, any and all incremental transportation expenses associated with the expansion of crude by rail would further reduce the realized price per barrel for North Dakota's royalty owners, producers, and tax revenue calculations.  Id.  Transportation rates on DAPL and rail vary by destination, shipper status, and contract terms.  Id.  The North Dakota Industrial Commission Pipeline Authority estimates that direct rail transportation expenses to Gulf Coast markets are generally $1-$3 per barrel higher than using DAPL.  Id.  Additional costs, such as loading, unloading, and car leasing, will further increase the all-in rail transportation expense.  Id.  Sales, use, and motor vehicle excise tax revenue has also become increasingly volatile and strongly correlated to oil and gas activity.  Morrissette Decl., Ex. A, ¶ 6.  During the oil price decline of 2015-2016, state sales tax collections fell by nearly 40%.  Id.  At the same time, oil and gas tax revenues fell by 50%.  Id.

While the potential impacts of the COVID-19 pandemic are impossible to quantify due to rapidly changing oil prices, employment numbers, and capital investment plans, it is certain that a Court ordered shutdown of DAPL will result in greatly increased destabilization now and even more destabilization when oil and gas market recovery begins.  Helms Decl., Ex. B, ¶ 15.

**CONCLUSION**

The State of North Dakota requests the Court proceed without vacatur, in order to avoid serious disruption to North Dakota's economy and a severe decrease in tax revenue to the state, both of which would result from a temporary or permanent shutdown of DAPL.

Respectfully Submitted,
Wayne Stenehjem
Attorney General of North Dakota

/s/ Matthew A. Sagsveen
Matthew A. Sagsveen
Solicitor General
State Bar ID No. 05613
Email:  masagsve@nd.gov

/s/ David R. Phillips
David R. Phillips
Assistant Attorney General
State Bar ID No. 06116
Email:  drphillips@nd.gov

OFFICE OF THE ATTORNEY GENERAL
500 North 9th Street
Bismarck, ND  58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300

Counsel for the State of North Dakota

13