**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

STANDING ROCK SIOUX TRIBE, YANKTON
SIOUX TRIBE; ROBERT FLYING HAWK;
OGLALA SIOUX TRIBE,

        Plaintiffs,

  and

CHEYENNE RIVER SIOUX TRIBE; SARA
JUMPING EAGLE ET AL.,

        Plaintiff-Intervenors,

      v.

U.S. ARMY CORPS OF ENGINEERS,

        Defendant-Cross Defendant,

  and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-Cross
        Claimant.

———————————————

**REDACTED BRIEF OF DAKOTA ACCESS, LLC REGARDING REMEDY**
———————————————

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................4

ARGUMENT .......................................................................................................................8

I.     There Is More Than A "Serious Possibility" That The Corps Can Substantiate
Its Decision To Grant The Easement ........................................................................8

     A.     The Corps Has Already Largely Completed The Work Required For
An EIS ...........................................................................................................10

     B.     The Bulk Of The Corps' Prior Analysis Remains Valid And Relevant ....12

     C.     The Corps Will Also Be Able To Resolve The Controversies This
Court Identified ............................................................................................17

           1.     The Corps Has Broad Discretion At The EIS Stage To Choose
Between Competing Methods, However Controversial ...............18

           2.     The Corps Can Draw On DAPL's Strong Safety Record Over
Three Years Of Operation ............................................................18

           3.     Each Purported Deficiency Is Easily Redressable ........................19

II.     Vacating The Easement Would Cause Immense Economic, Environmental,
And Other Harm ......................................................................................................31

     A.     Shuttering The Pipeline Would Have Devastating Economic
Consequences On Many Parties...................................................................31

           1.     Disruption To The DAPL-ETCOP System...................................32

           2.     Disruption To The Oil Industry And Its Employees.....................35

           3.     Disruption To States, Local Governments, And Tribes.................38

           4.     Disruption To The Public Interest.................................................40

     B.     Shutting Down The Pipeline Would Harm The Environment..................40

     C.     Preserving The Status Quo Will Not Harm The Tribes ............................43

CONCLUSION...................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. NRC,*
988 F.2d 146 (D.C. Cir. 1993) ....................................................................2, 3, 8, 9, 17, 18, 31

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
934 F.3d 649 (D.C. Cir. 2019) .................................................................................................8

*Apache Corp. v. FERC,*
627 F.3d 1220 (D.C. Cir. 2010) .......................................................................................32, 33

*Balt. Gas & Elec. Co. v. NRDC,*
462 U.S. 87 (1983) .................................................................................................................14

*Cal. Cmtys. Against Toxics v. EPA,*
688 F.3d 989 (9th Cir. 2012) .................................................................................................31

*Citizens Against Burlington, Inc. v. Busey,*
938 F.2d 190 (D.C. Cir. 1991) ...............................................................................................18

*City of Oberlin v. FERC,*
937 F.3d 599 (D.C. Cir. 2019) .............................................................................4, 19, 24, 32

*Davis Cty. Solid Waste Mgmt. v. EPA,*
108 F.3d 1454 (D.C. Cir. 1997) .............................................................................................13

*Defs. of Wildlife v. Jackson,*
791 F. Supp. 2d 96 (D.D.C. 2011) .........................................................................................34

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004) ............................................................................................................6, 9

*Fox Television Stations, Inc. v. FCC,*
280 F.3d 1027 (D.C. Cir. 2002) ...............................................................................................9

*Heartland Reg'l Med. Ctr. v. Leavitt,*
415 F.3d 24 (D.C. Cir. 2005) ...........................................................................................13, 14

*Heartland Reg'l Med. Ctr. v. Sebelius,*
566 F.3d 193 (D.C. Cir. 2009) .................................................................................................9

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989) ...............................................................................................................18

*Massachusetts v. NRC*,
    924 F.2d 311 (D.C. Cir. 1991) ........................................................................31

*Nat'l Parks Conservation Ass'n v. Semonite*,
    422 F. Supp. 3d 92 (D.D.C. 2019) ...................................................9, 31, 34, 45

*Nat'l Parks Conservation Ass'n v. Semonite*,
    916 F.3d 1075 (D.C. Cir. 2019) ...........................................................7, 18, 30

*Oceana, Inc. v. Ross*,
    275 F. Supp. 3d 270 (D.D.C. 2017) ................................................................12

*Oglala Sioux Tribe v. NRC*,
    896 F.3d 520 (D.C. Cir. 2018) ...................................................................33, 34

*Puntenney v. Iowa Utils. Bd.*,
    928 N.W.2d 829 (Iowa 2019) .........................................................................41

*Radio-Television News Dirs. Ass'n v. FCC*,
    184 F.3d 872 (D.C. Cir. 1999) .........................................................................9

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .............................................................................6, 9, 28

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    255 F. Supp. 3d 101 (D.D.C. 2017) .....................................7, 11, 13, 14, 15, 34, 43

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    282 F. Supp. 3d 91 (D.D.C. 2017) ................................7, 9, 14, 15, 19, 26, 31, 33, 34

*Town of Cave Creek v. FAA*,
    325 F.3d 320 (D.C. Cir. 2003) ........................................................................18

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) ...............................................................9, 10, 18

*Wis. Valley Improvement Co. v. FERC*,
    236 F.3d 738 (D.C. Cir. 2001) ........................................................................26

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019) ........................................................................41

**Statute**

42 U.S.C. § 4332 ......................................................................................6

**Regulations and Administrative Materials**

33 C.F.R. pt. 325, App. B ...................................................................................10, 11

33 C.F.R. § 230.10 ...................................................................................................10

40 C.F.R.
    § 1500.1.............................................................................................................30
    § 1501.1.............................................................................................................13
    § 1501.7.............................................................................................................13
    § 1502.1.............................................................................................................10
    § 1502.2.............................................................................................................13
    § 1502.6.............................................................................................................11
    § 1502.7.............................................................................................................10
    § 1502.8.............................................................................................................11
    § 1502.9.............................................................................................................11
    § 1502.10...........................................................................................................10
    § 1502.11...........................................................................................................10
    § 1502.12...........................................................................................................10
    § 1502.13...........................................................................................................10
    § 1502.14.....................................................................................................10, 11
    § 1502.15.....................................................................................................10, 11
    § 1502.16.....................................................................................................10, 11
    § 1502.17...........................................................................................................10
    § 1502.18...........................................................................................................10
    § 1502.21...........................................................................................................13
    § 1502.23...........................................................................................................11
    § 1502.24...........................................................................................................11
    § 1508.7.............................................................................................................11
    § 1508.8.............................................................................................................11
    § 1508.9.....................................................................................................10, 13
    § 1508.27.............................................................................................................7

Final Decision and Order, *In the Matter of Application of Dakota Access, LLC*,
    No. HP 14-002 (S.D. Pub. Utils. Comm'n Dec. 14, 2015)......................................19

Final Decision and Order, *In re Dakota Access, LLC*,
    No. HLP-2014-0001 (Iowa Utils. Bd. Mar. 10, 2016)............................................19

Findings of Fact, Conclusions of Law and Order, *Dakota Access, LLC, Dakota
    Access Pipeline Project, Siting Application*, No. PU-14-842 (N.D. Pub. Serv.
    Comm'n Jan. 20, 2016)............................................................................................19

Notice of Intent to Prepare an Environmental Impact Statement in Connection
    with Dakota Access, LLC's Request for an Easement to Cross Lake Oahe,
    North Dakota, 82 Fed. Reg. 5543 (Jan. 18, 2017) ..................................................12

Order, *In re Dakota Access, LLC*,
No. 14-0754 (Ill. Commerce Comm'n Dec. 16, 2015) ........................................................19

**Other Authorities**

*Addressing Misconceptions About the Dakota Access Pipeline*,
https://daplpipelinefacts.com/The-Facts.html ...........................................................6

Bloomberg, *Energy*, https://bloom.bg/3aMvSRh ........................................................35

David A. Lieb, *U.S. States Turn to Cash Reserves as Coronavirus Strains
Budgets*, AP (Mar. 15, 2020) .......................................................38

Jennifer Hiller & Liz Hampton, *Oil in the Age of Coronavirus: A U.S. Shale Bust
Like No Other*, Reuters (Apr. 15, 2020).........................................................36, 38

Justin Wolfers, *The Unemployment Rate Is Probably Around 13 Percent*, N.Y.
Times (updated Apr. 16, 2020) .......................................................38

Karen Clay, *et al.*, *External Costs of Transporting Petroleum Products: Evidence
from Shipments of Crude Oil from North Dakota by Pipelines and Rail*, 40
Energy J. 55 (2019).........................................................41, 42

PHMSA, Leak Detection Study (2012), https://bit.ly/2VoDtAY ................................................22

Stephen Cunningham, *U.S. Oil Producers Begin Storing Crude in Strategic
Reserve*, Bloomberg (Apr. 27, 2020) .......................................................40

Strata, *Pipelines, Rail & Trucks: Economic, Environmental, and Safety Impacts of
Transporting Oil and Gas in the U.S.* (2017) .......................................................41

Thomas R. Covert & Ryan Kellogg, *Crude by Rail, Option Value, and Pipeline
Investment,* Nat'l Bureau of Econ. Research (Sept. 2017) .......................................................37

Tony Romm, *More than 2,100 U.S. cities brace for budget shortfalls because of
coronavirus, with many planning cuts and layoffs*, Wash. Post (Apr. 14, 2020) ...................38

# INTRODUCTION

Plaintiffs' proposed remedy would shut down the safest, most environmentally friendly, way to move oil from North Dakota to Illinois and points beyond.  The Dakota Access Pipeline ("DAPL") is now as safe as—indeed, safer than—any other oil pipeline.  Period.  In nearly three years of operation it has transported more than *half a billion* barrels of oil with *zero* mainline releases.  Extensive government data proves that the chance of a major leak at Lake Oahe—*i.e.*, one materially larger than what the Corps has already extensively modeled—is *1 in nearly 200,000 years*.  That figure does not account for DAPL's many extra safety features or its location more than 90 feet below the lakebed.  The only spill modeling for this once-in-the-history-of-mankind event also shows that oil would come nowhere close to a tribal drinking water intake, even if no response occurred for 10 days.  Of course, that response delay could never happen under federal mandates.

Plaintiffs will complain still that no existing safety measures or response plans are sufficient, even for the safest oil pipeline currently in service anywhere in the world.  Of course the reality is that no set of safety measures or response plans will ever satisfy them, because they do not want any oil pipelines operating anywhere.  But objective, unbiased analysis shows just how safe DAPL is, and there is no reason to doubt it will continue to operate safely during remand.

Balanced against this absence of any benefit to a DAPL shutdown are severe, immediate, and long-lasting consequences for many parties.  It begins with several billion dollars in total annual losses to state, local, and tribal governments dependent on oil and gas tax and royalty revenue to fund public works; the North Dakota oil and gas industry; the owners of the pipeline and their partners and affiliates; and numerous downstream customers.  The pipeline, with a proven track record and modern safety features rivaling any other pipeline ever built, also accounts for 4.5% of all U.S. crude oil production and nearly 40% of crude oil produced in North Dakota, the nation's

second largest oil producer.  North Dakota, in turn, funds about half of its entire state budget with tax revenue generated by the oil industry.

Cutting off the supply line for that volume of such an important commodity would damage the national economy, several significant national industries, and national security, with severe ripple effects.  Agricultural and other industries, for example, would suffer major disruption from an effort to replace the pipeline with transport by rail or truck, both of which are unquestionably more expensive and greater threats to safety and the environment.  This Court should preserve the three-year status quo by remanding without vacatur while the Corps prepares an Environmental Impact Statement ("EIS").  Each *Allied-Signal* factor—the seriousness of the deficiencies requiring remand and the disruptive consequences of vacatur—independently favors that result.  *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

None of the grounds for remand that the Court identified in its March 25, 2020 opinion ("Opinion") casts serious doubt on the Corps' decision that the easement was and remains warranted.  The linchpin of the Corps' decision—the minimal risk of a large spill at Lake Oahe—is not seriously in question, and the Court has already upheld the bulk of the Corps' environmental analysis, much of which has not been in dispute for quite some time.  That analysis remains highly relevant to the task of preparing an EIS and, indeed, goes a long way toward fulfilling the EIS requirements.  The Corps, with decades of experience granting easements and permits to oil pipelines, already acknowledged the potentially significant consequences of an extremely unlikely large spill.  Any remaining dispute over details of those consequences is unlikely to alter the Corps' bottom line:  that DAPL—a safe, vital, state-of-the-art pipeline—is extremely unlikely to leak into Lake Oahe *at all*, much less with significant effects.  These discrete controversies can also be addressed through additional explanation of known facts and readily available information.  Given

that the Corps has devoted years of attention and more than hundreds of pages of analysis to the Lake Oahe crossing and easement—more than for many other pipelines it has allowed to cross jurisdictional waters, despite their having fewer safety features—there is *at least* a "serious possibility" that the Corps can prepare an EIS that substantiates its decision to grant the easement. *Allied-Signal*, 988 F.2d at 151.

