# EXHIBIT I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | |
| Plaintiffs, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| and | |
| CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL., | |
| Plaintiff-Intervenors, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

---

## DECLARATION OF JEFF D. MAKHOLM, PHD IN SUPPORT OF DAKOTA ACCESS, LLC'S BRIEF ON THE QUESTION OF REMEDY

---

1.  My name is Jeff D. Makholm.  I am a Managing Director at National Economic Research Associates, Inc. ("NERA").  My business address is 99 High Street, Boston, Massachusetts, 02110.

2.  I have M.A. and Ph.D. degrees in economics from the University of Wisconsin, Madison, with a major field of Industrial Organization and a minor field of Econometrics/Public Economics. I also have B.A. and M.A.  degrees in economics from the University of Wisconsin, Milwaukee.

3.  I have been employed by NERA since 1986.  My work as a consulting economist involves providing economic analysis to corporations, governments, regulatory agencies and interest groups, often in administrative or civil litigation settings. A particular focus of mine is regulated

industries, including local utilities and the regulated interstate transport/transmission of gas, oil and electricity.  I have researched and provided evidence regarding regulated pricing, the presence or absence of market power, competition, the cost of capital, regulatory rulemaking, incentive ratemaking, contract obligations, and bankruptcy, among other issues, concerning these industries. I have also directed studies on behalf of utility companies, governments, and the World Bank in many countries, and drafted regulations, established tariffs, recommended financing options for major capital projects, and advised on industry restructurings.  I provide my curriculum vitae, which more fully details my education and experience, as **Exhibit 1**.

4.   I have particular expertise in the history, institutions, economic, and regulatory issues regarding the world's oil and gas pipelines.  I became the director of NERA's work with interstate pipelines in the late 1980s, during which time I led the firm's involvement in two major innovations in the global pipeline industry.  The first was the restructuring of the U.S. interstate gas pipeline industry, in the 1980s and 1990s, which led to America's uniquely competitive domestic gas markets.  The second came in the late 1980s and 1990s, when I helped to create and/or regulate investor-owned pipeline companies out of government agencies around the world. In the process, I worked directly with most of the world's major oil and gas pipeline systems, in North and South America, Europe, Africa, China, Russia, and New Zealand/Australia.

5.   My many publications reflect my decades of experience with economic and regulatory issues associated with major pipeline systems around the world.  My latest book, *The Political Economy of Pipelines: A Century of Comparative Institutional Development* (The University of Chicago Press, 2012, re-issued in Chinese by Beijing's Petroleum Institute Press in 2016), focuses on the factors underlying the unique growth of investor-owned pipelines in the United States. Other recent refereed publications include my 2016 paper in the *Energy Law Journal*, "The Politics

of US Oil Pipelines: The First Born Struggles to Learn from the Clever Younger Sibling," (with Dr. Laura Olive), and my 2017 paper, "The Interaction of Pipelines and Geography in Support of Fuel Markets," in *The Handbook on Geographies of Technology* (Elgar, Cheltenham, UK, Warf, B.L., (Ed.)).

6.   This declaration describes my assessment of the disruptive economic effects—the harm— that would follow if the easement allowing the Dakota Access Pipeline ("DAPL") to cross Lake Oahe in North Dakota is vacated, and the pipeline is shut down while the U.S. Army Corps of Engineers prepares an Environmental Impact Statement ("EIS").

7.   I estimate that annual losses to Dakota Access, LLC ("Dakota Access"), which owns DAPL, and losses to its affiliate Energy Transfer Crude Oil Company, LLC, which owns the connected Energy Transfer Crude Oil Pipeline ("ETCOP"), would be over $**500 million** for the second half of 2020 and more than **$1 billion** each year thereafter; that North Dakota producers would lose **$2.03 billion to $3.17 billion** in the remaining months of 2020 and **$3.81 billion to $5.95 billion** in 2021; that North Dakota producers would lose **4,520 to 7,063 direct jobs**; that North Dakota would lose tax receipts of between **$252 million and $393 million** for the remaining months of 2020 and **$458 million to $715 million** in 2021; that tax revenue would be reduced for DAPL transit states (South Dakota, Iowa and Illinois) by **$4.5 million, $22.5 million, and $12,000** in 2021/2022, respectively, and dozens of jobs would be lost; and that the unprecedented shutdown of an interstate oil pipeline that has been operating for years would impose a new risk premium for the entire capital-intensive petroleum industry connected by such pipelines—the relative magnitude of which is indicated by an annual capital cost of **$1.1 billion** for every 10 basis points (one tenth of 1 percent) of extra capital cost, as I explain.

8.   DAPL is the newest and most direct crude oil transportation "highway" connecting North

Dakota—the second largest oil producing state after Texas—to competitive U.S. and world oil markets.  The competitive U.S. petroleum industry relies critically on its crude oil pipelines—by far the safest and most efficient means of overland transport for major volumes and distances between producing fields and refineries.  There is high demand for this particular pipeline route—a "bullet line" from the Bakken to America's second largest crude oil hub at Patoka, Illinois (and regional refineries), and then a further direct line, on ETCOP to the largest concentration of U.S. refining capacity in Nederland, Texas on the Gulf of Mexico. DAPL provides this service at a lower cost per barrel-mile to market than any other option.

9.   I discuss four aspects of the harm from shutting DAPL down: (1) direct financial harm to DAPL and its affiliate ETCOP; (2) harm to North Dakota producers, to that state's budget and to Native American tribes, political subdivisions, and others who rely on the income to the state coming from oil transported to market on DAPL; (3) harm to South Dakota, Iowa, Illinois—the interstate transit states and their region of the upper Midwest; and (4) harm to the competitive U.S. petroleum industry generally from the loss of a flowing interstate pipeline.

10. Evidence supporting my conclusions comes from several sources. On the harm to DAPL, I confirm the reasonableness of the conclusions of Mr. Glenn Emery of Energy Transfer LP.  On the harm to North Dakota producers and that state generally, I draw from public sources for revenues and distribution of oil production tax proceeds.  For the transit states, I refer to the conclusions from those state regulators who approved the construction of DAPL in late 2014 and early 2015 and to activity in the refining areas of Illinois and the U.S. Gulf Coast. For the U.S. petroleum industry generally, I refer to its overall size from public sources and the nature of the longstanding federal pipeline regulation that reliably ties together its widely dispersed activities. I also discuss whether the railroad system could serve as a means to mitigate the harm of a

shutdown of DAPL, referring to various sources of rail costs and the specific evidence and conclusions of Mr. William Rennicke, an expert on the U.S. railroad network.

11. My key conclusions relating to the harm of taking DAPL offline for the time it would take the U.S. Army Corps of Engineers to prepare an EIS are as follows:

    a. Dakota Access's own quantification of direct loss due to a shutdown of DAPL and ETCOP, which I view as reasonable, is over $**500 million** for the second half of 2020 and more than **$1 billion** each year thereafter.

    b. North Dakota would see a stranding of between 320,000 and 500,000 barrels per day (bpd) of DAPL's capacity of 570,000 bpd of Bakken crude oil at its source, as there is no available pipeline or feasible railroad alternative for most of DAPL's barrels. Such a stranding represents 22 percent to 35 percent of all Bakken crude oil production and 2 to 4 percent of U.S. crude oil production.

    c. The other pipeline routes are both committed and flow to less desirable destinations than DAPL's route, which goes straight to the major U.S. oil hub in Patoka, IL. Railroad options, either to the east or west (there are no routes to the south out of the state), are sharply limited as a practical matter, would incur much larger direct costs to producers (and thereby lower revenues), and also involve congestion and higher costs to all users of the regional rail network—as occurred before DAPL went into service.

    d. The harm to Bakken producers in North Dakota would range from **$2.03 billion to $3.17 billion** in the remaining months of calendar year ("CY") 2020, and would range from **$3.81 billion to $5.95 billion** in CY2021, accounting for diversions to rail transport and the recent drop in oil prices.  Producers earned $9.42 billion and $9.43 billion in calendar years 2018 and 2019, respectively.  Those values reflect the total

revenue of oil and gas production net of state tax revenues.

e.   The loss to employment in North Dakota would be about **4,520 to 7,063** jobs, which is approximately the number of jobs in North Dakota attributable to DAPL in CY2019, less any job creation attributable to the diversion of DAPL transport to rail transport.

f.   The State of North Dakota would lose approximately **$**252 million and $393 million in tax revenues in the remaining months of CY2020, and $458 million to $715 million in CY2021.  North Dakota uses its oil and gas tax revenue to support the Three Affiliated Tribes ($454 million in the North Dakota budget biennium period August 1, 2017 to July 31, 2019); counties, cities, townships and schools ($679 million in the 2017-2019 biennium); and other state funds ($3.5 billion in the 2017-2019 biennium).

g.   The harm to the transit states of South Dakota, Iowa and Illinois, through which North Dakota production reaches its market, involves the elimination of revenues and jobs. Illinois refiners will also lose the advantageous access to Bakken oil, affecting competition and fuel sales throughout the Upper Midwest.

h.   The harm to the wider U.S. petroleum market involves the evident risk to the industry of idling the most direct route from North Dakota to market.  The shut-down of DAPL, and stranding of most of that oil in North Dakota, without reasonable pipeline or rail options, would signal a material increase in risk and capital cost for an industry that has, until now, seen a century of interstate pipeline regulation as a reliable means by which to invest in the wider petroleum industry.

**Harm to Dakota Access and Its Affiliate ETCO**

12.   Dakota Access's quantification of the losses from shutting down DAPL and ETCOP (which currently sources all of its crude oil from DAPL) is between $516 million and $643 million for the second half of 2020, and between $1 billion and $1.4 billion for 2021, 2022, and 2023.

Those estimates, which account for the economic downturn and lower price of oil, are based on the proceeds of committed shippers for the pipeline, DAPL's and ETCOP's continued strong nominations, and the evident need for a reliable, economic, and direct transportation option to the U.S. Gulf Coast.

13. I find Dakota Access's estimates to be reasonable. Pipeline businesses rely on fixed-cost assets and are unable to economize on any significant operating costs to offset reduced revenue during a shutdown.  Thus, the loss in revenues represents the loss in ongoing opportunity cost of capital for the money invested in the pipeline—which cannot be redeployed elsewhere if not used for the specific service for which that pipeline was put in the ground.

14. Beyond DAPL, other pipelines' operations also would be disrupted.  There are dozens of other active gathering/feeder pipelines that currently aggregate and transport crude to the DAPL-ETCOP system.  Such pipelines would have to dramatically alter, or even cease, operations if DAPL is shut down.

**Harm to North Dakota Producers and the State**

15. In this section I describe the harm to North Dakota producers, to state tax revenues and to those who benefit from distribution of those revenues.  I start with the harm to producers and move to the harm to North Dakota public finances.

*Producer Losses*

16. Crude-oil production in North Dakota increased by more than 40 percent between June 2017, when DAPL came online, and January 2020.[1]  During that period, North Dakota oil and gas

---

[1] Production in June 2017 was 30,693,000 barrels, and production in January 2020 was 43,281,000 barrels.  *See North Dakota Field Production of Crude Oil*, U.S. Energy Info Admin. (release date Mar. 31, 2020), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrfpnd1&f=m (table reporting monthly production figures in thousands of barrels).

producers contributed $6.08 billion in taxes and royalty revenues to North Dakota.[2]  In just one year within that period, 2018, oil and gas producers invested $9.7 billion in new well infrastructure.[3]  DAPL has contributed greatly to this increased production and investment in North Dakota by economically and efficiently transporting 570,000 barrels of Bakken crude per day— approximately 40 percent of all Bakken crude oil and 4.5 percent of U.S. crude oil production.

17.  If DAPL were shut down, oil producers would have to shut-in wells and cease production due to the lack of available alternative transportation modes. Other pipelines out of the Bakken, such as those going west into Montana and then eventually south to Cushing, Oklahoma (the Bridger and "Double H" pipelines), are fully committed—and in any event are considerably smaller and require more interconnected transfers and storage than the DAPL-ETCOP route.[4]  Rail is not a viable alternative for DAPL because there are not enough tanker railcars available in the United States or Canada to transport DAPL's 570,000 bpd throughput, as Mr. Rennicke describes. Further, even if volumes could be transported, rail is significantly more expensive on a per-barrel basis and it does not go to the places that producers want to market their product.

18. In Table 1, below, I show the general order of magnitude difference in cost (not pertaining to any specific shipment or tariff) between pipelines and other modes of oil transport.

---

[2] *Quarterly Update Detail – Forecast to Actual Comparison*, N.D. Legislative Council, https://www.legis.nd.gov/historical-oil-and-gas-tax-revenue-publications (last visited Apr. 29, 2020) (multiple years).

[3] *Economic Impact of Oil and Gas Investment in North Dakota*, N.D. Dep't of Mineral Res., 1 (Jan. 2020), https://www.dmr.nd.gov/oilgas/DMR_Fact_Sheets.pdf.

[4] *See, e.g.*, *Is this expansion part of the Liberty Pipeline project*, Bridger Pipeline Expansion, https://bridgerexpansion.com/q-is-this-same-as-liberty/ (last visited Apr. 29, 2020); *Crude Operations – Kinder Morgan Double H Pipeline*, Kinder Morgan, https://www.kindermorgan.com/pages/business/products_pipelines/doubleH.aspx (last visited Apr. 29, 2020); *Open Season Held For Double H Pipeline Expansion*, 242 Pipeline & Gas J. 1 (2015), https://pgjonline.com/magazine/2015/january-2015-vol-242-no-1/projects/open-season-held-for-double-h-pipeline-expansion.

**Table 1. Cost of Shipping Crude Oil by Mode of Transport**[5]

| Shipping Method | Cost per Barrel |
|---|---|
| Pipeline | $2 - $5 |
| Rail | $10 - $15 |
| Truck | $10 - $20 |

19. In the current environment of lower oil prices, the cost differential associated with moving oil to rail from DAPL, apart from the added congestion and delay described by Mr. Rennicke, is a substantial part of the current price of oil and would cause the plugging of wells even if rail capacity and rail cars were freely available.  Many producers would not be able to afford the additional $5 to $10 per barrel in cost to ship oil by rail.[6]

20. Thus, I agree with Mr. Rennicke that shutting down DAPL would lead producers to strand from 320,000 to 500,000 bpd—or up to 35 percent of North Dakota crude oil production and 3.9 percent of national production.[7]  Shut-ins of that magnitude would result in the closure of between

---

[5] Megan E. Hansen & Ethan Dursteler, *Pipelines, Rail & Trucks: Economic, Environmental, and Safety Impacts of Transporting Oil and Gas in the U.S.*, Strata, 3 (2017), https://www.strata.org /pdf/2017/pipelines.pdf; *Pipelines Make Life Better For American Workers and Families*, Ass'n of Oil Pipelines, 5, http://www.pmpl.com/wp-content/uploads/AOPL-Pipelines-Make-Life-Better.pdf (last visited Apr. 29, 2020); *Potential Impacts of Reductions in Refinery Activity on Northeast Petroleum Product Markets*, U.S. Energy Info. Admin., 21 (2012), https://www.eia.gov /analysis/petroleum/nerefining/update/pdf/neprodmkts.pdf.

[6] Road transportation is likewise not a viable substitute for pipeline transport, given the additional $5 to $15 to ship oil by truck.  *See* Hansen, *supra*, at 3.

[7] To calculate approximately 35 percent of North Dakota crude oil production, I divide 500,000 bpd by 1,437,387 bpd (total North Dakota crude oil production in December 2019).  *See North Dakota Field Production of Crude Oil (Thousand Barrels)*, U.S. Energy Info. Admin. (release date Apr. 31, 2020), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrfpnd1&f=M (reporting 44,559,000 barrels produced in December 2019, or 1,437,387 barrels per day).  I divide 500,000 bpd by 12,804,000 bpd (the total U.S. crude oil production in December 2019) to calculate 3.9 percent of national production.  *See U.S. Field Production of Crude Oil*, U.S. Energy Info. Admin. (release date Mar. 31, 2020), https://www.eia.gov/dnav/pet/hist/LeafHandler .ashx?n=PET&s=MCRFPUS2&f=M.

