UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:16-cv-01534-JEB |
| U.S. ARMY CORPS OF ENGINEERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**AMICUS BRIEF FOR THE STATES OF INDIANA, MONTANA, ALABAMA,
ARKANSAS, IOWA, KANSAS, KENTUCKY, LOUISIANA, NEBRASKA, OHIO,
SOUTH DAKOTA, TEXAS, UTAH, AND WEST VIRGINIA
IN SUPPORT OF THE U.S. ARMY CORPS OF ENGINEERS**

TIM FOX
Attorney General of Montana

ROB CAMERON
Deputy Attorney General

Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Tel: (406) 444-2026
Email: Rob.Cameron@mt.gov

CURTIS T. HILL, Jr.
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

JULIA C. PAYNE
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov
        Julia.Payne@atg.in.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

INTEREST OF AMICI AND SUMMARY OF THE ARGUMENT .............................................1

ARGUMENT ....................................................................................................................2

I.     Shutting Down DAPL Would Both Disrupt the Flow of Oil from the Bakken Fields
and Tie Up Transportation for Other Commodities, Especially Grain ...................................3

        A.    DAPL alleviated otherwise intractable logistical problems that arose for the
nation's farmers and food supply when Bakken oil displaced grain commodities
on critical railway corridors ............................................................................................4

        B.    Shutting down the pipeline would return to pre-DAPL railroad congestion—this
time amidst a global pandemic where food security is already compromised ...............9

II.    Shutting Down the Pipeline Will Threaten Safety and Create Environmental Hazards.......15

CONCLUSION.................................................................................................................21

ADDITIONAL COUNSEL ...............................................................................................22

CERTIFICATE OF SERVICE ..........................................................................................23

# TABLE OF AUTHORITIES

**CASES**

*A.L. Pharma, Inc. v. Shalala*,
   62 F.3d 1484 (D.C. Cir. 1995) ................................................................................3

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ...............................................................................2

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
   934 F.3d 649 (D.C. Cir. 2019) ...............................................................................2

*Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*,
   622 F.3d 1094 (9th Cir. 2010) .............................................................................17

*Chamber of Commerce v. S.E.C.*,
   443 F.3d 890 (D.C. Cir. 2006) ...............................................................................2

*Citizens Against Burlington, Inc. v. Busey*,
   938 F.2d 190 (D.C. Cir. 1991) ...............................................................................3

*City of Seattle v. Burlington N. R.R. Co.*,
   41 P.3d 1169 (Wash. 2002) ..................................................................................17

*CSX Transp., Inc. v. Easterwood*,
   507 U.S. 658 (1993) .............................................................................................17

*Defenders of Wildlife v. Jackson*,
   791 F. Supp. 2d 96 (D.D.C. 2011) .........................................................................3

*Delaware v. Surface Transp. Bd.*,
   859 F.3d 16 (D.C. Cir. 2017) ...............................................................................17

*Elam v. Kansas City Southern Ry. Co.*,
   635 F.3d 796 (5th Cir. 2011) ...............................................................................17

*Maynard v. CSX Transp., Inc.*,
   360 F. Supp. 2d 836 (E.D. Ky. 2004) ..................................................................17

*Mont. Envtl. Info. Ctr. v. Dep't of Envtl. Quality*,
   988 P.2d 1236 (Mont. 1999) ................................................................................20

*State v. Norfolk Southern Ry. Co.*,
   107 N.E.3d 468 (Ind. 2018) .................................................................................17

**STATUTES**

49 U.S.C. § 10501(b) ...............................................................................................16

OTHER AUTHORITIES

Association of American Railroads, *The Environmental Benefits of Moving Freight by Rail* (2019), *available at* https://www.aar.org/wp-content/uploads/2018/07/AAR-Environmental-Benefits-Movig-Freight-by-Rail.pdf..........................................................................................................................4

Bob Costello, *Truck Driver Shortage Analysis 2019*, American Trucking Associations (July 2019).................................................................................................11

*COVID-19 Update—Tourism Industry for Montana*, Voices of Montana Tourism, http://www.voicesoftourism.com/...........................................................................18

*Expanding Access to Rate Relief: Opening Comments of National Grain and Feed Association and Other Interested Agricultural Parties*, STB Docket No. EP. 665 (Sub-No.2), November 14, 2016, https://www.ngfa.org/wp-content/uploads/NGFA-and-Other-Interested-Agricultural-Parties-Statement-to-STB-on-Rail-Rate-Proceeding-EP-665-2Nov.-14-2016.pdf..................................................................................................10

*Freight Commodity Statistics*, Association of American Railroads (2013)....................................6

*G20 Extraordinary Agriculture Ministers Meeting Ministerial Statement on COVID-19 Virtual Meeting*, April 21, 2020, https://g20.org/en/media/Documents/G20_Agriculture%20Ministers%20Meeting_Statement_EN.pdf.......................14

*Grain Car Consolidation Facility Impact Analysis*, 2010 Montana State Rail Plan, *available at* https://www.mdt.mt.gov/publications/docs/brochures/railways/railplan_sect5.pdf..............................................................................................................................5

Ivan Atanassov & C. Tyler Dick, *Capacity of Single-Track Railway Lines with Short Sidings to Support Operation of Long Freight Trains*, 2475 Transportation Research Record 95, *available at* https://railtec.illinois.edu/wp/wp-content/uploads/2019/01/Atanassov-et-al-2015-TRB-15-6026-TRR-final.pdf.....................................................................5, 6

Jacob Bunge & Kirk Maltais, *Pork Industry, USDA Discuss Euthanizing Hogs After Coronavirus Closes Plants*, Wall Street Journal, Apr. 27, 2020 ...................................13

