**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-01534-JEB (and Consolidated Case Nos. 1:16-cv-01796 and 1:17-cv-00267) |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL., | |
| Plaintiff-Intervenors, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

—————————————————

**BRIEF OF *AMICUS CURIAE* HESS CORPORATION IN SUPPORT OF
A NON-VACATUR REMEDY ON REMAND**

—————————————————

**CORPORATE DISCLOSURE STATEMENT**

In accordance with Rules 26.1 and 29(a)(4)(A) of the Federal Rules of Appellate Procedure and LCvR 7(o)(5), Hess Corporation states that it is the ultimate parent corporation of all of its members.  Hess Corporation is publicly traded on the New York Stock Exchange.

## TABLE OF CONTENTS

STATEMENT OF INTEREST AND INTRODUCTION ................................................................1

ARGUMENT .............................................................................................................................2

      A.      Hess Has Structured Its North Dakota Operations Based On The
             Availability Of DAPL. ..........................................................................................3

      B.      Shutting Down DAPL Would Significantly Disrupt Hess's Operations
             And Require Wells To Be Shut In. .........................................................................5

      C.      Shutting In Wells Would Have Significant Disruptive Consequences. ...................7

      D.      Shutting Down DAPL Would Have Significant Disruptive Consequences
             For Hess's Partners, The State Of North Dakota, And The Energy
             Industry. ..............................................................................................................9

CONCLUSION .........................................................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ..................................................................1, 2, 9, 11

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
    920 F.2d 960 (D.C. Cir. 1990) .....................................................................................1

**Statutes**

National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* .......................................................1

**Rules**

LCvR 7 ...........................................................................................................................1

**Other Authorities**

Exec. Order No. 13,766, 82 Fed. Reg. 8,657 (Jan. 24, 2017) ........................................................10

Memorandum on Expediting Review of Pipeline Projects from Cushing,
    Oklahoma, to Port Arthur, Texas, and Other Domestic Pipeline Infrastructure
    Projects, 77 Fed. Reg. 18,891 (Mar. 22, 2012) .......................................................10

U.S. Energy Information Administration, *April 2020 Monthly Energy Review*,
    https://www.eia.gov/totalenergy/data/monthly/pdf/mer.pdf (last accessed Apr.
    28, 2020) ....................................................................................................10

*What's on Your Mind?*, WZFG (Nov. 7, 2019),
    https://www.am1100theflag.com/news/12220-11719-dapl-20-pipeline-ryan-
    rauschenberger-nd-tax-commissioner .......................................................10

**STATEMENT OF INTEREST AND INTRODUCTION**

*Amicus curiae*, Hess Corporation ("Hess"),[1] is a major producer of crude oil and natural gas from the Bakken formation in North Dakota.  As described below and in Exhibit 3, the Declaration of Brent Lohnes, Hess has a compelling interest in whether the Dakota Access Pipeline ("DAPL") should be shut down while the U.S. Army Corps of Engineers (the "Corps") prepares an Environmental Impact Statement ("EIS") under the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*  That is because Hess transports 55,000 barrels of crude oil per day on DAPL, and does not have other practical options to transport or market those volumes.  If DAPL is shut down while the Corps prepares an EIS, Hess would likely need to shut in a portion of its production in the Bakken, which would have significant and far-reaching consequences for Hess, its counterparties, and its employees.  Hess is therefore interested in continued access to DAPL during remand.

Accordingly, Hess submits this *amicus* brief to address the second factor that courts consider in deciding whether an agency rule should be vacated during remand: the "disruptive consequences" of a DAPL shutdown while the Corps conducts its EIS.  *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993) (quoting *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)).

This brief was authored in whole by counsel for Hess and is filed pursuant to LCvR 7(o).  No other party, party's counsel, or any person other than Hess contributed money to fund the preparation or submission of this brief.

---

[1]     For ease of reference, Hess refers to both Hess Corporation and its affiliates.

1

**ARGUMENT**

Shutting down DAPL, even temporarily, would fundamentally and detrimentally impact Hess's operations in North Dakota. Today, Hess is one of the three biggest producers in the Bakken: Hess operates more than 1,600 wells that produce approximately 145,000 barrels of crude oil per day. Ex. 3 ¶ 5. Hess transports more than one-third of its Bakken production—55,000 barrels per day—on DAPL. *Id.* ¶ 9.

