**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,

        Plaintiffs,

  and

CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL.,

        Plaintiff-Intervenors,

      v.

U.S. ARMY CORPS OF ENGINEERS,

        Defendant-Cross Defendant,

  and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-Cross Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

**AMICI BRIEF OF NORTH DAKOTA FARM BUREAU, NORTH DAKOTA GRAIN DEALERS ASSOCIATION, NORTH DAKOTA GRAIN GROWERS ASSOCIATION, SOUTH DAKOTA CORN GROWERS ASSOCIATION, SOUTH DAKOTA FARM BUREAU FEDERATION, AND SOUTH DAKOTA SOYBEAN ASSOCIATION IN SUPPORT OF DEFENDANT-INTERVENOR-CROSS CLAIMANT DAKOTA ACCESS, LLC**

# CORPORATE DISCLOSURE STATEMENT

Pursuant to LCvR 7(o)(5), counsel for Amici hereby affirms that Amici do not have a

parent corporation and no publicly held companies own 10% or more of Amici's stock.

Dated:  April 29, 2020.


 /s/   Stephen R. Hanson II
Stephen R. Hanson II, (ND Bar No. 08585,
signing per LCvR 83.2(c))
Andrew D. Cook, (ND Bar No. 06278)
*Counsel for North Dakota Farm Bureau,*
*North Dakota Grain Dealers Association,*
*North Dakota Grain Growers Association,*
*South Dakota Corn Growers Association,*
*South Dakota Farm Bureau Federation, and*
*South Dakota Soybean Association*

OHNSTAD TWICHELL, P.C.
444 Sheyenne St., Ste. 102
P.O. Box 458
West Fargo, ND 58078-0458
Phone: (701) 282-3249
shanson@ohnstadlaw.com
acook@ohnstadlaw.com

 /s/ Kent Mayo
Kent Mayo (D.C. Bar No. 452842) (joining
with non-members per LCvR 83.2(c))
Adam Dec (D.C. Bar No. 888187500)
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
kent.mayo@bakerbotts.com
adam.dec@bakerbotts.com


J. Scott Janoe (TX Bar No. 24012897; ND Bar
No. 07461)
Paulina Williams (TX Bar No. 24066295)
BAKER BOTTS L.L.P.
910 Louisiana St., #3200
Houston, TX 77002
Phone: (713) 229-1234
scott.janoe@bakerbotts.com
paulina.williams@bakerbotts.com

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

STATEMENT OF INTEREST OF AMICI CURIAE ...............................................1

BACKGROUND .................................................................................................3

ARGUMENT ......................................................................................................5

    I.    **The Court should remand without vacating because a DAPL shutdown would cause disruptive consequences to the agricultural industry.** ...................................................................................... 5

        A.    Legal Standard for Vacatur ........................................................5

        B.    The equities weigh in favor of denying vacatur because of the disruptive consequences that would be faced by the agriculture industry if the Court ordered a DAPL shutdown. .......................................6

        C.    The Court's decision in *Semonite* favors a remand without vacatur. ..........7

CONCLUSION ....................................................................................................12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................................. 1, 5

*Black Oak Energy, LLC v. F.E.R.C.*,
  725 F.3d 230 (D.C. Cir. 2013) ...................................................................................... 7

*City of Oberlin, Ohio v. Fed. Energy Reg. Comm'n*,
  937 F.3d 599 (D.C. Cir. 2019) ...................................................................................... 6

*Humane Soc. of U.S. v. Johanns*,
  520 F.Supp.2d 8 (D.D.C. 2007) .................................................................................... 5

*Nat'l Parks Conservation Ass'n v. Semonite* (*Semonite I*),
  916 F.3d 1075 (D.C. Cir. 2019) .................................................................................... 8

*National Parks Conservation Association v. Semonite* (*Semonite II*),
  422 F.Supp.3d 92 (D.D.C. 2019) ......................................................................... 6, 7, 8, 9

*Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*,
  896 F.3d 520 (D.C. Cir. 2018) ...................................................................................... 7

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
  No. CV 16-1534 (JEB), 2020 WL 1441923 (D.D.C. Mar. 25, 2020) .................................. 8, 9

