**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 16-1534(JEB)** |
| **U.S. ARMY CORPS OF ENGINEERS,** *et al.,* | |
| **Defendants.** | |

<u>**EXHIBIT A**</u>**:**

*AMICI CURIAE* **BRIEF OF THE AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE AND THE
ASSOCIATION OF OIL PIPE LINES IN SUPPORT OF
DAKOTA ACCESS, LLC'S BRIEF ON VACATUR**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

INTEREST OF THE AMICI ................................................................................................... 3

BACKGROUND ..................................................................................................................... 5

   I.   The Free Flow of Petroleum Products is Imperative to U.S. Energy Security..................... 5

   II.  Crude Oil Pipelines Are Subject to Extensive Federal Regulation and Oversight ............. 8

ARGUMENT .......................................................................................................................... 11

   I.   The Deficiencies Identified by this Court Do Not Rise to the Level of Seriousness
       Requiring Vacatur Given the Overlay of Existing Federal Regulation............................. 12

   II.  The Disruptive Consequences That Would Result from Vacatur Warrant an Order by This
       Court that Allows DAPL Operations to Continue............................................................. 16

CONCLUSION........................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
　429 F.3d 1136, 1151  (D.C. Cir. 2005) ................................................................11

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
　988 F.2d 146 (D.C. Cir. 1993) .................................................................. *passim*

*Am. Farm Bureau Fed'n v. EPA*,
　559 F.3d 512 (D.C. Cir. 2009) (per curiam) ........................................................16

*Backcountry Against Dumps v. U.S. Dep't of Energy*,
　No. 3:12-cv-03062-L-JLB, 2017 WL 3712487 (S.D. Cal. Aug. 29, 2017) ...........12

*Black Oak Energy, LLC v. F.E.R.C.*,
　725 F.3d 230 (D.C. Cir. 2013) ............................................................................12

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*,
　781 F.3d 1271 (11th Cir. 2015) ...........................................................................23

*Cal. Cmtys. Against Toxics v. EPA*,
　688 F.3d 989 (9th Cir. 2012) .........................................................................17, 23

*Ctr. for Biologic Diversity v. EPA*,
　861 F.3d 174 (D.C. Cir. 2017) ............................................................................16

*Davis Cty. Solid Waste Mgmt. v. EPA*,
　108 F.3d 1454 (D.C. Cir. 1987) (per curiam) .....................................................16

*Grunewald v. Jarvis*,
　776 F.3d 893 (D.C. Cir. 2015) ............................................................................13

*Heartland Reg'l Med. Ctr. v. Sebelius*,
　566 F.3d 193 (D.C. Cir. 2009) ............................................................................16

*Nat'l Parks Conservation Ass'n v. Semonite*,
　422 F. Supp. 3d 92 (D.D.C. 2019) ..................................................................11, 23

*Nat'l Wildlife Fed'n v. Sec'y of the Dep't of Transp.*,
　374 F. Supp. 3d 634 (E.D. Mich. 2019) ..............................................................15

*North Coast Rivers Alliance v. United States Department of the Interior*,
　No. 1:16-cv-00307-LJO-MJS, 2016 WL 8673038 (E.D. Cal. Dec. 16, 2016) .......17

*Ocean Advocates v. U.S. Corps of Engineers*,
　　No. C00-1971L, 2005 WL 2035053 (W.D. Wash. Aug. 22, 2005)...........................................12

*Sierra Club, Inc. v. Bostick*,
　　787 F.3d 1043 (10th Cir. 2015) .........................................................................................15

*Sierra Club v. U.S. Forest Service*,
　　828 F.3d 402 (6th Cir. 2016) .............................................................................................13

*Sierra Club v. Van Antwerp*,
　　719 F. Supp. 2d 58 (D.D.C. 2010), *aff'd in part, rev'd in part*, 661 F.3d 1147
　　(D.C. Cir. 2011), *as amended* (Jan. 30, 2012) .................................................................13

*Sierra Forest Legacy v. Sherman*,
　　951 F. Supp. 2d 1100 (E.D. Cal. 2013)..............................................................................23

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
　　289 F.3d 89 (D.C. Cir. 2002) ..............................................................................11, 13, 16

*WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation & Enf't*,
　　104 F. Supp. 3d 1208 (D. Colo. 2015), *order vacated on other grounds,*
　　*appeal dismissed*, 652 F. App'x 717 (10th Cir. 2016)......................................................23

*Williston Basin Interstate Pipeline Co. v. F.E.R.C.*,
　　519 F.3d 497 (D.C. Cir. 2008) ...........................................................................................12

**Statutes**

33 U.S.C. § 1321.............................................................................................................9, 15

33 U.S.C. § 1321(j)...............................................................................................................16

49 U.S.C. § 60104(c) .............................................................................................................9

**Other Authorities**

33 C.F.R. Part 136.................................................................................................................10

49 C.F.R. Part 194.................................................................................................................9

49 C.F.R. Part 195.............................................................................................................2, 8

49 C.F.R. § 194.5...................................................................................................................14

49 C.F.R. § 194.105...............................................................................................................15

49 C.F.R. § 194.107(a)..........................................................................................................14

49 C.F.R. § 195.116...............................................................................................................8

49 C.F.R. § 195.200, *et seq*...........................................................................................8

49 C.F.R. § 195.406 ........................................................................................................8

49 C.F.R. § 195.446 ........................................................................................................8

49 C.F.R. § 195.446(e).....................................................................................................8

49 C.F.R. § 195.452 ........................................................................................................8

49 C.F.R. § 195.452(i)(3)............................................................................................8, 14

85 Fed. Reg. 21,140 (April 16, 2020) ...........................................................................14

Exec. Order No. 13,766 of January 24, 2017, 82 Fed. Reg. 8,657, 8,657 (Jan. 30,
2017), *Expediting Environmental Reviews and Approvals for High Priority
Infrastructure Projects* ................................................................................................5

Exec. Order No. 13,807, 82 Fed. Reg. 40,463, 40,463 (Aug. 24, 2017),
*Establishing Discipline and Accountability in the Environmental Review and
Permitting Process for Infrastructure Projects* .........................................................5

Memo. of January 24, 2017, Construction of the Dakota Access Pipeline, 82 Fed.
Reg. 11,129 (Feb. 17, 2017) .......................................................................................3

Memo. of March 22, 2012, *Expediting Review of Pipeline Projects from Cushing,
Oklahoma, to Port Arthur, Texas, and Other Domestic Pipeline Infrastructure
Projects*, 77 Fed. Reg. 18,891, 18,891 (Mar. 28, 2012) ...........................................5

