## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGALALA SIOUX TRIBE; | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | Case No. 1:16-cv-1534-JEB |
| CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE, ET AL., | ) ) ) | (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiff-Intervenors, | ) ) | |
| v. | ) ) | |
| U.S. ARMY CORPS OF ENGINEERS, | ) ) | |
| Defendant-Cross-Defendant, | ) ) | |
| and | ) ) | |
| DAKOTA ACCESS, LLC, | ) ) | |
| Defendant-Intervenor-Cross-Claimant. | ) ) ) | |

## BRIEF OF *AMICUS CURIAE* CONSUMER ENERGY ALLIANCE
## IN OPPOSITION TO VACATUR ON REMAND

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................. ii

IDENTITY AND INTEREST OF *AMICUS CURIAE* .................................................. 1

SUMMARY OF ARGUMENT ........................................................................................... 3

ARGUMENT ...................................................................................................................... 4

    I.     First *Allied-Signal* Factor:  Any Deficiency in the Corps' Compliance with NEPA Is Not Serious Enough to Vacate the Easement ................................................. 5

    II.    Second *Allied-Signal* Factor:  The Disruptive Consequences of Vacatur .................... 6

        A.     The Dakota Access Pipeline is Significant to the National Economy .............. 7

        B.     Current Reports and Statistics Illustrate that Vacatur on Remand Will Result in Significant Disruptive Consequences ................................................. 7

            1.     America Relies on Pipeline Infrastructure ........................................... 7

            2.     U.S. Poverty and Economic Data ...................................................... 10

            3.     After-Tax Dollars on Energy ............................................................. 11

            4.     Expected Future Pipeline Needs and Development ............................ 12

            5.     Pipelines Completed and Underway – Benefits .................................. 13

            6.     Recent Trends in Pipeline Safety ...................................................... 14

            7.     The Reality ........................................................................................ 15

            8.     Regional Impacts .............................................................................. 16

CONCLUSION ................................................................................................................. 19

CERTIFICATE OF SERVICE ......................................................................................... 21

## **TABLE OF AUTHORITIES**

**CASES**                                                                                    **Page(s)**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ................................................................................ *passim*

*Humane Soc'y of U.S. v. Johanns,*
    520 F. Supp. 2d 8 (D.D.C. 2007) ........................................................................4

*Nat'l Parks Conservation Ass'n v. Semonite,*
    916 F.3d 1075 (D.C. Cir. 2019) ..........................................................................5

*North Caroline v. EPA,*
    550 F.3d 1176 (D.C. Cir. 2008) ..........................................................................6

*Shands Jacksonville Med. Ctr. v. Burwell,*
    139 F. Supp. 3d 240 (D.D.C. 2015) ....................................................................6

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock III),*
    255 F. Supp. 3d 101 (D.D.C. 2017) ....................................................................4

**REGULATIONS**

40 C.F.R. § 1508.27 ....................................................................................................5

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

Consumer Energy Alliance ("CEA") is a national trade association with membership comprised of a diverse group representing families, businesses and various industries, including labor, manufacturing, agriculture, small business and conservation organizations. Its mission is to work alongside dedicated citizens and community leaders nationwide, advocating for sensible energy and environmental policies for all consumers.

Since its inception in 2006, CEA has helped advance the needs of individuals, families, and businesses, both large and small, who have been forgotten in the energy debate. These groups include those who can least afford to pay more for fuel and utility bills or who are struggling to meet payroll and stay open.

CEA's individual members are those, like each of its friends and neighbors, who each and every day, are trying to make a living, provide for their families and employees, and contribute to society. Its organizational members include a collection of companies from across the U.S. that employ people, grow and raise the food we eat, and produce and sell the goods that all Americans use and rely on daily. They are farmers, academia, conservation groups, truck drivers, laborers, trades-people, energy producers, manufacturers, and small business owners.

As an organization advocating for consumers across this nation, CEA continues to stand by its commitment to ensuring families – especially low-income individuals and those on fixed incomes or living paycheck-to-paycheck – and businesses trying to meet budgets and payrolls are able to access the energy they need.

CEA submits its *amicus curiae* brief out of concern that shutting down energy infrastructure projects such as the Dakota Access Pipeline ("DAPL") threatens the future of America's energy reliability and supply, thereby increasing costs of energy for consumers and

creating significant economic hardship; and leveling disproportionate harm to those in poverty, on fixed incomes and in society's margins, especially as the nation deals with the tremendous economic uncertainty created by the COVID-19 pandemic.

