IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, <br><br>　　　　Plaintiffs, <br><br>and <br><br>CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL., <br><br>　　　　Plaintiff-Intervenors, <br><br>　　v. <br><br>U.S. ARMY CORPS OF ENGINEERS, <br><br>　　　　Defendant-<br>　　　　Cross-Defendant <br><br>and <br><br>DAKOTA ACCESS, LLC, <br><br>　　　　Defendant-Intervenor-<br>　　　　Cross-Claimant. | Civil No: 1:16-cv-01534-JEB <br>(Consolidated with 1:16-cv-01796 and 1:17-cv-00267) |

**BRIEF OF *AMICUS CURIAE* NORTH DAKOTA PETROLEUM COUNCIL IN OPPOSITION TO VACATUR ON REMAND**

Paul J. Forster  (N.D. Bar No. 07398, signing per LCvR 83.2(c))
Zachary R. Eiken (N.D. Bar No. 07832)
Craig C. Smith (N.D. Bar No. 04623)
CROWLEY FLECK PLLP
100 West Broadway Ave., Suite 250
P.O. Box 2798
Bismarck, North Dakota 58502-2798
Phone: (701) 223-6585
Fax: (701) 222-4853
pforster@crowleyfleck.com
zeiken@crowleyfleck.com
csmith@crowleyfleck.com

Grant Snell (D. C. Bar No. 1014970) (joining with non-members per LCvR 83.2(c))
CROWLEY FLECK PLLP
1667 Whitefish Stage Rd.
P.O. Box 759
Kalispell, Montana 59903-0759
Phone:  (406) 752-6644
Fax: (406) 752-5108
gsnell@crowleyfleck.com

# **TABLE OF CONTENTS**

STATEMENT OF INTEREST AND INTRODUCTION ............................................................1

ARGUMENT.....................................................................................................................................2

    I.       This Court should decline to vacate the easement, because serious disruptive consequences will result from shutting down DAPL. ..............................................2

           A.      DAPL has become a crucial component of North Dakota's oil industry and the state's economy. ...............................................................................2

           B.      It would be physically impossible to arrange alternate transportation for much of DAPL's volumes in the near-term. ..................................................4

           C.      The cost differential of shifting transportation to rail is not economically feasible for much of North Dakota's production, especially in present market conditions.................................................................................................8

CONCLUSION................................................................................................................................10

## TABLE OF AUTHORITIES

**Page No.**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ................................................................................. 1, 2

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
  920 F.2d 960 (D.C. Cir. 1990) ..................................................................................... 1


**Regulations**

49 C.F.R. Parts 171-180 ........................................................................................................ 5

**STATEMENT OF INTEREST AND INTRODUCTION**

*Amicus Curiae*, North Dakota Petroleum Council ("NDPC"), is a trade association representing more than 500 companies involved in all aspects of the oil and gas industry in North Dakota, South Dakota, and the Rocky Mountain Region.[1] North Dakota ranks second nationally in oil production, and NDPC members produce approximately 98 percent of the oil in North Dakota. Established in 1952, the NDPC's mission includes promoting and enhancing the discovery, development, production, transportation, refining, conservation, and marketing of oil and gas; promoting opportunities for open discussion, lawful interchange of information, and education concerning the petroleum industry; and accumulating and disseminating information concerning the petroleum industry to foster the best interests of the public and industry.

This brief was authored in whole by counsel for the NDPC and is filed pursuant to LCvR 7(o). No other party, party's counsel, or any person other than the NDPC contributed money to fund the preparation or submission of this brief.

The Court requested that the litigants in this matter submit briefing on whether to vacate the easement held by Dakota Access, LLC during the remand ordered by this Court. ECF No. 496, Mem. Op. at 42. "The decision whether to vacate depends on '[1] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-151 (D.C. Cir. 1993) (quoting *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)).

---

[1] Energy Transfer Partners, L.P. is a member of the NDPC, but was not involved in the drafting of this brief or any associated pleadings.

This Court has recognized that vacatur of the easement "would carry serious consequences that a court should not lightly impose." ECF No. 496, Mem. Op. at 42. The NDPC submits this brief as *Amicus Curiae* to specifically address the second *Allied-Signal* factor, and to provide the Court with additional information on the disruptive consequences that will directly impact North Dakota oil producers should the Court order vacatur and shut down the Dakota Access Pipeline ("DAPL").

