EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, <br><br> Plaintiffs, <br><br> and <br><br> CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> U.S. ARMY CORPS OF ENGINEERS, <br><br> Defendant-Cross Defendant, <br><br> and <br><br> DAKOTA ACCESS, LLC, <br><br> Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-01534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

_____

**DECLARATION OF JOHN F. GODFREY IN SUPPORT OF
DAKOTA ACCESS, LLC'S BRIEF ON THE QUESTION OF REMEDY**
_____

1.   My name is John F. Godfrey.  I am a Senior Principal Consultant with the Integrity Solutions group within the Pipeline Services Department of DNV GL USA, Inc.  My business address is 5777 Frantz Road, Dublin, Ohio 43017.

2.   I have over 30 years of experience with pipeline construction, operation, maintenance, and safety issues.  I also have experience in regulatory compliance and standards development as a past Chairman of the American Petroleum Institute (API) Pipeline Integrity Committee, a past Vice Chair of the Pipeline Research Council International Materials Committee, and a previous

member of the API Operations Technical Committee.  I hold a B.S. in General Engineering with an emphasis in Hydraulics and Strength of Materials from the University of Illinois.  My current curriculum vitae is attached as **Exhibit 1**.

3.   This declaration addresses certain issues raised in the Court's March 25, 2020 Opinion, corrects apparent misconceptions regarding the safety and operation of the Dakota Access Pipeline ("DAPL"), and discusses the practical consequences of a potential suspension in DAPL operations. In particular, as detailed in the paragraphs below, I have concluded:

    a.   The Pipeline Safety and Hazardous Materials Administration's ("PHMSA") regulatory expertise and oversight helps ensure the accuracy of DAPL's worst-case discharge ("WCD") calculations.

    b.   DAPL's impressive design, leak detection instrumentation, and emergency controls meet or exceed federal safety regulations.

    c.   PHMSA data confirms there has been *no* leak from DAPL affecting people or the environment since it commenced operations, despite the fact that DAPL transports more than 200 million barrels of oil over approximately 1,200 miles each year.  In its three years of service, DAPL's safety record is as good as, or better than, any other pipeline in the United States.

    d.   Adverse weather conditions are unlikely to materially affect DAPL's spill-recovery efforts, particularly because of the steps DAPL has taken to prepare for them, from its winterization procedures to its contracts with highly specialized oil spill response organizations.

    e.   As intended by PHMSA regulations, DAPL's WCD calculation is highly conservative and reflects the necessary assumptions to adequately prepare a response plan for any

realistically conceivable release at Lake Oahe.

f.  A shutdown or idling of the pipeline would increase the risk of corrosion and other structural damage by impeding important protections and maintenance in place during DAPL operations.

## Regulatory Overview And PHMSA's Role

4.  Interstate hazardous liquids transmission pipeline design, construction, operation, and maintenance is exclusively regulated by PHMSA, an agency within the U.S. Department of Transportation.  PHMSA promulgates regulations, including in 49 C.F.R. Parts 194 and 195, to address pipeline safety legislation passed by Congress and specific safety or operational issues as they may occur.  While other Federal and State agencies like the U.S. Army Corps of Engineers ("the Corps") have various responsibilities and authorities when it comes to interstate pipeline siting, permitting and/or easements, and oil spill response, these responsibilities are generally site specific and do not infringe on PHMSA's sole authority to regulate pipeline safety and spill response planning.

5.  Specifically as to the matter before the Court, PHMSA is responsible for reviewing an operator's Facility Response Plan ("FRP")—a plan detailing how it will respond to and mitigate any WCD of oil into or on navigable waters or their adjoining shorelines.  WCDs are, by design, a highly conservative projection of a realistically conceivable discharge that could occur along the pipeline to ensure operators secure the necessary equipment and resources to prepare for a response.  They are not intended to capture an extremely unlikely, hypothetical release that could occur if all safety systems, design features, and operational parameters failed at the same time.

6.   FRPs must meet specific criteria.[1]  PHMSA reviews each plan submitted, requires amend-ments to any plan that does not meet the specified criteria, and approves any plan that does meet them.  PHMSA's review ensures the operator's WCD calculations are accurate and that all required elements of the response plan are included.  FRPs must be re-submitted every five years to ensure plans are updated based on changes in operational or environmental conditions.  In addition, PHMSA inspects operators' FRPs during the course of its normal pipeline oversight duties and may require an operator to update its FRP as needed to ensure that proper response plans are in place.

7.   Under 49 C.F.R. § 195.402, PHMSA also has authority to enforce compliance with proce-dures related to operations and maintenance, including spill response, equipment winterization, and control room procedures.  Section 195.402 requires an operator to prepare a procedural manual for operations, maintenance, and emergencies before beginning its operation of a pipeline and to keep the parts of the manual dealing with the various operator activities at all locations where those activities take place.  To ensure all procedures remain current and effective, the operator must review—and update as necessary—its procedural manual at least every 15 months and at least once each calendar year.  In addition to these recurring reviews and updates, PHMSA may require the operator to amend its plans and procedures as necessary to provide a reasonable level of safety.

8.   Because of its expertise in regulating pipeline safety and the analytics it has developed, PHMSA is uniquely positioned to provide guidance to other agencies such as the Corps concerning the accuracy of WCD calculations and the potential risks and impacts of pipeline operations.  Ac-cordingly, to assess whether a pipeline will have an environmental impact, the Corps relies sub-stantially on PHMSA rules and regulations and PHMSA's expertise gained through its regulatory

---

[1] 33 U.S.C. § 1321(j)(5)(D).

4

and enforcement activities when reviewing and approving FRPs.  In my opinion, the Corps is correct to rely on this experience to ensure accuracy and consistency of the FRPs it reviews.

