**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB |
| Plaintiff, | (and Consolidated Case Nos. 16-cv-1796 And 17-cv-267) |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross, Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor, Cross Claimant. | |

**BRIEF OF MEMBERS OF CONGRESS AS *AMICI CURIAE***
**<u>IN SUPPORT OF PLAINTIFFS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTEREST OF AMICI CURIAE ................................................................................................. 1

INTRODUCTION ........................................................................................................................ 2

I.     This Court Should Vacate The Lake Oahe Easement During The Second Remand To
Protect The Integrity Of NEPA ........................................................................................ 3

        A.     Leaving the Lake Oahe easement in place will encourage the Corps (and other
agencies) to act first and comply with NEPA later. ............................................... 5

        B.     There is no decision left for the Corps to justify under the first *Allied-Signal*
factor. ..................................................................................................................... 7

        C.     Federal pipeline safety regulations offer no shelter for "serious gaps in crucial
parts" of the Army Corps' flawed analysis. ........................................................... 8

        D.     The second *Allied-Signal* factor does not favor remand without vacatur. .............. 9

II.    Inadequate NEPA Analysis Erodes Tribal Sovereignty And Tribal Self-Determination
and Potentially Violates Plaintiffs' Treaty Rights, So Vacatur Is The Only Appropriate
Remedy In This Case. ..................................................................................................... 11

        A.     Failure to vacate the easement may result in abrogation of Plaintiffs' treaty rights
without an act of Congress, which is impermissible under *Minnesota v. Mille Lacs
Band of Chippewa Indians* ................................................................................... 11

        B.     Failure to properly analyze the impacts of the DAPL on Plaintiffs' treaty rights
and their communities violates NEPA and Executive Order 12898 and only
vacatur will ensure that a proper environmental justice analysis is completed. .... 14

        C.     Vacatur is proper because the Trump Administration's disregard for treaty rights
and tribal sovereignty erodes the laws and policies that Congress and the
executive branch have carefully constructed Since 1962, in support of tribal self-
determination. ...................................................................................................... 19

CONCLUSION ......................................................................................................................... 23

APPENDIX: ............................................................................................................................. A1

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal v. NRC*,
   988 F.2d 146 (D.C. Cir. 1993) ...................................................................................4, 11

*Cal. Cmtys. Against Toxics v. Envtl. Prot. Agency*,
   688 F.3d 989 (9th Cir. 2012 ...........................................................................................8

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
   499 F.2d 1109 (D.C. Cir. 1971) .....................................................................................4

*Communities Against Runway Expansion, Inc. v. FAA*,
   355 F.3d 678 (D.C. Cir. 2004) ......................................................................................15

*Dine Citizens Against Ruining Our Env't v. Bernhardt*,
   923 F.3d 831 (10th Cir. 2019) ......................................................................................22

*Ex Parte Crow Dog*,
   109 U.S. 556 (1883) .......................................................................................................18

*Friends of the River v. Fed. Energy Reg. Comm'n*,
   720 F.2d 93 (D.C. Cir. 1983) ..........................................................................................8

*Herrera v. Wyoming*,
   139 S. Ct. 1686 (2019) .............................................................................................12, 13

*Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*,
   756 F.3d 447 (6th Cir. 2014) ........................................................................................15

*League of Conservation Voters v. Trump*,
   363 F. Supp. 3d 1013 (D. Alaska 2019) .......................................................................21

*Marsh v. Oregon Nat. Res. Council*,
   490 U.S. 360 (1989). .......................................................................................................5

*Massachusetts v. Watt*,
   716 F.2d 946 (1st Cir. 1983) .......................................................................................5, 6

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000) ........................................................................................8

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
   345 F.3d 520 (8th Cir. 2003) ........................................................................................15

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999).................................................................12,14

*Montana v. United States*,
450 U.S. 544 (1981)......................................................................18

*Montana Wilderness Ass'n v. Fry*,
408 F. Supp. 2d 1032 (D. Mont. 2006)..........................................6

*Nat'l Labor Relations Bd. v. Pueblo of San Juan*,
280 F.3d 1278 (10th Cir. 2000) ...................................................21

*Nat'l Parks Conservation Ass'n v. Semonite*,
422 F. Supp. 3d 92 (D.D.C. 2019) ........................................4, 7, 11

*New Mexico v. Mescalero Apache Tribe*,
462 U.S. 324 (1983).....................................................................12

*Oglala Sioux Tribe v. NRC*,
896 F.3d 520 (D.C. Cir. 2018) .....................................................3, 7

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)..................................................................3, 4, 7

*Sierra Club v. Fed. Energy Regulatory Comm'n*,
867 F.3d 1357 (D.C. Cir. 2017) ...............................................15, 18

*Sioux Tribe of Indians v. United States*,
7 Cl. Ct. 468 (1985) .............................................................15, 16, 18

*Sioux Tribe of Indians v. United States*,
14 Cl. Ct. 94 (1987) .....................................................................15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
282 F. Supp. 3d 91 (D.D.C. 2017) ........................................5, 6, 7, 9

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
2020 WL 1441923 (D.D.C. Mar. 25, 2020)....................................5, 6

*United States v. Wheeler*,
435 U.S. 313 (1978).......................................................................18

*Washington v. Wash. St. Comm. Passenger Fishing Vessel Ass'n*,
443 U.S. 658 (1979)...................................................................13, 14

*White Mtn. Apache Tribe v. Bracker*,
    448 U.S. 136 (1980)..............................................................................................12

*Wood v. Burwell*,
    837 F.3d 969 (9th Cir. 2016) ...............................................................................4

**Treaties**

Treaty of Fort Laramie with Sioux, *et al.*, April 29, 1868, 15 Stat. 635.......................17

Treaty of Fort Laramie with Sioux, *et al.*, Art. I, Sept. 17, 1851, 11 Stat. 749 .......................16, 17

**Statutes**

33 U.S.C. § 1377..............................................................................................................20

42 U.S.C. § 470.........................................................................................................20, 21

42 U.S.C. § 4331................................................................................................................3

42 U.S.C. § 7601..............................................................................................................20

American Indian Religious Freedom Act,
    42 U.S.C. §§ 1996–1996a..............................................................................20

Indian Civil Rights Act of 1968,
    25 U.S.C. §§ 1301–1303................................................................................20

Indian Self-Determination and Education Assistance Act of 1975,
    25 U.S.C. § 450a............................................................................................20

Indian Child Welfare Act of 1978,
    25 U.S.C. §§ 1901–1903................................................................................20

