**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,     ) | |
|                       ) | |

STANDING ROCK SIOUX TRIBE,     )

              Plaintiff,       )

      and                 )

CHEYENNE RIVER SIOUX TRIBE,   )     Case No. 1:16-cv-1534-JEB

            Plaintiff-Intervenor,  )

            v.              )

U.S. ARMY CORPS OF ENGINEERS,  )

       Defendant-Cross Defendant,)

      and                 )

DAKOTA ACCESS, LLP          )

Defendant-Intervenor-Cross-Claimant )

_____)

## <u>Motion for Leave to File *Amicus* Brief</u>

NOW COMES the Lakota People's Law Project (LPLP) and moves this Honorable Court to grant leave for movant to file an *amicus* brief in the above-captioned case.

LPLP's proposed brief is attached hereto as Exhibit "A."

The Lakota Peoples' Law Project is a 16-year-old 501(C)(3) wholly-integrated auxiliary Public Interest Law Office and Public Policy Center officed at 522 7th Street in Rapid City, South Dakota. It functions under the auspices of the 40-year-old 501(C)(3) California-incorporated Romero Institute with its home office at The Holy Cross Cathedral Mission in Santa Cruz, California. The mission of The Lakota Peoples' Law project is to provide legal services to the People of The Seven Council Fires (The Great Sioux Nation) in

South Dakota and North Dakota in protection and promotion of their Treaty Rights and their Rights, Privileges & Immunities under our American Constitution.

LPLP files its proposed brief in support of Plaintiff's position that the rulings of the Court to date require *vacatur* of the easement at issue in this case.

LPLP brings to the Court's attention a legal proceeding in the D.C. Circuit that is highly relevant to the decision before the Court.  The contents and relevance of said case are set forth in the attached proposed brief.

No party has objected to the filing of this *amicus*.

For the above and foregoing reasons, LPLP respectfully moves this Honorable Court to grant LPLP's motion for leave to file an *amicus* brief.

Respectfully submitted,

/s/
Daniel P. Sheehan
(D.C. Bar No. 233874)
740 Front Street, Suite 265
Santa Cruz CA 95060
(831) 459-6136
Attorney for Dakota People's Law Project

EXHIBIT "A"

*AMICUS CURIAE MEMORANDUM*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,           )
                                     )
            Plaintiff,               )
                        )            )
                                     )
      and                            )
                                     )
CHEYENNE RIVER SIOUX TRIBE,          )     Case No. 1:16-cv-1534-JEB
                                     )
            Plaintiff-Intervenor,    )
                                     )
      v.                             )
                                     )
U.S. ARMY CORPS OF ENGINEERS,        )
                                     )
      Defendant-Cross Defendant,)
                                     )
      and                            )
                                     )
DAKOTA ACCESS, LLP                   )
                                     )
Defendant-Intervenor-Cross-Claimant  )
_____  )

**MEMORANDUM OF *AMICUS CURIAE* LAKOTA PEOPLE'S LAW PROJECT**
**IN SUPPORT OF PLAINTIFF STANDING ROCK SIOUX TRIBE'S**
**SUPPORT FOR  VACATUR**

Daniel P. Sheehan
(D.C. Bar No. 233874)
740 Front Street, Suite 265
Santa Cruz CA 95060
(831) 459-6136
Attorney for Lakota People's Law Project

Of Counsel
Lanny Alan Sinkin (Tx. Bar 18438675
P. O. Box 944
Hilo, Hawai'I. 96721-0944
(808) 936-4428
lanny.sinkin@gmail.com

## TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . .        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        1

II. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        2

    A.    Based on the Court's rulings, the easement is void
        and the flow of oil is barred. . . . . . . . . . . . . . . . . . . . . . . . . . .        2

    B.  Denying *vacatur* should not be
        an option in these circumstances. . . . . . . . . . . . . . . . . . . . . . . .        2

        1.  Under the first prong of the *vacatur* test,
            *vacatur* is appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . .        2

        2.  Under the second prong of the *vacatur* test,
            *vacatur* is appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . .        3

            a.  Any economic losses disruption for DAPL would be
                self-inflicted or market-driven. . . . . . . . . . . . . . . . . .        4

            b.  Denying *vacatur* will significantly increase
                the potential Adverse impacts to Plaintiffs. . . . . . .        5

            c.  The Court has no legal foundation for
                allowing the oil to continue flowing. . . . . . . . . . . . . .        7

        3.   *Vacatur* denies Plaintiffs relief intended by Congress. . . 7

    C.   Denying *vacatur* should be rare. . . . . . . . . . . . . . . . . . . . . . . . . .        11

III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        12

TABLE OF AUTHORITIES

Cases

<u>Allied Signal v. U.S. Nuclear Reg Com'n</u>, 988 F.2d 146 (D.C. Cir. 1993) . . . . . . . . . . . . . .
*passim*

<u>Allegheny Defense Project, et al. v. Federal Energy Regulatory Commission</u>,
        932 F.3d 940 (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *passim*

<u>Clifton Power Corp. v. FERC</u>, 294 F.3d 108, 110 (D.C. Cir. 2002) . . . . . . . . . . . . .        9

<u>Delaware Riverkeeper Network v. FERC</u>, 857 F.3d 388 (D.C. Cir. 2017) . . . . . . . .        9

<u>Transcontinental Gas Pipe Line Co. v. Permanent Easement for 2.14 Acres & Temp.
Easements for 3.59 Acres in Conestoga Township, Lancaster County, Pa., Tax Parcel No.
1201606900000, 2017 WL 3624250,</u> (E. D. Pa. Aug. 23, 2017)

Regulations

15 U.S.C. § 717r(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        9, 10

Articles

"Oil supply expected to hit 9-year low after demand collapses."
Financial Times, May 14, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        5

"The hunt for oil storage place is on – here is how it works  and why it matters";
CNBC, April 22, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        5

Mitch Smith and Julie Bosman, "Keystone Pipeline Leaks 210,000 Gallons of Oil in South
Dakota," N.Y. TIMES (Nov. 16, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        6

"Dakota Access oil pipeline eyes expansion over tribe's objections"
Reuters, November 13, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        5

I.      Introduction

Judicial review has little purpose, if the party seeking such review can be denied the

remedy that the review identifies as adequate to the circumstances.

In this case, the Plaintiffs are seeking to stop the flow of oil through a pipeline

because that flow has the potential to cause great damage to the Plaintiffs.

Earlier in this proceeding, the Court agreed that the Army Corps of Engineer's

Environmental Assessment (EA) was deficient.  ECF 239.

The Court remanded the case back to the agency to cure the problems identified by

the Court.  Id.

Despite the Court's finding of deficiencies in the EA, the Court left open the question

of whether the current flow of oil through the pipeline should be stopped and requested

briefing from the parties on the issue of *vacatur*.  Id.

The Court ultimately ruled that the flow of oil could continue while the agency

prepared its response to the Court's ruling.  ECF 284.

After receiving the agency response to the remand, the Court ruled that the EA was

still deficient and remanded the case to the agency with instructions to prepare an

Environmental Impact Statement (EIS).  ECF 496.

The Court returned to the *vacatur* issue and requested additional briefing from the

parties on that issue again.  ECF 496 at 42.

Currently, Plaintiffs are being blocked from receiving the remedy of stopping the oil

flow, despite rulings of the Court in which Plaintiffs prevailed.  The denial of *vacatur* to date

negates the Plaintiffs' successful litigation of the issues and denies Plaintiffs the remedy to

which the Court agrees they are entitled.

