**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE, et al.

     Plaintiffs,

         v.

U.S. ARMY CORPS OF ENGINEERS, et al.

     Defendants

Civil Action No. 16-1534 (JEB)

**_AMICUS CURIAE_ BRIEF OF THE GREAT PLAINS TRIBAL CHAIRMEN'S ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS FUND, INTER-TRIBAL ASSOCIATION OF ARIZONA, MIDWEST ALLIANCE OF SOVEREIGN TRIBES, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, AFFILIATED TRIBES OF NORTHWEST INDIANS, ASSOCIATION ON AMERICAN INDIAN AFFAIRS, AND 28 INDIAN TRIBES SUPPORTING A VACATUR REMEDY**

Matthew Lee Campbell, D.C. Bar No. CO0060
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Tel: (303) 447-8760
Fax: (303) 443-7776
mcampbell@narf.org

Joel West Williams, D.C. Bar No. 1023016
NATIVE AMERICAN RIGHTS FUND
1514 P Street, NW (Rear) Suite D
Washington, DC 20005
Tel: (202) 785-4166
Fax: (202) 822-0068
williams@narf.org

_Attorneys for Amici Curiae_

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................................................... iii

TABLE OF AUTHORITIES ........................................................................................... iv

STATEMENT OF INTEREST ...........................................................................................1

INTRODUCTION ..........................................................................................................3

ARGUMENT ................................................................................................................4

    I.    REMANDING WITHOUT VACATUR WOULD CONTINUE THE
        INEQUITABLE PATTERN OF SHIFTING THE BURDENS OF
        INFRASTRUCTURE DEVELOPMENT ONTO INDIAN TRIBES...........................4

    II.   VACATUR ENFORCES NEPA IN A MANNER THAT PROTECTS
        TRIBAL TREATY RIGHTS AND HOLDS AGENCIES ACCOUNTABLE
        FOR THEIR TRIBAL TRUST OBLIGATIONS. ........................................................8

CONCLUSION.............................................................................................................13

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LCvR 7(o) and Fed. R. App. P. 29(a)(4), *Amici Curiae* makes the following disclosure:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3) If there is a publicly held corporation which is not party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests: Counsel for *Amici Curiae* is aware of no such corporation.

DATED: May 20, 2020

*/s/ Matthew Lee Campbell*
Matthew Lee Campbell, D.C. Bar No. CO0060
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Tel: (303) 447-8760
Fax: (303) 443-7776
mcampbell@narf.org

*Attorney for Amici Curiae*

# TABLE OF AUTHORITIES

## CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ......................................................................................3

*Edwardsen v. U.S. Dep't of Interior,*
  268 F.3d 781 (9th Cir. 2001) ........................................................................................8

*Fed. Power Comm'n v. Tuscarora Indian Nation,*
  362 U.S. 99 (1960) ......................................................................................................12

*Friends of the Capital Crescent Trail v. Fed. Transit Admin.,*
  218 F. Supp. 3d 53 (D.D.C. 2016) ..............................................................................10

*Grand Canyon Trust v. FAA,*
  290 F.3d 339 (D.C. Cir. 2002) ......................................................................................9

*Humane Soc'y of U.S. v. Johanns,*
  520 F. Supp. 2d 8 (D.D.C. 2007) ..................................................................................3

*Humane Soc'y of U.S. v. Locke,*
  626 F.3d 1040 (9th Cir. 2010) ......................................................................................3

*Humane Soc'y of U.S. v. Zinke,*
  865 F.3d 585 (D.C. Cir. 2017) ......................................................................................3

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.,*
  88 F.3d 754 (9th Cir. 1996) ..........................................................................................9

*Int'l Union, UMW v. FMSHA,*
  920 F.2d 960 (D.C. Cir. 1990) ......................................................................................3

*Lands Council v. Powell,*
  395 F.3d 1019 (9th Cir. 2005) ......................................................................................9

*Morongo Band of Mission Indians v. Fed. Aviation Admin.,*
  161 F.3d 569 (9th Cir. 1998) ........................................................................................8

