**IN THE UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>       Plaintiff,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>       Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF<br>ENGINEERS,<br><br>       Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>       Defendant-Intervenor. | Case No. 1:16-cv-01534 (JEB)<br>(consolidated with Cases No.<br>1:16-cv-01796 & 1:17-cv-00267) |

**<u>UNITED STATES ARMY CORPS OF ENGINEERS' REPLY BRIEF REGARDING</u>**
**<u>REMEDY</u>**

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     VACATUR IS NOT REQUIRED .............................................................................. 2

III.    The *ALLIED-SIGNAL* FACTORS SUPPORT REMAND WITHOUT VACATUR ....... 4

        A.      Whether the Corps "chose correctly" in granting the easement is not placed
                in serious doubt by the NEPA deficiency identified by this Court ...................... 4

        B.      Vacating the easement entails significant disruptions and risks ........................ 11

IV.     Vacatur is overbroad; so too are any limitations on how the Corps should apply its
        Engineering Regulations in the event of vacatur ........................................................... 18

V.      CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*AARP v. U.S. Equal Emp't Opportunity Comm'n*,
  267 F. Supp. 3d 14 (D.D.C. 2017) ........................................................................ 10

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005) ............................................................................. 2

*Air Cargo v. U.S. Postal Serv.*,
  674 F.3d 852 (D.C. Cir. 2012) ............................................................................... 19

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ................................................................... 1, 3, 4, 11

*Bauer v. DeVos*,
  332 F. Supp. 3d 181 (D.D.C. 2018) ....................................................................... 2

*Bennett v. Donovan*,
  703 F.3d 582 (D.C. Cir. 2013) ............................................................................... 19

*Cal. Cmtys. Against Toxics v. Envtl. Prot. Agency*,
  688 F.3d 989 (9th Cir. 2012) ................................................................................. 18

*Califano v. Yamaski*,
  442 U.S. 682 (1979) .............................................................................................. 18

*Cty. of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999) ............................................................................. 20

*Fed. Trade Comm'n v. Standard Oil Co.*,
  449 U.S. 232 (1980) .............................................................................................. 5

*Flue-Cured Tobacco Coop. Stabilization Corp. v. Envtl. Prot. Agency*,
  313 F.3d 852 (4th Cir. 2002) ................................................................................. 5, 6

*Gov't of Province of Manitoba v. Zinke*,
  849 F.3d 1111 (D.C. Cir. 2017) ............................................................................. 5

*Heartland Regional Medical Center v. Sebelius*,
  566 F.3d 193 (D.C. Cir. 2009) ............................................................................... 3

*Int'l Union, United Mine Workers v. Fed. Mine Safety & Health Admin.*,
  920 F.2d 9607 (D.C. Cir. 1990 .............................................................................. 3, 4, 6

*Monsanto Co. v. Geertson Seed Farms*,
  130 S. Ct. 2743 (2010) .......................................................................................... 19

*Nat'l Parks Conservation Ass'n v. Semonite*,
  422 F. Supp. 3d 92 (D.D.C. 2019) ........................................................................ 10

*Natural Res. Def. Council v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020) ................................................................................. 3

*Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*,
  435 F.3d 326 (D.C. Cir. 2006) ........................................................................ 18

*North Carolina v. Envtl. Prot. Agency,*
  531 F.3d 896 (D.C. Cir. 2008) ..................................................................... 4, 5

*North Carolina v. Envtl. Prot. Agency,*
  550 F.3d 1176 (D.C. Cir. 2008) ....................................................................... 3

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004) ........................................................................................... 5

*Pub. Employees for Envtl. Responsibility v. Hopper*,
  827 F.3d 1077 (D.C. Cir. 2016) ................................................................ 12, 13

*Shands Jacksonville Med. Ctr. v. Burwell*,
  139 F. Supp. 3d 240 (D.D.C. 2015) ......................................................... 3, 6, 10

*Shands Jacksonville Med. Ctr., Inc. v. Azar*,
  No. 19-5087, 2020 WL 2709433 (D.C. Cir. May 26, 2020) ............................. 19

*Sierra Club v. Bosworth*,
  510 F.3d 1016 (9th Cir. 2007) ....................................................................... 10

*Sierra Forest Legacy v. Sherman*,
  951 F. Supp. 2d 1100 (E.D. Cal. 2013) ............................................................. 7

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock IV)*,
  282 F. Supp. 3d 91 (D.D.C. 2017) ............................................................. 10, 13

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock V),* No. CV 16-1534 (JEB),
  2020 WL 1441923 (D.D.C. Mar. 25, 2020) ........................................... 1, 6, 14, 15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers (Standing Rock III)*,
  255 F. Supp. 3d 101 (D.D.C. 2017) ............................................................... 6, 8

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ........................................................................... 4

*Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*,
  951 F.3d 1142 (9th Cir. 2020) ....................................................................... 14

*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,*
  435 U.S. 519 (1978) ....................................................................................... 19

*Winter v. Nat. Res. Def. Council:*,
  555 U.S. 7 (2008) ...................................................................................... 8, 9, 13

**Statutes**

5 U.S.C. § 704 .................................................................................................. 5

5 U.S.C. § 706(2)(A) ........................................................................................ 2

**Other Authorities**

*The Control of Air Pollution on Indian Reservations*,
   46 Envtl. L. 893 (2016)................................................................................................... 14

## I.    INTRODUCTION

Vacatur of the easement allowing the Dakota Access Pipeline to cross federally owned land at Lake Oahe is unnecessary and inappropriate under both prongs of the D.C. Circuit's *Allied-Signal* test. *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993). This is not a case where a project has yet to be constructed, environmental impacts of a federal approval are entirely unknown, and no mitigation measures have been imposed. To the contrary, the Pipeline has been operational for years without issue, and Plaintiffs' own expert submitted a declaration testifying that it has now entered a period of greater safety than when the Court last considered remand.

