UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Standing Rock Sioux Tribe; Yankton Sioux Tribe; Robert Flying Hawk; Oglala Sioux Tribe, | |
| Plaintiffs, | **Civil No. 1:16-cv-01534-JEB** |
| and | **(Consolidated Case Nos.** |
| Cheyenne River Sioux Tribe; Sara Jumping Eagle et al., | **1:16-cv-01796 and 1:17-cv-00267)** |
| Plaintiff-Intervenors, | |
| vs. | |
| U.S. Army Corps of Engineers, | |
| Defendant-Cross-Defendant, | |
| and | |
| Dakota Access, LLP, | |
| Defendant-Intervenor-Cross-Claimant. | |

I.    <u>Significant Harm to North Dakota.</u>

North Dakota writes solely to respond to and correct inaccurate statements in the brief filed by Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Plaintiffs" or "the Tribes"), ECF No. 527 ("Pls.' Br."), and in the declaration and report of Dr. Marie Fagan, ECF No. 527-2 ("Fagan Decl.") & ECF No. 527-4 ("Fagan Report").[1]   Plaintiffs' claim that North Dakota's crude oil production will remain stagnant for two years, that any economic harm on the State will be minor, that

---

[1]   The State of North Dakota is authorized by LCvR 7(o)(1) to file an amicus brief without consent of the parties and without leave of Court.  Courts routinely permit States to file multiple amicus briefs, particularly when—as here—the parties respond to the nonparties' arguments.  *See, e.g.*, *Amicus Curiae* Wyo.'s Final Reply Br., *Colorado River Cutthroat Trout v. Salazar*, No 1:09-cv-02233 (D.D.C. Sept. 19, 2011), ECF No. 47; Reply Br. Amici Mass., et al., *Cal. Ass'n of Private Postsecondary Sch. v. Devos*, No: 1:17-cv-00999 (D.D.C. May 10, 2019), ECF No. 104.

now is the "right" time to shut down the Dakota Access Pipeline ("DAPL"), and that any negative effects to North Dakota will somehow be cured by speculative "benefits" in other places. As described below, those assertions are flat wrong and irresponsible.

As an initial issue, North Dakota takes exception to the Tribes' position that the disruptive consequences on North Dakota and its citizens are of no moment because another state stands to benefit from DAPL's closure. Pls.' Br., at 27-28; *see also* Fagan Report, at 51. Because another state may benefit is hardly reassuring to North Dakota, whose producers could lose billions of dollars in 2020 and 2021 if DAPL is shut down, much less provide comfort to the North Dakotans who may lose their livelihoods or solace to all of North Dakota's citizens who will suffer as state programs are imperiled by drastically reduced tax revenues. Simply put, shutting down DAPL will have a significant impact on North Dakota and its citizens.

The Tribes' attempt to divert attention from this clear harm that would wreak havoc in North Dakota by distorting the governing legal standard. *Allied-Signal, Inc. v. United States Nuclear Regulatory Commission* requires the Court to evaluate the disruptive consequences that would result from a change in the status-quo—here, shutting down DAPL. 988 F.2d 146, 150-151 (D.C. Cir. 1993). Neither *Allied-Signal* nor subsequent case law suggest that a court should disregard billions of dollars in economic harm and thousands of job losses by simply speculating that other parties somewhere along the chain of causation could theoretically benefit from these disruptions. Courts applying the *Allied-Signal* standard consistently examine the harms to those involved in the case without speculating whether others could gain from them. *See, e.g.*, *Delta Air Lines, Inc. v. Exp.-Imp. Bank of the U.S.*, 718 F.3d 974, 978 (D.C. Cir. 2013) (revocation of loan guarantee to airline for purchase of aircraft held disruptive, without consideration of competitive advantage other airlines could gain from the revocation); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (vacatur of order approving sale of animal drug held disruptive due to financial harms drug maker would incur, without consideration

of benefits to other drug makers who might sell a replacement drug); *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 156 F. Supp. 3d 123, 148-49 (D.D.C. 2015) (harms to workers who would lose their jobs due to vacatur of visa program held disruptive, without consideration of potential benefits to other works who might take affected workers' places). Simply put, there is no suggestion that the *Allied-Signal* test is meant to be a zero-sum game. At bottom, the harm that North Dakota is certain to endure if DAPL were shut down is real—Plaintiffs' suggestion otherwise is not only incorrect but also inappropriate.

North Dakota is set to rebound from this short-term crisis, and a shutdown while North Dakota is at the lowest point of the downturn will only serve to amplify economic losses that have already occurred and prolong the anticipated recovery.

