## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE, YANKTON
SIOUX TRIBE; ROBERT FLYING HAWK;
OGLALA SIOUX TRIBE,

        Plaintiffs,

   and

CHEYENNE RIVER SIOUX TRIBE; SARA
JUMPING EAGLE ET AL.,

        Plaintiff-Intervenors,

     v.

U.S. ARMY CORPS OF ENGINEERS,

        Defendant-Cross Defendant,

   and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-Cross
        Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-
1796 and 17-cv-267)

---

## REDACTED REPLY BRIEF OF DAKOTA ACCESS, LLC REGARDING REMEDY

---

William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................1

ARGUMENT ...................................................................................................................3

I.     Plaintiffs Mischaracterize The Court's Power To Remand Without Shutting Down An Operational Pipeline ....................................................................................3

II.     The Corps Can Substantiate Its Decision To Grant The Easement ........................8

      A.     The Relevant Question Is Whether The Corps Has A Serious Possibility Of Substantiating Its Easement Decision ...................................8

      B.     Plaintiffs Offer No Reason To Doubt That The Corps Can Substantiate Its Easement Decision ..........................................................11

III.     Vacating The Easement Would Cause Immense Economic, Environmental, And Other Harm .........................................................................................16

      A.     Shuttering The Pipeline Would Impose Unprecedented Economic Consequences On Numerous Parties ........................................................17

           1.     Current Economic Conditions Would Only Exacerbate The Harmful Consequences Of Vacatur ...............................................17

           2.     There Is No Basis For Discounting The Disruptive Economic Consequences Of Vacatur .............................................................20

      B.     Shuttering The Pipeline Would Harm The Environment And Public Health ........................................................................................22

      C.     Preserving The Status Quo Will Not Harm Plaintiffs ...............................24

CONCLUSION ..............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A.L. Pharma, Inc. v. Shalala,*
  62 F.3d 1484 (D.C. Cir. 1995) .................................................................6

*Advocates for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
  429 F.3d 1136 (D.C. Cir. 2005) ..............................................................5

*Alaska v. Andrus,*
  580 F.2d 465 (D.C. Cir. 1978) .................................................................6

*Allied-Signal, Inc. v. NRC,*
  988 F.2d 146 (D.C. Cir. 1993) ..............................................3, 6, 9, 10, 14, 16

*Alpharma, Inc. v. Leavitt,*
  460 F.3d 1 (D.C. Cir. 2006) ...............................................................5, 16

*Am. Bankers Ass'n v. NCUA,*
  934 F.3d 649 (D.C. Cir. 2019) ............................................................5, 7

*Am. Farm Bureau Fed'n v. EPA,*
  559 F.3d 512 (D.C. Cir. 2009) .................................................................5

*Am. Wild Horse Pres. Campaign v. Perdue,*
  873 F.3d 914 (D.C. Cir. 2017) .................................................................7

*American Rivers v. U.S. Army Corps of Eng'rs,*
  271 F. Supp. 2d 230 (D.D.C. 2003) .........................................................20

*Backcountry Against Dumps v. Perry,*
  2017 WL 3712487 (S.D. Cal. Aug. 29, 2017) .....................................7, 20, 25

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.,*
  2016 WL 4445770 (C.D. Cal. Aug. 12, 2016) ...............................................7

*Black Oak Energy, LLC v. FERC,*
  725 F.3d 230 (D.C. Cir. 2013) .................................................................5

*Cement Kiln Recycling Coal. v. EPA,*
  255 F.3d 855 (D.C. Cir. 2001) ...............................................................14

*Checkosky v. SEC,*
  139 F.3d 221 (D.C. Cir. 1998) ...............................................................16

*City of Oberlin v. FERC,*
    937 F.3d 599 (D.C. Cir. 2019) ..............................................................................2, 5, 21

*Comcast Corp. v. FCC,*
    579 F.3d 1 (D.C. Cir. 2009) ...............................................................................................16

*In re Continental Airlines Corp.,*
    907 F.2d 1500 (5th Cir. 1990) ...........................................................................................21

*In re Core Commc'ns, Inc.,*
    531 F.3d 849 (D.C. Cir. 2008) ...........................................................................................16

*Davis Cty. Solid Waste Mgmt. v. EPA,*
    108 F.3d 1454 (D.C. Cir. 1997) .........................................................................................20

*Davis v. Mineta,*
    302 F.3d 1104 (10th Cir. 2002) .........................................................................................22

*Defs. of Wildlife v. U.S. Dep't of the Interior,*
    931 F.3d 339 (4th Cir. 2019) ...............................................................................................4

*Del. Riverkeeper Network v. FERC,*
    753 F.3d 1304 (D.C. Cir. 2014) ...........................................................................................6

*Diné CARE v. Jewell,*
    312 F. Supp. 3d 1031 (D.N.M. 2018) ..................................................................................6

*Diné CARE v. U.S. Office of Surface Mining Reclamation & Enf't,*
    2015 WL 1593995 (D. Colo. Apr. 6, 2015)....................................................................6, 22

*DOT v. Public Citizen,*
    541 U.S. 752 (2004)......................................................................................................10, 15

*Fox Television Stations, Inc. v. FCC,*
    280 F.3d 1027 (D.C. Cir. 2002) ...........................................................................................5

*Friends of Animals v. Bureau of Land Mgmt.,*
    2018 WL 3795222 (D. Or. Aug. 9, 2018)..............................................................................7

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs,*
    109 F. Supp. 2d 30 (D.D.C. 2000) .......................................................................................7

*Fund for Animals v. Norton,*
    294 F. Supp. 2d 92 (D.D.C. 2003) .....................................................................................22

*Greater Yellowstone Coal. v. Bosworth,*
    209 F. Supp. 2d 156 (D.D.C. 2002) .....................................................................................7

*Greater Yellowstone Coal. v. Kempthorne*,
    577 F. Supp. 2d 183 (D.D.C. 2008) ...................................................................7

*Harjo v. Andrus*,
    581 F.2d 949 (D.C. Cir. 1978) .........................................................................23

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F. 3d 193 (D.C. Cir. 2009) ..........................................................................9

*Humane Soc'y of U.S. v. Dep't of Commerce*,
    432 F. Supp. 2d 4 (D.D.C. 2006) .......................................................................7

*Humane Soc'y of U.S. v. Johanns*,
    520 F. Supp. 2d 8 (D.D.C. 2007) .......................................................................6

*Kunaknana v. U.S. Army Corps of Eng'rs*,
    2014 WL 12813625 (D. Alaska July 22, 2014) ................................................7

*La. Fed. Land Bank Ass'n v. Farm Credit Admin.*,
    336 F.3d 1075 (D.C. Cir. 2003) .........................................................................6

*Lilliputian Sys., Inc. v. PHMSA*,
    741 F.3d 1309 (D.C. Cir. 2014) .........................................................................5

*Maryland v. EPA*,
    958 F.3d 1185 (D.C. Cir. 2020) .........................................................................5

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ...........................................................................6

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ...........................................................................................7

*Mont. Wilderness Ass'n v. Fry*,
    408 F. Supp. 2d 1032 (D. Mont. 2006) ..........................................................4, 6

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs*,
    No. 9:19-cv-44, D.E. 151 (D. Mont. May 11, 2020) .........................................5

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) ...........................................................................................8

*Nat'l Parks Conservation Ass'n v. Semonite*,
    422 F. Supp. 3d 92 (D.D.C. 2019) ..........................................................6, 7, 9, 20

*Nat'l Parks Conservation Ass'n v. Semonite*,
    916 F.3d 1075 (D.C. Cir. 2019) .....................................................................9, 16

*Nat'l Wildlife Fed'n v. Norton*,
  332 F. Supp. 2d 170 (D.D.C. 2004) .......................................................................7

*New York v. NRC*,
  681 F.3d 471 (D.C. Cir. 2012) ........................................................................7, 14

*NRDC v. NRC*,
  606 F.2d 1261 (D.C. Cir. 1979) ........................................................5, 6, 10, 20

*NRDC v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020) ...........................................................................10

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  2005 WL 2035053 (W.D. Wash. Aug. 22, 2005) ...............................................6

