## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,<br><br>    Plaintiffs,<br><br>  and<br><br>CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL.,<br><br>    Plaintiff-Intervenors,<br><br>    v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>    Defendant-Cross Defendant,<br><br>  and<br><br>DAKOTA ACCESS, LLC,<br><br>    Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

---

### DAKOTA ACCESS, LLC'S NOTICE OF FILING ON THE PUBLIC DOCKET CERTAIN DOCUMENTS PREVIOUSLY FILED UNDER SEAL

---

On June 8, 2020, Dakota Access, LLC ("Dakota Access") filed all declarations attached to its Reply Brief Regarding Remedy, D.E. 538-1, as attachments to its sealed Motion for Leave to File Under Seal, D.E. 538.  That Motion contemplated a review and conferral process for identifying particular information appropriate for sealing that tracks the approach to which all parties ultimately agreed after Dakota Access filed its Opening Brief Regarding Remedy.  By Minute Order dated June 9, 2020, the Court granted the Motion.

Dakota Access has since notified the other parties that no material in the following attachments needs to be sealed:

- D.E. 538-2 – Sealed Declaration of William S. Scherman ("Scherman Dec.");

- D.E. 538-9 – Scherman Dec. Ex. G, Second Declaration of Garth R. Doll.

Those declarations are therefore attached for public filing.

As for the remaining declarations, Dakota Access seeks protection of certain material under the Protective Order. All parties have agreed that Dakota Access will file them publicly with the redactions that Dakota Access or another party proposes, leaving for a later date the possibility of another party challenging the redactions as overbroad. Under the parties' agreement, until further order of the Court no party will include the information that Dakota Access has redacted in the declarations in any future public filing. Until an order resolving any disagreement as to the scope of the redacted information, a party wishing to reference or quote the redacted information must do so in a separate, sealed filing.

Pursuant to that agreement, Dakota Access hereby files the public versions of the following declarations and associated exhibits. Each exhibit is an attachment to the Declaration of William S. Scherman, D.E. 538-2.

- D.E. 538-5 – Ex. C, Second Declaration of William J. Rennicke;

- D.E. 538-6 – Ex. D, Second Declaration of Glenn Emery.

- D.E. 538-7 – Ex. E, Second Declaration of Jeff D. Makholm; and

- D.E. 538-8 – Ex. F, Declaration of Continental Resources, Inc.

Dakota Access has proposed redactions to the remaining declarations and is continuing the conferral process with the other parties described in its June 8, 2020 Motion. Dakota Access will file public versions of those declarations as soon as that process has concluded.

Dated:  June 11, 2020

Respectfully submitted,

  /s/ William S. Scherman
William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of June, 2020, I electronically filed the foregoing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

  /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,<br><br>   Plaintiffs,<br><br> and<br><br>CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL.,<br><br>   Plaintiff-Intervenors,<br><br>  v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>   Defendant-Cross Defendant,<br><br> and<br><br>DAKOTA ACCESS, LLC,<br><br>   Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

**SEALED DECLARATION OF WILLIAM S. SCHERMAN IN
SUPPORT OF DAKOTA ACCESS, LLC'S REPLY BRIEF REGARDING REMEDY**

I, William S. Scherman, declare as follows:

  1.  I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Dakota Access, LLC.  I am a member in good standing of the Bar of this Court.

  2.  The attachments hereto are true and accurate copies of the following documents:

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| A. | Declaration of Michael C. Aubele, Vice President at EXP Energy Services, Inc., refuting Plaintiffs' misrepresentations regarding the Dakota Access Pipeline's ("DAPL's") state-of-the-art leak detection systems, and comprehensive safety and response measures; confirming the adverse environmental consequences if DAPL is shut down; and explaining the lack of any agency review comparable to that required by NEPA if DAPL's volumes are diverted to rail. |
| B. | Declaration of John F. Godfrey, Senior Principal Consultant at DNV GL USA, Inc., addressing DAPL's safety, Plaintiffs' mischaracterizations of Energy Transfer's safety record, and Plaintiffs' misrepresentations about DAPL's leak detection capabilities and worst-case discharge calculation; and explaining why there remains a near-zero risk of a significant incident at Lake Oahe, and the safety and environmental risks of shutting down DAPL. |
| C. | Declaration of William J. Rennicke, Partner at Oliver Wyman, addressing Plaintiffs' misrepresentations and incorrect assumptions regarding the current capacity of the rail infrastructure network and the disruptive market effects that would result from transporting additional volumes of crude oil by rail; and confirming the safety and environmental concerns of increasing crude-by-rail volumes. |
| D. | Declaration of Glenn Emery, Vice President at Energy Transfer LP, addressing Plaintiffs' inaccurate and misleading assertions concerning petroleum market conditions; and confirming the proven need for DAPL, the multi-billion-dollar direct and indirect losses that shutting down DAPL would inflict on multiple stakeholders—including states, regional economies, Native American tribes, other third parties, Dakota Access, and Energy Transfer Crude Oil Company, LLC—under current and expected economic conditions, and the lack of an alternative to DAPL for the shipper community. |
| E. | Declaration of Jeff D. Makholm, Managing Director at National Economic Research Associates, Inc., addressing Plaintiffs' misstatements and incorrect speculation about current and expected economic and market conditions; and confirming the need for DAPL and the quantifiable disruptive economic effects of shutting down DAPL—including multi-billion-dollar annual losses to North Dakota oil producers, a direct loss of thousands of jobs in that industry alone, hundreds of millions of dollars per year in reduced tax revenue to states, and significant increased costs to build interstate oil pipelines in the future due to the risk that they could be shut down years into safe operation. |
| F. | Declaration of Continental Resources, Inc., through Ramiro Rangel, Senior Vice President of Marketing, an upstream customer of DAPL, explaining that DAPL has become more important to crude oil operations in the Bakken region given the current economic climate; that there are no other pipelines in service, or expected to come online, that can meaningfully replace DAPL; and that there is insufficient rail and trucking capacity out of the Bakken to replace the volume that DAPL transports. |

| EXHIBIT | DESCRIPTION |
|---------|-------------|
| G. | Declaration of Garth R. Doll, Vice President, Marketing, at Enerplus Corporation, an upstream customer of DAPL, explaining that industry production is expected to rebound in the near term and that shutting down DAPL will weaken the recovery efforts of oil producers by adding transportation costs; and addressing the numerous disruptive effects on, and economic losses to, third-party oil producers, the State of North Dakota, and Native American tribes if DAPL is shut down. |

Executed:  June 8, 2020

   /s/ William S. Scherman
William S. Scherman

EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,<br><br>        Plaintiffs,<br><br>  and<br><br>CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL.,<br><br>        Plaintiff-Intervenors,<br><br>      v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>        Defendant-Cross Defendant,<br><br>  and<br><br>DAKOTA ACCESS, LLC,<br><br>        Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

**SECOND DECLARATION OF WILLIAM J. RENNICKE IN SUPPORT OF
DAKOTA ACCESS, LLC'S REPLY BRIEF ON THE QUESTION OF REMEDY**

1.      My name is William J. Rennicke. I am a Partner with Oliver Wyman, a leading general management consulting firm, which maintains one of the largest practices in the world dedicated to serving the transportation and logistics sectors. I submitted a declaration in this case on April 29, 2020 (D.E. 512-2), and my background and qualifications are discussed therein.

2.      This declaration responds to incorrect and misleading assertions made by Marie Fagan, Ph.D., in her declaration (D.E. 525-2) and report, titled *Impacts of a Temporary Shutdown of Dakota Access Pipeline* (D.E. 525-4). A summary of the most notable errors regarding rail transportation made by Dr. Fagan is attached as **Attachment 1**.

3.      Dr. Fagan makes a series of flawed and incorrect assumptions that undermine her estimations of the capacity of the current rail network infrastructure and the potential impact of a Dakota Access Pipeline (DAPL) shutdown on: the rail network in the Upper Midwest, shippers who rely on DAPL to ship crude oil, shippers of other commodities who rely on railroad transportation, and the public at large. A witness with rail industry experience would not have made the obvious flawed and incorrect assumptions that I found in Dr. Fagan's analysis. Notably absent from Dr. Fagan's resume is any expertise in, or even experience analyzing issues relevant to, rail transportation. *See* Dr. Fagan Resume (D.E. 525-1). In paragraphs 4 through 11 I summarize the impacts of a DAPL shutdown after correcting Dr. Fagan's inaccurate and fundamentally flawed assumptions.

4.      If DAPL were shut down, the regional railroad network could not make up in the short term anywhere near the loss in transport capacity provided by DAPL for crude oil—i.e., nearly 570,000 barrels per day ("bpd")—nor could the rail network handle without congestion the 29 to 43 percent of DAPL's volume that potentially could be accommodated in existing rail tank cars.

        a.      There are not enough tank cars available to handle even half of DAPL's current

volume. Dr. Fagan begins by relying on reduced crude oil volumes related to the COVID-19 pandemic to assume enough unrestricted tank cars will be available to transport crude oil if DAPL is shut down. Setting aside the threshold issue of whether the pandemic and its effects are temporary, her analysis ignores that the vast majority of tank cars are already committed to various crude oil shippers, or in some cases, to other commodities that use tank cars, under long-term leases. Dr. Fagan cites no support, nor is there any, for her assumption that shippers who control these cars would be willing to give up their lease rights in favor of crude oil shippers who now use DAPL. On the contrary, shippers are unlikely to release these cars, given the short-term nature of the pandemic's effects on crude oil demand. Her calculations therefore greatly overstate the supply of railcars that could be made available in the short term to handle the volume of crude oil carried by DAPL. Furthermore, Dr. Fagan bases her flawed calculations of tank car availability in part on a decline in Canadian rail traffic using all car types—not just tank cars. She claims that an 11 percent drop in all commodities that comprise Canadian rail traffic from January to February would lead to more tank cars being available. However, when the data is analyzed by commodity and adjusted for the fact that February has fewer days than January, the decline in crude oil shipments was only 2 percent, not 11 percent. The 11 percent decline Dr. Fagan applied to tank cars is based on traffic such as containers and trailers moving on intermodal flatcars (down 13 percent) and wheat moving in hopper cars (down 15 percent), none of which have any relation to the tank cars required to move DAPL's crude oil volume.

b.      Dr. Fagan also fails to acknowledge that even if enough tank cars were somehow available to transport DAPL's volume, there is insufficient crude oil terminal unloading capacity in the regions where the crude oil is destined for rail to handle that volume. Patoka, Illinois lacks rail access or any unloading terminal for getting crude oil off trains. The Patoka hub has

traditionally relied on *pipelines*, like DAPL, to supply regional refinery needs. As such, any of DAPL's capacity that shifts to rail would need to travel to refineries other than those at or near Patoka, such as destinations on the coasts (East, West, and Gulf), which is significantly more expensive; requires longer cycle times, more equipment, and more crews; and creates greater exposure to operational risks. Additionally, some refineries on the East Coast where DAPL volume could be diverted have mothballed their rail unloading facilities since DAPL came online. It would be cost prohibitive to bring these facilities back into service for what is predicted to be short-term and irregular use for only a year or two. Furthermore, Bakken region loading facilities were taken offline after DAPL became operational and would need to be reopened if DAPL is shut down. An expectation of usage for several years would be needed to justify bringing these rail facilities back online, given that it would cost millions to recertify staff and reopen those facilities. This lack of unloading infrastructure also defeats Dr. Fagan's unsupported assertion that rail transportation offers shippers "greater speed and flexibility." D.E. 525-4 at 43.

5.      Dr. Fagan incorrectly asserts that transferring a portion of DAPL's current volume to rail would not lead to significant rail line congestion and delays. She makes this mistake by first invoking the short-term impacts of the COVID-19 pandemic to assume that rail shipping volumes will remain low for more than two years into the future. But many leading indicators, including analyses by top rail financial experts and recent weekly rail loading data, show that demand for both crude oil and rail transportation will increase sooner. Regardless, Dr. Fagan estimates a transfer to rail of between 70,000 and 179,260 bpd of DAPL's volume, and as I demonstrated in my first declaration, a transfer of volume within this range would increase rail congestion and delays. In particular, sections of routes would become bottlenecks, slowing down traffic across the entire route. Dr. Fagan completely ignores my previous analysis of the effects of volumes of this

size on the rail network.

6.      Rail transport of crude oil displaced by a DAPL shutdown would be costly, even if existing rail rolling stock and infrastructure could handle this volume. In her current report, Dr. Fagan estimates that rail costs only $2 to $3 per barrel more than DAPL, D.E. 525-4 at 40, Figure 22, despite having testified in another pipeline proceeding that rail costs $5 to $10 per barrel more to transport crude oil than pipeline (*see supra* ¶ 42). Her new $2 to $3 per barrel estimate is far too low. But even using her unrealistic numbers, shippers would still incur hundreds of millions of dollars in annual losses. Using Dr. Fagan's own estimate that 179,260 bpd would need to shift to rail, producers would still incur $130 million to $173 million in additional shipping costs per year using her $1.99 to $2.65 per barrel estimate (179,260 bpd x 365 days x $1.99/barrel = $130,205,501; 179,260 bpd x 365 days x $2.65/barrel = $173,389,235). Using her $2.65 per barrel estimate, the additional costs would swell to more than $550 million each year if DAPL's 570,000 bpd volume could be moved to rail.

7.      More importantly, Dr. Fagan's calculations of the added costs to transport crude oil by rail are grossly understated, due to faulty assumptions that display a fundamental lack of understanding of rail transportation. These errors include:

        a.      By failing to distinguish between different types of tank cars, Dr. Fagan uses the wrong lease rates to calculate railcar lease costs;[1]

---

[1] This displays Dr. Fagan's lack of understanding of a basic feature of the national rail system. Federal regulations now ban various tank cars that previously could carry crude oil (such as the "DOT-111") from doing so. The newest specification tank car for crude oil, the "DOT-117J" (and equivalents) is more expensive to lease than the older, largely obsolete, and more dangerous cars that Dr. Fagan and Plaintiffs, in using the generic category of "tank cars," incorrectly assume could also carry this oil.

b.      Dr. Fagan incorrectly assumes that new or additional tank cars could be leased at rock-bottom spot prices, when lessors generally require shippers to agree to long-term *five-to seven-year* leases, even if they might need the cars for only one or two years;[2]

c.      Dr. Fagan incorrectly assumes a charge of $1 per barrel for transloading, but when the appropriate costs for both loading at origin *and* unloading at destination are accurately included, that component of the cost *triples*;

d.      Dr. Fagan fails to consider the cost of shipping crude oil to places where it can be unloaded, which would be much more distant than the 1,172-mile rail trip to Patoka she assumes, therefore adding significantly to freight charges; and

e.      Dr. Fagan simply assumes away another $1.71 per barrel cost by speculating that railroads will "waive" their existing surcharges for transporting crude oil in older and retrofitted tank cars, which make up a substantial portion of the available crude oil tank fleet.

8.      A correct calculation that properly accounts for all rail-related transportation costs in the range of the more realistic $5 to $10 differential offered by Dr. Fagan in prior testimony shows that shippers would incur between $1.04 billion and $2.08 billion *each year* in additional transportation costs.

9.      The potential congestion and delays caused by moving DAPL's volume to rail would have widespread negative effects on agricultural and other commodities. Dr. Fagan does not dispute Elaine Kub's projection of these effects. *See* D.E. 512-4 (Kub Declaration).

---

[2] Amortizing a five-year railcar lease over two years would result in an actual cost to shippers exceeding $58 per DOT-117J tank car per day ($712.50/month times 60 months (5 years) of lease payments divided by 730 days (2 years)), or approximately $0.084 per barrel per day. While this may sound like a small amount on a per-barrel basis, at DAPL's volume, a cost increase of a single penny per barrel equates to approximately $2.1 million in annual losses to shippers. Thus, those pennies would equate to over $17.4 million per year in additional costs to DAPL shippers.

10.     Increasing the volume of crude oil shipped by rail also would raise safety concerns, including an increased risk of pedestrian/vehicular fatalities, additional blockages of road-rail crossings, and the potential impacts of transporting highly flammable crude oil through population centers and other environmentally sensitive areas. These concerns were described at length in my first declaration. Dr. Fagan does not dispute them. Additionally, moving large volumes of crude oil to rail would not trigger additional regulatory protections or oversight or even increased spill-mitigation procedures for routes on which crude oil travels, including where routes run near or through environmentally sensitive areas.

11.     Finally, the best evidence of what crude oil shippers prefer is experience: Shippers overwhelmingly have chosen DAPL over rail, even when there is sufficient rail capacity. There even have been periods in the past 18 months when nominations (that is, efforts to reserve volume on DAPL) have equaled the *total* production of the Williston Basin (of which the Bakken formation is but one part). D.E. 520-4 ¶8. Thus, even if all of Dr. Fagan's other calculations were correct, forcing shippers to transfer DAPL volume to rail would be both costly and disruptive to the crude oil supply chain.

## I.     Current Rail Rolling Stock and Infrastructure Cannot Support Even a Portion of DAPL's Volume

12.     Due to a lack of available railcars and inadequate unit train unloading capacity, the existing rail system cannot handle DAPL's full volume or even a significant portion of that volume. Dr. Fagan, however, does not account for the lack of unloading facilities, and she attempts to write off the shortage of rail tank cars by claiming that the short-term impacts of the COVID-19 pandemic on crude oil demand have made more tank cars available. This vast oversimplification renders her conclusions wrong.

13.     As an initial matter, Dr. Fagan states that the amount of crude oil transported by rail in

2019 and projected to be transported in 2020 "is far lower than the nearly 800,000 b/d crude-by-rail shipments in 2014." D.E. 525-4 at 31. This statement insinuates that because the rail network moved 800,000 bpd in 2014, it can still do so in 2020. However, this reflects a basic misunderstanding of the changes to the tank car fleet that have occurred since 2014. In 2014, there was not the same level of restrictions on the types of tank cars that could carry crude oil as there is now. The Fixing America's Surface Transportation Act ("FAST Act"), enacted in 2015, restricted the use of DOT-111 cars to transport crude oil, significantly lowering the number of available tank cars in the crude oil fleet.[3] Owing substantially to the FAST Act, the crude oil tank car fleet has shrunk 58 percent since 2014.[4] Similarly, Dr. Fagan quotes a source as saying, "Substantial fleet build-ups over the last few years due to low costs of capital and a booming fracking market have created a temporary oversupply of railcars since freight rates slowed in recent years." D.E. 525-4 at 32. This quote is misleadingly cited out of context. The observer was discussing railcars in general, not specifically tank cars or even tank cars that can lawfully carry crude oil.[5] This general statement has no relevance to the crude oil tank car fleet, which has been drastically reduced by regulation not applicable to fleets used to transport other commodities.

14.     Moving to her more specific analysis, Dr. Fagan seriously overstates the number of crude oil tank cars that could be made available in the near term if DAPL is shut down. Her estimates reflect basic misunderstandings of both how tank car fleet contracting works and the amount of

---

[3] Non-jacketed DOT-111s had to be removed from crude oil services by January 1, 2018 and jacketed DOT-111s by March 1, 2018. Railway Supply Inst., *FAST Act Implementation Update* (Feb. 2019), https://tankcarresourcecenter.com/wp-content/uploads/2019/02/FASTAct_RSI_2.21.19-1.pdf.

[4] Dr. David Humphrey, *North American Railcar Review* 12, Railinc (March 2, 2020).

[5] *See Supply and Demand of Railcars*, TCIX Rail, https://tcixrail.com/railcar-leasing/railcar-leasing-information (last visited June 1, 2020).

crude oil tank cars can carry. She estimates, based on a short-term drop in demand for crude oil due to the COVID-19 pandemic and the temporary idling of crude oil tank cars in response, that 8,138 tank cars would be available, instead of the 1,500 to 3,700 I estimated in my first declaration. D.E. 525-4 at 42. I did not include the additional temporarily idled tank cars in my estimate because they are already committed to shippers under *long-term* leases, and their availability to other shippers is therefore unaffected by short-term fluctuations in the demand for crude oil. Shippers lease the majority of tank cars from railcar lessors under long-term (typically five-to-seven-year) agreements.[6] Dr. Fagan fails to support (or even mention) the unrealistic assumption that these leases would suddenly disappear if DAPL is shut down.

15.     There is no basis to assume that shippers would be willing to surrender their contractual rights by turning their cars over to other suppliers to carry displaced DAPL volumes, even if some of these cars are temporarily idled. As discussed in more detail below, it is widely expected that crude oil and overall rail transport volumes will rebound by the end of 2020 or the beginning of 2021. Thus, shippers with current long-term tank car leases would be acting at their peril and against their own self-interest if they were to release their tank cars to others for transporting crude oil displaced by a DAPL shutdown. Indeed, the purpose of those long-term leases is to protect lessors from such short-term fluctuations in demand. Even for any shippers who might be willing, there would be delay and expense in renegotiating leases. Put simply, contrary to Dr. Fagan's suggestion, short-term fluctuations in crude oil demand, such as those related to COVID-19, do not significantly increase the availability of crude oil tank cars, due to the existence of long-term leases committing the majority of the fleet to shippers for multiple years. My estimate of 1,500 to

---

[6] David Nahass, R.R. Fin. Corp., *Understanding the Tank Railcar Lease/Finance Marketplace* 5, Ne. Ass'n of Rail Shippers (Oct. 1, 2014).

3,700 available crude oil tank cars properly takes these leases into account, and it is accurate regardless of the pandemic's short-term impacts on crude oil demand.

16.      Further, Dr. Fagan bases her estimation of 8,138 available tank cars in part on an assumption that an 11 percent decline in all Canadian rail traffic from January to February 2020 will allow more tank cars currently in Canadian crude oil service to be pressed into service to transport Bakken crude oil. D.E. 525-4 at 43, Figure 23. This decline in tonnage that she reports is not just for crude oil, however, but for *all* commodities that move by rail in Canada,[7] including a 13 percent decline in containers and trailers, which move on intermodal flatcars, and a 15 percent decline in wheat, which moves in hopper cars. A decline in demand for flatcars and hoppers is not relevant to crude oil tank car availability. Indeed, as shown in Exhibit 1, when only crude oil is considered, and when a correction is made to account for February having two fewer days to ship crude oil than January, the actual decline in Canadian crude-by-rail was only 2 percent. Dr. Fagan compounds this overinclusive sample size by incorrectly dividing the total Canadian rail tonnes for the month by just the tank car loadings for the month, rather than all railcar loadings, arriving at an obvious error of 957 tonnes per tank car—more than ten times their actual capacity. D.E. 525-4 at 43, Figure 23. The correct average of crude oil per loaded tank car in Canada in January was 85 tonnes.[8]

---

[7] Statistics Canada, Table 23-10-0216-01, *Railway carloadings statistics, by total tonnage transported, monthly*, https://www150.statcan.gc.ca/t1/tbl1/en/tv.action?pid=2310021601 (last visited May 31, 2020). Dr. Fagan reports 27,156 thousand tonnes in January and 24,291 thousand tonnes in February for total rail traffic carried, while Statistics Canada shows 30,869 thousand tonnes in January and 27,661 thousand tonnes in February. Dr. Fagan does not explain why she altered the data, but it appears that she may have removed total traffic received from United States connections.

[8] The 85 tonnes per tank car for January 2020 is based on 2,412 thousand tonnes and 28,380 loaded tank cars, from Statistics Canada, Table 23-10-0216-02, *Railway carloadings statistics,*

**Exhibit 1: Corrected difference in Canadian Crude oil Shipments for January and February 2020[9]**

| | Dr. Fagan | | Oliver Wyman Corrected | |
|---|---|---|---|---|
| | January 2020 | February 2020 | January 2020 | February 2020 |
| Canada: thousand tonnes shipped by rail (for all commodities) | 27,156 | 24,291 | | |
| Canada: thousand tonnes shipped by rail (for "fuel oils and crude petroleum" only) | | | 2,412 | 2,212 |
| Adjusted to thousands of daily tonnes (31 days in Jan and 29 days in Feb) | | | 77.8 | 76.3 |
| Percent difference in tonnes between January and February | | -11% | | -2% |

17.     Dr. Fagan also ignores the expense and logistical difficulties that would need to be overcome to use tank cars currently in Canadian service for transporting Bakken crude oil if DAPL is shut down. Dr. Fagan assumes that because some Canadian producers have idled their fleets or reduced crude-by-rail shipments temporarily, all of these unused tank cars would be immediately available to DAPL's shippers. Yet both examples she provides of Canadian producers who have temporarily reduced crude-by-rail shipments—Cenovus Energy and Imperial Oil—are producers of heavy crude, which she concedes is "a lower-value crude oil than the light shale oil from the Bakken Region." D.E. 525-4 at 32. As a result, Bakken producers would need to have all these cars cleaned before shipping their crude oil, otherwise the heavy crude residue inside the cars would mix with the light, sweet crude coming from the Bakken region, lowering the latter's value.

---

*by commodity, monthly, fuel oils and crude petroleum*,
https://www150.statcan.gc.ca/t1/tbl1/en/tv.action?pid=2310021602 (last visited May 31, 2020).
[9] D.E. 525-4 at 43, Figure 23; Statistics Canada, Table 23-10-0216-01, *Railway carloadings statistics, by total tonnage transported, monthly*,
https://www150.statcan.gc.ca/t1/tbl1/en/tv.action?pid=2310021601 (last visited May 31, 2020);
Statistics Canada, Table 23-10-0216-02, *supra* note 8.

Cleaning these cars is an expensive, time-consuming, and labor-intensive process that often requires "dig out," or in some cases having a person enter the tank car to manually scrape away the heavy crude residue.[10] This process can damage the cars' cleaning equipment, which leads to additional fees on top of cleaning costs.[11] This additional time and expense further reduces the existing fleet's capacity to handle DAPL's volume and adds to the disruption that would occur if DAPL is shut down. More fundamentally, as explained, it is unlikely that these producers would release their cars for use by Bakken producers, in light of the short-term nature of the pandemic's effects, thereby risking supply chain shortages for their production as crude oil demand rebounds.

18.     In sum, Dr. Fagan's estimate that 8,138 tank cars are available and could haul crude oil displaced by DAPL in the short term is vastly overstated and rests on fatally flawed assumptions.

19.     Second, insufficient facilities are available to unload DAPL's volume even if additional tank car capacity could be created. There is only one facility (Gateway Terminal in Sauget, Illinois) within 500 miles of the Patoka hub with the ability to unload unit trains of crude oil. Gateway Terminal can handle only one unit train of 96 cars per day. Moreover, to unload the 96 cars per day requires a cumbersome and labor-intensive switching operation that delivers and removes groups of 12 cars at eight different times in a 24-hour period. Further, Gateway Terminal has no storage capacity available for at least the next year, and additional tankage would have to be built to accommodate crude oil traffic. And Gateway is not connected to refineries in the region.[12] In

---

[10] *See* Applied Mechanical Technology, L.L.C., *White Paper—Crude Oil Rail Car Tank Cleaning*, http://www.appliedmechtech.com/wp-content/uploads/2016/08/White-paper-crude-oil-tankcar-cleaning.pdf (last visited June 1, 2020).
[11] *Id.*
[12] U.S. Energy Info. Admin., *Crude Oil Rail Terminals 2017-2018* (updated Jan. 18, 2019), https://www.eia.gov/maps/layer_info-m.php; Union Pacific, *Crude Oil Destination Facilities*, https://www.up.com/customers/ind-prod/crude/destination_facilities/index.htm (last visited June

short, the almost total lack of suitable unloading terminal capacity would require crude oil diverted by a DAPL shutdown to be routed to destinations outside the Midwest, which would further increase transportation costs and disrupt existing energy supply chains.

20.     Additionally, although there are some crude-by-rail loading facilities in the Bakken region, some of these loading facilities that were available during the crude-by-rail boom in 2014 have since been shut down in the wake of DAPL coming online. Moving DAPL's volume back to rail could therefore require additional cost and time to bring these facilities back online, which again may not be cost-effective due to the short time DAPL is expected to be shut down.

21.     Crude oil loading and unloading facilities are capital-intensive, long-term investments. If a facility has been mothballed due to a drop in crude-by-rail demand, reopening costs can be in the millions.[13] These costs include, for example, hiring and training personnel, repairing and replacing equipment, validating safety of storage tanks, making any necessary repairs to rail infrastructure, developing emergency response plans, and obtaining all necessary local certifications of staff, equipment, and operations. Furthermore, if the unloading point is a transfer facility, then downstream customers need to be contracted and transportation to those customers from the transfer facility needs to be arranged. Given the cost of reopening with irregular volume, it would not be profitable to reopen facilities in anticipation of using them for only one to two years and then shutting them down again. It also takes much more—$75 million to $100 million—and longer

6, 2020); BNSF, *Crude-by-Rail Facilities Map*, http://www.bnsf.com/ship-with-bnsf/industrial-products/crude-and-lpg/interactive-map/overview.html (last visited June 6, 2020); telephone interview with Marshall Brockman, Operations Manager, Gateway Terminal (June 1, 2020).
[13] For example, USD Partners purchased a mothballed crude oil terminal with rail facilities near Stroud, Oklahoma in July 2017 and reported one-time costs associated with the restart of $1.3 million. USD Partners, *2017 Annual Report* 111 (2018).

than two years to build a new facility.[14] Therefore, a lack of unloading capacity likely will remain a significant constraint on rail capacity, even if shippers could find enough tank cars to transport DAPL's volume.

22.     Accordingly, as I explained in my first declaration, current rail rolling stock and infrastructure lacks the capacity to handle even a significant portion of the crude oil volumes currently being transported on DAPL. The short-term effects of the COVID-19 pandemic have not changed this.

