# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, <br><br> Plaintiffs, <br><br> and <br><br> CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE, ET AL., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> U.S. ARMY CORPS OF ENGINEERS, <br><br> Defendant-Cross Defendant, <br><br> and <br><br> DAKOTA ACCESS, LLC, <br><br> Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

---

**SECOND DECLARATION OF GLENN EMERY IN SUPPORT OF
DAKOTA ACCESS, LLC'S REPLY BRIEF ON THE QUESTION OF REMEDY**

---

1.   My name is Glenn Emery.  I am the Vice President, Commercial Operations, of Energy Transfer LP, one of the indirect equit. owners of Dakota Access, LLC ("Dakota Access") and Energy Transfer Crude Oil Company, LLC ("ETCO").  My business address is 800 E. Sonterra Blvd., San Antonio, Texas.  I submitted a declaration in the above-captioned case on April 29, 2020, and my background and qualifications are discussed therein.

2.   This declaration responds to inaccurate and misleading assertions made in the brief and declarations filed by Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Plaintiffs") on May 20, 2020, and in particular the declaration and

report of Dr. Marie Fagan, D.E. 527-2 ("Fagan Dec.") & D.E. 527-4 ("Fagan Report").   A consolidated list of Dr. Fagan's most critical misrepresentations is attached as **Exhibit 1**.  In trying to discredit my assessment of the economic impacts from shutting down DAPL, Dr. Fagan assumes that **(i)** the lower demand and production in May 2020 will persist for years and **(ii)** barrels of oil and methods for transporting oil are fungible, such that reduced production together with transportation alternatives like rail will avoid negative impacts to DAPL's customers.

3.   These assumptions are simply incorrect and contradicted by known facts, widely accepted market expectations, and the statements of the largest producers in the Bakken.  As explained in this declaration and the declarations of Dr. Jeff Makholm, William Rennicke, and several producers, Dr. Fagan's predictions of massively depressed and stagnant production are belied by the fact that production in the Bakken is *already* significantly higher than she predicts it will be for the next two years, and that expectations from federal and state agencies and producers are also significantly higher than Dr. Fagan predicts.   Likewise, Dr. Fagan's conclusion that zero production would shut-in if DAPL went offline—based on her already disproven speculation about economic conditions and the need for DAPL under current and future economic conditions—and thus that there will be zero harm to North Dakota and its producers as the volumes currently being shipped on DAPL will seamlessly shift to alternate rail transport without massive disruption is also belied by the facts.  Despite the current reduction in Bakken production, DAPL's nominations are currently more than ▮ percent of its  allowable capacity and, as explained by *the largest producers in the Bakken*, because alternate transport options are either unavailable or far more expensive and less efficient than DAPL, shutting down DAPL will render much of the volumes currently being shipped on DAPL uneconomic, resulting in their being shut-in.  Dr. Fagan's unsupported speculation and arguments to the contrary are wrong.  When these clearly erroneous assertions are

corrected, Dr. Fagan's own price calculations support losses of $5.26 billion to $8.21 billion to North Dakota's producers (as calculated by Dr. Makholm using accurate estimates of shut-in volumes if DAPL is shut down).  Based on my knowledge of the market and the current flows on DAPL, as I discuss below, I agree with Dr. Makholm's assessment of the barrels that will shut-in if DAPL is shut down, and thus his conclusion of billions of dollars in harm.  That is lost income in North Dakota communities that will never be recovered.

4.   Plaintiffs also attempt to zero out any economic harm to Dakota Access or third-party businesses, states, and Native American tribes by asserting that any loss to them from reduced Bakken production will be countered by an equal benefit to those in other regions.  That is wrong too.  Gains elsewhere will not offset the losses from shutting DAPL down, because substantial capital investments tied to the availability of DAPL will become worthless.  Moreover, allowing other states to benefit at North Dakota's expense would prevent North Dakota from participating in the overall economic recovery.  It is astounding that Dr. Fagan would argue that such harm to North Dakota, its producers, and its citizens is meaningless.  North Dakota is a small state that is already struggling as a result of the economic downturn, and multi-billion-dollar losses on top of that will take away the livelihood of ordinary people who need to feed their families and may not be able to if they lose their jobs and income as a result of DAPL shutting down.

5.   Here are my fact-based conclusions:  **(i)** The economic downturn caused by the pandemic and the geopolitical events affecting crude oil markets is temporary.  A recovery in demand to ship crude oil and consume refined petroleum products is *already occurring* as shown by the facts on the ground—actual production, nominations, shipments, and consumption—and is further supported by industry and government observations and expectations.  Current production in the Bakken region is already significantly above the level at which Dr. Fagan claimed it would remain

stagnant for the next two years, and projections show that production will continue to increase month over month until it reaches 2019 levels next year.   Demand for DAPL, which remained relatively strong through the pandemic, is also *already* rebounding toward pre-pandemic levels of the pipeline's current capacity of 570,000 barrels per day ("bpd").   Shipments on DAPL remained relatively strong in April 2020 at ███████ bpd (or █████ percent of DAPL's capacity).   After a dip in DAPL's throughput to ████████ bpd in May 2020 (about ███ percent of capacity) as the market reacted to April's low oil prices and demand, nominations for June 2020 are already climbing, currently at ██████ bpd (more than ████ percent of capacity) with potentially more still being added, as shippers react to higher oil prices and higher demand.   **(ii)** My calculation of economic harm to Dakota Access of at least $500 million for the second half of 2020 and more than $1 billion each calendar year through 2023 if DAPL is shut down is accurate.   The dollar figures are easily calculated using verifiable and publicly available data.   **(iii)** Third-party producers, shippers, states, and tribal members will suffer immense *additional* economic harm if DAPL is shut down.   This will be on top of the economic harm that these parties have already suffered as a result of the pandemic and the temporary downturn in the crude oil market.   This is based on known facts and forecasts provided by third parties and objective government sources.   **(iv)** Shutting down DAPL at this time will slow, or prevent, the ongoing economic recovery in North Dakota.   That is because DAPL is a key infrastructure link to bring Bakken oil production to market.   DAPL is critical to the movement of production that is still online (or that will restart as the country continues recovering from the pandemic) due to its specific attributes (cost, destinations, directness).   If DAPL is shut down, a large portion of that production will most likely be shut-in (or remain shut-in); conversely, if DAPL remains operational, current production will likely continue, and wells that have been shut-in as a result of the pandemic will likely be brought back online as the recovery

continues.  **(v)** Oil transportation modes and destinations are not fungible, despite what Plaintiffs' "expert" claims.  Even if some of the oil currently flowing on DAPL could be placed on different modes of transportation (*e.g.*, rail) for delivery to other destinations, it takes significant capital and *time*—typically months or years—to create the infrastructure needed to move those volumes to those different outlets.  Dr. Fagan shows her ignorance of these basic facts by (a) suggesting DAPL's throughput could instantaneously move on other modes of transportation to other destinations if DAPL goes offline (without consideration of the difficulties involved, or discussion of how or whether those volumes could reach their ultimate destinations), and (b) using Patoka, Illinois as her proposed destination for oil shipped by rail.  Even a lay person with minimal knowledge of this industry would know that crude oil cannot be unloaded from rail in Patoka, because Patoka has none of the capital-intensive facilities required to unload oil by rail.

**DAPL Is Still Needed Under Current And Expected Economic Conditions**

6.  Plaintiffs attempt to discredit my data-driven analysis of harm to Dakota Access, its affiliate ETCO, as well as various third-parties by assuming that (a) temporary economic conditions will be permanent, and (b) barrels currently moving on DAPL could instantaneously move to shippers' destinations on other modes of transport (*e.g.*, rail).  *See* D.E. 527, at 22-23 ("Plaintiffs' Remedy Br."); Fagan Dec. ¶¶ 5, 8; Fagan Report at 43.  This is wild speculation and should be considered as such, particularly in light of Plaintiffs' many earlier economic predictions that turned out to be dramatically wrong.  For example, in 2017 Plaintiffs predicted that DAPL would "be a relatively small event for the energy system."  D.E. 272-5, ¶ 43 ("Goodman Dec.").  But, as I explained in my first declaration, from September 2018 through March 2020, DAPL was consistently oversubscribed and transported approximately 40 percent of Bakken crude, or roughly 4.5 percent of all U.S. crude oil production.  D.E. 509-9, ¶ 6 & n.1 ("First Emery Dec.").  That is hardly the "small event" for the country, let alone for the energy system, that Plaintiffs predicted.

Even during the worst of the pandemic's impact on economic conditions in May 2020,[1] DAPL transported approximately ▮ percent of Bakken production,[2] or roughly ▮ percent of all U.S. tight (*i.e.*, shale) crude oil production.[3] This so-called "small event" for the energy system is in reality a critical link in the national crude oil supply system.

7.   Likewise, in 2017 Plaintiffs predicted that DAPL's capacity would be superfluous given the other rail and pipelines that moved crude oil out of the Bakken at that time.   Goodman Dec. ¶¶ 7-12 ("Prior to DAPL entering service in 2017, . . . [a]lmost 70% of Bakken crude production was being transported by pipelines (other than DAPL) and only about 25% via crude by rail.   Even before DAPL began operations, the use of crude by rail had dropped to about one-third of peak levels in 2014, so there is now substantial capacity available for continued (or even expanded) shipments via rail. . . .   Hence, a reasonable starting point for analysis is to assume that all Bakken crude production can be transported in the future, even without DAPL." (footnotes omitted)).   That too turned out to be wrong.   Despite alternatives, shippers quickly committed to the vast majority of DAPL's 570,000 bpd capacity.   Plaintiffs have an abysmal track record for economic

---

[1]   Lynn Helms, *Director's Cut:  March 2020 Production*, N.D. Dep't of Mineral Res., at 3 (May 15, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-05-15.pdf (reporting that "liquid fuel demand is expected to bottom out in May 2020").

