**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
|        Plaintiffs, | |
|   and | |
| CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL., | |
|        Plaintiff-Intervenors, | |
|     v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
|        Defendant-Cross Defendant, | |
|   and | |
| DAKOTA ACCESS, LLC, | |
|        Defendant-Intervenor-Cross Claimant. | |

---

**DAKOTA ACCESS, LLC'S NOTICE OF FILING ON THE PUBLIC DOCKET
CERTAIN DOCUMENTS PREVIOUSLY FILED UNDER SEAL**

---

On June 8, 2020, Dakota Access, LLC ("Dakota Access") filed all declarations attached to its Reply Brief Regarding Remedy, D.E. 538-1, as attachments to its sealed Motion for Leave to File Under Seal, D.E. 538. That Motion contemplated a review and conferral process for identifying particular information appropriate for sealing that tracks the approach to which all parties ultimately agreed after Dakota Access filed its Opening Brief Regarding Remedy. By Minute Order dated June 9, 2020, the Court granted the Motion.

Dakota Access filed public versions of six declarations yesterday. *See* D.E. 542.

As for the remaining two declarations, Dakota Access seeks protection of certain material under the Protective Order.  All parties have agreed that Dakota Access will file them publicly with the redactions that Dakota Access proposes, leaving for a later date the possibility of another party challenging the redactions as overbroad.  Under the parties' agreement, until further order of the Court no party will include the information that Dakota Access has redacted in the declarations in any future public filing.  Until an order resolving any disagreement as to the scope of the redacted information, a party wishing to reference or quote the redacted information must do so in a separate, sealed filing.

Pursuant to that agreement, Dakota Access hereby files the public versions of the following declarations and associated exhibits.  Each exhibit is an attachment to the Declaration of William S. Scherman, D.E. 538-2.  One of the redactions in these public versions was added at the request of the U.S. Army Corps of Engineers.

- D.E. 538-3 – Ex. A, Second Declaration of Michael C. Aubele

- D.E. 538-4 – Ex. B, Second Declaration of John F. Godfrey

With today's filings, Dakota Access has completed the review and conferral process described in its June 8, 2020 Motion because public versions of all attachments to that Motion are now available on the docket.

Dated:  June 12, 2020

Respectfully submitted,

 /s/ William S. Scherman
William S. Scherman
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com
*Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of June, 2020, I electronically filed the foregoing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

  /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

STANDING ROCK SIOUX TRIBE; YANKTON
SIOUX TRIBE; ROBERT FLYING HAWK;
OGLALA SIOUX TRIBE,

        Plaintiffs,

  and

CHEYENNE RIVER SIOUX TRIBE; SARA
JUMPING EAGLE, ET AL.,

        Plaintiff-Intervenors,

      v.

U.S. ARMY CORPS OF ENGINEERS,

        Defendant-Cross Defendant,

  and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-Cross
        Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

---

**SECOND DECLARATION OF MICHAEL C. AUBELE IN SUPPORT
OF DAKOTA ACCESS, LLC'S REPLY BRIEF ON THE QUESTION OF REMEDY**

---

1.     My name is Michael C. Aubele.  I am Vice President, Environmental and Regulatory, with EXP Energy Services, Inc. in Houston, Texas.  My business address is 1800 West Loop South, Houston, Texas 77027.  I have previously submitted a declaration in this matter and my qualifications and work history are discussed therein.

2.     This reply declaration responds to assertions made in the brief and declarations filed by Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Plaintiffs" or the "Tribes") on May 20, 2020, including the declarations of Donald

Holmstrom, D.E. 527-5, Elliot Ward, D.E. 527-9, Steve Vance, D.E. 527-10, and Albert Two Bears, D.E. 527-11.

3.      Nothing the Tribes filed in any way changes my overall position that there would be no negative environmental impacts to the Tribes from the Dakota Access Pipeline ("DAPL") continuing to operate while the U.S. Army Corps of Engineers ("Corps") prepares an Environmental Impact Statement; nothing the Tribes filed changes my view that there would be significant, adverse environmental consequences to the Tribes and others in the region if DAPL were shut down.

4.      It cannot be stressed enough that shutting down the pipeline and requiring producers to get crude to market via other transportation means like rail would be equivalent to a major federal action with no regulatory oversight or environmental agency review or approval.  I compare and contrast below the significant gap that exists between the extensive safety measures in place governing DAPL versus the lack of anywhere near comparable safety measures applicable to rail transport of oil.  In particular, shifting DAPL's volumes to rail or truck would be done without *any* of the careful analysis that is required by the National Environmental Policy Act ("NEPA") and that was done for the pipeline.

5.      My conclusions, which I develop more fully in the remainder of this declaration, are as follows:

(a) Mr. Holmstrom deliberately misstates the effectiveness of DAPL's leak detection systems and best practices.  He claims that DAPL's Computational Pipeline Monitoring ("CPM") system has a low success rate, yet he relies *solely* on the same PHMSA study that itself could not verify operator reports that are the basis for Mr. Holmstrom's assertion.  Thus, wholly apart from his reliance on generic data rather than addressing *DAPL*, his generic criticisms rest on flawed and

incomplete data that do not permit the conclusions that he draws and misrepresents DAPL's leak detection capabilities. Mr. Holmstrom's statements in this regard do not meet professional standards. A more complete list of Plaintiffs' declarants' misstatements concerning DAPL's safety is attached as **Exhibit 1.**

He further claims that Dakota Access does not comply with API recommended practices, specifically API 1173, 1175, 1160, and 1130. Yet Dakota Access and the Corps have repeatedly provided evidence in this proceeding and others that Dakota Access, in fact, employs those voluntary recommended practices. This evidence, which has been produced in other proceedings, is attached to Mr. John Godfrey's second declaration. Because Mr. Holmstrom has participated in those other proceedings, he is aware of this compliance.

Additionally, the Corps' Remand Analysis explicitly states that ETP "modeled, configured, and tuned the LeakWarn CPM system . . . in accordance with . . . API-RP-1130 guidance," RAR 126. Further, Mr. Holmstrom claims there is no evidence of any testing of DAPL's CPM system, but the Remand Analysis has numerous references to how ETP evaluates the effectiveness of its leak detection systems. *See, e.g.*, RAR 274. Mr. Holmstrom also wrongly claims that DAPL would not typically initiate pipeline shutdown and isolation upon detection, but he offers no conceivable basis for claiming there would be a delay between an alarm sounding and shutdown. In particular, he ignores that many of DAPL's systems would *automatically* shut down in the event of a hypothetical worst-case discharge ("WCD") incident. He further ignores the fact that DAPL detects leaks using a multifaceted approach. Again, consciously ignoring these facts, including that Dakota Access has adopted each recommended API practice for which he states the operator has not, is unconscionable.

(b)  Extensive modeling that Dakota Access has already completed is able to inform the Corps' analysis of the impacts of a hypothetical spill when preparing an Environmental Impact Statement.  DAPL's overly conservative modeling shows that a full-bore rupture, even if released at the bottom of the Lake bed, would not affect the Tribes' water supply and only temporally affect hunting and fishing resources within the Lake, even if the release went unmitigated for 10 days— an event that would never happen.  In this unlikely and really inconceivable scenario, measures required to be taken by Dakota Access would further isolate the incident with response and remediation as outlined in the Facility Response Plan ("FRP") and Geographical Response Plan ("GRP").  Plaintiffs attempt to raise the proposed increase in DAPL's throughput to 1.1 million barrels per day ("bpd") as a way to discredit the work that has already been done in this case.  This Optimization still awaits state approval.  In any event, initial modeling shows that the Optimization would not have significantly different downstream impacts.  The WCD at Lake Oahe would increase by less than ███ barrels to approximately ███ barrels (while the capacity will increase by nearly 100%, the WCD will increase by ██████ ).  As the geographic extent of the full-bore rupture is more dictated by river flow than release volume, the downstream distance impacts are similar to that modeled for the 600,000 bpd WCD relevant to this proceeding.  For the same reasons, the FRP and the GRP will also remain informative and would only require minimal updates for the Optimization if it were to move forward.

(c)  DAPL's spill response planning is very comprehensive.  Most significantly, DAPL is prepared to respond to a ████ -barrel spill at any point along the pipeline, including Lake Oahe. Dakota Access has developed a site-specific GRP for the Lake Oahe crossing that the Corps has thoroughly vetted and reviewed.  Dakota Access has updated the GRP numerous times throughout this proceeding to address concerns raised by the Corps and the Plaintiffs as well as new

information that has become available through additional studies such as the detailed spill modeling. Indeed, the GRP is a living document that Dakota Access continuously updates as necessary and appropriate. Mr. Holmstrom calculates WCDs using "hypothetical" volumes that vastly overstate the size of any possible incident at Lake Oahe. Mr. Holmstrom *could* calculate the *proper* volumes if he wanted to, but instead he uses figures that are plainly and deliberately inaccurate. And despite these inaccuracies, *Mr. Holmstrom's exaggerated "hypothetical" WCDs are still less than the volume to which DAPL is prepared to respond.*

Mr. Ward likewise makes several false assertions about Dakota Access's spill response planning and coordination. For example, Mr. Ward claims he has never received the site-specific Lake Oahe GRP or the applicable FRP from Dakota Access. This is just untrue. **Exhibit 2** is a December 8, 2018 email from Mr. Carl Borkland of Dakota Access's response planning team to Mr. Ward which included the GRP as an attachment. This was not the first time that Dakota Access provided Mr. Ward with the GRP and the FRP—the company also provided him with copies of these documents on October 24, 2017. *See, e.g.*, D.E. 298-1, ¶ 2 (Declaration of Carl Borkland, then Vice President for Environmental Projects & Emergency Response Planning at Energy Transfer Partners, stating he "provided copies" of the GRP and FRP to Mr. Ward on October 24, 2017). The Tribes, moreover, have received these documents several other times from both Dakota Access and the Corps (and they turned down even more opportunities than those). *See* First Aubele Decl., D.E. 504-3, ¶ 21. Furthermore, in February 2018, the Corps provided the Standing Rock Sioux Tribe with a revised GRP addressing the Tribes' comments, *see* RAR 6594, yet Mr. Ward bases his comments on the 2015 GRP prepared in the early planning phase of DAPL. For whatever reason, he simply fails to acknowledge that revised plans have been provided multiple times for his review. All of this correspondence is well documented in this proceeding.

*See, e.g.*, D.E. 456, Dakota Access Cross-Motion for Summary Judgment at 59-62. Dakota Access has made every attempt to coordinate with the Tribes, involve the Tribes in its spill response planning, and incorporate the Tribes' comments after the Tribes ultimately provided them.

Mr. Ward also claims that the WCD in the FRP is "understated" and "violates PHMSA," yet both the ▮▮▮▮-barrel WCD and the Lake Oahe-specific WCD were prepared in accordance with PHMSA regulations, and PHMSA subsequently approved them. *See* RAR 16849 (citing 49 C.F.R. § 194.105); D.E. 277-1 at 39 (Feb. 23, 2017 Letter from PHMSA finding the FRP "complies with PHMSA's regulations concerning onshore oil pipelines"); Stamm Dec., D.E. 509-5, at 112 (Jan. 20, 2020 Letter from PHMSA finding the FRP "complies with PHMSA's regulations concerning onshore oil pipelines").

Mr. Ward also falsely claims that the FRP and GRP do not address the properties of Bakken crude or plans to remediate oil in the water column; but, in reality, both the FRP and GRP provide specific information on Bakken crude oil, and the GRP includes procedures for cleaning up oil in the water column. *See* RAR 16758-66 (describing unique hazards of Bakken crude oil); RAR 6761-62 (explaining how a team uses an interface probe to determine if Bakken crude oil is below the surface); RAR 6667-68 (describing containment and recovery methods for spills under ice); RAR 6683 (describing the "[u]se of additional boom containment" to capture "fluids migrating from the collection point due to entrainment"). Mr. Ward attempts to overstate the severity and likelihood of oil entrainment in his declaration, but the Spill Model shows that even though entrainment may occur under high wind conditions, RAR 8073, droplets were typically contained within the top 5 meters with further resurfacing, which would be contained by methods articulated in the GRP. *See* RAR 6683; *see also* RAR 8270 ("[T]he maximum predicted concentrations of hydrocarbons in the water column were 0-5 meters.").

Mr. Ward also misrepresents the GRP and FRP by stating that "the FRP includes a 'site' safety plan acknowledged as 'generic.'" Second Ward Dec., D.E. 527-9, ¶ 4. In fact, the 2016 FRP states: "This Generic Health and Safety Plan is meant to provide an overview of site safety practices and procedures that will be implemented at chemical release/spill sites. Specific site conditions may result in the development of specific site safety plans to inform and protect site personnel, the public, and the environment. In any case, prior to commencing response activities involving hazardous materials or hazardous conditions, an informational meeting is held to review with response personnel the site conditions, hazards, hazard assessment methods, hazard reduction procedures, decontamination procedures, and emergency contingency plans relative to the site." RAR 16787. The GRP additionally includes site-specific safety concerns and considerations for each and every control point identified along Lake Oahe and includes a detailed Air Monitoring Plan in compliance with OSHA requirements. *See* RAR 6650; RAR 6664; RAR 6767-76.

Finally, Mr. Ward attempts to confuse matters further by referring to flammability information in the Safety Data Sheet ("SDS") for Bakken crude that is appended to the GRP and FRP. This SDS was not prepared by Dakota Access and includes information for both the Global Harmonized System ("GHS") and National Fire Protection Association ("NFPA") ratings. These two systems are not in conflict, as Mr. Ward undoubtedly is well aware. GHS is for normal conditions, and the NFPA ratings are for emergency personnel responding to a spill or fire. These differences are widely understood by competent experts.

(d) Dakota Access recognizes the significance of the waters of the Missouri River and Lake Oahe to the Tribes. But it is simply wrong for Plaintiffs to assert that no safeguards are in place to prevent an incident or to provide complete remediation in the extremely unlikely event one occurs. As I and others have explained, comprehensive historical PHMSA data that includes

older and less safe pipelines shows that the likelihood of a major pipeline incident at the Lake Oahe segment is infinitesimally small, nearly a *1 in 200,000 years* event.  And if that once-in-200,000-years event occurred, the conservative modeling shows that if the WCD volume was released from a full-bore rupture at the bottom of the Lake (when the pipeline is instead more than 90 feet below the Lake's bed) and then traveled downstream unmitigated for 10 days, it still would *not* affect the Tribes' water supply and would, at worst, only temporarily affect the use of a small portion of the Lake.  Thus, there is no support for the concern about completely unavailable access to the Missouri River and Lake Oahe even under these very hypothetical scenarios.  Moreover, drills and exercises show that Dakota Access would respond to a spill well within the six hours required by PHMSA, thereby further minimizing the downstream impacts, and the company is committed to bearing the burden of any such unlikely impacts.

(e) Shutting down DAPL would have negative environmental and safety impacts on Plaintiffs and other communities.  Plaintiffs' assertions of *no* safety risks to shutting down the pipeline are simply untrue.  Diverting the oil from pipeline to rail or truck would result in harmful environmental and safety effects that Plaintiffs have not meaningfully disputed.  And shutting down the pipeline would also increase the risk of an incident in the heart of the Standing Rock Reservation, as crude oil would likely once again traverse the Missouri River at Mobridge, South Dakota by rail, which indisputably has a higher incident rate than pipelines generally (and this pipeline in particular).  The record shows that pipelines are the least environmentally impactful means to transport oil and that alternative transport will have a greater potential for direct and significant environmental and safety impacts.

**<u>Environmental Effects on the Tribes if DAPL Continues to Operate</u>**

6.      As I previously explained, DAPL is a state-of-the-art pipeline, and one of the safest ever built due to its construction and design, advanced leak detection systems, comprehensive spill

response, and extensive mitigation and remediation procedures.  First Aubele Dec., D.E. 509-3, ¶¶ 7-27.  Plaintiffs' experts criticize DAPL's advanced leak detection systems, comprehensive spill response, and mitigation and remediation efforts, all of which I fully refute below.  And DAPL has provided ample evidence that should satisfy the Court that its concerns about the Corps' failure to fully address some of these issues can and will be resolved on remand.  But aside from these issues, Mr. Holmstrom primarily attacks Energy Transfer's safety record.  *See, e.g.*, Third Holmstrom Dec., D.E. 527-5, ¶ 9.  It is my understanding that Mr. Godfrey responds specifically to those unwarranted and misleading criticisms.  Those responses aside, Mr. Holmstrom ignores DAPL's unblemished safety record over its three years in operation.  During that time, there has not been a single leak on the approximate 1,200 miles of DAPL mainline.

### *Construction and Design Methods Contribute to Safety*

7.     DAPL's construction and design nearly eliminate any conceivable risk of oil reaching the water in Lake Oahe, even under the most extreme circumstances.  As I previously explained, the pipeline was installed via horizontal directional drilling ("HDD"), more than 90 feet below the bottom of the Lake.  First Aubele Dec., D.E. 509-3, ¶ 8.  Plaintiffs offer no counter to the reality that installation of the pipeline at such depths "'virtually eliminate[s] the ability of a spill to interact with the surface water.'"  RAR 13.  Moreover, Plaintiffs neither dispute that pipelines installed via HDD have a lower risk of incident than the already extremely low risk of an incident in general, nor that "the likelihood of a failure at an HDD crossing is extremely low." RAR 19. The Corps has agreed that the risk of a large spill is "extremely low," USACE_DAPL 71311, and that the chance of oil actually reaching the Lake itself is "even lower," RAR 58.

8.     In addition, Dakota Access built DAPL with the Supervisory Control and Data Acquisition ("SCADA") system that polls extensive data covering pipeline pressure, flow, temperature, and other indicators such as density every six seconds and provides it to the CPM

system.  First Aubele Dec., D.E. 509-3, ¶ 11; *see also* Stamm Dec., D.E. 509-5, ¶ 7.  Mr. Holmstrom claims that DAPL's CPM system has a low success rate.  He relies on a PHMSA study to claim that *generic* CPM systems "only had a successful detection rate of 20% for hazardous liquid spills."  Third Holmstrom Dec., D.E. 527-5, ¶ 55.  Apart from the very key fact that this does not address *DAPL's* CPM system, it ignores the PHMSA study's acknowledgement that operator reports supplying the data for this study were not verified and could be "incorrect," "flawed," or "incomplete," and, moreover, that the study's author expressly declined to offer any "conclusions or recommendations" or "probabilistic analysis."[1]   In addition, Mr. Holmstrom ignores that the study merely means that operators report other methods (including other detection systems) as detecting some leaks sooner, not that their CPM systems failed to detect the leaks. This point is consistent with the fact that DAPL's CPM system is able to detect a 0.75% leak or smaller within 45 minutes.  Stamm Dec., D.E. 509-5, ¶ 9.

9.     Mr. Holmstrom additionally asserts that DAPL's detection systems do not comply with API recommended practices, namely API 1130, which provides for testing of leak detection systems through actual or simulated withdrawal of pipeline hazardous liquids, and that there "is no evidence in the remand record of any actual CPM performance testing or results."   Third Holmstrom Dec., D.E. 527-5, ¶¶ 57-58.  Mr. Holmstrom is simply wrong.  As I previously stated, the Remand Analysis specifically states that "ETP modeled, configured, and tuned the LeakWarn CPM system specific to the DAPL installation facilities, to include elevation profiles and pipeline maximum operating pressure in accordance with PHMSA requirements and API-RP-1130 guidance."  RAR 126.  Mr. Holmstrom also claims that that there is "no evidence in the remand record of any actual CPM performance testing or results."  Third Holmstrom Dec., D.E. 527-5,

---

[1]  PHMSA, Leak Detection Study, at 2-6, 13-17 (2012), https://bit.ly/2VoDtAY.

¶ 58.   This is also wrong.   The Corps has explained that "ETP will evaluate the effectiveness of the leak detection system following the guidelines set forth in API-RP-1130," RAR 173, and that "ETP has an ongoing maintenance, inspection, and integrity testing program to monitor the safety of the DAPL pipeline system."   RAR 257.   The Corps further explained that "ETP evaluates the effectiveness of the leak detection systems through simulated leak tests, actual leak tests, or the analysis of confirmed releases."   RAR 274.   Mr. Holmstrom ignores the evidence that "ETP performed the simulated leak tests by electronically overriding the computers to simulate a leak condition, whereas the actual leak tests were performed by removing product from the pipe."   *Id.* And he ignores that ETP then "evaluates the results of each of these tests, and the response to actual releases (if applicable) to optimize the system capabilities, refine the product release tolerances, validate the response times, and further train the control room operators."   *Id.*

10.     Mr. Holmstrom additionally claims that Dakota Access does not comply with other API recommended practices, namely API 1173, 1175, 1160, and 1130.   This too is wrong.   Dakota Access has repeatedly provided evidence in this proceeding and others that it does, in fact, employ those voluntary recommended practices.   Incredibly, Mr. Godfrey's second declaration attaches this evidence, which has been produced in other proceedings in which Mr. Holmstrom has participated.   Mr. Holmstrom therefore undoubtedly is aware that Dakota Access employs all of these voluntary recommended practices; yet, he and Plaintiffs continue to falsely claim that Dakota Access does not.   This again fails to comport with professional standards.

11.     Mr. Holmstrom further claims that "[l]eak detection systems do not typically initiate pipeline shutdown and isolation" and that detection of a "pinhole leak" under the 1% detection "is very likely being hindered by ineffective control center human and organization factors."   Third Holmstrom Dec., D.E. 527-5, ¶¶ 59-60.   This ignores the evidence submitted in

this proceeding.  *See, e.g.*, RAR 126 (explaining how CPM detects "leaks down to 1 percent or better of the pipeline flow rate within a time span of approximately 1 hour or less and capable of providing rupture detection within 1 to 3 minutes"); RAR 127 ("While the alarm threshold may be 1%, the SCADA and LeakWarn systems are sensitive to smaller changes in flow rate and pressure. DAPL Pipeline controllers are trained to shutdown pipelines and investigate when there is any doubt regarding the alarming of the possible presence of a release/leak."); Stamm Dec., D.E. 509-5, ¶ 9 (explaining that DAPL's CPM vendor has provided evidence showing the system is able to detect a 0.75% leak or smaller within 45 minutes).

12.     As Mr. Godfrey explains, DAPL's system will detect a full-bore rupture almost immediately due to the sudden, significant change in flow and pressure.  When this happens, SCADA and CPM will alarm to quickly alert the pipeline controllers; downstream pump stations will independently alarm and shut down due to a loss of suction pressure; and upstream pump stations will trigger alarms to the control center and shut down due to excessive flow rate.  These shutdowns, Mr. Godfrey explains, will occur *automatically* as a result of local instrumentation and programmable logic controllers at pump stations.  Despite the fact that a full-bore rupture will be detected almost immediately, all of DAPL's WCD calculations build in time to both *detect* the rupture and *shut down* the pipeline.  Assertions to the contrary are simply wrong.  *See, e.g.*, RAR 254  (It will take 9 minutes to "detect a break on the line and shutdown pumps," which "includes 1 minute for time of detection"); USACE_DAPL 74723 (explaining that "leak-detection" was one of the "primar[y]" determinants of "[s]pill volume"); USACE_DAPL 74721 ("[d]etection" and "[s]hutdown" time of 12.9 minutes included 9 minutes for detecting the spill and shutting down the pumps).

13.     In addition, as Mr. Godfrey also explains, while a full-bore rupture will likely be detected faster than a "pinhole" leak of less than 1% of the pipeline's flow, DAPL's unparalleled instrumentation and layers of oversight on top of that ensure that the smaller leak would be detected long before the volume released could come close to the level of the WCD.  And again, as I have already mentioned, DAPL's CPM vendor has provided evidence that a leak as small as 0.75% can be detected in less than 45 minutes, versus a full-bore rupture, which can be detected almost instantaneously.

14.     Mr. Holmstrom similarly claims that it "could take days to discover" a leak in "ice conditions" if "power is unavailable."   Third Holmstrom Dec., D.E. 527-5, ¶ 65.  But Mr. Holmstrom's statement falsely portrays something that simply could not happen.  The Corps' easement requires that Dakota Access maintain backup power for communications with its CPM and SCADA systems at the valves on either side of Lake Oahe.  USACE_ESMT 39.  Even if the power for remotely operating the valves at Lake Oahe somehow temporarily failed, the backup power would still allow Dakota Access to monitor the pipeline at the Lake, detect a leak, and shut down the pumps and upstream valves if necessary.  And, in the unlikely event that the backup power were somehow rendered inoperable, a technician is prepared to travel onsite to inspect and manually operate the valves if necessary.  Moreover, as I and others have explained, DAPL's CPM and SCADA systems are only *one* aspect of Dakota Access's multifaceted approach to leak prevention, detection, and response, which includes, for example, weekly aerial patrols, coordination with third-party in-line inspections, maintenance "pigging" by field personnel, and corrosion control programs.  First Aubele Dec., D.E. 509-3, ¶¶ 11-12; Stamm Dec., D.E. 509-5, ¶¶ 10-11.  Indeed, as Mr. Godfrey explains, Dakota Access's personnel visit every facility along

the pipeline at least twice a day, and are constantly patrolling up and down the pipeline visiting each mainline valve every few days.

15.     Neither Mr. Holmstrom nor Plaintiffs can point to a single instance in which a leak of the size they postulate went *undetected* by a pipeline's CPM and SCADA systems.  Instead, the most they can point is one incident on another pipeline where human error contributed to a leak continuing after it was detected.  *See, e.g.*, D.E. 456, Dakota Access Cross-Motion for Summary Judgment, at 31.  Dakota Access's procedures are designed to prevent any such events happening on *this pipeline* and at *this segment at Lake Oahe in particular*.  Moreover, the undisputed facts are that *this pipeline has not had a single leak on more than 1,200 miles of mainline, which includes the Lake Oahe segment, in its three years of operation*.  And, the facts also show that *this pipeline is capable of detecting leaks down to a fraction of 1% of its flow in less than an hour*, dispelling Mr. Holmstrom's and Plaintiffs' concerns of a hypothetical and highly unlikely undetectable leak.

***Conservative Modeling Indicates Low Likelihood of Environmental Effects from a Spill***

16.     Even under the most conservative of multiple hypothesized circumstances, none of the Tribes' water intakes would be affected by even a full-bore rupture, even if no steps were taken to contain it for *10 days*.  PHMSA-approved modeling software showed that oil would get no closer than 25 miles upstream of the Standing Rock Sioux Tribe drinking water intake near Mobridge, South Dakota.  RAR 8072.  In addition, "the maximum predicted concentrations of hydrocarbons in the water column were in the surface 0-5 meters," and "[c]oncentrations within the water column decrease rapidly as depth increases . . . until near zero values were predicted at depths greater than 10 m[eters]."  RAR 8270.  As the modeling explains, this "would imply that water intakes such as the Standing Rock Sioux Tribe drinking water intake would therefore likely not be affected by the modeled releases," RAR 8270, for *two* reasons: the intake is located 75 miles downstream of the release point, and thus was "not predicted to be impacted within the 10 day

modeled period," RAR 8271, and, even if it were within the modeled period, the depth of the

Standing Rock Sioux Tribe intake is understood to be 18.3 to 24.4 meters and thus far below where

near-zero values of hydrocarbons were found.  RAR 8267.

17.     Similarly, and as I have explained before, the Downstream Receptor Report

evaluated this modeling to determine impacts on hunting and fishing, among other things, in the

unlikely event of an incident.  For game species, the Downstream Receptor Report concluded that

"the impact to hunting in the area from an oil spill would be minimal and of a temporary short

duration," due to behavioral responses of terrestrial game species, unimpacted alternative habitat

available nearby, and the limited total area that could be affected.  RAR 2744.  For fishing, the

Downstream Receptor Report similarly concluded that "even under the worst case unmitigated

discharge scenarios, impacts to benthic macro-invertebrates and fish species would be of limited

scale and of temporary duration and therefore impacts to fishing in the area would also be limited."

