**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **STANDING ROCK SIOUX TRIBE,** *et al.*, <br><br> **Plaintiffs,** <br><br> **and** <br><br> **CHEYENNE RIVER SIOUX TRIBE,** *et al.*, <br><br> **Plaintiff-Intervenors,** <br><br> **v.** <br><br> **U.S. ARMY CORPS OF ENGINEERS,** <br><br> **Defendant,** <br><br> **and** <br><br> **DAKOTA ACCESS, LLC,** <br><br> **Defendant-Intervenor.** | **Civil Action No. 16-1534 (JEB)** |

<u>**MEMORANDUM OPINION**</u>

Lake Oahe is a large reservoir lying behind a dam on the Missouri River and stretching between North and South Dakota.  Fearing severe environmental consequences, American Indian Tribes on nearby reservations have sought for several years to invalidate federal permits allowing the Dakota Access Pipeline to carry oil under the lake.  Today they finally achieve that goal — at least for the time being.

Following multiple twists and turns in this long-running litigation, this Court recently found that Defendant U.S. Army Corps of Engineers had violated the National Environmental Policy Act when it granted an easement to Defendant-Intervenor Dakota Access, LLC to construct and operate a segment of that crude-oil pipeline running beneath the lake.  This was

because the Corps had failed to produce an Environmental Impact Statement despite conditions that triggered such a requirement.  The Court consequently remanded the case to the agency to prepare such an EIS, but it asked for separate briefing on the appropriate interim remedy.  In other words, the Court asked the parties whether the easement should be vacated and the pipeline emptied during the remand process.  Although mindful of the disruption such a shutdown will cause, the Court now concludes that the answer is yes.  Clear precedent favoring vacatur during such a remand coupled with the seriousness of the Corps' deficiencies outweighs the negative effects of halting the oil flow for the thirteen months that the Corps believes the creation of an EIS will take.

## I.    Background

The Court recounts here only the background information necessary to set the stage for the remedy analysis.  For the full history of this case, the interested reader can refer to the Court's ten prior Opinions in this matter.  See, e.g., Standing Rock Sioux Tribe v. U.S. Army Corps. of Eng'rs (Standing Rock III), 255 F. Supp. 3d 101, 114–16 (D.D.C. 2017); see also ECF Nos. 39, 158, 206, 239, 284, 304, 392, 418, 496.  The Court begins with the relevant statute and then describes the procedural history of the litigation.

### A.  Statutory Scheme

The National Environmental Policy Act requires agencies to "consider every significant aspect of the environmental impact of a proposed action," Balt. Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97 (1983) (quoting Vt. Yankee Nuclear Power Corp v. NRDC, 435 U.S. 519, 553 (1978), so as to "inform the public that it has indeed considered environmental concerns in its decisionmaking process."  Id. (citing Weinberger v. Catholic Action of Haw., 454 U.S. 139, 143 (1981)).  In order to achieve these goals, NEPA imposes on agencies certain procedural

requirements, <u>Citizens Against Burlington, Inc. v. Busey</u>, 938 F.2d 190, 193–94 (D.C. Cir. 1991), but it "does not mandate particular consequences." <u>Id.</u> at 194.

First, an agency must draft an Environmental Assessment, <u>see</u> 40 C.F.R. § 1501.4(b), that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement [EIS] or a finding of no significant impact [FONSI]." <u>Id.</u> § 1508.9(a). "If <u>any</u> 'significant' environmental impacts might result from the proposed agency action[,] then an EIS must be prepared <u>before</u> agency action is taken." <u>Grand Canyon Trust v. FAA</u>, 290 F.3d 339, 340 (D.C. Cir. 2002) (quoting <u>Sierra Club v. Peterson</u>, 717 F.2d 1409, 1415 (D.C. Cir. 1983)); <u>see also</u> 42 U.S.C. § 4332(2)(C) (requiring statement of environmental impact of any proposed action "significantly affecting the quality of the human environment"). If, on the other hand, the agency determines that no EIS is required, it must prepare either a FONSI or a Mitigated FONSI, depending on whether the lack of significant impact results from an agency's commitment to mitigation measures. <u>See</u> 40 C.F.R. §§ 1501.4(e), 1508.13; Council on Environmental Quality, <u>Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact</u> 2, 7 (2011), https://ceq.doe.gov/ docs/ceq-regulations-and-guidance/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf.

In order to determine whether its actions may result in "significant" environmental impacts — and therefore whether it must prepare an EIS — an agency must examine both the "context" and the "intensity" of the action. <u>See</u> 40 C.F.R. § 1508.27. "[I]n evaluating intensity," the agency must consider ten factors, <u>id.</u> § 1508.27(b), only one of which is relevant here. "Implicating any one of the[se] factors may be sufficient to require development of an EIS." <u>Nat'l Parks Conservation Ass'n v. Semonite</u>, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (citing <u>Grand Canyon Trust</u>, 290 F.3d at 347). The decision here turned on the fourth of these factors — "[t]he

degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4).

Effects are "controversial" where "substantial dispute exists as to the size, nature, or effect of the major federal action rather than to the existence of opposition to a use." Town of Cave Creek v. FAA, 325 F.3d 320, 331 (D.C. Cir. 2003) (emphasis omitted) (quoting Found. for N. Am. Wild Sheep v. USDA, 681 F.2d 1172, 1182 (9th Cir. 1982)).   While "what constitutes the type of 'controversy' that requires a full EIS is not entirely clear," Nat'l Parks Conservation Ass'n v. United States, 177 F. Supp. 3d 1, 33 (D.D.C. 2016) (quoting Nat'l Wildlife Fed'n v. Norton, 332 F. Supp. 2d 170, 184 (D.D.C. 2004)), "something more is required besides the fact that some people may be highly agitated and be willing to go to court over the matter." Id. (quoting Fund for Animals v. Frizzell, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975)).