As for *Allied-Signal*'s second prong, the disruptive consequences of shutting down DAPL after nearly three years of safe operation would be far more severe, and even more certain to occur, than when the Court last considered the question. For three years now, DAPL has been safely and efficiently bringing to market almost 40% of North Dakota's crude oil production—amounting to 4.5% of the nation's output—every single day. As noted above, shutting it down would have catastrophic direct and indirect effects, including billions of dollars in unrecoverable losses each year the pipeline is idle, and thousands of lost jobs. These losses, which extend to states, localities, tribes, and other third parties, would come as the region and the nation reel from the economic devastation wrought by the COVID-19 pandemic and fight through a recovery phase. Well closings by producers and efforts to replace DAPL with rail or truck would also yield a net harm to the environment, including air pollution and *increased* risks of oil spills—all of this without the benefit of any agency oversight. As one expert states, that would be akin to a "*major federal action with no regulatory oversight or environmental agency review and approval*." Ex. A ¶ 37 (Aubele Dec.).

By contrast, the Tribes are exceedingly unlikely to suffer any harm if DAPL continues operating during the remand. *DAPL's safety record during its nearly three years of operation is as good as, if not better than, any other pipeline in the industry.* Even in the highly unlikely event of a leak—and the even more unlikely remote event one occurs almost 100 feet beneath Lake

Oahe—Dakota Access has equipment and plans in place to respond to and remediate a spill at Lake Oahe roughly ▇▇▇▇ *larger* than the worst-case discharge properly calculated for that crossing. These extremely remote risks pale in comparison to the certainty of severe economic and environmental harms that would follow from shutting down DAPL.

Either *Allied-Signal* factor—and certainly their combination—renders vacatur unwarranted given the breadth and depth of the record. It is *at least* "plausible that the [Corps] will be able to supply the explanations required, and vacatur of the [easement] would be quite disruptive, as the [Dakota Access] pipeline is currently operational." *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019).

## BACKGROUND

1. For nearly three years, DAPL has safely and efficiently transported crude oil—around 200 million barrels per year—1,172 miles from the Bakken shale region in North Dakota to Patoka, Illinois. From there, the roughly 800-mile Energy Transfer Crude Oil Pipeline ("ETCOP") connects DAPL to the Gulf Coast. DAPL brings to market almost 40% of the oil produced in North Dakota—the nation's second largest oil-producing state, Ex. G ¶ 4 (Emery Dec.)—and has done so without a single oil spill on the DAPL mainline and just seven minor incidents within its facilities, Ex. C ¶ 24 (Stamm Dec.). The only one leaving the facility involved less than half a barrel of "misting" and was promptly remediated. *Id*. This record places DAPL among the safest U.S. crude oil pipelines. *Id*. ¶¶ 4(a), 15.

By significantly reducing oil producers' transportation costs, DAPL has spurred a resurgence in North Dakota's economy. Crude-oil production in North Dakota increased 40% between mid-2017, when DAPL came online, and January 2020. Ex. I ¶ 16 (Makholm Dec.). During that time, North Dakota oil producers have invested billions of dollars in new infrastructure, created jobs, and contributed billions in taxes to North Dakota. *Id*. DAPL alone has generated billions of

dollars in tax revenue for state, local, and tribal governments, plus substantial royalty payments to tribes and other property owners.  *Id.* ¶¶ 24, 28-32; Ex. G ¶¶ 21, 28 (Emery Dec.).

**2.**  Plaintiffs in these consolidated cases—Standing Rock Sioux Tribe ("SRST"), Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe—filed lawsuits challenging the July 25, 2016 Environmental Assessment ("EA") and Mitigated Finding of No Significant Impact ("FONSI") that the U.S. Army Corps of Engineers ("Corps") relied upon to grant an easement allowing DAPL to cross federally owned lands at Lake Oahe in North Dakota.

The Lake Oahe crossing stretches 1.73 miles between two valves, each with built-in, state-of-the-art pressure sensors, part of a system capable of detecting not only a leak down to 0.75% of flow rate within 45 minutes, but also smaller leaks well before they would cause environmental harm.  Ex. C ¶¶ 6, 9 (Stamm Dec.).  As illustrated below, the pipeline was installed deep under the lakebed using horizontal directional drilling ("HDD"), which "'virtually eliminate[s] the ability of a spill to interact with the surface water,'" RAR 13, because that would require oil to rise more than 90 feet through low-permeability alluvium, glacial deposits, and sediments accumulated at the bottom of the Lake, when it instead would follow the path of the bore hole to land on either side of the Lake.  *See* Ex. A ¶ 15 (Aubele Dec.).[1]  HDD is so safe that from 2010 to 2018, only a single, 1.7 barrel leak was reported on *any* crude oil pipeline installed using HDD.  RAR 19.

---

[1]  All administrative record materials cited in the brief are reproduced in the Joint Appendix, D.E. 209, unless otherwise noted.



Source: *Addressing Misconceptions About the Dakota Access Pipeline*, https://daplpipeline-facts.com/The-Facts.html

In challenging the easement, the Tribes invoked the National Historic Preservation Act of 1966, the Religious Freedom Restoration Act, the Rivers and Harbors Act, the Clean Water Act, the Mineral Leasing Act, the Mni Wiconi Act, the National Environmental Policy Act ("NEPA"), and other laws.  This Court has rejected the bulk of these claims; only NEPA is at issue here.

NEPA requires federal agencies to evaluate the environmental effects of major federal actions.  If an action will "significantly" affect the "quality of the human environment," the agency must prepare a detailed EIS.  42 U.S.C. § 4332(2)(C).  With respect to the substance of the federal action, NEPA does not "mandate particular results," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); it "imposes only procedural requirements."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004).

Here, the Corps produced an extensive Environmental Assessment ("EA") evaluating the Lake Oahe crossing and a second proposal to cross federal flowage easements roughly 190 miles northwest, near Lake Sakakawea.  USACE_DAPL71227.  The EA was 163 pages long, with more than 1,000 pages of appendices.  That length allowed the Corps to address a wide range of potential environmental impacts.  The Tribes have challenged the Corps' analysis in the EA and FONSI for

the Lake Oahe crossing.

**3.**  In June 2017, this Court held that the EA "substantially complied with NEPA in many areas," singling out three discrete issues as to the Lake Oahe crossing that the Corps "did not adequately consider": (1) the degree to which the project's effects are likely to be highly controversial; (2) a spill's consequences on fishing and hunting rights; and (3) the project's environmental-justice impacts. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 112 (D.D.C. 2017) ("*SRST III*" per the Opinion).  "Aside from th[ose] discrete issues," "the Court conclude[d] that the Corps complied with its statutory responsibilities." *Id.* at 160.

After supplemental briefing, the Court declined to vacate the EA or the Lake Oahe easement pending remand "[i]n light of the 'serious possibility' that the Corps will be able to substantiate its prior conclusions" on remand.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 109 (D.D.C. 2017) ("*SRST IV*" per the Opinion).

**4.**  The Corps completed its remand analysis nearly 18 months ago, on August 31, 2018. It added to its EA a 138-page report focused on the three issues remanded by the Court, *see* RAR 3-140, plus a *further* 140-page review and analysis of all "Tribal documents expressing issues of concern," RAR 141; *see* RAR 141-280.  On March 25, 2020, after further briefing, the Court held that the Corps must prepare an EIS because "the pipeline's 'effects on the quality of the human environment are likely to be highly controversial.'"   D.E. 496, at 36 (quoting 40 C.F.R. § 1508.27(b)(4)).  The Court based this decision on "significant guidance" from *National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019), D.E. 496, at 2, a D.C. Circuit case decided six months after the Corps completed its remand analysis, D.E. 362.

Without casting doubt on its prior ruling that the Corps had otherwise complied with its statutory responsibilities through an EA, the Court identified four "non-extensive" areas where the

Corps had "not 'succeeded' in 'resolving … controversy'" regarding its "'analytical process and findings.'" D.E. 496, at 18, 35 (alteration omitted).  The areas were: (1) the "efficacy" of "DAPL's leak-detection system," *id.* at 19-22; (2) the safety record of DAPL's operator, Sunoco, including spills on other Sunoco-operated pipelines before Sunoco merged with or sold the pipelines in question to Energy Transfer, *id.* at 22-23; (3) the effect of winter weather on spill-response efforts, *id.* at 24-26; and (4) the premises of the EA's worst-case-discharge ("WCD") analysis, including the length of time needed to detect a rupture, *id.* at 30, and the impact of "human or machine error," *id.* at 32, or adverse weather conditions, *id.* at 34.  The Court concluded that it would remand for the Corps to complete an EIS, *id.* at 35, and called for briefing on "whether the easement should be vacated during the remand," *id.* at 42.

## ARGUMENT

Under *Allied-Signal*, the decision whether to vacate an agency's order depends on (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences of an interim change that may itself be changed." 988 F.2d at 150-51.  "A strong showing of one factor may obviate the need to find a similar showing of the other."  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019).

In this case, both prongs of the *Allied-Signal* analysis weigh heavily against vacatur.  First, there is a strong possibility that the Corps will be able to prepare an EIS that properly substantiates its decision to grant the easement.  Second, halting operation of the pipeline would impose severe hardship on private and public stakeholders alike.  Either is reason enough to reject vacatur.

## I. There Is More Than A "Serious Possibility" That The Corps Can Substantiate Its Decision To Grant The Easement

"When an agency may be able readily to cure a defect in its explanation of a decision, the

first factor in *Allied-Signal* counsels remand without vacatur." *Heartland Reg'l Med. Ctr. v. Sebe-lius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("*Heartland II*").  The question is whether the decision is "'so crippled as to be unlawful,'" or instead "'potentially lawful but insufficiently or inappropri-ately explained.'"  *SRST IV*, 282 F. Supp. 3d at 103.  If there is a "serious possibility" that the agency can "substantiate" its original decision, *Allied-Signal*, 988 F.2d at 151, reviewing courts "generally limit themselves to remanding for further consideration" without vacatur, *Fox Televi-sion Stations, Inc. v. FCC*, 280 F.3d 1027, 1047 (D.C. Cir. 2002).  Actions that are "potentially lawful but insufficiently or inappropriately explained" are "frequently remand[ed]" without vaca-tur.  *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999).

Remand without vacatur is appropriate because the Corps is fully capable of substantiating its decision to grant the easement. *Allied-Signal*, 988 F.2d at 151.[2]  NEPA is a procedural statute; it does not mandate particular results.  *Robertson*, 490 U.S. at 350; *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 756-57 (2004).  The import of this Court's Opinion is to require one proce-dural path (an EIS) over another (an EA).  The Corps therefore must prepare an EIS that "'ade-quately consider[s] and disclose[s] the environmental impact of'" the easement. *WildEarth Guard-ians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013).  But the agency has already done much of that work in the hundreds of pages of EA and remand analysis it prepared, which track the substantive

---

[2]  In *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019), the district court addressed the Corps' ability to substantiate either of two decisions:  the "initial pro-cedural decision to forgo an EIS," and the "original substantive decision to issue … the permit." *Id.*  The Corps will not be trying to substantiate its decision to forgo an EIS for the Lake Oahe crossing; the Court has foreclosed that option.  Instead, the decision to be substantiated here is the substantive decision whether to issue an easement.  This is the decision the Court is deciding "whether to vacate." *Heartland II*, 566 F.3d at 197; *see* D.E. 496, at 42 (ordering briefing on this question).  Although the court declined to vacate the permit in *Semonite*, it sided with the plaintiffs on the first *Allied-Signal* factor, because "the EIS will be far more extensive than the EA." 422 F. Supp. 3d at 99.  As explained below, the first *Allied-Signal* factor favors remand without vacatur given, among other reasons, the extent to which the EA in this case already properly addresses many of the issues required of an EIS.

requirements for both an EA and an EIS, and exhaustively address the Tribes' comments.