3,460 and 5,400 wells.[8]

21. The resulting revenue losses would be substantial.  Oil and gas producers in the Bakken region of North Dakota earned $9.42 billion and $9.43 billion (net of state taxes, but not net of royalties) in calendar years 2018 and 2019, respectively, for oil and gas production attributable to DAPL.[9]  I estimate that oil and gas producers would lose between $2.03 billion and $3.17 billion in the remainder of CY2020 (May 1, 2020 to December 31, 2020), if DAPL ceases to operate.  I estimate revenue losses in CY2021 of $3.81 billion to $5.95 billion if DAPL does not operate in 2021. Such ranges reflect the stranding of 320,000 to 500,000 bpd as well as declines in oil prices relative to 2019 as a result of reduced demand during the global pandemic.[10]  Stated in other terms,

---

[8] North Dakota had 16,042 active wells in December 2019, with a total production of nearly 46 million barrels of oil in that month.  Thus, average production per well in December 2019 was approximately 2,867 barrels.  Shutting in 500,000 barrels per day (or 15,500,000 barrels for the month) would result in shut-in of more than 5,400 wells (15,500,000 barrels/2,867 barrels per well = 5,406 wells).  Shutting in 320,000 barrels per day (or 9,920,000 barrels for the month) would result in shut-in of around 3,460 wells (9,920,000 barrels/2,867 barrels per well = 3,460 wells). *See Oil and Gas Production Report*, N.D. State Indus. Comm'n (2020), https://www.dmr.nd.gov /oilgas/mpr/2020_01.pdf.

[9] I estimate the historical earnings to oil and gas producers in North Dakota attributable to DAPL by multiplying barrels of oil shipped on DAPL by the price of crude oil for oil and gas taxed in North Dakota.  For North Dakota crude oil prices, *see Quarterly Update Detail – Forecast to Actual Comparison*, N.D. Legislative Council (Sept. 2017), https://www.legis.nd.gov/files/fiscal /2015-17/docs/17_9041_24000.pdf.  North Dakota crude oil prices reflect the average of Flint Hills Resources prices and West Texas Intermediate prices.

[10] I estimate expected earnings in 2020 and 2021 by multiplying barrels of oil shipped on DAPL in 2019 by historical North Dakota crude oil prices that are similar to expected prices in the latter half of 2020 and 2021.  The U.S. Energy Information Administration expects West Texas Intermediate crude oil average prices to decline by 48 percent and 28 percent in 2020 and 2021, respectively, relative to the average price in 2019. *See Short-Term Energy Outlook*, U.S. Energy Info. Admin. (release date Apr. 7, 2020), https://www.eia.gov/outlooks/steo/marketreview/crude .php.  I select two historical periods in which North Dakota crude oil prices reflect similar declines relative to 2019:  August 1, 2015 to July 31, 2016 (in which the North Dakota crude oil average price was 41 percent lower than the average price in 2019) and April 1, 2016 to March 31, 2017 (in which the North Dakota crude oil average price was 28 percent lower than the average price in 2019).  For those historical North Dakota crude oil prices, see *Monthly Update Detail – Forecast to Actual Comparison*, N.D. Legislative Council (Sept. 2017), https://www.legis.nd.gov/files /fiscal/2015-17/docs/17_9044_24000.pdf.  I calculate the monthly ranges of loss to oil and gas

producers would lose an estimated $253 million to $396 million in revenue every month through 2020, and an estimated $318 million to $496 million every month in 2021.  In addition to revenue losses, producers would incur approximately $30 million more every month in unrecoverable costs to shut-in and maintain their wells.[11]

22.  Producers' revenue losses would lead to thousands of job losses.  Oil production and transport activities attributable to DAPL employed an average of 7,456 and 8,051 people in 2018 and 2019, respectively.[12]  I estimate the net effect of job loss, accounting for potential job creation due to a diversion of crude oil from DAPL to rail transport, to range from 4,520 to 7,063 jobs.[13]

---

producers by multiplying the expected quantity of barrels per day shipped on DAPL each month that could not be shipped via rail (the quantity of barrels stranded) by the price per barrel that month and the number of days in the month.  I then sum this monthly loss for the remaining months in 2020 and all twelve months of 2021 to determine the 2020 and 2021 losses to oil and gas producers.

[11] To calculate the monthly investment cost of wells drilled in 2018 attributable to DAPL,  I assume an opportunity cost of capital of 10 percent and an average Bakken well life of 45 years.  For total investment in oil and gas wells in North Dakota, see *Economic Impact of Oil and Gas Investment in North Dakota*, N.D. Dep't of Mineral Res. (2020), https://www.dmr.nd.gov/oilgas/DMR_Fact _Sheets.pdf.  I multiply total investment ($9.7 billion) by my estimate of the share of oil production attributable to DAPL in 2018 (39 percent).

[12] I draw these estimates from county-level North Dakota data.  Specifically, I use county-level counts of employment related to oil extraction and supporting activities, petroleum wholesale activities, and crude oil pipeline transport.  For employment levels, I reviewed the U.S. Census Bureau Quarterly Workforce Indicators.  *QWI Explorer*, U.S. Census Bureau, https://qwiexplorer .ces.census.gov/static/explore.html#x=0&g=0 (last visited Apr. 29, 2020).  I acquire employment levels associated with North American Industry Classification System (NAICS) codes 2111 ("Oil and Gas Extraction"), 2131 ("Support Activities for Mining"), 4272 ("Petroleum and Petroleum Products Merchant Wholesalers"), and 4861 ("Pipeline Transport of Crude Oil").  I acquire employment levels associated with oil-producing counties in the North Dakota portion of the Bakken region.  To estimate the net effect of job losses, I multiply total employment in the industry (19,337 in CY2018 and 20,163 in CY2019) by the share of Bakken oil production attributable to Dakota Access (38.7 percent in CY2018 and 39.9 percent in CY2019).  For ND oil production, see *North Dakota Field Production of Crude Oil*, U.S. Energy Admin. Info. (release date Mar. 31, 2020), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrfpnd1&f=m.

[13] I calculate the range of possible job losses per month by multiplying monthly 2019 employment by the share of North Dakota monthly oil production attributable to DAPL under scenarios in which 320,000 bpd and 500,000 bpd are left stranded.  I calculate this share of monthly oil

These ranges again reflect the stranding of 320,000 to 500,000 bpd.[14]  Many displaced workers would have nowhere to turn for employment under current economic conditions.

23. Revenue and job losses would be substantial even if adequate rail capacity were available and oil prices were high enough to allow producers to utilize rail transport in greater quantities than Mr. Rennicke estimates.  Even in that scenario, producers would face $5 to $10 in additional transport costs per barrel.  Such increased costs would undermine producers' investments and expectations, limit oil production, reduce state taxes, and ultimately harm workers and consumers.

24. Landowners would share in these losses.  Royalties on oil production are negotiated between landowners and producers and therefore no publicly available information exists on total royalty payments to landowners.  However, using the North Dakota Department of Trust Lands sample oil and gas lease royalty rate equal to one sixth of production value, I calculate that landowner royalties would have amounted to $1.52 billion in each of calendar years 2018 and 2019 (before deductions for gathering and processing costs that may be shared between producers and landowners).[15]  Those royalties would be dramatically reduced in 2020 and 2021 if DAPL is shut down.

25. The plugging of oil wells for stranded barrels also matters.  Plugging a well typically costs

---

production attributable to DAPL under each scenario by dividing monthly DAPL oil exports by total North Dakota monthly crude oil production.  I then average the expected monthly employment losses under the 320,000 and 500,000 bpd scenarios in order to get the range of expected job loss.

[14] I assume that, for a given level of crude oil transport, the quantity of jobs created is the same whether that amount of crude oil is transported by rail or by pipeline.

[15] *Oil and Gas Lease*, N.D. Dep't of Trust Lands (effective Jan. 1, 2020), https://www.land.nd .gov/sites/www/files/documents/Minerals/News/Current%20Oil%20and%20Gas%20Lease.pdf.

a producer thousands of dollars depending on the well's depth and other factors.[16]  If a well is abandoned, as happens when producers shut-in for economic reasons, it may cost as much as $150,000 to plug and reclaim.[17]  In the North Dakota budget biennium period from August 1, 2017 to July 31, 2019, North Dakota allocated $8.4 million to an "Abandoned Well Reclamation Fund."[18]  Expenditures from that fund are used to plug abandoned wells; reclaim abandoned drilling and production sites, saltwater disposal pits, drilling fluid pits and access roads; pay mineral owners royalties for confiscated oil; and reclaim oil and gas pipelines and associated facilities.[19]  Whether private costs or relegated to the state for abandoned wells, it is a material cost of plugging that would follow a shutdown of DAPL.

26. Widespread shut-ins of oil wells would also affect associated gas production.  North Dakota is a significant producer of natural gas. In 2019, producers in North Dakota produced 1,054 billion cubic feet of natural gas from wells, equivalent in energy terms to about 176 million barrels of oil.[20]  In that same year, oil production was 512 million barrels in North Dakota.[21]

---

[16]  *See* Sophie Quinton, *Why 'Orphan' Oil and Gas Wells Are a Growing Problem for States*, Pew Charitable Trusts (July 9, 2018), https://www.pewtrusts.org/en/research-and-analysis/blogs /stateline/2018/07/09/why-orphan-oil-and-gas-wells-are-a-growing-problem-for-states.

[17] Amy R. Sisk, *Regulators talk abandoned oil wells ahead of hearings next week*, Bismarck Trib. (Oct. 2, 2019), https://bismarcktribune.com/bakken/regulators-talk-abandoned-oil-wells-ahead-of-hearings-next-week/article_cd20de77-5e5d-5071-9c33-12a48f2bbcbb.html.

[18] *Oil and Gas Tax Revenues and Allocations - Forecast to Actual Quarterly Update Detail*, N.D. Legislative Council, (July 2019), https://www.legis.nd.gov/files/fiscal/2017-19/docs/19_9009_08000.pdf.

[19] N.D. Cent. Code § 38-08-04.05.

[20] *Natural Gas Gross Withdrawals and Production*, U.S. Energy Info. Admin. (release date Mar. 31, 2020), https://www.eia.gov/dnav/ng/NG_PROD_SUM_DC_SND_MMCF_A.htm   (area: North Dakota).

[21]  *Crude Oil Production*, U.S. Energy Info. Admin. (release date Apr. 3, 2020), https://www.eia .gov/dnav/pet/pet_crd_crpdn_adc_mbbl_a.htm (period unit:  Annual Thousands of Barrels).

*North Dakota Tax Revenues and Disbursements*

27. North Dakota collects revenue from two types of oil and gas taxes: a 5 percent gross oil and gas production tax and a 5 percent oil and gas extraction tax.[22]  I estimate that 40 percent of the share of North Dakota's oil and gas tax revenue was attributable to DAPL in December 2019, the latest historical period in which data are available.[23]  In CY2019, approximately $1 billion of North Dakota's total state tax revenue was attributable to DAPL.  I show DAPL's relative historical monthly contributions since 2015, in Figure 1.

**Figure 1. Monthly Oil and Gas Tax Revenue in North Dakota, 2015 to 2019**



*Sources: North Dakota Legislative Council; US Energy Information Administration.*

---

[22] With respect to the gross production tax, a tax of five percent of the gross value at the well is levied on all oil and gas produced within North Dakota.  With respect to the gross extraction tax, a tax of five percent of the gross value at the well is levied on all oil and gas extracted from wells within North Dakota.  *See* N.D. Cent. Code § 57-51-02.

[23] In December 2019, DAPL transported 39.7 percent of the oil produced in North Dakota (44.6 million barrels).  As I explain in the paragraph associated with this footnote, oil production and extraction are taxed at fixed rates of 5 percent each of the gross value of production or extraction.  Therefore, I infer reasonably that DAPL accounted for 39.7 percent of state oil and gas tax revenues in December 2019.

28. Since DAPL came online in June 2017, approximately 40 percent of North Dakota's annual oil and gas tax revenue is attributable to the pipeline.  As I show in Table 2, the amount of revenue attributable to DAPL has increased year over year since CY2017.   In CY2019, approximately $1 billion of North Dakota's total state tax revenue was attributable to DAPL.

**Table 2. North Dakota State Oil and Gas Tax Revenue, Total and Attributable to Dakota Access Pipeline, Calendar Years 2015-19**

|  | Total State Oil and Gas Tax Revenue (Billion Dollars) | State Oil and Gas Tax Revenue Attributable to DAPL (Billion Dollars) | State Oil and Gas Tax Revenue Attributable to DAPL (Percent) |
|---|---|---|---|
| 2015 | 1.80 | 0.00 | 0 |
| 2016 | 1.29 | 0.00 | 0 |
| 2017 | 1.68 | 0.36 | 21 |
| 2018 | 2.55 | 0.99 | 39 |
| 2019 | 2.50 | 1.00 | 40 |

*Sources: North Dakota Legislative Council; North Dakota Office of State Tax Commissioner; U.S. Energy Information Administration.*

29. Considering Mr. Rennicke's assessment that shutting down DAPL would lead producers to strand 320,000 to 500,000 bpd, and considering also expected economic conditions, the range of losses to the state in the remainder of CY2020 (May 1, 2020 to December 31, 2020) is $214 million to $335 million.  The range of losses to the state in CY2021 is $403 million to $630 million.

30. Barrels switching to rail will also pay fewer taxes to North Dakota, because of higher rail costs as oil producers deduct transportation costs for calculating North Dakota's oil extraction and gross production taxes.[24]  Assuming an additional $5 dollars per barrel in transport cost for barrels that switch to rail, tax receipts to North Dakota would decline by $38-58 million in the remainder

---

[24] N.D. Cent. Code §§ 57-51, 57-51.1.

of CY2020 and $55-85 million in CY2021 for those barrels not shut in.  Adding those tax losses to the shut-in losses equals $252 million to $393 million for the remainder of CY2020, and $458 million to $715 million for CY2021.

31. The significant state oil and gas tax revenue in North Dakota attributable to DAPL from 2017 through 2019 has gone to support a wide range of public services and has supported the Three Affiliated Tribes (Mandan, Hidatsa, and Arikara Nation) as well as various North Dakota political subdivision and state funds.

32. A substantial portion of the Three Affiliated Tribes' oil tax revenue can be traced to DAPL. As explained by Mr. Emery, approximately 20 percent of all oil and gas exploration and production in North Dakota occurs on the Three Affiliated Tribes' lands and the loss of DAPL as a transport option will affect their revenue as production and future development become uneconomic.  The tribes' oil tax revenue in the fiscal years 2018-19 was $474 million out of a budget total of $734 million (65 percent).[25]  For wells drilled prior to July 1, 2019, the state allocates 50 percent of tax revenue associated with production on both reservation trust and privately-owned reservation "fee" lands.  As a result of recent renegotiation, for oil wells drilled after June 30, 2019, the allocations have moved to 80 percent on reservation trust lands, and 20 percent for production or extraction on fee lands.[26]

33. With respect to oil producing counties, the state allocates to each county up to $5 million of oil production tax revenue that occurs in that county per fiscal year plus 30 percent of oil tax

[25] Approval of Amended Fiscal-Year 2018 General Fund Budget for the Three Affiliated Tribes, Res. No. 18-106-FWF (Apr. 30, 2018), https://bit.ly/3cXGZbf; Approval of Fiscal Year 2019 General Fund Budget for the Three Affiliated Tribes, Res. No. 19-012-FWF (Feb. 14, 2019), https://bit.ly/2SjEIiV.