Karen Clay et al., *The External Costs of Transporting Petroleum Products by Pipelines and Rail: Evidence from Shipments of Crude Oil from North Dakota*, National Bureau of Economic Research (Sept. 2017) ..........................................16, 20

*Lac-Mégantic Runaway Train and Derailment Investigation Summary*, Transportation Safety Board of Canada, https://www.tsb.gc.ca/eng/rapports-reports/rail/2013/r13d0054/r13d0054-r-es.html .......................................................16

OTHER AUTHORITIES [CONT'D]

Lindsay Mitchell, *Illinois River Will Close to Traffic in 2020*, Illinois Corn, Nov. 12, 2018, https://ilcorn.org/news-and-media/current-news/article/2018/11/illinois-river-will-close-to-traffic-in-2020 ............................................12

Matt Volz, *35,000 Gallons of Oil Spills After Montana Train Derailment*, Independent Record (July 17, 2015), *available at* https://helenair.com/missoula/ news/state-and-regional/gallons-of-oil-spills-after-montana-train-derailment/article_9a7778f6-e118-5dad-afe3-3ea4aaf9a2d3.html ............................................................................................18

Megan E. Hansen & Ethan Dursteler, *Pipelines, Rail & Trucks*, Strata..................................9, 15

Mont. Const. art. 2, § 3 .................................................................................................................19

Mont. Const. art. 9, § 1 .................................................................................................................19

Montana Constitutional Convention, Vol. V, March 7, 1972.........................................................19

U.S. Dep't of Agriculture, *Grain Transportation Report* (Apr. 23, 2020), *available at* https://www.ams.usda.gov/sites/default/files/media/GTR04232020.pdf ...............................11

U.S. Dep't of Agriculture, *Grain Transportation Report* (Oct. 2, 2014), *available at* https://www.ams.usda.gov/sites/default/files/media/GTR_10-02-14.pdf ...................6, 7, 11

United States Department of Transportation Federal Highway Administration, *Freight Quick Facts Report* 32 Table 35 (2016) .............................................................15, 16

Xiaowen Lin et al., *Food Flows Between Counties in the United States*, Environmental Research Letters, July 26, 2019, *available at* https://iopscience.iop.org/article/10.1088/1748-9326/ab29ae/pdf..............................................5

## INTEREST OF AMICI AND SUMMARY OF THE ARGUMENT

The States of Indiana, Montana, Alabama, Arkansas, Iowa, Kansas, Kentucky, Louisiana, Nebraska, Ohio, South Dakota, Texas, Utah, and West Virginia respectfully submit this brief as amici curiae in support of the Defendants. Amici States include both those States that the Dakota Access Pipeline passes through and those that it does not. But all Amici States, even those that the pipeline does not pass through, stand to suffer disastrous consequences if the easement allowing operation of the pipeline is vacated.

First, many Amici States produce large amounts of grain currently shipped by rail—grain that will suffer displacement, owing to competition with higher-revenue oil for access rail transport, if the Dakota Access Pipeline is shut down. Such competition is likely to revisit the market conditions that obtained before the pipeline became operational in 2017, namely intractable railroad congestion, rotting grain, higher food prices and, ultimately, a potential for food shortages.

The Dakota Access Pipeline transports 570,000 barrels of crude oil per day, and if this Court vacates the easement that allows it to operate, the market will demand that as much of that oil as possible be diverted to other modes of transport. Railroads present the only viable alternative, meaning that Bakken crude will compete for train space with the agricultural sector, which produces food not only for the nation, but the world.

The universal market principle of arbitrage dictates that commodities flow from low value areas to high value areas so long as the cost of transportation is less than the price difference. That principle explains why North Dakota oil—which carries a much higher value than grain—will find a way to move either east or west by pipeline or rail to find a market, at the expense of stranding grain at its production origins. In that environment, transportation competition from the oil indus-

1

try makes the cost of procuring grain greater than the resale value, *i.e.*, greater than the price difference between origin and destination. And so substantial portions of the Nation's grain harvest will sit and rot because it would be too expensive to transport. Amici States have a strong interest in preventing such a dire disruption of the food chain, especially amidst a global pandemic and other dramatic threats to worldwide food security.

Second, crude oil shipments by rail or truck pose greater safety hazards than shipments by pipeline. Data show that pipeline transport of crude have yielded fewer accidents, injuries and deaths than truck and rail shipments, such that pipeline transport is both cheaper and less likely to cause widespread destruction—such as the rail accident that incinerated much of the town of Lac-Mégantic, Quebec, with Bakken crude. And because railroad regulations are set by federal law, state and local governments have very little recourse to protect their citizens against such accidents. Moreover, shipment by rail or by truck (in comparison with shipment by pipeline) has greater environmental effects due to the increased amount of greenhouse gases emitted by trains and automobiles.

For these reasons, Amici State urge this Court to leave the easement in place, allowing the Dakota Access Pipeline to operate while the Army Corps of Engineers prepares the EIS.

## ARGUMENT

When support for an agency rule is legally insufficient, "the decision to remand or vacate hinges upon court's assessment of 'the seriousness of the . . . deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Chamber of Commerce v. S.E.C.*, 443 F.3d 890, 908 (D.C. Cir. 2006) (ellipsis in original; quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). These factors are "balance[d]" against each other, and a "strong showing

2

of one factor may obviate the need to find a similar showing of the other." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019).