DAPL has significantly advanced Hess's operations in North Dakota, and Hess has taken numerous steps in reliance on it. As described in greater detail below and in the attached declaration of Brent Lohnes, Hess has:

- Increased its production by nearly 50 percent since DAPL became available, and utilized DAPL to transport that increased production;

- Designed its transportation and marketing strategy around DAPL's availability; and

- Invested tens of millions of dollars in infrastructure to be able to connect the oil that Hess produces in North Dakota to DAPL, while simultaneously divesting alternative transportation assets like railcars.

As a practical matter, if DAPL is shut down while the Corps prepares its EIS, Hess would need to shut in wells because there simply is no way to refine, sell, or transport the volume of oil that is currently being produced by Hess in the Bakken without DAPL. Shutting in wells, in turn, would impose significant direct and indirect costs on Hess, its counterparties, and its employees—including lost revenues, lost jobs, and potentially lost leasehold interests. And bringing wells back online after an extended shut-in will likely result in tens of millions of dollars in additional costs. Thus, vacatur during remand would have serious "disruptive consequences" for Hess under *Allied-Signal*, and this Court should not vacate the Lake Oahe easement and shut down DAPL while the Corps prepares its EIS.

### A.    Hess Has Structured Its North Dakota Operations Based On The Availability Of DAPL.

Hess or its predecessors have been operating in the Bakken since 1951.  Ex. 3 ¶ 4.  Today, Hess holds more than 500,000 net acres in the Bakken (both north and south of the Missouri River), with more than 1,600 active wells producing approximately 145,000 barrels of crude oil a day.  *Id.* ¶ 5.  To operate at this scale, Hess has invested more than $8.2 billion since 2014 in North Dakota, and is one of the largest private employers in the state.  *Id.* ¶ 6.  Hess has also invested tens of millions of dollars in North Dakota community initiatives in the past 5 years.  *Id.*

The availability of DAPL beginning in 2017 significantly affected Hess's operations in North Dakota.  Hess made numerous operational changes based on the availability of DAPL, including (1) increasing production; (2) investing in and building out infrastructure; (3) divesting alternative assets used to transport crude oil out of the basin; and (4) entering into contracts that depend on DAPL's ability to transport certain volumes of oil production.  *Id.* ¶¶ 8–12.

*First*, Hess has increased its Bakken production by nearly 50 percent since DAPL became available in 2017, and Hess uses DAPL to transport that increased production out of the Bakken region.  *Id.* ¶ 9.  Since the second quarter of 2017, Hess has shipped between 50,000 and 55,000 barrels or more per day on DAPL, and Hess plans to continue shipping 55,000 barrels or more per day on DAPL for the foreseeable future.  *Id.*

*Second*, Hess has made significant investments to be able to use DAPL.  For example, to be able to access DAPL, Hess entered into a multi-party agreement to build the Johnson's Corner Header System (which receives crude oil by pipeline and delivers it to interstate pipeline systems) to tie into DAPL, which was accompanied by a seven-year crude oil sale and purchase agreement (with two extensions available up to 20 years).  *Id.* ¶ 10.  Hess has invested approximately $11 million in developing that project, which took more than a year from start to finish.  *Id.*  Hess has

also invested more than $10 million to reverse the flow of its Keene Oil Gathering pipeline and connect it to the Johnson's Corner Header System.  *Id.*  Hess also made pipeline, storage, and terminal investments to connect its Tioga Rail Terminal and Rambert Terminal Facility to DAPL. *Id.*  In total, Hess has invested more than $40 million in infrastructure projects in reliance on DAPL's operation.  *Id.*

Hess has also built additional infrastructure to manage the increase in production based on the availability of DAPL.  When oil production increases, the production of other hydrocarbons— particularly natural gas and natural gas liquids—is increased as well.  *Id.* ¶ 24.  To handle the increased quantities of natural gas and natural gas liquids being produced as a result of DAPL's availability, Hess's Midstream affiliate also formed a 50-50 joint venture with Targa Resources in 2018 to build a gas processing plant called Little Missouri Four ("LM4") south of the Missouri River in North Dakota.  *Id.* ¶ 10.  LM4 was built at a net cost to Hess of about $120 million.  *Id.*

*Third*, Hess has also divested assets based on DAPL's availability.  Before DAPL, Hess transported a significant portion of its Bakken production by rail.  *Id.* ¶ 11.  But once DAPL became available, Hess no longer needed to rely as heavily on railcar transportation, and accordingly divested approximately two-thirds of its railcar assets.  *Id.*