**Other Authorities**

"Ag bracing for railroad delays as record harvest looms," ARGUS LEADER, Sept. 15,
  2014, https://www.argusleader.com/story/news/2014/09/15/ag-bracing-railroad-
  delays-record-harvest-looms/15653623/ ........................................................................ 5, 11

"Food or Fuel? The Rail Car Shortage Conundrum," NBC NEWS, May 9, 2014,
  https://www.nbcnews.com/business/ economy/food-or-fuel-rail-car-shortage-
  conundrum-n209781 ................................................................................................ 5, 10, 11

"National Ag Week Being Celebrated in South Dakota," RAPID CITY JOURNAL, Mar.
  20, 2017, https://rapidcityjournal.com/news/local/communities/sturgis/national-
  ag-week-being-celebrated-in-south-dakota/article_075f2bc1-9240-5653-8cce-
  3a23bdb35629.html ................................................................................................... 3, 4

**TABLE OF AUTHORITIES**
(continued)

Page(s)

2040 North Dakota State Rail Plan, NORTH DAKOTA DEPARTMENT OF
    TRANSPORTATION, Nov. 2017,
    https://www.dot.nd.gov/divisions/planning/railplan/FINALNorth%20Dakota%20
    State%20Rail%20Plan%20December%202017.pdf............................................................ 4, 6

Liz Hampton, "With Dakota Access in limbo, more Bakken crude to move on trains,"
    REUTERS, Dec. 22, 2016, https://www.reuters.com/article/us-north-dakota-
    pipeline-rail/with-dakota-access-in-limbo-more-bakken-crude-to-move-on-trains-
    idUSKBN14B240 ............................................................................................................. 7

Renee Jean, "North Dakota agriculture continues to play essential role amid
    coronavirus outbreak," WILLISTON HERALD, Mar. 25, 2020,
    https://www.willistonherald.com/news/farm_and_ranch/north-dakota-agriculture-
    continues-to-play-essential-role-amid-coronavirus-outbreak/article_6068edfe-
    6eb8-11ea-baa7-0ff43aad1f15. html ................................................................................ 3

Ron Nixon, "Grain Piles Up, Waiting for a Ride, as Trains Move North Dakota Oil,"
    THE NEW YORK TIMES, Aug. 25, 2014,
    https://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-
    trains-move-north-dakota-oil.html ................................................................................ 4, 10

Tom Meersman, "Farmers seek more rail capacity for grain," Star Tribune, April 8,
    2014, https://www.startribune.com/farmers-seek-more-rail-capacity-for-
    grain/254467091/?refresh=true ................................................................................... 7

## INTRODUCTION

The issue before the Court is whether to vacate the easement issued by the U.S. Army Corps of Engineers (the "Corps") following the Court's decision to remand to the Corps to complete an Environmental Impact Statement ("EIS"). Under this Circuit's decision in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), the question of whether to vacate must be answered by considering the seriousness of the deficiencies in the agency's order and the disruptive consequences that may flow from vacatur. The North Dakota Farm Bureau, North Dakota Grain Dealers Association, North Dakota Grain Growers Association, South Dakota Corn Growers Association, South Dakota Farm Bureau Federation, and South Dakota Soybean Association (collectively "Amici") submit this Amici Brief to address the disruptive consequences that would impact farmers, grain elevators, and others in the agriculture industry if the Court vacated the easement and ordered a shutdown of the Dakota Access Pipeline ("DAPL"). Based on these disruptive consequences, Amici respectfully submit the Court should remand this matter without vacatur.

## STATEMENT OF INTEREST OF AMICI CURIAE

The North Dakota Farm Bureau is a grassroots, member-driven general farm organization representing farmers, ranchers, and landowners throughout the state. The North Dakota Farm Bureau was organized in 1942 and has grown to more than 27,000 members today. The North Dakota Farm Bureau advocates through lobbying and community outreach to support agricultural interests throughout the state.

The North Dakota Grain Dealers Association is a 109-year-old voluntary membership trade organization representing the interests of country grain elevators in North Dakota. These elevators are the primary point of sale for grain raised by North Dakota farmers. The elevators receive, clean, condition, segregate by quality, and ship these grains to domestic and international markets.