## INTRODUCTION

The American Fuel & Petrochemical Manufacturers ("AFPM"), American Petroleum Institute ("API"), and the Association of Oil Pipe Lines ("AOPL") (collectively "Amici"), representing the interests of pipeline operators, upstream petroleum product manufacturers, and downstream refiners in North America, submit this Amicus Brief in support of Intervenor-Defendant Dakota Access, LLC ("Dakota Access").  Amici agree with Dakota Access that vacatur of the U.S. Army Corps of Engineers' ("Corps") easement for the Dakota Access Pipeline ("DAPL") is not warranted while the Corps completes the Environment Impact Statement ("EIS") required by this Court's March 25, 2020 opinion ("March Opinion").  [ECF No. 496].  Here, application of the two-factor test established by the U.S. Court of Appeals for the D.C. Circuit's opinion in *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) dictates that the Corps' easement for DAPL remain valid and in effect during the EIS remand process.  That test requires that this Court assess, first, the "seriousness" of the deficiencies the Court identified in the Corps' decision and, second, the "disruptive consequences of an interim change that may itself be changed."  *Id.*

First, while this Court's March Opinion identified issues relating to the Corps' assessment of important pipeline safety matters, these matters are directly addressed by the federal pipeline safety regulations that separately govern DAPL's continuing operations. Moreover, these regulations are administered and enforced by federal agencies other than the Corps.  As directed by this Court's March Opinion, the Corps must address in an EIS controversy relating to: DAPL leak detection sensitivity; the extent to which Dakota Access' spill record should be taken into account in assessing DAPL's leak detection system; Dakota Access' ability to respond to a release from DAPL during winter conditions; and the appropriate

methodology for calculating a worst-case discharge from DAPL.  Amici submit that the question of the "seriousness" of such matters for *Allied-Signal* purposes should be considered through the lens of existing federal regulation of these very matters by agencies other than the Corps.  The critical and undisputable fact is that pipeline operations are exclusively and comprehensively regulated by the U.S. Department of Transportation, Pipeline and Hazardous Materials Safety Administration's ("PHMSA").  *See* 49 C.F.R. Parts 194 and 195.  In light of PHMSA's pervasive regulatory framework, DAPL will operate safely while the Corps prepares an EIS on remand required by the Court's March Opinion.  The Corps' additional environmental analysis (that will inevitably recognize PHMSA regulatory requirements) can thus be expected to support a Corps' decision to maintain the DAPL easement.  Moreover, even if the Corps concludes through its preparation of an EIS that impacts resulting from DAPL are significant, that will not preclude the Corps from proceeding to affirm the DAPL easement.

Second, the severe and far-reaching consequences of a disruption of service on DAPL, including the resulting loss of jobs during a severe economic downturn, weigh heavily against vacatur.  Ceasing DAPL operations for any period of time, let alone the year or more that it likely will take the Corps to prepare an EIS and to then make a further permitting decision, would lead to extremely disruptive adverse consequences that are contrary to the public and national interest, both at this time of national emergency and high unemployment and after the COVID-19 emergency abates.  *See* Declaration of David Murk in Support of Amicus Brief, at ¶¶ 5-6 (hereinafter "Murk Decl.").  As reiterated in federal directives, the nation relies on the critical and essential service provided by DAPL, including a network of companies comprised of producers, other pipeline companies, pipeline shippers, downstream refiners, manufacturers, retailers, and ultimately the general public.  Substantial financial loss and uncertainty would

result from any DAPL shutdown, with a primary impact being borne by the employees of these companies who could very well lose their jobs. States and counties would also lose tax revenue, further adversely impacting the public and stifling the nation's economic recovery. *Id.* at ¶ 9. The certain harms resulting from a DAPL closure are made clearer by the fact that no feasible/viable pipelines or transportation modes exist that are capable of displacing the vital transportation function that DAPL is designed to serve by directly and affordably connecting the Bakken region to refinery markets in Illinois and the Gulf Coast. *See id.* at ¶ 11.

The continued operation of DAPL is thus in both the regional and national interest, and paramount to the American workers whose jobs directly and indirectly rely on the pipeline's operations.[1] Accordingly, the court should <u>not</u> vacate the Corps' easement in its remand order.

### INTEREST OF THE AMICI

Amici are trade associations whose members have a significant interest in the continued transportation of North American-produced crude oil. Collectively, Amici represent entities that account for, among other things, the vast majority of petroleum products that are transported, manufactured, and sold in the United States, including crude oil and other liquid hydrocarbons that are transported by pipelines and other modes in interstate commerce.

AFPM is a national trade association representing most U.S. refining and petrochemical manufacturing capacity. AFPM members receive crude oil and other liquids products via the midstream sector, which includes pipelines, rail roads, barges, tankers, and trucks. AFPM's member companies have an interest in ensuring that they consistently and reliably receive the North American crude oil volumes that are necessary to meet U.S. energy consumption demand.

---

[1] *See* Memo. of January 24, 2017, *Construction of the Dakota Access Pipeline*, 82 Fed. Reg. 11,129 (Feb. 17, 2017).

API is a national trade association that represents all aspects of America's oil and natural gas industry.  API's more than 600 corporate members, from the largest major oil company to the smallest of independents, come from all segments of the industry.  They are producers, refiners, suppliers, marketers, pipeline operators, and marine transporters, as well as service and supply companies that support the industry.  API is also the worldwide leading standards-making body for the oil and natural gas industry, including standards and recommended practices incorporated or referenced in numerous state and federal regulations.  API represents the oil and natural gas industry to the public, Congress, the Executive Branch of the Federal Government, state governments, and to the media.

AOPL is a nonprofit national trade association that represents the interests of oil pipeline owners and operators before the United States Congress, regulatory agencies, and the judiciary. AOPL's members operate pipelines that carry approximately 97% of the crude oil and petroleum products moved by pipeline in the United States, extending over 218,000 miles in total length. These pipelines safely, efficiently, and reliably deliver more than 21 billion barrels of crude oil and petroleum product each year, consistent with safety regulations implemented by PHMSA. AOPL strives to ensure that the public and all branches of government understand the benefits and advantages of transporting crude oil and petroleum products by pipeline as the safest, most reliable, and most cost-effective method.

The issue now before the Court is of great importance to Amici and their member companies.  In particular, Amici and their members seek to ensure that crude oil produced in the Bakken region and transported on DAPL to refinery destinations in the United States continues without the serious adverse consequences that would be caused by an interruption of service. DAPL provides essential and irreplaceable pipeline capacity that is vital to sustaining regional

and local economies, maintaining large numbers of jobs at a time when the nation desperately

needs employment opportunities to grow and not shrink, and furthering national energy security

and independence.

## BACKGROUND

I.      **The Free Flow of Petroleum Products is Imperative to U.S. Energy Security**

The Federal Government's long-standing regulation of pipelines underscores the national

interest in the continued and uninterrupted transportation of crude oil on DAPL.  Recognizing

the great importance of pipelines and other infrastructure, the current Administration has

declared that "it is the policy of the executive branch to streamline and expedite . . . approvals for

all infrastructure projects, especially projects that are a high priority for the Nation, such as . . .

repairing and upgrading critical . . . pipelines," among other infrastructure.  Exec. Order No.

13,766 of January 24, 2017, 82 Fed. Reg. 8,657, 8,657 (Jan. 30, 2017), *Expediting*

*Environmental Reviews and Approvals for High Priority Infrastructure Projects*.  This is because

"America needs increased infrastructure investment to strengthen our economy, enhance our

competitiveness in world trade, create jobs and increase wages for our workers, and reduce the

costs of goods and services for our families."  Exec. Order No. 13,807, 82 Fed. Reg. 40,463,

40,463 (Aug. 24, 2017), *Establishing Discipline and Accountability in the Environmental Review*

*and Permitting Process for Infrastructure Projects* (infrastructure includes "pipelines").