## SUMMARY OF ARGUMENT

CEA addresses the Court's request to consider the appropriate remedy on remand in light of the *Allied-Signal* factors[1] by supporting Defendants' position that vacatur on remand is unwarranted. First, the U.S. Army Corps of Engineers (the "Corps") utilized its discretion in following the procedural requirements of the National Environmental Policy Act ("NEPA") when it issued an environmental assessment ("EA") finding that no environmental impact statement ("EIS") was required, so its deficiency is not serious. Second, and most significantly, vacating the Dakota Access Pipeline ("DAPL") easement will result in substantial, disruptive, and far-reaching consequences. As such, vacatur on remand is an inequitable and untenable remedy.

As to the first *Allied-Signal* factor, the Corps exercised its discretion to analyze the environmental impacts from the DAPL and determine that no EIS was appropriate, so any deficiency in compliance with NEPA (paired with its ability to remedy any deficiency on remand) is not serious enough to warrant vacating the easement. Moreover, even if the Court would deem the deficiency as extremely serious, the severe, disruptive consequences under the second *Allied-Signal* factor still warrant remand without vacatur.

Under the second *Allied-Signal* factor, CEA submits that vacating the DAPL's easement will cause significant economic, security, and social harm. CEA's arguments will primarily cite to the organization's 2017 report titled "*Families, Communities and Finances: The Consequences of Denying Critical Pipeline Infrastructure*" (the "CEA Report").[2] The CEA Report examines the very real impacts to everyday Americans under a scenario where judges, lawmakers, or regulators

---

[1]    *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993).

[2]    *Families, Communities and Finances:  The Consequences of Denying Critical Pipeline Infrastructure,* PIPELINES FOR AMERICA:  A PROJECT OF CONSUMER ENERGY ALLIANCE, *available at*  https://consumerenergyalliance.org/cms/wp-content/uploads/2017/01/CEA_Pipelines_Report-011617.pdf.

block or interrupt the operations of pipeline infrastructure. CEA's arguments will highlight the role pipelines play in the American economy, their role in national security, and the socially regressive impact that disturbing pipeline infrastructure causes Americans who can least afford increased costs of energy.

CEA's position emphasizes that vacating the DAPL easement during the remand has the potential to increase energy costs to families and businesses, disrupt fuel supplies, impede manufacturing and industrial projects, reduce high-paying labor jobs, and deprive mineral rights owners of their ability to realize their property rights. Application of the *Allied-Signal* factors should not result in vacatur of the DAPL easement on remand.  This result is necessary as a matter of sound public policy to ensure that America's energy and economic future is secure.

## ARGUMENT

This Court has determined that the Corps failed to comply with NEPA when it determined in its Final EA that no EIS was required. While the standard remedy for violating the procedural dictates of NEPA is vacating the agency's action, *Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d 8, 37 (D.D.C. 2007), courts have discretion to forgo vacatur.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock III)*, 255 F. Supp. 3d 101, 147 (D.D.C. 2017).  Indeed, remand ***without*** vacatur affords the flexibility to equitably serve the best interests of the litigants, regulated entities and the public at large.  In this case, where vacatur would result in disruption of an operational pipeline easement resulting in significant, far-reaching consequences, vacatur on remand is unwarranted.

Courts may refrain from vacating an agency action if "[s]uch a move" would "carry serious consequences that a court should not lightly impose." *Standing Rock III*, 255 F. Supp. 3d at 147. To determine whether to vacate agency action on remand, courts consider: (1) the seriousness of

the deficiencies in the agency's decision, and (2) the disruptive consequences that would result from vacatur. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

Applying these two *Allied-Signal* factors, CEA's *amicus curiae* brief supports remand without vacatur. In support of this conclusion, CEA details the irreparable, devastating and disruptive economic, security, and social consequences of vacating the easement.