**ARGUMENT**

**I.    This Court should decline to vacate the easement, because serious disruptive consequences will result from shutting down DAPL.**

**A.    DAPL has become a crucial component of North Dakota's oil industry and the state's economy.**

DAPL began transporting oil on June 1, 2017. North Dakotans, state officials, and the state's oil industry have widely recognized that the pipeline was a game-changer for the industry and the state's economy. *See generally What's on Your Mind?* Interview by Scott Hennen with Justin Kringstad, Executive Director, North Dakota Pipeline Authority (KFYR radio broadcast Nov. 5, 2019), *available at* https://www.am1100theflag.com/news/12214-11519-dapl-20-pipeline-justin-kringstad-nd-pipeline-authority-executive-director; Renée Jean, *2017's top 10 stories — No. 4: Dakota Access, technology bring oil through downturn*, Williston Herald (Dec 29, 2017), *available at* https://www.willistonherald.com/news/s-top-stories-no-dakota-access-technology-bring-oil-through/article_40ac36dc-ec3e-11e7-be15-d746d97e0bd5.html.

The completion of DAPL marked the first time that North Dakota has enjoyed adequate pipeline capacity, and it enabled much of the state's oil production to move from high-cost rail to low-cost pipeline transportation. In one month, rail plummeted from 24% to 7% of North Dakota's oil transportation, comparing North Dakota Pipeline Authority figures for the month before and the month after DAPL commenced operations. *Compare* Justin Kringstad, *July 2017*

2

*Monthly Update*, North Dakota Pipeline Authority, p. 3 (July 14, 2017), *available at* https://ndpipelines.files.wordpress.com/2012/04/ndpa-july-14-2017-update.pdf *with* Justin Kringstad, *August 2017 Month Update*, North Dakota Pipeline Authority, p. 3 (August 11, 2017), *available at* https://ndpipelines.files.wordpress.com/2012/04/ndpa-august-11-2017-update.pdf.

In the almost three years since it began operating, DAPL has become a fully integrated and essential element of the state's oil industry and the state's economy. As this Court has noted, the pipeline transports about 600,000 barrels of oil per day. ECF No. 496, Mem. Op. at 20. DAPL's capacity, as a single pipeline, represents approximately 41% of North Dakota's 1,451,029 barrels per day in oil production, as of the most recent statewide production data. *See Director's Cut, February 2020 Production*, North Dakota Department of Mineral Resources (April 14, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-04-14.pdf.

DAPL's impacts reverberate through all corners of North Dakota's economy. North Dakota's Tax Commissioner, Ryan Rauschenberger, has noted North Dakota realized approximately $250,000,000 in additional tax revenues in the first two years after DAPL became operational. *What's on Your Mind?* Interview by Scott Hennen with Ryan Rauschenberger, North Dakota Tax Commissioner (KFYR radio broadcast Nov. 7, 2019), *available at* https://www.am1100theflag.com/news/12220-11719-dapl-20-pipeline-ryan-rauschenberger-nd-tax-commissioner; *see also* Editorial Board, *North Dakota's Pipeline Payoff: Six months later, the Dakota Access Pipeline proves its value*, Wall Street Journal (Dec. 29, 2017), *available at* https://www.wsj.com/articles/north-dakotas-pipeline-payoff-1514591716 (noting "solely because of the Dakota Access Pipeline, the state is on track for $210 million to $250 million in additional tax revenue by the end of this biennial budget period."). These revenues are largely used to fund education and human services. *See* Interview with Ryan Rauschenberger, *supra*.

Shutting down the pipeline at this point would not only wipe out these benefits but would result in dislocations that are difficult to overstate, as explained below.

### B. It would be physically impossible to arrange alternate transportation for much of DAPL's volumes in the near-term.

It is widely acknowledged that at recent production levels, or even 2017 production levels, a shutdown of DAPL would mean that producers would need to attempt to shift most of DAPL's volumes to rail transportation if they wished to maintain the production. Certainly, this is the prediction of the NDPC's membership, given their daily experience marketing and transporting North Dakota's oil production. Other existing pipeline systems have limited capacity and do not deliver oil to the same destinations as DAPL.