**Leak Detection And Risk**

9.  It is necessary to understand DAPL's unique configuration and properties when evaluating its potential risks and leak-detection capabilities.  The DAPL system was designed and constructed to meet or exceed all applicable pipeline safety regulations.  For example, DAPL (1) was constructed with a pipe wall thickness of at least 0.625 inches at sensitive water crossings like Lake Oahe, even though PHMSA regulations permit a wall thickness of 0.429 inches at all points on the pipeline and do not require additional thickness in sensitive areas; (2) contains pressure transmitters at all valve sites, which is not required; (3) was installed to provide a minimum cover of 60 inches at water crossings, when only 30 or 36 inches of cover is required; (4) underwent non-destructive testing ("NDT") inspection of all mainline girth welds, when NDT inspection of only 10 percent of mainline girth welds made by each welder each day was required; and (5) underwent extended hydrostatic pressure testing above and beyond applicable requirements.  In addition, all main-line valves on the DAPL system are equipped with actuators and controls that allow the valves to be closed remotely, thereby isolating pipeline segments as needed, in the event of an emergency.  Importantly, these valves are installed at all water crossings over 100 feet wide and on either side of other sensitive areas to allow quick isolation of line segments and effective mitigation of any spill at these points.  Such remotely controlled valves are referred to as Emergency Flow Restricting Devices ("EFRD") in PHMSA's regulations.  **Exhibit 2**.  In my more than 30 years of experience I know of no other pipeline of comparable length with as many valves, or as many EFRDs, as DAPL.

10. Moreover, DAPL is a simple pipeline system, meaning it ships one product along a single

line to one delivery point.  A simple system like DAPL makes it easier to detect pressure loss, changes in flow rate, or loss of volume, all of which indicate the presence of a leak.  This is true for even so-called "pinhole leaks" of less than one percent of the pipeline's flow.  Further, any discharge due to a "rupture" on a simple system like DAPL will be readily and quickly detectible due to an immediate, significant change in flow and pressure.  On this type of system, such a loss of flow and pressure from a significant breach is highly likely to be detected immediately.  Under such circumstances, DAPL's state-of-the-art Supervisory Control and Data Acquisition ("SCADA") and Computational Pipeline Monitoring ("CPM") leak-detection systems will alarm, thereby quickly alerting the pipeline controller.  In addition, downstream pump stations will independently alarm and shut down due to a loss of suction pressure, and upstream pump stations trigger alarms to the control center and shut down due to excessive flow rate.  These shutdowns will occur automatically as a result of local instrumentation and programmable logic controllers at the pump stations.  Finally, control room alarms may also be generated by loss of pressure at the various mainline valve sites along the pipeline, further alerting control room staff.  All of these protections serve as redundant layers of safety, each one *independently* capable of the rapid detection of the hypothetical rupture.  In my experience, all of these events will result in the shutdown of pumps well within the nine-minute detection and shutdown time included in DAPL's WCD calculation.  The WCD calculation also conservatively adds a further 3.9 minutes for the valves to close for a total time of 12.9 minutes from the time the leak occurs, even though the valves will likely begin to close simultaneously with the pump shutdown.

11. DAPL's CPM leak-detection system is a modern, state-of-the-art system that uses computer algorithms to calculate changes in mass flow based on measured volumetric flow rates, product characteristics, pressures, and temperatures along the pipeline.  A CPM system works by using

data collected along the pipeline to compare the mass flowing into the system to the mass leaving it.  Any discrepancy is identified as a potential leak.  DAPL far exceeds the industry standard in the number of sensory instruments installed along the pipeline by, for instance, including pressure transmitters at each valve site that provide extensive data to the CPM system.  This allows the system to detect leaks much smaller than the postulated rupture used in the WCD calculation.

12. Plaintiffs' contention that DAPL's CPM system may only detect leaks in a small percentage of cases is misleading and conflates detection of small leaks with detection of ruptures.  As discussed, ruptures (that is, large compromises of the pipeline's integrity) will be quickly detected by multiple, redundant layers of instrumentation and alarms, of which the leak-detection system is only one.  Plaintiffs did not provide any analysis of DAPL's design, instrumentation, or controls in support of their challenge to detection time included in the WCD calculations or PHMSA's approval of the same.  Plaintiffs made no effort to compare the nature, size, operation, or design of other pipelines cited, or their leak-detection systems, with those of DAPL, or disclose whether those other systems had multiple origin or delivery points, thus preventing an apples-to-apples comparison.  Nor do Plaintiffs account for the conservative assumptions made in DAPL's WCD calculations, such as assuming no reduction in flow rate during the process of pumps shutting down and valves closing and assuming no reduction in the total volume spilled due to on-site remedial responses.  As a result, Plaintiffs' assertions about the inadequacy of DAPL's WCD estimates are unsupported.  The Corps has knowledge and expertise to differentiate leak detection from rupture detection, and is capable of correctly separating these issues in its assessment.

13. Since 2010, there has not been an undetected spill of 5,000 barrels or more on a section of pipeline manufactured after 1968 where a CPM system was available to detect it, according to PHMSA data and information published by the National Transportation Safety Board

7

("NTSB").  PHMSA has published data pertaining to reported crude-oil spills dating from 2010 to the present day.  According to this data and NTSB findings, undetected large oil spills on modern pipelines monitored by leak-detection systems are virtually unheard of.  There have been 534 reported crude-oil spills from an on-shore pipeline or valve site since 2010.  Of those 534 spills, only ten involved a spill of at least 5,000 barrels.[2]  Six of these ten incidents involved a pipeline with a functional CPM system in place.  Of these six, four spills were reported as detected by CPM, SCADA, or both.  Thus, only two of ten crude-oil spills of at least 5,000 barrels were reported as undetected by both CPM and SCADA, and both of these spills involved pipelines manufactured and installed in the late 1960s.