Native American Graves Protection and Repatriation Act,
    25 U.S.C. §§ 3001–3013................................................................................20

Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011,
    125 Stat. 1904. ................................................................................................9

**Regulations and Administrative Materials**

40 C.F.R. § 1502 ...................................................................................................8

49 C.F.R. § 195.452 ..............................................................................................8

49 C.F.R. § 192.935 ..............................................................................................9

Council on Environmental Quality, Environmental Justice: Guidance under the National
Environmental Policy Act (Dec. 10, 1997)...........................................................15–18

Exec. Order 12898,
          59 Fed. Reg. 7629 (Feb. 11, 1994) ...........................................................15

Pipeline Safety: Valve Installation and Minimum Rupture Detection Standards,
          85 Fed. Reg. 7162 (Feb. 6, 2020) ...........................................................8, 9

Pres. Memorandum, Construction of the Dakota Access Pipeline,
          82 Fed. Reg. 8661 (Jan. 24, 2017) ...........................................................6

Pres. Procl. Modifying the Bears Ears National Monument,
          82 Fed. Reg. 58081 (Dec. 5, 2017) ..........................................................22

**Other Authorities**

Michael Eitner, *Meaningful Consultation with Tribal Governments: A Uniform Standard to
Guarantee That Federal Agencies Properly Consider Their Concerns*,
          85 U. Colo. L. Rev. 867 (2014) ........................................................18, 19, 21

Goldberg, Carol E., *et al*,
          *American Indian Law:  Native Nations and the Federal System* (7th ed. 2015) ...............20

Mashpee Wampanoag Reservation Reaffirmation Act (H.R. 312) (2019)....................................23

# INTEREST OF AMICI CURIAE[1]

*Amici curiae* are members of Congress with a strong interest in preserving the integrity of the National Environmental Policy Act (NEPA), including those aspects of the statute that protect and respect the sovereign rights of federally recognized tribes.  Congress passed NEPA 50 years ago to ensure federal agencies "look before they leap" into approving a project with possible consequences for the human environment.  As members of Congress who wish to preserve the integrity of this historic act, *amici* are concerned with the Trump administration's efforts to roll back NEPA's strict procedural requirements through executive orders and by forging ahead with projects (including the Dakota Access Pipeline) without *first* taking the necessary "hard look" at the consequences of the proposed action in full view of the public.  In this case, *amici* are particularly concerned that allowing the Lake Oahe easement to remain in place on remand will embolden federal agencies (and applicants) to avoid NEPA's procedural requirements by strategically using the judiciary's equitable powers to act first and justify their decision afterwards.  *Amici's* concerns are especially acute here because this Court has already forgiven the U.S. Army Corps of Engineers' transgressions once without vacating the Lake Oahe easement.  If the Court again allows the Army Corps to act first and comply later while leaving its three-year-old easement decision in place (for an indeterminate time), *amici* fear the precedent will cause incalculable harm to NEPA and the values Congress intended the statute to protect. *Amici* are similarly concerned that the Army Corps' failures to adequately analyze Plaintiffs' environmental justice concerns and treaty rights during its NEPA process, as well as the full

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

impacts of the pipeline on its communities and treaty rights, will impair Plaintiffs' sovereignty and self-determination.

## INTRODUCTION

The undersigned members of Congress offer this brief in support of Plaintiffs' request for this Court to vacate the U.S. Army Corps of Engineers' (Army Corps) Lake Oahe easement for the Dakota Access Pipeline (DAPL).  The Lake Oahe easement should never have been approved without the Army Corps first fully complying with the National Environmental Policy Act (NEPA).  But it was approved, and the pipeline became fully operational on June 1, 2017.  Within two weeks, this Court held that Army Corps' easement decision violated NEPA, though it later decided to leave the easement in place on remand.  Almost three years later, this Court again held that the Army Corps' decision to grant the easement violated NEPA.  The question now is whether the Court should, for a second time, allow the Corps' unlawfully granted easement to remain in place while the Corps (again) is asked to comply with the law.  With respect, it should not.

NEPA requires federal agencies to "look before they leap."  The statute accomplishes this goal by establishing strict procedural requirements that agencies must comply with before acting. This charge, however, is only as strong as the judiciary's willingness to vacate agency actions made in violation of the statute's strict procedural requirements.  If agencies can violate NEPA *twice* without significant consequences (including vacatur), the statute will be rendered meaningless and the values Congress sought to protect will suffer.

These values include protecting Plaintiffs' treaty rights in the Missouri River, Lake Oahe, and the surrounding off-reservation lands.  The Army Corps' failure to comply with NEPA has threatened the Plaintiffs' treaty rights and undermined the decades-long efforts of the

undersigned members, and previous Congress's attempts to reverse the nation's destructive past practice of diminishing tribal sovereignty, breaking treaties with indigenous nations, and undermining tribal self-determination.  By allowing the pipeline to continue operating without first complying with NEPA, the momentary interests of a non-native corporation will be elevated above the long-term interests of the tribes — protected environmental justice communities — in the sanctity of the resources they rely on and that are protected by treaty.

In order to protect NEPA's integrity and ensure the Army Corps takes seriously the issues raised by Plaintiffs in the primary pleadings and briefs, as well as to protect the Plaintiffs' treaty rights, we respectfully ask this Court to vacate the Lake Oahe easement pending the Corps' completion of an adequate environmental impact statement (EIS).

## I.      This Court Should Vacate The Lake Oahe Easement During The Second Remand To Protect The Integrity Of NEPA.

When Congress passed NEPA 50 years ago, it recognized the "critical importance" of the environment to our nation and declared the "federal government's responsibility to preserve important historic, cultural, and natural aspects of our national heritage."  42 U.S.C. § 4331; *see also Oglala Sioux Tribe v. NRC*, 896 F.3d 520, 529 (D.C. Cir. 2018) (recognizing that "the environmental values protected by NEPA are of a high order.").  The statute seeks to protect these important values by instructing federal agencies to prepare an EIS *before* taking any major actions significantly affecting the quality of the human environment.  *Oglala Sioux Tribe*, 896 F.3d at 523.  By completing an EIS before approving a proposed action, NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  It also "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking

process and the implementation of that decision." *Id.*  Otherwise, NEPA's procedural

requirements become a paper tiger—exactly what Congress did not intend.  *Calvert Cliffs'*

*Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 499 F.2d 1109, 1114 (D.C. Cir.

1971).