## II.  Argument

A.  Based on the Court's rulings, the easement is void and the flow of oil is barred.

The Court raises the question "what is the status of the easement – and ultimately the oil  in the meantime."  ECF 496 at 42.

The Court has now found that the EA prepared for the Army Corps of Engineers is insufficient and an EIS is required.

That ruling means that the easement was illegally granted.  The easement is, therefore, void.

The flow of oil relied upon the granting of the easement.  With the easement now void, the flow of oil has no legal basis.  The status of the oil is, therefore, that the oil is precluded from using the pipeline.

B.  Denying *vacatur* should not be an option in these circumstances.

1.  Under the first prong of the *vacatur* test, *vacatur* is appropriate.

The Court laid down its view of the law applicable to *vacatur* when it first found the EA to be deficient and yet still allowed the oil to flow through the pipeline.

The dispute over the Dakota Access Pipeline has now taken nearly as many twists and turns as the 1,200-mile pipeline itself. On June 14, 2017, in its third Opinion on the case, this Court held that the U.S. Army Corps of Engineers had failed to fully follow the National Environmental Protection Act when it determined that the pipeline would not have a significant environmental impact. Although the Court found that the agency had "substantially complied" with the statute, the Opinion identified three discrete deficiencies in the Corps' analysis and remanded the matter to the agency for further evaluation. In doing so, the Court asked the parties to submit further briefing on the question such an action raised: what is the proper remedy during this remand period? Specifically, the Court must determine whether or not to vacate the Corps' environmental assessment, as well as the easement granted to Dakota Access in reliance on that determination. Without such an easement, the oil cannot flow through the pipeline.

> The propriety of vacatur during remand is determined by a two-prong test that requires the Court to consider (1) the seriousness of the deficiencies in the agency action and (2) the disruptive consequences of vacating that prior approval. As to the first, the Court ultimately concludes that the three errors identified in the prior Opinion are not fundamental or incurable flaws in the Corps' original analysis; rather, the agency has a significant possibility of justifying its prior determinations on remand. Although the Court finds that the equities of disruption do not tip sharply in Defendants' favor on the second factor, prevailing on the first is enough here for them to avoid vacatur.

ECF 284 at 1-2 (emphasis in original).

The two prong test is found in Allied Signal, 988 F.2d 146, 150-151 (D.C. Cir. (1993). ("The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." (citation omitted).

Circumstances have radically changed since the Court's initial treatment of the *vacatur* issue.  The Court has now ruled the deficiencies in the EA to be sufficient to require an EIS.  That ruling essentially found the deficiencies in the EA to be "fundamental" and "incurable."  The EA is no longer viewed by the Court as having "substantially complied" with NEPA requirements.  The agency is no longer viewed by the Court as having "a significant possibility of justifying its prior determinations."

Under these circumstances, *vacatur* would be appropriate under the first prong of the test applied by the Court.

2.   Under the second prong of the *vacatur* test, *vacatur* is appropriate.

The second prong of the vacatur test is the potential disruption caused by *vacatur*. In this case, the Court earlier noted potential adverse impacts to both the Plaintiffs and DAPL.  ECF 284 at 18-22.

a.   Any economic losses disruption for DAPL
would be self-inflicted or market-driven.

As the Court noted, "[a]lthough construction is complete and oil is flowing, Plaintiffs

are not asking for the pipeline itself, or for any existing infrastructure, to be dismantled.

(citation omitted). Instead, their concerns in this case, and the deficiencies identified in the

prior Opinion, involve the risks presented by the continued passage of oil under the Lake."

ECF 285 at 25-26.

In pursuing construction and operation of the pipeline while this case was pending,

DAPL took a risk that the easement would ultimately be denied.

> Dakota Access began pumping oil into the pipeline with full knowledge that
> Plaintiffs were contesting the easement allowing them to do so. By nonetheless
> proceeding with its venture, the company assumed some risk of economic
> disruption. See ECF No. 259-2 (Declaration of David Murk), ¶ 8 (stating that impact
> of vacatur would not have been severe "had DAPL not begun operations in June
> 2017").

ECF 284 at 20 (Memorandum Opinion).

Arguably, DAPL pursued construction and operation in an attempt to foreclose

denial of the easement by the agency or the Court.  Such an outcome would be manifestly

unjust and undermine the entire administrative process.

> The Court notes, moreover, that denying vacatur on the basis of alleged economic
> harm risks creating undesirable incentives for future agency actions. If projections
> of financial distress are sufficient to prevent vacatur, the Court fears that agencies
> and third parties may choose to devote as many resources as early as possible to a
> challenged project – and then claim disruption in light of such investments. Such a
> strategy is contrary to the purpose of NEPA, which seeks to ensure that the
> government "looks before it leaps." ECF No. 269-1 (Brief of Amici Curiae of Law
> Professors and Practitioners) at 5. Finding that vacatur's alleged financial harms are
> dispositive under the second prong of Allied-Signal may encourage agencies to
> instead act first and ask later. In sum, although the Court concludes that there is
> likely to be some economic  disruption from vacatur, this factor does not weigh
> heavily in Defendants' favor under the Allied-Signal test.

ECF 284 at 22.

4

Meanwhile, circumstances have also changed radically for the oil industry.

Production is being massively reduced.  "Oil supply expected to hit 9-year low after

demand collapses."  Financial Times, May 14, 2020.

https://www.ft.com/content/ea63c5da-7b6d-4de9-bba1-0342a20c230b

Producers are even paying to have produced oil stored because market demand

collapsed.  "The hunt for oil storage place is on – here is how it works  and why it matters";

CNBC, April 22, 2020.  https://www.cnbc.com/2020/04/22/oil-prices-heres-how-oil-

storage-works-and-why-capacity-matters.html[1]

b.  The potential adverse impacts on Plaintiffs
of denying *vacatur* will be significantly increased.

When evaluating the potential disruption of *vacatur*, the Court acknowledges that

the impact on Plaintiffs is part of that evaluation.  ECF 284 at 22.

The Court had already identified the failure to adequately consider the potential

impact of an oil spill or leak as very serious.

Recent events have made clear, moreover, that there is a pressing need for such
ongoing monitoring. Earlier this month, the Keystone Pipeline leaked 210,000
gallons of oil in Marshall County, South Dakota. See Mitch Smith and Julie Bosman,

---

[1] Prior to the outbreak of the corona virus, Energy Transfer Partners was seeking to expand
the pipeline's capacity from more than 500,000 barrels per day to as much as 1.1 million
barrels.  "Dakota Access oil pipeline eyes expansion over tribe's objections,"
 https://www.reuters.com/article/us-energy-transfer-oil-pipeline/dakota-access-oil-
pipeline-eyes-expansion-over-tribes-objections-idUSKBN1XN2IB
       Obviously any increase in the amount of oil passing through the pipeline would
increase the potential likelihood and impact of a leak or spill.  The more oil flowing and the
longer the flow continues, the more at risk Plaintiffs become.
       The oversupply situation may be temporary and the expanded production may not
be realized.  Prediction is difficult when the circumstances are so extraordinary and fluid.
The Court would be well served to omit the pipeline economics in a coronavirus world
from its evaluation of the second prong.