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
  177 F.3d 800 (9th Cir. 1999) ........................................................................................8

*Nat'l Parks Conservation Ass'n v. Semonite,*
  422 F. Supp. 3d 92 (D.D.C. 2019) ...........................................................................3, 11

*Nez Perce Tribe v. U.S. Forest Serv.*,
No. 3:13-CV-348-BLW, 2013 WL 5212317 (D. Idaho Sept. 12, 2013) ..................... 10-11

*Okanogan Highlands All. v. Williams*,
236 F.3d 468 (9th Cir. 2000) ........................................................................................8

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) ........................................................................................8

*Radio Television News Directs Ass'n v. FCC*,
184 F.3d 872 (D.C. Cir. 1999) ......................................................................................7

*Sierra Club v. Peterson*,
717 F.2d 1409 (D.C. Cir. 1983).................................................................................. 8-9

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) ..............................................................................8

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
282 F. Supp. 3d 91 (D.D.C. 2017) ...................................................................... 6-7, 7, 11

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
No. 16-1534, 2020 WL 1441923 (D.D.C. Mar. 25, 2020) ...................................7, 8, 9, 10

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010) ........................................................................................9

*United States v. Michigan*,
508 F. Supp. 480 (W.D. Mich. 1980), *aff'd*, 712 F.2d 242 (6th Cir. 1983).......................10

*United States v. Washington*,
864 F.3d 1017 (9th Cir. 2017) ................................................................................ 11-12

## STATUTES, REGULATIONS, & RULES

40 C.F.R. § 1500.1(c)....................................................................................................9

42 U.S.C. § 4332(E)......................................................................................................9

Fort Laramie Treaty of 1851, arts. 5, 11 Stat. 749.........................................................7

Treaty of Fort Laramie with the Sioux, 15 Stat. 635, art. 2 (1868) ................................7

Fed. R. App. P. 29(4) ....................................................................................................1

LCvR 7(o) ..............................................................................................................................1

**OTHER AUTHORITIES**

American Psychological Association, *APA Urges Trump Administration to Safeguard Standing Rock Sioux in Response to Memorandum on Dakota Access Pipeline* (Jan. 26, 2017), http://www.apa.org/news/press/releases/2017/01/trump-dakota-pipeline.aspx ..................6

Colette Routel & Jeffrey Holth, *Toward Genuine Tribal Consultation in the 21st Century*, 46 U. Mich. J.L. Reform 417 (2013) ..................................................................................8

Kristina Daugirdas, *Evaluating Remand Without Vacatur: A New Judicial Remedy for Defective Agency Rulemakings*, 80 N.Y.U. L. Rev. 278 (2005) .........................................................11

Michael L. Lawson, *Dammed Indians: The Pick-Sloan Plan and the Missouri River Sioux, 1944-1980* (1982) .............................................................................................................5, 6

Michael L. Lawson, *The Oahe Dam and the Standing Rock Sioux* (1976) ....................................5

Michael Lawson, *The Historical Backdrop Leading up to DAPL Protests Today*, Indianz.com (Nov. 9, 2016), https://www.indianz.com/News/2016/11/09/michael-lawson-roots-of-nodapl-movement.asp .........................................................................5

Peter Capossela, *Impacts of the Army Corps of Engineers' Pick-Sloan Program on the Indian Tribes of the Missouri River Basin*, 30 J. Envtl. L. & Litig. 143 (2015) ...........................6

U.S. Commission on Civil Rights, *Broken Promises: Continuing Federal Funding Shortfall for Native Americans* (2018) .................................................................................................4

# INTEREST OF *AMICI CURIAE*[1]

The Great Plains Tribal Chairmen's Association ("GPTCA"), National Congress of American Indians Fund ("NCAI Fund"), Inter-Tribal Association of Arizona ("ITAA"), Midwest Alliance of Sovereign Tribes ("MAST"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), Affiliated Tribes of Northwest Indians ("ATNI"), Association on American Indian Affairs ("AAIA"), and 28 federally recognized Indian Tribes (collectively "*Amici Curiae*")[2] submit this *Amici Curiae* brief in support of the Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Yankton Sioux Tribe, and Oglala Sioux Tribe (collectively "Tribes").