At this time the Corps expects that the additional environmental review ordered by the Court will take approximately thirteen months, in part because the Corps is not starting from a blank canvas—rather the environmental impacts of the Corps' easement decision have been illustrated in significant detail already. Following its review, the Corps imposed meaningful safety-enhancing mitigation measures, well above what is required under applicable regulations. Given the amount of analysis that has occurred thus far and the specific easement conditions imposed, it is highly likely that the Corps will ultimately be able to substantiate its existing property management decision after correcting the procedural error identified by the Court. Vacating the easement while the Corps conducts additional environmental review is not warranted by the NEPA deficiency identified by the Court, which does not invalidate the top line conclusion that the "possibility of a future spill . . . is low." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock V),* No. CV 16-1534 (JEB), 2020 WL 1441923, at *19 (D.D.C. Mar. 25, 2020).

Moreover, vacatur of the easement could impose extremely disruptive consequences. If

the easement is vacated, Energy Transfer Partners will no longer have the required property

interest to cross and occupy Corps-managed federal land.  That scenario implicates the Corps'

regulations governing encroachments, which provide for removal as the general policy, with

several exceptions.  Disruptions from removal of the Pipeline could entail the "extreme waste" of

dismantling and rebuilding the Pipeline in the event the Corps reaffirms its easement decision.

But even temporary decommissioning could create additional construction-related impacts and

would likely result in oil being transported by truck or rail—transportation methods that entail

both greater risk of spills and greater air pollution than pipeline transport.

Vacatur would be needlessly costly, disruptive, and risky; it is not warranted under the

*Allied-Signal* test.  But in the event this Court does order vacatur, it should decline to order the

additional injunctive relief that Plaintiffs request with respect to the timeline or method by which

the Corps addresses the Pipeline's presence on federal property.  Such decisions are properly left

to the Corps, which has expertise and has been entrusted by Congress to undertake these federal

property management decisions.  The Corps respectfully submits that the Court should allow the

Corps' easement decision relating to the already-constructed Lake Oahe pipeline segment to

remain in place while the Corps conducts additional environmental review.

## II.   VACATUR IS NOT REQUIRED

Plaintiffs argue at length that vacatur is the "default remedy" under the APA, 5 U.S.C. §

706(2)(A).  ECF No. 527 at 2-5.  Federal Defendants do not dispute this; but it is clearly not the

entire picture.  It is equally well established that the presumption of vacatur, "is not absolute."

*Bauer v. DeVos*, 332 F. Supp. 3d 181, 184 (D.D.C. 2018); *Advocates for Highway & Auto Safety*

*v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151 (D.C. Cir. 2005).  Indeed, the entire

inquiry under *Allied-Signal* is undertaken by courts in order to make the "decision whether to

vacate" or not.  *Allied–Signal*, 988 F.2d at 150–51 (internal quotation marks omitted).  And after undertaking this inquiry courts in this Circuit do not uniformly order vacatur; indeed they "commonly remand[]without vacating an agency's rule or order."  *Int'l Union, United Mine Workers v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966-67 (D.C. Cir. 1990) (citations omitted); *see, e.g., North Carolina v. EPA,* 550 F.3d 1176, 1178 (D.C. Cir. 2008) (noting "practice of remanding without vacatur").

Plaintiffs argue that "failure to follow proper procedures weighs heavily in favor of vacatur."  ECF No. 527 at 3.  However, this case is not analogous to those Plaintiffs cite for this proposition.  For instance, *Heartland Regional Medical Center v. Sebelius* concerned the "[f]ailure to provide the required notice and to invite public comment."  566 F.3d 193, 199 (D.C. Cir. 2009).  The same is true of *Natural Resources Defense Council v. Wheeler*, where the court found that vacatur was appropriate where notice-and-comment rulemaking procedures were not followed.  955 F.3d 68, 84-85 (D.C. Cir. 2020).  As this Court has reasoned, "where an agency has completely bypassed the notice and comment procedure, there is substantial basis to 'doubt whether the agency chose correctly,' . . .  and the agency's decision lacks the legitimacy that comes with following the APA-mandated procedures for creating binding legal obligations."  *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 268 (D.D.C. 2015) (quoting *Allied–Signal*, 988 F.2d at 150–51).