II.    North Dakota Crude Oil Production Will Rebound.

Dr. Fagan suggests that it is "highly unlikely that North Dakota production will increase significantly in the next 18-24 months." Fagan Decl., ¶ 4, and predicts that the maximum of North Dakota crude oil production to be 936,500 barrels per day ("bpd"), Fagan Report, at 37, fig. 21. But these projections are wrong—there is no basis for Dr. Fagan's suggestion that North Dakota's crude oil production will remain stagnant for the next two years. The demand for crude oil is predicted to "bottom out," or reach its lowest point, in May 2020. Second Helms Decl., Ex. A ("Second Helms Decl."), ¶ 4. From there, DMR, relying on forecasting from the U.S. Energy Information Administration ("EIA"), projects that the balance of liquid fuels consumption will return to 2019 levels by the fourth quarter of 2020, and global production, which includes North Dakota, will return to 2019 levels by the fourth quarter of 2021. *Id.* In other words, reductions in North Dakota crude oil production are temporary.

While the State's production volumes for April and May will not be available until later in June 2020, the State currently projects North Dakota crude oil production to increase in the coming months. Daily oil production in North Dakota has already shown

positive signs of recovery since mid-May.  Second Helms Decl., ¶¶ 4, 7.

All of North Dakota's efforts toward rapid recovery, however, will be for naught if the Court orders DAPL to be shut down.  Crude oil production in North Dakota was increasing through 2019 and the first months of 2020, averaging more than 1,400,000 bpd in the year leading up the COVID-19 crisis.  Second Helms Decl., ¶ 8.  <u>To return to those levels and maintain the State's pace toward recovery alongside the global market, North Dakota needs DAPL to remain open</u>.  DAPL is still transporting roughly 40% of Bakken production volumes for the State.  *Id.* ¶ 9  And, DAPL's own data suggests that production volumes for June and July are already showing signs of a significant rebound based on increases in nominations for shipments.  *Id.* ¶ 7.

Forcing DAPL to shut down—particularly when the State is turning its eye toward recovery—will have immediate negative consequences.  Several oil and gas operators, for instance, will take their planned drilling activities from North Dakota to other states, which will only exacerbate the short-term reductions in crude oil production.  Second Helms Decl., ¶ 9.  Further, and as DMR recently explained, shutting down DAPL could disrupt "[c]rude oil take away capacity including rail deliveries to coastal refineries."  *Id.* ¶ 7.  Put differently, it is likely that a significant portion of DAPL's flows could not be diverted to rail due to insufficient rail capacity and the short-term reduction in demand.  *See* Amicus Br. N.D. Supp. Defs. & Opposing Vacatur of Easement, ECF No. 504 ("N.D. Amicus Br."), at 9-10.  Consequently, oil production will decrease *even more* because active oil and gas wells will need to be shut-in.  *Id.* at 10.  That result will not only stall recovery, but also impact the State's natural gas production, *id.* at 11, and harm shippers who may not be able to absorb additional costs resulting from more expensive transportation methods and supply chain disruption, *see* Second Helms Decl., ¶ 9.  This in turn will lead to *thousands* of lost jobs and *hundreds of millions* in reduced tax revenue for North Dakota, imperiling critical State programs at a time when our citizens need them most.

III.   **The Short-Term Impacts of the COVID-19 Pandemic in No Way Lessen the Disruptive Consequences of Shutting Down DAPL.**

North Dakota crude oil producers will lose billions of dollars in 2020 and 2021 if DAPL is shut down.  Plaintiffs remarkably claim that any harms resulting from shutting down DAPL would be "minor" and would be "lost in the noise" of the COVID-19 pandemic's short-term impacts on the demand for crude oil and that now is the "right" time to shut down DAPL.  Pls.' Br., at 24-25; Fagan Decl., ¶ 5; Fagan Report, at 8.  This is wrong, and is unfortunately cavalier about the safety and welfare of North Dakota's citizens, most importantly because the pandemic's effects on North Dakota crude oil production are temporary, as evidenced by the fact that production is already beginning to rebound.  Second Helms Decl., ¶¶ 4, 7.  Further, even assuming that Dr. Fagan is correct that oil production will remain stagnant (she is not), the pandemic's impacts would only amplify the economic disruption and negative effects to North Dakota and its citizens that would result from a DAPL shutdown.

North Dakota is a small, sparsely populated state with comparatively limited economic output.  Declaration of Joe R. Morrisette, Jr., ECF No. 504-1 ("First Morrissette Decl."), ¶ 4; Second Morrissette Decl., Ex. B ("Second Morrissette Decl."), ¶ 6, n.1.  Yet North Dakota is the nation's second largest oil and gas producer, accounting for more than 12% of United States crude oil production.  N.D. Amicus Br., at 2-3.  As a result, the State's economy is heavily dependent on the oil and gas industry, and the State extensively relies on revenues from the extraction and production of oil and natural gas to balance its budget and provide critical government services.  *Id.* at 4.  Nearly one-fifth of the State's general fund revenues come directly from oil and gas taxes, and other revenue sources comprising half of all general fund revenues are tied closely to oil and gas extraction and production.  First Morrissette Decl., ¶ 9; Second Morrissette Decl., ¶ 6.  Moreover, North Dakota cannot realistically turn to another revenue source to make up for substantial losses in oil and gas-related tax revenues.  As the Director of North

Dakota's Office of Management and Budget previously explained, the State would have to impose the highest sales tax and vehicle use taxes in the nation to make up for just a $2 billion reduction in tax revenues—the amount the State would lose if a DAPL shutdown caused a 500,000 bpd reduction in crude oil production.  First Morrissette Decl., ¶ 11.