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ............................................................................6

*Oglala Sioux Tribe v. NRC*,
  896 F.3d 520 (D.C. Cir. 2018) ......................................5, 6, 7, 11, 20, 21, 22

*Or. Nat. Desert Ass'n v. Zinke*,
  250 F. Supp. 3d 773 (D. Or. 2017) ...................................................................6

*Pac. Rivers Council v. U.S. Forest Serv.*,
  942 F. Supp. 2d 1014 (E.D. Cal. 2013) .............................................................7

*PEER v. FWS*,
  189 F. Supp. 3d 1 (D.D.C. 2016) .......................................................................6

*PEER v. Hopper*,
  827 F.3d 1077 (D.C. Cir. 2016) ...................................................................6, 20

*Radio-Television News Directors Ass'n v. FCC*,
  184 F.3d 872 (D.C. Cir. 1999) ......................................................................5, 6

*Realty Income Trust v. Eckerd*,
  564 F.2d 447 (D.C. Cir. 1977) ......................................................................6, 8

*Reed v. Salazar*,
  744 F. Supp. 2d 98 (D.D.C. 2010) ....................................................................6

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ..........................................................................................8

*Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) ....................................................................5, 6

*Sierra Club v. U.S. Army Corps of Eng'rs*,
645 F.3d 978 (8th Cir. 2011) ................................................................22

*Sierra Club v. U.S. Army Corps of Eng'rs*,
803 F.3d 31 (D.C. Cir. 2015) .................................................................4

*Sierra Club v. U.S. Army Corps of Eng'rs*,
909 F.3d 635 (4th Cir. 2018) ................................................................4

*Sierra Club v. USDA*,
841 F. Supp. 2d 349 (D.D.C. 2012) .......................................................6

*Sierra Club v. Van Antwerp*,
719 F. Supp. 2d 77 (D.D.C. 2010) .........................................................6

*Sierra Forest Legacy v. Sherman*,
951 F. Supp. 2d 1100 (E.D. Cal. 2013).................................................7

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
255 F. Supp. 3d 101 (D.D.C. 2017) ..............................................11, 21

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
282 F. Supp. 3d 91 (D.D.C. 2017) ...................10, 11, 16, 21, 22, 23

*Sugar Cane Growers Co-Op. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002) ................................................................6

*Susquehanna Int'l Grp., LLP v. SEC*,
866 F.3d 442 (D.C. Cir. 2017) ..............................................................5

*W. Watersheds Project v. Zinke*,
2020 WL 959242 (D. Idaho, Feb. 27, 2020)........................................6

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) ............................................................16

*Wildearth Guardians v. U.S. Bureau of Land Mgmt.*,
2020 WL 2104760 (D. Mont. May 1, 2020)......................................4, 6

*WildEarth Guardians v. Zinke*,
368 F. Supp. 3d 41 (D.D.C. 2019) ........................................................7

*Wisconsin v. EPA*,
938 F.3d 303 (D.C. Cir. 2019) .......................................................22, 23

*WorldCom, Inc. v. FCC*,
288 F.3d 429 (D.C. Cir. 2002) ..............................................................6

**Regulations and Administrative Materials**

40 C.F.R.

    § 1501.7.........................................................................................................................12
    § 1502.2.........................................................................................................................12
    § 1502.21.......................................................................................................................12
    § 1508.9.........................................................................................................................12

**Other Authority**

U.S. Nat'l Response Team, *Mid-Missouri River Sub-Area Contingency Plan*
    (2015).............................................................................................................................14

**INTRODUCTION**

Plaintiffs have not put even a pinhole in DAPL's unparalleled safety record or the multiple features that make it our Nation's safest mode for transporting oil.  Nothing the Plaintiffs offer changes the fact that the likelihood of a large spill at Lake Oahe is 1 in nearly 200,000 years.

The harm through 2021 *just* to North Dakota, its employers, and its residents from shutting DAPL down would exceed $7.5 billion—a huge sum for a state that size.  Plaintiffs brush off these losses—including hundreds of millions in needed tax revenue and thousands of jobs—on the ground that North Dakota's pain may be someone else's gain.  To paraphrase the famous October 1975 *Daily News* headline:  "Plaintiffs to North Dakota: Drop Dead."

Adding insult to injury, Plaintiffs exploit the COVID-19 pandemic to argue billions in lost dollars would just be "lost in the noise" of an already temporarily depressed economy.  That speaks volumes on whether the Plaintiffs have *any* good faith disruption argument but for the pandemic— they don't—and it contradicts Plaintiffs' assertion that others will gain if North Dakota loses.

The pandemic is no excuse for vacatur.  The Court should not embark on Plaintiffs' novel experiment of shutting down a major pipeline, which has been in service for three years, and which carries 4.5% of the nation's crude oil, during a pandemic, on the pessimistic and flawed hope that the economy will remain depressed for more than another year anyway.  The pandemic is a once-in-a-century event with respect to its effect on the economy, and to the extent there has been a slowdown, it has been as a result of government decisions that are already being reversed.  The economy is already rebounding, as last Friday's employment numbers show.  And even under Plaintiffs' predictions, the cure for an economic downturn is seldom to eliminate whole industries that provide employment for U.S. citizens.  To say that now is "the best time" to force a major crude oil pipeline offline for such an extended period, D.E. 525-4 § 9 (Fagan Report.), is like saying that a storm is the best time for an airplane to lose an engine.  Shutting down the pipeline

1

now would be a foolish gamble based on data already known to be inaccurate and rank speculation.

From an environmental perspective, shutting down the pipeline—and thus requiring producers to try to get crude to market by other means—would be the judicial equivalent of a major federal action with no additional regulatory oversight or environmental agency review or approval. For instance, while Dakota Access undisputedly has equipment and personnel in place to respond to a spill in Lake Oahe roughly ■ *times* larger than the Corps' WCD, rail carriers' existing response plans are much less comprehensive, have no tailoring for a train wreck into Lake Oahe, and would not need to be updated to account for the increased rail traffic in the event of vacatur.

And shutting DAPL down would be entirely unprecedented.  Plaintiffs identify not ***a single case*** of vacatur after an interstate pipeline has begun operation, let alone one that has been in service for three years despite Plaintiffs' repeated opportunities to try to shut it down.

Both the Corps and this Court have carefully studied the alternative to vacatur, and it is supported by three years of safe operation with zero mainline releases.  The Court has directed the Corps to prepare an EIS, and Plaintiffs do not deny it is "plausible that the [Corps] will be able to supply the explanations required" of it on remand.  *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019).  The EIS need not resolve to Plaintiffs' satisfaction each of the concerns the Court raised, and Dakota Access's brief offered comprehensive evidence, which the Corps will consider on remand, that would easily justify the easement.  Plaintiffs' responsive declarations are inaccurate and misinformed, and even on their own terms none refute that the likelihood of a large spill at Lake Oahe is 1 in nearly 200,000 years.  Plaintiffs' own expert previously stated, unequivocally, that the risk of an incident on DAPL would be *lower* today than it was three years ago, when the Court allowed DAPL to continue operating.  *See* Ex. B ¶ 20 (2nd Godfrey Dec.).

But despite this uncontroverted safety record and reality, Plaintiffs, as predicted, continue

to advocate that the Court impose a "zero-risk" safety standard for oil pipelines.  *See* D.E. 527-11 (Dec. of Albert Two Bears), ¶ 5 (seeking assurance that "an oil pipeline leak will not happen").  Dakota Access anticipated this in its opening brief.  *See* D.E. 509-1 ("D.A. Br."), at 1 ("Of course the reality is that no set of safety measures or response plans will ever satisfy them, because they do not want any oil pipelines operating anywhere.").  There is no merit to Plaintiffs' novel no-risk standard.  *See* Ex. B ¶ 3(e) (2nd Godfrey Dec.) ("No law or regulation applies such a zero-risk standard.  It is not, and never has been, a requirement for operating pipelines, because there is no such thing as a zero-risk mode of transportation of any commodity.").  There is nothing new in Plaintiffs' brief or declarations that would support the Court overriding extensive federal regulation along the lines Plaintiffs seek.