## II. Increasing the Volume of Bakken Crude Oil Transported by Rail Would Cause Congestion and Delays

23.     Dr. Fagan claims that rail congestion and delays are not a major concern if DAPL is shut down and its volume moves to rail because (a) Bakken crude oil production will remain depressed through 2022 and (b) overall rail transport volumes will remain lower as a result of the pandemic. Those assumptions are deeply flawed.

24.     As Dakota Access witnesses Dr. Jeff Makholm and Glenn Emery explain, crude oil demand is already starting to recover, and the temporary reduction in crude oil demand caused by the COVID-19 pandemic is expected to be replaced by demand *growth* in 2021. As of mid-May, the U.S. Energy Information Administration (EIA) expected Bakken crude oil production to reach 1,109,000 bpd in May 2020 and 1,309,000 bpd in June 2020, and the North Dakota Department of Mineral Resources has revised its shut-in production figures downward to just 475,000 bpd as of

---

[14] *See* Dynamic Risk, *Final Report: Alternatives Analysis for the Straits Pipelines* 7-10 (2017), https://mipetroleumpipelines.com/document/alternatives-analysis-straits-pipeline-final-report; Nicholas Zeman, *Bakken Shale Field Pushing East Coast Rail Terminal Projects*, Eng'g News-Record (Mar. 6, 2013), https://www.enr.com/articles/4245-bakken-shale-field-pushing-east-coast-rail-terminal-projects (reporting $70 million as the cost for a crude-by-rail oil terminal in 2013, which amounts to $86 million in 2020 dollars using the U.S. Bureau of Labor Producer Price Index for New Industrial Building Construction).

May 28, 2020, evincing the beginnings of a rally in production volumes that is already beginning and gaining steam faster than expected. Consistent with these numbers, Mr. Emery explains that DAPL nominations for June and July demonstrate a trend of relatively quick recovery in the demand for transportation on DAPL.

25.     As for rail transport volumes, Dr. Fagan criticizes the use of normalized traffic data to assess the impact of a DAPL shutdown. *See* D.E. 525-4 at 41. Normalized models are needed to adjust for inevitable short-term fluctuations. Dr. Fagan instead uses outlier rail and crude oil statistics grounded in the immediate reaction to one of the most severe pandemics in modern history. Data from the very bottom of the demand trough is not an accurate foundation upon which to model the capacity of the crude oil supply chain over the next two years. This is like choosing to wear a winter coat all year because it was cold in February. Dr. Fagan's unreasonably pessimistic model ignores the critical role rail will need to play in the economic recovery as demand for automobiles, energy products, agricultural products, imports/exports, and other goods return to normal levels.

26.     Dr. Fagan lacks the expertise to opine on future rail demand levels. Time and again, sudden changes in demand and operating conditions have swallowed up the rail network's reserve capacity—a situation not even the railroads can necessarily foresee. For example, in late 2012, the major railroads expected 2013 to be at most a year of slow growth with ample capacity, and early 2013 rail traffic was slightly down over the previous year.[15] Yet, by late 2013, a rapid increase in

---

[15] Pat Foran, *Rail outlook 2013*, Progressive Railroading (December 2012), https://www.progressiverailroading.com/mechanical/article/Rail-outlook-2013-reading-the-rail-car-order-barometer-Pat-Foran-Context-December-2012--33574; Tony Hatch, *Q4 2012 review: Signs that 2013 will be one terrific bridge year for the rails*, Progressive Railroading (Feb. 2013), https://www.progressiverailroading.com/canadian_national/article/Q4-2012-review-Signs-that-2013-will-be-one-terrific-bridge-year-for-the-rails-analysis-by-Tony-Hatch--35191.

crude-by-rail volumes, a record grain harvest, and severe winter weather had combined to create crippling rail network congestion in the U.S. Northern Tier. *See* D.E. 512-2 ¶24.

27.    Dr. Fagan's lack of understanding of rail traffic flows is reflected in her choice to use February 2020 as the starting point for her projection of future crude-by-rail volumes. Even in normal circumstances, February is the lowest month of the entire year for crude-by-rail volumes. She states that "US crude oil shipments by rail were down 30% in February 2020 (at 9,199 thousand bbls), compared to the most recent January 2020 shipments (13,151 thousand bbls)." D.E. 525-4 at 42. But Dr. Fagan ignores that shipments of crude-by-rail have gone down from January to February in 10 of the past 11 years (2010 to 2020). As shown in Exhibit 2, the average decline for February was 23.6 percent, making 2020's decline of 28.7 percent not far from the average.



**Exhibit 2: Percentage Change in Crude-by-Rail Shipments from January to February, by Year**[16]
U.S. domestic movement of crude oil by rail, January 2010 through February 2020



[16] U.S. Energy Info. Admin., *Total Crude Oil by Rail, monthly volumes from January 2010 through February 2020*, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=ESM_EPC0_RAIL_NUS-NUS_MBBL&f=M (last visited May 23, 2020).

28.     February has fewer crude oil shipments than any other month, as shown in Exhibit 3, for

multiple reasons including seasonality and fewer days in the month. It has a seasonality index of

0.76, while January, the month I used, has a seasonality index of 1.00, meaning it matches the

annual average of crude-by-rail monthly volumes.[17] Therefore, based on this dataset, January is

much more representative than February for determining the availability of tank cars.

**Exhibit 3: Indexed Seasonality of Crude Oil Shipments by Rail[18]**
U.S. domestic movement of crude oil by rail, January 2010 through February 2020, average = 1.0



29.     Dr Fagan further states, "It is likely that when March and April data are available, the

declines relative to January will be even steeper." D.E. 525-4 at 42. This implies that the traffic

levels of those months in 2020—months during which pandemic-related lockdowns and economic

impacts spread even further—are indicative of future crude-by-rail and overall rail traffic.

---

[17] A seasonality index indicates how demand changes month-to-month over the course of a year.
The index of 1.00 indicates average monthly demand for the year; numbers below 1.00 indicate
lower than average monthly demand; numbers above 1.00 indicate higher than average monthly
demand. The values in Exhibit 3 are based on an 11-year average (2010-2020) for January and
February and a 10-year average (2010-2019) for March through December.
[18] Volume for each month was divided by the average monthly volume for the year to establish an
index for each year; these yearly indices were then averaged for January 2010 through February
2020 to establish a monthly seasonality index. Source: *Total Crude Oil by Rail, supra* note 16.

Selecting these clear outliers from a period during which most of the United States and the world were paralyzed by a once-in-a-generation event is both misleading and methodologically unsound.

30.     Financial analysts who closely follow the rail industry—and who developed their forecasts in the March/April timeframe of expected steeper decline but used more than just outlier data— have a different outlook. While these analysts do project an overall decline in rail volumes in 2020, they expect this decline to be most acute in the early part of the year, followed by a strong recovery later in the year and continuing into 2021. Exhibit 4 provides projections from four of the leading rail financial analysts, showing an average rail traffic decline in 2020 of 10.9 percent, followed by a rebound of 12.2 percent in 2021. The Royal Bank of Canada (RBC) confirms that we are currently experiencing the trough, stating, "Our view is that this weakness [in rail volume] will continue through Q2 and then slowly start to improve in Q3"; with regard to industrial activity, RBC notes: "We are modelling for weakness to continue into Q3 and for growth to return by Q4 [2020]."[19]

**Exhibit 4: Projections by Financial Industry Analysts Are for a Full Recovery of Rail Traffic in 2021[20]**

Projections of year-over-year rail volumes

| Analyst | 2020 Traffic | 2021 Traffic | Forecast Date |
|---|---|---|---|
| Barclays | -20.4% | 29.6% | 9-Apr-2020 |
| Deutsche Bank | -10.6% | 5.8% | 8-Apr-2020 |
| Evercore | -5.6% | 6.4% | 26-Mar-2020 |
| RBC | -7.0% | 7.0% | 9-Apr-2020 |

[19] RBC Capital Markets, *(Re-)adjusting rail estimates for COVID-19*, at 3 (April 9, 2020).
[20] Barclays, North America Transportation, *Rail Est. Lower; Deep Dive on Valuation* 24-29 (April 9, 2020); Deutsche Bank Research, North America, *Railroads, Cutting industry revenue by $9 billion* 4 (April 8, 2020); Evercore ISI, Transportation, *Surface Transportation* 14 (March 26, 2020); *(Re-)adjusting rail estimates for COVID-19*, *supra* note 19, at 37; Association of American Railroads, *Weekly Railroad Traffic, 2019 Annual Summary* 37 (2019). Industry average weighted based on projected 2019 carloads for each railroad. Note: BNSF is not included in analyst reports, as not publicly traded.

| Average | -10.9% | 12.2% | |
|---------|--------|-------|---|

31.     In addition, the latest data on weekly rail carloadings shows sequential improvement in recent weeks (i.e., the weeks ending May 16 and May 23)—as lockdowns are being incrementally lifted—compared to the prior six weeks of the most stringent lockdowns.[21] The Association of American Railroads commented in its weekly rail traffic report for the week ending May 23, for example: "Of 20 carload categories we track, 15 had modestly higher loadings last week than the week before, led by motor vehicles and grain. *Meanwhile, intermodal originations were higher last week than in any of the previous 11 weeks*."[22] Similarly, trucking volumes, after hitting a low in April, are now rising: "The combination of essential freight and replenishment orders returning to the marketplace has created a double-up wave of freight moving domestically in the U.S. This surging volume exceeds many expectations."[23]

32.     Additionally, Dr. Fagan fails to recognize that oil supply and demand levels can change rapidly in the wake of an unprecedented global event such as we are experiencing now. For example, *American Shipper* noted on May 20 that the oil demand/supply narrative already had changed radically in a few weeks' time:

> Until very recently, the narrative in the tanker market went like this: The coronavirus has destroyed oil demand, excess oil will be forced into storage on tankers, a huge portion of the fleet will be tied up for an extended period, [and] far fewer ships will be left in the spot market….

---

[21] Stifel Nicolaus, *AAR Week 21: The First Week of Recovery?* (May 26, 2020); Association of American Railroads, *Weekly Rail Traffic for the Week Ending May 23, 2020*, press release (May 27, 2020).

[22] Association of American Railroads, *Weekly Rail Traffic for the Week Ending May 23, 2020*, press release (May 27, 2020) (emphasis added).

[23] Zach Strickland, FreightWaves, *Longhaul domestic freight driving May recovery, signaling a strong June* (May 30, 2020), https://www.freightwaves.com/news/longhaul-domestic-freight-driving-may-recovery-signaling-a-strong-june.

The new tanker story goes like this: Oil demand is coming back fast, floating storage has peaked, oil already stored on tankers will be drawn down much quicker than predicted, rate pain during the drawdown period will be less prolonged than expected, market dynamics will revert to old-fashioned supply versus demand, [and] demand will exceed constrained supply.[24]

33.     Even Dr. Fagan recognizes in her testimony that crude oil and rail volumes will increase: "Eventually, economic activity will recover…. And, eventually, oil production in the Bakken and other regions will begin to increase." D.E. 525-4 at 30. In an environment where there have been massive and unexpected swings in economic activity and rail traffic volumes, it is both risky and inappropriate to base long-term future crude oil supply chain actions on the lowest depths of an unprecedented trough—depths from which the network has already begun to recover. Yet Dr. Fagan used data that is rapidly becoming outdated as the basis for her claim that crude oil demand is unlikely to recover quickly and ignored evidence that the market is already regaining steam.

34.     Further, an all-time record grain yield is projected in 2020. *See* Kub Dec. ¶33 (projecting "a record-large 17 billion-bushel [grain] crop, much of which will need to be shipped by rail"). This yield is expected to significantly contribute to a quick recovery in rail volumes. Dr. Fagan fails to take this forecast into account in any part of her analysis.

35.     Accordingly, the normalized traffic model I used as the basis for my congestion analysis is a much better gauge of the potential disruptive effects on the rail network of a DAPL shutdown. Rail traffic has already begun to recover, and industry analysts agree that it will continue to do so in the coming months and into 2021, meaning that both crude-by-rail and overall rail volumes could likely reach or even surpass pre-COVID levels during the time of a DAPL shutdown.

36.     Another fundamental error Dr. Fagan makes is focusing only on "overall railroad system

---

[24] Greg Miller, *Tanker pitch goes back to basics as floating storage fades*, American Shipper (May 20, 2020), https://www.freightwaves.com/news/tanker-pitch-goes-back-to-basics-as-floating-storage-fades.

traffic," rather than region-specific figures or analysis specific to the BNSF and CP lines that would transport Bakken crude oil if DAPL is shut down. D.E. 525-4 at 34. System-wide trends simply do not paint an accurate picture of what is happening in the Williston-Bakken Basin. Although BNSF and CP do not share data specific to these routes, as explained by Dr. Makholm and Ms. Kub, it is known that the primary commodities transported over these lines are crude oil and grain, both of which are expected to rebound quickly from the effects of the pandemic. Dr. Fagan makes no effort to engage with the route-specific analysis I performed in my first declaration.

37.     As I explained at length in my first declaration, at those expected traffic levels, moving even a portion of DAPL's volumes to rail could cause significant congestion and delays on segments of the rail network. *See* D.E. 512-2 ¶¶ 17-49. Routes over which DAPL-diverted crude oil would move already have congested sections, based on the calculations in my first declaration, that would become worse bottlenecks, slowing down traffic across the entire the route. D.E. 512-2, Exhibits 18-23 and 27-29. These bottlenecks include single-track bridges with double-track approaches and line segments with already heavy train volumes (including passenger trains).

38.     Indeed, even accepting Dr. Fagan's estimate of 179,260 bpd of crude oil moving to rail if DAPL is shut down, substantial congestion and delays could result. The figure of 179,260 bpd is approximately 31 percent of DAPL's capacity, which falls within the range of 29 to 43 percent I estimated in my first declaration. *Id.* ¶ 5a. Dr. Fagan apparently ignored or does not understand my analysis, which demonstrated the delays along various segments of the Midwest rail network that could result even if only 29 percent of DAPL's capacity is shifted to rail. *See id.* ¶¶ 17-49.

39.     As I explained in my first declaration, level-of-service (LOS) is a widely accepted way to measure congestion on rail network line segments. *Id.* ¶ 36. LOS is expressed by a letter grade, from A to F. An LOS of D (near capacity), E (at capacity), or F (over capacity) means that a line

segment is becoming too congested; that is, there are too many trains running on the line compared to available capacity, which could result in slowdowns and service failures. *Id.* ¶¶35-36. Such congestion indicates that the line needs capital investment to expand capacity, or it may be necessary to reduce the number of trains if service impacts become too severe.

40.     Exhibit 5, which I presented in my first declaration, demonstrates how rail route congestion increases as the number of trains increases. As more trains are added to a rail line, the average delay for all trains increases. A large, sudden increase in trains on a route, as would be the case in the event of a DAPL shutdown, would add delay for *all* trains using the route. The impact on the specific routes likely to move the crude oil currently moved on DAPL in the event of a shutdown are set forth in greater detail in my first declaration. *See id.* ¶¶ 17-49, Exhibits 18-23 and 27-29. Dr. Fagan does not dispute my congestion analysis, but instead speculates that because of the COVID-19 pandemic, there would be excess capacity on rail routes. D.E. 525-4, Section 1.2. Yet Dr. Fagan only offers generalities, with no evidence or actual analysis to support her opinion, such as any evaluation of the specific routes I analyzed in Minnesota and Montana. Also, as I have demonstrated in this declaration (see *infra* ¶¶ 30-31), rail traffic is already showing signs of recovery from the temporary trough caused by the pandemic and is expected to continue growing through 2021.

**Exhibit 5: Example of Average Hours of Train Delay vs. Number of Trains** [25]
For 100 miles of single track, CTC, and two types of trains (assume merchandise and intermodal)



41.     Dr. Fagan cannot dispute that rapidly increasing the volumes of crude oil transported by rail as a result of a shutdown of DAPL could disrupt rail lines by increasing current traffic levels, regardless of then-current traffic levels. The formula is simple: Higher volumes of crude-by-rail translate to higher volumes of rail traffic and more congestion.

## III.  Crude Oil by Rail Transport Costs $5 to $10 Per Barrel More Than Pipeline Transport

42.     Dr. Fagan previously testified in another pipeline proceeding that "Pipelines are, in general, considered more cost-effective than rail to transport oil, with a cost of $5 per barrel by pipeline

---

[25] Oliver Wyman analysis. *See* D.E. 512-2, § II for complete analysis of rail capacity and level-of-service scenarios.

compared to $10 to $15 on rail."[26] Contradicting her prior testimony, Dr. Fagan now insists that an estimated cost differential between pipeline and rail of $5 to $10 per barrel is overstated. She then proceeds to recalculate the rail cost for transporting crude oil using inaccurate assumptions and omitting significant cost components. As an initial matter, even using her inaccurate estimate, shippers would incur more than $550 million in additional shipping costs if DAPL's volume were to be moved by rail instead. Taking Dr. Fagan's suggested volume, 179,260 bpd, producers would still incur $130 million to $173 million in additional shipping costs per year using her $1.99 to $2.65 per barrel estimate and (179,260 bpd x 365 days x $1.99/barrel = $130,205,501; 179,260 bpd x 365 days x $2.65/barrel = $173,389,235).

43.     More importantly, Dr. Fagan's lack of understanding of rail transportation leads her to a completely erroneous conclusion that grossly understates the cost of crude oil transportation by rail. The *actual increased* cost to shippers of moving DAPL's volume to rail is demonstrably between $5 and $10 dollars more per barrel and would increase yearly costs for North Dakota's crude oil shippers by $1.04 billion to $2.08 billion.

44.     Crucially, Dr. Fagan's analysis of the cost to move DAPL volume by rail uses an origin and destination pair that does not exist on the North American railroad network. Her fictitious example assumes shipment termination and unloading at the oil terminal located in Patoka, Illinois. But there is no rail line within 10 miles of Patoka and no unloading terminal within 70 miles that can unload crude oil shipments. *See supra* ¶ 19. A more appropriate—and factual—comparison of rail and pipeline costs will use *actual* origins and destinations. For my analysis of rail versus DAPL

---

[26] Before the Minnesota Office of Administrative Hearings for the Minnesota Public Utilities Commission, *In the Matter of the Application of Enbridge Energy, Limited Partnership, for a Certificate of Need for the Line 3 Replacement Project in Minnesota*, Docket No. PL-9/CN-14-916, Direct Testimony of Dr. Marie Fagan, Section 4.42, p. 36 (October 11, 2017).

costs, I used the North Dakota origin of Stanley and a destination on the U.S. Gulf Coast, Nederland, Texas. Both locations have pipeline access and crude-by-rail unit train terminal facilities for loading and unloading crude oil unit trains.

45.     Even if Dr. Fagan's analysis of rail transport costs for crude oil used a rail origin and destination movement that actually existed, her analysis is flawed, as it contains a number of significant assumption errors, several of which result in further understatement of the cost of moving crude by rail.

46.     Her first error is that she uses a railcar lease rate that does not represent the cost of the tank cars that would most likely be used over a lease period that covers the potential shutdown of DAPL. The Reuters article used as the source for Dr. Fagan's current lease rate information states, "Lease rates for railcars have fallen from about $800 per month to about $500."[27] A crude oil tank car is not just any railcar, though, nor will just any tank car do for crude oil haulage. As explained in my first declaration, there are major differences in the types and deployment of tank cars. D.E. 512-2 ¶¶ 7-11. As of April 1, 2020, several of the most common tank car types in the North American flammable liquids tank car fleet (jacketed and non-jacketed DOT-111s and non-jacketed CPC-1232s) that were once available to move crude oil are now forbidden by federal regulations from carrying crude oil. In 2018, jacketed and non-jacketed DOT-111s and non-jacketed CPC-1232s comprised 49 percent of the flammable liquids tank car fleet.[28] It is not unreasonable to assume that even though unavailable for crude oil haulage, they still represent a significant portion of the

---

[27] Devika Krishna Kumar & Laura Sanicola, *U.S. railroads push against oil industry demands for storage in railcars*, Reuters (April 9, 2020), https://www.reuters.com/article/us-global-oil-rail-storage/u-s-railroads-push-against-oil-industry-demands-for-storage-in-rail-cars-idUSKCN21R2TO.

[28] U. S. Dep't of Transp., *Fleet Composition of Rail Tank Cars Carrying Flammable Liquids: 2019 Report* 12 (Oct. 4, 2019), https://doi.org/10.21949/1504519.

reported tank car fleet. As such, their presence in the flammable liquids tank car fleet can pull down the representative "average" lease rates like those reported by Reuters, as compared to the lease rates for tank cars that can lawfully move crude oil.

47.     The appropriate method for determining the correct lease rate for tank cars capable of carrying crude oil must be specific to the actual tank car type and not an average of representative tank cars or tank cars in general. DOT-117J tank cars are designed to handle crude oil and are fully approved by regulation. Recent monthly rates on one-year or greater subleases for DOT-117J tank cars averaged between $675 and $750 per car.[29] I used $712.50 per car per month, the long-term rate (minimum term of seven years), as a more accurate estimate of a DOT-117J car's leasing cost. This is the proper rate to use because it is difficult to get long-term leases for less than five to seven years: After being burned by the collapse of crude-by-rail post-2014 and changes in tank car regulations, lessors insist on long-term leases to ensure that they can recover their investment in new cars. For jacketed CPC-1232s and DOT-117Rs, which also may be used for crude oil transport by rail, I used Dr. Fagan's $500 per car monthly lease rate, as demand for them in crude oil service is lower, given that the railroads add risk-mitigation-related surcharges to transport these cars when used to haul crude oil. *See* D.E. 512-2 ¶ 9. As a result, using the existing crude oil tank car fleet as a base, I calculate the monthly weighted average lease rate (weighted based on the percentage of units in the fleet of each crude oil tank car type) to be $584.10.[30]

48.     In addition to the lease rate, I included the excess mileage charge that lessors typically levy

---

[29] Clifton Linton, *Long Tank Cars, Short Storage*, Energy Transport Insider (April 8, 2020), https://energytransportinsider.com/post_detail.php?p=612; David G. Nahass, Correspondence (May 22, 2020) (on file with author).

[30] Weighted average lease rate calculated by summing the products of lease rates by car type multiplied by the number of that car type in the crude oil tank car fleet. The sum is then divided by the total number of tank cars in the in-service crude oil fleet.

to cover maintenance on tank cars that exceed 30,000 miles annually. Dr. Fagan makes a second error in not including this charge, which is commonplace in the tank car leasing industry. Lessors typically charge $0.04/mile for miles in excess of 30,000 per year. Assuming a 1,138-mile trip each way to a hypothetical terminal in Patoka, IL and a cycle time of 10 days roundtrip, a tank car would incur 83,074 miles a year, generating an additional $177 per month in mileage costs. If these charges and the long-term lease rate are combined, the total monthly lease cost for a DOT 117J tank car would therefore be an estimated $900 per month, or about $30 per day.[31]

49.     A third error Dr. Fagan makes is in failing to account for the surcharges applied by the railroads to jacketed CPC-1232 and DOT-117R tank cars used in crude oil service. Dr. Fagan erroneously states that the surcharge would be rarely applied to crude oil shipments, as crude oil volumes have collapsed, and railroads seek to retain customers. *See* D.E. 525-4 at 39-40. The imposition of the surcharge by the railroads is not a commercial pricing action, but rather is done in recognition of the higher risk carried by crude oil shipments using these obsolete tank car designs, which are more prone to failure during derailments. The jacketed CPC-1232 design is less robust than the DOT-117J and more prone to failure in the event of a derailment or collision, as it does not meet the HM-251 tank car standards put in place by the U.S. Department of Transportation in May 2015.[32] The DOT-117R, a retrofitted tank car, has a thinner tank shell than the DOT-117J, and thus is less puncture resistant.[33] Through the risk recovery surcharge, the

---

[31] David G. Nahass, Correspondence (May 22, 2020) (on file with author); Richard Kloster phone interview (May 26, 2020).

[32] David Nahass, *Tempest in a Tank Car*, Railway Age (July 27, 2018), https://www.railwayage.com/regulatory/tempest-in-a-tank-car/.

[33] Platts Commodity News, *BNSF, Union Pacific raises the bar for shipping crude on railroads* (July 13, 2018).

railroads seek "to encourage customers to transition to the safest equipment as soon as possible,"[34] because they have "an obligation both corporately and morally to run the safest railroad possible."[35] That obligation extends to the railcars transiting their networks and will exist regardless of the waxing and waning of crude oil traffic volumes.

50.      To properly account for risk mitigation surcharges, I added to my analysis the most recent surcharge amount of $1,200 applied to crude oil shipments using jacketed CPC-1232 tank cars.[36] For the DOT-117R tank car, I also applied the $1,200 surcharge, as both BNSF and Union Pacific have actively discouraged the use of any tank car but the DOT-117J for crude oil haulage in new contracts.[37]

51.      A fourth error is Dr. Fagan's substantial underestimation of transload costs. Dr. Fagan uses $700 per car in her analysis (*i.e.*, $1 per barrel). Her source is Dynamic Risk's *Final Report: Alternatives Analysis for the Straits Pipelines*, which was prepared for the State of Michigan.[38] The $700 cost estimate represents the transloading cost for *propane*, an entirely different commodity. The *same* document contains a more appropriate cost of approximately $1.50 per

[34] *UPRR Petroleum/LGP/Crude Oil Tariff Renewal Announcement CH2020-1*, UPRR (Mar. 9, 2020), https://www.up.com/customers/announcements/chemicals/lpg/CH2020-1.html.
[35] *Tempest in a Tank Car*, *supra* note 32.
[36] Union Pacific, Tariff UP 4917 (effective Aug. 1, 2015). Note that in my first declaration, I used an estimate of $1,000 for the surcharge, based on available press reports. *See* D.E. 512-2 ¶ 9. The recently obtained UP tariff schedule provides a more accurate figure, as it is a surcharge in actual use.
[37] *BNSF*, *Union Pacific raises the bar*, *supra* note 33; Jarrett Renshaw, *Oil industry concerned over BNSF's move to limit retrofit tank cars*, Reuters (July 23, 2018), https://www.reuters.com/article/us-usa-oil-rail/oil-industry-concerned-over-bnsfs-move-to-limit-retrofit-tank-cars-idUSKBN1KD2H6.
[38] Dynamic Risk, *Final Report: Alternatives Analysis for the Straits Pipelines*, Appendix J, p. J-2 (Oct. 26, 2017), *available at* https://mipetroleumpipelines.com/document/alternatives-analysis-straits-pipeline-final-report.

barrel for loading and $1.50 per barrel for unloading crude oil tank cars.[39] Of that $1.50, about $0.25 is for capital recovery.[40] The $1.50 for loading and another $1.50 for unloading is more accurate for crude oil transportation by rail.

52.     The fifth error is Dr. Fagan's assumption of the number of crude oil barrels per ton. Bakken crude oil has an API gravity of 40.[41] That means that the number of barrels of Bakken crude oil in a ton is 6.92, not 7.33. The specific gravity of crude oil with an API of 40 is 0.8251.[42] Pounds per gallon is derived by multiplying the specific gravity by 8.345.[43] Pounds per gallon is multiplied by 42 to arrive at pounds per barrel, and pounds per barrel is then divided into a short ton to arrive at the barrels per ton figure of 6.92, which I used in my calculation.

53.     Making the corrections explained above, I recalculated Dr. Fagan's hypothetical rail cost to Patoka as $11.35 per barrel. Compared to DAPL's uncommitted and committed tariff rates, that is a difference of $5.34 and $5.99 per barrel, respectively. Dr. Fagan's erroneous assumptions and cost estimates and Oliver Wyman's corrected and expanded information are shown in Exhibit 6.

**Exhibit 6: Comparison of Dr. Fagan's Original and Oliver Wyman's Corrected Assumptions and Cost Estimates for Hypothetical Crude-by-Rail Movement from Stanley, ND to Patoka, IL**

| Category | Dr. Fagan | Oliver Wyman | Unit |
|---|---|---|---|
| **Assumptions** | | | |
| Oil volume per tank car | 700 | 700 | Barrels |
| Railcar lease cost | 500 | - | $ per car, per month |

---

[39] *Id.*

[40] *Id.*

[41] *See* D.E. 512-2 at 9 n.12. API gravity is a comparison of the weight of petroleum versus water. An API gravity greater than 10 means that the petroleum is lighter and would float on water; an API gravity less than 10 means it is heavier and would sink in water. API gravity is an inverse of specific gravity (a petroleum liquid's density relative to that of water).

[42] *See SG - API Converter*, Engineering Toolbox, https://www.engineeringtoolbox.com/api-gravity-d_1212.html (last visited May 25, 2020).

[43] Chris Deziel, *How to Convert Specific Gravity to Pounds Per Gallon*, Sciencing (updated Apr. 19, 2018), https://sciencing.com/convert-gravity-pounds-per-gallon-6367099.html.

| Category | Dr. Fagan | Oliver Wyman | Unit |
|---|---|---|---|
| DOT-117J lease cost | - | 712.50 | $ per car, per month |
| Jacketed CPC-1232 lease cost | - | 500 | $ per car, per month |
| DOT-117R lease cost | - | 500 | $ per car, per month |
| Excess mileage charge for annual miles over 30,000 | - | 0.04 | $ per mile |
| DOT-117J crude oil tank car fleet[44] | - | 11,021 | Tank cars |
| Jacketed CPC-1232 crude oil tank car fleet[45] | - | 8,825 | Tank cars |
| DOT-117R crude oil tank car fleet[46] | - | 8,000 | Tank cars |
| Jacketed CPC-1232 surcharge | - | 1,200 | $ per car, per shipment |
| DOT-117R surcharge | - | 1,200 | $ per car, per shipment |
| Transload cost | 700 | - | $ per car |
| Loading cost | - | 1.50 | $ per barrel |
| Unloading cost | - | 1.50 | $ per barrel |
| Freight rate | 0.0423 | 0.0423 | $ per ton-mile |
| Rail distance (Stanley, ND, to Patoka, IL) | 1,172 | 1,138[47] | miles |
| Bakken crude oil API | - | 40 | API gravity |
| Specific gravity (API 40) | - | 0.8251 | specific gravity |
| Gallons per barrel | - | 42 | gallons |
| Tank car cycle time | 10 | 10 | days |
| **Cost estimates** | | | |

---

[44] David Humphrey, Ph.D., *North American Railcar Review*, Railinc, Mar. 2, 2020, at 12.