[2]   I calculate this by dividing DAPL's actual throughput of ▮▮▮ bpd in May by the total projected Bakken crude oil production in May 2020 of 1,135,000 bpd.   *See Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https://www.eia.gov/petroleum/drilling/#tabs-summary-2.   Note that this projected crude oil production is almost 200,000 bpd higher than the level at which Dr. Fagan predicted North Dakota production (which accounts for nearly all Bakken production) to remain stagnant for the next two years (936,500 bpd).   Fagan Report at 37 & Fig. 21.   Using Dr. Fagan's number, DAPL's May shipments would account for an even higher proportion of shipments out of the Bakken—nearly ▮ percent.

[3]   I calculate this by dividing DAPL's actual throughput of ▮▮▮ bpd in May by the total projected U.S. tight (*i.e.*, shale) crude oil production in May 2020 of 8,019,000.   *See Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https://www.eia.gov/petroleum/drilling/#tabs-summary-2.

predictions.

8.   Also wrong are Plaintiffs' *new* predictions of stagnant, low production for the next two years and their baseless speculation about the need for DAPL.  Both are contradicted by fact-based evidence.

9.   My analysis of anticipated harm to Dakota Access and ETCO, as well as to various third parties, is based on *actual* shipments and contracted and nominated volumes on DAPL and the Energy Transfer Crude Oil Pipeline ("ETCOP"), as well as *actual* projected oil demand and production from impartial government agencies and some of the largest producers in the Bakken. Plaintiffs, on the other hand, have cherry-picked the lowest estimated demand and production numbers for the second quarter of 2020 and speculate that as a result of the pandemic these numbers will repeat themselves indefinitely.  *See* Fagan Report at 15-18.  Plaintiffs also say that the number of barrels no longer being produced in the Bakken region is roughly equal to DAPL's current capacity (570,000 bpd), and then *assume* both that DAPL will no longer be needed for at least the next two years and that the delta (either 20,000 bpd or 70,000 bpd) can be easily moved by other means.  *See* Plaintiffs' Remedy Br. at 22; Fagan Report at 6-7 (assuming 20,000 bpd delta), 36 (assuming 70,000 bpd delta).   Apart from getting the numbers wrong (government reports, as discussed below, contradict their claims of 550,000 fewer bpd as of mid-May 2020 or 500,000 bpd fewer through 2022),[4] the facts refute Plaintiffs' self-serving guesswork.

10.  First, projections from government agencies, including the U.S. Energy Information Administration ("EIA") (whose purpose is to report energy statistics) and the North Dakota Department of Mineral Resources, are that global oil demand reached its lowest point in May 2020

---

[4]   *See* Plaintiffs' Remedy Br. at 22; Fagan Report at 6, 31, 32, 36.

(the point at which Plaintiffs assume demand will stay indefinitely) and that demand will recover almost fully to 2019 levels by the fourth quarter of 2020.[5]  Global production is projected to rise similarly.  Figure 1 shows the relationship between global production, consumption, and stockpiles based on EIA data and projections.  Production in the Bakken region is also already starting to recover as global oil prices are trending to pre-pandemic levels and demand in the United States rebounds.  Like global demand, May 2020 is expected to be the lowest production month in the Bakken region and government agencies expect Bakken production to recover to 2019 levels.  This rise in production is supported, in part, by oil prices that have more than doubled since the price collapse in March 2020 that stemmed from a dispute between Saudi Arabia and Russia.[6]  In fact, the EIA projects Bakken productivity of more than 1.1 million bpd in May 2020 and June 2020, which is almost 200,000 bpd higher than Plaintiffs' unsubstantiated estimate of the "high case" of North Dakota production over the next two years (936,000 bpd), and the data clearly indicates a trend toward market recovery.[7]  Likewise, on May 15, 2020 the North Dakota Department of

---

[5]  Lynn Helms, *Director's Cut:  March 2020 Production*, N.D. Dep't of Mineral Res., at 3 (May 15, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-05-15.pdf  (reporting that "liquid fuel demand is expected to bottom out in May 2020," citing EIA projections); *Short-Term Energy Outlook*, U.S. Energy Info. Admin., at Tbl. 3a (May 2020), https://www.eia.gov /outlooks/steo/pdf/steo_full.pdf (reporting liquids consumption levels as 20.57 million bpd in the fourth quarter of 2019, and projecting consumption to be lowest in the second quarter of 2020, at 15.87 million bpd, and to increase to 18.67 million bpd in the third quarter and 19.26 million bpd in the fourth quarter, and to rise further through 2021).

[6]  *Oil jumps to highest level since March on lower U.S. inventories, recovering demand*, CNBC (May 21, 2020), https://www.cnbc.com/2020/05/21/oil-markets-us-crude-inventories-global-economy-in-focus.html.

[7]  *Compare* Fagan Report at 37 Fig. 21 (projecting, without citation, 936,500 bpd of annual crude oil production in North Dakota in 2020-2022) *with Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https://www.eia.gov/petroleum/drilling/#tabs-summary-2 (projecting 1,135,000 bpd of crude oil produced in the Bakken region in May 2020 and 1,114,000 bpd in June 2020).  North Dakota typically contributes about 95 percent of crude oil production in the Bakken region.  *See US Williston Basin Oil Production*, N.D. Pipeline Authority, https://north dakotapipelines.com/us-williston-basin-oil-production/ (last visited June 5, 2020) (showing that in

Mineral Resources ("DMR") estimated that at least 950,000 bpd were still being produced in North Dakota compared to approximately 1.43 million bpd in March 2020 (meaning only about 480,000 bpd of North Dakota production had been shut-in),[8] and DMR subsequently revised its estimate of shut-in production downward to 475,000 bpd on May 28, 2020.[9]  (Most Bakken production is from North Dakota.)  Further, Continental Resources, Inc., the largest producer of oil and gas in the Bakken estimates that North Dakota production alone will not fall below 1 million bpd.[10]  Based on these figures, crude oil production in the Bakken region was likely between 1 million and 1.1 million bpd in May, as it will be in June 2020, and will increase from there.  In addition, indications are that consumer behavior will return to earlier patterns as COVID-19 shutdown orders continue to be lifted.  The data from other countries, such as China, that implemented COVID-19 social-distancing measures ahead of the United States bears this out.  These countries are returning to normal activity levels with corresponding increases in demand for refined petroleum products.  For example, crude oil processing rates in China in April 2020 were higher than in April 2019 and car sales in China increased in April 2020 for the first time in about two years.[11]  Fuel demand is also

---

2020 about 95 percent of crude oil produced in the Williston Basin, which includes the Bakken formation, came from North Dakota).

[8]  N.D. Dep't of Mineral Res., *May 2020 Director's Cut*, YouTube, at 13:20  (May 15, 2020), https://www.youtube.com/channel/UCp5qbfZG4EBcW1c3AryHsBA?view_as=subscriber (reporting North Dakota production of 950,000 bpd and thus 500,000 bpd of shut-in production); Lynn Helms, *Director's Cut:  March 2020 Production*, N.D. Dept. of Mineral Res., at 1 (May 15, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-05-15.pdf (reporting March 2020 crude oil production as 1,428,273 bpd).

[9]  *Bakken Restart Task Force*, N.D. Dep't of Mineral Res., at 3 (May 28, 2020), https://www. dmr.nd.gov/oilgas/FinalBakken_Restart_Task_Force_Action_Report.pdf (reporting 475,000 bpd of shut-in production in North Dakota).

[10]  *See* Declaration of Ramiro Rangel at 2 ("Rangel Dec.") ("Continental expects crude oil production in North Dakota will not drop below 1,000,000 barrels per day.").

[11]  *China crude oil runs rebound in April as fuel demand picks up*, Reuters (May 14, 2020), https://www.reuters.com/article/china-economy-output-oil/china-crude-oil-runs-rebound-in-

rebounding in European countries like Germany and Spain where stay-at-home orders are being relaxed.[12]   Independent observers and industry leaders are seeing similar behavior in the United States.[13]   The data thus discredits Plaintiffs' self-serving speculation about the pandemic's impact being permanent.

---

april-as-fuel-demand-picks-up-idUSL4N2CV24T?rpc=401&; Trefor Moss, *China's Auto Market Rumbles Back to Growth*, Wall St. J. (May 7, 2020), https://www.wsj.com/articles/chinas-auto-market-rumbles-back-to-growth-11588845921.

[12]   *Fears of Mass Transit Fuel Increases in Oil Demand*, Inst. for Energy Research (May 20, 2020),   https://www.instituteforenergyresearch.org/fossil-fuels/gas-and-oil/fears-of-mass-transit-fuel-increases-in-oil-demand/.