*Id.*  Moreover, as evidenced by the comprehensive mitigation and response measures, Dakota

Access is committed to bearing the full financial burden of a spill, in the unlikely event that one

occurs.  *See* First Aubele Dec., D.E. 509-3, ¶¶ 26-27.  Dakota Access is committed to minimizing

impacts to hunting, fishing, recreation and cultural use, and to restoring, replacing, and acquiring

"the equivalent natural resources" affected by a hypothetical spill.  RAR 2849.  While it is highly

unlikely that any of the Tribes' food or water sources would be affected, Dakota Access would

"restore, replace, or acquire the equivalent natural resources in accordance with the Oil Pollution

Act of 1990," which provides that the owner or operator is liable for the costs associated with the

containment, cleanup, and damages resulting from a hypothetical spill.  *Id*.  Moreover, Dakota

Access "maintains financial responsibility for the duration of the response actions," and it has

dedicated significant financial resources to remediating any harm, including $6.8 billion in insurance coverage.

18.     To distract from reality, the Tribes point to DAPL's plans to optimize the pipeline to transport up to 1,100,000 bpd.  Third Holmstrom Dec., D.E. 527-5, ¶ 68.  The Tribes claim that "doubling the capacity of the pipeline renders all of the previous analysis about spills and risks obsolete" and that the Corps "must effectively start major portions of the analysis over."  D.E. 527, at 17.  But the Tribes' claims are unfounded, particularly because the Optimization, which involves only the improvement of pumping facilities, is not a foregone conclusion.  Illinois, for example, has not approved DAPL's Optimization proposal.  Mr. Holmstrom, therefore, is purely speculating when he claims that the Tribes' safety concerns would be even greater if DAPL moved ahead with the Optimization.  Third Holmstrom Dec., D.E. 527-5, ¶ 66.

19.     As previously stated above, Dakota Access has performed preliminary spill modeling in connection with the proposed Optimization that addresses hypothetical unmitigated releases based on an updated proposed flow rate of 1,100,000 bpd.  This modeling relies on conservative assumptions used in the spill modeling before this Court, including modeling a full-bore rupture released at the sediment/water interface, despite the pipeline's placement 92 feet below the Lake bed, and without accounting for anti-siphoning effects.  The preliminary optimization modeling uses a worst-case discharge of ███[2] barrels, calculated in accordance

---

[2]  The reason the Optimization WCD is not "double" the size of the original WCD is simple. One component of the calculation is the amount of oil that would continue to flow through the pipeline after an incident until the pumps would be shut down.  This portion of the calculation—which includes time to detect an incident, shut down the pumps and isolate the segment by closing the valves—is increased in the Optimization because the flow rate is higher.  The second and largest part of the original calculation—the amount of oil that can drain down after the segment is isolated—is the same under either scenario because the amount of oil involved does not depend on flow rate. *See, e.g.*, Holmstrom Third Decl., D.E. 527-5, n.65 (showing that drain-down is the same in multiple WCD calculations).

with PHMSA regulations, including time to detect, shut down, and isolate the pipeline segment, and reveals that the proposed Optimization throughput would not result in significantly different environmental impacts than the modeling for the original 600,000 bpd flow rate, as reflected in the following table.  This makes sense as the geographic extent of impacts from a hypothetical incident would be more dictated by the river flow than the volume of oil released.

**Table 1: Comparison of Impacts of WCDs for 600,000 bpd and 1,100,000 bpd Flows**



20.     While Dakota Access continues to refine its modeling in connection with the proposed Optimization, the current results indicate that the Corps will not be starting from scratch. Moreover, the WCD used for the Optimization modeling is within approximately ▮ barrels of Mr. Todd Stamm's estimate of additional spill under a hypothesized scenario in which the closest valves to Lake Oahe do not shut.  As Mr. Stamm explained, that scenario—which was raised by the Tribes and this Court as the worst, worst-case scenario—would be a spill of ▮ barrels at Lake Oahe.  Stamm Dec., D.E. 509-5, ¶ 41.  Thus, the worst, worst-case scenario, which assumes

multiple independent failures in excess of PHMSA regulations and involves a release volume only about ███ barrels higher than the Optimization modeling (just ███ more), is unlikely to result in any significant modeling outcomes, further suggesting that the Corps' conclusions with regard to granting an easement under Lake Oahe during the remand will remain the same.

***Response Procedures Plan for Spills Larger than Those Likely to Occur at Lake Oahe***

21.     As I previously explained, DAPL approached its spill response planning conservatively and worked diligently to develop response plans and implement protective measures in the unlikely event of a spill. *See* First Aubele Dec., D.E. 509-3, ¶¶ 20-25.  The FRP, which covers DAPL's North Response Zone, including all of North Dakota, contains notification procedures, spill mitigation procedures, and containment and recovery methods for different types of spills, including spills under ice, at each point along the pipeline.  *See generally* RAR 16807-17091.  In accordance with PHMSA regulations, the FRP's procedures are designed to respond to a hypothetical release of ███ barrels, which represents "the worst case scenario" at any point along the pipeline.  RAR 16850 (underscore omitted).  This means that at every location, including Lake Oahe, DAPL is prepared to respond to a spill of ███ barrels, or ███ the size of the modeled WCD that has been specifically calculated for Lake Oahe.  Dakota Access additionally developed the GRP, specific to Lake Oahe, to plan the response in the highly unlikely event of a spill at the crossing.  *See* RAR 6642-6886.  The GRP requires that sufficient resources and materials, such as containment equipment, be pre-positioned for rapid deployment in the event of a release.  Dakota Access is overly prepared and has these materials staged at the river and ready for use in the unlikely event it ever has to respond to an incident at Lake Oahe.

22.     Mr. Ward claims that the FRP and GRP are deficient, yet he offers no basis for those views and from his declaration it appears he never reviewed the updated response plans that have been provided directly to him and to the Tribes on multiple occasions as part of this

proceeding.   Mr. Ward claims that Standing Rock "has never been involved in DAPL's spill response planning, nor have they provided a copy of the Spill Response Plans or Emergency Plans." *See* Second Ward Dec., D.E. 527-9, ¶ 4.  This is false as I have already documented.  First Aubele Dec., D.E. 504-3, ¶ 21.   Standing Rock—and Mr. Ward in particular—received and otherwise had access to both the FRP and GRP *many* times.  For example, on December 8, 2018, Mr. Carl Borkland of Dakota Access's response planning team emailed Mr. Ward proposing an initial emergency response planning meeting and attaching the most current draft of the GRP.  *See* **Exhibit 2**; *see also* D.E. 339-2 at 6 (same).  This is not the only time Mr. Ward was corrected for the same false statement with proof that Dakota Access provided the GRP and FRP to Mr. Ward. Mr. Borkland also filed declarations with this Court explaining that he provided copies of the GRP and FRP to Mr. Ward on October 24, 2017.   *See* D.E. 298 at 2; D.E. 298-1, ¶ 2 (Borkland Declaration, stating he "provided copies" of the GRP and FRP to Mr. Ward on October 24, 2017). In fact, Mr. Borkland documented his frequent communications with Mr. Ward in spill response planning.   *See* D.E. 288-1, ¶ 2 (Borkland Declaration, explaining that he has been in "direct contact" with Mr. Ward since October 31, 2017).

23.     Moreover, as I explained in my prior declaration, Dakota Access attempted to work with Standing Rock in good faith, as directed by this Court, to update its response planning documents, including the FRP and GRP, so that the company could consider the Tribe's environmental, cultural, and safety concerns.  *See* First Aubele Dec., D.E. 509-3, ¶ 21.   In furtherance of those efforts, Dakota Access attempted to meet with Standing Rock and others at least three times from January to March 2018 to collaborate on spill response planning, bringing unredacted plans and modeling to these meetings for the Tribes to retain and review.  RAR 240. But it was the Tribes that chose not to participate—going so far as to appear for one meeting only

to say they wouldn't participate and then refusing to take or even look at the materials offered for their review.  *See id.*; *see also, e.g.*, D.E. 456, Dakota Access Cross-Motion for Summary Judgment, at 59-62.  After the Tribes refused to participate in those meetings and receive copies of the GRP and FRP, the Corps provided an updated draft of the GRP to the Tribes on February 23, 2018.  RAR 6594.  Mr. Ward's statements fail to comply with professional standards.

24.     Mr. Ward next claims that the FRP's WCD for Lake Oahe is "grossly understated" and "violates PHMSA's minimum requirements for calculating the WCD."  Second Ward Dec., D.E. 527-9, ¶¶ 6, 10.  This too is wrong.  Dakota Access prepared the ▮▮▮▮-barrel figure for the FRP in accordance with PHMSA regulations, which require an operator to identify the largest volume using the "capacity of the single largest tank or battery of tanks within a single secondary containment system" "[i]f the response zone contains one or more breakout tanks."  *See* RAR 16849 (citing 49 C.F.R. § 194.105).  PHMSA itself also approved DAPL's FRP.  *See* Stamm Dec. D.E. 509-5, at 112 (Jan. 23, 2020 Letter from PHMSA finding the FRP "complies with PHMSA's regulations concerning onshore oil pipelines").  Mr. Ward provides no explanation otherwise.

25.     Mr. Ward also insists that Dakota Access has "refused to provide any information to [his] office relating to the volatility, flammability or chemical composition of the Bakken crude," and that the "FRP only references generic crude hazards that are contradicted by the Bakken crude oil ConocoPhillips Safety Data Sheet (SDS) that is appended but not referenced in the body of the FRP."  Second Ward Dec., D.E. 527-9, ¶¶ 7-8.  Again, this is wrong.  Table 6-1 in the FRP to which Mr. Ward refers plainly identifies the product's "SDS NAME," RAR 16756—here, Bakken crude oil.  The SDS sheet appended to the FRP (and GRP for that matter, *see* RAR 6801-10), which Standing Rock has, contains information about the unique hazards of Bakken crude oil, *see* RAR 16758-66.  Moreover, this is all publicly available information that can be

found through a quick Google search and that most competent personnel involved in emergency planning and response are already intimately familiar with.  Dakota Access provided the information that Mr. Ward now falsely claims is missing, and Mr. Ward also could have easily discovered that information on his own.  Mr. Ward's statements fail to comply with professional standards.

26.     Mr. Ward additionally criticizes the GRP, a document that *included* the Tribes' comments after their review.  RAR 125.  Mr. Ward appears to have not reviewed the revised versions, because he still references the 2015 GRP instead of the versions provided in October 2017, February 2018, or December 2018 that are all part of this proceeding and that Dakota Access and the Corps have provided to the Standing Rock Sioux Tribe.  Mr. Ward claims that the GRP "lacks any reference to cleaning up oil contained in the water column or equipment that could be used to capture oil under this scenario."  Second Ward Dec., D.E. 527-9, ¶ 10.  But the GRP does address this, explaining that "[d]ue to the density of the Bakken Crude Oil, it might settle on the sediment or streambed of the waterbodies when released," and during surveys and sampling activities done by Shoreline Clean-up Assessment Techniques, a team that is activated in the event of an incident, an "oil/water interface probe will be used to determine (if any) Bakken Crude Oil is below the surface of the water."  RAR 6761; *see also* RAR 6761-62 (describing sampling procedures for below the water surface).  If necessary, as the GRP sets forth, "additional boom[s]" will be used to capture "fluids migrating from the collection point due to entrainment."  RAR 6683. Despite the fact that Dakota Access did consider containment and cleanup of oil that could become entrained in the water column, Mr. Ward attempts to overstate the severity and likelihood of oil entrainment in his declaration.  I do not disagree that cleaning up oil that has become entrained in the water column is challenging, but the Spill Model shows that even though entrainment may

occur under high wind conditions, RAR 8073, droplets were typically contained within the top 5 meters with further resurfacing, which would be contained by methods articulated in the GRP.  *See* RAR 8270 ("[T]he maximum predicted concentrations of hydrocarbons in the water column were 0-5 meters.").  In addition, the GRP prescribes containment and recovery methods for spills *under* ice, a scenario in which the oil could be entrained in the water column.  *See* RAR 6667-68.

27.     Finally, Mr. Ward also misrepresents the GRP and FRP by stating that "the FRP includes a 'site' safety plan acknowledged as 'generic.'"  Second Ward Dec., D.E. 527-9, ¶ 4.  In fact, the 2016 FRP states:  "This Generic Health and Safety Plan is meant to provide an overview of site safety practices and procedures that will be implemented at chemical release/spill sites. Specific site conditions may result in the development of specific site safety plans to inform and protect site personnel, the public, and the environment.  In any case, prior to commencing response activities involving hazardous materials or hazardous conditions, an informational meeting is held to review with response personnel the site conditions, hazards, hazard assessment methods, hazard reduction procedures, decontamination procedures, and emergency contingency plans relative to the site."   RAR 16787.   The GRP additionally includes site-specific safety concerns and considerations for each and every control point identified along Lake Oahe.  *See* RAR 6650.  Mr. Ward also criticizes the GRP's Air Monitoring Plan, claiming it fails to advise on sheltering in place.  Second Ward Dec., D.E. 527-9, ¶ 9.  But the GRP's Air Monitoring Plan, which was developed in compliance with OSHA requirements, includes "standards or guidelines [that] are intended to protect the general public and sensitive community members from lifetime exposure," RAR 6772-73, and the GRP itself explains that in the event of an incident, procedures will be "establish[ed] and implement[ed]" to "ensure appropriate responses to elevated levels of"

compounds of interests that may be emitted in the unlikely event of a spill, RAR 6664; *see also* RAR 6767-76.

28.     Finally, for the reasons that I explain above, the proposed Optimization would not render the FRP or GRP "unsuitable," as Mr. Ward suggests.  Second Ward Dec., D.E. 527-9, ¶ 6. The Optimization is still in the approval process, and thus not a foregone conclusion.  These response documents will be updated at the appropriate time and in accordance with the appropriate federal regulations or easement conditions and, again, in coordination with the Tribes if they will participate.  Moreover, the initial modeling suggests the appropriate WCD for the increased throughput is approximately ███ barrels.  Dakota Access is prepared to respond to a spill, including at Lake Oahe, that is ████ that size.

### *Comprehensive Mitigation and Response Measures Will Limit or Remediate Impacts*

29.     The Tribes assert that there are no "complete safeguards in place to assure anyone that an oil pipeline leak will not happen."  Albert Two Bears Dec., D.E. 527-11, ¶ 5.  They further state that the waters of the Missouri River and Lake Oahe are necessary to their existence and survival.  *See* Vance Dec., D.E. 527-10, ¶ 13; Ward Dec., D.E. 527-9, ¶ 13; Albert Two Bears Dec., D.E. 527-11, ¶¶ 3-4, 6.  They additionally state that "the existence of this crude oil pipeline under the Lake Oahe Reservoir poses a special threat" to their religion and "it inflicts ceaseless anxiety upon [them] that will not end until the pipeline is removed."  *See* Vance Dec., D.E. 527-10, ¶¶ 15-17.

30.     Dakota Access does not doubt the significance of the water of Lake Oahe and the Missouri River to the Tribes and surrounding communities.  This is why Dakota Access carefully and deliberately chose the most environmentally protective route to the greatest extent practicable in order to minimize new land disturbance and maximize public safety benefits from co-locating with existing utility infrastructure, particularly a natural gas pipeline that has been in place for

nearly 40 years under Lake Oahe.[3]  As I have explained, and as the Corps has determined and this Court has agreed, the chances of an incident occurring at this segment are "extremely low." Indeed, the undisputed comprehensive historical PHMSA data shows that the likelihood of a major incident at the Lake Oahe segment is infinitesimally small—1 in 200,000 years.

31.     In choosing DAPL's route, Dakota Access used a sophisticated and proprietary Geographic Information System (GIS)-based routing program, which evaluated data sets such as "engineering (e.g., existing pipelines, railroads, karst, powerlines, etc.), environmental (e.g., critical habitat, fault lines, state parks, national forests, brownfields, national registry of historic places, etc.), and land (e.g., fee owned federal lands, federal easements, dams, airports, cemeteries, schools, mining, tribal lands, and military installations.)."  USACE_DAPL 71231.  Each of these data sets was weighted based on the risk associated with the crossing, and the route of the pipeline would naturally follow features "identified as low risk, avoid or minimize crossing features identified as moderate risk, and exclude features identified as high risk."  *Id.*  During this routing phase, Dakota Access considered alternative routes, but eliminated those options after analyses showed they would increase, rather than reduce, the potential for environmental consequences. USACE_DAPL 71231-36.  For example, a proposed alternative crossing north of Bismarck would have added "approximately 11-miles of length" to the pipeline, "consisting of roughly 165 additional acres of impact, multiple additional road crossings, waterbody and wetland crossings, etc."  USACE_DAPL 71232.  In short, DAPL's current route was chosen in order to reduce environmental impacts.  And indeed, that northern alternative route would still have crossed the

---

[3]  Richard Nemec, *Dakota Access Pipeline in Limbo as Protests Continue*, Nat. Gas Intelligence (Jan. 4, 2017), https://www.naturalgasintel.com/articles/108927-dakota-access-pipeline-in-limbo-as-protests-continue (reporting that the Northern Border Pipeline was built under Lake Oahe in 1982).

Missouri River *upstream* of the Tribes' reservations.  There are *many other* pipelines in addition to DAPL that cross the Missouri River upstream of the reservations, including the pipelines that DAPL was co-located with to minimize environmental and other impacts.

## Environmental Effects if DAPL is Shut Down

32.     As I previously explained, pipelines are the least environmentally impactful means to transport oil, whether measured in rate of accidents per ton-mile travelled, net amount of oil spilled per ton-mile travelled, human safety (e.g., death, fire/explosions, injuries), or air pollution.

33.     Plaintiffs do not even challenge my observations that transportation of hazardous liquids (including crude oil) on highways results in about five times more fatalities than transportation by pipelines and about 37 times more injuries on a per ton-mile basis.  First Aubele Dec., D.E. 509-3, ¶ 30.  Nor do they dispute the increase in exhaust that would occur due to the combustion of diesel fuel in truck engines, which would lead to an increase in air pollution from emissions of criteria pollutants such as volatile organic compounds ($VOC_s$), carbon monoxide (CO), nitrogen dioxide ($NO_x$), sulfur dioxide ($SO_2$), and particular matter ($PM_{10}$ and $PM_{2.5}$).  *Id.* Plaintiffs also do not refute my observations that rail transport poses far higher safety risks.  As I previously explained, petroleum incident rates for rail lines are at least 4.5 times higher than hazardous liquid pipelines, and rail transportation results in more fatalities per year.  *Id.* ¶ 31. Moreover, greater rail traffic increases the emissions of combustion products due to the use of diesel engines, which could have an adverse impact on air quality in the region.  *Id.* ¶ 32.

34.     Plaintiffs merely claim that the Court has already rejected Dakota Access's arguments that rail transportation is less safe than transportation via pipeline, D.E. 527 at 25; that the Corps misrepresents a PHMSA report as establishing that pipelines are always safer, *id.*; and that the parties' "generic comparison of pipelines and rail begs the question of whether vacatur of permits for '*this* pipeline in *this* location' will increase the risk of spills," claiming that DAPL is

more proximate to the Tribal reservations than rail, *id.*  None of these points responds to the top-line conclusion that shifting even a fraction of DAPL's current throughput to trucks and/or rail would be more hazardous to the environment and the Tribes in terms of human injury, potential for spills, and air pollution.  Each of Plaintiffs' points is also wrong.

35.     As an initial matter, the Court has not already rejected Dakota Access's arguments that pipeline transportation is safer than rail.  Rather, the Court stated: "*On this record*, Defendants have failed to persuade the Court that transport to train is significantly more dangerous than allowing oil to continue to flow beneath Lake Oahe.  The record contains no concrete figures or substantiated studies regarding the risks presented by rail transportation versus DAPL's Lake Oahe crossing."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 107 (D.D.C. 2017) (emphasis added).  In light of the Court's statement, my most recent declaration substantiated this claim with "figures" and "studies regarding the risks presented by rail transportation," which the Plaintiffs simply ignore.  *See, e.g.*, First Aubele Dec., D.E. 509-3, at 17-21, nn.3-9.

36.     Next, the Plaintiffs ignore critical points from the PHMSA report.  The report suggests that the safety of alternative transport is unknown, and diverting oil to another form of transport without knowing the potential for harm or risk places the Tribes in a more, not less, dangerous situation.  The report further states that "[i]f percent spilled is used as a proxy for safety . . . shipping crude . . . by pipeline would be safer than by truck, and by truck would be safer than by rail"; and that "[i]f incident rate is used as a proxy for safety, shipping crude by pipeline would be considered safer than by truck, and by truck would be considered safer than by rail."  D.E. 507-2 at 9.  And as for the only factor that favored rail (14 serious injuries and 3 deaths resulting from pipeline incidents, compared to none for rail), the supposed advantage vanishes after including the

47 deaths resulting from the derailment in Lac Megantic, Quebec of a train carrying Bakken crude oil. *See* D.E. 507-2 at 8. Similarly, the report's figures omit the serious injuries and fatalities that crude oil trains cause even when oil is not released, as frequently happens when oil trains hit motorists at crossings. *See id*. Accounting for those incidents, the increased rail traffic that the Tribes concede could result from a shutdown, on its own, would cause more fatalities and injuries per year than all pipeline incidents across the country. *Compare* First Rennicke Dec., D.E. 509-6, ¶ 90 (between 0.6 and 1.4 fatalities and between 1.8 and 4.4 injuries per year from increased rail transport), *with* D.E. 507-2 at 8 (3 fatalities and 14 injuries from pipeline incidents).

37.     In response to the Tribes' final argument here, shifting transport to rail *will* increase the risk of spills as compared to *this* pipeline in *this* location. The Tribes' argument to the contrary ignores the fact that if a 110-car train carrying crude oil were to derail at or around the crossing at Mobridge—just 1.6 miles upstream of the Standing Rock Sioux Tribe's new water intake—it could spill more than ████ barrels of oil directly into the Lake and surrounding area (based on 700 barrels per car). In contrast, the Standing Rock Sioux Tribe water intake is 75 miles downstream from DAPL's crossing at Lake Oahe, and even if a spill were to travel unmitigated for 10 days, which would not happen, it would still not reach Standing Rock Sioux Tribe's water intake. RAR 8271. Contrary to the Tribes' assertions, the potential for a rail incident is far more proximate to the Tribes than the hypothetical pipeline incident. In addition, the risks from rail accidents to persons and the environment in other locations are greater than the risks of a pipeline spill at Lake Oahe because of the extra safety features already discussed for the Lake Oahe segment. A shift to rail transport, therefore, increases environmental and safety risks rather than decreasing them.

38.     Plaintiffs and their declarants, moreover, do not respond to the State Coalition's concerns of increased risk of harm to third parties if any of DAPL's current volumes are shifted to

rail.  Specifically, the State Coalition explains how diverting oil to rail transport would result in thousands of individuals losing their jobs and severe reductions in tax revenue for state governments—revenue that supports critical state government programs such as public elementary and secondary education, higher education, and health and human services.  D.E. 504 at 8-10.

39.     As I previously stated, diverting oil from the pipeline to trains would be equivalent to a major federal action with no regulatory oversight.   In response, Plaintiffs claim that "transportation of crude via rail is regulated by the federal Surface Transportation Board and the U.S. Department of Transportation" and that "DAPL itself points to federal regulation that has taken older, unsafe tank cars off the market."  D.E. 527, at 25 n.7.  But this is not accurate and is misleading for multiple reasons.

40.     As Mr. Rennicke explains, shutting down DAPL and effectively diverting a large portion of DAPL's current volume to rail would not trigger *any* regulatory review or oversight.  As a threshold point, what I mean when I say there would be no regulatory oversight is that NEPA—the law governing these proceedings—would not apply to a railroad that would carry DAPL's current volumes.  This means, a railroad would not be required to comply with NEPA or conduct any of the additional analysis required under this Act to ensure compliance with many other federal statutes or laws, such as compliance with the Endangered Species Act, National Historic Preservation Act, Clean Water Act, etc.  Additionally, without NEPA, a railroad would not be required to complete an assessment of environmental impact, consider alternatives, socioeconomics, environmental justice, and etc.  Perhaps most importantly, the railroad would not be required to meet the public interest criteria or involve the public at all (including the Plaintiffs) in its decision to transport large volumes of crude across Lake Oahe in very close proximity to Standing Rock's new water intake.  Avoiding that stark reality, Plaintiffs claim that the Surface

Transportation Board regulates rail safety, but that is incorrect.[4]  It is PHMSA that regulates rail safety, particularly with respect to the transport of crude by rail.  But PHMSA's regulations place no limitation on how much crude oil a railroad can haul over particular routes or through high-consequence areas like Lake Oahe.  Relevant here, railroads are not required by PHMSA to update spill response plans if additional crude oil volumes are added to a route.  Thus, there will not be any additional oversight or review if a large portion of DAPL's volume is suddenly, and catastrophically, diverted to rail.

41.     Moreover, the existing regulations and safety requirements for crude-by-rail pale in comparison with the above-and-beyond efforts Dakota Access has put in place to ensure that *this pipeline* and *this crossing* remain safe.  There is a substantial difference between the relative <u>size</u> of incidents to which pipelines and railroads must be prepared to respond.  Pipelines are required to respond to the largest WCD at any point on their pipeline.  Railroads, regardless of the size of the largest possible incident, must only plan to respond to an incident totaling 7,143 barrels or "15 percent of the total lading of liquid petroleum oil transported within the largest train reasonably expected to transport liquid petroleum oil in a given response zone,"[5] which amounts to approximately 10,500 barrels if one assumes a 100-car train carrying 700 barrels per car.  Thus, while pipelines must be prepared to respond to the largest possible incident even in places where only a smaller incident could occur, railroads are only required to be prepared to respond to an incident that is a fraction (15 percent) of the size of an incident that is possible anywhere on their railroad.  And, while pipelines must have personnel and equipment available to respond to such

---

[4]  *About STB*, Surface Transp. Bd., https://prod.stb.gov/about-stb/ (last visited June 3, 2020).

[5]  49 C.F.R. § 130.5.

volumes within 6 hours, railroads must only "identify and describe" the response "resources that are available to arrive onsite within *12 hours*."[6]

42.     A comparison of the relevant safety efforts of DAPL and what is required of railroads is instructive.  I explain some of the key points below of what would happen if DAPL were shut down and crude were diverted to rail, and provide a broader (but still partial) comparison in Table 2:

(a)     ***Rail May Have Outdated Spill Response Planning That May Not Involve Plaintiffs:*** A railroad would not be required to automatically update its spill response plan if it increased the volumes of crude oil transported on a given route, and thus an outdated response plan would likely govern the rail lines crossing Lake Oahe and the Missouri River.[7]  Because a railroad would not be required to update its current plans, it would also not be required to engage with Plaintiffs to develop a specific plan for the Lake Oahe crossing based on actual volumes moving over the crossing.  In contrast, Dakota Access has *continually* attempted to work with the Tribes and *continually* updates the GRP, which is a detailed site-specific plan for Lake Oahe that incorporates the Tribes' comments that have been provided.

(b)     ***Rail Has Longer Spill Response Times:*** If an incident were to occur, a railroad is only required to respond to an incident within 12 hours, which is **double** the 6-hour response time required of DAPL by regulation.  Moreover, DAPL has conducted drills that show it could respond to an incident, even in winter conditions, in an even shorter amount of time.  Given that the rail crossing at Mobridge, South Dakota is just 1.6 miles away from the Standing Rock Sioux Tribe's

---

[6]  *Id.* § 130.130(b) (emphasis added).