B.  Procedural History

This case involves efforts by several American Indian Tribes to enjoin Defendant United States Army Corps of Engineers from permitting Defendant-Intervenor Dakota Access, LLC to constructe and operate a segment of its oil pipeline under Lake Oahe, which lies on the Missouri River.  In 2016, Plaintiff Standing Rock Sioux Tribe filed its Complaint in this Court, followed shortly by Plaintiff-Intervenor Cheyenne River Sioux Tribe and later by Plaintiffs Oglala and Yankton Sioux Tribes, the latter two in cases that have now been consolidated into the present one. Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock VI), No. 16-1534, 2020 WL 1441923, at *3 (D.D.C. Mar. 25, 2020).  Early on, both Standing Rock and Cheyenne River were unsuccessful in seeking preliminary injunctions under the National Historic Preservation Act and the Religious Freedom Restoration Act.  Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock II), 239 F. Supp. 3d 77, 100 (D.D.C. 2017);

Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock I), 205 F. Supp. 3d 4,

37 (D.D.C. 2016).  In between these two Opinions, the Corps "announced that DAPL

construction would be suspended pending the Corps' reconsideration of its statutory obligations"

under NEPA.  Standing Rock VI, 2020 WL 1441923, at *3.  A few months later, however,

following the change of administration in January 2017 and a presidential memorandum urging

acceleration of the project, the Corps again reconsidered and decided to move forward.  Id.  It

granted the sought permit, construction was completed, and oil commenced flowing through the

Dakota Access Pipeline.  Standing Rock III, 255 F. Supp. 3d at 120.

Undeterred, later in 2017, Standing Rock and Cheyenne River switched focus and

"sought summary judgment under [the National Environmental Policy Act], arguing that the

Corps was required to prepare an [Environmental Impact Statement], and Defendants similarly

cross-moved."  Standing Rock VI, 2020 WL 1441923, at *4.  The Court found that the Corps'

decision "not to issue an EIS largely complied with NEPA," but three "substantial exceptions" to

that compliance necessitated a remand.  Standing Rock III, 255 F. Supp. 3d at 147.  Specifically,

the Court "found wanting the Corps' analysis of: (1) whether the project's effects were likely to

be highly controversial; (2) the impact of an oil spill on the Tribe's fishing and hunting rights

under the Treaty of 1851; and (3) 'whether,' under a required environmental-justice analysis,

'Standing Rock would be disproportionately harmed by a spill.'"  Standing Rock VI, 2020 WL

1441923, at *5 (citations omitted) (quoting Standing Rock III, 255 F. Supp. 3d at 140).  This

raised the significant question of whether the permit should be vacated — and the oil flow

arrested — during the remand.  In a subsequent Opinion, the Court declined to so order, finding

that there was a "'serious possibility' that the Corps w[ould] be able to substantiate its prior

conclusions." Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs (Standing Rock IV),

282 F. Supp. 3d 91, 109 (D.D.C. 2017).

During the remand, which stretched on for well over a year, the D.C. Circuit "issued a

significant opinion clarifying a court's role in reviewing an agency's finding that a project was

not 'highly controversial.'"  Standing Rock VI, 2020 WL 1441923, at *7.  In Semonite, that

court held that it was not sufficient for an agency to simply "acknowledge and try to address

concerns raised during the NEPA process."  916 F.3d at 1085 (emphasis added).  "The question

is not whether the Corps attempted to resolve the controversy, but whether it succeeded."  Id. at

1085–86.  Because the Corps in that case had failed to resolve the scientific controversy raised

by expert and agency comments, the Semonite court found that it had been wrong to choose not

to prepare an EIS and remanded for such action.  Id. at 1087–88.

After the remand in this case was completed, the parties again cross-moved for summary

judgment.  Realizing that Semonite guided both "the nature and scope of [this Court's] review,"

Standing Rock VI, 2020 WL 1441923, at *8; see id. at *6–8 (detailing reasons for following

Semonite), the Court conducted a detailed analysis of some of the many expert critiques of the

environmental effects of the proposed project.  Id. at *8–16 (discussing leak-detection system,

operator safety record, winter conditions, and worst-case discharge).  Ultimately, "even this non-

extensive selection suffice[d] to show the necessity of an EIS."  Id. at *9.  The Court found that

"the Corps ha[d] not 'succeeded' in 'resolv[ing] the controversy' created by 'consistent and

strenuous opposition, often in the form of concrete objections to the Corps' analytical process

and findings,' by 'organizations with subject-matter expertise.'"  Id. at *16 (second alteration in

original) (quoting Semonite, 916 F.3d at 1086).  As in Semonite, "[t]his demonstrate[d] the

'something more' needed to show that the 'effects on the quality of the human environment are

likely to be highly controversial.'" Id. (first alteration in original) (quoting Semonite, 916 F.3d at 1086). "The Corps ha[d] thus violated NEPA by determining that an EIS was unnecessary even though one of the EIS-triggering factors was met." Id.