Much of that work remains valid, including the Corps' key premise that a large spill is so unlikely that the risk does not foreclose an easement, even if such a spill could have significant consequences. Outside the specific issues raised by this Court, the Corps can continue to rely largely, if not exclusively, on its prior analysis. And in revisiting the topics identified by the Court, the Corps need not show that they are *uncontroversial*, only that its resolutions are reasonable. *WildEarth Guardians*, 738 F.3d at 308. Given the extensive body of undisputed environmental analysis supporting the easement; the extremely low likelihood of a spill; the sterling safety record of this important, state-of-the-art pipeline; the discreteness of the identified deficiencies; and the ability to resolve those deficiencies, the Corps is highly likely to substantiate its decision to issue the easement. Prong one of *Allied-Signal* accordingly favors remand without vacatur.

## A.     The Corps Has Already Largely Completed The Work Required For An EIS

The Corps' task on remand will be to prepare an EIS. This document provides a "full and fair discussion of significant environmental impacts" associated with a proposed action and evaluates "reasonable alternatives" to the action. 40 C.F.R. § 1502.1. NEPA regulations establish a "standard format" comprising eleven different components analyzing, for example, the alternatives considered, the affected environment, and the environmental consequences of the action. *See id.* §§ 1502.10(a)-(k), 1502.11-.18. An EIS is "normally … less than 150 pages," or "less than 300 pages" for "proposals of unusual scope or complexity." *Id.* § 1502.7.

The Corps has already produced a document addressing these components, and more. Unlike a typical EA—which is "concise," 40 C.F.R. § 1508.9(a)(1), and together with a FONSI "normally should not exceed 15 pages," 33 C.F.R. pt. 325, App. B(7) (Corps regulations); *id.* § 230.10(c)—the EA here is 163 pages, not including appendices. It includes each and every component required of an EIS except perhaps an index, which can easily be compiled. *See*

USACE_DAPL 71221-24 (table of contents).   And it meets the procedural requirement that an EIS be published in a "two stag[e]" process, 40 C.F.R. § 1502.9, with the draft EA published in December 2015 and the final EA issued after a comment process in July 2016, *see* USACE_DAPL 71220, 71225.

The EA's main environmental analysis is extensive, USACE_DAPL 71229-332, and commensurate with the requirements for an EIS.   It discusses "Impacts and Mitigation" on 25 distinct aspects of the environment—ranging from water resources to wildlife to noxious weeds—and on each topic, it "succinctly describe[s] the environment," 40 C.F.R. § 1502.15; explains the direct and indirect "environmental impacts" of the project, *id.* § 1502.16; and identifies "appropriate mitigation measures," *id.* § 1502.14(f).   *See also* USACE_DAPL 71333, 71341-49 (consolidated summary of mitigation measures).   The EA separately discusses the "cumulative" effects of these environmental impacts, *compare* 40 C.F.R. §§ 1502.16(a)-(b), 1508.7-.8, *with* USACE_DAPL 71322-31; *SRST III*, 255 F. Supp. 3d at 129-30 (upholding this analysis), and evaluates the relevant "cost considerations," *compare* 40 C.F.R. §§ 1502.23; 33 C.F.R. pt. 325, App. B(9)(5)(d), *with* USACE_DAPL 71235.   It also presents "in comparative form" the environmental impacts of the proposal and six categories of alternatives—including a "no action" alternative and alternative routes—and rigorously evaluates them.   *Compare* 40 C.F.R. § 1502.14(a)-(d), *with* USACE_DAPL 71229-46; *see also SRST III*, 255 F. Supp. 3d at 134-35 (affirming alternatives analysis).   The EA takes an "interdisciplinary approach," 40 C.F.R. § 1502.6, evaluating environmental, economic, social, cultural, and environmental-justice considerations, *see* USACE_DAPL 71248, 71299-311, 71329.   And it backs this analysis with a list of scientific references, *compare* 40 C.F.R. § 1502.24, *with* USACE_DAPL 71355-62; graphics, *compare* 40 C.F.R. § 1502.8, *with* USACE_DAPL 71364-82; and more than 1,000 pages of supporting appendices, USACE_DAPL

71220-990; 74227-581; 74980-75099.

There is more.  In October 2016 the Corps prepared a 36-page memorandum focusing on six issues that the Department of the Army had identified for further review.  USACE_ESMT 231; *see* USACE_ESMT 241.  In February 2017, after the Corps received initial comments in response to a notice of intent to prepare an EIS, *see* 82 Fed. Reg. 5543 (Jan. 18, 2017), the Corps again "review[ed] the record in its entirety and g[ave] further consideration to the input received" by the Corps since the October 2016 memorandum, "including additional review and analyses of the subjects identified by the [Assistant Secretary of the Army (Civil Works)], other federal executive offices," and a "series of letters" from SRST.  USACE_ESMT 235.  Then, following this Court's remand, the Corps added a 138-page report addressing the three remand topics—highly controversial effects, hunting and fishing, and environmental justice, RAR 3-140—plus an additional 140 pages responding at length to the Tribes' criticisms of the EA, RAR 141-280.  The analysis drew on extensive additional modeling tracking the flow of a 12,517-barrel discharge at Lake Oahe over a 10-day period, RAR 8065-8402, and modeling its impact on drinking water intake and wildlife, RAR 2739-2867, in reports totaling 467 pages.

All told, the Corps' 441 pages of EA and remand analysis, backed by comprehensive reports, memoranda, and appendices, already dwarf the extent of analysis required when preparing an EIS.  While the Corps must still address any substantive deficiencies found by the Court and otherwise prepare a complete EIS, it already has significantly addressed each topic, both in considering those issues and explaining their role in the decision to issue an easement.

### B.    The Bulk Of The Corps' Prior Analysis Remains Valid And Relevant

The Corps, without prejudging the outcome of the EIS process, can nonetheless continue to draw on the extensive analysis it has already performed.  An agency ordinarily does not need to "'start from scratch'" and "reconsider everything" on remand.  *Oceana, Inc. v. Ross*, 275 F. Supp.

3d 270, 288 (D.D.C. 2017) (alteration omitted), *aff'd*, 920 F.3d 855 (D.C. Cir. 2019).  To comply

with a remand, the agency need only "fil[l] the analytical gap identified [by the court]." *Heartland*

*Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) (calling it the "only obligation")

("*Heartland I*").

That rule does not change here, where the Corps will perform a similar analysis in prepar-

ing an EIS rather than an EA.  To the contrary, NEPA regulations make clear that an EA may be

used to "[f]acilitate preparation of [an EIS] when one is necessary."  40 C.F.R. § 1508.9(a)(1), (3).

Under NEPA regulations, an EIS *need not* involve an in-depth review of every potential issue

implicated by a federal action.  *Id.* § 1502.2(a)-(c).  It must instead focus its detailed analysis on

"significant" issues and—as in a FONSI—include *"only enough discussion to show why more*

*study is not warranted*" for insignificant issues.  *Id.* § 1502.2(b) (emphasis added).  There is ac-

cordingly no need for the Corps to redo its work on issues that it has already covered and that have

not been found to be deficient or highly controversial.  *Id.* §§ 1501.1(d), 1501.7(a)(2)-(3).  Indeed,

to the extent the Court has not found fault in portions of the Corps' EA and related documents,

NEPA regulations allow—in fact, require—the Corps to incorporate this material by reference to

"cut down on bulk."  *Id.* § 1502.21 (stating agencies "shall" do so where appropriate).

Importantly, the Court has already upheld much of the Corps' analysis with respect to the

Lake Oahe easement.[3]  *SRST III* significantly narrowed the issues requiring further analysis by

limiting the remand to three "discrete issues" and concluding that the Corps had otherwise "com-

plied with its statutory responsibilities" when it prepared the EA and FONSI.  *SRST III*, 255 F.

---

[3]  The Tribes have not challenged the Corps' analysis or permitting of the Lake Sakakawea cross-
ing, *see* USACE_ESMT 1523 (authorization) (D.E. 66-3, at 138-41); USACE_DAPL 71174
(FONSI), 71220 (EA), and any decision related to that crossing is plainly severable from the
Corps' decisions about Lake Oahe, *see Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459
(D.C. Cir. 1997) (severability depends on agency's intent); USACE_DAPL 71239 (finding that
"[t]he two federal permissions are not connected actions").

Supp. 3d at 160; *see also SRST IV*, 282 F. Supp. 3d at 94 (same).  The Opinion narrows the issues

further.  It identifies four areas of criticism pertaining to one remand topic.  An agency's task on

remand is to fill "the analytical gap identified [by the court]."  *Heartland I*, 415 F.3d at 29.

The Corps' key premises for granting the easement therefore remain intact, and they

strongly suggest that the Corps will be able to reach the same top-line conclusion on remand.

*First*, it remains the case that DAPL is a pipeline of national importance.  *See infra*, at

31-43.  The Corps knows that no other existing interstate pipelines or alternative method of trans-

portation can replace it, USACE_DAPL 71229, because alternative methods do "not address …

existing demand," USACE_DAPL 71237, and pipelines are "more reliable, safer, and more eco-

nomical" than rail for "large volumes," USACE_DAPL 71231.  The Corps has also recognized

DAPL's *environmental* benefits compared to the alternatives—including decreased spill risks

compared to trucks and rail and reduced "exhaust" from locomotive combustion and "air pollu-

tion" from potential releases during filling operations.  USACE_DAPL 71229-31.

These benefits continue to favor an easement.  The Corps' task is no longer to substantiate

a finding of no significant impact, but to weigh any impact against competing concerns.  Whatever

impact the Corps ultimately finds after its further review on a subset of topics, NEPA does "not

require [it] to elevate environmental concerns over other appropriate considerations," *Balt. Gas &*

*Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983).

*Second*, there is no viable alternative route.  The Court has already upheld the Corps' find-

ing that routes like that to the north of Bismarck would have additional environmental conse-

quences and pose other significant risks.  *See SRST IV*, 282 F. Supp. 3d at 102; *SRST III*, 255 F.

Supp. 3d at 134-36; USACE_DAPL 71231-35.  In particular, the North Bismarck route would

entail "greater risk" to "water intakes" and "minority and low-income populations" than the exist-ing route, which also takes greater advantage of the ability to reduce environmental impacts by co-locating along existing rights-of-way.  RAR 100.  And because the pipeline is already built, the Corps would further need to account for added costs and disruptions from restarting construction and rerouting a pipeline already in operation.  The only logical choice short of permanently shut-tering the pipeline and losing its benefits is to stand by the decision to grant an easement.

*Third*, no matter what becomes of the criticisms featured in the Court's Opinion, none of them alters the Corps' conclusion the risk of a large spill near Lake Oahe is exceedingly small. The Corps has determined it to be not only "low," but "extremely low."  USACE_DAPL 71272, 71316, 71311; *see also*, *e.g.*, RAR 1, 19, 119.  And the Court has upheld this "top-line conclusion" as reasonable.  *SRST III*, 255 F. Supp. 3d at 127; *see SRST IV*, 282 F. Supp. 3d at 96; *id.* at 101 (describing spill risk as "minimal").  The chances of oil actually "reaching Lake Oahe itself" are "even lower," RAR 58, because "[i]nstallation of the pipeline at a depth of 92 feet below the bot-tom of Lake Oahe 'virtually eliminat[es] the ability of a spill to interact with the surface water.'" RAR 13; *see also* RAR 14-19.