[26] KVRR Staff, *Burgum signs oil tax-sharing bill with Three Affiliated Tribes*, KVRR Local News (Mar. 28, 2019), https://www.kvrr.com/2019/03/28/burgum-signs-oil-tax-sharing-bill-with-three-affiliated-tribes/.

revenue if such revenue exceeds $5 million.[27]  Counties allocate oil tax revenue to their county general funds, and to cities, school districts, and townships.

34. The state uses the remaining revenue for public uses specified by law.  It reports those allocation amounts for the 2017-2019 biennium, defined by the state as the 24-month period from August 1, 2017 to July 31, 2019.  Those public uses include the Strategic Investment and Improvements Fund ($780 million in oil and gas tax revenue in the 2017-2019 biennium); the Resources Trust Fund for construction of water-related projects and energy conservation ($357 million in the 2017-2019 biennium); public schools and other state education programs ($358 million in oil and gas tax revenue in the 2017-2019 biennium); funds that may be used to offset a revenue shortfall in the state government budget ($75 million in the 2017-2019 biennium); and funds that go toward repairing abandoned wells ($8.4 million in the 2017-2019 biennium).[28]

35. Figure 2 shows the allocations to the Three Affiliated Tribes ($454 million), state political subdivisions ($679 million shared between counties, cities, school districts, and townships), and state funds ($3,551 million shared between state funds) in the 2017-2019 biennium (August 1, 2017 to July 31, 2019).

---

[27]  N.D. Cent. Code § 57-51-15.

[28]  These funds are specified by law at N.D. Cent. Code § 15-08.1-08 (Strategic Investment and Improvements Fund); N.D. Const. art. X, § 22 (The Resources Trust Fund); *id.* art. IX (The Common Schools Trust Fund); *id.* art. X, § 24 (The Budget Stabilization Fund); and N.D. Cent. Code § 38-08-04.5 (Abandoned Well Reclamation Fund).  For dollar allocation amounts, see *54th Biennial Report for the biennial period of July 1, 2017 through June 30, 2019*, N.D. Office of State Tax Comm'r, 18 (year), https://www.nd.gov/tax/data/upfiles/media/54th-biennial-report.pdf?20200429175717; *Quarterly Update Detail - Forecast to Actual Comparison*, North Dakota Legislative Council (July 2019), https://www.legis.nd.gov/files/fiscal/2017-19/docs/19_9009_08000.pdf.



**Figure 2. Oil Tax Revenue Allocations, North Dakota 2017-2019 Biennium (August 1, 2017 to July 31, 2019)**

*Sources: North Dakota Legislative Council, Oil and Gas Tax Revenue and Allocations, Quarterly Update Detail – Forecast to Actual Comparison, Fiscal Years 2016-19. [1] "Strategic Investment and Improvements Fund" [2] "Common Schools Trust Fund" [3] "Foundation Aid Stabilization Fund."*

36. To summarize, there would be great harm to the producers of oil and gas in North Dakota and to the state if DAPL shuts down.  A cessation of operations of DAPL on May 1, 2020, would result in financial loss to producers of approximately $2.03 billion to $3.17 billion through to the end of CY2020, and $3.81 billion to $5.95 billion in CY2021.  The state would lose oil and gas tax revenue of approximately $252 million to $393 million in the remaining months in CY2020, and $458 million to $715 million in CY2021.  The high ends of such ranges reflect about one third of the total state oil and gas tax revenue in those periods. These losses would have broad impacts across the state, as it would be unable to distribute those tax revenues to the Three Affiliated Tribes, political subdivisions, or state public interest funds.

**Harm to the Transit States**

37. The harm to the transit states of South Dakota, Iowa and Illinois understandably does not match the scale of harm to North Dakota. Nevertheless, the regulatory commissions in those three

18

states that approved the construction of DAPL in late 2015 and early 2016 noted both the short-term and permanent tax and employment benefits of DAPL and the public-interest contributions of the pipeline to interstate commerce and state residents due to increased availability of lower-cost fuels and refined products—benefits that would be lost if DAPL's easement to cross Lake Oahe is vacated while the EIS is prepared.

38. Iowa in particular, in its expansive order approving DAPL in 2016, noted both Iowa-specific benefits (12 direct and a similar number of non-direct long-term jobs) and the broader public interest benefits associated with the interstate nature of Dakota Access, including $27 million in property taxes (which are tied to throughput revenues).[29]  South Dakota recognized that DAPL brought "jobs, both temporary and permanent" to its state.[30]  Illinois noted both the benefits for regional consumers of a more robust domestic oil industry, and recognized specific jobs that both DAPL and ETCOP, its affiliated pipeline that travels from the oil hub in Patoka to Nederland, Texas, would provide in Illinois.[31]  I understand from Mr. Emery that South Dakota, Iowa, and Illinois will receive less in tax revenue from DAPL in the amounts of approximately $17.75 million, $88.13 million, and $47,000 respectively for the years 2021-2024.

39. The benefit to Illinois as a transit state for DAPL extends to the Midwest refiners that have access to a lower cost, stable source of crude oil from DAPL than they would otherwise have. Several refineries, including the Marathon Robinson Refinery and the Phillips 66 Wood River Refinery (both in Illinois) as well as other Midwest refineries in Indiana (e.g., BP's Whiting,

---

[29] Iowa Dep't of Commerce Utils. Bd., *In re Dakota Access, LLC*, Docket No. HLP-2014-0001, Final Order and Decision at 46 (Mar. 10, 2016).

[30] S.D. Pub. Utils. Comm'n, *In re Dakota Access, LLC*, Docket No. HP 14-002, Final Decision and Order at 20 (Dec. 14, 2015).

[31] Ill. Commerce Comm'n, *Dakota Access LLC*, Docket No. 14-0754, Order at 26-28 (Dec. 16, 2015).

Indiana refinery) and Ohio (e.g. Husky's Lima, OH refinery) have access to Bakken crude oil transported by DAPL at the Patoka, Illinois oil hub.[32]  Refined-product consumers benefit from lower transport costs of crude oil used to make motor gasoline, jet fuel, heating oil, and other products.  Such refiners make investments based on reliable, lower-cost sources of crude, including DAPL, as a means to make a greater profit on the refined products they sell.  There are substantial benefits to regional refineries given the economies of scale from being located along the DAPL-ETCOP route to the major refining center of the Gulf Coast. Being situated along such a route permits those Midwest refineries to enjoy the lower unit transport cost of a much larger pipeline than that which would be needed to serve Midwest refineries alone.

**Harm to the Competitive U.S. Petroleum Industry**

40. Pipelines are by far the safest and most efficient means of overland transport for oil and gas for major volumes and/or distances. But such pipelines represent the ultimate sunk costs— they cannot be moved and tie up large amounts of capital. Only the United States has a history of strictly investor-owned pipelines serving a competitive petroleum industry. The United States' success in facilitating investment funds to promote its highly competitive petroleum sector, for more than century, is a function of the deliberate and predictable regulation of its interstate pipelines.[33]  Such regulation has been consistent with the needs of those who invest capital at every link in the industrial chain to know that pipeline access is reasonable, contracts are reliable, and that the regulation of the pipeline segment does not allow for confiscation of capital of those who

---

[32] *See Canadian and U.S. Crude Oil Pipelines and Refineries - 2019*, Canadian Ass'n of Petroleum Producers (2019), https://www.capp.ca/wp-content/uploads/2019/11/Crude-oil-pipelines-and-refineries.pdf.

[33] Indeed, the bedrock U.S. Supreme Court case regarding the protection of regulated capital from regulatory "taking"—the 1944 *Hope Natural Gas* decision—came out of the first fully-regulated rate case under the 1938 Natural Gas Act. *See* Jeff D. Makholm, *The Political Economy of Pipelines* 129-32 (Univ. of Chi. Press 2012).

provide the investment funds for the sunk costs represented by those pipelines.

41. The regulation of U.S. interstate pipelines, whether for oil or gas, has thus always recognized that pipelines physically connect to, and are operationally inseparable from, other highly capital-intensive activities in the competitive petroleum market (i.e., production facilities, refineries, local utility gas distributors) and that the links in such industrial chains must be mutually supportive, either by vertical integration or contract.  The deliberations leading to the 1906 Hepburn Amendment (regulating interstate oil pipelines) and the 1938 Natural Gas Act demonstrated Congress's appreciation for the mutual interdependency throughout these industrial chains.[34]

42. A decision to shut down DAPL, after three years of safe and reliable service, when the market still demands its services, would disrupt those longstanding expectations for deliberate and predictable federal interstate pipeline regulation.  The capital value of the mutually supportive links of the U.S. petroleum chain connected by interstate oil pipelines totals more than $1.1 trillion as of April 2020 ($134.5 billion for pipeline, $110.83 billion for petroleum production, $793.86 billion for integrated petroleum, and $67.00 billion for oilfield services).[35]  Even a small risk premium of 10 basis points (one tenth of one percent) for such capitalized values in the U.S. petroleum industry equates to $1.1 billion in annual losses.  I do not present this number as my assessment of the effect on the market's cost of capital for the industry, but rather as a realistic

---

[34] The oil pipeline story is documented authoritatively in Arthur M. Johnson, *The Development of American Petroleum Pipeline: A Study in Private Enterprise and Public Policy, 1862-1906*, (Cornell Univ. Press 1956), and the similar story for the natural gas act is detailed in M. Elizabeth Sanders, *The Regulation of Natural Gas: Policy and Politics, 1938-1978* (Temple Univ. Press 1981).

[35] Dollar amounts are from Value Line, as of 17 April 2020 for Pipeline MLPs and Petroleum (Producing) industries, and 18 April 2020 for the Petroleum (Integrated) and Oilfield Services & Equipment industries.  This information is on file with the author.

indication of the very large consequences of actions that would undermine what I described as the deliberate and predictable regulation of the U.S. interstate pipeline industry that ties the larger U.S. petroleum industry together.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: April 29, 2020

_____

Jeff D. Makholm, PhD

22

# MAKHOLM EXHIBIT 1

**JEFF D. MAKHOLM, Ph.D.**
**Managing Director**

National Economic Research Associates, Inc.
99 High Street
Boston, Massachusetts 02110
(617) 927-4540

Dr. Makholm concentrates on the issues surrounding the regulation of energy, mining and transportation industries—those that operate networks (such as oil and gas pipelines, electricity transmission and gas distribution systems, telecommunications and water utility systems) and those operating infrastructure business at specific sites, such as mines, hydrocarbon rigs, oil refineries, electricity generation plants, oil and gas storage facilities, gas treatment plants, sewage treatment plants and airports.  These issues include the broad categories of project valuation, efficient pricing, market definition and the components of reasonable regulatory practices.  Specific valuation issues in the extractive industries include the value of permits for include the right to explore and develop natural resources. Specific pricing issues include tariff design, incentive ratemaking, and the unbundling of prices and services, and analysis of energy commodities markets (including derivative markets comprising forwards, futures and swaps for commodities and liquefied natural gas--LNG).  Issues of market definition include assessments of mergers, including the identification and measurement of market power.  Issues of reasonable regulatory practices include the creation of credible and sustainable accounting rules for ratemaking as well as the establishment of administrative procedures for regulatory rulemaking and adjudication.  On such issues among others, Dr. Makholm has prepared expert testimony, reports and statements, and has appeared as an expert witness in many states, federal and U.S. district court proceedings as well as before courts, international arbitrations and regulatory bodies and Parliamentary panels abroad.

Dr. Makholm's clients in the United States include privately held oil, gas and utility corporations, public corporations and government agencies.  He has represented dozens of gas and electric distribution utilities, as well as both intrastate and interstate oil and gas pipeline companies and oil, gas and electricity producers.  Dr. Makholm has also worked with many leading law firms engaged in issues pertaining to the local and interstate regulation of energy utilities.

Internationally, Dr. Makholm has directed an extensive number of projects in the mining, utility and energy transportation businesses in 20 countries on six continents.  These projects have involved work for investor-owned and regulated business as well as for governments and the World Bank.  These projects have included advance pricing and regulatory work prior to major gas, railroad and toll highway privatizations (Poland, Argentina, Bolivia, Mexico, Chile and Australia), gas industry restructuring and/or pricing studies (Canada, China, Spain, Morocco, Mexico and the United Kingdom), utility mergers and market power analyses (New Zealand), gas development and and/or contract and financing studies (Tanzania, Egypt, Israel and Peru), regulatory studies (Chile, Argentina), and oil pipeline transport financing and regulation (Russia).  As part of this work, Dr. Makholm has prepared reports, drafted regulations and conducted training sessions for many government, industry and regulatory personnel.

Dr. Makholm has published many papers in various peer-reviewed and editor-reviewed publications (*Review of Environmental Economics and Policy, Economics of Energy & Environmental Policy, Public Utilities Fortnightly*, *Natural Gas and Electricity*, *The Electricity Journal*, *The Energy Law Journal, and Competition and Regulation in Network Industries*)—involving a wide range of subjects pertaining to his research work. He is a frequent speaker in the U.S., Europe and elsewhere at conferences and seminars addressing market, pricing and regulatory issues for the energy, commodity and transportation sectors.  His latest book, *The Political Economy of Pipelines: A Century of Comparative Institutional Development*, was published by the University of Chicago Press in 2012 and re-issued in Chinese in 2016 by Beijing's Petroleum Institute Press.

2

**EDUCATION**

> UNIVERSITY OF WISCONSIN-MADISON,
> MADISON, WISCONSIN
> Ph.D., Economics, 1986
> Dissertation:  Sources of Total Factor Productivity in the Electric Utility Industry
> M.A., Economics, 1985
>
> BROWN UNIVERSITY
> PROVIDENCE, RHODE ISLAND
> Graduate Study, 1980-1981
>
> UNIVERSITY OF WISCONSIN-MILWAUKEE
> MILWAUKEE, WISCONSIN
> M.A., Economics, 1980
> B.A., Economics, 1978

**EMPLOYMENT**

1996-present    <u>Senior Vice President/Managing Director</u>.  National Economic Research Associates, Inc., (NERA) Boston, Massachusetts.

1986-1996    <u>Vice President/Senior Consultant</u>.  National Economic Research Associates, Inc., (NERA) Boston, Massachusetts.

1987-1989    <u>Adjunct Professor</u>.  College of Business Administration, Northeastern University, Boston, Massachusetts

1984-1986    <u>Consulting Economist</u>.  National Economic Research Associates, Inc., (NERA) Madison, Wisconsin.

1983-1984    <u>Consulting Economist</u>.  Madison Consulting Group, Madison, Wisconsin.

1981-1983    <u>Staff Economist</u>.  Associated Utility Services, Inc., Moorestown, New Jersey.

3

**RECENT TESTIMONY (SINCE 2000)**

Before the Public Service Commission of the State of North Dakota, Direct Testimony on behalf of Dakota Access, LLC, November 13, 2019. Subject: Siting Application for new pumping facilities to expand capacity.

Before the Illinois Commerce Commission, Rebuttal Testimony on behalf of Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC., Docket No. 19-0673, October 22, 2019. Subject: Authority to expanding pumping capacity on Certificated Pipelines in the State of Illinois.

Before the Illinois Commerce Commission, Surrebuttal Testimony on behalf of NextEra Energy Transmission MidAtlantic, Inc., Docket No. 18-0843, June 21, 2019. Subject: Certificate of Public Convenience and Necessity for electricity transmission asset purchase.

In the United States District Court for the Eastern District of New York, Case No.: 17 CIV. 5787 (WFK) (SJB), Expert Declaration on behalf of Just Energy Group, Inc., April 30, 2019. Subject: Pricing for retail energy supply.

Before the Massachusetts Department of Public Utilities, Case No. D.P.U. 18-150 (Massachusetts Electric Company and Nantucket Electric Company), Sur-Rebuttal Testimony on behalf of Cumberland Farms, Global Partners, etc., April 30, 2019. Subject: Electric vehicle charging incentive program.