Here, remand without vacatur of the easement is appropriate because there is a "high likelihood" vacatur "would cause significant disruption." *Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 118 (D.D.C. 2011). The widespread economic and safety disruptions that would arise from vacatur would far outweigh any actual harm caused by the short-term lack of an environmental impact statement, which, after all, is a procedural agency obligation designed to provide more public information, but which does not itself hold the prospect of changing the substantive outcome of the Corps' ultimate decision about the easement. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (holding that the National Environmental Policy Act (NEPA) mandates certain *procedures* for agency action that may impact the environment, but not certain *results*). The Dakota Access Pipeline has already been constructed, the oil is flowing, and the American economy has come to rely on its benefits as an alternative to rail or truck transport. "Where the proverbial 'egg has been scrambled and there is no apparent way to restore the status quo ante,' the Court may remand without vacating." *Defenders of Wildlife*, 791 F. Supp. 2d at 118.

I.   **Shutting Down DAPL Would Both Disrupt the Flow of Oil from the Bakken Fields and Tie Up Transportation for Other Commodities, Especially Grain**

Shutting down DAPL would prove enormously disruptive to the producers and consumers who have "relied on it in good faith" for years. *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995). As it happens, one need not speculate about how the world of commodities transportation would look without DAPL, for the agriculture economy sustained substantial congestion and attendant losses when the Bakken fields began pumping crude *before* DAPL opened. Shutting down the pipeline would at the very least revisit those unsustainable market conditions. Vacatur

would divert hundreds of thousands of barrels of crude oil to rail transport. ECF No. 512-2, Declaration of William J. Rennicke ¶ 5.a. And, because railways cannot adapt quickly to heightened demand on capital-intensive infrastructure, crude oil would thereby displace grain commodities, disrupt the economics of grain distribution and, ultimately, threaten the food supply chain. Particularly amidst a global pandemic and the recession it is inducing, the risk of creating conditions for food insecurity in various pockets of the country—and of bankrupting farmers—makes vacatur inappropriate.

### A. DAPL alleviated otherwise intractable logistical problems that arose for the nation's farmers and food supply when Bakken oil displaced grain commodities on critical railway corridors

1.      One fundamental of the commodities transportation market is that grain producers have very few transportation options. Agricultural products are grown in remote, highly distributed fields, requiring farmers and dealers to aggregate grain from multiple sources for shipping to faraway food-processing purchasers. ECF No. 512-4, Declaration of Elaine Kub ¶ 8. Grain is too heavy to be transported economically as air cargo, and remote agricultural areas lack access to inland waterways. ECF No. 512-2 (Rennicke) ¶ 53. That leaves truck and rail, but trucks require far more labor: While every truck needs a driver, a small team can drive a train carrying large amounts of grain in multiple cars. Trains also use less fuel than a large fleet of trucks. Association of American Railroads, *The Environmental Benefits of Moving Freight by Rail* 1 (2019), *available at*      https://www.aar.org/wp-content/uploads/2018/07/AAR-Environmental-Benefits-Movig-Freight-by-Rail.pdf.

As a result, grain farmers have grown to rely substantially on rail for long-haul shipping; rail is "the primary source of transportation for moving the region's bulk products, such as grain, crude oil, and ores," and in turn "agricultural products in aggregate represent 42 percent of rail

loadings, with cereal grains accounting for nearly 24 percent of rail tonnage originating in the region in 2018." ECF No. 512-2 (Rennicke) ¶ 52.

Cereal grains grown in the Upper Midwest or Rocky Mountain regions, like hard red spring wheat and barley from Montana and North Dakota, must typically be shipped westward toward mills and export facilities in the Pacific Northwest. *See Grain Car Consolidation Facility Impact Analysis*, 2010 Montana State Rail Plan 5-3, *available at* https://www.mdt.mt.gov/publica-tions/docs/brochures/railways/railplan_sect5.pdf. In fact, Montana and North Dakota rely on rail service to ship the vast majority of their grain out of State, Montana 84.6% and North Dakota 79.2%. ECF No. 512-4 (Kub) Table 1. Meanwhile, the markets for oilseeds and feed grains from the central Corn Belt States (primarily corn and soybeans) also rely on rail service to move grain south to export customers at the Gulf of Mexico, southwest toward cattle feeding facilities in the United States and Mexico, west toward dairies in California, or southeast toward poultry feeding facilities in Tennessee, Alabama, Georgia, and North Carolina. Xiaowen Lin et al., *Food Flows Between Counties in the United States*, Environmental Research Letters, July 26, 2019, *available at* https://iopscience.iop.org/article/10.1088/1748-9326/ab29ae/pdf.

Overall, "the states of Illinois, North Dakota, Minnesota, Wisconsin, and Montana rank 1, 5, 8, 11, and 15, respectively in the US for transported grain originations (all modes), accounting for 29 percent of all domestic originations in the United States." ECF No. 512-2 (Rennicke) ¶ 52.

2.      In the past decade, rapidly developing technology has made it feasible to extract oil from underground shale rock formations in the Bakken region of North Dakota. As the volume of oil from that region increased, limited pipeline capacity meant that producers had to rely on rail tankers for transportation. Owing to the standard length of available railroad sidings, trains have a practical limit of just over 100 cars, and the railroads, already stretched to capacity with grain

shipments, struggled to handle both crude oil and grain. Ivan Atanassov & C. Tyler Dick, *Capacity of Single-Track Railway Lines with Short Sidings to Support Operation of Long Freight Trains*, 2475 Transportation Research Record 95, 95–96, *available at* https://railtec.illinois.edu/wp/wp-content/uploads/2019/01/Atanassov-et-al-2015-TRB-15-6026-TRR-final.pdf.