*Fourth*, Hess has made marketing and transportation arrangements based on its ability to access and transport oil on DAPL.  *Id.* ¶ 12.  These arrangements include commitments to terminals, tanks, and docks that are connected to and supplied by DAPL, such as agreements to lease tanks and commit to volume throughput over the terminal's dock.  The commitments exceed $50 million.  *Id.*

**B.    Shutting Down DAPL Would Significantly Disrupt Hess's Operations And Require Wells To Be Shut In.**

Shutting down DAPL while the Corps prepares an EIS would fundamentally and detrimentally impact Hess's operations in North Dakota.  Hess would face substantial operational challenges because there is no practical alternative or efficient way to transport the volume of oil that Hess currently ships on DAPL if the pipeline is shut down.  *Id.* ¶ 13.  Rather, producers like Hess would be required to shut in a portion of their North Dakota wells, which would have both direct and indirect disruptive consequences.  *Id.*

To begin, Hess would not be able to use existing alternative transportation methods to transport the 55,000 barrels of crude oil that Hess ships on DAPL per day in a way that allows Hess to maintain its volume commitments and marketing arrangements.  *See id.* ¶ 9.  The transportation challenges are exacerbated by the local geography.  The Bakken formation is naturally divided by the Missouri River and Lake Sakakawea, which has limited pipeline crossings.  *Id.* ¶ 15.  About half of Hess's production is from north of the river, with the other half to the south.  *Id.*  If DAPL were unavailable, Hess would likely be required to attempt to ship by rail the 55,000 barrels per day that are currently shipped on DAPL.  But Hess's rail terminal (the Tioga Rail Terminal) and terminal facility (the Ramberg Terminal Facility) are north of the river.  *Id.*  And while Hess currently has some capacity to transport crude oil by pipeline across the river, that capacity is temporary, *see id.*, and when it is no longer available, Hess would need to transport its south-of-the-river production to Tioga by tanker truck.  *Id.*  A tanker truck can transport less than 200 barrels of oil at a time, and a round trip from Hess's production fields south of the river to Tioga takes approximately eight hours.  *Id.*  Thus, at the current pace of production, hundreds of trucks a day would be required to transport crude oil from the south Bakken fields to Tioga.  *Id.*  That is logistically impossible and cost-prohibitive while also increasing safety and environmental

concerns.  Practically speaking, Hess's production fields south of the river would be partially or totally stranded while DAPL is shut down.  *Id.*

Nor could Hess simply make alternative transportation or marketing arrangements to manage the 55,000 barrels of oil per day that would be displaced by a shutdown of DAPL.  Not only would such arrangements take time to develop, but they would not replace all of the displaced volumes, and they would be at a lower price (and at a higher cost) in any event.  *See id.* ¶ 14.  That is in part because in-basin supply of crude oil far exceeds in-basin demand, *id.* ¶ 18, and in part because the cost of shipping via DAPL is significantly lower (on a per barrel basis) than shipping via railcar or other alternative means.  And, of course, if DAPL is shut down, it is not just Hess's 55,000 barrels that would be displaced: the total displaced volumes would be ten times that given how much oil is transported on DAPL on a daily basis.

Hess also could not simply build new infrastructure, like a new pipeline to transport crude oil from south of the river to Tioga or out of the basin, or like a new rail terminal south of the river.  *Id.* ¶ 16.  Such infrastructure would take well over a year—and tens of millions of dollars—to develop.  *Id.*  Moreover, because Hess already divested two-thirds of its railcars based on the availability of DAPL, Hess would need to acquire substantial new rail assets at a time when demand for rail assets would be abnormally high given the basin-wide need to transport millions of barrels of oil by rail that had previously been transported on DAPL.  *Id.*  And unless DAPL is shut down permanently, it would make no economic sense to invest tens of millions of dollars in building out new, temporary infrastructure.  *Id.* ¶ 17.  Assuming an EIS takes even as long as two to three years but that DAPL thereafter resumes operations, it would be difficult to justify expending capital to develop, build, and install expensive parallel infrastructure that will be uneconomic as soon as DAPL comes back online.  *Id.*

Finally, Hess also could not store the crude oil locally or in a nearby field. *Id.* ¶ 19. Storage capacity in the region is already at maximum capacity, and there is no practical way to build storage facilities capable of storing the millions of barrels of crude oil that are being transported on DAPL. *Id.*

The bottom line is that because Hess would be unable to transport, market, or store the oil that it produces in the Bakken and ships on DAPL at the current rate of production, it would be required to shut in wells soon thereafter, particularly south of the Missouri River. *Id.* ¶¶ 14, 20. As discussed below, that, in turn, would have significant disruptive consequences.