The North Dakota Grain Growers Association has represented North Dakota wheat and barley farmers in domestic policy issues on the local, state and national levels for more than 50 years. The North Dakota Grain Growers Association's mission is to serve North Dakota wheat and barley producers with education, leadership, information, and representation to increase profitability and enhance value added opportunities.

The South Dakota Corn Growers Association is comprised of 1,060 dues-paying members and represents more than 12,000 corn farmers. The association works to promote corn, improve producer profitability, and increase corn use through livestock feeding, production of ethanol and byproducts, and other uses.

The South Dakota Farm Bureau Federation is a grassroots general agriculture organization with nearly 16,000 member families across the state. Formed in 1917, the South Dakota Farm Bureau Federation represents farming and ranching interests by focusing on advocacy, education and policy development. The organization's vision is to create a robust agriculture industry in South Dakota, which contributes to a strong economy, healthy environment, thriving communities and nutritious food. The South Dakota Farm Bureau Federation participates in state and federal policy and regulatory efforts relating to the protection of private property rights and enhancing its members' livelihoods.

The South Dakota Soybean Association is a 501(c)(5) membership organization that was organized in 1982. The mission of the organization is to improve the competitiveness and profitability for South Dakota soybean farmers through education and policies.

Amici have an interest in the outcome of the Court's decision because a ruling from this Court to vacate the easement could have far-reaching implications threatening the entire agricultural industry of the Dakotas. Remanding with vacatur would unduly burden the

agricultural industry with increased transportation costs by forcing the agricultural industry to compete with the oil industry for railroad transportation to transport its commodities.  In a time when farmers and ranchers are already facing financial stress, such increased transportation costs could have a crippling effect on the agricultural industry.  The Court's decision on this issue will directly affect the industry of Amici.

Counsel for Amici hereby certifies that no person or entity other than Amici and their counsel authored this brief in whole or in part, and no other person or entity other than Amici funded the preparation of this brief.

## BACKGROUND

Today, just as in generations past, "agriculture remains an essential part of the fabric of American life" and the economies of North Dakota and South Dakota.  Renee Jean, "North Dakota agriculture continues to play essential role amid coronavirus outbreak," WILLISTON HERALD, Mar. 25, 2020, https://www.willistonherald.com/news/farm_and_ranch/north-dakota-agriculture-continues-to-play-essential-role-amid-coronavirus-outbreak/article_6068edfe-6eb8-11ea-baa7-0ff43aad1f15. html.  More than 26,000 farms call North Dakota home, while production agriculture and related industries support almost a quarter of the State's workforce.  *Id.*  Together, these farms produce more than 50 different commodities, and North Dakota is the top producer in 10 of those commodities.  *Id.*

Similarly, agriculture is the number one industry in South Dakota, generating more than 30 percent of the State's economic activity.  "National Ag Week Being Celebrated in South Dakota," RAPID CITY JOURNAL, Mar. 20, 2017, https://rapidcityjournal.com/news/local/communities/sturgis/national-ag-week-being-celebrated-in-south-dakota/article_075f2bc1-9240-5653-8cce-3a23bdb35629.html.  More than twenty

percent of South Dakotans work on South Dakota's 31,000 farms and agriculture-related industries. *Id.*

A thriving agriculture industry is vital to the economies of North Dakota and South Dakota, and the agriculture industry's success relies heavily on the availability of rail service. "The competitive cost of rail transport for long-distance high-volume shipments makes rail transportation attractive for the movement of North Dakota grain to the ports and domestic markets." 2040 North Dakota State Rail Plan, NORTH DAKOTA DEPARTMENT OF TRANSPORTATION, Nov. 2017, https://www.dot.nd.gov/divisions/planning/railplan/FINALNorth%20Dakota%20State%20Rail%20Plan%20December%202017.pdf at 1-5. "Railroads have long been the backbone of North Dakota's transportation system and the most dependable way for farmers to move crops – to ports in Portland, Ore., Seattle and Vancouver, from which the bulk of the grain is shipped across the Pacific to Asia; and to East Coast ports like Albany, from which it is shipped to Europe." Ron Nixon, "Grain Piles Up, Waiting for a Ride, as Trains Move North Dakota Oil," THE NEW YORK TIMES, Aug. 25, 2014, https://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-trains-move-north-dakota-oil.html. In a typical year, railroads transport 72 to 82 percent of North Dakota's crop output. 2040 North Dakota State Rail Plan, *supra* at 2-89. The total amount of crop rail shipments has vastly increased in recent history; overall agricultural shipments by rail doubled between 2000 and 2014. *Id.*