The Obama Administration also recognized the importance of pipelines: "rising

production is outpacing the capacity of pipelines to deliver the oil to refineries," and the only

option is therefore for new pipelines to be constructed or for existing pipelines to be reconfigured

to meet that demand and "enhance our Nation's energy security."  *See* Memo. of March 22,

2012, *Expediting Review of Pipeline Projects from Cushing, Oklahoma, to Port Arthur, Texas,*

*and Other Domestic Pipeline Infrastructure Projects*, 77 Fed. Reg. 18,891, 18,891 (Mar. 28,

2012) ("2012 Presidential Memorandum").  Obama Presidential Policy Directive 21 also identifies the Energy Sector as uniquely critical because it provides an "enabling function" across all critical infrastructure sectors.[2]  These findings highlight the fundamental role that crude oil pipelines like DAPL play in satisfying America's energy needs and its economy.

More than 80 percent of the country's critical energy infrastructure is owned by the private sector, supplying fuels to the transportation industry, electricity to households and businesses, and other sources of energy that are integral to growth and production across the nation.  In furtherance of national energy policy and security, North America's private sector has funded the establishment of an extensive pipeline system that safely and efficiently carries more than 21 billion barrels of liquid products each year.[3]  Pipelines such as DAPL play a vital role in safely and reliably transporting significant volumes of unrefined petroleum products from extraction points to refinery destinations in North America and beyond.  Such pipelines enable "the safe movement of extraordinary quantities of energy products to industry and consumers, literally fueling our economy and way of life."[4]  Pipelines are also one of the safest and least costly ways to transport energy products.  The more than 218,000 miles of pipelines in the United States safely deliver hundreds of billions of tons of liquid petroleum products per mile each year.[5]

The North American crude oil industry is complex and interrelated.  The inability to transport crude oil on one pipeline not only impacts the owner, operator and users of that

---

[2] *See* https://obamawhitehouse.archives.gov/the-press-office/2013/02/12/presidential-policy-directive-critical-infrastructure-security-and-resil.

[3] *See* https://www.aopl.org/documents/en-us/d904059a-c130-41f9-b8da-3ca7e100ad4a/1.

[4] *See* PHMSA, General Pipeline FAQs, *available at* https://www.phmsa.dot.gov/faqs/general-pipeline-faqs.

[5] *See* https://www.phmsa.dot.gov/data-and-statistics/pipeline/annual-report-mileage-hazardous-liquid-or-carbon-dioxide-systems.

pipeline, but also: (i) the many upstream producers who extract crude oil and are otherwise unable to transport their crude to market; (ii) the upstream pipeline companies that tie-into downstream pipeline, such as DAPL; (iii) the shippers, independent of the pipeline owner/operator, who pay for the transportation of crude oil on a pipeline and profit from sales of that crude to refinery customers; (iv) the downstream liquid terminal operators who store oil; (v) refiners and manufacturers who produce end-use products; (vi) the retailers who sell the end-use petroleum products to consumers; and (vii) consumers whose jobs rely on the continued and steady operation of all of these companies, who may otherwise face potentially higher prices for gasoline as a result of pipeline outages, and who require such products to support daily life (e.g., fuels for heating homes, running cars, etc.).  Every part of this complex web of goods and services would be directly impacted were crude oil service to cease on a major pipeline like DAPL.

Nor can U.S. energy demands be satisfied without a fully-functioning pipeline system. Pipelines provide vital access to secure and reliable supplies of North American crude oil; reduce the nation's reliance on imports from nations that are less stable or unfriendly to U.S. interests; ensure refineries in the U.S. continue to operate at a high utilization rate and receive the type of oil needed to satisfy public demand for petroleum products; generate millions of dollars of tax revenue for communities along the pipeline routes that provide funding for schools, roads and other community needs; and most importantly at this juncture in the nation's history provide jobs to thousands of U.S. workers.

The national importance that such pipelines play is further emphasized by the fact that the vast oil volumes that pipelines safely transport cannot be easily or feasibly replaced by other transportation modes.  It would, for example, take a constant line of tanker trucks, about 750 per

day, loading up and moving out every two minutes, 24 hours a day, seven days a week, to move the volume of even a modest-sized pipeline.[6] That is an impossibility, however, because no tanker truck fleet or rail infrastructure exists to displace crude volumes efficiently and safely transported by pipeline directly to refinery destinations throughout North America.

## II.   Crude Oil Pipelines Are Subject to Extensive Federal Regulation and Oversight

Consistent with the broad national interest in energy, the Federal Government has for decades occupied virtually the entire field of regulating pipeline operations.  First, the operation and maintenance of a crude oil pipeline are extensively regulated by PHMSA pursuant to the Pipeline Safety Act ("PSA"), 49 U.S.C. §§ 60101, *et seq*.  PHMSA's regulations govern all facets of pipeline operations, including design, specifications, construction, operation, and maintenance so as to ensure safety.  *See, e.g.*, 49 C.F.R. Part 195.  PHMSA regulations, for example, dictate the design and specifications for all segments of a pipeline (49 C.F.R. § 195.200, *et seq*.) and the pressures at which such pipelines may be operated (49 C.F.R. § 195.406).  Those regulations further establish the frequency within which operators must conduct internal and external investigations to identify potential integrity threats, including the timelines under which even potential threats must be inspected and repaired (49 C.F.R. § 195.452).  PHMSA regulations further address possible releases, establishing the procedures under which an operator is to control a pipeline, including leak detection capabilities (49 C.F.R. § 195.452(i)(3)) and procedures for responding to alarms or triggers that may be indicative of a release (49 C.F.R. § 195.446); the placement of valves that may be remotely shut to minimize a potential release (49 C.F.R. § 195.116); and requirements for alarms to notify a control room in the event of a potential release (49 C.F.R. § 195.446(e)).  The PSA preempts any State or local

---

[6] *See* https://www.phmsa.dot.gov/faqs/general-pipeline-faqs.

government from implementing any such matters concerning pipeline safety.  *See* 49 U.S.C. § 60104(c).

Second, to respond to, contain, and minimize a release to the environment (should one occur), the federal government has imposed extensive emergency response planning requirements under the Oil Pollution Act ("OPA"), also administered by PHMSA for pipelines such as DAPL.  *See* 33 U.S.C. § 1321.  In accordance with OPA, pipeline operators are required to prepare and implement comprehensive emergency response plan documents, which include extensive and detailed tactics and strategies to respond to a release from regulated facilities, including pipelines, storage tanks, and vessels.  These robust plans are designed to: (i) ensure that a release of oil is quickly contained; (ii) direct initial clean-up efforts to mitigate adverse consequences to natural resources; and (iii) establish procedures for coordinating with state and federal agencies regarding a long-term response effort.  *See* 49 C.F.R. Part 194.