I.   **First *Allied-Signal* Factor: Any Deficiency in the Corps' Compliance with NEPA is Not Serious Enough to Vacate the Easement.**

The Corps' deficiency in compliance with NEPA is not serious enough to vacate the easement. The NEPA implementing regulations lay out two factors to determine whether actions may result in "significant" environmental impacts. *See* 40 C.F.R. § 1508.27. The two factors are "context" and "intensity." *Id.* Section 1508.27(b) puts forth ten (10) factors that agencies should consider to determine the "intensity" of a proposed action. Of these ten factors to determine the intensity of proposed action, "[i]mplicating any one of the[se] factors ***may*** be sufficient to require development of an EIS." *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (emphasis supplied). This is a permissive standard, calling for interpretation and discretion. *See id.*

Here, the Corps exercised its statutory authority in reviewing the potential environmental impact of the DAPL easement. The Corps interpreted NEPA and the NEPA implementing regulations to support a reasoned determination to prepare an EA finding that no EIS was required. Further, the Corps explained its rationale and responded to numerous comments that were critical of its position on tunneling under Lake Oahe. While this Court did not agree with the Corps' reasoned determination, the inherent discretion involved in the determination reduces the

seriousness of the deficiency.  The deficiency is further likely to be rehabilitated after remand and preparation of an EIS.

Accordingly, any deficiency in compliance with NEPA is not serious enough to vacate the easement; and to the extent the Court does deem it serious, then the extreme disruptive consequences, detailed more fully *infra*, still warrant remand without vacatur.  *See Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 271 (D.D.C. 2015) (concluding that the remand should be without vacatur where the second *Allied-Signal* factor indicated significant disruption); *see also North Carolina v. EPA,* 550 F.3d 1176, 1178 (D.C. Cir. 2008) (remanding without vacatur, despite serious flaws in rule, where vacatur would be disruptive).

## II.    Second *Allied-Signal* Factor: The Disruptive Consequences of Vacatur

The second *Allied-Signal* factor considers the disruptive consequences that would result from vacatur. Pipeline infrastructure is critical to America's continued access to affordable, reliable, and environmentally sound energy. Vacating the DAPL's easement, when it is likely to be reissued after the Corps' EIS is completed, will cause significant economic, security, and social harm. To that end, CEA issued a report in 2017 titled "*Families, Communities and Finances: The Consequences of Denying Critical Pipeline Infrastructure.*" This report examines the very real impacts to everyday Americans under a scenario where judges, lawmakers, and regulators block critical pipeline infrastructure. CEA's arguments under the second *Allied-Signal* factor highlight the role pipelines play in the American economy, their role in national security, and the socially regressive impact that disturbing pipeline infrastructure causes to the Americans who can least afford increased energy costs.

### A.      The Dakota Access Pipeline Is Significant to the National Economy.

The DAPL is a 1,172-mile underground 30" pipeline transporting light sweet crude oil from the Bakken/Three Forks production area in North Dakota to Patoka, Illinois. Since its operation began in 2017, DAPL has been safely transporting 570,000 barrels of oil per day, and it employs anywhere between 8,000 to 12,000 people during construction. "The pipeline is the safest and most efficient means to transport crude oil from the geographically constrained region, providing better access to Gulf Coast and Midwest refineries and other downstream markets."[3]

DAPL has helped bolster production in the Bakken production area, currently moving approximately 40% of the Bakken's oil output per day. It also helped to improve the region's drilling economics by lowering transportation costs for operators and increasing domestic crude oil production, which translates into greater energy security, lower trade deficit, and boosted economic growth. Further, the significant expansion of pipeline capacity has helped to reduce flaring associated with oil and natural gas production in the Bakken region, thus providing improved environmental conditions. Pipelines enable the crude oil to safely reach refining and manufacturing markets where it can be used to make all of the products that Americans use every day.

Since DAPL began operations, it has not impacted groundwater in any of the four states in which it operates; does not encroach or touch on land owned by the Standing Rock Sioux Tribe; crosses under Lake Oahe at least 95 feet below water level; was studied by the Corps for an additional year beyond what was required; and surpasses all federal safety requirements.[4]

---

[3]      *Moving America's Energy, The Dakota Access Pipeline,* ENERGY TRANSFER, *available at* https://daplpipelinefacts.com.

[4]      *See Addressing Misconceptions About The Dakota Access Pipeline*, *available at* https://daplpipelinefacts.com/The-Facts.html.