However, North Dakota presently lacks the rail capacity to transport more than a fraction of DAPL's volumes. At its peak, North Dakota rail export volumes reached 850,000 barrels per day. *Estimated ND Rail Export Volumes,* North Dakota Pipeline Authority, *available at* https://ndpipelines.files.wordpress.com/2020/04/17.jpg. This capacity no longer exists. A shutdown of DAPL, even if temporary, would strand most of the oil that DAPL moves. The industry lacks the necessary infrastructure to transport these volumes by rail. Specifically, it lacks sufficient rail terminals (some of which have been retired or repurposed since DAPL began operating), trucks to haul oil to the terminals, locomotives, and tank cars.

Take the example of available tank cars. Over the 2013 to 2018 period, the overall fleet of rail cars carrying oil has plummeted. During that time, "The number of rail tank cars carrying crude oil decreased by 63 percent, from nearly 29,000 tank cars to just under 13,000 tank cars." *Fleet Composition of Rail Tank Cars Carrying Flammable Liquids: 2019 Report*, United States Department of Transportation, p. 7 (Oct. 4, 2019) ("USDOT Fleet Report"), *available at* https://doi.org/10.21949/1504519. Moreover, at the time that DAPL began operating, the

nation's rail fleet was in the process of upgrading or decommissioning oil tank cars to meet new federal safety regulations. Specifically, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") and the Federal Railroad Administration issued a rule entitled *Hazardous Materials: Enhanced Tank Car Standards and Operational Controls for High-Hazard Flammable Trains*. 49 C.F.R. Parts 171-180. After revisions in response to legislation, the rule resulted in mandatory phase-outs of various car types allowed to carry crude oil from January 1, 2018 through May 1, 2025. USDOT Fleet Report at p. 3 and Table 1. These phase-outs prohibited 6,514 cars in existing oil car fleets from carrying crude oil as of a 2019 U.S. Department of Transportation fleet report, with another 2,098 in-service cars to be phased out from crude oil transportation by April 1, 2020.[2] USDOT Fleet Report at Table 1. Other types of flammable liquids, such as ethanol, refined fuel products, and chemicals, have later phase out dates, meaning the classes of cars phased out for crude oil continue to transport other types of flammable liquids. *See id.*

Thus, it is questionable that the country possesses a rail fleet capable of transporting DAPL's volumes in addition to existing demands. To illustrate the impact of a DAPL shutdown on rail car needs, assume that the nation still possesses a fleet of approximately 13,000 rail cars dedicated to transporting crude oil, as was the case in USDOT's 2019 report, even though this number included 2,098 cars that were phased out as of April 1, 2020. *See id.* at p. 3, Table 1 and p. 7. Each car can carry about 600 barrels of oil; for instance, DAPL would replace approximately 750 rail cars per day at an assumed volume of 450,000 barrels per day. *Dakota Access, LLC: United States Fish and Wildlife Service Environmental Assessment of Grassland*

---

[2] For cars dedicated to carrying crude oil, Table 1 in the USDOT Fleet Report reflects a phase-out of 276 non-jacketed DOT-111 cars; 90 jacketed DOT-111 cars; and 6,148 non-jacketed CPC-1232 cars, with another 2,098 non-jacketed CPC-1232 cars remaining in service as of 2018 but required to be phased out by April 1, 2020.

5

*and Wetland Easement Crossings*, p. 16 (May 2016), *available at* https://www.fws.gov/uploadedFiles/DAPL%20EA.pdf. Applying the same math to the nearly 600,000 barrels per day of flow identified in this Court's recent Memorandum Opinion (ECF No. 496 at 20) means that moving DAPL's volumes would require about 1,000 rail cars <u>per day</u>.

Though individual times vary by destination, a rail car can make on average 1.75 roundtrips per month transporting North Dakota crude oil to market, or one round trip every 17 days (30 / 1.75 = 17.14). Thomas Covert & Ryan Kellogg, *Crude by Rail, Option, Value, and Pipeline Investment*, p. A-9 (2018), *available at* https://www.nber.org/papers/w23855. At this rate, railroads would need to dedicate 17,000 rail cars (1,000 rail cars per day x 17 days) to carry DAPL's daily flows as estimated by this Court. Even if only 450,000 barrels per day needed to move to rail, such a move would require about 12,750 rail cars.[3] This total approaches or exceeds the total number of rail cars already dedicated to transporting crude oil in all fifty states as of the USDOT's most recent statistics. *See* USDOT Fleet Report, *supra*, at 7. Even assuming some availability of railcars currently serving other liquid classes, these fleets include many cars that have been phased out of service for crude oil. *See id.* at 3, Table 1.