14. Moreover, the detection data reported to PHMSA for one of the two, the Marshall, Michigan spill, was inaccurate.  According to the accident report prepared for this incident by the NTSB, "Enbridge's leak detection and [SCADA] systems generated alarms consistent with a ruptured pipeline."[3]  But because the rupture coincided with a scheduled pipeline shutdown, "the control center staff attributed the alarms to the shutdown and interpreted them as indications of an incompletely filled pipeline."[4]  The other spill, which occurred in Romeoville, Illinois in 2010 and involved 7,538 barrels, occurred on a pipeline built in 1968.  This spill was the result of a leak of

---

[2] The following filters were used in the PHMSA database: COMMODITY_RELEASED_TYPE = "CRUDE OIL"; SYSTEM_PART_INVOLVED = "ONSHORE PIPELINE, INCLUDING VALVE SITE"; and UNINTENTIONAL_RELEASE_BBLS = greater than or equal to 5,000. *PHMSA Portal Access Page*, PHMSA, https://portal.phmsa.dot.gov/analytics/saw.dll?Portalpages&PortalPath=%2Fshared%2FPublic%20Website%20Pages%2F_portal%2F10%20Year%20Incident%20Summary%20Reports (last accessed Apr. 23, 2020).

[3] *Enbridge Incorporated Hazardous Liquid Pipeline Rupture and Release, Marshall, Michigan, July 25, 2010: Accident Report NTSB/PAR-12/01*, Nat'l Transp. Safety Bd., xiii (2012), https://www.ntsb.gov/investigations/AccidentReports/Reports/PAR1201.pdf.

[4] *Id.* at xii-xiii.

unknown flow rate and duration, preventing any meaningful performance evaluation of that pipe-line's leak-detection system.[5]

15. In its March 25, 2020 opinion, the Court specifically referenced an 8,600-barrel leak on a Sunoco pipeline in Sweetwater, Texas in 2016.  However, as shown in the PHMSA incident-reporting data, the pipeline—which was not then under Energy Transfer's control—did not have a functioning CPM system at the time of the incident.  Moreover, the leak was detected by the pipe-line's SCADA system.  Plaintiffs' concerns about DAPL's CPM system are thus unfounded.

**DAPL Safety Record**

16. Publicly available accident data shows that DAPL is as safe or safer than any other com-parable pipeline.  In almost three years of operation, there have been no incidents on the mainline, and only seven minor and limited events at company facilities.  In only one of those events did any product leave a facility, and that was less than half a barrel of misting[6] that was quickly remediated and did not affect people or the environment.

17. PHMSA maintains and publishes accident data for regulated pipelines including DAPL.[7] Specific to the issue of DAPL's safety record relative to industry, PHMSA publishes pipeline op-erator data on pipeline accidents greater than five gallons impacting people or the environment. The currently published report for hazardous liquid pipelines longer than 300 miles is derived from PHMSA accident reports through 2018.  This is publicly available data and would be considered

---

[5] National Transportation Safety Board, Pipeline Accident Brief, September 9, 2010.  Accident No. DCA-10-FP-009, https://www.ntsb.gov/investigations/AccidentReports/Reports/PAB1303.pdf.

[6] Misting is the spray of very small oil droplets into the air through a very small opening, such as a narrow crack.

[7] *Crude Oil/Refined Petroleum/Biofuel Accidents Impacting People or the Environment: Operators with 300 or more miles*, PHMSA (data as of Apr. 22, 2020), https://portal.phmsa.dot.gov/analytics/saw.dll?Dashboard.

by the Corps and PHMSA.

18. The three-year average from the data of barrels spilled per billion barrel-miles is particularly notable.  This period corresponds roughly with the time DAPL has been in operation, and the use of barrel-miles standardizes the data between small and large operators, both by mileage and volume transported.  The tabular data used to develop these averages was further reviewed based on statistical process control methodology to draw additional conclusions.[8]  In this data, DAPL and the Energy Transfer Crude Oil Pipeline ("ETCOP") are combined under one operator ID for reporting purposes.  It is evident from this data that DAPL/ETCOP performance is better than the industry average, with only one ETCOP incident having a reportable impact on the environment and no accidents affecting people.  This single incident occurred at a pump station during pipeline commissioning when a sump tank that was being filled overflowed.  Four barrels of crude oil were released on company property and did not leave the facility.  The pump station is located within a sensitive resource, however no impact to the resource was reported.  DAPL/ETCOP's superior performance would be even more clear if 2019 data were included, because there were no reportable accidents on either system in 2019.[9]

19. Provided below is a statistical process control chart derived from PHMSA data, which shows reported spill-performance information for operators with 300 or more miles of pipeline for the most recent three-year period.  This excludes the maximum value reported to prevent an extreme outlier from skewing the results.  The left-hand Y-axis represents the number of barrels

---

[8] William Harper et al., *Management of Oil/Gas Pipelines using Statistical Process Control, Joint Statistical Meeting - Section on Physical and Engineering Sciences* (2018).

[9] *See Distribution, Transmission & Gathering, LNG, and Liquid Accident and Incident Data*, PHMSA, https://www.phmsa.dot.gov/data-and-statistics/pipeline/distribution-transmission-gathering-lng-and-liquid-accident-and-incident-data (last updated Apr. 6, 2020) (see "Hazardous Liquid Accident Data – January 2010 to Present (ZIP)" under "Related Links").

spilled per billion barrel-miles averaged over the most recent three-year reporting period. Each

data point along the X-axis represents an individual company's performance. The data point that

represents DAPL/ETCO performance (number 46) is marked with an arrow. This chart provides

three metrics on the right side: LCL (lower control limit), X-bar regular average of data used, and

UCL (upper control limit). If an observation falls between the LCL and UCL, it is not an outlier.

If it falls between the X-bar and LCL, it is better than average.



20. From this data, the following conclusions can be drawn:

- DAPL/ETCO's spill performance is significantly better than the industry average scaled by barrel miles.

- DAPL/ETCO's spill performance is below (better than) the statistical Upper Control Limit, even after excluding extreme outliers.

- There is statistically significant evidence that DAPL/ETCO's spill performance is better than similar operator performance within the industry.

Moreover, a review of the underlying accident data allows for an analysis of DAPL's performance separated from its combined performance with ETCOP. PHMSA data does not identify any leak from the DAPL system that has affected people or the environment since the commencement of operations in 2017, despite the fact that DAPL transports more than 200 million barrels of oil over approximately 1,200 miles of pipeline each year. Because the PHMSA data does not identify any leak from the DAPL system that has affected people or the environment since it commenced operations, the data shows that DAPL's safety record is as good as or better than 100 percent of tracked U.S. pipelines.