Nothing in the statute's text authorizes agency actions to continue in force when taken in

violation of NEPA.  Without a textual basis in the statute for allowing actions (like the Lake

Oahe easement) to remain in force pending NEPA compliance, agencies have turned to the

judiciary's equitable powers to avoid vacatur.  Under the framework for vacatur established by

the D.C. Circuit, "[t]he decision whether to vacate depends on the seriousness of the order's

deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive

consequences of an interim change that may itself be changed." *Allied-Signal v. NRC*, 988 F.2d

146, 151 (D.C. Cir. 1993) (internal quotations omitted).  Vacatur is the default remedy in cases

where the plaintiffs have demonstrated an APA violation and the burden is on the defendants to

"prove that vacatur is not necessary." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp.

3d 92, 99 (D.D.C. 2019).  When analyzing the appropriateness of this remedy, this Court has

ruled that the *Allied Signal* factors are not dispositive and that vacatur is appropriate based on a

court's assessment of the "overall equities and practicality of the alternatives." *Id.* at 99; *see*

*Wood v. Burwell*, 837 F.3d 969, 976 (9th Cir. 2016) (noting that remand without vacatur is

remedy that should be "used sparingly.").  Forgiving NEPA violations by remanding uninformed

agency decisions without vacatur (or the functional equivalent) means "there will be nothing left

to the protections that Congress intended [NEPA] to provide." *Oglala Sioux Tribe*, 896 F.3d at

534.  If the judiciary is going to strip the statute of these protections on equitable grounds, it

should do so only in the rarest circumstances, which are not present here.

**A.      Leaving the Lake Oahe easement in place will encourage the Corps (and other agencies) to act first and comply with NEPA later.**

More than two years ago, this Court held that remand without vacatur was an appropriate remedy for the Army Corps' NEPA violations.  The Court was satisfied the first *Allied-Signal* factor had been met having found there was a "serious possibility" that the Corps "[would] be able to substantiate the prior [environmental assessment]."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 99 (D.D.C. 2017) ("*Standing Rock IV*").  But in hindsight, the Court's faith in the Corps was undeserved — the Army Corps was unable to substantiate its decision to forego an EIS because there were  "serious gaps in crucial parts of the Corps' analysis" of pipeline safety issues and the Corps was "not able to fill *any* of them." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 2020 WL 1441923 *16 (D.D.C. Mar. 25, 2020) ("*Standing Rock V*") (emphasis added).  These gaps tainted the Corps' evaluation of critical issues including: (1) DAPL's leak detection system; (2) how quickly that system can catch spills; (3) the impact of "harsh North Dakota winters on spill response efforts"; (4) the operator's safety record; (5) potential human or machine error; and (6) the Corps' related evaluation of potential worse case discharges from the pipeline.  *Id.* at *9–16.  Thus, oil has continued to flow for almost three years through an unlawfully approved pipeline despite Congress's "manifest concern with preventing uninformed action."  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989).  Given this history, the Court should not put its faith in the Corps again.

The Corps' failure to comply with NEPA on the first remand is not surprising.  Courts have warned against bureaucratic momentum upending NEPA for decades.  In 1983, then Judge Breyer described the problem in *Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983).  He wrote that "once large bureaucracies are committed to a course of action, it is difficult to change that

course—even if new, or more thorough, NEPA statements are prepared and the agency is told to 'redecide.'" *Id*. at 952–53.  But bureaucratic momentum is only part of the story here.  The Corps is also facing pressure from the President who on his fourth day in office instructed the Secretary of the Army to "review and *approve* [the Dakota Access pipeline] in an expedited manner . . . ."  82 Fed. Reg. 8661 (Jan. 24, 2017) (emphasis added).  With the White House and the Army Corps having already committed to approving the Lake Oahe easement, there is little incentive for the Army Corps to approach its earlier decision with an open mind and the rigor demanded by NEPA's procedural requirements.  The Corps' actions during remand suggest it is more concerned with keeping the oil flowing and merely checking the box on NEPA.  *See, e.g., Standing Rock V*, 2020 WL 1441923 *10 (finding that the pipeline operator's history "did not inspire confidence" yet on remand the Corps "focused its response on defending the operator's performance record").  This is precisely the kind of executive branch momentum and uninformed agency action that NEPA was meant to protect against and that has led courts to halt projects authorized in violation of NEPA.  *See, e.g., Montana Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032, 1037–38 (D. Mont. 2006) (enjoining an operational natural gas pipeline); *Marsh*, 490 U.S. at 371.

When the judiciary permits uninformed agency actions to remain in effect on remand, it undermines Congress's command in NEPA that agencies "look before they leap."  *Standing Rock IV*, 282 F. Supp. 3d at 106.  Allowing (or indeed encouraging) agencies to justify their actions in the face of NEPA violations *a second time* creates "undesirable incentives for future agency actions" similar to those this Court recognized in its first decision on vacatur.  *Id.*  Just as "agencies and third parties may choose to devote as many resources as early as possible to a challenged project—and then claim disruption in light of such investments" so too may they

choose to approve projects without the rigor NEPA demands if courts are unwilling vacate that approval.  *Id.*  Strategic maneuverings like these are "contrary to the purpose of NEPA, which seeks to ensure that the government looks before it leaps," *id.*, and allows for meaningful public involvement in the decisionmaking process, especially by those members of the public likely to be impacted.  *Robertson,* 490 U.S. at 349.

The D.C. Circuit recently admonished another agency for "disparaging" NEPA violation as "merely procedural" and leaving a federal license in place while the agency sought to cure it. *See Oglala Sioux Tribe*, 896 F.3d at 534 (internal quotations omitted).  But agencies are left to believe NEPA's requirements are "merely procedural" when their actions remain undisturbed despite repeated violations.  If the Court does not vacate the Lake Oahe easement, it is unreasonable to believe that the Corps will fully and fairly evaluate the environmental impacts of operating the DAPL under Lake Oahe and seriously consider reasonable alternatives. Remanding without vacatur again would further signal to the Corps and other agencies that acting first and complying with NEPA later is a strategy worth taking.

**B.     There is no decision left for the Corps to justify under the first *Allied-Signal* factor.**

Vacatur is warranted under the first *Allied-Signal* factor because there is no NEPA decision left for the Corps to justify.  This court has previously held that "[o]n remand, the Corps cannot substantiate its initial procedural decision to forego an EIS, as the [court] has already found that such a decision would violate NEPA."  *Semonite*, 422 F. Supp. 3d at 99.  The Corps must instead produce an EIS.