Keystone Pipeline Leaks 210,000 Gallons of Oil in South Dakota, N.Y. TIMES (Nov. 16, 2017), https://www.nytimes.com/2017/ 11/16 /us/keystone-pipeline-leaks-south-dakota.html. The spill occurred near the boundaries of the Lake Traverse Reservation, home of the Sisseton Wahpeton Oyate Tribe, thus highlighting the potential impact of pipeline incidents on tribal lands. Id. Although the Court is not suggesting that a similar leak is imminent at Lake Oahe, the fact remains that there is an inherent risk with any pipeline. As stated in the prior Opinion, "[T]here is no doubt that allowing oil to flow through the pipeline during remand risks the potentially disruptive effect about which the Tribes are most concerned – a spill under Lake Oahe." Standing Rock IV, 2017 WL 4564714, at *10. Such incidents, the Court noted, "have the potential to wreak havoc on nearby communities and ecosystems." Id. at *11.

ECF 304 at 3.

The Court ultimately found the seriousness of the potential leak threat to be sufficient to conclude that the Defendant's analysis did not satisfy NEPA requirements.  ECF 496 at 19-22.

Because the risk is havoc, the potential disruption of Plaintiffs lives and potential harm to the environment should be the deciding factor in the second prong of the *vacatur* test.

That conclusion is even more called for by the changed situations since the Court last visited the *vacatur* issue.

As the Court found earlier regarding the first decision to deny *vacatur*,

[T]he multiple-month period of review increases the risk that a spill will occur prior to the new analysis and thus strengthens the Tribes' assertion that such an incident could occur during the remand process.

ECF 284 at 26.

The Court has now ordered the Defendant to prepare an EIS.  ECF 496.  That process could take years, rather than months.

Without *vacatur*, as acknowledged by the Court, the Plaintiffs will face an ever-increasing risk of disaster, even though the conditions precedent to that disaster were

created by the pipeline, not the Plaintiffs, and the Court found for the Plaintiffs in their challenge to that risk.  In this case, denying *vacatur* and allowing continued oil flow would impose an impermissible burden on Plaintiffs to live under the cloud of the lawless permit.

Given the great disparity between the potential impacts of *vacatur* on DAPL and the far greater potential impacts on Plaintiffs, *vacatur* is an appropriate result of the second prong test.

> c.   The Court has no legal foundation for allowing the oil to continue flowing.

Overall, in the circumstances of this case, denying *vacatur* would amount to the Court granting an easement without benefit of any valid administrative record to review. The only authority for allowing oil to flow through the pipeline would be the Court essentially substituting its authority for the responsibility of the agency to comply with the law before a decision is made and exercising that authority to give the pipeline a waiver to continue operation without any legal basis.

> 3.   *Vacatur* denies Plaintiffs relief intended by Congress.

NEPA requires that government agencies make their decisions based on taking a hard look at the evidence of potential harm to the environment prior to making a decision that could adversely impact the environment.

If the agency did not adequately consider relevant issues, the appropriate NEPA remedy is to vacate the decision and prevent the project at issue from going forward.

Allied-Signal essentially amends NEPA to create an exception.  The exception denies a  petitioner successfully challenging an agency decision the fruits of that success, if certain conditions are met.

The Court in this case has already denied *vacatur* once based on the Court's application of the Allied-Signal exception to the standard *vacatur* remedy.  Under the Allied-Signal exception, Plaintiffs are being denied the remedy that NEPA mandates and the Court agrees Plaintiffs are entitled to receive.

The Court is now considering whether to continue denying *vacatur* based on application of the Allied-Signal exception.

This case may make the case for overturning the Allied-Signal precedent.  Having now seen the Allied-Signal case in action, there is a strong argument that the Allied-Signal case went too far in permitting courts to deny successful plaintiffs the relief intended by the law.  For *vacatur* to be denied in this particular case on this particular record fundamentally undermines the legitimacy of the Allied-Signal case.

A similar precedent is now subject to scrutiny by an *en banc* panel Allegheny Defense Project, et al. v. Federal Energy Regulatory Commission, 932 F.3d 940 (2019) *En Banc* Appeal No. 17-098, April 27, 2020. Plaintiffs herein are situated similarly to Plaintiffs in Allegheny.

The central issue in the *Allegheny* case, is whether an agency can allow pipelines to be constructed while administrative proceedings relevant to the granting of the agency certificate at issue are still being litigated.  In that case, the agency interpreted a statutory requirement that the agency reach a decision on a certification application within 30 days to be subject to modification by the agency repeatedly issuing "tolling" orders delaying a rehearing of the certification issue that would produce a final decision subject to judicial review.

At the same time, those filing the application could not seek judicial review because there was no final agency decision.  That inability to seek judicial review would continue for as long as the agency continued to issue tolling orders.

Meanwhile, the agency allowed construction of the pipeline based on only the agency's decision to grant the certification application.  Much like the oil flow through DAPL now relies entirely on the Court's "approving" the easement by withholding *vacatur*.

An earlier decision set a precedent that tied the hands of the *Allegheny* court and allowed the agency to flout the law.  One judge found that precedent to have created a "kafkaesque" legal situation.

Similar issues would be raised by this Court's allowing a continued oil flow in the absence of a legally required EIS.

> A party wishing to challenge the Commission's issuance of a certificate of public convenience and necessity must file a petition for rehearing with the Commission. 15 U.S.C. § 717r(a). Until the Commission disposes of that rehearing petition, the agency action is not final for purposes of judicial review. *See id.* § 717r(a)-(b); *Clifton Power Corp. v. FERC,* 294 F.3d 108, 110-111 (D.C. Cir. 2002). The filing and disposition of such a rehearing petition is thus a mandatory prerequisite to obtaining judicial review of the Commission's action. *See Delaware Riverkeeper Network v. FERC,* 857 F.3d 388, 399 (D.C. Cir. 2017); *Clifton Power Corp.,* 294 F.3d at 110-111. Congress directed that petitions for rehearing may be "deemed to have been denied" if the Commission has not "act[ed] upon the application for rehearing within thirty days after it is filed[.]" 15 U.S.C. § 717r(a).

*Allegheny* <u>supra</u> at 944.

> In late August, a Pennsylvania federal district court presiding over Transco's eminent domain action entered an order that declared Transco's "right to immediate possession of the properties in question," based on the presumed validity of FERC's Certificate Order. *Transcontinental Gas Pipe Line Co. v. Permanent Easement for 2.14 Acres & Temp. Easements for 3.59 Acres in Conestoga Township, Lancaster County, Pa., Tax Parcel No. 1201606900000,* 2017 WL 3624250, at *1, *3 (E.D. Pa. Aug. 23, 2017) (rejecting the Homeowners' objections as "attacks on the FERC order itself," which "can only be challenged in front of FERC, and then in the United States Court of Appeals for the District of Columbia Circuit"), *aff'd,* 907 F.3d 725 (3d Cir. 2018).

Id.

Millett, Circuit Judge, concurring:

As for the Homeowners' due-process claim, I recognize that circuit precedent ties my hands. But the Commission has twisted our precedent into a Kafkaesque regime. Under it, the Commission can keep homeowners in seemingly endless administrative limbo while energy companies plow ahead seizing land and constructing the very pipeline that the procedurally handcuffed homeowners seek to stop. The Commission does so by casting aside the time limit on rehearing that Congress ordered —treating its decision as final-enough for the pipeline companies to go forward with their construction plans, but not final for the injured landowners to obtain judicial review. This case starkly illustrates why that is not right.