GPTCA is comprised of the elected leadership of the sixteen federally recognized Indian tribes located in the states of North Dakota, South Dakota, and Nebraska. Its primary purpose is to defend the Tribes' inherent rights, to promote the welfare of the People, and to protect the sovereignty of each Tribe.

The NCAI Fund is the public education arm of the National Congress of American Indians ("NCAI"), the oldest, largest, and most representative organization comprised of American Indian and Alaska Native tribal governments and their citizens. NCAI serves as a forum for consensus-based policy development among its member tribes from every region of the country. Its mission is to promote better education about the rights of Tribes and to improve the welfare of Indians.

ITAA is an intertribal organization comprised of 21 federally recognized Indian tribes with lands located primarily in Arizona, as well as in California, New Mexico and Nevada. Founded in

---

[1] No party's counsel authored this brief, in whole or in part, and no party or party's counsel made a monetary contribution to fund the preparation or submission of this brief. No person other than *Amici Curiae* or their counsel made a monetary contribution to preparation or submission of this brief. *See* LCvR 7(o); Fed. R. App. P. 29(4).

[2] Appendix A lists all *Amici Curiae*.

1952, ITAA is a united voice for tribal governments on common issues and concerns. The representatives of ITAA are the highest elected tribal officials from each Indian tribe, including tribal chairpersons, presidents, and governors.

MAST represents the interests of the 35 sovereign tribal nations of Minnesota, Wisconsin, Michigan, Indiana, and Iowa. MAST's mission is to advance, protect, preserve, and enhance the mutual interests, treaty rights, sovereignty, and cultural way of life of the sovereign nations of the Midwest throughout the 21st century.

USET SPF is a nonprofit organization representing 27 federally recognized tribal nations in 13 states stretching from Texas to Maine. USET SPF works at the regional and national level to educate federal, state, and local governments about the unique historic and political status of its member tribal nations. USET SPF is dedicated to enhancing the development of federally recognized tribal nations, improving the capabilities of tribal governments, and assisting USET SPF member tribal nations in dealing effectively with public policy issues and in serving the broad needs of Indian people.

Based upon the principles of unity and cooperation, ATNI is a nonprofit organization representing tribal governments from Oregon, Idaho, Washington, Alaska, California and Montana. Its purpose is to provide a forum for sharing information on matters of interest to its member Tribes, develop consensus on matters of mutual importance, assist member Tribes in their governmental and programmatic development consistent with their goals for self-determination and self-sufficiency, and provide for effective public relations and education programs with the non-Indian communities.

AAIA is the oldest nonprofit American Indian and Alaska Native advocacy organization and is governed by an all-Native American board of directors. One of its priorities is to advocate

for the protection of Native American lands as well as environmental and cultural resources. AAIA's work in this area includes training and technical assistance to Indian tribes and the general public. It also actively participates in legally required environmental and cultural review processes by providing comments and legal assistance to Indian tribes.

The 28 named Tribal governments represent a diverse cross-section of Tribes throughout Indian country. *Amici Curiae* share an interest in maintaining the federal government's fiduciary duty to protect the health and welfare of Indian Tribes, including the natural resources necessary to sustain them. *Amici Curiae* offer critical context regarding the grave consequences of disregarding Tribal treaty rights and the necessary role courts play in the accountability of the federal government to Indian Tribes.

## INTRODUCTION

"Pursuant to the case law in this Circuit, vacating a rule or action promulgated in violation of NEPA is the standard remedy." *Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d 8, 37 (D.D.C. 2007) (collecting cases); *see also Humane Soc'y of U.S. v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) (noting vacatur is "[a] common remedy"). Only in "rare circumstances" is there a remand without vacatur. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). "The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 967 (D.C. Cir. 1990) (internal quotation marks omitted)). "Because vacatur is the default remedy . . . defendants bear the burden to prove that vacatur is unnecessary." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019).