This case does not concern a rule that was subject to formal notice-and-comment procedures.  Nor was the deficiency the Court identified failing to provide notice and opportunity to comment on the Corps' action.  To the contrary, in this case the Corps provided significant opportunities for public input and responded to a large volume of comments.  *See, e.g.*, DAPL_0072855, 0063966; RAR_001166.  Though NEPA is procedural, this case is not

3

analogous to the cases vacating agency rules issued without required notice and comment procedures.  Instead, this is a unique situation where following literally years of public process and environmental review, that review was found lacking in its consideration of a single significance factor.  There was no wholesale failure of public process as there was in the cases on which Plaintiffs rely on.  Further, the Corps' environmental review was largely upheld, initially, and the single deficiency was found based on a Circuit Court decision that post-dates most of the Corps' environmental work.  Under these unique circumstances, as explained below, vacatur is not warranted.

III.    **THE *ALLIED-SIGNAL* FACTORS SUPPORT REMAND WITHOUT VACATUR**

A.    **Whether the Corps "chose correctly" in granting the easement is not placed in serious doubt by the NEPA deficiency identified by this Court**

Under this Circuit's *Allied-Signal* test, the decision whether to vacate or remand without vacatur depends on two factors, the first of which is "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)." *Allied-Signal,* 988 F.2d at 150-51 (quoting *Int'l Union, United Mine Workers of Am.,* 920 F.2d at 967).  Where there is not sufficient doubt about whether the agency chose correctly such that it is possible that the agency could substantiate its decision, vacatur is not warranted.  *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002); *cf. North Carolina v. EPA,* 531 F.3d 896, 900 (D.C. Cir. 2008) (concluding that the EPA's rule "must" be vacated because "fundamental flaws" prevented the EPA from promulgating the same rule on remand).  The question is therefore to what extent there is serious doubt about whether the Corps "chose correctly" in issuing the easement given the "deficiencies" this Court found in the Corps' NEPA analysis.

Plaintiffs argue, however, that "this Court should find that the *Allied-Signal* inquiry is

4

focused on the Corps' NEPA determination . . . rather than its issuance of the underlying

permits." ECF No. 527 at 6. This interpretation of the *Allied-Signal* test is inconsistent with

*Allied-Signal* itself, and would render the first part of this test surplusage.

First, it is important to consider that Plaintiffs brought this case under the APA's limited

waiver of sovereign immunity, which provides for courts to review and potentially "set aside"

only certain agency actions. *See* 5 U.S.C. § 704 (provision allowing for APA review of "final

agency action"); *id.* § 551 (defining "agency action"); *see Norton v. S. Utah Wilderness All.*, 542

U.S. 55, 61 (2004). A NEPA determination such as an EA/FONSI, however, is not itself a final

agency action from which legal consequences flow such and that it is subject to review under the

APA. *See, e.g.*, *Gov't of Province of Manitoba v. Zinke,* 849 F.3d 1111, 1115 (D.C. Cir. 2017).

Instead, an EA is a "preliminary, procedural, or intermediate agency action" meant to inform the

agency's decision whether to take some other, substantive final agency action. 5 U.S.C. § 704.[1]

Thus, in the *Allied-Signal* inquiry of whether or not to vacate an agency action, it is appropriate

to look to the agency action that the APA empowers to this Court to vacate.[2] This interpretation

---

[1] *See FTC v. Standard Oil Co.,* 449 U.S. 232, 244-45 (1980) (discussing APA's treatment of preliminary action); *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA,* 313 F.3d 852, 860 (4th Cir. 2002) (holding report was not final agency action, noting that "even when agency action significantly impacts the choices available to the final decisionmaker, this distinction does not transform the challenged action into reviewable agency action under the APA").

[2] This is consistent with the Corps' prior remedy arguments. There, the Corps argued the question was whether its "authorizations to construct a portion of the Dakota Access Pipeline under Lake Oahe should be vacated during remand." ECF No. 258 at 1. The Corps characterized the first *Allied-Signal* prong as looking to "the seriousness of the [agency action's] deficiencies." *Id.* at 4 (alterations in original). That the Corps argued that additional explanation on remand would substantiate the Corps' conclusions in the EA is not inconsistent with the Corps' argument that the question was ultimately whether the underlying final agency action should be vacated.

is consistent with *Allied-Signal* itself.  In that case, the Court referred to "the seriousness of the *order's* deficiencies" and it was that "order" the Court decided whether or not to vacate.  *Id.* (emphasis added); *see* 5 U.S.C § 551(6) (defining "order").  And *United Mine Workers,* which *Allied-Signal* quotes, referred to both an "an agency's rule or order."  920 F.2d at 966–67; *see* 5 U.S.C § 551(4) (defining rule).

In this case, the challenged agency action that is analogous to the "order" in *Allied-Signal* is the issuance of an easement under the Mineral Leasing Act.[3]  However, unlike in *Allied-Signal*, this case does not concern the failure or lack of explanation on the merits of the agency's substantive decision.  Rather, this case concerns the agency's procedural evaluation of environmental impacts of the decision, as required by NEPA.