The losses resulting if DAPL is shut down would be devastating in any economic climate, but doubly so if they were experienced during an economic crisis.   The importance of oil and gas extraction and production makes it easy to understand why the pandemic has deeply affected North Dakota's economy, residents, and government.   All parties agree that the crisis has depressed crude oil demand and production in the short term.   Consequently, overall tax revenues from February to May 2020 represent a shortfall of $133 million year over year, due in large part to the decline in oil production, shopping, and motor vehicle activity necessitated by social-distancing measures.  Second Morrissette Decl., ¶ 7.   At the same time, unemployment claims and public-health expenditures have spiked.  *Id.* ¶ 8.

Shutting down DAPL in the face of these losses would add far more than "minor" additional harms, including substantial additional job losses and a further reduction in state oil and gas tax revenues.   DAPL still is transporting more than a third of Bakken region crude oil production.   These shipments are crucial, because it is $5 to $10 cheaper to transport crude oil on DAPL than on other transportation networks, even assuming unrealistically that those networks could transport all of DAPL's volume.   The short-term decline in the price of and demand for crude oil has narrowed already small margins for producers in North Dakota and caused thousands of wells to be temporarily shut-in.  *See* Second Helms Decl., ¶ 9.   Shutting down DAPL—the most economic and efficient transportation method, and, in the case of Midwestern refiners, the *only* feasible method—would erode these margins even more, making production uneconomic for *additional* producers, who would be forced to shut-in *additional* wells until the price of oil recovers.   These shut-ins would of course lead to *additional* lost drilling jobs in a time of

6

high unemployment and *additional* lost state tax revenues.  *Id.*  Second Morrissette Decl.,  ¶¶ 8-9.  Neither the workers who would lose their jobs until the wells reopen nor the State officials who must find funds to continue providing critical government services until tax revenues rebound would discount these impacts simply because other losses have been experienced as a result of the current short-term crisis or because some other State may benefit.

It is also important to understand that *all* North Dakota residents—including Plaintiff Standing Rock Sioux Tribe—stand to lose from large reductions in State tax revenues.  North Dakota's general fund supports various public programs and services benefitting all residents, including:

- Road construction and maintenance;

- State law enforcement;

- State parks and recreation areas;

- Development projects related to the State's water sources, including the Missouri River; and

- Healthcare services.

Second Morrissette Decl., ¶ 10.  A shutdown of the pipeline would cause up to $2 billion in lost tax revenues.  First Morrissette Decl., ¶ 11.  This is a distinct possibility, especially when as now, low crude oil prices have narrowed already thin margins.  Losses anywhere near this magnitude would reduce the State's ability to provide these crucial services to all its residents, including Plaintiffs.

Simply put, shutting down DAPL would be extremely disruptive to North Dakota's economy in *any* economic climate, but *the worst possible time* to shut down DAPL is in the midst of an economic crisis.  Plaintiffs' suggestion otherwise is irresponsible.  And DAPL—which transports 40% of all Bakken crude oil production—will be integral to the much needed and rapidly approaching economic recovery.

IV.     DAPL Does Not Pose a Threat to Lake Oahe or the Missouri River.

Finally, it should go without saying that North Dakota takes the safety and environmental rights of all its residents seriously, and the State carefully considered those rights in weighing whether to join this matter in support of Dakota Access.  Plaintiffs' witnesses Steve Vance and Albert Two Bears discuss the importance of Lake Oahe and the larger Missouri River to the economic and physical health and the cultural and spiritual traditions of the Cheyenne River Sioux and Standing Rock Sioux Tribes, respectively. *See* ECF No. 527-10 ("Vance Decl."); ECF No. 527-11 ("Two Bears Decl."). North Dakota does not take lightly the River's importance to the Tribes, as well as its importance to the State's residents as a whole.  Indeed, the "Missouri River is the state's most valuable and readily available water source, and it is needed for a broad spectrum of beneficial uses, such as irrigation, drinking water supplies, and industry." *See* N.D. Water Comm'n & State Eng'r,  *Missouri   River   Basin   and   James   River   Basin* https://www.swc.nd.gov/basins/missouri_river/missouri_river.html (last visited May 27, 2020).