A straightforward application of each *Allied-Signal* factor—the Corps' ability to substantiate its decision to issue the easement and the disruptive consequences of vacatur—thus strongly weighs against vacatur.  That is why Plaintiffs seek to avoid *Allied-Signal*'s application by asserting inaccurately that remand without vacatur is rare and that the first prong is unavailable when a court remands for preparation of an EIS.  The case law supports neither position.  Under a proper application of *Allied-Signal*, the Court should decline to vacate.

## ARGUMENT

### I.     Plaintiffs Mischaracterize The Court's Power To Remand Without Shutting Down An Operational Pipeline

As in the prior remedy briefing, Plaintiffs try to distract from a straightforward application of *Allied-Signal, Inc. v. NRC*, 988 F.2d 146 (D.C. Cir. 1993), with broad claims that remand without vacatur is inappropriate in NEPA cases.  D.E. 527 ("Tribes Br."), at 2-5, 12-18.  But because that remedy is far more common than Plaintiffs let on, the Court should again apply *Allied-Signal* based on the circumstances of this case, rather than Plaintiffs' inaccurate generalizations.

Those circumstances show how *unusual* vacatur would be.  Indeed, Plaintiffs' brief confirms that shutting down an operational pipeline pending remand would be literally unprecedented—to say nothing of a pipeline as well-vetted, safe, and important as DAPL.  D.A. Br. 31-32. Although Plaintiffs claim there is "nothing unusual about vacating or enjoining pipelines . . . once operations begin," Tribes Br. 20, they fail to cite ***even a single case*** of an active pipeline being shut down for the duration of a remand.

Plaintiffs cite ***only one example*** of shutting down an active pipeline—or ***any active infrastructure project or utility***, for ***any period of time*** for ***any purpose***—and even then they misrepresent that case.  *See Mont. Wilderness Ass'n v. Fry*, 408 F. Supp. 2d 1032 (D. Mont. 2006).  Plaintiffs leave out that the court in *Fry* thought the pipeline was *already* inoperative and thus should "remain" so pending compliance with NEPA.  *Id.* at 1034.  But when the court learned that the pipeline *was* operational, it *lifted* its injunction.  *See* D. Mont. No. 4:00-cv-39, D.E. 172 ¶¶ 5-8 (Jan. 26, 2006); *id.*, D.E. 174 (Feb. 3, 2006) (lifting Jan. 12, 2006 injunction).  With that and one other brief exception apparently premised on the same mistake, *id.*, D.E. 132 (Apr. 23, 2004); *see id.*, D.E. 172 ¶¶ 3-5, the court allowed the pipeline to remain in operation for nearly two and a half years pending completion of an EA or EIS, *see id.*, D.E. 190 (Sept. 22, 2006).  Plaintiffs' *sole* example of a court shutting down an active pipeline thus counsels *against* vacatur, not for it.

Plaintiffs are left with other inapt cases that:  (1) did not involve pipelines or other infrastructure projects, *Wildearth Guardians v. U.S. Bureau of Land Mgmt.*, 2020 WL 2104760, at *2 (D. Mont. May 1, 2020) (oil and gas development leases); (2) did not vacate anything, *see Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 34 (D.C. Cir. 2015) (finding no NEPA violation); or (3) addressed construction of proposed pipelines not yet in operation, *e.g.*, *Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 343 (4th Cir. 2019) ("proposed . . . pipeline"); *Sierra*

*Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635, 639 (4th Cir. 2018) ("propose[d]" pipeline); *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, No. 9:19-cv-44, D.E. 151, at 11 (D. Mont. May 11, 2020) ("construction of new" pipelines).  Plaintiffs offer a double dose of fiction to assert that *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017), "vacate[d] permits for a gas pipeline that was already in operation," Tribes Br. 20.  All three pipelines in that case were "under construction" at the time of the decision, 867 F.3d at 1363, and construction continued, with vacatur never taking effect, because the D.C. Circuit stayed its mandate until remand was completed.  *See* D.C. Cir. No. 16-1329, Doc. 1716729, at 3 (Feb. 6, 2018) (FERC committing to complete remand by March 23, 2018); *id.*, Doc. 1721094 (Mar. 7, 2018) (staying mandate until March 26, 2018).  Simply put, there is *no* precedent for shuttering DAPL nearly three years into its safe operation.

Ultimately the remedy decision here requires a "particularized analysis" of the circumstances of *this* case.  *NRDC v. NRC*, 606 F.2d 1261, 1272 (D.C. Cir. 1979).  Where, as here, agency action is "potentially lawful but insufficiently or inappropriately explained," courts "frequently" remand without vacatur, wholly apart from disruptive consequences.  *Radio-Television News Directors Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999); *see Maryland v. EPA*, 958 F.3d 1185, 1208 n.13 (D.C. Cir. 2020); *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1047-49 (D.C. Cir. 2002).  And courts *almost always* remand without vacatur where, as here, the consequences of vacatur are disruptive.  *E.g.*, *City of Oberlin*, 937 F.3d at 611; *Am. Bankers Ass'n v. NCUA*, 934 F.3d 649, 673-74 (D.C. Cir. 2019); *Oglala Sioux Tribe v. NRC*, 896 F.3d 520, 538 (D.C. Cir. 2018); *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 451 (D.C. Cir. 2017); *Lilliputian Sys., Inc. v. PHMSA*, 741 F.3d 1309, 1314 (D.C. Cir. 2014); *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013); *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 528 (D.C. Cir. 2009); *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 12 (D.C. Cir. 2006); *Advocates for Hwy. & Auto Safety v. Fed.*

*Motor Carrier Safety Admin.*, 429 F.3d 1136, 1151-52 (D.C. Cir. 2005); *La. Fed. Land Bank Ass'n v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002); *Sugar Cane Growers Co-Op. of Fla. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002); *WorldCom, Inc. v. FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995); *Radio-Television News Directors Ass'n*, 184 F.3d at 888; *Allied-Signal*, 988 F.2d at 151.

*Allied-Signal*—not some categorical preference for vacatur—governs NEPA cases. *Oglala*, 896 F.3d at 538 (denying vacatur based on both *Allied-Signal* factors despite "serious" NEPA violations).  Plaintiffs' brief shows this empirically.  They cite nine cases, including *Oglala*, allowing challenged agency actions to stand in whole or in part pending a NEPA remand.[1]  This *outnumbers* the NEPA cases Plaintiffs cite that vacated in full after applying *Allied-Signal*.[2]  And they omit many other NEPA cases that have remanded without vacatur.  *E.g.*, *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1309 (D.C. Cir. 2014) (remanding pipeline certificate without vacatur); *NRDC v. NRC*, 606 F.2d at 1272; *Sierra Club v. USDA*, 841 F. Supp. 2d 349, 362-63

---

[1]  *See Sierra Club v. FERC*, 867 F.3d at 1379 (discussed *supra*, at 5); *PEER v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016) (declining to vacate existing regulatory approvals for wind turbine generators); *Alaska v. Andrus*, 580 F.2d 465, 473 (D.C. Cir. 1978) (declining to set aside sale of oil and gas lease); *Realty Income Trust v. Eckerd*, 564 F.2d 447, 457 (D.C. Cir. 1977) (denying injunction and allowing office building construction to proceed); *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 103 (D.D.C. 2019) (declining to vacate permits for electrical infrastructure project); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 79 (D.D.C. 2010) (partial vacatur allowing some construction to continue pending remand); *Fry*, 408 F. Supp. 2d at 1034 (discussed *supra*, at 4); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 871-72 (9th Cir. 2005) (remanding to district court, which declined to vacate permit or enjoin operation of refinery platform, 2005 WL 2035053, at *2 (W.D. Wash. Aug. 22, 2005)).

[2]  *See WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 2020 WL 2104760 (D. Mont. May 1, 2020); *W. Watersheds Project v. Zinke*, 2020 WL 959242 (D. Idaho, Feb. 27, 2020); *PEER v. FWS*, 189 F. Supp. 3d 1 (D.D.C. 2016); *Diné CARE v. U.S. Office of Surface Mining Reclamation & Enf't*, 2015 WL 1593995 (D. Colo. Apr. 6, 2015); *Or. Nat. Desert Ass'n v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017); *Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2010); *see also Humane Soc'y of U.S. v. Johanns*, 520 F. Supp. 2d 8, 37 (D.D.C. 2007) (applying similar analysis without citing *Allied-Signal*); *cf. Diné CARE v. Jewell*, 312 F. Supp. 3d 1031, 1110-13 (D.N.M. 2018).