[45] *Id.*

[46] *Id.*

[47]  I calculated the rail distance to Patoka by taking 1,128 miles—the distance from Stanley, North Dakota, to Boulder, Illinois, the nearest railroad station to Patoka—and adding another 10 miles to account for the rail spur that would have to be constructed to connect the Patoka Oil Terminal to the national railroad system. *See* BNSF Railway: *Chicago Division Timetable No. 6* (June 20, 2007),                                        *available*                                        *at* http://www.multimodalways.org/docs/railroads/companies/BNSF/BNSF%20ETTs/BNSF%20Chicago%20Div%20ETT%20%236%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.pdf; *Heartland Division Timetable No. 1* (Oct. 5, 2016); *Montana Division Timetable No. 7* (Dec. 19, 2007) *available at* http://www.multimodalways.org/docs/railroads/companies/BNSF/BNSF%20ETTs/ BNSF%20Montana%20Div%20ETT%20%237%2012-19-2007.pdf; *Nebraska Division Timetable No. 8* (June 26, 2013); *Springfield Division Timetable No. 6* (Jan. 17, 2007), *available at* http://www.multimodalways.org/docs/railroads/companies/BNSF/BNSF%20ETTs/BNSF%20Springfield%20Div%20ETT%20%236%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.pdf; *Twin Cities Division Timetable No. 3* (Oct.                     24,                     2007),                     *available                     at* http://www.multimodalways.org/docs/railroads/companies/BNSF/BNSF%20ETTs/BNSF%20Twin%20Cities%20Div%20ETT%20%233%2010-24-2007.pdf;                     Google                     Maps, https://www.google.com/maps (last visited May 29, 2020). Dr. Fagan simply assumed a one-way distance of 1,172 miles, which is DAPL's length.

| Category | Dr. Fagan | Oliver Wyman | Unit |
|---|---|---|---|
| Average lease cost | - | 584.10 | $ per car, per month |
| Pounds per gallon (API 40) | - | 6.89 | pounds |
| Pounds per barrel | - | 289.19 | pounds |
| Barrels per ton | 7.33 | 6.92 | barrels |
| Freight rate per barrel | 0.00577 | 0.00612 | $ per barrel mile |
| Freight charge | 6.76 | 6.9604 | $ per barrel |
| Annual miles travelled by one tank car in this lane | - | 83,074 | miles |
| Annual miles over 30,000 miles | - | 53,074 | miles |
| Total annual excess mileage charge | - | 2,123 | $ |
| Average excess mileage charge per barrel | - | 0.0831 | $ per barrel |
| Jacketed CPC-1232 percentage of fleet | - | 32% | |
| DOT-117R percentage of fleet | - | 29% | |
| Surcharge adjusted for probability of using a jacketed CPC-1232 or DOT-117R | - | 725.06 | $ per shipment |
| Adjusted surcharge per barrel | - | 1.04 | $ per barrel |
| Rail car lease cost | 0.02 | 0.0274 | $ per barrel per day |
| Rail car lease cost per barrel | 0.24 | 0.2743 | $ per barrel |
| Transload cost | 1.00 | - | $ per barrel |
| **Total estimated cost** | **8.00** | **11.3536** | **$ per barrel** |

54.     As discussed, a more accurate comparison—one that reflects a rail movement that could occur in the real world—is to compare pipeline and rail shipping costs for a barrel of crude oil between Stanley, North Dakota, and Nederland, Texas. DAPL oil moves to this destination by pipeline now, and importantly there is a rail route and facilities that would provide all the infrastructure for a "real world" rail movement of crude oil to this destination as well.

55.     Energy Transfer Partners' (ETP) ETCO Project Pipeline carries crude oil from DAPL's termination point at Patoka to ETP's Nederland Terminal, the largest above-ground crude oil storage facility in the United States.[48] The Nederland Terminal provides storage and distribution services (via pipeline and marine tankers) to ETP, refiners, and other large petroleum and petrochemical transporters.

---

[48] Energy Transfer, *Nederland Terminal* (2020), https://www.energytransfer.com/crude-oil.

56.     Unlike Patoka, the Nederland Terminal is served directly by a Class I railroad, Kansas City

Southern Railway (KCS), and possesses an existing crude-by-rail unloading terminal with a two-

track loop and five-track storage yard. The most direct rail route from Stanley to Nederland is via

the BNSF network to Kansas City, Missouri, and then KCS from there to Nederland. The route is

1,788 miles in length.[49] To account for this greater distance, I adjusted the tank car cycle time to

15.7 days. As a result, the per barrel cost for rail transport from Stanley, North Dakota to

Nederland, Texas would be $15.53.

57.     ETP's joint tariff for DAPL and the ETCO Project Pipeline shows a rate of $5.84, based

on a 10-year commitment for 90,000-plus barrels per day, for transport of crude oil from Stanley

to the Nederland Terminal. (The "uncommitted" rate is $8.18.)[50] Rail would thus cost $7.35 per

barrel more than the uncommitted rate and $9.69 per barrel more than the committed rate. Oliver

Wyman's corrected and expanded data for crude-by-rail movements, as applied to Stanley to

---

[49] It is important to understand that this calculation involves conservative assumptions. This is the most direct route on BNSF between Stanley and Nederland. However, as reported in the 2017 Iowa State Rail Plan, a 158-mile segment between Sioux City Line Jct., Minnesota and Alvord, Iowa is primarily single-track and is considered "dark territory," i.e., it lacks a higher-level train signaling system. Due to this lack of effective signaling to help trains avoid collisions and optimize traffic along the segment, trains must travel more slowly and are at greater risk of an accident along this segment. This long segment of dark territory thus makes the line less desirable for operations and significantly reduces capacity. My calculations show that adding three loaded and three empty trains per day carrying DAPL crude oil would cause the entire 158-mile segment to be over capacity, with a level-of-service grade of F. Sources: Iowa Dep't of Transp., *2017 Iowa State Rail Plan* at A-13, Appendix A, Table A.-4 (Feb. 2017), https://iowadot.gov/iowainmotion/railplan/2017/IowaSRP2017_Complete.pdf; *see supra* note 47 for BNSF Railway: *Heartland Division Timetable No. 1*, *Montana Division Timetable No. 7*, *Nebraska Division Timetable No. 8*, *Twin Cities Division Timetable No. 3*; *Kansas City Southern Railway Company, System Timetable No. 14* (Apr. 1, 2018). As a result, crude oil would likely travel along a more circuitous route to avoid this dark territory, further adding to rail transportation costs.

[50] Energy Transfer, Dakota Access, LLC, *Joint Pipeline Tariff In Connection With Energy Transfer Crude Oil Company, LLC* (effective 1 July 2019), https://cms.energytransfer.com/wp-content/uploads/2019/08/DAPL_ETCO_Joint_Rates_Tariff_4_5_0.pdf.

Nederland, is shown in Exhibit 7.

**Exhibit 7: Oliver Wyman's Corrected Assumptions and Cost Estimates for a Representative Crude-by-Rail Movement from Stanley, ND to Nederland, TX**

| Category | Oliver Wyman data | Unit |
|---|---|---|
| **Assumptions** | | |
| Oil volume per tank car | 700 | Barrels |
| DOT-117J lease cost | 712.50 | $ per car, per month |
| Jacketed CPC-1232 lease cost | 500 | $ per car, per month |
| DOT-117R lease cost | 500 | $ per car, per month |
| Excess mileage charge for annual miles over 30,000 | 0.04 | $ per mile |
| DOT-117J crude oil tank car fleet | 11,021 | Tank cars |
| Jacketed CPC-1232 crude oil tank car fleet | 8,825 | Tank cars |
| DOT-117R crude oil tank car fleet | 8,000 | Tank cars |
| Jacketed CPC-1232 surcharge | 1,200 | $ per car, per shipment |
| DOT-117R surcharge | 1,200 | $ per car, per shipment |
| Loading cost | 1.50 | $ per barrel |
| Unloading cost | 1.50 | $ per barrel |
| Freight rate | 0.0423 | $ per ton-mile |
| Rail distance (Stanley, ND, to Nederland, TX) | 1,788 | Miles |
| Bakken crude oil API | 40 | API gravity |
| Specific gravity (API 40) | 0.8251 | specific gravity |
| Gallons per barrel | 42 | gallons |
| Tank car cycle time | 15.7 | days |
| **Cost estimates** | | |
| Average lease cost | 584.10 | $ per car, per month |
| Pounds per gallon (API 40) | 6.89 | pounds |
| Pounds per barrel | 289.19 | pounds |
| Barrels per ton | 6.92 | barrels |
| Freight rate per barrel | 0.0061 | $ per barrel mile |
| Freight charge | 10.9360 | $ per barrel |
| Annual miles travelled by one tank car in this lane | 83,074 | miles |
| Annual miles over 30,000 miles | 53,074 | miles |
| Total annual excess mileage charge | 2,123 | $ |
| Average excess mileage charge per barrel | 0.1305 | $ per barrel |
| Jacketed CPC-1232 percentage of fleet | 32% | |
| DOT-117R percentage of fleet | 29% | |
| Surcharge adjusted for probability of using a jacketed CPC-1232 or DOT-117R | 725.06 | $ per shipment |
| Adjusted surcharge per barrel | 1.04 | $ per barrel |
| Rail car lease cost | 0.0274 | $ per barrel per day |
| Rail car lease cost per barrel | 0.4310 | $ per barrel |
| **Total estimated cost** | **15.5334** | **$ per barrel** |

58.     The $5 to $10 per barrel estimate referenced by Dakota Access witnesses Emery and

Makholm is thus an accurate estimation of the price differential shippers will pay to move crude

oil by rail if DAPL shuts down. Multiplying DAPL's 570,000 bpd volume by $5 to $10 per barrel

equates to an annual loss of $1.04 billion to $2.08 billion in shipping costs. Assuming only 43

percent of DAPL volume moves by rail, shippers would still lose $447 million to $895 million per

year.

## IV.  History Contradicts Dr. Fagan's Assertion that Shippers Prefer Rail Because of Greater Flexibility

59.     Dr. Fagan asserts that rail offers shippers greater speed and flexibility. But it is an historical

fact that crude oil shippers overwhelmingly prefer transportation on DAPL to rail for multiple

reasons. Dr. Fagan does not refute that shutting DAPL down would harm shippers by removing

that transport option.

60.     One of the most important considerations for shippers, which Dr. Fagan fails to account

for, is that to be a viable option, a transportation method must move the product to the proper

destination. Her statements that rail transportation offers "greater speed and flexibility" than

pipeline and allows "opportunities to find buyers of oil in a variety of geographic locations." D.E.

525-4 at 44, show a basic misunderstanding of how rail transportation works. Crude oil cannot

simply be unloaded anywhere a railroad runs. It requires specific unloading facilities capable of

handling crude-by-rail. As I noted previously, these facilities are limited.

61.     Despite the consistent availability of surplus rail capacity in modest amounts, crude oil

shippers have chosen DAPL over rail throughout the three years that DAPL has been operational.

*See* D.E. 520-4 ¶ 8. Simply put, shippers view rail as a long-haul bulk transport mode of last resort

for crude oil when pipelines are available, because of its limited unloading destinations, higher

cost, and diverse safety, environmental, and community impacts. *See* D.E. 520-4 ¶ 34 (explaining that "DAPL is the most economically efficient means to transport crude oil out of the Bakken region"); D.E. 512-2 ¶ 85 (explaining that "adding crude oil trains to already busy main rail lines also can produce a bevy of safety, environmental, and community impacts"). Dr. Fagan's report completely overlooks this.[51]

## V. Increasing Crude-by-Rail Volumes Would Have Safety, Environmental, and Community Impacts Without Heightened Regulatory Protections or Oversight

62.     As just noted, Dr. Fagan fails to acknowledge the specific safety risks presented by increasing the volume of crude oil shipped by rail. I discussed these in my first declaration. *See* D.E. 512-2 ¶¶ 85-95. I also reviewed the Amicus Brief for the States (D.E. 514) and find that their

---

[51] As if that were not enough, Dr. Fagan's pipeline transit time assumptions also grossly overstate the amount of time it takes oil to flow along the DAPL-ETCOP pipelines, based on her generic North Dakota to Gulf Coast route. Crude oil pipelines typically have a velocity of 6 to 12 feet per second (fps). *E.g.*, U.S. Envtl. Prot. Agency, *Mid-Missouri River Sub-Area Contingency Plan* 10 (2015). Even using the lowest end of this range, 6 fps, oil can traverse the specific route that I identified, from Stanley, North Dakota to Nederland, Texas (approximately 1,916 miles) in just 19.5 days—less than half the 40 days Dr. Fagan posits for a generic North Dakota-Gulf Coast route. This can be easily calculated by dividing the distance from Stanley to Nederland (1,916 miles x 5,280 ft/mile) by the flow rate, 6 fps, and then multiplying by the number of seconds in a day, 86,400. Publicly available data can be used to calculate that the velocity of crude oil on DAPL falls well within this 6-10 fps range. *See Pipes and Fluid Flow Velocities*, Engineering Toolbox, https://www.engineeringtoolbox.com/pipe-velocity-d_1096.html (last visited May 31, 2020). More fundamentally, unlike a customer awaiting delivery of a unique, non-fungible item to complete an assembly, downstream refiners do not rely on timely delivery of *individual shipments* of crude oil, but rather on a steady, reliable supply of crude oil to keep the refinery running. Thus, the time it takes for one particular shipment of crude oil to run through the pipeline is moot. Rather, the proper rubric for measuring a transportation method's effectiveness is whether it is capable of delivering crude oil consistently and cost effectively. For the reasons discussed throughout this declaration and in my first declaration, pipeline transportation is a more effective option because of the crude oil volumes it can supply and the ease with which refineries can receive and unload those volumes for processing. In addition to being more expensive, rail transportation—which depends upon complex coordination of delivery timing and unloading and is subject to unpredictable delays—cannot maintain the same type of steady, reliable supply.

concerns regarding overall safety and environmental risks are valid, as even modest increases in the volume of crude oil shipped by rail as a result of a DAPL shutdown would increase these risks.

63.     At-grade crossings remain one of the largest safety concerns for train operations. It is common for automobile drivers to cross railroad tracks on their daily drives and sometimes to be stopped waiting for a train at one of over 24,000 public road-rail at-grade crossings in the region.[52] In 2019, for example, there were 239 road-rail crossing accidents in the five-state region of Minnesota, Montana, Illinois, North Dakota, and Wisconsin (i.e., states through which DAPL rail-hauled volumes are likely to pass), resulting in 37 fatalities and 59 injuries. D.E. 512-2 ¶¶86-88.[53]

64.     If more trains are added to haul DAPL's volume, the opportunity for more at-grade crossing accidents will increase, and more injuries and fatalities can be expected. The increased number of accidents will vary proportionally with the increase in trains and the distance traveled. Using the scenario from my first declaration, where 29 percent of DAPL volume is moved by rail to Chicago or the Pacific Northwest, the annual increase in incidents is estimated to be 4.8 to 7.6, and the annual increase in fatalities is estimated to be 0.6 to 1.0, depending on the rail routes involved. D.E. 512-2, Exhibit 36. An even higher number of accidents and fatalities at grade crossings would be expected for longer routes to the East Coast or Gulf Coast.

65.     Another concern for communities is the prospect of trains blocking intersections and disrupting traffic. These blockages are not just inconvenient; they can lead to economic disruption

---

[52] Fed. R.R. Admin., Office of Safety Analysis, *Highway-Rail Crossings* (current through Mar. 31, 2020), https://safetydata.fra.dot.gov/OfficeofSafety/default.aspx. Includes at-grade crossings for MT, MN, IL, ND, and WI only, with specified (not null) railroads and mileposts. Excludes closed crossings, private road crossings, and crossings with no specified (null) street or highway.
[53] Fed. R.R. Admin., Office of Safety Analysis, *Frequency of Crossing Collisions* (last updated Jan. 31, 2020), https://safetydata.fra.dot.gov/OfficeofSafety/default.aspx.

and adversely impact quality of life. During peak crude-by-rail volumes in 2014, it was reported in Buffalo, Minnesota, for example, that "freight trains, which residents believe are longer and more numerous than ever thanks to the North Dakota oil boom, have increasingly been blocking intersections, cutting off the city's north side from its south side and sending drivers scrambling sometimes out of town to find an open crossing."[54] D.E. 512-2 ¶¶91-94. Such blockages can endanger public safety, as police, fire trucks, and ambulances have been delayed or unable to reach emergency sites or hospitals in communities where rail crossings intersect main roads, which are often the only viable routes in rural towns.[55]

66.    In addition, the east and west rail main lines that would transport DAPL's volume pass near or through population centers, national parks, and many environmentally sensitive areas, such as rivers.[56] A DAPL shutdown would introduce increased volumes of hazardous materials to these

---

[54] Bill McAuliffe, *Buffalo getting impatient with old No. 9 (and 10, and 11 ...)*, Star Tribune (Apr. 16, 2014), https://www.startribune.com/buffalo-grows-impatient-with-north-dakota-oilboom-trains/255429531/.

[55] Taylor Chase, *New Conflicts Emerge as Rail Continues Moving Frac Sand*, Green Bay Press-Gazette (July 26, 2014), https://madison.com/ct/news/local/environment/as-rail-moves-frac-sand-across-the-wisconsin-landscape-new-conflicts-emerge/article_d7acbd14-0a0f-11e4-8b6c-0019bb2963f4.html; Rob Schultz, *Safety and Reliability Issues Plaguing Railroads Across the State*, Wisconsin State Journal (March 24, 2014), https://madison.com/wsj/news/local/safety-and-reliability-issues-plaguing-railroads-across-the-state/article_285b9889-623f-533a-a835-b827891b9280.html.

[56] As noted in my first declaration, the closure of DAPL would make more likely the use of the Enserco rail loading facility in Gascoyne, North Dakota, which has the capacity to load 65,000 bpd of crude oil. *See* D.E. 512-2 ¶ 34 (explaining that the Gascoyne facility "could be an important link to rail access under a DAPL shutdown scenario, because it would allow crude oil to be placed on the BNSF line passing through northern South Dakota," the "only viable route to transport crude oil from the southwestern Bakken region through South Dakota to link up with the lines in Minnesota that reach the Chicago area"). Use of the Gascoyne loading facility would result in greater volumes of crude oil crossing the Missouri River at a rail crossing in Mobridge, South Dakota, just upstream of the Standing Rock Tribe's water intake. *Id.* Plaintiffs state in passing that it is "unlikely" that the Gascoyne terminal would be utilized, D.E. 527 at 25 n.29 (citing Goodman Decl. ¶ 104), but they fail to rebut the reasons I explained why the Gascoyne terminal could be a

routes. Exhibit 7 contains a small sample of some of these highly populated and sensitive areas. *See also* D.E. 514 at 16-17 (describing population centers and environmentally sensitive areas along the potential western rail route). This is reflected with particular emphasis in the States' amicus brief, which sets out in detail the significant environmental concerns associated with routing any significant additional volume of crude oil through the Mountain West.[57] I concur with those concerns and find them valid.

**Exhibit 8: Selected High-Consequence Areas (HCAs) That Would Likely See Increased Crude Oil trains if DAPL Were Shut Down[58]**

| Category | BNSF route east through Minnesota | CP route east through Minnesota | BNSF route west through Montana |
|---|---|---|---|
| Population Centers | • Bismarck, ND<br>• Fargo, ND<br>• Minneapolis and St. Paul, MN<br>• Chicago, IL | • Minneapolis and St. Paul, MN<br>• Dubuque, IA<br>• Chicago, IL | • Spokane, WA<br>• Tacoma, WA<br>• Seattle, WA |
| Rivers (crossed and/or adjacent) | • Red<br>• St. Croix<br>• Missouri<br>• Mississippi | • Bois de Sioux<br>• Mississippi | • Missouri<br>• Flathead<br>• Kootenai<br>• Spokane<br>• Columbia |
| Other | • Red River Valley | • Sheyenne National Grassland | • Glacier National Park<br>• Puget Sound |

67.     Dr. Fagan does not acknowledge any of the well-documented safety and environmental risks of transferring even a portion of DAPL's volume to the nation's rail network.

68.     Increasing crude-by-rail volumes as a result of a DAPL shutdown would not trigger additional regulatory oversight of rail safety or spill-mitigation requirements for environmentally

---

key facility in the event of a DAPL shutdown, and even then they do not rule its use out under such a scenario.
[57] D.E. 514 at 18-19.
[58] Oliver Wyman analysis.

sensitive areas like river crossings, and the regulations in place do not require the extensive degree of spill response and mitigation planning that Dakota Access has put in place for the Lake Oahe crossing. There are no regulatory limitations on how much crude oil a railroad can haul over particular routes or through high-consequence areas.[59]

69.     Although Pipeline and Hazardous Materials Safety Administration (PHMSA) regulations published in 2019 require railroads to have in place oil spill response plans for routes or route segments over which substantial volumes of crude oil travel, these regulations do not require the extensive level of specifically tailored incident planning and mitigation efforts that Dakota Access has put in place for the Lake Oahe crossing.

- First, PHMSA's rail spill response regulations require railroads to assume and prepare for a worst-case discharge of the larger of 7,143 barrels (300,000 gallons) or "15 percent of the total lading of liquid petroleum oil transported within the largest train reasonably expected to transport liquid petroleum oil in a given response zone"[60] (10,500 barrels if a 100-car train carrying 700 barrels per car is assumed). However, a single 100-car train can carry more than 70,000 barrels of crude oil.[61] Contrast these maximum worst-case discharge amounts with the ████-barrel worst-case discharge amount calculated for a

---

[59] Neither the Pipeline and Hazardous Materials Safety Administration (PHMSA), which regulates hazardous materials, nor the Federal Railroad Administration, which regulates rail safety, places any limitation on how much crude oil a railroad can haul over particular routes or through high-consequence areas.  Plaintiffs state that "transportation of crude via rail is regulated by the federal Surface Transportation Board," D.E. 527 at 25 n.7, but the Surface Transportation Board does not regulate rail safety—its mandate is *economic* regulation of freight rail transport.  *About STB*, Surface Transp. Bd., https://prod.stb.gov/about-stb/ (last visited June 2, 2020).
[60] 49 C.F.R. § 130.5.
[61] D.E. 512-2 ¶ 12.

DAPL spill on Lake Oahe[62] or the ▮▮▮▮–barrel amount prepared for by Dakota Access in its Facility Response Plan.[63] Put simply, Dakota Access has resources in place to respond to a discharge at Lake Oahe ▮▮▮▮▮▮ larger than the maximum discharge into the Missouri River for which PHMSA regulations require railroads to prepare.

- Second, PHMSA regulations require railroads to "identify and describe in the plan the response resources that are available to arrive onsite *within twelve hours* of the discovery of a worst-case discharge or the substantial threat of such a discharge."[64] By contrast, Dakota Access has prepared response plans and mitigation procedures specific to Lake Oahe that require the company to respond to a hypothetical incident *within six hours*.

- Third, PHMSA regulations do not necessarily require a railroad to update its spill response plan if it increases the volume of crude oil traveling over a route, even for environmentally sensitive crossings.[65] Contrast this with the specific, regularly updated spill modeling and response planning undertaken by Dakota Access for the Lake Oahe crossing.

70. Even in the event of a large increase in crude-by-rail volumes, regulatory agencies most likely would not step in until after the occurrence of a major incident or multiple shippers complain about congestion and delays. The 2013 Lac Mégantic rail disaster—in which 42 people were killed after multiple tank cars carrying Bakken crude oil exploded—prompted the design of DOT 117J

---

[62] D.E. 520-3 ¶ 36.

[63] D.E. 520-4 ¶ 37.

[64] 49 C.F.R. § 130.130(b).

[65] 49 C.F.R. § 130.145(c) states, "Each railroad must update its plan to address new or different conditions or information." However, what constitutes sufficient "new or different conditions" is not specified in the regulations, and thus is left to the discretion of the railroad.

tank cars and the federally mandated phase out of less safe DOT 111 and CP 1232 tank cars. It was only after this tragedy that the U.S. Department of Transportation convened "an emergency meeting of the Railroad Safety Advisory Committee to discuss this accident and potential regulatory actions to prevent similar future accidents from occurring."[66] Similarly, the STB did not hold hearings to address the problems caused by the 2014 crude-by-rail boom until after multiple shippers of various commodities complained about the losses associated with the heavy congestion and delays caused by rail transportation of large volumes of crude oil.[67]

---

[66] Lac-Mégantic Railroad Accident Discussion and DOT Safety Recommendations, 78 Fed. Reg. 48,224, 48,225 (Aug. 7, 2013).
[67] D.E. 512-2 ¶¶ 61-84.

Pursuant to 28 U.S.C. § 2746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: June 8, 2020
William J. Rennicke

Partner
OLIVER WYMAN

# RENNICKE
# ATTACHMENT 1

**Plaintiffs' and Their Declarants' Most Significant Errors Regarding Rail Transportation**

1.  Dr. Fagan incorrectly assumes that any crude oil tank cars idled as a result of decreased production could be transferred to new owners/leasers without disruption to move Bakken crude oil displaced by shutting down DAPL.[1]  But these cars are committed to other shippers under long-term leases and it is highly unlikely that current leaseholders will agree to a transfer (and would be highly disruptive in any event).[2]

2.  Dr. Fagan mistakenly claims that an 11-percent drop in *all* Canadian rail traffic from January to February would lead to 11 percent more *crude oil* tank cars being available.[3]  However, when the data is analyzed by commodity and adjusted for the fact that February has fewer days than January, the decline in crude oil shipments was only *2 percent*, not 11 percent.[4]

3.  Dr. Fagan erroneously bases all of her pipeline-to-rail comparisons on the assumption that rail could carry crude oil to Patoka, Illinois (where DAPL terminates).[5]  This is a fundamental error.  There is no rail access within 10 miles of Patoka and no unloading facilities capable of handling even a portion of DAPL's crude oil volume within 70 miles of Patoka.[6]  Crude oil shipped by rail would be routed to the East, West, and Gulf Coast, all of which are much further than Patoka and would thus require more freight charges, longer cycle times, more equipment, and more crews.[7]

4.  Dr. Fagan incorrectly assumes that the average lease rate of a crude oil tank car is the same as the average lease rate of all tank cars.[8]  But DOT 117J tank cars (the cars designed and approved by PHMSA to carry crude oil) are much more expensive than standard DOT 111 tank cars.[9]

5.  Dr. Fagan assumes that new or additional tank cars could be leased at rock-bottom spot prices.[10]  This is a false assumption.  Lessors generally require shippers to agree to long-term *five-to-seven year* leases, even if they might need the cars for only one or two years.[11]

[1]  Fagan Report at 42.

[2]  Second Rennicke Dec. ¶¶ 14-15.

[3]  Fagan Report at 42.

[4]  Second Rennicke Dec. ¶ 16.

[5]  Fagan Report at 38.

[6]  Second Rennicke Dec. ¶ 44.

[7]  *Id.* at ¶¶ 4(b), 44.

[8]  Fagan Report at 38.

[9]  Second Rennicke Dec. ¶¶ 46-47.

[10]  Fagan Report at 38.

[11]  Second Rennicke Dec. ¶ 47; Continental Resources, Inc. Dec. at 3.

6.  Dr. Fagan wrongly assumes that all combined transloading costs amount to $1 per barrel.[12] This is a fundamental error.  Actual transloading costs are $1.50 per barrel for loading and another $1.50 to unload, for a total cost of $3 per barrel—*triple* the amount she assumes.[13]

7.  Dr. Fagan wrongly claims that "it is logical to assume" that railroads will waive their existing surcharges for transporting crude oil in older and retrofitted tank cars in order to attract business.[14]  In fact, this is totally illogical.  These surcharges are added in recognition of the higher risk carried by crude oil shipments using these obsolete and less-safe tank car designs, which are more prone to failure during derailments, and to encourage shippers to transition to the safest equipment as soon as possible.[15]

8.  Dr. Fagan claims that rail offers greater "speed and flexibility" than pipeline.[16]  This is false. First, Dr. Fagan's analysis overstates by more than 100% the time oil takes to travel to the gulf coast by pipeline, and understates by 50% the time it takes by rail by failing to allot the time needed for the empty rail cars to make their return trip.  Second, any "flexibility" is a myth, because there are limited unloading facilities around the country capable of servicing these volumes, and none at all in Patoka, Illinois, as Dr. Fagan suggests.[17]  Further, transportation contracts for this commodity are not "one-off" deals—they are generally long-term contracts resulting in *daily* shipments.

9.  Dr. Fagan wrongly suggests that because the rail network moved 800,000 bpd in 2014, it can still do so in 2020.[18]  This inexplicably ignores that the crude-oil tank car fleet has shrunk 58 percent since 2014 largely due to new regulations restricting the most unsafe types of rail cars.[19]

---

[12]  Fagan Report at 39.