[13]   *Id.*; *Valero Energy Corp (VLO) Q1 2020 Earnings Call Transcript*, The Motley Fool (Apr. 29, 2020),   https://www.fool.com/earnings/call-transcripts/2020/04/29/valero-energy-corp-vlo-q1-2020-earnings-call-trans.aspx (reporting "about a 9% increase" in gasoline demand from the beginning to the end of April and a "significant sharp increase in demand" in regions where stay-at-home orders had already been lifted); *HollyFrontier (HFC) Q1 2020 Earnings Call Transcript*, The Motley Fool (May 9, 2020), https://www.fool.com/earnings/call-transcripts/2020/05/09 /hollyfrontier-hfc-q1-2020-earnings-call-transcript.aspx (reporting "a 10% to 15% increase in gasoline demand in the areas that we operate" since early April and anticipating in "June . . . people will be consuming a lot more gasoline at what are very attractive prices"); *PBF Energy (PBF) Q1 2020 Earnings Call Transcript*, The Motley Fool (May 16, 2020), https://www.fool.com/earnings /call-transcripts/2020/05/16/pbf-energy-pbf-q1-2020-earnings-call-transcript.aspx (reporting that gasoline production is steadily increasing).

**Figure 1**
**World Liquid Fuels Production and Consumption Balance**



*Source*:  *Short-Term Energy Outlook*, U.S. Energy Info. Admin., at 26 (May 2020), https://www.eia.gov/outlooks/steo/pdf/steo_full.pdf.

11. Second, as shown in Figures 2 and 3 below, *data* confirms that demand for DAPL and ETCOP has remained high even as overall production and demand have decreased.  Specifically, in March 2020, DAPL shipped about 570,000 bpd—its current capacity—and received nominations to ship more than ███████ bpd that month.  Shipments dropped in April 2020 to ███████ bpd, or about ████ percent of allowable capacity, as the effects of stay-at-home orders were felt nationwide; and shipments dipped further to ██████ bpd in May 2020 as the market reacted to the low oil prices and tightening storage experienced in April 2020.  But nominations are already rebounding for June 2020—they are up to ██████ bpd as of June 4, 2020 and may increase further for June as recovery continues.  Nominations are expected to again reach DAPL's capacity by April 2021 and may return sooner.

**Figure 2**
**Actual and Expected Shipments on DAPL in 2020 and 2021**



**Figure 3**
**Actual and Expected Shipments on DAPL in 2020 and 2021 ..  Barrels per Day ("bpd")**



12. Thus, the *actual* demand for DAPL—like the demand for oil nationwide—is represented by a sharp decline and rebound (like a narrow letter "v") rather than a sharp decline and flat line for the foreseeable future, as Plaintiffs incorrectly suggest.  DAPL's nominations are particularly strong given that overall production in the Bakken region was between 1 million and 1.1 million bpd in May 2020 based on available reports, down from a high of about 1.45 million in February

2020.[14]  (Plaintiffs assert cuts of 550,000 bpd based on older estimates in the popular press, but their source has since reduced its estimate of cuts by almost 15 percent.[15])  Plaintiffs use these estimates of temporary production cuts to speculate that DAPL is not needed because production supposedly has decreased by roughly the amount of the pipeline's volume.  But, as noted, the estimates from state and federal agencies and the largest producers in the Bakken suggest that actual production in the Bakken region is currently between 1 million and 1.1 million bpd, and is rising, refuting Plaintiffs' speculation.  And actual shipper behavior and data show how ridiculous Plaintiffs' assertion is.  Despite production cuts, a significant portion of the produced oil continues to move on DAPL, which shows that the market needs and will continue to rely on DAPL even when overall production decreases temporarily.  Now that production is recovering, shippers are proving their reliance on DAPL over other modes of transportation by quickly ramping up shipments.

**Direct Economic Harm to Dakota Access and ETCO**

13. Plaintiffs also question my calculation of lost revenues to Dakota Access if DAPL is shut down by relying on transient market conditions that have already passed.  But Plaintiffs do not even attempt to quantify these losses themselves.  *See* Plaintiffs' Remedy Br. at 24-25; Fagan Dec. ¶ 5; Fagan Report § 7.  Simple arithmetic shows that my calculations of potential losses to Dakota

---

[14]  *See Drilling Productivity Report*, U.S. Energy Info. Admin. (release date May 18, 2020), https://www.eia.gov/petroleum/drilling/#tabs-summary-2 (projecting 1,135,000 bpd of crude oil produced in the Bakken region in May 2020); Lynn Helms, *Director's Cut:  March 2020 Production*, N.D. Dep't of Mineral Res., at 1 (May 15, 2020), https://www.dmr.nd.gov/oilgas /directorscut/directorscut-2020-05-15.pdf (reporting 1,451,681 bpd produced in North Dakota in February 2020).

[15]  *See* Fagan Report at 6 & n.1, citing James MacPherson, *North Dakota aims to use COVID-19 aid to plug oil wells*, Associated Press (May 14, 2020), https://billingsgazette.com/news/state-and-regional/north-dakota-aims-to-use-covid-19-aid-to-plug-oil-wells/article_eadee456-3b1f-5b04-8d75-a0280fcb72ea.html.

Access and ETCO are accurate.  These calculations can be verified by multiplying the per-barrel cost of shipping on DAPL by the pipeline's committed throughput.  In my prior declaration, I estimated the high end of the revenue range by assuming the DAPL-ETCOP system would be fully utilized (570,000 bpd), and the low end by considering only "take or pay" contracted capacity (▇▇▇▇ bpd)[16] and assuming zero walk-up shippers, for which ten percent of DAPL and ETCOP's capacity is reserved (in keeping with FERC guidance).  Dakota Access can expect payments for all of the take-or-pay capacity at a fixed price *regardless of whether a lesser amount actually ships*, as long as the pipeline remains in service.  Plaintiffs recognized this in their 2017 remedy briefing.  *See* Goodman Dec. ¶ 29 ("shippers may be committed to pay for up to 90% of capacity . . . even if the amount of crude actually transported is below the committed volumes").  Simple math shows that the ranges of losses included in my original declaration were accurate.

14. The rates for shipping on DAPL and ETCOP are filed with FERC in a "tariff" that is unaffected by the market price of oil.  Dakota Access files both a local tariff with rates for shipping oil from specific origin points in North Dakota to the Patoka Hub in Illinois, and a joint tariff with ETCO for shipping oil from points in North Dakota to points in Tennessee and Texas.[17]  The company's tariff sets out many factors in determining the price to ship a particular barrel of oil, including the origin and destination points and the amount shipped.  Overall, the cost for a contracted shipper to transport one barrel of oil from North Dakota to the Patoka Hub ranges from

---

[16] The DAPL-ETCOP system has contracted capacity of ▇▇▇▇ bpd.  ▇▇▇▇ bpd of this capacity is contracted on a "take or pay" basis.

[17] *See* **Exhibits 2** and **3**.  These tariffs are publicly available on FERC's website by searching the "eTariff" database for "Dakota Access" in the "Company Name" field, selecting "Effective" in the "Section Status" field, and selecting the documents titled (1) "DAPL Local Rates, DAPL FERC 2.0.0, 2.4.0" that was effective July 1, 2019, and (2) "Joint Tariff Rates, DAPL FERC 4.0.0, 4.5.0" that was effective July 1, 2019.  *Tariff Section Search*, Fed. Energy Regulatory Comm'n, https://etariff.ferc.gov/TariffSearch.aspx (last visited June 7, 2020).  Both contracted and walk-up tariff rates change annually.

about $4.50 to $5.50 and the cost for a walk-up shipper is approximately $6.50.  The cost for a contracted shipper to transport one barrel of oil from North Dakota to ETCOP's terminus in Nederland, Texas is between about $5.85 and $6.90, and the cost for a walk-up shipper on the same route is approximately $8.20.

15. Once the inputs are known, the math is straightforward.  Using, by way of example, an average blended rate of $6 per barrel, transporting ▆▆▆▆ barrels per day generates ▆▆▆▆▆▆ per day and approximately ▆▆▆ billion per year.  Using the same average blended shipping rate of $6, transporting 570,000 barrels per day generates revenue of $3,420,000 per day, or approximately $1.25 billion per year.  These straightforward calculations establish the high and low ends of the revenue range for Dakota Access and ETCO and support the estimates in my prior declaration.  *See* First Emery Dec. ¶¶ 9-10 (estimating combined revenue for Dakota Access and ETCO through 2020 would be approximately $1.078 to $1.220 billion and revenue through 2021 would be approximately $1.035 billion to $1.298 billion).  The slight differences between the numbers in my earlier declaration and the results of the math calculations above are due to my declaration's use of the precise figures for actual shipping costs and the actual volumes shipped for the months in 2020 that had already occurred rather than the blended rate used above to show how the math works.

**Economic Effects to Third Parties**

16. Plaintiffs assert alternatively that shutting down DAPL would have *no* impact on third parties, because any volumes that would have shut-in as a result of DAPL going offline have already been shut-in, *or* that any impacts would be "so minor" as to be "lost in the noise" of "other industry currents."  Plaintiffs' Remedy Br. at 23-25 (quotation marks omitted); *see also* Fagan Dec. ¶¶ 5, 8, 11; Fagan Report at 6-7.  They support this by pointing vaguely to the economic downturn and suggesting that third parties can transform their businesses by producing and shipping oil in

other ways.  Plaintiffs also assume that lower Bakken region production—which is rebounding and is already above the low level that, according to Dr. Fagan, will persist through 2022—means DAPL's transport capacity of 570,000 bpd is no longer needed.  These assumptions are baseless given actual events and actual industry needs.