[7]  *See* 49 C.F.R. § 130.145(c), (e) (requiring a railroad to "update its plan to address new or different conditions or information" but not specifically listing changes in the volumes transported on a route as one of those changes in conditions).

water intake, the additional six hours afforded to a railroad to respond to a spill increases risk and decreases timely containment, mitigation, and remediation.

(c)     ***Rail Is Required To Prepare Only For A Fraction Of Possible Incident Volumes:***
Railroads are also not required to be prepared to respond to the full-size of a possible incident that could result from a catastrophic accident involving a full-sized, fully loaded crude oil train.  A railroad is only required to be prepared to respond to an incident involving 7,143 barrels or approximately 15 percent of the volume of the largest single train in that zone (approximately 10,500 barrels).  Thus, the railroads are only required by regulation to respond to an incident a fraction (15 percent) the size of the 70,000+ barrel incident that is possible if a train were to derail on the bridge in Mobridge and enter Lake Oahe.  By comparison, DAPL is prepared to respond to an incident that is ▮▮▮ larger than the modeled Lake Oahe WCD and more than ▮▮ the size of Mr. Holmstrom's hypothetical (and overblown) WCD calculations.  Put differently, a railroad incident could be ▮▮ to ▮▮▮ larger than a hypothetical pipeline incident at Lake Oahe, but the railroad is only required to be prepared to respond to an incident smaller than DAPL's Lake Oahe-specific WCD, less than a third of Dr. Holmstrom's overblown WCD calculations, and ▮▮ ▮▮ the size of the incident that DAPL is committed to respond to in the unlikely event of an incident at Lake Oahe.

(d)     ***Rail is Required To Commit Fewer Resources For Immediate Response***: Because a railroad is required to plan for an incident that involves just a fraction (15 percent) of the amount of oil that could be involved in an incident, and because it has twice as long to bring those minimal resources to bear, they are required to commit far fewer resources to a response than what DAPL has available.  The largest rail incident possible at Lake Oahe is more than 70,000 barrels.  By contrast, the Corps' WCD for Lake Oahe is just ▮▮▮ barrels and even Mr. Holmstrom's

calculation using overblown hypothetical numbers and response times is 35,000 barrels.   The railroad is required only to commit resources capable of responding to a 10,500-barrel incident within 12 hours.   By contrast, DAPL has resources in place to respond to a ████ barrel incident within 6 hours.   With fewer resources available, diverting DAPL's volumes to rail would only increase risk and decrease containment, mitigation, and remediation.

(e)   ***DAPL's Safety Efforts Are Far Superior To Those Required By Rail****:*   As detailed more fully in Table 2, the efforts by DAPL and the Corps to ensure the safety of the Lake Oahe crossing surpass those of railroads for a crossing of the same waterbody.   While both DAPL and railroads must have regional response plans, DAPL is prepared to respond to an incident ████ ████ larger than any incident predicted at Lake Oahe (no matter how unreasonable), and has committed sufficient personnel and resources to respond within 6 hours.   By contrast, the railroad is only required to commit personnel and resources to respond to an incident a fraction the size of one that is reasonably possible, and then must only commit those resources to respond within 12 hours.   DAPL also has a site-specific response plan for this crossing separate from the PHMSA-required system-wide response plan (the GRP), which has been reviewed and vetted by multiple stakeholders and agencies; the railroad would have no such plan as it is not required to create anything beyond a more generic PHMSA-required response plan.   DAPL also engages in 24/7 monitoring of both the pipeline and the product flowing through it; while the railroads presumably monitor their trains 24/7 (equivalent to DAPL monitoring the product), they do not monitor their actual rails 24/7 (equivalent to DAPL monitoring pressures within the pipeline).   DAPL conducts bi-weekly overflights, walks its right-of-way, and engages in significant public outreach to detect and isolate potential incidents; it is unknown if a railroad does that.   Finally, DAPL is state-of-the-art, constructed to the highest possible standards and with the most modern safeguards whereas,

as Mr. Rennicke explains, railroads are still permitted to use less safe railcars for the next few years until they are phased out.

**Table 2:  Comparison of DAPL Pipeline Safety Efforts with Rail Safety Efforts**

| Safety Measure | DAPL | Railroad |
|---|---|---|
| Compliance with NEPA | Yes | Not required |
| Continual updating of spill response plans | Yes | Not required (update only required in the event of "new or different conditions or information," such as when crude oil is added to a route (but not necessarily when the amount of crude oil traveling over a route is increased)) |
| Required response time | 6 hours | 12 hours |
| WCD volume assumed for the purpose of planning response and mitigation resources | ▮ barrels, which is ▮ *greater* than what is possible for an incident via DAPL | 10,500 barrels, which is seven times *less* than what is possible in the event of an accident involving a fully loaded, 100-car crude oil train |
| Completed site-specific spill response plan for Lake Oahe crossing that has been vetted by the Plaintiffs, separate from PHMSA-required regional response plan | Yes, GRP | Not required |
| 24/7 monitoring | Yes | Not required |
| Aerial patrols of entire route | Yes | Not required |
| Visual inspection to detect spills and route integrity | Yes | Unknown |
| Public awareness and first responder meetings | Yes, Dakota Access has met with the Local Emergency Planning Committee at least twice in all 50 counties that the pipeline traverses) | Not required |
| Completed spill modeling to predict impacts and plan mitigation and remediation efforts | Yes, Spill Model; Downstream Receptor Report; FRP; GRP. | Not required |

| Safety Measure | DAPL | Railroad |
|---|---|---|
| Modern safeguards | Yes, state-of-the-art CPM and SCADA systems | Tank cars deemed unsafe are still in use[8] |

43.     Plaintiffs baldly dismiss safety risks from shutting down a pipeline, observing that pipelines like DAPL are shut down all the time.   D.E. 527 at 28.   This is a serious mischaracterization.  First, pipelines or portions of pipelines are often shut down *temporarily*, that is for a matter of hours or days—not weeks, months or years.  Plaintiffs and their declarants make no effort to distinguish between the risks of shutting down a pipeline for a few days and shutting it down for a year or more.  Second, shutting down DAPL would introduce environmental harm and safety risks from the release of large amounts of nitrogen gas.  As Mr. Stamm explained, the safest way to preserve a pipeline during a shutdown is to replace the oil with nitrogen gas, which is then released into the atmosphere once the pipeline can operate again.  Stamm Decl., D.E. 509-5, ¶¶ 46-47.  Nitrogen, when released into the atmosphere, can combine with readily available oxygen to create greenhouse gases known as $NO_x$, a generic term for nitrogen oxides.  Ordinarily, nitrogen releases are not concerning because they are largely contained and done on a small scale. However, releasing all of the nitrogen from a 30-inch, 1,917-mile pipeline like the DAPL-ETCOP system would be a much larger undertaking with serious health and environmental implications. These unnecessary risks will be avoided if DAPL continues to operate.

44.     Finally, as I previously explained, shutting down DAPL could lead to the closure of many production wells in a short timeframe.  Plaintiffs point out that the global pandemic further exacerbates this issue, as North Dakota has recently shut in more than 5,000 wells.[9]  Shutting down

---

[8]  *See* D.E. 512-2 ¶¶ 7-10.

[9]  Meghan Gordon, *North Dakota shuts in 35% of its oil production as rigs sink to 12*, S&P Global Market Intelligence (May 15, 2020), https://platform.mi.spglobal.com/web/client?auth =inherit#news/article?id=58662425&KeyProductLinkType=4.

Dakota Access could potentially result in the shut-in of thousands more North Dakota wells.  If wells are not shut-in properly, this could result in leaks and contamination of groundwater with hydrocarbons and other toxins.  And if wells are abandoned, they could emit significant amounts of methane, impairing air quality and threatening human health.  First Aubele Decl., D.E. 509-3, ¶ 37.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: June 8, 2020

Michael C. Aubele

# AUBELE

# EXHIBIT 1

**Plaintiffs' and Their Declarants' Most Significant**
**Errors Regarding the Safety of the Dakota Access Pipeline**

1.  Mr. Holmstrom falsely claims that Dakota Access does not comply with API recommended practices, namely API 1173, 1175, 1160, and 1130.[1]  Mr. Holmstrom knows this is wrong. Dakota Access has repeatedly provided evidence in this proceeding and others that Dakota Access employs those voluntary recommended practices.[2]  Because Mr. Holmstrom has participated in those proceedings, he is aware of this compliance.

2.  Mr. Holmstrom claims there is "no evidence in the remand record of any actual CPM performance testing or results."[3]  This is false.  The Corps has explained that "ETP will evaluate the effectiveness of the leak detection system following the guidelines set forth in API-RP-1130"[4]; that "ETP has an ongoing maintenance, inspection, and integrity testing program to monitor the safety of the DAPL pipeline system"[5]; and that "ETP evaluates the effectiveness of the leak detection systems through simulated leak tests, actual leak tests, or the analysis of confirmed releases."[6]

3.  Mr. Ward falsely claims that Standing Rock "has never been involved in DAPL's spill response planning, nor have they provided a copy of the Spill Response Plans or Emergency Plans."[7] To the contrary, Standing Rock—and Mr. Ward in particular—received and otherwise had access to both the FRP and GRP many times.[8]  In fact, Dakota Access frequently communicated with Mr. Ward about spill response planning.[9]

4.  Mr. Ward claims that the FRP's WCD for Lake Oahe "violates PHMSA's minimum requirements for calculating the WCD."[10]  This is wrong.  Dakota Access prepared the ███ barrel-figure for the FRP in accordance with PHMSA regulations.[11]  PHMSA itself also

---

[1]  Third Holmstrom Dec. ¶¶ 57-58.

[2]  Second Godfrey Dec. ¶¶ 17-18.

[3]  Third Holmstrom Dec. ¶ 58.

[4]  RAR 137.

[5]  RAR 257.

[6]  RAR 274.

[7]  Second Ward Dec. ¶ 4.

[8]  Ex. 2, Second Aubele Dec. (Dec. 8, 2018 Email from Dakota Access to Mr. Ward attaching GRP); D.E. 298-1, ¶ 2 (Declaration of Carl Borkland, then-Vice President for Environmental Projects & Emergency Response Planning at Energy Transfer Partners, stating he "provided copies" of the GRP and FRP to Mr. Ward on October 24, 2017).

[9]  D.E. 288-1 (explaining "direct contact" with Mr. Ward since October 31, 2017).

[10]  Second Ward Dec. ¶¶ 6, 10.

[11]  *See* RAR 16849 (citing 49 C.F.R. § 194.105).

approved DAPL's FRP, stating unequivocally that the FRP "complies with PHMSA's regulations concerning onshore oil pipelines found at 49 Code of Federal Regulations (CFR) Part 194."[12]

5.  Mr. Ward insists that Dakota Access has "refused to provide any information to [his] office relating to the volatility, flammability or chemical composition of the Bakken crude," and that the "FRP only references generic crude hazards that are contradicted by the Bakken crude oil ConocoPhillips Safety Data Sheet that is appended but not referenced in the body of the FRP."[13]  Again, this is wrong.  Table 6-1 in the FRP to which Mr. Ward refers plainly identifies the product's "SDS NAME"[14]—here, Bakken crude oil.  The SDS sheet appended to the FRP, which Standing Rock has, contains information about the unique hazards of Bakken crude oil.[15]

6.  Mr. Holmstrom falsely claims that Energy Transfer's "corporate family" has the "second worst spill record overall."[16]  He reaches that erroneous result by failing to standardize the data to account for Energy Transfer's size as one of the largest pipeline operators in the world.  In 2019, there were only 1.42 incidents per 1,000 miles of pipeline across all Energy Transfer pipelines—an incident rate consistent with the industry average.[17]

7.  Mr. Holmstrom falsely claims that Energy Transfer lacks a DAPL-specific Integrity Management Plan ("IMP").[18]  He knows this is wrong.  He testified in person at the North Dakota proceeding where John Godfrey explained how Energy Transfer's comprehensive IMP exists and reflects industry best practices.[19]

8.  Mr. Flanders makes the outrageous claim that "[t]he lack of adequate pipeline surge relief at the river crossings is contrary to regulatory requirements, industry best practices, and in my view constitutes a non-compliant (nonexistent) safety layer that warrants suspension of operations."[20]  The claim that surge-relief valves ("SRVs") should be located at river crossings is not a regulatory requirement or a best practice; indeed, it flies in the face of sound engineering judgment and risk management principles.  A remote SRV site consists of, at minimum, a mainline take-off valve, the SRV, an isolation valve, a tank shell valve, a relief tank, sump tank, drain lines, power supplies, communication, instrumentation, and sometimes

---

[12]  Ex. 8, Stamm Dec. at 112 (Jan. 20, 2020 approval letter from PHMSA).

[13]  Second Ward Dec. ¶¶ 7-8.

[14]  RAR 16756.

[15]  *See* RAR 16758-66.

[16]  Third Holmstrom Dec. ¶ 28.

[17]  Second Godfrey Dec. ¶ 7.

[18]  Third Holmstrom Dec. ¶¶ 52-53.

[19]  Second Godfrey Dec. ¶¶ 13-15.

[20]  Flanders Dec. ¶¶ 6, 15-17.

a truck loading facility.  All of this equipment increases the risk of a release from multiple potential sources in close proximity to a high-consequence area.[21]

---

[21]  Second Godfrey Dec. ¶ 38.

# AUBELE
# EXHIBIT 2

| | |
|---|---|
| **From:** | Borkland, Carl G <CARL.BORKLAND@energytransfer.com> |
| **Sent:** | Friday, December 8, 2017 12:49 PM |
| **To:** | dnelson@crstepd.org; Elliott Ward; Cossette, Brent J CIV USARMY CENWO (US) |
| **Subject:** | Emergency Planning Meeting |
| **Attachments:** | 2017_10_23_Geographical Response Plan_Lake Oahe.pdf |

All:

I will be in the lead for Dakota Access, LLC on the first condition of Judge Boasberg's December 4 Order (requiring the parties to coordinate on finalizing an oil-spill response plan affecting Tribal resources and lands at Lake Oahe). We would like to schedule a meeting to discuss the necessary steps and receive initial input from the parties on response planning. We suggest meeting in Bismarck and are available the following dates:

December 19, 20
January 3, 4, 5, 9, 10, 11, 12

Once we have responses, we will circulate a date that is mutually convenient. Also, attached to this email is the current Geographic Response Plan for the Lake Oahe crossing (with minimal redactions). If there is any information relevant to response planning that you would like us to have before we meet, please feel free to email it to me.

Thanks,

 

C. Gus Borkland
VP- Environmental Projects & Emergency Planning/Response
EHS&S
Energy Transfer Partners
4041 Market Street
Aston, PA 19014
O: 610.859.5419
C: 215.620.5934

EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE, ET AL., | Case No. 1:16-cv-01534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| Plaintiff-Intervenors, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

---

**SECOND DECLARATION OF JOHN F. GODFREY IN SUPPORT OF
DAKOTA ACCESS, LLC'S REPLY BRIEF ON THE QUESTION OF REMEDY**

---

1. My name is John F. Godfrey.  I am a Senior Principal Consultant with the Integrity Solutions group within the Pipeline Services Department of DNV GL USA, Inc.  My business address is 5777 Frantz Road, Dublin, Ohio 43017.  I submitted an earlier declaration in this matter, dated April 28, 2020, and my qualifications and work history are discussed therein.

2. This declaration responds to assertions in the brief and declarations filed by Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Plaintiffs" or "the Tribes") on May 20, 2020.  Having carefully reviewed the data in Plaintiffs'

declarations, my assessment is straightforward and unequivocal:  There will be a near-zero risk of a spill at Lake Oahe if DAPL continues to operate.  DAPL is extremely safe, and it is one of the safest operating oil pipelines in the United States.  Nothing in Plaintiffs' declarations challenges that analysis.

3.  More specifically, as detailed below, I have concluded:

   a.  Donald Holmstrom's declaration, D.E. 525-5 ("Third Holmstrom Dec."), does not demonstrate any increased safety risk posed by DAPL's operations.  In fact, it does not challenge any spill data specific to *DAPL*—the pipeline at issue here.  Mr. Holmstrom does not challenge Pipeline and Hazardous Materials Safety Administration ("PHMSA") data showing that there has been no leak from the DAPL system affecting either people or the environment in three years of operations.  D.E. 509-4, ¶ 20 ("First Godfrey Dec.").  That data indisputably shows that DAPL's safety record is as good as or better than every other tracked U.S. pipeline.  *Id.*

   b.  Mr. Holmstrom instead cherry picks data across nine different pipeline operators going back 14 years.  He then misleads with that data by failing to standardize it so that he is making an apples-to-apples comparison.  In particular, he disregards the metric of barrel-miles, which his type of analysis requires to standardize the data between small and large operators, both by mileage and volume transported.  This is the same metric used and reported by PHMSA.  This is particularly important when looking at operators like Energy Transfer who have extensive and varied pipeline assets.  To further compound these methodological problems, Mr. Holmstrom's claims about Energy Transfer's safety record are misleading and

outright wrong.

c. Patrick Flanders's declaration, D.E. 525-8 ("Flanders Dec."), demonstrates a lack of knowledge about transmission pipeline design and operations.  Many of his conclusions regarding the risk of surge pressures are incorrect, and his position that surge relief valves are required at river crossings is inconsistent with industry design standards and best practices.

d. Plaintiffs also continue to rely on an early declaration of Richard Kuprewicz, D.E. 272-2 ("Third Kuprewicz Dec."), but they ignore the many ways in which his opinions have turned out to be wrong or directly contradict the opinions of Plaintiffs' current witnesses.  Indeed, Mr. Kuprewicz stated unequivocally that the risk of an incident on DAPL would be *lower* today than it was three years ago, when the Court allowed DAPL to continue operating.

e. Plaintiffs unreasonably seek to apply a zero-risk standard in assessing the risk of spills or other incidents on DAPL.  Mr. Holmstrom states his expectation, for example, of "zero incidents," instead of engaging in a realistic, apples-to-apples comparison of risk across the industry.  Third Holmstrom Dec. ¶ 46.  Plaintiffs contend that they should not bear *any* risk of *any* spill or accident while the remand takes place.  No law or regulation applies such a zero-risk standard.  It is not, and never has been, a requirement for operating pipelines, because there is no such thing as a zero-risk mode of transportation of any commodity.  The goal is to reduce and mitigate those risks.  Nothing in Plaintiffs' declarations or briefs challenges the indisputable conclusion that DAPL has reduced the risk of spills or other incidents to near-zero.

f.   A proper comparative risk analysis favors continued operation of DAPL because

the risk of an incident occurring at Lake Oahe is so low as to be effectively zero.

**Plaintiffs' Safety Claims Do Not Show Any Increased Risk Of A Spill**

4.   Mr. Holmstrom does not address DAPL's operating history; instead, Mr. Holmstrom

selectively focuses on data of his choosing from nine different pipeline operators over 14 years to

support his claims.   Even then, he fails to conduct an apples-to-apples comparison that accounts

for the miles of pipeline and quantity of oil transported by different operators.   Mr. Holmstrom's

safety challenges are consequently mistaken, misleading, or both.

5.   PHMSA reports industry data using the metric of spills per barrel-miles.   This metric

standardizes the data by taking into account both a pipeline's length and volume transported.   For

example, it would be inaccurate to compare the static spill record of a one mile line to the record

of a 1,000 mile transmission line.   Standardizing the data allows one to assess their comparative

records in relation to the number of miles of pipeline operated and the number of barrels

transported, providing a more realistic and meaningful assessment of their safety.   Similarly, a line

transporting 100 barrels per day will have a substantially different spill performance than a pipeline

transporting 10,000 barrels per day.   Pipeline performance must be standardized to assess risk

properly.   By omitting volume transported, Mr. Holmstrom attempts to make DAPL's safety

performance look worse than the data actually shows.

6.   The lack of any DAPL spill impacting people or the environment when compared to the

volume transported and the distance spanned is remarkable and supports the conclusion that the

risk of a failure on DAPL is practically zero.   Mr. Holmstrom does not challenge that data.   He

instead points to spills on the Energy Transfer Crude Oil Pipeline (or "ETCOP"), a separate and

distinct pipeline, to conclude that there have been 12 spills total on DAPL and ETCOP since the

pipelines were operational, including a spill of 5,000 gallons (119 barrels) categorized as

4

significant.  Third Holmstrom Dec. ¶ 18.  The 119 barrel spill he cites occurred on ETCOP and was entirely contained within a pump building.  All 119 barrels of oil were recovered.  The release did not involve line pipe such as the Lake Oahe crossing and it did not impact people or the environment.[1]  Similarly, of the 12 total releases, of which five occurred on ETCOP, only two releases on ETCOP were classified by PHMSA as affecting people or the environment, and only then due to their proximity to High Consequence Areas ("HCAs").  About 14.35 of the 15.85 barrels released were recovered, and all contaminated soil and gravel was removed.[2]  No people were injured and no environmental contamination occurred.  In total, DAPL only accounts for 6.08 barrels—about 5 percent— of the total Mr. Holmstrom cites.[3]  Moreover, all seven of the DAPL releases occurred at facilities, and all of the spilled oil was remediated.  None of the releases involved line pipe such as the Lake Oahe crossing.  First Godfrey Dec. ¶ 16; D.E. 509-5, ¶ 24 ("Stamm Dec.").  By failing to include this analysis, and by misconstruing the record of DAPL, Mr. Holmstrom attempts to misleadingly suggest DAPL and more specifically the Lake Oahe crossing is somehow dangerous.  Nothing could be further from the truth.

7.  Mr. Holmstrom then looks across nine different pipelines to conclude that Energy Transfer's "corporate family" has the "second worst spill record overall."  Third Holmstrom Dec. ¶ 28.  Even if data from other pipelines could fairly be used against DAPL, Mr. Holmstrom uses static release statistics, but fails to standardize the data to account for Energy Transfer's size as one of the largest pipeline operators in the world.  Energy Transfer and its subsidiaries operate

---

[1]  This information is confirmed by publicly available PHMSA incident data.  *See Incident Statistics*, PHMSA, https://www.phmsa.dot.gov/hazmat-program-management-data-and-statistics/data-operations/incident-statistics (last visited June 5, 2020) (download file titled *Hazardous Liquid Accident Data - January 2010 to present (ZIP)*).

[2]  *Id.*

[3]  *Id.*

approximately 16,000 miles of liquids pipelines and over 100 liquid pump stations and liquids storage facilities.  Stamm Dec. ¶ 27.  The pipelines transport more than 2 billion barrels of crude oil, natural gas liquids, refined products, and other liquids each year.  *Id.*  Under Energy Transfer management and control, the number of incidents on Sunoco lines decreased by 50% from 2017 to 2019.  *Id.*  And in 2019, there were only 1.42 reportable incidents per 1,000 miles of pipeline across all Energy Transfer pipelines.  *Id.*  That record is consistent with the industry average and shows that Energy Transfer's being in control does not present any heightened risk of a spill on a pipeline.

8.   Mr. Holmstrom also tries to make the case that the number of Energy Transfer spills and repairs in HCAs is unusual.  Third Holmstrom Dec. ¶¶ 21, 22.  But he fails to compare the number of spills and repairs in HCAs to the number of spills and repairs outside of HCAs.  The data from Mr. Holmstrom's own sources show that pipeline mileage that could affect HCAs makes up 47% of the total mileage across the nine pipelines he considers.  *See id.* ¶ 21.  Put another way, the 47% most sensitive pipeline miles on Energy Transfer's systems experienced only 20% of all spills. Energy Transfer continues to reduce the number of HCA spills per mile through its Integrity Management Program, described below.  In 2018, the last reporting year where PHMSA data is available, Energy Transfer conducted integrity assessments on 40% of its total pipeline mileage and made 499 total repairs.[4]  The number of repairs in HCAs was 150, or 30% of the total, again much lower than the 47% total HCA mileage.  *Id.*

9.   Energy Transfer has made all necessary HCA repairs to date.[5]  In my experience, it is

---

[4]  PHMSA Gas Distribution, Gas Gathering, Gas Transmission, Hazardous Liquids, Liquefied Natural Gas (LNG), and Underground Natural Gas Storage (UNGS) Annual Report Data (last updated June 3, 2020), https://www.phmsa.dot.gov/data-and-statistics/pipeline/gas-distribution-gas-gathering-gas-transmission-hazardous-liquids.

[5]  RAR 741.

exceedingly rare to actually shut down a pipeline when "immediate condition repairs" are discovered.  *See* Third Holmstrom Dec. ¶ 22.  These repairs are anomalies identified from in-line inspection that the operator is allowed five days to correct before the need to file a safety-related condition report with PHMSA and implement a pressure reduction.[6]  If a pressure reduction is taken, operators have up to one year to make repairs.[7]  Since 2017, the nine pipelines identified by Mr. Holmstrom have filed only 11 safety-related condition reports related to pressure reductions or shut downs, and none of those were for DAPL or ETCO.[8]  By sandwiching his statement between discussions of spill numbers, Mr. Holmstrom leaves the false impression that the conditions are immediate threats to people and the environment that require extraordinary action.  Indeed, the fact that Energy Transfer does such a good job of identifying these necessary repairs, and that it does so in a timely fashion, supports my conclusion that its operating record is far better than Mr. Holmstrom attempts to make it seem.

10. Mr. Holmstrom further misleads the Court in his claims about Energy Transfer's "regulatory violations" and "cavalier attitude toward safety management systems."  Third Holmstrom Dec. ¶¶ 45-46.  Mr. Holmstrom describes various alleged incidents involving environmental contamination and other right-of-way issues related to the *construction* of pipelines—not their *operation*.  In particular, he points to spills of drilling mud (or what he refers to as drilling fluid), which is used during the installation of pipe by horizontal directional drilling ("HDD").  *Id.* ¶ 42.  The mud, which is an inert slurry, is pumped down the bore hole during the HDD process under the control of the drilling contractor.  USACE_DAPL0071324.  The mud is

---

[6]  *Id.*

[7]  *Id.*

[8]  HL    IM    Notifications    (last    updated    Mar.    19,    2020), https://www.phmsa.dot.gov/pipeline/hazardous-liquid-integrity-management/hl-im-notifications.

then recovered during drilling.  USACE_DAPL0071257.  Any residual mud in the bore hole around the completed crossing consolidates and fills the void between the pipe and bore hole. Once the HDD is completed, there is no risk of a mud spill.  The safety of DAPL's construction, including the HDD below Lake Oahe, is not in any doubt because construction was completed without these issues.  Incidents like the Mariner East 2 and Rover spills during the construction of natural gas pipelines in Pennsylvania and Ohio are therefore irrelevant to evaluating the risks posed by DAPL now or in the future.

11. Mr. Holmstrom similarly fails to notice, or chooses to ignore, that the PHMSA inspection he cites for purportedly "numerous pipeline safety violations" resulted from a *construction* accident on the West Texas Gulf ("WTG") pipeline in 2015, not an *operations* issue.  Third Holmstrom Dec. ¶ 38.  Moreover, Mr. Holmstrom misleadingly suggests that this incident should be attributed to Energy Transfer, when he knows that Energy Transfer did not control WTG at that time.  The first page of the cited order clearly states that "[a]t the time of the accident, Sunoco owned WTG" and that "[o]n April 28, 2017, Energy Transfer Partners (ETP) and Sunoco Logistics Partners merged."[9]  Until 2017, two years after the incident, Energy Transfer had only an ownership stake in Sunoco.  Energy Transfer thus had no involvement in an incident that, in any event, involved construction issues.

12. The same error infects Mr. Holmstrom's assertion that "[a] number of other recent Energy Transfer significant enforcement actions have addressed similar issues."  Third Holmstrom Dec. ¶ 38 & n.34.  Two cited Corrective Action Orders were issued to Mid-Valley Pipeline Company in

---

[9]  PHMSA Final Corrected Order, West Texas Gulf Pipeline Company, CPF No. 4-2016-5022, (Dec. 9, 2019), https://primis.phmsa.dot.gov/comm/reports/enforce/documents/420165022 /420165022_Corrected%20Final%20Order_12092019_text.pdf.