While there were two remaining NEPA topics — other than the "highly controversial" factor — that had formed the basis for the Court's first remand, it found no need to reach them, since the remedy for any finding in the Tribes' favor would be the same — viz., an EIS — and such EIS would require consideration of them in any case. Id. After disposing of a handful of other, non-NEPA issues, id. at *16–19, the Court again "remand[ed] to the agency for it to complete such EIS." Id. at *16 (citing Semonite, 916 F.3d at 1082; then citing Grand Canyon Trust, 290 F.3d at 340). It asked for separate briefing, however, on "the status of the easement — and, ultimately, the oil — in the meantime." Id. at *19. Unsurprisingly, the Tribes have argued for vacatur of the permits, Defendants have opposed, and each side is joined by an army of amici. See ECF Nos. 504, 514–19, 521, 532–33, 537. With the benefit of this bountiful briefing, the Court is now prepared to rule as to vacatur.

## II.    Legal Standard

"The ordinary practice is to vacate unlawful agency action." United Steel v. Mine Safety & Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)); accord FCC v. NextWave Personal Comms. Inc., 537 U.S. 293, 300 (2003) ("In all cases agency action must be set aside if the action . . . failed to meet statutory, procedural, or constitutional requirements.") (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413–14 (1971)). Vacatur is also the "standard remedy" in this Circuit for an "action promulgated in violation of NEPA." Humane Soc'y of U.S. v. Johanns, 520 F. Supp. 2d 8, 37 (D.D.C. 2007) (citing Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001)); see Reed v. Salazar, 744

F. Supp. 2d 98, 118–20 (D.D.C. 2010) (finding NEPA violation and ordering vacatur); Sierra

Club v. Van Antwerp, 719 F. Supp. 2d 77, 78–80 (D.D.C. 2010) (finding NEPA violation and

ordering remand with partial vacatur); Greater Yellowstone Coal. v. Kempthorne, 577 F. Supp.

2d 183, 204–05, 210 (D.D.C. 2008) (finding NEPA violation and ordering vacatur); see also Pub.

Emps. for Envtl. Responsibility v. U.S. Fish & Wildlife Serv., 189 F. Supp. 3d 1, 2 (D.D.C.

2016) (surveying "cases in this district" and noting "the primacy of vacatur to remedy NEPA

violations").

Although vacatur may be the "presumptively appropriate remedy," Sierra Club, 719 F.

Supp. 2d at 78, it is not the only option.  Instead, as equity requires, the reviewing court has

discretion to leave the agency action in place.  See, e.g., Advocates for Highway & Auto Safety

v. Fed. Motor Carrier Safety Admin., 429 F.3d 1136, 1151 (D.C. Cir. 2005) (declining to vacate

vehicle-safety rule found arbitrary and capricious under APA); Int'l Union, United Mine

Workers of Am. v. Fed. Mine Safety & Health Admin., 920 F.2d 960, 966–67 (D.C. Cir. 1990)

(same for mine-safety rule).  Indeed, that is precisely what this Court did last time around.  See

Standing Rock IV, 282 F. Supp. 3d at 109.

In Allied-Signal v. United States Nuclear Regulatory Commission, 988 F.2d 146 (D.C.

Cir. 1993), the court laid out the operative test for whether to vacate a deficient agency action

during remand.  First, a court must consider "the seriousness of the order's deficiencies (and thus

the extent of doubt whether the agency chose correctly)."  Id. at 150 (quoting Int'l Union, 920

F.2d at 967).  Second, it analyzes "the disruptive consequences of an interim change that may

itself be changed."  Id. at 150–51 (quoting Int'l Union, 920 F.2d at 967).  "Because vacatur is the

default remedy, . . . defendants bear the burden to prove that vacatur is unnecessary."  Nat'l

Parks Conservation Ass'n v. Semonite, 422 F. Supp. 3d 92, 99 (D.D.C. 2019).

III.    **Analysis**

The Court analyzes each prong of the Allied-Signal test separately, keeping in mind that "[t]here is no rule requiring either the proponent or opponent of vacatur to prevail on both factors." Shands Jacksonville Med. Ctr. v. Burwell, 139 F. Supp. 3d 240, 270 (D.D.C. 2015). It ultimately concludes that shutting down the pipeline is warranted.

A.  Seriousness of Deficiencies

Unlike the Court's last Opinion on remedy in this case, the first Allied-Signal prong is quite straightforward here. The Court's task in considering this first factor is to determine whether there is "a significant possibility that the [agency] may find an adequate explanation for its actions" on remand. Williston Basin Interstate Pipeline Co. v. FERC, 519 F.3d 497, 504 (D.C. Cir. 2008) (citing Allied-Signal, 988 F.2d at 150–51); accord Nat'l Parks Conservation Ass'n v. Jewell, 62 F. Supp. 3d 7, 20 (D.D.C. 2014) ("[R]emand without vacatur is appropriate where 'there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand.'") (second alteration in original) (quoting Allied-Signal, 988 F.2d at 151). In its prior remedy Opinion, this Court went through the three topics to be covered on remand in significant detail, see Standing Rock IV, 282 F. Supp. 3d at 97–103, finding in each case that the Corps was likely to be able to "substantiate its prior decision to issue an EA." Id. at 100 (fishing and hunting rights); see also id. at 99 (highly controversial); id. at 102 (environmental justice).