The Corps already has bolstered this conclusion with extensive historical data that the Tribes cannot refute.  Examining PHMSA data, the Corps determined on remand that since 2010, there had been 156 reported hazardous-liquid accidents involving a pipeline with a diameter of 16 inches or more.  RAR 18.  The majority of these spills (53%) involved "relatively small" spill amounts (less than 4 barrels).  RAR.18.  Larger spills are even more rare:  75% were below 105 barrels; 90% were below 3,000 barrels; and 95% were below 7,600 barrels.  RAR 18.  The Corps thus found that "most pipeline spills are small," and that releases of 10,000 barrels or more are "extremely uncommon."  RAR 18-19.  A spill materially *greater* than the WCD that the Corps has

already analyzed would be rarer still.  Between 2010 and 2020, there were only two such high-volume crude-oil spills, amounting to 0.2 per year.  *See* Ex. B ¶ 21 (Godfrey Dec.).[4]  Based on an annual average during that period of approximately 67,216 miles of pipeline in the United States, the number of such high-volume spills per mile of pipeline per year is less than 0.000003.  *Id.*  For a pipeline segment measuring 1.73 miles, such as that between valves at the Lake Oahe crossing, *see* Ex. C ¶ 6 (Stamm Dec.), a leak materially exceeding the Corps' WCD is a once in 193,972-year event, Ex. B ¶ 21 (Godfrey Dec.)—about the amount of time since the dawn of humanity.

*Fourth*, this same probability analysis means the Corps can support an easement again, even if a hypothetical spill entails potentially significant consequences or the effects remain highly controversial for the reasons the Opinion identified.  In fact, the Corps already concluded that, despite its recognition of such possible significant consequences, the "low risk/high consequence" combination favored an easement.  USACE_DAPL 71316; *see also* USACE_DAPL 71312-18. There is good reason to think the Corps would be able to retain its top-line conclusion even if a still-low-likelihood WCD (or other spill estimate) turns out to be larger than originally calculated. That is especially true for impacts from even lower probability perfect-storm events, like a valve failure during a guillotine rupture.  D.E. 496, at 33.  The fact that the Tribes' "experts" can posit ever-more-improbable worst-case scenarios is unlikely to influence the Corps' top-line conclusion, even if NEPA required the Corps to do that additional math.  Put another way, the Corps can properly conclude, based on years of real-world pipeline operating data and experience, that the probability of a large spill is low enough to render each purported topic of high controversy im-material to the easement decision.

---

[4] A third involved a volume comparable to the WCD already analyzed by the Corps.  *See* Ex. B ¶ 21 n.10 (Godfrey Dec.) (12,615-barrel spill).

*Fifth*, the effects of a 12,517-barrel spill for which 10 days pass with no response are already known, and the Opinion does not call them into question.  *See* RAR 8065-8402 (Spill Model); RAR 2739-2867 (Downstream Receptor Report).  The points the Opinion discusses bear on the main input into this model (the volume of oil spilled), and if the Corps reaffirms on remand that 12,517 barrels is the WCD and that DAPL can mitigate such a spill within 10 days—despite, for example, leak-detection issues and winter conditions, D.E. 496, at 24-26—the Corps will have little difficulty reaching the same finding about the potential spill impact and thus the same decision to grant an easement.

Taken together, and notwithstanding the points the Opinion raises, these considerations provide a strong foundation for the Corps to adhere to its decision to grant the Lake Oahe easement. The Corps has already stated that "[w]hile there may be other methods for predicting oil spill effects, it is not likely that employing further methods will result in substantively different views or information that is more comprehensive than what the Corps has considered."  RAR 139-40.

## C.   The Corps Will Also Be Able To Resolve The Controversies This Court Identified

Given the substantial progress that the Corps has already made towards the preparation of an EIS, and with many of its key premises still intact, there is a "serious possibility" that the Corps can substantiate its decision after addressing the items this Court identified on the topic of highly controversial effects. *Allied-Signal*, 988 F.2d at 151.  The question at the EIS stage is no longer whether the Corps' methods and factual premises are disputed or even whether such disputed effects negate a finding of no significant impact.  The question instead is whether such disputes require the different substantive outcome of not issuing an easement.  The Corps will face that question armed with three years of operating data showing DAPL's exemplary safety record. Drawing on that evidence and additional input on the very topics the Opinion raises, the Corps can

easily reach the same decision by resolving this Court's concerns.

### 1. The Corps Has Broad Discretion At The EIS Stage To Choose Between Competing Methods, However Controversial

The Court based its remand on the conclusion that the effects of a spill at Lake Oahe are "'highly controversial'" under *Semonite*, which alone requires an EIS.  D.E. 496, at 35-36.  The question the Court posed was whether a "substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use."  *Id.* at 13 (quoting *Town of Cave Creek v. FAA*, 325 F.3d 320, 331 (D.C. Cir. 2003)).  The Court ruled that the agency needed to show it *succeeded* in resolving controversy resulting from Plaintiffs' "'consistent and strenuous opposition'" to the project.  *Id.* at 14-15.

The task for this topic on remand is simpler.  Rather than "do away with [any] controversy" to the Tribes' satisfaction, D.E. 496, at 34, or disprove that a "'dispute exists,'" *id.* at 13, the Corps need only *decide* any remaining disputes.  In doing so, the "choice of … methodology"—even if controversial—will be left to the Corps' "wisdom and experience," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 200-01 (D.C. Cir. 1991), and "dispute[s] … of fact" left to its "'informed discretion,'" *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).  So long as the Corps "'adequately consider[s] and disclose[s] the environmental impact'" of an easement and that "'decision is not arbitrary or capricious,'" the decision will be sustained.  *WildEarth Guardians*, 738 F.3d at 308.  The Corps thus faces a lower burden in "substantiat[ing] its decision" at the EIS stage, *Allied-Signal*, 988 F.2d at 151, than the one this Court articulated for defending the decision to forego an EIS.

### 2. The Corps Can Draw On DAPL's Strong Safety Record Over Three Years Of Operation

The Corps will also benefit on remand from a more robust record supported by real-world experience.  DAPL is nearing the end of three years in operation.  It has been as safe as (if not

safer than) any other pipeline, with *no* spills on the mainline (including the Lake Oahe crossing) and only seven small incidents at company facilities.  Ex. B ¶ 16 (Godfrey Dec.); Ex. C ¶ 24 (Stamm Dec.).  Moreover, only one facility discharge involved any product leaving the facility— less than half a barrel of misting that was quickly remediated.  Ex. C ¶ 24 (Stamm Dec.).  Notably, all but one event occurred within the first 12 months of operations and related primarily to com-missioning issues that have since been fixed.  *Id.*  Indeed, despite safety-related arguments like those Plaintiffs raise, state agencies in each of the four States that DAPL traverses have given their approvals.[5]

Numerous other indicators further confirm that DAPL is one of the safest pipelines in op-eration.  Ex. B ¶¶ 17-20 (Godfrey Dec.); Ex. C ¶¶ 15-28 (Stamm Dec.).  These facts bear out the care with which Dakota Access has approached its responsibilities in operating the pipeline and the effectiveness of the DAPL's state-of-the-art safety systems.  This track record can give the Corps comfort on remand that the pipeline will operate safely at Lake Oahe.

### 3.      Each Purported Deficiency Is Easily Redressable

Armed with DAPL's safety record, the Corps can easily address the four discrete issues that this Court found "highly controversial"—leak-detection systems, operator safety records, ad-verse conditions, and worst-case-discharge predictions.  Even if "'insufficiently or inappropriately explained,'" the Corps' reasoning on these issues is not "'so crippled as to be unlawful,'" *SRST IV*, 282 F. Supp. 3d at 103, and it is highly likely—and certainly "plausible"—that the Corps can "supply the explanations required," *City of Oberlin*, 937 F.3d at 611.

---

[5] Final Decision and Order, *In re Dakota Access, LLC*, No. HLP-2014-0001 (Iowa Utils. Bd. Mar. 10, 2016); Findings of Fact, Conclusions of Law and Order, *Dakota Access, LLC, Dakota Access Pipeline Project, Siting Application*, No. PU-14-842 (N.D. Pub. Serv. Comm'n Jan. 20, 2016); Order, *In re Dakota Access, LLC*, No. 14-0754 (Ill. Commerce Comm'n Dec. 16, 2015); Final Decision and Order, *In the Matter of Application of Dakota Access, LLC*, No. HP 14-002 (S.D. Pub. Utils. Comm'n Dec. 14, 2015).

**i.** <u>Leak-Detection Systems</u>:  DAPL's state-of-the-art computational pipeline monitoring ("CPM") system ensures that the Corps can easily address the Court's concerns about leak detection on remand.  DAPL's CPM system receives information from the pipeline's supervisory control and data acquisition ("SCADA") system every 6 seconds, which polls extensive data about the pipeline.  Ex. C ¶ 7 (Stamm Dec.).  Each DAPL valve monitors pressure, and each pump station monitors flow rate, pressure, and temperature, among other variables.  USACE_DAPL 71266; *see* Ex. C ¶ 6 (Stamm Dec.).  DAPL has more valves per mile than the vast majority of other pipelines, making it capable of collecting more leak-detection data than "just about any other pipeline in the world."  Ex. C ¶ 6 (Stamm Dec.).  This includes pressure-monitoring mainline valves close to each side (within about half a mile) of Lake Oahe—one near milepost 166, and one near milepost 168—a fact that the Corps already "did in fact take … into consideration."  D.E. 496, at 22; *see* RAR 156, 173; USACE_DAPL 71366; *see also* Ex. C ¶ 6 (Stamm Dec.).  In the highly unlikely event of a rupture underneath Lake Oahe, pressure waves would travel at the speed of sound through the pipeline and be detected within seconds, allowing operators to quickly close the valves and prevent oil from draining downhill into the rupture.  RAR 156, 173.

DAPL's advanced leak-detection system is highly capable of detecting small leaks.  Ex. C ¶¶ 5-13 (Stamm Dec.).  The CPM system's vendor has provided updated data showing that, for the segment of the pipeline including the Lake Oahe crossing, the system will detect a 0.75% leak or smaller within 45 minutes.  *Id.* ¶ 9.  And DAPL's leak-detection technology is likely even more sensitive than that.  *Id.*  For example, it detected a flow imbalance of just 4.7 barrels in less than two minutes when product was removed from the pipeline and used to fill a "scraper trap" device during routine maintenance.  *Id.*  DAPL also has only one origin point and one delivery point, making it easier to detect a pressure loss, flow rate change, or volume loss, and thus to detect a

20

leak's presence—even a pinhole leak of less than 1% of the pipeline's flow rate—than would be the case for complex systems with multiple injection or delivery facilities. Ex. B ¶ 10 (Godfrey Dec.). In short, DAPL's leak-detection system is among the best available, and the Corps will have ample "reassurance" on remand, D.E. 496, at 21, that it would detect even a slow leak long before it approached the Corps' 12,517-barrel WCD scenario, Ex. C ¶ 9 (Stamm Dec.).

It is more than likely that the Corps can reaffirm on remand that DAPL's state-of-the-art systems will detect a leak well before it can exceed the 12,517-barrel WCD already analyzed by the Corps. As explained *supra* at 15-16, pipeline leaks are rare, and high-volume leaks are even rarer. Undetected high-volume leaks on state-of-the-art pipelines are virtually unheard of. Since 2010, there has *never* been an undetected spill exceeding 5,000 barrels on a section of pipeline manufactured after 1968 that had a CPM system. Indeed, since 2010 there have been only ten spills of 5,000 barrels or more throughout the industry on *any* section of *any* pipeline or at *any* valve site. Only six spills of those involved a pipeline with a functional CPM system and, in all but one, CPM or SCADA detected the leak or triggered an alarm. Ex. B ¶¶ 13-14 (Godfrey Dec.) (noting that the exception, 7,538 barrels, occurred on a 42-year-old pipeline). The 8,600-barrel leak that the Court referenced, D.E. 496, at 21—which occurred on a Texas pipeline before it came under Energy Transfer's control—was one of the four incidents in which, unlike DAPL, no functional CPM system was in place. Ex. B ¶ 15 (Godfrey Dec.). Even so, this leak *was* detected by Sunoco's SCADA system. *Id.*; Ex. C ¶ 13 (Stamm Dec.). It took so long to *isolate* that leak (13 days) only because the pipeline lacked capabilities that are installed on DAPL. Ex. C ¶ 13 (Stamm Dec.). The Tribes have not identified a single leak even close to 12,517 barrels that went undetected by a leak-detection system remotely comparable to DAPL's state-of-the-art of system. The chance that the first such spill ever would happen on a pipeline as safe as DAPL, let alone at Lake

Oahe, is infinitesimal.