Before the Illinois Commerce Commission, Rebuttal Testimony on behalf of NextEra Energy Transmission MidAtlantic, Inc., Docket No. 18-0843, March 28, 2019. Subject: Certificate of Public Convenience and Necessity for electricity transmission asset purchase.

Before the Massachusetts Department of Public Utilities, Case No. D.P.U. 18-150 (Massachusetts Electric Company and Nantucket Electric Company), Direct Testimony on behalf of Cumberland Farms, Global Partners, etc., March 22, 2019. Subject: Electric vehicle charging incentive program.

In the United States District Court for the District of Puerto Rico, PROMESA Title III, Case No. 17 BK 3283-LTS and Case No 17 BK 4780-LTS, Expert Declaration on behalf of Movants, February 25, 2019. Subject: Value of receiver in the bankruptcy of the Puerto Rico Electric Power Authority (PREPA).

In the Matter of the Arbitration and Conciliation Act, Cap. A18 Laws of the Federation of Nigeria, 2004, Addax Petroleum Development (Nigeria) Limited**,** Claimant, vs. Chevron Nigeria Limited, Respondent, Expert Report on behalf of Chevron Nigeria Limited, February 22, 2019. Subject: Value of crude oil.

Before the Federal Energy Regulatory Commission, Comments in the Matter of the FERC Notice of Inquiry Regarding Certification of New Interstate Gas Facilities, Docket No. PL18-1-000, July 25, 2018.

Before the Ontario Energy Board, Expert Report and Direct Testimony in case EB-2017-0307 on behalf of Enbridge Gas Distribution and Union Gas Limited regarding support of the productivity offset (the *X-factor*) to be used in the price cap formula that will apply to the two distribution businesses for the upcoming deferred rebasing periods, November 23, 2017.

Before the International Court of Arbitration, Case No. 19576/CA/ASM, Drummond Coal Mining LLC (DCM), et al, Respondents/Counterclaimants, vs. Ferrocarriles del Norte de Colombia S.A.., Claimant/Counter-Respondent, Third Expert Report, 1 November 2017.  Subject: Market values of mining export losses due to imposed constraints on capacity.

**4**

**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the New York State Public Service Commission, Rebuttal Testimony on behalf of the Retail Energy Supply Association (RESA). October 27, 2017.  Subject: Provide perspective regarding the operation of retail energy markets in New York state.

Before the New York State Public Service Commission, Direct Testimony on behalf of the Retail Energy Supply Association (RESA). September 15, 2017.  Subject: Provide perspective regarding the operation of retail energy markets in New York state.

Before the International Court of Arbitration, Case No. 19576/CA/ASM, Drummond Coal Mining LLC (DCM), et al, Respondents/Counterclaimants, vs. Ferrocarriles del Norte de Colombia S.A.., Claimant/Counter-Respondent, Second Expert Report, 29 August 2017.  Subject: Response to alleged damages claimed as a result of failure to meet contractual rail shipment obligations.

Before the Michigan Public Service Commission, Direct Testimony on behalf of Constellation NewEnergy Inc., Case No U-18248. DTE Electric Company.  July 21, 2017. Subject: Economic analysis of proposed charges for electricity capacity in Michigan.

Before the Michigan Public Service Commission, Direct Testimony on behalf of Constellation NewEnergy Inc., Case No U-18239. Consumer's Energy Company. July 17, 2017. Subject: Economic analysis of proposed charges for electricity capacity in Michigan.

Before the International Court of Arbitration, Case No. 19576/CA/ASM, Drummond Coal Mining LLC (DCM), et al, Respondents/Counterclaimants, vs. Ferrocarriles del Norte de Colombia S.A.., Claimant/Counter-Respondent, Expert Report, 20 June 2017.  Subject: Market values of mining export losses due to imposed constraints on capacity.

Before the National Energy Board, Expert Report and Reply Testimony on behalf of Plains Midstream Canada ULC.  Hearing Order RH-002-2016, May 15, 2017.  Subject: Proper cost allocation for liquid fuel pipeline tariffs.

Before the National Energy Board, Expert Report and Direct Testimony on behalf of Plains Midstream Canada ULC.  Hearing Order RH-002-2016, November 2016.  Subject: Proper cost allocation for liquid fuel pipeline tariffs.

Before the Supreme Court of the State of New York, County of New York, Expert Testimony on behalf of plaintiffs in: S.A. de Obras y Servicios, Copasa and Cointer Chile, S.S. and Azvi Chile, S.A. Agencia en Chile, Plaintiffs v. The Bank of Nova Scotia and Scotiabank Capital, IAS Part 49, Index No. 651649/2013 and 651555/2012.  August 10, 2016, Subject: Value of P3 toll road enterprise in Chile.

Before the National Energy Board, Expert Testimony on behalf of FortisBC Energy Inc., Hearing Order Number GH-003-2015, March, 2016. Subject: Tolling for pipeline extensions

Before the Superior Court of the State of Delaware in and for New Castle County, Expert Report on behalf of Deere & Company, in C.A. No. N13C-07-330 MMJ CCLD. December 2, 2015. Subject: Value of Power Purchase Agreements in the wind power industry.

Before the Superior Court of the State of California for the County of Los Angeles in the Matter of GAF Materials Corporation v. Paramount Petroleum Corporation, Opinion given September 3, 2015. Case No: BC 481673. Subject: Oil price indexing to set asphalt prices.

**5**
**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the United States District Court for the Northern District of Oklahoma, Expert Report on behalf of SFF-TIR, LLC, the Stuart Family Foundation (et al), Case No. 14-CV-369-TCK-FHM, June 30, 2015. Subject: Fair value of shares in a pipeline industry services firm.

Before the International Chamber of Commerce Expert Report on behalf of STP Energy Pte Ltd. Subject: Valuation of offshore oil and gas exploration permit, April 29, 2015.

Before the Régie de l'énergie, Written Evidence on behalf of Gaz Métro. Subject: Pricing of gas distribution system expansion, January 20, 2015

Before the Supreme Court of Western Australia, Filed Statement on behalf of North West Shelf Pty Ltd, Subject: Value and interpretation of gas swaps agreement, December 24, 2014.

Before the District Court of Tarrant County, Texas, 17th Judicial District, Expert Report of Jeff D. Makholm on behalf of OAO Gazprom, et al, Subject: Valuation of failed LNG import project, November 14, 2014.

Before the National Energy Board, Expert Report and Direct Testimony on behalf of MAS (Market Area Shippers Group), Hearing Order RH-001-2014, July 2014.  Subject: Effectiveness of toll design//regime in settlement.

Before the National Energy Board, Expert Testimony on behalf of FortisBC Energy Inc., Hearing Order Number GH-001-2014, July 10, 2014. Subject: Tolling for pipeline extensions.

Before the National Energy Board, Expert Testimony on behalf of Alliance Pipeline, May 22, 2014. Subject: Restructuring services/tolls.

Before the Economic Regulation Authority of Western Australia on behalf of ATCO Gas Australia, March 2014. Subject: Cost accounting for gas pipeline regulation.

Before the 298th Judicial District Court of Dallas County, Texas, Expert Testimony on behalf of plaintiff in Energy Transfer Partners, L.P., and Energy Transfer Fuel, L.P. v. Enterprise Products Partners, L.P., Enbridge (US) Inc., and Enterprise Products Operating LLC, Cause No. 11-12667, February 2014. Subject: Assessment of causation and valuation of damages from lost crude oil pipeline opportunity.

Before the National Energy Board, Expert Testimony on behalf of Enbridge Gas Distribution Inc. and Union Gas limited, Hearing Order MH-001-2013, November 1, 2013. Subject: Tolling issues involving pipeline abandonment.

Before the National Energy Board, Expert Report and Direct Evidence on behalf of MAS (Market Area Shippers Group), Hearing Order RH-001-2013, July 26, 2013.  Subject: Contract renewal provisions.

Before the 298th Judicial District Court of Dallas County, Texas, Supplemental Report on behalf of plaintiff in Energy Transfer Partners, L.P., and Energy Transfer Fuel, L.P. v. Enterprise Products Partners, L.P., Enbridge (US) Inc., and Enterprise Products Operating LLC, Cause No. 11-12667, July 24, 2013. Subject: Causation and damages in abandoned joint oil-pipeline venture

Before the 298th Judicial District Court of Dallas County, Texas, Rebuttal Expert Report on behalf of plaintiff in Energy Transfer Partners, L.P., and Energy Transfer Fuel, L.P. v. Enterprise Products Partners, L.P., Enbridge (US) Inc., and Enterprise Products Operating LLC, Cause No. 11-12667, March 2013. Subject: Causation and damages in abandoned joint oil-pipeline venture

**6**

**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the 298th Judicial District Court of Dallas County, Texas, Direct Expert Report on behalf of plaintiff in Energy Transfer Partners, L.P., and Energy Transfer Fuel, L.P. v. Enterprise Products Partners, L.P., Enbridge (US) Inc., and Enterprise Products Operating LLC, Cause No. 11-12667, January 2013. Subject: Causation and damages in abandoned joint oil-pipeline venture

Before the Alberta Public Utility Commission, Direct Testimony on behalf of ATCO Electric and ATCO Gas, Proceeding ID #2131, December 2012. Subject: Analysis of ATCO Electric's and ATCO Gas' capital tracker proposals

Before the American Arbitration Association, Expert Report with Dr. Victor P. Goldberg, Case No. AAA No. 16 132 Y 00502 11.  December 17, 2012.  Subject: Confidential Arbitration.

Before the National Energy Board, Written Evidence on behalf of FortisBC Energy Inc., Hearing Order GH-001-2012, May 29, 2012.  Subject: Tariff treatment for pipeline extensions to new Canadian gas production regions.

Before the National Energy Board, Expert Report and Direct Testimony on behalf of Market Area Shippers Group, Hearing Order RH-003-2011, March 2012. Subject: Assessment of TransCanada's omnibus restructuring proposal and commentary on Market Area Shippers Group's alternative solution.

Before the Alberta Public Utility Commission (with Agustin J. Ros).  Reply Expert Report. Application No. 1606029, AUC Proceeding 566.  February 22, 2012.  Subject:  Update to TFP analysis and review of PBR plans for the Commission's performance-based regulation initiative.

Before the State Corporation Commission of the State of Kansas, Testimony on Behalf of Coffeyville Resources Refining & Marketing, LLC, Docket No. 12-MDAP-068-RTS.  October 25, 2011.  Subject: Reasonable ratemaking methodology.

Before the United States Federal Energy Regulatory Commission, Prepared Direct Testimony in Public Utilities Commission of Nevada and Sierra Pacific Power Company v Tuscarora Gas Transmission Company, Docket No. RP11-1823-000.  October 17, 2011.  Subject: Reasonable interstate gas pipeline tariff levels.

Before the Public Utilities Commission of Nevada, Pre-filed Rebuttal Testimony on behalf of Nevada Power Company and Sierra Pacific Power Company d/b/a NV Energy. Docket Nos. 11-03003, 11-03004 & 11-03005. August 3, 2011. Subject: Prudence of hedging practices.

Before the United States Federal Energy Regulatory Commission, Affidavit in Public Utilities Commission of Nevada and Sierra Pacific Power Company v Tuscarora Gas Transmission Company, Docket No. RP11-1823-000.  February 28, 2011.  Subject: Reasonable interstate gas pipeline tariff levels.

Before the Public Utilities Commission of Nevada, Prepared Direct on behalf of Nevada Power Company d/b/a NV Energy, 2011 Gas and Electric Deferred Energy Proceeding, Docket No. 11-03___.  February 24, 2011.  Subject: Prudence of hedging practices.

Before the Public Utilities Commission of Nevada, Prepared Direct on behalf of Sierra Pacific Power Company d/b/a NV Energy, 2011 Gas Deferred Energy Proceeding, Docket No. 11-03___.  February 24, 2011.  Subject: Prudence of gas hedging practices.

7

**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the Federal Energy Regulatory Commission and the State of Alaska Regulatory Commission, Prepared Direct Testimony on behalf of Trans Alaska Pipeline System.  Docket No. IS09-348-004, *et al.*  January 21, 2011.  Subject:  Prudence of capital rehabilitation costs.

Expert report filed before the Alberta Public Utility Commission (with Agustin J. Ros).  Application No. 1606029, AUC Proceeding 566.  December 30, 2010.  Subject:  Total factor productivity study for use in the Commission's performance-based regulation initiative.

Before the Commonwealth of Kentucky, Edmonson Circuit Court.  Opinion on behalf of plaintiff in Honeycutt vs. Atmos Energy Corporation.   Docket No. 09-CI-00198 and 10-CI-00040.  September 10, 2010.  Subject: Valuation of natural gas for royalty computations.

Before the Régie de l'Energie, Direct Testimony on behalf of Hydro-Québec TransÉnergie.  Demande R-3738-2010.  August 2, 2010.  Subject:  Economic analysis of issues related to the regulatory policies for network upgrades.

Before the Public Utilities Commission of Nevada, Pre-Filed Supplemental Direct Testimony on behalf of Nevada Power Company, Sierra Pacific Power Company d/b/a NV Energy (electric and gas departments), Docket No: 10-03003, 10-03004, 10-03005.  May 5, 2010.  Subject: Gas hedging.

Before the Arkansas Public Service Commission, Rebuttal Testimony on behalf of Entergy Arkansas, Inc., Docket No. 09-084-U.  March 24, 2010. Subject: Justification of the operation of a multi-year formula rate plan.

Before the Public Utilities Commission of Nevada, Pre-Filed Direct on behalf of Nevada Power Company, Docket No. 10-03003.  February 26, 2010.  Subject: Prudence of gas purchase costs.

Before the New York State Public Service Commission, Rebuttal Testimony on behalf of Rochester Gas and Electric Corporation, Case 09-E--07717 Case 09-G-0718 and  New York State Electric & Gas Corporation, Case 09-E-0715, Case 09-E-0716.  February 12, 2010.  Subject: Cost of equity capital.

Before the Public Utilities Commission of Nevada, Pre-Filed Direct Testimony on behalf of Sierra Pacific Power Company , Docket No. 09-09001.  December 15, 2009. Subject:  Gas hedging plan.

Before the Public Utilities Commission of Nevada, Pre-Filed Direct Testimony on behalf of Nevada Power Company , Docket No. 09-07003.  December 15, 2009. Subject:  Gas hedging plan.

Before the New York State Public Service Commission, Direct Testimony on behalf of Rochester Gas and Electric Corporation, Case 09-E--07717 Case 09-G-0718.  September 17, 2009.  Subject: Cost of capital and capital structure.

Before the New York State Public Service Commission, Direct Testimony on behalf of New York State Electric & Gas Corporation, Case 09-E-0715, Case 09-E-0716.  September 17, 2009.  Subject: Cost of capital and capital structure.

Before the Arkansas Public Service Commission, Direct Testimony on behalf of Entergy Arkansas, Inc., Docket No. 09-084-U.  September 4, 2009. Subject: Justification of the operation of a multi-year formula rate plan.

Submission before the New Zealand Commerce Commission, on behalf of Orion New Zealand Limited, July 31, 2009. Subject: Theory and practice of price cap regulation.

8

**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the Hawaii Public Utilities Commission, Testimony on behalf of Hawaiian Electric Company Inc., Docket No. 2008-0083.  July 2009.  Subject:  Energy cost adjustment clause.

Before the Public Utilities Commission of Nevada, Pre-Filed Direct Testimony on behalf of Nevada Power Company , Docket No. 09-02____.  February 27, 2009.  Subject:  Prudence of gas purchase costs.

Before the Public Utilities Commission of Nevada, Pre-Filed Direct Testimony on behalf of Sierra Pacific Power Company, Docket No. 09-02_____.  February 27, 2009.  Subject:  Prudence of gas purchase costs.

Before the Department of Public Utility Control of Connecticut, Direct Testimony on behalf of Connecticut Natural Gas Corporation.  Docket No. 08-12-06.  January 11, 2009.  Subject: Cost of capital.