As a consequence, railroads scrambled to obtain sufficient oil tanker rail cars. Oil, as it happens, provides railroads substantially greater revenue than grain. In 2013—before the pipeline became operational—railroads were receiving average revenue of over $56 per originated ton for shipping crude petroleum, but only $38.45 per originated ton for shipping field crops. *Freight Commodity Statistics*, Association of American Railroads (2013), A.1, A.3 (dividing revenue for field crops (011) and crude petroleum/natural gas (131) by originated tons for each); *see also* ECF No. 512-4 (Kub) ¶ 30 (reciting similar data for 2018). So, from 2013 through 2015, unprecedented volumes of crude oil tankers clogged the rail lines. ECF No. 512-4 (Kub) Figure 3. "In 2010, Class I railroads carried an average of 2 million barrels of crude oil per month; by 2014, this had increased to an average of 31.8 million barrels per month, representing growth of more than 1,500 percent in four years (Exhibit 6). This run-up over several years was the result of domestic crude oil production outpacing the development of pipeline capacity." ECF No. 512-2 ¶ 19 (Rennicke) (footnotes omitted).

The result was less rail capacity for the coal and grain that the trains had previously pulled. Shippers of grain and other agricultural products saw significant increases in rates along oil-shipment corridors, as well as historically high prices in the secondary grain railcar market (sublease prices bid among grain shippers for committed space on railcars). ECF No. 512-4 (Kub) ¶ 14. Average bids just to get car space—above the tariff rate and fuel surcharges paid directly to railroads—reached a record high of $4,625 per car at the start of October 2014, equivalent to $1.03

per bushel paid by a grain shipper. U.S. Dep't of Agriculture, *Grain Transportation Report* (Oct. 2, 2014), *available at* https://www.ams.usda.gov/sites/default/files/media/GTR_10-02-14.pdf. These higher freight costs yielded lower revenues for farmers, not only in areas where grain shipments were dependent on rail transportation, but all across America where the secondary freight prices were inflated by competition between crude oil and grain. *Id.*

In addition, service levels for grain deteriorated as crude by rail shipments increased. ECF No. 512-4 (Kub) ¶ 16. In October of 2014, both grain and ethanol trains were moving as slow as 19.8 mph. *Id.* ¶ 24. Trains carrying grain or ethanol were also more likely to have longer dwell times at their origin (loading) location—up to 35 hours per week for trains carrying grain and 35.8 hours for ethanol trains—74% longer than average. *Id.* Chicago became a particular chokepoint, with rail capacity falling for both eastward and westward routes. ECF No. 512-2 (Rennicke) ¶ 82.

Westward rail routes proved particularly vulnerable to freight congestion, as the few rail passages across the Rocky Mountains meant that a bottleneck on any route left all the grain behind it stranded. *Id.* ¶ 47. In January 2014, "grain unit trains from Minnesota to the Pacific Northwest were taking up to 22 days, compared to a normal transit time of 12 days," with grain carloads lagging behind normal levels in the tens (and hundreds) of thousands compared with prior years. *Id.* ¶ 63. Observers traced the problem back to Bakken crude. "The executive director of the Minnesota Grain and Feed Association blamed crude oil shipments for increasing congestion in regional rail yards (such as St. Paul and Chicago)." *Id.* ¶ 63.

Moreover, congestion in rail shipments also posed problems for other industries. Ethanol refineries experienced a spike in transportation rates that mirrored the increase in crude-by-rail shipments, prompting them to scale back production when they were unable to obtain rail cars for transport. *Id.* ¶ 79. In 2014, a grain ship was held up for nearly a month in the Port of Duluth

waiting for rail shipments. *Id.* ¶ 72. And Mosaic, a Minneapolis-based fertilizer company, saw a 43% decline in earnings due to its inability to make spring fertilizer shipments. *Id.* ¶ 77. Congestion problems also caused disruption for auto manufacturers that were unable to ship new cars to dealers. *Id.* ¶ 81.

All of this congestion and delay in rail service led to higher food prices for consumers and lower profits for farmers. In 2014, North Dakota farmers experienced depressed corn basis prices, $1.25 less than the benchmark futures price, nearly double the usual $0.65 discount off the futures price. ECF No. 512-4 (Kub) at 15–16. Similarly, in the central Corn Belt, where local corn basis prices tend to be around $0.05 less than the benchmark futures price, local corn prices dropped by a factor of *eight* to $0.40 less than the benchmark futures price during the freight congestion of 2014.

To be sure, these depressed basis prices were the result of many factors (including competitive forces between rail shippers and domestic processors that don't rely on rail service). Yet the data make clear that transportation costs are the primary influence on grain basis-price differentials. In 2015, USDA's Office of the Chief Economist and the Agricultural Marketing Service, concluded that, even accounting for the many variables at play, Upper Midwest farmers may have received $570 million less for their crops in 2014 than they would have earned in a regular seasonal transport cost environment. ECF No. 512-4 (Kub) ¶ 13.

3.     When DAPL opened in 2017, it provided much-needed transportation relief for the Bakken region. In 2014, the volume of crude oil shipped by rail hit a peak of 31.8 million barrels per month. ECF No. 512-2 (Rennicke) ¶ 19. In 2017, the volume of crude shipped by rail declined to a low of less than 10 million barrels per month, and by 2019 remained at a mere 70% of the volume shipped by rail in 2014. *Id.* ¶ 19 & Ex. 6. As a percentage of Bakken crude, "at the end of

2014, rail accounted for about 60 percent of North Dakota crude oil production, dropping to 17 percent of production in 2019; at the same time, pipeline share grew from about 31 percent in 2014 to 72 percent in 2019." *Id.* ¶ 20.

That relief benefitted grain farmers and shippers as well, for transporting crude oil by pipeline frees up rail capacity for agricultural products, plain and simple. The ultra-depressed North Dakota corn basis, seen at $1.20 less than the benchmark futures contract during the peak of the freight congestion in 2014, has once again settled in its normal seasonal basis of $0.65 less than the benchmark futures contract price. ECF No. 512-4 (Kub) ¶ 22. Nationwide, rail service to the grain industry has returned to normal train speeds and dwell times. *Id.* Table 2.