**C.   Shutting In Wells Would Have Significant Disruptive Consequences.**

Shutting in wells has substantial costs and disruptive consequences, particularly if wells are shut-in for an extended period of time—such as the length of time needed for the Corps to conduct an EIS. *Id.* ¶ 21.

*First*, shutting in wells has direct economic effects. If Hess cannot produce oil and sell it, that deprives Hess (and working interest owners) of revenues. *Id.* ¶ 22. Moreover, if Hess cannot earn revenues from production, that deprives royalty interest owners (typically landowners in North Dakota who have leased their land to Hess for purposes of developing mineral assets) of revenues as well. *Id.* The royalties that Hess pays in any given year are substantial. For example, in 2019, Hess made more than $340 million in royalty payments based on its North Dakota production.

*Second*, if wells are shut-in for a prolonged period of time (*i.e.*, a year or more), Hess could lose some of the leasehold interests that it has spent decades acquiring, depending on the terms of the lease at issue. *Id.* ¶ 23. In most oil and gas leases, the primary term of a lease can be extended if a well is producing in paying quantities—that is, the lease remains in effect so long as there is production. *Id.* While the precise language varies from lease to lease, if Hess is unable to produce

7

hydrocarbons for a period that is longer than a lease allows, there is a risk that it would lose at least some of its leasehold interests and be forced to buy back those leasehold interests in the future at significant cost (if it could do so at all). *Id.*

*Third*, if Hess is not able to maintain its current production based on shut-ins, it would not be able to satisfy natural gas and natural gas liquids volume commitments. *Id.* ¶ 24. As discussed above, natural gas and natural gas liquids are produced with crude oil and are valuable commodities that are gathered and processed, and then often transported to downstream markets. *Id.* Hess's midstream affiliate operates a field gathering system and the Tioga Gas Plant to gather and process most of the natural gas and natural gas liquids Hess produces in the Bakken. *Id.* Hess also operates the LM4 gas plant with Targa Resources. *Id.* If crude oil production is curtailed south of the river, the LM4 plant could be underutilized as a result of the decline in the production of associated natural gas and natural gas liquids. *Id.*

Moreover, as is typical in the industry, numerous of Hess's midstream and downstream natural gas and natural gas liquids contracts contain volume commitments—*i.e.*, Hess contractually agrees to move a certain quantity of hydrocarbons on these gathering and interstate pipelines. *Id.* ¶ 25. For example, Hess's contracts with interstate pipelines such as Alliance, Northern Border, ONEOK, and Vantage all contain volume commitments. *Id.* Hess must pay its contractual counterparties based on those volume commitments whether or not it can supply those volumes. *Id.* Thus, Hess would be required to pay to move more hydrocarbons than it is actually able to supply given the shut-ins. *Id.*

*Fourth*, bringing a well back online after it has been shut in for an extended period (approximately a year, but sometimes less) involves significant operational costs. *Id.* ¶ 26. Because water produced in conjunction with drilling activities is typically corrosive, a well that is

shut-in suffers downhole corrosion during extended periods of inactivity.  *Id*.  It can easily cost $200,000 per well or more to perform the workover, re-stimulation, and other maintenance activities required to restart production from these shut-in wells.  *Id*.  Given that Hess operates more than 1,600 wells in the Bakken, shutting in even a relatively small percentage of wells would quickly result in large costs in bringing wells back online.  *Id*.  For example, if Hess were to shut in just 10 percent of its wells, the costs of bringing them back online could easily exceed $30 million.  *Id*.

*Fifth*, if a significant portion of Hess's operations are shut in for an extended period, it would not be able to maintain its full workforce of employees and contractors.  *Id*. ¶ 27.  Hess utilizes a workforce of approximately 1,500 people to service its North Dakota operations.  *Id*. Hess will likely not be able to maintain a workforce of this size if its operations are significantly reduced, and it thus would be required to furlough or lay-off workers in the event of an extended shut-in.  *Id*.

Thus, the disruptive effects of vacatur on Hess's distribution operations would have cascading effects on Hess's production operations.

### D.   Shutting Down DAPL Would Have Significant Disruptive Consequences For Hess's Partners, The State Of North Dakota, And The Energy Industry.