"In South Dakota, farmers are dependent on trains to move their corn, soybeans, wheat and other commodities hundreds of miles to coastal ports such as Seattle and New Orleans or livestock operations in the Southwest at a greater cost than farmers in neighboring states who are closer to rivers or have more rail options." "Ag bracing for railroad delays as record harvest looms," ARGUS

LEADER, Sept. 15, 2014, https://www.argusleader.com/story/news/2014/09/15/ag-bracing-railroad-delays-record-harvest-looms/15653623/. "Unlike Iowa, for example, where the state's burgeoning ethanol industry and livestock producers consume millions of bushels of corn that don't need to be moved long distances, South Dakota grows more than it needs," as about 50 percent of grain is transported out of the State. *Id.*

Given the interdependence of the agricultural and railroad industries, "[t]he farmers and grain elevator operators are at the mercy of the railroads." "Food or Fuel? The Rail Car Shortage Conundrum," NBC NEWS, May 9, 2014, https://www.nbcnews.com/business/ economy/food-or-fuel-rail-car-shortage-conundrum-n209781. As a result, the continued operation of DAPL is essential to the agriculture industry because DAPL eases transportation shortages by freeing up rail cars to move grain and other agricultural products. Amici thus respectfully request the Court remand the matter to the Corps without ordering the termination of DAPL operations.

## ARGUMENT

I.     **The Court should remand without vacating because a DAPL shutdown would cause disruptive consequences to the agricultural industry.**

A.     **Legal Standard for Vacatur**

Although vacating a rule or action in violation of the National Environmental Policy Act (NEPA) is the standard remedy under the case law of this Circuit, district courts maintain discretion to leave the agency action in place pending a remand. *Humane Soc. of U.S. v. Johanns*, 520 F.Supp.2d 8, 37 (D.D.C. 2007). In *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), the Court stated that two factors guide the district court's decision of whether to vacate. First, the district court should analyze "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)[.]" *Id.* Second, the district court should consider "the disruptive consequences" of vacatur. *Id.* "Neither factor is

dispositive, as 'there is no rule requiring either the proponent or opponent of vacatur to prevail on both factors.'" *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F.Supp.3d 92, 99 (D.D.C. 2019) (quoting *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F.Supp.3d 240, 270 (D.D.C. 2015)). "Instead, resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives." *Id.* (internal quotation marks and citation omitted).

**B.     The equities weigh in favor of denying vacatur because of the disruptive consequences that would be faced by the agriculture industry if the Court ordered a DAPL shutdown.**

In this case, the overall equities and practicality of the alternatives weigh in favor of denying vacatur.  As an initial matter, vacatur would pose disruption because DAPL is currently in operation.  This Circuit recently refused to vacate a FERC natural gas pipeline approval because of the disruptive effects of shutting down an operational pipeline.  *See, e.g.*, *City of Oberlin, Ohio v. Fed. Energy Reg. Comm'n*, 937 F.3d 599, 611 (D.C. Cir. 2019) (remanding without vacatur because vacatur "would be quite disruptive, as the [natural gas] pipeline is currently operational").

If the Court rules DAPL can no longer operate, the crude oil currently transported by DAPL would need to be shipped through alternate means.  As the North Dakota Department of Transportation explained in its 2040 North Dakota State Rail Plan, there is a direct correlation between pipeline capacity and rail shipments of crude oil.  *See* 2040 North Dakota State Rail Plan, *supra*.  As pipeline capacity increases, crude oil shipments by rail generally decline, since pipelines are a less expensive option for moving oil.  *Id.* at 1-5, 2-84.  Conversely, when pipeline capacity decreases, which would occur if the Court orders a shutdown of DAPL, there would be a corresponding increase in the need for rail service to transport crude oil.