Third, should any release of crude oil into waters of the United States result from a pipeline spill, the Clean Water Act ("CWA") establishes a liability framework under which the Federal Government may seek civil or criminal penalties and impose injunctive measures applicable at any facility from which a release has occurred or is threatened.  *See, e.g.*, 33 U.S.C. § 1321.  The CWA, as amended by OPA, also sets forth requirements for owners and operators of facilities from which oil has been discharged to clean-up, remediate, and restore natural resources in accordance with administrative orders issued by the U.S. Environmental Protection Agency ("EPA") (for onshore spills) and the U.S. Coast Guard ("Coast Guard") (for offshore spills).

Fourth, the CWA establishes the Oil Spill Liability Trust Fund, which provides local governments and the public with the ability to recover any damages or costs (including natural

resource damages) that may be incurred as a result of an oil release.  *See* 33 C.F.R. Part 136.

Thus, any individual, community, or resource – including natural or cultural resources of

importance to Native American Tribes – that may be harmed by an oil spill will be fully

compensated by the Oil Spill Liability Trust Fund for any and all recoverable costs and damages,

and those funds will be recovered by the Federal Government from the pipeline owner and/or

operator.  Accordingly, for any release from a pipeline, it is the pipeline company that is

ultimately and solely held financially accountable.

Notably, federal statutes assign the Corps *no role* in regulating pipeline safety, liability

for releases, or emergency response.  Thus, while the EIS ordered by the Court in this case will

assess pipeline spill risks on lands subject to Corps jurisdiction, the reduction of such risks is not

primarily the Corps' role, but rather that of other agencies that regulate DAPL and other

interstate petroleum pipelines.  In other words, by virtue of the ongoing and extensive regulation

administered by other agencies, the DAPL pipeline will be no less safe based on whether or

when the Corps completes an EIS consistent with this Court's March Opinion.  While the Corps

could impose mitigation measures identified as part of the EIS process, any such measures would

be merely supplemental to the extensive federal regime that already occupies the field of

regulating pipeline safety and operation.

In sum, there is a broad and pervasive federal regulatory regime in place to protect

against potential releases of crude oil from pipelines.  Pipeline companies ensure that their

pipelines operate safely and without a threat of release in accordance with PHMSA regulations.

Should a release occur, federal law ensures a prompt response and cleanup of any released crude

oil at the direction of EPA and/or the U.S. Coast Guard.  Any individuals, including tribes,

harmed as a result of a release may immediately be reimbursed by the Federal Government, which in turn collects costs from the pipeline company as the responsible party.

## ARGUMENT

Amici address below whether the Court should vacate the Corps' easement for DAPL under the two-factor test articulated in *Allied–Signal, Inc.*, 988 F. 2d at 150-51, which requires the Court to consider: (1) "the seriousness of [an agency's errors]" and (2) "the disruptive consequences [that would result from vacatur]." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).  "Neither [*Allied-Signal*] factor is dispositive, as 'there is no rule requiring either the proponent or opponent of vacatur to prevail on both factors.'" *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019) (citing *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015).  Instead, whether an agency's decision should be vacated "'turns on the Court's assessment of the overall equities and practicality of the alternatives.'" *Id.* (citing *Burwell*, 139 F. Supp. 3d at 270 (remanding without vacatur when the first factor favored vacatur but the second did not)).

Mandatory vacatur in the setting presented before the Court "is simply not the law." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002).  The Court should conclude that the application of the *Allied-Signal* factors dictates that the Corps' easement for DAPL remain intact throughout the Corps' remand process, as explained in the sections that follow.

I.      **The Deficiencies Identified by this Court Do Not Rise to the Level of Seriousness Requiring Vacatur Given the Overlay of Existing Federal Regulation**

The Corps can conduct a full and fair EIS, including assessment of controversy relating to potential spill and operational issues, while the easement for DAPL remains in place.  The "seriousness" of an agency's error under *Allied-Signal* is not measured against some absolute scale according to which any erroneous failure to prepare an EIS is so "egregious" as to preclude remand without vacatur as a matter of law.  Instead, seriousness is considered in terms of the likelihood that the agency's decision may be re-affirmed after correcting its error.

The fact that an EIS must now be prepared by the Corps is no reason to vacate the easement for DAPL.  Courts have in fact remanded without vacating agency action in similar circumstances while the agency completes an EIS.  *See, e.g.*, *Ocean Advocates v. U.S. Corps of Engineers*, No. C00-1971L, 2005 WL 2035053, at *2 (W.D. Wash. Aug. 22, 2005) (remanding to the Corps along with instructions to prepare an EIS to evaluate whether to "revoke the permit or place conditions on the operation of the [project] if necessary to ensure compliance with the law"); *Backcountry Against Dumps v. U.S. Dep't of Energy*, No. 3:12-cv-03062-L-JLB, 2017 WL 3712487 at *6 (S.D. Cal. Aug. 29, 2017) (ECF No. 128) (declining to vacate the permit after finding the agency had prepared a deficient EIS that ignored an alternative and omitted analysis of relevant impacts; but the court found that the errors were capable of being corrected).  The Court should reach the same conclusion here for the several reasons discussed below.

A primary question under the first *Allied-Signal* factor is whether the Corps may "reach[ ] the same result" on remand and reaffirm its substantive decision to reissue the DAPL easement when fully informed by an EIS.  *Black Oak Energy, LLC v. F.E.R.C.*, 725 F.3d 230, 244 (D.C. Cir. 2013); *see also Williston Basin Interstate Pipeline Co. v. F.E.R.C.*, 519 F.3d 497, 504 (D.C. Cir. 2008) (declining to vacate when "significant possibility that the [agency] may find an

adequate explanation for its actions").  Here, the results of the extensive evaluation and

consideration of DAPL previously conducted by the Corps provide sufficient basis to believe

that the Corps *may* arrive at the same substantive decision to grant the easement for DAPL to

satisfy the first prong under *Allied-Signal*.  *Sugar Cane Growers Coop. of Fla.*, 289 F.3d at 97-

98 (remanding without vacatur where "it is at least possible" that the agency could come to the

same decision on remand).

The controversy-related deficiencies identified in the Court's March Opinion are

primarily factual determinations that the Corps can address on remand, but which do not prevent

the Corps from arriving at the same decision to issue the easement for DAPL.  This is because

NEPA is a procedural statute only; it does not "mandate particular results."  *Grunewald v. Jarvis*,

776 F.3d 893, 903 (D.C. Cir. 2015).  Accordingly, the Corps may reaffirm its decision to issue

the DAPL easement even if it ultimately concludes that the impacts further assessed in the EIS,

including those resulting from any potential leaks or Dakota Access' ability to respond to a

release, are significant.  *See Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 58, 68 (D.D.C. 2010),

*aff'd in part, rev'd in part*, 661 F.3d 1147 (D.C. Cir. 2011), *as amended* (Jan. 30, 2012) (finding

project impacts "significant enough to require preparation of an EIS," but stating "[i]t is

important to note that the preparation of an EIS does not foreclose the CCTC project; it simply

mandates the Corps to follow NEPA's procedures.").