Vacating DAPL's easement, even temporarily, will have enormous economic consequences on the United States in the form of higher costs for goods Americans need for their everyday lives – such as fuel, food, medicine, and clothes – because pipelines are the lowest cost means for transporting fuels. If the cost of fuel goes up, so does the cost of everything else. Virtually nothing within the current American economy reaches a consumer without being produced from or transported by a fossil fuel source. Taking DAPL offline by vacating the easement during remand is likely to raise the cost of an untold amount of goods and services in the Midwest and Mid-Continent portion of the country, and it will put economic pressure on fuel markets nation-wide.

### B.   Current Reports and Statistics Illustrate that Vacatur on Remand Will Result in Significant Disruptive Consequences.

1.   <u>America Relies on Pipeline Infrastructure</u>.

America's national pipeline grid is a critical part of the nation's energy lifeline, much like blood vessels and arteries are vital to the functioning of the human body. As the continued retirement of coal-fired generation facilities occurs, domestically produced natural gas is expected to play a larger role in meeting our future energy needs through electricity generation and other critical uses.

U.S. Energy Information Administration ("EIA") data forecasts that natural gas will meet 37% of U.S. electricity needs by 2030. *See* CEA Report p. 9.  This reliance on natural gas will help reduce our nation's vulnerability to imports, clean our air and help meet greenhouse gas emission reduction targets. *Id.*  However, in order to deliver the necessary volume of natural gas to power plants, factories, homes, and farms, as well as fuel to our refineries, transportation industries, and consumers, our pipeline delivery infrastructure must be upgraded and expanded. *Id.*  Real energy security is not just the presence of abundant natural resources – it is the ability to

readily access and deliver those resources at an affordable price. *Id.* Thus, advancing new projects, preventing disruptions and upgrading existing natural gas pipeline networks will enhance the nation's energy security, with the energy revolution that produces those fuels continuing to provide enormous benefits to families and businesses.

Blocking or disrupting midstream and pipeline infrastructure denies American families, households, and industries the energy benefits of over 3.1 million barrels per day of domestic petroleum products and feedstocks, as well as 44.5 billion cubic feet of natural gas supplies that are vital to keeping our economy moving and that provide the building blocks for a myriad of consumer staples: critical medicines, food packaging, fertilizers, jet fuel, chemical feedstocks for computers and smartphones, and more. It would also deny jobs to hard-working, high-wage earners in fields such as construction and the building trades, as well as other high-wage earners such as electricians, welders and steel fabricators. At the same time, it would significantly raise fuel prices, increase foreign oil import dependency and forfeit hundreds of millions of state and local tax dollars as well as billions in capital expenditures.

In recent years, projects that enable the development and delivery of fossil fuels have become highly vulnerable to delay efforts and disruptions via litigation, disputes, complex and often lengthy federal permitting processes, *see id.*, and anti-development protests premised on curtailing energy development and delivery projects, all of which present obstacles to the benefits of expanded pipeline capacity and energy supply. Coal-fired power generation and mining, natural gas development, natural gas and petroleum transportation through pipelines, natural gas-fired power generation, and emissions-free nuclear power facilities have been and will continue to be susceptible to such ill-conceived protests in the months and years ahead.

At the same time, virtually all independent analyses and studies predict that baseload power and energy provided by fossil fuels and nuclear power will form the backbone of electricity generation for decades to come.  *See id*. While promising options like wind and solar continue to expand at a very significant rate, they alone will not be able to meet future demand.  *Id.* at 9-10. Even so, the reality of the current environmental landscape reflects that carbon emissions, the target of many activist organizations, are down to their lowest levels since 1991 even with increased U.S. natural gas production and pipeline development.  *Id*. at 10.

2.    U.S. Poverty and Economic Data.

The sheer number of Americans living on the margins of society is an often overlooked component of the energy policy discussion. For far too many, paying for the basic necessities of food, clothing, shelter and monthly utility bills is a continual challenge. Disrupting energy infrastructure projects that bring more abundant supplies of low-cost energy places additional burdens and difficulties on those with the least amount of resources.  *Id.* at 11.