As a result, additional manufacturing or retrofitting of rail cars would be required to accommodate the volumes currently carried by DAPL. This would entail significant costs. For instance, one study estimates costs of $155,000 or more to manufacture each car compliant with the new regulations. *The Economic Impacts of Changes to the Specifications for the North American Rail Tank Car Fleet,* ICF International, p. 22 (2014), *available at* https://energyinfrastructure.org/~/media/energyinfrastructure/images/rail/related-documents/economic-impact-of-changes-to-the-specif.pdf. The same study estimates retrofit

---

[3] 450,000 barrels per day / 600 barrels per rail car x 17 days = 12,750 rail cars.

costs of one common car type at $47,200 to $54,200, while PHMSA estimated between $26,230 and $32,900 for the same car type. *Id.* As for timing, USDOT recently projected 6,700 new builds and 8,410 retrofits of rail cars to the new regulatory standards for the entire year of 2019. USDOT Fleet Report, *supra*, at 12. In other words, USDOT projected that the rail industry would require an entire year to manufacture and retrofit a volume of cars approaching the number necessary to transport DAPL's current volumes. This is to say nothing of the delay and substantial switching and transportation costs that would be required to move additional cars and locomotives to the appropriate rail systems, or the delays and costs of hiring and training or relocating sufficient employees to operate a massive influx of trains. It would most likely also mean a return to congested traffic on the rail lines serving North Dakota, harming not only oil producers but also farmers attempting to bring their products to market. *See, e.g.*, Ron Nixon, *Grain Piles Up, Waiting for a Ride, as Trains Move North Dakota Oil*, N.Y. Times (Aug. 25, 2014), *available at* https://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-trains-move-north-dakota-oil.html.

Moreover, NDPC members have entered into marketing contracts and built substantial gathering infrastructure premised on delivering oil to DAPL and selling it in the markets to which DAPL delivers its volumes. A shutdown of DAPL would leave many members of North Dakota's oil industry unable to honor contractual commitments and out the substantial capital costs of building oil gathering systems designed to deliver production to DAPL. The investment in gathering infrastructure for delivering oil to DAPL effectively idled or phased out certain rail terminals in addition to the trucking fleet necessary to deliver oil to the terminals. Suddenly shutting down DAPL would also require producers to reestablish both idled rail terminals and an enormous trucking fleet. The time and costs necessary for such a transition is difficult to predict.

In sum, the dramatic logistical changes needed to shift the majority of DAPL's flows to rail are not physically possible any time soon.  A sudden shutdown of DAPL would necessitate widescale shut-ins of North Dakota production.

**C.     The cost differential of shifting transportation to rail is not economically feasible for much of North Dakota's production, especially in present market conditions.**

The above analysis illustrates some of the problems that a shutdown of DAPL would entail in normal economic conditions.  In recent weeks, of course, the coronavirus pandemic has turned the nation's economy and the oil industry upside down.  Nevertheless, NDPC continues to hope and expect that our country's economy and the industry will recover in coming months.  Therefore, the Court should consider the impacts that a DAPL shutdown would have under normal conditions, because any shutdown of the pipeline is likely to outlast the acute but temporary market dislocations caused by the pandemic.  At the same time, the Court should also consider the impacts that a shutdown of DAPL would have under present conditions, especially in the event that the Court rules before the economy and oil markets have stabilized.

The high cost differential between transport on DAPL and transport on rail would cost North Dakota producers and citizens millions of dollars in the best of times. Under current conditions, the cost differential would mean even more lost production and lost jobs beyond those already lost due to the pandemic, and would likely extend the losses for a longer term.

After almost three years of operation, it is well-documented that price differentials between DAPL and rail transportation range from $5.00–$10.00 per barrel.  For instance, a recent study comparing pipeline to rail transportation in the Bakken noted that "'Railroad transport reportedly costs in the neighborhood of $10 to $15 per barrel compared with $5 per barrel for pipeline.' This is consistent with information from Genscape's *Petrorail Report* (various dates) and with the prices reported in Covert and Kellogg (2017)." K. Clay, A. Jha, N.