21. Further, other data from PHMSA show that it is extraordinarily unlikely that a spill materially larger than the ███-barrel WCD analyzed by the Corps in this case would occur at the Lake Oahe crossing. Between 2010 and 2020, there were two crude-oil spills materially higher than ███ barrels in the United States, amounting to 0.2 such spills per year.[10] From 2010 through 2018, the latest year for which PHMSA has compiled and published data, the average number of hazardous liquid pipeline miles per year in the United States was 67,216 miles.[11] Based on this and the spill rate noted above, there would be 0.00000298 high-volume spills per mile of pipeline per year, or 2.98 high-volume spills per million miles of pipeline per year. For a section of pipeline measuring 1.73 miles, like the Lake Oahe segment, that amounts to just 5.16 high-volume spills every *million* years. Put otherwise, PHMSA data suggests that any given 1.73-mile stretch of pipeline would experience a spill materially larger than the ███ barrel WCD used in this case only once every 193,971.4 years. Other factors could increase or decrease the likelihood

---

[10] *See id.* I do not include a ███-barrel spill, as that volume is comparable to the Corps' ███-barrel WCD.

[11] *Annual Report Mileage for Hazardous Liquid or Carbon Dioxide Systems*, PHMSA, https://www.phmsa.dot.gov/data-and-statistics/pipeline/annual-report-mileage-hazardous-liquid-or-carbon-dioxide-systems (last updated Apr. 6, 2020).

of a spill for a particular stretch of pipeline, but PHMSA data suggests that, on the whole, spills materially greater than the Corps' WCD estimate for the Lake Oahe crossing are very, very rare.

22. As mentioned above, this is publicly available data that PHMSA and the Corps would consider in their respective analyses.  This data shows that DAPL's impressive safety record is not accurately captured in the 2012 PHMSA study referenced by Plaintiffs and the Court, which pre-dated DAPL's construction and operation.

**<u>Adverse Weather Conditions</u>**

23. Another issue raised in the Court's order is the potential impact of adverse weather conditions, particularly subfreezing temperatures, on detection or control of a rupture on DAPL.  Based on my understanding and experience, and for a number of overlapping reasons, subfreezing temperatures are highly unlikely to affect how quickly a pipeline spill is detected or how quickly the flow of oil is shut off.  First, the mechanical and electrical components necessary to detect and shut off the flow of oil in the pipeline are rated to perform in temperature ranges from -20 degrees to +150 degrees Fahrenheit, RAR 157.  In addition, the internal oil temperature and valve actuator motor heaters maintain valve components above ambient winter temperatures.  Further, DAPL has operating procedures—subject to PHMSA oversight and enforcement as described above—that require operators to winterize valves each season to further mitigate the risk of a valve becoming inoperable.  This procedure is integrated with the bi-annual valve inspections required under 49 C.F.R. § 195.420.

24. Subfreezing temperatures are also unlikely to materially affect spill-recovery efforts.  DAPL has contracted with two North Dakota Oil Spill Removal Organizations ("OSRO") as part of its FRP planning.  OSROs specialize in oil spill response and remediation and are classified by the U.S. Coast Guard.  The OSRO classification program identifies organizations capable of

providing spill responses that equal or exceed the requirements of operators' FRPs.  In addition, OSROs participating in the classification program must maintain detailed lists of response resources in the Response Resource Inventory, which allows response planners to ensure adequate response equipment is available at each location.[12]  OSROs are required to have additional specialized capabilities for their respective regions, including the ability to obtain personnel and equipment during adverse weather conditions.[13]  The use of trained OSRO personnel, familiar with local conditions, works to mitigate the risk of personnel injuries such as slipping, tripping, or falling.  Put simply, classified OSROs are specialists in the field and well equipped to respond across a range of local conditions, including extreme cold, snow, and ice.  Both of DAPL's contracted OSROs are classified as meeting or exceeding the requirements of the FRP.  Thus, I do not expect that the risk of slipping, tripping, or falling or other factors related to subfreezing temperatures would materially increase spill-response times during winter.

25. Further, OSROs and other DAPL recovery personnel have access to specialized equipment for recovery of oil under ice, on water, and in all environmental conditions, and would deploy this equipment if a spill occurred during the winter to negate the effect of freezing temperatures and shorter daylight hours on recovery operations.  Indeed, many recovery operations take place on vehicles or vessels that do not present a significant risk of slipping, tripping, or falling.

26. Dakota Access also has the ability to assign additional personnel to any incident response during adverse conditions to ensure a quick, efficient cleanup.  Indeed, as discussed in more detail below, the current DAPL North Response Zone FRP is scaled to respond to a WCD much higher

---

[12] *Guidelines for the U.S. Coast Guard Oil Spill Removal Organization Classification Program*, U.S. Coast Guard, 5 (June 2019), https://homeport.uscg.mil/Lists/Content/Attachments/55022 /2019%20Guidelines%20for%20the%20US%20Coast%20Guard%20OSRO%20Classification %20Program.pdf.

[13] *See id.* at 33-34 (discussing adverse weather conditions).

than could be experienced at Lake Oahe and, by its nature and design, assures that more-than-adequate resources are available.  To ensure that personnel are prepared to respond effectively to a discharge incident in various weather conditions, Dakota Access also conducts on-site drills, two of which have been held since the pipeline went into operation, with one drill specifically focused on winter operations at Lake Oahe.

27. Moreover, the complications associated with recovering oil in icy conditions would apply to any similar body of water in similar conditions; they are not unique to Lake Oahe or DAPL.

**Worst-Case Discharge (WCD)**

28. It is important to understand the purpose of the WCD calculation.  The purpose of the WCD requirements in 49 C.F.R. Part 194 is to define the resources needed in oil spill response planning to reduce the impact of, and ultimately remediate, potential oil spills.  Thus, WCD estimates are used for these response planning purposes—such as staffing, contracting oil spill response organizations, organizing response drills, and communicating with stakeholders.  Under the applicable PHMSA regulations, an effective and compliant plan means accurately calculating WCD volume estimates and putting in place a response plan for that volume based on emergency response guidelines and regulations.  This is because WCD volumes are, by design, the highest volume that is realistically conceivable to occur on the pipeline.  Contrary to Plaintiffs' suggestion, the WCD is not intended to capture the unreasonable scenario where all equipment and redundant systems put in place to respond to such a release fail simultaneously.