Even if there were a NEPA decision left to substantiate, asking whether the Army Corps can justify its decision to grant the Lake Oahe easement a second time is squarely at odds with "the EIS requirement [that] inhibits *post hoc* rationalizations of inadequate environmental

decisionmaking." *Friends of the River v. Fed. Energy Reg. Comm'n*, 720 F.2d 93, 106 (D.C. Cir. 1983); *see also Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (noting that "[p]roper timing is one of NEPA's central themes.  An assessment must be 'prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made.'") (quoting 40 C.F.R. § 1502.5).  Courts should not remand without vacatur when doing so risks the very harm Congress sought to protect against in NEPA—uninformed agency action.  *See Cal. Cmtys. Against Toxics v. Envtl. Prot. Agency*, 688 F.3d 989, 994 (9th Cir. 2012) (remanding without vacatur where vacatur could increase air pollution and undermine the Clean Air Act's goals).

### C.    Federal pipeline safety regulations offer no shelter for "serious gaps in crucial parts" of the Army Corps' flawed analysis.

The existence of federal pipeline safety regulations does not render the Corps' NEPA violations any less serious.  The regulations are simply not very stringent.  For example, the Department of Transportation, Pipeline and Hazardous Materials Safety Administration's (PHMSA) leak detection regulations merely require that an operator "have a means to detect leaks on its pipeline system."  49 C.F.R. § 195.452(i)(3).  The regulations do not set any particular standard that the leak detection system must meet.  It is merely up to the operator to "evaluate the capability of its leak detection means."  *Id.*

Congress set out to improve pipeline safety regulations roughly 10 years ago after two major pipeline incidents.  The first incident involved a crude oil pipeline rupture near Marshall, Michigan, which spilled approximately 800,000 gallons of crude oil into the Kalamazoo River causing $1 billion in damages.  The second incident involved a natural gas pipeline rupture in San Bruno, California that killed 8 people, sent 51 people to the hospital, destroyed 38 homes, damaged 70 other homes, and required 300 households to evacuate.  *See* Pipeline Safety: Valve

Installation and Minimum Rupture Detection Standards, 85 Fed. Reg. 7162, 7163 (Feb. 6, 2020) (notice of proposed rulemaking).  Congress responded by passing the Pipeline Safety, Regulatory Certainty, and Job Creation Act of 2011.  125 Stat. 1904.  Section 4 of this statute requires PHMSA to issue regulations, if appropriate, requiring the use of automatic or remote-controlled shutoff valves, or equivalent technology to improve safety.  49 U.S.C. § 60102(n).  Yet nine years after its passage, PHMSA has only recently given notice of a proposed rulemaking and soliciting comments on its proposals.  85 Fed. Reg. 7162 (Feb. 6, 2020).  These rules, based on Congress's 2011 statute, have not gone into effect.

The proposed rulemaking references significant shortcomings in PHMSA's existing regulations that were identified by the Government Accountability Office.  *Id.* at 7166.  For example, current safety regulations for incident response are too general, requiring merely that operators respond in a "prompt and effective manner."  *Id.* at 7167.  Regulations requiring operators to install automatic shutoff valves and remote-controlled valves are similarly vague. These valves are required only "if the *operator* determines, through risk analysis, such valves are *necessary* to protect [High Consequence Areas]."  *Id.* (citing 49 C.F.R. § 192.935(c)) (emphasis added).  Thus, PHMSA's pipeline safety regulations do not make the "serious gaps in crucial parts of the Corps' analysis" relating to pipeline leaks and spills any less serious for purposes of crafting an appropriate remedy on remand.

**D.    The second *Allied-Signal* factor does not favor remand without vacatur.**

In 2017, this Court held that the disruptive effect of remand "does not counsel strongly in favor of remand without vacatur" and "tip[ped] only narrowly in favor of [the Corps]."  *Standing Rock IV*, 282 F. Supp. 3d at 108.  Since 2017, the price and demand for oil has plummeted due to factors well beyond the operation of this pipeline.  Those factors include international oil

9

production wars between Russia and Saudi Arabia and the ongoing Covid-19 pandemic.  At one point this year, U.S. oil prices fell to less than zero dollars per barrel.[2]  As of May 4, 2020, economic conditions have resulted in 6,800 shut-in wells and a 450,000 barrels per day drop in production.[3]  Factoring into these difficulties is the fact that Bakken oil is among the costliest to produce and must be transported longer distances to refineries when compared to other regions.[4]  As in other producing regions of the U.S., oil producers in the Bakken region that ship oil through the DAPL are curtailing investment in new production, shutting in oil wells, and investing in storing oil rather than shipping it to refineries.[5]  The reality is that these economic conditions are likely to continue for some time.  For example, North Dakota state regulators are allowing companies to seek waivers so they can halt production from wells for longer than a year without deciding whether to permanently plug a well or start operating again.  *Id.*  Given the significantly reduced demand for Bakken oil, vacating the Lake Oahe easement during remand would likely have fewer and less severe disruptive impacts on oil markets than in 2017.

Without vacatur, the Tribes have borne the risk of the Corps' unlawful decision to approve the Lake Oahe easement and will continue to bear those risks until the Corps prepares an adequate EIS and makes a fully informed decision about spill risks.  While the Tribes' resources have not yet been affected by a spill, it may be only a matter of time.  Within six months of

---

[2] Derek Brower, *Bakken pain reflects long road back for US shale*, FINANCIAL TIMES (May 7, 2020), https://www.ft.com/content/f62ba8aa-4304-4a66-b5ec-26b66b7e2a2b.

[3] North Dakota Department of Mineral Resources, Bakken Restart Task Force 2 (May 4, 2020), https://www.dmr.nd.gov/oilgas/Bakken_Restart_Task_Force_Action_Report.pdf.

[4] Brower, *supra* note 2 ("The average break-even price needed for a Bakken producer is about $45 a barrel . . . well above $26, where [one of the benchmarks] is now trading.").

[5] Amy Sisk, *Bakken regulator talks latest pandemic developments: 4,600 oil wells idled, new tank farms on horizon*, BISMARCK TRIBUNE, https://bismarcktribune.com/bakken/bakken-regulator-talks-latest-pandemic-developments-4-600-oil-wells-idled-new-tank-farms-on/article_c9d06c8e-36ae-50fd-b34d-1b0f5b7b8561.html.

operation, the DAPL leaked at least five times.[6]  As past pipeline spills have shown, the

consequences of inadequate pipeline safety measures can be long-standing and severe.  As noted

above, the 2010 pipeline rupture in Marshall, Michigan cost approximately $1 billion to clean up

over many years.