My concern is not one of outcomes. The law and administrative record dictate who should win in this case, as in all Commission cases. My concern is about fair process and, in particular, the ability of those who are directly injured—the individuals whose property is taken in whole or in part by Commission order—to have their day in court before it is too late.

Ibid. at 948

Circuit precedent gave the Commission the tools it has used to create this administrative quagmire for those who seek to challenge its decisions. In my view, we should put an end to it. A scheme that walls homeowners off from timely judicial review of the Commission's public-use determination, while allowing eminent domain and functionally irreversible construction to go forward, is in substantial tension with statutory text and runs roughshod over basic principles of fair process.

Ibid. 951.

The Plaintiffs in this case are entitled to receive judicial relief.  That relief is blocked only by the application of the Allied-Signal precedent.  That precedent also creates a "kafkaesque regime," Allegheny, supra at 948, in which allowing the oil to flow is "in substantial tension with statutory text and runs roughshod over  basic principles of fair process."  Ibid. at 951.

If *vacatur* is denied in this case, when the agency has violated NEPA and its failures are incurable or when *vacatur* would create serious risks for the successful plaintiffs and

minimal impacts to the recipient of the agency's largesse, then the door for future denial of statutorily-mandated relief will be wide open.  Courts will be free to deny *vacatur* even when the record before it provides no support for such a decision as is the case here.

The oil is flowing absent any valid or even deficient EA or easement.  To allow the oil to continue flowing in these circumstances renders NEPA meaningless.

### C.   Denying *vacatur* should be rare.

The rulings of the Court in this case provide an example of the range of reasons a Court could deny *vacatur* that calls into question whether the standard for doing so adequately protects the Plaintiffs interest in receiving the benefits of their successful petition to the government.

In the first *vacatur* decision, the Court focused on <u>Allied Signal</u>'s first prong  and found that there was a reasonable possibility that the agency could correct the deficiencies identified by the Court and, thereby, satisfy the requirements of the law.  The Court found that the deficiencies were not "fundamental" nor "incurable."  ECF 284 at 1-2

To grant *vacatur* only if the agency's deficiencies are fundamental or incurable would significantly expand the cases in which a Plaintiff could successfully challenge an agency action only to have the mandates of the relevant statute ignored and relief ultimately denied.

The opposite should be the rule, e.g. only if the agency deficiencies in such cases are de minimus or the adverse impacts on the non-prevailing party significantly outweigh the adverse impacts on the prevailing party should *vacatur* be an option even considered.  That the prevailing party is losing an earned benefit and the non-prevailing party is receiving an unearned benefit should be part of any balancing pursuant to the second prong.

III.     Conclusion

In light of the Court's ruling on the EA, a denial of *vacatur* based on the facts of this
case would make the <u>Allied Signal</u> exception to the standard *vacatur* remedy more the rule
than the exception.

The <u>Allied-Signal</u> exception changes the entire calculus for a party considering filing
suit.  Now that decision has to include a judgment as to whether the suit may succeed and
the remedy be denied anyway.  That determination would be very difficult to make with
any confidence and act to frustrate potential litigants from seeking to receive the
protection for themselves and the environment mandated by NEPA or other similar
statutes.

What if the government had told the tribes years ago that (1)  they had a
constitutional right to petition the government for a redress of a grievance caused by
government actions, (2) such a petition could challenge the EA prepared by the
government as deficient in its evaluation of the threat posed to the tribes by the pipeline,
(3) if that challenge was successful, the law would call for the flow of oil to stop, and
(4) even if the challenge was successful, the government would not stop the oil flow?
Would the tribes have filed suit?

If vacatur is denied, the tribes would now understand that litigating  against the
government was meaningless and tantamount to a bait and switch designed to fool those
naïve enough to believe that the rule of law still has efficacy.

The Court is in a position to grant Plaintiffs the remedy that they earned by pursuing
their case and that the Court agrees that they are entitled to receive.

The <u>Allied-Signal</u> analysis strongly favors *vacatur.*

Alternatively, denying *vacatur* based on the application of the <u>Allied-Signal</u> tests to

the facts of this case would confirm that those tests are an overly-broad, court-created

exception that seriously impedes the pursuit of justice.

Justice delayed is justice denied.  In this case, justice delayed may mean catastrophe

for the Plaintiffs.

For the above and foregoing reasons, *vacatur* is the appropriate decision to make at

this time.

<div style="margin-left: 40%">

Respectfully submitted,

/s/
Daniel P. Sheehan
(D.C. Bar No. 233874)
740 Front Street, Suite 265
Santa Cruz CA 95060
(831) 459-6136
Attorney for Dakota People's Law Project

</div>

Of Counsel
Lanny Alan Sinkin (Tx. Bar 18438675
P. O. Box 944
Hilo, Hawai'I. 96721-0944
(808) 936-4428
lanny.sinkin@gmail.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| *)* | | |
| | ) | |
| and | ) | |
| | ) | |
| CHEYENNE RIVER SIOUX TRIBE, | ) | Case No. 1:16-cv-1534-JEB |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | Certificate of Service |
| U.S. ARMY CORPS OF ENGINEERS, | ) | |
| | ) | |
| Defendant-Cross Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAKOTA ACCESS, LLP | ) | |
| | ) | |
| Defendant-Intervenor-Cross-Claimant | ) | |
| _____ | ) | |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day a copy of the foregoing was duly served on the following by filing electronically:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | *)* | |
| | ) | |
| and | ) | |
| | ) | |
| CHEYENNE RIVER SIOUX TRIBE, | ) | Case No. 1:16-cv-1534-JEB |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | Certificate of Service |
| U.S. ARMY CORPS OF ENGINEERS, | ) | |
| | ) | |
| Defendant-Cross Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAKOTA ACCESS, LLP | ) | |
| | ) | |
| Defendant-Intervenor-Cross-Claimant | ) | |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day a copy of the Notice of Appearance for Daniel Sheehan, Motion for Leave to File *Amicus* Brief with proposed brief attached as Exhibit "A," and proposed Order were duly served on the following by filing electronically:

Jan Hasselman
EARTHJUSTICE
810 Third Avenue
Suite 610
Seattle, WA 98104
206-343-7340
Fax: 206-343-1526
Email: jhasselman@earthjustice.org
Counsel for Plaintiff Standing Rock Sioux Tribe

Stephanie Kathleen Tsosie
EARTHJUSTICE

810 Third Avenue
Suite 610
Seattle, WA 98104
206-343-7340
Fax: 206-343-1526
Email: stsosie@earthjustice.org
Counsel for Plaintiff Standing Rock Sioux Tribe

Patti A. Goldman
EARTHJUSTICE
810 Third Avenue
Suite 610
Seattle, WA 98104
(206) 343-7340
Fax: (206) 343-1526
Email: pgoldman@earthjustice.org
Counsel for Plaintiff Standing Rock Sioux Tribe

Jeffrey S. Rasmussen
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO 80027
(303)-673-9600
Fax: (303)-673-9155
Email: jrasmussen@ndnlaw.com
Counsel for Plaintiff Yankton Sioux Tribe and
Plaintiff Robert Flying Hawk

Jennifer S. Baker
FREDERICKS PEEBLES & MORGAN LLP
1900 Plaza Drive
Louisville, CO 80027
(303) 673-9600
Fax: (303) 673-9600
Email: jbaker@ndnlaw.com
Counsel for Plaintiff Yankton Sioux Tribe and
Plaintiff Robert Flying Hawk