As this Court weighs the costs and benefits under *Allied Signal*, your *Amici Curiae* suggest that this equitable analysis should also be informed by where those costs and benefits are distributed. Put another way: Who benefits and who is burdened? Unfortunately, this case presents yet another instance where Tribes and Native communities are burdened, and non-Native corporations reap enormous benefits. It is surely inequitable to again expect the Tribal governments and communities represented in this case to bear the hazards posed by oil spills while the Corps ponders the magnitude of that risk and Dakota Access cashes its checks. Conversely, stopping the flow of oil in the pipeline during remand ensures the ordered process established by NEPA and provides an opportunity for the Corps to properly evaluate impacts on the Tribes' treaty resources. This case does not present the "rare circumstances" counseling against vacatur.

## ARGUMENT

### I.     REMANDING WITHOUT VACATUR WOULD CONTINUE THE INEQUITABLE PATTERN OF SHIFTING THE BURDENS OF INFRASTRUCTURE DEVELOPMENT ONTO INDIAN TRIBES.

The federal government has a long history of approving infrastructure projects, such as the one at issue in this case, without due consideration of Tribal rights and over the objections of Tribal governments. These projects have come at great cost to Indian Tribes – harming the health of Tribal citizens, damaging Tribal natural resources, sacred places, and disregarding treaty rights. At the same time, the benefits of these projects have not inured to Tribes and their citizens, whose drinking water, roads, and other infrastructure is either nonexistent or in shambles. *See* U.S. Commission on Civil Rights, *Broken Promises: Continuing Federal Funding Shortfall for Native Americans* 165-166 (2018). Every single Indian Tribe has a story of federally approved destruction – often several.

The burden shouldered by the Tribes, both historically and with reference to the Dakota Access Pipeline ("DAPL"), should be in the front of this Court's mind in weighing whether vacatur is the appropriate remedy. Especially relevant to this case is the Pick-Sloan Project, which burdened the Tribes with tremendous costs, while non-Natives reaped the benefits. This project dammed significant areas of the Missouri River and "caused more damage to Native American lands and resources than any other single public works project in the United States." Michael Lawson, *The Historical Backdrop Leading up to DAPL Protests Today*, Indianz.com (Nov. 9, 2016), https://www.indianz.com/News/2016/11/09/michael-lawson-roots-of-nodapl-movement.asp. The project "inundated 160,000 acres of reservation lands, including 56,000 acres on the Standing Rock reservation." *Id.* A product of this project was Lake Oahe, the location of the pipeline at issue in the instant case.

The Corps was a particularly bad actor in the sordid history of the Pick-Sloan Project. Without authorization, it altered portions of the project to protect non-Indian communities and flood Indian communities. Michael L. Lawson, *Dammed Indians: The Pick-Sloan Plan and the Missouri River Sioux, 1944-1980* 59 (1982). If that weren't bad enough, in the initial stages of construction of the Oahe Dam, the Corps attempted to condemn portions of Standing Rock land without the required condemnation authority. Michael L. Lawson, *The Oahe Dam and the Standing Rock Sioux* 218 (1976). At the behest of Standing Rock, a court stepped in and ruled in 1958 that the Corps' actions were "wholly repugnant to the entire history of Congressional and judicial treatment of the Indians[.]" *Id.*

The shifting of the costs onto the Tribes was neither happenstance nor oversight. Indeed, Congress acknowledged at the time of the Oahe Dam's construction that it would benefit mostly

the non-Indian communities below the lake, and that "no benefits will accrue to the Indians." *Dammed Indians*, *supra*, at 65.