In cases concerning failures of process, courts do not look to the deficiencies in the process alone to evaluate whether the agency "chose correctly."  Such an inquiry would border on tautological where the Court has already decided that the agency's "choice" of process was insufficient.  Rather, in cases concerning a failure of process courts properly look to whether the deficiency in process is so serious as to cast doubt on the underlying final agency action the Court is reviewing.  *See, e.g.*, *Shands Jacksonville Med. Ctr.*, 139 F. Supp. at 268 (evaluating whether agency could justify Medicare rule on remand in light of omission of material upon

---

[3] The Court asked the Parties to "brief the issue of whether the easement should be vacated during the remand."  *Standing Rock V*, 2020 WL 1441923, at *19; *cf.* ECF No. 527 at 2, n.1. Granting the easement was the action taken after Plaintiffs submitted "the expert reports . . . [and] *after* the Final EA was published but *before* the Corps again decided in February 2017 that an EIS was not required," *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock III)*, 255 F. Supp. 3d 101, 129 (D.D.C. 2017), and that the Court found created scientific controversy. Although the easement is therefore the focus of this brief, the analysis applies to the Corps' other permissions.

6

which it relied in rulemaking and consequent failure of ability of parties to comment on this material); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1109 (E.D. Cal. 2013) (ordering "that the NEPA deficiency…be corrected" but not vacating as the court had not found that "the NEPA error raises serious doubts that the 'agency chose correctly'" in issuing a forest plan). The question here is therefore whether the deficiency in the Corps' NEPA analysis cast such doubt on the easement decision that the decision should be remanded with vacatur. It does not.

The standard for granting rights-of-way to cross federal land within the Corps' control is whether the activity will "be in the public interest" and "compatible with the installation/ project mission." Army Reg. 405-80 ¶ 4-1(c), USACE_ESMT004250; *see also* Engineering Regulation 405-1-12, USACE_ESMT005810; Engineering Regulation 1130-2-550, USACE_ESMT003656.

In order to make this determination the Corps considered any potential impact on the project's purpose. *See* Section 408 Decision Package, ECF No. 183-9 at 71181-85; Geotechnical Investigation Package, ECF No. 183-10 at 75304-07. The Corps also evaluated anticipated environmental, economic, cultural, social, and environmental justice effects, as well as potential cumulative effects of the proposed crossing. *Id.*; *see generally* EA §§ 3-4, ECF No. 172-1 at 71247-331; *see also* FONSI, ECF No. 172-2 at 71179. In addition, the Corps evaluated and ultimately imposed numerous measures that would mitigate against any risk of oil impacts to the Lake and its resources. FONSI, ECF No. 172-2 at 71175-78; EA § 6 & Table 8.2, ECF No. 172-1 at 71333-34, 71341-49. Further, the Corps compared the risks of alternative methods of transporting crude oil, such as by truck or rail, with the proposed Lake Oahe crossing. *See, e.g.*, EA, ECF No. 172-1 at 71229-46; FONSI, ECF No. 172-2 at 71175.

Plaintiffs do not argue that this analysis is on the whole mistaken. Nor do Plaintiffs argue

that greater analysis in an EIS will reveal that the easement is incompatible with the project's mission; indeed the Court has largely foreclosed this argument. *Standing Rock III*, 255 F. Supp. 3d at 153; *see also* ECF No. 183 at 14-28.  Nor have Plaintiffs argued that an EIS would reveal the easement is not in the public interest.  Plaintiffs only note that presidential candidate Joe Biden's website calls for limits on oil and gas permitting on public land.  ECF No. 527 at 15 n.3. Any conclusions based upon this statement, however, are sheer speculation.  Moreover it is unclear if the statement would apply to existing pipelines or even pipelines at all (as opposed to direct oil and gas extraction).  Regardless, this is not a legally or factually supported argument that the Corps' conclusion that the Pipeline was in the public interest is mistaken.  The Corps found that the Pipeline brings "tremendous secondary and sustainable economic benefits to the United States by supporting energy independence, increasing employment opportunities, and adding to demand in many manufacturing sectors, which would be a boost to the overall economy."  ECF No. 172-1 (Final EA) at 71305; USACE_ESMT000313; *see also* ECF No. 512-3 (addressing how shutting down the Pipeline would weaken energy infrastructure and national security); ECF No. 504 (amicus brief of State of North Dakota describing economic impacts to the State).  While the Corps has not prejudged the conclusions of the EIS, a further examination of the environmental impacts of the Pipeline is not likely to contradict this conclusion.  This is especially likely to be the case as the Corps has already studied the impact the Plaintiffs focus on most—the risk and consequence of an oil spill—in significant detail.

Plaintiffs correctly state that "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures."  *Winter v. Nat. Res. Def. Council*: 555 U.S. 7, 23 (2008); ECF No. 527 at 8.  Though Plaintiffs invoke *Winter* for this proposition they have not

8

argued that the environmental review done to date in this case has yielded "little if any information" about harms or mitigation measures.  Quite the opposite is the case.  The environmental impacts of the Corps' approval of the Oahe Crossing have been analyzed in significant depth in an EA that along with its appendices totaled over 1,200 pages, was then followed by a Technical and Legal Review of the easement that totaled 136 pages, and then an additional 280 pages of analysis on remand.