North Dakota has spent decades working diligently to protect and develop its interests in the Missouri River, and the State seeks to use it for the beneficial use of *all* its citizens. *See id.* Due in part to this longstanding commitment, the Missouri River has the best water quality of any river in the State.  N.D. State Water Comm'n, *A Reference Guide to N. D. Waters,* at 17 (2014); N.D. State Water Comm'n, *Today's Missouri River: A N. D. Perspective, at* 8 (2011).  As it has for decades, North Dakota remains committed at all levels of government to protecting and developing this vital natural resource.

Against this backdrop, the North Dakota Public Service Commission carefully reviewed DAPL's design, construction, and operational plans and determined that the pipeline "is compatible with the environmental preservation and the efficient use of resources," "will produce minimal adverse effects on the environment and upon the welfare of the citizens of North Dakota," and "will minimize adverse human and

environmental impact." *See* Findings of Fact, Conclusions of Law and Order, *Dakota Access, LLC, Dakota Access Pipeline Project, Siting Application*, No. PU-14-842, at 10 (N.D. Pub. Serv. Comm'n Jan. 20, 2016).  An applicant for a permit to construct a pipeline in North Dakota must prove all of these elements to the Commission in order to proceed, and Dakota Access did so.  The Public Service Commission recently re-reviewed DAPL's safety as part of an amendment to DAPL's permits, and after what one Commissioner called "one of the most extensive public hearings in Commission history" the Commission again concluded that the pipeline is safe.  See News Release, *PSC Approves Permit for Dakota Access Pipeline Pump Station in Emmons Cty.*, N.D. Pub. Serv. Comm'n (Feb. 19, 2020), https://www.psc.nd.gov/public/newsroom/2020/2-19-20Approval-DAPL-Emmons-County-Pump-Station.pdf.  During that process, the Commission "fully vetted" all the evidence that Plaintiffs and amici have filed in North Dakota proceedings related to safety of the pipeline.  *Id.*

Simply put, the State is satisfied that the pipeline poses no risk to Lake Oahe and that there is a serious possibility that the United States Army Corps of Engineers will be able to re-grant its easement on remand.  And because DAPL is safe, a vital part of the North Dakota economy, and integral to the State's duty to further the public interest, shutting the pipeline down would cause a multitude of disruptive consequences to North Dakota and its residents.

V.    Conclusion.

In light of these disruptive consequences, the State of North Dakota requests the Court proceed without vacatur in order to avoid devastating disruption to North Dakota's citizens, economy and a severe decrease in tax revenue, both of which would result from a temporary or permanent shutdown of DAPL.

Dated this 8th day of June, 2020.

State of North Dakota
Wayne Stenehjem
Attorney General

By:     /s/ Matthew A. Sagsveen
        Matthew A. Sagsveen
        Solicitor General
        State Bar ID No. 05613
        Email:  masagsve@nd.gov

By:     /s/ David R. Phillips
        David R. Phillips
        Assistant Attorney General
        State Bar ID No. 06116
        Email:  drphillips@nd.gov

        OFFICE OF THE ATTORNEY GENERAL
        500 North 9th Street
        Bismarck, ND  58501-4509
        Telephone (701) 328-3640
        Facsimile (701) 328-4300

Counsel for the State of North Dakota.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Standing Rock Sioux Tribe; Yankton Sioux Tribe; Robert Flying Hawk; Oglala Sioux Tribe, <br><br> Plaintiffs, <br><br> and <br><br> Cheyenne River Sioux Tribe; Sara Jumping Eagle et al., <br><br> Plaintiff-Intervenors, <br><br> vs. <br><br> U.S. Army Corps of Engineers, <br><br> Defendant-Cross-Defendant, <br><br> and <br><br> Dakota Access, LLP, <br><br> Defendant-Intervenor-Cross-Claimant. | **Civil No. 1:16-cv-01534-JEB** <br> **(Consolidated Case Nos.** <br> **1:16-cv-01796 and 1:17-cv-00267)** |

## SECOND DECLARATION OF LYNN D. HELMS

I, Lynn D. Helms, state and declare as follows:

1.      My name is Lynn D. Helms.  I am over 21 years of age and am fully competent and duly authorized to make this Declaration.  The facts contained in this Declaration are based on my personal knowledge and are true and correct.

2.      I am the Director of the North Dakota Industrial Commission ("NDIC") Department of Mineral Resources ("DMR") and I have previously submitted a declaration in this matter discussing the role of the NDIC DMR and my duties there.