(D.D.C. 2012) (declining to vacate past permit while leaving open whether construction can proceed without further permit); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019) (declining to vacate existing leases).[3]  The NEPA cases that vacated without addressing *Allied-Signal* are inapt.[4]  They merely reflect a court's "discretion" not to address *Allied-Signal* when the agency "has not requested remand without vacatur." *Am. Bankers*, 934 F.3d at 674.  To read these cases as going further would be contrary to *Oglala*.  Where vacatur is contested and "would have the effect of injunctive relief"—such as by shutting down an active pipeline—"it cannot be held that a vacatur is the presumptive remedy [for] a NEPA . . . violation." *Beverly Hills*, 2016 WL 4445770, at *6 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)).

The case law thus shows that where an agency has already made a good-faith effort to analyze a project's environmental impacts, NEPA's purpose can be served without vacatur by giving the agency a chance to either "substantiate [its] original substantive decision" or "make a different . . . decision" based on further analysis. *Semonite*, 422 F. Supp. 3d at 99.

Here, as the prior Administration recognized, the Corps has exhibited "remarkable diligence and professionalism" throughout its NEPA review, USACE_ESMT 605, devoting years of attention and hundreds of pages of analysis to the Lake Oahe crossing—more than for many other pipelines it has allowed to cross jurisdictional waters.  That this Court has now called for further

---

[3]  *See also Friends of Animals v. Bureau of Land Mgmt.*, 2018 WL 3795222 (D. Or. Aug. 9, 2018); *Backcountry Against Dumps v. Perry*, 2017 WL 3712487, at *3 (S.D. Cal. Aug. 29, 2017); *Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, 2016 WL 4445770, at *6 (C.D. Cal. Aug. 12, 2016); *Kunaknana v. U.S. Army Corps of Eng'rs*, 2014 WL 12813625, at *3 (D. Alaska July 22, 2014); *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1018, 1024 (E.D. Cal. 2013); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1109 (E.D. Cal. 2013).

[4]  *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017); *New York v. NRC*, 681 F.3d 471 (D.C. Cir. 2012); *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 210 (D.D.C. 2008); *Humane Soc'y of U.S. v. Dep't of Commerce*, 432 F. Supp. 2d 4, 25 (D.D.C. 2006); *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170 (D.D.C. 2004); *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 44 (D.D.C. 2000).

analysis based on four topics, D.E. 496, at 18—out of the 339 discrete comments that the Corps carefully rebutted on remand, RAR 110, 141-280—hardly suggests an agency decision to "act first and comply with NEPA later." D.E. 521-1 ("Members of Congress Amicus Br."), at 5-7.[5] This is not a case, therefore, in which vacatur is needed to properly align the Corps' "'incentives'" in "'future agency actions,'" *id.* at 6—an approach incommensurate with the "'presumption of regularity'" that Congress and this Court owe to their coequal branches of government. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004). Relief for NEPA violations is not meant to be "punitive." *Realty Income Trust*, 564 F.2d at 456-57. Crediting the Corps' extensive environmental analysis to date, D.A. Br. 10-12, would only *encourage* careful analysis in future cases.

Finally, given the Corps' record of good faith and the presumption of regularity to which it is entitled, there is no reason to believe that denying vacatur would negatively affect the Corps' decision on remand. The Corps has already pledged that it "will not prejudge the outcome" of the remand. D.E. 507 ("Corps Br."), at 10. Cases on the preference for an EIS before "resources have been committed," Tribes Br. 8 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)), are inapt. Resources *have* been committed. Plaintiffs had—and they exercised—multiple fair opportunities to stop both construction and operation. Vacatur would only encourage Plaintiffs to drag the remand process out, as they did during the last remand when even less motivated to cause delay. D.E. 456, at 58-60. The Court should not allow it.

## II.  The Corps Can Substantiate Its Decision To Grant The Easement

### A.  The Relevant Question Is Whether The Corps Has A Serious Possibility Of Substantiating Its Easement Decision

Unable to deny the "serious possibility" that the Corps will "substantiate" its decision to

---

[5]  Only one of the 37 members of Congress who joined this brief comes from a state crossed by DAPL or ETCOP, and that one member represents a district far from the pipeline right-of-way.

grant an easement, *Allied-Signal*, 988 F.2d at 151, Plaintiffs try to alter that prong such that it could never apply in NEPA cases like this. The Court should reject those efforts and focus on the "extent of doubt whether [the Corps] chose correctly" to issue an easement. *Id.* at 150-51.

**1.** Plaintiffs start by addressing the wrong agency decision. The decision that the Corps must "'justify'" is the decision that the Court is considering "whether to vacate." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F. 3d 193, 197 (D.C. Cir. 2009) ("*Heartland II*"). That is the decision to issue "the easement." D.E. 496, at 42.[6] *Allied-Signal* thus asks whether, on remand, the Corps can substantiate its determination to issue the easement, rather than its earlier "determination not to perform a full EIS." Tribes Br. 6-7.

Plaintiffs' sole authority for disregarding the first *Allied-Signal* prong is dicta from the district court in *Semonite*. Tribes Br. 7. But *Semonite* points the other way. That judge found in favor of vacatur on prong one only *after* concluding that "a proper EIS . . . would potentially lead the Corps to make a different substantive decision." 422 F. Supp. 3d at 99. The Corps and Dakota Access merely ask this Court to undertake that same analysis here. The result of that analysis is different because the facts here are different. In *Semonite*, multiple expert federal agencies found that massive transmission lines would significantly harm historic views of the district encompassing Jamestown, "a region of . . . singular importance to the nation's history." *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1077-78, 1080, 1082-86 (D.C. Cir. 2019). An EIS was needed there, not because of controversy about a low probability environmental impact, but to address the magnitude of impacts that appeared to be certain and that other agencies strongly opposed. Here, the Corps has a serious possibility of substantiating its decision to issue the easement.

---

[6] The Court rightly focused on issuing the easement, D.E. 496, at 42, rather than the NWP 12 verification or Section 408 permit, *see* Tribes Br. 2 n.1, because the construction those permits authorize is now complete. The outcome would be unchanged, though, because the EIS standard and environmental impacts for those authorizations would be the same.

**2.** Plaintiffs also get the standard wrong.  They contend that the first *Allied-Signal* factor rarely can be satisfied when the agency omits a "procedur[al]" requirement because following the proper procedures on remand could "'persuad[e] [the agency] to alter what it proposed.'"  Tribes Br. 3, 8-9 (emphasis omitted).  But the D.C. Circuit has never suggested that *Allied-Signal* prong one is inapplicable every time the agency *could* change its mind.  That is always possible when the agency has "fail[ed] to consider" an aspect of the problem and must consider it for the first time on remand, as in *Allied-Signal*, 988 F.2d at 149, or *NRDC v. NRC*, 606 F.2d at 1272.  Yet remand without vacatur is still justified if the agency appears "able to substantiate its decision" after further consideration, *Allied-Signal*, 988 F.2d at 151, because in those circumstances the ultimate decision is not "'so crippled as to be unlawful,'" *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 103 (D.D.C. 2017) ("*SRST IV*").

Here, the Court ordered an EIS because it found that the Corps' "responses" to Plaintiffs' comments did not "'succeed' in resolving the points of scientific controversy."  D.E. 496, at 14, 17-18.  That is quintessentially a matter of "'insufficien[t] or inadequat[e] expla[nation]'"—the type of error that satisfies *Allied-Signal* prong one.  *SRST IV*, 282 F. Supp. 3d at 103.  Here, an EIS rather than an EA means more "analys[is] of the environmental impact" of the Corps' decision, *DOT v. Public Citizen*, 541 U.S. 752, 756-57 (2004), not necessarily a different outcome.