[13]  Second Rennicke Dec. ¶ 51.

[14]  Fagan Report at 39-40.

[15]  Second Rennicke Dec. ¶ 49.

[16]  Fagan Report at 43.

[17]  Second Rennicke Dec. ¶¶ 59-61 & n.51.

[18]  Fagan Report at 31.

[19]  Second Rennicke Dec. ¶ 13.

EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,<br><br>        Plaintiffs,<br><br>   and<br><br>CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE, ET AL.,<br><br>        Plaintiff-Intervenors,<br><br>   v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>        Defendant-Cross Defendant,<br><br>   and<br><br>DAKOTA ACCESS, LLC,<br><br>        Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

---

## SECOND DECLARATION OF GLENN EMERY IN SUPPORT OF DAKOTA ACCESS, LLC'S REPLY BRIEF ON THE QUESTION OF REMEDY

---

1.  My name is Glenn Emery.  I am the Vice President, Commercial Operations, of Energy Transfer LP, one of the indirect equit. owners of Dakota Access, LLC ("Dakota Access") and Energy Transfer Crude Oil Company, LLC ("ETCO").  My business address is 800 E. Sonterra Blvd., San Antonio, Texas.  I submitted a declaration in the above-captioned case on April 29, 2020, and my background and qualifications are discussed therein.

2.  This declaration responds to inaccurate and misleading assertions made in the brief and declarations filed by Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Plaintiffs") on May 20, 2020, and in particular the declaration and

report of Dr. Marie Fagan, D.E. 527-2 ("Fagan Dec.") & D.E. 527-4 ("Fagan Report").   A

consolidated list of Dr. Fagan's most critical misrepresentations is attached as **Exhibit 1**.  In trying

to discredit my assessment of the economic impacts from shutting down DAPL, Dr. Fagan assumes

that **(i)** the lower demand and production in May 2020 will persist for years and **(ii)** barrels of oil

and methods for transporting oil are fungible, such that reduced production together with

transportation alternatives like rail will avoid negative impacts to DAPL's customers.

3.   These assumptions are simply incorrect and contradicted by known facts, widely accepted

market expectations, and the statements of the largest producers in the Bakken.  As explained in

this declaration and the declarations of Dr. Jeff Makholm, William Rennicke, and several

producers, Dr. Fagan's predictions of massively depressed and stagnant production are belied by

the fact that production in the Bakken is *already* significantly higher than she predicts it will be

for the next two years, and that expectations from federal and state agencies and producers are also

significantly higher than Dr. Fagan predicts.   Likewise, Dr. Fagan's conclusion that zero

production would shut-in if DAPL went offline—based on her already disproven speculation about

economic conditions and the need for DAPL under current and future economic conditions—and

thus that there will be zero harm to North Dakota and its producers as the volumes currently being

shipped on DAPL will seamlessly shift to alternate rail transport without massive disruption is also

belied by the facts.  Despite the current reduction in Bakken production, DAPL's nominations are

currently more than ██ percent of its  allowable capacity and, as explained by *the largest producers*

*in the Bakken*, because alternate transport options are either unavailable or far more expensive and

less efficient than DAPL, shutting down DAPL will render much of the volumes currently being

shipped on DAPL uneconomic, resulting in their being shut-in.  Dr. Fagan's unsupported

speculation and arguments to the contrary are wrong.  When these clearly erroneous assertions are

corrected, Dr. Fagan's own price calculations support losses of $5.26 billion to $8.21 billion to North Dakota's producers (as calculated by Dr. Makholm using accurate estimates of shut-in volumes if DAPL is shut down). Based on my knowledge of the market and the current flows on DAPL, as I discuss below, I agree with Dr. Makholm's assessment of the barrels that will shut-in if DAPL is shut down, and thus his conclusion of billions of dollars in harm. That is lost income in North Dakota communities that will never be recovered.

4.   Plaintiffs also attempt to zero out any economic harm to Dakota Access or third-party businesses, states, and Native American tribes by asserting that any loss to them from reduced Bakken production will be countered by an equal benefit to those in other regions. That is wrong too. Gains elsewhere will not offset the losses from shutting DAPL down, because substantial capital investments tied to the availability of DAPL will become worthless. Moreover, allowing other states to benefit at North Dakota's expense would prevent North Dakota from participating in the overall economic recovery. It is astounding that Dr. Fagan would argue that such harm to North Dakota, its producers, and its citizens is meaningless. North Dakota is a small state that is already struggling as a result of the economic downturn, and multi-billion-dollar losses on top of that will take away the livelihood of ordinary people who need to feed their families and may not be able to if they lose their jobs and income as a result of DAPL shutting down.

5.   Here are my fact-based conclusions:  **(i)** The economic downturn caused by the pandemic and the geopolitical events affecting crude oil markets is temporary. A recovery in demand to ship crude oil and consume refined petroleum products is *already occurring* as shown by the facts on the ground—actual production, nominations, shipments, and consumption—and is further supported by industry and government observations and expectations. Current production in the Bakken region is already significantly above the level at which Dr. Fagan claimed it would remain

stagnant for the next two years, and projections show that production will continue to increase month over month until it reaches 2019 levels next year.   Demand for DAPL, which remained relatively strong through the pandemic, is also *already* rebounding toward pre-pandemic levels of the pipeline's current capacity of 570,000 barrels per day ("bpd").   Shipments on DAPL remained relatively strong in April 2020 at ████ bpd (or ██ percent of DAPL's capacity).   After a dip in DAPL's throughput to ████ bpd in May 2020 (about ██ percent of capacity) as the market reacted to April's low oil prices and demand, nominations for June 2020 are already climbing, currently at ████ bpd (more than ██ percent of capacity) with potentially more still being added, as shippers react to higher oil prices and higher demand.   **(ii)** My calculation of economic harm to Dakota Access of at least $500 million for the second half of 2020 and more than $1 billion each calendar year through 2023 if DAPL is shut down is accurate.   The dollar figures are easily calculated using verifiable and publicly available data.   **(iii)** Third-party producers, shippers, states, and tribal members will suffer immense *additional* economic harm if DAPL is shut down.   This will be on top of the economic harm that these parties have already suffered as a result of the pandemic and the temporary downturn in the crude oil market.   This is based on known facts and forecasts provided by third parties and objective government sources.   **(iv)** Shutting down DAPL at this time will slow, or prevent, the ongoing economic recovery in North Dakota.   That is because DAPL is a key infrastructure link to bring Bakken oil production to market.   DAPL is critical to the movement of production that is still online (or that will restart as the country continues recovering from the pandemic) due to its specific attributes (cost, destinations, directness).   If DAPL is shut down, a large portion of that production will most likely be shut-in (or remain shut-in); conversely, if DAPL remains operational, current production will likely continue, and wells that have been shut-in as a result of the pandemic will likely be brought back online as the recovery

continues.  **(v)** Oil transportation modes and destinations are not fungible, despite what Plaintiffs' "expert" claims.  Even if some of the oil currently flowing on DAPL could be placed on different modes of transportation (*e.g.*, rail) for delivery to other destinations, it takes significant capital and *time*—typically months or years—to create the infrastructure needed to move those volumes to those different outlets.  Dr. Fagan shows her ignorance of these basic facts by (a) suggesting DAPL's throughput could instantaneously move on other modes of transportation to other destinations if DAPL goes offline (without consideration of the difficulties involved, or discussion of how or whether those volumes could reach their ultimate destinations), and (b) using Patoka, Illinois as her proposed destination for oil shipped by rail.  Even a lay person with minimal knowledge of this industry would know that crude oil cannot be unloaded from rail in Patoka, because Patoka has none of the capital-intensive facilities required to unload oil by rail.

**DAPL Is Still Needed Under Current And Expected Economic Conditions**

6.  Plaintiffs attempt to discredit my data-driven analysis of harm to Dakota Access, its affiliate ETCO, as well as various third-parties by assuming that (a) temporary economic conditions will be permanent, and (b) barrels currently moving on DAPL could instantaneously move to shippers' destinations on other modes of transport (*e.g.*, rail).  *See* D.E. 527, at 22-23 ("Plaintiffs' Remedy Br."); Fagan Dec. ¶¶ 5, 8; Fagan Report at 43.  This is wild speculation and should be considered as such, particularly in light of Plaintiffs' many earlier economic predictions that turned out to be dramatically wrong.  For example, in 2017 Plaintiffs predicted that DAPL would "be a relatively small event for the energy system."  D.E. 272-5, ¶ 43 ("Goodman Dec.").  But, as I explained in my first declaration, from September 2018 through March 2020, DAPL was consistently oversubscribed and transported approximately 40 percent of Bakken crude, or roughly 4.5 percent of all U.S. crude oil production.  D.E. 509-9, ¶ 6 & n.1 ("First Emery Dec.").  That is hardly the "small event" for the country, let alone for the energy system, that Plaintiffs predicted.

Even during the worst of the pandemic's impact on economic conditions in May 2020,[1] DAPL transported approximately ██ percent of Bakken production,[2] or roughly ██ percent of all U.S. tight (*i.e.*, shale) crude oil production.[3]  This so-called "small event" for the energy system is in reality a critical link in the national crude oil supply system.

7.   Likewise, in 2017 Plaintiffs predicted that DAPL's capacity would be superfluous given the other rail and pipelines that moved crude oil out of the Bakken at that time.   Goodman Dec. ¶¶ 7-12 ("Prior to DAPL entering service in 2017, . . . [a]lmost 70% of Bakken crude production was being transported by pipelines (other than DAPL) and only about 25% via crude by rail.  Even before DAPL began operations, the use of crude by rail had dropped to about one-third of peak levels in 2014, so there is now substantial capacity available for continued (or even expanded) shipments via rail.  . . .  Hence, a reasonable starting point for analysis is to assume that all Bakken crude production can be transported in the future, even without DAPL." (footnotes omitted)).  That too turned out to be wrong.  Despite alternatives, shippers quickly committed to the vast majority of DAPL's 570,000 bpd capacity.   Plaintiffs have an abysmal track record for economic

---

[1]  Lynn Helms, *Director's Cut:  March 2020 Production*, N.D. Dep't of Mineral Res., at 3 (May 15, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-05-15.pdf (reporting that "liquid fuel demand is expected to bottom out in May 2020").

[2]  I calculate this by dividing DAPL's actual throughput of ██████ bpd in May by the total projected Bakken crude oil production in May 2020 of 1,135,000 bpd.  *See Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https://www.eia.gov/petroleum /drilling/#tabs-summary-2.  Note that this projected crude oil production is almost 200,000 bpd higher than the level at which Dr. Fagan predicted North Dakota production (which accounts for nearly all Bakken production) to remain stagnant for the next two years (936,500 bpd).  Fagan Report at 37 & Fig. 21.  Using Dr. Fagan's number, DAPL's May shipments would account for an even higher proportion of shipments out of the Bakken—nearly ██ percent.

[3]  I calculate this by dividing DAPL's actual throughput of ██████ bpd in May by the total projected U.S. tight (*i.e.*, shale) crude oil production in May 2020 of 8,019,000.  *See Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https://www.eia.gov /petroleum/drilling/#tabs-summary-2.

predictions.

8. Also wrong are Plaintiffs' *new* predictions of stagnant, low production for the next two years and their baseless speculation about the need for DAPL. Both are contradicted by fact-based evidence.

9. My analysis of anticipated harm to Dakota Access and ETCO, as well as to various third parties, is based on *actual* shipments and contracted and nominated volumes on DAPL and the Energy Transfer Crude Oil Pipeline ("ETCOP"), as well as *actual* projected oil demand and production from impartial government agencies and some of the largest producers in the Bakken. Plaintiffs, on the other hand, have cherry-picked the lowest estimated demand and production numbers for the second quarter of 2020 and speculate that as a result of the pandemic these numbers will repeat themselves indefinitely. *See* Fagan Report at 15-18. Plaintiffs also say that the number of barrels no longer being produced in the Bakken region is roughly equal to DAPL's current capacity (570,000 bpd), and then *assume* both that DAPL will no longer be needed for at least the next two years and that the delta (either 20,000 bpd or 70,000 bpd) can be easily moved by other means. *See* Plaintiffs' Remedy Br. at 22; Fagan Report at 6-7 (assuming 20,000 bpd delta), 36 (assuming 70,000 bpd delta). Apart from getting the numbers wrong (government reports, as discussed below, contradict their claims of 550,000 fewer bpd as of mid-May 2020 or 500,000 bpd fewer through 2022),[4] the facts refute Plaintiffs' self-serving guesswork.

10. First, projections from government agencies, including the U.S. Energy Information Administration ("EIA") (whose purpose is to report energy statistics) and the North Dakota Department of Mineral Resources, are that global oil demand reached its lowest point in May 2020

---

[4] *See* Plaintiffs' Remedy Br. at 22; Fagan Report at 6, 31, 32, 36.

(the point at which Plaintiffs assume demand will stay indefinitely) and that demand will recover almost fully to 2019 levels by the fourth quarter of 2020.[5]  Global production is projected to rise similarly.  Figure 1 shows the relationship between global production, consumption, and stockpiles based on EIA data and projections.  Production in the Bakken region is also already starting to recover as global oil prices are trending to pre-pandemic levels and demand in the United States rebounds.  Like global demand, May 2020 is expected to be the lowest production month in the Bakken region and government agencies expect Bakken production to recover to 2019 levels.  This rise in production is supported, in part, by oil prices that have more than doubled since the price collapse in March 2020 that stemmed from a dispute between Saudi Arabia and Russia.[6]  In fact, the EIA projects Bakken productivity of more than 1.1 million bpd in May 2020 and June 2020, which is almost 200,000 bpd higher than Plaintiffs' unsubstantiated estimate of the "high case" of North Dakota production over the next two years (936,000 bpd), and the data clearly indicates a trend toward market recovery.[7]  Likewise, on May 15, 2020 the North Dakota Department of

---

[5]  Lynn Helms, *Director's Cut:  March 2020 Production*, N.D. Dep't of Mineral Res., at 3 (May 15, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-05-15.pdf (reporting that "liquid fuel demand is expected to bottom out in May 2020," citing EIA projections); *Short-Term Energy Outlook*, U.S. Energy Info. Admin., at Tbl. 3a (May 2020), https://www.eia.gov /outlooks/steo/pdf/steo_full.pdf (reporting liquids consumption levels as 20.57 million bpd in the fourth quarter of 2019, and projecting consumption to be lowest in the second quarter of 2020, at 15.87 million bpd, and to increase to 18.67 million bpd in the third quarter and 19.26 million bpd in the fourth quarter, and to rise further through 2021).

[6]  *Oil jumps to highest level since March on lower U.S. inventories, recovering demand*, CNBC (May 21, 2020), https://www.cnbc.com/2020/05/21/oil-markets-us-crude-inventories-global-economy-in-focus.html.

[7]  *Compare* Fagan Report at 37 Fig. 21 (projecting, without citation, 936,500 bpd of annual crude oil production in North Dakota in 2020-2022) *with Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https://www.eia.gov/petroleum/drilling/#tabs-summary-2 (projecting 1,135,000 bpd of crude oil produced in the Bakken region in May 2020 and 1,114,000 bpd in June 2020).  North Dakota typically contributes about 95 percent of crude oil production in the Bakken region.  *See US Williston Basin Oil Production*, N.D. Pipeline Authority, https://north dakotapipelines.com/us-williston-basin-oil-production/ (last visited June 5, 2020) (showing that in

Mineral Resources ("DMR") estimated that at least 950,000 bpd were still being produced in North Dakota compared to approximately 1.43 million bpd in March 2020 (meaning only about 480,000 bpd of North Dakota production had been shut-in),[8] and DMR subsequently revised its estimate of shut-in production downward to 475,000 bpd on May 28, 2020.[9]   (Most Bakken production is from North Dakota.)   Further, Continental Resources, Inc., the largest producer of oil and gas in the Bakken estimates that North Dakota production alone will not fall below 1 million bpd.[10]   Based on these figures, crude oil production in the Bakken region was likely between 1 million and 1.1 million bpd in May, as it will be in June 2020, and will increase from there.   In addition, indications are that consumer behavior will return to earlier patterns as COVID-19 shutdown orders continue to be lifted.   The data from other countries, such as China, that implemented COVID-19 social-distancing measures ahead of the United States bears this out.   These countries are returning to normal activity levels with corresponding increases in demand for refined petroleum products.   For example, crude oil processing rates in China in April 2020 were higher than in April 2019 and car sales in China increased in April 2020 for the first time in about two years.[11]   Fuel demand is also

---

2020 about 95 percent of crude oil produced in the Williston Basin, which includes the Bakken formation, came from North Dakota).

[8]  N.D. Dep't of Mineral Res., *May 2020 Director's Cut*, YouTube, at 13:20  (May 15, 2020), https://www.youtube.com/channel/UCp5qbfZG4EBcW1c3AryHsBA?view_as=subscriber (reporting North Dakota production of 950,000 bpd and thus 500,000 bpd of shut-in production); Lynn Helms, *Director's Cut:  March 2020 Production*, N.D. Dept. of Mineral Res., at 1 (May 15, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-05-15.pdf (reporting March 2020 crude oil production as 1,428,273 bpd).

[9]  *Bakken Restart Task Force*, N.D. Dep't of Mineral Res., at 3 (May 28, 2020), https://www.dmr.nd.gov/oilgas/FinalBakken_Restart_Task_Force_Action_Report.pdf (reporting 475,000 bpd of shut-in production in North Dakota).

[10]  *See* Declaration of Ramiro Rangel at 2 ("Rangel Dec.") ("Continental expects crude oil production in North Dakota will not drop below 1,000,000 barrels per day.").

[11]  *China crude oil runs rebound in April as fuel demand picks up*, Reuters (May 14, 2020), https://www.reuters.com/article/china-economy-output-oil/china-crude-oil-runs-rebound-in-

rebounding in European countries like Germany and Spain where stay-at-home orders are being

relaxed.[12]   Independent observers and industry leaders are seeing similar behavior in the United

States.[13]   The data thus discredits Plaintiffs' self-serving speculation about the pandemic's impact

being permanent.

---

april-as-fuel-demand-picks-up-idUSL4N2CV24T?rpc=401&; Trefor Moss, *China's Auto Market Rumbles Back to Growth*, Wall St. J. (May 7, 2020), https://www.wsj.com/articles/chinas-auto-market-rumbles-back-to-growth-11588845921.

[12]   *Fears of Mass Transit Fuel Increases in Oil Demand*, Inst. for Energy Research (May 20, 2020), https://www.instituteforenergyresearch.org/fossil-fuels/gas-and-oil/fears-of-mass-transit-fuel-increases-in-oil-demand/.

[13]   *Id.*; *Valero Energy Corp (VLO) Q1 2020 Earnings Call Transcript*, The Motley Fool (Apr. 29, 2020), https://www.fool.com/earnings/call-transcripts/2020/04/29/valero-energy-corp-vlo-q1-2020-earnings-call-trans.aspx (reporting "about a 9% increase" in gasoline demand from the beginning to the end of April and a "significant sharp increase in demand" in regions where stay-at-home orders had already been lifted); *HollyFrontier (HFC) Q1 2020 Earnings Call Transcript*, The Motley Fool (May 9, 2020), https://www.fool.com/earnings/call-transcripts/2020/05/09 /hollyfrontier-hfc-q1-2020-earnings-call-transcript.aspx (reporting "a 10% to 15% increase in gasoline demand in the areas that we operate" since early April and anticipating in "June . . . people will be consuming a lot more gasoline at what are very attractive prices"); *PBF Energy (PBF) Q1 2020 Earnings Call Transcript*, The Motley Fool (May 16, 2020), https://www.fool.com/earnings /call-transcripts/2020/05/16/pbf-energy-pbf-q1-2020-earnings-call-transcript.aspx (reporting that gasoline production is steadily increasing).

**Figure 1**
**World Liquid Fuels Production and Consumption Balance**



Source: Short-Term Energy Outlook, May 2020

*Source*:  *Short-Term Energy Outlook*, U.S. Energy Info. Admin., at 26 (May 2020), https://www. eia.gov/outlooks/steo/pdf/steo_full.pdf.

11. Second, as shown in Figures 2 and 3 below, *data* confirms that demand for DAPL and ETCOP has remained high even as overall production and demand have decreased.  Specifically, in March 2020, DAPL shipped about 570,000 bpd—its current capacity—and received nominations to ship more than ███ bpd that month.  Shipments dropped in April 2020 to ███ bpd, or about ██ percent of allowable capacity, as the effects of stay-at-home orders were felt nationwide; and shipments dipped further to ███ bpd in May 2020 as the market reacted to the low oil prices and tightening storage experienced in April 2020.  But nominations are already rebounding for June 2020—they are up to ███ bpd as of June 4, 2020 and may increase further for June as recovery continues.  Nominations are expected to again reach DAPL's capacity by April 2021 and may return sooner.

**Figure 2**
**Actual and Expected Shipments on DAPL in 2020 and 2021**



**Figure 3**
**Actual and Expected Shipments on DAPL in 2020 and 2021 ..   Barrels per Day ("bpd")**



12. Thus, the *actual* demand for DAPL—like the demand for oil nationwide—is represented by a sharp decline and rebound (like a narrow letter "v") rather than a sharp decline and flat line for the foreseeable future, as Plaintiffs incorrectly suggest.  DAPL's nominations are particularly strong given that overall production in the Bakken region was between 1 million and 1.1 million bpd in May 2020 based on available reports, down from a high of about 1.45 million in February

2020.[14]  (Plaintiffs assert cuts of 550,000 bpd based on older estimates in the popular press, but

their source has since reduced its estimate of cuts by almost 15 percent.[15])  Plaintiffs use these

estimates of temporary production cuts to speculate that DAPL is not needed because production

supposedly has decreased by roughly the amount of the pipeline's volume.  But, as noted, the

estimates from state and federal agencies and the largest producers in the Bakken suggest that

actual production in the Bakken region is currently between 1 million and 1.1 million bpd, and is

rising, refuting Plaintiffs' speculation.  And actual shipper behavior and data show how ridiculous

Plaintiffs' assertion is.  Despite production cuts, a significant portion of the produced oil continues

to move on DAPL, which shows that the market needs and will continue to rely on DAPL even

when overall production decreases temporarily.  Now that production is recovering, shippers are

proving their reliance on DAPL over other modes of transportation by quickly ramping up

shipments.

### Direct Economic Harm to Dakota Access and ETCO

13. Plaintiffs also question my calculation of lost revenues to Dakota Access if DAPL is shut

down by relying on transient market conditions that have already passed.  But Plaintiffs do not

even attempt to quantify these losses themselves.  *See* Plaintiffs' Remedy Br. at 24-25; Fagan Dec.

¶ 5; Fagan Report § 7.  Simple arithmetic shows that my calculations of potential losses to Dakota

---

[14]  *See Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https://www.eia.gov/petroleum/drilling/#tabs-summary-2 (projecting 1,135,000 bpd of crude oil produced in the Bakken region in May 2020); Lynn Helms, *Director's Cut:   March 2020 Production*, N.D. Dep't of Mineral Res., at 1 (May 15, 2020), https://www.dmr.nd.gov/oilgas /directorscut/directorscut-2020-05-15.pdf (reporting 1,451,681 bpd produced in North Dakota in February 2020).

[15]  *See* Fagan Report at 6 & n.1, citing James MacPherson, *North Dakota aims to use COVID-19 aid to plug oil wells*, Associated Press (May 14, 2020), https://billingsgazette.com/news/state-and-regional/north-dakota-aims-to-use-covid-19-aid-to-plug-oil-wells/article_eadee456-3b1f-5b04-8d75-a0280fcb72ea.html.

Access and ETCO are accurate.  These calculations can be verified by multiplying the per-barrel cost of shipping on DAPL by the pipeline's committed throughput.  In my prior declaration, I estimated the high end of the revenue range by assuming the DAPL-ETCOP system would be fully utilized (570,000 bpd), and the low end by considering only "take or pay" contracted capacity (███████ bpd)[16] and assuming zero walk-up shippers, for which ten percent of DAPL and ETCOP's capacity is reserved (in keeping with FERC guidance).  Dakota Access can expect payments for all of the take-or-pay capacity at a fixed price *regardless of whether a lesser amount actually ships*, as long as the pipeline remains in service.  Plaintiffs recognized this in their 2017 remedy briefing.  *See* Goodman Dec. ¶ 29 ("shippers may be committed to pay for up to 90% of capacity . . . even if the amount of crude actually transported is below the committed volumes").  Simple math shows that the ranges of losses included in my original declaration were accurate.

14. The rates for shipping on DAPL and ETCOP are filed with FERC in a "tariff" that is unaffected by the market price of oil.  Dakota Access files both a local tariff with rates for shipping oil from specific origin points in North Dakota to the Patoka Hub in Illinois, and a joint tariff with ETCO for shipping oil from points in North Dakota to points in Tennessee and Texas.[17]  The company's tariff sets out many factors in determining the price to ship a particular barrel of oil, including the origin and destination points and the amount shipped.  Overall, the cost for a contracted shipper to transport one barrel of oil from North Dakota to the Patoka Hub ranges from

---

[16] The DAPL-ETCOP system has contracted capacity of ███████ bpd.  ███████ bpd of this capacity is contracted on a "take or pay" basis.

[17]  *See* **Exhibits 2** and **3**.  These tariffs are publicly available on FERC's website by searching the "eTariff" database for "Dakota Access" in the "Company Name" field, selecting "Effective" in the "Section Status" field, and selecting the documents titled (1) "DAPL Local Rates, DAPL FERC 2.0.0, 2.4.0" that was effective July 1, 2019, and (2) "Joint Tariff Rates, DAPL FERC 4.0.0, 4.5.0" that was effective July 1, 2019.  *Tariff Section Search*, Fed. Energy Regulatory Comm'n, https://etariff.ferc.gov/TariffSearch.aspx (last visited June 7, 2020).  Both contracted and walk-up tariff rates change annually.

about $4.50 to $5.50 and the cost for a walk-up shipper is approximately $6.50.  The cost for a contracted shipper to transport one barrel of oil from North Dakota to ETCOP's terminus in Nederland, Texas is between about $5.85 and $6.90, and the cost for a walk-up shipper on the same route is approximately $8.20.

15. Once the inputs are known, the math is straightforward.  Using, by way of example, an average blended rate of $6 per barrel, transporting ▮▮▮▮ barrels per day generates ▮▮▮▮ per day and approximately ▮▮▮ billion per year.  Using the same average blended shipping rate of $6, transporting 570,000 barrels per day generates revenue of $3,420,000 per day, or approximately $1.25 billion per year.  These straightforward calculations establish the high and low ends of the revenue range for Dakota Access and ETCO and support the estimates in my prior declaration.  *See* First Emery Dec. ¶¶ 9-10 (estimating combined revenue for Dakota Access and ETCO through 2020 would be approximately $1.078 to $1.220 billion and revenue through 2021 would be approximately $1.035 billion to $1.298 billion).  The slight differences between the numbers in my earlier declaration and the results of the math calculations above are due to my declaration's use of the precise figures for actual shipping costs and the actual volumes shipped for the months in 2020 that had already occurred rather than the blended rate used above to show how the math works.

## Economic Effects to Third Parties

16. Plaintiffs assert alternatively that shutting down DAPL would have *no* impact on third parties, because any volumes that would have shut-in as a result of DAPL going offline have already been shut-in, *or* that any impacts would be "so minor" as to be "lost in the noise" of "other industry currents."  Plaintiffs' Remedy Br. at 23-25 (quotation marks omitted); *see also* Fagan Dec. ¶¶ 5, 8, 11; Fagan Report at 6-7.  They support this by pointing vaguely to the economic downturn and suggesting that third parties can transform their businesses by producing and shipping oil in

15

other ways.  Plaintiffs also assume that lower Bakken region production—which is rebounding and is already above the low level that, according to Dr. Fagan, will persist through 2022—means DAPL's transport capacity of 570,000 bpd is no longer needed.  These assumptions are baseless given actual events and actual industry needs.

17. As discussed above, shippers continue to rely on DAPL despite an overall short-lived decrease in production.  DAPL is the most economic means of transporting Bakken production to market.  That is to say, without DAPL, less oil would most likely be produced because it would be less economic to ship and sell.  The economic downturn has temporarily made margins even thinner than before.  For some producers, any added costs—particularly an increase in transportation costs—may mean the difference between continuing production and shutting in production.  Dr. Fagan has agreed and testified in another matter that lower-cost pipeline transportation can make the difference between production being economic or not:  "Because pipeline capacity is generally cheaper than rail, adding more pipeline capacity could allow marginally more-expensive oil supply to become profitable at any given global oil price."[18]  The cost for DAPL's current contracted shippers to ship on DAPL is much lower than other modes of transport, as I have explained.  Dr. Fagan disputes that the added cost for rail transportation would be $5 to $10 per barrel, asserting it would be much lower, but in testimony elsewhere she has agreed with that exact range.  She testified that "[p]ipelines are, in general, considered more cost-effective than rail to transport oil, with a cost of *$5 per barrel by pipeline compared to $10 to $15*

---

[18]  Direct Testimony of Dr. Marie Fagan on behalf of the Minnesota Department of Commerce Division of Energy Resources at 36, *In re Application of Enbridge Energy, Ltd. Partnership for a Certificate of Need for the Line 3 Replacement Project in Minnesota from the North Dakota Border to the Wisconsin Border*, Docket No. PL9/CN-14/916 (Sept. 11, 2017), https://mn.gov/eera/web /project-file?legacyPath=/opt/documents/34079/Fagan_Direct_Testimony%2014-916.pdf.