17. As discussed above, shippers continue to rely on DAPL despite an overall short-lived decrease in production.  DAPL is the most economic means of transporting Bakken production to market.  That is to say, without DAPL, less oil would most likely be produced because it would be less economic to ship and sell.  The economic downturn has temporarily made margins even thinner than before.   For some producers, any added costs—particularly an increase in transportation costs—may mean the difference between continuing production and shutting in production.  Dr. Fagan has agreed and testified in another matter that lower-cost pipeline transportation can make the difference between production being economic or not:  "Because pipeline capacity is generally cheaper than rail, adding more pipeline capacity could allow marginally more-expensive oil supply to become profitable at any given global oil price."[18]  The cost for DAPL's current contracted shippers to ship on DAPL is much lower than other modes of transport, as I have explained.  Dr. Fagan disputes that the added cost for rail transportation would be $5 to $10 per barrel, asserting it would be much lower, but in testimony elsewhere she has agreed with that exact range.  She testified that "[p]ipelines are, in general, considered more cost-effective than rail to transport oil, with a cost of *$5 per barrel by pipeline compared to $10 to $15*

---

[18]  Direct Testimony of Dr. Marie Fagan on behalf of the Minnesota Department of Commerce Division of Energy Resources at 36, *In re Application of Enbridge Energy, Ltd. Partnership for a Certificate of Need for the Line 3 Replacement Project in Minnesota from the North Dakota Border to the Wisconsin Border*, Docket No. PL9/CN-14/916 (Sept. 11, 2017), https://mn.gov/eera/web /project-file?legacyPath=/opt/documents/34079/Fagan_Direct_Testimony%2014-916.pdf.

*on rail.*"[19]

18. Moreover, three of the six largest producers in the Bakken region—Continental Resources, Hess, and ConocoPhillips—whose collective production represented about a *quarter* of Bakken crude oil production as of February 2020,[20] *see* Fagan Report at 21, Fig. 8, are so concerned about a DAPL shutdown that they have filed statements asking this court to keep DAPL online during the remand because a shutdown would cause them serious economic harm and even lead them to shut-in production.

19. Continental Resources, the *largest* crude oil producer in the Bakken, responds to "Plaintiffs' mistaken assertions that . . . there is sufficient alternative takeaway capacity . . . and [that] taking DAPL out of service will not impact upstream entities given the current economic climate and temporarily reduced oil demand," explaining that shutting down DAPL "would significantly disrupt crude oil operations in the Bakken, especially during this time of decreased demand and low commodity prices." Rangel Dec. at 2.  Continental confirms that shutting down DAPL will result in "lost revenue," "the costs associated with shutting-in wells and restarting them later," "impacts to oil and gas employees and service contractors . . . and customers," and "[b]y far the largest" impacts to "the State of North Dakota." *Id.* at 3-4.  Continental goes on to explain further that Plaintiffs are incorrect and "[t]here is insufficient alternative takeaway rail and trucking capacity out of the Bakken to replace the current volumes transported by DAPL," and that "[t]here are no other pipelines in service, or expected to come online, that can meaningfully replace DAPL." *Id.* at 2.  Continental estimates that even if there were truck or rail capacity, it would likely

---

[19]  *Id.* § 4.4.2 (emphasis added).  Mr. Rennicke's analysis in his second declaration also confirms that the estimate of a $5 to 10 per barrel cost differential between pipeline and rail was accurate.

[20]  Lynn Helms, *Director's Cut:  March 2020 Production*, N.D. Dept. of Mineral Res., at 1 (May 15, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-05-15.pdf (reporting 1,451,680 bpd produced in North Dakota in February 2020).

"increase[] costs spread across all producers and shippers . . . [by] $832 million and $1.456 billion for each year DAPL is shut down." *Id.* at 3.  Continental points out that with these increased costs, if DAPL is shut down "crude oil producers would likely be forced to curtail crude oil production until the pipeline is again operational." *Id.* at 3.

20. Hess Corporation, the *second* largest producer in the Bakken, states that it "structured its North Dakota operations based on the availability of DAPL" and that it would stop producing the volumes that it currently moves on DAPL if the pipeline is shut down "because there is no practical alternative or efficient way to transport the volume of oil that Hess currently ships on DAPL if the pipeline is shut down."  D.E. 501-2, at 3, 5 ("Hess Amicus Br.") (bold and caps omitted); D.E. 501-3, ¶ 14 ("Lohnes Dec.").  Shutting in the crude oil that Hess ships on DAPL could affect Hess's long-term contracts with refineries, landowners, and royalty owners, and it would mean lost jobs in North Dakota, where Hess is one of the largest private employers.  Lohnes Dec. ¶¶ 6, 22, 27.

21. ConocoPhillips, the *sixth* largest producer in the Bakken (operating as Burlington Resources), Fagan Report at 21, Fig. 8, and "one of the world's largest independent exploration and production" companies,[21] explains that it too relies on DAPL's "vital" service to reach particular refining markets and that if DAPL shuts down and Conoco and other producers "are not able to efficiently get their Bakken production to a market where they can receive sufficient value for it," particularly under temporary lower price conditions, "that crude oil may remain uneconomic to produce, causing companies to further delay the return to active investment." Moreover, Conoco notes that while it has shut-in some production temporarily, "demand is

---

[21] **Exhibit 4** (June 6, 2020 Letter in Support of Dakota Access, LLC's Reply Brief Regarding Remedy from Chris W. Conway, Vice President, Commercial, ConocoPhillips to Judge Boasberg) ("Conway Letter").

returning, crude oil prices have risen, and production is already returning," and the company "has retained its staff in North Dakota in anticipation of resuming production relatively quickly." ConocoPhillips concludes that "DAPL is a key element for the recovery of crude oil production activity in the Bakken region," and that shutting it down "would prolong the economic distress being experienced by many businesses, families and individuals who depend on the Bakken producing region for their livelihoods."

22. On the downstream side, Marathon Petroleum, one of the nation's largest refiners of crude oil, echoes the producers, explaining that it "has made significant investments across its refining system to ensure continued access to" specific third-party assets leading from the Bakken to Patoka, Illinois, and that DAPL is a critical piece of that system because it "provides the only direct crude oil transportation service for Bakken crude oil to the Patoka hub." D.E. 509-12, ¶¶ 7-9.

23. Other DAPL customers have made similar statements, including Enerplus, which in April 2020 told this Court that it not only benefits from DAPL, but has committed to increase its shipments as soon as there is adequate capacity in order to capitalize on the more than $1.2 billion it has invested in developing its North Dakota crude oil play since 2017. D.E. 509-13, at 2. Enerplus emphasizes in a second declaration that it considered its 10-year contract with DAPL a "low[] risk," high reward decision based on DAPL's several years of safe operation to valuable markets. Second Declaration of Garth R. Doll at 3 ("Second Doll Dec."). While Enerplus has shut-in some production as a result of the recent temporary economic downturn, it, like others in the industry, expects "that most of the economically curtailed industry production will return in the very near term." *Id.* at 2. Enerplus further explains that taking DAPL offline now, when the market is still recovering, will threaten the resurgence of Bakken production by depressing local oil prices because there would be insufficient egress from the region to the required markets. *Id.*

at 3.  Specifically, Enerplus explains "[t]here are no other operational or planned pipelines in the Bakken region that can meaningfully replace DAPL," and that Enerplus *does not use* rail due to the cost and "environmental liability associated with doing so."  *Id.* at 4.

24. As discussed in more detail below and by Dr. Makholm and Mr. Rennicke, Dr. Fagan's statements about how crude oil will or could move are based on speculation and incorrect assumptions rather than the *actual* needs and experience of crude oil producers, shippers, and buyers.

25. In addition, North Dakota, Illinois, and the other states DAPL and ETCOP pass through will suffer meaningful losses in tax revenue if DAPL is shut down.  *See* First Emery Dec. ¶¶ 28-29.  Plaintiffs admit that these losses may occur, but assert that these losses are based on incorrect projections of production loss due to the pandemic.  *See* Plaintiffs' Remedy Br. at 27; Fagan Report at 51.  This argument assumes there is no recovery.  That is contradicted by the overwhelming weight of expert expectations around the country, by those more specific to Bakken production, by impartial government estimates, and by those of the actual producers on the ground.  The loss of DAPL absolutely will result in significant lost tax revenue to the states.  As I just explained, and as detailed by Dr. Makholm, Dr. Fagan assumes away the economic reality that producers need the efficient, lower-cost transportation of DAPL in order to competitively continue producing oil.

26. Likewise, the Mandan, Hidatsa, and Akira Tribes, known as the Three Affiliated Tribes, will suffer losses as described in my prior declaration and that of Dr. Makholm.  *See* First Emery Dec. ¶ 32; D.E. 509-11, ¶¶ 32, 34 ("First Makholm Dec.").  Plaintiffs make no effort to dispute the estimated lost revenues to these tribes in my prior declaration or the declaration of Dr. Makholm.  Regardless of whether the leadership of the Three Affiliated Tribes supported protests against

DAPL, Plaintiffs' Remedy Br. at 24 n.5, those tribes did recently negotiate a more favorable revenue sharing arrangement with the State of North Dakota and continue to base a large portion of their budgets on that revenue.  First Emery Dec. ¶ 32; First Makholm Dec. ¶ 32.  The Three Affiliated Tribes earn this revenue based on the amount of oil produced on their land.  As of March 2019, about 20 percent of North Dakota's oil production took place on the Three Affiliated Tribes' land.[22]  Accordingly, their members stand to suffer significant losses if DAPL goes offline and North Dakota production fails to recover or declines as a result.