2014, while Mid-Valley was owned by Sunoco.[10]  A third involved a construction accident at Sunoco's Nederland terminal in 2016.[11]  Again, Mr. Holmstrom misleads the Court by failing to mention that these incidents pre-dated completion of Energy Transfer's merger with Sunoco and that Energy Transfer thus had no involvement in any of the three incidents.

13. Mr. Holmstrom further criticizes Energy Transfer for supposedly lacking a DAPL-specific Integrity Management Plan ("IMP"), Third Holmstrom Dec. ¶ 52, even though he knows that is wrong.  My recent testimony in a North Dakota proceeding that Plaintiffs mention explained how Energy Transfer's comprehensive IMP reflects industry best practices.[12]  Not only does Mr. Holmstrom know about this proceeding; he testified in person.[13]

14. A single comprehensive IMP allows operators to allocate resources and compare performance across all systems, including failure analysis, lessons learned, risk assessments, preventive and mitigative measures, management of change, and stakeholder communication.  In this way, Energy Transfer's IMP meets the requirements of API 1173, which Mr. Holmstrom touts as being a best practice.  Third Holmstrom Dec. ¶¶ 4, 12.  Energy Transfer's IMP nonetheless

---

[10]  *See* Corrective Action Order, *In the Matter of Mid-Valley Pipeline Co.*, CPF No. 4-2014-5026H               (PHMSA               Oct.               17,               2014), https://primis.phmsa.dot.gov/comm/reports/enforce/documents/420145026H/420145026H_Corre ctive%20Action%20Order_10172014.pdf; Corrective Action Order, *In the Matter of Mid-Valley Pipeline      Co.*,      CPF      No.      3-2014-5002H      (PHMSA      Mar.      25,      2014), https://primis.phmsa.dot.gov/comm/reports/enforce/documents/320145002H/320145002H_Corre ctive%20Action%20Order_03252014.pdf.

[11]  *See* Corrective Action Order, *In the Matter of Sunoco Logistics Partners, LP*, CPF No. 4-2016-5030H               (PHMSA               Sept.               14,               2016), https://primis.phmsa.dot.gov/comm/reports/enforce/documents/420165030H/420165030H_Corre ctive%20Action%20Order_09142016.pdf.

[12]  *See* Hearing Transcript at 329-31, *Dakota Access, LLC, Dakota Access Pipeline Pump, Station—Emmons Cty., Siting Application*, Case No. 19-204 (N.D. Pub. Serv. Comm'n Dec. 30, 2019) (D.E. 93), https://psc.nd.gov/database/documents/19-0204/093-010.pdf ("Hearing Tr.").

[13]  *See id.* at 319-402.

contains components specific to DAPL because for each particular pipeline (including DAPL) it includes detailed analysis and action plans such as HCA impact assessment, detailed spill modeling, risk assessment, individualized integrity assessment and reassessment schedules, preventive and mitigative measures, and performance metrics. *See* **Exhibit 1**. Particularly for large operators like Energy Transfer, the best practice is to have one IMP to ensure a consistent approach. Separate, distinct IMPs for each pipeline would be counterproductive because that would hinder a company's ability to apply lessons learned and best practices from experiences with individual pipelines to the rest of the company's assets. A program as critical as integrity management benefits from a singular management focus as compared to 20 or 30 separate plans operating independently of one other. Mr. Holmstrom himself emphasizes the importance of a corporate safety culture and management systems that draw on collective experience. Third Holmstrom Dec. ¶¶ 44-46. Energy Transfer's company-wide IMP does just that.

15. Based on my review of the IMP and my experience with PHMSA audits, Energy Transfer's IMP complies with or exceeds all applicable regulations. As Mr. Holmstrom states, "IMPs must be developed for 'each segment of pipeline' and include a requirement of an initial baseline assessment of that specific pipeline." Third Holmstrom Dec. ¶ 53. DAPL met this requirement immediately following construction through a hydrostatic test and in-line inspection of the Lake Oahe crossing. RAR 109. DAPL has also completed a reassessment of the crossing in accordance with the Corps's easement and the requirements in its IMP. Mr. Holmstrom knows this, but he still makes the unsupported and erroneous claim that each named pipeline must have its own separate document to be compliant with PHMSA regulations. Third Holmstrom Dec. ¶¶ 52-53. This is an uninformed interpretation of the rule and ignores tangible actions taken by Energy Transfer to be compliant.

16. Likewise, Energy Transfer has already implemented pipeline-specific operations, maintenance, and emergency procedures. *See, e.g.*, RAR 16798-16818.  PHMSA has inspected DAPL during its construction, commissioning, and operation.  Most recently, PHMSA conducted operations and headquarters inspections on the DAPL South system in 2018 and DAPL North in 2019.  These inspections looked at the same records that Mr. Holmstrom deems noncompliant.  Indeed, DAPL has arguably been subject to more scrutiny than any other pipeline project in history.  Regulators still have found no issues with its compliance.

17. Mr. Holmstrom also mistakenly claims that Energy Transfer failed to implement API Recommended Practices ("RP") 1173, 1160, 1175, and 1130.  Third Holmstrom Dec. ¶ 69.  As Mr. Holmstrom knows from the state proceedings he attended, DAPL has already implemented API RP 1173.  *See* **Exhibit 2**.  Mr. Stamm testified in those proceedings and again here that Energy Transfer began developing a safety management system under API RP 1173 in 2015 and has since implemented it across a majority of its liquid pipelines, including DAPL and ETCO.  Stamm Dec. ¶ 26.  As I testified in state proceedings, API RP 1173 is a *recommended practice* and specifies that it is "flexible" and "scalable."[14]  It is not a one-size-fits-all approach.  API RP 1173 can be described as an umbrella document that provides a framework for operators to manage processes within one overall management system.  As such, API RP 1173 provides limited details on implementation and leaves it to operators to decide how best to manage their specific assets, processes, and resources.  PHMSA already reviewed and approved Energy Transfer's API RP 1173 pipeline safety management system in the course of business on another Energy Transfer pipeline.

18. Energy Transfer has also adopted the other recommended practices Holmstrom cites.  The

---

[14]  Hearing Tr. at 440.

IMP described above encompasses API RP 1160, including the parameters it identifies for site-specific reviews. *See* **Exhibit 1**. Energy Transfer's Computational Pipeline Monitoring ("CPM") leak-detection system is also designed and operated in accordance with API RP 1130 and API RP 1175. *See, e.g.*, RAR 126, 206, 273-74. For example, Energy Transfer defined operational performance targets for its primary leak detection methods using the four performance metrics defined by API RP 1130. These include leak detection sensitivity, reliability, accuracy, and robustness. Energy Transfer also conducts an API RP 1175 gap assessment annually to identify areas of improvement and encourages participation on API committees related to API RP 1130 and API RP 1175 to share its experiences and stay apprised of industry initiatives. Thus, DAPL has already implemented each of the recommended practices that Mr. Holmstrom emphasizes.

19. Mr. Holmstrom also repeats Plaintiffs' mistake of using a one-page Pipeline Safety Trust report to assert that new pipelines are inherently more dangerous than older ones. Third Holmstrom Dec. ¶ 29. As an initial matter, Mr. Holmstrom mischaracterizes that report. It actually says that "[w]hile some types of old pipelines are well-known to be riskier, like cast iron pipes and pipes with seams welded using LF-ERW (low frequency electric resistance weld), in general we do not see older pipes failing much more than new pipes on a per mile basis."[15] Second, the report interpreted its data about "newer" pipelines installed since 2010 (between zero and three years old) to mean that "some pipelines are initially installed with weak and vulnerable aspects which fail; and only after fixing these initial failures do the pipelines operate safely." DAPL, now into its fourth year of operation, has safely transitioned beyond the juvenile phase for pipelines and is now considered mature. Third, DAPL has followed the report's safety recommendation that

---

[15] *Are Old Pipelines Really More Dangerous?*, PIPELINE SAFETY TRUST (Spring 2015), https://pstrust.org/wp-content/uploads/2013/03/Incidents-by-age-of-pipes-PST-spring2015-newsletter-excerpt.pdf.

pipelines be "sited, installed, tested and inspected in the best way possible, and for the regulators to ensure that is the case through strong and enforced regulations."[16]  As discussed above, DAPL was in fact sited along an existing utility corridor, safely installed under Lake Oahe, successfully tested during construction and following operation, and thoroughly inspected by both Energy Transfer and PHMSA.  This further affirms the low risk of continuing to operate DAPL.  Thus, even if Mr. Holmstrom were correct that some pipelines that have operated for fewer than three years are almost as risky as older pipelines, that does not apply to DAPL.

20. During the last remedy briefing, Mr. Kuprewicz and Plaintiffs themselves claimed that incident risks are highest when a pipeline is beginning to operate.  Third Kuprewicz Dec. ¶ 9; D.E. 272, at 29.  Drawing on the "bathtub curve" shown below to depict pipeline life cycle reliability, Mr. Kuprewicz argued that DAPL presented an immediate risk in 2017 to Lake Oahe and the Tribes.  DAPL has since emerged from what Mr. Kuprewicz called a riskier "[s]tart-up commissioning" period with zero reportable releases and zero incidents at all on its 1,200 miles of mainline (which includes the Lake Oahe segment).  All of the minor incidents cited by Mr. Holmstrom were associated with the start-up and commissioning of the pipeline.  *See* Third Holmstrom Dec. ¶ 18.  Notably, Mr. Kuprewicz has not submitted a declaration in this round of remedy briefing.[17]  Based on Mr. Kuprewicz's and Plaintiffs' own prior arguments, DAPL presents a *lower* risk of incident today than it did during the original remedy briefing.

---

[16]  *Id.*

[17]  Plaintiffs have also dropped other arguments Mr. Kuprewicz previously raised, including that crude oil has sufficient compressibility to increase spill volumes beyond WCD calculations, that surge modeling was only done after he raised the issue, and that valves on DAPL used as EFRDs would increase potential surge pressures over other valve designs.  *See* D.E. 118-1 ¶ 14.  None of the statements were true.

Figure 1[18]



21. Finally, Mr. Holmstrom asserts that the optimization project (if completed) will further increase the risk of an incident and the potential results of an incident at the Lake Oahe crossing. Third Holmstrom Dec. ¶ 68.   Neither argument is correct.   The key design parameter for the pipeline relevant here is Maximum Operating Pressure (MOP), determined in accordance with PHMSA regulations, and **the pipeline's MOP will not change as a result of the optimization project**.   In fact, **the average operating pressures at the Lake Oahe crossing would be lower after optimization**.   The addition of a new pump station just downstream of the crossing will change the hydraulic gradient resulting in a new, lower pressure profile at Lake Oahe.   Plaintiffs' expert, Mr. Kuprewicz, admitted as much during his testimony in North Dakota at proceedings in which Mr. Holmstrom participated.   North Dakota November, 13, 2019 Hearing Tr.  266:11-267:2 ("Q: And in fact one of those places where the operating pressure will be lower than prior to optimization, is at the crossing at Lake Oahe. Right? . . . A: Yeah.").   Similarly, the risk of an impact from a

---

[18]   William Livoti, *The Bathtub Curve as Applied to Pumping Systems*, PUMPS & SYSTEMS (Aug. 2018), https://www.pumpsandsystems.com/bathtub-curve-applied-pumping-systems.

hypothetical incident will not increase from the optimization project.  A small pinhole leak of the type postulated by Mr. Holmstrom would have a lower leak rate at lower average operating pressures.  In engineering terms, these small leaks behave as an orifice.  The leak rate is determined by the differential pressure across the opening, which is the average operating pressure minus external pressure caused by the combined water and soil cover over the pipeline at Lake Oahe. After optimization, this differential pressure will be significantly lower and hence lower the potential leak rate.  The potential leak volume from a WCD event depends on the flow rate and inventory between the nearest upstream and downstream isolation valves relative to the site of the WCD.  Although the increased flow rate after the additional pumping facilities are installed will incrementally increase potential WCD leak volumes at Lake Oahe, the major determinant—the volume between isolation valves—will not change.

**Plaintiffs' WCD and Leak Detection Claims Have Not Shown Any Increased Risk of a Spill**

22. Plaintiffs recycle the same mistaken arguments about DAPL's leak detection capabilities. Mr. Holmstrom points to the Permian Express II ("PE2") spill.  As has already been explained, and Mr. Holmstrom repeats, PE2's CPM system was not "functional" during that spill.  *See* Third Holmstrom Dec. ¶ 59.  That means it cannot be used as an example of how the CPM system would function during the detection of small leaks.  The incident also happened before PE2 was under Energy Transfer's control, so the ineffective "human and organizational factors" that Mr. Holmstrom emphasizes cannot be attributed to Energy Transfer or DAPL.  *Id.* ¶ 60.  In any event, the lessons learned from PE2 have been incorporated into the DAPL operations manual and that, combined with the far more robust instrumentation on DAPL, makes it inconceivable for a similar issue to occur on DAPL.

23. Plaintiffs also continue to conflate the detection of small pinhole leaks with the detection of full-bore ruptures.  As previously discussed, the guillotine rupture assumed in a WCD would be

detected almost instantaneously on a system like DAPL, with just one origin point and one delivery point, due to the sudden loss of flow and pressure.  First Godfrey Dec. ¶ 10.  Downstream pump stations would alarm and shut down due to a loss of suction pressure, upstream pump stations would shut down from excessive flow, and/or alarms may be generated by loss of pressure at mainline valve sites.  *Id.*  Without any support and in direct conflict with the design of DAPL, Mr. Holmstrom calculates the WCD based on "a one hour time to respond and shutdown the pipeline." Third Holmstrom Dec. ¶¶ 65, 68 n.65.  Mr. Holmstrom further claims that a pinhole leak under the 1% detection limit could result in a much larger WCD if it occurred under ice or based on delays in conducting aerial inspections due to adverse weather conditions.  *Id.* ¶ 65.  He ignores that DAPL's CPM vendor provided evidence that a leak as small as 0.75% can be detected in fewer than 45 minutes.  Stamm Dec. ¶ 9.  The periodic line balancing conducted by Energy Transfer's control room would also detect a line imbalance at much lower volumes in much less time than Mr. Holmstrom speculates.  *See* Third Holmstrom Dec. ¶ 65.  Line imbalances are calculated hourly and the control room information system updates a real time table so the pipeline controller can see at a quick glance if any imbalance is occurring and respond accordingly.  Any on-duty operator could then shut down the pipeline immediately without supervisory authorization, as shown in the policies attached to Mr. Stamm's declaration.  *See* Stamm Dec. Ex. 2.  While a full-bore rupture will be detected faster than a "pinhole" leak of less than one percent of the pipeline's flow, DAPL's unparalleled instrumentation and layers of oversight on top of that ensure that the smaller leak would be detected long before the volume released could come close to the level of the WCD.

24. Mr. Holmstrom, like Mr. Kuprewicz previously, engages in no analysis to support his attacks on the WCD calculations.  Neither has made any effort to compare the nature and size of

other pipelines or their leak detection systems with DAPL's, such as identifying whether the systems have multiple origin or delivery points or any other information that would show they are making apples-to-apples comparisons.  As a result, the assertions about DAPL's WCD shutdown times are unsupported.

25. Mr. Holmstrom contends that "DAPL has failed to rebut the fact that the WCD at Lake Oahe is grossly understated."  Third Holmstrom Dec. ¶ 63.  This is far from the truth.  My previous declaration clearly explained the conservative assumptions in DAPL's WCD, including a guillotine break 90 feet below the lake bed, sequential rather than simultaneous closure of the valves and pump stations for a total detection and shutdown time of 12.9 minutes, no reduction in flow rate during the process of pumps shutting down and valves closing, and no reduction in the total volume spilled due to on-site remedial responses.  First Godfrey Dec. ¶¶ 10, 12, 29-30, 32.

26. The WCD calculation is also conservative in that it does not model anti-siphoning effects. *See* Stamm Dec. ¶ 41.  The full volume of the crossing between isolation valves is used in the calculation.  Siphoning occurs when a fluid at one level flows to a lower level even if the points in between are higher.  An example would be draining an above ground pool with a garden hose.  For siphoning to occur, both ends of a hose or pipe have to be open (or at least the container being siphoned).  When one end or the other is closed, with an isolation valve for example, the siphon stops.  With hydrocarbons like crude oil, this is not an instantaneous stop.  The column of liquid separates as the lighter end constituents vaporize.  When the height of the fluid column reaches the vapor pressure of the oil, the siphon is stopped.  A WCD calculation like that for DAPL does not account for these fluid-stopping anti-siphoning effects and assumes a full pipe drain down instead, rendering the WCD calculation even more conservative.

27. PHMSA does not require the WCD calculation to incorporate every endlessly worse worst-

case scenario that Plaintiffs and Mr. Holmstrom imagine.  As discussed, PHMSA has clarified that adverse weather conditions do not affect WCD calculations and has proposed rules that would further refine WCD calculations and better serve their purpose of informing response planning. First Godfrey Dec. ¶¶ 34-36.  Mr. Holmstrom nonetheless insists that the Court consider the scenario where a pipeline buried 90 feet below a lake, with pipe twice the strength of the maximum operating pressure, hydrostatically tested twice, inspected for and protected against corrosion, and patrolled constantly, will catastrophically fail during a full-bore rupture—and, at the exact same time, a severe winter storm will knock out power to the isolation valves, cut off communication, and impede travel all while the lake is frozen solid.  These are not sound or appropriate risk management principles and are rightly not considered in PHMSA's approval of Facility Response Plans ("FRPs").

28. Indeed, Mr. Holmstrom's own citation belies his attack on DAPL's WCD calculation.  As shown in a PHMSA order (CPF No. 4-2014-5026H) on which his declaration relies, Third Holmstrom Dec. ¶ 38 & n.34, a Mid-Valley pipeline ruptured at approximately 8:00 a.m. and the pumps were shut down at 8:02 a.m.—resulting in a detection and response time of just two minutes.[19]  Yet Mr. Holmstrom continues to argue that DAPL, with significantly more instrumentation and monitoring, cannot possibly detect and respond to a WCD event similar to the Mid-Valley release in a full 12.9 minutes.  *See* Third Holmstrom Dec. ¶¶ 63-64.

29. Mr. Holmstrom mistakenly states, in referring to different DAPL segments, that while "[t]he South Dakota pipeline WCD unlike Lake Oahe did use a 12.9 minute shutdown time in the calculation," "the Lake Oahe WCD was shown in the FRP only as the total volume and lacks any

---

[19]  Corrective Action Order, *In the Matter of Mid-Valley Pipeline Co.*, CPF No. 4-2014-5026H (Oct. 17, 2014) at 2, https://primis.phmsa.dot.gov/comm/reports/enforce/documents/420145026H/ 420145026H_Corrective%20Action%20Order_10172014.pdf.

methodology or calculations." *Id.* ¶ 64.  Although Mr. Holmstrom typically does not hesitate to provide independent calculations in an effort to buttress his positions, he is remarkably reticent in this instance.  As he acknowledges, the FRP provides the calculation for the largest line pipe WCD (i.e., the location, in South Dakota, where the WCD result is the largest).  *Id.* ¶ 64.  To instead calculate the WCD at Lake Oahe, one only needs to change the drain down volume between the isolation valves.  If Mr. Holmstrom had taken this little effort, he would realize that the calculations are the same and include EFRD closure time.  PHMSA and the Corps, which had the same information available to them, were also easily able to verify the calculations.

30. DAPL's Lake Oahe WCD estimate is also consistent with the generic spill estimate for a 30-inch pipeline (like DAPL) found in the U.S. EPA's Mid-Missouri River Sub-Area Contingency Plan ("SACP"), *see* **Exhibit 3**, that Plaintiffs have referenced in this case, D.E. 433-2 at 14.  The SACP uses the same PHMSA-specified calculation method.  **Exhibit 3** at 9.  The volume reported in the SACP is not pipeline-specific, and the SACP notes that WCD calculations can "vary significantly."  *Id.* at 10.  It estimates the WCD for a generic 30-inch pipeline to be 50,800 barrels based on generic assumptions, including a 15-minute maximum detection and shutdown time, a 6 feet/second (289 barrel/minute) flow rate, and a line section of 10 miles.  *Id.*  The assumptions underlying DAPL's Lake Oahe WCD calculation of ███ barrels—a 12.9 minute shut down time, a 416.6 barrel/minute flow rate, and a 1.73-mile segment between isolation valves—are based on the pipeline's actual design, performance, and installed equipment at the Lake Oahe crossing.  Notably, the 15-minute detection and shutdown time in the SACP's WCD calculation is comparable to, and demonstrates the accuracy of, the 12.9 minute detection and shutdown time used in the DAPL calculations.  DAPL's 12.9 minute timeframe is based on actual figures.  The slightly larger SACP value of 15 minutes is generic.  The main difference in the WCD outcomes

results from different drain-down volumes.  The SACP uses a 10-mile generic drain-down segment that holds approximately 46,460 barrels, making up 91% of the SACP's WCD volume.  The much shorter line segment and associated drain down of a hypothetical release at Lake Oahe accounts for ▉▉▉ barrels of DAPL's still conservative WCD estimate of ▉▉▉ barrels.  *See* First Godfrey Dec. ¶ 37.  Moreover, any actual discharge at the Lake Oahe crossing would likely be fewer than ▉▉▉ barrels because, among other things, drain drown will be limited with a pipeline buried approximately 90 feet beneath the lakebed.  *Id.* ¶¶ 29, 32.

31. Mr. Holmstrom also states that "DAPL has falsely asserted that the WCD would not change if the capacity was doubled.  However, in the PHMSA regulation the WCD would significantly increase—it is directly correlated to the 'maximum flow rate expressed in barrels per hour.'"  Third Holmstrom Dec. ¶ 68.  Mr. Holmstrom knows this is wrong, and appears to be deliberately attempting to mislead the court.  In the North Dakota proceeding, in which Mr. Holmstrom testified, Dakota Access witness Todd Stamm could not have been more clear that it is *the* ▉▉▉ *barrel WCD in the FRP* that will not change as a result of the optimization:

> Q. [by counsel] Has there been a worst-case-discharge analysis done on the projected expansion to 1.1 million barrels a day?
>
> A. [Stamm] Not as of yet.  But as I indicated, I anticipate there will be no increase in the worst-case discharge.
>
> Q. When I asked you if the worst-case discharge was going to be higher because you're going from 570 to 1.1 million, you said no.  And now you're telling me you haven't even done that math yet. Is that fair what I understand?
>
> A. Yeah, I think it's fair to help answer your question before the Commission, that the worst-case discharge, once again, looks at that—those assets, and *in the case of this Facility Response Plan* the worst-case discharge is the discharge of a tank, which has a significantly greater volume than that of the  pipeline.  Hence, my comment that the worst-case discharge *for this FRP* will not change.

N.D. November, 13, 2019 Hearing Tr.  251:11-252:10 (emphases added).

Neither Dakota Access nor Energy Transfer has made any statement or assertion that the WCD for the Lake Oahe crossing would not change, and Mr. Holmstrom does not cite one. As discussed, Mr. Holmstrom can easily do these calculations himself, and doing so shows that the drain down volume between isolation valves is the single most significant contributor to the WCD and that the drain down will not change. As noted above, there will be a minor incremental increase in the WCD with a faster flow rate that increases the throughput.

### Plaintiffs' Surge Potential Claims Have Not Shown Any Increased Risk Of A Spill

32. Like Mr. Holmstrom's declaration, Mr. Flanders's declaration raises serious credibility concerns. He repeatedly misstates facts about DAPL's surge relief valves and appears to misunderstand the nature of fluid mechanics and transmission pipeline design altogether.

33. Surge pressure or "water hammer" is generated when a fluid is suddenly stopped. The momentum of the fluid creates a pressure wave at the blockage that propagates back upstream towards the source of the line pressure. According to Mr. Flanders, DAPL's surge analysis report "limited the scope of the required Surge Relief Valves to only the pump station inlets, leaving the pipeline High Consequence Area river crossing HDD pipeline segments without protection. In other words, the surge protection system is designed to protect *the pump stations* along the pipeline from damage caused by pressure surge, but *not* the segments of the pipeline at the Lake Oahe crossing or other river crossings." Flanders Dec. ¶ 15 (emphases in the original). This criticism makes no sense. Surge relief valves are installed on the *upstream* side of DAPL pump stations so they can protect the *upstream* pipeline from surges initiating *at* the pump stations.[20] Surges that would affect upstream line pipe caused by the shutdown of pumps or closure of pump station valves are mitigated by the installed surge relief valves. Mr. Flanders misses the point of the

---

[20]  *See, e.g.*, Fluid Flow Consultants' report, RAR 17287, 17289.

design, which ensures that every surge initiator (including those in pump stations) is addressed.

34. Mr. Flanders also states that "[s]urge relief is required to ensure that a mistaken closure of mainline valves, such as the Emergency Flow Restriction Devices (EFRDs) on both sides of Lake Oahe, does not cause a dangerous pressure surge in the pipeline.  If one of the Lake Oahe EFRDs were to be subject to a spurious closure, there would no surge protection available for this high consequence area."  Flanders Dec. ¶ 18.  Mr. Flanders suggests here that the inadvertent closure of either valve at Lake Oahe would cause a surge at the crossing, but only *one* of the Lake Oahe valves, the *downstream* valve, could potentially have any impact on pressure surges at the crossing.  Pressure surges initiated at the upstream valve would travel upstream, *away* from the crossing.

35. DAPL's design and surge protection systems ensure that such an incident would not occur at either valve.  DAPL is designed and operated with multiple layers of protection to avoid a pressure surge, including installed equipment, protective devices, alarms, operating procedures, training requirements, and control systems.  First Godfrey Dec. ¶ 10; Stamm Dec. ¶¶ 10-12.  Despite recognizing that a "system must be designed so that a single point failure will be mitigated by other Safety Critical Devices in an integrated system," Flanders Dec. ¶ 12, Mr. Flanders focuses only on surge relief valves and ignores other surge protection efforts.  For instance, DAPL utilizes Supervisory Control and Data Acquisition ("SCADA") systems and Programmable Logic Controllers ("PLCs") at valve sites and pump stations to automatically shut down pump stations and protect against potential surges due to inadvertent valve closure.  First Godfrey Dec. ¶ 10.  Backup communication systems and power supplies ensure that the SCADA and PLC systems will be available when needed.  In the unlikely event of a total loss of communication, the pipeline controllers are trained to immediately bring the pipeline to a safe mode of operation where pressure surges cannot exceed safety limits.  In addition, the protection design is not solely dependent upon

communications via SCADA.  The PLC logic for closing mainline valves and commanding pump station shutdown is interdependent, meaning that mainline valves cannot close when pump stations cannot shutdown.  If SCADA and PLC communication or power is lost, then the mainline valves cannot receive a permissive command to allow them to close, and they will remain in their last position (fully or partially open).  This additional layer of protection ensures that surges due to mainline valve closure cannot occur.

36. Mr. Flanders reveals his unfamiliarity with transmission pipeline design when he asserts that "[n]o supporting documentation was provided in the Fluid Flow Consultants' report ["FFC report"] to support that the DAPL surge prevention system (valve position monitoring devices, communications, programmable logic, and pump controls) are maintained as Safety Critical Devices or that the integrated control system meets even the minimum requirements for design, component selection, and functional testing procedures of an IEC 61511/ISA S84 compliant Safety Instrumented System."  Flanders Dec. ¶ 14.  He repeatedly refers to the FFC report as if it were a final design document, when it is actually a study used to inform design engineers about risks and potential mitigations that are then incorporated into the overall system design.  As stated in the introduction of the report, "[t]he purpose of this surge study is to determine if these station suction MOV closures, MLV closures or pump station shutdowns cause excessive pressures (greater than 110% of MOP) and to *suggest and test measures* . . . to mitigate or eliminate any excessive surges."[21]  Energy Transfer has incorporated all of its surge consultant's recommendations into the final design and operation of DAPL and continues to operate under those recommendations.  These recommendations are consistent with standard, proven practices for surge protection and ensure that any surge event on the DAPL pipeline will not exceed 110% of maximum operating pressure

---

[21]  FFC report, RAR 17287.

consistent with federal regulations (*see* 49 C.F.R. § 195.406(b)).