Now, however, that decision has been weighed, it has been measured, and it has been found wanting. The Court's March 2020 Opinion examined the first of the three remand topics — namely, whether the effects were highly controversial — and found definitively that, notwithstanding the Court's earlier optimism, the Corps had not been able to substantiate its decision to publish only an EA and not an EIS:

> As shown at great length in the preceding analysis, the Corps has not "succeeded" in "resolv[ing] the controversy" created by "consistent and strenuous opposition, often in the form of concrete objections to the Corps' analytical process and findings," by "organizations with subject-matter expertise."   As in <u>Semonite</u>, "[t]his demonstrates the 'something more' needed to show that the 'effects on the quality of the human environment are likely to be highly controversial.'"   The Corps has thus violated NEPA by determining that an EIS was unnecessary even though one of the EIS-triggering factors was met.

<u>Standing Rock VI</u>, 2020 WL 1441923, at *16 (alterations in original) (citations omitted) (quoting <u>Semonite</u>, 916 F.3d at 1086).  There is no longer any question of the Corps being able to justify its choice.

In such a circumstance, Circuit precedent overwhelmingly dictates that vacatur is appropriate.  That court routinely vacates agency action when remanding for preparation of an EIS, and often without discussion.  <u>See, e.g.</u>, <u>Sierra Club v. FERC</u>, 867 F.3d 1357, 1379 (D.C. Cir. 2017) (vacating agency approval of interstate natural-gas pipelines); <u>Am. Wild Horse Preservation Campaign v. Perdue</u>, 873 F.3d 914, 932 (D.C. Cir. 2017) (vacating Forest Service decision to eliminate 23,000 acres of wild horse territory); <u>see also</u> <u>Sierra Club v. U.S. Army Corps of Eng'rs</u>, 803 F.3d 31, 43 (D.C. Cir. 2015) ("If the NEPA analysis were legally inadequate, 'we could order that the [pipeline] be closed or impose restrictions on its use,' at least on federally authorized segments, 'until [the agencies] complied with NEPA.'") (alterations in original) (quoting <u>Airport Neighbors All., Inc. v. United States</u>, 90 F.3d 426, 429 (10th Cir. 1996)).  When vacatur <u>is</u> discussed, the seriousness of a failure to produce an EIS under NEPA is emphasized.  <u>See, e.g.</u>, <u>Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n</u>, 896 F.3d 520, 536 (D.C. Cir. 2018) ("The seriousness of the NEPA deficiency is particularly clear here because the point of NEPA is to require an adequate EIS before a project goes forward . . . .").

In fact, to the Court's and the parties' knowledge, only twice has a court (once the Circuit, once the district court here) not vacated agency action that violated NEPA because of a missing or defective EIS.  Defendants attempt to hang their hat on these cases, but to no avail.  In both, the second prong of the Allied-Signal test, but not the first, weighed in favor of remand without vacatur, leading those courts to find that the scales tipped toward the agency.  See id.; Semonite, 422 F. Supp. 3d at 99–100 ("[T]he seriousness of the defect is significant.  If the first Allied-Signal factor were the only consideration, the standard remedy [of vacatur] would likely apply."); id. at 103 ("For all of these reasons, the second Allied-Signal factor forces the Court to conclude that vacating the permit would be inappropriate.").  That second factor will be analyzed presently, see infra Section III.B, and the Court will revisit these two cases at that time.  As to this first prong, however, both decisions strongly support the Court's conclusion here.

Defendants and Defendant-Intervenor next argue that, instead of focusing on the Corps' decision not to prepare an EIS, the Court should be analyzing whether "the Corps will likely substantiate its substantive easement decision."  ECF No. 507 (Corps Remedy Brief) at 7 (emphasis added); see ECF No. 509-1 (DA Remedy Brief) at 14 ("The Corps' key premises for granting the easement . . . remain intact, and they strongly suggest that the Corps will be able to reach the same top-line conclusion on remand.").  They maintain that focusing on the EIS decision "would render the first part of th[e Allied-Signal] test surplusage," since it suggests that any agency action that is invalid for failure to produce an EIS will always flunk this first prong of the vacatur test.  See ECF No. 536 (Corps Remedy Reply) at 5; see ECF No. 541 (DA Remedy Reply) at 9 (arguing that focusing on the EIS "alter[s] that prong such that it could never apply in NEPA cases like this").  Instead, they would have the Court evaluate their ability in an EIS to remedy the specific areas of concern stated in its prior Opinion.  They thus spill

considerable ink rehashing the merits of the Court's prior Opinions.  See, e.g., DA Remedy Br. at 19–31 (arguing in great detail why Corps will be able to "easily address the four discrete issues that this Court found 'highly controversial,'" id. at 19); Corps Remedy Br. at 10–14 (arguing that pipeline's Mineral Leasing Act easement is valid for the reasons argued in first round of summary judgment).

To the extent that Defendants complain that the "seriousness" of an agency's failure to produce an EIS under NEPA is a foregone conclusion, they are taking issue with the caselaw in this Circuit, as just explained.  See also Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 757 (2004) (describing EIS as being "[a]t the heart of NEPA").  But the magnitude of those shortcomings is even clearer here, where the Court had the benefit of a second round of summary-judgment briefing to determine that the defects in the EA were, in fact, too serious to be ignored.  See generally Standing Rock VI, 2020 WL 1441923.  The Court determined in March of this year that these infirmities were so significant as to merit the preparation of an Environmental Impact Statement, id. at *16, and, as just explained, an EIS failure under NEPA is considered a very serious deficiency in this Circuit.  The Court's focus on the EIS, rather than on the entire easement decision, is in fact supported by one of the aforementioned two cases on which Defendants rely.  See Semonite, 422 F. Supp. 3d at 99 ("Looking at the first Allied-Signal factor, the Court does not assess the deficiency of the ultimate decision itself — the choice to issue the permit — but rather the deficiency of the determination that an EIS was not warranted.") (emphasis added).