Far from showing that such state-of-the-art leak-detection systems regularly fail, D.E. 496, at 19-20, the Tribes' data merely reveals that pipeline operators have multiple ways to identify leaks. The Tribes rely here on a 2012 Pipeline and Hazardous Materials Safety Administration ("PHMSA") study summarizing operators' reports about how leaks were detected. It states that in 20% of leaks on pipelines with functioning CPM systems—a method used by DAPL, Ex. C ¶ 7 (Stamm Dec.)—operators reported CPM as the method of detection. PHMSA, Leak Detection Study, at 2-11 (2012), https://bit.ly/2VoDtAY ("PHMSA Study"). Others were detected by either other systems, such as SCADA, which DAPL also uses, Ex. C ¶ 7 (Stamm Dec.), control room and local operating personnel, or different means. PHMSA Study, at 2-10 to 2-11. The study does not conclude that CPM has "an 80% failure rate," D.E. 496, at 20, just that operators reported other means (including other detection systems) that detected some leaks earlier. This is consistent with CPM's ability to detect a 0.75% leak within 45 minutes, Ex. C ¶ 9 (Stamm Dec.), with other methods detecting slow leaks sooner.[6]

In any event, the study was not limited to state-of-the-art pipelines and most of the spills it considered were far smaller than the Corps' WCD. The smallest release volume not detected by CPM was 0.42 gallons and the median was 1,004 gallons (approximately 24 barrels). PHMSA Study, at 3-30, 3-43. Nondetection of a half-milk-jug spill of crude is not a "failure." Accordingly, the Corps will be able to conclude that the PHMSA study does not undermine its decision to grant the easement.

    **ii.** <u>Operator Safety Record</u>: Information about Sunoco's safety record, while that company

---

  [6] The study further acknowledges that the operator reports on which the Tribes rely for their criticism were not verified and could be "incorrect," "flawed," or "incomplete." PHMSA Study, at 2-6, 3-17. The authors thus expressly declined to offer any "conclusions or recommendations," *id.* at 3-17, or "probabilistic analysis," *id.* at 2-6.

was under different management and on pipelines lacking DAPL's safety features, is also unlikely to lead the Corps to a different outcome on remand. The Corps need not change its decision based on the safety record—just "justif[y] [the] decision to not incorporate [it] into [the EA]," D.E. 496, at 23—and the information merits little weight.

The data the Tribes cited to challenge Sunoco's record does not differentiate based on pipeline safety features or risks, and it covers events before Energy Transfer assumed common control over operations for relevant assets. Ex. C ¶ 25 (Stamm Dec.). Under Energy Transfer, Sunoco has transformed its safety culture. *Id.* ¶ 26. It voluntarily adopted the same safety-management standard (API 1173) the Tribes prefer, D.E. 433-2, at 31, and the number of incidents on its pipelines decreased by approximately 50% from 2017 to 2019, Ex. C ¶ 27 (Stamm. Dec.). DAPL's own sterling record over its three years of operation, *see supra*, at 4, is the more relevant data point.

Even were Sunoco's record relevant, the rate of incidents on its pipelines in 2019 was in line with the industry average. Ex. C ¶ 27 (Stamm. Dec.). And its largest spill—which also occurred before Energy Transfer assumed control over it, *id.* ¶ 13—was still far less than the WCD used by the Corps. *See* D.E. 496, at 21. Sunoco's record therefore is unlikely to alter the Corps' predictions about "risk or magnitude of a spill" on DAPL. *Id.* at 22.

**iii.** <u>Winter Conditions</u>: The concern that winter conditions may impact spill recovery can also be addressed satisfactorily on remand. Energy Transfer has already provided the Corps with extensive modeling of the unmitigated movement of a 12,517-barrel WCD spill over a 10-day simulation period in a wide range of weather conditions, including winter. RAR 8070. The Corps can validate use of the modeling if a response to a spill is possible within 10 days year-round.[7]

---

[7] The Corps thus could adhere to its decision on remand without substantiating Energy Transfer's conclusion that for purposes of "'cleanup of a spill,' … difficult winter conditions will be counterbalanced by the slower movement of the oil beneath the ice," RAR 151. *See* D.E. 496, at 26 (raising issue as a concern). But that conclusion also *can* be substantiated. The spill report

That way, the net impact of a WCD spill would be no worse than what the Corps already found acceptable, and the Corps will have no reason to withdraw the easement.

Separately, while the Court has called for further analysis of Dakota Access's response time in winter, it did not find incorrect or even doubtful the Corps' bottom line—that Dakota Access can respond safely and rapidly even in winter.  It therefore remains "plausible" that the Corps can "supply the explanations required," *City of Oberlin*, 937 F.3d at 611, and substantiate the decision to issue the easement.

None of the cold-weather criticisms in the Earthfax Report come close to questioning the ability to respond within 10 days.  In fact, they are mostly unsubstantiated generalizations based solely on the author's anecdotal "experience."  RAR 1248; *see id.* (speculating whether response times would be affected by workers "bundling" up, taking "breaks," and moving more slowly to avoid "slip-trip-fall risk").  None would be expected to materially increase response times, particularly where Dakota Access's response planning contemplates that additional workers and resources will be assigned to spill-recovery efforts during adverse weather conditions, and many recovery operations will take place on vehicles or vessels that do not present a significant risk of slipping, tripping, or falling.  Ex. B ¶ 25 (Godfrey Dec.); Ex. C ¶ 34 (Stamm Dec.).

As the Corps acknowledged in the Remand Analysis, oil recovery and removal may be

---

bears out the prediction that "ice cover retards the movement of oil downstream by trapping the hydrocarbons in the vicinity of the release location."  RAR 151.  The report states as much, RAR 8877, and illustrates it with a map showing the position of oil after 10 days, RAR 8892.  The map makes clear that in cleaning a spill in winter, Dakota Access will need to cover a much smaller area than in other seasons.  *Compare id.*, *with* RAR 8883.  That is fully consistent with the model's prediction that in simulations with ice cover, "[t]he ice effectively capped the oil, prevented evaporation, and resulted in enhanced dissolution, all of which led to the maximum mass of oil in the water column," RAR 8875.  The first consideration (trapping) concerns how far the oil travels downstream; the second (capping) concerns its depth in the water column, which leads to greater dissolution.  While trapping does aid cleanup, "counterbalanc[ing]" other factors that make it more difficult, RAR 151, nothing suggests that dissolution impedes cleanup at all.

more difficult during icy conditions.  RAR 115.  But this difficulty is not unique to Lake Oahe or

DAPL—it applies to any similar body of water in similar conditions.  Ex. B ¶ 27 (Godfrey Dec.).

And Dakota Access addresses this difficulty by contracting with highly trained, Coast Guard cer-

tified, Oil Spill Removal Organizations ("OSROs").   *Id.* ¶ 24; Ex. C ¶ 34 (Stamm Dec.).   These

organizations are neither company- nor pipeline-specific—they are experts in the field and have

specialized oil-recovery capabilities suited to the region, including in subfreezing temperatures.

Ex. B ¶ 24 (Godfrey Dec.); Ex. C ¶ 34 (Stamm Dec.).  OSROs and other recovery personnel have

access to specialized equipment for recovery of oil under ice and in all environmental conditions

and would deploy this equipment if a spill occurred during the winter to mitigate the effects of

freezing temperatures and shorter daylight hours on spill-recovery efforts.  Ex. B ¶ 25 (Godfrey

Dec.).  DAPL's facility response plan assures that adequate resources are available.  Ex. C ¶¶ 4(f),

19, 32, 39 (Stamm Dec.).

**iv.**  <u>Worst-Case Discharge</u>:  Addressing the Court's concerns about the Corps' WCD cal-

culation also is not likely to change the Corps' decision.  As already noted, the real-world data

proves that the chances of a 12,500-barrel spill into Lake Oahe are much more remote than needed

to support the Corps' low-likelihood, significant-consequence assessment.   And, even so, the

Corps can substantiate its 12,517-barrel WCD calculation on remand.

WCD modeling is expressly designed to assist in spill-response planning.  PHMSA created

a formula, applicable across the universe of oil pipelines, that assigns a large volume to an ex-

tremely unlikely and purely hypothetical oil spill.  The calculation is unlikely to make a material

difference in deciding *whether to approve* a pipeline; rather, it presupposes that the pipeline exists

and that it will have a large spill.  As explained *supra* at 16, the probability of a spill materially

greater than 12,517 barrels at Lake Oahe is 1 in 194,000 years.  Even if a "worse worst case" could

be conjured by adding the confluence of multiple unlikely system failures—a spill on top of human error, on top of multiple sequential mechanical errors, on top of extreme weather, and so on—the Corps has already satisfied itself, for other valid reasons, that such low probability events need not affect its decisionmaking. *E.g.*, RAR 255. Instead, the spill-modeling process has already reached the point of diminishing returns: "While there may be other methods for predicting oil spill effects, it is not likely that employing further methods will result in substantively different views or information that is more comprehensive than what the Corps has" already considered. RAR 139. That determination "fits squarely within the realm of those 'factual disputes' committed to agency expertise." *SRST IV*, 282 F. Supp. 3d at 99 (citing *Wis. Valley Improvement Co. v. FERC*, 236 F. 3d 738, 746 (D.C. Cir. 2001)).

PHMSA regulations require WCD estimates to be prepared on a *regional* basis, not merely a site-specific basis. *See* Ex. C ¶¶ 19, 36-39 (Stamm Dec.); Ex. B ¶¶ 28, 37 (Godfrey Dec.). This builds in an added level of protection supporting the easement. These regulations require conservatively ballparking the potential size of a spill at the location on the pipeline system where the largest potential spill is deemed possible, and then ensuring adequate response plans and resources, including staffing, drills, and communications, for a spill that size. *See* Ex. B ¶¶ 28, 37 (Godfrey Dec.); Ex. C ¶¶ 36-40 (Stamm Dec.). For DAPL, the PHMSA methodology yielded ███ barrels for the largest WCD volume in DAPL's Northern Region, which encompasses Lake Oahe. Ex. C ¶ 39 (Stamm Dec.). The location is a ████████████████████████████████████ from Lake Oahe. *Id.* Dakota Access therefore has in place a Facility Response Plan that enables it to effectively respond to a ████-barrel spill *at any point* in the Northern Response Zone, *including Lake Oahe*. Ex. B ¶ 37 (Godfrey Dec.); Ex. C ¶¶ 36-39 (Stamm Dec.). Thus, even if the 12,517-barrel figure used by the Corps were off by ███ barrels, the response plan covering Lake

Oahe has it covered.  Ex. B ¶ 37 (Godfrey Dec.); Ex. C ¶¶ 36-39 (Stamm Dec.).

Particularly in light of these points, none of the three issues raised in the Opinion as to the WCD is likely to prevent the Corps from substantiating its decision to grant the easement.

**a.** <u>Leak-detection time</u>:  To address the Court's concerns about leak-detection time on remand, the Corps need only confirm that it would take 12.9 minutes to detect a leak, shut down the pumps, and close the valves.  Dakota Access's experts can substantiate that number for the Corps on remand and dispel the Tribes' apples-to-oranges-based criticisms.