Before the Department of Public Utility Control of Connecticut, Direct Testimony on behalf of Southern Connecticut Gas Corporation.  Docket No. 08-12-06.  January 11, 2009.  Subject: Cost of capital.

Before the Public Utility Commission of Texas, Rebuttal Testimony on behalf of Lone Star Transmission, LLC.  Docket No. 35665.  November 14, 2008.  Subject: Licensing of new electricity transmission projects.

Before the Public Utilities Commission of Ohio, Direct Testimony on behalf of The Dayton Power and Light Company.  Case No. 08-1094-EL-SSO.  October 10, 2008.  Subject: Cost of capital.

Before the Illinois Commerce Commission, Rebuttal Testimony on behalf of Northern Illinois Gas Company, Case No. 08-0363.  September 25, 2008.  Subject:  Cost of capital.

Before the Illinois Commerce Commission, Testimony on behalf of Northern Illinois Gas Company, Case No. 08-0363.  April 29, 2008.  Subject:  Cost of equity.

Before the Illinois Commerce Commission, Rebuttal Testimony on behalf of Shelby Coal Holdings, LLC, Christian Coal Holdings, LLC and Marion Coal Holdings, LLC.  Docket No. 07-0446.  April 7, 2008.  Subject: Pipeline certification and competition in pipeline transport market.

Before the New York State Public Service Commission, Rebuttal Testimony on behalf of Iberdrola, S.A., Energy East Corporation, RGS Energy Group, Inc., Green Acquisition Capital, Inc., New York State Electric & Gas Corporation and Rochester Gas and Electric Corporation, Case No. 07-M-0906. January 31, 2008.  Subject: Regulatory philosophy/ merger issues.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Sierra Pacific Power Company, Docket No. 07-09016.  January 14, 2008.  Subject:  Stand-alone costs and cost allocation issues.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Sierra Pacific Power Company.  Docket No. 07-09016.  January 11, 2008.  Subject: Allocation of pipeline transport costs.

Before the Illinois Commerce Commission, Testimony on behalf of Shelby Coal Holdings, LLC, Christian Coal Holdings, LLC and Marion Coal Holdings, LLC.  Docket No. 07-0446.  January 7, 2008.  Subject: Pipeline certification and competition in pipeline transport market.

**9**

**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the Federal Energy Regulatory Commission, Affidavit on behalf of Consolidated Edison Company of New York, Docket No. OA08-13-000.  January 7, 2008.  Subject: Planning and allocation of electric transmission costs.

Before the Public Utilities Commission of Nevada, Direct Testimony on behalf of Sierra Pacific Power Company, Docket No. 07-09016.  December 14, 2007. Subject:  Stand-alone costs and cost allocation issues.

Before the New Hampshire Public Service Commission, Docket No. DE 07-064, invited appearance on an expert panel to present perspectives and answer questions on policies and practices regarding retail gas and electric distribution rate "decoupling," November 7, 2007.

Before the Public Utilities Commission of Nevada, Prefiled Direct Testimony on behalf of Sierra Pacific Power Company, Docket No. 07-05019.  May 15, 2007. Subject:  Prudence of gas purchase costs.

Before the United States Bankruptcy Court, Southern District of New York, Supplemental Report on behalf of Solutia, Inc., *et al*., Debtors, Case No. 03-17949 (PCB) (Jointly Administered), April 20, 2007.  Subject: Discount rate for contract rejection damages.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Sierra Pacific Power Company, Docket No. 06-12001.  April 19, 2007. Subject:  Stand-alone costs and cost allocation issues.

Before the United States Bankruptcy Court, Southern District of New York, Supplemental Report on behalf of Solutia, Inc., et al., Debtors, Case No. 03-17949 (PCB) (Jointly Administered), March 23, 2007.  Subject: Discount rate for contract rejection damages.

Before the United States District Court, District of Kansas, Expert Report on behalf of J.P. Morgan Trust Company, *et al*. in the matter of J.P. Morgan Trust Company, *et al*. V. Mid-America Pipeline Company, *et.al*., Docket No. 05-CV-2231-CM/JPO.  March 21, 2007.  Title: "Harm to Farmland's Coffeyville Refinery Expert Report", by Jeff. D. Makholm.

Before the Public Utilities Commission of Nevada, Prefiled Direct Testimony on behalf of Nevada Power Company, Docket No. 07-01022.  January 16, 2007. Subject:  Prudence of gas purchase costs.

Before the Public Utilities Commission of the State of Hawaii, Supplemental Testimony on behalf of Hawaii Electric Light Company, Inc., Docket No. 05-0135.  December 29, 2006.  Subject: Energy cost adjustment clause.

Before the Public Utilities Commission of the State of Hawaii, Testimony on behalf of Hawaiian Electric Company, Inc., Docket No. 2006-0386.  December 22, 2006.  Subject:  Energy cost adjustment clause.

Before the Public Utilities Commission of Nevada, Pre-filed Direct Testimony on behalf of Sierra Pacific Power Company, Docket No. 06-12001.  December 1, 2006. Subject:  Stand-alone costs and cost allocation issues.

Before the State of New Jersey Board of Public Utilities, Prepared Reply Testimony on behalf of Public Service Electric & Gas, OAL Docket No. PUC1191-06 and BPU Docket No. EO05111005. November 3, 2006.  Subject:  Unregulated contract prices for telecommunication conduit rental contracts.

**10**
**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the State of New Jersey Board of Public Utilities, Rebuttal Testimony on behalf of the New Jersey American Water Company, Case No. WR06030257, October 10, 2006.  Subject:  Cost of Capital.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Sierra Pacific Power Company, Docket No. 06-05016.  October 2, 2006. Subject:  Prudence of gas purchase costs.

Before the Federal Energy Regulatory Commission, Reply Testimony on behalf of the State of Alaska, Docket No. OR05-2-001, August 11, 2006.  Subject:  Relative risk and capital structure for the Trans Alaska Pipeline System (TAPS).

 Before the Maine Public Utilities Commission, Response to the Bench Analysis on behalf of Central Maine Power Company, Docket 2005-729.  May 19, 2006.   Subject: Specification of productivity offset for price cap formula.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Sierra Pacific Power Company, Docket No. 05-12001.  May 17, 2006. Subject:  Prudence of the company's gas hedging strategy.

Before the Public Utilities Commission of Nevada, Prefiled Direct Testimony on behalf of Sierra Pacific Power Company (Gas Division, WestPac Gas), Docket No. 06-0516.   May 15, 2006. Subject:  Prudence of the company's gas hedging strategy.

Before the State of New Jersey Board of Public Utilities, Testimony on behalf of the New Jersey American Water Company, Case No. WR06030257, March 29, 2006.  Subject: Cost of Capital.

Before the Public Utilities Commission of Nevada, Direct Testimony on behalf of Nevada Power Company, Docket No.06-01016.  January 17, 2006. Subject:  Prudence of the company's gas hedging costs.

Before the New Brunswick Board of Commissioners of Public Utilities, Rebuttal Testimony on behalf of the Public Intervenor, Board Reference 2005-002.  December 30, 2005 (original filing), January 23, 2006 (updated filing).  Subject: Cost of capital.

Before the Public Utilities Commission of Nevada, Pre-Filed Direct Testimony on behalf of Sierra Pacific Power Company, Docket No.05-12001. December 1, 2005. Subject:  Prudence of the company's gas hedging costs.

Before the Public Utilities Commission of Nevada, Pre-Filed Rebuttal Testimony on behalf of Sierra Pacific Power Company, Docket No.05-9016. December 2, 2005. Subject:  Prudence of the company's energy supply plan.

Before the Public Utilities Commission of Nevada, Pre-Filed Rebuttal Testimony on behalf of Nevada Power Company, Docket No.05-9017. December 2, 2005. Subject:  Prudence of the company's energy supply plan.

Before the Public Utilities Commission of Ohio, Supplemental Testimony on behalf of The Dayton Power and Light Company.  Case No. 05-276-EL-AIR.  September 26, 2005.  Subject: Cost of capital.

Before the Illinois Commerce Commission, Surrebuttal Testimony on behalf of Northern Illinois Gas Company d/b/a Nicor Gas Company. Case No. 04-0779. May 12, 2005.  Subject: Cost of capital.

**11**

**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the United States Bankruptcy Court, Northern District of Texas, Fort Worth Division, Reply Report on behalf of Mirant Corporation, et al, Debtors.  Case No. 03-46590 (Jointly Administered). April 12, 2005. Subject: Pipeline capacity valuation.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Sierra Pacific Power Company.  Docket No 05-1028.  April 12, 2005.  Subject: Prudence of gas purchase costs.

Before the Illinois Commerce Commission, Rebuttal Testimony on behalf of Northern Illinois Gas Company d/b/a Nicor Gas Company. Case No. 04-0779. April 5, 2005.  Subject: Cost of capital.

Before the United States Bankruptcy Court, Northern District of Texas, Fort Worth Division, Report on behalf of Mirant Corporation, et al, Debtors.  Case No. 03-46590 (Jointly Administered). March 22, 2005. Subject: Pipeline capacity valuation.

Before the Public Utilities Commission of the State of Oregon, Direct Testimony and Exhibits on behalf of Portland General Electric.  Docket No.UE-88 Remand.  February 15, 2005.  Subject: The cost consequences of abandoning the regulatory compact in Oregon on prudent invested capital.

Before the Louisiana Public Service Commission, testimony on behalf of Entergy Gulf States, Ind., and Entergy Louisiana, Inc., in Re: Analysis of Competitive Implications, Consolidated Docket No. U-21453, et al, January 13, 2005. Subject: Retail electricity competition.

Before the Public Utilities Commission of Nevada, Testimony and Exhibits on behalf of Sierra Pacific Power Company.  Docket No 05-1028.  January 5, 2005.  Subject: Prudence of gas purchase costs.

Before the Public Utility commission of Oregon, Direct Testimony on behalf of Portland General Electric.  Docket No. UE-165.  November 17, 2004.  Subject:  Power supply risk related to PGE's hydroelectric generation sources.

Before the Public Utilities Commission of Nevada, Testimony on behalf of Nevada Power Company.  Docket No. 04-11028.  November 10, 2004. Subject: Examination of the prudence of gas purchase and hedging decision in the Company's 2004 deferral case.

Before the Illinois Commerce Commission, Testimony on behalf of Nicor Gas Company.  Docket No. 04-0779.  November 1, 2004.  Subject: Cost of Capital.

Rebuttal Report for an ad-hoc arbitration on behalf of CITIBANK, N.A. in their case against NEW HAMPSHIRE INSURANCE COMPANY.  Policy No. 576/ MF5113500.  October 15, 2004.  Subject: Claimants right to collect on a political risk insurance policy as a result of the expropriation of a toll-road concession's assets in Argentina.

Before the International Center for the Settlement of Investment Disputes, Testimony on behalf of Azurix Corp., in the case of Azurix Corp v. Government of Argentina in Paris, France, October 11th, 2004.  Subject:  Expropriation of a water utility concession in the province of Buenos Aires.

Before the Circuit Court of Fairfax, Virginia, Testimony on behalf of Upper Occoquan Sewage Authority  in the case against Blake Construction Co., Inc., Poole and Kent, a Joint Venture. Case No. 206595.  October 1, 2004. Subject: Valuation of capacity expansion project.

Expert Report for an ad-hoc arbitration on behalf of CITIBANK, N.A. in their case against NEW HAMPSHIRE INSURANCE COMPANY.  Policy No. 576/ MF5113500.  October 1, 2004.  Subject: Claimants right to collect on a political risk insurance policy as a result of the expropriation of a toll-road concession's assets in Argentina.

**12**

RECENT TESTIMONY (SINCE 2000 CONTINUED)

Before the London Courts of International Arbitration, Rebuttal Report on behalf of CITIBANK, N.A. AND DRESDNER BANK AG in their case against AIG EUROPE (UK) LTD. AND SOVEREIGN RISK INSURANCE.  Arbitration No. 3473.  September 17, 2004.  Subject: Claimants right to collect on a political risk insurance policy as a result of the expropriation of electric utility assets in Argentina.

Before the London Courts of International Arbitration, Expert Report on behalf of CITIBANK, N.A. AND DRESDNER BANK AG in their case against AIG EUROPE (UK) LTD. AND SOVEREIGN RISK INSURANCE.  Arbitration No. 3473.  August 6, 2004.  Subject: Claimants right to collect on a political risk insurance policy as a result of the expropriation of electric utility assets in Argentina.

Before International Center for the Settlement of Investment Disputes, Rebuttal Report on behalf of Azurix Corp., in the case of Azurix Corp v. Government of Argentina, April 15th, 2004.  Subject: Expropriation of a water utility concession in the province of Buenos Aires.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Sierra Pacific Power Company.  Case No: 03-12002. March 29, 2004.  Subject:  Rebutted argument that there was a link between the merger and the cost of electricity in the post-merger period.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Nevada Power Company.  Case No: 03-10001 and 03-10002. February 5, 2004.  Subject:  Rebutted argument that there was a link between the merger and the cost of electricity in the post-merger period.

Before the New Zealand Commerce Commission, Testimony on behalf of Orion New Zealand.  November 5, 2003.  Subject:  Productivity measures used in resetting the price path thresholds for electricity distributors in New Zealand.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Sierra Pacific Power Company.  Case No: 03-5021.  September 2, 2003.  Subject:  Structure in place for governing and overseeing hedging/risk management process at Westpac Utilities, an operating division of Sierra Pacific Power Company.

Before the State of Maine Public Utilities Commission, Rebuttal Testimony on behalf of FairPoint New England Telephone Companies.  July 11, 2003.  Subject: Cost of capital.

Before the Public Utilities Commission of Nevada, Testimony on behalf of Sierra Pacific Power Company.  Case No: 03-5021.  May 14, 2003.  Subject:  Structure in place for governing and overseeing hedging/risk management process at Westpac Utilities, an operating division of Sierra Pacific Power Company.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Sierra Pacific Power Company.  Case No:  03-1014.  May 5, 2003.  Subject: Prudence of gas procurement and hedging program.

Before the State of Maine Public Utilities Commission, Direct Testimony on behalf of FairPoint New England Telephone Companies.  April 7, 2003.  Subject: Cost of capital.

Before the Public Utilities Commission of Nevada, Rebuttal Testimony on behalf of Nevada Power Company.  Case No: 02-11021.  March 31, 2003.  Subject: Prudence of gas procurement and hedging program.

Before Federal Communications Commission, Testimony on behalf of Iowa Telecommunications Services, Inc.  Case No.  March 25, 2003.  Subject: Cost of capital.

13

RECENT TESTIMONY (SINCE 2000 CONTINUED)

Before Federal Energy Regulatory Commission, Testimony on behalf of PPL Wallingford Energy LLC.  Case No: ERO3-421-000.  January 9, 2003.  Subject: Cost of equity.

Before the State of New Hampshire Public Utilities Commission, Rebuttal Testimony on behalf of Kearsarge Telephone Company.  Case No. DT 01-221.  December 20, 2002.  Subject: Rebuttal on cost of equity.

Before the New York State Public Service Commission, Affidavit in support of Rochester Gas and Electric Corporation's Response to Staff's November 8, 2002 filing.  Case No. 02-E-0198, 02-G-0199.  November 14, 2002.   Subject: Respond to staff's filing with respect to the rate-of-return and risk impacts of various regulatory mechanisms.

Before the Public Utility Commission of Texas, Rebuttal Testimony on behalf of American Electric Power Company, Inc., Mutual energy CPL, LP, Mutual Energy WTU, LP and Centrica PLC, Centrica N.S. Holding, Inc., Centrica Holdco, Inc..  Case No. 25957.  October 28, 2002.  Subject:  Impact of the merger on competition in the retail electric market.

Before the International Center for the Settlement of Investment Disputes, Expert Testimony on behalf of Azurix Corp in the case of Azurix Corp v. Government of Argentina, October 15, 2002.  Subject: Expropriation of a water utility concession in the province of Buenos Aires.