### B. Shutting down the pipeline would return to pre-DAPL railroad congestion—this time amidst a global pandemic where food security is already compromised

Vacating the DAPL easement would force oil producers to find new ways of transporting output, with a likely return to pre-DAPL depression on corn basis prices, and worse. While three non-DAPL pipelines also transport oil from the Bakken, they have capacity for at most 12–18 percent of the oil that would be displaced as result of vacatur. *See* ECF No. 512-2 (Rennicke) ¶ 5.a. For the balance, rail—itself two or three times more expensive than pipeline—is the only economically viable alternative, as shipping crude by truck can be twice as expensive as rail. Megan E. Hansen & Ethan Dursteler, *Pipelines, Rail & Trucks*, Strata, at 3. At trucking transport rates, the price advantage Bakken crude generally enjoys over other sources of crude evaporates. *See* ECF No. 512-2 (Rennicke) ¶ 5.a. (stating that Bakken crude that cannot be transported by pipeline or rail "would have no immediate viable transportation outlet").

If the pipeline is shut down, it will displace 208.1 million barrels of crude oil per year. Even if only one-third of the displaced crude were transported by rail, the result would still be crude volumes exceeding the average amount of crude on railways in 2014—and even approaching

the maximum volume of that year. *Id.* ¶¶ 20, 22 & Ex. 7. And now, amplifying the congestion, regulatory changes since 2014 will push crude oil trains onto the hazardous materials network, a more limited set of tracks featuring "positive train control," or PTC. It happens, however, that "PTC corridors are *also* rail main lines, which already have among the highest overall traffic densities . . . ." *Id.* ¶ 25. As a consequence, "[d]iverting DAPL's volume to rail could create a higher level of congestion on the region's rail lines than that which was experienced during the last peak in rail shipments of crude oil, in 2014." *Id.* ¶ 27.

Yet railroads are already operating near full capacity, so even small, unexpected changes in the supply or demand for rail services may cause significant problems. *Id.* ¶ 5.c. If the DAPL oil is shipped by rail rather than by pipeline, the effects will be largely felt in certain corridors where the oil is shipped, and many of these corridors already carry high density shipments of other goods. *Id.* ¶ 59. Because crude oil must be shipped from the Bakken to Patoka or Chicago, Illinois, rail lines in the upper Midwest would experience the worst of the congestion. *Id.* ¶ 32. And since Patoka does not currently have rail access, facilities will need to be built to accommodate multiple loads of crude oil per day. *Id.*

Moreover, grain shippers are especially vulnerable to price spikes because they do not enter into long-term transportation contracts with railroads due to varying shipment volumes and changing routes. *See Expanding Access to Rate Relief: Opening Comments of National Grain and Feed Association and Other Interested Agricultural Parties*, STB Docket No. EP. 665 (Sub-No.2), November 14, 2016, at 4-6, https://www.ngfa.org/wp-content/uploads/NGFA-and-Other-Interested-Agricultural-Parties-Statement-to-STB-on-Rail-Rate-Proceeding-EP-665-2Nov.-14-2016.pdf. For this reason, agricultural producers require reliable and on-demand rail service to move prod-

ucts quickly and meet favorable price windows. ECF No. 512-2 (Rennicke) ¶ 55. Added competition from crude oil producers will likely reduce the competitiveness of farmers reliant on rail lines that are already near or above capacity. *Id.*

Switching the bulk of America's long-haul grain movement from rail to truck would likely be impossible. The trucking industry, already struggling to find sufficient drivers, Bob Costello, *Truck Driver Shortage Analysis 2019*, American Trucking Associations, at 2 (July 2019), is not equipped to move grain efficiently over the long-distance routes currently served by the rail system. Given the standard limit of 900 bushels per semi-truck load, the lost carrying capacity from a single 110-car grain shuttle train would require 544 truckloads to haul an equivalent volume. For those volumes, hauling a bushel of corn 1,730 miles from Minneapolis to Portland, Oregon routinely costs about $1.31 by rail. *See* U.S. Dep't of Agriculture, *Grain Transportation Report* (Oct. 2, 2014), *available at* https://www.ams.usda.gov/sites/default/files/media/GTR_10-02-14.pdf. But at the standard rate of $1.00 per truckload mile, those 900 bushels would cost $3.84 each for the same 3,460 mile round-trip by semi. Truck transportation alone would thus very likely exceed the arbitrage value of the corn itself—roughly $3.00 per bushel, *see* U.S. Dep't of Agriculture, *Grain Transportation Report* (Apr. 23, 2020), *available at* https://www.ams.usda.gov/sites/default/files/media/GTR04232020.pdf—with the result that, without rail service, billions of bushels of grain would be effectively stranded in the center of the continent, unable to reach coastal export facilities or the central domestic processing facilities and collection points which underpin America's food supply chain.

In addition, an influx of crude-by-rail traffic would almost certainly inflict substantial harm on the economies of ag-dependent States, as exemplified by the following estimated losses:

- Indiana: $24 to $59 million in revenue

- Minnesota: $98 to $243 million in revenue

- Montana: $41 to $104 million in revenue

- North Dakota: $127 to $317 million in revenue

- South Dakota: $55 to $137 million in revenue

ECF No. 512-4 (Kub) ¶ 39 & Table 3. In Indiana alone, those revenue losses would be the equiv-

alent of 1,450 lost jobs. *Id.* What is more, recent analysis looking at present-day grain production

volumes in twelve high-producing States, applying the same methodology as the 2015 USDA

study that revealed staggering farm losses from the 2014 congestion, suggests that if rail conges-

tion were to affect the grain markets over an entire marketing year, the revenue losses to America's

farmers could range from $526 million to $1.3 billion. *Id.* ¶ 38.