The "disruptive consequences" under *Allied-Signal* of even a temporary DAPL shutdown would be significant and widespread, with millions of dollars in costs and lost revenues and material harm not just to Hess's employees and contractors, but also to the contractors' employees, the State of North Dakota, and the U.S. energy industry.  Shutting down DAPL would require shutting in wells and reducing production, which would force both Hess and the contractors that service its operations to reduce their staffing.  Diminished production would lead to fewer jobs, which would have "disruptive consequences" for the State of North Dakota's economy, which has

already realized hundreds of millions of dollars in tax revenue because of DAPL.  *See What's on Your Mind?*, WZFG (Nov. 7, 2019), https://www.am1100theflag.com/news/12220-11719-dapl-20-pipeline-ryan-rauschenberger-nd-tax-commissioner (interview by Scott Hennen with Ryan Rauschenberger, North Dakota Tax Commissioner, noting that North Dakota realized about $250 million in new tax revenues in the two years after DAPL became operational).  Shutting down DAPL would result in economic hardship for the thousands of people who rely on oil production in the Bakken for their livelihoods, and would also reduce the state severance taxes that Hess pays based on its North Dakota production.  Moreover, Hess makes substantial royalty payments to landowners (including both North Dakota private landowners and the federal government) based on its North Dakota production—royalty payments that would be curtailed as a result of a shutdown of DAPL.  *See* Ex. 3 ¶ 22.

Reducing production in the Bakken would also have significant implications for U.S. energy security, as it would increase reliance on foreign oil.  Both the Trump Administration and the Obama Administration have recognized the vital national importance of crude oil pipelines.  *See* Exec. Order No. 13,766, 82 Fed. Reg. 8,657, 8,657 (Jan. 24, 2017); Memorandum on Expediting Review of Pipeline Projects from Cushing, Oklahoma, to Port Arthur, Texas, and Other Domestic Pipeline Infrastructure Projects, 77 Fed. Reg. 18,891, 18,891 (Mar. 22, 2012).  Pipelines like DAPL helped the U.S. reduce its 2019 reliance on imported oil to its lowest levels since the 1950s.  *See* U.S. Energy Information Administration, *April 2020 Monthly Energy Review* at 59 (Table 3.1 Petroleum Overview, March 2020), https://www.eia.gov/totalenergy/data/monthly/pdf/mer.pdf (last accessed Apr. 28, 2020).  But a DAPL shutdown would require producers like Hess to reduce their production in the Bakken, inevitably forcing American industries and households to rely more heavily on imported oil.

DAPL is a critical component of the U.S. energy infrastructure and the "disruptive consequences" of even a temporary shutdown would extend far beyond Hess.

Hess therefore asks this Court, in light of *Allied-Signal* and the significant disruptive consequences to Hess's operations, employees, and contractors, as well as the disruptive consequences for the State of North Dakota and the U.S. energy sector more broadly, to not vacate the Lake Oahe easement and shut down DAPL while the Corps prepares its EIS.

## CONCLUSION

For the above reasons, Hess respectfully requests that the Court order that the remand proceed without vacatur.

Dated:  April 29, 2020

**KIRKLAND & ELLIS LLP**

By: */s/ Ragan Naresh, P.C.*

Daniel T. Donovan, P.C., #459680
Ragan Naresh, P.C., #984732
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
(202) 389-5200
daniel.donovan@kirkland.com
ragan.naresh@kirkland.com

*Counsel for* Amicus Curiae *Hess Corporation*

11

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rules 29(a)(4)(G) and 32(g)(1) of the Federal Rules of Appellate Procedure and LCvR 7(o)(5), I hereby certify that the foregoing Brief of *Amicus Curiae* Hess Corporation in Support of a Non-Vacatur Remedy, filed on April 29, 2020, complies with LCvR 7(o)(4) because it does not exceed 25 pages.