Under these circumstances, a sudden shutdown of DAPL would drastically decrease the available pipeline capacity, thereby increasing the demand on rail service for transporting oil.  *Id.* at 2-83; *see also* Doc. #279-1 (discussing the impact of a loss of DAPL capacity).  Many farmers

view pipelines such as DAPL as the long-term solution to ease rail congestion for the agriculture industry, and a shutdown of an active pipeline would give rise to the very problems the pipeline was meant to address.  Tom Meersman, "Farmers seek more rail capacity for grain," Star Tribune, April 8, 2014, https://www.startribune.com/farmers-seek-more-rail-capacity-for-grain/254467091/?refresh=true; Liz Hampton, "With Dakota Access in limbo, more Bakken crude to move on trains," REUTERS, Dec. 22, 2016, https://www.reuters.com/article/us-north-dakota-pipeline-rail/with-dakota-access-in-limbo-more-bakken-crude-to-move-on-trains-idUSKBN14B240 (noting energy companies would turn to rail to ship crude after the Corps denied an easement in December 2016).  Accordingly, multiple industries have reasonably relied upon the continued operation of DAPL, including not just the energy industry, but also the railroad industry and the agriculture industry.  *See Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018) (noting vacatur would pose disruptive consequences to an entity who "reasonably relied on the [agency's] ruling and settled practice" and it would suffer economic consequences if the court vacated the license).

Ultimately, the agriculture industry is already facing challenging times because of the current low crop prices.  A DAPL shutdown would worsen the outlook for farmers because it is likely to increase the costs of transporting grain due to the enhanced demand it would place on rail service.  These consequences to the uninvolved market participants in the agriculture industry warrant a remand without vacatur.  *See Black Oak Energy, LLC v. F.E.R.C.*, 725 F.3d 230, 244 (D.C. Cir. 2013) (concluding vacatur would be disruptive because of the increased costs it would impose on "uninvolved market participants").

C.    **The Court's decision in *Semonite* favors a remand without vacatur.**

The recent decision in *National Parks Conservation Association v. Semonite* (*Semonite II*), 422 F.Supp.3d 92 (D.D.C. 2019), is particularly instructive to the question pending before the

Court.  In the first *Semonite* ruling, the court found the Corps violated NEPA by failing to conduct an EIS before issuing a permit.  *Nat'l Parks Conservation Ass'n v. Semonite* (*Semonite I*), 916 F.3d 1075, 1082 (D.C. Cir. 2019).  In reaching this decision, the court analyzed three factors indicating there would be serious environmental impacts as a result of the project:  the degree to which the effects on the quality of the human environment were likely to be "highly controversial," the unique characteristics of the geographic area, and the degree to which the action may adversely affect sites listed in the National Register of Historic Places.  *Id.* at 1083-88.

This Court emphasized in its March 25, 2020 decision that it "received significant guidance" from *Semonite I* in deciding to remand this matter for preparation of an EIS.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. CV 16-1534 (JEB), 2020 WL 1441923, at *1 (D.D.C. Mar. 25, 2020).  Given what this Court viewed as similar issues between the cases, it relied heavily on *Semonite I* in deciding to remand this matter for preparation of an Environmental Impact Statement.  *Id.*

Just as *Semonite I* guided this Court's March 25, 2020 Order, the decision in *Semonite II* analyzing whether to vacate or remand "lights the way" on the same question now pending before the Court.  *Id.* at *8.  In *Semonite II*, the court determined the deficiency was serious under the first *Allied-Signal* factor.  *Semonite II*, 422 F.Supp.3d at 99.  According to the court, "[i]f the first *Allied-Signal* factor were the only consideration, the standard remedy would likely apply."  *Id.* at 99-100.  However, the court concluded the second *Allied-Signal* factor was "critical to the ultimate determination that vacatur is not appropriate in this instance."  *Id.*

At the outset, the court recognized "the simple fact that if vacatur were ordered, that decision would have serious impacts beyond the mere procedural step of saying that the permit is revoked."  *Id.* at 100.  "By revoking the permit, this Court would set in motion a chain of events

that could lead to the type of serious, disruptive consequences with which the second *Allied-Signal* factor is concerned." *Id.* Namely, the inability to continue with the electrical infrastructure project in question would result in serious "real-world consequences," including the threat of rolling blackouts in the region. *Id.* at 101. The project was constructed to resolve a power emergency in the region, and it became "a crucial source of electricity in the area" since the time of its installation. *Id.* Before the project became operational, the region encountered numerous power shortages that were likely to return if the project were not allowed to continue. *Id.* at 101-102. These consequences would be felt directly by "the hundreds of thousands of people in the region relying on this project as their power source," and it "would be unjust to force all of those people to bear the brunt of the harm when they are not responsible for its cause." *Id.* at 102.