Further, the "seriousness" element of Allied Signal should be measured in this unique

case in light of the fact that the four issues requiring more study by the Court's March Opinion

relate to issues that are ***exclusively and comprehensively regulated by PHMSA and other***

***federal agencies***.  *See, e.g.*, *Sierra Club v. U.S. Forest Service*, 828 F.3d 402 (6th Cir. 2016)

(recognizing that PHMSA is the federal agency responsible for regulating the safety of pipelines,

including spill risk, and that the agency granting the right to cross federal lands was not). Specifically, first, PHMSA regulations establish requirements for leak detection on pipelines, including requirements to identify leaks capable of identification at the sensitivity levels possible with available technology.  49 C.F.R. § 195.452(i)(3)(requiring that "[a]n operator must have a means to detect leaks on its pipeline system.").  The Corps' EIS will not change the sensitivity at which DAPL operates its leak detection systems in conformance with PHMSA regulations.

Second, PHMSA regulations expressly require that a pipeline operator's leak detection system must account for that pipeline's spill record – specifically, 49 C.F.R. § 195.452(i)(3) provides that "[a]n operator's evaluation [to identify an appropriate leak detection system] must, at least, consider . . . *leak history*," among other factors (emphasis added).  Thus, Dakota Access is already required to assess and take into account its spill record in order to develop a PHMSA-compliant leak detection system for DAPL.

Third, PHMSA's regulations governing the preparation of emergency response plans require that the operator identify adequate resources to address a "worst case discharge," 49 C.F.R. § 194.107(a), which is "the largest foreseeable discharge of oil, including a discharge from fire or explosion, in ***adverse weather conditions***."  49 C.F.R. § 194.5 (emphasis added). Under PHMSA's regulations, "adverse weather" includes "ice conditions, temperature ranges, weather-related visibility, significant wave height."  *Id*.  Accordingly, Dakota Access' emergency response plan approved by PHMSA must already identify personnel, equipment, and strategies to respond to and mitigate a potential release from DAPL in winter (including ice) conditions.  In a recent proposed rulemaking PHMSA has reaffirmed the need for operators to take into account adverse weather conditions in identifying adequate equipment, personnel, and strategies in a response plan.  *See* 85 Fed. Reg. 21,140, 21,144 (April 16, 2020) (PHMSA is

proposing to "consider adverse weather in § 194.107 when developing" a response plan; adverse weather "is an important consideration for planning the spill response").

Fourth, PHMSA's regulations also establish the precise methodology for calculating the worst-case discharge for a pipeline, which is based on the largest volume that could be released between valve-to-valve segments.  49 C.F.R. § 194.105; *see also Nat'l Wildlife Fed'n v. Sec'y of the Dep't of Transp.,* 374 F. Supp. 3d 634, 650 n.12 (E.D. Mich. 2019) (the PHMSA worst-case discharge "calculation yields a conservative estimate of the worst-case discharge volume regardless of weather conditions") (internal citation omitted).  While the Court believes that commenters on the Corps' environmental assessment call into question the validity of the methodology employed to calculate the worst-case discharge from DAPL so as to warrant the preparation of an EIS, the fact remains that the maximum discharge for the pipeline is simply and accurately calculated based on the throughput on the line and valve locations, inclusive of the volume that may be released before the valves are closed.

Further, as discussed above, in the event of a discharge EPA and the Coast Guard would be involved in spill response efforts in their capacities assigned by the OPA.  As with pipeline safety matters, Congress has assigned no role to the Corps.

Because DAPL leak detection and spill response is fully regulated by PHMSA and other agencies, vacatur would not advance any legitimate pipeline safety concerns that are to be assessed in the Corps' EIS process; those safety concerns are already the subject of strict federal oversight.  *See Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1050 (10th Cir. 2015) (concluding that "the risk of oil spills fell within the domain of other agencies" (*i.e.*, PHMSA), and not the Corps).  Unlike, for example, EPA or the Coast Guard, the Corps possesses no authority under the Clean Water Act (33 U.S.C. § 1321) to impose injunctive measures to prevent potential

releases of crude oil into waters of the United States.  Nor does the Corps regulate spill

preparedness measures under 33 U.S.C. § 1321(j).  The Corps' EIS may thus provide

information that will be relevant to the permitting decision and could conceivably result in the

imposition of mitigation measures over and above federal regulatory requirements.  However,

while one might speculate about what the Corps might do following an EIS (and notably it has

proposed no mitigation measures to date) the DAPL pipeline will operate safely under federal

regulation in the interim.

For the foregoing reasons "it is at least possible" that, upon completing the EIS, the

Corps may justify its original decision on remand.  This warrants that the DAPL easement not be

vacated in the interim and that DAPL be allowed to continue to operate consistent with its

existing leak detection and spill response requirements imposed by federal law.  *Sugar Cane

Growers*, 289 F.3d at 97-98; *see also Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198

(D.C. Cir. 2009) ("When an agency may be able readily to cure a defect in its explanation of a

decision, the first factor in *Allied-Signal* counsels remand without vacatur.").  The Corps'

easement should thus not be vacated under the first *Allied-Signal* factor and the Court thus need

not reach the second factor addressed next.

## II.    The Disruptive Consequences That Would Result from Vacatur Warrant an Order by This Court that Allows DAPL Operations to Continue

The second *Allied-Signal* factor—disruptive consequences resulting from vacatur—also

weighs against vacatur of the Corps' easement for DAPL.  In other situations where vacatur

would cause more harm than maintaining the status quo during the remand period, this Circuit

has recognized that remand without vacatur is appropriate.  *See Ctr. for Biologic Diversity v.

EPA*, 861 F.3d 174, 188 (D.C. Cir. 2017); *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454,

1460 (D.C. Cir. 1987) (per curiam); *accord Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 528

16

(D.C. Cir. 2009) (per curiam).  Other courts have concluded that an agency's decision should not be vacated where doing so prevents use of a much-needed resource.  *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993-94 (9th Cir. 2012) (declining to vacate approval of an electric power plant where "vacatur would pave the road to legal challenges to . . . construction that could well delay a much needed power plant") (applying *Allied-Signal*).

Here, the significant "disruptive consequences" in terms of job losses, energy supply chain disruptions and other adverse economic consequences of rescinding the Corps' easement far "outstrip the consequences" of allowing DAPL operations to continue.  *North Coast Rivers Alliance v. U.S. Dep't of the Interior*, No. 1:16-cv-00307-LJO-MJS, 2016 WL 8673038, at *11 (E.D. Cal. Dec. 16, 2016) (granting the federal defendants' motion for voluntary remand without vacatur of the NEPA documents that applied to water contracts).  Vacating the Corps' approvals and ordering DAPL operations to cease would have serious adverse economic impacts throughout the oil industry, hitting local and regional economies harshly due to the unavailability of feasible transportation alternatives in the Bakken region.  *See* Murk Decl. ¶¶ 5- 6.