The official U.S. poverty rate in 2015 was 13.5%, down 1.2 percentage points from 14.8% in 2014.  *Id.*  In 2015, there were 43.1 million people living in poverty, 38% of whom are children and seniors 65 and older.  *Id.*  Real median household income in the United States was $56,516 in 2015 - this is the first annual increase in median household income since 2007 according to the U.S. Census Bureau.  *Id.*  In 2014, median household income was $53,657.  *Id.*

Regional poverty data (at or below poverty) in 2015 was as follows:

- Northeast – 6.89 million people
- Midwest – 7.84 million people
- South – 18.3 million people
- West – 10.07 million people

*Id*. The U.S. Department of Agriculture Food and Nutrition Service reports that as of October 2016, there were approximately 43.3 million individual (over 21 million households) food stamp

recipients. *Id.* For a family of four, those earning $31,596 per year are eligible for assistance. *Id.* Across the five regions selected for this study, the breakdown of food stamp recipients was as follows:

- New England – over 1.7 million people
- Mid-Atlantic – over 7.8 million people
- Southeast – over 10.2 million people
- Midwest – over 6.8 million people
- Mid-Continent – over 8.4 million people

*Id.*

> 3.    <u>After-Tax Dollars on Energy</u>.

Several studies and federal data highlight the disparate impact that higher energy prices have on the working poor in the United States. According to Bureau of Labor Statistics data, in April 2016 the bottom quintile of U.S. households spent 22% of their after–tax income on residential utility bills and gasoline compared to just 5% by the top quintile. *Id.*

Renewable energy advocacy group Groundswell conducted an analysis which found that the bottom 20% of earners spend almost 10% of their income solely on electricity, more than seven times the portion of income that the top quintile pays, with 50% of all families that spend 10% of income on power bills being African-American. In addition, the report found that more than half of those energy-insecure households are below the federal poverty level. *Id.* at 12.

Many of these individuals live in older, less energy efficient multifamily housing in more urban areas of the country or in manufactured housing in rural areas that can also see tremendously expensive energy bills relative to overall take-home pay compared to other demographics living in single-family housing. The U.S. Department of Housing and Urban Development found that 88% of multifamily households are renters with an average annual income ($31,000) that is just over half that of average homeowners ($61,000). In other words, the burden of those living in older

and less energy-efficient multifamily housing is being borne by families with the fewest financial resources. Consequently, renters typically pay a higher percentage of their income for energy use and utilities, with the resulting reduction in discretionary income making them much more vulnerable to harsh swings in energy prices. In fact, energy prices increased faster than housing costs between 2001 and 2009, with renters in multifamily units experiencing an average rent increase of 7.6% and a 22.7% increase in energy costs. *Id.*

The problem of high energy bills disproportionately hitting the poor has been acute and lingering for many years, so much so that the federal government has a dedicated funding stream that is appropriated to states through the Low Income Home Energy Assistance Program ("LIHEAP"). *Id.* In 2016, Congress spent well over $3 billion to provide LIHEAP assistance to families to help pay energy and heating bills. *Id.* To be eligible for assistance, families must have incomes at or below 150% of the federal poverty level (about $30,000 annually for a family of three), or 60% of the state's median income level. As recently as 2011, roughly 9 million households, or 23 million people, received LIHEAP assistance. *Id.* Currently, nearly 7 million households depend on LIHEAP to help pay high home heating and cooling bills. *Id.* According to a coalition of groups supporting increased programmatic LIHEAP funding, at least 90% of all LIHEAP recipients have at least one household member who is a child, elderly or disabled. *Id.*

### 4. Expected Future Pipeline Needs and Development.

In April 2016, the consulting firm ICF International prepared an analysis of future North American pipeline infrastructure construction needs through 2035. The study examined two market scenarios (high and low case), and concluded the following:

- U.S. and Canadian natural gas transportation capacity addition by 2035 is projected at 44 to 58 billion cubic feet (Bcf) per day for both scenarios, with a midpoint value of 51 Bcf per day.

   o To put these numbers in perspective, 1 Bcf of gas can power over 27,100 homes for an entire year. One company in the Marcellus Shale in Pennsylvania can produce that much every single day. CEA Report p. 17. Thus, the midpoint value in the study estimates that enough gas capacity could come online to power over 1.2 million homes in Canada and the U.S.

- U.S. and Canadian natural gas liquids ("NGL") transportation capacity addition is projected to be 1.1 to 2.3 million barrels per day ("BPD") for both scenarios, with a midpoint of 1.7 million BPD.

- U.S. and Canadian oil pipeline capacity addition is projected at 4.5 to 6.9 million BPD, with a midpoint value of 5.7 million BPD.