8

Z. Muller, R. Walsh, *The external costs of shipping petroleum products by pipeline and rail: Evidence of shipments of crude oil from North Dakota*. 40 Energy J. 55, 58 (2019), *available at* https://www.iaee.org/en/publications/ejarticle.aspx?id=3277&id=3277 (citation omitted).[4] The Congressional Research Service has quoted these same numbers. *U.S. Rail Transportation of Crude Oil: Background and Issues for Congress*, Congressional Research Service, p. 4 (Dec. 4, 2014), https://fas.org/sgp/crs/misc/R43390.pdf. Concerning DAPL specifically, another recent study noted that DAPL has a published "tariff of $5.50–$6.25/bbl for 10-year committed shippers," and estimated North Dakota rail options at "minimum reported costs" as follows: "$13.00/bbl for shipments to the East Coast, $10.94 for the Gulf Coast, $9.23 for the West Coast, and $8.54 for within-Midwest shipments to Cushing, OK." Covert, *supra*, at 5, 20 (emphasis added). Rates published by DAPL effective July 1, 2019 state tariff rates of $5.84 to $6.63 for North Dakota to Nederland, Texas for 10-year committed shippers. *F.E.R.C. I.C.A. Oil Tariff*, Dakota Access, LLC (May 31, 2019), *available at* https://cms.energytransfer.com/wp-content/uploads/2019/08/DAPL_ETCO_Joint_Rates_Tariff_4_5_0.pdf.

In the best of times, the high cost differential between DAPL and rail would harm North Dakota producers to the tune of tens or hundreds of millions of dollars per month. Applying a $5.00 to $10.00 per barrel cost differential, each 100,000 barrels per day on rail instead of DAPL would equate to North Dakota producers paying $15,000,000 to $30,000,000 per month in additional interstate transportation costs. Such costs could not quickly be undone, because they would be tied to fixed-term rail contracts.

---

[4] As relevant to the potential environmental consequences of shutting down DAPL, this study examines North Dakota production and concludes that "total air pollution and greenhouse gas costs are substantially larger for rail than for pipelines." Clay, *supra*, at 69.

In the presently depressed market conditions, an additional $5.00 to $10.00 per barrel of transportation costs will likely mean that producers opt to shut in the majority of DAPL's volumes if the pipeline is shuttered. Some of North Dakota's oil production is already being temporarily shut in due to low prices caused by the pandemic. If this Court orders DAPL to shut down in such an environment, oil producers will likely choose to shut in most of their production that was travelling on the pipeline, rather than seek new transportation arrangements that would be uneconomic at current prices. Put differently, shutting down DAPL at the present time would result in another wave of shut-in production on top of whatever volumes producers have already curtailed due to low prices.

In sum, shutting down DAPL after three years of operation and under the current market conditions would undermine the substantial commitments North Dakota's oil producers have made over the past three years. It would further harm the North Dakota oil and gas industry in a time when it is already down due to the coronavirus pandemic. It would also delay any recovery from the pandemic. The loss of oil production would harm not only the companies who produce the oil, but also royalty owners and the state and local governments who rely on royalties and taxes from the production, both during the pandemic and long afterward. It would also harm the service industries and employees who supported the lost production. Ultimately, a shutdown of DAPL in the currently distressed environment likely would cause companies to fail who otherwise might have survived, and jobs to be lost that otherwise might have been saved.

## CONCLUSION

The NDPC urges the Court to avoid the highly disruptive effects of a DAPL shutdown, and respectfully requests that the Court order that the remand proceed without vacatur.

Dated this 29th day of April, 2020.                    Respectfully Submitted,

  */s/ Paul J. Forster*                                         */s/ Grant Snell*
Paul J. Forster  (N.D. Bar No. 07398,              Grant Snell (D. C. Bar No. 1014970) (joining
signing per LCvR 83.2(c))                                with non-members per LCvR 83.2(c))
Zachary R. Eiken (N.D. Bar No. 07832)       CROWLEY FLECK PLLP
Craig C. Smith (N.D. Bar No. 04623)            1667 Whitefish Stage Rd.
CROWLEY FLECK PLLP                              P.O. Box 759
100 West Broadway Ave., Suite 250              Kalispell, Montana 59903-0759
P.O. Box 2798                                                   Phone:  (406) 752-6644
Bismarck, North Dakota 58502-2798           Fax: (406) 752-5108
Phone: (701) 223-6585                                    gsnell@crowleyfleck.com
Fax: (701) 222-4853
pforster@crowleyfleck.com
zeiken@crowleyfleck.com
csmith@crowleyfleck.com