29. Instead, to conservatively estimate the largest realistically conceivable discharge at a given point, a full-bore rupture (also known as a "guillotine break") of the pipeline is assumed with unrestricted flow out of the pipeline for the purpose of planning response efforts.  But in many cases, such an incident is highly unlikely or even impossible at many points along the pipeline.

Indeed, at Lake Oahe, the pipeline lies approximately 90 feet below the riverbed, is constructed of heavier wall thickness pipe, was successfully tested prior to operation, and is subject to corrosion control measures and periodic inspection.  The regulations require planning for a guillotine break occurring in the river crossing even though the chances are extremely low and hard to fathom for this pipeline at this location 90 feet below the lake bed.

30. Similarly, during the detection and shutdown periods in a WCD, the release volume is defined as the maximum flow rate multiplied by the combined detection and shutdown times.  This approach is very conservative, because in a real-world guillotine break scenario, flow rates would quickly decrease as pumps are shutting down and valves are closing.  In the case of DAPL, any given pump would "spin down" in approximately one minute, with flow decreasing immediately once the control room transmits the command to shut down a pump.  The response and valve closure times used in the WCD calculation are also conservative in how they are modeled.  Due to the design of the system, the characteristics of the valves employed, and the spin-down time of the pumps, it is not necessary to wait for the pumps to completely shut down before sending commands to close isolation valves.  Valves and pump stations can be commanded to close simultaneously, with the pumps shut down and flow significantly reduced before the valves fully close.  By instead estimating response and valve closure time in series, another level of conservative calculation is added.  Plaintiffs' suggestion that this amounts to a "best case" scenario is unfounded.

31. In light of the conservative nature of the WCD calculation, PHMSA regulations under-standably do not require pipeline operators to assume that systems designed to mitigate an inci-dent's impact will simultaneously fail.  For example, there is no requirement that an operator con-sider simultaneous pipe rupture, valve inoperability, and/or communication failures.  In engineer-ing terms, this would constitute "double jeopardy," because a worst-case failure has already been

calculated using assumptions that overstate the size of a leak.  I have reviewed PHMSA's publicly available enforcement actions, inspection guidance, and operator advisories and find no example that postulates the simultaneous failure of unrelated pipeline components or systems.

32.     I have reviewed the WCD volume calculations in DAPL's North Zone FRP and find them to be very conservative.  For instance, Dakota Access's calculations assume a full drain down of the line segment at Lake Oahe without considering terrain or response.  However, in a real-world scenario, the terrain where the pipeline is buried would act to reduce potential WCD volumes as oil would remain in the pipeline at low points and not fully drain the pipe between valves.  This pooling within the pipeline could significantly reduce the spill volume if the release were to occur at the top of a hill between isolation valves, or within a long, flat segment such as the section of pipeline immediately below Lake Oahe.  Similarly, effective response timing and resources, as provided for in the DAPL FRP, have been proven to reduce overall spill volumes and impacts to sensitive areas.

33. The formula used to calculate the WCD in the FRP is the same formula used to calculate the Lake-Oahe-specific WCD.  Dakota Access's overall pipeline WCD calculation was approved by PHMSA, which, as described above, reviews and ensures an operator's calculations are accurate and that all required elements of the response plan are included in the filed plan.  Their approval further indicates that Dakota Access accurately calculated WCD volume estimates at Lake Oahe and put in place a response plan based on emergency response guidelines to address the WCD estimate.  Further, PHMSA will periodically inspect pipeline operators for compliance with 49 C.F.R. Part 194, including their WCD calculations.  PHMSA's protocols for field inspection specifically state that inspectors are to evaluate whether "records demonstrate that the worst case discharge for each

response zone was adequately determined."[14]

34. Recently, PHMSA expressly recognized the conservative nature of WCD estimates like the one prepared for the crossing at Lake Oahe.  In an April 16, 2020 Notice of Proposed Rulemaking ("NPRM") published in the Federal Register, PHMSA observed that "[t]he largest historical discharge is almost never the WCD" and that, "in the past five years, PHMSA has found only one instance in which a plan noted a historic spill volume that exceeded the calculated WCD volume, and in that instance, the difference was less than 50 barrels of hazardous liquid."[15]  Based on these observations, PHMSA views WCD calculations as appropriate for response planning purposes and is even proposing to stop requiring operators to provide a pipeline's historic spill volumes in its FRPs.

35. Contrary to the position expressed by Plaintiffs, there is no current or proposed requirement to consider multiple equipment or system failures when calculating the WCD.  To the contrary, PHMSA is embracing *refinement* of WCD volumes by considering terrain and the response capabilities of installed pipeline equipment, which will serve to produce estimated pipeline WCD volumes more representative of actual conditions.  In the NPRM, PHMSA further stated:

> PHMSA is also proposing to clarify that an operator may use oil spill modeling programs to calculate the WCDs.  These programs calculate the likelihood of a spill, as well as the magnitude and environmental impacts that might occur.  An adequate spill model could also provide more accurate predictions of potential spill volumes.  Several operators use spill models to calculate WCD for State-required response plans or to assist them with managing the integrity of their pipeline facilities.  *PHMSA is aware of several models that use the same variables as the current regulatory requirements, such as pipeline diameter, line section length, detection and shutdown times, and maximum product flow rates*.  Certain oil spill modeling

---

[14] *PHMSA Hazardous Liquid IA Question Set*, PHMSA, 68 (Jan. 2020), https://www.phmsa.dot
.gov/sites/phmsa.dot.gov/files/docs/forms/70206/phmsa-hazardous-liquid-ia-question-set-2020-
01.pdf.

[15] Pipeline Safety: Regulatory Reform for Hazardous Liquid Pipelines, 85 Fed. Reg. 21140,
21147 (proposed Apr. 16, 2020).