## II.    Inadequate NEPA Analysis Erodes Tribal Sovereignty And Tribal Self-Determination and Potentially Violates Plaintiffs' Treaty Rights, So Vacatur Is The Only Appropriate Remedy In This Case.

The Court should view the *Allied-Signal/Semonite* framework through the lens of the

significant sovereign rights of the Plaintiffs, which may be potentially lost if the Court does not

vacate this easement issued by the Army Corps.  The seriousness of the Army Corps' above-

referenced deficiencies cannot be overstated against the foundational backdrop of Plaintiffs'

treaty rights.  Moreover, the Supreme Court has held that Congress is the only branch of

government with the power to abrogate, eliminate, or alter treaty rights, guaranteeing that if this

drastic outcome is to occur, it happens only after careful consideration by hundreds of members

of Congress.

### A.    Failure to vacate the easement may result in abrogation of Plaintiffs' treaty rights without an act of Congress, which is impermissible under *Minnesota v. Mille Lacs Band of Chippewa Indians*.

The *Allied-Signal* decision, as interpreted by *Semonite*, instructs the court to evaluate "the

seriousness" of an agency decision's "deficiencies" in light of the "overall equities" involved.

*Semonite*, 422 F. Supp. 3d at 99 (citing *Allied-Signal,* 988 F.2d at 150–51).  When federal and

tribal interests are in tension, the lens through which courts resolve that tension is different from

that involved in a federal-state conflict, or a conflict between a private individual and an agency.

---

[6] Alleen Brown, *Five Spills, Six Months in Operation: Dakota Access Track Record Highlights Unavoidable Reality–Pipelines Leak*, THE INTERCEPT (Jan. 9, 2018), https://theintercept.com/2018/01/09/dakota-access-pipeline-leak-energy-transfer-partners/.

*See New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 334 (1983) (noting "certain broad considerations" that guide the Court's analysis of federal and tribal interests).  The Supreme Court has held that courts should analyze statutory conflicts involving tribes using "traditional notions of Indian sovereignty [as] a crucial 'backdrop.'"  *Id.* (quoting *White Mtn. Apache Tribe v. Bracker,* 448 U.S. 136,143 (1980)).  Moreover, courts should analyze conflicts arising from federal statutes in a way that respects the federal government's commitment "to the goal of promoting tribal self-government, a goal embodied in numerous federal statutes."  *Id.* at 335.  The Supreme Court has "stressed that Congress' objective of furthering tribal self-government encompasses far more than encouraging tribal management of disputes between members, but includes Congress' overriding goal of encouraging 'tribal self-sufficiency.'"  *Id.* (quoting *Bracker,* 448 U.S. at 143).

Altering or abrogating treaty rights is a serious act that is not undertaken lightly, especially in the modern era.  *Herrera v. Wyoming*, 139 S. Ct. 1686, 1698 (2019) (holding that Crow Treaty rights had not been abrogated by implication by Wyoming Enabling Act or act creating Bighorn National Forest).  Moreover, the Supreme Court has long held that only an act of Congress can abrogate tribal treaty rights, and that the Executive branch lacks the authority to abrogate treaties unless it has been clearly delegated that authority by Congress.  *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 188 (1999) (holding that President Taylor's 1850 Executive Order could not terminate tribal hunting, fishing and gathering rights protected by 1837 Treaty).  For a congressional abrogation to occur, there must be clearly expressed intent to eliminate the treaty rights; or, in the words of the Supreme Court, "clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty."  *Herrera*,

139 S. Ct. at 1698.  The strength of treaty rights cannot be overstated—they survive statehood acts, establishment of protected public lands by Congress, and they do not "expire" with time or by implication.  *Id.*

It is also well settled that tribal treaty rights are to be construed in a manner that is most beneficial to tribes, not the federal government.  *Washington v. Wash. St. Comm. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 676 (1979), *modified sub nom. Washington v. United States*, 444 U.S. 816 (1979) (noting that "treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians").  When governmental actions threaten treaty rights, the actions must be paused, or vacated entirely, until the treaty rights can be fully defined, and in some cases, quantified.  *Id.* at 695 (holding that district court may assume "direct supervision of the [Columbia River] fisheries if state recalcitrance or state-law barriers should be continued.").  Similarly, courts must take precautions to ensure that treaties impacted by government agency decisions are not violated, or worse yet, abrogated, without an express act of Congress.  *See id.*

The undersigned members have the utmost respect for tribal treaty rights as an essential function of tribal self-government and self-determination.  In the case of NEPA, it is the undersigned members' view that NEPA requires an agency to thoroughly consider and respect treaty rights as part of the NEPA "hard look" analysis and applying NEPA in any other manner diminishes the respect for tribal sovereignty, tribal self-determination, and treaty rights that Congress and the Supreme Court have demonstrated since the beginning of the self-determination era.  The undersigned are of the view that NEPA in no way abrogates treaty rights, nor does it delegate the authority to the executive branch to abrogate or alter treaty rights.  Allowing the easement to stand, and a *post hoc* NEPA analysis to be conducted while oil flows

through the pipeline, risks violation and potential abrogation of the Plaintiffs' treaty rights at the hands of a federal agency, which would contravene the Supreme Court's rules from *Mille Lacs* and *Fishing Vessel*.  526 U.S. at 188; 443 U.S. at 676.

Without knowing the full scope and extent of Plaintiffs' treaty rights in Lake Oahe and the surrounding lands subject to the 1851 Treaty, neither the Army Corps, nor this Court, can be sure that they are adequately protected.  It is entirely possible that the pipeline is currently interfering with Plaintiffs' treaty rights in a way that only Plaintiffs truly understand, and it is impossible for the Army Corps to fully and meaningfully evaluate those treaty rights, their exercise in the modern context, and potential alternatives, while *the pipeline is in situ and operating*.  The purpose and intent of NEPA is for agencies like the Army Corps to fully evaluate all facts and information about a proposed project before authorizing the project, and this analysis necessarily includes treaty rights.  The doctrine of treaty abrogation holds that only Congress can abrogate or alter treaty rights, to ensure that this extreme consequence is not lightly or accidentally undertaken.  *Mille Lacs*, 526 U.S. at 188.  Only a complete evaluation of Plaintiffs' treaty rights will ensure that they are not violated, abrogated, or altered, especially by implication due to the Army Corps' NEPA decision on the pipeline easement.  Those are the overall equities at stake in this case and remanding this matter to the agency for another bite at the NEPA apple, without vacating the easement, risks ongoing and perhaps even further and more permanent treaty violations.