Patricia Ann Marks
FREDERICKS PEEBLES & PATTERSON LLP
401 9th Street, NW
Suite 700
Washington, DC 20004
(202) 450-4887

Fax: (202) 450-5106
Counsel for Yankton Sioux Tribe and
Plaintiff Robert Flying Hawk

Michael L. Roy
HOBBS, STRAUS, DEAN & WALKER, LLP
1899 L Street, NW
Suite 1200
Washington, DC 20036
(202) 822-8282
Fax: (202) 296-8834
Email: mroy@hobbsstraus.com
Counsel for Plaintiff Oglala Sioux Tribe

Nicole E. Ducheneaux
Big Fire Law & Policy Group LLP
1404 Fort Crook Road South
Bellevue, NE 68005
United Sta
531-466-8725
Email: nducheneaux@bigfirelaw.com
Counsel for Plaintiff Oglala Sioux Tribe and
Intervenor Plaintiff Steve Vance

Tracey A. Zephier
Cheyenne River Sioux Tribe Attorney General
PO Box 590
Eagle Butte, SD 57625
(605) 964-6686
Fax: (605) 964-1160
Counsel for Intervenor Plaintiff Cheyenne River Sioux Tribe

Matthew M. Marinelli
U.S. DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
(202) 305-0293
Fax: (202) 353-2021
Email: Matthew.Marinelli@usdoj.gov
Counsel for Defendant U.S. Army Corps of Engineers

Reuben S. Schifman

DEPARTMENT OF JUSTICE
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044
(202) 305-4224
Email: reuben.schifman@usdoj.gov
Counsel for Defendant U.S. Army Corps of Engineers

Brian Matthew Collins
U.S. DEPARTMENT OF JUSTICE
ENRD
P.O. Box 7611
Washington, DC 20044
(202) 305-0428
Fax: (202) 305-0506
Email: brian.m.collins@usdoj.gov
Counsel for Defendant U.S. Army Corps of Engineers

Erica M. Zilioli
U.S. DEPARTMENT OF JUSTICE
Envionment & Natural Resources Division
P.O. Box 7611
Washington, DC 20044
(202) 514-6390
Fax: (202) 514-8865
Email: erica.zilioli@usdoj.gov
Counsel for Defendant U.S. Army Corps of Engineers

Kimberly Hope Caine
NORTON ROSE FULBRIGHT US LLP
799 9th Street, NW
Suite 1000
Washington, DC 20001
(202) 662-0394
Fax: (202) 662-4643
Email: kim.caine@nortonrosefulbright.com
Counsel for Intervenor Defendant Dakota Access LLC

David Debold
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Suite 300
Washington, DC 20036-5306

(202) 955-8551
Fax: (202) 530-9682
Counsel for Intervenor Defendant Dakota Access LLC

Miguel A. Estrada
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Suite 300
Washington, DC 20036-5306
(202) 955-8257
Fax: (202) 530-9616
Email: mestrada@gibsondunn.com
Email: ddebold@gibsondunn.com
Counsel for Intervenor Defendant Dakota Access LLC

Robert D. Comer
NORTON ROSE FULBRIGHT US LLP
1200 17th Street
Suite 1000
Denver, CO 80202
(303) 801-2700
Fax: (393) 801-2777
Email: bob.comer@nortonrosefulbright.com
Counsel for Intervenor Defendant Dakota Access LLC

William S. Scherman
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Suite 300
Washington, DC 20036-5306
(202) 887-3510
Fax: (202) 530-9557
Email: wscherman@gibsondunn.com
Counsel for Intervenor Defendant Dakota Access LLC

Dated:  Santa Cruz, California, May 19, 2020

_____
Daniel P. Sheehan

EXHIBIT "A"

*AMICUS CURIAE MEMORANDUM*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHEYENNE RIVER SIOUX TRIBE, | ) | Case No. 1:16-cv-1534-JEB |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. ARMY CORPS OF ENGINEERS, | ) | |
| | ) | |
| Defendant-Cross Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAKOTA ACCESS, LLP | ) | |
| | ) | |
| Defendant-Intervenor-Cross-Claimant | ) | |

**MEMORANDUM OF *AMICUS CURIAE* LAKOTA PEOPLE'S LAW PROJECT**
**IN SUPPORT OF PLAINTIFF STANDING ROCK SIOUX TRIBE'S**
**SUPPORT FOR  VACATUR**

Daniel P. Sheehan
(D.C. Bar No. 233874)
455 Henry Cowell Drive
Santa Cruz, California 95060
(831) 459-6136
Attorney for Lakota People's Law Project

Of Counsel
Lanny Alan Sinkin (Tx. Bar 18438675)
P. O. Box 944
Hilo, Hawai'i. 96721-0944
(808) 936-4428
lanny.sinkin@gmail.com

# TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . .     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1

II. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

    A.     Based on the Court's rulings, the easement is void
         and the flow of oil is barred. . . . . . . . . . . . . . . . . . . . . . . . . .     2

    B.  Denying *vacatur* should not be
        an option in these circumstances. . . . . . . . . . . . . . . . . . . . . . . .     2

        1.   Under the first prong of the *vacatur* test,
           *vacatur* is appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . .     2

        2.   Under the second prong of the *vacatur* test,
           *vacatur* is appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . .     3

           a.   Any economic losses disruption for DAPL would be
              self-inflicted or market-driven. . . . . . . . . . . . . . . . .     4

           b.   Denying *vacatur* will significantly increase
              the potential Adverse impacts to Plaintiffs. . . . . . .     5

           c.   The Court has no legal foundation for
              allowing the oil to continue flowing. . . . . . . . . . . . .     7

        3.   *Vacatur* denies Plaintiffs relief intended by Congress. . . 7

    C.   Denying *vacatur* should be rare. . . . . . . . . . . . . . . . . . . . . . . . . .     11

III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12

TABLE OF AUTHORITIES

**Cases**

Allied Signal v. U.S. Nuclear Reg Com'n, 988 F.2d 146 (D.C. Cir. 1993) . . . . . . . . . . . . . .
*passim*

Allegheny Defense Project, et al. v. Federal Energy Regulatory Commission,
     932 F.3d 940 (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *passim*

Clifton Power Corp. v. FERC, 294 F.3d 108, 110 (D.C. Cir. 2002) . . . . . . . . . . . . .   9

Delaware Riverkeeper Network v. FERC, 857 F.3d 388 (D.C. Cir. 2017) . . . . . . . .   9

Transcontinental Gas Pipe Line Co. v. Permanent Easement for 2.14 Acres & Temp.
Easements for 3.59 Acres in Conestoga Township, Lancaster County, Pa., Tax Parcel No.
1201606900000, 2017 WL 3624250, (E. D. Pa. Aug. 23, 2017)

**Regulations**

15 U.S.C. § 717r(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9, 10

**Articles**

"Oil supply expected to hit 9-year low after demand collapses."
Financial Times, May 14, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

"The hunt for oil storage place is on – here is how it works  and why it matters";
CNBC, April 22, 2020. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

Mitch Smith and Julie Bosman, "Keystone Pipeline Leaks 210,000 Gallons of Oil in South
Dakota," N.Y. TIMES (Nov. 16, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

"Dakota Access oil pipeline eyes expansion over tribe's objections"
Reuters, November 13, 2019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

I.      Introduction

Judicial review has little purpose, if the party seeking such review can be denied the remedy that the review identifies as adequate to the circumstances.