This destructive legacy lives on across the Dakotas today. As a result of the Corps' operation of the Missouri River, the various lakes in North and South Dakota "experience huge fluctuations in their water levels." Peter Capossela, *Impacts of the Army Corps of Engineers' Pick-Sloan Program on the Indian Tribes of the Missouri River Basin*, 30 J. Envtl. L. & Litig. 143, 188 (2015). "This has significant impacts on the water supply, aesthetics and natural environment [of the Great Plains] Tribal communities along the upper Missouri River . . . ." *Id.* The ability to use reserved water rights is also impacted by the Corps' operation. *Id*. Consistently, the Corps favors "downstream navigation and water intakes, to the detriment of water uses on Indian reservations." *Id*. at 197. Consequently, extremely low levels of water result in silt deposits that destroy public water systems on reservations and, in turn, cause the loss of water for weeks at a time. *Id*. The American Psychological Association has observed a link between the United States' historical abuses, DAPL, and the mental well-being of Tribal citizens: "Research has linked historical trauma to health disparities, including increased likelihood of early death due to substance abuse, unintentional injuries, assault, homicide and suicide." American Psychological Association, *APA Urges Trump Administration to Safeguard Standing Rock Sioux in Response to Memorandum on Dakota Access Pipeline* (Jan. 26, 2017), http://www.apa.org/news/press/releases/2017/01/trump-dakota-pipeline.aspx.

This case is yet another instance of the Corps running roughshod over the Tribes' treaty rights while non-Natives receive the benefit. Having concluded more than two years ago that the Corps' decision was "potentially lawful but insufficiently or inappropriately explained," *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 103 (2017) ("*Standing Rock*

*IV*") (quoting *Radio Television News Directs Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999)), this Court gave the Corps ample opportunity to provide an explanation fulfilling NEPA's requirements. *Standing Rock IV*, 282 F. Supp. 3d at 98. The Court even suggested ways in which the Corps could cure its errors. *Id.* at 100.  At the same time, the Court set the expectation that "the Corps not [] treat remand as an exercise in filling out the proper paperwork *post hoc*." *Id.* at 109. Yet, that is precisely what the Corps did and, even with a court-provided roadmap, the Corps still came up short – again. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534, 2020 WL 1441923, at *16 (D.D.C. Mar. 25, 2020) ("*Standing Rock V*").

The consequences to the Tribes are not merely theoretical or abstract. The Treaties of Fort Laramie created a permanent homeland for these Tribal citizens, and reserves to them fish and game resources necessary to sustain them. Fort Laramie Treaty of 1851, arts. 5, 11 Stat. 749; Treaty of Fort Laramie with the Sioux, 15 Stat. 635, art. 2 (1868); *Standing Rock V*, 2020 WL 1441923, at *2. The waters of Lake Oahe support not only the Tribes' treaty-reserved fish and game resources, but are also vital for "drinking, agriculture, industry, and sacred religious and medicinal practices." *See Standing Rock V*, 2020 WL 1441923 at *3. It is clear that the flow of oil through this pipeline was predicated on a flawed process, which did not consider impacts to the Tribes' rights. Consequently, the Corps' imperiled the Tribes' treaty-guaranteed resources without understanding the magnitude of the risk. Moreover, at bottom, the Corps' insistence on opening the pipeline created the purported reliance interests that Dakota Access and its *amici* now beg this Court to preserve. They would not be in that position if the Corps had simply followed the law rather than hastily opening the pipeline.

Remanding without vacatur would once again elevate non-Native pecuniary interests above the Tribes' legal rights.

## II.   VACATUR ENFORCES NEPA IN A MANNER THAT PROTECTS TRIBAL TREATY RIGHTS AND HOLDS AGENCIES ACCOUNTABLE FOR THEIR TRIBAL TRUST OBLIGATIONS.