Nor is this a case where there have there been "little if any" mitigation measures imposed.  *Cf. Winter*, 555 U.S. at 23.  The Corps imposed thirty-six conditions that are specifically tailored to further mitigate risk of rupture at the Lake Oahe crossing.  These include: specific coatings to prevent corrosion during installation; corrosion surveys after installation; more stringent requirements for Dakota Access's Facility response plan; mainline valve and automatic shutdown requirements; and additional measures for initial and ongoing leak and crack detection.  *See* Dep't of the Army Easement for Fuel Carrying Pipeline Right-of-way Located on Lake Oahe Project, USACE_ESMT000005.

It is also notable that *Winter* in fact held that the remedy the plaintiffs in that case sought was *not* warranted, based on several arguments that apply equally here.[4]  First, the *Winter* Court found it "pertinent that this is not a case in which the defendant is conducting a new type of activity with completely unknown effects on the environment," *Winter*, 555 U.S. at 23, and the defendants had issued "a detailed, 293–page EA."  *Id.*  Here the length of the environmental review is substantially greater, and the type of pipeline at issue is not new—PHMSA has detailed records concerning pipeline safety going back decades.  *See, e.g.*, ECF No. 473.  Thus the

---

[4] *Winter* did not concern the *Allied-Signal* factors, it was a case concerning an injunction.

9

Plaintiffs' argument that the Pipeline's continued operation presents "ongoing harm and unexamined risks" are considerably less persuasive than in a case where "little or no" environmental review had actually occurred.

The Corps readily acknowledges the importance of NEPA and its goal of fostering informed decisionmaking.  However, the fact remains that not every NEPA violation requires a court to fully set aside the challenged action, and not every NEPA violation indicates that the agency acted without knowledge of the risk "of the likely effects of [its] decision on the environment."  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1034 (9th Cir. 2007) (citation omitted). There can be little doubt that the Corps has considered potential impacts of the easement in significant detail, including impacts stemming from an unlikely oil spill.  In sum, in the context of the agency's full decisionmaking process, the NEPA deficiencies identified by this Court were not so serious as to place in doubt the Corps' finding that the easement was consistent with Lake Oahe's mission and the public interest.

Finally, even if the Court does find that the NEPA deficiency is of such seriousness that it cast doubt on the Corp's decision to issue the easement, the second *Allied-Signal* factor provides independent grounds not to vacate.  As this Court has recognized, there is "no rule requiring the proponent or opponent of vacatur to prevail on both factors."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock IV)*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) (quoting *Shands Jacksonville Med. Ctr.,* 139 F. Supp. at 270); *AARP v. EEOC*, 267 F. Supp. 3d 14, 38-39 (D.D.C. 2017) (remanding without vacatur when the first factor favored vacatur but the second did not); *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 99 (D.D.C. 2019) (same).  Even if the Court finds the first factor favors vacatur, the disruption that vacating the Corps' easement is an independent rationale for leaving the easement in place while the

Corps conducts additional environmental review.

**B.    Vacating the easement entails significant disruptions and risks**

The second *Allied-Signal* factor requires consideration of "the disruptive consequences of an interim change that may itself be changed."  988 F.2d at 150-51 (citation omitted).  As described in the Corps' opening remedy brief, if the easement were vacated, the Pipeline would constitute an encroachment on federal property at Lake Oahe.  ECF No. 507 at 3-4.  Vacatur would thus implicate the Corps' Engineering Regulations regarding encroachments, and require the Corps to take administrative steps to consider whether corrective action is necessary to cure the Pipeline's encroachment on federal property—including potentially ordering the Pipeline to be removed.  *Id.*  Such a removal, or even court-ordered halt in oil flow within the Pipeline would likely cause oil that would otherwise travel through the Pipeline to be transported via other modes of transportation that could impose greater spill risks and in so doing cause greater pollution impacts.  *See* USACE_DAPL0071230.  In contrast, the low risk that the Pipeline will spill oil into Lake Oahe means that vacatur is exceedingly unlikely to disrupt, much less harm, Plaintiffs or the public.  Indeed, according to Plaintiffs' own expert the risk of spill is now lower than when the Court previously considered remedy.  ECF No. 272-2 at 5.  Thus the significant disruption entailed by vacatur counsels against this remedy.

There are several disruptive consequences that could follow from vacatur of the easement.  First, as discussed in the Corps' opening brief, if vacatur resulted in removal of the Pipeline crossing at Lake Oahe, it would likely result in a waste of time, energy, and resources, as well as environmental impacts such as ground disturbance and increased emissions from heavy construction machinery if the Corps substantiated its decision to grant an easement at Lake Oahe after completing an EIS.  ECF No. 507 at 10-12.  Even a temporary court-ordered

11

decommissioning would entail significant economic costs for State governments, oil producers, and the Pipeline operator. *See* ECF Nos. 512-7 and 512-8 (addressing economic impacts); ECF No. 504 (economic impacts to State); *Pub. Emps for Envtl. Responsibility v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016) (considering economic impacts in not vacating regulatory approvals). And even if the Pipeline is not removed, which is possible under the Corps' encroachment regulations, significant work would have to be undertaken by the Corps and Pipeline operator to determine the appropriate remedy. Moreover, as noted above, the Corps found that the Pipeline was not injurious to the public interest, and the economic benefits to the public of the Pipeline would be lost if the easement were vacated. So, too, would the safety-enhancing mitigation measures such as inspections that are imposed by the easement.