3.      This declaration responds to and corrects inaccurate statements made in the brief and declarations filed by Standing Rock Sioux Tribe, Cheyenne River Sioux

Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Plaintiffs" or "the Tribes") on May 20, 2020, ECF No. 527 ("Pls.' Br."), in particular the declaration and report of Dr. Marie Fagan, ECF No. 527-2 ("Fagan Decl.") & ECF No. 527-4 ("Fagan Report"). Contrary to Plaintiffs' and Dr. Fagan's view, the current pandemic and its effect on North Dakota crude oil production will be temporary. North Dakota crude oil production is expected to rebound quickly, as evidenced by global and state trends. Plaintiffs and Dr. Fagan have no basis to suggest otherwise. Furthermore, and also contrary to Plaintiffs' and Dr. Fagan's view, the harms to North Dakota from a shutdown of DAPL will worsen the harm that has already been endured by North Dakota as a result of the pandemic and short-term collapse in crude oil demand and will not simply be "lost in the noise." Fagan Decl., ¶ 5.

4.     Dr. Fagan suggests that it is "highly unlikely the North Dakota production will increase significantly in the next 18-24 months." Fagan Decl., ¶ 4; *see also* Fagan Report, at 16, 31, 36. Fagan predicts the maximum of North Dakota crude oil production to be 936,500 barrels per day ("bpd") through 2022. Fagan Report, at 37, fig. 21. Her suggestion that oil production will not recover at all for two years is wrong. North Dakota crude oil production will recover, and the current reductions are temporary. Our most recent data shows March 2020 daily oil production of 1,430,026 decreasing 211,542 barrels per day to 1,218,484 barrels per day in April 2020 and bottoming out around May 16, 2020 at -510,000 barrels per day with 7,500 wells shut in. Daily oil production has already begun recovering to -450,000 barrels per day on June 6, 2020 with 6,200 wells shut in. To substantiate that prediction, we relied on the following graph from the U.S. Energy Information Administration's ("EIA") that forecasts the balance of liquid fuels consumption to return to 2019 levels by the fourth quarter of 2020, and *global* production to return to 2019 levels by the fourth quarter of 2021.[1]

---

[1] *Short-Term Energy Outlook*, U.S. Energy Info. Admin., https://www.eia.gov/outlooks/steo/ (last visited June 8, 2020)



5.      North Dakota's crude oil production is consistent with global trends because it is transported to coastal markets where it competes with all other domestic and international crude oil and again, the impacts to global, domestic, and North Dakota production from the pandemic are temporary.  The State currently projects North Dakota crude oil production to continue to increase in the coming months.[2]



---

[2]  *May 2020 Director's Cut,* YouTube, N.D. Dep't of Mineral Res. (May 15, 2020) https://www.youtube.com/channel/UCp5qbfZG4EBcW1c3AryHsBA?view_as=subscriber.

6.     To that end, we have also established a Bakken Restart Task Force to "facilitate rapid recovery of the oil and gas industry."[3]

7.     Plaintiffs point to statements that I made to the media, "production in the state has dropped by 550,000 barrels/day", almost identical to DAPL's 570,000 barrel/day capacity. Pls.' Br., at 22.[4] They interpret my statements to "mean[] that closure of the pipeline would not result in any noticeable change in oil transportation through other options (like rail and other pipelines) compared to a few months ago." Id. Plaintiffs take my statements out of context and are incorrect as to their meaning. I was discussing how "thousands of wells had been idle in recent weeks," which corresponded to the drop in production of 550,000 bpd.[5] I made no comparison of the idle wells to DAPL's capacity, much less offer conclusions that shutting down DAPL would not affect oil transport. In fact, my May 15, 2020 DMR report "Director's Cut" explicitly states that "[a] possible shut down of DAPL" could "disrupt[] "[c]rude oil take away capacity including rail deliveries to coastal refineries"[6] Moreover, DMR data agrees with DAPL's data, suggesting that while May was a depressed month, June and July are already showing signs of a significant rebound based on an increase in nominations for shipments. Given DAPL's expected rebound, diverting its daily flows to rail transport would take years and result in extensive job losses, as I previously explained. See ECF No. 504-2 ("First Helms Decl.") ¶¶ 10, 14.

8.     Dr. Fagan's claim that "[p]rospects for North Dakota oil production growth were weakening before the coronavirus crisis," Fagan Report, at 6, is also not true. The EIA shows that crude oil production *was increasing through 2019 with normal seasonal*

---

[3] Press Release, *Bakken Restart Task Force established to outline plan forward to strengthen N. D.'s energy future*, N.D. Dept. of Mineral Res., at 1 (May 6, 2020), https://www.dmr.nd.gov/oilgas/pressreleases/Final.5.06.20_Bakken_Restart_Task_Force_Press_Release.pdf

[4] *See* James MacPherson (AP), *N.D. aims to use COVID-19 aid to plug oil wells*, Billing Gazette (May 15, 2020), https://billingsgazette.com/news/state-and-regional/north-dakota-aims-to-use-covid-19-aid-toplug-oil-wells/article_eadee456-3b1f-5b04-8d75-a0280fcb72ea.html.

[5] *Id.*

[6] Lynn Helms, *supra*.