Plaintiffs rely on cases addressing the APA's notice-and-comment rulemaking requirement to urge a strict standard for "procedural" violations.  Tribes Br. 3.  But those cases do not fit this context.  Before an agency puts a rule proposal out for public comment, it cannot be sure what "concerns" will be "aired by interested parties" or how "the agency's decisionmaking may be affected."  *NRDC v. Wheeler*, 955 F.3d 68, 84-86 (D.C. Cir. 2020).  Here, by contrast, the Corps published its draft EA in the Federal Register and received extensive commentary from the public

and Plaintiffs specifically. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 115 (D.D.C. 2017) ("*SRST III*"); USACE_DAPL 66166-221, 69152-69169, 71225; RAR 110. As a result, the universe of issues for the Corps to address has been far more defined and identified, and then further narrowed by this litigation. D.E. 496, at 18. This Court can therefore readily assess the Corps' ability to substantiate its decision on remand with no need to speculate on which issues the agency must confront.

**3.** Plaintiffs also invoke the "seriousness" of the alleged deficiencies and the importance of "treaty and trust resources," Tribes Br. 10-11, but even when a court has "no doubt about the seriousness of [an] order's deficiencies" under NEPA, *Allied-Signal* counsels remand without vacatur unless "the agency will be unable to correct those deficiencies." *Oglala*, 896 F.3d at 538. "[T]he question for vacatur is not the *importance* of the issue, but the *extent* of the error." *SRST IV*, 282 F. Supp. 3d at 103 (citation omitted).

**B.     Plaintiffs Offer No Reason To Doubt That The Corps Can Substantiate Its Easement Decision**

Plaintiffs have little to say about how *Allied-Signal*'s first prong in fact applies to the specific facts here. The Corps' extensive, good-faith efforts to comply with NEPA, combined with the extremely low risk of a spill at Lake Oahe, leave little doubt that the Corps can substantiate its decision to grant the Lake Oahe easement.

Plaintiffs do not dispute that the Corps' EA, supplemental memoranda, and remand analysis *already* track all topics required in an EIS. D.A. Br. 10-12. They perform much of the work Plaintiffs claim will be required on remand, including evaluating "all of the pipeline's environmental effects," Tribes Br. 14, and addressing "the option of denying the permits outright" and other "alternatives" to granting the easement, *id.* at 15. *See* D.A. Br. 11-12. There is no reason the Corps cannot draw on this material and those of the agency's corresponding conclusions that

the Court's ruling leaves unaffected.  In particular, Plaintiffs never dispute that NEPA regulations encourage an agency to draw on its EA in preparing an EIS, 40 C.F.R. §§ 1502.21, 1508.9(a)(3), and limit the EIS to "significant" issues that require "more study," *id.* § 1502.2(b).  D.A. Br. 13. Critically, complying with these regulations does not mean "'substitut[ing]'" an EA "'for preparation of an EIS'" or prejudging the issues, as Plaintiffs suggest.  Tribes Br. 12-14.  Instead, it is simply a matter of "[d]etermining the . . . scope" of the EIS and which "significant issues" must be "analyzed in depth."  40 C.F.R. § 1501.7(a)(2)-(3).

Because, under NEPA and its implementing regulations, the Corps need not revisit determinations it made in the EA and that Plaintiffs already had ample opportunity to challenge, the source of any such requirement is the Court's ruling.  D.E. 496, at 18.  Plaintiffs note that this Court "did not reach" certain issues from the summary judgment briefing, Tribes Br. 14, but Plaintiffs fail to make a case for why those issues will prevent the Corps from substantiating its easement decision.  And nothing in the Court's ruling undermines the key findings supporting the easement, including DAPL's national importance, D.A. Br. 14, the lack of a viable alternative route, *id.* at 14-15, the exceedingly small risk of a spill reaching Lake Oahe, *id.* at 15-16, the "low risk/high consequence" finding, *id.* at 16, and the evaluation of the effects of a ▮▮▮▮-barrel spill, *id.* at 17.

Notably, Plaintiffs offer no reason to think that the Corps would (or should) change its top-line conclusion that the risk of a large spill is extraordinarily low, especially given the extensive PHMSA data for all pipelines showing that a spill at Lake Oahe exceeding the ▮▮▮▮-barrel worst case discharge that the Corps already modeled is a once-in-193,972-years event, D.E. 509-4 ¶ 21 (1st Godfrey Dec.).  And the odds are even lower.  Plaintiffs do not dispute that DAPL has had zero spills on its nearly 1,200 miles of mainline pipe, including the segment near Lake Oahe which

is further protected by HDD installation, thicker pipe walls, and other enhanced safety features.  D.A. Br. 18-19.  And Plaintiffs' own expert admitted in 2017 that DAPL is likely to be even safer from here on out because it is past the "brand new" stage when start-up issues arise.  D.E. 272-2 at 5 (Kuprewicz Dec.); *see also* Corps Br. 22; Ex. B ¶ 20 (2nd Godfrey Dec.).

Plaintiffs' response to the Corps' top-line conclusion on spill probability is that this Court "held to the contrary in its summary judgment ruling."  Tribes Br. 33.  They are wrong.  The Court held that four discrete aspects of the Corps' analysis were "highly controversial."  D.E. 496, at 35.  The Court did not purport to resolve the controversies.  Dakota Access's opening brief also explained in detail why those topics will not prevent the Corps from reaching the same top-line conclusion under the first *Allied-Signal* prong.  Plaintiffs ignore it entirely.  And they devote all of three sentences to the pipeline's safety when addressing the second prong.  Tribes Br. 34.  There, they rely on a declaration so full of selective statistics and apples-to-oranges comparisons as to render the author non-credible.  *E.g.*, D.E. 525-5 ¶¶ 16-21, 24-28 (3rd Holmstrom Dec.); *see* Ex. B ¶¶ 4-9 (2nd Godfrey Dec.).  That declaration's inaccuracies aside, Plaintiffs do not even attempt to explain how Sunoco's safety record could possibly transform a once-in-human-existence probability to a level that could preclude the Corps from reaffirming its easement decision.  That is especially so when the incident rate on company pipelines in 2019 was in line with the industry average, and DAPL's sterling safety record through three years of operation—better than any other pipeline—is the more relevant data point, D.A. Br. 22-23; D.E. 509-5 ¶ 27 (Stamm Dec.); Ex. B ¶¶ 7, 44 (2nd Godfrey Dec.).

Plaintiffs are even less responsive to Dakota Access's extensive discussion of the remaining three controversies.  *Compare* D.A. Br. 20-30, *with* Tribes Br. 34.  Conclusory assertions that

Dakota Access is "incorrect," plus citations to declarations, Tribes Br. 34, are not enough to preserve a response. *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001). Those declarations themselves are seriously flawed. In criticizing DAPL's leak-detection system, Plaintiffs and their witness recycle arguments that Dakota Access has already discredited. *Compare* D.E. 525-5 ¶¶ 55-56 (3rd Holmstrom Dec.) (discussing PHMSA data and study based on it), *with* D.A. Br. 22 (addressing PHMSA data), *and* D.E. 509-4 ¶¶ 11-15 (1st Godfrey Dec.) (addressing DAPL's leak-detection-system and PHMSA data); *see also* Ex. B ¶¶ 22-23 (2nd Godfrey Dec.) (elaborating on these points). As to DAPL's documentation, the pipeline has all required operations safety plans, Ex. B ¶¶ 13-16 (2nd Godfrey Dec.), and flyspecking the level of detail in a response plan—the "purpose" of which "is to provide tactical response information" for trained operations personnel, D.E. 509-5 ¶ 21 (Stamm Dec.)—does not show that the plan or response is "based on false assumptions," Tribes Br. 34. Nor is the Corps' WCD figure "flawed," *id.*; to the contrary, it is conservative and reasonable, as confirmed by the EPA's *own* estimates. Ex. B ¶ 30 (2nd Godfrey Dec.) (discussing U.S. Nat'l Response Team, *Mid-Missouri River Sub-Area Contingency Plan* (2015), Ex. 3 to Ex. B (2nd Godfrey Dec.)); *see also* D.A. Br. 25-30. By contrast, Plaintiffs' witness erroneously calculates the WCD by, among other flaws, farcically pairing the response time of a *small leak* ("one hour time to respond and shutdown") with the discharge rate of a *full-bore rupture*. D.E. 525-5 ¶ 68 n.65 (3rd Holmstrom Dec.); *see* Ex. B ¶¶ 23-24 (2nd Godfrey Dec.). The Court should not rely upon such shoddy analysis.