*on rail.*"[19]

18. Moreover, three of the six largest producers in the Bakken region—Continental Resources, Hess, and ConocoPhillips—whose collective production represented about a *quarter* of Bakken crude oil production as of February 2020,[20] *see* Fagan Report at 21, Fig. 8, are so concerned about a DAPL shutdown that they have filed statements asking this court to keep DAPL online during the remand because a shutdown would cause them serious economic harm and even lead them to shut-in production.

19. Continental Resources, the *largest* crude oil producer in the Bakken, responds to "Plaintiffs' mistaken assertions that . . . there is sufficient alternative takeaway capacity . . . and [that] taking DAPL out of service will not impact upstream entities given the current economic climate and temporarily reduced oil demand," explaining that shutting down DAPL "would significantly disrupt crude oil operations in the Bakken, especially during this time of decreased demand and low commodity prices." Rangel Dec. at 2. Continental confirms that shutting down DAPL will result in "lost revenue," "the costs associated with shutting-in wells and restarting them later," "impacts to oil and gas employees and service contractors . . . and customers," and "[b]y far the largest" impacts to "the State of North Dakota." *Id.* at 3-4. Continental goes on to explain further that Plaintiffs are incorrect and "[t]here is insufficient alternative takeaway rail and trucking capacity out of the Bakken to replace the current volumes transported by DAPL," and that "[t]here are no other pipelines in service, or expected to come online, that can meaningfully replace DAPL." *Id.* at 2. Continental estimates that even if there were truck or rail capacity, it would likely

---

[19] *Id.* § 4.4.2 (emphasis added).  Mr. Rennicke's analysis in his second declaration also confirms that the estimate of a $5 to 10 per barrel cost differential between pipeline and rail was accurate.

[20] Lynn Helms, *Director's Cut:  March 2020 Production*, N.D. Dept. of Mineral Res., at 1 (May 15, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-05-15.pdf (reporting 1,451,680 bpd produced in North Dakota in February 2020).

"increase[] costs spread across all producers and shippers . . . [by] $832 million and $1.456 billion for each year DAPL is shut down." *Id.* at 3.  Continental points out that with these increased costs, if DAPL is shut down "crude oil producers would likely be forced to curtail crude oil production until the pipeline is again operational." *Id.* at 3.

20. Hess Corporation, the *second* largest producer in the Bakken, states that it "structured its North Dakota operations based on the availability of DAPL" and that it would stop producing the volumes that it currently moves on DAPL if the pipeline is shut down "because there is no practical alternative or efficient way to transport the volume of oil that Hess currently ships on DAPL if the pipeline is shut down."  D.E. 501-2, at 3, 5 ("Hess Amicus Br.") (bold and caps omitted); D.E. 501-3, ¶ 14 ("Lohnes Dec.").  Shutting in the crude oil that Hess ships on DAPL could affect Hess's long-term contracts with refineries, landowners, and royalty owners, and it would mean lost jobs in North Dakota, where Hess is one of the largest private employers.  Lohnes Dec. ¶¶ 6, 22, 27.

21. ConocoPhillips, the *sixth* largest producer in the Bakken (operating as Burlington Resources), Fagan Report at 21, Fig. 8, and "one of the world's largest independent exploration and production" companies,[21] explains that it too relies on DAPL's "vital" service to reach particular refining markets and that if DAPL shuts down and Conoco and other producers "are not able to efficiently get their Bakken production to a market where they can receive sufficient value for it," particularly under temporary lower price conditions, "that crude oil may remain uneconomic to produce, causing companies to further delay the return to active investment." Moreover, Conoco notes that while it has shut-in some production temporarily, "demand is

---

[21]  **Exhibit 4** (June 6, 2020 Letter in Support of Dakota Access, LLC's Reply Brief Regarding Remedy from Chris W. Conway, Vice President, Commercial, ConocoPhillips to Judge Boasberg) ("Conway Letter").

returning, crude oil prices have risen, and production is already returning," and the company "has retained its staff in North Dakota in anticipation of resuming production relatively quickly." ConocoPhillips concludes that "DAPL is a key element for the recovery of crude oil production activity in the Bakken region," and that shutting it down "would prolong the economic distress being experienced by many businesses, families and individuals who depend on the Bakken producing region for their livelihoods."

22. On the downstream side, Marathon Petroleum, one of the nation's largest refiners of crude oil, echoes the producers, explaining that it "has made significant investments across its refining system to ensure continued access to" specific third-party assets leading from the Bakken to Patoka, Illinois, and that DAPL is a critical piece of that system because it "provides the only direct crude oil transportation service for Bakken crude oil to the Patoka hub." D.E. 509-12, ¶¶ 7-9.

23. Other DAPL customers have made similar statements, including Enerplus, which in April 2020 told this Court that it not only benefits from DAPL, but has committed to increase its shipments as soon as there is adequate capacity in order to capitalize on the more than $1.2 billion it has invested in developing its North Dakota crude oil play since 2017. D.E. 509-13, at 2. Enerplus emphasizes in a second declaration that it considered its 10-year contract with DAPL a "low[] risk," high reward decision based on DAPL's several years of safe operation to valuable markets. Second Declaration of Garth R. Doll. at 3 ("Second Doll Dec."). While Enerplus has shut-in some production as a result of the recent temporary economic downturn, it, like others in the industry, expects "that most of the economically curtailed industry production will return in the very near term." *Id.* at 2. Enerplus further explains that taking DAPL offline now, when the market is still recovering, will threaten the resurgence of Bakken production by depressing local oil prices because there would be insufficient egress from the region to the required markets. *Id.*

at 3.   Specifically, Enerplus explains "[t]here are no other operational or planned pipelines in the Bakken region that can meaningfully replace DAPL," and that Enerplus *does not use* rail due to the cost and "environmental liability associated with doing so."   *Id.* at 4.

24. As discussed in more detail below and by Dr. Makholm and Mr. Rennicke, Dr. Fagan's statements about how crude oil will or could move are based on speculation and incorrect assumptions rather than the *actual* needs and experience of crude oil producers, shippers, and buyers.

25. In addition, North Dakota, Illinois, and the other states DAPL and ETCOP pass through will suffer meaningful losses in tax revenue if DAPL is shut down.   *See* First Emery Dec. ¶¶ 28-29.   Plaintiffs admit that these losses may occur, but assert that these losses are based on incorrect projections of production loss due to the pandemic.   *See* Plaintiffs' Remedy Br. at 27; Fagan Report at 51.   This argument assumes there is no recovery.   That is contradicted by the overwhelming weight of expert expectations around the country, by those more specific to Bakken production, by impartial government estimates, and by those of the actual producers on the ground.   The loss of DAPL absolutely will result in significant lost tax revenue to the states.   As I just explained, and as detailed by Dr. Makholm, Dr. Fagan assumes away the economic reality that producers need the efficient, lower-cost transportation of DAPL in order to competitively continue producing oil.

26. Likewise, the Mandan, Hidatsa, and Akira Tribes, known as the Three Affiliated Tribes, will suffer losses as described in my prior declaration and that of Dr. Makholm.   *See* First Emery Dec. ¶ 32; D.E. 509-11, ¶¶ 32, 34 ("First Makholm Dec.").   Plaintiffs make no effort to dispute the estimated lost revenues to these tribes in my prior declaration or the declaration of Dr. Makholm. Regardless of whether the leadership of the Three Affiliated Tribes supported protests against

DAPL, Plaintiffs' Remedy Br. at 24 n.5, those tribes did recently negotiate a more favorable revenue sharing arrangement with the State of North Dakota and continue to base a large portion of their budgets on that revenue.  First Emery Dec. ¶ 32; First Makholm Dec. ¶ 32.  The Three Affiliated Tribes earn this revenue based on the amount of oil produced on their land.  As of March 2019, about 20 percent of North Dakota's oil production took place on the Three Affiliated Tribes' land.[22]  Accordingly, their members stand to suffer significant losses if DAPL goes offline and North Dakota production fails to recover or declines as a result.

**Lack of Viable Alternative Transportation Options**

27. Plaintiffs speculate that the capacity currently flowing on DAPL will magically move to other transportation methods if DAPL is forced offline, and that any decline in production will reduce the need for DAPL in a one-to-one ratio thus removing the need for alternative transportation altogether.  *See, e.g.*, Fagan Report at 6-7, 41; Fagan Dec. ¶ 5.  Both statements cannot be true and, in fact, neither is.

28. First, DAPL was built because of lack of capacity for shipping Bakken oil directly and efficiently to destinations in the Midwest and down to the Gulf Coast.  Plaintiffs say that the capacity DAPL serves could shift to rail or other pipelines simply because rail or other pipelines might have capacity out of the Bakken to different destinations.  *See* Goodman Dec. ¶¶ 7-10; Fagan Report at 41.  Dr. Fagan discusses rail capacity at length and then states that other regional pipelines and rail could compensate for the loss of DAPL's capacity.  *See* Fagan Report at 41 (asserting that "incremental [rail] capacity would be more than enough to accommodate North Dakota production along with other pipelines in the next two years").  But Dr. Fagan's description

---

[22]  KVRR Staff, *Burgum signs oil tax-sharing bill with Three Affiliated Tribes*, KVRR Local News (Mar. 28, 2019), https://www.kvrr.com/2019/03/28/burgum-signs-oil-tax-sharing-bill-with-three-affiliated-tribes/.

of these alternate pipelines (there are four she posits have capacity) does not show that any capacity they have is a replacement for DAPL's capacity.  *See* Fagan Report at 36, Fig. 20.  Dr. Fagan asserts that two of these other pipelines go to Guernsey, Wyoming and that they *interconnect* to Cushing, Oklahoma and that the other two pipelines head north and east and, eventually, *interconnect* with the Enbridge Mainline in Clearbrook, Minnesota and Saskatchewan, Canada. Dr. Fagan does not explain whether there is capacity for DAPL's volumes to move from Guernsey, Wyoming to Cushing Oklahoma, or on the Enbridge Mainline, nor whether or how these hypothetical volumes would go from these interconnections to their ultimate destination in the Gulf Coast.  And Dr. Fagan does not explain the *costs* of using these alternate systems.  An accurate analysis of other pipelines' viability must account for not only the cost and capacity of the proposed replacement pipelines, but *also* both the cost and capacity of the pipelines with which it interconnects and the cost and capacity of the feeder infrastructure supporting them, such as trucks, crude-gathering pipelines, and related infrastructure necessary to move crude oil from the wells to those other pipelines' terminal heads.

29. Continental raises these exact points, explaining that, "[d]espite Plaintiffs' claims there is excess pipeline capacity on other pipelines leading out of the Bakken, there are no other pipelines in service, or expected to come online, that can meaningfully replace DAPL."  Rangel Dec. at 2. Continental further explains that "[a]ny existing non-DAPL pipeline takeaway capacity does not service the same markets DAPL serves . . . [and] the markets [they] . . . do serve are often less economically attractive because of market saturation and additional transportation costs."  *Id.*  All of these pipelines existed before DAPL was completed, and to my knowledge all of them had some unused capacity at that time.  DAPL was built, at the request of DAPL's customers, to meet a specific, *unmet* need.  Without DAPL, that need will again be unmet.

30. Second, transportation modes and destinations are simply not fungible. As I have explained, before Dakota Access built its pipeline it proposed to potential shippers several options for terminal locations, including Cushing, Oklahoma. Its customers chose Patoka, Illinois. First Emery Dec. ¶¶ 40-41. Customers chose Patoka and/or Nederland, Texas (via ETCOP) based on existing business relationships, and/or because it gave them an opportunity to reach valuable markets. No matter the choice at that time, customers rely on the long-term existence of specific point-to-point routes because of the investment required to create and use the "tie-in" infrastructure at the pipelines' origin and destination points. For example, DAPL allowed Hess to increase its operations because Hess can now move product from one side of the Missouri River to the other without the need for expensive, inefficient, and unsafe rail or truck transportation. Hess Amicus Br. at 5-6. Hess explains that, having made that choice, it "invested more than $40 million in infrastructure projects in reliance on DAP[L]." *Id.* at 4. New infrastructure for switching to less efficient rail and truck transit "would take well over a year—and tens of millions of dollars—to develop." *Id.* at 6.

31. Moreover, forcing shippers to move product on other pipelines that have different origin points than DAPL or go to different delivery points would be disruptive to their businesses and may result in shutting in some or all of their production. Rangel Dec. at 2-4; Second Doll Dec. at 2-3; Conway Letter. As I discussed in my prior declaration and as Marathon Petroleum, Enerplus, and Hess discussed in their declarations or briefs (*see* D.E. 520-5; D.E. 520-6; D.E. 501-2), shippers make arrangements with particular terminals, refiners, and others along their supply chain far in advance, and in reliance on particular fixed or projected costs. Forcing them to alter their supply chain, with different costs, would significantly affect the ability of those producers to turn a profit, with ripple effects on companies along their supply chain.

23

32. Dr. Fagan's claim that rail provides "helpful" flexibility ignores these realities entirely. *See* Fagan Report at 43.  As Mr. Rennicke discusses at length in his declarations, producers cannot simply put their product on a train and send it to wherever that rail line goes.  There are many layers of cost, regulations, and transactions to consider.  Likewise, Dr. Fagan embarks on a fool's errand when she compares rail and pipeline transport costs using Patoka, Illinois as the destination. *See id.* at 38.  Patoka cannot receive crude oil by rail because it lacks the facilities to offload crude oil.  In addition, Dr. Fagan's suggestion that Patoka is an unattractive destination because of supposedly diminishing storage capacity, *id.* at 43, again misses the point that producers cannot quickly pivot to different destinations.  This also represents her clear misunderstanding of how storage markets function.  Storage exists to manage the ebbs and flows of supply and demand.  To imply that Patoka storage being full today (which it is not) has any meaningful impact on future market conditions is simply wrong and misleading.

33. Other pipelines, which Plaintiffs assume are an option without citation or explanation (*see* Fagan Report at 36), likewise cannot replace DAPL.  Rangel Dec. at 3; Conway Letter.  Dr. Makholm explained in his April 29, 2020 declaration that at least two of the other pipelines in the Bakken region—the Bridger and "Double H" lines—are or have been fully committed, and, even if they were not fully committed, they go to Montana or Oklahoma rather than the destinations DAPL's customers need.  *See* First Makholm Dec. ¶ 17.  If other pipelines in the Bakken region have available capacity that is not being utilized, it is because that capacity serves markets that are less desirable for shippers, as discussed above.  Otherwise, shippers would be using those pipelines already.  And any added temporary capacity caused by the recent economic downturn will vanish as demand for oil increases.

34. Third, shifting to a patchwork of smaller pipelines, trains, and trucks can lead to mixing

grades of oil as the Bakken light crude comes into contact with tanks or pipes that have held or hold other types of oil.  As I explained before, mixing light, sweet crude oil with other grades can degrade the product and lead to lower-quality and less valuable barrels being delivered to the shipper at the ultimate destination.  First Emery Dec. ¶ 41.  This mixing does not happen on DAPL or ETCOP because those pipelines carry one grade of crude oil to fixed destinations.  Thus, shifting to other transportation options would increase a shipper's costs while reducing the product's value. Precisely *because* oil prices are now currently depressed, shutting down DAPL would make shipping oil uneconomic for many producers and shippers.

35. Finally, consistently strong demand for DAPL demonstrates why shippers continue to need this mode of transport.  During the 2017 remedy briefing, Plaintiffs projected that DAPL would be underutilized due to the existence of transportation alternatives, *see* Goodman Dec. ¶¶ 7-12, but history has proven them to be wrong.  Requests to ship on DAPL have consistently exceeded 570,000 bpd since September 2018, and in some months DAPL has received nominations to ship *all* of the oil being produced in the Williston Basin (an area larger than the Bakken formation). *See* First Emery Dec. Fig. 1.  This is concrete evidence from the market that it relies on DAPL to the exclusion of other modes of transportation and that demand will be strong into the foreseeable future.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: June 8, 2020


Glenn E. Emery

# EMERY
# EXHIBIT 1

**Plaintiffs' and Their Declarants' Most Significant Misleading Claims Concerning
Economic Harm to Dakota Access and Third Parties from Shutting Down DAPL**

1. Dr. Fagan wrongly claims that North Dakota oil production will remain stagnant at 936,500 barrels per day ("bpd") for the next two years.[1]  Oil production in North Dakota is *already* significantly above that level and increasing.  The U.S. Energy Information Administration projects Bakken productivity of more than 1.1 million bpd in May 2020 and June 2020 (200,000 bpd *higher* than Plaintiffs' estimate of North Dakota production over the next two years), and various government agencies project that global oil demand reached its lowest point in May 2020 (the point at which Plaintiffs assume demand will stay indefinitely) and that demand will almost recover fully to 2019 levels by the fourth quarter of 2020.[2]

2. Dr. Fagan wrongly claims there will not be any, or only "marginal and readily managed," losses to third parties from DAPL shutting down.[3]  There is absolutely no support for this claim.  Applying Dr. Fagan's own price estimates to the *correct* volumes that will be forced to shut in if DAPL closes (320,000 to 500,000 bpd), Dr. Jeff Makholm calculates her loss estimate to North Dakota producers as $5.26 billion to $8.21 billion through 2021.[4]

3. Dr. Fagan speculates, incorrectly, that any economic losses in the Bakken region may be offset by gains in other regions.[5]  This "zero sum" argument is absurd, and even ignoring the fundamental flaws of this premise, it is purely speculative and just plain wrong.  A loss to one third party is a loss, regardless of any speculative gains by another third party somewhere else.[6] Dr. Fagan blithely assumes away numerous impacts—stranded fixed assets, upset supply agreements, closed highly-desirable routes (as in the direct line from the Bakken to Patoka and the Gulf Coast), and billions of dollars in lost tax revenue to states and Native American tribes—that all constitute un-recoupable losses to third parties if DAPL is shut down.[7]

4. Dr. Fagan erroneously claims that now is the right time to shut down DAPL.[8]  This defies all evidence and logic.  If anything, this is among the *worst* times to shut down DAPL.  North Dakota and the oil producers in the state have suffered tangible losses from the Russia/Saudi Arabia oil price dispute and the short-term shock to markets caused by the COVID-19

---

[1]  Fagan Report at 37.

[2]  Second Emery Dec. ¶ 10.

[3]  Fagan Dec. ¶ 11.

[4]  Second Makholm Dec. ¶ 7.

[5]  Fagan Dec. ¶ 7.

[6]  Second Emery Dec. ¶ 4.

[7]  *Id.*  ¶¶ 25-26, 30-31; *see also* D.E. 509-9, ¶¶ 28-29, 32 ("First Emery Dec."); D.E. 509-11, ¶¶ 32, 34 ("First Makholm Dec.").

[8]  Fagan Report at 6.

pandemic.[9]  To further erode industry expectations and already thin margins by shutting down a pipeline that has operated safely for three years would add to these harms and impede the recovery in demand, oil prices, and production that is already underway in North Dakota.[10]

5. Dr. Fagan wrongly claims demand for DAPL will be reduced in a one-to-one ratio with decreased production.[11]  This is belied by actual data for nominations, which shows that demand for DAPL persisted even as production decreased, and nominations are increasing.[12] Nominations for June 2020 are more than ███████ bpd—or more than ██ percent of DAPL's maximum capacity.[13]

6. Dr. Fagan claims that other pipelines can adequately transport most of DAPL's volume.[14]  This is false.  First, shippers use DAPL instead of other transportation options because of its specific qualities—it delivers crude oil to the right refineries in the right regions—and because they have made specific, long-term investments in reliance on DAPL that they cannot unwind.[15] The pipelines Dr. Fagan suggests *do not serve the same markets as* DAPL; indeed, when DAPL was being planned, shippers rejected those other pipelines in favor of DAPL's straight-line service to Patoka, Illinois.[16]  Shippers also rejected those pipelines when DAPL came online in 2017.  Plaintiffs suggested in 2017 that DAPL was unnecessary based on supposedly available rail and pipeline capacity in the Bakken region at the time, but shippers quickly committed to DAPL.[17]  Second, even if those other pipelines had capacity, Dr. Fagan has not shown that they connect to pipelines or other transportation options that have capacity to move the oil from those pipelines to their ultimate destination.[18]  And, third, even if there was another option, shipping on other pipelines may result in a degraded product as a result of grade mixing, which would cause further economic losses by reducing the value of the oil.[19]  As DAPL's customers attest, the barrels moving on DAPL will largely be shut-in rather than moved elsewhere.[20]

---

[9]   Second Emery Dec. ¶¶ 5(i), 10; Second Makholm Dec. ¶¶ 5, 9.

[10]   Second Emery Dec. ¶¶ 17-23.

[11]   *E.g.*, Fagan Report at 41.

[12]   Second Emery Dec. ¶¶ 11-12.

[13]   *Id.* ¶ 11, Fig. 3.

[14]   Fagan Report at 35-36.

[15]   Second Emery Dec. ¶¶ 30, 35.

[16]   *Id.*  ¶¶ 28-30.

[17]   *Id.* ¶ 7; D.E. 272-5, ¶¶ 7-12 ("Goodman Dec.").

[18]   Second Emery Dec. ¶ 33.

[19]   *Id.* ¶ 34.

[20]   Rangel Dec. (Continental Resources, Inc.) at 2; Second Doll Dec. (Enerplus Corp.) at 3-4; D.E. 501-3, ¶ 13 ("A shutdown of DAPL will likely require Hess to shut in a portion of its production in North Dakota."); Second Emery Dec. ¶¶ 18-21, 23.

# EMERY
# EXHIBIT 2

**F.E.R.C. I.C.A. Oil Tariff**                    **F.E.R.C. No. 2.4.0**
                                                  (Cancels F.E.R.C. No. 2.3.0)

# DAKOTA ACCESS, LLC

## LOCAL PIPELINE TARIFF

Applying On
**CRUDE PETROLEUM**
**FROM POINTS IN NORTH DAKOTA**
**TO POINTS IN ILLINOIS**

Committed rates filed in compliance with the Commission's order in Docket No. OR14-42-000, 149 F.E.R.C. ¶ 61,275.  Uncommitted rates filed in compliance with 18 CFR §342.3, Indexing.

Governed by the rules and regulations published in Dakota Access, LLC's F.E.R.C Tariff No. 1.3.0, supplements thereto, and successive issues thereof.

[C]~~Issued on twenty seven (27) day's notice under authority of 18 C.F.R. § 341.14. This tariff publication is subject to refund pending a 30 day review period.~~

The provisions published herein will, if effective, not result in an effect on the quality of the human environment.

---

**ISSUED: MAY 31, 2019**          **EFFECTIVE: JULY 1, 2019**

Issued by:                        Compiled by:
Greg Mills, President             Diane A. Daniels
Dakota Access, LLC                Dakota Access, LLC
1300 Main Street                  1300 Main Street
Houston, TX 77002                 Houston, TX 77002
                                  (713) 989-7425
                                  tariffs@sunocologistics.com

**TABLE OF RATES**

Uncommitted Rates:

| From | To<br>Patoka, Illinois |
|---|---|
| **Rate is in dollars per barrel of 42 US gallons** ||
| An Origin Point that is an Eligible Bakken Origin Point* | **[I] $6.5475** |

**Committed Rates for Bakken Crude Petroleum from a Committed Shipper's Selected Origin Point(s) that is an Eligible Bakken Origin Point* to Destination Point of Patoka, Illinois:**

| Volume Commitment Requirement (bpd) | Term | | 10 Years |
|---|---|---|---|
| | **5 Years** | **7 Years** | |
| 3,500+† | **[I] $5.5713** | **[I] $5.5713^** | **[I] $5.5713** |

**Notes:**

\* **Eligible Bakken Origin Points:**

  1) **Bakken Field Points:**  The point(s) of origin established as selected origin points under the TSAs: Stanley, Mountrail County, North Dakota; Ramberg, Williams County, North Dakota, Epping, Williams County, North Dakota, Trenton, Williams County, North Dakota, Watford City, McKenzie County, North Dakota, and Johnson's Corner, McKenzie County, North Dakota.

  2) **Alternate Bakken Origin Points:**  Alexander Junction, McKenzie County, North Dakota, Trenton Junction, McKenzie County, North Dakota, and others as updated from time to time.

Provided that for any month during the initial term of a Committed Shipper's TSA, for the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA), with the selected destination point of Patoka, Illinois, such Committed Shipper's tariff rate for Bakken Crude Petroleum shall be **[I]** <u>$4.7754</u> per Barrel, subject to the same escalation and the notification and audit procedures in all TSAs, for the portion of the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) (a) received from the Pipeline by a carrier at Patoka, Illinois, in such month and (b) subject to a Patoka Delivery Point Verification as provided in such Committed Shipper's TSA under which such Committed Shipper warranted to Carrier that such Barrels shall thereafter be transported and delivery by a carrier with a point of origin at Patoka, Illinois (and through any additional carriers thereafter) to Roxana, Illinois, (WRB Refining, LLC Refinery), or to an Ohio/Michigan Location in accordance with the terms set forth in the TSAs.  Provided further that for any month during the initial term of a Committed Shipper's TSA, for the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) with the selected destination point of Patoka, Illinois, such Committed Shipper's tariff rate for Bakken Crude Petroleum shall be **[I]** <u>$5.0407</u> per Barrel, subject to the same escalation and the notification and audit procedures in all TSAs, for the portion of the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) (a) received from the Pipeline by a carrier at Patoka, Illinois, in such month and (b) subject to a Patoka Delivery Point Verification as provided in such Committed Shipper's TSA under which such Committed Shipper warranted to Carrier that such Barrels shall thereafter be transported and delivery by a carrier with a point of origin at Patoka, Illinois (and through any additional carriers thereafter) to a Southern Illinois-Indiana/Kentucky Location in accordance with the terms set forth in the TSAs.

^    Provided that in any month during the initial term of a Committed Shipper's TSA, for the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) with the selected destination point of Patoka, Illinois, the Committed Shipper's tariff rate for Bakken Crude Petroleum shall be **[I]** <u>$5.0407</u> per Barrel, subject to escalation and the notification and audit procedures in all TSAs, for the portion of the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) received from the Pipeline by a carrier at Patoka, Illinois, in such month and delivered to any Patoka Adjustment Delivery Point, in accordance with the terms set forth in the TSAs; provided that if such Committed Shipper included a Patoka Delivery Point Verification with its Patoka Adjustment Notification in accordance with the provisions set forth in such Committed Shipper's TSA, verifying the downstream destination of the relevant portion of the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA), then the Committed Shipper's tariff rate for the Barrels that the Committed Shipper warranted shall be delivered: (x) to Roxana, Illinois (WRB Refining,

LLC Refinery), a S IL-IN/KY Location or an Ohio/Michigan Location shall be **[I]** __$4.7754__ per Barrel, subject to escalation and the notification and audit procedures in all TSAs; (y) to a Chicago Region Location shall be **[I]** __$4.6428__ per Barrel, subject to escalation and the notification and audit procedures in all TSAs;

or (z) if applicable based on the applicable TSA, to a Canada Location shall be **[I]** __$4.5101__ per Barrel, subject to escalation and the notification and audit procedures in all TSAs.

For purposes hereunder, "Patoka Adjustment Delivery Point" means, individually, any of the following: Lemont, Illinois (CITGO Corp. Refinery); Joliet, Illinois (ExxonMobil Corp. Refinery); Whiting, Indiana (BP plc Whiting Refinery); Roxana, Illinois, (WRB Refining, LLC Refinery); Sarnia, Ontario (Imperial Oil Limited); Sarnia, Ontario (Nova Chemicals Corp.); Sarnia, Ontario (Suncor Energy Inc.); Sarnia, Ontario (Royal Dutch Shell plc, Corunna); Nanticoke (Imperial Oil Limited); Montreal, Quebec (Suncor Energy Inc.); Quebec City, Quebec (Valero Energy Corp., Jean Gaulin Refinery).

For purposes hereunder, "Chicago Region Location" means, individually, any of the following: Lemont, Illinois (CITGO Corp. Refinery); Joliet, Illinois (ExxonMobil Corp. Refinery); and Whiting, Indiana (BP plc Whiting Refinery).

For purposes hereunder, "Canada Location" means, individually, any of the following: Sarnia, Ontario (Imperial Oil Limited); Sarnia, Ontario (Nova Chemicals Corp.); Sarnia, Ontario (Suncor Energy Inc.); Sarnia, Ontario (Royal Dutch Shell plc, Corunna); Nanticoke, Ontario (Imperial Oil Limited); Montreal, Quebec (Suncor Energy Inc.); and Quebec City, Quebec (Valero Energy Corp., Jean Gaulin Refinery). A "Canada Location" is only available to the extent provided by a Committed Shipper's TSA.

For purposes hereunder, "Ohio/Michigan Location" means, individually, any of the following: Lima, Ohio (Husky Energy); Toledo, Ohio (BP-Husky Refining); Toledo, Ohio (PBF Energy); Canton, Ohio (Marathon Petroleum Corp.); Detroit, (Marathon Petroleum Corp.).

For purposes hereunder, "Southern Illinois-Indiana/Kentucky Location" means, individually, any of the following Robinson, Illinois (Marathon Petroleum Corp.); Mount Vernon, Indiana (CountryMark); and Catlettsburg, Kentucky (Marathon Petroleum Corp.).

† For all of a Committed Shipper's Excess Throughput Volumes (as defined in a TSA and to the extent permitted by the applicable TSA) nominated for Patoka, Illinois, the following rates shall apply:

| Volume Commitment Requirement (bpd) | 5 Years | 7 Years |
|---|---|---|
| 3,500+ | **[I]** $4.7754 | **[I]** $4.7754 |

The above rates for Excess Throughput Volumes are only available to the extent permitted by a Committed Shipper's TSA.