**Lack of Viable Alternative Transportation Options**

27. Plaintiffs speculate that the capacity currently flowing on DAPL will magically move to other transportation methods if DAPL is forced offline, and that any decline in production will reduce the need for DAPL in a one-to-one ratio thus removing the need for alternative transportation altogether.  *See, e.g.*, Fagan Report at 6-7, 41; Fagan Dec. ¶ 5.  Both statements cannot be true and, in fact, neither is.

28. First, DAPL was built because of lack of capacity for shipping Bakken oil directly and efficiently to destinations in the Midwest and down to the Gulf Coast.  Plaintiffs say that the capacity DAPL serves could shift to rail or other pipelines simply because rail or other pipelines might have capacity out of the Bakken to different destinations.  *See* Goodman Dec. ¶¶ 7-10; Fagan Report at 41.  Dr. Fagan discusses rail capacity at length and then states that other regional pipelines and rail could compensate for the loss of DAPL's capacity.  *See* Fagan Report at 41 (asserting that "incremental [rail] capacity would be more than enough to accommodate North Dakota production along with other pipelines in the next two years").  But Dr. Fagan's description

---

[22]  KVRR Staff, *Burgum signs oil tax-sharing bill with Three Affiliated Tribes*, KVRR Local News (Mar. 28, 2019), https://www.kvrr.com/2019/03/28/burgum-signs-oil-tax-sharing-bill-with-three-affiliated-tribes/.

of these alternate pipelines (there are four she posits have capacity) does not show that any capacity they have is a replacement for DAPL's capacity.  *See* Fagan Report at 36, Fig. 20.  Dr. Fagan asserts that two of these other pipelines go to Guernsey, Wyoming and that they *interconnect* to Cushing, Oklahoma and that the other two pipelines head north and east and, eventually, *interconnect* with the Enbridge Mainline in Clearbrook, Minnesota and Saskatchewan, Canada. Dr. Fagan does not explain whether there is capacity for DAPL's volumes to move from Guernsey, Wyoming to Cushing Oklahoma, or on the Enbridge Mainline, nor whether or how these hypothetical volumes would go from these interconnections to their ultimate destination in the Gulf Coast.  And Dr. Fagan does not explain the *costs* of using these alternate systems.  An accurate analysis of other pipelines' viability must account for not only the cost and capacity of the proposed replacement pipelines, but *also* both the cost and capacity of the pipelines with which it interconnects and the cost and capacity of the feeder infrastructure supporting them, such as trucks, crude-gathering pipelines, and related infrastructure necessary to move crude oil from the wells to those other pipelines' terminal heads.

29. Continental raises these exact points, explaining that, "[d]espite Plaintiffs' claims there is excess pipeline capacity on other pipelines leading out of the Bakken, there are no other pipelines in service, or expected to come online, that can meaningfully replace DAPL."  Rangel Dec. at 2. Continental further explains that "[a]ny existing non-DAPL pipeline takeaway capacity does not service the same markets DAPL serves . . . [and] the markets [they] . . . do serve are often less economically attractive because of market saturation and additional transportation costs."  *Id.*  All of these pipelines existed before DAPL was completed, and to my knowledge all of them had some unused capacity at that time.  DAPL was built, at the request of DAPL's customers, to meet a specific, *unmet* need.  Without DAPL, that need will again be unmet.

22

30. Second, transportation modes and destinations are simply not fungible.  As I have explained, before Dakota Access built its pipeline it proposed to potential shippers several options for terminal locations, including Cushing, Oklahoma.  Its customers chose Patoka, Illinois.  First Emery Dec. ¶¶ 40-41.  Customers chose Patoka and/or Nederland, Texas (via ETCOP) based on existing business relationships, and/or because it gave them an opportunity to reach valuable markets.  No matter the choice at that time, customers rely on the long-term existence of specific point-to-point routes because of the investment required to create and use the "tie-in" infrastructure at the pipelines' origin and destination points.  For example, DAPL allowed Hess to increase its operations because Hess can now move product from one side of the Missouri River to the other without the need for expensive, inefficient, and unsafe rail or truck transportation.  Hess Amicus Br. at 5-6.  Hess explains that, having made that choice, it "invested more than $40 million in infrastructure projects in reliance on DAP[L]."  *Id.* at 4.  New infrastructure for switching to less efficient rail and truck transit "would take well over a year—and tens of millions of dollars—to develop."  *Id.* at 6.

31. Moreover, forcing shippers to move product on other pipelines that have different origin points than DAPL or go to different delivery points would be disruptive to their businesses and may result in shutting in some or all of their production.  Rangel Dec. at 2-4; Second Doll Dec. at 2-3; Conway Letter.  As I discussed in my prior declaration and as Marathon Petroleum, Enerplus, and Hess discussed in their declarations or briefs (*see* D.E. 520-5; D.E. 520-6; D.E. 501-2), shippers make arrangements with particular terminals, refiners, and others along their supply chain far in advance, and in reliance on particular fixed or projected costs.  Forcing them to alter their supply chain, with different costs, would significantly affect the ability of those producers to turn a profit, with ripple effects on companies along their supply chain.

32. Dr. Fagan's claim that rail provides "helpful" flexibility ignores these realities entirely. *See* Fagan Report at 43.  As Mr. Rennicke discusses at length in his declarations, producers cannot simply put their product on a train and send it to wherever that rail line goes.  There are many layers of cost, regulations, and transactions to consider.  Likewise, Dr. Fagan embarks on a fool's errand when she compares rail and pipeline transport costs using Patoka, Illinois as the destination. *See id.* at 38.  Patoka cannot receive crude oil by rail because it lacks the facilities to offload crude oil.  In addition, Dr. Fagan's suggestion that Patoka is an unattractive destination because of supposedly diminishing storage capacity, *id.* at 43, again misses the point that producers cannot quickly pivot to different destinations.  This also represents her clear misunderstanding of how storage markets function.  Storage exists to manage the ebbs and flows of supply and demand.  To imply that Patoka storage being full today (which it is not) has any meaningful impact on future market conditions is simply wrong and misleading.

33. Other pipelines, which Plaintiffs assume are an option without citation or explanation (*see* Fagan Report at 36), likewise cannot replace DAPL.  Rangel Dec. at 3; Conway Letter.  Dr. Makholm explained in his April 29, 2020 declaration that at least two of the other pipelines in the Bakken region—the Bridger and "Double H" lines—are or have been fully committed, and, even if they were not fully committed, they go to Montana or Oklahoma rather than the destinations DAPL's customers need.  *See* First Makholm Dec. ¶ 17.  If other pipelines in the Bakken region have available capacity that is not being utilized, it is because that capacity serves markets that are less desirable for shippers, as discussed above.  Otherwise, shippers would be using those pipelines already.  And any added temporary capacity caused by the recent economic downturn will vanish as demand for oil increases.

34. Third, shifting to a patchwork of smaller pipelines, trains, and trucks can lead to mixing

grades of oil as the Bakken light crude comes into contact with tanks or pipes that have held or hold other types of oil.  As I explained before, mixing light, sweet crude oil with other grades can degrade the product and lead to lower-quality and less valuable barrels being delivered to the shipper at the ultimate destination.  First Emery Dec. ¶ 41.  This mixing does not happen on DAPL or ETCOP because those pipelines carry one grade of crude oil to fixed destinations.  Thus, shifting to other transportation options would increase a shipper's costs while reducing the product's value.  Precisely *because* oil prices are now currently depressed, shutting down DAPL would make shipping oil uneconomic for many producers and shippers.

35. Finally, consistently strong demand for DAPL demonstrates why shippers continue to need this mode of transport.  During the 2017 remedy briefing, Plaintiffs projected that DAPL would be underutilized due to the existence of transportation alternatives, *see* Goodman Dec. ¶¶ 7-12, but history has proven them to be wrong.  Requests to ship on DAPL have consistently exceeded 570,000 bpd since September 2018, and in some months DAPL has received nominations to ship *all* of the oil being produced in the Williston Basin (an area larger than the Bakken formation).  *See* First Emery Dec. Fig. 1.  This is concrete evidence from the market that it relies on DAPL to the exclusion of other modes of transportation and that demand will be strong into the foreseeable future.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: June 8, 2020

Glenn E. Emery

# EMERY
# EXHIBIT 1

**Plaintiffs' and Their Declarants' Most Significant Misleading Claims Concerning Economic Harm to Dakota Access and Third Parties from Shutting Down DAPL**

1. Dr. Fagan wrongly claims that North Dakota oil production will remain stagnant at 936,500 barrels per day ("bpd") for the next two years.[1]  Oil production in North Dakota is *already* significantly above that level and increasing.  The U.S. Energy Information Administration projects Bakken productivity of more than 1.1 million bpd in May 2020 and June 2020 (200,000 bpd *higher* than Plaintiffs' estimate of North Dakota production over the next two years), and various government agencies project that global oil demand reached its lowest point in May 2020 (the point at which Plaintiffs assume demand will stay indefinitely) and that demand will almost recover fully to 2019 levels by the fourth quarter of 2020.[2]

2. Dr. Fagan wrongly claims there will not be any, or only "marginal and readily managed," losses to third parties from DAPL shutting down.[3]  There is absolutely no support for this claim.  Applying Dr. Fagan's own price estimates to the *correct* volumes that will be forced to shut in if DAPL closes (320,000 to 500,000 bpd), Dr. Jeff Makholm calculates her loss estimate to North Dakota producers as $5.26 billion to $8.21 billion through 2021.[4]

3. Dr. Fagan speculates, incorrectly, that any economic losses in the Bakken region may be offset by gains in other regions.[5]  This "zero sum" argument is absurd, and even ignoring the fundamental flaws of this premise, it is purely speculative and just plain wrong.  A loss to one third party is a loss, regardless of any speculative gains by another third party somewhere else.[6]  Dr. Fagan blithely assumes away numerous impacts—stranded fixed assets, upset supply agreements, closed highly-desirable routes (as in the direct line from the Bakken to Patoka and the Gulf Coast), and billions of dollars in lost tax revenue to states and Native American tribes—that all constitute un-recoupable losses to third parties if DAPL is shut down.[7]

4. Dr. Fagan erroneously claims that now is the right time to shut down DAPL.[8]  This defies all evidence and logic.  If anything, this is among the *worst* times to shut down DAPL.  North Dakota and the oil producers in the state have suffered tangible losses from the Russia/Saudi Arabia oil price dispute and the short-term shock to markets caused by the COVID-19

---

[1]  Fagan Report at 37.