37. Mr. Flanders also refers to International Society of Automation's International Electrotechnical Commission ("ISA/IEC") standards to support his position.  Flanders Dec. ¶ 11. However, ISA/IEC standards *are not* incorporated into pipeline safety regulations—nor should they be.  These standards were promulgated for the *process* industry (such as refineries and chemical plants) and the unique conditions within that industry.  Mr. Flanders appears to be conflating his experience in process safety with pipeline safety when he mistakenly suggests that these standards are a design requirement.

38. If that were not enough, Mr. Flanders then makes the outrageous claim that "[t]he lack of adequate pipeline *surge relief* at the river crossings is contrary to regulatory requirements, industry best practices, and in my view constitutes a noncompliant (nonexistent) safety layer that warrants suspension of operations."  Flanders Dec. ¶ 6;  *see also id.* ¶¶ 15-17.  First, I am aware of no regulatory requirement to have surge protection at HDD river crossings and HCAs.  And Mr. Flanders points to none.  Second, and notwithstanding the fact that surge protection in accordance with Fluid Flow Consultants' recommendations currently exists along the *entire length* of DAPL, Mr. Flanders's position that surge relief valves are specifically required at HDD river crossings flies in the face of sound engineering judgment and risk management principles.  A remote surge relief valves site would need to consist of, at minimum, a mainline take-off valve, the surge relief valves, an isolation valve, a tank shell valve, a relief tank, sump tank, drain lines, power supplies, communication, instrumentation, and sometimes a truck loading facility.  This would only increase the risk of a release from multiple potential sources in close proximity to an HCA.

39. In my 30-plus years of experience in transmission pipeline design, construction, and operations, I have not been aware of any pipeline with standalone surge relief valve sites at HDD

river crossings.  There is a good reason for that.  Additional remote surge relief facilities increase the risk of leakage from installed equipment, incorrect operations, tank overflow, and the threat of internal corrosion in stagnant piping.  To be effective at Lake Oahe, the surge relief valve facility with valves, storage tank, pump, and piping would have to be installed *between* the Lake Oahe isolation valves, compounding the spill risk to Lake Oahe by reducing the value provided by the EFRDs.

40. Moreover, HDD crossings are inherently safer than line pipe.  USACE_DAPL 71273. DAPL's HDD crossings already mitigate the risk of a potential surge with heavier wall thickness pipe, extra corrosion protection coating, and installation at depths that mitigate the risks of outside force damage including river bottom scour and earth movement.  Mr. Flanders's proposed surge relief valve at Lake Oahe would only increase the risk of an incident and contravene industry best practices.

**There Is A Near-Zero Risk Of A Spill At Lake Oahe If DAPL Continues Operating**

41. There is an extremely low, near-zero, risk of a spill occurring during the EIS process along any segment of the pipeline, particularly the segment that passes under Lake Oahe.

42. The risk of a spill at Lake Oahe is even lower than other segments of DAPL and other pipelines in general for several reasons.  First, multiple rounds of testing have confirmed the safety of the segment.  The pipe was hydrostatically tested twice, once following fabrication and a second time after installation below the lake.  The line was also inspected in 2018 using in-line inspection tools, approximately one year after beginning operation.   The in-line inspection used high resolution tools capable of identifying internal and external corrosion, dents, mechanical damage, manufacturing defects, and cracking.

43. I have reviewed the results of these inspections.  No issues were identified, and no repairs or remediation were required.  Instead, the inspections show the design of the crossing is meeting

its safety goals and presents a low risk of failure.  Future integrity inspections are scheduled at five-year intervals in accordance with PHMSA regulations.  *See* 49 C.F.R. § 195.452(j).  This interval is sound and prudent for DAPL as no threat of corrosion, mechanical damage, or cracking has been identified in prior inspections.  Energy Transfer's IMP will further assess the condition of the crossing and adjust inspection frequency if necessary, subject to PHMSA oversight through their inspection protocols and annual reporting requirements.  Dakota Access personnel also visit every facility along the pipeline at least twice a day.

44. Second, DAPL has demonstrated its safety through its best-in-class safety record after three years of operation, as shown in PHMSA and company data.  First Godfrey Dec. ¶¶ 16-20.  Since it began operating, DAPL has had no incidents on its mainline and only one incident that ever left a facility, which was less than half a barrel of misting that did not affect people or the environment.  *Id.* ¶ 16.  Mr. Holmstrom does not deny that or any of my data.  He instead takes spills from other pipelines to attempt to tarnish DAPL's record.  As discussed above, each claim is mistaken or misleading.

45. Third, DAPL's conservative WCD calculation is based on an FRP that exceeds PHMSA requirements and demonstrates that Energy Transfer has secured resources to prepare for an incident ███████ larger than any that could occur at Lake Oahe.  *Id.* ¶ 37.  The Lake Oahe easement imposes additional requirements that bolster DAPL's safety, including a cathodic protection schedule, test parameters for interference current surveys, and initial in-line inspection frequency.  USACE_ESMT 40-41.  Several emergency response drills, including at Lake Oahe in winter conditions, have confirmed that the resources in the FRP and GRP are available and beyond sufficient.  Stamm Dec. ¶ 23.

46. Finally, there are no unique or heightened risks at Lake Oahe.  DAPL was co-located with

other utility lines that run under Lake Oahe in order to reduce the project's overall impacts compared to alternative routes.  USACE_DAPL 72320.  This was not a greenfield.  There are numerous other pipelines under the Missouri River upstream of the DAPL crossing.  *See* D.E. 509-3, Fig. 1 ("First Aubele Dec.") (cross-section map).  Moreover, those other lines are older and not buried at the depth of DAPL.

47. The risk of an incident at Lake Oahe has only *decreased* since 2017 when the Court decided not to vacate the easement.  Time and real-world experience have proven Mr. Kuprewicz's and Mr. Holmstrom's prior statements and predictions about DAPL's safety risks to be wrong.  *See, e.g.*, Third Kuprewicz Dec. ¶¶ 9-10; D.E. 195-1 ¶¶ 19-20; D.E. 272-4, ¶ 27.  There have been no pipeline ruptures, no discharges to water, no undetected leaks, no landslides, and no immediate or significant line repairs.  There is no reason to expect that will change.

**Shutting Down The Pipeline Would Increase The Risk To The Tribes**

48. Plaintiffs misrepresent the nature of risk in arguing that DAPL should be shut down because there is *some* alleged risk of an incident.  Mr. Holmstrom, for instance, rejects industry comparisons for a standard of "zero incidents," Third Holmstrom Dec. ¶ 46, while Plaintiffs even speculate about "the safety risks of not vacating . . . due to a recent decline in government enforcement," D.E. 527, at 28-29 ("Plaintiffs' Br.").

49. Their "no risk" standard is unreasonable and unattainable.  No law or regulation applies such a standard, and none appears in relevant academic literature or guidance.  Risk is a balance of potential consequences and the probability of those consequences.  It can be reduced and mitigated, but not eliminated.  DAPL is reducing both elements through its state-of-the-art technology, integrity management program, notification and monitoring systems, and the mitigation and remediation plans in place.  A shutdown and alternative transport would only present more risk.

50. Shutdowns of several months or longer are not normal events for an operational pipeline and carry significant preservation expenses and risks. Plaintiffs confuse the issue by conflating the long-term shutdown being considered for DAPL with brief shutdowns for routine maintenance and repairs. *See* Plaintiffs' Br. 28-29. As explained, shutting down a crude oil pipeline like DAPL for an extended period significantly increases the risk of internal corrosion. Water naturally entrained in the oil will separate from solution and settle in low spots such as Lake Oahe. This will allow for the formation of corrosion cells, and most significantly, microbially induced corrosion. Once such corrosion is established, it is very hard to eradicate and increases the long-term risk to the pipeline even after operations resume.

51. Shifting oil from a pipeline to alternative transport like rail or truck would only pose a higher risk of an incident. For example, while there has been extensive planning and study done at DAPL's Lake Oahe crossing, I am aware of nothing similar to prepare for a potential train accident at the Lake Oahe crossing in Mobridge, South Dakota, which is near the Standing Rock Sioux Tribe's water intake and the Cheyenne River Sioux Tribe reservation. First Aubele Dec. ¶¶5, 17, 37. A whole unit-car train carries as much as 77,000 barrels of oil. *Id.* ¶ 36. All of that oil spilling would be greater than the WCD for the entire northern portion of DAPL, and more than ████████ greater than DAPL's WCD at Lake Oahe. And it would be worse from an environmental perspective because the oil could enter the Lake directly from a rail accident, whereas DAPL is more than 90 feet below the lake bed. Moreover, the impacts of this additional crossing would not have the environmental agency review and approval that DAPL did. *See* First Aubele Dec. ¶ 34.

52. Likewise, the use of rail and truck pose increased safety and environmental risks as compared to pipeline transport. Studies show that rail transport of crude oil is 4.5 times more likely to result in an accident than pipeline transport of crude oil, and the resulting rail accidents

and spills cost about 600% more. States' Amicus Br., D.E. 514, at 16. The results are often catastrophic, like the incident involving a train carrying Bakken crude oil that incinerated the town of Lac-Mégantic, Canada and killed over 40 people. *Id.* As explained by Mr. Aubele, rail transportation also results in more fatalities per year, more emissions from combustion products, and more petroleum incidents than pipelines. Pipeline transport—particularly through DAPL— minimizes these risks.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: June 8, 2020

John F. Godfrey

29

# GODFREY
# EXHIBIT 1

Integrity Management Plan

FILED UNDER SEAL

SUBJECT TO THE PROTECTIVE ORDER

# GODFREY

# EXHIBIT 2



# Organizational Excellence (OE)

# Policy

Authorized and Approved by: OE Steering Committee

Initial Version:  November 1, 2017

Revision Date:  December 2019



# *Table of Contents*

| Section | Page |
|---|---|
| OE Vision Statement | 3 |
| OE - A Culture of Continuous Improvement | 4 |
| OE Based Foundation Processes | 5 |
| OE Element Based Process | 6 |
| OE Governance Structure | 7 |
| OE Governance Roles | 8 |
| OE Leadership and Responsibilities | 9 - 10 |
| OE Strategic Initiatives | 11 |
| Appendix A: API-RP-1173 Element General Descriptions | 12 - 14 |
| Revision Log | 15 |



<div style="background:#1F3864; color:white; text-align:center;">

# *OE Vision Statement*

</div>

**OE Vision Statement**

Energy Transfer is committed to delivering excellence and results in our Operations and Engineering functions through the application of Organizational Excellence (OE) that is equivalent to the elements essential in API-RP-1173.  OE will:

1. Promote a *Culture of Continuous Improvement* for all employees and contractors with an emphasis on the following actions:
   - Identifying and Managing Risks
   - Executing Work
   - Evaluating Results
   - Taking Action Now
   - Continuously Improving

2. Develop and use OE Based Foundation Standards including:
   - Unwanted Event Documentation, Investigation, and Lessons Learned
   - Work Planning
   - MOC's for physical, technical, procedural and organizational changes

3. Strive to continuously improve our engineering, operations, maintenance, and construction activities through the use of an OE Element Based process with a focus on the following ten areas:

   - Leadership and Management Commitment

   - Stakeholder Engagement

   - Risk Management

   - Operational Controls

   - Incident Investigations, Evaluations, an Lessons Learned

   - Safety Assurance

   - Management Review and Continuous Improvement

   - Emergency Preparedness and Response

   - Competence, Training and Awareness

   - Documentation and Record Keeping



## *OE - A Culture of Continuous Improvement*

A culture of continuous improvement is the collective set of attitudes, values, norms, beliefs, and practices that the company, employees and contractors share with respect to getting better.  A positive culture is one where employees and contractor personnel collaborate; are responsible for public safety, protection of the environment, and for each other's safety; have positive attitudes towards compliance (meeting and exceeding minimum standards); are committed to our customers, and for the health of our business.

Energy Transfer promotes a culture of continuous improvement through the following five areas of focus:

1. Identifying and Managing Risks
   - Proactively think of what can go wrong to identify areas for improvement.
   - Identify and reveal risks to management
   - Promote the sharing of Lessons Learned

2. Executing Work
   - Conducting engineering, operations, maintenance, and construction activities in a safe, environmentally sound and regulatory compliant manner with a goal of zero incidents
   - Expecting our employees and contractors to follow approved policies, procedures, and practices.  Provide training and assistance as needed
   - Ensure clear expectations and responsibilities for each employee

3. Evaluating Results
   - Regularly evaluate projects, jobs and tasks to ensure desired results and performance

4. Taking Action Now
   - Encourage leadership at all levels
   - Take ownership
   - Be mindful of cascading failures early on to take action to prevent a catastrophic event (i.e. small issues leading to a larger event)
   - In cases where an employee believes that following a procedure will cause an unsafe condition, he/she has authority to stop work and get permission to deviate

5. Continuously Improving
   - Promote a questioning and learning environment
   - Inspire, enable, and nurture change when necessary
   - Encourage two-way conversations about learnings
   - When faced with abnormal conditions or nonconforming processes/procedures, identify improvements



# *OE Based Foundation Standards*

OE based foundation standards set in place processes with the purpose of preventing the occurrence or re-occurrence of unwanted events.


These standards  include, but are not limited to the following:


1.  Unwanted Event Documentation, Investigation, and Lessons Learned
    - This process provides direction to ensure consistent internal documentation of unwanted events, outlines the provisions of when an investigation should be performed, and sets forth the expectations related to the creation of lessons learned.  The purpose is to learn from events and prevent future events.

2.  Work Planning
    - An overview of processes utilized to pre-plan work.  Work planning is to assist in efficiently and effectively carrying out work activities in a safe manner.  The work planning process plays a role in pre-job hazard recognition/assessment.

3.  MOCs
    - A risk reduction practice that formalizes a process that is intended to minimize negative impacts to the safety, health, environment, and business functions of the company caused by changes.  It includes physical changes, technical changes, procedural changes, and organizational changes.



# *OE Element Based Process*

The OE Element Based Process is a system that promotes a goal of delivering excellence and results in our Operations and Engineering functions through the upkeep of an organization-wide Safety Management System that is equivalent to the elements considered essential to API-RP-1173, including:

1. Leadership and Management Commitment
2. Stakeholder Engagement
3. Risk Management
4. Operational Controls
5. Incident Investigations, Evaluations, an Lessons Learned
6. Safety Assurance
7. Management Review and Continuous Improvement
8. Emergency Preparedness and Response
9. Competence, Training and Awareness,
10. Documentation and Record Keeping

Key aspects of the OE Element Based Process include:

- OE Governance Structure & Governance Roles
- OE Leadership and Responsibilities
- OE Strategic Initiatives - Annual  goal setting

6


**ENERGY TRANSFER**

## *OE Governance Structure*

OE Governance sets the framework to ensure a sustainable OE element based process is in place.





## OE Governance Roles

| Role | Description | General Duties |
|------|-------------|----------------|
| OE Steering Committee | Senior leaders responsible for defining and carrying out company strategies and policies. At least one meeting to be held each year. | • Review the output from Management Review meetings.<br>• Review the OE Policy Document to confirm the document is properly aligned with the company direction.<br>• Develop OE short and long term goals. |
| Management Review Team | Management team personnel responsible for reviewing the overall OE program effectiveness, providing feedback to Element Teams, and providing recommendations to the OE Steering Committee.  At least one meeting to be held each year. | • Annual review of: (1) overall OE program effectiveness, (2) Risk Management results and priorities, (3) continuous improvement recommendations, (4) budget and resource needs.<br>• Provide feedback to Element Teams<br>• Provide recommendations to the Steering Committee |
| OE Program Team | OE department personnel responsible for the development, implementation and on-going execution of OE from a programmatic standpoint. | • Facilitate Element Team Reviews.<br>• Provide OE Training, Tools, Resources.<br>• Manage OE Inputs and Element Team Outputs.<br>• Prepare materials for Management Review meetings. |
| Element Teams | Chaired by an Element Chairperson who is accountable for the element topic, and facilitated by a member of the OE Program Team, members of the Element Review Teams include functional leaders who may also be stakeholders in the element topic.  Members shall be in a position to delegate tasks and assign resources to address open items or areas for improvement.  At least four (i.e. quarterly meetings) per year. | • Participate in Element Review Meetings.<br>• Review OE Inputs (KPIs, Stakeholder Engagement, Audits and Evaluations, Culture Surveys, Lessons Learned…)<br>• Develop Element Team Outputs (Stakeholder Feedback, Continuous Improvement Initiatives…) |
| Management Personnel | All Managers and Supervisors with direct reports.  All Project Managers. All company Leads or higher positions.  All Operations Leads.  Role is to set goals for individual departments and ensure local level participation in the OE program. | • Set local goals and objectives for departments and individuals aligned with the vision of the OE.<br>• Promote the processes related to OE.<br>• Encourage employee participation and recognize success |
| All Employees and Contractors | All employees and Contractors | • Recognize hazards<br>• Follow procedures<br>• Provide input on continuous improvement<br>• Exercise stop work authority appropriately |

8



## *OE Leadership and Responsibilities*

**OE Leadership** at all levels is essential to achieve the desired results.

Characteristics of effective leadership:

- Sets priorities, monitors progress, and brings a focus to the highest impact items.

- Ensures clear accountability and performance objectives

- Visibly demonstrate their beliefs through engagement with others throughout the organization where they demonstrate their commitment to Organizational Excellence and the promotion of pipeline/facility/engineering safety, personal safety, the environment, risk mitigation, and continuous improvement.

Responsibilities related to OE for the OE Steering Committee, Management Review Team, Department Managers/Supervisors, and all employees are as follows:

The **OE Steering Committee** and the **Management Review Team** shall meet at least annually and are accountable to:

- Set goals and objectives for the OE;

- Review key performance indicators (KPIs);

- Ensure continuous improvement and the continuous improvement culture is assessed over time, there is a connection between the objectives set and day-to-day activities, and that there is an openness and two-way dialogue to ensure lessons learned are shared and effective ;

- Ensure all leadership levels of the organization are engaged with the vision of the OE through direct communication with reportable employees;

- Ensure there is accountability for adherence to OE through the annual performance appraisal process and that annual performance reviews/bonus programs take into account recognition and discipline with respect to the OE;

- Ensure resources are allocated for safe, environmentally sound, reliable and efficient operations through the annual budget process;

- Evaluate recommended changes for inclusion into the OE;

- Ensure continuous improvement is promoted and communicate the company's commitment to the OE to internal and external stakeholders.



# *OE Leadership and Responsibilities*

The **Element Teams** shall:

- Ensure there is a connection between the OE element processes  in place and day-to-day activities.

- Assess, evaluate, and continually improve the culture related to each element of API-RP-1173.

- Ensure risk management is occurring, and that risk is being managed.

- Develop, implement and continuously improve processes related to planned work and emerging risks.

- Review KPIs for each element and recommend improvements as warranted.

**Department Managers and Supervisors** shall:

- Set goals and objectives for departments or groups that are aligned with the vision and goals of OE, including continuous improvement.

- Ensure, through goal setting and local meetings, a culture that promotes risk management, hazard recognition, and continuous improvement is practiced when conducting day to day operations.

- Promote the sharing of Lessons Learned.

- Hold all employees accountable for adherence to the vision of OE.

- Ensure all employees understand their authority to stop work when unsafe.

- Identify and communicate areas for improvement to Element Review Teams through use of the OE.Mailbox@energytransfer.com email.

**Employees** shall:

- Follow procedures set forth by the organization

- Identify and reveal risks to management

- When faced with abnormal conditions or nonconforming processes/procedures, identify improvements taking into  account employees, contractors, and the public.

- Be mindful of cascading failures early on to take action to prevent a catastrophic event (i.e. small issues building into a larger event.)

- In cases where an employee believes that following a procedure will cause an unsafe condition, he/she has  authority to stop work and get permission to deviate.



# *OE Strategic Initiatives*

**2020 OE Strategic Initiatives**

- Develop and implement a companywide MOC process.

- Develop and implement a companywide PSSR process.

- Develop and implement a companywide Work Plan process.

- Roll-Out and implementation of a new Unwanted Event Reporting and Investigation procedure.

- Communication and roll-out of OE to the regulated natural gas operations.

- Completion of OE field/area assessments (conduct at least 4 in 2020)

- Perform a needs/gap assessment, and then develop a strategy/plan to develop Operating Procedures that provide clear instructions for safely operating facilities/equipment/assets. (the strategy/plan is anticipated to require a multi-year implementation)

- Initiate routine meetings with Divisions/Areas (including E&C) to provide OE implementation updates and assistance.

- OE Group support of:
  - ◊ OE Participation in Standing Committees,
  - ◊ OE Element Team Meetings,
  - ◊ OE Processes,
  - ◊ PipelineSMS Industry Team

- Develop an OE roll-out plan for 2021 that includes terminals and any other operating assets not already part of the program.



# *Appendix A: API-RP-1173 Element General Descriptions*

## Leadership and Management Commitment

API-RP-1173 (5.1):  "The pipeline operator shall establish and maintain a OE and build a shared understanding of safety culture.  Top management shall communicate expectations by documenting the pipeline operator's policies, goals, and commitment to safety, as well as identifying safety responsibilities of personnel at all levels.  The pipeline operator shall improve upon the OE and measure its effectiveness and maturity in accordance with the requirements of this document."

## Stakeholder Engagement

API-RP-1173 (6.1): "The pipeline operator shall maintain a process and a plan for communication and engagement with internal and external stakeholders regarding risk identification and management, safety performance, and as appropriate, other OE elements.  The plan shall identify the organization's stakeholders, both internal and external, and the communication responsibilities of pipeline operator personnel."

## Risk Management

API-RP-1173  (7.1): "The pipeline operator shall maintain (a) procedure(s) for the performance of risk management.  The operator shall maintain a description of the assets comprising the pipeline, including the surrounding environment, to identify threats to pipeline safety.

The operator shall analyze risk considering the threat occurrence likelihood and consequence.  The operator shall evaluate pipeline safety risk and make decisions on how to manage it through preventative controls, monitoring, and mitigation measures."

## Operational Controls - Operating Procedures

API-RP-1173 (8.1.1):  "The pipeline operator shall maintain procedure that address safe work practices to assure the safe conduct of operating, maintenance, and emergency response activities and the control of materials that impact pipeline safety.  Pipeline operating personnel shall follow written procedures.   In cases were an employee believes that following a procedure will cause an unsafe condition, he/she shall have authority to stop work and seek permission to deviate.  Deviations should be documented for future analysis.  Pipeline operating personnel shall have responsibility and authority to raise concerns through designated processes."

## Operational Controls - System Integrity

API-RP-1173 (8.2.1):  "The pipeline operator shall assure that pipeline systems subject to this document are designed, manufactured, fabricated, installed, operated, maintained, inspected, and tested pipeline systems subject to this document to maintain safety in a manner consistent with the specified requirements, regulations, and applicable standards."

## Operational Controls - Management of Change

API-RP-1173 (8.3.1): "The pipeline operator shall maintain a procedure for management of change (MOC).  For each MOC, the pipeline operator shall identify the potential risks associated with the change and any required approvals prior to the introduction of such changes."



# *Appendix A: API-RP-1173 Element General Descriptions*

## Operational Controls - Use of Contractors

API-RP-1173 (8.4):   "When a pipeline operator elects to outsource activities on the pipeline affected by the OE, it shall define and document the process for:

(a) communicating requirements of the OE applicable to the contractor's scope of work;

(b) Defining responsibility, accountability, and authority for managing the outsourced activities;

(c) Incorporating lessons learned into the operators operations;

(d) Training and orientation on safety policies;

(e) Evaluating contractor safety performance;

(f) Communicating risks at the work site; and

(g) Communicating the MOC procedure."

## Incident Investigation, Evaluation, and Lessons Learned

API-RP-1173 (9.1.1): "The pipeline  operator shall maintain a procedure for investigating incidents and near-misses that led, or could have led, to an incident with serious consequences. Incident investigations shall be initiated as promptly as possible considering the need to secure the incident scene, protect people and the environment, and maintain and recover important evidence and testimony."

## Safety Assurance

API-RP-1173 (10.1): "The operator should evaluate the application of its OE and determine whether expected progress toward effective risk management and improved pipeline safety performance are being achieved.  The pipeline op-

-erator shall demonstrate the proper application of its OE and continually improving risk management and pipeline safety performance."

## Management Review and Continuous Improvement

API-RP-1173 (11.1.1):  "The pipeline operators OE and safety performance shall be reviewed to determine the extent to which the performance goals and objectives have been met."

## Emergency Preparedness and Response

API-RP-1173 (12): "The pipeline operator shall maintain procedures for responding effectively to a pipeline incident. Emergency preparedness and response plans shall be in place and ready for immediate implementation.  The plans shall be accessible and communicated to all personnel and contractors.  The plans shall be based on applicable laws and regulations."

## Competence, Awareness, and Training

API-RP-1173 (13): "The pipeline operator shall assure that personnel whose responsibilities fall within the scope of the OE have an appropriate level of competence in terms of education, training, knowledge, and experience.  Where contractors are used to support the OE, the pipeline operator shall assure that they have the requisite competence.

The pipeline operator shall define the need for and provide training to enable development and implementation of the OE elements.



<div style="border">

# *Appendix A: API-RP-1173 Element General Descriptions*

</div>

Training shall include refresher training and raising awareness where executing the safety assurance and continuous improvement sub-elements reveal opportunities to improve processes and procedures.  Records of training shall be maintained."