Defendants' argument, moreover, betrays what appears to be a misunderstanding of their obligations going forward.  The time for justifying the Environmental Assessment has passed — the Court has ordered an Environmental Impact Statement, and another limited remand analysis

will not fit the bill.  <u>Contra</u> DA Remedy Br. at 14 (arguing that task on remand is to address only "four areas of criticism pertaining to one remand topic").  Indeed, the Court explicitly did not reach the other two remand topics because "the remedy for them would be the same," and "'[i]n preparing its EIS, the Corps [would] have to revisit' those issues in any case."  <u>Standing Rock VI</u>, 2020 WL 1441923, at *16 (alterations in original) (quoting <u>Semonite</u>, 916 F.3d at 1088). <u>Contra</u> Corps Remedy Br. at 10 ("[T]he Court found no fault with the Corps' consideration of environmental justice or of the impacts to the Tribes' treaty hunting and fishing rights . . . .").

An EIS, it is important to remember, is a separate regulatory beast, with its own requirements.  <u>See, e.g</u>, <u>Taxpayers of Mich. Against Casinos v. Norton</u>, 433 F.3d 852, 857 (D.C. Cir. 2006) (describing EIS as "detailed" and "comprehensive").  The fact that the Corps has submitted a detailed EA does not minimize its obligations when preparing that EIS.  <u>See</u> <u>Anderson v. Evans</u>, 371 F.3d 475, 494 (9th Cir. 2004) ("No matter how thorough, an EA can never substitute for preparation of an EIS, if the proposed action could significantly affect the environment.").  <u>Compare</u> 40 C.F.R. § 1501.4 (laying out considerations for "whether to prepare an environmental impact statement"), <u>with</u> 40 C.F.R. §§ 1502.1–1502.24 (laying out requirements for environmental impact statement).  <u>Contra</u> DA Remedy Br. at 10 (arguing that Corps can "continue to rely largely, if not exclusively, on its prior analysis").  The Corps must perform a full and complete EIS for the entire project, potentially subject to the full scope of judicial review normally applied to environmental impact statements.  <u>See, e.g.</u>, 40 C.F.R. § 1502.14 (comparison of environmental impacts of alternatives to proposed agency project "is the heart of the environmental impact statement"); <u>Sierra Club</u>, 867 F.3d at 1371–72 (discussing agency's duty in preparing EIS to consider indirect environmental effects of pipeline operations).

In sum, the first Allied-Signal factor weighs entirely in favor of vacatur. The Court has had ample opportunity to consider the serious deficiencies in the Corps' decision not to prepare an EIS, see Standing Rock VI, 2020 WL 1441923, at *8–16, and it finds no "possibility that the [agency] may find an adequate explanation for its actions." Williston Basin Interstate Pipeline, 519 F.3d at 504; see Allied-Signal, 988 F.2d at 151.

B.  Disruptive Consequences

The second Allied-Signal factor is less straightforward here than the first. At issue are "the disruptive consequences of vacating," 988 F.2d at 151, particularly those that threaten to "'set back' the Act's objective[s]." Am. Bankers Ass'n v. Nat'l Credit Union Admin., 934 F.3d 649, 674 (D.C. Cir. 2019); accord Envtl. Def. Fund, Inc. v. EPA, 898 F.2d 183, 190 (D.C. Cir. 1990) (remanding without vacatur when no party requested to vacate and doing so would defeat "the enhanced protection of the environmental values covered by the [Clean Air Act]"). Courts may choose "not [to] vacate regulations when doing so would risk significant harm to the public health or the environment." Wisconsin v. EPA, 938 F.3d 303, 336 (D.C. Cir. 2019) (citing Allied-Signal, 988 F.2d at 150–51).

1.  *Economic Disruption*

Dakota Access's central and strongest argument as to the second Allied-Signal prong is that shutting down the pipeline would cause it, and the industries that rely on it, significant economic harm, including substantial job losses. See, e.g., DA Remedy Br. at 32 (stating that shutdown would "pose an existential threat to DAPL" due to "massive" revenue loss). It submits declarations stating that DAPL could lose as much as $643 million in the second half of 2020 and $1.4 billion in 2021 if shut down pursuant to the Court's order. See ECF No. 509-9 (Declaration of Glenn Emery), ¶ 10. "All of these financial losses would be absorbed by the

14

owners of Dakota Access," particularly Energy Transfer Partners, the current parent company of DAPL after a merger with Sunoco.  See DA Remedy Br. at 33; Standing Rock VI, 2020 WL 1441923, at *10.