The evidence on remand will show that DAPL's leak-detection system is more than "capable" of detecting a WCD consistent with this timeframe.  D.E. 496, at 30.  A WCD estimate assumes a *full-bore rupture or "guillotine" rupture*, in which the entire pipeline diameter is exposed.  RAR 19 n.8; *see* Ex. C ¶¶ 37-38, 40 (Stamm Dec.).  This is much more catastrophic—and thus much easier to detect—than either the *leaks* referenced by the commenters, D.E. 496, at 29, or other smaller ruptures, which make up the upper end of the "1 to 3 minutes" range noted in the Opinion, *id.* (quoting RAR 126-27).  *See* Ex. C ¶ 8 (Stamm Dec.).  A guillotine rupture would be detected *almost immediately* and trigger an *automatic* shutdown of the pumps, reducing the flow of the pipeline to a minimal amount.  Ex. C ¶¶ 8, 40 (Stamm Dec.); *cf.* RAR 173 (DAPL receives data from field instruments every 6 seconds).  Thus, the 1-minute detection time assumed in the WCD, RAR 254, is conservative.  Ex. C ¶ 40 (Stamm Dec.).  So are the further assumptions that the pumps would be shut down manually (instead of automatically), that it would take an *additional* 3.9 minutes to close the valves upstream and downstream from the rupture (instead of the valves closing *while* the pumps shut down), and that the flow rate would *remain the same* for the entire period (instead of slowing as the pumps themselves slow to a stop).  *Id.*

Even if the numbers were adjusted up to 13.9 or even 15.9 minutes, D.E. 496, at 29-30,

3 additional minutes at 416 barrels per minute, *id.* at 30, would only increase the WCD to 13,765 barrels. There is no reason to expect this would alter the Corps' overall low-probability, high-impact conclusion.

    **b.** <u>Shutdown time</u>: The Court gave credence to an expert who speculated (without evidentiary substantiation) that "human or machine error might result in the valves' not beginning the closure process at all." D.E. 496, at 32. Although the Corps explained that "human error was considered in the *design* of the pumps and/or valves," the Court concluded that the Corps had not adequately addressed the fact that human error could nevertheless affect valve closure. *Id.* at 33. The Corps can easily address these issues in a way that substantiates its decision to grant the easement.

    As an initial matter, the relevant PHMSA regulations, which specify how to calculate a WCD, do not require pipeline operators to assume that systems designed to mitigate an incident's impact will fail. Ex. B ¶ 31 (Godfrey Dec.). Given that NEPA does not require a WCD analysis, *Robertson*, 490 U.S. at 354, it certainly does not require calculation of a WCD in a manner other than the one relied upon by DAPL's PHMSA-approved Facility Response Plan, *see* RAR 6443; D.E. 277-1, at 39. The Tribes' ability to manufacture theoretical even-worse-case scenarios than the PHMSA-approved WCD does not require the Corps to use a different method.

    Moreover, PHMSA's WCD methodology already accounts for human and machine error, as explained above. *See supra*, at 27; Ex. C ¶ 40 (Stamm Dec.). Even if the valves could not be closed remotely—due, *e.g.*, to loss in communication at a valve—shutdown of the pumps would minimize the flow of oil through the pipeline. Ex. C ¶ 40 (Stamm Dec.). And the Lake Oahe-specific WCD analysis intentionally omits consideration of physical barriers that limit the amount of oil that could drain into the Lake after pump shutdown, even if the two valves nearest Lake

Oahe were inoperable during a full-bore rupture. *Id.* ¶ 41.  First, once still-operational valves are closed, they will create an anti-siphoning effect on oil draining toward the rupture, similar to the way that placing a finger over the end of a soda straw prevents liquids from escaping the straw.  *Id.* Anti-siphoning effects would reduce the release of oil in the event of an incident.  *Id.*  Second, it is extremely unlikely that oil would seep through the low-permeability materials above the bore-hole and reach Lake Oahe directly, given that oil is more likely to travel along the path of least resistance up the borehole and away from the Lake.  *Id.*  Third, regardless of how much total oil is sitting between the inoperable valves and the next set of valves, gravity can pull down oil only from the net length of pipeline that forms a downhill slope toward the bottom of Lake Oahe.  *Id.* At most, this would amount to a total additional release of 5,000 barrels of oil, *id.*—an amount that is unlikely to change the Corps' bottom-line conclusion, particularly given the exceedingly low probability of both valves adjacent to Lake Oahe becoming inoperable during a full-bore rup-ture.  And the Corps can always adjust the WCD numbers further, recognizing that the possibility of the WCD actually occurring decreases significantly as more and more assumed errors are intro-duced into the estimate.  Given that Dakota Access is already prepared to respond to a spill several times greater than the amount predicted, this exercise is unlikely to affect the Corps' decision to grant the easement.  Ultimately, the Corps' decision will be evaluated for compliance with NEPA's hard-look requirement, not Murphy's Law.

    **c.**  <u>Adverse conditions</u>:  The Opinion discussed winter weather again in the worst-case discharge discussion.  *See* D.E. 496, at 34.  The Corps can easily substantiate the easement in light of concerns about "what the worst-case discharge would be" if materials and equipment did not work as intended.  *Id.*  Ground-level winter conditions such as "'deep snow, ice cover limitations on oil spill sighting, [and] extreme cold,'" *id.*, do not affect detection, which is based on factors

inside the below-ground pipeline, such as pressure and flow rate, Ex. C ¶¶ 6-7 (Stamm Dec.). There is no basis to conclude that a WCD would be worse in winter, because DAPL's equipment is rated to withstand the most extreme temperature ranges along the pipeline route. *Id.* ¶ 30.  For example, the valves were designed to meet operating temperatures ranging from -20 degrees to +150 degrees Fahrenheit, even though actual average ambient temperatures historically range from 4 to 82 degrees Fahrenheit, and the flow of oil through the pipeline actually warms the equipment from the inside, keeping it operational even if the ambient temperature drops below -20 degrees. *Id.*  Dakota Access also maintains and follows a winterization policy for its equipment.  *Id.* ¶ 31. Accordingly, subfreezing temperatures are "highly unlikely" to affect how quickly a pipeline spill is detected or how quickly the flow of oil is shut off.  Ex. B ¶ 23 (Godfrey Dec.).

Moreover, if NEPA warranted a spill-volume calculation that expressly accounts for winter-specific factors, the Corps would be able to justify the easement by reasonably concluding that the likelihood of *any* spill occurring on this state-of-the-art pipeline, much less a WCD in winter with malfunctioning equipment, is extremely low.  Accounting for that possibility might make for "better documents" in the eyes of certain commenters, but it would not meaningfully contribute to a "better decisio[n]" on the Lake Oahe easement.  40 C.F.R. § 1500.1(c) ("Ultimately, of course, it is not better documents but better decisions that count.").

*     *     *

With respect to each topic the Opinion addresses, one final point unique to this case supports the conclusion that the Corps can substantiate its decision on remand.  This Court relied on the D.C. Circuit decision in *National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019), in ordering a remand, calling *Semonite* "a significant opinion clarifying a court's role in reviewing an agency's finding that a project was not 'highly controversial.'"  D.E. 496, at 14.

30

The Corps completed its remand work in August 2018, months before this "[c]rucial[]" clarification of an agency's duty. *Id.* at 14-15. The need for a remand is less likely to signal an agency's inability to substantiate its earlier decision when the remand was grounded in legal reasoning that the courts clarified in a significant manner only after the agency acted.

The first *Allied-Signal* prong favors remand without vacatur.

## II.    Vacating The Easement Would Cause Immense Economic, Environmental, And Other Harm

Remand without vacatur is independently warranted by the "'disruptive consequences'" of shutting down DAPL. *Allied-Signal*, 988 F.2d at 151. The last time the Court considered this question, it found that disruptive consequences "slightly" favored remand without vacatur. *SRST IV*, 282 F. Supp. 3d at 103, 108. At that time, DAPL had only just become operational, and the Court had no need to "define the precise scale of the potential disruption." *Id.* at 108. Now that DAPL has been transporting nearly 40% of crude oil produced in North Dakota and nearly 4.5% of crude oil produced nationally—for nearly three years with one of the nation's best pipeline safety records—not only are the disruptive consequences of a shutdown more precise and certain, they would be much more severe. And the harms asserted by the Tribes are more speculative. The second *Allied-Signal* factor thus decisively favors preserving the status quo and remanding without vacatur.

### A.    Shuttering The Pipeline Would Have Devastating Economic Consequences On Many Parties

Courts routinely recognize that shutting down—or even delaying—large infrastructure projects has "immensely disruptive" consequences. *Massachusetts v. NRC*, 924 F.2d 311, 336 (D.C. Cir. 1991) (declining to vacate nuclear power plant operating license); *Semonite*, 422 F. Supp. 3d at 100 (shutting down electrical infrastructure would have "serious, disruptive consequences"); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (delaying power

plant construction would be "economically disastrous"). Pipeline infrastructure is no different. As the D.C. Circuit recently acknowledged, shutting down any "operational" pipeline—even a minor one—has "quite disruptive" consequences. *City of Oberlin*, 937 F.3d at 611 (refusing to shut down 257-mile natural gas pipeline after less than a year of operations); *see also Apache Corp. v. FERC*, 627 F.3d 1220, 1223 (D.C. Cir. 2010) (declining to vacate pipeline lease because it would cause "substantial" disruption). Shuttering DAPL, a major interstate pipeline carrying 4.5% of the nation's crude oil, would devastate not only Dakota Access and the DAPL-ETCOP system that connects DAPL to the Gulf Cost, but also the oil industry; state, local, and tribal governments; and the nation's energy security and economic recovery. Collectively, the toll would be *billions* of dollars in costs and lost revenue, and *thousands* of lost jobs.

## 1.    Disruption To The DAPL-ETCOP System

Shutting down DAPL would pose an existential threat to Dakota Access and the entire DAPL-ETCOP system. Dakota Access would lose use of its only material asset and the source of all revenue. Ex. G ¶ 9 (Emery Dec.). The ETCO pipeline ("ETCOP"), which connects DAPL to the Gulf Coast, also would have to close because it relies on DAPL for all of its oil. *Id.*

The resulting revenue losses would be massive. DAPL operated at or near its maximum allowable throughput of 570,000 barrels per day between September 2018 and March 2020; in fact, it was substantially "oversubscribed" for most of that time, meaning significant excess demand for its services existed. Ex. G ¶ 8 (Emery Dec.). Despite the current economic downturn, all transportation contracts for committed shippers remain in effect and demand for DAPL remains strong. *Id.* Dakota Access projects that DAPL will continue to transport significant volumes of Bakken crude oil throughout 2020 and that volumes will steadily increase as the economy recovers from the COVID-19 pandemic. *Id.* ¶ 6. Shutting down the pipelines thus is projected to cost Dakota Access and ETCOP's owner, Energy Transfer Crude Oil Co. LLC ("ETCO"), between

$2.8 million and $3.5 million in unrecoverable revenue every day the pipelines are idle in 2020, amounting to between $516 million and $643 million for the second half of 2020. *Id.* ¶ 10. Losses for 2021 would increase to between $1 billion and $1.4 billion. *Id.* Dakota Access alone would incur 75% of the losses. *Id.*

A shutdown would inflict additional unrecoverable expenses and liabilities on both companies. It would cost Dakota Access approximately $15 million, and ETCO an additional $10 million, to safely purge their pipelines of oil and preserve them for future use. Ex. C ¶ 46 (Stamm Dec.); Ex. G ¶ 11 (Emery Dec.). That does not include ongoing expenses to maintain, preserve, and ensure the safety of the pipeline: a combined $67.5 million per year that the pipelines remain inoperable. Ex. C ¶ 44 (Stamm Dec.); Ex. G ¶ 11 (Emery Dec.). Both companies, moreover, would need to reduce or eliminate the use of services under contracts with third-party utility and maintenance contractors (among others). Ex. G ¶ 12 (Emery Dec.). All of these financial losses would be absorbed by the owners of Dakota Access and ETCO in proportion to their ownership stakes, with Energy Transfer suffering 36% of the losses to the DAPL-ETCOP system. *Id.* ¶ 13.

These serious consequences more than satisfy *Allied-Signal*'s second prong. *See Oglala Sioux Tribe v. NRC*, 896 F.3d 520, 538 (D.C. Cir. 2018) (court is "concerned about the disruptive consequences of vacating" for a company representing "that its stock price 'would plummet'"); *Apache Corp.*, 627 F.3d at 1223 (finding disruptive consequences based on "substantial" disruption to pipeline operators).

In *SRST IV*, the Court stated that Dakota Access had "assumed some risk of economic disruption" by proceeding with pipeline construction and operation despite the Tribes' unresolved lawsuit. 282 F. Supp. 3d at 104. But however one might have quantified what the "economic disruption" risk was back then, the potential economic risk now is quantifiable and catastrophic.