Before the State of New York Public Service Commission, Rebuttal Testimony on behalf of Rochester Gas and Electric Corporation.  Case No. 02-E-0198, Case No. 02-G-0199.  September 30, 2002.  Subject:  Cost of capital

Before the Connecticut Department of Public Utility Control, Update and Rebuttal Testimony on behalf of The United Illuminating Company, Case No. 01-10-10, April 4, 2002.  Subject:  Cost of capital.

Before the State of New York Public Service Commission, Direct Testimony on behalf of Rochester Gas and Electric Corporation.  Case No. 02-E-0198, Case No. 02-G-0199.  February 15, 2002.  Subject:  Cost of capital.

Before the Alberta Energy and Utilities Board, Update of Evidence on behalf of UtiliCorp Networks Canada, November 30, 2001.  Subject: Testimony on the elements of the company's performance based regulation plan.

Before the Connecticut Department of Public Utility Control, Direct Testimony on behalf of The United Illuminating Company, Case No. 01-10-10, November 15, 2001.  Subject:  Cost of capital.

Before the Illinois Commerce Commission, Surrebuttal Testimony on behalf of Commonwealth Edison Company, Case No. 01-0423, October 24, 2001.  Subject:  Economic pricing for unbundled retail distribution services.

Before the Illinois Commerce Commission, Rebuttal Testimony on behalf of Commonwealth Edison Company, Case No. 01-0423, September 18, 2001.  Subject:  Economic pricing for unbundled retail distribution services.

Before the State of New York Public Service Commission, Prepared Rebuttal Testimony on behalf of New York State Electric & Gas Corporation.  Case 01-E-0359.  September 12, 2001.  Subject: Electric price protection plan

14

**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the State of Maine Public Utilities Commission, Joint Rebuttal Testimony on behalf of Community Service Telephone Company.  September 6, 2001 (with C. Zarkadas).  Subject:  Cost of equity capital.

Before the Public Service Commission of the State of Missouri, Rebuttal Testimony on behalf of Gateway Pipeline Company.  Case GM-2001-595.  August 20, 2001.  Subject:  Acquisition of Capital Stock of Utilicorp Pipeline Systems, and connection.

Before the State of New York Public Service Commission, Prepared Direct Testimony on behalf of New York State Electric & Gas Corporation.  Case 01-E-0359.  August 3, 2001.  Subject:  Electric price protection plan.

Before the Federal Energy Regulatory Commission, Prepared Answering Testimony on behalf of the Association of Oil Pipe Lines. Case No: OR96-2-000.  June 21. 2001.  Subject:  Light-handed regulation of oil pipeline tariffs.

Before the Illinois Commerce Commission, Direct Testimony on behalf of Commonwealth Edison Company, Case No. 01-0423, June 1, 2001.  Subject:  Economic pricing for unbundled retail distribution services.

Before the Federal Energy Regulatory Commission, Affidavit on behalf of Florida Power & Light Co.  May 31, 2001.  Subject:  Pricing of transmission services.

Before the Public Utility Commission of the State of Oregon, Rebuttal Testimony on behalf of Portland General Electric Company.  May 21, 2001.  Subject:  Cost of capital.

Before the State of Maine Public Utilities Commission, Direct Testimony on behalf of Community Service Telephone Company.  April 4, 2001 (with C. Zarkadas).  Subject:  Cost of equity capital.

Before the State of New Jersey Board of Public Utilities, Cross-Answering Testimony on behalf of Public Service Electric and Gas Company, Case No. GM00080564, March 26, 2001.  Subject:  Forecasting the net market value for natural gas transportation and storage contracts.

Before the Indiana Utility Regulatory Commission, Testimony on behalf of Tipton Telephone Company, Inc, February 23, 2001 (with C. Zarkadas).  Subject:  Cost of capital.

Before the Supreme Court of Victoria at Melbourne, in the matter of an appeal brought by TXU Electricity Limited of the Final Determination of the Office of the Regulator General of the 2001 to 2005 tariffs for the Victorian electricity distributors.  Testimony on behalf the Office of the Regulator General, February 11, 2001.  Subject:  The distinctions between price cap and rate of return regulatory practices.

Before the Australian Competition Tribunal.  Statement on behalf of the National Competition Council regarding the application under section 38(1) of the Gas Pipelines Access Law for review of the decision by the Minister for Industry, Science and Resources to Cover (i.e., regulate) the Eastern Gas Pipeline pursuant to the provisions of the National Third Party Access Code for Natural Gas Pipeline Systems and the Gas Pipelines Access Law, January 19, 2001.  Subject:  Evaluation of the criteria for regulating an interstate gas pipeline.

**15**
**RECENT TESTIMONY (SINCE 2000 CONTINUED)**

Before the Public Utility Commission of Texas.  Rebuttal Testimony on behalf of American Electric Power Texas Companies (Central Power & Light Company, Southwest Electric Power Company, West Texas Utilities Company), Entergy Gulf States, Inc., Reliant Energy HL&P, Southwestern Public Service Company, Texas-New Mexico Power Company, and TXU Electric Company.  October 27, 2000.  Subject:  Capital structure and allowed return on equity.

Before the Federal Energy Regulatory Commission, "Assessment of PJM Owner's Transmission Enhancement Package," prepared in support of the PJM (Pennsylvania, New Jersey, Maryland) electricity transmission owners as part of their Order No. 2000 compliance filing.  Docket No. RT01-2, October 11, 2000.  Subject:  Analysis of incentive package for transmission efficiency.

Before the Appeal Panel under Section 38(2) of the Office of the Regulator-General Act 1994, Victoria, Australia.  In the matter of an appeal pursuant to s.37 of the Act brought by United Energy Ltd., Testimony on behalf of the Office of the Regulator General, October 10, 2000.  Subject:  The distinctions between price cap and traditional cost-based regulatory practices.

Before the Alberta Energy and Utilities Board, Evidence on behalf of UtiliCorp Networks Canada, September 1, 2000.  Subject: Testimony on the elements of the company's performance based regulation plan.

Before the Illinois Commerce Commission, Rebuttal Testimony on behalf of Commonwealth Edison Company, Case No. 00-0361, August 2000.  Subject: Treatment of nuclear decommissioning costs.

Before the State of Maine Public Utilities Commission, Surrebuttal Testimony on behalf of Central Maine Power Company, Case No. 99-666, August 10, 2000.  Subject:  Empirical analysis and productivity offset for price cap formula.

Before the State of New Jersey Board of Public Utilities, Testimony on behalf of Public Service Electric and Gas Company, Case No. GM00080564, July 26, 2000.  Subject:  Forecasting the net market value for natural gas transportation and storage contracts.

Before the State of Maine Public Utilities Commission, Rebuttal Testimony on behalf of Central Maine Power Company, Case No. 99-666, June 22, 2000.  Subject:  Empirical analysis and productivity offset for price cap formula.

Before the Illinois Commerce Commission, Surrebuttal Testimony on behalf of Commonwealth Edison Company, Case No. 99-0013, Phase III, June 12, 2000.  Subject: Investigation Concerning the Unbundling of delivery Services under Section 16-108 of the Public Utilities Act.

Before the Illinois Commerce Commission, Rebuttal Testimony on behalf of Commonwealth Edison Company, Case No. 99-0013, Phase III, June 5, 2000.  Subject: Investigation Concerning the Unbundling of delivery Services under Section 16-108 of the Public Utilities Act.

16

**PUBLICATIONS**

"Pursuing Grid Modernization: With a 'New Regulatory Paradigm?'" *Natural Gas and Electricity*, Vol. 36, No. 7 (forthcoming 2020)

"Prudence: Under Strain in California," *Natural Gas and Electricity*, Vol. 36, No. 5 (December 2019), pp. 29-32.

"Why Publitize? Part II: When Public Ownership Gained Ground in the Us Electricity Industry," *Natural Gas and Electricity*, Vol. 36, No. 3 (October 2019), pp. 19-25.

"Why Publitize? Prospects for Undoing Investor-Ownership of Electric Utilities," *Natural Gas and Electricity*, Vol. 35, No. 10 (May 2019), pp. 19-25.

"Polar Vortexes in New England: Missing Money, Missing Markets, or Missing Regulation?" *Economics of Energy and Environmental Policy*, Vol. 8, No. 1 (March 2019) with L. T. W. Olive.

"Gas Industry's Version of Demand Response Cures its "Duck Curve," *Natural Gas and Electricity*, Vol. 35, No. 7 (February 2019), pp. 28-32.

Letter to the Editor on Abada, et al.: "What Models Tell us about Long-term Contracts in Times of the Energy Transition," *Economics of Energy & Environmental Policy*, Vol. 8, No. 1., 2019.

"Gas Wars in Ukraine Illustrate Europe's Vulnerability to Russian Energy Dominance," *Transnational Dispute Management*, Vol. 15, issue 7 (December 2018), with J.E. Sullivan and D. Kamensky, (also appearing in *Oil, Gas & Energy Law Intelligence*, Vol. 16, issue 5, December 2018).

After NAFTA: New Risks to North American Gas Trade?" *Natural Gas and Electricity*, Vol. 35, No. 5 (December 2018), pp. 23-27.

"The rise and decline of the *X factor* in performance-based electricity regulation," *The Electricity Journal*, Vo1. 31, Issue 9 (November 2018), pp. 38-43.

"Natural Gas and Greenhouse Gases—What's the Connection?" *Natural Gas and Electricity*, Vol. 35, No. 3 (October 2018), pp. 28.

"The New 'Three Ds" in Regulation—Decarbonization, Decentralization and Digitization," *Natural Gas and Electricity*, Vol. 35, No. 2 (September 2018), pp. 18-22.

"Incentive Regulation 3.0 for Electric Utilities," *Natural Gas and Electricity*, Vol. 34, No. 11 (June 2018), pp. 25-29.

"The Discounted Cash Flow Method of Valuing Damages in Arbitration," in Legum, B. (ed.) *Investment Treaty Arbitration Review, Third Edition*, The Law Reviews, London (2018), pp. 239-247.

"Incentive Regulation 3.0 for Electric Utilities," *Natural Gas and Electricity*, Vol. 34, No. 10 (May 2018), pp. 25-29.

"The Seemingly Futile Search for the "Missing Money," *Natural Gas and Electricity*, Vol. 34, No. 10, (May 2018), pp. 24-29.

"Certification of US Gas Pipelines: Assault on a Modern Miracle"? *Natural Gas and Electricity*, (February 2018), Vol. 34, No. 7, pp. 25-29.

"Electricity Regulation Under Siege II: Temptation of the Kleptocrats", *Natural Gas and Electricity*, Vol. 34, No. 5 (December 2017), pp. 29-32.

**PUBLICATIONS (CONTINUED)**

"Where to Regulate Electricity? Energy Secretary Rick Perry's Proposed Rulemaking", ABA *Environmental & Energy Litigation*, Fall 2017, Volume 2, No. 1. November 17, 2017.

"Regulating Utility Efficiency, "Fast and Slow"; The Current Australian Problem," *Natural Gas and Electricity*, Vol. 34, No. 3 (October 2017), pp.28-32.

"Electricity Regulation Under Siege", *Natural Gas and Electricity*, Vol 34, No. 1 (August 2017), pp. 28-32.

"The Mysterious Cost of Capital for Energy Utilities," *Natural Gas and Electricity*, Volume 33, No. 11 (June 2017), pp. 28-32.

"Climate Change, "Grid Neutrality," and Electricity Distributors," *Natural Gas and Electricity*, Volume 33, No. 9 (April 2017), pp. 28-32.

"The Interaction of Pipelines and Geography in Support of Fuel Markets," in Warf, B.L., (Ed.) *The Handbook on Geographies of Technology*, Edward Elgar, Cheltenham, UK (2017), pp. 347-361.

"Brexit and Divestiture Provides New Hope for "British" Gas," *Natural Gas and Electricity*, Volume 33, Number 7, (February 2017), pp. 28-32.

"When Worlds Collide:  Universal Challenges in Natural Gas and Electricity Markets," *Natural Gas and Electricity*, Volume 33, Number 5, December 2016.

 "The REVolution Yields to a More Familiar Path: New York's Reforming the Energy Vision (REV)," *The Electricity Journal* (November 2016). pp. 48-55.

 "The Politics of US Oil Pipelines: The First Born Struggles to Learn from the Clever Younger Sibling," *Energy Law Journal*, November 11, 2016, (with Laura T.W. Olive). pp. 409-427.

"Will LNG Rescue World Gas Market? Maybe a Little," *Natural Gas and Electricity*, Volume 33, Number 3, October 2016.

"Distributed Energy and Low Carbon vs. Consumers, Regulators and Tin Men," *Natural Gas and Electricity,* Volume 33, Number 1, August 2016.

Section Editor (Midstream Sector), *Current Sustainable and Renewable Energy Reports*, Springer (ISSN: 2196-3010), 2016.

"There is But One True Hub, and His Name is Henry," *Natural Gas and Electricity*, Volume 32, Number 11 (June 2016). pp. 27-30.

"El Nino's Uneven Disruption of World's Electricity Systems," *Natural Gas and Electricity*, Volume 32, Issue 9 (April 2016), pp. 29–32.

"Choose your path: the future for Australia's gas market," *The Australian Pipeliner*, April 2016.

"Why Does Most Shale Gas Worldwide Remain in the Ground?" *Natural Gas and Electricity*, Volume 32, Issue 7 (February 2016), pp. 29–32.

"Utility Regulation Principles Vary Widely Country to Country," *Natural Gas and Electricity*, Volume 32, Issue 5 (December 2015), pp. 31–32

PUBLICATIONS (CONTINUED)

"'Entry/Exit' Pipeline Pricing in Gas "Islands" Enables EU to Resist Competition," *Natural Gas and Electricity*, Volume 32, Issue 3 (October 2015), pp. 27–29

"Regulation of Natural Gas in the United States, Canada, and Europe: Prospects for a Low Carbon Fuel," *Review of Environmental Economics and Policy*, Vol. 9, Issue 1 (Winter 2015), pp. 107-127.

"Congress Can Stop the Boom in Oil Tank Cars," The London School of Economics daily weblog on American Politics and Policy, 30 March 2015.

"If Europe wants to embrace natural gas as a bridge to a low-carbon future, it should draw from America's success," The London School of Economics daily weblog on European Politics and Policy, 21 March 2015.

"Ensuring Natural Gas Availability," paper included in MIT Energy Initiative 2013 MITEI Symposium Publication: *Growing Concerns, Possible Solutions: The Interdependency of Natural Gas and Electricity Systems*, April 16, 2013.

"Marginal Costs with ~~Wings~~ a Ball and Chain: Pipelines and Institutional Foundations for the U.S. Gas Market," *Economics of Energy and Environmental Policy*, Vol. 1, No. 2 (September 2012), pp. 15-24.

"North American Performance-Based Regulation for the 21st Century," *The Electricity Journal*, May 2012, Vol. 25, Issue 4, (with Agustin J. Ros and Stephen C.W. Collins).

*The Political Economy of Pipelines: A Century of Comparative Institutional Development*, The University of Chicago Press, Chicago and London (2012). Chinese-language edition published by the Petroleum Industry Press, Beijing (2016).

"Real Unbundlings: The Foundation for a Competitive Gas Market in the United States," *Competition and Regulation in Network Industries*, Vol. 12, No.4 (2011).

"Zone of Reasonableness: Coping with Rising Profitability a Decade after Restructuring," *Public Utilities Fortnightly*, 1 July 2011 (with K. Strunk).

"Fueling the Price of Power (and Gas): The Rising Profitability of Pipelines and the Need for Collective Action," *The Electricity Journal,* June 2011, Vol. 24 Issue No.5. pp. 7-13 (with W. Olson).