These estimates do not include losses to other segments of the agriculture industry, includ-

ing ethanol plants, soybean processors, and other grain customers who must also transport their

finished goods by rail. The grain processing industry, struggling during a short-term slow-down in

demand during the COVID-19 pandemic, already faces challenging market conditions. When do-

mestic demand slows for grain products (ethanol, distillers grain, soybean meal, and soybean oil),

a higher proportion of total production must be directed toward foreign sales. Before being ex-

ported in ocean-going vessels, grain products must first be transported to an export facility either

by barge or rail. As it happens, the Illinois Waterway that normally ships agricultural goods from

several surrounding States to the Mississippi will close for repairs from July through October 2020.

Lindsay Mitchell, *Illinois River Will Close to Traffic in 2020*, Illinois Corn, Nov. 12, 2018,

https://ilcorn.org/news-and-media/current-news/article/2018/11/illinois-river-will-close-to-traf-

fic-in-2020. Without that significant route for southbound agriculture exports, rail will be the only

viable option for many processors to reach profitable markets—but not if Bakken crude takes over the rail network.

In addition, in January of 2020, the United States entered into a two-year trade agreement that provided China would purchase $40 billion of American agricultural products. In order to fulfill this trade deal, the United States will need to ship even higher volumes of grain by rail, compared to record-high 2017 volumes, to the Gulf of Mexico or the Pacific Northwest for loading on ocean vessels and shipping to China. These shipments will make the agriculture industry more dependent on timely rail service than ever before, and less able to withstand railroad congestion than ever before. If these shipments are not made, Chinese purchasers will likely turn to South American producers instead, which would cause U.S. farmers to lose billions of dollars along with their reputation as a reliable supplier. ECF No. 512-2 (Rennicke) ¶¶ 67–68.

Meanwhile, the COVID-19 pandemic provides a stark demonstration of how food supply chain interruption harms both consumers and producers, with consumers already facing higher food prices due to end-point shortages, and agricultural producers forced to discard (for zero revenue) perishable commodities, even as processing facilities contend with labor shortages. Already, COVID-19 has forced meat processors such as Tyson to shutter facilities, leaving hog farmers with nowhere to send their hogs and, with new generations coming behind, nowhere to house them— with massive porcine euthanasia (a threat to the availability of animal protein for a hungry world) being the contemplated result. Jacob Bunge & Kirk Maltais, *Pork Industry, USDA Discuss Euthanizing Hogs After Coronavirus Closes Plants*, Wall Street Journal, Apr. 27, 2020, https://www.wsj.com/articles/pork-industry-usda-discuss-euthanizing-hogs-after-coronavirus-closesplants11588015611?shareToken=ste5d9e790670e42c5bada946ff0483acf&reflink=article_email_share. For some animals, however, another possibility may be that livestock will need

to be fed for longer periods while farmers await processing capacity—further increasing volumes of grain to be shipped west, southwest, and southeast out of the Corn Belt in 2020.

Either way, the food supply chain already stands to be under duress in 2020. Agricultural ministers from the G20 group of major developed and developing nations recently observed that, while the global inventory of agricultural commodities is presently sufficient, governments should not create any "unnecessary . . . disruption to global food supply chains" and should avoid "food losses and waste caused by disruptions throughout food supply chains, which would exacerbate food insecurity and nutrition risks and economic loss." *G20 Extraordinary Agriculture Ministers Meeting Ministerial Statement on COVID-19 Virtual Meeting*, April 21, 2020, https://g20.org/en/media/Documents/G20_Agriculture%20Ministers%20Meeting_Statement_EN.pdf.   Yet   adding Bakken crude oil to the rail transport load would threaten to cause exactly the sort of disruption to the global food supply chain that the G20 ministers warned about.

On this point, it is worth observing that the recent precipitous decline in the price of oil futures is unlikely to have any significant bearing on the market dynamics of shipping oil from the Bakken region. Even when crude oil futures head into negative territory, Bakken crude will still move as long as it represents a cheaper alternative to other sources of oil—and as long as it is worth more at the refinery at Patoka, Illinois than it is straight from the ground in Williston, North Dakota. As long as Americans still need fuel to operate their cars, haul their goods, and conduct the business of life, and as long as traders can make the oil worth more by transporting it to a higher-value location, arbitrage will take place, and oil will move, at the cost of pushing grain off the nation's railways.

With no substitute freight provider available to serve America's farmers, the implications of shutting down DAPL for the world's food supply become unthinkable. If grain cannot be

shipped from its origins and is stranded across the Midwest, swaths of grain customers with time-critical needs—such as animal feedlots that demand grain each day—would quickly fail, with staggering implications for animal welfare and food security. The most food-secure nation on earth could well experience food shortages, to say nothing of the consequences for developing nations whose industries and food security also rely on American grain exports.

The mere delay in the Corps' preparation of an EIS does not merit such drastic consequences.

## II.    Shutting Down the Pipeline Will Threaten Safety and Create Environmental Hazards

The burdens of vacating the DAPL easement are not just a function of economic impact, as dramatic as those impacts will be. Rather, vacating the easement also threatens serious safety and environmental hazards owing to the volatility of crude oil and the potential for trains to collide and derail.