*/s/ Ragan Naresh, P.C.*
Ragan Naresh, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
(202) 389-5200
ragan.naresh@kirkland.com

*Counsel for* Amicus Curiae *Hess Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of April 2020, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

*/s/ Ragan Naresh, P.C.*
Ragan Naresh, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
(202) 389-5200
ragan.naresh@kirkland.com

*Counsel for* Amicus Curiae *Hess Corporation*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, <br><br> Plaintiffs, <br><br> and <br><br> CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> U.S. ARMY CORPS OF ENGINEERS, <br><br> Defendant-Cross Defendant, <br><br> and <br><br> DAKOTA ACCESS, LLC, <br><br> Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-01534-JEB (and Consolidated Case Nos. 1:16-cv-01796 and 1:17-cv-00267) |

---

**DECLARATION OF BRENT LOHNES IN SUPPORT OF HESS CORPORATION'S**
***AMICUS CURIAE'S* BRIEF ON THE QUESTION OF REMEDY**

---

1. My name is Brent Lohnes.  I am the General Manager for North Dakota at Hess Corporation (together with its affiliates, "Hess").  In this role, I am responsible for the safe and efficient operation of all Bakken assets within Hess, including the Tioga Gas Plant, the producing assets in the field, the Tioga Rail Terminal, the oil and gas gathering systems in North Dakota, and all the personnel used to manage these facilities and others.  I work closely with internal and external organizations as well as governmental and regulatory agencies to manage stakeholder relationships to support commercial, production, infrastructure operations, and regulatory

compliance.  I have worked at Hess since 2007.  My business address today is 1501 McKinney Street, Houston, TX 77010.

2.  Hess is a major producer of crude oil and natural gas from the Bakken formation in North Dakota.  There is not enough processing capability in North Dakota to refine all of the crude oil being produced there, nor is there enough local demand for it.  Hess uses the Dakota Access Pipeline ("DAPL") to transport a substantial percentage of its crude oil production in North Dakota to various downstream markets.  Hess does not have other practical options to transport the crude oil that is currently being shipped on DAPL.

3.  This declaration describes the potential disruptive effects on Hess if DAPL is shut down while the U.S. Army Corps of Engineers (the "Corps") completes an Environmental Impact Statement ("EIS").

**<u>Hess's Operations In The Bakken And Utilization Of DAPL</u>**

4.  Hess or its predecessors have been operating in the Bakken since 1951.

5.  Today, Hess holds more than 500,000 net acres in the Bakken (both north and south of the Missouri River), with more than 1,600 active wells producing approximately 145,000 barrels of crude oil a day.  The wells also produce substantial quantities of associated natural gas and natural gas liquids.  Hess is one of the three largest producers in the Bakken today.

6.  Hess has made substantial investments to be able to operate on this scale.  Hess has invested more than $8.2 billion since 2014 in North Dakota, and is one of the largest private employers in the state.  Hess has also invested tens of millions of dollars in North Dakota community initiatives in the past 5 years.

7.  Hess is committed to environmental stewardship and sustainability in conducting its operations.  For example, Hess helped form the Intelligent Pipeline Integrity Program

("iPIPE"), a collaboration of oil and gas operators; the Energy and Environmental Research Center, a nonprofit division of the University of North Dakota; and the North Dakota Industrial Commission ("NDIC").  Program participants are investing a total of $9 million (a $2.4 million grant from the NDIC plus matching funds from participating operators) over four years to research and demonstrate emerging technologies that can enhance pipeline integrity efforts and encourage industrywide adoption of worthy technologies.  For these efforts and others, Hess has been recognized as a leader in climate change stewardship by CDP, an international nonprofit seeking to drive sustainable economies, for eleven consecutive years.  Hess has also been named on the Dow Jones Sustainability Index ("DJSI") North America – which recognizes public companies for outstanding performance across economic, environmental, and social factors – for ten consecutive years, and is one of four U.S. oil and gas producers listed on the North America index.

8. While Hess has operated in the Bakken for nearly 70 years, the availability of DAPL beginning in 2017 significantly affected Hess's operations.  Hess has made numerous operational changes in reliance on the availability of DAPL, including: increasing production, investing in and building infrastructure, and divesting alternative assets used to transport crude oil out of the basin.

9. Hess increased its production because of the availability of DAPL.  Before DAPL became available in 2017, Hess produced approximately 100,000 barrels of crude oil a day.  Today, Hess produces approximately 145,000 barrels of crude oil a day.  Hess uses DAPL to transport that increased production out of the Bakken region.  Since the second quarter of 2017, Hess has shipped 50,000 barrels or more per day on DAPL, and today, Hess ships approximately

55,000 barrels of oil per day on DAPL with plans to continue shipping similar volumes for the foreseeable future.