Moreover, the court noted the Corps might ultimately decide to reissue the permit after conducting an EIS, in which case it would result in an extreme amount of waste and significant costs if vacatur were ordered. *Id.* at 103. Under these circumstances, the court held that "the second *Allied-Signal* factor forces the Court to conclude that vacating the permit would be inappropriate." *Id.*

Like *Semonite II*, a decision to vacate and cease operation of DAPL in this case would have serious impacts beyond simply revoking the easement.[1] Similar to the electrical infrastructure project in *Semonite II*, DAPL was constructed to alleviate an ongoing infrastructure demand, in this case concerning the infrastructure to transport crude oil. Since coming online, DAPL carries

---

[1] The first time the question of vacatur was before this Court, it found both factors weighed in favor of remand without vacatur. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 282 F.Supp.3d 91, 108 (D.D.C. 2017). But the Court placed more emphasis on the first factor, as it found the second prong only slightly tipped in favor of the Defendants. *Id.* Even if the Court were to reach the opposite conclusion from its earlier decision with respect to the first factor, the recent decision in *Semonite II* still favors remand without vacatur because of its emphasis on the disruptive consequences posed under the second factor.

in excess of 550,000 barrels of oil per day out of North Dakota.  Thus, DAPL has become a crucial component of the transportation infrastructure utilized by the State's energy industry.  As discussed above, if DAPL were forced to cease operation, the crude oil currently transported by pipeline would necessarily need to be shipped through alternate means, including through the increased use of rail cars.  This directly affects the agriculture industry because, as more rail cars are allocated to transport crude oil, less rail cars are available to move agricultural products in a timely and affordable manner.

Amici respectfully submit this scenario is not mere conjecture, but a real-world consequence the agriculture industry was forced to confront just a few years ago.  In 2014, rail shipments of crude oil surged as there were few existing pipelines available to ship oil.  Nixon, *supra*.  Given the finite amount of rail cars available, the increased demand for oil shipments resulted in a shortage of cars that could be allocated for agricultural purposes.  *Id.*  Consequently, grain elevators reached capacity, but they could not ship crops to market due to a shortage of rail cars.  "Food or Fuel? The Rail Car Shortage Conundrum," *supra*.  This, in turn, meant the elevators could not make room for new grains.  *Id.*  Without a viable means for transporting their product, farmers were faced with arranging for alternate, more expensive means of transportation or, even worse, simply letting their crop rot.  Nixon, *supra*.

On the other end of the transaction, food processors reluctantly halted production when they could not obtain their shipments.  *Id.*  For instance, breakfast cereal giant General Mills lost dozens of days of production due to logistics problems, including rail car congestion.  *Id.*  While some producers obtained product from other sources to fulfill their needs, this meant the original farmer was unable to sell his or her product to complete the transaction as had been originally intended.  *Id.*

Making matters worse, there are often financial penalties imposed for late or nondeliveries to processors.  "Food or Fuel? The Rail Car Shortage Conundrum," *supra*.  On top of the late fees imposed when shipments fail to arrive on time, grain companies often pay less for commodities because of the higher transportation costs, the risks involved, and the delays factored into the price. "Ag bracing for railroad delays as record harvest looms," *supra*.  "Ultimately, that means farmers receive a lower price for their crop."  *Id.*

In sum, like *Semonite II*, a decision to shut down DAPL may trigger a chain reaction of events causing immense disruption within the agriculture industry and beyond.  The rail car shortages encountered in the years prior to DAPL's operation may still return if DAPL operations cease, similar to the power shortages in *Semonite II*.  Moreover, the disruption posed by a DAPL shut down would be felt not just by the energy industry, but also by thousands in the agriculture industry who depend on having affordable, available rail cars to transport and receive grain, ethanol, fertilizer, and other agricultural products.