DAPL plays an integral role in the regional economy, transporting over a third of all oil produced in the Bakken.  *Id*. ¶ 7.  Currently, the Bakken is producing 1.45 million barrels per day, but only has pipeline and local refining takeaway capacity of 1.4 million barrels per day, inclusive of the 570,000 barrels per day transported by DAPL.  *Id*.  Since the pipeline was placed into service in 2017, DAPL has enhanced market access to regional-produced crude by creating the most cost-effective solution for the transportation of North Dakota crude to sought-after refinery markets.  *Id*. at ¶ 10.  The June 2017 startup of DAPL, in fact, marked the first time since 2011 that pipeline capacity was made available to not only finally meet existing demand, but to grow production considerably.  *See id*.  Also, because the Bakken produces high quality,

low-sulfur crude that is considered to possess highly desired characteristics for the production of gasoline, diesel, and jet fuel, Bakken crude costs more on a per-barrel basis and thus must be transported to specific refinery markets that are willing to pay for its higher cost. *See id*. DAPL was the first (and indeed remains the only) pipeline to provide an economic conduit to transport higher-priced Bakken crude directly to refinery markets in Illinois and the Gulf Coast that require and prefer it for production of finished products. *Id*. The vast volume of crude oil that is shipped on DAPL on a daily basis is worth over $6.3 million, or more than $190 million each month that DAPL remains in operation. *Id*. at ¶ 8. If DAPL were to be taken out of service for the year or more that it could take the Corps to prepare an EIS and issue a further permitting decision, the direct financial impact of the stalled crude deliveries would be staggering.

The critical and essential service DAPL performs remains unchanged even in the face of the current economic downturn. Some reduction in Bakken crude oil production is expected in the coming months due to lower crude prices. *Id*. at ¶ 12. However, any such reduction is expected to be far less than the total 570,000 barrels per day transported by DAPL. *Id*. More importantly, to the extent that Bakken production levels are reduced by any level, rail transport of Bakken crude will be the first to see declines because rail transport costs more than pipeline on a barrel-per-mile basis. *Id*. A reduction in Bakken production would result in fewer barrels transported on various existing pipelines; however, no (or only a very slight) reduction on DAPL would be expected because DAPL is the critical infrastructure that makes continued Bakken production economical when crude prices remain so low. *Id*. In other words, DAPL will remain the key outlet for Bakken oil even in a downturn, and its importance relative to other, more costly transportation outlets will only grow.

DAPL's closure would be devastating to regional producers, to refineries and to the persons who depend on it for their employment. That is because DAPL is crucial to providing an efficient, low-cost transportation option for Bakken crude; it was built for exactly that reason, i.e., to fill a transportation void and thus allow Bakken oil to reach its market at a cost that the market demands. *See id*. at ¶¶ 10-11, 13. No existing pipeline system other than DAPL has the ability to efficiently and directly transport Bakken-produced crude oil to the refinery markets that depend on Bakken crude. As a result, the use of other, more circuitous pipelines to reach the refinery markets that are willing to pay for higher-priced Bakken crude would become uneconomical because this would drastically increase transportation costs as compared to DAPL. *See id*. at ¶¶ 11, 13. Further, assuming that Bakken production levels drop due to short-term COVID-related macroeconomic conditions, a DAPL shutdown would cause further reductions in production levels because, as noted, DAPL is the primary transportation mode that makes production economical. *Id*. at ¶ 13. The closure of DAPL, in other words, would result in a downward spiral throughout the region, prompting the closure of even more production wells, and the consequent loss of even more jobs, than may otherwise close in the current economic climate. *See id*.

This is problematic not only for producers, but especially for their employees. The shut-in of existing wells and lack of continued well development in the region due to the unavailability of affordable transportation options would be expected to result in "significant job loss" throughout the North Dakota production region. *Id*. There is also no certainty that such jobs would return – closed (i.e., shut-in) wells may not ever produce at the same level once/if reopened and producers may choose to never reopen the wells at all for other financial reasons,

leaving existing employees stranded indefinitely if a DAPL-like solution is not made immediately available.  *See id.*

A drastic reduction in Bakken production would also come at exactly the wrong time for our nation's economy.  Not only would thousands of U.S. workers likely lose their jobs, but continued Bakken production is needed in order to meet the rapid increase in demand for gasoline, diesel, and jet fuel that is expected once the current COVID-19 crisis has abated. While oil prices in the region remain historically low right now, volumes continue to ship on DAPL and the volumes transported will increase once COVID-19-related restrictions begin to be lifted throughout the country.  *Id.*  ¶ 14.  As discussed above, DAPL must be in place to allow North Dakota production to remain economical; if DAPL were taken out of service, a significant production shortfall in the Bakken region would develop.  *Id.*  That could only be avoided if existing production wells that are DAPL-dependent continue to operate during the current slowdown and new investment/development occurs.  *See id.*  On the other hand, it could take the Bakken region several years to recover if DAPL were shutdown, and only then if DAPL were placed back into service or a pipeline functionally identical to DAPL were constructed and placed into operation.  *Id.*

Downstream refineries, which include Amici members, will obviously also be significantly and adversely impacted by any DAPL shutdown.  *Id.* ¶ 15.  As noted above, refiners in Illinois and the Gulf Coast rely on the transport of Bakken crude for its specific, and highly desirable, characteristics.  *Id.* at ¶¶ 10-11.  Each refinery is currently optimized to refine a particular type of crude oil.  *Id.* at ¶ 15.  Crude oils have different properties, including API gravity (heavy, medium, light crudes), sulfur (sweet/sour), total acid number, paraffins, and a host of other characteristics.  *Id.*  Each refinery that receives DAPL volumes is thus configured to

refine the specific properties of that delivered crude oil, which includes a very low sulfur content. *Id*. Changes to a different crude may cause the refineries to incur adjustment costs during reconfiguration. *Id*. Also, the purchase of a substitute crude may be more expensive and of a lower quality than Bakken crude, in turn leading to higher refining costs to produce a similar product. *Id*. As a result, employees at such refineries "could lose their jobs." *Id*.

Further, Dakota Access is not the only pipeline company that would be adversely impacted by a DAPL shutdown. *Id*. ¶ 16. Pipeline companies have constructed and developed gathering lines that collect Bakken crude from production sites and feed that crude directly into the DAPL pipeline. *Id*. To the extent that DAPL were shutdown, the existing pipeline infrastructure operated by these companies would have no utility – *i.e.*, they would transport oil to a dead-end where DAPL previously operated to transport their volumes onward to refinery destinations. *See id*. The only option would be for these companies to construct new infrastructure to connect their pipelines to interstate pipelines. *Id.* However, it is highly doubtful that the necessary investment in pipeline expansion would be made in this economic climate and with potential Bakken contraction. *See id.* Some existing gathering lines may not be able to be reconfigured at all, thereby causing their shutdown as a result of any order by this Court requiring the shutdown of DAPL. *Id*. Their shutdown would consequently lead to job losses in a time where our country's unemployment levels are already staggering. *Id*.