- Capital expenditure ("CAPEX") for new midstream infrastructure will range from $471 billion to $621 billion over the next 20 years (or an average $22.5 to $30 billion per year), with a midpoint expenditure of $546 billion.

- Investment in pipelines (including both transmission and gathering lines and compression and pumping) will range from $183 billion to $282 billion, with a midpoint CAPEX of $232 billion. *Id.* at 16-17.

        5.    Pipelines Completed and Underway – Benefits.

IHS Economics and the National Association of Manufacturers developed a study examining the macroeconomic impacts that increased energy production will have for job creation and growth for the country. It found:

- Expanded energy access created 1.9 million jobs economy-wide in 2015.

- Shale gas production put an extra $1,337 in the wallets of an average American family.

- New pipeline construction meant more than 347,000 jobs, with 60,000 alone for manufacturing.

- Total natural gas demand was poised to increase by 40% over the next decade, and our domestic production is expected to increase by 48% over the next decade to meet new demand.

- In 2015 and 2016, 13,252 miles of new crude oil transmission pipelines would be constructed in the U.S. at a cost of $25.6 billion.

- From both construction and maintenance in 2016, crude oil pipelines would contribute 243,167 jobs, including 28,438 manufacturing jobs.

- U.S. economic output was estimated to grow by $91.7 billion from combined economic output between 2015 and 2016 - considering direct spending and indirect and induced multipliers.

- From 2015 to 2016, construction and operation of crude oil pipelines contributed a combined $46.9 billion to gross domestic product (GDP), including $7.6 billion in manufacturing.

- $31.8 billion in combined domestic labor income in 2015 and 2016. *Id.* at 17.

As these statistics above clearly show, disrupting the construction or operation of pipelines would have an immediate impact on consumers, families, manufacturers and energy-intensive industries. If all pending and planned projects were canceled, the ripple effects would be enormous.

6.    Recent Trends in Pipeline Safety.

Transporting energy over long distance pipelines in the United States is remarkably safe. Federal data continues to show that pipelines are the safest and most environmentally favorable way to move oil and natural gas across the country.  CEA Report p. 18. A Crescent analysis for the petroleum pipeline found that 99.999% of all crude oil and refined products reached their destination safely in 2015. *Id*. at 18. Interstate natural gas pipelines have similar and impressive safety numbers with 99.999997% of the gas moved nationwide reaching its destination safely in 2014.

In addition, pipeline leaks on natural gas lines are down 94% from 1984-2012 according to the Interstate Natural Gas Association of America. *Id*.  Release statistics for the liquids pipeline industry are also trending downward significantly with reportable incidents (anything over five barrels) to the Pipeline and Hazardous Materials Safety Administration declining 52% since 1999. *Id.*

These statistics are all the more impressive as safety has improved while volumes and miles have increased.  Total pipeline mileage and barrels of crude oil and petroleum products have increased by 13% and 20% respectively since 2011. *Id*.  During the initial stages of the significant

expansion of oil and natural gas production in areas like the Bakken Shale, there was very limited pipeline capacity and storage in the region. The result was a major increase in rail and truck traffic – often on rural roads – to get oil to markets and refineries. While current crude by rail volumes are down significantly, as late as October 2014, volume was roughly 1 million barrels per day according to EIA data.  *Id.*  As a consequence of denying additional pipeline infrastructure, communities may face the impacts from increased rail, barge, and truck traffic. An August 2015 study by the Fraser Institute found that rail is 4.5 times more likely to experience a release or spill compared to pipeline transportation.  *Id.*

7.   The Reality.

The rapid development of renewables has been a welcome sign of growth and expansion for the economy and the trajectory of its rise is truly impressive (although renewable energy is not immune from protests and permitting obstacles).  *Id.* at 19. According to the Solar Energy Industries Association, there are now 32 gigawatts of installed solar with enough capacity to power 6.2 million homes.  *Id.*  Similar strong growth patterns have been occurring for wind as well, with the American Wind Energy Association estimating enough wind capacity to power 20 million homes. Installed wind capacity has nearly tripled since 2008, from 25,000 megawatts to over 75,000 megawatts.  *Id.*

These are important and positive developments, but the hard truths remain: America will depend on baseload electricity and fossil fuels to meet its energy for many years and decades to come. EIA notes that coal, natural gas and nuclear power made up 86 percent of our nation's electricity in 2015, with just 5.3 percent supplied by wind and solar.  *Id.*  Could a $16 trillion a year economy be powered solely on intermittent sources of energy that need to be available, affordable, and easily dispatched 24 hours a day, seven days a week?