> programs *may also consider terrain, proximity to navigable waters, mechanical capabilities of valves, and other variables.* These models can also provide valuable information if a spill were to occur anywhere along the pipeline facility, not just at the location of the WCD.[16]

This proposed rulemaking further shows that the Corps did not underestimate spill volumes by using PHMSA's WCD calculation methodology.

36. Indeed, PHMSA is proposing in the NPRM to clarify that adverse weather conditions do *not* affect WCD calculations. Rather, as PHMSA explains, adverse weather conditions should be considered in response planning:

> PHMSA proposes to move the phrase "in adverse weather conditions" from the definition of WCD to § 194.107(a). While *weather conditions do not change the calculations for WCD values*, adverse weather or climate conditions can affect how to plan for and respond to spills. Adding a reference to adverse weather in the plan requirements would clarify that response planning must consider the operating environment that may be present during a spill. *These changes codify PHMSA's current practices.*[17]

37. Even if Dakota Access's Lake Oahe WCD calculations were flawed (they are not), the FRP includes a WCD volume for the entire response zone that is ▉▉▉ the size of the Lake Oahe-specific WCD volume. The company has procedures, measures, and equipment in place across the entire North Response Zone (including at Lake Oahe) to respond to a ▉▉▉ barrel incident. In other words, the company is prepared to respond to an incident at Lake Oahe that is ▉▉▉ larger than the calculated ▉▉▉ barrel WCD for Lake Oahe. Thus, even if the Lake Oahe site-specific ▉▉▉-barrel WCD calculation understated a potential release at Lake Oahe by many thousands of barrels, Dakota Access's FRP ensures that plans and resources are in place to mitigate a potential release of up to ▉▉▉ barrels at Lake Oahe. Plaintiffs have estimated a WCD at Lake Oahe of an additional 21,000 barrels in the event the valves fail to close. Notwithstanding the lack

---

[16] *Id.* (emphases added).

[17] *Id.* (emphases added).

of detailed modeling supporting this volume or the misrepresentation that the line would continue to flow at full rate during a drain down, Plaintiffs' proposed WCD of 33,517 barrels is still less ███████ the WCD planned for in the FRP.  The resources required to respond to a spill of this size are still an order of magnitude less than those Dakota Access has identified and committed to provide through the FRP.[18]  Thus, any purported inaccuracies in Dakota Access's Lake Oahe-specific WCD calculation do not affect the company's ability, as specified in the FRP, to respond to any conceivable release at Lake Oahe.

38. Finally, to address other issues raised regarding the WCD at Lake Oahe, it is my opinion that the argument put forth by Plaintiffs that DAPL's WCD estimate, which is in full accordance with PHMSA's definition of a WCD calculation, is erroneous because other extreme events (loss of power, human error, and extreme weather) must be considered is at best improper and at worst an attempt to mislead the Court.  A guillotine rupture under Lake Oahe is already more than a "worst-case" scenario in its own right given how the design of the crossing makes this nearly impossible, and any failure of line pipe under the crossing would be independent of weather conditions at the surface.  Further, conflating the ability to detect a guillotine rupture with the ability to detect a "pinhole" leak is also misleading.  A guillotine rupture will be detected almost instantaneously due to sudden loss of flow and pressure.  A "pinhole" leak of less than one percent of the pipeline's flow may take longer to detect, but based on my understanding of the leak detection systems used by Dakota Access, it is my professional opinion that such a "pinhole" leak would be detected and responded to long before the volume of oil released approached the level of the WCD.

**Physical And Practical Consequences Of Shutting Down The Pipeline**

---

[18] Memorandum in Support of Standing Rock Sioux Tribe's Motion for Summary Judgement on Remand (No. 1:16-cv-1534-JEB) (D.E. 433-2) at 30.

39. A shutdown of the pipeline would have significant physical and practical consequences.

40. The best way to preserve and maintain the integrity of a pipeline containing hazardous liquids is to continue operating it. Much like an automobile placed in storage, pipeline equipment will deteriorate with time unless operated, and certain maintenance activities require product flow to be effective. Shutting down, or "idling," a pipeline requires planning to ensure threats to the integrity of the pipeline are mitigated and risks continue to be addressed during the idle period. In fact, if major purging and mitigation measures are not taken, the risk of degradation due to internal corrosion will increase.

41. DAPL was constructed and is operated to mitigate the potential for internal corrosion that can occur as a result of water mixed into the crude oil product within the pipeline. For instance, DAPL has coupon monitoring stations installed in the crude oil product stream to trap water and measure any internal corrosion rates. If any corrosion is identified, chemical biocides and inhibitors are injected. DAPL also has a maintenance "pigging" program that removes water that may be left behind from crude oil or hydrostatic testing. However, both of these programs require product flow in the pipeline. If DAPL operations are suspended, the coupon monitoring and maintenance programs would be ineffective and eliminate important protections in place to minimize the risk of corrosion. During an extended shutdown, any water mixed in the oil will separate from solution and accumulate at the bottom of the pipeline at low points along the profile (terrain)—particularly the crossing beneath Lake Oahe—and could compromise the structural integrity of the pipeline if allowed to stay for an extended period of time (*i.e.*, more than a month). Additional steps, such as purging the pipeline with inert gas, would therefore need to be taken to reduce the risk of internal corrosion if the pipeline is taken offline.

42. The DAPL pipeline is also subject to periodic in-line inspection under PHMSA integrity management regulations. Under the existing Corps permit and easement requirements, the section of the line under Lake Oahe was last inspected in 2018 and is scheduled for re-inspection prior to 2023. No actionable conditions were identified at the last inspection, and no repairs required.

43. It has also been suggested that if DAPL is shut down some portion of its current 570,000 barrels per day capacity could be shifted to alternate means of transportation, including rail. While the amount of capacity that could be shifted to rail is beyond the scope of this declaration, it is important to note that such a shift, if it occurred, would cause significant safety and welfare concerns. It is widely accepted, and the empirical research shows, that on a per-barrel-mile basis, pipelines are safer than rail transport.