> **B.      Failure to properly analyze the impacts of the DAPL on Plaintiffs' treaty rights and their communities violates NEPA and Executive Order 12898 and only vacatur will ensure that a proper environmental justice analysis is completed.**

When conducting an environmental justice analysis, agencies must consider whether the projects they approve will have a "'disproportionately high and adverse' impact on low-income

and predominantly minority communities." *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867

F.3d 1357, 1368 (D.C. Cir. 2017) (quoting Exec. Order 12898, § 1-101, 59 Fed. Reg. 7629 (Feb.

11, 1994) (requiring each federal agency to "make achieving environmental justice part of its

mission by identifying and addressing, as appropriate, disproportionately high and adverse

human health or environmental effects of its programs, policies, and activities on minority

populations and low-income populations in the United States."); *Communities Against Runway

Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004).  According to Executive Order

12,898, as interpreted by the D.C. Circuit, agencies must include an environmental justice

analysis in their NEPA review and follow the guidance of the Council on Environmental Quality

(CEQ) with respect to environmental justice analyses.  *Sierra Club*, 867 F.3d at 1368.

The Clinton Executive Order also requires an agency engaged in a NEPA analysis "to

consider alternatives to avoid or minimize disproportionately high adverse impacts on minority

populations." *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756

F.3d 447, 476–77 (6th Cir. 2014).  In short, "NEPA requires . . . that the [agency] consider the

environmental impacts of its projects in making its decisions." *Id.* at 477.  The purpose of

conducting an environmental justice analysis "is to determine whether a project will have a

disproportionately adverse effect on minority and low income populations," including "Indian

tribe[s]." *Mid States Coal. for Progress v. Surface Transp. Bd.,* 345 F.3d 520, 541 (8th Cir.

2003).  Moreover, CEQ guidance provides that "[w]here a potential environmental justice issue

has been identified by an agency, the agency should state clearly *in the EIS* . . . whether, in light

of all of the facts and circumstances, a disproportionately high and adverse human health or

environmental impact on minority populations, low-income populations, or Indian tribe is likely

to result from the proposed action and any alternatives."  Council on Environmental Quality,

Environmental Justice: Guidance under the National Environmental Policy Act 13 (Dec. 10, 1997) (CEQ Guidance) (emphasis added).  Finally, CEQ guidance requires agencies to consider how to consult environmental justice communities regarding the potential adverse impacts of a proposed project, and notes that, "Participation of low-income populations [and] minority populations . . . may require adaptive or innovative approaches to overcome linguistic, *institutional*, *cultural*, economic, *historical*, or other potential barriers to effective participation in the decision-making processes of Federal agencies under customary NEPA procedures." *Id.* (emphasis added).

The environmental justice communities squarely within the path of the pipeline and bearing the greatest risks of its leaks and malfunctions are those of the Plaintiff tribes.  A primary reason these communities are environmental justice communities today is the historical failures of the federal government, and particularly, the Executive branch, to honor legal obligations to the Sioux in various treaties, starting with the Treaty of Fort Laramie, signed in 1851.  Indeed, nearly "'the entire course of dealings between the United States and the Sioux is marked, on the part of the Federal Government, primarily by broken promises, by the rapacious acquisition of land, by the repeated sacrifice of Sioux rights to non-Indian interests, and by the oppression of Sioux society.'" *Sioux Tribe of Indians v. United States*, 14 Cl. Ct. 94, 96–97 (1987), *aff'd*, 862 F.2d 275 (Fed. Cir. 1988) (quoting *Sioux Tribe of Indians v. United States*, 7 Cl. Ct. 468, 470 (1985)).

In the 1851 Treaty with the Sioux, the U.S. government made a promise to "maintain good faith and friendship" in all dealings, to ensure "an effective and lasting peace" with the tribes.  Treaty of Fort Laramie with Sioux, *et al.*, Art. I, 11 Stat. 749 (1851).  Article V of the Treaty guaranteed the Sioux the lands along the western bank of the Missouri River in what are

now the Standing Rock Sioux Nation and the Cheyenne River Sioux Reservation, along with rights in the river itself.  *Id.* Art. V (describing rights extending "on the Missouri River" and "down the Missouri River.").  In 1868,  a second treaty was signed, in an attempt to rectify the rights of non-Indian settlers and the federal government on Sioux lands, under pressure of continual white settlement on Sioux lands, but this treaty preserved the boundary of the 1851 Treaty with respect to the Missouri River and Sioux lands.  Treaty of April 29, 1868, 15 Stat. 635.  In violation of the Treaty, the federal government permitted miners and other settlers to invade the treaty lands, eventually securing to themselves the most culturally vital and sacred place to the Sioux people – the Black Hills.  *Sioux Tribe*, 7 Cl. Ct. at 473-74.  Congress also allotted Sioux lands, unlawfully reducing the Great Sioux Nation into smaller reservations, and built dams, including the one that created Lake Oahe, flooding Sioux bottomlands.  *Id.* at 472. There are significant legal questions about the scope of rights preserved in the 1851 Treaty, which are before this Court in this action.  Vacatur is the appropriate remedy in this case, to require the Army Corps to conduct a thorough analysis of the 1851 Treaty rights, and evaluate the potential impacts of the DAPL, before making the decisions required by NEPA (such as whether to draft an Environmental Impact Statement).

In addition, vacatur is the appropriate remedy given that the Army Corps did not properly consider the institutional barriers that arose as a result of the federal government's continued breaching of treaties with the Sioux and the theft of its lands, which are significant.  *See* CEQ Guidance (requiring agency to consider "institutional barriers" as part of environmental justice analysis).  Had the federal government complied with the terms of the 1851 and 1868 treaties, the Sioux would have primary jurisdiction and some regulatory authority over the waters of the Missouri River within Lake Oahe, subject to specific limitations involving non-members and fee

lands. *Montana v. United States*, 450 U.S. 544, 564 (1981). Their citizens would have direct access to the tribal government to raise concerns about the pipeline and its potential cultural and environmental consequences, and they would be able to raise these issues pursuant to tribal law, not federal law. *See id.* (citing *United States v. Wheeler*, 435 U.S. 313, 323 (1978) (tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory.")). Yet, that is not the history or present situation of the Plaintiff tribes. They were unlawfully divested of jurisdiction over their lands and waters, and Congress vested that authority in the Army Corps of Engineers and other federal agencies, which were delegated authority to design processes of accepting public comment on environmentally harmful projects according to federal law. *Sioux Tribe of Indians*, 7 Cl. Ct. at 474-75. The system in which they are forced to assert their legal rights is not their own, and in many ways, is designed to exclude them. *See Ex Parte Crow Dog*, 109 U.S. 556, 571 (1883) (noting the historical challenges tribal members faced when federal laws were applied to them without their consent). Vacatur of the DAPL easement would signal that the Army Corps' lackluster attempts at rectifying the institutional barriers to Sioux participation in the NEPA process will not stand.