In this case, the Plaintiffs are seeking to stop the flow of oil through a pipeline because that flow has the potential to cause great damage to the Plaintiffs.

Earlier in this proceeding, the Court agreed that the Army Corps of Engineer's Environmental Assessment (EA) was deficient.  ECF 239.

The Court remanded the case back to the agency to cure the problems identified by the Court.  Id.

Despite the Court's finding of deficiencies in the EA, the Court left open the question of whether the current flow of oil through the pipeline should be stopped and requested briefing from the parties on the issue of *vacatur*.  Id.

The Court ultimately ruled that the flow of oil could continue while the agency prepared its response to the Court's ruling.  ECF 284 (Memorandum Opinion).

After receiving the agency response to the remand, the Court ruled that the EA was still deficient and remanded the case to the agency with instructions to prepare an Environmental Impact Statement (EIS).  ECF 496 (Memorandum Opinion).

The Court returned to the *vacatur* issue and requested additional briefing from the parties on that issue again.  Ibid. at 42.

Currently, Plaintiffs are being blocked from receiving the remedy of stopping the oil flow, despite rulings of the Court in which Plaintiffs prevailed.  The denial of *vacatur* to date negates the Plaintiffs' successful litigation of the issues and denies Plaintiffs the remedy to which the Court agrees they are entitled.

## II.  Argument

A.   Based on the Court's rulings, the easement is void and the flow of oil is barred.

The Court raises the question "what is the status of the easement – and ultimately the oil  in the meantime." <u>Id</u>.

The Court has now found that the EA prepared for the Army Corps of Engineers is insufficient and an EIS is required.

That ruling means that the easement was illegally granted.  The easement is, therefore, void.

The flow of oil relied upon the granting of the easement.  With the easement now void, the flow of oil has no legal basis.  The status of the oil is, therefore, that the oil is precluded from using the pipeline.

B.   Denying *vacatur* should not be an option in these circumstances.

1.   Under the first prong of the *vacatur* test, *vacatur* is appropriate.

The Court laid down its view of the law applicable to *vacatur* when it first found the EA to be deficient and yet still allowed the oil to flow through the pipeline.

The dispute over the Dakota Access Pipeline has now taken nearly as many twists and turns as the 1,200-mile pipeline itself. On June 14, 2017, in its third Opinion on the case, this Court held that the U.S. Army Corps of Engineers had failed to fully follow the National Environmental Protection Act when it determined that the pipeline would not have a significant environmental impact. Although the Court found that the agency had "substantially complied" with the statute, the Opinion identified three discrete deficiencies in the Corps' analysis and remanded the matter to the agency for further evaluation. In doing so, the Court asked the parties to submit further briefing on the question such an action raised: what is the proper <u>remedy</u> during this remand period? Specifically, the Court must determine whether or not to vacate the Corps' environmental assessment, as well as the easement granted to Dakota Access in reliance on that determination. Without such an easement, the oil cannot flow through the pipeline.

> The propriety of vacatur during remand is determined by a two-prong test that requires the Court to consider (1) the seriousness of the deficiencies in the agency action and (2) the disruptive consequences of vacating that prior approval. As to the first, the Court ultimately concludes that the three errors identified in the prior Opinion are not fundamental or incurable flaws in the Corps' original analysis; rather, the agency has a significant possibility of justifying its prior determinations on remand. Although the Court finds that the equities of disruption do not tip sharply in Defendants' favor on the second factor, prevailing on the first is enough here for them to avoid vacatur.

ECF 284 (Memorandum and Opinion) at 1-2 (emphasis in original).

The two prong test is found in <u>Allied Signal v. U.S. Nuclear Reg Com'n</u>, 988 F.2d 146, 150-151 (D.C. Cir. (1993). ("The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." (citation omitted).

Circumstances have radically changed since the Court's initial treatment of the *vacatur* issue. The Court has now ruled the deficiencies in the EA to be sufficient to require an EIS. That ruling essentially found the deficiencies in the EA to be "fundamental" and "incurable." The EA is no longer viewed by the Court as having "substantially complied" with NEPA requirements. The agency is no longer viewed by the Court as having "a significant possibility of justifying its prior determinations."

Under these circumstances, *vacatur* would be appropriate under the first prong of the test applied by the Court.

2.   Under the second prong of the *vacatur* test, *vacatur* is appropriate.

The second prong of the vacatur test is the potential disruption caused by *vacatur*. In this case, the Court earlier noted potential adverse impacts to both the Plaintiffs and DAPL. ECF 284 at 18-22.

a.  Any economic losses disruption for DAPL
would be self-inflicted or market-driven.

As the Court noted, "[a]lthough construction is complete and oil is flowing, Plaintiffs

are not asking for the pipeline itself, or for any existing infrastructure, to be dismantled.

(citation omitted). Instead, their concerns in this case, and the deficiencies identified in the

prior Opinion, involve the risks presented by the continued passage of oil under the Lake."

ECF 284 at 25-26.

In pursuing construction and operation of the pipeline while this case was pending,

DAPL took a risk that the easement would ultimately be denied.

> Dakota Access began pumping oil into the pipeline with full knowledge that
> Plaintiffs were contesting the easement allowing them to do so. By nonetheless
> proceeding with its venture, the company assumed some risk of economic
> disruption. See ECF No. 259-2 (Declaration of David Murk), ¶ 8 (stating that impact
> of vacatur would not have been severe "had DAPL not begun operations in June
> 2017").

ECF 284 at 20 (Memorandum Opinion).

Arguably, DAPL pursued construction and operation in an attempt to foreclose

denial of the easement by the agency or the Court.  Such an outcome would be manifestly

unjust and undermine the entire administrative process.

> The Court notes, moreover, that denying vacatur on the basis of alleged economic
> harm risks creating undesirable incentives for future agency actions. If projections
> of financial distress are sufficient to prevent vacatur, the Court fears that agencies
> and third parties may choose to devote as many resources as early as possible to a
> challenged project – and then claim disruption in light of such investments. Such a
> strategy is contrary to the purpose of NEPA, which seeks to ensure that the
> government "looks before it leaps." ECF No. 269-1 (Brief of Amici Curiae of Law
> Professors and Practitioners) at 5. Finding that vacatur's alleged financial harms are
> dispositive under the second prong of Allied-Signal may encourage agencies to
> instead act first and ask later. In sum, although the Court concludes that there is
> likely to be some economic  disruption from vacatur, this factor does not weigh
> heavily in Defendants' favor under the Allied-Signal test.

ECF 284 at 22.

Meanwhile, circumstances have also changed radically for the oil industry.

Production is being massively reduced.  "Oil supply expected to hit 9-year low after

demand collapses."  Financial Times, May 14, 2020.

https://www.ft.com/content/ea63c5da-7b6d-4de9-bba1-0342a20c230b

Producers are even paying to have produced oil stored because market demand

collapsed.  "The hunt for oil storage place is on – here is how it works  and why it matters";

CNBC, April 22, 2020.  https://www.cnbc.com/2020/04/22/oil-prices-heres-how-oil-

storage-works-and-why-capacity-matters.html[1]

> b.  The potential adverse impacts on Plaintiffs
> of denying *vacatur* will be significantly increased.

When evaluating the potential disruption of *vacatur*, the Court acknowledges that

the impact on Plaintiffs is part of that evaluation.  ECF 284 at 22.