Protection of the Tribes' treaty-reserved rights and NEPA's procedural requirements are inextricably tied. As their trustee, the federal government owes a fiduciary obligation to Indian tribes. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006); Colette Routel & Jeffrey Holth, *Toward Genuine Tribal Consultation in the 21st Century*, 46 U. Mich. J.L. Reform 417 (2013). At a minimum, this fiduciary obligation requires the government to demonstrate "compliance with general regulations and statutes not specifically aimed at protecting Indian tribes." *Pit River Tribe*, 469 F.3d at 788 (quoting *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 574 (9th Cir. 1998)). NEPA requires an agency to take a "hard look" at issues affecting a tribe's reserved rights when considering the environmental consequences of a proposed action. *See Okanogan Highlands All. v. Williams*, 236 F.3d 468, 480 (9th Cir. 2000); *Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 785 (9th Cir. 2001); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809 (9th Cir. 1999) (EIS must examine probable environmental consequences, including consideration of a tribe's reserved rights); *see also Standing Rock V*, 2020 WL 1441923, at *2 (citing *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 130-32 (D.D.C. 2017) ("*Standing Rock III*")). Hence, violation of NEPA requirements constitutes a failure of the federal government to meet its minimum fiduciary obligations to Indian tribes. *Pit River Tribe*, 469 F.3d at 788.

Robust judicial enforcement of NEPA is, therefore, key to ensuring thorough examination of the effects of agency action on tribal treaty resources. Timing is of the utmost importance in order for NEPA to achieve its goals through procedural mechanisms. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) ("If *any* 'significant' environmental impacts might result

8

from the proposed agency action then an EIS must be prepared *before* the action is taken." (emphasis in original)); *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002); *Standing Rock V*, 2020 WL 1441923, at \*2. For example, a chief function of NEPA's procedural requirements is to facilitate informed public comment on the proposed action and <u>alternatives that might cause less harm</u>. *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996); *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005); 42 U.S.C. § 4332(E); 40 C.F.R. § 1500.1(c); *see also Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 601–02 (9th Cir. 2010). However, a *post hoc* EIS, developed after agency action is taken, denies meaningful public input and may deprive the agency of critical data and information regarding less harmful alternatives. This type of "ready, fire, aim" approach risks creating a hazard that may not be fully understood – precisely the folly that NEPA's ordered procedural requirements were enacted to avoid.

Such is the case at bar. The Tribes set forth numerous scientific critiques that highlight the hazards posed by oil flowing through the pipeline, but the Corps gave them short shrift and, as this Court concluded, did not adequately examine them under NEPA's lens. *Standing Rock V*, 2020 WL 1441923, at \*16. Expert reports showed the leak detection systems employed by DAPL fail 80% of the time. *Id.* at \*9. Moreover, the pipeline's design allows for about 25,200 gallons/day to be released, over a long period of time, without detection. *Id.* The Corps response that the leak would be detected in some unspecified period of time was, in this Court's words, "less than reassuring." *Id.* at \*10. Despite these concerns being repeatedly raised, the Corps attorney said that "there was no particular reason that they didn't look at a slow leak" scenario. *Id.*

The Corps, likewise, did not account for the historic performance of the operator. *Id.* at \*10-11. Perhaps it was because the operator's history "did not inspire confidence." *Id.* at 10. From

2006-2016, Sunoco experienced 276 incidents, resulting in over $53 million in property damage. *Id*. Rather than give this data a "hard look," as NEPA requires, the Corps "focused its responses on defending the operator's performance record" and offered "form language" responses to these critiques. *Id.* at *10-11.

Not only did the Corps gloss over failure rates and operator performance, serious concerns about spill response have gone unrebutted. *Id.* at *11. And perhaps worst of all, the Corps did not adequately analyze the maximum amount of oil that could possibly leak from the pipeline before a spill is detected and stopped. *Id.* at *14-15.

At best the Corps is flying blind, and at worst it swept crucially important scientific critiques under the rug. Either way, it fell short of the robust analysis mandated by NEPA, and its abdication leaves the Tribes' treaty resources imperiled. Further, it is far from certain that the Corps will be able to resolve these scientific controversies on remand, especially in light of the fact that their past responses were so woefully inadequate, despite ample opportunity to (again) provide this Court with an improved analysis and explanations. *See Id*. at *16 (describing Corps past opportunities to supplement its analysis). Ultimately, "[v]acatur ensures that the project will proceed only with the benefit of a fully fleshed out consideration of the issues required by NEPA[,]" *Friends of the Capital Crescent Trail v. Fed. Transit Admin.*, 218 F. Supp. 3d 53, 60 (D.D.C. 2016), which includes the Tribes' treaty rights.