Another consequence of vacatur is air pollution and risk of spill associated with oil transport by rail or truck in the event the Pipeline is not operational while the Corps prepares an EIS. The Corps cannot state definitively the amount of oil that would shift to rail or truck in this circumstance, but there are reasons to suspect it would be significant. Evidence in the record shows that rail is a general alternative to pipeline transport, and requires no additional federal approval to increase capacity. *See* U.S. Rail Transportation of Crude Oil: Background and Issues for Congress (Dec. 2014), USACE_ESMT3634. As a result, railroads can increase capacity relatively quickly. *Id.* Vacating the easement is thus likely to result in at least some portion of that oil being transported via rail.

It is also likely that if the Pipeline is removed, temporarily decommissioned, or otherwise not operational, there would still be demand to transport oil. Though the coronavirus pandemic does appear to have reduced increases in oil production that would have otherwise occurred, it does not appear that it has caused such a significant decrease in oil production that there would

be no need to transport oil.  Specifically, the Energy Information Administration projects a modest decrease in oil production in 2020 and 2021, but still production that is several million barrels per day higher than when the Pipeline first became operational in 2017.[5]  Moreover, oil production from the Bakken region has increased in recent months.[6]  Based on this information, it appears that oil production will not drop severely and that transport by rail or truck would become a likely alternative to pipeline transport.

Transport by rail and truck presents greater risk of oil spill relative to pipeline transport.  The Corps described these relative risks in its opening remedy brief relying in part on a PHMSA report that clearly shows pipelines are in general associated with fewer oil spills than trail or truck transport.  ECF No. 507-2.  Specifically, the report found that for oil transported by pipeline, an incident occurred approximately once every 720 million gallons of crude oil shipped.  *Id.* at 8.  For rail, an incident occurred approximately once every fifty million gallons of crude oil shipped.  *Id.*  For truck, an incident occurred approximately once every fifty-five million gallons of crude oil shipped.  *Id.*

Plaintiffs do not directly argue this data is erroneous but nonetheless assert "nothing has changed" since the prior remedy briefing when this Court was not persuaded that rail transport is more dangerous than pipeline transport.  ECF No. 527 at 25.  But the prior round of remedy briefing occurred *before* the 2018 PHMSA report which the Corps now relies upon.  And the Court did not find that pipeline transport was safer than rail, only that the defendants had not substantiated the opposite claim at that time.  *Standing Rock IV*, 282 F. Supp. 3d at 107

---

[5] EIA forecasts U.S. crude oil production to fall in 2020 and 2021,
https://www.eia.gov/todayinenergy/detail.php?id=43735

[6] EIA Drilling Productivity Report, https://www.eia.gov/petroleum/drilling/

(citing Corps Brief at 13).

Plaintiffs have no adequate response to the general point that the PHMSA report shows that pipelines are, in general, safer than rail or truck transport.  Instead Plaintiffs argue that this generic comparison does not contain information about the Oahe Crossing specifically.  ECF No. 527 at 25.  This is true, but it cuts against Plaintiffs' argument.  There is substantial evidence in the record that the segment under Lake Oahe is substantially *safer* than the average pipeline segment due to its new construction, spill detection technology, construction method (HDD), and the easement conditions that the Corps imposed.  *See, e.g.*, EA at 71314; ECF Nos. 520-1 and 520-2 (describing safety features and record in greater detail).  Indeed, this Court has agreed with the Corps' conclusion that for this pipeline the "possibility of a future spill . . . is low."  *Standing Rock V,* 2020 WL 1441923, at *19.

PHMSA's data showing pipeline transport is generally safer than rail supports the conclusion that this Pipeline is safer than rail, as does specific safety information available for this Pipeline.  Taken together, this information suggests that allowing the easement to remain during the remand process entails lesser risk of a spill—as otherwise oil is shifted to relatively more risky forms of transportation.  Because the rail lines and highways travel through tribal lands, rail transport likely entails greater risk to Tribes and tribal members as well as the general public.  *See, e.g.*, *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1151 (9th Cir. 2020) (suit by Tribe to stop transport of Bakken crude by rail over reservation lands).

Additionally, the Corps argued that one form of disruption that could occur from a shift from pipeline to rail and truck transport is an increase in air pollution.  ECF No. 507 at 21. Plaintiffs do not respond to this argument.  Because rail and truck transport may occur on tribal lands, some of which have air pollution challenges, these impacts are also likely to be borne by

Tribes as well as the general public.  *See generally* Arnold W. Reitze, Jr., *The Control of Air Pollution on Indian Reservations*, 46 Envtl. L. 893 (2016).