*variation in the first few months of* 2020, averaging more than 1,400,000 bpd in the year leading up to the COVID-19 crisis, as reflected in the following table that reflects North Dakota's production of crude oil (thousand barrels per day).[7]

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| **2019** | 1.374 | 1.310 | 1.363 | 1.364 | 1.367 | 1.400 | 1.416 | 1.442 | 1.404 | 1.480 | 1.477 | 1.439 |
| **2020** | 1.398 | 1.425 | | | | | | | | | | |



JJ Kringstad - North Dakota Pipeline Authority

9.      There is no support for Plaintiffs' claim that any harms to North Dakota that would be suffered as a result of a DAPL shutdown have already been incurred due to the collapse in demand for crude oil. Pls.' Br., at 28. DAPL is still transporting roughly 40 percent of Bakken production volumes. Much of this crude oil transportation is subject to

---

[7] *N.D. Field Prod. of Crude Oil*, U.S. Energy Information Admin., https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=MCRFPND2&f=M (last visited May 27, 2020).

price hedges and firm capacity transportation contracts, so it must be produced and transported to market commitments or shut in if a force majeure event occurs.  If DAPL is shut down, this production will likely be shut-in until prices rebound and alternative transportation can be secured.  This would lead a number of oil and gas operators in North Dakota to take their planned drilling activities from the State to other areas, which would cause extensive job losses.  *See* First Helms Decl., ¶ 12.  A shutdown would also increase costs for shippers.  Margins are already razor thin due to the pandemic's short-term effects on crude oil demand, and shippers cannot absorb additional costs resulting from more expensive transportation methods and supply chain disruption.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 8, 2020.

Executed on June ___8th___, 2020.

_____
Lynn D. Helms

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Standing Rock Sioux Tribe; Yankton Sioux Tribe; Robert Flying Hawk; Oglala Sioux Tribe,<br><br>        Plaintiffs,<br><br>and<br><br>Cheyenne River Sioux Tribe; Sara Jumping Eagle et al.,<br><br>        Plaintiff-Intervenors,<br><br>    vs.<br><br>U.S. Army Corps of Engineers,<br><br>        Defendant-Cross-Defendant,<br><br>and<br><br>Dakota Access, LLP,<br><br>        Defendant-Intervenor-Cross-Claimant. | **Civil No. 1:16-cv-01534-JEB**<br>**(Consolidated Case Nos.**<br>**1:16-cv-01796 and 1:17-cv-00267)** |

## SECOND DECLARATION OF JOE R. MORRISETTE

I, Joe R. Morrisette, state and declare as follows:

    1.    My name is Joe R. Morrisette.  I am over 21 years of age and am fully competent and duly authorized to make this Declaration.  The facts contained in this Declaration are based on my personal knowledge and are true and correct.

    2.    I am the Director of the North Dakota Office of Management and Budget (the "OMB") and I have previously submitted a declaration in this matter discussing the role of OMB and my duties there.

    3.    This declaration responds to various assertions made in the brief and declarations filed by Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala

Sioux Tribe, and Yankton Sioux Tribe ("Plaintiffs" or "the Tribes") on May 20, 2020 (ECF No. 527) ("Pls.' Br.") and their witnesses, in particular the declaration and report of Dr. Marie Fagan, ECF No. 527-2 ("Fagan Dec.") & ECF No. 527-4 ("Fagan Report").

4.      Plaintiffs' expert's own numbers suggest that North Dakota crude oil producers will lose billions of dollars in 2020-21 if even a portion of DAPL's volume is shut-in.  Fagan Report, at 48.   Nevertheless, Dr. Fagan goes on to argue that "[a]ny impacts [to North Dakota] that could occur would be so minor as to be lost in the noise of the other factors affecting the market."  Fagan Decl., ¶ 5.  Far from "minor," these losses would be devastating to North Dakota, a small state in terms of both population and economic output that is extremely dependent upon revenues from the extraction and production of oil and natural gas. These expected losses to North Dakota producers— which are significant on their face—also represent the further loss of jobs and considerable tax revenue.

5.      As North Dakota witness Lynn Helms describes, crude oil demand and production are widely expected to quickly recover from the substantial, but temporary impacts of the COVID-19 pandemic.   *See* Second Helms Decl., Ex. A ("Second Helms Decl."), ¶ 4.  This is the most important reason why Dr. Fagan's assessment is incorrect. Crude oil production is expected to rebound as the nation continues to reopen from the pandemic.  However, shutting down DAPL would hamper this recovery by taking away the most cost-effective crude oil transportation option at a time when crude prices are still recovering and margins are still thin as a result.   *See* Second Helms Decl., ¶¶ 4, 7. Additionally, a DAPL shutdown before this inevitable recovery takes place would amplify the short-term effects of the current economic crisis by adding to already high short-term job and revenue losses.