The Corps' significant head start on preparing an EIS, along with the substantial and undeniable factual support for the Corps' low-probability-of-a-high-consequence-event conclusion, *see New York*, 681 F.3d at 478-79, 482, make it not only "possible," *Allied-Signal*, 988 F.2d at 151, but *likely* that the Corps can resolve the items that the Court identified, prepare an appropriate

EIS, and reasonably confirm its decision to issue the easement. Indeed, Plaintiffs **do not contend otherwise**. Instead they quibble about the *scope* of the EIS, such as consideration of DAPL's "effect on incentivizing crude oil production," Tribes Br. 13, and "the fact that DAPL now proposes to *double* its capacity," *id.* at 17. But Plaintiffs do not explain how either topic would stand in the way of the Corps reaffirming its decision. In fact, because the Corps "has no ability to prevent" increased crude-oil production "due to [the Corps'] limited statutory authority over the relevant actions," its easement decision for a single water crossing "cannot be considered a legally relevant 'cause' of" crude-oil production. *DOT*, 541 U.S. at 770.

As for the proposal to increase (*i.e.*, optimize) DAPL's capacity, it awaits state-level approvals, making Plaintiffs' arguments premature. The question here is whether the Corps would be able to reaffirm the original easement decision—the one before the Court.[7] By suggesting instead that flow capacity is an all-or-nothing proposition, Plaintiffs badly contradict themselves. They acknowledge it is "incorrect" to "presume" that the Corps has only two options: "affir[m]" the pipeline "exactly as is, or not at all." Tribes Br. 14. As Plaintiffs note, the EIS process will allow the Corps to explore "alternatives" for "mitigation, or spill detection and response." *Id.* That gives the agency additional options for resolving the controversies (such as considering back-up power for valves), thus *increasing* the likelihood of the Corps being able to substantiate its decision to issue an easement.

Finally, Plaintiffs argue that "the 'seriousness' of an agency's failure is greater when the

---

[7] Plaintiffs' declarant on safety also knows that increasing DAPL's flow capacity would actually *decrease* the risk of an incident at Lake Oahe because a new pumping station would lower the pressure in the pipe under the Lake. Ex. B ¶ 21 (2nd Godfrey Dec.). Modeling also shows that a 100% increase in flow capacity would entail an increase in the WCD by only a fraction of that amount because oil drain down is not affected by flow rate. Ex. A ¶¶ 5(b), 18-20 & n.2, 28 (2nd Aubele Dec.) (increase of less than ███ barrels, from ███ to ███ barrels, with modeling showing no material difference in impact). That WCD volume would still fall well within what DAPL's PHMSA-approved response plan is prepared for. D.E. 509-5, ¶ 19 (Stamm Dec.).

agency has already been given an opportunity to better explain itself, but failed." Tribes Br. 10-11. But the D.C. Circuit's *Semonite* decision had not even been *issued* at the time of the first remand, and Plaintiffs do not dispute that this Court treated that decision as a significant change in the law. *Compare SRST IV*, 282 F. Supp. 3d at 99 (requiring "consideration" of critiques and noting agency deference), *with* D.E. 496, at 15 (requiring "'succe[ss]'" in affirmatively "re-solv[ing]" critiques). The Corps also addressed, exhaustively and in good faith, 339 comments on remand. This Court found four issues needed further resolution. Now that the Corps knows the Court's specific concerns about these issues, there is no reason to doubt that it can address them. And, as Dakota Access explained, the Corps will no longer be seeking to justify an EA under the standard in *Semonite*. *See* D.A. Br. 18. Instead, it will be producing an EIS, making this the Corps' *first* attempt to satisfy the deferential "hard look" standard that governs an EIS's review. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013). This case thus bears no resemblance to cases involving "egregious," years-long "dereliction[s]" of duty in which the agency declined to follow the "expres[s] instruct[ions]" of the Court. *Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009); *see In re Core Commc'ns, Inc.*, 531 F.3d 849, 850, 861 (D.C. Cir. 2008); *Checkosky v. SEC*, 139 F.3d 221, 226 (D.C. Cir. 1998); *see also Alpharma*, 460 F.3d at 12 (remanding without vacatur a second time).

## III.   Vacating The Easement Would Cause Immense Economic, Environmental, And Other Harm

The extraordinary "'disruptive consequences'" of shutting down DAPL independently warrant remand without vacatur. *Allied-Signal*, 988 F.2d at 151. As the Corps and diverse amici—including 15 states—have confirmed, shutting down DAPL after nearly three years of operations would cause billions of dollars in economic losses to states, industry, and Native American tribes, and put thousands out of work during an economic crisis. D.A. Br. 32-40; D.E. 504 ("ND Amicus

Br.") 7, 9-10; D.E. 514 ("States' Amicus Br.") 3-15.  The notion that the COVID-19 pandemic

will *mitigate* the damage is nonsense.  A shutdown would cause billions of dollars in economic

damage to third parties alone.  And Plaintiffs hardly dispute that a shutdown would *increase* envi-

ronmental risks, nor that there is virtually *no risk* of a large spill into Lake Oahe during the remand.

Remand without vacatur is warranted based on disruptive consequences alone.

> ### A.      Shuttering The Pipeline Would Impose Unprecedented Economic Consequences On Numerous Parties

> #### 1.      Current Economic Conditions Would Only Exacerbate The Harmful Consequences Of Vacatur

The unprecedented shutdown of DAPL would cause catastrophic economic disruption.

The cost to North Dakota oil producers alone would be approximately $5 to $9 *billion* through the

end of 2021.  Ex. E ¶¶ 7, 10(a) n.3 (2nd Makholm Dec.)  Plaintiffs erroneously speculate that the

pandemic will depress the economy and oil production "for years," causing the effects of shutting

down DAPL to be "lost in the noise."  Tribes Br. 24-25.  But it is more than just "unintuitive" (as

Dr. Fagan admits) to contend that an ongoing, once-in-a-century health and economic crisis is "the

best time" to close a major crude oil pipeline.  D.E. 525-4 § 9 (Fagan Report).  It defies reason,

because (1) market data already proves wrong Plaintiffs' economic predictions, and (2) removing

the safest, most cost-effective means of transporting more than 40% of the Bakken's current crude

oil production to the Gulf Coast would only *exacerbate* the current crisis.  *See* Ex. D ¶¶ 10-11 (2nd

Emery Dec.).  A temporary economic slowdown is no reason to keep digging a deeper hole by

destroying an important source of tax revenue for state and local governments and jobs for thou-

sands of Americans.

All available evidence undercuts Plaintiffs' central premise that a pandemic-induced de-

cline in North Dakota oil production will persist for two full years.  Market conditions and oil

production levels *already* surpass Plaintiffs' forecasted level and are improving rapidly.  D.E.

525-4 § 4.3 (Fagan Report) (predicts two years at 936,500 bpd); Ex. E ¶ 26(d) (2nd Makholm Dec.) (official reports of about 1 million bpd in North Dakota in May 2020 and projections of more than 1.1 million bpd in the Bakken in May and June 2020); Ex. D ¶ 10 (2nd Emery Dec.) (same). Spurred by the end of the Saudi-Russian trade war and the worldwide and nationwide easing of lockdowns—the temporary reason for any economic decline during the pandemic—oil prices have *more than doubled* since late April.  Ex. D ¶ 10 (2nd Emery Dec.).  The U.S. Energy Information Agency expects global oil demand to return almost to 2019 levels by the end of 2020, with a similar rise in production, and North Dakota and its in-state producers predict a corresponding local recovery.  *Id.*; Ex. G at 3 (2nd Enerplus Dec.).