**Pipeline Loss Allowance**: As set forth in the local rules and regulations pipeline tariff, Item No. 20.

**OSHA H2S Fee**: When OSHA regulations require the presence of a second Carrier employee at a site because of H2S levels, an additional fee of **[U]** $0.1379 per Barrel will be assessed and collected. This fee may be waived if Shipper provides a permanent alternative mechanism to comply with such rules. Any alternative must be approved and agreed to by Carrier.

**EXPLANATION OF REFERENCE MARKS:**
**[C]**     **CANCELLED**
**[I]**     **INCREASED**
**[U]**     **UNCHANGED**

# EMERY
# EXHIBIT 3

**F.E.R.C. I.C.A. Oil Tariff**                    **F.E.R.C. No. 4.5.0**

(Cancels F.E.R.C. No. 4.4.0)

# DAKOTA ACCESS, LLC
## JOINT PIPELINE TARIFF
### In Connection With
### Energy Transfer Crude Oil Company, LLC

Applying On
**CRUDE PETROLEUM**
**FROM POINTS IN NORTH DAKOTA**
**TO POINTS IN TEXAS AND TENNESSEE**

Committed rates filed in compliance with the Commission's order in Docket No. OR14-42-000, 149 F.E.R.C. ¶ 61,275.  Uncommitted rates filed in compliance with 18 CFR § [W] 342.3, Indexing ~~342.2(b), Initial Rate~~.

Governed by the rules and regulations published in Dakota Access, LLC's F.E.R.C Tariff No. 3.3.0, supplements thereto, and successive issues thereof.

**[C]** ~~Request for Special Permission~~

~~Issued on [W] less than one (1) twenty seven (27) days' notice under authority of 18 C.F.R. § 341.14. This tariff publication is subject to refund pending a 30-day review period~~.

The provisions published herein will, if effective, not result in an effect on the quality of the human environment.

**ISSUED: MAY 31, 2019**                **EFFECTIVE: JULY 1, 2019**

Issued by:
Greg Mills, President
Dakota Access, LLC
1300 Main Street
Houston, TX 77002

Compiled by:
Diane A. Daniels
Dakota Access, LLC
1300 Main Street
Houston, TX 77002
(713) 989-7425
tariffs@sunocologistics.com

**[I] INCREASED.  ALL RATES INCREASED.**

<u>**TABLE OF RATES**</u>
**ALL Rates in dollars per barrel of 42 US gallons**

| UNCOMMITTED RATES FOR BAKKEN CRUDE PETROLEUM | | |
|---|---|---|
| **From** | **To**<br>**Nederland, Jefferson County, Texas**<br>(SXL Nederland Terminal or P66<br>Nederland Terminal) | **To**<br>**Collierville, Tennessee**<br>(Valero Terminal) |
| An Origin Point that is an Eligible Bakken Origin Point* | $8.1844 | $8.1844 |

**Committed Rates for Bakken Crude Petroleum from a Committed Shipper's Selected Origin Point(s) that is an Eligible Bakken Origin Point* to Destination Point of NEDERLAND, Texas – SXL Nederland Terminal**

| Volume Commitment (bpd)^ | Term | |
|---|---|---|
| | **7 Years** | **10 Years** |
| 3,500 – 29,999 | $6.8979** | $6.6326** |
| 30,000 – 49,999 | $6.6326** | $6.3672** |
| 50,000 – 69,999 | $6.3672** | $6.1019** |
| 70,000 – 89,999 | $6.3672** | $5.9428** |
| 90,000+ | $5.9428** | $5.8366** |

**[I] INCREASED.  ALL RATES INCREASED.**

**Committed Rates for Bakken Crude Petroleum from a Committed Shipper's Selected Origin Point(s) that is an Eligible Bakken Origin Point\* to Destination Point of NEDERLAND, Texas – P66 Nederland Terminal**

| Volume Commitment Requirement (bpd)\*^ | Term | |
|---|---|---|
| | **7 Years** | **10 Years** |
| 3,500 – 29,999 | $6.8979\*\* | $6.6326\*\* |
| 30,000 – 49,999 | $6.6326\*\* | $6.3672\*\* |
| 50,000 – 69,999 | $6.3672\*\* | $6.1019\*\* |
| 70,000 – 89,999 | $6.3672\*\* | $5.9428\*\* |
| 90,000+ | $5.9428\*\* | $5.8366\*\* |

**Notes:**

**\*** **Eligible Bakken Origin Points:**

1) **Bakken Field Points:**  The point(s) of origin established as selected origin points under the TSAs: Stanley, Mountrail County, North Dakota; Ramberg, Williams County, North Dakota, Epping, Williams County, North Dakota, Trenton, Williams County, North Dakota, Watford City, McKenzie County, North Dakota, and Johnson's Corner, McKenzie County, North Dakota.

2) **Alternate Bakken Origin Points:**  Alexander Junction, McKenzie County, North Dakota, Trenton Junction, McKenzie County, North Dakota, and others as updated from time to time.

**\*\*** For a Committed Shipper's Monthly Maximum Committed Entitlement, to the extent granted pursuant to an applicable TSA, to the extent that the Committed Shipper nominates and delivers (in accordance with the nomination procedures set forth in the Tariff and the Proration Policy) all or a portion of such volumes for a particular path at one or more of the

Illinois Destination Point(s) in a such month, then solely to the extent that committed capacity is available for such nominations due to the failure of other committed shippers who have selected the applicable Illinois Destination Point as their Selected Destination Point to nominate their full minimum volume commitment for such month, Committed Shipper's Committed Rate for Bakken Crude Petroleum for that portion of such volumes so delivered to such Illinois Destination Point(s) shall be, to the extent permitted under the provisions of Schedule B of the Committed Shipper's TSA regarding the availability of such rate, as follows, subject to escalation as provided in the Committed Shipper's TSA:

**[I] INCREASED.  ALL RATES INCREASED.**

| Volume Commitment Requirement (bpd)(1)^^ | Term | |
|---|---|---|
| | **7 Years** | **10 Years** |
| 3,500 – 29,999 | $5.8366** | $5.5713** |
| 30,000 – 49,999 | $5.5713** | $5.3060** |
| 50,000 – 69,999 | $5.5713** | $5.3060** |
| 70,000 – 89,999 | $5.5713** | $5.3060** |
| 90,000+ | $5.5713** | $5.3060** |

For the avoidance of doubt, with respect to a Committed Shipper's path with a Destination Point of a Nederland Destination Point, the above rate shall only be applicable to such portion of a Committed Shipper's nomination to an Illinois Destination Point that qualifies for the rate in accordance with the previous sentence and a Committed Shipper's TSA; otherwise, a Committed Shipper's rate for deliveries to the Illinois Destination Point shall be the committed rate for deliveries to such Nederland Destination Point set forth in the previous table.

The term "Illinois Destination Point(s)" shall be the following point(s) of destination under the Local Rates tariff of Dakota Access, LLC, FERC No. [W] 2.3.0 2.4.0: Patoka, Illinois.

^ With respect to any Committed Shipper that executed a TSA pursuant to an open season commenced by Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC, for all of such Committed Shipper's Excess Throughput Volumes (as defined in a TSA) nominated for a Nederland Destination Point, the following rates shall apply for all such Excess Throughput

Volumes that are within the specified volume ranges below, for such Committed Shipper's Minimum Volume Commitment tier and original term to the extent permitted under such Committed Shipper's TSA:

**[I] INCREASED.  ALL RATES INCREASED.**

| Volume Commitment Requirement (bpd) | Excess Throughput Volumes Range (applicable to Barrels in the below volume tiers as Tendered in a given month)† | Original Term | Rate |
|---|---|---|---|
| 3,500 – 29,999 | 30,000 – 49,999 | 7 years | $6.6856 |
| | | 10 years | $6.5264 |
| | 50,000+ | 7 years | $6.4734 |
| | | 10 years | $6.3672 |
| 30,000 – 49,999 | 50,000 – 69,999 | 7 years | $6.4734 |
| | | 10 years | $6.2081 |
| | 70,000+ | 7 years | $6.3672 |
| | | 10 years | $6.1019 |
| 50,000 – 69,999 | 70,000 – 89,999 | 7 years | $6.2611 |
| | | 10 years | $5.9958 |
| | 90,000+ | 7 years | $6.1550 |
| | | 10 years | $5.8366 |
| 70,000 – 89,999 | 90,000 – 109,999 | 7 years | $6.1550 |
| | | 10 years | $5.8366 |
| | 110,000+ | 7 years | $6.0489 |
| | | 10 years | $5.4652 |
| 90,000+ | 110,000 – 129,999 | 7 years | $5.7836 |
| | | 10 years | $5.5713 |
| | 130,000+ | 7 years | $5.6775 |
| | | 10 years | $5.3060 |

† With respect to any Committed Shipper that executed a TSA pursuant to an open season commenced by Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC, Barrels in excess of such Committed Shipper's Minimum Volume Commitment, but below the volume tier(s) in this column shall be assessed the Committed Rate that is otherwise applicable to such Committed Shipper's committed volume.

^^ With respect to any Committed Shipper that executed a TSA pursuant to an open season commenced by Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC, for all of

such Committed Shipper's Excess Throughput Volumes (as defined in a TSA) nominated for an Illinois Destination Point (to the extent permitted under the applicable TSA), the following rates shall apply for all such Excess Throughput Volumes that are within the specified volume ranges below, for such a Committed Shipper's Minimum Volume Commitment tier and original term:

**[I] INCREASED.  ALL RATES INCREASED.**

| Volume Commitment Requirement (bpd) | Excess Throughput Volumes Range (applicable to Barrels in the below volume tiers as Tendered in a given month)‡ | Original Term | Rate |
|---|---|---|---|
| 3,500 – 29,999 | 30,000 – 49,999 | 7 years | $5.0938 |
| | | 10 years | $5.0407 |
| | 50,000+ | 7 years | $4.9877 |
| | | 10 years | $4.9877 |
| 30,000 – 49,999 | 50,000 – 69,999 | 7 years | $5.0407 |
| | | 10 years | $4.9877 |
| | 70,000+ | 7 years | $4.9877 |
| | | 10 years | $4.9346 |
| 50,000 – 69,999 | 70,000 – 89,999 | 7 years | $4.9877 |
| | | 10 years | $4.9346 |
| | 90,000+ | 7 years | $4.9346 |
| | | 10 years | $4.8816 |
| 70,000 – 89,999 | 90,000 – 109,999 | 7 years | $4.8816 |
| | | 10 years | $4.8285 |
| | 110,000+ | 7 years | $4.8285 |
| | | 10 years | $4.7754 |
| 90,000+ | 110,000 – 129,999 | 7 years | $4.7754 |
| | | 10 years | $4.7224 |
| | 130,000+ | 7 years | $4.7224 |
| | | 10 years | $4.6693 |

‡ With respect to any Committed Shipper that executed a TSA pursuant to an open season commenced by Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC, Barrels in excess of such Committed Shipper's Minimum Volume Commitment, but below the volume tier(s) in this column shall be assessed the Committed Rate that is otherwise applicable to such Committed Shipper's committed volume.  The above rates for Excess Throughput Volumes are only available to the extent permitted by a Committed Shipper's TSA.

**Pipeline Loss Allowance**: As set forth in the joint pipeline tariff, Item No. 20.

**OSHA H2S Fee**: When OSHA regulations require the presence of a second Carrier employee at a site because of H2S levels, an additional fee of **[U]** $0.1379 per Barrel will be assessed and collected. This fee may be waived if Shipper provides a permanent alternative mechanism to comply with such rules. Any alternative must be approved and agreed to by Carrier.

**Nederland Out-Of-Path Rate:** Notwithstanding the fact that no Nederland Destination Point shall be within the same continuous path of any other Nederland Destination Point, if Shipper has made a Minimum Volume Commitment for a path with a Nederland Destination Point as the Selected Destination Point, then Shipper may nominate and (subject at all times to the Proration Policy) Tender volumes for delivery to another Nederland Destination Point; provided that if Shipper so nominates and Tenders volumes and designates such nominations as nominations for such path, then (a) such Tendered volumes shall be counted toward Shipper's Monthly Minimum Volume Commitment for such path for the Month in which such volumes are so Tendered to Carriers; (b) for volumes that are so Tendered within Shipper's Monthly Maximum Committed Entitlement for such path, in addition to the then-effective Committed Tariff Rate applicable to such path, Shipper shall pay (i) twelve cents **[U]** ($0.12) per Barrel during each of the first three (3) years during the Term, then (ii) eight cents **[U]** ($0.08) per Barrel during each of the next three (3) years during the Term (if and as applicable), then (iii) four cents **[U]** ($0.04) per Barrels during each of the next three years during the Term (if and as applicable), then (iv) zero cents **[U]** ($0.00) per Barrel during each of the years remaining in the Term (if and as applicable).  The above referenced rates shall only be applicable to the extent provided in a Committed Shipper's TSA.

**<u>EXPLANATION OF REFERENCE MARKS:</u>**
**[I]      INCREASED**
**[U]      UNCHANGED**
**[W]    CHANGE IN WORDING**

# EMERY
# EXHIBIT 4



Chris W. Conway
Vice President, Commercial
925 N. Eldridge Parkway
Houston, Texas 77079
281-293-2035

June 6, 2020

To:     Honorable Judge James E. Boasberg
        United States District Court for the District of Columbia

Re:     Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)
        Letter in support of Dakota Access, LLC's Reply Brief Regarding Remedy

Dear Judge Boasberg:

ConocoPhillips Company ("ConocoPhillips") is one of the world's largest independent exploration and production (E&P) companies based on production and proved reserves. ConocoPhillips is one of the top five producing companies in the Bakken region.

This letter describes my professional assessment of the economic effects on ConocoPhillips and other producers if the Dakota Access Pipeline (DAPL) is shut down, and it responds to Plaintiffs' assertions that there is sufficient alternative takeaway capacity for current or anticipated Bakken production and that taking DAPL out of service will not affect upstream entities given the current economic climate and temporarily reduced oil demand.

DAPL represents more than 40% of the pipeline capacity available for transporting production from the Bakken area; industry consultants estimate that DAPL was running at near full capacity prior to the crisis. ConocoPhillips is a shipper on DAPL and on other pipelines that transport crude oil out of the region to key refining markets in the Rockies, Patoka, Cushing, and Gulf Coast markets. ConocoPhillips, among many others, have temporarily shut in certain wells in response to the unprecedented impact on demand from COVID-19. However, demand is returning, crude oil prices have risen, and production is already returning. ConocoPhillips has retained its staff in North Dakota in anticipation of resuming production relatively quickly.

Removing DAPL from service at this time would take away vital, cost-effective takeaway capacity at a time when economics are already very challenged. If producers, including ConocoPhillips are not able to efficiently get their Bakken production to a market where they can receive sufficient value for it, that crude oil may remain uneconomic to produce, causing companies to further delay the return to active investment. As a result, this would prolong the economic distress being experienced by many businesses, families and individuals who depend on the Bakken producing region for their livelihoods.

DAPL is a key element for the recovery of crude oil production activity in the Bakken region, and this important pipeline should remain in service.

Respectfully submitted,

DocuSigned by:

*Chris Conway*

C925A6BEB41D476

Chris W. Conway
Vice President, Commercial

EXHIBIT E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE; YANKTON
SIOUX TRIBE; ROBERT FLYING HAWK;
OGLALA SIOUX TRIBE,

        Plaintiffs,

  and

CHEYENNE RIVER SIOUX TRIBE; SARA
JUMPING EAGLE ET AL.,

        Plaintiff-Intervenors,

      v.

U.S. ARMY CORPS OF ENGINEERS,

        Defendant-Cross Defendant,

  and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-Cross
        Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-
1796 and 17-cv-267)

---

### SECOND DECLARATION OF JEFF D. MAKHOLM, PHD IN SUPPORT OF
### DAKOTA ACCESS, LLC'S REPLY BRIEF ON THE QUESTION OF REMEDY

---

1.  My name is Jeff D. Makholm. I submitted a declaration in the above-captioned case on April 29, 2020, D.E. 509-11 ("First Makholm Dec."), and my background and qualifications are discussed therein.

2.  This declaration responds to the declaration and report of Dr. Marie Fagan, D.E. 527-2 & 527-4, filed by Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe (collectively, the "Plaintiffs") in the above-captioned proceeding.

3.  My declaration dated April 29, 2020 documented many billions of dollars of losses and thousands of lost jobs coming from a shuttering of the Dakota Access Pipeline ("DAPL").

4.   Dr. Fagan's declaration and report offer a radically different picture regarding the consequences of shutting down DAPL. She speculates that North Dakota oil production will be mired in such a deep and sustained slump that DAPL's capacity would effectively not be missed for one to two years. In offering this opinion, she further assumes the ready availability of low-cost rail transport and that barrels of oil currently delivered on DAPL can simply move both from one mode of transportation to another and to alternate destinations. She also speculates that losses from a shutdown of DAPL would be offset by gains to others in other states. All of this leads her to reach what she admits to be the "unintuitive" conclusion that now is the "right" time to shut down the pipeline.

5.   Dr. Fagan's assumptions and conclusions are wrong. First, oil production is already higher than the level at which Dr. Fagan predicted it would stay for two years. And production levels are rising. Glenn Emery's Second Declaration describes, with evidence on DAPL nominations, the recovery of North Dakota crude oil production in June and beyond. His evidence is factual, and he draws from objective sources. He effectively rebuts Dr. Fagan's speculations with evidence that North Dakota oil shipments are rebounding reasonably rapidly from the April/May 2020 slump (as is the U.S. oil market generally). This evidence is credible: there are reasonable and objective prospects that DAPL nominations will grow steadily, and that the pipeline will be fully nominated again by April 2021—which is what I would expect as the oil market recovers from the immediate effects of the Russia/Saudi Arabia dispute (which caused crude oil prices to plunge in March) and the weakened demand accompanying the pandemic, which followed. Dr. Fagan, on the other hand, relies on no objective or disinterested source but rather her own speculation. I document her speculations, and also the times she draws from her references conclusions that those references do not support, regarding her assertion that the oil slump in North Dakota will be so prolonged that

DAPL will not be missed.

6.   Second, as to Dr. Fagan's assumption that displaced DAPL volumes could shift to other transportation means, William Rennicke in his Second Declaration charts the cumulative faults in Dr. Fagan's rail analysis—one after the other—plainly and objectively. Besides demonstrating that Dr. Fagan has greatly skewed her analysis by selectively using one predictably inappropriate month as a base (February 2020), Mr. Rennicke shows the faults of her analysis regarding tank car availability, lease rates, speed of travel, congestion, lack and cost of loading and unloading, displacement of other rail commodities, and other factors that cause the rail option for shipping North Dakota crude oil to be vastly more complicated and costly—and far less available as an economic and logistical matter—than Dr. Fagan posits. Mr. Rennicke's analysis, and his refutation of Dr. Fagan's cumulative errors and oversights, reflect a level of experience and expertise in the rail industry that Dr. Fagan lacks.

7.   Third, in addition to Dr. Fagan's mistaken assumptions that no oil production would be shut in and that all DAPL volumes could shift to other transport means, she disagrees with my estimates for the future price of oil in North Dakota through 2021, claiming that I overstated harm by $2 billion to $5 billion due to my price estimates. She is mistaken in that respect—the *difference* in my harm computations, if I had used her price estimates, is less than $1 billion. Thus, even if *her own* pricing estimates are applied to the *correct* volumes that will be forced to shut in if DAPL closes, the economic harm to North Dakota oil producers through 2021 would still be **$5.26 billion to $8.21 billion**.

8.   Fourth, the notion that any losses to Dakota Access, North Dakota producers, or the State of North Dakota itself will be made up by gains somewhere else is absurd. Crude oil delivery is not a cloud-based service in which product can be shifted around geographically at will. The oil

transportation industry involves costly, point-to-point, sunk cost infrastructure hardware tied specifically to particular geographic locations. The losses associated with shutting DAPL cannot, as an industrial or economic matter, be balanced by gains somewhere else—as if shutting DAPL were a frictionless, zero-sum game without costly consequences in economic damages and lost jobs. The tangible costs that Dr. Fagan assumes away in making that assumption—stranded fixed assets, upset supply agreements, closed highly desirable "trade routes" (as in the bullet line from the Bakken to Patoka and south that DAPL represents)—all constitute un-recoupable loses if DAPL shuts down and strands barrels in North Dakota.

9.   Finally, as to Dr. Fagan's ultimate conclusion that "[*i*]*f one had to choose* a time in which to shut down a pipeline temporarily, now would be it," Fagan Report at 6 (emphasis added), oil markets have improved in the past two months, as OPEC has agreed to production limits (among other things),[1] and the U.S. economy has begun to recover from the early shock of the pandemic. I agree with Dr. Fagan about the importance of petroleum industry *expectations*.[2] Shutting DAPL now would dash expectations for the continued resumption of normal shipments along the chosen route to market for North Dakota crude oil. With positive expectations more important than ever, the challenging circumstances now facing the U.S. petroleum industry and our domestic economy make this the *worst* time to shut down DAPL and shatter those expectations for a reasonable resumption of production and transport activity for the North Dakota and U.S. petroleum markets generally (in which DAPL plays a prominent role).

10. Dr. Fagan evidently wishes to paint the unprecedented shut down of the preferred pipeline route out of North Dakota as a mere triviality when she says: "Any impacts that could occur [from

---

[1] Colm Quinn, *Saudi Arabia and Russia Reach Deal to Cut Oil Production*, Foreign Policy (Apr. 10, 2020), https://foreignpolicy.com/2020/04/10/saudi-arabia-russia-deal-cut-oil-production/.

[2] Fagan Report at 6, 27.

a shutdown of DAPL] would be so minor as to be lost in the noise of the other factors affecting the market." Fagan Dec. ¶ 5. It is hard to understand why Dr. Fagan would make such a statement—a manifestly unsupported opinion concerning what would be the unprecedented closure of the most desirable new pipeline, representing the more direct route to market, for the second most productive oil producing state in the country. Far from a triviality, shutting down DAPL at this moment in time would include:

    a.   between $6.55 billion and $10.23 billion in lost revenues to North Dakota producers, residents of the State of North Dakota, and to the State itself, which collects more than half of all taxes from the Oil and Gas Industry;[3]

    b.   tens of millions of dollars in lost property tax revenue to the transit states that DAPL passes through;

    c.   thousands of lost jobs to the producers, landowners, developers and service companies servicing the upstream Oil and Gas industry in North Dakota and their employees and families;

    d.   hundreds of millions of dollars in lost revenue (including production revenues, royalties, and taxes collected) to the Native American tribes that rely heavily on such revenues to fund their sovereign government programs; and

    e.   billions of dollars in losses and increased costs to states other than North Dakota, downstream entities, the consuming public, and the American economy as those who nominate and ship on DAPL try to find an alternative, less desirable, and more costly means of getting more than half a million barrels per day of North Dakota crude oil to market.

---

[3] First Makholm Dec. ¶ 36 (calculating $5.84 billion to $9.12 billion in lost revenue to North Dakota producers through 2021, and $0.71 billion to $1.11 billion in lost North Dakota tax revenue through 2021).

11. Shutting down an operational pipeline like DAPL, after nearly three years of safe operation, would be unprecedented in my experience, and Plaintiffs offer no example of such a thing ever happening before. Calling the shutdown of DAPL a mere triviality ("lost in the noise") is, in my opinion, not just a gross understatement of the tangible costs that an objective analysis of DAPL supports—but indeed an avoidance of objective evidence on the part of Dr. Fagan that a DAPL shutdown would have such costly consequences in lost economic activity and jobs.

12. To support my opinion, I organize this declaration as follows. First, I describe the conceptual problems with Dr. Fagan's declaration and report, which include (a) a faulty conceptual foundation, (b) extensive speculation about future North Dakota crude oil production for which she provides no credible sources, and (c) an unreliable series of conclusions that her own reference materials do not support. Second, I describe the empirical problems in her report, including matters dealing with the cost consequences of stranded North Dakota crude oil. Third, I return to widespread pipeline and petroleum industry impacts that would follow from such an unprecedented shut down of DAPL.

# I.  Conceptual Faults in Dr. Fagan's Declaration and Report

13. There are three conceptual problems with Dr. Fagan's declaration and report that I describe here. The first regards her description of the industry that DAPL serves as *essentially immune to any costs of shutdown*, because losses to one party are gains to another. The second documents what I find to be her rampant speculation about future business condition for the petroleum industry—in North Dakota and generally. The third concerns the way that she draws from many of her references conclusions that those references do not support.

### Dr. Fagan Errs in Describing the Nature of the U.S. Petroleum Industry

14. Dr. Fagan supports her analysis not by describing the essential nature of the interstate

pipeline industry, where entry and price are regulated by federal and state regulators for a reason, but on the basis of what she herself describes as *intuition* and *logic* that lead her to conclude: (1) it is an opportune time to shut DAPL, as the oil market has slumped anyway; and (2) any cost we attribute to vacating DAPL's easement and shutting the pipeline down will net out through a gain somewhere else.

15. Specifically, regarding intuition and logic, Dr. Fagan states (my emphasis): "It might be *unintuitive*, but LEI's analysis detailed in the declaration shows that a temporary shut-down of an oil pipeline such as Dakota Access will have a relatively small impact in the current and near-term environment of low oil prices and low demand. . . . [T]he impact . . . would be billions of dollars less than claimed by other intervenors." Fagan Report at 54. She also states (again, my emphasis): "Finally, Dr. Makholm makes another error in *logic*. He forgets that losses to one party are often gains to another party. The losses to DAPL and increased cost to transport by rail is a loss to oil producers, but a gain to railroads and railcar lease companies. The loss of tax and royalty revenues in North Dakota will result in gains in such revenues for other oil-producing states . . . ." *Id.* at 51.

16. From these perspectives, she states: "If one had to choose a time in which to shut down a pipeline temporarily, now would be the time to do it." Fagan Report at 6. And: "Even if some North Dakota production becomes unprofitable and ceases because DAPL is not available, . . . it simply means production someplace else will fill that demand." Fagan Dec. ¶ 7.

17. By drawing her conclusions in this way, Dr. Fagan strips any context away from the real-world costs of shutting down DAPL. In fact, expectations and long-term investments are how the U.S. petroleum market handles the interstate transportation that ties the competitive elements of our domestic petroleum industry together. The United States has regulated the interstate pipeline transport of crude oil for more than a century specifically to deal with the public interest flowing

from multi-state fixed infrastructure investments to serve a competitive petroleum market. This case involving DAPL is not about a *cloud-based service* that can be shifted around at will; but one involving costly point-to-point infrastructure.

18. The story that she paints with these statements is contrary to how interstate pipeline transport makes the competitive U.S. petroleum industry possible. The industry is built on long-term investments and similarly long-term agreements, existing under the aegis of federal regulation, to facilitate the competitive petroleum market. If such shutdowns and production shifts were indeed so frictionless, and the consequences of a forced operating pipeline shut down were so trivial as Dr. Fagan suggests, no such agreements and regulation would ever have been warranted. On the contrary, we regulate price and entry for interstate oil pipeline for a reason—at the federal and state levels—because of unique institutional, geographical, and economic nature of the industry.

19. Stranding fixed assets, upsetting contractual supply agreements, and closing highly desirable "trade routes" (like the market's clearly revealed preference for DAPL's "bullet line" to Patoka, Illinois and south to the Gulf Coast) involve un-recoupable losses. Shifting modes of transportation or boosting supplies from other states has other high costs. Furthermore, no such shifts would be seen as permanent, so any new route, mode, or source will come at high variable cost to save on stranding other capital facilities when DAPL returns and shippers move production back to DAPL. Mr. Rennicke confirms this perspective throughout his reply to Dr. Fagan (e.g., railcar leases are governed by five-year leases, with shorter durations, if available at all, coming at much higher cost).

20. To draw her ultimate conclusions, Dr. Fagan simply assumes away (a) the tangible structure of the industry and long-term investments and agreements needed to make it work, (b)

clear market preferences inherent in the commitments (of the capital market and the oil market) to DAPL, (c) huge inter-modal transaction costs for rail as a stopgap (as Mr. Rennicke aptly describes), and (d) the short-term nature of the oil price drop in a long-term market.

21. Dr. Fagan includes a discussion of risk in the petroleum industry—to the extent that its participants buy crude oil price risk protection from the financial market through hedges.[4] The competitive markets indeed deal with commodity price risks through such hedges. But the specialized point-to-point interstate pipeline service requires specialized regulatory and contractual institutions to deal with the risk of stranding of capital investments—and thus ensure its economical provision of interstate transportation. The shutdown of DAPL represents an unpredictable and un-hedge-able event. It will damage the market and harm the public interest (considerations that drove the various states along the route to approve DAPL, as I described in my declaration[5]) whatever secondary transport options might be pressed temporarily into service.

22. Ultimately, Dr. Fagan's analysis rests on an evidently faulty conceptual foundation. To draw her ultimate conclusions, Dr. Fagan simply assumes away (a) the short-term nature of the oil price drop in a long-term market; (b) the structure of the oil industry and long-term investments and agreements needed to make it work; (c) clear market needs inherent in the commitments of shippers to DAPL; and (d) huge inter-modal transaction costs for rail as a stopgap measure (as Mr. Rennicke credibly describes).

### Dr. Fagan Speculates About Future Petroleum Industry Conditions

23.  A signal fault of Dr. Fagan's analysis is that she fogs the difference between the facts and

---

[4] "Oil is a notoriously boom-bust industry, and the people who work in the business expect ups and downs. Many mid-sized oil companies therefore hedge their production forward to insulate cash flows from volatile oil prices." Fagan Report at 27.