[2]  Second Emery Dec. ¶ 10.

[3]  Fagan Dec. ¶ 11.

[4]  Second Makholm Dec. ¶ 7.

[5]  Fagan Dec. ¶ 7.

[6]  Second Emery Dec. ¶ 4.

[7]  *Id.*  ¶¶ 25-26, 30-31; *see also* D.E. 509-9, ¶¶ 28-29, 32 ("First Emery Dec."); D.E. 509-11, ¶¶ 32, 34 ("First Makholm Dec.").

[8]  Fagan Report at 6.

pandemic.[9]  To further erode industry expectations and already thin margins by shutting down a pipeline that has operated safely for three years would add to these harms and impede the recovery in demand, oil prices, and production that is already underway in North Dakota.[10]

5.  Dr. Fagan wrongly claims demand for DAPL will be reduced in a one-to-one ratio with decreased production.[11]  This is belied by actual data for nominations, which shows that demand for DAPL persisted even as production decreased, and nominations are increasing.[12] Nominations for June 2020 are more than ███ bpd—or more than █ percent of DAPL's maximum capacity.[13]

6.  Dr. Fagan claims that other pipelines can adequately transport most of DAPL's volume.[14]  This is false.  First, shippers use DAPL instead of other transportation options because of its specific qualities—it delivers crude oil to the right refineries in the right regions—and because they have made specific, long-term investments in reliance on DAPL that they cannot unwind.[15] The pipelines Dr. Fagan suggests *do not serve the same markets as* DAPL; indeed, when DAPL was being planned, shippers rejected those other pipelines in favor of DAPL's straight-line service to Patoka, Illinois.[16]  Shippers also rejected those pipelines when DAPL came online in 2017.  Plaintiffs suggested in 2017 that DAPL was unnecessary based on supposedly available rail and pipeline capacity in the Bakken region at the time, but shippers quickly committed to DAPL.[17]  Second, even if those other pipelines had capacity, Dr. Fagan has not shown that they connect to pipelines or other transportation options that have capacity to move the oil from those pipelines to their ultimate destination.[18]  And, third, even if there was another option, shipping on other pipelines may result in a degraded product as a result of grade mixing, which would cause further economic losses by reducing the value of the oil.[19]  As DAPL's customers attest, the barrels moving on DAPL will largely be shut-in rather than moved elsewhere.[20]

---

[9]  Second Emery Dec. ¶¶ 5(i), 10; Second Makholm Dec. ¶¶ 5, 9.

[10]  Second Emery Dec. ¶¶ 17-23.

[11]  *E.g.*, Fagan Report at 41.

[12]  Second Emery Dec. ¶¶ 11-12.

[13]  *Id.* ¶ 11, Fig. 3.

[14]  Fagan Report at 35-36.

[15]  Second Emery Dec. ¶¶ 30, 35.

[16]  *Id.*  ¶¶ 28-30.

[17]  *Id.* ¶ 7; D.E. 272-5, ¶¶ 7-12 ("Goodman Dec.").

[18]  Second Emery Dec. ¶ 33.

[19]  *Id.* ¶ 34.

[20]  Rangel Dec. (Continental Resources, Inc.) at 2; Second Doll Dec. (Enerplus Corp.) at 3-4; D.E. 501-3, ¶ 13 ("A shutdown of DAPL will likely require Hess to shut in a portion of its production in North Dakota."); Second Emery Dec. ¶¶ 18-21, 23.

# EMERY
# EXHIBIT 2

**F.E.R.C. I.C.A. Oil Tariff**    **F.E.R.C. No. 2.4.0**
(Cancels F.E.R.C. No. 2.3.0)

# DAKOTA ACCESS, LLC

## LOCAL PIPELINE TARIFF

Applying On
**CRUDE PETROLEUM
FROM POINTS IN NORTH DAKOTA
TO POINTS IN ILLINOIS**

Committed rates filed in compliance with the Commission's order in Docket No. OR14-42-000, 149 F.E.R.C. ¶ 61,275.  Uncommitted rates filed in compliance with 18 CFR §342.3, Indexing.

Governed by the rules and regulations published in Dakota Access, LLC's F.E.R.C Tariff No. 1.3.0, supplements thereto, and successive issues thereof.

[C]~~Issued on twenty seven (27) day's notice under authority of 18 C.F.R. § 341.14. This tariff publication is subject to refund pending a 30 day review period.~~

The provisions published herein will, if effective, not result in an effect on the quality of the human environment.

**ISSUED: MAY 31, 2019**    **EFFECTIVE: JULY 1, 2019**

Issued by:
Greg Mills, President
Dakota Access, LLC
1300 Main Street
Houston, TX 77002

Compiled by:
Diane A. Daniels
Dakota Access, LLC
1300 Main Street
Houston, TX 77002
(713) 989-7425
tariffs@sunocologistics.com

## TABLE OF RATES

**Uncommitted Rates:**

| From | To<br>Patoka, Illinois |
|---|---|
| **Rate is in dollars per barrel of 42 US gallons** | |
| An Origin Point that is an Eligible Bakken Origin Point* | **[I]** $6.5475 |

**Committed Rates for Bakken Crude Petroleum from a Committed Shipper's Selected Origin Point(s) that is an Eligible Bakken Origin Point* to Destination Point of Patoka, Illinois:**

| Volume Commitment Requirement (bpd) | Term | | |
|---|---|---|---|
| | **5 Years** | **7 Years** | **10 Years** |
| 3,500+† | **[I]** $5.5713 | **[I]** $5.5713^ | **[I]** $5.5713 |

**Notes:**

**\*    Eligible Bakken Origin Points:**

1)  **Bakken Field Points:**  The point(s) of origin established as selected origin points under the TSAs: Stanley, Mountrail County, North Dakota; Ramberg, Williams County, North Dakota, Epping, Williams County, North Dakota, Trenton, Williams County, North Dakota, Watford City, McKenzie County, North Dakota, and Johnson's Corner, McKenzie County, North Dakota.

2)  **Alternate Bakken Origin Points:**  Alexander Junction, McKenzie County, North Dakota, Trenton Junction, McKenzie County, North Dakota, and others as updated from time to time.

Provided that for any month during the initial term of a Committed Shipper's TSA, for the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA), with the selected destination point of Patoka, Illinois, such Committed Shipper's tariff rate for Bakken Crude Petroleum shall be **[I]** **$4.7754** per Barrel, subject to the same escalation and the notification and audit procedures in all TSAs, for the portion of the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) (a) received from the Pipeline by a carrier at Patoka, Illinois, in such month and (b) subject to a Patoka Delivery Point Verification as provided in such Committed Shipper's TSA under which such Committed Shipper warranted to Carrier that such Barrels shall thereafter be transported and delivery by a carrier with a point of origin at Patoka, Illinois (and through any additional carriers thereafter) to Roxana, Illinois, (WRB Refining, LLC Refinery), or to an Ohio/Michigan Location in accordance with the terms set forth in the TSAs.  Provided further that for any month during the initial term of a Committed Shipper's TSA, for the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) with the selected destination point of Patoka, Illinois, such Committed Shipper's tariff rate for Bakken Crude Petroleum shall be **[I]** **$5.0407** per Barrel, subject to the same escalation and the notification and audit procedures in all TSAs, for the portion of the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) (a) received from the Pipeline by a carrier at Patoka, Illinois, in such month and (b) subject to a Patoka Delivery Point Verification as provided in such Committed Shipper's TSA under which such Committed Shipper warranted to Carrier that such Barrels shall thereafter be transported and delivery by a carrier with a point of origin at Patoka, Illinois (and through any additional carriers thereafter) to a Southern Illinois-Indiana/Kentucky Location in accordance with the terms set forth in the TSAs.

^ Provided that in any month during the initial term of a Committed Shipper's TSA, for the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) with the selected destination point of Patoka, Illinois, the Committed Shipper's tariff rate for Bakken Crude Petroleum shall be **[I]** **$5.0407** per Barrel, subject to escalation and the notification and audit procedures in all TSAs, for the portion of the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA) received from the Pipeline by a carrier at Patoka, Illinois, in such month and delivered to any Patoka Adjustment Delivery Point, in accordance with the terms set forth in the TSAs; provided that if such Committed Shipper included a Patoka Delivery Point Verification with its Patoka Adjustment Notification in accordance with the provisions set forth in such Committed Shipper's TSA, verifying the downstream destination of the relevant portion of the Committed Shipper's Monthly Maximum Committed Entitlement or 110% of the Committed Shipper's Monthly Minimum Volume Commitment (as applicable based on the applicable TSA), then the Committed Shipper's tariff rate for the Barrels that the Committed Shipper warranted shall be delivered: (x) to Roxana, Illinois (WRB Refining,

LLC Refinery), a S IL-IN/KY Location or an Ohio/Michigan Location shall be **[I]** **$4.7754** per Barrel, subject to escalation and the notification and audit procedures in all TSAs; (y) to a Chicago Region Location shall be **[I]** **$4.6428** per Barrel, subject to escalation and the notification and audit procedures in all TSAs;
or (z) if applicable based on the applicable TSA, to a Canada Location shall be **[I]** **$4.5101** per Barrel, subject to escalation and the notification and audit procedures in all TSAs.