**<u>Documentation and Record Keeping</u>**

API-RP-1173 (14):  "The pipeline operator shall maintain a procedure for the identification, distribution, and control of documents required by its OE.  The procedure shall specify responsibilities for document approval and re-approval, and shall identify the controls needed to assure that the documents required by the OE, including revisions, translations, and updates:

 (a) are reviewed and approved for adequancy prior to issue and use;

 (b) identify changes and revision status;

 (c) remain legible and readily identifiable; and

 (d) are readily available and accessible to workers performing an activity."



| Revision Log |
|---|

**January 2019:**

- Addition of 2019 Strategic Initiatives on page 4
- Addition of a Revision Log on page 14

**November 2019:**

- Rebranding from PSMS to OE
- Revised vision statement
- Displaced former "Objectives" throughout the document
- Addition of sections on A Culture of Continuous Improvement and the OE Based Foundation Programs
- New 2020 OE Strategic Initiatives

GODFREY
EXHIBIT 3

**Mid-Missouri River Sub-Area Contingency Plan**

**April 16, 2015**

**For Further Information and/or Updating the Mid-Missouri River Sub-Area Plan, Contact:**

On-Scene Coordinator for Mid-Missouri River Sub-Area Contingency Plan
U.S. Environmental Protection Agency, Region 8
Emergency Response Program
1595 Wynkoop Street
Denver, CO 80202
EPA Region 8 (Spill Line) - 303-293-1788

# CONTENTS

**Section**                                                                                                          **Page**

1.0    INTRODUCTION ........................................................................................................... 1

  1.1    PURPOSE.................................................................................................................1
  1.2    SCOPE....................................................................................................................2
  1.3    STATUTORY AUTHORITY....................................................................................3

2.0    DESCRIPTION OF SUB-AREA ................................................................................. 3

  2.1      WATERSHED AND CLIMATE ................................................................. 3
  2.2      SENSITIVE AREAS ................................................................................... 4

3.0    OIL THREATS...............................................................................................................7

  3.1    EPA-REGULATED FRP (FIXED) FACILITY HAZARDS.......................................7
  3.2    TRANSPORTATION HAZARDS..............................................................................8
  3.3    OIL PRODUCTION FACILITIES..............................................................................8
  3.4    WORST-CASE DISCHARGES AND PROJECTIONS...............................................8

      3.4.1    FRP Spill Projections......................................................................... 9
      3.4.2    FRP Worst-Case Discharges .............................................................. 9

4.0    RESPONSE OPERATIONS AND ROLES ................................................................. 10

  4.1    GENERAL PATTERN OF RESPONSE (OPERATIONS)........................................10
    4.2      RESPONSE ROLES................................................................................... 14

      4.2.1    Responsible Party Roles/Responsibilities.................................................. 15
      4.2.2    Federal OSC Roles/Responsibilities.......................................................... 16
      4.2.3    Federal Agency Roles/Responsibilities ..................................................... 18
      4.2.4    State Government Roles/Responsibilities................................................... 19
      4.2.5    Tribal Government Roles/Responsibilities................................................. 20
      4.2.6    Local Jurisdictions/Agencies Roles/Responsibilities................................. 21

  4.3    RESPONSE STRATEGIES AND CONTROL POINTS............................................22
  4.4    RESOURCES AND EQUIPMENT............................................................................23
  4.5    THE EMERGENCY RESPONSE APPLICATION....................................................24

5.0    CHEMICAL COUNTERMEASURES, IN-SITU BURNS, BIOREMEDIATION ..................... 25

  5.1    CHEMICAL COUNTERMEASURES/SUBPART J AGENTS....................................25
  5.2    IN-SITU BURNS.......................................................................................................26
  5.3    BIOREMEDIATION.................................................................................................26

6.0      OTHER CONTINGENCY PLANS ............................................................................. 27

**APPENDICES**

**Appendix**

A      SUB-AREA CONTACT LIST

B      OIL SPILL RESPONSE TECHNIQUES

# MID-MISSOURI RIVER SUB-AREA CONTINGENCY PLAN

## 1.0        INTRODUCTION

The three levels of contingency plans under the Federal National Response System are the National Contingency Plan (NCP), Regional Contingency Plan (RCP), and Area Contingency Plan (ACP). ACPs were most recently required by the Oil Pollution Act of 1990 (OPA 90). Following OPA, most EPA regions, including Region 8, added various ACP requirements into their Regional Plans, resulting in combined RCP/ACP plans. However, the area covered by the combined plans (RCP/ACP) was regional in scope and lacked localized geographic details necessary for oil spill response planning and coordination. Region 8 has combined the ACP into the RCP.

To conduct planning in localized areas, Region 8 designated 10 smaller sub-areas based on watershed boundaries for oil spill planning. The Sub-Area Contingency Plans (SACP) provide a greater level of tactical response planning to guide initial actions in response to major discharges of oil that threaten waters of the United States. These planning efforts focus on areas most vulnerable to oil spills. For additional detail on the area planning strategy, refer to the EPA Region 8 RCP, dated December 30, 2014. The area planning development strategy was approved by the Region 8 Regional Response Team (RRT) in August 2013. This SACP, in conjunction with the RCP, will constitute Region 8's ACP for the Mid-Missouri River Sub-Area. This SACP was developed via a collaborative effort of federal, tribal, state, and local agencies, as well as industry groups.

## 1.1        PURPOSE

OPA 90 defined the purpose of area planning as follows:  "*The Area Contingency Plan shall, when implemented with the National Contingency Plan, be adequate to remove a worst-case discharge and to mitigate or prevent a substantial threat of such a discharge from a vessel, offshore facility or onshore facility operating in or near the area.*"

## 1.2    SCOPE

OPA 90 required that several elements be met in developing ACPs, which were later codified into the Clean Water Act (CWA) 311 (j)(4)(c) and subsequently into the NCP at 40 *Code of Federal Regulations* (CFR) Section 300.210 (c).  The requirements of CWA Section 311 (j)(4)(C) are as follows:

(i)     *When implemented in conjunction with the National Contingency Plan, be adequate to remove a worst-case discharge[of oil] and to mitigate or prevent a substantial threat of such a discharge from a vessel, offshore facility, or onshore facility operation in or near the area;*

(ii)    *Describe the area covered by the plan, including the areas of special economic or environmental importance that might be damaged by a discharge;*

(iii)   *Describe in detail the responsibilities of an owner or operator and of federal, state, and local agencies in removing a discharge, and in mitigating or preventing a substantial threat of a discharge;*

(iv)    *List the equipment (including firefighting equipment), dispersants or other mitigating substances and devices, and personnel available to an owner or operator and federal, state and local agencies to ensure an effective and immediate removal of a discharge and to ensure mitigation or prevention of a substantial threat of a discharge;*

(v)     *Describe the procedures to be followed for obtaining an expedited decision regarding the use of dispersants;*

(vi)    *Describe in detail how the plan is integrated into other Area Contingency Plans and vessel, offshore facility, and onshore facility response plans approved under this subsection, and into operating procedures of the National Response Unit;*

(vii)   *Include any other information the President requires; and*

(viii)  *Be updated periodically by the Area Committee.*

Additionally, NCP Section 300.210(c)(4)(i) calls for Area Plans to incorporate a detailed annex containing a Fish and Wildlife and Sensitive Environments Plan that is consistent with Regional Plans. The EPA Region 8's Fish and Wildlife Sensitive Environments Plan is included as Annex III of the Region 8 RCP and provides information for Federal On-Scene Coordinator (OSC) and other responders for protection of threatened and endangered species and their habitats during a response.

Within a particular geographic watershed boundary, each SACP will assess threats from facilities that could cause substantial harm to the environment by discharging into or on the navigable waters and or adjoining shorelines.  Section 300.211 of the NCP identifies those facilities that "could cause substantial harm to the environment" and that must submit a Facility Response Plan (FRP) for responding to a worst-case discharge and to a substantial threat of such a discharge.  Requirements for FRPs for non-

transportation related onshore facilities are specified at 40 CFR Section 112.20, and pertain to those facilities with total storage capacity exceeding one million gallons and that meet certain criteria.  These facilities are regulated by the EPA and are referred to as FRP facilities.  Requirements for pipeline (transportation) FRPs are specified at 49 CFR Part 194 and are regulated by the Department of Transportation (DOT).  While these higher threat facilities are the focus of this planning effort, spills from smaller and more prevalent sources and facilities, such as railroads, production facilities, trucking operations, etc., could also be addressed by response strategies developed as part of this SACP.  Discharges from these other potential sources may constitute a "Major Discharge" as defined in the NCP for inland waters.  The SACP response strategies are expected to assist in responding to such discharges that may be more prevalent.

Although this SACP focuses on oil spill response, the successful development of this plan (and the web-based response tool discussed in this document), along with planned updates to the RCP will prepare and enhance the Region's ability to respond to both oil discharges and hazardous substance releases.  This SACP and associated response strategies do not relieve operators of requirements for FRPs or other applicable regulatory compliance.

## 1.3    STATUTORY AUTHORITY

This SACP was prepared under the NCP, 40 CFR Part 300 and Section 311(j) of the CWA, as amended by OPA 90, 33 *United States Code* (U.S.C.) 1251 et seq.

## 2.0    DESCRIPTION OF SUB-AREA

This section describes the sub-area, its sensitive environments and critical infrastructure (sensitive resources), and the planning approach developed for protection of these.

## 2.1    WATERSHED AND CLIMATE

Using a watershed-based approach for defining sub-area boundaries, the Mid-Missouri River is composed of the Missouri-Little Missouri and the Missouri Oahe watersheds (referred to as sub-regions).  These watersheds are classified as Hydrologic Unit Code 4.  The sub-area includes parts of 44 counties within North Dakota, South Dakota, Montana, and Wyoming.  The Missouri River is the principal drainage system within the sub-area.

The Missouri-Little Missouri watershed encompasses western North Dakota and portions of eastern Montana and northeastern Wyoming.  The watershed covers an area of 17,234 square miles and includes

3

six counties.  The Missouri-Little Missouri watershed drains into Lake Sakakawea in North Dakota—the third largest reservoir in the United States, 178 miles long and including 1,340 miles of shoreline.

The Missouri Oahe watershed encompasses central North Dakota (below Garrison Dam on Lake Sakakawea) to Lake Oahe in South Dakota.  The watershed covers an area of 37,085 square miles.  The Missouri Oahe watershed drains into Lake Oahe—the fourth largest reservoir in the United States, 231 miles long and including 2,250 miles of shoreline.

The Mid-Missouri River Sub-Area is within the Great Plains Physiographic Province.  The topography varies from flat, gently rolling hills in the glaciated regions to steep and dissected rolling plains to the west.  Climate of the sub-area is characterized by large seasonal fluctuations in temperature, long winters, warm summers with moderate to high relative humidity, and frequent high winds.  Average annual precipitation varies across the sub-area from 13 inches in the northwest portion to 20 inches in the southern portion.

Three distinct seasons of water flow occur within the sub-area:  (1) winter, (2),spring runoff or peak/high flow, and (3) base flow.  The winter season is primarily from November through late April when the rivers and reservoirs of the sub-area are covered by ice.  Spring runoff, or peak/high flow, generally starts late April to early May and continues through late May to June.  The period of peak flows varies year to year; however, May is the primary month of peak flow.  Following the spring runoff, base flow occurs. These seasonal variations are likely to impact response strategies devised by the Sub-Area Committee, and adjustments in the field may be necessary.

## 2.2    SENSITIVE AREAS

As part of the development of this SACP, the planning process focused on identifying areas where sensitive environmental areas could be impacted by a worst-case discharge of oil.  The river system and reservoirs described in Section 2.1 are considered sensitive and/or critical for multiple reasons that include, but are not limited to, provision of drinking water, irrigation/industrial water, critical wildlife habitat, and recreational opportunities.  Planning initially focused on the areas along the Missouri River and Lakes Sakakawea and Oahe where higher density of oil operations and transportation are located. However, other sensitive environments/areas were accounted for during the planning process.  Those included smaller streams, rivers, and water bodies throughout the sub-area.  The majority of the planning focus was in the Williston Basin area of North Dakota.  Currently, within South Dakota, response planning is limited to the North and South Forks of the Grand River, as well Bowman-Haley Lake, all of which could be potentially impacted by oil field production activities.  There are not currently any major

oil transmission lines or railroad corridors in this area.  In the future, additional planning may be appropriate.  Water intakes are located in rivers and reservoirs within the sub-area and are used for various purposes (drinking water, irrigation, etc.).  Water intake information is included as a data layer on the web-based response tool (under the "Water" layer) discussed further in this document.  That data is primarily associated with drinking water intakes; therefore, not all water intakes within the sub-area are identified.  The specific location and potential threat to an intake should be addressed on an incident-specific basis by responding personnel.

A general approach to protection of the sub-area was devised via close coordination among members of the Sub-Area Committee that included representatives from the North Dakota Department of Health, North Dakota Department of Emergency Services, South Dakota Department of Environment & Natural Resources, United States Fish and Wildlife Service (USFWS), North Dakota Game and Fish Department, Mandan, Hidatsa & Arikara (MHA) Nation (also known as the Three Affiliated Tribes), Bureau of Indian Affairs, federal land management agencies including the United States Army Corps of Engineers (USACE), and several county emergency management offices.  Within the Mid-Missouri River Sub-Area, the Missouri River and associated shoreline are designated critical habitat for threatened and endangered species.  As such, resource trustees and managers preferred a general protection approach rather than the development of habitat and/or location-specific strategies.  The general approach is to control the source of the spill as quickly as possible and then focus actions on limiting impacts downstream.  For example, if an oil spill would threaten Lake Sakakawea, the initial goal would be to contain the oil within the first impacted waterway or bay.  This would limit impact on the main body of the lake.  Conversely, if a spill would occur on the main body of the lake, the initial goal would be to contain the oil within the main body and thus protect the shoreline and lake bays to the extent possible.

Threatened and endangered federal and state species that may be present in riparian corridors within the SACP area are provided in Appendix C (to be provided).  This list was prepared by US Fish and Wildlife and is a subset of the complete listing of federal and state threatened and endangered species in Annex III to the RCP.

Although sensitive environments that include threatened or endangered species and critical habitat are present across the sub-area, the committee agreed that this general protection approach is most applicable within the first 24 to 72 hours of a response.  Importantly, this approach does not replace the requirement for coordination and consultation with the trustees as required under the NCP during an incident.  In fact, protection of trustee-managed resources, including wildlife and habitat, must be factored into oil spill response operations.  The Federal On-scene Coordinator (OSC) shall ensure that natural resource trustees

and natural/historic resource managers are promptly notified of a discharge or release.  If threatened or endangered species or their habitat may be affected, the Federal OSC must initiate consultation with the USFWS in accordance with the Fish and Wildlife and Sensitive Environments Plan (refer to Annex III of the Region 8 RCP) and the Endangered Species Act Memorandum of Understanding (refer to Annex IV of the Region 8 RCP).

If cultural, historic, or archaeological sites could be affected by response operations, the Federal OSC must consult the State Historic Preservation Officer (SHPO) and other appropriate entities as specified in the *Programmatic Agreement on Protection of Historic Properties During Emergency Response Under the NCP* (refer to Annex V of the Region 8 RCP).   Additionally, response actions on tribal property should factor in the potential impacts on cultural resources.  Identification of culturally, historically, or archaeologically sensitive sites in the vicinity of a spill can be accomplished by contacting the appropriate SHPO or land managing agency cultural resource specialist or other appropriate contact.  This individual is generally associated with the State Historical Preservation Office or Society.  Contacts for states associated with the sub-area are as follows:

- North Dakota State Historic Preservation Officer (North Dakota Historical Society ) – (701) 328-2666 or http://www.history.nd.gov/hp/

- South Dakota State Historic Preservation Officer (South Dakota Historical Society) – (605) 773-3458  or http://history.sd.gov/preservation/

- Montana State Historic Preservation Officer (Montana Historical Society) – (406) 444-7715 or http://mhs.mt.gov/shpo/

- Wyoming State Historic Preservation officer (Wyoming Historical Society) – (307) 777-6421 or http://wyoshpo.state.wy.us/

Note:  The *Programmatic Agreement on Protection of Historic Properties During Emergency Response Under the NCP* applies to oil response actions pursuant to the CWA/OPA and to hazardous substance response actions pursuant to CERCLA. In accordance with the Programmatic Agreement, in 2014 Region 8 provided a public comment period for the Regional Contingency Plan. The State Historic Preservation Offices for each state as well the federal trustees were notified of this comment period and the regional approach for addressing cultural resources in the RCP and SACPs.

Advanced clearance at identified historic sites is not anticipated. However, if a land management agency, SHPO, tribal or other entity with knowledge of historic sites identifies cultural resources in the vicinity of a pre-established oil spill control point, evaluation of impacts to the cultural resource will be coordinated through the appropriate parties. Proper consultation with these and other appropriate entities should occur

to ensure protection of all culturally sensitive resources. Otherwise, it is anticipated agencies with cultural resource responsibilities will be relied upon to identify and coordinate cultural resources during a response action with the lead response agency.

Additionally, EPA Region 8 has developed an interactive web-based tool (see Section 4.5 of this SACP for details concerning The Emergency Response Application [TERA]) that will identify some sensitive and/or critical features within the sub-area.  The information may include, but is not limited to, critical habitat, threatened and endangered species, public use areas, cultural and historic areas, managed and protected areas, resources extraction areas, and water supplies.

## 3.0     OIL THREATS

This section discusses oil-related sources that pose a spill threat within the sub-area.  Those threats include:  (1) EPA-regulated storage facilities (those exceeding one million gallons in storage capacity) and DOT-regulated transport pipelines (six inches in diameter or greater), (2) other facilities including oil production wells and associated tank batteries, and (3) truck and rail transport activities.  Regarding oil production wells, it should be noted that oil well technology advancements employing horizontal drilling and hydraulic fracturing have resulted in basins with significant well production rates, such as in the Bakken Formation.  An uncontrolled discharge from a production site could pose a significant threat if occurring near water, but as previously discussed, the planning process for the SACPs places specific emphasis on large-scale discharges.  The results of this planning process will also enhance capability to respond to smaller incidents.

## 3.1     EPA-REGULATED FRP (FIXED) FACILITY HAZARDS

EPA-regulated FRP facilities could cause substantial harm to the environment.  These facilities within the sub-area have oil storage capacities exceeding 1,000,000 gallons.  Each of these facilities is required to develop an approved FRP that documents, by contracts or other approved means, the resources capable of addressing a worst-case discharge at that facility.  EPA regulated FRP facilities have been determined to pose such a risk, most of which are within the northwest portion of the sub-area.  EPA Region 8 maintains current copies of all FRPs.  FRP facilities within Region 8 are identified on the TERA Viewer under the "Facilities" layer.

## 3.2     TRANSPORTATION HAZARDS

Transportation threats include potential discharges from pipelines and along truck and rail transportation routes.  Currently, the sub-area includes more than 3,000 miles of DOT-regulated pipelines.  Additionally,

thousands of miles of smaller diameter, non-regulated pipelines and oil field gathering lines are present within the sub-area. Small-diameter pipelines are not evaluated as worst-case threats. DOT-regulated pipelines within Region 8 are identified on the TERA Viewer under the "Energy" layer.

Truck and rail transportation of oil is another threat. Truck transport of oil is of concern because so much of this occurs within the sub-area, particularly within the Bakken region. Rail transport continues to be a primary means of moving oil. Currently, approximately 2,000 miles of rail lines are present within the sub-area. In particular, the Bakken Oil Express (BOE) is a unit train facility west of Dickinson, North Dakota, with a loading capacity up to 1,000,000 barrels of oil per day. Railroads within Region 8 are identified on the TERA Viewer under the "Infrastructure" layer.

## 3.3     OIL PRODUCTION FACILITIES

Oil and gas production wells throughout the sub-area pose a threat of release, although such facilities were not evaluated as worst-case threats based on their limited storage capacities. According to the February 2014 North Dakota Industrial Commission Oil and Gas Production Report, approximately 10,000 active oil wells exist within the state, most in the Bakken Formation. Active energy wells (including oil wells) within Region 8 are identified on the TERA Viewer under the "Energy" layer.

## 3.4     WORST-CASE DISCHARGES AND PROJECTIONS

As part of the planning process, worst-case discharge threats were identified from facilities that could cause substantial harm to the environment by discharging oil into or on the navigable waters and adjoining shorelines. To illustrate downstream extents of spills within the sub-area, oil spill projections were developed for 11 FRP facilities and 13 pipeline crossings over water bodies. Spill response planning was conducted for these worst-case discharge threats. The planning process completed in preparation for a worst-case discharge from these facilities included, but was not limited to, identification/prioritization of key sensitive areas, identification of response equipment, and development of pre-planned response strategies.

### 3.4.1     FRP Spill Projections

EPA-regulated FRPs are required to calculate planning distances (spill projections) per regulation 40 CFR Part 112 Appendix C. The planning distance represents the estimated distance a discharged material would travel within the first 27 hours following a discharge. Planning distance calculations are required to account for adverse weather conditions.

Development of spill planning distances is not required for DOT-regulated pipelines per 40 CFR Part 194.  Pipeline spill projections for this plan were developed by first identifying priority locations where pipeline spills could impact significant water bodies.  These locations were primarily pipeline crossings over major rivers and primary tributaries.  Within the sub-area, projections were created for pipeline crossings over water bodies considered stream order six or larger, as classified by the United States Geological Survey (USGS).

By use of the USGS National Hydrography Dataset (NHD) and the NHDPlus dataset, flow direction was determined within a watershed from a potential spill point.  The NHDPlus dataset was utilized to provide mean velocity data for water bodies throughout the sub-area., and oil spill projections were developed following a stream channel segment-by-segment approach.  Stream segments have been established by USGS.  Velocity data for each segment were used to plot the 27-hour projection.  The velocity data are based on annual mean values that have been compiled over an approximate 30 year period; therefore, the projections are for average velocity conditions but do account for variable conditions, including periods of flooding and droughts.

### 3.4.2    FRP Worst-Case Discharges

**Storage Facilities**

For single-tank facilities, the worst-case discharge planning volume equals the capacity of the oil storage tank.  For multiple-tank facilities, the worst-case discharge is based on the capacity of the largest oil storage tank within a common secondary containment area or the largest single oil storage tank within a secondary containment area, whichever is greater.  For tanks with common piping operated as one unit, the worst-case discharge is based on the combined volume of all the tanks manifolded together.

**Pipelines**

DOT-regulated pipelines are required to determine the worst-case discharge for each of their response zones per 40 CFR Section 194.105.  The worst-case discharge is calculated as the largest volume of one of the following:

- The pipeline's maximum release time in hours, plus the maximum shutdown response time in hours (based on historical data or operator's best estimate) multiplied by maximum flow rate, plus the largest line drainage volume after shutdown of the line section(s) in the response zone;

Or

9

- The largest foreseeable discharge for the line section based on the maximum historical discharge, if one exists, adjusted for any subsequent corrective or preventive action taken;

Or

- If the response zone contains one or more breakout tanks, the capacity of the single largest tank or battery of tanks within a single secondary containment system, adjusted for the capacity or size of the secondary containment system.

The maximum flow rate in a pipeline is based on the specific oil density and pipeline operating pressures. The operating range of pipeline velocities varies from three to 15 feet per second, with most operators likely running between six and 12 feet per second. The range of worst-case discharges using the calculation procedure listed above can vary significantly, depending on the operating velocities, assumptions of release time, maximum shutdown time, and length of largest line. For a conservative estimate, the following worst-case discharges listed in the table below assume a release time of 0 minutes, a maximum shutdown time of 15 minutes, a lower end velocity of six feet per second, and a line section of 10 miles:

| Pipe Size (inches) | 6 | 8 | 10 | 12 | 16 | 30 | 36 |
|---|---|---|---|---|---|---|---|
| Worst-Case Discharge (barrels [bbl]) | 2,000 | 3,600 | 5,600 | 8,100 | 14,400 | 50,800 | 73,000 |

## 4.0     RESPONSE OPERATIONS AND ROLES

This section describes response roles, notification procedures, control point and response strategies, equipment and resources, and the EPA-managed web-based tool TERA.

## 4.1     GENERAL PATTERN OF RESPONSE (OPERATIONS)

Subpart D of the NCP outlines the general pattern of response and expected response operations. This is defined in detail at 40 CFR Sections 300.300 through 300.315, and generally includes the following:

**Phase I—Discovery or Notification**

A discovery and reporting of a spill or discharge of oil may be communicated to the appropriate agencies through various sources including members of the public, governmental agencies, private companies, etc. Reporting requirements differ among counties and states. Critical aspects of reporting are timeliness and accuracy of information provided. Specific federal reporting requirements apply to the facilities from

which a discharge of oil threatens waters, and the federal reporting requirements are not met by reporting to the State or local agencies.  Federal reporting requirements are specified below:

*"Any person in charge of a vessel or a facility shall, as soon as he or she has knowledge of any discharge from such vessel or facility in violation of Section 311(b)(3) of the CWA, immediately notify the NRC [National Response Center].  If direct reporting to the NRC is not practicable, reports may be made to the USCG [US Coast Guard] or EPA predesignated OSC [On-Scene Coordinator] for the geographic area where the discharge occurs.  **The EPA predesignated OSC may also be contacted through the Regional 24-hour emergency response telephone number.**  All such reports shall be promptly relayed to the NRC.  In any event such person in charge of the vessel or facility shall notify the NRC as soon as possible."* (40 CFR Section 300-300(b)).

The NRC is the national communications center for oil and hazardous substance spill reporting.  The NRC acts as the single point of contact, at the federal level, for all incident reporting.  Notice of an oil discharge or release of a hazardous substance in an amount equal to or greater than the reportable quantity must occur immediately in accordance with the CWA and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) under 33 CFR Part 153, Subpart B, and 40 CFR Part 302, respectively.  All notices of discharges or releases received at the NRC are relayed by telephone to the Region 8 Regional Response Center.  The OSC receiving these notifications will ensure notification to the appropriate federal, state, or tribal agency affected by or reasonably expected to be affected by the discharge or release.  The NRC spill reports are also sent directly to the RRT agencies, including the states, and certain other agencies.

To notify the NRC Duty Officer, call (800) 424-8802.

To notify the Region 8 Regional Response Center, call (303) 293-1788.

The Department of Interior (DOI) Regional Environmental Officer, Office of Environmental Policy and Compliance (303-445-2500), should be notified and kept advised of any spills or releases on or potentially affecting DOI-administered lands or resources.  The United States Department of Agriculture (USDA) should be kept advised of any spills or releases on USDA-administered lands.  Additional notification protocols are further defined in the Region 8 RCP.

Appendix A of this SACP includes a list of Sub-Area Committee members, sub-area stakeholders, and industry contacts.  The sub-area contact list is also available on TERA (discussed further in Section 4.5 of

this SACP), on the Tool Bar in the "Documents" folder.  The contact list available on TERA will be revised periodically as contact information changes.  TERA Viewer is available at the following website: https://r8.ercloud.org/TERA_External/.

## Phase II—Preliminary Assessment and Initiation of Action

Following a report to the NRC and/or the EPA that an oil discharge has occurred which threatens surface water, a Federal OSC will initiate efforts to determine potential impacts from the oil and whether response actions are under way.  The purpose of the assessment is to determine the magnitude and potential threats to the public using available information such as existing mapping tools, contacting the reporting party, contacting state and/or local officials on scene, and possibly deploying EPA personnel and contractors to directly assess conditions.

If a response action is under way or deemed necessary, the Federal OSC will assess whether to rely on personnel on scene or if a response by the EPA is necessary.  Generally, any major discharge of oil that threatens waters (10,000 gallons or more to inland zone waters) will result in deployment of a Federal OSC from the Regional office to ensure implementation of an adequate response action.  The standard incident management approach during a significant incident includes a Unified Command organization with appropriate agency and industry representatives.  The following section from the NCP describes generally the protocol for evaluating a response and determining the level of federal involvement:

*"Except in a case when the OSC is required to direct the response to a discharge that may pose a substantial threat to the public health or welfare of the United States (including but not limited to fish, shellfish, wildlife, other natural resources, and the public and private beaches and shorelines of the United States), the OSC may allow the responsible party to voluntarily and promptly perform removal actions, provided the OSC determines such actions will ensure an effective and immediate removal of the discharge or mitigation or prevention of a substantial threat of a discharge. If the responsible party does conduct the removal, the OSC shall ensure adequate surveillance over whatever actions are initiated. If effective actions are not being taken to eliminate the threat, or if removal is not being properly done, the OSC should, to the extent practicable under the circumstances, so advise the responsible party.  If the responsible party does not respond properly the OSC shall take appropriate response actions and should notify the responsible party of the potential liability for federal response costs incurred by the OSC pursuant to the OPA and CWA.  Where practicable, continuing efforts should be made to encourage response by responsible parties."* (40 CFR Section 300.305(d))

In addition, the Federal OSC shall ensure that the natural resource trustees are promptly notified.  The Federal OSC will coordinate with affected trustees regarding assessment, evaluations, investigations, and planning of appropriate removal actions as per 40 CFR Section 300.305(e).

**Phase III—Containment, Countermeasures, Cleanup, and Disposal**

The appropriate actions to implement to reduce impacts of an oil spill will vary significantly, depending on the physical environment, water flow conditions, access to the area, and potential threats to public safety and the environment.  The NCP outlines basic guidelines for responding that include:

*"(a) Defensive actions shall begin as soon as possible to prevent, minimize, or mitigate threat(s) to the public health or welfare of the United States or the environment. Actions may include but are not limited to: analyzing water samples to determine the source and spread of the oil; controlling the source of discharge; measuring and sampling; source and spread control or salvage operations; placement of physical barriers to deter the spread of the oil and to protect natural resources and sensitive ecosystems; control of the water discharged from upstream impoundment;....."*  (40 CFR Section 300.310(a))

*"(b) As appropriate, actions shall be taken to recover the oil or mitigate its effects. Of the numerous chemical or physical methods that may be used, the chosen methods shall be the most consistent with protecting public health and welfare and the environment. Sinking agents shall not be used."*  (40 CFR Section 300.310 (b)).