In addition, both Dakota Access and many *amici* argue, shutting the pipeline down would have serious repercussions for the entire North Dakota oil industry.  "There is no viable pipeline alternative for transporting the 570,000 barrels of Bakken crude that DAPL is capable of carrying each day," Dakota Access states, and railroads do not have the capacity "to fill the breach."  DA Remedy Br. at 35–36; see ECF No. 504 (Amicus Brief of State of North Dakota) at 11 ("An increase in crude by rail volumes sufficient to offset current pipeline deliveries by DAPL would take an unknown amount of time to assemble the required tank cars, engines, and crews, and to ensure market destinations would be prepared for a surge in rail volume.").  Several states also argue that their grain farmers would be harmed by having to pay a premium for railroad cars once oil, which is more valuable by volume, enters that market and drives up prices.  See ECF No. 514 (Amicus Brief of IN, MT, AL, AR, IA, KS, KY, LA, NE, OH, SD, TX, UT, and WV) at 9–10.  "[M]any North Dakota oil producers," meanwhile, with no way to get their oil to market, "would have no choice but to respond by 'shutting in' some of their wells and ceasing production entirely," with consequent effects on the workers at those wells.  See DA Remedy Brief at 35 (citing ECF No. 509-11 (Declaration of Jeff D. Makholm), ¶ 17; then citing Emery Decl., ¶¶ 14, 18).  Specifically, Dakota Access estimates, "producers would have to shut-in between 3,460 and 5,400 wells, stranding up to 34.5% of North Dakota crude production."  Id. at 36; see also, e.g., North Dakota Br. at 8 (estimating that "[e]ach of those wells represents 1.6 full time jobs") (citing ECF No. 504-2 (Declaration of Lynn Helms), ¶ 10).  This would also have a reverberating effect on the state of North Dakota, whose economy derives a large part of

its revenue from oil and gas taxes, largely from the Williston Basin, which includes the Bakken

fields that supply DAPL.  See North Dakota Br. at 2–3; DA Remedy Br. at 4; see also North

Dakota Br. at 2 (explaining that "despite the small overall size of North Dakota's economy, [it] is

a large producer of oil and natural gas").

The Tribes and other *amici* respond that these projected consequences are "wildly

exaggerated" because, following "a precipitous collapse in oil prices, demand, and production"

caused in part by the COVID-19 pandemic, "production in North Dakota has [already]

plummeted."  ECF No. 527 (Tribes Remedy Brief) at 21–22; see also ECF No. 531 (Amicus

Brief of Members of Congress) at 9 ("Since [the Court's last remedy Opinion in this case in]

2017, the price and demand for oil has plummeted due to factors well beyond the operation of

this pipeline."); ECF No. 519 (Amicus Brief of North Dakota Petroleum Council) at 8 ("In recent

weeks, of course, the coronavirus pandemic has turned the nation's economy and the oil industry

upside down.").  They point out that North Dakota estimates that "as many as 5,000 wells may

now be shut-in" because of "the current economic situation," North Dakota Br. at 3 n.4, noting

that this is more than the number of wells Dakota Access claimed would be affected by a DAPL

shutdown.  See Tribes Remedy Br. at 22–23; see also id. at 23 (citing news articles reporting that

North Dakota well shut-ins have now increased to 7,000).  Other briefs allude to the pandemic,

admitting some effect on the oil market but maintaining more optimism than realism.  See, e.g.,

N.D. Petroleum Council Br. at 8 ("In recent weeks, of course, the coronavirus pandemic has

turned the nation's economy and the oil industry upside down.  Nevertheless, NDPC continues to

hope and expect that our country's economy and the industry will recover in coming months.");

North Dakota Br. at 12 ("[T]he potential impacts of the COVID-19 pandemic are impossible to

quantify due to rapidly changing oil prices, employment numbers, and capital investment

plans . . . .").  The Tribes further claim that this drop in production may mean that there will be "little or no increase in rail transportation."  Tribes Remedy Br. at 25 (citing ECF No. 527-2 (Declaration of Marie Fagan), ¶ 5).  And to the extent that a DAPL shutdown causes crude-oil demand to drop even further or its transportation to switch to railroads, the Tribes argue that with "some participants in the North Dakota oil market [facing] increased costs," "other participants," such as railroads and other oil-producing states, would "benefit from the shift."  Tribes Remedy Br. at 26 (citing ECF No. 272-2 (Third Declaration of Richard Krupewicz), ¶ 30; then citing Fagan Decl., ¶ 7).  Defendant-Intervenors, for their part, dismiss the Tribes' take on the pandemic, calling their analysis of the continuing effects of a pandemic-depressed oil market "bearish" and "erroneous[]."  DAPL Remedy Rep. at 17–18.

        The Court need not pick apart the various positions in these disputes, for it is clear that at least some immediate harm to the North Dakota oil industry should be expected from a DAPL shutdown, even if its effects are tempered by a decreased demand for oil.  See DA Remedy Rep. at 18 (averring that "demand for [the pipeline]'s services has remained strong").  Indeed, the Court does not take lightly the serious effects that a DAPL shutdown could have for many states, companies, and workers.  Losing jobs and revenue, particularly in a highly uncertain economic environment, is no small burden.  Ultimately, however, these effects do not tip the scales decisively in favor of remanding without vacatur.  This is so for several reasons.

        First, "the Corps anticipates the [EIS] process" for DAPL "will take approximately thirteen months," Corps Remedy Br. at 5, whereas in general "the mean time from initiation to completion of an EIS is 3.6 years" across all federal agencies, and the Corps' own average time is even longer.  See Tribes Remedy Br. at 16 n.4 (citing Council on Envtl. Quality, Environmental Impact Statement Timelines (2010–2017), at 1, 8, https://www.whitehouse.gov/

wp-content/uploads/2017/11/CEQ-EIS-Timelines-Report.pdf).  This expedited process, if it proceeds on track, would cabin the economic disruption of a shutdown.  See Standing Rock IV, 282 F. Supp. 3d at 108 ("[T]he Corps' assertions regarding the timing of the remand process are also relevant to analyzing the disruption in this case.").  Without vacatur, conversely, the Corps and Dakota Access would have little incentive to finish the EIS in a timely matter.