33

And after almost three years of operations and several court rulings, it has been reasonable for Dakota Access, the state of North Dakota, and all the other interested third parties to assume that the "risk" of a shutdown would decrease significantly over time.  Even then, this does nothing to diminish the serious harms to numerous third parties—oil producers, royalty owners, governments, and the general public, *see infra*, at 35-43.  "It would be unjust to force all of *those people* to bear the brunt of the harm" resulting from vacatur.  *Semonite*, 422 F. Supp. 3d at 102 (emphasis added).  As for Dakota Access itself, the D.C. Circuit has since clarified that parties *are* entitled to "reasonably rel[y]" on duly issued agency licenses and permits—even in the face of ongoing legal challenges—and that disruptive consequences from such reliance counsel *against* vacatur.  *See Oglala Sioux Tribe*, 896 F.3d at 538 (finding disruption in part because company "reasonably relied on the NRC's ruling and settled practice that permitted the continued effectiveness of the license the Staff issued").  Vacatur is improper where it "would punish" a party "for following the Agency's directions."  *Defs. of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 118 (D.D.C. 2011).  Were the law otherwise, many large infrastructure projects could be held captive by litigation and repeatedly delayed (or never started), to the detriment of numerous third parties.

Moreover, the landscape has changed significantly since *SRST IV*.  The pipeline has now been operating for nearly three years, and Dakota Access and ETCO have entered into long-term supply contracts and made investments and hiring decisions in reasonable reliance not only on the Corps' approvals, but also on this Court's prior determinations that the Corps "substantially complied" with NEPA, *SRST III*, 255 F. Supp. 3d at 112, and had "a significant likelihood" of being able to remedy the discrete issues in the EA that the Court identified for the first remand, *SRST IV*, 282 F. Supp. 3d at 103.  The disruptive consequences flowing from that reasonable reliance counsel strongly against vacatur.  *See Oglala Sioux Tribe*, 896 F.3d at 538.

### 2.    Disruption To The Oil Industry And Its Employees

*North Dakota oil producers.*  The economic consequences of a shutdown for the oil indus-try would extend far beyond Dakota Access and ETCO, as many North Dakota oil producers would have no choice but to respond by "shutting in" some of their wells and ceasing production entirely.[8] Ex. I ¶ 17 (Makholm Dec.); Ex. G ¶¶ 14, 18 (Emery Dec.).  The extent of this disruption will depend on the availability and economics of replacement transportation for the crude oil that DAPL carries.  Those modes are likely to be quite limited and more expensive, and they would create greater harms on a barrel-by-barrel basis.

There is no viable pipeline alternative for transporting the 570,000 barrels of Bakken crude that DAPL is capable of carrying each day.  Ex. I ¶¶ 17-19 (Makholm Dec.).  Other pipelines lack capacity to pick up the slack.  *Id.* ¶ 17; Ex. K at 4 (Enerplus Dec.).  That problem aside, they also either do not connect to the distribution hubs served by the DAPL-ETCOP system or do so only by way of other pipelines that may carry different types of crude, which can lead to degraded product.  Ex. I ¶ 17 (Makholm Dec.); Ex. G ¶ 41 (Emery Dec.).

Nor could substantial amounts of DAPL's crude be shifted to rail transport.  Even when oil prices rise again from current levels—$15 per barrel for West Texas Intermediate crude as of April 29, 2020[9]—many producers will not be able to afford the additional $5 to $10 *per barrel* in cost to ship oil by rail.  Ex. I ¶¶ 18-19 (Makholm Dec.).  Pricing aside, rail capacity is insufficient.  At around 700 barrels of oil per rail car, it would take eight 110-car trains every single day—almost 300,000 cars and about 2,700 locomotives each year—just to equal DAPL's capacity.  Ex. G ¶ 35

---

[8]  Similar effects would occur within the North Dakota natural gas industry, because oil and nat-ural gas production often go hand-in-hand.  Ex. I ¶ 26 (Makholm Dec.).  If an oil well is forced to shut-in, the gas-production facilities will likely also need to shut-in.  While not as big as the oil-production effort, North Dakota is a significant producer of natural gas.  *Id.*

[9]  Bloomberg.com, *Energy*, https://bloom.bg/3aMvSRh (last accessed Apr. 29, 2020).

(Emery Dec.).  There are not enough rail cars or locomotives to fill the breach.  Ex. D ¶¶ 5a-5b, 6-16 (Rennicke Dec.); Ex. I ¶ 17 (Makholm Dec.).  Railroads, moreover, do not connect to DAPL's destination terminal in Patoka, Illinois, and provide only a circuitous route to ETCOP's destination terminal in Nederland, Texas.  Ex. D ¶ 32 (Rennicke Dec.); Ex. G ¶¶ 24, 38 (Emery Dec.).

Of the 570,000 barrels of crude that DAPL transports every day, therefore, only between 70,000 and 250,000 barrels per day likely could be diverted to railroads in the near-term.  Ex. D ¶¶ 5a, 6-13 (Rennicke Dec.); Ex. G ¶ 35 (Emery Dec.).  With nowhere to turn to transport the bulk of DAPL's oil, producers would have to shut-in between 3,460 and 5,400 wells, stranding up to 34.5% of North Dakota crude production.  Ex. I ¶ 20 (Makholm Dec.); Ex. K at 4 (Enerplus Dec.).  Producers would lose between $253 million and $396 million in revenue every month in 2020, and face millions more in unrecoverable costs to shut-in and maintain their wells.  Ex. I ¶¶ 7, 21 (Makholm Dec.); Ex. K at 2 (Enerplus Dec.).  With producers already suffering historically low demand stemming from COVID-19, the additional losses would force producers to further slash capital expenditures and lay off even more employees.  Ex. I ¶¶ 21-22 (Makholm Dec.).[10]  Decreased oil production also would harm third-party vendors, such as maintenance contractors, utility companies, and trucking companies.  Ex. G ¶ 21 (Emery Dec.).

The losses would be sizeable even if more rail capacity could eventually be generated.  The extra $5 to $10 per barrel paid for rail travel, *see supra*, at 35, equates to $1 to $2 *billion* dollars a year in additional transport costs.  Ex. G ¶ 36 (Emery Dec.).  And that price differential would certainly increase with the greater rail-capacity demand caused by a shutdown.  These costs would

---

[10]  *See also* Jennifer Hiller & Liz Hampton, *Oil in the Age of Coronavirus: A U.S. Shale Bust Like No Other*, Reuters (Apr. 15, 2020), https://reut.rs/2z61NyZ ("Fuel demand has plunged by as much as 30 million barrels per day"—30%—as "the coronavirus pandemic ha[s] grounded aircraft, reduced vehicle usage and pushed economies worldwide toward recession.").

impair producers' investments, constrain oil production, and hurt workers and consumers. Ex. I ¶ 23 (Makholm Dec.); Ex. K at 2, 4 (Enerplus Dec.).[11] Moreover, a significant shift to rail transportation of crude oil would cause (1) a net *increase* in environmental harms, *infra*, at 41-42, and (2) increased congestion and shipping costs for other rail users, including Midwest farmers, who rely heavily on rail transport for their products, Ex. F ¶¶ 4, 29-41 (Kub Dec.); Ex. D ¶¶ 17-27, 60-84 (Rennicke Dec.).

*Refineries and pipelines.* A shutdown likewise would have severe impacts on downstream users of oil transported by DAPL, such as refineries and other pipelines. Refineries in the Midwest and Gulf Coast have made significant investments and designed their facilities based on the expectation of a consistent, economic supply of "light sweet" Bakken crude that DAPL moves cheaply and efficiently. Ex. G ¶¶ 25-27 (Emery Dec.); Ex. J ¶¶ 9, 12 (Marathon Dec.). In response to a shutdown, these refineries would struggle to find—and would have to pay a premium for—alternative sources of light sweet crude. Ex. G ¶¶ 24-26 (Emery Dec.); Ex. J ¶¶ 11-12 (Marathon Dec.). That supply shock could lead to revenue losses for refiners, undermine their investments, and cause job losses and higher prices for consumers. Ex. G ¶¶ 24-26 (Emery Dec.); Ex. J ¶¶ 9, 12 (Marathon Dec.). Other pipelines' operations also would be disrupted. In addition to ETCOP, some of the dozens of other active pipelines that currently aggregate and transport crude to and from the DAPL-ETCOP system would have to drastically alter or even cease operations if DAPL is stopped, irreparably harming their businesses. Ex. G ¶¶ 22, 24 (Emery Dec.).

*Jobs.* In all, shutting down DAPL would cause between 4,500 and 7,000 workers their jobs as oil producers shut-in their wells. Ex. I ¶¶ 7, 22 (Makholm Dec.). Third-party vendors and

---

[11] *See also* Thomas R. Covert & Ryan Kellogg, *Crude by Rail, Option Value, and Pipeline Investment,* Nat'l Bureau of Econ. Research, 33, (Sept. 2017), https://tinyurl.com/y9ozyhbd (estimating that even if more than 90% of DAPL's capacity shifted to rail transport, crude oil flows out of the Bakken region would see a net decrease of between 42,000 and 66,000 barrels per day).

other local industries that cater to oil workers—like restaurants and hotels—would face yet further layoffs on top of the effects that are expected to endure until COVID-19 restrictions are lifted.  *See* Ex. G ¶ 21 (Emery Dec.).  With the oil industry already expected to cut around a third of its workforce this year—and the economy as a whole struggling under unprecedented circumstances—many of these workers would have nowhere to turn for employment.[12]

### 3.    Disruption To States, Local Governments, And Tribes

A shutdown also would be catastrophic for state, local, and tribal governments, which rely on the hundreds of millions of dollars in tax revenues DAPL generates every year.  Ex. G ¶ 28 (Emery Dec.); Ex. I ¶¶ 28-30 (Makholm Dec.).  A shutdown would cut off those revenues just as states are increasing spending to fight COVID-19, buoy their economies, and keep residents employed.[13]  And workers displaced by the shutdown would strain state budgets yet further through state unemployment benefits claims.  *See* Ex. I ¶ 22 (Makholm Dec.).

North Dakota would be particularly hard-hit.  North Dakota's Tax Commissioner has estimated that DAPL's reduced transportation costs alone generated *a quarter of a billion dollars* in oil tax revenues in its first two years of operations.  Ex. G ¶ 28 & n.14 (Emery Dec.).  And that is just a fraction of DAPL's total tax impact.  Every year since 2017, DAPL has been responsible for a significant portion of the billions in oil production and extraction taxes that North Dakota collected from the state's oil industry, which in turn account for almost 50% of North Dakota's annual

---

[12]  Hiller & Hampton, *supra* note 10 ("up to 240,000 oil-related jobs will be lost this year, about a third of the onshore and offshore oilfield workforce"); Justin Wolfers, *The Unemployment Rate Is Probably Around 13 Percent*, N.Y. Times (updated Apr. 16, 2020), https://nyti.ms/2XFdOW6 (unemployment rate is "rising at a speed unmatched in American history").

[13]  David A. Lieb, *U.S. States Turn to Cash Reserves as Coronavirus Strains Budgets*, AP (Mar. 15, 2020), https://bit.ly/3579K2P; *see also* Tony Romm, *More Than 2,100 U.S. Cities Brace for Budget Shortfalls Because of Coronavirus, with Many Planning Cuts and Layoffs*, Wash. Post (Apr. 14, 2020), https://wapo.st/2XEf102.

state tax receipts. Ex. I ¶¶ 28-30 (Makholm Dec.); Ex. G ¶ 28 (Emery Dec.). That revenue—earmarked to support, for example, local governments, tribes, and public schools—is already forecast to decrease sharply in 2020 due to falling oil prices and decreased production. Ex. I ¶¶ 29, 31-35 (Makholm Dec.). If DAPL is shut down, North Dakota's oil tax receipts would fall by up to $393 million in 2020 and $715 million in 2021. *Id.* ¶ 30. Such dramatic reductions in tax revenues would compound the state's fiscal difficulties while spending rises in response to the COVID-19 pandemic.