"Seeking Competition and Supply Security in Natural Gas: the US Experience and the European Challenge," in Lévêque, F., Glachant, J-M., Barquín, J., von Hirschhausen, C., Holz, F., and Nuttal, W.J., (eds.), *Security of Energy Supply in Europe*, Edward Elgar, Cheltenham, UK (2010), pp. 21-55.

"Decoupling" for Energy Distributors: Changing 19th Century Tariff Structures to Address 21st Century Energy Markets," *Energy Law Journal*, Vol. 29, No.1 (2008), pp.157-172.

"Electricity Transmission Cost Allocation: A Throwback to an Earlier Era in Gas Transmission," *The Electricity Journal*, Vol. 20, Issue 10 (December 2007), pp. 13-25

"Elusive Efficiency and the X-Factor in Incentive Regulation:  The Törnqvist v. DEA/Malquist Dispute," in Voll, S.P., and King, M.K. (Eds.), *The Line in the Sand: The Shifting Boundaries Between Markets and Regulation in Network Industries*, National Economic Research Associates, White Plains, New York (2007), pp. 95-115.

"Theoretische Rechtfertigung des X-Faktors" ("Theoretical Justification for X-Factors"), *Energiewirtschaftliche Tagesfragen*, Vol. 47, No. 3 (March 2007), pp. 50-52.

PUBLICATIONS (CONTINUED)

"Ex Ante or Ex Post? Risk, Hedging and Prudence in the Restructured Power Business," with Meehan, E.T., and Sullivan, J.E., *The Electricity Journal*, Vol. 19, No 3 (April 2006), pp. 11-29.

"The Thaw: The End of the Ice Age for American Utility Rate Cases," with Parmesano, H., *The Electricity Journal*, Vol. 17, No. 4 (July 2004), pp.69-74.

"In Defense of the 'Gold Standard," *Public Utilities Fortnightly*, Vol. 141, No. 10 (May 2003), pp. 12-18.

"Incentive Regulation Meets Electricity Transmission on a Grand Scale: FERC Order No. 2000 and PBR," *The Electricity Journal*, Vol. 13, No. 2 (May 2000), pp.57-64.

"ISO's Not the Answer for Gas," *Natural Gas*, Vol. 14, No. 5 (December 1997), pp. 1-6.

*Utility Regulation 1997: Economic Regulation of Utilities and Network Industries Worldwide* (Chapter on United States), Center for the Study of Regulated Industries, (ISBN 1-901597-00-8) 1997.

"X Marks the Spot: How to Calculate Price Caps for the Distribution Function," *Public Utilities Fortnightly*, Vol. 135, No. 22 (December 1997), p. 52.

"FERC Takes the Wrong Path in Pricing Policy," *Natural Gas*, Vol. 12, No. 3 (September 1995), pp. 7-11.

*The Distribution and Pricing of Sichuan Natural Gas*, Chonxing University Press, Chonxing, China (ISBN 7-5624 -1006-2/F 94), 1995.

"Secondary Market Can Compete," *Natural Gas*, Vol. 11, No. 3 (October 1994), pp. 13-17.

"Gas Pipeline Capacity: Who Owns It?  Who Profits?  How Much?" *Public Utilities Fortnightly*, Vol. 132, No. 18 (October 1994), pp. 17-20.

"Calculating Fairness," with Sander, D.O., *Public Utilities Fortnightly*, Vol. 131, No. 21 (November 1993), pp. 25-29.

"The Risk Sharing Strawman," *Public Utilities Fortnightly*, Vol. 122, No. 1 (July 1988), pp. 24-29.

"The FERC Discounted Cash Flow: A Compromise in the Wrong Direction," with C. J. Cicchetti, *Public Utilities Fortnightly*, Vol. 120, No.1 (July 1987), pp. 11-15.

**UNPUBLISHED WORKING PAPERS**

"Institutions, to Property Rights, to High-Technology Gas Markets", Presented to the Property and Environment Research Center (PERC) Workshop: Innovation, Property Rights and the Structure of Energy. August 10-13, 2017. Bozeman, Montana.

"The Political Economy of "P3" Public-Private Partnerships: Chilean Lessons for Rebuilding US Infrastructure," NERA publication, March 25, 2017.

"A Square Regulatory Peg in a Round Industry Hole: Europe's Gas Industry Problems," NERA publication, 11 January 2017.

"2011 Speech Revisited—Whither the "Fourth Gas Package" for the EU: Dealing with Paralysis in Europe's Gas Industry," NERA publication, 8 December 2016.

"A Half-Century of Computing the Cost of Capital for Utilities at NERA," NERA publication, November 9, 2015.

"Pipeline Capacity Rights to Support a Competitive Gas Market: Theory and Applications", with Nina Hitchins, NERA publication, September 26, 2015.

"A Petroleum Tanker of a Different Color: Obstacles to an LNG-based Global Gas Spot Market," with Laura T.W. Olive, NERA Publication, August 18, 2015.

"Seeking Competition and Supply Security in Natural Gas: The US Experience and European Challenge," Prepared for the 1st CESSA Conference, Berlin University of Technology, Berlin, Germany, May 31, 2007.

"The Theory of Relationship Specific Investments, Long-Term Contracts and Gas Pipeline Development in the United States," paper given at the Conference on Energy Economics and Technology at the Dresden University of Technology, Dresden, Germany, April 21, 2006.

"Benchmarking, Rate Cases and Regulatory Commitment," paper given at the Australian Competition & Consumer Commission's Incentive Regulation and Overseas Developments Conference, Sydney, Australia, November 14, 1999

"Price Cap Plans for Electricity Distribution Companies Using TFP Analysis," with Quinn, M.J., NERA Working Paper, July 23, 1997.

"Rocks on the Road to Effective Regulation: The Necessary Elements of Sound Energy Regulation," paper presented at the Brazil-U.S. Aspen Global Forum, December 5, 1996.

"Profit Sharing and "Sliding Scale" Regimes," NERA Working Paper, Quinn, M.J., and Augustine, C., February 29, 1996.

"Four Common Errors in Applying the DCF Model in Utility Rate Cases," with Sander, D.O., NERA Working Paper, February 1992.

"Pareto Optimality through Non-Collusive Bilateral Monopoly with Cost-Of-Service Regulation," with Cicchetti, C.J., *Energy and Environmental Policy Center*, Harvard University, Working Paper, April 1988.

21

**RECENT SPEECHES**

"Discounted Cash Flow (DCF) Method of Valuing Damages in Arbitration," Harvard International Arbitration Law Student's Association, Harvard University, March 26, 2019 (with Laura T.W. Olive).

"Pipeline Wars: The Battles Over Gas Infrastructure Development," NYU School of Law, Frank J. Guarini Center on Environmental, Energy, and Land Use Law, New York, Feb. 6, 2019.

Panel Moderator, 33rd Annual IPPNY Fall Conference, A New Energy Standard: Adapting to An Evolving Market & Grid, Panel Discussion - REV: An Outlook, September 14, 2018, Saratoga Springs, NY.

"An Economist's View of Where and Why such IA Disputes Arise," Presented at the 5th International Arbitration Conference. November 21, 2017. Perth, Australia.

"Institutions, to Property Rights, to High-Technology Gas Markets", Presented to the Property and Environment Research Center (PERC) Workshop: Innovation, Property Rights and the Structure of Energy. August 10-13, 2017. Bozeman, Montana.

"The New Market Conditions in Latin America's Energy Space," Latin Lawyer 8th Annual Oil and Gas Conference, Mexico City, 18 May 2017.

"The Uncertain Connection between Unbundled Electricity Distributors and Interstate Pipeline Capacity," Law Seminars International Energy in the Northeast Seminar, with Laura T.W. Olive, PhD. Boston, MA, September 23, 2016

"The Difficult Economics of a Worldwide LNG Commodity Market," International Bar Association Annual Conference, Oil and Gas Law Committee Section. Washington DC, September 22, 2016

"How to Make LNG Accessible to All of Europe?" CEER Workshop. Athens, Greece, September 12, 2016.

"Gas Markets, Gas Use and Europe's Gas Supply from the East," Eurasian Natural Gas Infrastructure Conference, Istanbul, Turkey, June 9, 2015

"International Perspective on Pathways for Gas Market Reform in Australia," Australian Domestic Gas Outlook, 2016, Sydney, Australia, March 8, 2016.

"What does a Gas Market Need?" Australian Domestic Gas Outlook 2016 In-Depth Learning Session B. Sydney, Australia, March 7, 2016.

"Gas as the Low-Carbon Bridge Fuel? Not without a Lot of Trouble," International Bar Association, Vienna, Austria, October 8, 2015.

"Gas Market Centers and Balancing in the US: Facilitating the Competitive Entry and Trade in Gas," FSR Specialized Training on the Regulation of Gas Markets, Florence, Italy, March 27, 2015.

"Gas Market in the US: Are there some lessons for Europe?" Gas Infrastructure Europe (GIE) Annual Conference 2014, Berlin, Germany, June 13, 2014.

"Ensuring Natural Gas Availability," MIT Energy Initiative, 2013 MITEI Symposium, Cambridge, Massachusetts, April 16, 2013.

"Regulating Access to Gas in North America," Florence School of Regulation, FSR Specialized Training, Florence, Italy, March 13, 2013.

RECENT SPEECHES (CONTINUED)

"The Role of Regulation and the Challenges Going Forward," Speech given at the 10th Annual Tufts Energy Conference, Panel 3: The Natural Gas Boom. Medford, Massachusetts, February 21, 2015.

"Natural Gas in the Transformation Process in Europe," German Institution for Economic Research (DIW Berlin), Schumpeter Hall, Berlin, Germany. May 15, 2012.

"The Trouble with Europe: Infrastructure, Institutions and Investment," Keynote Speech at EPRG Winter Seminar 809. Cambridge, U.K., December 5, 2011.

"Regulating Gas TSO's in Europe: Where are all the Pipelines?" Oil and Gas Pipes Global Conference. London, U.K., November 29, 2011.

"Security of Supply in Europe," Florence School of Regulation, State of the EU Conference at the European University Institute. Florence, Italy, May 10, 2012.

"Regulating Gas Pipelines: United States and Europe," Florence School of Regulation, FSR Summer Course Advanced Training on Gas Markets. Florence, Italy, March 23, 2011.

"Foundation for Regulating Pipelines, United States and Europe: Two Different Regulatory Worlds," Florence School of Regulation Summer Course on Regulation of Energy Utilities. Florence, Italy, June 30, 2010.

"Governance and the Electricity Sector," Governance and Regulation in the Electricity Sector Conference. Toronto, Ontario, June 4, 2010.

"Public Utility Companies and Regulatory Risk," Saul Ewing's 4th Annual Public Utility Symposium. Philadelphia, PA, May 24, 2010.

"It's All About Inland Transportation," US Gas Pipelines Reflect What's Happening in Europe," Florence School of Regulation Specialized Training on Regulation of Gas Markets. Florence, Italy, March 24, 2010.

"Windmills and Wires: FERC Rate Cases, Transmission Cost Allocation, and Renewable Power Development," Law Seminars International Sixth Annual National Conference on Today's Utility, Las Vegas, Nevada, February 11, 2010.

"The East-West Energy Corridor and Europe's Energy Security," The Brookings Institution conference on Turkey, Russian and Regional Energy Strategies, Washington D.C., July 15, 2009.

"Understanding U.S. Gas Pipelines," Florence School of Regulation, FSR Summer School on Regulation of Energy Utilities. Florence, Italy, June 24, 2009.

"Vertical Relations in Energy Markets: On the Role of Contracts and Other Legal Entitlements in the U.S. Gas Transport Market", Vienna University of Economics and Business, Workshop 2009. Vienna, Austria, May 29, 2009.

"Institutional, Transactional and Political Barriers to Competitive Gas Market in Europe: Europe's Pipelines and Economics," Florence School of Regulation Workshop: Tariffs for European Gas Transmission Networks. Florence, Italy, March 6, 2009.

"Cost recovery mechanisms: Options and where each works best; what approach is most likely to get necessary projects built," Law Seminars International, Utility Rate Case: Issues and Strategies 2009. Las Vegas, Nevada, February 5, 2009.

**RECENT SPEECHES (CONTINUED)**

"Alaska as a Gas Supplier: Where is the North Slope Gas Going, and How?" Law Seminars International, Energy in Alaska conference.  Anchorage, Alaska, December 8-9, 2008.

"Maintaining Adequate Infrastructure in the Natural Gas and Electric Industries," Increasing Longer-Term Stability in Energy Markets conference sponsored by the Institute for Regulatory Policy Studies.  Springfield, Illinois, May 1, 2008.

"Rate Decoupling and Associated Rate and Cost Issues," New Hampshire Public Utilities Commission, Concord, New Hampshire, November 6, 2007.

"Electricity Transmission Cost Allocation in New England:  A Throwback to an Earlier Era in Gas Transmission," Law Seminars International, Energy in the Northeast conference, Boston, Massachusetts, October 18-19, 2007.

"Rate Decoupling and Associated Rate and Cost Issues,"  American Gas Association (AGA) Legal Forum.  Vail, Colorado, July 15- 17, 2007.

"Seeking Competition and Supply Security in Natural Gas: The US Experience and European Challenge," 1st CESSA Conference, Berlin, Germany, May 31-June 1, 2007.

"Toward a Regulatory Equilibrium in Gas Hedging,"  Electric Utility Consultants' Conference: Utility Hedging in an Era of Natural Gas Price Volatility, Arlington, Virginia, October 4, 2006.

"The Theory of Relationship Specific Investments: Long-Term Contracts and Gas Pipeline Development in the United States." Dresden University of Technology Workshop on Energy Economics and Technology, April 21, 2006.

"A Gas Network to Meet the Needs of New Electricity Generators," Ontario Energy Association, Ontario, Canada, June 23, 2005.

"Forks in the Road for Electricity Transmission," Electricity Industry Regulation and Restructuring conference by The Salt River Project and The Arizona Republic, October 11, 2002.

"Role of Yardsticks in Cost & Service Quality Regulation," London Regulated Industries Group, November 30, 2000.

"Natural Gas Issues:  Retail Competition, LDC Gas Rate Unbundling, and Performance Based Rates," Wisconsin Public Utility Institute, November 17, 2000.

"Performance Based Ratemaking (PBR) in Restructured Markets," Edison Electric Institute Seminar in San Antonio Texas, April 27, 2000.

"Benchmarking versus Rate Cases and the Half Live of Regulatory Commitment," Australian Competition & Consumer Commission's Incentive Regulation and Overseas Development Conference, Sydney, Australia, November 19, 1999.

"Benchmarking, Rate Cases and Regulatory Commitment," Australian Competition & Consumer Commission's Incentive Regulation and Overseas Developments Conference, Sydney, Australia, November 14, 1999.

"Gas and Electricity Sector Convergence: Economic Policy Implications," Energy Week '99, "The Global Shakeout," The World Bank, Washington D.C., April 6-8, 1999.

"Gas and Electricity Sector Convergence: Economic Policy Implications," Economic Development Institute, The World Bank, Washington D.C., December 8-9, 1998.

**RECENT SPEECHES (CONTINUED)**

"Sustainable Regulation for Russian Oil Pipelines," Presentation at Pipeline Transportation:  A Linkage Between Petroleum Production and Consumers, Moscow, June 25, 1997.

"Rocks on the Road to Effective Regulation," Brazil/US Aspen Global Forum, Aspen, Colorado, December 5-8, 1996.

"Stranded Cost Case Studies in the Gas Industry:  Promoting Competition Quickly," MCLE Seminar: Retail Utility Deregulation, Boston, MA, June 17, 1996.

"Why Regulate Anyway? The Tough Search for Business-As-Usual Regulation,"—Panelist at St. Louis 1996, The Fifth Annual DOE-NARUC Natural Gas Conference, St. Louis, Missouri, April 30, 1996.

"Antitrust for Utilities:  Treating Them Just Like Everyone Else"—Panelist at  St. Louis 1996, The Fifth Annual DOE-NARUC Natural Gas Conference, St. Louis, Missouri, April 29, 1996.