Transporting crude oil by pipeline is safer than transporting it by rail or truck owing to the volatility of the crude and the safety of pipelines compared to rail and truck shipments. A 2016 USDOT comparison of freight-related fatalities among various modes of transportation showed that rail transportation fatality rates were nearly 35 times higher than pipeline transportation on a per-billion ton-miles basis. United States Department of Transportation Federal Highway Administration, *Freight Quick Facts Report* 32 Table 35 (2016). Trucks are even less safe. Crude oil transportation by truck kills an average of 10.2 people per year, whereas rail transportation results in 2.4 fatalities per year and pipeline transportation results in 1.7 fatalities per year. Megan E. Hansen & Ethan Dursteler, *Pipelines, Rail & Trucks*, Strata, at 4–5. And in terms of injuries (rather than fatalities), rail transportation injury rates exceed 50 times the rate for pipeline shipments.

United States Department of Transportation Federal Highway Administration, *Freight Quick Facts Report* 32 Table 35 (2016).

Pipelines also compare favorably to rail when considered in terms of incident and accident rates. A 2015 report by the Fraser Institute showed that, for the decade 2003–13, rail transport of crude oil was 4.5 more times more likely to result in an accident than pipeline transport of crude oil. Fraser Research Bulletin 1. And a 2017 study by the National Bureau of Economic Research concluded that, on a normalized cost-per-million-barrel-mile basis, crude-by-rail accidents and spills cost roughly 600% more than pipeline accidents and spills. Karen Clay et al., *The External Costs of Transporting Petroleum Products by Pipelines and Rail: Evidence from Shipments of Crude Oil from North Dakota*, National Bureau of Economic Research, at 20 (Sept. 2017).

The result is not simply higher economic costs, but sometimes tragic human suffering, such as happened in the 2013 rail disaster in Lac-Mégantic Quebec, when an unattended 74-car train carrying Bakken crude oil rolled down some low-grade track, ultimately derailing. *Lac-Mégantic Runaway Train and Derailment Investigation Summary*, Transportation Safety Board of Canada, https://www.tsb.gc.ca/eng/rapports-reports/rail/2013/r13d0054/r13d0054-r-es.html. The resulting conflagration killed over 40 people and forced 2000 more people from their homes. *Id.*

By prompting shipment of crude by rail, an order from this Court vacating the DAPL easement will threaten States and localities with similar disasters. Absent the DAPL easement, Bakken oil shipments will likely to cause 11.4 more accidents each year, with attendant additional injuries and fatalities, than would occur if the oil continues to be transported by pipeline. ECF No. 512-2 (Rennicke) ¶ 90 & Ex. 36. State and local governments have very few options to protect themselves from these costs owing to preemption by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10501(b). In light of ICCTA, States and localities may not, for example, regulate the

air pollution created by trains, *Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094 (9th Cir. 2010); prohibit railroad switching activities, *City of Seattle v. Burlington N. R.R. Co.*, 41 P.3d 1169 (Wash. 2002); set speed limits for trains, *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993); prohibit idling, *Delaware v. Surface Transp. Bd.*, 859 F.3d 16 (D.C. Cir. 2017); set negligence standards for trains, *Elam v. Kansas City Southern Ry. Co.*, 635 F.3d 796 (5th Cir. 2011); or regulate the use of sidings, *Maynard v. CSX Transp., Inc.*, 360 F. Supp. 2d 836 (E.D. Ky. 2004).

Indeed, States and localities may not even prohibit trains from blocking intersections. *See State v. Norfolk S. Ry. Co.*, 107 N.E.3d 468 (Ind. 2018). When trains block intersections, they impose significant burdens on the economies and quality of life of rural (and sometimes urban) communities. "[S]uch blockages can impact public safety, because police and fire departments may be delayed or unable to reach emergency sites or hospitals in the many communities where rail crossings intersect main roads, which are often the only viable routes in smaller and/or older towns." ECF No. 512-2 (Rennicke) ¶ 91. Towns in the Upper Midwest suffered increased instances of blocked intersections during the 2014 peak congestion—a circumstance likely to repeat if DAPL is shut down and more crude is transported by rail. *Id.*

Shipping crude by train is also likely to inflict substantial more environmental damage than shipping by pipeline, even as the Corps completes its EIS. Railroads would likely transport the displaced DAPL crude along main lines, which means introducing the hazardous cargo "near or through rivers, population centers, national parks, and many environmentally sensitive areas." *Id.* ¶ 95. These rail lines crisscross various branches and tributaries of the Mississippi and Missouri Rivers, for example. *Id.*

17

Environmental protection in western States is of particular importance for the people liv-ing, working, and recreating there. First, States such as Montana rely heavily on tourism revenues resulting from non-residents seeking to enjoy the pristine beauty of the environments of these States. Consequently, in Montana, for example, "non-resident tourism supports 59,380 local jobs, adds over $3.7 billion to the economy annually, and contributes to the preservation of historical, cultural and recreational treasures." *COVID-19 Update—Tourism Industry for Montana*, Voices of Montana Tourism, http://www.voicesoftourism.com/. As western States have experienced in recent years with wildfires, environmental harms translate to lost tourism revenues. It is thus vital to the economies of western States that potential threats to the environment—such as oil spills caused by train derailments—be minimized to the greatest extent possible.

The potential environmental harms—and risks to human lives—from oil transported by rail are not hypothetical. For example, before DAPL became operational, in July 2015 a train haul-ing oil from North Dakota derailed in rural northeastern Montana, and four tank cars leaked an estimated 35,000 gallons of oil. Matt Volz, *35,000 Gallons of Oil Spills After Montana Train De-railment*, Independent Record (July 17, 2015), *available at* https://helenair.com/missoula/news/state-and-regional/gallons-of-oil-spills-after-montana-train-derailment/article_9a7778f6-e118-5dad-afe3-3ea4aaf9a2d3.html. In addition to the 2013 Quebec derailment referenced above (in which 47 people were killed and much of the town of Lac-Megantic was incinerated), "trains hauling crude from the Bakken region of North Dakota and Montana have been involved in fiery derailments in six states." *Id*.