10. Hess has made significant investments to be able to use DAPL.  For example, to be able to access DAPL, Hess entered into a multi-party agreement in November 2016 to build the Johnson's Corner Header System to tie into DAPL, which was accompanied by a seven-year crude oil sale and purchase agreement (with two extensions available up to 20 years).  Hess has invested approximately $11 million to develop that project, which took more than a year from start to finish.  Hess also invested more than $10 million to reverse the flow of its Keene Oil Gathering pipeline and connect it to the Johnson's Corner Header System.  Hess also made pipeline, storage, and terminal investments to connect its Tioga Rail Terminal and Rambert Terminal Facility to DAPL at the Beaver Lodge station.  In total, Hess has invested more than $40 million in infrastructure projects in reliance on DAPL's operation.  Hess has also built out additional infrastructure to manage increased production.  For example, in 2018, Hess's Midstream affiliate also formed a 50-50 joint venture with Targa Resources to build a gas processing plant called Little Missouri Four ("LM4") at Targa's existing Little Missouri facility, south of the Missouri River in North Dakota.  The plant was built at a net cost to Hess of approximately $120 million and came online last year with a processing capacity of 200 million standard cubic feet per day.

11. Hess also divested alternative transportation assets based on DAPL's availability.  Before DAPL was available, Hess transported approximately 30 percent of its Bakken production by rail.  Once DAPL became available, Hess divested approximately two-thirds of its railcar assets based on the availability of DAPL.  While Hess still operates assets for the transportation of

crude oil by rail, Hess has neither the capacity nor the commercial agreements in place to offset crude oil volumes that are currently being shipped on DAPL.

12. Finally, Hess has made marketing and transportation arrangements based on its ability to access and transport oil on DAPL.  These arrangements include commitments to terminals, tanks, and docks that are connected to and supplied by DAPL, such as agreements to lease tanks and commit to volume throughput over the terminal's dock.  The commitments exceed $50 million.

**Shutting Down DAPL Would Cause Significant Disruptions**

13. A shutdown of DAPL while the Corps prepares an EIS would fundamentally and detrimentally impact Hess's operations in North Dakota.  Hess would face substantial operational challenges given that there is no practical alternative or efficient way to transport the volume of oil that is currently being produced there.  A shutdown of DAPL will likely require Hess to shut in a portion of its production in North Dakota.

14. First, if the Court orders an immediate shut down of DAPL, Hess would have no choice but to shut in production volumes equal to what it is currently shipping on DAPL.  Although Hess could begin seeking alternative commercial and transportation arrangements, that would take at least several months – and would offset only a portion of the displaced volumes.  There are unlikely to be alternative commercial and transportation arrangements for at least half of the displaced volumes.  And for displaced volumes that could be marketed and transported, the transportation costs would be higher and Hess would likely be forced to sell those volumes at a discount.

15. For Hess to maintain its volume commitments and marketing arrangements if DAPL is taken out of service, Hess would need to attempt to transport tens of thousands of barrels of crude

oil every day by tanker truck.  The Bakken formation is naturally divided by the Missouri River and Lake Sakakawea, which has limited pipeline crossings.  As a result, transporting crude oil from south of the river (where Hess has approximately half of its production) to north of the river (where Hess operates its Tioga Rail Terminal, Ramberg Terminal Facility, and Tioga Gas Plant) is capacity constrained.  While Hess currently has some capacity to transport crude oil by pipeline across the river, that capacity is permitted only through the third quarter of 2021, and is unlikely to be capable of transporting all of the displaced volumes in any event.  When that pipeline capacity is no longer available, to get to Tioga from south of the river, crude oil would likely need to cross the river by tanker truck.  A tanker truck can transport less than 200 barrels of oil at a time, and a round trip from Hess's production fields south of the river to Tioga takes approximately eight hours.  Thus, at the current pace of production, hundreds of trucks a day would be required to transport crude oil from the south Bakken to Tioga.  That is logistically impossible and cost-prohibitive while also increasing safety and environmental concerns.  Given the difficulty in transporting the crude oil from production fields south of the river to Hess's existing transportation infrastructure, which is located north of the river, it is likely that production south of the river would be partially or totally stranded while DAPL is shut in.

16. Hess could not simply build new infrastructure, like a new pipeline to transport crude oil from south of the river to Tioga or out of the basin, or like a new rail terminal south of the river.  Such infrastructure would take well over a year – and tens of millions of dollars – to develop.  Moreover, because Hess already divested two-thirds of its railcars based on the availability of DAPL, Hess would need to acquire substantial new rail assets at a time when demand for rail

assets would be abnormally high given the basin-wide need to transport millions of barrels of oil by rail that had previously been transported on DAPL.

17. Moreover, unless DAPL is shut in permanently, it would make no economic sense to invest tens of millions of dollars in building out new infrastructure.  Assuming an EIS takes even as long as two to three years but that DAPL thereafter resumes operations, it would be difficult to justify expending capital to develop, build, and install expensive parallel infrastructure that will be uneconomic as soon as DAPL comes back online.

18. Nor could Hess practically change its marketing arrangements by selling in-basin.  The local markets for crude oil in North Dakota have been oversaturated.  Given that DAPL receives 550,000 barrels of crude oil a day from Bakken producers, a shut-down of DAPL would result in massive local surpluses where supply far exceeds demand.

19. Hess also could not store the crude oil locally or in a nearby field.  Storage capacity in the region is already at maximum capacity, and there is no practical way to build storage facilities capable of storing the millions of barrels of crude oil that are being transported on DAPL.

20. If DAPL is shut down, Hess will likely be required to shut-in wells soon thereafter, particularly south of the Missouri River.  The number of wells and volume of production shut in would depend on the timing of the Court's ruling, to what extent Hess could find alternative transportation and markets for the crude oil, and the economics of alternative transportation and markets (if they can even be found).

21. Shutting in wells has substantial costs, particularly if wells are shut in for an extended period of time – such as the length of time needed for the Corps to conduct an EIS.

22. First, shutting in wells has direct economic effects:  Hess, working interest owners, and royalty interest owners (*i.e.*, local landowners in North Dakota) will not be able to sell crude oil and

natural gas and earn revenues (and royalties) from those wells while they are shut-in.  In 2019, Hess paid over $340 million in royalties based on its North Dakota production.

23. Second, if wells are shut-in for a prolonged period of time (*i.e.*, a year or more), Hess could lose some of the leasehold interests that it has spent decades acquiring, depending on the terms of the lease at issue.  In most oil and gas leases, the primary term of a lease can be extended if a well is producing in paying quantities – that is, the lease remains in effect so long as there is production.  While the precise language varies from lease to lease, if Hess is unable to produce hydrocarbons for longer than a leasehold allows, there is a risk that it would lose at least some of its leasehold interests, and be forced to buy back those leasehold interests in the future at significant cost (if it could do so at all).

24. Third, if Hess is not able to maintain its current production based on shut-ins, it would not be able to satisfy natural gas and natural gas liquids volume commitments.  Natural gas and natural gas liquids are produced with crude oil and are valuable commodities that are gathered and processed, and then often transported to downstream markets.  Hess's midstream affiliate operates a field gathering system and the Tioga Gas Plant to gather and process most of the natural gas and natural gas liquids Hess produces in the Bakken.  Hess also operates the LM4 gas plant with Targa Resources.  If crude oil production is curtailed south of the river, the LM4 plant could be underutilized as a result of the decline in the production of associated natural gas and natural gas liquids.

25. As is typical in the industry, numerous of Hess's midstream and downstream natural gas and natural gas liquids contracts contain volume commitments – *i.e.*, Hess contractually agrees to move a certain quantity of hydrocarbons on these gathering and interstate pipelines.  For example, Hess's contracts with interstate pipelines such as Alliance, Northern Border,

ONEOK, and Vantage all contain volume commitments.  Hess must pay its contractual counterparties based on those volume commitments whether or not it can supply those volumes.  Thus, Hess would be required to pay to move more hydrocarbons than it is actually able to supply given the shut-in.

26. Fourth, bringing a well back online after it has been shut in for an extended period (approximately a year, but sometimes less) involves significant operational costs.  Because water produced in conjunction with drilling activities is typically corrosive, a well that is shut-in suffers downhole corrosion and formation of salt deposits that restrict production from the well after extended periods of inactivity.  It can easily cost $200,000 per well or more to perform the workover, restimulation, and other maintenance activities required to restart production from these shut-in wells.  Given that Hess operates 1,600 wells in the Bakken, shutting in even a relatively small percentage of wells would quickly result in large costs in bringing wells back online.  For example, if Hess were to shut-in 10 percent of its wells, the costs of bringing them back online could easily exceed $30 million.

27. Fifth, if a significant portion of Hess's operations are shut in for an extended period, it would not be able to maintain its full workforce of employees and contractors.  Hess utilizes a workforce of approximately 1,500 people to service its North Dakota operations.  Hess will likely not be able to maintain a workforce of this size if its operations are significantly reduced and it thus would be required to furlough or lay-off workers in the event of an extended shut-in.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: April 29, 2020   _____