In addition, the Corps may ultimately decide to grant an easement after conducting an EIS, like the court in *Semonite II* hypothesized, in which case it would result in an extreme amount of waste and unnecessary costs if vacatur had been ordered in the interim.  If DAPL operations cease, agricultural suppliers and producers will likely face increased costs and delays.  If the Corps ultimately grants an easement again after the EIS is complete, these costs and delays would have been unnecessary and wasteful.

Under these circumstances, the holding in *Semonite II* applies with equal force in this matter as *Semonite I* did in this Court's initial decision.  Consequently, the Court should conclude that vacatur and ordering the cessation of DAPL is inappropriate under the second *Allied-Signal* factor.

## CONCLUSION

Farmers are in the midst of challenging times, as the agricultural economy has been depressed for the past couple of years, commodity prices are low, and the COVID-19 pandemic is making the situation worse.  Additional pressures on rail transportation and availability would be devastating to North Dakota and South Dakota farmers.

Under this Circuit's guiding precedent, and the recent decision in *Semonite II*, vacatur is inappropriate if disruptive consequences may result.  If the Court were to order a shutdown of DAPL, farmers, grain elevators, and others in the agriculture industry and beyond would face serious disruptive consequences.  As a result, the Court should exercise its discretion to remand without vacating the easement.

Dated:  April 29, 2020.

Respectfully submitted,

  /s/   Stephen R. Hanson II
Stephen R. Hanson II, (ND Bar No. 08585, signing per LCvR 83.2(c))
Andrew D. Cook, (ND Bar No. 06278)
*Counsel for North Dakota Farm Bureau,*
*North Dakota Grain Dealers Association,*
*North Dakota Grain Growers Association,*
*South Dakota Corn Growers Association,*
*South Dakota Farm Bureau Federation, and*
*South Dakota Soybean Association*

OHNSTAD TWICHELL, P.C.
444 Sheyenne St., Ste. 102
P.O. Box 458
West Fargo, ND 58078-0458
Phone: (701) 282-3249
shanson@ohnstadlaw.com
acook@ohnstadlaw.com

  /s/ Kent Mayo
Kent Mayo (D.C. Bar No. 452842) (joining with non-members per LCvR 83.2(c))
Adam Dec (DC Bar No. 888187500)
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
kent.mayo@bakerbotts.com
adam.dec@bakerbotts.com

J. Scott Janoe (TX Bar No. 24012897; ND Bar No. 07461)
Paulina Williams (TX Bar No. 24066295)
BAKER BOTTS L.L.P.
910 Louisiana St., #3200
Houston, TX 77002
Phone: (713) 229-1234
scott.janoe@bakerbotts.com
paulina.williams@bakerbotts.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with LCvR 7(o)(4) because it does not exceed 25 pages.

Respectfully submitted,

 /s/   Stephen R. Hanson II
Stephen R. Hanson II, (ND Bar No. 08585, signing per LCvR 83.2(c))
Andrew D. Cook, (ND Bar No. 06278)
*Counsel for North Dakota Farm Bureau, North Dakota Grain Dealers Association, North Dakota Grain Growers Association, South Dakota Corn Growers Association, South Dakota Farm Bureau Federation, and South Dakota Soybean Association*

OHNSTAD TWICHELL, P.C.
444 Sheyenne St., Ste. 102
P.O. Box 458
West Fargo, ND 58078-0458
Phone: (701) 282-3249
shanson@ohnstadlaw.com
acook@ohnstadlaw.com

 /s/ Kent Mayo
Kent Mayo (D.C. Bar No. 452842) (joining with non-members per LCvR 83.2(c))
Adam Dec (D.C. Bar No. 888187500)
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
kent.mayo@bakerbotts.com
adam.dec@bakerbotts.com

J. Scott Janoe (TX Bar No. 24012897; ND Bar No. 07461)
Paulina Williams (TX Bar No. 24066295)
BAKER BOTTS L.L.P.
910 Louisiana St., #3200
Houston, TX 77002
Phone: (713) 229-1234
scott.janoe@bakerbotts.com
paulina.williams@bakerbotts.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of April, 2020, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.


         */s/ Adam Dec*
         Adam Dec (D.C. Bar No. 888187500)
         BAKER BOTTS L.L.P.
         700 K Street, NW
         Washington, D.C. 20001
         Phone: (202) 639-7700
         adam.dec@bakerbotts.com