There is also no doubt that DAPL operations benefit local and regional economies up and down the supply chain. *Id*. at ¶ 9. In 2018, DAPL paid taxes of $7.6 million to North Dakota and $22.5 million to Iowa, which does not account for taxes and other revenue generated for states by producers and other third parties that use DAPL. *Id*. This revenue, which is so critical during the country's economic downturn, would thus be lost. Aside from increased tax revenue,

the operation of DAPL also supports additional annual economic activity for surrounding states. *Id*. DAPL thus both directly and indirectly creates jobs throughout the region, and its closure would have a domino effect, lessening revenue and annual sales, thereby leading to "higher unemployment in these states." *Id*.

Nor is rail a viable alternative to ship all of the DAPL volumes. *Id*. at ¶ 17. The usage of rail to transport Bakken-produced crude occurs at times when the price per barrel for Bakken-produced crude has made the use of higher-priced rail transport economical. Now, however, with the drastic lowering of crude prices, rail is not an economic option for Bakken producers to move DAPL quantities, and (as noted above) significant declines in rail usage out of the Bakken are expected. Namely, if faced with a choice of continuing or not to transport oil on rail following a DAPL closure, it is possible that many producers will choose to shut-in their wells, deciding that continued transportation in the face of increased rail transportation costs is uneconomic. *See id*.

In addition, even if rail were an economically viable alternative to pipeline transport (which it is not), new rail infrastructure would first be needed. *Id*. at ¶ 18. Namely, new rail terminals and pipelines connecting to those terminals would need to be constructed to link Bakken-produced oil to existing rail infrastructure. *Id*. This would require significant financial investment, not only in new rail loading facilities, but also in additional rail tank cars; and it is almost certain that this mandatory investment will not occur in the current economic climate. *Id*. Even if such investment were to be made, there is no certainty that existing rail lines could reach refineries that demand DAPL crude on a per-mile dollar basis that producers/shippers are willing to pay. *Id*.

**CONCLUSION**

A closure of DAPL would be devastating to our nation's economy, the petroleum industry, and its many employees.  The positive economic benefits resulting from DAPL would come to an abrupt end if this Court were to order the pipeline's operations to cease.  These extensive adverse impacts at a local, regional, and industry-wide level are reason alone for this Court to order DAPL operations to continue while the Corps prepares its EIS.  *See, e.g.*, *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 98 (2019) (declining to vacate while agency prepared EIS under second *Allied-Signal* factor); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 993-94 (9th Cir. 2012) (despite the flaws in the agency's NEPA process, the court reasoned that the "delay and trouble vacatur would cause [were] severe" and the potential job losses and electricity blackouts would be "economically disastrous" resulting from delay in the "much needed power plant."); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015) (declining to invalidate a national Clean Water Act permit on the grounds that "vacatur could suspend a substantial amount of surface mining in the state of Alabama"); *WildEarth Guardians v. U.S. Office of Surface Mining, Reclamation & Enf't*, 104 F. Supp. 3d 1208, 1232 (D. Colo. 2015) (delaying entry of vacatur order despite NEPA defects on grounds that immediate vacating of mining permit would result in layoffs and disruption of power plant operations), *order vacated on other grounds, appeal dismissed*, 652 F. App'x 717 (10th Cir. 2016); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1116 (E.D. Cal. 2013) (declining to vacate national forest plan despite NEPA defects due to harm vacatur would cause to timber and forest products industry in Sierra Nevada region).

For the foregoing reasons this Court should allow DAPL operations to continue while the Corps prepares the EIS required by the Court's March Opinion.

RESPECTFULLY SUBMITTED this 29th day of April 2020.

/s/   David H. Coburn
David H. Coburn (DC # 241901)
Joshua H. Runyan (DC # 977664)
**STEPTOE & JOHNSON LLP**
1330 Connecticut Ave., NW
Washington, D.C. 20036
Telephone: (202) 429-8063
Facsimile: (202) 429-3902
dcoburn@steptoe.com

*Attorneys for the American Fuel & Petrochemical Manufacturers, American Petroleum Institute, and the Association of Oil Pipe Lines*

## CERTIFICATE OF SERVICE

I, David H. Coburn, hereby certify that on April 29, 2020, I caused a true and correct copy of a copy of the foregoing document to be served on all parties of record via the CM/ECF system.

/s/   David H. Coburn
David H. Coburn (DC # 241901)
**STEPTOE & JOHNSON LLP**
1330 Connecticut Ave., NW
Washington, D.C. 20036
Telephone: (202) 429-8063
Facsimile: (202) 429-3902
dcoburn@steptoe.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 16-1534(JEB)** |
| **U.S. ARMY CORPS OF ENGINEERS,** *et al.,* | |
| **Defendants.** | |

### DECLARATION OF DAVID MURK IN SUPPORT OF *AMICI CURIAE* BRIEF

I, David Murk, have personal knowledge of the following and hereby make this declaration in support of the American Fuel & Petrochemical Manufacturers, the American Petroleum Institute ("API") and the Association of Oil Pipe Lines' (collectively "Amici") Amicus Brief in support of Intervenor-Defendant Dakota Access, LLC's ("Dakota Access") Memorandum on Vacatur.

1.      My business address is 200 Massachusetts Avenue NW, Washington, D.C. 20005.

2.      My current position is Pipeline Director for API, which I have held since April 2016.  My current responsibility is to direct API's policy positions with respect to liquids pipelines in the United States.

3.      API is a national trade association that represents all aspects of America's oil and natural gas industry.  API's more than 600 members – which include exploration and production, refining, marketing, pipeline, and marine businesses, and service and supply firms – provide much of the nation's energy, including oil-related services in North Dakota and the Bakken

region.  Together with its member companies, API is committed to ensuring a strong, viable U.S.

oil and natural gas industry capable of meeting the energy needs of our country in a safe and

environmentally responsible manner.

4.     Representation of the economic interests of the oil and gas industry in litigation is

part of API's overall purpose, and API has on numerous occasions participated in litigation

affecting those interests, such as the litigation at issue here.

5.     API and its member companies have a significant interest in the continued and

uninterrupted transportation of North American-produced crude oil.  In particular, API and its

members seek to ensure that crude oil produced in North Dakota and transported on the Dakota

Access Pipeline ("DAPL") to refinery destinations in the U.S. continues without interruption.

DAPL provides necessary pipeline capacity to the Bakken region, thereby helping to ensure

regional and local economic growth, as well as national energy security and independence.

Thus, the issue now before the Court – whether to vacate the U.S. Army Corps of Engineers'

("Corps") approvals for DAPL – is of great importance to API and its member companies.

6.     API believes that any order by this Court to require DAPL to cease operations for

any period of time would have substantial and extensive disruptive consequences, including a

large number of job losses that the nation can ill-afford at this time.  The consequences are

certain to result because no existing pipelines or economic transportation modes exist that are

capable of displacing the vital transportation function that DAPL is designed to serve.  It is also

highly doubtful that the necessary investment would (or could) be made in the current economic

climate to construct any new infrastructure that would be necessary to provide an affordable

replacement to DAPL.

7.     DAPL currently transports 570,000 barrels per day.  This volume represents

nearly 30% of the current total Bakken production of 1.45 million barrels per day.  Inclusive of

DAPL, the Bakken has pipeline and local refining takeaway capacity of only 1.4 million barrels per day. Removing DAPL's 570,000 barrels per day capacity would reduce takeaway (i.e., transportation) capacity from the Bakken region to less than 60% of production based on the current 1.45 million barrels per day production level.

8.      Even in light of lower crude oil prices, the vast volume of crude oil that is shipped on DAPL on a daily basis is worth over $6.3 million, or more than $190 million each month that DAPL remains in operation.  If DAPL were to be taken out of service for the two years or more that it could take the Corps to prepare an EIS and issue a further permitting decision, the direct financial impact of the stalled crude deliveries would be staggering.

9.      DAPL operations greatly benefit local and regional economies up and down the supply chain.  In 2018, DAPL paid taxes of $7.6 million to North Dakota and $22.5 million to Iowa, which would all be lost in future years if DAPL were closed.  The operation of DAPL also supports additional annual economic activity for surrounding states.  DAPL both directly and indirectly has created jobs throughout the region, and its closure would have a domino effect, lessening revenue and annual sales, and undoubtedly leading to higher unemployment in these states.

10.      DAPL was placed into service in 2017 to provide direct and economical access to sought-after refinery markets.  Because the Bakken produces high quality, low-sulfur crude that is considered to possess highly-desired characteristics, Bakken crude costs more on a per-barrel basis and thus must be transported to specific refinery markets that are willing to pay for its higher cost.  Accordingly, DAPL first provided – and continues to provide – producers and marketers with the only affordable access to the Patoka, Illinois market and direct connectivity to Gulf Coast markets on the Energy Transfer Crude Oil Pipeline, markets that have been willing to pay for higher-priced Bakken crude.  Because DAPL was able to reliably provide direct access to

new markets, it has grown production in the Bakken region since 2017, and a further expansion

of the pipeline is necessary to meeting existing and future demand.

11.     If DAPL is taken out of service, no other existing pipeline or combination of

pipelines have the ability to efficiently and directly transport Bakken-produced crude oil to the

Illinois and Gulf Coast refinery markets that are willing to pay for higher priced Bakken crude.

A series of existing pipelines on indirect routes would need to be utilized to reach the Illinois and

Gulf Coast refinery markets.  The use of such pipelines could drastically increase transportation

costs.  Accordingly, the use of these alternative pipelines would make Bakken wells uneconomic,

leading to additional decreases in production and the closure/shut-in of existing crude wells, and

the consequent loss of jobs.

12.     A reduction in Bakken crude oil production may be expected in the coming

months due to lower crude prices.  However, any such reduction would likely be far less than the

total 570,000 barrels per day transported by DAPL.  To the extent that Bakken production levels

are reduced by any level, rail transport of Bakken crude will experience declines due to rail's

higher cost as compared to pipelines.  Rail transport, in other words, is economic only when the

price of Bakken crude is high enough to support its higher cost.  Any significant reductions in

Bakken production will also result in fewer barrels transported on various other existing

pipelines; however, no (or only a very slight) reduction on DAPL would be expected because it

is the critical infrastructure that makes continued Bakken production economical when crude

prices remain so low.

13.     A DAPL shutdown would be expected to cause further reductions in production

levels, in addition to those already occurring due to lowered crude prices.  DAPL is the primary

transportation mode that makes Bakken production economical.  The closure of DAPL could

also cause additional wells (that may have survived in the current economic climate) to be shut-

in or closed permanently and fewer (if any) new wells to be developed because the demand for the producers' oil would drop due to the inability to economically transport their volumes on DAPL to reach refinery markets that demand Bakken crude.  The shut-in or closure of existing wells and reduction of exploration and production activities in the region due to the unavailability of affordable transportation options would likely result in significant job loss throughout the North Dakota production region.  There is also no certainty that such jobs would return – shut-in wells may not ever produce at the same level once/if reopened and producers may choose to never reopen the wells at all for other financial reasons, leaving existing employees stranded indefinitely.

14.     Continued Bakken production is needed should we see an increase in the United States' demand for gasoline, diesel, and jet fuel once Covid-19 restrictions are lifted.  While oil prices in the region remain historically low right now, substantial volumes continue to ship on DAPL.  If DAPL were taken out of service, there could be a significant production shortfall in the Bakken region, which could only be avoided if existing production wells operate continuously in the interim and new investment/development occurs.  This is largely due to the fact that it can take many months if not years for production levels to ramp-up to meet expected future demand.  If DAPL were taken out of service, it could take the Bakken region several years to recover, and it could do so in that timeframe only if DAPL were placed back into service or a pipeline identical to DAPL were constructed and placed into operation.

15.     A DAPL closure would also significantly and adversely impact downstream refiners that rely on the reliable and continued receipt of Bakken crude.  Each refinery is optimized to refine a particular type of crude oil.  Crude oils have different properties and each refinery that receives DAPL volumes is configured to refine the specific properties of that delivered crude oil, which includes differences in API gravity (heavy, medium, light crudes),

sulfur (sweet/sour), total acid number, paraffins, sulfur content, etc.  Any change to a different crude could cause the refineries to incur shut-down or other adjustment costs during reconfiguration.  Any such change in crude supply could be expected to adversely impact refiners' profitability, with a main impact being that the many employees at such refineries could lose their jobs.

16.     Midstream companies have constructed and developed systems of smaller pipelines called gathering lines that collect Bakken crude from production sites and feed that crude directly into the DAPL pipeline.  These include, but are not limited to, gathering lines operated by API members.  A DAPL closure would adversely impact the continued operation of these companies' pipeline assets, each of which feeds into DAPL.  To utilize their existing infrastructure in the face of a DAPL closure, the operators of these pipeline assets would be required to construct new infrastructure to connect to other interstate pipelines.  Some existing gathering lines may not be able to be reconfigured at all, thereby causing their shutdown, which would consequently lead to additional economic losses.

17.     Rail cannot economically move more than a fraction of current DAPL volumes.  If DAPL were closed, many producers and/or shippers may choose, from an economic standpoint, to forego the higher costs associated with rail transport because doing so could cause their production wells to become uneconomic.

18.     Even if producers were willing to pay higher costs associated with rail transport (which is highly unlikely), new rail infrastructure would be needed to allow Bakken-produced crude to be gathered and reach refinery markets.  This would include the construction of new rail terminals and pipelines connecting to those terminals in order to link Bakken-produced oil to existing rail infrastructure.  The construction of such infrastructure would require significant financial investment, not only in new rail loading facilities, but also in additional rail tank cars.

However, even if such investment were to be made in the current economic climate, there is no certainty that existing rail lines could reach refineries that demand DAPL crude on a per-mile dollar basis that producers/shippers are willing to pay.

19.     For the foregoing reasons, API believes that this Court should allow DAPL to continue to operate so that it can fulfill the national interest through the safe and reliable transportation of 570,000 bpd from North Dakota to refinery destinations, thereby meeting U.S. energy and related security demands and retaining jobs critical to the nation's economy at this time.

I, David Murk, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate with respect to the declarations made on behalf of API.

_____
DAVID MURK
Executed on this 29th day of April, 2020.