For the sake of argument, CEA investigated beyond the headlines and rhetoric to examine the practical implications for the American power delivery system of shutting down pipelines projects and removing fossil fuels and baseload electricity. Every demand made by anti-development groups was extrapolated and compared to data from the 2016 EIA Energy Outlook, using its baseline assumptions for expanded renewable energy generation premised on implementation of the Obama Administration's Clean Power Plan, as well as assumptions that favorable tax treatment would remain in place. The scenario removes the existing coal fleet, excludes the use of petroleum for electric generation, assumes no new or relicensed nuclear power plants, and no new additional natural gas capacity additions by 2030. *Id.*

        8.    <u>Regional Impacts</u>.

        i.    *Midwest*

Consumers and families in the Midwest are seeing significant changes now in their electricity generation fleet. Large-scale coal retirements are creating a tremendous need for additional new pipeline capacity to bring natural gas into markets to meet existing and future demand. The state of Michigan alone is expected to retire 25 coal plants *by* 2020 – largely to meet EPA regulatory requirements and market requirements. Two utilities predicted the possibility of an electricity shortage starting in 2016 and the loss of enough generating capacity to power Detroit, Grand Rapids and Lansing. *Id.* at 24.  The region is also home to many large nuclear power plants that are under threat of closure, and activists have been very vocal in opposition to nuclear power. EIA Outlook Assessment has portions of Southeast states divided into the Southern Plains.  For this assessment, the states of LA and MS are assumed to be in the Southeast. No plants up for relicense in LA and MS were included in the CEA Southern Plains assessment. *Id.* at 24.

Without bringing in more natural gas for electricity deliveries, it will be virtually impossible to maintain the reliability of the electric grid. Here are the consequences, and those affected most, by the disruptions to pipeline infrastructure and the premature removal of large amounts of baseload electric generation for the region:

- U.S. Census Bureau data estimates that over 7.8 million people in the Midwest live at or below the poverty line.  *Id*. at  24.

- Of the 43.3 million people on food stamps nationwide, over 6.8 million reside in the Midwest (IL-1,924,612, IN-714,806, MI-1,445,487, OH-1,556,937, MN-476,536, and WI-713,065).  *Id.* at 25.

- In Illinois, 15% of residents depend on food stamps to make ends meet.  *Id.*

- Reliability gap of 44.8% that the poor, young people, seniors and hard-working families in the Midwest simply can't afford.

- The region's residential electricity prices are 13% higher than the national average, according to EIA data.  *Id.*

- Based on information from EIA, the Midwest/Mid-Atlantic region would be two of the most impacted by the shortfall scenario, with a 46%+ energy shortfall by 2030 due to prematurely retiring nuclear units, zeroing out coal and prohibiting the use of new natural gas.

- The region has several proposed NGL pipeline projects that could bring over 215,000 barrels per day in feedstocks for uses such as industrial applications and propane, with the Utopia project alone injecting over $1 billion in state and local economic activity.  *Id.*

- There are at least five major projects totaling 3,200 MMcf/day awaiting final consideration at FERC that could help consumers, families and small businesses deal with energy shortfalls.  *Id.*

   *ii.*  *Mid-Continent*

Energy production has greatly expanded in the nation's Mid-Continent region – especially in regions like the Bakken, Eagle Ford and Permian Basin in West Texas and Eastern New Mexico. For example, production in North Dakota has more than tripled from 2010 to 2014, with over 1 million barrels per day of production.  *Id.*   One of the major challenges these regions are facing is a dearth of pipeline infrastructure and storage required to bring this surge in American energy

production to our nation's refinery centers where families, businesses and industries can utilize more of our domestic resources to displace foreign imports. *Id.* The result is that much of this crude oil must be placed on trucks and railcars, which can add a layer of transportation cost and stress to infrastructure. A lack of storage and pipelines can also cause increased emissions from venting and flaring of methane at the wellhead. *Id.*

Further, the Midcontinent Independent System Operator (the independent grid manager for 15 states) stated in June 2016 that the region could have a power generation shortfall starting in 2018 due to significant power plant retirements. *Id.* at 26. While reserve margins were adequate in Texas in summer 2016, Electric Reliability Council of Texas ("ERCOT") set a record demand for electricity use in August 2016. *Id.*   Here are the consequences, and those affected most, by the denial of new pipeline infrastructure and the premature removal of large amounts of baseload electric generation for the region:

- Of the 43.3 million people on food stamps nationwide, over 8.4 million reside in the Mid-Continent (AR-401,980, CO-469,090, IA-377,379, KS-247,976, LA – 925,861, MO-778,698, OK-614,993, NE-176,130, NM-486,098, ND-54,330, SD-95,654, TX-3,796,484). *Id.*

- As of October 2016, New Mexico has the highest percentage of residents in the nation (23.3%) reliant on food stamps. *Id.*

- Reliability gap of 46% in some areas of the Mid-Continent that the poor, young people, seniors and hardworking families in the simply can't afford.

- The 12 state region has a residential electricity rate that is roughly 9% lower than the national average of 12.90 kwh; however, it is home to high residential use states like Texas, where the average monthly bill ($136.00) is 17% higher than the national average ($114.03). *Id.*

- Several major petroleum pipelines are proposed to transport crude oil from this region to help meet consumer demands in refineries across the country.

- The Obama Administration denied the Northern Leg of the Keystone XL Project that would have brought an additional 100,000 barrels per day of oil from the Bakken region in Montana and North Dakota to domestic refineries

and would have displaced crude oil imported by the U.S. from unfriendly regimes like Venezuela.  *Id.*

- The Obama Administration supported allowing the Southern Leg of the Keystone XL Pipeline to move forward, which provided:

    o Over $5.7 billion into the local economies of Oklahoma and Texas, as well as $72 million in new local tax revenues;

    o More than 11 million hours of labor completed by 4,844 workers in the United States - heavy equipment operators, welders, laborers, transportation operators and supervisory personnel (including environment, safety and quality control inspectors); and

    o Initial delivery of over 700,000 barrels per day of crude oil from storage in Cushing, OK to the Gulf Coast to be refined for consumers across the country.  *Id.*

- Disturbing pipelines in the Mid-Continent would prevent more than 2.4 million barrels per day of American energy from filling our tanks, planes and trains, and from assisting manufacturers with developing products and reducing our trade deficit.  *Id.*

- There are at least 11 major projects at FERC waiting final consideration totaling 12,718 MMcf/day in natural gas that could help consumers, families and small businesses deal with energy shortfalls.  *Id.*

Based on the facts and statistics highlighted above, it is apparent that pipeline infrastructure is good for the American economy, national security, the environment, and those living in poverty. Vacating DAPL's easement will harm each.

## CONCLUSION

The *Allied-Signal* factors do not support vacating DAPL's easement while the Corps prepares an EIS.

Dated:  April 30, 2020                    Respectfully submitted,

                                          **CONSUMER ENERGY ALLIANCE**

                                          *By Counsel,*


                                          _____/s/ *Amy Miller*_____
                                          Amy Miller (DC Bar No. 473517)
                                          Victoria Bechtold Kush (PA Bar No. 308424)
                                          *joining with D.C. Bar member per LCvR 44.1(c)*
                                          **BUCHANAN INGERSOLL & ROONEY PC**
                                          1700 K Street, N.W., Suite 300
                                          Washington, DC  20006
                                          Tel.:    (202) 452-7935
                                          Fax:    (202) 452-7989
                                          amy.miller@bipc.com
                                          victoria.kush@bipc.com

                                          *Counsel for Consumer Energy Alliance*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of April, 2020, a true and correct copy of the foregoing *Amended Motion for Leave to File Brief of Amicus Curiae Consumer Energy Alliance in Opposition to Vacatur on Remand* was today served via the Court's CM/ECF system on all counsel of record.

_____/s/ *Amy Miller*_____

Amy Miller (DC Bar No. 473517)
Victoria Bechtold Kush (PA Bar No. 308424)
*joining with D.C. Bar member per LCvR 44.1(c)*
**BUCHANAN INGERSOLL & ROONEY PC**
1700 K Street, N.W., Suite 300
Washington, DC  20006
Tel.:    (202) 452-7935
Fax:    (202) 452-7989
amy.miller@bipc.com
victoria.kush@bipc.com

*Counsel for Consumer Energy Alliance*

21