44. To summarize, in my opinion, shutting down DAPL without significant mitigation would not eliminate any risks associated with the pipeline and may only introduce additional risks. The more practical course of action is to continue to operate the pipeline under current pipeline safety and integrity management regulations, taking advantage of the safety elements built into the pipeline and the many, ongoing integrity management efforts.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: April 28, 2020

John F. Godfrey

22

GODFREY
EXHIBIT 1

# John F. Godfrey
**Principal Consultant**



# Curriculum Vitae:

**Personal Statistics:**
Citizenship:    United States

**Language Capabilities:**
Language        Level
English         Native

**Academic Attainment:**
- o   Bachelor of Science in Engineering with emphasis in Hydraulics and Strength of Materials, University of Illinois, 1987

**Present Position:**
**DNV GL**                                                         **Sept. 2014 – Present**
Mr. Godfrey is a Principal Consultant with the Integrity Solutions group within the Pipeline Services Department of Det Norske Veritas (U.S.A.), Inc. (DNV GL) in Columbus, Ohio.

Prior to joining DNV GL, Mr. Godfrey held various positions in pipeline operations, manufacturing, consulting, and Asset Integrity services.  His experience includes Integrity Management Program development and management, regulatory compliance, standards development, pipeline operations, pipeline design and construction, line pipe manufacturing and non-destructive examination.  Mr. Godfrey is the past Chairman of the API Pipeline Integrity Committee, past Vice Chair of the PRCI Materials Committee, and previous member of the API Operations Technical Committee.

**Detailed Professional Experience:**

**SGS Industrial Services, Asset Integrity Management,**                **April 2012 – Sept. 2014**
**Bartlesville, OK**
*Vice President - Operations*
Full responsibility for the Asset Integrity Solutions (AIS) division which provides Mechanical Integrity (MI) services in support of Process Safety Management (PSM) implementation for the oil and gas industry in the upstream, mid-stream, downstream, and petrochemical industry.  Services provided by AIS include;
- Engineering Fitness for Service, failure analysis and Risk Based Inspection (RBI) services
- API Certified Inspection of pressure vessels and piping
- Non-Destructive Examination and Integrity Testing Planning
- Data Management and Hosting for compliance with PSM requirements
- Customer and staff training for PSM compliance

**RCP, Inc., Houston, TX**                                         **2011 – April 2012**
*Executive Consultant*
Regulatory and engineering consulting services for the oil and gas pipeline industry.  Areas of focus include;
- Process management and procedure development
- Internal and regulatory audit support
- Integrity Management Program development and review
- Litigation support and expert witness
- Merger and acquisition due diligence

**BERG STEEL PIPE CORPORATION, Panama City, FL**                   **2009 – 2011**

# John F. Godfrey
**Principal Consultant**



# Curriculum Vitae:

*Vice President of Quality Assurance*
Major responsibilities include technical services, material testing, production quality control, and customer service for pipe and coating mills in Panama City, FL and Mobile, AL.  Lead a team of professionals responsible for;
- Management of Quality Assurance and API/ ISO certification programs
- Ensure inventory control, traceability and the investigation and disposition of non-conforming materials in accordance with Company API and ISO certified processes.
- Internal audit in support of API, ISO and company requirements
- Technical support, specification review and document preparation in support of raw material procurement and sales
- Preparation of Manufacturing Procedure Specifications, Integrity Testing Plans and mill instructions in accordance with customer specifications and technical agreements
- Test laboratory services, material test reports, and product traceability in support of production
- Non Destructive Testing and Quality Control training for production staff


**Explorer Pipeline Company, Tulsa, OK**                                    **2005 – 2009**
*Manager, Asset Integrity*
Accountable for the overall management of Explorer Pipeline Company's (EPL) integrity management program including pipeline inspection and remediation efforts.  Responsibilities included training of staff and contractors, risk management, pipeline inspection and testing, defect assessment, welding procedures and qualification, root cause failure analysis, corrosion control and fitness-for-service.  Work functions included strategic planning, budget development, project management and field implementation.  Represented the company during regulatory audits and failure investigations working closely with state and federal agencies to ensure safe pipeline operations.

**Colonial Pipeline Company, Alpharetta, GA**                              **2004 – 2005**
*Engineering Manager–ULSD Project*
Management oversight of all Colonial Pipeline Company's (CPC) engineering functions related to facility upgrades and modifications related to the shipment of Ultra Low Sulfur Diesel fuel.  Coordinated with operations to ensure engineering modifications meet or exceed safety goals, regulatory standards, and product quality requirements.  Lead a team of internal and contract engineering resources responsible for all standards, designs and specifications for the project.

**Colonial Pipeline Company, Alpharetta, GA**                              **1999 - 2004**
*Operational Excellence and Asset Integrity Team Leader*
Responsible for the development and implementation of the company's Integrity Management Program (IMP) inclusive of line pipe, facilities and tankage.  Reporting departments included regulatory compliance, risk management, corrosion control, tank inspection, and line pipe inspection and remediation.  Operational excellence responsibilities included the development of safety related processes, failure investigations and management of corrective action order and consent agreement activities resulting from spills and regulatory findings.  Lead a team of engineers and professionals with responsibility for procedure development, process mapping, and training of operations and engineering personnel.  Represented the company during regulatory audits, failure investigations, and subsequent corrective actions to ensure safe pipeline operations.

**Colonial Pipeline Company, Linden, NJ**                                     **1999**
*Operations Manager*
Management of petroleum products delivery facility and tank farm operations for Colonial's terminus at Linden, NJ.  Duties included performance management of 24 technicians and operators, local customer relations, product quality

# John F. Godfrey
**Principal Consultant**



# Curriculum Vitae:

control, public education, and emergency response. Implemented conduct of operations training and local procedure development in support of company Operational Excellence initiatives.

**Colonial Pipeline Company, Various Locations**                                         **1987 – 1999**
*Project Management and Engineering*
Lead a team of project managers and inspectors with responsibility for implementation and management of all construction projects, pipeline maintenance, tank inspection and maintenance, damage prevention, and cathodic protection within Colonial's Southeast District.  Field implementation and project management of construction and maintenance projects in North Carolina and Southern Virginia.  Mechanical engineering corporate design functions including line pipe, facility piping, hydraulic design, equipment and tank foundations, and storage tank modifications and repairs.  Responsible for field engineering support for pipelines, tanks, and facilities located in Delaware, Pennsylvania, New Jersey and New York.

**Accomplishments**
- Course instructor, Pipeline Safety Management Systems, PPIM - 2015
- Lead Bergs quality assurance organization in support of start-up and qualification of Berg's new spiral pipe mill in Mobile, AL.
- Integration of EPL's Integrity Management Program into corporate strategic planning and formal work processes.
- Lead all major aspects of Colonial Pipeline's (CPC) integrity program resulting in an unprecedented 4 years as API Distinguished Pipeline of the Year.
- Leader of CPC's Integrity Management, work process development, and regulatory compliance teams.
- Frequent presenter on MI and regulatory issues at the API Pipeline Conference and PHMSA regulatory workshops.  Additional presentations to AGA, NACE and Senior Government Officials.
- Administered the development and implementation of the AOPL Performance Excellence in System Integrity effort resulting in unprecedented industry cooperation.

**Investigations and Incident Response**
- Variable and low strength pipeline materials root cause analysis and remedial action
- Major pipeline ruptures and failure root cause analysis and response
- Tank fires and loss of containment root cause analysis
- Process equipment failure and subsequent fire investigation
- Company liaison to DOT PHMSA, EPA, NTSB, DOJ, USCG, OSHA

**Professional Affiliations**
- American Petroleum Institute, Pipeline Integrity Committee 2005 – 2009.  Past Chairman, 2005 to 2007.
- API/AOPL Performance Excellence Team, 1999 to 2009
- Pipeline Research Council International (PRCI), Vice Chairman of the Materials Committee, 2005
- American Petroleum Institute, Operations Technical Committee balloting representative, 1999 to 2005
- API 1160, Managing System Integrity for Hazardous Liquid Pipelines work group

# GODFREY
# EXHIBIT 2

| DAPL Plans & Specifications | DOT CFR 195 Requirements | DOT Part 195 Reference |
|---|---|---|
| **Pipeline Cover and Separation Distances** | | |
| Providing a minimum clearance of 24 inches (2 feet) between drain tile and DAPL pipeline as indicated in the Agricultural Impact Mitigation Plan | Minimum clearance required between pipe and drain tile is 2 inches | CFR 195.250 |
| Providing a minimum cover (from top of pipe to ground level) of 48 inches (4 feet) in cultivated fields | Pipe must be buried so that it is below the level of cultivation or to a depth of 30 inches of cover, whichever is deeper | CFR 195.248 |
| Providing a minimum cover (from top of pipe to ground level) of 60 inches (5 feet) at public road drainage ditches | Minimum cover required for public road drainage ditch crossings is 36 inches (3 feet) | CFR 195.248 |
| Providing a minimum cover (from top of pipe to ground level) of 48 inches (4 feet) through industrial, commercial, and residential areas | Minimum cover required is 36 inches (3 feet) | CFR 195.248 |
| Providing at least 60 inches (5 feet) of cover for waterbody crossings | Minimum cover required is 30 or 36 inches (3 feet) | CFR 195.248 |
| Horizontally Directionally Drilling underneath waterbody crossings wider than 100 feet in width to a depth of at least 20 feet under the bottom of the waterbody | Minimum cover required is only 48 inches (4 feet) | CFR 195.248 |
| **Pipeline Strength** | | |
| DAPL line pipe is specified to API 5L, PLS-2 standards which mandate additional metallurgical requirements, factory inspections and record retention. Longitudinal seam of all line pipe has been 100% examined by non-destructive testing (NDT) | Line pipe must be fit-for-purpose | CFR 195.112 |
| All pipe mills were inspected for their quality assurance and quality testing programs prior to being allowed to bid to supply pipe for DAPL | No requirement | N/A |
| Inspectors for DAPL were placed in each pipe mill while DAPL pipe was being produced to ensure full compliance with all quality control measures | Line pipe inspection only required at the job site during installation | CFR 195.206 |

| DAPL Plans & Specifications | DOT CFR 195 Requirements | DOT Part 195 Reference |
|---|---|---|
| 0.50 Design factor will be used for all public road, waterway and railroad crossings, and for all above-ground sections of the DAPL system (mainline valve sites and pump stations).  Line pipe with 0.625" wall thickness (WT) will be installed through these areas. | 0.72 Design Factor is permitted throughout the entire pipeline system - which equates to providing line pipe with 0.429" WT. | CFR 195.106 |
| **Pipeline Valves** | | |
| All mainline valves on DAPL will have motorized actuators to provide for the capability to remotely close all valves to isolate pipeline segments as needed.  All mainline valves qualify as Emergency Flow Restriction Devices (EFRD). | No requirement | N/A |
| **Pipeline Construction** | | |
| 100% of all mainline girth welds will be have an NDT inspection, either by radiographic (x-ray) or ultrasonic means | Need to perform an NDT for only 10% of girth welds made by each welder each day | CFR 195.234 |
| Hydrotesting entire pipeline for 8 hours at 125% | Hydrotest for 4 hours at 125% plus 4 additional hours at 110% | CFR 195.304 |
| Hydrotesting all valves and above-ground equipment for 8 hours at 125% | Manufacturing facilities only provide 1 hour leak tests | CFR 195.305 |
| An Internal Line Inspection deformation tool will be run through the entire pipeline prior to start-up | No requirement | N/A |
| Cathodic Protection System will be activated in stages along the right of way as the pipeline is backfilled and completed. | Cathodic protection must be activated within 1 year after the pipeline begins operation | CFR 195.563 |
| **Pipeline Operations** | | |
| The pipeline right of way will be inspected weekly, weather permitting, by aerial means | Right of way inspections are required 26 times per year, with intervals not to exceed three weeks | CFR 109.412 |