Finally, Executive Order 12898 and CEQ Guidance require agencies to adequately consult environmental justice communities about the potential impacts of a project on their communities. *Sierra Club*, 867 F.3d at 1368; CEQ Guidance. Despite the affirmative consultation requirement in the regulations, agencies are not required to adopt the proffered suggestions of tribes, and consultation often works against, rather than for, tribal interests. *See* Michael Eitner, *Meaningful Consultation with Tribal Governments: A Uniform Standard to Guarantee That Federal Agencies Properly Consider Their Concerns*, 85 U. Colo. L. Rev. 867, 900 (2014). Members of Congress, including some of the undersigned, have repeatedly

emphasized the institutional obstacles and other shortcomings that tribes face in navigating the

participation and consultation processes of statutes like NEPA and the National Historic

Preservation Act.  Eitner, 85 U. Colo. L. Rev. at 900 (quoting Letter from Lisa Murkowski,

United States Senator from Alaska, to Barack Obama, 44th President of the United States, (June

22, 2012) & Press Release: Grijalva Introduces Bill to Mandate Federal Consultation With

Native American Tribes During Rulemaking Process, Congressman Grijalva,

http://grijalva.house.gov/news-and-press-releases/grijalva-introduces-bill-to-mandate-federal-

consultation-with-native-american-tribes-during-rulemaking-process/ (last visited Mar. 20, 2014)

(expressing concerns that "the current consultation process is inadequate and inefficient,"  that

"consultation is currently a 'one way road of communication dissemination instead of discussion

and dialogue," that Indian tribes cannot be "an afterthought in federal policymaking" and that

"[c]onsultation and discussion are a necessity, not a favor to be granted one day and denied the

next.").  Given that this Court has concluded that the Army Corps did not adequately consider

the Plaintiffs' treaty rights in the lands and waters in the path of the pipeline, or the impacts of

the pipeline on those treaty rights and communities, vacatur of the easement and a thorough

examination and environmental justice analysis are the only result that ensures proper

compliance with the NEPA process.

**C. Vacatur is proper because the Trump Administration's disregard for treaty rights and tribal sovereignty erodes the laws and policies that Congress and the executive branch have carefully constructed Since 1962, in support of tribal self-determination.**

In addition to the "overall equities" mentioned previously, the Court should consider how

the Army Corps' decision to proceed with an environmental assessment and not complete a full

EIS, including an analysis of Plaintiffs' treaty rights and the impacts of the pipeline and related

infrastructure on environmental justice communities, contravenes the current policy of the

federal government towards sovereign indigenous nations and threatens to repeat tragic events of

the past.  The current policy of the United States with respect to sovereign tribal nations is one

based on a government-to-government relationship, in which the United States recognizes and

respects tribal sovereignty, tribal self-determination, and tribal treaty rights.  This policy began

with the election of President John F. Kennedy, who declared that, as of 1962, there would be

"no change in treaty or contractual relationships without the consent of the tribes concerned.  No

steps . . .  taken to impair the cultural heritage of any group . . . and [there] would be protection

for the Indian land base."  Goldberg, Carol E., *et al*, American Indian Law:  Native Nations and

the Federal System, p. 35 (7th ed. 2015).   In the 58 years since Kennedy's promise, the Executive

branch and Congress have taken tremendous strides to respect and further the government-to-

government relationship envisioned by tribes and the Founders in the earliest treaties signed with

Indian nations.  *See* Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301–1303; Indian Self-

Determination and Education Assistance Act of 1975, 25 U.S.C. § 450a; Indian Child Welfare

Act of 1978, 25 U.S.C. §§ 1901–1903; American Indian Religious Freedom Act, 42 U.S.C. §§

1996–1996a; Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001–

3013; Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 (authorizing tribes to open and

run high-stakes gaming on tribal lands); Clean Water Act, 33 U.S.C. § 1377 (authorizing tribes

to obtain primacy over water quality standards, permitting, and other regulatory functions that

states may perform); Clean Air Act, 42 U.S.C. § 7601(d)(2)(B) (authorizing tribes to regulate air

quality in Indian Country).  Congress has also begun to codify the requirement of tribal

consultation into some federal environmental statutes, in part to ensure that treaty rights are

adequately safeguarded during federal agency decision making processes.  *E.g.* National Historic

Preservation Act, 42 U.S.C. § 470(a)(d)(6) (requiring federal agencies to identify properties of

religious and cultural significance to tribes and consult with tribes prior to authorizing activities

that will impact such properties).  Presidents from Kennedy to Obama echoed Congress's

support for tribal self-determination, tribal sovereignty, and treaty rights, forming a consistent

and predictable governmental relationship with federally recognized tribes over nearly half a

century.  Goldberg, American Indian Law, p. 35.  Courts have also recognized an affirmative

obligation on the part of federal agencies administering statutes that affect tribal interests,

holding that the "[a]pplication of federal statutes to Indian tribes must be viewed in light of the

federal policies which promote tribal self-government, self-sufficiency, and economic

development." *Nat'l Labor Relations Bd. v. Pueblo of San Juan*, 280 F.3d 1278, 1284 (10th Cir.

2000), *reh'g en banc*, 276 F.3d 1186 (10th Cir. 2002).

Despite the uniform application of this federal policy by the legislative, judicial, and

Executive branches in recent decades, the Trump Administration has taken a dramatically

different tack.  In the past three years, the Administration has undertaken what many indigenous

peoples view as an assault on tribal sovereignty, tribal treaty rights, and tribal self-determination,

particularly when large corporate interests are involved.  In his first year in office, President

Trump attempted to reverse President Obama's protection of the submerged lands of the

continental shelf from mineral leasing, over the objections of indigenous Alaskans, to increase

the pace of offshore oil and gas drilling in the Arctic and North Atlantic Oceans.  *League of*

*Conservation Voters v. Trump*, 363 F. Supp. 3d 1013, 1024 (D. Alaska 2019) (invalidating

Trump Executive Order attempting to modify Obama withdrawal under Outer Continental Shelf

Lands Act).  The President also issued a Proclamation reducing the Bears Ears National

Monument, breaching the terms of the agreement President Obama had negotiated with the Hopi,

Navajo, Ute and Zuni nations to establish and protect the Bears Ears region from development,

including uranium mining and oil and gas leasing.  Pres. Procl. Modifying the Bears Ears

National Monument, 82 Fed. Reg. 58081 (Dec. 5, 2017) (reducing Bears Ears National

Monument to allow mineral development); *see also* Amended Complaint, *Hopi Tribe v. Trump*,

2019 WL 7943150, ¶ 29 (D.D.C., filed Nov. 7, 2019) (challenging Trump reduction of Bears

Ears National Monument).  The effects of diminishing the first tribally proposed national

monument were compounded by President Trump's decisions to re-name part of the new

national monument using only the Navajo Nation's term for Bears Ears (Shash Jaa'), rather than

the tribal Coalition's agreed upon English name, Bears Ears National Monument, and his attempt

to dilute the indigenous representation on the tribal advisory commission by changing the

structure of the commission to include a local county commissioner.  82 Fed. Reg. 58081.  The

Administration took these actions despite the strenuous objections of the affected tribes, leading

many to conclude that the Administration was directly attacking their sovereignty and self-

determination.  *See* Bears Ears Coalition, Press Release - Tribal Leaders Extremely Disappointed

Over Action by President Trump to Revoke and Replace Bears Ears National Monument (Dec. 4,

2017), available at https://bearsearscoalition.org/tribal-leaders-extremely-disappointed-over-

action-by-president-trump-to-revoke-and-replace-bears-ears-national-monument/

More recently, the Department of Interior has advanced several proposals that threaten

tribal communities, including increased drilling for natural gas near Chaco Canyon National

Historic Park, over the objection of neighboring tribal communities.  *Dine Citizens Against*

*Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 842 (10th Cir. 2019), *reh'g denied* (June 24,

2019).  In March 2020, the Department announced that it will remove the land-into-trust decision

for the Mashpee Wampanoag tribe, effectively disestablishing its reservation, in the midst of the

Covid-19 global health pandemic, which has devastated several tribal communities.  This is

despite Congress's ongoing process of formally recognizing the Mashpee reservation; the House

of Representatives passed the Mashpee Wampanoag Reservation Reaffirmation Act (H.R. 312)

on May 15, 2019 and the bill is currently under consideration in the Senate.  Collectively, these

actions demonstrate unilateral and purposeful acts of an Executive branch set on diminishing

tribal sovereignty and tribal self-determination, reversing the course of decades of federal Indian

policy and undermining the efforts of co-equal branches of government, Congress and the

judiciary.  The overall equities in this case require the Court to vacate the easement to ensure that

the Trump Administration does not further diminish the Plaintiffs' sovereign rights or their treaty

rights, without the in-depth analysis that NEPA requires.

## CONCLUSION

For the foregoing reasons, the undersigned members of Congress request that this Court

vacate the Lake Oahe easement on remand.


Dated: May 20, 2020                    Respectfully submitted,


/s/ William S. Eubanks II
William S. Eubanks II
Eubanks & Associates, LLC
D.C. Bar No. 987036
2601 S. Lemay Ave., Ste. 7-240
Fort Collins, CO 80525
(970) 703-6060
bill@eubankslegal.com

Kenneth J. Rumelt, Vt. Bar No. 4801
(*D.D.C. admission pending*)
Hillary M. Hoffmann, Vt. Bar No. 4451, Utah Bar No. 9899
(*D.D.C. application pending*)
Jim Murphy, Vt. Bar No. 3367
Environmental Advocacy Clinic
Vermont Law School

164 Chelsea Street, PO Box 96
South Royalton, VT 05068
(802)-831-1031
krumelt@vermontlaw.edu
hhoffmann@vermontlaw.edu
jmurphy@vermontlaw.edu

Counsel for *amici*

## APPENDIX:

### LIST OF *AMICI*

**U. S. House of Representatives**

Raúl M. Grijalva
        Representative of Arizona

Nanette Diaz Barragán
        Representative of California

Earl Blumenauer
        Representative of Oregon

Bonnie Watson Coleman
        Representative of New Jersey

Gerald E. Connolly
        Representative of Virginia

Adriano Espaillat
        Representative of New York

Ruben Gallego
        Representative of Arizona

Jesús G. "Chuy" García
        Representative of Illinois

Jimmy Gomez
        Representative of California

Deb Haaland
        Representative of New Mexico

Alcee L. Hastings
        Representative of Florida

Jahana Hayes
        Representative of Florida

Jared Huffman
        Representative of California

Mike Levin
        Representative of California

## LIST OF *AMICI* – cont'd

Alan Lowenthal
        Representative of California

Betty McCollum
        Representative of Minnesota

A. Donald McEachin
        Representative of Virginia

James P. McGovern
        Representative of Massachusetts

Gwen Moore
        Representative of Wisconsin

Grace Napolitano
        Representative of California

Eleanor Holmes Norton
        District of Columbia Delegate

Alexandria Ocasio-Cortez
        Representative of New York

Chellie Pingree
        Representative of Maine

Jamie Raskin
        Representative of Maryland

Gregorio Sablan
        Northern Mariana Islands Delegate

José E. Serrano
        Representative of New York

Darren Soto
        Representative of Florida

Jackie Speier
        Representative of California

Nydia M. Velázquez
        Representative of New York

## LIST OF *AMICI* – cont'd

**U. S. Senate**

Jeffrey A. Merkley
        Senator of Oregon

Tom Carper
        Senator of Delaware

Cory A. Booker
        Senator of New Jersey

Kamala D. Harris
        Senator of California

Edward J. Markey
        Senator of Massachusetts

Elizabeth Warren
        Senator of Massachusetts

Sheldon Whitehouse
        Senator of Rhode Island

Ron Wyden
        Senator of Oregon

## CERTIFICATE OF SERVICE

I certify that on May 20, 2020, I electronically filed the foregoing document with the

Clerk of the Court for the U.S. District Court for the District of Columbia using the CM/ECF

system, causing it to be served on all counsel of record.

<u>/s/ William S. Eubanks II</u>
William S. Eubanks II
Eubanks & Associates, LLC
D.C. Bar No. 987036
2601 S. Lemay Ave., Ste. 7-240
Fort Collins, CO 80525
(970) 703-6060
bill@eubankslegal.com