The Court had already identified the failure to adequately consider the potential

impact of an oil spill or leak as very serious.

---

[1] Prior to the outbreak of the corona virus, Energy Transfer Partners was seeking to expand the pipeline's capacity from more than 500,000 barrels per day to as much as 1.1 million barrels.  "Dakota Access oil pipeline eyes expansion over tribe's objections,"  https://www.reuters.com/article/us-energy-transfer-oil-pipeline/dakota-access-oil-pipeline-eyes-expansion-over-tribes-objections-idUSKBN1XN2IB
    Obviously any increase in the amount of oil passing through the pipeline would increase the potential likelihood and impact of a leak or spill.  The more oil flowing and the longer the flow continues, the more at risk Plaintiffs become.
    The oversupply situation may be temporary and the expanded production may not be realized.  Prediction is difficult when the circumstances are so extraordinary and fluid.  The Court would be well served to omit the pipeline economics in a coronavirus world from its evaluation of the second prong.

> Recent events have made clear, moreover, that there is a pressing need for such ongoing monitoring. Earlier this month, the Keystone Pipeline leaked 210,000 gallons of oil in Marshall County, South Dakota. See Mitch Smith and Julie Bosman, Keystone Pipeline Leaks 210,000 Gallons of Oil in South Dakota, N.Y. TIMES (Nov. 16, 2017), https://www.nytimes.com/2017/ 11/16 /us/keystone-pipeline-leaks-south-dakota.html. The spill occurred near the boundaries of the Lake Traverse Reservation, home of the Sisseton Wahpeton Oyate Tribe, thus highlighting the potential impact of pipeline incidents on tribal lands. Id. Although the Court is not suggesting that a similar leak is imminent at Lake Oahe, the fact remains that there is an inherent risk with any pipeline. As stated in the prior Opinion, "[T]here is no doubt that allowing oil to flow through the pipeline during remand risks the potentially disruptive effect about which the Tribes are most concerned – a spill under Lake Oahe." Standing Rock IV, 2017 WL 4564714, at *10. Such incidents, the Court noted, "have the potential to wreak havoc on nearby communities and ecosystems." Id. at *11.

ECF 304 (Memorandum and Opinion) at 3.

The Court ultimately found the seriousness of the potential leak threat to be sufficient to conclude that the Defendant's analysis did not satisfy NEPA requirements.  ECF 496 (Memorandum and Opinion) at 19-22.

Because the risk is havoc, the potential disruption of Plaintiffs lives and potential harm to the environment should be the deciding factor in the second prong of the *vacatur* test.

That conclusion is even more called for by the changed situations since the Court last visited the *vacatur* issue.

As the Court found earlier regarding the first decision to deny *vacatur*,

> [T]he multiple-month period of review increases the risk that a spill will occur prior to the new analysis and thus strengthens the Tribes' assertion that such an incident could occur during the remand process.

ECF 284 at 26.

The Court has now ordered the Defendant to prepare an EIS.  ECF 496.  That process could take years, rather than months.

Without *vacatur*, as acknowledged by the Court, the Plaintiffs will face an ever-increasing risk of disaster, even though the conditions precedent to that disaster were created by the pipeline, not the Plaintiffs, and the Court found for the Plaintiffs in their challenge to that risk.  In this case, denying *vacatur* and allowing continued oil flow would impose an impermissible burden on Plaintiffs to live under the cloud of the lawless permit.

Given the great disparity between the potential impacts of *vacatur* on DAPL and the far greater potential impacts on Plaintiffs, *vacatur* is an appropriate result of the second prong test.

    c.   The Court has no legal foundation for allowing the oil to continue flowing.

Overall, in the circumstances of this case, denying *vacatur* would amount to the Court granting an easement without benefit of any valid administrative record to review. The only authority for allowing oil to flow through the pipeline would be the Court essentially substituting its authority for the responsibility of the agency to comply with the law before a decision is made and exercising that authority to give the pipeline a waiver to continue operation without any legal basis.

    3.   *Vacatur* denies Plaintiffs relief intended by Congress.

NEPA requires that government agencies make their decisions based on taking a hard look at the evidence of potential harm to the environment prior to making a decision that could adversely impact the environment.

If the agency did not adequately consider relevant issues, the appropriate NEPA remedy is to vacate the decision and prevent the project at issue from going forward.

Allied-Signal essentially amends NEPA to create an exception.  The exception denies a petitioner successfully challenging an agency decision the fruits of that success, if certain conditions are met.

The Court in this case has already denied *vacatur* once based on the Court's application of the Allied-Signal exception to the standard *vacatur* remedy.  Under the Allied-Signal exception, Plaintiffs are being denied the remedy that NEPA mandates and the Court agrees Plaintiffs are entitled to receive.

The Court is now considering whether to continue denying *vacatur* based on application of the Allied-Signal exception.

This case may make the case for overturning the Allied-Signal precedent.  Having now seen the Allied-Signal case in action, there is a strong argument that the Allied-Signal case went too far in permitting courts to deny successful plaintiffs the relief intended by the law.  For *vacatur* to be denied in this particular case on this particular record fundamentally undermines the legitimacy of the Allied-Signal case.

A similar precedent is now subject to scrutiny by an *en banc* panel Allegheny Defense Project, et al. v. Federal Energy Regulatory Commission, 932 F.3d 940 (2019) *En Banc* Appeal No. 17-098, April 27, 2020. Plaintiffs herein are situated similarly to Plaintiffs in Allegheny.

The central issue in the *Allegheny* case, is whether an agency can allow pipelines to be constructed while administrative proceedings relevant to the granting of the agency certificate at issue are still being litigated.  In that case, the agency interpreted a statutory requirement that the agency reach a decision on a certification application within 30 days to be subject to modification by the agency repeatedly issuing "tolling" orders delaying a

rehearing of the certification issue that would produce a final decision subject to judicial review.

At the same time, those filing the application could not seek judicial review because there was no final agency decision.  That inability to seek judicial review would continue for as long as the agency continued to issue tolling orders.

Meanwhile, the agency allowed construction of the pipeline based on only the agency's decision to grant the certification application.  Much like the oil flow through DAPL now relies entirely on the Court's "approving" the easement by withholding *vacatur*.

An earlier decision set a precedent that tied the hands of the *Allegheny* court and allowed the agency to flout the law.  One judge found that precedent to have created a "kafkaesque" legal situation.

Similar issues would be raised by this Court's allowing a continued oil flow in the absence of a legally required EIS.

> A party wishing to challenge the Commission's issuance of a certificate of public convenience and necessity must file a petition for rehearing with the Commission. 15 U.S.C. § 717r(a). Until the Commission disposes of that rehearing petition, the agency action is not final for purposes of judicial review. *See id.* § 717r(a)-(b); *Clifton Power Corp. v. FERC,* 294 F.3d 108, 110-111 (D.C. Cir. 2002). The filing and disposition of such a rehearing petition is thus a mandatory prerequisite to obtaining judicial review of the Commission's action. *See Delaware Riverkeeper Network v. FERC,* 857 F.3d 388, 399 (D.C. Cir. 2017); *Clifton Power Corp.,* 294 F.3d at 110-111. Congress directed that petitions for rehearing may be "deemed to have been denied" if the Commission has not "act[ed] upon the application for rehearing within thirty days after it is filed[.]" 15 U.S.C. § 717r(a).

*Allegheny* supra at 944.

> In late August, a Pennsylvania federal district court presiding over Transco's eminent domain action entered an order that declared Transco's "right to immediate possession of the properties in question," based on the presumed validity of FERC's Certificate Order. *Transcontinental Gas Pipe Line Co. v. Permanent Easement for 2.14 Acres & Temp. Easements for 3.59 Acres in Conestoga Township, Lancaster County, Pa., Tax Parcel No. 1201606900000,* 2017 WL 3624250, at *1, *3

(E.D. Pa. Aug. 23, 2017) (rejecting the Homeowners' objections as "attacks on the FERC order itself," which "can only be challenged in front of FERC, and then in the United States Court of Appeals for the District of Columbia Circuit"), *aff'd,* 907 F.3d 725 (3d Cir. 2018).

Id.

Millett, Circuit Judge, concurring:

As for the Homeowners' due-process claim, I recognize that circuit precedent ties my hands. But the Commission has twisted our precedent into a Kafkaesque regime. Under it, the Commission can keep homeowners in seemingly endless administrative limbo while energy companies plow ahead seizing land and constructing the very pipeline that the procedurally handcuffed homeowners seek to stop. The Commission does so by casting aside the time limit on rehearing that Congress ordered —treating its decision as final-enough for the pipeline companies to go forward with their construction plans, but not final for the injured landowners to obtain judicial review. This case starkly illustrates why that is not right.

My concern is not one of outcomes. The law and administrative record dictate who should win in this case, as in all Commission cases. My concern is about fair process and, in particular, the ability of those who are directly injured—the individuals whose property is taken in whole or in part by Commission order—to have their day in court before it is too late.

Ibid. at 948

Circuit precedent gave the Commission the tools it has used to create this administrative quagmire for those who seek to challenge its decisions. In my view, we should put an end to it. A scheme that walls homeowners off from timely judicial review of the Commission's public-use determination, while allowing eminent domain and functionally irreversible construction to go forward, is in substantial tension with statutory text and runs roughshod over basic principles of fair process.

Ibid. 951.

The Plaintiffs in this case are entitled to receive judicial relief.  That relief is blocked only by the application of the Allied-Signal precedent.  That precedent also creates a "kafkaesque regime," Allegheny, supra at 948, in which allowing the oil to flow is "in substantial tension with statutory text and runs roughshod over  basic principles of fair process."  Ibid. at 951.

If *vacatur* is denied in this case, when the agency has violated NEPA and its failures are incurable or when *vacatur* would create serious risks for the successful plaintiffs and minimal impacts to the recipient of the agency's largesse, then the door for future denial of statutorily-mandated relief will be wide open.  Courts will be free to deny *vacatur* even when the record before it provides no support for such a decision as is the case here.

The oil is flowing absent any valid or even deficient EA or easement.  To allow the oil to continue flowing in these circumstances renders NEPA meaningless.

### C.   Denying *vacatur* should be rare.

The rulings of the Court in this case provide an example of the range of reasons a Court could deny *vacatur* that calls into question whether the standard for doing so adequately protects the Plaintiffs interest in receiving the benefits of their successful petition to the government.

In the first *vacatur* decision, the Court focused on <u>Allied Signal</u>'s first prong  and found that there was a reasonable possibility that the agency could correct the deficiencies identified by the Court and, thereby, satisfy the requirements of the law.  The Court found that the deficiencies were not "fundamental" nor "incurable."  ECF 284 at 1-2

To grant *vacatur* only if the agency's deficiencies are fundamental or incurable would significantly expand the cases in which a Plaintiff could successfully challenge an agency action only to have the mandates of the relevant statute ignored and relief ultimately denied.

The opposite should be the rule, e.g. only if the agency deficiencies in such cases are de minimus or the adverse impacts on the non-prevailing party significantly outweigh the adverse impacts on the prevailing party should *vacatur* be an option even considered.  That

the prevailing party is losing an earned benefit and the non-prevailing party is receiving an

unearned benefit should be part of any balancing pursuant to the second prong.

### III.      Conclusion

In light of the Court's ruling on the EA, a denial of *vacatur* based on the facts of this

case would make the <u>Allied Signal</u> exception to the standard *vacatur* remedy more the rule

than the exception.

The <u>Allied-Signal</u> exception changes the entire calculus for a party considering filing

suit.  Now that decision has to include a judgment as to whether the suit may succeed and

the remedy be denied anyway.  That determination would be very difficult to make with

any confidence and act to frustrate potential litigants from seeking to receive the

protection for themselves and the environment mandated by NEPA or other similar

statutes.

What if the government had told the tribes years ago that (1)  they had a

constitutional right to petition the government for a redress of a grievance caused by

government actions, (2) such a petition could challenge the EA prepared by the

government as deficient in its evaluation of the threat posed to the tribes by the pipeline,

(3) if that challenge was successful, the law would call for the flow of oil to stop, and

(4) even if the challenge was successful, the government would not stop the oil flow?

Would the tribes have filed suit?

If vacatur is denied, the tribes would now understand that litigating  against the

government was meaningless and tantamount to a bait and switch designed to fool those

naïve enough to believe that the rule of law still has efficacy.

The Court is in a position to grant Plaintiffs the remedy that they earned by pursuing their case and that the Court agrees that they are entitled to receive.

The <u>Allied-Signal</u> analysis strongly favors *vacatur.*

Alternatively, denying *vacatur* based on the application of the <u>Allied-Signal</u> tests to the facts of this case would confirm that those tests are an overly-broad, court-created exception that seriously impedes the pursuit of justice.

Justice delayed is justice denied.  In this case, justice delayed may mean catastrophe for the Plaintiffs.

For the above and foregoing reasons, *vacatur* is the appropriate decision to make at this time.

Respectfully submitted,

Dated:  Santa Cruz, California, May 20, 2020

Daniel P. Sheehan
(D.C. Bar No. 233874)
455 Henry Cowell Drive
Santa Cruz, California 95060
(831) 459-6136
Attorney for Lakota People's Law Project

13

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, | ) | Case No. 1:16-cv-1534-JEB |
| | ) | Consolidated with 1:16-cv-0176 |
| Plaintiff, | ) | and 1:17-cv-00267 |
| | ) | |
| and | ) | |
| | ) | |
| CHEYENNE RIVER SIOUX TRIBE, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U.S. ARMY CORPS OF ENGINEERS, | ) | |
| | ) | |
| Defendant-Cross Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAKOTA ACCESS, LLP | ) | |
| | ) | |
| Defendant-Intervenor-Cross-Claimant | ) | |
| | ) | |

**ORDER GRANTING THE LAKOTA PEOPLE'S LAW PROJECT'S MOTION FOR
LEAVE TO FILE BRIEF MEMORANDUM IN SUPPORT OF PLAINTIFF STANDING
ROCK SIOUX TRIBE'S SUPPORT FOR VACATUR**

This Matter Having Come Before This Court On The Lakota People's Law

Project's Motion For Leave To File *Amicus Curiae* Brief In Support Of Plaintiff

Standing Rock Sioux Tribe's Support for Vacatur, and this Court having reviewed the

motion and being otherwise advised,

IT IS ORDERED that the motion is granted, and

IT IS FURTHER ORDERED that the Clerk of the Court shall file the submitted

Memorandum of *Amicus Curiae* Lakota People's Law Project in Support of Vacatur.

DATED this _____ day of _____, 2020

_____
Honorable James E. Boasberg
United States District Judge