The nature of the Tribes' rights in this case also counsels in favor of vacatur. Analogously, several courts have concluded that Tribal treaty rights warrant unique protection in the preliminary injunction context because harm to them is presumed to be irreparable. *See United States v. Michigan*, 508 F. Supp. 480, 492 (W.D. Mich. 1980), *aff'd*, 712 F.2d 242 (6th Cir. 1983); *Nez Perce Tribe v. U.S. Forest Serv.*, No. 3:13-CV-348-BLW, 2013 WL 5212317, at *7 (D. Idaho

Sept. 12, 2013) ("The plaintiffs are not seeking damages; they are seeking to preserve their Treaty rights along with cultural and intrinsic values that have no price tag."). Such is the case here: oil spills from DAPL threaten destruction of the subject of their treaty rights (fish and game). When these most basic, treaty-guaranteed rights to food and a homeland are imperiled, it is prudent to remove the hazard while significant scientific controversies are resolved.

Moreover, under these circumstances, shutting off the flow of oil in the pipeline is a modest and reasonable remedy. Unlike *Semonite*, "Plaintiffs are not asking for the pipeline itself, or for any existing infrastructure, to be dismantled." *Compare Standing Rock IV*, 282 F. Supp. 3d at 107 *with Semonite*, 422 F. Supp. 3d at 100. Instead, the Tribes seek removal of the hazard – the presence of which was facilitated by the Corps' NEPA violation. Vacatur is a prudent safety measure, which holds the agency accountable for its statutory and tribal trust obligations. Without vacatur, the Corps has little incentive to act expeditiously, *see* Kristina Daugirdas, *Evaluating Remand Without Vacatur: A New Judicial Remedy for Defective Agency Rulemakings*, 80 N.Y.U. L. Rev. 278, 302-305 (2005) (analyzing cases where agencies did not prioritize remand when there was no vacatur), thus potentially exposing the Tribes to the hazard *ad infinitum* and compounding the consequences of the Corps' error.

The rejoinder of the Corps and Dakota Access that "the risk of an oil spill is low" merely invites this Court to share in their myopia. It completely misses the central, unresolved question: the potential magnitude of an oil spill should it occur. Likewise, their alarmist assertions about the financial impact of shutting off the pipeline are predictable arguments in Indian treaty cases. Most courts see it for what it is: profiting at the expense of Indians. Many cases involving tribal treaty rights similarly require costly outlays to remedy interference with those legal rights. *See, e.g.*, *United States v. Washington*, 864 F.3d 1017 (9th Cir. 2017) (denying *en banc* review where state

projected $1.88 billion cost to remediate infrastructure installed in violation of tribal treaty rights). The solution is clear and simple: do not imperil Tribal treaty rights in the first instance. Give treaty rights due consideration and analysis in advance and develop mitigation measures where necessary. Engage in Tribal consultation early in the planning process, so that there is a clear understanding of tribal rights, interests, and concerns. Looked at in this light, "stop, look, and listen" statutes, such as NEPA, implemented with appropriate consultation procedures, protect the interests of *all* parties.

Vacatur incentivizes an ordered process that analyzes possible environmental harms – including to Indian treaty resources – and develops mitigation measures where necessary in advance, just as the statute requires. Conversely, remanding without vacatur transforms a process protective of tribal rights into an exercise in clerical tidying up. It would allow the Corps to disregard its obligations entirely and signal to federal agencies that they can ignore Tribal treaty rights and federal trust obligations in approving projects and later simply invoke the rejoinder of "disruptive consequences" to absolve themselves. This is a far cry from NEPA's procedural design of considering impacts on tribal rights *in advance* of making a decision, and is certainly not how great nations keep their word. *See Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 142 (1960) (Black, J., dissenting) ("Great nations, like great men, should keep their word.").

## CONCLUSION

For the foregoing reasons, *Amici Curiae* respectfully request that this Court issue the standard remedy and vacate the easement on remand to the Corps.

Respectfully submitted this 20th day of May, 2020.

*/s/ Matthew Lee Campbell*
Matthew Lee Campbell, D.C. Bar No. CO0060
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Tel: (303) 447-8760
Fax: (303) 443-3776
mcampbell@narf.org

Joel West Williams, D.C. Bar No. 1023016
NATIVE AMERICAN RIGHTS FUND
1514 P Street, NW (Rear) Suite D
Washington, DC 20005
Tel: (202) 785-4166
Fax: (202) 822-0068
williams@narf.org

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 29(a)(4)(G) and 32(g)(1) of the Federal Rules of Appellate Procedure and LCvR 7(o)(5), I hereby certify that the foregoing **AMICUS CURIAE BRIEF OF THE GREAT PLAINS TRIBAL CHAIRMEN'S ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS FUND, INTER-TRIBAL ASSOCIATION OF ARIZONA, MIDWEST ALLIANCE OF SOVEREIGN TRIBES, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, AFFILIATED TRIBES OF NORTHWEST INDIANS, ASSOCIATION ON AMERICAN INDIAN AFFAIRS, AND 28 INDIAN TRIBES SUPPORTING A VACATUR REMEDY**, filed on May 20, 2020, complies with LCvR 7(o)(4) because it does not exceed 25 pages.

*/s/ Matthew Lee Campbell*
Matthew Lee Campbell, D.C. Bar No. CO0060
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Tel: (303) 447-8760
Fax: (303) 443-7776
mcampbell@narf.org

## CERTIFICATE OF SERVICE

I hereby certify that, on the 20th day of May, 2020, a copy of the foregoing *AMICUS CURIAE* **BRIEF OF THE GREAT PLAINS TRIBAL CHAIRMEN'S ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS FUND, INTER-TRIBAL ASSOCIATION OF ARIZONA, MIDWEST ALLIANCE OF SOVEREIGN TRIBES, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, AFFILIATED TRIBES OF NORTHWEST INDIANS, ASSOCIATION ON AMERICAN INDIAN AFFAIRS, AND 28 INDIAN TRIBES SUPPORTING A VACATUR REMEDY** was filed through the Court's CM/ECF management system and electronically served on counsel of record.

*/s/ Matthew Lee Campbell*
Matthew Lee Campbell, D.C. Bar No. CO0060
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302
Tel: (303) 447-8760
Fax: (303) 443-7776
mcampbell@narf.org

15

**APPENDIX A**

## LIST OF *AMICI CURIAE*

### Federally Recognized Indian Tribes

Bay Mills Indian Community
Confederated Salish and Kootenai Tribes of the Flathead Reservation
Confederated Tribes of Siletz Indians of Oregon
Confederated Tribes of the Umatilla Indian Reservation
Hoonah Indian Association
Kaw Nation
Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas
Little River Band of Ottawa Indians
Little Traverse Bay Bands of Odawa Indians
Lower Brule Sioux Tribe
Lytton Rancheria of California
Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians of Michigan (a/k/a the Gun Lake Tribe)
Nez Perce Tribe
Nottwaseppi Huron Band of the Potawatomi
Pascua Yaqui Tribe
Pokagon Band of Potawatomi Indians, Michigan and Indiana
Ponca Tribe of Nebraska
Pueblo of Tesuque, New Mexico
Red Lake Band of Chippewa Indians
Rosebud Sioux Tribe
Sault Ste. Marie Tribe of Chippewa Indians
Shoshone-Bannock Tribes of the Fort Hall Reservation
Stillaguamish Tribe of Indians
Stockbridge-Munsee Community
Shoalwater Bay Indian Tribe
Wichita and Affiliated Tribes
Winnebago Tribe of Nebraska
Yurok Tribe

### Tribal Organizations

Affiliated Tribes of Northwest Indians
Association on American Indian Affairs
Great Plains Tribal Chairmen's Association
Inter-Tribal Association of Arizona
Midwest Alliance of Sovereign Tribes
National Congress of American Indians Fund
United South and Eastern Tribes Sovereignty Protection Fund