In comparison, the risk of a spill at the Oahe Crossing—and risk that any such spill would be so severe as to impact Plaintiffs—is low.  *Standing Rock V,* 2020 WL 1441923, at *19. When remedy was last briefed, Plaintiffs argued that the risk of spill was greater during the first several years of a pipeline's operation—which means that the risk of spill today is lower than when the Court previously declined to vacate.  Plaintiffs' current declarants' effort to retreat from these clear statements are unavailing.  Mr. Holmstrom contends that the Corps "mischaracterizes the Tribe's position concerning . . . failures with newer pipelines."  Mr. Holmstrom's current suggestion that new pipelines are the more dangerous than old pipelines, ECF No. 527-5 at ¶ 29, is markedly different from the position taken by Standing Rock when it sought to have the pipeline shut down only months into its operation in August, 2017.  At that time, the Tribe's experts concluded that "the likelihood of a leak or rupture is likely higher now [in August 2017] for DAPL than for pipelines that have been operating for years" because "pipelines are mostly likely to leak or fail when they are brand new, and then again when they reach the end of their useful lives."  ECF No. 272-2 at 5.  Indeed, the report cited by the Tribe's expert states that "[m]any of the early failures are due to construction and installation quality. This results in an initially high component failure rate as shown in the 'installation' portion of the curve. . . .  The steady state portion of the curve in figure 4.6.1 shows that there will be a very low failure rate for long periods of time for a well-installed pipeline."  New Jersey Institute of Tech., "Final Rep. - Pipeline Industry Comparison of U.S. with Foreign Pipeline Land Use and Siting Standards, Maintenance, Rehabilitation and Retrofitting Policies and Practices," Apr. 1996, p. 34 (copy available at: http://pstrust.org/docs/usdot_doc4.pdf); ECF No. 272-2 at 5

(including the following graph):



Figure 4.6.1  Assumed failure rate function.

While it may be inconvenient for the Tribe that the pipeline has entered a post-installation phase that the Tribe previously characterized as lower risk, the Tribe's effort to transform its position is unpersuasive.  Ultimately, the Corps' conclusion that the risk of spill was low is at least as persuasive now as it was when the Court last declined to vacate the easement.

Plaintiffs' reliance on Mr. Holmstrom's declaration is similarly concerning because Mr. Holmstrom misconstrues PHMSA data.  For example, paragraphs 30-31 of the Holmstrom Declaration blend together two different time periods (2012-present and 2016-present) in a misleading way.  Mr. Holmstrom first reports that since it "acquired Sunoco in 2012, Energy Transfer's family of pipelines have seen . . . five Corrective Action Orders (CAOs)."  ECF 527-5 at ¶ 30.  He then avers that "PHMSA has only issued 15 corrective action orders since 2016."  ECF 527-5 at ¶ 31 n.29.  Mr. Holmstrom thus conflates two different time periods, implying that CAOs against ETP operators comprise a larger percentage of overall CAOs than is accurate.  To the extent that CAOs provide meaningful data here, it is important to compare apples to apples.  The PHMSA website Mr. Holmstrom relied upon, *id.* at ¶ 31 n.29, allowed for

a more meaningful comparison, as it provides annual CAO data since 2002.[7]  This website

provides the following statistics:

- PHMSA initiated fifteen CAO cases from 2016 to present;
  - In this period PHMSA initiated one CAO case against Energy Transfer operators;
- PHMSA has initiated 45 CAO cases since ETP's acquisition of Sunoco in 2012;
  - In this period PHMSA initiated four CAO cases against the Energy Transfer operators identified in Paragraph fourteen of the Holstrom Declaration:
    - These cases were initiated against Mid-Valley Pipeline Company in 2014 (Case Numbers 320145002H, 420145026H), West Texas Gulf Pipeline Co in 2015 (Case Number 420155005H) and Sunoco in 2016 (Case Number 420165030H).[8]

It is thus not illuminating to compare the fifteen CAO cases initiated since 2016 with the

four cases initiated against Energy Transfer operators since 2012.  To the extent that the CAO

data is meaningful, it is important to analyze comparable data.

Plaintiffs' reliance on the Declaration of Elliot Ward is similarly misplaced.  Plaintiffs

cite to Paragraph 10 of Mr. Ward's declaration, ECF No. 527 at 34, to assert that Dakota

Access's spill plans are flawed because they are based on "false assumptions."  The purported

"false assumptions" (sic) identified by Mr. Ward is that "spilled oil will be floating on the Lake's

surface."  ECF No. 527-9 at ¶ 10.  Despite Mr. Ward's assertions to the contrary, it is beyond

dispute that crude oil floats on water.  This basic fact of chemistry is clear in the record in this

---

[7] PHMSA Corrective Action Order Cases Initiated,
https://primis.phmsa.dot.gov/comm/reports/enforce/CAO_opid_0.html#_TP_1.

[8] A CAO case against Sunoco initiated in January 2012 (Case Number 320125002H) predated
the ETP's Sunoco acquisition by several months.

case and discussed at length in summary judgment briefing.  ECF No. 450 at 5, 9-11, 20-21; ECF

472 at 6-7.  And while Standing Rock does not rely on it, the remainder of Mr. Ward's

declaration suffers from significant credibility issues.  For example, Mr. Ward is incorrect that

Standing Rock "has never been involved in DAPL's spill response planning, nor have they

provided a copy of the Spill Response Plans to my office, or to the Tribal Chairman or any other

Tribal official."  ECF No. 527-9 at ¶¶ 3-4.  To the contrary, the Corps and Dakota Access

attempted to engage with Standing Rock in spill planning and provided spill response plans to

the Tribe—only for the Tribe to rebuff those attempts at engagement repeatedly.  ECF No. 458 at

9-11, 40-42.

Regardless of the reliability of Plaintiffs' declarations, it remains the case that an accurate

weighing of the potential disruptive consequences of vacatur suggests the low risk of a pipeline

spill compares favorably against the risks related to transporting oil by rail.  *See Cal. Cmtys.*

*Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012).  That rail and truck transportation

poses a higher risk of disruptive accident and greater pollution risk ultimately weights against

vacatur.  And even if oil is not transported via rail or truck in the event the Pipeline is ordered to

be temporarily decommissioned or even removed, significant environmental costs, economic

losses, and other disruptions would nonetheless occur.  As a result, the second *Allied-Signal*

prong suggests vacatur is not appropriate and the easement should remain in place while the

Corps conducts additional environmental review.

IV.     **VACATUR IS OVERBROAD; SO TOO ARE ANY LIMITATIONS ON
        HOW THE CORPS SHOULD APPLY ITS ENGINEERING
        REGULATIONS IN THE EVENT OF VACATUR**

Equitable relief must be narrowly tailored to the precise violation found.  *Califano v.*

*Yamaski*, 442 U.S. 682, 702 (1979).  This standard applies to vacatur decisions as well as

injunctions.  *Neb. Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d

18

326, 330 (D.C. Cir. 2006).  Here, the violation found by the Court concerned procedural NEPA environmental review—the underlying MLA easement was not found to be substantively flawed. It therefore is appropriate to tailor the relief narrowly to redress the NEPA issue identified by the Court, instead of setting aside the substantive MLA decision that was upheld.

Moreover, this Circuit has recently reiterated that "when when a court sets aside an unlawful agency action under the APA, it is ordinarily 'the prerogative of the agency to decide in the first instance how best to provide relief.'" *Shands Jacksonville Med. Ctr., Inc. v. Azar*, No. 19-5087, 2020 WL 2709433, at *3 (D.C. Cir. May 26, 2020) (quoting *Bennett v. Donovan*, 703 F.3d 582, 589 (D.C. Cir. 2013) (citation omitted)); *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council,* 435 U.S. 519, 544 (1978) (holding that following remand "the agency should normally be allowed to 'exercise its administrative discretion in deciding how, in light of internal organization considerations, it may best proceed to develop the needed evidence and how its prior decision should be modified in light of such evidence as develops.'").

Plaintiffs ask this Court not only to vacate the easement, but also to require the Pipeline to be decommissioned within a set timeline.  ECF No. 527-1. This intrudes upon the Corps' ability to exercise its expertise and apply the engineering regulations that provide a process for determining how to best address a potential encroachment.

While this Court has found that it has jurisdiction to impose such injunctive relief, ECF No. 284 at 27-28, the Supreme Court has reiterated that such injunctive relief constitutes an "extraordinary remedy, which should not be granted as a matter of course"—not even in an environmental case. *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010). *See also N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) (remanding without vacatur and stating that "[w]hen a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an

appellate tribunal" (citation omitted)); *see also Cty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011-12 (D.C. Cir. 1999) ("Not only was it unnecessary for the court to retain jurisdiction to devise a specific remedy for the Secretary to follow, but it was error to do so.").

Accordingly, the Court should not vacate the easement; but, if does find vacatur appropriate, it should not dictate how the Corps should precede on remand, nor what actions it should take in response to the Pipeline's presence on federal property if the easement is vacated.

## V.      CONCLUSION

The Corps respectfully submits that the Court should not vacate the Corps' easement decision authorizing Dakota Access to construct a portion of the Dakota Access Pipeline 100 feet under the bed of Lake Oahe.  The Corps' errors were not "serious" in context, and the disruptive consequences of vacatur would be significant.

Dated: June 8, 2020                                      Respectfully submitted,

                                                         PRERAK SHAH
                                                         Deputy Assistant Attorney General
                                                         United States Department of Justice
                                                         Environment & Natural Resources Division

                                                         By: *Reuben Schifman*
                                                         REUBEN SCHIFMAN, NY BAR
                                                         MATTHEW MARINELLI, IL Bar 6277967
                                                         U.S. Department of Justice
                                                         Natural Resources Section
                                                         P.O. Box 7611
                                                         Benjamin Franklin Station
                                                         Phone: (202) 305-4224 (Schifman)
                                                         Phone: (202) 305-0293 (Marinelli)
                                                         Fax: (202) 305-0506
                                                         reuben.schifman@usdoj.gov
                                                         matthew.marinelli@usdoj.gov

                                                         ERICA M. ZILIOLI, D.C. Bar 488073
                                                         U.S. Department of Justice
                                                         Environmental Defense Section
                                                         P.O. Box 7611

Washington, DC 20044
Phone: (202) 514-6390
Fax: (202) 514-8865
Erica.Zilioli@usdoj.gov

*Attorneys for the United States Army Corps of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

## CERTIFICATE OF SERVICE

I, Reuben S. Schifman, hereby certify that on June 8, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and copies will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

*/s/ Reuben Schifman*
REUBEN S. SCHIFMAN

21