6.      If North Dakota crude oil producers lose billions of dollars, North Dakota would experience a large and irreplaceable shortfall in tax revenues at a time when the State's budget is already strained as a result of the short-term effects of the COVID-19

pandemic.  Nearly one-fifth of all the State's general fund revenues come directly from oil and gas taxes, and other revenue sources comprising half of the State's revenues are heavily correlated to oil and gas activity and are thus indirectly dependent on oil and gas extraction and production.  *See* ECF No. 504-1 ("First Morrissette Decl."), ¶ 9.  These revenues support critical state government programs, including public elementary and secondary education, higher education, and health and human services.[1]  However, due to the COVID-19 pandemic, the State's tax revenues have already fallen dramatically, both as a result of reduced oil and gas production and because of the pandemic's effects on other revenue sources.

7.      Direct tax revenues from oil and gas extraction and production in February through May 2020 grew by $4M year over year, an increase of less than 1%.  However, the State budget was based on an expected increase in oil and gas tax revenues of over 13% during that time. Actual revenues represent a shortfall of $89.9 million compared the projected revenues upon which the official budget is based.  Other crucial revenue sources have suffered heavily as well.  For example, the State is heavily reliant on sales, use, and motor vehicle excise tax revenue, which for 2019-21 is expected to be $2.1 billion, or 44%, of all general fund revenues.  First Morrissette Decl., ¶ 9.  The COVID-19 pandemic has temporarily reduced this revenue stream, as residents have been forced to avoid shopping and motor vehicle travel to avoid spreading the illness.  The State saw a $39 million year-over-year decrease in sales, use, and motor vehicle excise tax revenues in February through May 2020, a 12% reduction.   The collapse in oil activity and the COVID-19 pandemic has affected all State tax revenues.  Considering oil and

---

[1]  As a small, sparsely populated state, North Dakota cannot simply turn to other revenue streams to cover this huge percentage of its biennial budget.  *See* First Morrissette Decl., ¶ 11 (explaining that to make up for a $2 billion reduction in tax revenues, which represents the amount that would be lost from a reduction in crude oil production equal to DAPL's 570,000 bpd volume, the State would have to impose the highest sales and vehicle use taxes in the nation).  Thus, North Dakota's reliance on revenues from the crude oil industry is not, as Plaintiffs claim, merely a "policy choice[]."  Pls.' Br., at 27.

gas taxes and all general fund tax revenue types, North Dakota saw a $133 million year-over-year reduction in overall tax receipts for February through May 2020, which represented a shortfall of $161 million against expected revenues for that period.

8.     At the same time, like numerous states throughout the country, North Dakota has seen an acute spike in unemployment claims.  Unemployment claims in the State  increased from 5,135 during February 1 to June 1, 2019 to over 76,000 during the same months of 2020.  Unemployment benefits paid during that time period grew from $37 million in 2019 to over $146 million in 2020.  North Dakota's  services to its citizens are more critical than ever.

9.     Thus, contrary to Dr. Fagan's statement that "[t]he best time to close a pipeline is when oil demand and prices are low," Fagan Report, at 54, now is the *worst possible time* to shut down DAPL, an integral part of the State's economy and tax-revenue stream.  DAPL is still transporting more than a third of Bakken region crude oil production.  Shippers rely so heavily on DAPL for a reason: It is vastly more economical than the transportation alternatives.  At 570,000 barrels per day, a $5 to $10 per barrel increase in shipping costs translates to $1 to $2 billion per year.[2]  Given the pandemic's short-term effects on the price of and demand for crude oil, margins for producers are already razor thin, and in some cases non-existent.  *See* Second Helms Decl., ¶¶ 4, 7.  Under these conditions, it is incorrect to assume that shippers can collectively absorb billions of dollars

---

[2]  Dr. Fagan's estimate of only a $2-$3 differential between DAPL and rail is grossly inaccurate and does not comport with the State's understanding and experience regarding the cost components of these alternative transportation options.  *See* Fagan Report 39-40, fig. 22.  In fact, Dr. Fagan testified on behalf of the Minnesota Department of Commerce in 2017, stating that "[p]ipelines are, in general, considered more cost-effective than rail to transport oil, with a cost of $5 per barrel by pipeline compared to $10 to $15 on rail."
*See In re:  Appl. Enbridge Energy, Ltd. P'ship Certificate of Need for Line 3 Replacement Project in Minn. from N.D. Border to Wis. Border*, Direct Test. of Dr. Marie Fagan, Minn. P.U.C., Docket No. PL9/CN-14-916, at 36, https://mn.gov/eera/web/project-file?legacyPath=/opt/documents/34079/Fagan_Direct_Testimony%2014-916.pdf (Sept. 11, 2017).

in additional transportation costs.  When the costs of producing and delivering crude oil to its destination exceed the revenues that can be obtained on the market for them, producers will shut-in wells to stop the bleeding until prices recover.  This is a basic economic principle.  These closures would cause furloughs or layoffs of workers and reduced tax revenues for the State in addition to those already related to the temporary impacts of COVID-19 on the North Dakota economy.

10.    All North Dakota residents, including Plaintiff Standing Rock Sioux Tribe, stand to lose from these shortfalls.  General fund revenues support various public programs from which all state residents benefit, including:

- Road construction and maintenance;

- State law enforcement;

- State parks and recreation areas;

- Development projects on the State's water sources, including the Missouri River; and

- Healthcare services.

11.    Moreover, as the demand for crude oil rebounds (which it is already beginning to do) and Bakken production consequently increases, a DAPL shutdown would slow the recovery by depriving the State of as much as $2 billion in state oil and gas tax revenues during a two-year budget period.  *See* First Morrissette Decl., ¶ 10.

12.    North Dakota has obviously not "already" incurred these losses, as Plaintiffs and Dr. Fagan suggest.  *See* Pls." Br. 27 ("Shutting down DAPL would not trigger a decrease in North Dakota oil production of 570,000 barrels a day, or anything close to it. Oil production—and associated tax revenue—has already plummeted by that amount …." (internal citation omitted));  Shutting down DAPL at this time would add *additional* losses to those already realized as a result of COVID-19's temporary but far-reaching impacts on North Dakota's economy, adding to already high unemployment rates and reducing

the State's ability to fund crucial government services until the economic rebound accelerates.

13.     Finally, North Dakota takes the safety and environmental concerns of its residents very seriously.  Plaintiffs' witnesses Steve Vance and Albert Two Bears discuss the importance of Lake Oahe and the larger Missouri River to the economic and physical health and the cultural and spiritual traditions of the Cheyenne River Sioux and Standing Rock Sioux Tribes, respectively.  *See* ECF No. 525-10 ("Vance Decl."); ECF No. 525-11 ("Two Bears Decl.").  North Dakota does not take lightly the River's importance to the Tribes, as well as its importance to the State's residents as a whole.  Indeed, the Missouri River-Lake Oahe system is the most important water body in North Dakota.  *See* N.D. Water Comm'n & State Eng'r, *Missouri River Basin and James River Basin* (last visited May 27, 2020), https://www.swc.nd.gov/basins/missouri_river/missouri_river.html ("The Missouri River is the state's most valuable and readily available water source, and it is needed for a broad spectrum of beneficial uses, such as irrigation, drinking water supplies, and industry.").  The State has spent decades working diligently to protect and develop its interests in the Missouri River, and is committed to utilizing it for the beneficial use of *all* its citizens.  *See id.*  Due in part to this longstanding commitment, the Missouri River has the best water quality of any river in the State.  N.D. State Water Comm'n, *A Reference Guide to N. D. Waters, at* 17 (2014); N.D. State Water Comm'n, *Today's Missouri River: A N. D. Perspective, at* 8 (2011).  As it has for decades, *North* Dakota remains committed at all levels of government to protecting and developing this vital natural resource.

14.     Against this backdrop, I understand that the North Dakota Public Service Commission carefully reviewed DAPL's design, construction, and operational plans and determined that the pipeline "is compatible with the environmental preservation and the efficient use of resources," "will produce minimal adverse effects on the environment and upon the welfare of the citizens of North Dakota," and "will minimize adverse human and

environmental impact." *See* Findings of Fact, Conclusions of Law and Order, *Dakota Access, LLC, Dakota Access Pipeline Project, Siting Application*, No. PU-14-842, at 10 (N.D. Pub. Serv. Comm'n Jan. 20, 2016).  An applicant for a permit to construct a pipeline in North Dakota must prove all of these elements to the Commission in order to proceed, and Dakota Access did so.  The Public Service Commission recently re-reviewed DAPL's safety as part of an amendment to DAPL's permits, and after what one Commissioner called "one of the most extensive public hearings in Commission history" the Commission again concluded that the pipeline is safe.  See News Release, *PSC Approves Permit for Dakota Access Pipeline Pump Station in Emmons* Cty., N.D. Public Service Comm'n (Feb. 19, 2020), https://www.psc.nd.gov/public/newsroom/2020/2-19-20Approval-DAPL-Emmons-County-Pump-Station.pdf.  During that process, it is my understanding that the Commission considered all the evidence Plaintiffs and amici have filed in North Dakota proceedings related to the safety of the pipeline. *Id.* Simply put, the State is satisfied that the pipeline poses no risk to Lake Oahe.  And because DAPL is safe, a vital part of the North Dakota economy, and integral to the State's duty to further the public interest, shutting the pipeline down would cause disruptive consequences to North Dakota and its residents.

Executed on June __8___, 2020.

_____
Joe R. Morrisette