Plaintiffs' bearish estimate is a single declarant's say so, without corroboration from a single market or industry expert.  Ex. E ¶¶ 5, 26(d) (2nd Makholm Dec.); D.E. 525-4 §§ 3, 4 (Fagan Report).  The same approach in 2017 yielded a dead-wrong prediction.  Plaintiffs then predicted that production would stagnate throughout the last remand period, D.E. 272-5 ¶ 55; instead, it increased 40% between mid-2017 and 2020, D.E. 512-6 ¶ 16 (1st Makholm Dec.).

Even today, demand for DAPL's services has remained strong.  June nominations are at more than ███████ barrels per day and growing as producers react to rising oil prices and demand. Ex. D ¶ 11 (2nd Emery Dec.).  It is wrong to assume that other pipelines or railroads could replace DAPL.  D.E. 525-4 § 4.3 (Fagan Report).  As DAPL's customers explain, they have long-term contracts with terminals, refiners, and others along *DAPL's* route, which no other pipeline services. Ex. D ¶¶ 28-31 (2nd Emery Dec.); Ex. F at 2-3 (Continental Dec.); Ex. G at 4 (2nd Enerplus Dec.).

Plaintiffs' own witness concedes that even if the majority of DAPL volume shifted to other pipelines—which is not even possible, Ex. E ¶ 33 (2nd Makholm Dec.); Ex. D ¶¶ 28-34 (2nd Emery Dec.)—70,000 to 179,000 barrels per day would also need to shift to rail.  D.E. 525-4 § 4.3

(Fagan Report).  The extra transport costs of $5 to $10 per barrel could cause producers to shut in *all* of that oil, even accepting Plaintiffs' economic assumptions.  *See* Ex. D ¶¶ 19-23 (2nd Emery Dec.).  Dr. Fagan's lower cost estimate has no basis in reality.  *See* D.E. 525-4 § 4.4.1 (Fagan Report).  It even contradicts *her own* prior testimony that "[p]ipelines are, in general, considered more cost-effective than rail to transport oil, with a cost of $5 per barrel by pipeline compared to $10 to $15 on rail."  *See* Ex. C ¶ 42 (2nd Rennicke Dec.).  Dr. Fagan commits a number of other basic errors that can be explained by the absence of *any* railroad experience on her resume.  These include basing her estimates for rail freight cost on only needing to get oil to Patoka, Illinois, which *has no rail terminals for unloading oil*, and counting in her rail car estimates thousands of cars that are under long-term leases or cannot carry oil.  *Id.* ¶¶ 14-16, 44.  Correcting even a fraction of Dr. Fagan's errors brings her estimate in line with Dakota Access's.  *Id.* ¶ 53.[8]

Even accepting all of Plaintiffs' assumptions, though, shipping 179,000 barrels per day to Patoka at an increased cost of $2 to $2.65 per barrel would saddle oil producers already in financial distress with at least between $130 million and $173 million in additional shipping costs per year.  Ex. C ¶ 6 (2nd Rennicke Dec.).  North Dakota alone would lose millions in annual tax revenues.  *See* D.E. 512-6 ¶ 30 (1st Makholm Dec.).  Increased rail congestion would cause significant losses to Midwest farmers expecting an all-time record grain yield—not to mention more train accidents, fatalities, air pollution, and oil spills.  Ex. C ¶¶ 64-65 (2nd Rennicke Dec.); D.E. 512-4 ¶¶ 4, 29-41 (Kub Dec.); *see also infra*, at 22-24.  These consequences amply justify remand without vacatur.

---

[8]  Plaintiffs misrepresent the rail cost estimate in North Dakota's amicus brief and declaration.  *See* Tribes Br. 26.  The "$3/barrel difference" on which Plaintiffs rely omits "[a]dditional costs, such as loading, unloading, and car leasing" that "further increase the all-in rail transportation expense."  D.E. 504-3 ¶ 10 (Kringstad Dec.); ND Amicus Br. 12.

### 2. There Is No Basis For Discounting The Disruptive Economic Consequences Of Vacatur

Plaintiffs cannot avoid these undeniable consequences by claiming that "financial" impacts do not count. Tribes Br. 18. More is at stake here. Shuttering DAPL would *increase* environmental harms, *see infra*, at 22-24, cost thousands of workers their jobs, and deprive states, localities, and other tribes of revenue to fund sovereign priorities. Regardless, D.C. Circuit precedent is clear that "social and economic costs" merit considerable weight in the *Allied-Signal* analysis, even in NEPA cases. *NRDC v. NRC*, 606 F.2d at 1272; *see also Oglala*, 896 F.3d at 538; *PEER v. Hopper*, 827 F.3d at 1084.

Plaintiffs quote *American Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230 (D.D.C. 2003) as stating that the "'[p]ublic interest weighs in favor of protecting ecosystem over avoiding economic harms.'" Tribes Br. 18. But the quote appears nowhere in that decision, nor does the case say anything about *Allied-Signal* or NEPA. Instead, the D.C. Circuit considered economic harms in *NRDC v. NRC*, *Oglala*, and *Hopper*, and it has recognized that economic losses can be "[m]ore importan[t]" than environmental harms. *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997).

This is such a case. Here, in contrast to the cases on which Plaintiffs rely, the economic consequences are substantial and certain, while the alleged environmental harm—a once-in-human-existence risk of a large spill—is speculative and offset by real environmental harms, *infra* at 22-24. Courts do not hesitate to remand without vacatur in similar circumstances. *See*, *e.g.*, *Backcountry Against Dumps*, 2017 WL 3712487, at *3, *4-5 ($44 million in lost revenue and "thirty [paying] jobs" outweighed "low" probability that operating wind farm pending preparation of an EIS could trigger "a large wildfire"); *Semonite*, 422 F. Supp. 3d at 101, 103 ("[T]he negative effects of keeping the project in place while the Corps conducts its EIS do not outweigh the . . .

harms that will occur if vacatur is ordered," including "the threat of rolling blackouts" and the "waste" of $86 million from deconstructing electrical infrastructure).

Plaintiffs, who have argued that it matters which people face perceived environmental risks from the pipeline, *SRST III*, 255 F. Supp. 3d at 135-36 (addressing Plaintiffs' arguments for an alternative route running closer to many more persons and water intakes), now insist that economic harm is fungible. They say "losses to one party are often gains to another party." *See* D.E. 525-4 § 7.1.2 (Fagan Report). The premise is as wrong as the principle is offensive. First, substantial losses would not be offset by gains anywhere else. Vacatur would strand fixed pipeline assets, upset supply agreements, and close off transport routes, Ex. E ¶ 8 (2nd Makholm Dec.), causing serious unrecoverable loss. Moreover, it is cold comfort to the state of North Dakota and its residents, who will lose hundreds of millions of dollars in desperately needed tax revenue and thousands of jobs. Courts routinely find such economic losses disruptive without attempting to predict offsetting gains to others. *See, e.g.*, *City of Oberlin*, 937 F.3d at 611 (considering harm to pipeline operator without assessing whether railroads would benefit); *Oglala*, 896 F.3d at 538 (considering financial losses to uranium mine operator without assessing whether coal miners would benefit).

Plaintiffs' argument that Dakota Access "assumed [the] risk" of vacatur, Tribes Br. 30 (quoting *SRST IV*, 282 F. Supp. 3d at 104), fails to grapple with what has changed since that decision. Dakota Access has now been operating the pipeline for three years in reliance on *this Court's* order allowing such operations to continue during the first remand. D.A. Br. 34; *cf. In re Continental Airlines Corp.*, 907 F.2d 1500, 1520 (5th Cir. 1990) ("reliance on [court] order" weighs against modifying status quo). And Plaintiffs ignore the numerous third parties who will face their own heavy losses. An unprecedented shutdown of a pipeline that has safely operated for three years would also substantially increase the risk, and thus the cost, of building new infrastructure,

yielding a more expensive, less reliable energy system.  Ex. E ¶¶ 11, 49-50 (2nd Makholm Dec.).

Plaintiffs also note Dakota Access's acknowledgement of risk during early construction, *before* all permits were issued, Tribes Br. 31 (citing D.E. 6-60 at 5), but the D.C. Circuit has clarified that reliance on duly issued agency permits—even in the face of longstanding opposition—weighs *against* vacatur.  *Oglala*, 896 F.3d at 538.  Against that binding decision, Plaintiffs cite only nonbinding *preliminary injunction* cases discounting costs that parties incurred *before* obtaining necessary agency approvals.  *See Fund for Animals v. Norton*, 294 F. Supp. 2d 92 (D.D.C. 2003) (costs of buying snowmobiling tickets before rule authorizing snowmobiling); *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978 (8th Cir. 2011) (pre-permit coal-plant construction costs); *Davis v. Mineta*, 302 F.3d 1104 (10th Cir. 2002) (disruption to contracts entered into before agency approval).  These cases say nothing about lost revenues from closing a pipeline that began operation *after* the Corps issued its approvals, and in reasonable reliance thereon.  And the only *Allied-Signal* case Plaintiffs cite involved "conclusory" harms that the court found unlikely to occur.  *Diné CARE*, 2015 WL 1593995, at *3.  None of these cases provides any basis to discount the serious harm to Dakota Access and third parties that would result from shutting down DAPL.

### B.        Shuttering The Pipeline Would Harm The Environment And Public Health

The environmental and health consequences of closing DAPL independently support remand without vacatur.  *See* D.A. Br. 40-45; *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019).

All agree that vacatur would increase rail transportation of crude oil.  *See supra*, at 18.  Contrary to Plaintiffs' assertion (at 25), this Court previously said only that the "record contain[ed] no concrete figures or substantiated studies" showing greater danger from rail transport.  *SRST IV*, 282 F. Supp. 3d at 107.  Dakota Access, the Corps, and amici have now provided those studies, which consistently show that pipeline transport yields fewer incidents per barrel-mile, a lower

percentage of crude oil spilled, fewer fatalities and injuries, and less air pollution than rail transport. D.A. Br. 41-42; *see also* D.E. 507-2. Plaintiffs ignore the greater air pollution that more trains would cause. Their sole rejoinder on the rest is a recent PHMSA study that supposedly found rail "safer . . . according to some safety metrics." Tribes Br. 25. But that study found pipelines safer than rail on every metric but one. The sole exception—14 more serious injuries and 3 more fatalities between 2007 and 2016, D.E. 507-2 at 8—is more than made up for by the serious injuries and fatalities that crude oil trains cause even when oil is *not* released, as often occurs when they hit motorists at crossings, *see* Ex. A ¶ 36 (2nd Aubele Dec.). Indeed, the increased rail traffic Plaintiffs concede could result from a shutdown would *on its own* cause more fatalities and injuries per year than *all* pipeline incidents nationwide. *Id.* The PHMSA figures also do not account for the 47 deaths caused by the 2013 derailment of a Bakken crude train in Quebec, more than fifteen times the number of fatalities from *all pipeline incidents between 2007 and 2016. Id.*

Plaintiffs try to discount these harms, saying "DAPL [is] more proximate to Tribal reservations than rail." Tribes Br. 25. But the Court must consider the increased risks to "the *public* health" and "the environment," not just Plaintiffs' interests, *Wisconsin*, 938 F.3d at 336 (emphasis added), because vacatur is an "equitable" remedy, *SRST IV*, 282 F. Supp. 3d at 109, and equity requires "reconcil[ing] the public interest with private needs," *Harjo v. Andrus*, 581 F.2d 949, 952 (D.C. Cir. 1978). Moreover, rail traffic runs *through* the SRST reservation and crosses Lake Oahe within two miles of SRST's new water intake. *See* Ex. C ¶ 66 n.56 (2nd Rennicke Dec.); Ex. A ¶ 37 (2nd Aubele Dec.). Plaintiffs' prior expert "c[ould] not rul[e] out" the risk of an incident at that crossing, D.E. 272-5, and the PHMSA report that Plaintiffs (and the Corps) cite suggests it is *more probable* than the once-in-human-existence risk of an oil spill 75 miles upstream, D.E. 507-2. *See* Ex. A ¶¶ 36-37 (2nd Aubele Dec.).

In contrast to the extensive study of, and preparation for, a large pipeline spill, the increased rail traffic would require no agency approval; no regulation would require response plans to be updated; and existing response plans for rail incidents are much less comprehensive with no tailoring for a train wreck into Lake Oahe.  Ex. A ¶¶ 39-42 (2nd Aubele Dec.); Ex. C ¶¶ 68-70 (2nd Rennicke Dec.).  The largely undisputed environmental and safety harms from increased rail transport would make shutting down DAPL "the equivalent to a major federal action with no regulatory oversight or environmental agency review and approval."  D.E. 509-3 ¶ 5 (1st Aubele Dec.).  *No regulator* has analyzed or prepared for the environmental and safety risks of diverting DAPL's oil to rail, which even Plaintiffs' expert conceded is "complicated" and would require a "very extensive analysis."  D.E. 272-5 at 33, 37.

The safety and environmental risks from increased rail transport would be just one result of vacatur.  Plaintiffs do not dispute that capping oil wells could pollute the air and contaminate groundwater.  No regulator has studied the effects of vacatur on shutting down wells either.  As for the corrosion and safety risks of shutting down DAPL, Plaintiffs respond that pipelines "like DAPL are shut down all the time in the normal course of events."  Tribes Br. 28.  But a shutdown lasting a year or more is not "the normal course of events," and would create environmental and safety risks—such as releases of huge quantities of nitrogen from the pipeline into the atmosphere.  Ex. A ¶ 43 (2nd Aubele Dec.).  By contrast, federal and state regulators have extensively studied (and approved) DAPL's safety systems, environmental impacts, and response plans.

### C.    Preserving The Status Quo Will Not Harm Plaintiffs

Preserving the status quo also is almost certain to cause Plaintiffs *no disruption*.

Plaintiffs do not address the proof that DAPL is an industry leader in safety and is likely to continue that record going forward.  *See supra*, at 13.  They do not deny that, in the extremely unlikely event of a spill, Dakota Access has resources in place to respond to ■ *times* the PHMSA-

approved WCD for Lake Oahe—much more than even Plaintiffs' extreme calculations would require.  D.A. Br. 42.  They do not dispute that a spill at the WCD volume would not affect Plaintiffs' drinking water intakes.  RAR 8072.  They falsely claim that DAPL has not implemented four API recommended practices for leak detection and safety, D.E. 527-5 ¶ 69 (3rd Holmstrom Dec.), when their witness *knows* that DAPL has done so, Ex. B ¶¶ 14, 17-18 (2nd Godfrey Dec.).  They falsely allege that surge protection is not in place by quoting the *planning* document listing recommendations that DAPL later *implemented*.  *Id.* ¶ 36.  And each of their criticisms of response plans and the planning process is demonstrably false.  Ex. A ¶¶ 22-27 (2nd Aubele Dec.).

Most importantly for purposes of preserving the status quo, a spill into Lake Oahe materially exceeding the Corps' WCD is less than a once in 193,972-year event.  *See supra*, at 12.   Any perceived consequences of such an event must be discounted by the "near-zero" likelihood that such a spill would reach Lake Oahe at all, much less harm the Tribes, during the remand.  Ex. B ¶ 2 (2nd Godfrey Dec.); *see also Backcountry Against Dumps*, 2017 WL 3712487, at *5 (discounting the consequences of "a large wildfire" on remand that "could cause irreparable injury to Plaintiffs" because the "FEIS concluded that the chances of such a fire are 'rare'").

Balancing the harms, this is not a close case.  Vacatur would cause billions in losses to states, tribes, and private parties; thousands of lost jobs; and severe environmental and safety harms.  Preserving the status quo, on the other hand, is almost certain to harm no one, and would preserve the stability of this country's oil infrastructure while we emerge from an economic crisis.

## CONCLUSION

For the reasons stated above and in the Corps' briefs, this Court's remedy order should not include vacatur.  Should the remedy include vacatur, Dakota Access joins the Corps' argument that vacatur should not include any extra language invading the Corps' prerogative to determine how to deal with an encroachment.

Dated:  June 8, 2020

Respectfully submitted,


 /s/ William S. Scherman
William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of June, 2020, I electronically filed the foregoing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

   /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*