[5] First Makholm Dec. ¶¶ 37-39.

her own opinions. That is, she speculates about future conditions for the oil market or North Dakota producers, without support, throughout her report—blurring the line between fact and opinion.

24. Dr. Fagan devotes a major portion of her report (pages 14 through 30) to a presentation of many facts regarding oil production in North Dakota. Much of what she presents are objective facts about the years leading up to 2020. The essential problem with her analysis does not concern the facts that she presents (which I cannot criticize) but concerns her unsupported speculations about a sustained slump in North Dakota production, for which she offers no factual or disinterested support. The harm in costs and jobs that I documented in my April 29, 2020 declaration involved future consequences *if* DAPL is shut down. None of the historical facts that Dr. Fagan presents bear on those future consequences. Only her speculations drive her ultimate conclusions.

25. Dr. Fagan has elsewhere made a sharp distinction between what constitutes the line separating assumptions and analytical conclusions. In a 2017 testimony in Minnesota regarding what she called a "critical review" of an application for a new pipeline, she faulted another witness for failing to distinguish between an assumption ("an input to the analysis") and an analytical conclusion.[6] I levy an even more basic and obvious criticism at her in this case than she did in 2017 in Minnesota—that she repeatedly fails to distinguish her speculations from the facts that she presents. For example (my emphasis):

a. Page 15: "A portion of this demand **may** be lost forever, as working from home and other cultural changes adopted in effort to control the pandemic **may** take root in the

---

[6] Direct Testimony of Dr. Marie Fagan on behalf of the Minnesota Department of Commerce Division of Energy Resources at 8, 22-23, *In re Application of Enbridge Energy, Ltd. Partnership for a Certificate of Need for the Line 3 Replacement Project in Minnesota from the North Dakota Border to the Wisconsin Border*, Docket No. PL9/CN-14/916 (Sept. 11, 2017), https://mn.gov/eera /web/project-file?legacyPath=/opt/documents/34079/Fagan_Direct_Testimony%2014-916.pdf.

economy." Dr. Fagan speculates here about future demand.

b.   Page 19: "Even when the economy eventually recovers, oil demand **<u>might</u>** not reach previous levels relative to economic activity. For example, despite the lifting of government stay-at-home orders, potential travelers **<u>might</u>** wait for a vaccine to be sure of safety during air travel or non-essential trips like long-distance driving vacations." Here she speculates about future consumer preferences and oil demand. As noted in Mr. Emery's second declaration, oil demand is already rising globally and in the United States, and objective sources project oil demand will recover to 2019 levels.

c.   Page 19: "Without a vaccine, widespread unemployment **<u>may</u>** stubbornly persist in service sectors such as hospitality, reducing travel to and from work and reducing the discretionary income that funds travel and leisure." Again, speculation about future economic activity.

d.   Page 19: "Even when workers can begin to return to offices and other locations outside the home, demand for gasoline **<u>may</u>** not recover fully." She speculates about gasoline demand, without support. In fact, as Mr. Emery discusses in his second declaration, widespread reports, including from authoritative government sources, show that gasoline demand is *already* climbing in the United States and globally and that it will continue to rise because individual cars are becoming the preferred mode of personal transportation.[7]

e.   Page 20: "Other vehicle travel such as for social and recreational purposes,

---

[7]   *This Week in Petroleum*, U.S. Energy Info. Admin. (release date June 3, 2020), https://www.eia.gov/petroleum/weekly/gasoline.php (reporting in "Gasoline demand (million barrels per day)" chart and table that U.S. gasoline demand sharply decreased and hit bottom around April 2020 and sharply increased in May 2020, week over week); *Fears of Mass Transit Fuel Increases in Oil Demand*, Inst. for Energy Research (May 20, 2020), https://www.instituteforenergyresearch.org/fossil-fuels/gas-and-oil/fears-of-mass-transit-fuel-increases-in-oil-demand/.

shopping and errands, and other home-based trips **may** be more subject to discretion, and slower to recover." Again, speculation. Where stay-at-home orders have lifted or been relaxed, actual behavior shows that individuals are resuming social and recreational outings.[8]

f.   Page 30: "The pace of this recovery will be impacted by the ongoing and future policies which **may** impact demand and supply (for example, policies based on producing and consuming less fossil fuel to address global climate concerns), as well as structural changes to how economies use oil, which **may** take hold in the wake of the coronavirus economic crisis." Dr. Fagan provides no examples or citations here—it is also speculation. Based on my knowledge of the oil and gas industry and actual reports about supply and demand, some of which I cite above, this is wishful thinking.

g.   Page 32: "[C]losing DAPL's 570,000 b/d would leave only 70,000 b/d requiring other export options (assuming that remaining 70,000 b/d is economic to produce and ship). If that option is rail, it amounts to a small increase in rail exports that would carry **none of the severe impacts** claimed in the DAPL litigation filings." Against Mr. Rennicke's detailed description of rail problems, she is only speculating on rail impacts.

h.   Page 36, footnote 52: "LEI's assumption that North Dakota production will be 500,000 b/d lower on an ongoing basis for two years is conservative, as it is **somewhat lower** than the loss of 550,000 /bd as of May 2020; it **assumes** a small amount of production (50,000 b/d) comes back relative to May 2020. However, actual lost production **could be** much

---

[8]   *See* Sal Gilbertie, *As Cities Reopen, Traffic and Oil Demand Reappear, Rallying Oil Prices*, Forbes (May 28, 2020), https://www.forbes.com/sites/salgilbertie/2020/05/28/as-cities-reopen-traffic-and-oil-demand-reappear-rallying-oil-prices/#4ce59b412a7e  ("[I]f China, Japan, and Germany are any guide, when the US begins to reopen traffic, oil and gasoline demand may rebound more quickly than originally anticipated. This could have major implications for oil and gasoline markets and prices as the summer season progresses.").

greater." Dr. Fagan declares her assumption "conservative" without citation or explanation,

other than her prior assumption that production will stay at a particular level for at least two

years and a new leap that some amount could return. Her speculation is already wrong, as

confirmed by the fact that production is already *higher* than her "conservative" assumption.[9]

26. What I list above are Dr. Fagan's straightforward speculations, using words like "may,"

"might," or "could." But Dr. Fagan also speculates about other elements of her analysis in a more

indirect way, as follows:

    a.   She speculates that the "seeds of the next [2020] downturn in the cycle began at the

end of 2014," suggesting that prices may have soon been too low to support Bakken production

even if the pandemic had not temporarily depressed demand. Fagan Report at 57-59; *see also*

*id.* at 14-15. This is speculation on her part—implying without support that the pandemic's

effect was somehow inevitable.

    b.   She also asserts that the global oil market "is currently undergoing an

unprecedented and rapid period of change, brought about by the collapse in oil demand caused

by the COVID-19 health crisis." Fagan Dec. ¶ 3. But the Russia/Saudi Arabia dispute caused

oil prices to collapse in early March 2020 before the impact of the pandemic was widely

recognized and felt. *See* D.E. 509-7, ¶ 17 ("Caruso Dec.").[10] The error in her speculation is

evident, as oil markets have improved in the past two months, as OPEC has agreed to

---

[9]  *Bakken Restart Task Force*, N.D. Dept. of Mineral Res., at 3 (May 28, 2020), https://www. dmr.nd.gov/oilgas/FinalBakken_Restart_Task_Force_Action_Report.pdf (reporting 475,000 bpd of Bakken crude oil production shut-in to date).

[10]  Pippa Stevens, *Oil plunges 24% for worst day since 1991, hits multi-year low after OPEC deal failure sparks price war*, CNBC (Mar. 8, 2020), https://www.cnbc.com/2020/03/08/oil-plummets-30percent-as-opec-deal-failure-sparks-price-war-fears.html.

production limits (among other things),[11] and the U.S. economy has begun to recover from the early shock of the pandemic.[12]

   c.   She opines that low oil prices and investor expectations will cause low production for at least two years. Fagan Report at 6, 23, 29. But there is no reasonable basis for her to speculate about a correlation between prices and production. The history of North Dakota production (which accounts for nearly all Bakken production), as shown in Figure 1 below, shows that production does not move lockstep with contemporaneous oil prices—other factors are at play.[13] Figure 1 shows a robust oil production in North Dakota was spurred by the very high oil prices in the early 2000s, but has continued to top those early levels even at considerably lower oil prices after 2015-2016.

---

[11] Colm Quinn, *Saudi Arabia and Russia Reach Deal to Cut Oil Production*, Foreign Policy (Apr. 10, 2020), https://foreignpolicy.com/2020/04/10/saudi-arabia-russia-deal-cut-oil-production/; *Oil jumps to highest level since March on lower U.S. inventories, recovering demand*, CNBC (May 21, 2020), https://www.cnbc.com/2020/05/21/oil-markets-us-crude-inventories-global-economy-in-focus.html.

[12]  Jeff Cox, *May sees biggest jobs increase ever of 2.5 million as economy starts to recover from coronavirus*, CNBC (June 5, 2020), https://www.cnbc.com/2020/06/05/jobs-report-may-2020.html ("Employment stunningly rose by 2.5 million in May and the jobless rate declined to 13.3%, according to data Friday from the Labor Department that was far better than economists had been expecting and indicated that an economic turnaround could be close at hand.").

[13] *North Dakota Daily Oil Produced and Price*, N.D. Dep't of Mineral Res., https://www.dmr.nd.gov/oilgas/stats/DailyProdPrice.pdf (last visited June 7, 2020).

**Figure 1**



*Source: North Dakota Daily Oil Produced and Price*, N.D. Dep't of Mineral Res., https://www.dmr.nd.gov/oilgas/stats/DailyProdPrice.pdf (last visited June 7, 2020).

    d.  She also speculates, without support, that a substantial North Dakota crude oil production decrease will persist for at least two years and calls this assumption "conservative" (this time assuming 500,000 bpd decreased production, not 550,000 bpd). Fagan Report at 36 n.52; *see also* Fagan Dec. ¶¶ 4, 10 (stating, without support, that "it is highly unlikely that North Dakota production will increase significantly in the next 18-24 months"). But actual production reports and forecasts from government agencies show that production is and will continue to increase to meet the already increased demand as crude oil storage is drawn down.[14]

---

[14] *Short-Term Energy Outlook*, U.S. Energy Info. Admin., at Tbl. 3a (May 2020), https://www.eia.gov/outlooks/steo/pdf/steo_full.pdf (reporting liquids consumption levels as 20.57 million bpd in the fourth quarter of 2019, and projecting consumption to be lowest in the second quarter of 2020, at 15.87 million bpd, and to increase to 18.67 million bpd in the third quarter and 19.26 million bpd in the fourth quarter, and to rise further through 2021); Lynn Helms, *Director's Cut: March 2020 Production*, N.D. Dep't of Mineral Res., at 3 (May 15, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-05-15.pdf (reporting that "liquid fuel demand is expected to bottom out in May 2020," citing EIA projections).

The North Dakota Department of Mineral Resources revised shut-in production figures to just 475,000 bpd as of May 28, 2020.[15] And as of mid-May, the EIA expected Bakken crude oil production of more than 1.1 million bpd in May and June 2020.[16] These reports also reflect positive investor expectations.

e.   In addition, Dr. Fagan incorrectly asserts that weak global and domestic demand will remove the need for continued production and shipment and obviate energy security concerns regarding overreliance on foreign oil. Fagan Dec. ¶ 9; Fagan Report at 10 ("The purpose of recent and ongoing pipeline projects such as the Bakken Pipeline . . . is to give US and Canadian oil access to export markets."); *id.* at 53. Global and U.S. oil demand are rising, which indicates the need for added production in the near future.[17] And as Guy Caruso—a global and national energy security expert—explained in his declaration, maintaining strong domestic production capabilities is critical to being able to react quickly to unpredictable disruptive events like natural disasters, in addition to geopolitical events. Caruso Dec. ¶¶ 13, 18. DAPL has continued to move between ▮ and ▮ percent of Bakken crude oil production and ▮ percent of national shale oil production under depressed conditions (which are improving),[18] signaling the market's need for *this* pipeline over other transportation modes.

---

[15]  *Bakken Restart Task Force*, N.D. Dep't of Mineral Res., at 3 (May 28, 2020), https://www. dmr.nd.gov/oilgas/FinalBakken_Restart_Task_Force_Action_Report.pdf.

[16]  *Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https:// www.eia.gov/petroleum/drilling/#tabs-summary-2 (projecting 1,135,000 bpd of crude oil produced in the Bakken region in May 2020 and 1,114,000 in June 2020).

[17]  *Short-Term Energy Outlook*, U.S. Energy Info. Admin. (May 2020), https://www.eia.gov /outlooks/steo/pdf/steo_full.pdf.

[18]  I calculate DAPL's shipments in April and May 2020 as about ▮ percent of Bakken production by dividing DAPL's actual throughput of ▮▮▮▮ bpd in April and ▮▮▮▮ bpd in May, or ▮▮▮▮ bpd together, by the total actual and projected Bakken crude oil production in April and May 2020 of 2,483,774 bpd. *See Drilling Productivity Report*, U.S. Energy Info. Admin. (release

Without it, 320,000 to 500,000 bpd will shut in, as I discuss below (¶ 35(d)). Further, Dr. Fagan acknowledges that major oil producing countries like Saudi Arabia welcome conditions that would take U.S. production offline. *See* Fagan Report at 58. This is not just because it transforms the United States from a competitor to a customer, but also because it gives those countries more power to control global oil prices through strategic production hikes or restrictions because the United States could not provide a counterbalance. *See* Caruso Dec. ¶ 17.

f.    Ultimately, Dr. Fagan asserts in her declaration that "[b]ecause closure of DAPL will have marginal or no effect on oil production or transportation in North Dakota, other impacts described in DAPL's expert declarations are also not credible." Fagan Dec. ¶ 8. There is no evidence in her report for her "marginal or no effect" statement—only speculation. As such, her statement reads that she finds the views of Dakota Access, North Dakota, and numerous other states and industry leaders non-credible because they do not agree with her unsupported speculations.

## Dr. Fagan Misquotes and Misrepresents Source Material

27. Where Dr. Fagan draws conclusions from media or data sources to support her opinions, she often misquotes those sources, and what she draws from them are in general one-sided and

---

date May 18, 2020), https://www.eia.gov/petroleum/drilling/#tabs-summary-2 (see "Report data.xlsx" for complete historical data and "Bakken Region" tab: reporting 1,348,276 bpd of crude oil produced in the Bakken region in April 2020 and projecting production of 1,135,498 bpd in May 2020). And I calculate DAPL's April and May 2020 shipments as about ███ percent of U.S. shale oil production by dividing DAPL's actual throughput of ███████ bpd in April and May 2020 combined by the total actual and projected U.S. tight crude oil production in April and May 2020 of 16,843,242. *See Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https://www.eia.gov/petroleum/drilling/#tabs-summary-2 (see "Report data.xlsx" for complete historical data: reporting 8,824,302 bpd of total U.S. tight crude oil production in April 2020 and projecting 8,019,000 bpd of total U.S. tight crude oil production in May 2020).

unreflective of the sources' larger points. For example, citing Dr. Fagan's report:

a.  Page 16, Figure 3: Dr. Fagan says that multiple WTI price outlooks remain beneath $50/bbl through 2022, and her Figure 3 represents that four different sources forecast the price at less than $50/bbl through 2022. But one of her sources, the Sproule Price Forecast, shows that as of April 2020 the forecasted price in the first month of 2022 is $53/bbl,[19] and two of the other sources (the May 2020 Energy Information Administration ("EIA") STEO and the ICE Futures Market) *do not provide* forecasts for 2022 at all.[20]

b.  Pages 7 and 14: Dr. Fagan states North Dakota crude oil production as 1,434,500 bpd in February 2020, but the source reports 1,451,681 bpd of crude oil produced in North Dakota that month.[21]

c.  Page 17, Figure 4: Dr. Fagan claims in the paragraph before Figure 4, based on an April 9, 2020 report from the Conference Board source, that "in the case of a COVID-19 resurgence in the fall, the total economic contraction projected by the Conference Board for 2020 would be 7.4%." Even under that assumption, the Conference Board's more recent predictions do not show an estimated contraction of 7.4 percent. The graph from the source is below, as Figure 2. Its three projection scenarios indicate a contraction of only 4 percent in 2020 under a quick reopening scenario; a 6.1 percent contraction if that quick reopening triggers a COVID-19 resurgence that leads to additional closures (the scenario Dr. Fagan

---

[19] *Sproule Price Forecast*, Sproule, https://sproule.com/price-forecast/ (last visited May 29, 2020).

[20] *See Short-Term Energy Outlook*, U.S. Energy Info. Admin. (May 2020), https://www.eia.gov /outlooks/steo/pdf/steo_text.pdf; *WTI Crude Futures*, ICE Futures Europe, https://www.theice .com/products/213/WTI-Crude-%20Futures/data?marketId=463544&span=1 (last visited May 29, 2020).

[21] *US Williston Basin Oil Production*, N.D. Pipeline Authority, https://northdakotapipelines.com /us-williston-basin-oil-production/ (last visited May 29, 2020).

describes as leading to a 7.4 percent contraction); and a 7.2 percent contraction under a scenario that assumes a slow recovery in the second half of 2020.[22]

**Figure 2**



*Source: The Conference Board Economic Forecast for the US Economy*, The Conference Bd., https://www.conference-board.org/data/usforecast.cfm (last visited June 6, 2020).

28. Dr. Fagan states that North Dakota production decreased by 550,000 bpd from February 2020 to mid-May, Fagan Report at 6-7, when a report from the Director of the North Dakota Department of Mineral Resources ("DMR") stated the figure as 500,000 bpd before Dr. Fagan executed her declaration on May 19, 2020.[23] (A DMR report from May 28, 2020 further revises

---

[22] *The Conference Board Economic Forecast for the US Economy*, The Conference Bd., https://www.conference-board.org/data/usforecast.cfm (last visited June 6, 2020).

[23] *N.D. Dep't of Mineral Res. May 2020 Director's Cut*, YouTube, at 13:20 (May 15, 2020), https://www.youtube.com/channel/UCp5qbfZG4EBcW1c3AryHsBA?view_as=subscriber (reporting production of 950,000 bpd); *see also* Meghan Gordon, *North Dakota shuts in 35% of its oil production as rigs sink to 12*, S&P Global (May 15, 2020), https://platform.mi.spglobal.com/web/client?auth=inherit#news/article?id=58662425&KeyProductLinkType=4 (reporting North

19

this figure to only 475,000 bpd.[24]) Dr. Fagan states later in her report that reduced production may be 500,000 bpd over the next two years in her alternative transportation discussion—even though her ultimate conclusion appears to be that 550,000 bpd in losses will persist, *see* Fagan Report at 7—but she derived this from an arbitrary assumption that North Dakota production would only increase by 50,000 bpd over the next two years, *id.* at 36 n.52; *see also id.* at 32, 37 & Fig. 21.

29. This sample of misstatements is sufficient for me to conclude that Dr. Fagan draws conclusions that cannot reliably be supported by the citations she provides nor by other current publications, which are generally more balanced in their predictions of the consequences of the current downturn in prices, and the duration of those impacts, than Dr. Fagan would have us believe.

### Empirical Problems with Dr. Fagan's Analysis

30. Dr. Fagan's ultimate conclusions are that DAPL would not be missed (because of her speculations about a sustained slump on North Dakota production), and if missed, would be made up by gains elsewhere (because of the way she has ignored the basic nature of the regulated interstate pipeline industry—positing that it is as movable to other states, without friction or cost, as a cloud-based service). That means that her analysis does not rest on any empirical analysis at all. There remain, however, empirical problems with her declaration and report that deserve correction—which is what this section is about.

31. Dr. Fagan implies wrongly that producer bankruptcy could itself shut-in North Dakota wells. Fagan Report § 3.3. Her reference to bankruptcy is misleading. The only Chapter 11

---

Dakota production as 950,000 bpd down from 1.45 million bpd in February 2020 based on DMR statement).

[24] *Bakken Restart Task Force*, N.D. Dep't of Mineral Res., at 3 (May 28, 2020), https://www. dmr.nd.gov/oilgas/FinalBakken_Restart_Task_Force_Action_Report.pdf.

bankruptcy filing to which she points (Whiting Petroleum) has no bearing on DAPL's prospects. Whiting Petroleum was in trouble long before the recent drop in oil prices.[25] Thus, its bankruptcy was already expected. Furthermore, Whiting's bankruptcy filing asked the court to permit the lenders to take over the equity holders' interests (as is common in Chapter 11 bankruptcy proceedings). Nothing about the bankruptcy would prevent productive wells and other drilling and production assets from continuing to run to earn returns for the new equity owners—whether equity owners of the reorganized and restructured company, or new owners of the assets— particularly as oil prices rise. Indeed, such a Chapter 11 reorganization for Whiting may benefit the Bakken region as the enterprise emerges more strongly afterward.

32. Dr. Fagan also asserts that Bakken production will not increase or be maintained for the next few years based on the break-even cost per barrel producers must achieve (Fagan Report § 3)—but ignores the effects of the added burdens that other, less desirable pipeline or rail options would place on those producers. As I explained in my prior declaration, because DAPL keeps costs low for producers it has allowed the expansion of Bakken production to occur in the first place. First Makholm Dec. ¶¶ 16-17. Removing DAPL would mean more companies going out of business, more wells shutting in, and fewer wells opening—and would inhibit the economic recovery of the region.

33. Many major producers and refiners have made investments based on the presence of DAPL as a safe, reliable, direct, and low-cost access to U.S. oil markets. *See* D.E. 515 & 515-1 (Hess Amicus Br. & Lohnes Dec.); D.E. 520-5 (Marathon Dec.); D.E. 520-6 (Enerplus Dec.). The "other pipelines" in the Bakken region that Dr. Fagan vaguely references are simply not an option,

---

[25] Leslie A. Pappas, *Whiting Petroleum Aims to Exit Chapter 11 by August*, Bloomberg Law (May 6, 2020), https://news.bloomberglaw.com/bankruptcy-law/whiting-petroleum-aims-to-exit-chapter-11-by-august.

because they do not provide the service that DAPL's customers require in terms of location, speed, cost, or point-to-point connections, or because they are already being used. *See* Fagan Report at 7, 36, 41; First Makholm Dec. ¶ 17. That means contracted shippers would prefer transportation on DAPL to *any other* means.

34. Dr. Fagan's criticism of the oil prices I apply to calculate lost revenue to producers as a result of shut-in production if DAPL shut down appears to be the result of a misunderstanding of how I performed those computations. *See* Fagan Report § 7.1.2. Below I show the sources of the computations that I included in my first declaration. First Makholm Dec. ¶ 21 & n.10.

**Table 1. North Dakota Prices (12-month averages) for My Estimates of Economic Harm to Bakken Producers for 2020 and 2021 Barrels**

| Oil prices in North Dakota, August 2015 to July 2016 (North Dakota Legislative Council) | | | | | | | | | | | | Average (% Difference from 2019) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aug. | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | |
| 29.52 | 31.17 | 34.37 | 32.16 | 26.75 | 21.13 | 18.07 | 26.62 | 30.75 | 33.74 | 38.40 | 35.75 | **$29.85** (41%) |
| WTI oil prices, January 2020 to December 2020 (EIA) | | | | | | | | | | | | Average (% Difference from 2019) |
| Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | |
| 57.52 | 50.62 | 29.21 | 20.00 | 20.50 | 20.00 | 21.50 | 23.50 | 25.50 | 27.00 | 29.00 | 31.00 | $29.61 (48%) |
| Oil prices in North Dakota, April 2016 to March 2017 (North Dakota Legislative Council) | | | | | | | | | | | | Average (% Difference from 2019) |
| Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | |
| 30.75 | 33.74 | 38.40 | 35.57 | 33.73 | 32.98 | 39.31 | 34.58 | 39.93 | 40.51 | 42.74 | 38.13 | **$36.70** (28%) |
| WTI oil prices, January 2021 to December 2021 (EIA) | | | | | | | | | | | | Average (% Difference from 2019) |
| Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | |
| 33.50 | 36.50 | 39.50 | 40.50 | 40.50 | 41.50 | 42.50 | 43.50 | 43.50 | 43.50 | 43.50 | 43.50 | $41.00 (28%) |

*Sources*: *Forecast and Actual 2015-17 Biennium Oil Tax Revenue Collections and Allocations*, N.D. Legislative Council, https://www.legis.nd.gov/files/fiscal/2015-17/docs/17_9042_24000.pdf (last visited May 26, 2020); *Short-Term Energy Outlook*, U.S. Energy Info. Admin. (release date Apr. 7, 2020), https://www.eia.gov/outlooks/steo/marketreview/crude.php.

a. The far-right column in Table 1 above shows that, using 2019 as the benchmark, the EIA projected an average 12-month decline in WTI prices of 48 percent in 2020 and 28 percent in 2021. The historical North Dakota ("ND") prices that I use for the 2020-2021

projections are **$29.85** (the lowest 12-month average in the historical price record—a 41 percent difference from 2019) and **$36.70** (a 28 percent 12-month decline, matching the decline in the WTI). These prices reflect the nearest 12-month ND historical average to the price declines projected by the EIA, as I explained in footnote 10, page 10, of my first declaration. The average discount (i.e., lower price) in ND prices compared to WTI prices over these two 12-month periods, using these available ND prices, is 2.03 percent.[26]

35. Dr. Fagan estimates that my calculation of economic harm to Bakken producers ($2.03 to $3.17 billion in 2020 and $3.81 to $5.95 billion in 2021, or $5.84 billion to $9.12 billion total) is overstated by $2 billion to $5 billion. First Makholm Dec. ¶ 21; Fagan Report at 48. Her critique of my estimate of economic harm to producers is based in part on her conclusion that my estimates are too high regarding the price of oil in North Dakota in 2020 and 2021. Fagan Report § 7.1.2. I explain the matter below and show that her critique is erroneous.

    a.  Dr. Fagan assumes that I use in my estimates of economic harm oil prices that are higher than the prices that I actually use. She suggests "economically credible" prices that I could have used instead. Fagan Report at 51. I compare in Figure 3 the economic damages to oil producers in North Dakota using those three sets of oil prices: the prices that Dr. Fagan assumes I use ("Assumed Makholm Prices," $35.54 per barrel in 2020 and $42.26 per barrel in 2021); the prices that I actually use ("Actual Makholm Prices," $29.85 per barrel in 2020 and $36.70 per barrel in 2021); and the prices that Dr. Fagan suggests would be economically credible ("Suggested Prices," $23.84 per barrel in 2020 and $35.62 dollars per barrel in 2020).

    b.  Figure 3 consists of three panels. Panel (a) shows damages in 2020 (May through

---

[26] I assume an average oil price in North Dakota that is 24 cents per barrel higher than the average WTI price in 2020, and $4.30 per barrel lower than the average WTI price in 2021. The average of those differences ($0.24 per barrel and -$4.30 per barrel) is -$2.03 per barrel.

December), panel (b) shows damages in 2021, and panel (c) shows total damages in 2020 and 2021. I estimate for each of the damages calculations in panels (a) through (c) a low estimate of damages associated with a diversion of 250,000 bpd from DAPL to rail, and a high estimate associated with a diversion of 70,000 bpd from DAPL to rail, my estimates of the volumes that could divert to rail when DAPL is operating at its 570,000 bpd capacity. First Makholm Dec. ¶ 20 ("shutting down DAPL would lead producers to strand from 320,000 to 500,000 bpd").

**Figure 3. Comparison of Economic Harm to Oil Producers in North Dakota Using Different Oil Price Assumptions**



*Sources:* Fagan Report at 48-51; *Quarterly Update Detail – Forecast to Actual Comparison*, N.D. Legislative Council, https://www.legis.nd.gov/historical-oil-and-gas-tax-revenue-publications (last visited June 8, 2020) (multiple years); *North Dakota Field Production of Crude Oil*, U.S. Energy Info. Admin. (release date May 29, 2020), https://www.eia.gov/dnav/pet/hist/LeafHandler .ashx?n=pet&s=mcrfpnd1&f=m (table reporting monthly production figures in thousands of barrels).

c.  Dr. Fagan concludes that I overstate my estimate of economic harm to producers by $2 billion to $5 billion. Fagan Report at 48. This is similar to the range she would calculate using her "Assumed Makholm Prices" and her "Suggested Prices," $1.67 billion to $5.57 billion. But to derive such a range, she needed to calculate the high value ($5.57 billion) by subtracting damages associated with a diversion of 250,000 bpd from DAPL to rail (using her "Suggested Prices"), from damages associated with a diversion of 70,000 bpd to rail (using her "Assumed Makholm Prices"). This mixing and matching of two scenarios is wrong. The correct calculation for her high value would have been to subtract damages associated with a 70,000 bpd diversion (using her "Suggested Prices") from damages associated with a 70,000 bpd diversion (using her "Assumed Makholm Prices"). Using that correct methodology, I show that that difference in harm to North Dakota producers between Dr. Fagan's "Suggested Price" and the "Actual Makholm Price" is just $0.58 billion to $0.91 billion.

d.  Furthermore, if Dr. Fagan's *own* "Suggested Prices" are applied to the *correct* volumes that will be forced to shut in if DAPL closes (my fact-based estimate of 320,000 bpd to 500,000 bpd), the economic harm to North Dakota oil producers through 2021 would be **$5.26 billion to $8.21 billion**.

e.  Thus, even using Dr. Fagan's discount method, the losses to North Dakota producers would be *multiple billions* of dollars if DAPL is shut down.

36. Dr. Fagan says, without support, that "it is possible that there would be no additional need to transport crude by rail or other means, compared to the volumes transported by those means during 2019." Fagan Dec. ¶ 5. This opinion flows from Dr. Fagan's assumption that DAPL would lose volumes, barrel for barrel, equal to the entirety of the immediate production decline after the recent price collapse—as if no rebound from that collapse was possible and all shipment options

out of North Dakota are equal. There are three problems here: (1) DAPL is the clearly preferred route to market as the "bullet line" to Patoka—none of the other options out of North Dakota are such a direct route to market, at low long-term cost; (2) removing DAPL raises costs and lowers netback values, prompting marginal wells to shut and flowing wells to experience lower revenues; and (3) production in North Dakota is already above the level that she assumes. Her suggestion that there would be no harm to North Dakota producers in these respects is simply not credible.

## II.   Shutting DAPL Will Have Severe Disruptive Effects for Those It Has Served for the Past Three Years

37. As I said at the outset, Dr. Fagan offers sweeping conclusions in her five-page declaration that have no support in her report:

a.   In her declaration summary she states that the global oil market "is currently undergoing an unprecedented and rapid period of change, brought about by the collapse in oil demand caused by the COVID-19 health crisis." Fagan Dec. ¶ 3. She overlooks the Russia/Saudi Arabia dispute that caused prices to collapse before the impact of the pandemic was widely recognized and felt. That distinction is important, because the petroleum market is familiar with the rebound process from oil price collapse brought about by production excesses from OPEC members (like Russia and Saudi Arabia).

b.   Dr. Fagan takes the sudden collapse in oil prices as a given long-term trend, even though it is merely her own speculation. *See* Fagan Dec. ¶¶ 5, 10. Mr. Emery, in contrast, describes in his second declaration a rebound in nominations and expectations that is already occurring, and is expected to continue as pandemic-related restrictions ease.

c.   Dr. Fagan states that "[a]ny impacts that could occur [on oil production, transportation, or prices] would be so minor as to be lost in the noise of the other factors affecting the market." Fagan Dec. ¶ 5. She never defines what this "noise" is, or why reasonable

estimates of billions of dollars or harm or thousands of jobs lost could possibly be lost in any such "noise."

    d.   She says that "it is possible that there would be no additional need to transport crude by rail or other means, compared to the volumes transported by those means during 2019." Fagan Dec. ¶ 5. This opinion flows from Dr. Fagan's assumption that DAPL would absorb, barrel for barrel, the entirety of the immediate production decline after the post Russia/Saudi price collapse—as if no rebound from that collapse was possible. There is already evidence of such a rebound.

    e.   She asserts that DAPL's declarations "describe a world that no longer exists," and are based on "the false premise that closure of DAPL would cause the entire volume (or a very large portion of it) currently being carried on it to stop production." Fagan Dec. ¶ 6. It is a great overstatement on her part to label the Russia/Saudi Arabia production dispute and resulting price dispute as ushering in a "world that no longer exists." It is unreasonable to consider this recent price collapse (and the immediate well shut-ins) as different from others in the recent past—which were followed by the type of rebound occurring now as described by Mr. Emery. Moreover, the price and supply disruption caused by the pandemic is *temporary*. It is important to examine past trends when supply and demand were operating under normal conditions to determine the effects of shutting down a piece of major infrastructure for what could be a year or more.

    f.   She states: "Even if some North Dakota production becomes unprofitable because DAPL is not available, which is not likely at any noticeable level, it simply means production someplace else will fill that demand." Fagan Dec. ¶ 7. Again, this is Dr. Fagan's "cloud-based," "zero-sum" conjecture, where she ignores the very attributes that make the long-distance

overland transport of crude oil by pipeline such a unique industry as to require specialized federal regulation. The institutional and regulatory arrangements upon which the industry rests specifically recognize the problems of stranded fixed assets, upset supply agreements, and market preferences that Dr. Fagan "simply" assumes away in such a statement.

g.   She finally states: "Because closure of DAPL will have marginal or no effect on oil production or transportation in North Dakota, other impacts described in DAPL's expert declarations are also not credible." Fagan Dec. ¶ 8. There is no evidence behind her "marginal or no effect" statement—only speculation. As such, her statement reads that she finds DAPL's expert declarations non-credible because they do not agree with her unsupported speculation.

38. Aside from these ways of merely postulating or assuming away the harm of a DAPL shut down, Dr. Fagan has no reasonable way to address the types of harm that I described in my declaration of April 29.

a.   Her criticism of my North Dakota prices amounts to less than $1 billion dollars difference in the harm that will befall North Dakota producers.

b.   Mr. Rennicke computes the extra cost of shipping by rail, which either shuts down wells in a difficult time or reduces revenues. Mr. Rennicke calculates the actual shipping cost difference between rail and DAPL as between $7.52 and $9.87 per barrel depending on whether shippers are paying committed or uncommitted rates, consistent with my own separate estimate of an additional $5 to $10 per barrel (and Dr. Fagan's cost estimate of $5 per barrel by pipeline compared to $10 to $15 on rail in earlier testimony)[27] versus Dr. Fagan's $1.99 to $2.65 per

---

[27] Direct Testimony of Dr. Marie Fagan on behalf of the Minnesota Department of Commerce Division of Energy Resources at 36, *In re Application of Enbridge Energy, Ltd. Partnership for a Certificate of Need for the Line 3 Replacement Project in Minnesota from the North Dakota Border to the Wisconsin Border*, Docket No. PL9/CN-14/916 (Sept. 11, 2017), https://mn.gov/eera/web /project-file?legacyPath=/opt/documents/34079/Fagan_Direct_Testimony%2014-916.pdf.

barrel estimate in her report. Fagan Report at 38. Even using what Dr. Fagan's current price estimates, which Mr. Rennicke concludes are unrealistically low, the additional costs to shippers would be more than $550 million each year if DAPL's 570,000 bpd volume could be moved by rail. All such rail transport costs would be an additional burden on North Dakota producers at a time when margins are thin. I agree with Mr. Rennicke that a more realistic estimate of additional costs associated with shipping DAPL's volumes by rail are $1.04 billion and $2.08 billion *each year*, as explained in his second declaration.

39. These third-party losses alone would be in the multiples of billions if DAPL were shut down for a year or more, not to mention the additional billions in losses to Dakota Access, D.E. 509-8 ¶¶ 9-10 ("First Emery Dec."). Such losses are not "so minor as to be lost in the noise" of the economic downturn or "marginal and readily managed," as Dr. Fagan asserts. Fagan Dec. ¶¶ 5, 11. They cannot be zeroed out based on speculative gains to other regions. They are real and unrecoverable, and they will result in true hardship for the many people who rely on the North Dakota petroleum industry.

40. Significant disruptive consequences to third-party states, Native American tribes, businesses, and individuals would result from shutting down DAPL *at this time* because of how producers and shippers continue to need DAPL in order to maintain production. Despite decreased production in the Bakken region overall, any current production by shippers with long-term DAPL contracts would likely be put on DAPL. Any shift to another mode of transportation would be weighed against the low cost of DAPL. And because the cost of any other mode of transport would be higher—and potentially render the production uneconomic—the existing oil would be stranded and further production would be stopped.

41. The per-barrel cost of transportation on DAPL is lower for its shippers than other

transportation alternatives. This low shipping cost is critical to shippers currently because of today's lower oil prices and the revenue required to make Bakken production economic. The break-even cost differs by operator depending on the oil they are extracting or the technology they are using or the cost of landowner royalties and the shipping cost, which plays a significant role.

42. The lost revenue to North Dakota producers based volumes that would be shut-in if DAPL were shut down under current conditions would be significant, and in line with the estimates in my prior declaration based on economic conditions to that point. *See* First Makholm Dec. ¶¶ 21, 36 (calculating losses to North Dakota producers of $2.03 billion to $3.17 billion through CY2020 and $3.81 to $5.95 billion in CY2021 based on estimated shut-in volumes at the time). If Dr. Fagan's *own* "Suggested Prices" are applied to the *correct* volumes that will be forced to shut in if DAPL closes (my estimate of 320,000 bpd to 500,000 bpd), the economic harm to North Dakota oil producers through 2021 would be $5.26 billion to $8.21 billion.

43. Likewise, producers' revenue losses would lead to thousands of job losses. Dr. Fagan does not estimate the number of jobs that would be lost if DAPL were to shut down, but states without quantitative analysis that the economic losses to oil producers in North Dakota are economic gains to railroads and railcar lease companies. Fagan Report at 51. **I estimate the net job losses in North Dakota, accounting for potential job creation due to a diversion of crude oil from DAPL to rail transport, to range from 4,568 to 7,168 jobs.**[28]

44. I estimate North Dakota job losses based on county-level counts of employment related to oil extraction and supporting activities, petroleum wholesale activities, and crude oil pipeline

---

[28] I estimated in my first Declaration the net job loss to be 4,520 to 7,063 jobs. First Makholm Dec. ¶ 11(e). The slightly larger numbers in this Declaration reflect my incorporation of employment data published by the U.S. Census Bureau after April 29, 2020.

transport.[29] I acquire employment levels associated with North American Industry Classification System ("NAICS") codes 2111 ("Oil and Gas Extraction"), 2131 ("Support Activities for Mining"), 4247 ("Petroleum and Petroleum Products Merchant Wholesalers"), and 4861 ("Pipeline Transport of Crude Oil").[30] I acquire employment levels associated with oil-producing counties in the North Dakota portion of the Bakken region. To estimate the net effect of job losses, I multiply total employment in the industry (an average 20,207 in the first three quarters of 2019) by the share of Bakken oil production attributable to Dakota Access (39.9 percent in CY2019).

45. I show in Figure 4 my estimates of (a) employment attributable to DAPL assuming 250,000 bpd shift from DAPL to rail; (b) employment attributable to DAPL assuming 70,000 bpd shift from DAPL; and (c) total oil-related employment in North Dakota. I estimate that shutting down DAPL would lead to a loss in employment of 4,568 to 7,168 jobs in North Dakota, the average numbers of jobs in 2019 in Figure 4 (a) and Figure 4 (b), respectively.

---

[29] *QWI Explorer*, U.S. Census Bureau, https://qwiexplorer.ces.census.gov/static/explore.html #x=0&g=0 (last visited June 3, 2020) ("U.S. Census Bureau Quarterly Workforce Indicators").

[30] Four-digit NAICS classifications contain five- and six-digit classifications. There are three six-digit NAICS classifications within NAICS code 2131 ("Support Activities for Mining") that pertain to support activities for coal mining, metal mining, and nonmetallic minerals. In this regard I am likely to overestimate employment attributable to DAPL associated with NAICS code 2131. On the other hand, I am likely to underestimate employment associated with four-digit NAICS classifications I did not include. I did not include NAICS code 2371 ("Utility System Construction") even though it contains NAICS code 237120 ("Oil and Gas Pipeline and Related Structures Construction"). Nor did I include NAICS code 3241 ("Petroleum and Coal Products Manufacturing"), NAICS code 3331 (which includes 333132, "Oil and Gas Field Machinery and Equipment Manufacturing"), or NAICS codes 3251, 3252, 3261, or 3262 (each of which includes six-digit classifications related to the manufacture of oil-based products).

**Figure 4. Estimates of Employment Attributable to DAPL and Total Oil-Related Employment in North Dakota**



*Sources:* U.S. Census Bureau Quarterly Workforce Indicators, *supra*; *North Dakota Field Production of Crude Oil*, U.S. Energy Info. Admin. (release date May 29, 2020), https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrfpnd1&f=m.

46. My estimates of job losses are similar to the estimates of job losses reported by the State of North Dakota and Lynn Helms, the Director of the North Dakota Industrial Commission Department of Mineral Resources ("DMR"). Mr. Helms estimates that shutting down DAPL would lead to a temporary loss of 8,950 full-time jobs and a permanent loss of 4,475 to 7,175 full-time jobs if 300,000 bpd of crude oil can be diverted to rail. D.E. 504-2, ¶ 14 ("Helms Dec."); D.E. 504, at 10 (State of N.D. Br.). Mr. Helms also estimates that jobs will not be created if DAPL is shut down. *See also* Helms Dec. ¶ 12 (estimating that shutting down DAPL would result "in loss of at least four to five drilling rigs," which would in turn result in "seven to nine less new wells drilled per month and the associated loss of 11-14 new full-time [drilling rig] jobs per month"). He estimates job losses based on a study the DMR conducted with the North Dakota State University Department of Agribusiness and Applied Economics, and the Vision West Project. *Id.* ¶ 13.

47. Furthermore, based on the amount of oil still flowing on DAPL, the State of North Dakota and the other states DAPL traverses still stand to lose significant tax revenue. As I explained in my prior declaration, putting more oil on rail reduces tax revenue to the state because the state does not tax rail transportation costs. *See* First Makholm Dec. ¶ 30. In my prior declaration, I estimated lost tax receipts to North Dakota of $252 to $393 million for the remainder of 2020 and $458 million to $715 million in 2021, and lost tax revenue to South Dakota, Iowa, and Illinois— the transit states—of $4.5 million, $22.5 million, and $12,000, respectively in 2021/2022. *Id.* ¶¶ 7, 30. These losses if DAPL shut down would be only marginally less given the pipeline's current shipments, as provided by Mr. Emery.

48. As I discussed at length in my prior declaration, these lost tax revenues translate to lost services for the public, *see* First Makholm Dec. ¶¶ 33-34, which are especially important now when so many have lost their jobs and are thus more reliant on state services.[31]

## III.   Widespread Pipeline and Petroleum Industry Impacts from Shutting Down DAPL

49. As I also explained in my prior declaration, it would be unprecedented to shut down a major interstate oil pipeline of the importance to a particular region as DAPL after years of safe operation for reasons unrelated to shifting petroleum resources or the preferences of the market. Shutting down DAPL after nearly three years of safe operation would, in my opinion, also set a dangerous precedent that a longstanding pipeline can be removed from service for a reason unrelated to economics, the expectations of its customers (i.e., those who commit capital and barrels to the pipeline), or the performance of the pipeline itself. In such a context, a court order

---

[31] Joshua Peguero, *Governor says North Dakota has set a record for unemployment claims*, MSN (Mar. 27, 2020), https://www.msn.com/en-us/money/smallbusiness/governor-says-north-dakota-has-set-a-record-in-unemployment-filings/ar-BB11LBgK.

requiring DAPL to shut down would effectively signal a new risk accompanying other large infrastructure projects—either building in a potential and substantial delay (in this instance, more than four years) or building in an additional capital cost to reflect the risk. As I said in my last declaration, I have not done an assessment of the risk premium associated with a judicial action to shut DAPL for those who commit capital to what they have heretofore held to be a reliably regulated pipeline segment. I did, however, emphasize the great cost of any reasonably measurable risk premium—that I compute to be $1.1 billion for every 10 basis points (one tenth of one percent) based on the value of committed capital in the domestic petroleum industry that depends critically on its pipeline infrastructure. First Makholm Dec. ¶ 42.

50. Such an unprecedented need to build in delay, or additional risk-adjusted capital costs while litigation reaches its conclusion, would burden all such capital infrastructure projects requiring regulatory and environmental approval. Ultimately, customers, states, and other third parties would bear the cost of more expensive infrastructure. This would be particularly troubling now because of the impact it would have on the U.S. economy's ability to recover from this temporary economic downturn as explained in the declaration of my colleague Dr. Laura Olive, D.E. 509-10, ¶ 5.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: June 8, 2020

Jeff D. Makholm, PhD

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE; YANKTON
SIOUX TRIBE; ROBERT FLYING HAWK;
OGLALA SIOUX TRIBE,

                Plaintiffs,

   and

CHEYENNE RIVER SIOUX TRIBE; SARA
JUMPING EAGLE ET AL.,

            Plaintiff-Intervenors,

     v.

U.S. ARMY CORPS OF ENGINEERS,

           Defendant-Cross Defendant,

   and

DAKOTA ACCESS, LLC,

           Defendant-Intervenor-Cross
           Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-
1796 and 17-cv-267)

## DECLARATION OF CONTINENTAL RESOURCES. INC. IN SUPPORT OF DAKOTA ACCESS, LLC'S REPLY BRIEF REGARDING REMEDY

- My name is Ramiro Rangel. I am the Senior Vice President of Marketing for Continental Resources, Inc. ("Continental"), a customer of Dakota Access, LLC. Continental utilizes the Dakota Access Pipeline ("DAPL") to transport its crude oil production from the Bakken Region to downstream refiners. My business address is 20 North Broadway Avenue, Oklahoma City, Oklahoma 73102. I lead all marketing efforts at Continental and have over 30 years' experience in oil and gas marketing.

- This Declaration describes my professional assessment of the potential disruptive economic effects on Bakken crude oil producers if DAPL is shut down, and responds to Plaintiffs' mistaken assertions that (1) there is sufficient alternative takeaway capacity for current or anticipated Bakken production and, (2) taking DAPL out of service will not impact upstream entities given the current economic climate and temporarily reduced oil demand.

- Based on my experience and familiarity with operations in the Bakken Region, taking DAPL out of service at this time would have significant disruptive effects on Bakken crude oil

producers. Moreover, taking DAPL out of service will indirectly harm numerous other stakeholders within the Bakken, including royalty owners and citizens of the State of North Dakota who benefit from the taxes generated from oil sales.

I.   **Brief Overview of Continental's Bakken Operations.**

-   Continental is the largest oil and gas producer in the Bakken and over the past decade has invested billions of dollars in drilling and completing oil and gas wells in the region.

-   Continental relies on DAPL's existing capacity, reliable and safe service, and straight-line transportation service to the Patoka, Illinois hub (the only pipeline providing such service) and a more direct route to Gulf Region refiners.

-   Over the last three years, Continental has shipped or marketed nearly ██% of its Bakken crude oil production on DAPL, and has existing contracts to ship or market between ██████ barrels and ██████ barrels per day.

II.  **Plaintiffs incorrectly conclude the current economic downturn translates to less need for DAPL's takeaway capacity. Indeed, DAPL has become *more* important to crude oil operations in the Bakken given the current economic climate.**

-   Although the current economic downturn has resulted in significantly reduced crude oil production in the Bakken, Continental expects crude oil production in North Dakota will not drop below 1,000,000 barrels per day.

-   DAPL is a low cost, reliable, and environmentally-friendly transportation option for Continental and other Bakken crude oil producers. Shifting to alternative transportation or being forced to curtail or shut-in additional production if such alternative transportation is not economically feasible would significantly disrupt crude oil operations in the Bakken, especially during this time of decreased demand and low commodity prices.

III. **Despite Plaintiffs' assertions, much of the Bakken crude oil production cannot be transported using alternative transportation methods because such methods are either not feasible or uneconomical.**

-   Despite Plaintiffs' claims there is excess pipeline capacity on other pipelines leading out of the Bakken, there are no other pipelines in service, or expected to come online, that can meaningfully replace DAPL.

-   Any existing non-DAPL pipeline takeaway capacity does not service the same markets DAPL services. Moreover, the markets such non-DAPL pipelines do serve are often less economically attractive because of market saturation and additional transportation costs.

-   There is insufficient alternative takeaway rail and trucking capacity out of the Bakken to replace the current volumes transported by DAPL.

- Moreover, even if Plaintiffs are correct and sufficient alternative rail and trucking capacity are available, shifting crude oil production to transport by rail and truck would be highly disruptive and costly.

- Rail companies are generally unwilling to lease tank cars under short-term agreements. Moving some or all of DAPL's takeaway capacity to rail during a temporary shutdown would likely require entering into five-year leases, even though DAPL would be shut down for only one to two years.

- Additionally, rail transportation generally does not serve the same markets as DAPL, and where it can, it requires an indirect route, which is more expensive and time consuming. Shipping Bakken crude oil production to alternative destination markets would be highly disruptive to crude oil operations in the Bakken.

- In the past, when rail and trucking were used as alternative transportation methods, crude oil prices were higher and basin production was substantially lower.

- Rail and truck transportation have significantly higher costs per barrel than DAPL.

- Continental estimates the impact of ceasing DAPL operation would be in the range of -$4.00 to -$7.00 dollars per barrel of realized price for every producer in the Bakken Region.

- Even assuming for the sake of argument, as Plaintiffs do, all of DAPL's 570,000 barrels per day takeaway capacity could be shifted to alternative transportation methods (which is extremely unlikely), and shippers on DAPL were able to transport their production at similar rates (also extremely unlikely), the increased costs spread across all producers and shippers would be between $832 million and $1.456 billion for each year DAPL is shut down.

- Such increased transportation costs would be extremely disruptive to Bakken crude oil producers, particularly during times of reduced margins due to the COVID-19 pandemic.

## IV. Shutting down DAPL would be highly disruptive and costly to crude oil producers in the Bakken and the State of North Dakota.

- Because a shutdown of DAPL would eliminate a safe, environmentally-friendly, economically favorable source of takeaway capacity out of the Bakken, crude oil producers would likely be forced to curtail crude oil production until the pipeline is again operational.

- In addition to the resulting lost revenue from curtailing production and the costs associated with shutting-in wells and restarting them later, there are likely to be further impacts to

oil and gas industry employees and service contractors as a result of less business, and to customers who purchase Bakken crude oil, especially refiners who will be forced to find alternative crude oil supplies.

- By far the largest impacted party, however, would be the State of North Dakota. The lost royalty and tax revenue resulting from curtailed crude oil production would further worsen an unprecedented state budget situation caused by the COVID-19 pandemic.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: June 5, 2020 _____

103861952.7

EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, <br><br>      Plaintiffs, <br><br>   and <br><br> CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL., <br><br>      Plaintiff-Intervenors, <br><br>      v. <br><br> U.S. ARMY CORPS OF ENGINEERS, <br><br>      Defendant-Cross Defendant, <br><br>   and <br><br> DAKOTA ACCESS, LLC, <br><br>      Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

---

## DECLARATION OF GARTH R. DOLL IN SUPPORT OF
## DAKOTA ACCESS, LLC'S REPLY BRIEF REGARDING REMEDY

---

- My name is Garth R. Doll. I am the Vice President, Marketing of Enerplus Corporation ("Enerplus"), a customer of Dakota Access, LLC, which uses the Dakota Access Pipeline ("DAPL") to transport its crude oil production to downstream refiners. My business address is Suite 3000, 333 - 7th Avenue SW, Calgary, AB T2P 2Z1.

- This declaration describes my professional assessment of the potential disruptive economic effects on Enerplus of taking DAPL offline, and responds to Plaintiffs' assertion shutting down DAPL will not impact upstream entities given the current economic climate because there is sufficient alternative takeaway capacity for Bakken crude oil production.

- Taking DAPL offline would have numerous disruptive effects on third-party upstream producers like Enerplus that depend on the pipeline to move a significant portion of their crude products to refiners.  DAPL transports more than one-third of North Dakota production, providing producers like us an alternative physical destination for our product.  Shutting the

pipeline down may also have a negative impact on numerous other stakeholders including those receiving royalty payments and taxes.

**I.    Enerplus has contracted for long-term service on DAPL, which service relies on its continued operation.**

- Enerplus relies on DAPL because of its existing capacity, its reliable and safe service, and because it is the only pipeline that provides straight-line transportation service to the Patoka, Illinois hub and a more direct route to Gulf Region refiners.

- Enerplus invested over $460 million in the development of its North Dakota crude oil play in 2019 (over $1.2 billion since 2017).[1] This capital has a positive economic benefit to the communities in which we operate.

- Enerplus entered into a contract for 3,550 barrels per day of firm capacity on DAPL for delivery into Beaumont, Texas in order to diversify our pricing exposure to a variety of markets. Our commitment increases to over 10,000 barrels per day once the system expansion currently in front of state regulators is approved to proceed.

- To compete, Enerplus committed to using DAPL to transport a portion of our production due to safety and economic considerations.  DAPL has consistently provided one of the strongest netback prices for our crude oil produced in North Dakota since we signed a firm contract for service. We entered into a 10-year firm commitment in order to provide market diversification with a view the pipeline will remain in-service for the duration of our contract term.

**II.   Plaintiffs are incorrect that the economic downturn translates to less need for DAPL's takeaway capacity.  DAPL remains of critical importance to Enerplus' operation under the current economic conditions.**

- As publicly announced on May 8, 2020, the recent decline in crude oil prices resulted in Enerplus temporarily curtailing approximately 25% of its production across all its assets. Enerplus has publicly stated it does not anticipate curtailing production beyond current levels for the remainder of the second quarter.

- I thank the Plaintiffs for mentioning in their response to our original submission that Enerplus has the "ability to shut-in and quickly restore volumes to pre-shut in production levels". We will not hesitate to make these decisions based on preserving the economics of producing crude oil across all our operations.

---

[1] https://www.enerplus.com/investors/reports-and-filings.cfm

- Before DAPL was placed into service, market prices for North Dakota crude oil were approximately $5/barrel lower than in the months immediately after it was placed into service.  In today's recovering crude oil price environment, this difference is extremely significant, and will directly influence the amount of oil a company is willing to produce.

- With local prices for North Dakota crude oil trading over $30/barrel for July and for the rest of 2020, based on forward curves on June 2, 2020, it is widely expected by industry analysts (and has been announced by a number of public companies already) that most of the economically curtailed industry production will return in the very near term, which directly refutes the plaintiff's expert witness opinions that curtailed production will remain offline for up to two years.

- If DAPL is taken out of service and local prices fall by $5/barrel or more (as demonstrated based on historical data in our previous submission) due to inadequate pipeline egress, this production recovery will be tenuous as economics will again be significantly challenged in this recovering market. The resultant weakening in local prices will negate much of the positive recovery in prices we have experienced since our original submission and will make it more challenging on the economics of producing oil in North Dakota in the near-term. This will have direct economic impacts to numerous stakeholders in North Dakota.

- Oil and gas will continue to rely on safe and accessible modes of egress for our production to reach end use markets. During this time of gradual oil market recovery, North Dakota producers are increasingly relying on dependable access to DAPL to transport up to 570,000 barrels per day safely and reliably out of North Dakota to end use markets as it has since its inception.

- When Enerplus decided to enter into a 10 year firm commitment for capacity on DAPL in 2019, nearly two years AFTER the pipeline was brought into service, we did so with the understanding that it was operating according to the approvals it received from multiple local, state and federal agencies after very extensive and consultative regulatory process that took a number of years to complete. The pipeline had been operating safely and was effectively delivering North Dakota production into a market that was a preferred destination for Enerplus for market diversification reasons.  Enerplus decided that the lowest risk method of contracting available was with a pipeline that had already been in service and operating for several years and was the best alternative available to us at the time of committing to the contract.

- Taking this pipeline out of service when it has been operating legally and safely for a number of years completely negates the careful and thoughtful approach we took when committing to a 10 year contract. Had we known there was a risk of an operating pipeline project being shut-in after permits were issued and after operating safely for over 3 years, we would not have made that term commitment.

**III.    If DAPL is shut down in this economic environment, Enerplus will have to assess the potential impacts of increased cost, safety risks and market access before deciding how to transport its production.**

- If DAPL is taken out of service, it is not a simple decision for any company to make to begin redirecting its crude oil production to rail.

- As stated in its 2019 Annual Information Form[2], Enerplus "transports its U.S. crude oil production to its buyers by pipeline and/or truck, and may occasionally sell a portion to buyers who may utilize rail transportation (*after title is transferred into the buyer's name*)" (emphasis added). Enerplus has not transported crude oil under its own title on rail cars due to our unwillingness to be exposed to the potential environmental liability associated with doing so, although certain purchasers of our crude oil production may utilize rail once title to and ownership of that production has been transferred to them – that is a risk they are willing to accept as part of their business. If DAPL is shut down, Enerplus will lose direct access to the US Gulf Coast under a long-term firm contract for a portion of its production as we will not simply shift to transporting our production on rail under our name and title for the reasons stated above.

- Enerplus will be directly impacted by any requirement of its buyers using higher-cost transportation.

- There are no other operational or planned pipelines in the Bakken region that can meaningfully replace DAPL and the access it provides to the US Gulf Coast market.

  - Any other existing pipeline takeaway capacity in the Bakken region does not service the same markets as DAPL.  There are also practical barriers to using such capacity – e.g., Enerplus does not hold firm contracts to ship a meaningful amount of its production on these competing pipelines.

  - Moreover, as regional production returns based on a recovering oil price environment, these alternative pipeline routes will be likely filled to capacity. North Dakota producers will be left without adequate pipeline infrastructure to transport its production to end us markets if DAPL is shut down.

  - Pipeline infrastructure like DAPL is crucial to meet long-term transportation needs of shippers in the region.

---

[2] https://www.enerplus.com/investors/reports-and-filings.cfm

**IV.      Shutting down DAPL would be highly disruptive and cause harm to third parties.**

- Shutting in wells results in lost revenue from curtailing production.  The State of North Dakota estimated in May 2020 there were over 7,000 wells shut-in (approx. 500,000 bbl/day of production) since March 2020 due to market conditions[3]. Every month these wells remain shut-in results in $450 million of lost revenue if oil prices average $30/bbl as an example.  The State of North Dakota also estimates it will cost between $185 to $375 million for industry to restart these wells.

- This revenue pays salaries to families and production taxes and royalties to the state and to landowners across North Dakota and on the Fort Berthold Indian Reservation. Shutting DAPL down will require an even stronger oil price recovery in order for that curtailed production and lost tax revenue to be brought back online. Taking one of the lower cost and safest modes of transport out of service will cause harm to the industry and associated stakeholders during this time of economic uncertainty.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

                    Executed: June 5, 2020         _____

---

[3] https://www.dmr.nd.gov/oilgas/FinalBakken_Restart_Task_Force_Action_Report.pdf