For purposes hereunder, "Patoka Adjustment Delivery Point" means, individually, any of the
following: Lemont, Illinois (CITGO Corp. Refinery); Joliet, Illinois (ExxonMobil Corp. Refinery); Whiting, Indiana (BP plc Whiting Refinery); Roxana, Illinois, (WRB Refining, LLC Refinery); Sarnia, Ontario (Imperial Oil Limited); Sarnia, Ontario (Nova Chemicals Corp.); Sarnia, Ontario (Suncor Energy Inc.); Sarnia, Ontario (Royal Dutch Shell plc, Corunna); Nanticoke (Imperial Oil Limited); Montreal, Quebec (Suncor Energy Inc.); Quebec City, Quebec (Valero Energy Corp., Jean Gaulin Refinery).

For purposes hereunder, "Chicago Region Location" means, individually, any of the following: Lemont, Illinois (CITGO Corp. Refinery); Joliet, Illinois (ExxonMobil Corp. Refinery); and Whiting, Indiana (BP plc Whiting Refinery).

For purposes hereunder, "Canada Location" means, individually, any of the following: Sarnia, Ontario (Imperial Oil Limited); Sarnia, Ontario (Nova Chemicals Corp.); Sarnia, Ontario (Suncor Energy Inc.); Sarnia, Ontario (Royal Dutch Shell plc, Corunna); Nanticoke, Ontario (Imperial Oil Limited); Montreal, Quebec (Suncor Energy Inc.); and Quebec City, Quebec (Valero Energy Corp., Jean Gaulin Refinery). A "Canada Location" is only available to the extent provided by a Committed Shipper's TSA.

For purposes hereunder, "Ohio/Michigan Location" means, individually, any of the following: Lima, Ohio (Husky Energy); Toledo, Ohio (BP-Husky Refining); Toledo, Ohio (PBF Energy); Canton, Ohio (Marathon Petroleum Corp.); Detroit, (Marathon Petroleum Corp.).

For purposes hereunder, "Southern Illinois-Indiana/Kentucky Location" means, individually, any of the following Robinson, Illinois (Marathon Petroleum Corp.); Mount Vernon, Indiana (CountryMark); and Catlettsburg, Kentucky (Marathon Petroleum Corp.).

† For all of a Committed Shipper's Excess Throughput Volumes (as defined in a TSA and to the extent permitted by the applicable TSA) nominated for Patoka, Illinois, the following rates shall apply:

| Volume Commitment Requirement (bpd) | 5 Years | 7 Years |
|---|---|---|
| 3,500+ | **[I]** $4.7754 | **[I]** $4.7754 |

The above rates for Excess Throughput Volumes are only available to the extent permitted by a Committed Shipper's TSA.

**Pipeline Loss Allowance**: As set forth in the local rules and regulations pipeline tariff, Item No. 20.

**OSHA H2S Fee**: When OSHA regulations require the presence of a second Carrier employee at a site because of H2S levels, an additional fee of **[U]** $0.1379 per Barrel will be assessed and collected. This fee may be waived if Shipper provides a permanent alternative mechanism to comply with such rules. Any alternative must be approved and agreed to by Carrier.

**EXPLANATION OF REFERENCE MARKS:**
[C]    **CANCELLED**
[I]    **INCREASED**
[U]    **UNCHANGED**

# EMERY
# EXHIBIT 3

**F.E.R.C. I.C.A. Oil Tariff**                    **F.E.R.C. No. 4.5.0**

(Cancels F.E.R.C. No. 4.4.0)

# DAKOTA ACCESS, LLC
## JOINT PIPELINE TARIFF
## In Connection With
## Energy Transfer Crude Oil Company, LLC

Applying On
**CRUDE PETROLEUM**
**FROM POINTS IN NORTH DAKOTA**
**TO POINTS IN TEXAS AND TENNESSEE**

Committed rates filed in compliance with the Commission's order in Docket No. OR14-42-000, 149 F.E.R.C. ¶ 61,275.  Uncommitted rates filed in compliance with 18 CFR § [W] <u>342.3, Indexing</u> ~~342.2(b), Initial Rate~~.

Governed by the rules and regulations published in Dakota Access, LLC's F.E.R.C Tariff No. 3.3.0, supplements thereto, and successive issues thereof.

**[C]** ~~Request for Special Permission~~

~~Issued on [W] less than one (1) twenty seven (27) days' notice under authority of 18 C.F.R. § 341.14. This tariff publication is subject to refund pending a 30-day review period~~.

The provisions published herein will, if effective, not result in an effect on the quality of the human environment.

**ISSUED: MAY 31, 2019**                    **EFFECTIVE: JULY 1, 2019**

Issued by:
Greg Mills, President
Dakota Access, LLC
1300 Main Street
Houston, TX 77002

Compiled by:
Diane A. Daniels
Dakota Access, LLC
1300 Main Street
Houston, TX 77002
(713) 989-7425
tariffs@sunocologistics.com

**[I] INCREASED.  ALL RATES INCREASED.**

## TABLE OF RATES
### ALL Rates in dollars per barrel of 42 US gallons

| UNCOMMITTED RATES FOR BAKKEN CRUDE PETROLEUM | | |
|---|---|---|
| **From** | **To**<br>**Nederland, Jefferson County, Texas**<br>(SXL Nederland Terminal or P66<br>Nederland Terminal) | **To**<br>**Collierville, Tennessee**<br>(Valero Terminal) |
| An Origin Point that is an Eligible Bakken Origin Point* | $8.1844 | $8.1844 |

**Committed Rates for Bakken Crude Petroleum from a Committed Shipper's Selected Origin Point(s) that is an Eligible Bakken Origin Point* to Destination Point of NEDERLAND, Texas – SXL Nederland Terminal**

| Volume Commitment (bpd)^ | Term | |
|---|---|---|
| | **7 Years** | **10 Years** |
| 3,500 – 29,999 | $6.8979** | $6.6326** |
| 30,000 – 49,999 | $6.6326** | $6.3672** |
| 50,000 – 69,999 | $6.3672** | $6.1019** |
| 70,000 – 89,999 | $6.3672** | $5.9428** |
| 90,000+ | $5.9428** | $5.8366** |

**[I] INCREASED.  ALL RATES INCREASED.**

**Committed Rates for Bakken Crude Petroleum from a Committed Shipper's Selected Origin Point(s) that is an Eligible Bakken Origin Point\* to Destination Point of NEDERLAND, Texas – P66 Nederland Terminal**

| Volume Commitment Requirement (bpd)\*^ | Term | |
|---|---|---|
| | **7 Years** | **10 Years** |
| 3,500 – 29,999 | $6.8979\*\* | $6.6326\*\* |
| 30,000 – 49,999 | $6.6326\*\* | $6.3672\*\* |
| 50,000 – 69,999 | $6.3672\*\* | $6.1019\*\* |
| 70,000 – 89,999 | $6.3672\*\* | $5.9428\*\* |
| 90,000+ | $5.9428\*\* | $5.8366\*\* |

**Notes:**

**\***     **Eligible Bakken Origin Points:**

    1) **Bakken Field Points:**  The point(s) of origin established as selected origin points under the TSAs: Stanley, Mountrail County, North Dakota; Ramberg, Williams County, North Dakota, Epping, Williams County, North Dakota, Trenton, Williams County, North Dakota, Watford City, McKenzie County, North Dakota, and Johnson's Corner, McKenzie County, North Dakota.

    2) **Alternate Bakken Origin Points:**  Alexander Junction, McKenzie County, North Dakota, Trenton Junction, McKenzie County, North Dakota, and others as updated from time to time.

**\*\***     For a Committed Shipper's Monthly Maximum Committed Entitlement, to the extent granted pursuant to an applicable TSA, to the extent that the Committed Shipper nominates and delivers (in accordance with the nomination procedures set forth in the Tariff and the Proration Policy) all or a portion of such volumes for a particular path at one or more of the

Illinois Destination Point(s) in a such month, then solely to the extent that committed capacity is available for such nominations due to the failure of other committed shippers who have selected the applicable Illinois Destination Point as their Selected Destination Point to nominate their full minimum volume commitment for such month, Committed Shipper's Committed Rate for Bakken Crude Petroleum for that portion of such volumes so delivered to such Illinois Destination Point(s) shall be, to the extent permitted under the provisions of Schedule B of the Committed Shipper's TSA regarding the availability of such rate, as follows, subject to escalation as provided in the Committed Shipper's TSA:

**[I] INCREASED.  ALL RATES INCREASED.**

| Volume Commitment Requirement (bpd)(1)^^ | Term | |
|---|---|---|
| | **7 Years** | **10 Years** |
| 3,500 – 29,999 | $5.8366** | $5.5713** |
| 30,000 – 49,999 | $5.5713** | $5.3060** |
| 50,000 – 69,999 | $5.5713** | $5.3060** |
| 70,000 – 89,999 | $5.5713** | $5.3060** |
| 90,000+ | $5.5713** | $5.3060** |

For the avoidance of doubt, with respect to a Committed Shipper's path with a Destination Point of a Nederland Destination Point, the above rate shall only be applicable to such portion of a Committed Shipper's nomination to an Illinois Destination Point that qualifies for the rate in accordance with the previous sentence and a Committed Shipper's TSA; otherwise, a Committed Shipper's rate for deliveries to the Illinois Destination Point shall be the committed rate for deliveries to such Nederland Destination Point set forth in the previous table.

The term "Illinois Destination Point(s)" shall be the following point(s) of destination under the Local Rates tariff of Dakota Access, LLC, FERC No. [W] 2.3.0 2.4.0: Patoka, Illinois.

^ With respect to any Committed Shipper that executed a TSA pursuant to an open season commenced by Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC, for all of such Committed Shipper's Excess Throughput Volumes (as defined in a TSA) nominated for a Nederland Destination Point, the following rates shall apply for all such Excess Throughput

Volumes that are within the specified volume ranges below, for such Committed Shipper's Minimum Volume Commitment tier and original term to the extent permitted under such Committed Shipper's TSA:

**[I] INCREASED.  ALL RATES INCREASED.**

| Volume Commitment Requirement (bpd) | Excess Throughput Volumes Range (applicable to Barrels in the below volume tiers as Tendered in a given month)† | Original Term | Rate |
|---|---|---|---|
| 3,500 – 29,999 | 30,000 – 49,999 | 7 years | $6.6856 |
|  |  | 10 years | $6.5264 |
|  | 50,000+ | 7 years | $6.4734 |
|  |  | 10 years | $6.3672 |
| 30,000 – 49,999 | 50,000 – 69,999 | 7 years | $6.4734 |
|  |  | 10 years | $6.2081 |
|  | 70,000+ | 7 years | $6.3672 |
|  |  | 10 years | $6.1019 |
| 50,000 – 69,999 | 70,000 – 89,999 | 7 years | $6.2611 |
|  |  | 10 years | $5.9958 |
|  | 90,000+ | 7 years | $6.1550 |
|  |  | 10 years | $5.8366 |
| 70,000 – 89,999 | 90,000 – 109,999 | 7 years | $6.1550 |
|  |  | 10 years | $5.8366 |
|  | 110,000+ | 7 years | $6.0489 |
|  |  | 10 years | $5.4652 |
| 90,000+ | 110,000 – 129,999 | 7 years | $5.7836 |
|  |  | 10 years | $5.5713 |
|  | 130,000+ | 7 years | $5.6775 |
|  |  | 10 years | $5.3060 |

† With respect to any Committed Shipper that executed a TSA pursuant to an open season commenced by Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC, Barrels in excess of such Committed Shipper's Minimum Volume Commitment, but below the volume tier(s) in this column shall be assessed the Committed Rate that is otherwise applicable to such Committed Shipper's committed volume.

^^ With respect to any Committed Shipper that executed a TSA pursuant to an open season commenced by Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC, for all of

such Committed Shipper's Excess Throughput Volumes (as defined in a TSA) nominated for an Illinois Destination Point (to the extent permitted under the applicable TSA), the following rates shall apply for all such Excess Throughput Volumes that are within the specified volume ranges below, for such a Committed Shipper's Minimum Volume Commitment tier and original term:

**[I] INCREASED.  ALL RATES INCREASED.**

| Volume Commitment Requirement (bpd) | Excess Throughput Volumes Range (applicable to Barrels in the below volume tiers as Tendered in a given month)‡ | Original Term | Rate |
|---|---|---|---|
| 3,500 – 29,999 | 30,000 – 49,999 | 7 years | $5.0938 |
| | | 10 years | $5.0407 |
| | 50,000+ | 7 years | $4.9877 |
| | | 10 years | $4.9877 |
| 30,000 – 49,999 | 50,000 – 69,999 | 7 years | $5.0407 |
| | | 10 years | $4.9877 |
| | 70,000+ | 7 years | $4.9877 |
| | | 10 years | $4.9346 |
| 50,000 – 69,999 | 70,000 – 89,999 | 7 years | $4.9877 |
| | | 10 years | $4.9346 |
| | 90,000+ | 7 years | $4.9346 |
| | | 10 years | $4.8816 |
| 70,000 – 89,999 | 90,000 – 109,999 | 7 years | $4.8816 |
| | | 10 years | $4.8285 |
| | 110,000+ | 7 years | $4.8285 |
| | | 10 years | $4.7754 |
| 90,000+ | 110,000 – 129,999 | 7 years | $4.7754 |
| | | 10 years | $4.7224 |
| | 130,000+ | 7 years | $4.7224 |
| | | 10 years | $4.6693 |

‡ With respect to any Committed Shipper that executed a TSA pursuant to an open season commenced by Dakota Access, LLC and Energy Transfer Crude Oil Company, LLC, Barrels in excess of such Committed Shipper's Minimum Volume Commitment, but below the volume tier(s) in this column shall be assessed the Committed Rate that is otherwise applicable to such Committed Shipper's committed volume.  The above rates for Excess Throughput Volumes are only available to the extent permitted by a Committed Shipper's TSA.

**Pipeline Loss Allowance**: As set forth in the joint pipeline tariff, Item No. 20.

**OSHA H2S Fee**: When OSHA regulations require the presence of a second Carrier employee at a site because of H2S levels, an additional fee of **[U]** $0.1379 per Barrel will be assessed and collected. This fee may be waived if Shipper provides a permanent alternative mechanism to comply with such rules. Any alternative must be approved and agreed to by Carrier.

**Nederland Out-Of-Path Rate:**  Notwithstanding the fact that no Nederland Destination Point shall be within the same continuous path of any other Nederland Destination Point, if Shipper has made a Minimum Volume Commitment for a path with a Nederland Destination Point as the Selected Destination Point, then Shipper may nominate and (subject at all times to the Proration Policy) Tender volumes for delivery to another Nederland Destination Point; provided that if Shipper so nominates and Tenders volumes and designates such nominations as nominations for such path, then (a) such Tendered volumes shall be counted toward Shipper's Monthly Minimum Volume Commitment for such path for the Month in which such volumes are so Tendered to Carriers; (b) for volumes that are so Tendered within Shipper's Monthly Maximum Committed Entitlement for such path, in addition to the then-effective Committed Tariff Rate applicable to such path, Shipper shall pay (i) twelve cents **[U]** ($0.12) per Barrel during each of the first three (3) years during the Term, then (ii) eight cents **[U]** ($0.08) per Barrel during each of the next three (3) years during the Term (if and as applicable), then (iii) four cents **[U]** ($0.04) per Barrels during each of the next three years during the Term (if and as applicable), then (iv) zero cents **[U]** ($0.00) per Barrel during each of the years remaining in the Term (if and as applicable).  The above referenced rates shall only be applicable to the extent provided in a Committed Shipper's TSA.

**<u>EXPLANATION OF REFERENCE MARKS:</u>**
**[I]**      **INCREASED**
**[U]**      **UNCHANGED**
**[W]**      **CHANGE IN WORDING**

# EMERY EXHIBIT 4



Chris W. Conway
Vice President, Commercial
925 N. Eldridge Parkway
Houston, Texas 77079
281-293-2035

June 6, 2020

To:     Honorable Judge James E. Boasberg
        United States District Court for the District of Columbia

Re:     Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)
        Letter in support of Dakota Access, LLC's Reply Brief Regarding Remedy

Dear Judge Boasberg:

ConocoPhillips Company ("ConocoPhillips") is one of the world's largest independent exploration and production (E&P) companies based on production and proved reserves. ConocoPhillips is one of the top five producing companies in the Bakken region.

This letter describes my professional assessment of the economic effects on ConocoPhillips and other producers if the Dakota Access Pipeline (DAPL) is shut down, and it responds to Plaintiffs' assertions that there is sufficient alternative takeaway capacity for current or anticipated Bakken production and that taking DAPL out of service will not affect upstream entities given the current economic climate and temporarily reduced oil demand.

DAPL represents more than 40% of the pipeline capacity available for transporting production from the Bakken area; industry consultants estimate that DAPL was running at near full capacity prior to the crisis. ConocoPhillips is a shipper on DAPL and on other pipelines that transport crude oil out of the region to key refining markets in the Rockies, Patoka, Cushing, and Gulf Coast markets. ConocoPhillips, among many others, have temporarily shut in certain wells in response to the unprecedented impact on demand from COVID-19. However, demand is returning, crude oil prices have risen, and production is already returning. ConocoPhillips has retained its staff in North Dakota in anticipation of resuming production relatively quickly.

Removing DAPL from service at this time would take away vital, cost-effective takeaway capacity at a time when economics are already very challenged. If producers, including ConocoPhillips are not able to efficiently get their Bakken production to a market where they can receive sufficient value for it, that crude oil may remain uneconomic to produce, causing companies to further delay the return to active investment. As a result, this would prolong the economic distress being experienced by many businesses, families and individuals who depend on the Bakken producing region for their livelihoods.

DAPL is a key element for the recovery of crude oil production activity in the Bakken region, and this important pipeline should remain in service.

Respectfully submitted,

DocuSigned by:

*Chris Conway*

C925A6BEB41D476

Chris W. Conway
Vice President, Commercial