Additional standards apply to use of chemical countermeasures such as dispersants, and these are addressed in the NCP and the RCP, and as discussed below in Section 5.  In short, chemical agents may be used only if approved by the Federal OSC after consultation with and approval by the RRT.

Oil and contaminated materials recovered in cleanup operations shall be disposed of in accordance with applicable laws, regulations, or requirements. Any localized disposal requirements identified by Sub-Area Committees will be described in those SACPs. Disposal assistance may be obtained through the EPA RCRA National Hotline at 1-800-424-9346, the EPA Region 8 Hotline at 1-800-227-8917, or http://www2.epa.gov/region8/contact-region-8.

Additional authorities are available to the Federal OSC during response actions conducted under the NCP that address CWA regulations.  For example, the Federal OSC has the authority to direct a discharge to water without a permit as specified in 40 CFR Section 122.3(d), and actions subject to CWA 404 permit requirements are authorized under Nationwide Permit 20.

**Phase IV—Documentation and cost recovery**

Agencies undertaking response actions funded by the Oil Spill Liability Trust Fund (OSLTF) must comply with reporting and documentation requirements to receive reimbursement and to allow for cost recovery from responsible parties.  In addition, the information must be obtained during a response to an oil spill to accurately record the impacts, and that information must be available to trustees to assist in evaluating potential injuries to natural resources.  For more information regarding the OSTLF, please refer to Sections 300. 315 and 300.335 of the NCP.

## 4.2    RESPONSE ROLES

The NCP and the National Response System it created address response roles of many federal, state, local, and tribal organizations.  More information about the National Response System is in Sections 300.100 through 300.185 of the NCP.  The general assumption is that local and state authorities will be the first responders at the scene of an oil discharge, with federal resources to follow as needed.  Some incidents may impact multiple jurisdictions.  The NCP relays the expectation that responding entities will coordinate their efforts and, to the extent practicable, respond in a manner that considers each jurisdiction's priorities and concerns.  This should be accomplished through a National Incident Management System Unified Command structure or some other appropriate means.

If an oil spill poses a threat to the public, the NCP describes in significant detail the role of lead agencies and other federal agencies during both planning activities and response actions.  As a matter of general practice and as conceived in the NCP, the intent is for the Responsible Party (RP) to conduct response actions.  Also, the state and local agencies with such authority are part of the National Response System and will likely oversee most response actions.  The federal government may respond to an incident in various ways depending on the nature and magnitude of the incident.  Many oil spills are handled completely at the local and/or state level.  During such incidents, the Federal OSC must assess the situation in coordination with the appropriate state and local officials.

In addition to the elements described in Section 4.1 above, Section 300.317 of the NCP identifies the response priorities to a discharge of oil regardless of who conducts the response action.  The National Response Priorities are listed below.

(a)    Safety of human life must be given top priority during every response action.

(b)    Stabilizing the situation to preclude the event from worsening is the next priority.  All efforts must be focused on measures to stabilize a situation involving a facility, pipeline, or other source of pollution.  Stabilizing the situation includes securing the source of this

14

spill and/or removing the remaining oil from the container (vessel, tank, or pipeline) to prevent additional oil spillage, to reduce the need for follow-up response actions, and to minimize adverse impact to the environment.

(c)     The response must use all necessary containment and removal tactics in a coordinated manner to ensure a timely, effective response that minimizes adverse impact to the environment.

(d)     All parts of this national response strategy should be addressed concurrently, but safety and stabilization are the highest priorities.   The OSC should not delay containment and removal decisions unnecessarily and should take actions to minimize adverse impact to the environment that begins as soon as a discharge occurs, as well as actions to minimize further adverse environmental impact from additional discharges.

(e)     The priorities set forth in this section are broad in nature, and should not be interpreted to preclude the consideration of other priorities that may arise on a site-specific basis.

The sections that follow highlight some of the major entities involved with a typical oil spill incident and their roles/responsibilities.  This is not intended to be all inclusive.  An agency's or jurisdiction's involvement may vary based on site-specific conditions and concerns.

## 4.2.1     Responsible Party Roles/Responsibilities

The Responsible Party (RP) is the individual, agency, or company owning or operating the vessel or facility that becomes the source of a discharge of oil into navigable waters or threatens to discharge thereto.  As defined in OPA, each party responsible for oil discharged, or if there is substantial threat of a discharge, into or upon the navigable waters or adjoining shorelines, is liable for the removal costs and damages specified in Section 311(f) of CWA.  Section 311(c)(3)(b) of CWA requires a facility owner or operator participating in removal efforts to act in accordance with the NCP and the applicable response plan required under Section 311(j).

Any person in charge of a vessel or facility (as defined in Section 300.5 of the NCP) shall, as soon as he or she has knowledge of any discharge from such vessel or facility in violation of Section 311(b)(3) of the CWA, immediately notify the NRC, as described in the Emergency Notifications section above.

The RP shall immediately provide the Federal OSC and relevant authorities with information about the discharge and assist the Federal OSC with the preliminary assessment, including determining the magnitude and severity of the discharge and the threat to public health or welfare of the United States or the environment.  As soon as practicable, the RP should assess the feasibility of removal and initiate response actions.  Once established, the RP is expected to operate within a Unified Command with federal, state, and local authorities to achieve an effective and efficient response.

Permission to access private property to conduct the response action must be obtained from the property owner.  The RP is expected to secure such access before or during response actions.  Furthermore, restoration of private property damaged during the response is considered appropriate as part of the removal action.

If the RP is unknown, fails to respond, or responds in a manner considered inadequate, the local, state, or federal agency having jurisdiction must exercise its authority to assume control of the response effort.  The RP shall provide all reasonable cooperation and assistance requested by the Federal OSC, consistent with the CWA (CWA Section 311(c)(3)(B)).  Following termination of the emergency response, the RP is required by law to take steps to prevent recurrence of spills or releases.  Corrective actions may include improved planning, increased inspections, or implementation of physical preventive measures.

### 4.2.2   Federal OSC Roles/Responsibilities

The CWA and OPA 90 direct the President to respond to, oversee, and ensure adequate removal of discharges of oil to waters of the United States.  This authority and responsibility has been delegated to the Federal OSC. The primary duties of the OSC have been described in the above sections of this document.  In summary, the Federal OSC, once notified of a discharge of oil that has entered or that threatens waters of the United States, must perform a preliminary assessment of the spill and ensure notification to the natural resource trustees.  If a response is required to mitigate the threat from the oil, the Federal OSC must evaluate adequacy of the response by private, state, or local authorities.  Not all spills warrant that a Federal OSC perform on site oversight, and in many cases, the state and local agencies will assume that responsibility to monitor RP cleanup activities.

However, if the Federal OSC determines that EPA involvement is required, based on information available from the scene, the Federal OSC will request funding as needed from the National Pollution Fund Center to conduct a response.  The Federal OSC will encourage and may allow the RP to voluntarily and promptly perform removal actions, provided the Federal OSC determines such actions will ensure an effective and immediate removal of the discharge or mitigation or prevention of a substantial threat of a discharge.  When the RP does conduct the removal, the Federal OSC shall ensure adequate surveillance over whatever actions are initiated.  If effective actions are not being taken to eliminate the threat, or if removal activity is not adequate, the Federal OSC should, to the extent practicable under the circumstances, so advise the RP. (40 CFR Section 300.305(d)).

If the RP does not respond adequately, the Federal OSC shall take appropriate response actions and should notify the RP of the potential liability for federal response costs incurred by the Federal OSC

pursuant to the OPA and CWA. The Federal OSC has the responsibility and authority to respond and commit federal resources to implement the actions necessary to respond to a discharge of oil. Because no coastal zones are present within Region 8, EPA is the agency that will provide the Federal OSC for oil discharges in accordance with the CWA and OPA 90.

In carrying out a response under this section, the Federal OSC may:

- Remove or arrange for removal of a discharge, and mitigate or prevent a substantial threat of a discharge, at any time;

- Direct or monitor all federal, state, and private actions to remove a discharge; and

- Remove and, if necessary, destroy a vessel discharging, or threatening to discharge, by whatever means are available. (40 CFR Section 300.305 (d)(1)).

If the oil discharge results in a substantial threat to the public health or welfare of the United States (including, but not limited to fish, shellfish, wildlife, other natural resources, and the public and private beaches and shorelines of the United States), the Federal OSC must direct all response efforts, as provided in Section 300.322(b) of the NCP. The Federal OSC should declare as expeditiously as practicable to spill response participants that the federal government will direct the response. The Federal OSC may act without regard to any other provision of the law governing contracting procedures or employment of personnel by the federal government in removing or arranging for removal of such a discharge (refer to Subpart D of the NCP).

The Federal OSC shall ensure that the natural resource trustees are promptly notified, to the maximum extent practicable as provided in the Fish and Wildlife and Sensitive Environments Plan Annex to the RCP for the area in which the discharge occurs. The Federal OSC and the trustees shall coordinate assessments, evaluations, investigations, and planning with respect to appropriate removal actions. The Federal OSC shall consult with the affected trustees and natural and cultural resource managers on the appropriate removal action to be taken. This is required by Section 6 of the National Historic Preservation Act and Section 7 of the Endangered Species Act. National memoranda of understanding were developed to define how these consultations shall be performed during oil and hazardous substance emergencies. These memoranda are included as annexes to the RCP.

Natural resource damage assessment activities by the trustee agencies are separate from removal activities but should be coordinated to ensure greatest efficiency and protection. When circumstances permit, the Federal OSC shall share use of non-monetary response resources (i.e., personnel and equipment) with the trustees, provided trustee activities do not interfere with response actions. The lead administrative trustee

facilitates effective and efficient communication between the Federal OSC and the other trustees during response operations and is responsible for applying to the Federal OSC for non-monetary federal response resources on behalf of all trustees. The lead administrative trustee is also responsible for applying to the National Pollution Funds Center to initiate funding for damage assessment pertaining to injuries to natural resources.

### 4.2.3   Federal Agency Roles/Responsibilities

The federal government may respond to an oil discharge in various ways depending on the nature and magnitude of the incident.  Federal agencies have defined roles established in the NCP, and those agencies have responsibilities under delegated authorities.  They may also have resources needed to assist during a response.  If assistance is required, it will be coordinated through an incident-specific RRT (refer to Section 300.115 of the Region 8 RCP for further details concerning Incident-Specific RRTs).  Federal agencies are expected to make facilities and resources available to the Federal OSC consistent with agency capabilities and authorities, as called for in the NCP (NCP Sections 300.170 and 175).

In any case, where a natural resource is injured or threatened, the natural resource trustees and natural and cultural resource managers (both federal and state) will provide additional assistance and provide advice regarding response priorities.  These entities will provide timely advice concerning recommended actions regarding natural and cultural resources potentially affected.  The natural resource trustees also will assure that the Federal OSC is informed of their activities in natural resource damage assessment that may affect response operations.  The trustees shall assure, through the lead administrative trustee, that all data from the natural resource damage assessment activities which may support more effective operational decisions are provided in a timely manner to the Federal OSC.

In the event of a worst-case discharge of oil, as described herein, the Federal OSC will respond and coordinate the response activities with local and state responders and the RP within a Unified Command system.

Generally, many federal agencies may have significant roles to fulfill during a response action. Departments and agencies having land management, cultural resource, and wildlife management duties may have resource concerns that must be factored into the response operations. It is the responsibility of the Federal OSC to coordinate with the appropriate trustees in the event a discharge of oil or hazardous substance release that impacts those resources.

Other federal agencies involved with the National Response System, such as the Department of Health and Human Services, Department of Energy, and the Federal Emergency Management Agency (FEMA), may be called upon to assist in accordance with their usual statutory roles.

### 4.2.4    State Government Roles/Responsibilities

The roles of the respective state agencies during an oil discharge are generally well established, and coordination with the EPA through the RRT occurs on regular basis.  Each state is encouraged to actively participate in National Response System activities, and each Governor has designated lead state agencies for certain activities.  These designations can be found in the RCP.  These designees and other state entities are critical to oil spill response because of their authorities governing water quality, management of state lands, and other items.

The state RRT representative is responsible for ensuring the following actions are completed, as appropriate:  notify downstream water users (municipal, industrial, and agricultural) of all discharges and releases that may pose a threat to the water supply; notify and coordinate with other state and local agencies, including other state natural resource trustees, as appropriate; take responsibility, in conjunction with the Federal OSC, for selection of disposal sites, arrangements for use of disposal sites, and selection of transportation routes to disposal sites; make arrangements with the State Emergency Response Commission to provide security for all on-scene forces and equipment; assist the EPA with the determination of the degree of hazard of the discharge; and operate a site, if necessary and when no RP or principal RP has been identified.

For incidents not subject to the National Response System organization (i.e., because these are not regulated by CERCLA or CWA), states are encouraged to undertake response actions themselves or to use their authorities to compel potential RP(s) to undertake response actions.

### State Emergency Management Agencies

State Emergency Management Agencies are often heavily involved in maintaining situational awareness of local incidents occurring within each state.  They are also responsible for coordinating with, resourcing, and mobilizing elements and agencies in the rest of state government for incident response and local support, as needed.  Spill notifications and distribution of this information to other federal, state, and local agencies is critical to initiating response actions under this SACP.

**State Environmental Regulatory Agencies**

State environmental regulatory agencies typically have a role in overseeing response to oil and hazardous materials incidents, and often provide a representative to the Region 8 RRT.  Generally, states have primary authority for enforcing standards related to water quality and permitting.  In these capacities, the states play a key role in notification, monitoring, and approval of certain actions during an oil removal action.  For example, if an in-situ burn is determined appropriate, a state emergency air permit may be required prior to commencing that burn.  Also, if drinking water supplies are impacted, the state has a role in evaluating those impacted facilities and water supplies, if necessary.

**State Resource Trustee Agencies**

State resource trustees are typically technical resources for the Unified Command.  State wildlife management agencies often serve as subject matter experts on local river access, wildlife habitat and behavior, and sensitive ecological resources.  State land management agencies may be able to provide technical support and resources, including personnel and equipment to assist where appropriate.  Consultation with state resource trustees is necessary to ensure proper measures are implemented to limit the effects of the response actions on natural resources and recreation facilities.  For example, proper decontamination is necessary to prevent spread of aquatic invasive species into a state or their migration to multiple areas within a state.  Support from the appropriate state agency to inspect response contractor equipment may be necessary during a large incident.

### 4.2.5    Tribal Government Roles/Responsibilities

The NCP also defines roles and responsibilities of tribal governments.  Tribes act as trustees for the natural resources, including their supporting ecosystems, belonging to, managed by, controlled by, or appertaining to such Indian tribe, or held in trust for the benefit of such Indian tribe, or belonging to a member of such Indian tribe, if such resources are subject to a trust restriction on alienation.  Designated tribal officials are assigned to act when there is injury to, destruction of, loss of, or threat to natural resources, including their supporting ecosystems.

In addition, tribal emergency management and environmental agencies have responsibilities similar to those described above for state agencies.  Water and air quality program standards within reservations must be factored in during response actions.  Representatives from these agencies should be consulted during response activities.

### 4.2.6    Local Jurisdictions/Agencies Roles/Responsibilities

#### Local Fire Departments, Law Enforcement, and Emergency Medical Services

Public safety organizations will generally be the first government representatives at the scene of a discharge or release.  They are expected to initiate public safety measures necessary to protect public health and welfare and that are consistent with containment and cleanup requirements in the NCP.  They are responsible for directing evacuations pursuant to existing state or local procedures.  Local agencies may provide the initial incident command and establish a command post.  The local agency may also establish a Unified Command with other government agencies, depending upon the extent of the incident.  They will likely isolate the scene and restrict access, conduct appropriate initial notifications, and perform any other necessary life-safety functions including search and rescue, firefighting, or other defensive actions, emergency medical care, and decontamination of exposed persons.  They may also provide emergency communications equipment, on-scene liaison with Unified Command, public information support to Unified Command, and protective action guidance to stakeholders.

#### Local Emergency Planning Committee (LEPC) and County Emergency Management

As specified in Sections 301 and 303 of the Superfund Amendments and Reauthorization Act (SARA) Title III, local emergency planning districts are designated by the State Emergency Response Commission (SERC) in order to facilitate preparation and implementation of emergency plans.  Each LEPC is to prepare a local emergency response plan for the emergency planning district and establish procedures for receiving and processing requests from the public for information generated by SARA Title III reporting requirements.  The LEPC is to appoint a chair and establish rules for the LEPC.  The LEPC is to designate an official to serve as coordinator for information, and designate in its plan a community emergency coordinator.  In addition to meeting the requirements for local emergency plans under SARA Section 303, state and local government agencies are encouraged to include contingency planning in all emergency and disaster planning for responses, consistent with the NCP, RCP, and ACP.

#### Local Hazardous Material (HAZMAT) Response Teams

Local HAZMAT response teams  perform specialized mitigation and response actions at incidents involving hazardous materials and petroleum.  These resources are often a sub-set of the local fire departments in the largest cities and towns throughout each state.  Generally, dispatch of local HAZMAT response teams outside of their local jurisdictions in support of neighboring communities within their designated regions must occur via the state emergency management agencies.  Local HAZMAT teams

may implement defensive measures in the initial response, and these agencies are critical to ensure public safety.  However, most local HAZMAT teams are not equipped to perform oil containment and recovery on water.

## 4.3       RESPONSE STRATEGIES AND CONTROL POINTS

A key component of this sub-area oil spill response planning effort is development of pre-planned response strategies.  Field reconnaissance activities were conducted to identify accessible control points along the rivers and large water bodies within the sub-area where response strategies could be implemented relatively quickly.  Control points and response strategies were developed in relation to worst-case discharge spill projections..  Control Points are identified on the TERA Viewer within the "Geographic Response Plans" layer.  This layer also contains boat ramps, staging areas, booming strategies, and other response-related information.

These control points were determined to be the best locations identified to contain/collect oil with the goal of protecting sensitive resources.  Assumedly, these control points will be used during the initial 24 to 72-hour response period, when response equipment and resources are often limited.

Relative ease of access to the pre-identified control points was considered during the response planning.  The majority of the control points are on public lands, so legal access (i.e., permission to enter the property) is expected to be granted.  However, several control points are on, or require passing through, privately-owned property.  To obtain entry on privately-owned property, access agreements, verbal or written, are required.  Response strategies developed as part of this SACP are not the only activities required to contain and recover oil during a response.  Defensive actions must be initiated as soon as possible to prevent, minimize, or mitigate threat(s) to the public health or the environment.

Response strategies to be implemented at each control point area were developed for certain conditions (flow, weather, etc.).  A response strategy is the technique likely to be implemented at a particular control point (e.g., deflection boom deployed to move oil away from sensitive receptors/habitat).  However, incident-specific or site-specific conditions, movement of oil, and time necessary to mobilize response resources to a control point must be considered during an incident.  Response personnel must be knowledgeable and ready to modify the response strategies as needed to mitigate the threat, given specific environmental conditions during a response.

Implementation of the response strategies requires trained personnel.  Facility owners or operators must ensure that all private response personnel they employ are trained to meet the Occupational Safety and

Health Administration standards for emergency response operations promulgated in 29 CFR 1910.120 (Hazardous Waste Operations and Emergency Response regulations).  These regulations were established to ensure the health and safety of personnel employed in hazardous substance response and cleanup operations.  Additionally, response activities could involve boat operations and handling of oil response equipment.  Trained personnel who may be available to assist during a response include those affiliated with private industry, response contractors, and federal/state/local agencies.

Additionally, Appendix B of this SACP is an oil spill response document that summarizes general oil spill response techniques that are relevant to the Mid-Missouri Sub-Area.  Response strategies/techniques discussed in this document are not site/location-specific and are intended for broad planning use.

## 4.4      RESOURCES AND EQUIPMENT

As previously discussed, owners of EPA-regulated FRP facilities and DOT-regulated pipelines are required to develop plans to address a worst-case discharge from their facilities or pipelines.  These plans include notification procedures, identification of resources, and provisions for specific actions.  The plans also include details on installation or construction of equipment or structures so that spills can be contained as soon as possible.  This usually involves secondary containment systems, such as dikes, barriers, and diversionary flow paths.  In general, industry planning is designed to contain spills at the source and at the facility.  Downstream planning with a focus on protection of sensitive resources is often not included.

In addition, regulated facilities/pipelines have minimum equipment requirements to address a worst-case discharge (generally 1,000 feet of boom).  Facility equipment and resources are often limited and used immediately at the time of a spill at the source or the nearest downstream location.  Regulated FRP facilities and pipelines have contracts with Oil Spill Removal Organizations (OSROs) to respond to spills.  Mobilization time for an OSRO can be lengthy depending on the location of the spill.  The initial 24 to 72 hours following a spill are the most critical for containment and planning of upcoming response operations.  The control points and response strategies discussed in Section 4.3 were primarily developed to provide guidelines for potential response measures designed to reduce downstream spread of an oil spill.

Available equipment and resources may be a limiting factor within the initial hours following a spill.  Notably, in addition to equipment caches owned by private companies (to address spills from their facilities), industry coalition groups such as Sakakawea Area Spill Response, LLC (SASR) maintain shared equipment.  While these companies may have trained personnel to respond to spills from their

operated facilities, this does not mean these same personnel are available to respond to spills from other facilities.  The intent of the SACP planning effort is to include information regarding equipment cache locations, inventories, and contacts in this plan.  Equipment cache information is available within the "Geographic Response Plan" layer, in the "Documents" folder on the Tool Bar.

## 4.5     THE EMERGENCY RESPONSE APPLICATION

TERA is an EPA-developed and -managed web-based tool (referred to as a Viewer).  TERA contains geospatial data from federal, state, and private sources.  TERA was developed to assist in planning and response.  TERA also provides the initial geospatial platform for the EPA during spill responses.

TERA was used in this plan to assess reaches of navigable waters and adjoining shoreline that would be impacted by a discharge of oil from an FRP.  The 27-hour FRP spill projection data layer was used in conjunction with data layers where sensitive areas are identified.  These areas include:  critical habitat for threatened and endangered species, national wildlife refuges and wilderness areas as identified by USFWS; national parks and monuments as designated by the National Park Service; all of the state parks in Region 8; public drinking water facilities in the 6-state area, and other such critical resources as identified by the EPA.  Representatives from federal and state trustees who manage these sensitive areas were contacted to attend area committee meetings and conduct field work with the Federal OSC to establish access locations (control points) for development of response strategies (see Section 4.3).

TERA is composed of mapping components and data layers including drinking water intakes, critical habitat information, sensitive species information, protected areas, bulk oil storage facilities, pipelines, tactical response strategies, equipment caches, and river access points (control points and/or boat ramps).  Each component is organized and grouped in a layer structure and includes pertinent response information.  The user can access and display critical response information, such as emergency contacts and boom deployment strategies.  TERA is an important tool in the initial stages of a response and provides readily-accessible information to OSCs, trustees, and state, tribal, and local emergency responders.

TERA will be the primary method of disseminating this SACP because it allows the Sub-Area Committee to readily maintain up-to-date information.  TERA is available to the Sub-Area Committee, RRT, and responding governmental agencies and industry that is subject to oil spill and hazardous substances response planning requirements; however, a username and password must be obtained through EPA Region 8.  TERA Viewer is available at the following website:

https://r8.ercloud.org/TERA_External/  A TERA User Guide is available on the TERA Viewer Tool Bar in the "Documents" folder.

## 5.0   CHEMICAL COUNTERMEASURES, IN-SITU BURNS, BIOREMEDIATION

A number of actions are possible to address oil discharges.  Normal physical recovery methods of containment, pumping, sorbing, and digging are preferred in Region 8, but chemical countermeasures, in-situ burns, and bioremediation are also options. These techniques include use of various chemicals to emulsify, solidify, gel, or herd oil on water; chemicals to promote biodegradation of oil; and combustion of spilled oil to quickly reduce the volume of oil in the environment.  Section 311(j)(4)(C)(v) of the CWA, as amended by OPA 90, requires that the Area Committee "describe the procedures to be followed for obtaining an expedited decision regarding the use of dispersants."  General procedures are described in the following sections, and more detail is available in Annex IX of the Region 8 RCP.

## 5.1   CHEMICAL COUNTERMEASURES/SUBPART J AGENTS

Region 8 does not provide pre-authorizations for use of chemical countermeasures.  If subject to Subpart J regulations in the NCP, chemical countermeasure use must be reviewed and authorized by the incident-specific RRT.  This includes use of surface collecting agents, dispersants, biological additives, burning agents, or miscellaneous oil spill control agents.  "Sinking agents" are not allowed in EPA Region 8.  The Federal OSC may request RRT approval to use chemicals on behalf of the RP for the spill.  However, physical recovery and removal of oil is the preferred cleanup technique.

The EPA has compiled a list of dispersants and other chemicals that the Federal OSC or the party responding to the spill may consider for use during a spill emergency—the NCP Product Schedule (available at:  http://www.epa.gov/emergencies/docs/oil/ncp/schedule.pdf).  Listing of a product on the NCP Product Schedule does not authorize or pre-approve use of listed products, and products not listed may not be used.

The Federal OSC may authorize use of any chemical countermeasure agent without obtaining RRT authorization if it is immediately necessary to prevent or substantially reduce hazard to human life.  In this event, the Federal OSC will inform the RRT and the RRT representative of the affected state as soon as practicable.  In situations not involving immediate human hazard, the Federal OSC must notify and receive concurrence of the RRT Co-Chairs (EPA Region 8 and USCG) and the RRT representative of the affected state, and where practicable, will consult with the natural resource trustees.

## 5.2     IN-SITU BURNS

Under certain specific conditions, in-situ burning may offer a logistically simple, rapid, inexpensive, and relatively safe means of reducing impacts of an oil spill.  Burning can reduce the need for collection, storage, transport, and disposal of recovered material.  In certain circumstances, such as in remote, difficult to access areas and or where ice has contained the oil, burning may be the more effective and preferred response technique.  In-situ burning may have significant short-term impacts (e.g., airborne release of particulate matter), but may actually produce the lowest long-term impact because it removes the oil quickly.  In-situ burning should augment, not replace, other oil spill response techniques such as mechanical removal or chemical countermeasures.  For the Mid-Missouri River Sub-Area, the use of in-situ oil burning will be considered as a means to avert potential oil spill impacts.

In accordance with the NCP, RCP, and ACPs, if an accelerant is used to promote sustained burning of oil, procedures described in Section 5.0 above and Subpart J of the NCP must be followed.  Specifically, the RRT must authorize use of the accelerant for the in-situ burn.  If no accelerant or other chemical countermeasure is used, the RP/Unified Command must consult with the affected state(s) and natural resource trustees to obtain appropriate permits (i.e., air quality permits) and other permissions for the burn.

## 5.3     BIOREMEDIATION

Bioremediation activities may be subject to the same regulations and authorizations described for chemical countermeasure use as defined in Section 5.1 above, depending on site-specific conditions and desired use of the bioremediation agent.  Any entity wanting to use bioremediation agents during an incident should contact the Federal OSC for more information.  Biotreatment cells or land-farming cells for contaminated soils are likely subject to other solid waste management requirements but not necessarily Subpart J standards.

**6.0     OTHER CONTINGENCY PLANS**

This SACP was prepared under Section 311(j) of the CWA, as amended by OPA 90.  This plan is intended to be fully consistent with and supportive of other private, local, state, regional, and federal plans as described in this section.  It also functions as a part of the RCP and ACP for Region 8.

<u>**Private-Sector Response Plans**</u>

Private-sector response plans, including those for FRP facilities and pipelines, are structured and written as self-contained documents that serve as a complete reference tool for their operators during a spill response.  These plans must be consistent with local, state, and federal government contingency plans.  They must identify response personnel and equipment to be used to mitigate a worst-case discharge.  Environmental, economic, and cultural sensitivity data, as well as response resources and other information required as part of private-sector response plans, must be consistent with this sub-area plan.

<u>**State and Local Response Plans**</u>

In addition to meeting the requirements for local emergency plans under SARA Section 303, state and local government agencies are encouraged to include contingency planning for responses consistent with the NCP, RCP, and ACP in all emergency and disaster planning (NCP Section 300.180).

<u>**Federal Response Plans**</u>

The U.S. EPA Region 8 RRT developed the RCP to coordinate timely, effective responses by various state and federal agencies and other organizations to discharges of oil or releases of hazardous substances.  When implemented in conjunction with other federal, state, and local contingency plans, the RCP and ACP are designed to effectively facilitate removal of a worst-case discharge from a facility or vessel operating in Region 8, which includes the states of Montana, South Dakota, and North Dakota.

The RCP provides the organizational structure and objectives necessary to prepare for and respond to a discharge of oil or release of hazardous substances, pollutants, and contaminants. It provides for timely and effective coordination and direction of federal, state, and local response systems, and supports development of capability for the private sector to handle such incidents.

The Region 8 RCP fulfills the requirements of the NCP for both RCP and ACP, and includes references to relevant portions of the National Response Framework (NRF), particularly Emergency Support

Function (ESF) #10 Hazardous Materials. The RCP implements the NCP and the ESF #10 component of the NRF at the regional level and is the chief working document of the RRT.

**National Oil and Hazardous Substances Pollution Contingency Plan (NCP)**

The NCP (40 CFR Part 300), referenced repeatedly herein, created the National Response System.  This provides the organizational structure and procedures to prepare for and respond to discharges of oil and releases of hazardous substances, including specific responsibilities among government agencies, descriptions of resources available for response, a summary of state and local emergency planning requirements, and procedures for undertaking removal actions under the CWA.  This is the mechanism for coordinating response actions by all levels of government in support of the local incident commander and/or state or Federal OSC.

**National Response Framework**

The National Response Framework (NRF) (http://www.fema.gov/emergency/nrf/) was developed under the Disaster Relief Act of 1974, as amended by the Stafford Disaster Relief Act of 1988.  The NRF established a foundation for coordinating federal assistance to supplement state and local response efforts to save lives, protect public health and safety, and protect property in the event of a natural disaster, such as a catastrophic earthquake or other incident declared a major disaster by the President.  Response actions under OPA/CWA to discharges of oil are not managed through the NRF or the Disaster Relief Act.

Under the NRF, federal assistance is delivered through 15 annexes, or ESFs, each of which describes a single functional area of response activity.  The Hazardous Materials Annex, ESF #10, addresses releases of oil and hazardous substances that occur as a result of a natural disaster or catastrophic event, and incorporates preparedness and response actions carried out under the NCP.  The EPA serves as the chair of ESF #10 and is responsible for overseeing all preparedness and response actions associated with ESF #10 activities.  The National Response Team and RRT departments and agencies serve as support entities.

An oil discharge may occur during a natural disaster; however, response to such an incident will not likely be conducted within the structure of the NRF.  Specifically, this means the EPA and others may respond without the state's request for assistance and without a mission assignment from FEMA.  In such cases, the oil response actions will still be coordinated by and communicated to the state Emergency Operations Center  and/or FEMA's Joint Field Office  and other response agencies.  However, funding, incident action planning, and operations will be largely independent of FEMA and state actions.

**APPENDIX A**

**SUB-AREA CONTACT LIST**

| CONTACT LIST<br>MID-MISSOURI RIVER SUB-AREA | |
| --- | --- |
| **Agency** | **Phone Number** |
| National Response Center  -<br>24 hour National Reporting Center for Oil and Chemical Spills | 800-424-8802 -<br>On-line Reporting Tool:  http://www.nrc.uscg.mil/nrchp.html |
| U.S. EPA Region 8 - Spill Line | 303-293-1788 |
| North Dakota Department of Emergency Services | 800-472-2121 |
| North Dakota Oil and Gas Division | 701-328-8020 |
| North Dakota Department of Health | 701-328-5210 |
| North Dakota Game and Fish Department<br>- Bismarck Office<br>- Riverdale Office<br>- Williston Office<br>- Dickinson Office | 701-328-6300<br>701-654-7475<br>701-774-4320<br>701-227-7431 |
| South Dakota Department of Public Safety/Office of Emergency Management | 605-773-3231 (24-hour)<br>605-773-3580 |
| South Dakota Department of Environment and Natural Resources | 605-773-3231 (24-hour)<br>605-773-3296<br>605-773-6035 |
| South Dakota Game, Fish and Parks | 605-773-3718 |
| Montana Disaster and Emergency Services | 406-431-0411 (24-hour) or<br>406-324-4777 (24-hour) |
| Montana Department of Fish, Wildlife, and Parks | 406-444-5686 |
| Montana Department of Natural Resources and Conservation | 406-444-2074 |
| Montana Department of Environmental Quality | 406-431-0014 (24-hour)<br>406-431-2411 |
| Wyoming Department of Environmental Quality | 307-777-7781<br>307-630-8497 (24-hour) |

| CONTACT LIST<br>MID-MISSOURI RIVER SUB-AREA | |
|---|---|
| **Agency** | **Phone Number** |
| Wyoming Game and Fish Department | 307-777-4587 |
| U.S. Corps of Engineers<br>- Garrison Dam - Riverdale Office<br>- Dam Power Plant Control Room | 701-654-7411<br>701-654-7770 - (Emergency Only) |
| U.S. Fish and Wildlife Service - Bismarck | 701-250-4481 |
| - Bismarck Office<br>- Dickinson Office<br>- Waterford City Office | 701-250-4443<br>701-227-7800<br>701-842-2393 |
| Bureau of Reclamation - Great Plains Region | 406-246-7662 or 406-698-6340 (Emergency Duty Officer) |
| Three Affiliated Tribes<br>- Main Number - New Town Office<br>- Environmental | 701-627-4781<br>701-627-4569 |
| Standing Rock Sioux Tribe | 701-854-8644 |
| Cheyenne River Sioux Tribe | 605-964-4155 |
| Bureau of Indian Affairs - New Town<br>BIA - Cheyenne River Agency<br>BIA - Standing Rock Agency | 701-627-4707<br>605-964-6611<br>701-854-3433 |

| CONTACT LIST | | | |
|---|---|---|---|
| **MID-MISSOURI RIVER SUB-AREA** | | | |
| **Agency** | **Name** | **Phone Number** | **Email Address** |
| U.S. EPA Region 8 | Steve Way | 303-312-6723 | way.steven@epa.gov |
| North Dakota Department of Health | Kris Roberts | 701-328-5236 | kroberts@nd.gov |
| North Dakota Department of Emergency Services | Ray DeBoer | 701-328-8112 | rdeboer@nd.gov |
| North Dakota State Fire Marshall's Office | Doug Myers | 701-328-5555 | |
| North Dakota Game and Fish Department<br>- Bismarck Office<br>- Williston Office<br>- Riverdale Office | Headquarters<br>Kent Luttschwager<br>Dave Fryda | 701-328-6300<br>701-774-4320<br>701-654-7475 | dfryda@nd.gov<br>kluttschwager@nd.gov |
| North Dakota Oil and Gas Division | Dave Hvinden | 701-328-8037 | dhvinden@nd.gov |
| South Dakota Department of Environment and Natural | Kim McIntosh | 605-773-323 | kim.mcintosh@state.sd.us |
| Department of Interior - RRT Representative | Robert F. Stewart | 303-445-2500 | robert_f_stewart@ios.doi.gov |
| U.S. Fish and Wildlife Service | Kevin Shelley<br>Jessica Johnson | 701-355-8512<br>701-355-8507 | kevin_shelley@fws.gov<br>jessica_n_johnson@fws.gov |
| U.S. Fish and Wildlife Service - South Dakota | Matt Schwarz<br>Scott Larson | 605-224-8693 x232<br>605-224-8693 x224 | matt_schwarz@fws.gov<br>scott_larson@fws.gov |
| U.S. Fish and Wildlife Service - Montana | Karen Nelson<br>David Rouse | 406-449-5225 x210<br>406-449-5225 x211 | karen_nelson@fws.gov<br>david_rouse@fws.gov |
| U.S. Corps of Engineers | William Harlon | 701-654-7746 | william.d.harlon@usace.army.mil |
| U.S. Corps of Engineers | Todd Lindquist | 701-654-7702 | todd.j.lindquist@usace.army.mil |
| U.S. Corps of Engineers | Jeff Keller | 701-572-6494 | jeffrey.e.keller@usace.army.mil |
| Bureau of Reclamation - Dakotas Area Office | David Rosenkrance | 701-221-1201 | drosenkrance@usbr.gov |
| Bureau of Reclamation - Montana Area Office | Brent Esplin | 406-247-7298 | besplin@usbr.gov |
| Three Affiliated Tribes | Harlan Deane | 701-421-0053 | hdeane@mhanation.com |
| Three Affiliated Tribes Emergency Manager | Cliff Whitman | 701-627-4805 | cwhitman@mhanation.com |
| Bureau of Indian Affairs - Berthold Agency | Jeff Hunt | 701-627-4707 | |
| **County/City Emergency Managers** | | | |

| CONTACT LIST | | | |
|---|---|---|---|
| MID-MISSOURI RIVER SUB-AREA | | | |
| **Agency** | **Name** | **Phone Number** | **Email Address** |
| **North Dakota** | | | |
| Adams County Emergency Manager | Michele Gaylord | 701-567-4598 | adams-em@nd.gov |
| Billings County Emergency Manager | Pat Rummel | 701-623-4876 | prummel@nd.gov |
| Bowman County Emergency Manager | Dean Pearson | 701-523-3129 | dapearson@bownmancountynd.gov |
| Burleigh County Emergency Manager | Mary Senger | 701-222-6727 | msenger@nd.gov |
| City of Bismarck Emergency Manager | Gary Stockert | 701-222-6727 | gstockert@nd.gov |
| Dunn County Emergency Manager | Denise Brew | 701-573-4612 | denise.brew@dunncountynd.org |
| Emmons County Emergency Manager | Mary Senger | 701-222-6727 | msenger@nd.gov |
| Golden Valley County Emergency Manager | Brenda Frieze | 701-872-4733 | bjfrieze@nd.gov |
| Grant County Emergency Manager | Joann Ozbun | 701-622-3944 | jmo@westriv.com |
| Hettinger County Emergency Manager | Ilene Hardmeyer | 701-824-4227 | ihardmeyer@nd.gov |
| Mckenzie County Emergency Manager | Jerry Samuelson | 701-444-6853 | jsamuelson@co.mckenzie.nd.us |
| McLean County Emergency Manager | Richard Johnson | 701-462-8103 - ext. 265 | rijohnson@nd.gov |
| Mercer County Emergency Manager | Carmen Reed | 701-745-3302 | creed@nd.gov |
| Morton County Emergency Manager | Tom Doering | 701-667-3307 | tom.doering@mortonnd.org |
| Mountrail County Emergency Manager | Don Longmuir | 701-444-6853 | donl@co.mountrail.nd.us |
| Oliver County Emergency Manager | Carmen Reed | 701-745-3302 | creed@nd.gov |
| Sioux County Emergency Manager | Frank Landeis | 701-854-3481 | flandeis@nd.gov |
| Slope County Emergency Manager | Dick Frederick | 701-879-6278 | outlaw@ndsupernet.com |
| Stark County Emergency Manager | Bill Fahlsing | 701-456-7911 | bfahlsing@starkcountynd.gov |
| Ward County Emergency Manager | Amanda Schooling | 701-857-6534 | amanda.schooling@wardnd.com |
| Williams County Emergency Manager | Andrea Cross | 701-577-7707 | andreac@co.williams.nd.us |
| **South Dakota** | | | |
| Butte County | Tyler Trohkimoinen | 605-723-0900 | emergencymgmt@buttesd.org |
| Campbell County | Lawrence Goehring | 605-955-3598 | larrygoehring@valleytel.net |

| CONTACT LIST | | | |
|---|---|---|---|
| **MID-MISSOURI RIVER SUB-AREA** | | | |
| **Agency** | **Name** | **Phone Number** | **Email Address** |
| Corson County | Keith Gall | 605-273-4210 | corsoncoso@sdplains.com |
| Dewey County | Ted Schweitzer | 605-865-3691 | ted.schweitzer@state.sd.us |
| Edmunds County | Leland Treichel | 605-287-4394 | edmundscountyem@yahoo.com |
| Haakon County | Lori Quinn | 605-859-2186 | haakon@gwtc.net |
| Harding County | Kathy Glines | 605-375-3313 | kathy.glines@state.sd.us |
| Hughes County | Rob Fines | 605-773-7454 | rob.fines@co.hughes.sd.us |
| McPherson County | Dawn Jenner | 605-439-3667 | mcphersonem@valleytel.net |
| Perkins County | Kelly Serr | 605-244-5243 | perkinscoso@sdplains.com |
| Potter County | Cheryl Sautner | 605-765-9405 | sautner2000@yahoo.com |
| Stanley County | Rob Fines | 605-773-7454 | rob.fines@co.hughes.sd.us |
| Sully County | Curt Olson | 605-258-2244 | curt.olson@sullycounty.net |
| Walworth County | Shannon Thompson | 605-649-7878 | wcoemergencymanagement@hotmail.com |
| Ziebach County | Shane Farlee | 605-515-3768 | farleezcemerman@yahoo.com |
| **Montana** | | | |
| Carter County | George Bruski | 406-975-6416 | ccdes42@gmail.com |
| Fallon County | Chuck Lee | 406-778-7121 | clee@midrivers.com |
| Wibaux County | Frank Datta | 406-796-2218 | wibaux@midrivers.com |
| **Wyoming** | | | |
| Crook County | Sheila Hansen | 307-283-4516 | homelandsecurity@crookcounty.wy.gov |
| **Industry** | | | |
| **Pipelines** - Refer to the Pipeline Emergency Contact Directory - Available on EPA's TERA Website | | | |
| Sakakawea Area Spill Response LLC.  (SASR) | Bob Dundas<br>Jennifer Satterwhite<br>Jason Tuhy | 307-247-3702<br>307-272-1900<br>701-290-3562 | Bob.Dundas@truecos.com<br>jsatterwhite@marathonoil.com<br>jason.tuhy@whiting.com |
| **EPA-Regulated Facility Resonse Plan (FRP) Facilities** | | | |
| **Facility Name** | **Location** | **Phone Number** | **Contact** |

| CONTACT LIST | | | |
|---|---|---|---|
| MID-MISSOURI RIVER SUB-AREA | | | |
| **Agency** | **Name** | **Phone Number** | **Email Address** |
| Bakken Oil Express LLC Rail Hub | Dickinson, ND | 402-631-7918<br>402-631-7664<br>402-631-7708<br>316-440-7531 | Mike Salik-VP Operations-Alt QI<br>Jimmy McClain-Operations Mgmt-Alt QI<br>Chris Lewis-Operations-Primary QI<br>Donn Lentz-Principal Manger-Primary |
| Rangeland Terminals & Rangeland Pipelines | Epping, ND | 562-461-6076<br>734-548-3617 | Robert Sinclair-Ops Supervisor<br>Joe Young-Ops Superintendent |
| Brigham Oil & Gas, L.P.-Trenton Crude Oil Facility | Williston, ND | 701-875-3501<br>701-580-1505<br>701-580-5016 | Office Phone Number<br>Randy Samuleson-Production super-Alt QI<br>Russell Rankin-Op Manager-Primary QI |
| Tioga Rail Terminal | Tioga, ND | 701-701-389-2236<br>701-664-2756<br>701-641-8317 | Shane Gillet-Safety Coordinator-Alt QI<br>Michael Yanish-Watco Companies-Alt QI<br>Jody Schroeder-Field Ops Supr-Primary QI |
| New Town Transfer Station | New Town, ND | NA | NA |
| Tesoro Refining & Marketing Company, LLC | Mandan, ND | 701-667-2412<br>701-319-8632<br>701-667-2402<br>701-319-8602 | Dave Vinchattle- Manager-Alt QI<br>"<br>John Berger-Refinery Manager-Primary QI |
| Petro-Hunt Corp. Charlson Oil Field | Charlson, ND | 701-675-2464<br>701-675-8072<br>701-863-6622<br>713-863-6564 | Ron Shimek-Alt QI<br>"<br>Gene McLeod-Primary QI<br>" |
| BNSF Mandan Facility | Mandan, ND | 701-667-2264<br>1-800-832-5452<br>701-667-2218 | Mike Long-Alt QI<br><br>Bill Snider-Primary QI |
| Cenex (CHS) Mandan Asphalt Terminal | Mandan, ND | 406-628-5209<br>800-421-4122<br>406-628-5210 | S. Michael Stahly-Enviro Mgmt-Primary QI<br><br>Jeff Casey-Enviro Coor-Alt QI |

| CONTACT LIST | | | |
|---|---|---|---|
| MID-MISSOURI RIVER SUB-AREA | | | |
| **Agency** | **Name** | **Phone Number** | **Email Address** |
| Blue Flint Ethanol | Underwood, ND | 701-442-7503<br>701-527-5198<br>701-442-7501<br>701-202-7107 | Adam Dunlop<br>"<br>Travis Strickland<br>" |
| Bridger Pipeline LLC | Stanley, ND | 701-570-0120<br>701-225-6269<br>701-260-2278 | Jim Hill-Station Mgmt-Primary QI<br>"<br>Don Clark-Area Super-Alt QI |
| Falkirk Mine | Underwood, ND | 701-250-2467<br>701-400-5843 | Randall Crooke<br>Jeremy Eckroth |
| Basin Transload | Beulah, ND | 406-855-5008<br>701-880-8305 | Ray Sheldon-Primary QI<br>Ron Rusch-Alternate QI |
| Dakota Petroleum Transport Solution | New Town, ND | 701-389-2792 | Jim Tate-Primary QI |
| Johnson's Corner Oil Terminal | Watford City, ND | 701-580-5972<br>970-946-7485 | Tim Stubstad-Primary QI<br>Shawn Rust-Operations Manager |
| Enable Midstream Bear Den Terminal | Watford City, ND | 479-461-6583<br>701-495-1253 | Johnny Hardaway<br>Clint Fowler |
| Alexander Crude Oil Terminal | Alexander, ND | 701-580-5972<br>970-946-7485 | Tim Stubstad-Primary QI<br>Shawn Rust-Operations Manager |
| Van Hook Crude Terminal, LLC | New Town, ND | 701-421-3334<br>281-954-1888 | Conrad Crockford<br>Brian Troxel |
| Oil Spill Cleanup Contractors | | | |
| Contractors - Refer to the State of South Dakota and State of North Dakota Cleanup Contractors List - Available on EPA's TERA Website | | | |

**APPENDIX B**

**OIL SPILL RESPONSE TECHNIQUES**

## APPENDIX B:  OIL SPILL RESPONSE TECHNIQUES

This appendix provides supplemental information to the SACP on response strategies for oil spills that may be appropriate for a variety of locations within the sub-area.  A key component of the sub-area oil spill response planning effort is development of pre-planned response strategies.  Field reconnaissance activities have occurred in coordination with the Sub-Area Committee to identify accessible control points along streams, rivers, and Lakes Sakakawea and Oahe where response strategies could be implemented relatively quickly.  These SACP control points were identified and response strategies were developed to provide sufficient information to expedite and guide the initial response actions to a worst-case oil discharge.  The selected control points were determined to be the best locations under normal flow conditions to contain/collect oil with the goal of protecting sensitive resources during the initial 24- to 72-hour response period when response equipment and resources are often limited.  The control points and associated booming strategies for those locations are available on The Emergency Response Application (TERA) Viewer at the link provided below.  In the event of a major oil spill incident, the incident specific planning will ultimate direct the operations and equipment needs for the long-term response actions.

EPA Region 8 TERA Viewer link:  https://epar8gis.net/TERA_external

The oil spill control points and response strategies presented on the TERA Viewer are intended to provide the basic information needed  for oil spill response planning at those specific locations.  Conversely, the response strategies/techniques discussed in this document are not site/location-specific and are intended for broad planning use.  Facility- and incident-specific response plans should also be developed as required to supplement the sub-area planning efforts completed to date.  It should be noted that sub-area response planning, including identification of oil spill control points and response strategies, is not a substitute for regulatory planning requirements that facilities may be subject to.

Per 40 Code of Federal Regulations, Part 300, (National Contingency Plan), Section 300.317, safety of human life is the highest priority during a response.  Stabilizing the situation to prevent worsening of the event is the next priority.  The response must use all necessary containment and removal tactics in a coordinated manner to ensure a timely, effective response that minimizes adverse impact on the environment.  There are various techniques that emergency responders may use to control oil spills and minimize impacts to human health and the environment.  A key to effectively mitigating oil spills is responding as quickly as possible to minimize the migration of oil and proper selection and use of equipment and materials best suited to the type of oil involved in the incident and appropriate for conditions at the spill site.  Most spill response equipment and materials are greatly affected by

environmental factors such as water velocity/current and wind, and may vary to suit the size of the water body where the spill occurred.  Oil-related damage to shorelines and threats to flora, fauna, and sensitive areas can be reduced by timely and proper use of response equipment.

Detailed below are techniques that can be utilized during an oil spill response.  These techniques are most applicable for spills to small drainages, as well as larger rivers and streams.  Additionally, detailed below is an approach (and subsequent strategies) that can be utilized on large open water bodies such as Lake Sakakawea.  Three oil spill response scenarios have been identified that are most likely within Region 8 and are all applicable for this sub-area.  Those scenarios are:

- Dry ditches/coulees and small flowing streams/ditches
- Large flowing rivers/streams
- Open water bodies

For each of these scenarios, photographs of oil containment techniques that could be implemented during an incident are provided below.  It should be noted that early stoppage of a spill source and quick containment will greatly reduce the scope of cleanup operations and environmental damage.

Vital to any response is the timely identification of locations where on-site activities can be successfully conducted.  Some potential locations be predetermined during spill planning activities.  Such locations should meet the following criteria: (1) accessible by truck (or boat) so that response personnel and equipment can efficiently collect and remove spilled oil, and (2) located within the oil flow path so that the spilled material can be intercepted/diverted, particularly at sensitive areas.  These locations should be selected to avoid high flow/current conditions and areas with poor anchoring options.

Response Techniques for Dry Ditches/Coulees and Small, Flowing Streams/Ditches:

- Earthen dams
- Under flow dams (small, large, and T-pipe)
- Straw bale dams
- Wier dams
- Culvert block dams
- Sorbent boom
- Containment boom



**Earthen Dam**



**Small Under Flow Dam**



**Large Under Flow Dam**



**T-Pipe Under Flow Dam**



Straw Bale Dam



Wood Wier Dam/Culvert Block



Sorbent Boom



Containment Boom

<u>Response Techniques for Large, Flowing Rivers/Streams:</u>

- Containment Boom

- In-situ Burn/Fire Boom

As previously mentioned, as part of the ongoing sub-area planning activities within EPA Region 8, control points and response strategies have been developed to address worst-case discharge spill projections. Some of the control point locations and booming strategies identified for the larger rivers and streams within the sub-area are available on the TERA Viewer.

Response strategies to be implemented at each control point were developed for average/typical conditions (flow velocity, weather impacts, etc.). Response personnel must be knowledgeable and ready to modify the response strategies as needed to mitigate the threat, if unusual environmental conditions are encountered during a response. It should be noted there are condition-related limitations regarding the deployment of certain response equipment. These limitations are often associated with high flow conditions and flooding. Under high flow conditions, a primary objective is to limit the spread of oil within the flood zone and backwater areas. Health and safety of response workers must be taken into consideration under all circumstances.



**Containment Boom**

Under certain conditions, in-situ burning may offer a logistically simple, rapid, inexpensive, and relatively safe means for reducing impacts of an oil spill. Burning can substantially reduce need for

collection, storage, transport, and disposal of recovered material.  Under certain circumstances, such as oil spilled under ice, burning may be the only viable response technique.  In-situ burning may have significant short-term impacts (e.g., airborne release of particulate matter and hazardous substances, etc.), but may actually produce the lowest long-term impact because it removes the oil quickly.  In-situ burning should augment, not replace, other oil spill response techniques such as mechanical removal.  Burning often requires the use of fire boom as shown in the picture below.  Other factors associated with in-situ burns are detailed in the strategies/priorities discussion for large, open water bodies section below.



Fire Boom

Response Approach for Large, Open Water Bodies:

An oil spill to a large, open water body, such as Lake Sakakawea, poses many challenges.  Response strategies and techniques that should be considered during such a spill are discussed below.  Once oil is released to an open water body, it will naturally spread, fragment, and disperse under the influence of wind, waves, and current.

Approach:

- Assess the amount and type of spilled oil via surveillance and tracking.  Aerial flights may be warranted if the area/shoreline associated with a spill is large, and access to visually assess the spill is limited.

- Based on surveillance data, determine the most effective uses of response equipment.  Response resources may be limited during the first 24 to 36 hours following a spill, so determination of where to mobilize resources is critical.

- Utilize existing information/plans to identify pre-existing control/access points where response activities can be implemented.

Strategies/Priorities for Large, Open Water Bodies:

The highest priorities during a response are safety and then stabilization.  For an open water environment, in non-ice conditions, environmental factors (flow/current and wind in particular) will determine the oil flow path and locations where spilled oil will accumulate.  Listed below are strategies/techniques that can be applied to an oil spill response on large, open water bodies.  These strategies and techniques are not listed by priority.  Response strategies implemented during the initial phases (24 to 72 hours) of a response will largely be dependent on access points and resource/equipment availability.  All factors must be evaluated to ensure an effective response is conducted.  Followup evaluation will be required as additional resources become available.

- Protection:  Identify sensitive areas regarding human health and environment (drinking water intakes, critical habitats, etc.) that could be impacted by the spill.  Implement response activities for protection of these areas.  Response actions may include placement of deflection or protection boom to divert or prevent oil from impacting the sensitive area/receptor/resource.  Based on the availability of oil spill equipment/boom, protection may not be feasible until additional equipment and boom become available.

- Containment:  Based on initial surveillance information, identify where oil has accumulated and where collection can be performed most efficiently.  These locations are likely to be in bays, inlets, and shoreline pockets.  Containment boom can be used to either deflect oil into collection areas or to contain the oil so collection can occur.  As a note, bay inlets on Lake Sakakawea can reach up to 1 mile in distance; therefore, implementation of this strategy may depend on the amount of required resources (boom).  Large reels of inflatable boom may be

the best option for rapid deployment of boom.  However, no inflatable boom is known to be
currently located within the sub-area.  Photographs of inflatable boom are included below.

- Collection:  Additional techniques that can be used to collect oil in open water include
  corralling oil using two boats (working together) to drag containment boom (with trapped oil)
  to recovery sites, and use of open water skimmer boats.  This method is slow and will be of
  limited benefit in significant wave and wind conditions.

- In-situ Burning:  Oil accumulation may occur in areas where mechanical removal is more
  harmful or not practical, and in-situ burning may be preferred to reduce the long-term impacts
  to aquatic and riparian/shoreline ecosystems.  This type of action must be well managed to
  ensure the fire will not damage other resources, and generally it will require an evaluation by
  the resource trustees and acquisition of emergency air release permits.  Time is also a
  consideration for in-situ burning.  The longer oil is exposed to the environment, the less likely
  it is to effectively burn.



**Inflatable Boom**



**Inflatable Boom**