Second, while economic disruption is a proper consideration for the second Allied-Signal prong, it may not necessarily be "determinative."  Standing Rock IV, 282 F. Supp. 3d at 104; see also Am. Water Works Ass'n v. EPA, 40 F.3d 1266, 1273 (D.C. Cir. 1994) (considering "disrupti[on] to the [affected] industries" in vacatur analysis).  Courts more often cite "harm to the public health or the environment," Wisconsin, 938 F.3d at 336 (citing Allied-Signal, 988 F.2d at 150–51), and those that "'set back' the Act's objective[s]."  Am. Bankers Ass'n, 934 F.3d at 674.  The Court will discuss environmental disruption shortly.  See infra Section III.B.2,.

Third, accepting Dakota Access's arguments wholesale would subvert the structure of NEPA, the "objective[s]" of which are an important touchstone when considering disruption. Am. Bankers Ass'n, 934 F.3d at 674.  NEPA's "requirement that a detailed environmental impact statement be made for a 'proposed' action makes clear that agencies must take the required hard look before taking that action."  Oglala Sioux Tribe, 896 F.3d at 532; see also Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989) ("The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's 'action-forcing' purpose  . . . .") (citing Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 97 (1983); then citing Weinberger v. Catholic Action of Haw., 454 U.S. 139, 143 (1981)).  When it comes to NEPA, it is better to ask for permission than

forgiveness: if you can build first and consider environmental consequences later, NEPA's action-forcing purpose loses its bite.

Dakota Access attempts the same workaround of this principle as was offered last time, and the Court again finds it unavailing.  In 2017, Defendants "argue[d] that vacatur here would 'have greater disruptive consequences than in the typical NEPA case' because the pipeline has already been completed."  Standing Rock IV, 282 F. Supp. 3d at 107 (citing ECF No. 258 at 12); see DA Remedy Br. at 33–34 ("[H]owever one might have quantified what the 'economic disruption' risk was back then, the potential economic risk now is quantifiable and catastrophic. And after almost three years of operations and several court rulings, it has been reasonable for Dakota Access, the state of North Dakota, and all the other interested third parties to assume that the 'risk' of a shutdown would decrease significantly over time.")  The Court's response to these arguments is the same now as then:

> [D]enying vacatur on the basis of alleged economic harm risks creating undesirable incentives for future agency actions.  If projections of financial distress are sufficient to prevent vacatur, the Court fears that agencies and third parties may choose to devote as many resources as early as possible to a challenged project — and then claim disruption in light of such investments. Such a strategy is contrary to the purpose of NEPA, which seeks to ensure that the government "looks before it leaps."

Standing Rock IV, 282 F. Supp. 3d at 106 (quoting ECF No. 269-1).

Fourth and finally, such "economic myopia," id. at 105, causes Dakota Access to "address the 'potentially disruptive effects of vacatur as if they occur in a vacuum,' thus giving short shrift to the 'potentially disruptive effects that could flow from remand without vacatur.'"  Id. at 105 (quoting Friends of Capital Crescent Trail v. Fed. Transit Admin., 218 F. Supp. 3d 53, 60 (D.D.C. 2016)).  As before, "there is no doubt that allowing oil to flow through the pipeline during remand risks the potentially disruptive effect about which the Tribes are most

19

concerned — a spill under Lake Oahe."  Id.  Indeed, even while "[t]he likelihood of any such

rupture may be low," id., the impact of such a spill has been one of the Court's central concerns

throughout the case.  See Standing Rock III, 255 F. Supp. 3d at 139 ("As to the effects from a

spill (as distinct from the risk of a spill occurring), the EA's discussion is minimal . . . .");

Standing Rock IV, 282 F. Supp. 3d at 105 ("[T]he possible effects of an oil spill on the Tribes'

treaty rights and communities were at the center of this Court's prior Opinion.").  Indeed, while

the most recent Opinion in this case did not have cause to reach the topic of the impact of a spill

on tribal hunting and fishing rights, it did spend much time discussing the possibility that, in the

unlikely event of a spill, systems may not be in place to prevent that spill from becoming

disastrous.  See, e.g., Standing Rock VI, 2020 WL 1441923, at *10 (discussing unaddressed

possibility that DAPL's leak-detection system was incapable of detecting leaks of less than 1%

of its flow rate, meaning that "6,000 barrels per day" could leak without triggering an alarm); id.

at *11 (noting that 30% of spills on pipelines operated by DAPL's operator occurred outside of

operator property); id. at *11–12 (recounting expert concerns that wintertime spill would be

difficult to contain and had not been sufficiently prepared for in EA).  Even assuming the risk of

a spill remains small, "pausing the operation of the pipeline would mitigate even this small risk."

Standing Rock IV, 282 F. Supp. 3d at 105.

       One final word here so that the Court may make good on its earlier promise to address

the two cases offered by Defendant-Intervenor as examples of courts' declining to vacate when

faced with an EIS failure.  Recall that both cases based their decision not on the first Allied-

Signal factor, which they found supported vacatur, but on the second.  See Oglala Sioux Tribe,

896 F.3d at 538; Semonite, 422 F. Supp. 3d at 99–100, 103.  In Oglala Sioux Tribe, the D.C.

Circuit held that this second factor disfavored vacatur simply because a "South Dakota

permitting requirement independently bar[red] it from moving forward with construction on the site until the [agency] complete[d] its compliance with NEPA." 896 F.3d at 538.  In Semonite, however, there was significant disruption anticipated from vacatur: the district court was concerned by "the risk that hundreds of thousands of people will be left with an unreliable power source if the permit is vacated." 422 F. Supp. 3d at 103.  It would be "unjust," that court reasoned, "to force all of those people to bear the brunt of the harm when they are not responsible for its cause." Id. at 102.  Such is not the case here: the disruption Dakota Access focuses on is to its own interests and those of the industry, both of whom relied on the continued operation of the pipeline in the face of ongoing litigation as well as changes in the administration's stance on the environmental propriety of the pipeline.  The parties do not raise any possibility that hundreds of thousands of ordinary citizens will be deprived of a reliable source of oil if DAPL is shut down, and, in fact, as already discussed, oil wells are currently being closed given a low demand having nothing to do with the pipeline.

The other reason that the district court in Semonite considered the disruption too weighty to ignore was that the removal of the agency project in question — which "would [have] involve[d] dismantling seventeen steel lattice towers and removing 37.8 miles of conductor, 8.4 miles of fiber optic shield wire, 32 solar panels and solar lighting systems, and all associated hardware" would have posed a "risk of massive waste" should the Corps ultimately "reissue the permit after conducting an EIS." 422 F. Supp. 3d at 103.  The Corps admittedly does raise a similar removal issue here, pointing out that the dismantling of the pipeline under Lake Oahe would lead to "waste of time, energy, and resources, as well as environmental impacts such as ground disturbance and increased emissions from heavy construction machinery." Corps Remedy Br. at 17.  But the Court is not ordering that such step be taken, and any decision to

remove is entirely within the Corps' control.  As the agency explains, once the Court vacates the easement, the pipeline is considered an "encroachment" on federal lands and can be dealt with in one of four ways at the Corps' discretion.  See id. at 6.  Removal is indeed one of those options, but so is "outgrant or consent (for easements)."  Id. (quoting one of the Corps' engineering regulations).  Removal is therefore not the remedy being considered by the Court today, and it may not be the remedy chosen by the Corps in the future.  Accord Standing Rock IV, 282 F. Supp. 3d at 107 ("Plaintiffs are not asking for the pipeline itself, or for any existing infrastructure, to be dismantled.").

### 2.  *Environmental Disruption*

Dakota Access here attempts to resurrect an unsuccessful argument from the last round of remedy briefing.  It argues that if DAPL is inoperative, the crude oil must be transported by rail, and rail transport has worse environmental consequences than any potential pipeline spill.  In 2017, however, the Court "reject[ed] th[e] argument" that "alternative modes of transport required by vacatur, if any, will necessarily increase the risk of an oil spill."  Id. at 107.

Not much has changed this time around.  DAPL once again frames the shift to rail transportation in speculative terms.  Compare id. ("Defendants[] assert[] that vacatur 'could result in at least some portion' of the oil being moved via train . . . ."), with Corps Remedy Br. at 21 ("The Corps cannot state definitively that a particular percentage of the oil currently being transported by pipeline would be switched to rail in the event the Pipeline's easement is withdrawn.").  Even assuming that some more oil will be transported by rail than would have been without a shutdown, the only new evidence the Corps and DAPL point to is a recent study by the Pipeline and Hazardous Materials Safety Administration comparing modes of oil transport, which ultimately concluded that "[e]ach mode has its own unique safety risks, and

more factors or different methodologies need to be considered to comprehensively answer the question of which mode is the safest." ECF No. 507-2 (PHMSA Report) at 9; see id. ("Significant knowledge gaps exist for the exposure, vulnerability, and consequences of crude oil transportation."). The report did find that, subject to these warnings, pipelines appear to have lower spill occurrences and amounts than rail transport. Id. While this is certainly an improvement on the dearth of information provided in the last round of remedy briefing, the report's self-stated limitations do not get Defendants and Defendant-Intervenor much farther than before.

The Court cannot forget, moreover, its responsibility to consider the potential environmental disruption of not vacating the easement, which it has discussed at length in prior Opinions and recapped above. See *supra* Section III.B.1. On balance, the inconclusive evidence of environmental harm from an unknown number of barrels being transferred to rail transportation does not move the needle toward remand without vacatur.

* * *

Putting this all together, the Court finds that vacatur is the only appropriate remedy here. The first Allied-Signal prong weighs strongly in its favor, even if the second is a much closer call. The Court does not reach its decision with blithe disregard for the lives it will affect. It readily acknowledges that, even with the currently low demand for oil, shutting down the pipeline will cause significant disruption to DAPL, the North Dakota oil industry, and potentially other states. Yet, given the seriousness of the Corps' NEPA error, the impossibility of a simple fix, the fact that Dakota Access did assume much of its economic risk knowingly, and the potential harm each day the pipeline operates, the Court is forced to conclude that the flow of oil must cease. Not wishing to micromanage the shutdown, it will not prescribe the method by which DAPL must achieve this. The Court will nonetheless require the oil to stop flowing and

23

the pipeline to be emptied within 30 days from the date of this Opinion and accompanying

Order.  This time period was proposed by the Tribes and should provide sufficient time for the

pipeline to be shut down in a safe and efficient manner, which is undoubtedly in everyone's

interest.

**IV.      Conclusion**

       For the foregoing reasons, the Court will vacate the Corps' decision to grant Dakota

Access an easement under the Mineral Leasing Act and order that the Dakota Access Pipeline be

shut down within 30 days.  A separate Order consistent with this Opinion shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  July 6, 2020