Similarly, many Native American tribes would suffer severe economic hardship if DAPL is shut down. For instance, the Mandan, Hidatsa, and Arikara Nation have 14 active drilling rigs and more than 2,000 wells on their land. Ex. G ¶ 32 (Emery Dec.). Those wells produce more than 315,000 barrels of Bakken crude per day, roughly 20% of North Dakota's total oil output. *Id.* A shutdown would cause many of those wells to shut-in and drilling rigs to move elsewhere, depriving the tribes of a significant source of tax revenues, royalty payments, and jobs.[14] *Id.* Indeed, the loss of a single drilling rig would cost the tribes around $8 million per year in tax revenue. *Id.* These lost funds, which would be unrecoverable, would impact the tribes' efforts to pay for schools, hospitals, and government services. *See id.*

In addition, the states crossed by DAPL and ETCOP would experience significant property-tax losses. Ex. G ¶ 29 (Emery Dec.). Dakota Access and ETCO project that a shutdown would reduce property taxes they pay to states in fiscal year 2021 by approximately $45 million, including by $22.5 million to Iowa, $7 million to North Dakota, $4.5 million to South Dakota, $5 million to Louisana, $3.5 million to Mississippi, and $1 million to Tennessee. *Id.* Total property-tax payments would decrease by $65 million in fiscal year 2022—and that is just a small fraction

---

[14] Private landowners also would receive dramatically reduced royalty payments if the pipelines are shut down. Ex. I ¶ 24 (Makholm Dec.).

of the hundreds of millions of dollars in lost tax revenues and billions of dollars in overall eco-

nomic harm that would result from a shutdown.  *Id.*

### 4.  Disruption To The Public Interest

The disruptive consequences of shutting down DAPL would not be limited to the oil in-

dustry and oil-producing states, but instead would reverberate through the national economy, in-

creasing uncertainty and volatility in the energy markets, distorting investment decisions, and po-

tentially hindering the national economic recovery.  Ex. H ¶ 5 (Olive Dec.); *see id.* ¶¶ 15-21.  It

would also endanger national energy security.  Over the past decade, dramatic increases in domes-

tic oil production and improved oil infrastructure have buttressed the nation's security by decreas-

ing our reliance on foreign sources of oil.  Ex. E ¶¶ 15-16 (Caruso Dec.).  DAPL has played a

critical role in that regard, both by spurring increased domestic oil production and by providing a

stable and efficient means for bringing to market nearly 40% of the oil from the Bakken region.

*Id.* ¶¶ 7-12.

Shutting down DAPL could decrease oil production and curtail investment in the industry,

undermining the stability of the nation's crude infrastructure.  Ex. E ¶ 21 (Caruso Dec.).  That

would limit our ability to respond to foreign and domestic supply disruptions such as wars and

natural disasters, and increase our dependence on foreign (and sometimes hostile) nations.  *Id.*

¶¶ 16, 22.  A shutdown would also sever the largest and most direct pipeline connection between

the Bakken region and the U.S. Strategic Petroleum Reserve—just as the government is seeking

to fill that reserve to help stabilize oil prices.  *Id.* ¶ 23; *see also* Stephen Cunningham, *U.S. Oil*

*Producers Begin Storing Crude in Strategic Reserve*, Bloomberg (Apr. 27, 2020),

https://bloom.bg/2SetDzq.

### B.  Shutting Down The Pipeline Would Harm The Environment

Although the substantial economic disruption of a shutdown is sufficient reason to remand

without vacatur, courts also will "not vacate [agency actions] when doing so would risk significant harm to the public health or the environment." *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019). Here, rather than protecting the environment, a shutdown would have the opposite effect, posing at least three significant environmental and safety risks, each affecting millions in the region, including the Tribes. Shutting down the pipelines thus "would be the equivalent to a major federal action with no regulatory oversight or environmental agency review and approval." Ex. A ¶ 5 (Aubele Dec.).

*First*, the increased rail transportation that eventually will result from a shutdown, even though insufficient to replace DAPL, would nevertheless heighten spill risks and increase air pollution. Ex. A ¶¶ 31-35 (Aubele Dec.). Courts, academics, and government agencies have consistently recognized that "pipeline transportation of oil is safer than rail transportation" on a "volume-distance basis (i.e., per barrel-mile)." *Puntenney v. Iowa Utils. Bd.*, 928 N.W.2d 829, 842 (Iowa 2019); *see also* Strata, *Pipelines, Rail & Trucks: Economic, Environmental, and Safety Impacts of Transporting Oil and Gas in the U.S.*, at 6 (2017) ("Pipelines in particular have advantages in terms of safety, efficiency, and low environmental impacts."). One study, for example, estimates that the incident rate for rail is *4.5 times higher* than for crude oil pipelines when the amount of oil transported is taken into account. Strata, *supra*, at 6. Another study concludes that rail transport is *six times* more costly to the environment and human health than pipeline transport. Karen Clay, *et al.*, *External Costs of Transporting Petroleum Products: Evidence from Shipments of Crude Oil from North Dakota by Pipelines and Rail*, 40 Energy J. 55, 68 (2019).

The air pollution costs of exporting oil by rail from North Dakota to the Gulf Coast are also significant—more than double that of pipeline transport. *See* Clay, *supra*, at 69. "[G]round-level

emissions, such as those from locomotives, tend to be more harmful than the same level of emissions released from tall smokestacks" at power plants and pumping stations, which power pipelines. *Id.* at 55-56. And trains often pass through large population centers, whereas power plants and pumping stations are typically located in sparsely populated areas. *Id.* at 67.[15]

These environmental risks would be especially acute for SRST, as a railroad track crosses Lake Oahe just 1.6 miles upstream of the reservation's new water intake. Ex. A ¶ 36 (Aubele Dec.); Ex. D ¶ 34 (Rennicke Dec.). A rail incident over or near Lake Oahe is much more likely to harm the environment and human health than a pipeline incident occurring 90 feet below the Lake Oahe lakebed. Ex. A ¶ 36 (Aubele Dec.). Plaintiffs have conceded that some crude-oil trains would use this crossing of the Missouri River. D.E. 272-5 ¶ 104. While they disputed the precise number, every additional train increases the likelihood of an incident at this crossing. And a 110-car train could carry 77,000 barrels of oil—so a train incident at this location could potentially dump more than 6 times as much oil directly into Lake Oahe than was modeled in the WCD. Ex. A ¶ 36 (Aubele Dec.). Whereas PHMSA requires the response plan that DAPL put in place, including equipment and personnel available to respond to a spill roughly ▌▌▌▌ larger than the PHMSA-approved WCD for Lake Oahe, such plans, personnel, and equipment are not mandated for responses to a train incident of this magnitude. *Id.* ¶ 37.

*Second*, the rash of oil well closures that would result from shuttering DAPL, *see supra*, at 35-37, would be costly and risky. If not closed properly, the idle wells could leak and contaminate

---

[15] And, of course, increased crude oil shipments by rail will likely impact urban and suburban population centers, as well as Native American tribes other than Plaintiffs. Ex. D ¶¶ 34, 85-95 (Rennicke Dec.). For example, some of the rail lines that crude-oil trains would need to take to replace DAPL's capacity travel through downtown Chicago and its densely packed suburbs, exposing hundreds of thousands, if not millions of people to increased environmental risks. *Id*. ¶¶ 32, 95. Similarly, those same rail lines travel close to/cross the SRST reservation. *Id*. ¶ 34.

groundwater with hydrocarbons and other toxins, which could endanger the health of nearby residents, including members of the Tribes.  Ex. A ¶ 38 (Aubele Dec.).  Many closed wells also emit significant amounts of methane, a greenhouse gas far more harmful than carbon dioxide, which can impair air quality and cause explosions.  *Id.* ¶ 38 & n.13.

*Third*, as discussed in detail previously, discontinuing pipeline operations creates the risk of leaks due to corrosion.  D.E. 260, at 16-17; Ex. B ¶¶ 3(f), 40-41 (Godfrey Dec.).  When DAPL is operational, multiple systems detect and prevent corrosion from water entrained in the crude oil. Ex. B ¶ 41 (Godfrey Dec.).  If operations are suspended, those systems will no longer function and stagnant water could compromise the pipeline's structural integrity.  *Id*.  That is of particular concern at the Lake Oahe crossing, a low point, because water is more likely to collect there.  *Id*. Purging the pipeline and filling it with an inert gas would not eliminate those risks, and it would pose safety risks to the workers performing the purge.  Ex. C ¶ 46 (Stamm Dec.).  At best, the speculative advantage of avoiding extremely low probability spills is offset by these other environmental risks to a shutdown.

## C.    Preserving The Status Quo Will Not Harm The Tribes

In contrast to the serious economic disruption and environmental harms that a shutdown would cause, keeping the pipeline in operation during the remand period is extremely unlikely to cause any disruption at all.  It remains well settled—as the Corps found and this Court affirmed— that DAPL's state-of-the-art components and leak-detection systems, the process by which it was installed underground, and Dakota Access's response plans make "the risk of an inadvertent release in, or reaching, Lake Oahe … extremely low."  USACE_DAPL71311; *see also SRST III*, 255 F. Supp. 3d at 127 (affirming the EA's "top-line conclusion that the risk of a spill is low").

The track record speaks for itself.  Since DAPL began operating in June 2017, there have been ***no spills*** on its nearly 1,200 miles of main-line pipe, which includes the Lake Oahe crossing.

Ex. C ¶ 24 (Stamm Dec.); Ex. A ¶ 4 (Aubele Dec.).  Even at Dakota Access facilities, there have been only seven minor incidents, none larger than two barrels, and only one of which resulted in less than half a barrel of oil leaving the facility as misting, which was quickly remediated.  Ex. C ¶ 24 (Stamm Dec.).  All but one event occurred within the first 12 months of operations and related to commissioning issues that are now resolved.  *Id.*  DAPL's tiny volume of releases falls well below the industry average.  Ex. B ¶¶ 18-20 (Godfrey Dec.).  DAPL's safety record is also consistent with PHMSA historical data, which shows that the likelihood of a large or even modest spill, including at or near Lake Oahe, is exceedingly low.  RAR 14-19; Ex. B ¶ 21 (Godfrey Dec.); Ex. A ¶ 4 (Aubele Dec.).

In fact, Lake Oahe is among the *least* likely locations for a significant spill because the portion of the pipeline under the Lake was installed using horizontal directional drilling (or HDD).  Ex. C ¶ 28 (Stamm Dec.).  Of the more than 3,300 pipeline spills that have occurred across all pipelines in the country between 2010 and 2018, there has been *only one* spill—less than two barrels in volume—from a crude oil pipe installed using HDD.  Ex. A ¶ 13 (Aubele Dec.).  That makes sense.  HDD puts pipelines well below ground where they are not nearly as susceptible to one of the common causes of pipeline spills—third-party damage.  Ex. C ¶ 28 (Stamm Dec.).

Moreover, even a large spill—an exceedingly unlikely event—would be mitigated to the point of not harming the Tribes.  Modeling for a release that would never happen—12,517 barrels directly into the Lake followed by 10 days with zero response effort—showed limited and temporary impacts on the Tribes' use of Lake Oahe and no impact at all to the Tribes' water supplies.  Ex. A ¶¶ 17-19 (Aubele Dec.).  Moreover, response plans and equipment already in place are capable of swiftly and effectively responding to a spill roughly ████ *larger* than that volume.  Ex. C ¶ 19 (Stamm Dec.).  These response tools are a condition of the Lake Oahe easement.  *Id.*

¶ 32; Ex. A ¶ 12 (Aubele Dec.).

Any speculative harms to the Tribes thus pale in comparison to the severe and certain economic disruption and environmental harms that would ensue from shutting down DAPL during the remand.   The balance of the harms in this case therefore decisively favors remand without vacatur.  *See Semonite*, 422 F. Supp. 3d at 103 ("the negative effects of keeping the project in place while the Corps conducts its EIS do not outweigh the aforementioned harms that will occur if vacatur is ordered").

### CONCLUSION

This Court's remedy order should not include vacatur.


Dated:  April 29, 2020                                    Respectfully submitted,


                                             /s/ William S. Scherman
                                            William S. Scherman
                                            David Debold
                                            GIBSON, DUNN & CRUTCHER LLP
                                            1050 Connecticut Avenue, N.W.
                                            Washington, D.C.  20036
                                            (202) 955-8500
                                            wscherman@gibsondunn.com

                                            *Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of April, 2020, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

  /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*