"Natural Gas Pricing: The First Step in Transforming Natural Gas Industries"—One-Day Interactive Workshop on Pricing Strategy at The Future of Natural Gas in the Mediterranean Conference, Milan, Italy, March 27, 1996.

"Open Access in Gas Transmission," New England Chapter of the International Association for Energy Economics, Boston, Massachusetts, December 13, 1995.

"Light-Handed Regulation for Interstate Gas Pipelines," Twenty-Seventh Annual Institute of Public Utilities Conference, Williamsburg, Virginia, December 12, 1995.

"Ending Cost of Service Ratemaking," Electric Industry Restructuring Roundtable, Boston, Massachusetts, October 2, 1995.

"Promoting Markets for Transmission:  Economic Engineering or Genuine Competition?" The Forty-Ninth Annual Meeting of the Federal Energy Bar Association, Inc., May 17, 1995.

"End-Use Competition Between Gas and Electricity: Problems of Considering Gas and Electric Regulatory Reform Separately," ORLANDO '95, The Fourth Annual DOE-NARUC Natural Gas Conference, Orlando, Florida, February 14, 1995.

"Incremental Pricing: Not a Quantum Leap," Natural Gas Ratemaking Strategies Conference, Houston, Texas, February 3, 1995.

"The Feasibility of Competition in the Interstate Pipeline Market," Institute of Public Utilities Twenty-Sixth Annual Conference, Williamsburg, Virginia, December 13, 1994.

"A Mirror on the Evolution of the Gas Industry:  The Views from Within the Business and from Abroad," 1994 LDC Meeting-ANR Pipeline Company, October 4, 1994.

"Creating New Markets Out of Old Utility Services," Fifteenth Annual NERA Santa Fe Antitrust and Trade Regulation Seminar, Santa Fe, New Mexico, July 9, 1994.

"Sources of and Prospects for Privatization in Developed and Underdeveloped Economies," Spring Conference of the International Political Economy Concentration and the National Center for International Studies at Columbia University, New York, March 30, 1994.

25

**RECENT SPEECHES (CONTINUED)**

"Experiencias en el Desarrollo del Mercado de Gas Natural (Experiences in gas market development)," "Perspectivas y Desarrollo de Mercado de Gas Natural," Centro de Extensión de la Pontificia Universidad Católica de Chile, November 16, 1993.

"The Role of Rate of Return Analysis in a More Progressive Regulatory Environment," Twenty-Fifth Financial Forum held by the National Society of Rate of Return Analysts, Philadelphia, Pennsylvania, April 27, 1993.

"Privatization of Energy and Natural Resources," International Privatization Conference "Practical Issues and Solutions in the New World Order," New York, New York, November 20, 1992.

**RECENT INTERNATIONAL REPORTS**

"Serious Problems with CREG Document 070 Facing Colombia's Energy Market.", report generated for the Asociación Nacional de Empresas Generadoras (ANDEG). White paper (with Graham Shuttleworth) assessing the economic and policy implications of a proposal by the Colombian Energy and Gas Regulatory Commission (CREG) to reform the country's Reliability Charge mechanism for the wholesale power market. September 2015.

"Principles and Methodology of a Domgas Commercial Price Threshold" Report generated for North West Shelf Joint Venture (NWSJV) to define a methodology for computing a schedule of minimum *reasonable* prices (the Commercial Price Threshold) for prospective gas production for domestic gas (Domgas) based on the NWSJV's supply costs. August 13, 2014.

Gas Pipeline Transport in China: An Economic, Financial and Institutional Analysis," report prepared for Gazprom Export and BP Russian Investments Limited on gas transmission networks and gas pipeline tariffs in China. August 6, 2008.

"Consultation Paper:  Development of Approaches Towards Regulating Tariffs for Petroleum Pipelines, Storage and Loading Facilities in South Africa,"  Report prepared for the National Energy Regulator of South on the determination of economically feasible approaches towards establishing revenue requirements, regulating the setting/approval of tariffs, and developing rules, guidelines and framework regarding regulatory accounts for the petroleum pipelines, storage, and loading facilities in South Africa.  December 14, 2006.

"Regulatory Assessment of the Turkish Electricity Sector."  Report prepared for Prisma Energy on the examination of the economic and regulatory risks facing investors in the privatization of the energy infrastructure of Turkey.  December 6, 2006.

"Calculation of the X-Factor in the 2nd Reference Report of the Bundesnetzagentur." Report prepared for E. ON Ruhrgas, Germany: Design of a regulatory method based on comparison of average tariffs, consistent with new German legislation on the regulation of gas transmission networks.  April 21, 2006. (with Graham Shuttleworth and Michael Kraus).

"Cargo Access Charges for the Jorge Chavez International Airport in Lima, Peru." A report prepared for OSITRAN (Public Transport Infrastructure Regulator) on behalf of Lima Airport Partners S.R.L. February 19, 2004.

A Critique of CEPA's Report on "Productivity Improvements in Distribution Network Operators:" A report for EDF Energy (with Graham Shuttleworth).  December 16, 2003.

Advised on Fare Regulation Issues related to the Impending Merger of the MTRC and KCRC Railroad Companies in Hong Kong, Mercer Consulting on behalf of MTRC, 2003-2004.

"Natural Gas Pipeline Access Regulation".  Report prepared for BHP Petroleum Pty Ltd., May 31, 2001.

"Manual de Procedimientos para el Sistema Uniforme de Cuentas Regulatorias Eléctricas (SUCRE) de México" (April 2000).  The report includes an explanation of each of the accounts needed for regulation, recording procedures and the structure the information should take when reporting to the regulator.

"Investigation into Petronets' Liquid Fuels Pipeline Tariffs: Final Report" (March 9th, 2000).  This report presents NERA opinions in the quasi-arbitration of the tariffs disputes in the oil industry in South Africa for their liquids pipelines.

"Seeking Genuine Gas Competition in NSW", prepared for BHP Petroleum Pty. Ltd., February 18, 2000.

"Análisis y Revisión del Recurso de Revocatoria Interpuesto por la Compañía Boliviana de Energía S.A. (COBEE) a la Resolución SSDE Nº 92/99 de la Superintendencia de Electricidad" (September 6, 1999).  This report represents NERA's opinion on COBEE's appeal in the electricity tariff review process in Bolivia (report in Spanish).

"Gas Sector Regulation Consultancy Services" report prepared for the Vietnam Oil and Gas Corporation, August 10, 1999.

"Natural Gas Demand Estimation for Guatemala, Honduras and El Salvador" (July 19th, 1999).  This report done for an international consortium of companies presents calculations of prices and volumes of natural gas demand for three Central American countries if a pipeline is built from Mexico.

"Comments on East Australian Pipeline Limited Access Arrangements: (July 15, 1999).  Report prepared on behalf of Incitec Ltd.

"Supplementary Submission to IPART on AGLGN's Proposed Access Arrangements" on behalf of Incitec Limited (April 27th, 1999).  This submission discusses reload practices, customer contributions, operating expenses and recalculates charges for a user of the distribution network in New South Wales, Australia.

"Supplementary Submission to IPART on AGLGN's Proposed Costs and Tariffs" on behalf of BHP (April 15th, 1999).  This submission explains how NERA recalculated charges for AGLGN in New South Wales, Australia.

"Initial Comments on AGLGN's Revised Access Arrangement Information" on behalf of BHP (March 20th, 1999).  This submission presents NERA's comment to AGLGN submission to IPART in New South Wales, Australia.

"International Restructuring Experience" (February 12th, 1999).  This paper surveys a number of countries whose experience of restructuring and competition in the electricity sector is directly relevant to the proposed changes in Mexico – Argentina, Australia, Chile, Guatemala, New Zealand, Norway, Spain, the US and the UK

"Report I: Review of the Regulatory Framework" (January 18th, 1999).  This report presents the options for a natural gas framework in Peru.

"Conceptual Framework for the Reform of the Electricity Sector in Mexico: White Paper" (November 24th, 1998).  This report represents the White Paper for restructuring of the electricity sector in Mexico which is being used in Congress for debate.

"Precios del Gas Natural para la Generación de Electricidad en el Perú" (November 16th, 1998).  This report analyzes different alternatives for the treatment of natural gas prices in the electricity tariff model (report in Spanish).
"Tariffs and Subsidies: Report for the Tariffs Group" (November 10th, 1998).  This report presents recommendation on the path for tariffs and subsidies for 1999 to the Electricity Tariffs Group of the Government of Mexico.

"Gasoducto México-Guatemala: Informe Final" (October 22nd, 1998).  This report analyzes the legal and regulatory framework in both Mexico and Guatemala and costs and volumes for the building of a natural gas pipeline connecting both countries.  A copy of the report was given by President Zedillo (Mexico) to President Arzú (Guatemala) (report in Spanish).

**28**

"Checks and Balances in Regulating Power Pools: Seven case Studies.  A Report for the Electricity Pool of England and Wales" (September 10th, 1998).  This report surveys the regulation of power pools in electricity industries around the world.

"Fuels Policy Group: Recommendations" (September 11th, 1998).  This report presents recommendations to the Government of Mexico on their fuels policies for the electricity sector.

"Análisis de Costos e Inversiones.  Revisión Tarifaria de Transener" (August 25, 1998).  Report given to ENRE (the Argentinean electricity regulator) on behalf of a Consortium of Generators on the analysis of costs and investments to be considered for the revenue requirement of the electricity transmission company (report in Spanish).

"Central America Pipeline: Regulatory Analysis and Proposal" (July 28, 1998).  This report presents the regulatory analysis and development of a fiscal, legal and commercial framework proposal for gas import, transportation, distribution and marketing in El Salvador, Honduras and Guatemala regarding the proposed Central American Pipeline.

"Energy Regulation in El Salvador" (July 28, 1998).  This report presents a deep analysis of the electricity and natural gas regulatory, legal and tax frameworks in El Salvador.

"Energy Regulation in Guatemala" (July 28, 1998).  This report presents a deep analysis of the electricity and natural gas regulatory, legal and tax frameworks in Guatemala.

"The Cost of Capital for Gas Transmission and Distribution Companies in Victoria" (June 22, 1998).  Report prepared for BHP Petroleum Pty Ltd.

"Principios Económicos Básicos de Tarificación de Transmisión Eléctrica.  Revisión Tarifaria de Transener" (May 26, 1998).  The main purpose for this report was to provide an economic and regulatory analysis of laws, decrees, license and documents of the tender to provide advise in the tariff review of Transener (the electricity transmission company in Argentina), to present an economic analysis of transmission tariffs and to provide an opinion on specific topics to be discussed in the public hearing.  This report was written for a consortium of generators in Argentina (reports in English and Spanish)

"Asesoría en la Fijación de Tarifas de Transener y Normativa del Transporte, Benchmarking Study" (May 26, 1998).  This report compares the costs of Transener (the electricity transmission company in Argentina) with those of other companies elsewhere for a consortium of generators (the electricity transmission company in Argentina).

"International Regulation Tool Kit: Argentina" (March 20, 1998).  This document describes the natural gas regulatory framework in Argentina for BG.

"Tarificación de los Servicios Que Prestan las Terminales de Gas LP"  (January 9, 1998). The final report given to PEMEX Gas y Petroquímica Básica (México) for the determination of rates for LPG terminals.

"NERA-Pérez Companc Distribution Tariff Model" (January 5, 1998).  This report explains the methodology behind NERA's calculations of distribution tariffs for Pérez Companc in Monterrey.

"Monterrey Natural Gas Market Assessment," (January 5, 1998). A series of reports were written to present the results of the market study of the demand for natural gas in the geographic zone of Monterrey to a company interested in bidding for the natural gas distributorship.

"Resolving the Question of Escalation of Phases (bb) and (cc) Under the Maui Gas Sale and Purchase Contract", prepared for the New Zealand Treasury, December 16, 1997.

**29**

"Timetable and Regulatory Review for the Monterrey International Public Tender," (December 5, 1997).  A description of the necessary steps to bid for a distribution company as well as an explanation and analysis of natural regulations in Mexico for Pérez Companc.

"Economic Issues in the PFR for 18.3.1(I)(bb) & (cc)", prepared for the New Zealand Treasury, November 17, 1997.

"NERA's Distribution Tariff Model" (October 29, 1997).  This report explains the methodology behind NERA's calculations of distribution tariffs for MetroGas.

"Evaluation Design Standards for MetroGas," (October 24, 1997).  This report dealt with the analytical support resulting from work with MetroGas to create a meticulously-documented security criterion analysis that supported its efforts to obtain due recognition—and appropriate tariff treatment—for its costs.

"Ghana Natural Gas Market Assessment," prepared for the Ministry of Mines and Energy, Ghana (March-July, 1997).  A series of four reports assessing prospective gas demand usage and netback prices for a number of proposed pipeline project alternatives.

"Final Report for Russian Oil Transportation & Export Study: Commercial, Contractual & Regulatory Component," prepared for The World Bank, June 25, 1997.

Response to FIEL's criticisms regarding NERA's report "Cálculo del Factor de Eficiencia (X)" (June 2, 1997).

"Impacts on Pemex of Natural Gas Regulations" prepared for Pemex Gas y Petroquímica Básica México, May 21, 1997.

"Market Models for Victoria's Gas Industry:  A Review of Options," April 1997, prepared for Broken Hill Proprietary (BHP) Petroleum, to propose an alternative model for gas industry restructuring in Victoria, Australia.

"New Market Arrangements for the Victorian Gas Industry," prepared for Broken Hill Proprietary Petroleum; March 13, 1997.

"CEG Privatization: Comments to the Regulatory Framework," prepared for Capitaltec Consultoria Economica SA describing our comments with respect to the regulatory framework and the license proposed in the privatization of Riogas and CEG in Rio de Janeiro, Brazil; March 7, 1997.

"Determination of the Efficiency Factor (X)," prepared for ENARGAS, Argentina, January 24, 1997.

"Determination of Costs and Prices for Natural Gas Transmission," prepared for Pemex Gas y Petroquímica Básica, México, December 19, 1996.

"Regulating Argentina's Gas Industry," a report prepared for The Ministry of Economy and The World Bank, November 26, 1996.

"Open Access and Regulation," prepared for Gascor, in the State of Victoria, Australia; (October 2, 1996).

 "A Review and Critique of Russian Oil Transportation Tariffs (Russian Oil Transportation & Export Study; Commercial, Contractual & Regulatory Component)," prepared for The World Bank, June 13, 1996.

"Tariff Options for Transneft (Russian Oil Transportation & Export Study; Commercial, Contractual & Regulatory Component)," prepared for The World Bank, June 6, 1996.

**30**

"Comments on the Proposed Amendments to the Regulation of Airports in New Zealand," prepared for the New Zealand Parliament Select Committee hearings on the regulation of monopolies, March 13, 1996.

"Evaluating the Shell Camisea Project," prepared for Perupetro S.A., Government of Peru, December 8, 1995.

"Towards a Permanent Pricing and Services Regime," prepared for British Gas, London, England, November, 1995.

"Final Report: Gas Competition in Victoria," prepared for Gas Industry Reform Unit, Office of State Owned Enterprises, June 1995.

"Natural Gas Tariff Study," prepared for the World Bank, May 1995, consisting of:

> *Principles and Tariffs of Open-Access Gas Transportation and Distribution Tariffs*
> *Handbook for Calculating Open-Access Gas Transportation and Distribution Tariffs*

"Economic Implications of the Proposed Enerco/Capital Merger," prepared for Natural Gas Corporation of New Zealand, December 1994.

"Contract Terms and Prices for Transportation and Distribution of Gas in the United States," prepared for British Gas TransCo, November 1994.

"Economic Issues in Transport Facing British Gas," prepared for British Gas plc, December 1993.

"Overview of Natural Gas Corporation's Open-Access Gas Tariffs and Contract Proposals," prepared for Natural Gas Corporation of New Zealand, October 1993.