If the easement is vacated and DAPL ceases to be operational, to the extent a significant additional portion of Bakken oil is shipped westward by rail, it would pass through environmen-tally sensitive areas. Trains heading west from the Bakken skirt the banks of the upper Missouri

18

River from Snowden, Montana, to east of Glasgow, Montana, nearly to Ft. Peck Lake. On the west side of Montana, the line climbs through the Rockies over Marias Pass and skirts the southern boundary of Glacier National Park from East Glacier to Columbia Falls. At Columbia Falls it crosses the Flathead River heading west to Whitefish and then along the shore of Whitefish Lake. East of Libby, Montana, the railroad parallels the Kootenai River all the way to Bonner's Ferry, Idaho. These areas, including Glacier National Park, pristine wilderness, and blue ribbon trout streams, are some of the most environmentally sensitive areas in the country. Oil spills from train derailments would not merely be disruptive; they would be devastating.

Indeed, the beauty of the mountains and the clear running mountain rivers and streams brought many people to make places like Montana their home. Thus, the importance of preservation and protection of the environment cannot be overstated. In 1972 Montana adopted a new Constitution reflecting this value, as the first enumerated, inalienable, fundamental constitutional right is "the right to a clean and healthful environment." Mont. Const. art. 2, sec. 3. This is not a mere aspirational statement. On the contrary, Article 9, section 1 of the Constitution mandates:

(1) The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations.

(2) The legislature shall provide for the administration and enforcement of this duty.

(3) The legislature shall provide adequate remedies for the protection of the environmental life support system from degradation and provide adequate remedies to prevent unreasonable depletion and degradation of natural resources.

The right to a clean and healthy environment was deemed paramount by the delegates to Montana's 1972 Constitutional Convention and was, therefore, included as a fundamental right by a vote of 79 to 7. Montana Constitutional Convention, Vol. V at 1640, March 7, 1972.

Moreover, as the Montana Supreme Court has concluded, "the delegates' intention was to provide language and protections which are both anticipatory and preventative"—and not "merely prohibit that degree of environmental degradation which can be conclusively linked to ill health or physical endangerment." *Mont. Envtl. Info. Ctr. v. Dep't of Envtl. Quality*, 988 P.2d 1236, 1249 (Mont. 1999). Indeed, the Montana Constitution "does not require that dead fish float on the surface of our state's rivers and streams before its farsighted environmental protections can be invoked." *Id.* Rather, the legislature has a textual obligation "to provide adequate remedies for degradation of the environmental life support system and to prevent unreasonable degradation of natural resources," period. *Id.* In short, a shut-down of DAPL would create an entirely avoidable set of dangers and risks to the values those in the West hold most dear.

Shutting down DAPL will likely introduce negative environmental externalities in other ways as well. One study found that, for moving Bakken crude to the Gulf of Mexico in 2014, the sum of air pollution and greenhouse gas costs were nearly twice for rail as for pipeline. Karen Clay et al., *The External Costs of Transporting Petroleum Products by Pipelines and Rail: Evidence from Shipments of Crude Oil from North Dakota*, National Bureau of Economic Research, at 15 (Sept. 2017). That report estimated that a fully loaded 100-car train of Bakken crude headed to the Gulf Coast would impose air pollution and greenhouse gas costs of $150,000, compared to $78,000 if it moved by pipeline. *Id.* at 21. And as trains move through more densely populated areas, those costs increase as trains idle for substantial periods of time in hubs like Chicago, often threatening more environmental harm in under-resourced residential urban areas than affluent suburbs. *Id.* at 11. By contrast, not only do pipelines pose no threat to residential urban areas themselves, but they terminate at refineries which do not sit in residential areas. *Id.* at 9.

\*\*\*

This case is ostensibly about the Corps' failure to study the environmental impact of an oil pipeline. But if pipeline flow must cease while the environment is studied, it is not only oil producers who will suffer—so will grain farmers, the world food supply, public safety, and the environment itself (particularly in the West). One way or another, oil will continue to pour out of the Bakken fields. The questions for this Court are at what cost and whether, pending study of an oil pipeline's environmental impact, grain will too.

## CONCLUSION

For these reasons, Amici States urge this Court not to vacate the easement that allows continued operation of the Dakota Access Pipeline.

Respectfully submitted,

TIM FOX
Montana Attorney General

By: */s/Rob Cameron*
Rob Cameron
Deputy Attorney General

Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Tel: (406) 444-2026
Email: Rob.Cameron@mt.gov

CURTIS T. HILL, JR.
Indiana Attorney General

By: */s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Julia C. Payne
Deputy Attorney General

Office of the Indiana Attorney General
302 W. Washington St.
Indiana Government Center South, 5th Floor
Indianapolis, IN 46204-2770
Phone:  (317) 232-6255
Fax:  (317) 232-7979
Email: Tom.Fisher@atg.in.gov
Julia.Payne@atg.in.gov

# ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

LESLIE RUTLEDGE
Attorney General
State of Arkansas

TOM MILLER
Attorney General
State of Iowa

DEREK SCHMIDT
Attorney General
State of Kansas

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

DOUG PETERSON
Attorney General
State of Nebraska

DAVE YOST
Attorney General
State of Ohio

JASON R. RAVNSBORG
Attorney General
State of South Dakota

KEN PAXTON
Attorney General
State of Texas

SEAN REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2020, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which shall send notification of such filing to any CM/ECF

participants.

*/s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov