**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE; YANKTON
SIOUX TRIBE; ROBERT FLYING HAWK;
OGLALA SIOUX TRIBE,

        Plaintiffs,

   and

CHEYENNE RIVER SIOUX TRIBE; SARA
JUMPING EAGLE ET AL.,

        Plaintiff-Intervenors,

     v.

U.S. ARMY CORPS OF ENGINEERS,

        Defendant-Cross Defendant,

   and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-Cross
        Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

**DAKOTA ACCESS, LLC'S REDACTED
MOTION FOR STAY PENDING APPEAL**

Dakota Access, LLC moves for a stay pending appeal of this Court's July 6, 2020 Order,

D.E. 545, pursuant to Federal Rule of Appellate Procedure 8(a)(1)(A).  Dakota Access relies on

the accompanying Memorandum of Law and on other written and oral arguments as may be pre-

sented to the Court.

Pursuant to Local Civil Rule 7(m), Dakota Access has conferred with counsel for Plaintiffs,

Plaintiff-Intervenors, and Defendant-Cross Defendant.  Plaintiffs and Plaintiff-Intervenors  oppose

the stay motion.  Defendant-Cross Defendant reserves its position.

Dakota Access respectfully requests that the Court resolve this motion no later than July 14, 2020 so that, if necessary, Dakota Access can promptly seek relief in the D.C. Circuit.  Dakota Access requests that the status conference for this Motion be held Thursday, July 9, 2020.

Respectfully submitted this 8th day of July, 2020.

By: */s/ William S. Scherman*
    Miguel A. Estrada
    William S. Scherman
    David Debold
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    (202) 955-8500
    wscherman@gibsondunn.com

    *Counsel for Dakota Access, LLC*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE; YANKTON
SIOUX TRIBE; ROBERT FLYING HAWK;
OGLALA SIOUX TRIBE,

        Plaintiffs,

   and

CHEYENNE RIVER SIOUX TRIBE; SARA
JUMPING EAGLE ET AL.,

        Plaintiff-Intervenors,

     v.

U.S. ARMY CORPS OF ENGINEERS,

        Defendant-Cross Defendant,

   and

DAKOTA ACCESS, LLC,

        Defendant-Intervenor-Cross
        Claimant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-
1796 and 17-cv-267)

**REDACTED MEMORANDUM OF LAW IN SUPPORT OF DAKOTA ACCESS, LLC'S
MOTION FOR STAY PENDING APPEAL**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 5

ARGUMENT ...................................................................................................... 9

    I.      The Equitable Factors Weigh In Favor Of A Stay ................................. 10

          A.     Shutting Down The Pipeline Would Irreparably Harm Dakota Access ... 10

          B.     Shutting Down The Pipeline Would Also Irreparably Injure The Public. 12

          C.     Preserving The Status Quo Would Not Harm The Tribes ....................... 21

    II.     Dakota Access Is Likely To Succeed On The Merits ........................... 23

          A.     The Court's Decision To Grant Summary Judgment To The Tribes Presents Serious And Substantial Legal Questions .................................. 24

          B.     The Court's Decision To Order An EIS Raises Serious And Substantial Legal Questions Too ................................................................................. 31

          C.     The Court Erred In Vacating The Easement Pending Completion Of The Remand ................................................................................................ 32

CONCLUSION .................................................................................................. 39

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aamer v. Obama,*
   742 F.3d 1023 (D.C. Cir. 2014) ...........................................................................9

*\*Akiachak Native Cmty. v. Jewell,*
   995 F. Supp. 2d 7 (D.D.C. 2014) ......................................................................9, 24

*\*Allied-Signal, Inc. v. NRC,*
   988 F.2d 146 (D.C. Cir. 1993) ....................................................................4, 32-36

*\*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
   934 F.3d 649 (D.C. Cir. 2019) .........................................................................32

*Apache Corp. v. FERC,*
   627 F.3d 1220 (D.C. Cir. 2010) ........................................................................10

*\*Arrow Air, Inc. v. United States,*
   649 F. Supp. 993 (D.D.C. 1986) ........................................................................12

*Backcountry Against Dumps v. Perry,*
   2017 WL 3712487 (S.D. Cal. Aug. 29, 2017) ...........................................................36

*\*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.,*
   2016 WL 4445770 (C.D. Cal. Aug. 12, 2016).....................................................36, 38

*\*Biodiversity Conservation All. v. U.S. Forest Serv.,*
   765 F.3d 1264 (10th Cir. 2014) ........................................................................25

*Cal. Cmtys. Against Toxics v. EPA,*
   688 F.3d 989 (9th Cir. 2012) ..........................................................................10

*Chamber of Commerce v. Reich,*
   897 F. Supp. 570 (D.D.C. 1995).........................................................................24

*Citizens Against Burlington, Inc. v. Busey,*
   938 F.2d 190 (D.C. Cir. 1991) .........................................................................34

*\*City of Oberlin, Ohio v. FERC,*
   937 F.3d 599 (D.C. Cir. 2019) .........................................................................10

*Clarke v. Office of Fed. Hous. Enter. Oversight,*
   355 F. Supp. 2d 56 (D.D.C. 2004) ......................................................................11

\* Authorities on which we chiefly rely are marked with an asterisk.

## TABLE OF AUTHORITIES

Page(s)

*Comcast Corp. v. FCC,*
  579 F.3d 1 (D.C. Cir. 2009) ................................................................................................34

*Cuomo v. NRC,*
  772 F.2d 972 (D.C. Cir. 1985) ..............................................................................................9

*\*DOT v. Pub. Citizen,*
  541 U.S. 752 (2004) ..........................................................................................................6, 32

*Friends of Animals v. Bureau of Land Mgmt.,*
  2018 WL 3795222 (D. Or. Aug. 9, 2018) ............................................................................36

*Fund for Animals v. Frizzell,*
  530 F.2d 982 (D.C. Cir. 1975) .............................................................................................25

*\*Heartland Reg'l Med. Ctr. v. Leavitt,*
  415 F.3d 24 (D.C. Cir. 2005) ...............................................................................................33

*\*Heartland Reg'l Med. Ctr. v. Sebelius,*
  566 F.3d 193 (D.C. Cir. 2009) .............................................................................................34

*Kelso v. U.S. Dep't of State,*
  13 F. Supp. 2d 12 (D.D.C. 1998) .........................................................................................38

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) .............................................................................................................34

*Massachusetts v. NRC,*
  924 F.2d 311 (D.C. Cir. 1991) .............................................................................................10

*\*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) .............................................................................................................38

*\*Myersville Citizens for a Rural Cmty., Inc. v. FERC,*
  783 F.3d 1301 (D.C. Cir. 2015) ...........................................................................................31

*Nat'l Parks Conservation Ass'n v. Semonite,*
  422 F. Supp. 3d 92 (D.D.C. 2019) .................................................................................10, 34

*\*Nat'l Parks Conservation Ass'n v. Semonite,*
  916 F.3d 1075 (D.C. Cir. 2019) ..............................................................3-4, 8, 25-27, 31-33

*\*New York v. NRC,*
  681 F.3d 471 (D.C. Cir. 2012) ......................................................................................7, 28-29

# TABLE OF AUTHORITIES

Page(s)

*Oceana, Inc. v. Ross*,
 275 F. Supp. 3d 270 (D.D.C. 2017) ............................................................33

*Oglala Sioux Tribe v. NRC*,
 896 F.3d 520 (D.C. Cir. 2018) ..................................................................35

*Pac. Rivers Council v. U.S. Forest Serv.*,
 942 F. Supp. 2d 1014 (E.D. Cal. 2013).....................................................36

*Population Inst. v. McPherson*,
 797 F.2d 1062 (D.C. Cir. 1986) ................................................................24

*Puntenney v. Iowa Utils. Bd.*,
 928 N.W.2d 829 (Iowa 2019) ...................................................................19

*\*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989).............................................................................6, 29

*\*Sierra Club v. U.S. Dep't of Agric.*,
 841 F. Supp. 2d 349 (D.D.C. 2012) ..........................................................35

*Sierra Club v. DOT*,
 753 F.2d 120 (D.C. Cir. 1985)..................................................................25

*Sierra Forest Legacy v. Sherman*,
 951 F. Supp. 2d 1100 (E.D. Cal. 2013).....................................................36

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 205 F. Supp. 3d 4 (D.D.C. 2016) ..............................................................37

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 239 F. Supp. 3d 77 (D.D.C. 2017) ............................................................37

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 255 F. Supp. 3d 101 (D.D.C. 2017) ...........................7, 21, 28, 31, 33

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 282 F. Supp. 3d 91 (D.D.C. 2017) .........................7, 25, 28, 33, 35, 37

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
 2019 WL 161950 (D.D.C. Jan. 10, 2019)..................................................36

*Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*,
 805 F.2d 351 (10th Cir. 1986) ............................................................ 11-12

# TABLE OF AUTHORITIES

Page(s)

*United States v. Fokker Servs. B.V.*,
    818 F.3d 733 (D.C. Cir. 2016) ......................................................................................38

*United States v. Munsingwear, Inc.*,
    340 U.S. 36 (1950) .......................................................................................................38

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) ...........................................................3, 9, 23-24

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) ....................................................................................34

*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019) ..............................................................................36

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................................................9

*Wis. Valley Improvement Co. v. FERC*,
    236 F.3d 738 (D.C. Cir. 2001) ....................................................................................25

*World Duty Free Ams., Inc. v. Summers*,
    94 F. Supp. 2d 61 (D.D.C. 2000) ................................................................................11

**Statute**

*42 U.S.C. § 4332(C) .............................................................................................6, 26

**Rule**

Fed. R. App. P. 8(a)(1) ...................................................................................................4

**Regulations**

*40 C.F.R.
    *§ 1508.9(a)(1) ........................................................................................................33
    *§ 1508.9(a)(3) ........................................................................................................33
    § 1508.27(b)(4) ..................................................................................................8, 25

# TABLE OF AUTHORITIES

Page(s)

**Other Authorities**

Bloomberg.com, *Energy*, https://bloom.bg/3aMvSRh (last accessed July 7, 2020)......................14

Heather Long, *A 'Misclassification Error' Made the May Unemployment Rate
    Look Better Than It Is.  Here's What Happened*, Wash. Post (June 6, 2020),
    https://wapo.st/3hpycCj ............................................................................................16

*Karen Clay et al., *External Costs of Transporting Petroleum Products: Evidence
    from Shipments of Crude Oil from North Dakota by Pipelines and Rail*, 40
    Energy J. 55 (2019)..................................................................................................19

Melissa Etehad, *Governors Across U.S. Face Tough Choices as Coronavirus
    Takes its Toll on State Budgets*, L.A. Times (May 16, 2020),
    https://lat.ms/2MN3ggT ............................................................................................16

Philip Jordan, *US Energy Employment Initial Impacts from the COVID-19
    Economic Crisis, April 2020*, BW Research P'ship (May 18, 2020),
    https://bit.ly/2XQmed4 ..............................................................................................16

*Strata, *Pipelines, Rail & Trucks: Economic, Environmental, and Safety Impacts
    of Transporting Oil and Gas in the U.S.* (2017) ......................................................19

Thomas R. Covert & Ryan Kellogg, *Crude by Rail, Option Value, and Pipeline
    Investment*, Nat'l Bureau of Econ. Research (Sept. 2017),
    https://tinyurl.com/y9ozyhbd ....................................................................................15

**INTRODUCTION**

This Court's decision seeking to shut down a major interstate pipeline that has operated safely for more than three years is literally unprecedented. The severe economic toll—just as our nation is regaining its footing and struggling to emerge from a global pandemic—would be in the billions of dollars, with many thousands forced out of work. The environmental and safety harms of a shutdown would also exceed any risks from continued operation. In light of these devastating and irreparable consequences, and because the rulings that formed the predicate for the Court's order raise novel and important issues on which Dakota Access has a substantial likelihood of success on appeal, the Court should stay its decision pending appeal.

The Dakota Access Pipeline ("DAPL") is the safest, most environmentally friendly option for bringing to market around 40% of the crude oil produced in North Dakota, the nation's second largest oil-producing state. That supply represents 4.5% of the nation's crude oil production. During DAPL's more than three years of safe operation, oil producers and downstream customers have come to rely on it to operate their businesses; state, local, and tribal governments have come to depend on it for billions of dollars in tax and royalty revenue; and the rail industry has fundamentally shifted infrastructure to reflect the reduced demand for rail transportation of crude oil. The harm through 2021 just to North Dakota, its employers, and its residents from shutting DAPL down would exceed $7.5 billion—a huge sum for a state that size. Other states would suffer significant losses as well. Cutting off the supply line for that volume of such an important commodity would damage a national economy still trying to rebound, several significant national industries, and national security, with severe ripple effects.

No court has ever ordered the shutdown of any remotely similar infrastructure project, much less after its safe operation for such a lengthy period. And the decision to do so for the first time here rests on another first: the application of a new D.C. Circuit decision to a novel set of

circumstances.  This Court should not impose such a drastic outcome without first allowing the court of appeals to weigh in.  To preserve the status quo, therefore, this Court should enter a stay pending appeal.

The equities strongly favor a stay.  In ordering the pipeline shut down, this Court properly acknowledged "the serious effects that [the] shutdown could have for many states, companies, and workers."  D.E. 546, at 17.  But the Court did not fully grapple with the gravity of those consequences, nor with the large number of innocent actors who would be severely affected by the decision.  Nor did the Court weigh those consequences against the extremely remote risk that the potential harms the Tribes posit will ever come to pass—either during the time that it would take to prepare an EIS or the more limited time for the decision on an appeal that Dakota Access is prepared to expedite on any schedule that the D.C. Circuit orders.

The broad economic and environmental consequences for third parties, including the numerous states that strongly support continued operation of the pipeline, coupled with the irreparable loss of revenue to Dakota Access and its affiliates, far exceed any possible risk—much less any conceivable harm—to the Tribes from a stay.  No crude oil pipeline in this country is safer than DAPL.  In more than three years of operation, it has transported more than *half a billion* barrels of oil more than 1,100 miles with *zero* mainline releases.  Extensive government data proves that the chance of a materially larger leak at Lake Oahe than what the U.S. Army Corps of Engineers ("Corps") has already extensively modeled is *1 in nearly 200,000 years*.  And that is an overstatement, because it does not account for DAPL's many extra safety features or its location more than 90 feet below the lakebed.  The spill modeling also shows that oil would come nowhere close to a tribal drinking water intake, even if no response to a major spill occurred for 10 days.  Of course, that delay could never happen due to a federal mandate to respond within 6 *hours*.

2

Instead, Dakota Access has equipment and plans in place for a swift and effective response to, and remediation of, a leak or spill many times larger than the Pipeline and Hazardous Materials Safety Administration-approved worst-case discharge at Lake Oahe.  And any further risk would be mitigated because Dakota Access will move for expedited review of its appeal.

A stay would merely preserve that safe status quo during the appeal.  By contrast, shutting down the pipeline would *increase* environmental and health risks by shifting crude oil to rail transport, which is statistically proven to be more likely to result in oil spills and related incidents. No governmental agency will be tasked with reviewing those risks to ensure that adequate mitigation and response measures are in place.  Accordingly, shutting down the pipeline would be the judicial equivalent of a major federal action with no additional regulatory oversight or environmental agency review or approval.

A stay pending appeal is also warranted because the Court's Opinion and Order conflict with the law and the record.  Dakota Access's appeal will seek review of both the Court's March 25, 2020 summary judgment decision that the Corps must prepare an environmental impact statement ("EIS"), D.E. 496, and its July 6, 2020 remedy decision vacating the easement for crossing Lake Oahe and ordering Dakota Access to shut down the pipeline, D.E. 545.  These appeals at the very least will raise "serious legal question[s]" that warrant appellate review before altering the status quo so dramatically.  *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).  First, the decision to require an EIS was based on a new court of appeals ruling, *National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019), that post-dated the Corps' remand decision.  Dakota Access believes the Court was mistaken in its reading of *Semonite*.  But even giving Plaintiffs the benefit of the doubt in portraying these controversies, they cast no serious doubt on the Corps' top-line conclusion that the *likelihood* of a

3

high-consequence spill is far too small to warrant revoking DAPL's existing easement.

Even if a remand were needed for the Corps to conduct further analysis, moreover, there is no reason to doubt the Corps could justify its decision to grant an easement after doing so. Failure to anticipate the intervening *Semonite* decision, even if the Court correctly read it to require an EIS, scarcely justifies the Court in concluding, as it suggested in vacating the easement, that this is a case of parties who willfully failed to comply with the law and are now asking for "forgiveness" instead of "permission." D.E. 546, at 18-19. Any infrastructure project of any significance routinely is challenged in litigation, yet government processes ordinarily are entitled to a presumption of regularity, and regulated parties and other innocent parties may reasonably rely on them. It is not the case that just because anyone can sue that regulated parties must always proceed at their peril. For these reasons, and because of the severe consequences of shutting down the pipeline, both *Allied-Signal* factors—the seriousness of the deficiencies requiring remand and the disruptive consequences of vacatur—preclude vacatur of the Lake Oahe easement. *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

Dakota Access therefore respectfully requests that the Court grant a stay pending appeal of this Court's decision vacating the easement. D.E. 496, at 42; D.E. 545, at 1; D.E. 546, at 24. The Third Todd Stamm declaration sets forth greater detail on a number of expensive and time-consuming steps to shut down a major pipeline. Absent a stay, those costs would be incurred well before a ruling on appeal. In light of these costs and the serious irreparable economic and environmental harms that would result from a shutdown, Dakota Access respectfully requests that the Court resolve this motion no later than July 14, 2020 so that, if necessary, the company can promptly seek relief in the D.C. Circuit. *See* Fed. R. App. P. 8(a)(1) (party seeking stay pending appeal must "ordinarily move first in the district court"). If the Court declines to enter a stay for

the full pendency of the appeal, Dakota Access requests that, at a minimum, the Court issue a stay pending a ruling by the court of appeals on a motion to be filed promptly by Dakota Access in that court for a stay pending appeal.

## BACKGROUND

1.  For more than three years, DAPL has safely and efficiently transported crude oil— around 200 million barrels per year—1,172 miles from the Bakken shale region in North Dakota to Patoka, Illinois.  From there, the roughly 800-mile Energy Transfer Crude Oil Pipeline ("ETCOP") connects DAPL to the Gulf Coast.  DAPL brings to market around 40% of the oil currently produced in North Dakota—the nation's second largest oil-producing state, D.E. 509-9 ¶ 4; D.E. 538-6 ¶¶ 10-11—and has done so without a single oil spill on the DAPL mainline.  D.E. 509-5 ¶ 24; D.E. 538-4 ¶ 20.  Of the seven minor incidents occurring at Dakota Access facilities, the only release beyond a facility was less than half a barrel of "misting" that Dakota Access promptly remediated.  D.E. 509-5 ¶ 24.  This record places DAPL among the safest crude oil pipelines anywhere in the country.  *Id*. ¶¶ 4(a), 15.

By significantly reducing oil producers' transportation costs, DAPL has spurred a resurgence in North Dakota's economy and raised needed state, local, and tribal government revenue. Crude oil production in North Dakota increased 40% between mid-2017, when DAPL came online, and January 2020.  D.E. 512-6 ¶ 16.  North Dakota oil producers have invested billions of dollars in new infrastructure and created jobs during that period, and DAPL has generated billions of dollars in tax revenue for state, local, and tribal governments, plus substantial royalty payments to tribes and other property owners.  *See id. ¶¶* 16, 24, 28-32; D.E. 509-9 ¶¶ 21, 28; D.E. 515-1 ¶¶ 6, 10; D.E. 542-6, at 2; D.E. 504-1 ¶ 4; D.E. 504-2 ¶ 12; D.E. 504-4 ¶ 10.

2.  Plaintiffs in these consolidated cases—Standing Rock Sioux Tribe ("SRST"), Cheyenne River Sioux Tribe ("Cheyenne River"), Oglala Sioux Tribe ("Oglala"), and Yankton Sioux

Tribe—filed lawsuits challenging the July 25, 2016 Environmental Assessment ("EA") and Mitigated Finding of No Significant Impact ("FONSI") that the Corps relied upon to grant an easement allowing DAPL to cross federally owned lands at Lake Oahe in North Dakota.

The Lake Oahe crossing measures 1.73 miles between two valves, each with built-in, state-of-the-art pressure sensors, part of a system capable of detecting not only a leak down to 0.75% of flow rate within 45 minutes, but also smaller leaks well before they would cause environmental harm.  D.E. 509-5 ¶¶ 6, 9; *see also* D.E. 538-4 ¶ 23.  The pipeline was installed deep under the lakebed using horizontal directional drilling ("HDD"), which "'virtually eliminate[s] the ability of a spill to interact with the surface water,'" RAR 13, because oil would need to rise more than 90 feet through low-permeability alluvium, glacial deposits, and sediments accumulated at the bottom of the Lake, when it instead would follow the path of the bore hole to land on either side of the Lake.  *See* D.E. 509-3 ¶ 15; D.E. 509-5 ¶ 41.  HDD is so safe that from 2010 to 2018, only a single, 1.7-barrel leak was reported on *any* crude oil pipeline installed using that method.  RAR 19; *see also* D.E. 538-4 ¶ 40.

The Tribes invoked various statutes in challenging the easement and other permissions, but only the National Environmental Policy Act ("NEPA") is at issue here.  NEPA requires federal agencies to evaluate the environmental effects of major federal actions.  If an action will "significantly" affect the "quality of the human environment," the agency must prepare an EIS; otherwise an EA and FONSI suffice.  42 U.S.C. § 4332(C).  With respect to the substance of the federal action, NEPA does not "mandate particular results," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); it "imposes only procedural requirements."  *DOT v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004).

Here, the Corps' EA addressed a wide range of issues related to potential environmental

impacts at the Lake Oahe crossing, USACE_DAPL 71227; *see also* USACE_DAPL 71247-332, and, as part of its analysis, assessed both the likelihood and consequences of a hypothetical worst-case oil spill using a project-specific spill model that was designed in accordance with Pipeline and Hazardous Materials Safety Administration ("PHMSA") regulations, RAR 12-13; RAR 143-44.  The Corps reached its FONSI and easement decisions using the judicially approved "high consequence, but low likelihood" mode of reasoning:  *i.e.*, a large oil spill could have serious consequences, but the risk of such an event was "extremely low" at the Lake Oahe crossing given "the engineering design, proposed installation methodology, quality of material selected, operations measures and response plans." USACE_DAPL 71311; *see also, e.g.*, USACE_DAPL 71315; *New York v. NRC*, 681 F.3d 471, 478-79 (D.C. Cir. 2012).

**3.**  In June 2017, this Court held that the EA "*substantially complied with NEPA in many areas*," singling out just three discrete issues as to the Lake Oahe crossing that the Corps "did not adequately consider": (1) the degree to which the project's effects are likely to be highly controversial; (2) a spill's consequences on fishing and hunting rights; and (3) the project's environmental-justice impacts.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 112 (D.D.C. 2017) ("*SRST III*" per the Opinion) (emphasis added).  "Aside from th[ose] discrete issues," "the Court conclude[d] that the Corps complied with its statutory responsibilities." *Id.* at 160.

After supplemental briefing, the Court declined to vacate the EA or the Lake Oahe easement pending remand "[i]n light of the 'serious possibility' that the Corps will be able to substantiate its prior conclusions" on remand.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 109 (D.D.C. 2017) ("*SRST IV*" per the Opinion).

**4.**  The Corps completed its remand analysis on August 31, 2018, reaffirming the EA and

FONSI.  RAR 1-2.  On March 25, 2020, after further briefing, the Court held that the Corps must prepare an EIS because "the pipeline's 'effects on the quality of the human environment are likely to be highly controversial.'"  D.E. 496, at 36 (quoting 40 C.F.R. § 1508.27(b)(4)).  The Court cited "significant guidance" from *Semonite*, D.E. 496, at 2, a D.C. Circuit case decided six months *after* the Corps completed its remand analysis, D.E. 362.

Without casting doubt on its prior ruling that the Corps had otherwise complied with its statutory responsibilities through an EA, the Court identified four "non-extensive" areas where the Corps had "not 'succeeded' in 'resolving . . . controversy'" regarding its "'analytical process and findings.'"  D.E. 496, at 18, 35 (alteration omitted).  The areas were: (1) the "efficacy" of "DAPL's leak-detection system," *id.* at 19-22; (2) the safety record of DAPL's operator, Sunoco, including spills on other Sunoco-operated pipelines before Sunoco merged with or sold such pipelines to Energy Transfer (part-owner of Dakota Access), *id.* at 22-23; (3) the effect of winter weather on spill-response efforts, *id.* at 24-26; and (4) the premises of the EA's worst-case-discharge ("WCD") analysis, including the length of time needed to detect a rupture, *id.* at 30, and the impact of "human or machine error," *id.* at 32, or adverse weather conditions, *id.* at 34.  The Court concluded that it would remand for the Corps to complete an EIS, *id.* at 35, and called for briefing on "whether the easement should be vacated during the remand," *id.* at 42.

After reviewing that briefing, the Court vacated the easement and ordered that "Dakota Access shall shut down the pipeline and empty it of oil by August 5, 2020."  D.E. 545, at 1-2.  The Court recognized "the serious effects that a DAPL shutdown could have for many states, companies, and workers," D.E. 546, at 17, but concluded that "precedent favoring vacatur during such a remand coupled with the seriousness of the Corps' deficiencies outweigh[ed] the[se] negative effects," *id.* at 2.

**ARGUMENT**

"In the D.C. Circuit, a court assesses four factors when considering a motion to stay . . . pending appeal": "(1) the moving party's likelihood of success on the merits of its appeal, (2) whether the moving party will suffer irreparable injury, (3) whether issuance of the stay would substantially harm other parties in the proceeding, and (4) the public interest." *Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 12 (D.D.C. 2014) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). "Before the Supreme Court decided *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008), the four factors for a stay . . . were analyzed on a sliding scale," such that "[a] stay may be granted with either a high probability of success and some injury, or *vice versa*." *Akiachak*, 995 F. Supp. 2d at 12 (quoting *Cuomo v. NRC*, 772 F.2d 972, 974 (D.C. Cir. 1985)). "[I]n this circuit, it remains an open question" whether *Winter* affected the stay standard, and "courts in this jurisdiction have continued to analyze motions . . . under the sliding scale approach." *Id.* (quoting *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014)). Under that approach, a stay "may be granted when a serious legal question is presented, when little if any harm will befall other interested persons or the public, and when denial of the order would inflict irreparable injury on the movant." *Id.* at 12-13 (quotation marks omitted).

Here the equitable factors strongly favor a stay because the acknowledged, irreparable harm to Dakota Access and the public at large—including North Dakota oil producers, downstream customers, and state, local, and tribal governments—vastly outweighs the risk to the Tribes from an extraordinarily unlikely spill. And regardless whether *Winter* alters the mode of analysis, Dakota Access has a substantial basis for appealing this Court's summary judgment and remedy orders. The Court should therefore grant a stay until the D.C. Circuit can decide on appeal the serious legal questions raised by this Court's decision to shut down the pipeline.

9

## I.      The Equitable Factors Weigh In Favor Of A Stay

Courts routinely recognize that shutting down—or even delaying—large infrastructure projects has "immensely disruptive" consequences. *Massachusetts v. NRC*, 924 F.2d 311, 336 (D.C. Cir. 1991) (nuclear power plant operating license); *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 100 (D.D.C. 2019) (shutting down electrical infrastructure would have "serious, disruptive consequences"); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (delaying power plant construction would be "economically disastrous"). Pipelines are firmly in that category. As the D.C. Circuit recently acknowledged, shutting down any "operational" pipeline—even a minor one—has "quite disruptive" consequences. *City of Oberlin, Ohio v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019); *see also Apache Corp. v. FERC*, 627 F.3d 1220, 1223 (D.C. Cir. 2010) (vacating pipeline lease would cause "substantial" disruption).

Shuttering DAPL, a major interstate pipeline carrying roughly 40% of North Dakota's crude oil and nearly 4.5% of the country's oil production, would be unprecedented. It would not only cause immediate, irreparable injury to Dakota Access and the DAPL-ETCOP system that connects DAPL to the Gulf Coast; it would devastate the oil industry; state, local, and tribal governments; and the nation's energy security and economic recovery. As the Court recognized, these "immediate harm[s]"—"particularly in a highly uncertain economic environment"—would be "no small burden." D.E. 546, at 17. A shutdown would also strand fixed pipeline assets, upset supply agreements, and close off transport routes, D.E. 538-7 ¶ 8, causing serious unrecoverable loss. Collectively, the toll would be ***billions*** of dollars in costs and lost revenue and ***thousands*** of lost jobs. These harms vastly outweigh any asserted injury to the Tribes.

### A.      Shutting Down The Pipeline Would Irreparably Harm Dakota Access

Shutting down DAPL would deprive Dakota Access of use of its only material asset and the source of all revenue. D.E. 509-9 ¶ 9. A shutdown is projected to cost Dakota Access and

10

ETCOP's owner, Energy Transfer Crude Oil Co. LLC ("ETCO"), between $2.8 million and $3.5 million in unrecoverable revenue every day DAPL is idle in 2020, amounting to between $516 million and $643 million for the second half of 2020. *Id.* ¶ 10; *see also* D.E. 538-6 ¶¶ 13-15. Added losses for 2021 would be between $1 billion and $1.4 billion. D.E. 509-9 ¶ 10. Dakota Access alone would incur 75% of the losses. *Id.*

A shutdown would inflict additional unrecoverable expenses and liabilities. It would take about three months and cost Dakota Access approximately $24 million to safely purge the pipeline of oil and preserve it for future use. Ex. A ¶ 6 & n.1 (3rd Stamm Dec.).[1] That does not include ongoing expenses to maintain, preserve, and ensure the safety of the pipeline: $67.5 million per year that the pipeline remains inoperable. D.E. 509-5 ¶ 44; D.E. 509-9 ¶ 11. Dakota Access would also need to reduce or eliminate the use of services under contracts with third-party utility and maintenance contractors (among others). D.E. 509-9 ¶ 12. All of these financial losses would be absorbed by the owners of Dakota Access and ETCO in proportion to their ownership stakes, with Energy Transfer suffering 36% of the losses to the DAPL-ETCOP system. *Id.* ¶ 13.

These serious consequences easily establish the irreparable harm needed to support a stay pending appeal. Any "damages are unrecoverable," *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 65 (D.D.C. 2004), and a shutdown "would significantly damage [Dakota Access's] business above and beyond a simple diminution in profits," *World Duty Free Ams., Inc. v. Summers*, 94 F. Supp. 2d 61, 67 (D.D.C. 2000) (quotation marks omitted) (finding irreparable harm based on a "loss amount[ing] to approximately one-third of plaintiffs['] total business"); *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th

---

[1] Because a safe shutdown using a nitrogen purge takes this long, a requirement to drain the pipeline by August 5 would mean leaving the pipeline untreated against corrosion. D.E. 509-5 ¶ 45; Ex. A ¶ 5 (3rd Stamm Dec.). If a nitrogen purge were conducted later, the pipeline would need to be refilled with oil first. Ex. A ¶ 10 (3rd Stamm Dec.).

Cir. 1986) (a "substantial loss of . . . business" is irreparable harm).  The potential "economic loss" here "threatens the very existence of [Dakota Access's] business," and it is well settled that such injuries "may constitute irreparable harm."  *Arrow Air, Inc. v. United States*, 649 F. Supp. 993, 1000 (D.D.C. 1986).

### B.       Shutting Down The Pipeline Would Also Irreparably Injure The Public

The irreparable harm resulting from closing the pipeline would extend far beyond Dakota Access and ETCO.  As the Corps recognized—and this Court has not questioned—DAPL "has tremendous secondary and sustainable economic benefits to the United States by supporting energy independence, increasing employment opportunities, and adding to demand in many manufacturing sectors, which . . . boost . . . the overall economy."  USACE_DAPL 71305.  DAPL operated at or near its maximum allowable throughput of 570,000 barrels per day between September 2018 and March 2020; in fact, it was substantially "oversubscribed" for most of that time, meaning demand significantly exceeded capacity.  D.E. 509-9 ¶¶ 8-9.  Even during the recent economic downturn, all transportation contracts for committed shippers have remained in effect and demand for DAPL has remained strong.  *Id.*; D.E. 538-6 ¶¶ 11-12.  When the parties briefed the remedy issue, June nominations were already at more than ███████ barrels per day, and Dakota Access projects that volumes will steadily increase as the economy recovers from the COVID-19 pandemic, surpassing 90% of DAPL's capacity by year's end and reaching 570,000 barrels per day by ████████.  D.E. 538-6 ¶ 11.  In fact, July nominations have increased significantly, to approximately ██████ barrels per day.  Ex. A ¶ 15 n.2 (3rd Stamm Dec.).

With an economy that remains highly volatile and hard to predict over the short-term, an economic engine like DAPL for long-term recovery is all the more vital.  Market conditions and oil production levels already point the way toward improvement.  D.E. 538-7 ¶ 26(d) (official reports of about 1 million bpd in North Dakota in May 2020 and projections of more than 1.1

12

million bpd in the Bakken region in May and June 2020); D.E. 538-6 ¶ 10 (same).  Spurred by the end of the Saudi-Russian trade war and the worldwide and nationwide easing of lockdowns— temporary causes of economic decline during the pandemic—oil prices have *more than doubled* since late April.  D.E. 538-6 ¶ 10.  The U.S. Energy Information Agency expects global oil demand to return almost to 2019 levels by the end of 2020, with a similar rise in production, and North Dakota and its in-state producers predict a corresponding local recovery.  *Id.*; D.E. 542-6, at 3. Shutting down the pipeline would saddle the public with several billion dollars annually in costs and lost revenue, put or keep thousands out of work, and harm rather than protect the environment.

*North Dakota oil producers*.  The cost to North Dakota oil producers alone would be approximately $5 to $9 billion through the end of 2021.  D.E. 538-7 ¶¶ 7, 10(a) n.3; D.E. 512-6 ¶ 36. North Dakota oil producers already in financial distress would have no choice but to respond to a shutdown by "shutting in" some of their wells or ceasing production entirely.[2]  D.E. 512-6 ¶ 17; D.E. 509-9 ¶¶ 14, 18; D.E. 501-3 ¶ 13.  This is because other transportation modes for the crude oil that DAPL carries are quite limited and more expensive.  And, to the extent those modes *are* available, their use would create greater harms and costs on a barrel-by-barrel basis.

There is no viable pipeline alternative for transporting DAPL's oil.  D.E. 512-6 ¶¶ 17-19. As DAPL's customers have explained, they have long-term contracts with terminals, refiners, and others along *DAPL's* route, which no other pipeline services.  D.E. 538-6 ¶¶ 28-31; D.E. 538-8, at 2-3; D.E. 542-6, at 4.  Substantial amounts of DAPL's crude would be unable to shift to rail transport.  D.E. 538-7 ¶ 33; D.E. 538-6 ¶¶ 28-34.  Even at current oil prices—$40 per barrel for

---

[2]   The North Dakota natural gas industry would suffer too, because oil and natural gas production often go hand-in-hand.  D.E. 512-6 ¶ 26.  If an oil well is forced to shut in, the gas production facilities would likely also need to shut in.  North Dakota is a significant producer of natural gas. *Id.*

West Texas Intermediate crude as of July 7, 2020[3]—many producers would be unable to absorb the additional $5 to $10 *per barrel* in cost to ship by rail.  D.E. 512-6 ¶¶ 18-19; D.E. 538-6 ¶¶ 19-23; D.E. 538-5 ¶ 44.  Pricing aside, rail capacity is insufficient.  Even under current economic conditions, there are not enough uncommitted crude oil rail cars to handle DAPL's oil.  D.E. 512-2 ¶¶ 5a-5b, 6-16; D.E. 512-6 ¶ 17.  Nor would rail terminal capacity for unloading that oil be sufficient.  D.E. 538-5 ¶ 4(b).  In particular, there are no rail unloading facilities in Patoka, Illinois (where DAPL connects to ETCOP), and railroads provide only a circuitous route to ETCOP's destination terminal in Nederland, Texas.  D.E. 512-2 ¶ 32; D.E. 509-9 ¶¶ 24, 38; D.E. 538-5 ¶ 4(b).

Thus, only between 70,000 and 250,000 barrels per day of DAPL's oil likely could be diverted to railroads in the near-term.  D.E. 512-2 ¶¶ 5a, 6-13; D.E. 509-9 ¶ 35.  With nowhere to turn to transport the bulk of DAPL's oil, producers would have to shut in thousands of wells.  D.E. 512-6 ¶ 20; D.E. 520-6, at 4.  Producers would lose hundreds of millions of dollars in revenue *every month* in 2020, and face millions more in unrecoverable costs to shut in and maintain their wells.  D.E. 512-6 ¶¶ 7, 21; D.E. 520-6, at 2.  The additional losses would force already distressed producers to further slash capital expenditures and lay off even more employees.  D.E. 512-6 ¶¶ 21-22.  Decreased oil production also would harm third-party vendors, such as maintenance contractors, utility companies, and trucking companies.  D.E. 509-9 ¶ 21.

The losses would be sizeable *even if* more rail capacity could be generated to account for DAPL's capacity of 570,000 barrels per day.  The extra $5 to $10 per barrel paid for rail travel would equate to $1 to $2 *billion* dollars a year in additional transport costs.  D.E. 509-9 ¶ 36.  And that price differential would certainly increase with the greater rail-capacity demand caused by a

---

[3]   Bloomberg.com, *Energy*, https://bloom.bg/3aMvSRh (last accessed July 7, 2020).

DAPL shutdown. These costs would impair producers' investments, constrain oil production, and hurt workers and consumers. D.E. 512-6 ¶ 23; D.E. 520-6, at 2, 4.[4] Moreover, a significant shift to rail transportation of crude oil would cause (1) a net *increase* in environmental harms, *see infra*, at 18-20, and (2) increased congestion and shipping costs for other rail users, including Midwest farmers, who rely heavily on rail transport for their products and are expecting an all-time record grain yield, D.E. 512-4 ¶¶ 4, 29-41; D.E. 512-2 ¶¶ 17-27, 60-84; D.E. 538-5 ¶¶ 64-65.

*Refineries and other pipelines.* A shutdown likewise would have severe impacts on downstream users of oil transported by DAPL, such as refineries and other pipelines. Refineries in the Midwest and Gulf Coast have made significant investments and designed their facilities based on the expectation of a consistent, economic supply of "light sweet" Bakken crude that DAPL moves cheaply and efficiently. D.E. 509-9 ¶¶ 25-27; D.E. 520-5 ¶¶ 9, 12. In response to a shutdown, these refineries would struggle to find—and would have to pay a premium for—alternative sources of light sweet crude. D.E. 509-9 ¶¶ 24-26; D.E. 520-5 ¶¶ 11-12. That supply shock could lead to revenue losses for refiners, undermine their investments, and cause job losses and higher consumer prices. D.E. 509-9 ¶¶ 24-26; D.E. 520-5 ¶¶ 9, 12. Other pipelines' operations also would be disrupted. In addition to ETCOP, some of the dozens of other active pipelines that currently aggregate and transport crude to and from the DAPL-ETCOP system would have to drastically alter or even cease operations if DAPL is stopped, irreparably harming their businesses. D.E. 509-9 ¶¶ 22, 24.

*Oil industry jobs.* Shutting down DAPL would mean between 4,500 and 7,100 workers losing or being unable to return to their jobs as a result of oil producers shutting their wells in.

---

[4]  *See also* Thomas R. Covert & Ryan Kellogg, *Crude by Rail, Option Value, and Pipeline Investment*, Nat'l Bureau of Econ. Research 33 (Sept. 2017), https://tinyurl.com/y9ozyhbd (estimating that even if more than 90% of DAPL's capacity shifted to rail transport, crude oil flows out of the Bakken region would see a net decrease of between 42,000 and 66,000 barrels per day).

D.E. 512-6 ¶¶ 7, 22; D.E. 538-7 ¶ 43; D.E. 504-2 ¶ 14.  Third-party vendors and other local indus-tries that serve oil workers—like restaurants and hotels—would face yet further layoffs on top of the effects that persist from COVID-19 restrictions.  *See* D.E. 509-9 ¶ 21.  With the oil industry already expected to cut around a third of its workforce this year—and the economy as a whole struggling under unprecedented circumstances—many of these workers would have nowhere to turn for employment.[5]

*Harm to states, local governments, and tribes.*  A shutdown also would be catastrophic for state, local, and tribal governments, which rely on the hundreds of millions of dollars in tax revenue DAPL generates every year.  D.E. 509-9 ¶ 28; D.E. 512-6 ¶¶ 28-30.  A shutdown would cut off those revenues at a time when states have needed to increase spending to fight COVID-19, prop their economies up, and keep residents employed.[6]  *See* D.E. 537-2 ¶ 6.  And workers displaced by the shutdown would strain state budgets even more through additional unemployment benefits claims.  *See* D.E. 512-6 ¶ 22; D.E. 537-2 ¶ 8.

North Dakota would be particularly hard-hit.  Its Tax Commissioner estimates that DAPL's reduced transportation costs alone generated *a quarter of a billion dollars* in oil tax revenues for the state in its first two years of operations.  D.E. 509-9 ¶ 28 & n.13.  And that is just a fraction of DAPL's total tax impact.  Every year since 2017, DAPL has been responsible for a significant

---

[5]  Philip Jordan, *US Energy Employment Initial Impacts from the COVID-19 Economic Crisis, April 2020*, BW Research P'ship (May 18, 2020), https://bit.ly/2XQmed4 ("89,600 oil and gas drilling and refinery jobs lost since March, or a more than 16 percent decline"); Heather Long, *A 'Misclassification Error' Made the May Unemployment Rate Look Better Than It Is.  Here's What Happened*, Wash. Post (June 6, 2020), https://wapo.st/3hpycCj (unemployment rate "would be about 16.3 percent for May").

[6]  Melissa Etehad, *Governors Across U.S. Face Tough Choices as Coronavirus Takes its Toll on State Budgets*, L.A. Times (May 16, 2020), https://lat.ms/2MN3ggT.

portion of the billions of dollars in taxes on oil production and extraction that North Dakota collected from the state's oil industry, which in turn account for almost 50% of North Dakota's annual state tax receipts.  D.E. 512-6 ¶¶ 28-30; D.E. 509-9 ¶ 28.  That revenue—earmarked to support, for example, local governments, tribes, and public schools—is already forecast to decrease sharply in 2020 due to falling oil prices and decreased production.  D.E. 512-6 ¶¶ 29, 31-35; D.E. 537-2 ¶ 10.  If DAPL shuts down, North Dakota estimates that shut-ins and increased rail transport would cause "*hundreds of millions* in reduced tax revenue in North Dakota, imperiling critical State programs at a time when our citizens need them most."  D.E. 537, at 4.

In addition, the states that DAPL crosses would experience significant property-tax losses. D.E. 509-9 ¶ 29.  Dakota Access and ETCO have projected that a shutdown would reduce property taxes they pay to Iowa, North Dakota, South Dakota, Louisiana, Mississippi, and Tennessee in fiscal year 2021 by tens of millions of dollars.  *Id.*

Similarly, many Native American tribes would suffer severe economic hardship if DAPL is shut down.  For instance, the Mandan, Hidatsa, and Arikara Nation have active drilling rigs and more than 2,000 wells on their land.  D.E. 509-9 ¶ 32.  Those wells can produce more than 315,000 barrels of Bakken crude per day.  *Id.*  A shutdown would cause many of those wells to shut in and drilling rigs to move out, depriving the tribes of a significant source of tax revenues, royalty payments, and jobs.[7]  *Id.*  Each lost drilling rig would cost these tribes alone around $8 million per year in tax revenue.  *Id.*  These unrecoverable losses would reduce the tribes' funds to pay for schools, hospitals, and government services.  *See id.*

*Harm to the national economy and national energy security*.  The disruptive consequences of shutting down DAPL would not be limited to the oil industry and oil-producing states; rather,

---

[7]   Private landowners also will receive dramatically reduced royalty payments.  D.E. 512-6 ¶ 24.

17

they would reverberate through the national economy, adding even greater uncertainty and vola-tility to the energy markets, distorting investment decisions, and threatening the national economic recovery.  D.E. 512-5 ¶¶ 5, 15-21.  An unprecedented shutdown of a pipeline that has safely oper-ated for more than three years would also substantially increase the risk, and thus the cost, of building new infrastructure, yielding a more expensive, less reliable energy system.  D.E. 538-7 ¶¶ 11, 49-50.  The disruptive consequences would also endanger national energy security.  Over the past decade, dramatic increases in domestic oil production and improved oil infrastructure have buttressed the nation's security by decreasing our reliance on foreign sources of oil.  D.E. 512-3 ¶¶ 15-16.  DAPL has played a critical role, by both spurring increased domestic oil production and providing a stable and efficient mode to bring to market around 40% of the oil from the Bakken region.  *Id.* ¶¶ 7-12; D.E. 538-6 ¶¶ 10-11.  The negative effects of decreased oil production and curtailed infrastructure investment resulting from a DAPL shutdown would limit our ability to respond to foreign and domestic supply disruptions such as wars and natural disasters, and increase our dependence on foreign (and sometimes hostile) nations.  D.E. 512-3 ¶¶ 16, 21-22.

*Harms to the environment and public safety*.  In addition to these substantial economic and national security harms, closing the pipeline would inflict at least three significant environmental and safety risks on millions in the region, including the Tribes.  A shutdown causing environmental and safety harms that outweigh any perceived benefits also "would be . . . equivalent to a major federal action with no regulatory oversight or environmental agency review and approval."  D.E. 509-3 ¶ 5.

*First*, for every barrel of oil that shifts from DAPL to rail transportation there would be a net increase in spill risks, potential fatalities and injuries, and air pollution.  D.E. 509-3 ¶¶ 31-35.

Courts, academics, and government agencies have consistently recognized that "pipeline transpor-

tation of oil is safer than rail transportation" on a "volume-distance basis (i.e., per barrel-mile)."

*Puntenney v. Iowa Utils. Bd.*, 928 N.W.2d 829, 842 (Iowa 2019); *see also* Strata, *Pipelines, Rail*

*& Trucks: Economic, Environmental, and Safety Impacts of Transporting Oil and Gas in the U.S.*

6 (2017) ("Pipelines in particular have advantages in terms of safety, efficiency, and low environ-

mental impacts."). One recent study, for example, estimates that, after controlling for the amount

of oil transported, the incident rate for rail is *4.5 times higher* than for crude oil pipelines. Strata,

*supra*, at 6; *see also* D.E. 507-2 (2018 PHMSA study finding higher spill risks for rail transport).

Another study concludes that rail transport is *six times* more costly to the environment and human

health than pipeline transport. Karen Clay et al., *External Costs of Transporting Petroleum Prod-*

*ucts: Evidence from Shipments of Crude Oil from North Dakota by Pipelines and Rail*, 40 Energy

J. 55, 68 (2019). Crude oil trains also cause more fatalities and injuries than pipelines. D.E. 538-1,

at 22-23. And they result in more than double the air pollution than do pipelines in moving oil

from North Dakota to the Gulf Coast. *See* Clay, *supra*, at 69. Plaintiffs have not disputed any of

these studies and findings, and the Court—without even considering the Strata and Clay studies—

acknowledged PHMSA's finding that "pipelines appear to have lower spill occurrences and

amounts than rail transport." D.E. 546, at 23.

Environmental risks from a possible oil spill would be especially acute for those who rely

on SRST's new water intake, as a railroad track crosses Lake Oahe just 1.6 miles upstream of the

intake. D.E. 509-3 ¶ 36; D.E. 512-2 ¶ 34; D.E. 538-5 ¶ 66 n.56; D.E. 538-3 ¶ 37. Plaintiffs' expert

"c[ould] not rul[e] out" the risk of an incident at that crossing, D.E. 272-5, and the PHMSA report

that Plaintiffs (and the Corps) have cited suggests it is *more probable* than the once-in-human-

existence risk of an oil spill 75 miles upstream, D.E. 507-2; *see* D.E. 538-3 ¶¶ 36-37. Because a

110-car train could carry 77,000 barrels of oil, a train wreck could dump directly into Lake Oahe more than six times the volume of oil that was modeled for a pipeline spill.  D.E. 509-3 ¶ 36. Whereas DAPL's spill plan includes, per PHMSA requirements, equipment and personnel available to respond to a spill roughly ████████ larger than the PHMSA-approved WCD for Lake Oahe, no agency approval would be required for increased rail traffic; no regulation would require response plans to be updated; and existing response plans for rail incidents are much less comprehensive with no tailoring for a train wreck into Lake Oahe.  D.E. 538-3 ¶¶ 39-42; D.E. 538-5 ¶¶ 68-70.[8]

The largely undisputed environmental and safety harms from increased rail transport would make shutting down DAPL "the equivalent to a major federal action with no regulatory oversight or environmental agency review and approval."  D.E. 509-3 ¶ 5.  That is all the more concerning given this Court's characterization of the environmental impact of such a massive shift in oil transport modes as "inconclusive."  D.E. 546, at 23.  By contrast, federal and state regulators have extensively studied (and approved) DAPL's safety systems, environmental impacts, and response plans.

*Second*, the rash of long-term oil well closures that would result from shuttering DAPL, *see supra*, at 13-14, would be costly and risky.  If not closed properly, the idle wells could leak and contaminate groundwater with hydrocarbons and other toxins, which could endanger the health of nearby residents, including members of tribes.  D.E. 509-3 ¶ 38.  Many closed wells also emit significant amounts of methane, a greenhouse gas far more harmful than carbon dioxide,

---

[8]    And, of course, increased crude oil shipments by rail will likely impact urban and suburban population centers, as well as Native American tribes other than Plaintiffs.  D.E. 512-2 ¶¶ 34, 85-95.  For example, some of the rail lines that crude oil trains would need to use to replace DAPL's capacity travel through downtown Chicago and its densely packed suburbs, exposing hundreds of thousands, if not millions of people to increased environmental risks.  *Id*. ¶¶ 32, 95.

which can impair air quality and cause explosions.  *Id.* ¶ 38 & n.13.  Plaintiffs have never disputed these risks, and the remedy opinion does not mention them.

*Third*, the extended shutdown of an entire operational pipeline like DAPL is highly unusual and would create significant safety and environmental risks.  D.E. 260, at 16-17; D.E. 509-4 ¶¶ 3(f), 40-41; D.E. 538-4 ¶ 50.  Among other things, purging a pipeline and filling it with an inert gas shifts safety risks to the workers performing the purge, and huge quantities of nitrogen would need to be released into the atmosphere when the pipeline comes back online.  *Id.*; D.E. 509-5 ¶ 46; D.E. 538-3 ¶ 43.  Again, the Court did not address these impacts in its remedy opinion.

At best, the speculative advantage of avoiding an extremely low probability spill is offset by these multiple, largely undisputed environmental harms from a shutdown.

### C.    Preserving The Status Quo Would Not Harm The Tribes

In contrast to the serious economic disruption and environmental harms that a shutdown would cause, keeping the pipeline in operation pending appeal is extremely unlikely to cause any harm to Plaintiffs at all.  It remains well settled—as the Corps found and this Court affirmed—that DAPL's state-of-the-art components and leak-detection systems, the process by which it was installed underground, and Dakota Access's response plans make "the risk of an inadvertent release in, or reaching, Lake Oahe . . . extremely low."  USACE_DAPL 71311; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 127 (D.D.C. 2017) ("*SRST III*") (affirming the EA's "top-line conclusion that the risk of a spill is low").

The track record speaks for itself.  Plaintiffs' expert told the Court in 2017 that the pipeline's start-up phase would be where the rubber meets the road.  He predicted the revelation of a host of flaws if DAPL was allowed to operate, because more incidents occur on a pipeline at the beginning (and again at the end) of its operational lifespan.  D.E. 272-2, at 5; *see also* D.E. 507, at 22.  But in DAPL's more than three years of operations, there have been ***no spills*** on its nearly

1,200 miles of mainline pipe, which includes the Lake Oahe crossing.  D.E. 509-5 ¶ 24; D.E. 509-3 ¶ 4.  Even at Dakota Access facilities, none of only seven minor incidents has exceeded two barrels, and a half a barrel of oil that left a single facility as misting was quickly remediated.  D.E. 509-5 ¶ 24.  All but one event occurred within the first 12 months of operations—the more risky start-up period of which Plaintiffs' expert spoke—and they related to since-resolved commissioning issues.  *Id.*  DAPL has thus significantly outperformed the industry average for safe operation.  D.E. 509-4 ¶¶ 18-20.  Moreover, PHMSA historical data shows that, even if only the average is used, the likelihood of a large or even modest spill that would reach Lake Oahe is exceedingly low.  RAR 14-19; D.E. 509-4 ¶ 21; D.E. 509-3 ¶ 4.  That is, without even adjusting for DAPL's safety record and the special manufacturing and installation features designed to reduce the likelihood of a large release, extensive historical data shows that the chance of a major leak at Lake Oahe is 1 in nearly 200,000 years.  D.E. 509-4 ¶ 21.

In fact, Lake Oahe is among the *least* likely locations for a significant spill because the portion of the pipeline under the Lake was installed using horizontal directional drilling (or HDD), thicker pipe walls, and other enhanced safety features.  D.E. 509-5 ¶ 28; D.E. 538-4 ¶ 40.  As noted above, in a recent nine-year period of more than 3,300 pipeline spills nationwide, *only one* crude oil pipe installed using HDD had a spill—and the volume was less than two barrels.  *Supra*, at 6; D.E. 509-3 ¶ 13.  That makes sense.  HDD puts pipelines well below ground where they are not nearly as susceptible to third-party damage—a significant cause of leaks.  D.E. 509-5 ¶ 28.

Moreover, even a large spill—an exceedingly unlikely event—would be mitigated to the point of not harming the Tribes.  Modeling for a release that would never happen—██████ barrels directly into the Lake followed by 10 days with zero response effort—showed limited and temporary impacts on the Tribes' use of Lake Oahe and no impact at all to the Tribes' water supplies.

22

D.E. 509-3 ¶¶ 17-19.  Indeed, such an unmitigated spill would not even *reach* the closest of Plain-

tiffs' water intakes, which is 75 miles from DAPL.  D.E. 538-3 ¶ 16; D.E. 509-3 ¶ 17.  Moreover,

response plans already in place are capable of swiftly and effectively responding to a spill roughly

██████ *larger* than that volume.  D.E. 509-5 ¶ 19.  These response tools are conditions of the

Lake Oahe easement.  *Id.* ¶ 32; D.E. 509-3 ¶ 12.

Rather than address this extensive evidence that the spill impacts conjured by the Tribes

are unlikely to materialize, this Court's remedy opinion focuses exclusively on the purported de-

ficiencies the Court identified in the Corps' environmental analysis during remand.  D.E. 546, at

19-20.  But in weighing the equities for purposes of this motion, the Court must consider the full

record now before it.  That includes the additional evidence Dakota Access has submitted regard-

ing the pipeline's safety record and safety features, which go even farther than the administrative

record in undercutting any risk of a significant oil spill at Lake Oahe.

Maintaining the status quo here of a pipeline that has operated safely for more than three

years stands in stark contrast to the speculative harm the Tribes posit.  Any speculative harms to

the Tribes thus pale in comparison to the severe and certain economic disruption and environmen-

tal harms that would ensue from shutting down DAPL pending appeal.  The balance of the harms

in this case therefore decisively favors a stay.

## II.    Dakota Access Is Likely To Succeed On The Merits

Given the balance of the equities, the D.C. Circuit should have an opportunity to decide

the "serious legal question[s]" raised by this Court's decisions before DAPL is shut down.  *Holiday*

*Tours*, 559 F.2d at 844.  "[A]s the D.C. Circuit has explained," to obtain a stay pending appeal, "a

movant 'need not establish an absolute certainty of success on the merits:  It will ordinarily be

enough that the movant has raised serious legal questions going to the merits, so serious, substan-

tial, difficult as to make them a fair ground of litigation and thus for more deliberative investigation.'" *Akiachak*, 995 F. Supp. 2d at 13 (brackets omitted) (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986)); *see also Holiday Tours*, 559 F.2d at 844 ("An order maintaining the status quo is appropriate when a serious legal question is presented.").

Accordingly, even where the Court has ruled against a movant's position on the merits, it has appropriately granted stays pending appeal because the movant's claims at least presented "substantial" legal questions. *See*, *e.g.*, *Akiachak*, 995 F. Supp. 2d at 13-14, 18 (granting stay pending appeal because, even "[t]hough the Court disagrees with Alaska's position, and finds there to be a low likelihood of success on the merits, it recognizes that the case presented difficult and substantial legal questions regarding the balance between federal and state regulation of Indian land, and that its decision was at times, a close one"); *Chamber of Commerce v. Reich*, 897 F. Supp. 570, 584-85 (D.D.C. 1995) (granting injunction pending appeal "despite the [court's] adverse ruling" on movant's claim because "the balance of equities sharply favors the party seeking injunctive relief because of the irreparable harm it will suffer"), *rev'd on other grounds*, 74 F.3d 1322 (D.C. Cir. 1996).

That is the appropriate course here.  Each step at issue—granting partial summary judgment to the Tribes, requiring an EIS, and vacating the Lake Oahe easement while that EIS is completed—presents "serious" and "substantial" questions that warrant "more deliberative investigation" on appeal before taking actions that would impose devastating, disruptive, and irreparable harm to many third parties and the economy as a whole.  *Akiachak*, 995 F. Supp. 2d at 13.

## A.   The Court's Decision To Grant Summary Judgment To The Tribes Presents Serious And Substantial Legal Questions

Dakota Access first has substantial grounds for challenging the Court's summary judgment decision.  The Court held that "the pipeline's 'effects on the quality of the human environment are

likely to be highly controversial'" because the Corps had failed to resolve discrete controversies on the topic of a possible high-consequence spill at Lake Oahe.  D.E. 496, at 36 (quoting 40 C.F.R. § 1508.27(b)(4)).  That holding raises substantial questions as to the correct application of the D.C. Circuit's recent decision in *National Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019), and there are serious reasons to doubt that the controversies identified by the Court undermine the Corps' EA and FONSI.

1.  The Court invoked "significant guidance" from *Semonite*, D.E. 496, at 2, but there is at least a serious question whether *Semonite* is distinguishable in ways that underscore why the Corps' decisions were lawful.  In *Semonite*, the D.C. Circuit reaffirmed the longstanding principle that a project is not highly controversial simply because "some people may be highly agitated and be willing to go to court over the matter."  916 F.3d at 1083 (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975)).  Instead, as this Court previously recognized, "the degree to which the project is likely to be highly controversial fits squarely within the realm of those 'factual disputes' committed to agency expertise," *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 99 (D.D.C. 2017) ("*SRST IV*") (citing *Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738, 746 (D.C. Cir. 2001)), and the agency is permitted to apply its "expertise and discretion" in preparing an EA, even when its methods are criticized, *Sierra Club v. DOT*, 753 F.2d 120, 128 (D.C. Cir. 1985).  Criticisms only rise to the level of high controversy when "information in the record casts substantial doubt on the adequacy of the agency's methodology and data."  *Biodiversity Conservation All. v. U.S. Forest Serv.*, 765 F.3d 1264, 1275 (10th Cir. 2014).

The critical factor in *Semonite* was that "federal and state agencies with relevant expertise harbor[ed] serious misgivings," not just about the Corps' mode of analysis, but also its ultimate misguided substantive decision: a permit to build electrical towers across the historic James River,

"a region of such singular importance to the nation's history." 916 F.3d at 1077. NEPA operates through input from federal agencies with "special expertise." 42 U.S.C. § 4332(C). *Semonite* thus focused on "critical comments" from two subject-matter-expert federal agencies—the Advisory Council on Historic Preservation and the Department of Energy's Argonne National Laboratory. Not only did these agencies question the Corps' overall methodology for analyzing the impact to the river's historical views, they excoriated it as "'superficial,'" "'scientifically unsound, inappropriate, and completely contrary to accepted professional practice.'" 916 F.3d at 1081, 1083, 1086. As a result, these agencies and others believed the project could not be justified at all in that it "'threaten[ed] to irreparably alter a relatively unspoiled and evocative landscape'" of "'transcendent national significance,'" and these "'adverse effects . . . could not be mitigated.'" *Id.* at 1080-81, 1084 (alteration omitted). *Semonite* mentioned criticisms from other organizations, but did not rule that those criticisms alone would render the Corps' decision highly controversial. *Id.* at 1086.

Here, by contrast, the topics of controversy identified by the Court were all pursued by the Tribes, not federal agencies. *E.g.*, D.E. 496, at 19 (citing "[e]xperts for both Standing Rock and Cheyenne River"). The Court pointed to just two comments from federal agencies, but neither questioned the Corps' ultimate ability to justify the Lake Oahe easement. The first comment, by the Department of Interior, raised no specific criticism at all, and merely suggested that the Corps' *draft* EA had not yet "adequately justified" the decision to forgo an EIS. USACE_DAPL 5750.

According to the Court, the second agency ("EPA") recommended "that the Corps analyze more closely the leak-detection system it had selected, including its 'ability . . . to identify small volume leaks.'" D.E. 496, at 16. That is incorrect. EPA instead wrote, again as to the *draft* EA: "It may be appropriate to require routine physical inspections in sensitive surface water and groundwater areas to augment the ability of the SCADA system to identify small volume leaks."

26

USACE_DAPL 5746. The easement requires the inspections that EPA recommended, USACE_ESMT 4, and Dakota Access has already explained that its state-of-the-art leak-detection system can detect a 0.75% leak or smaller within 45 minutes, and is likely even more sensitive than that, D.E. 509-5 ¶ 9. Moreover, the Corps later supported the decision to forgo an EIS, *e.g.*, RAR 1-280, through further discussion of leak detection, *e.g.*, USACE_DAPL 71266; RAR 126-27; RAR 173-74; RAR 205-08; RAR 238. The Court also stated that an EPA spill estimate "for a spill from a pipeline of DAPL's size" was larger than the Corps' estimate, D.E. 496, at 16, but the Corps, which acknowledged the contingency plan from which the estimate came, USACE_DAPL 71263; USACE_DAPL 71315, reasonably used a WCD figure based on the shutdown time and pipe segment lengths specific to the Lake Oahe crossing (12.9 minutes to detect a leak and shut down a 1.73-mile segment), rather than higher, generic assumptions relied upon by EPA (15 minutes to detect a leak and shut down a 10-mile segment). USACE_DAPL 72252-53; D.E. 538-4 ¶ 30 & Ex. 3, at 10.

The Court identified no criticism from either agency relevant to *Semonite* of the Corps' *final* EA or remand analysis. The Court's reliance on *Semonite* was thus unwarranted. And there is at least a serious question whether *Semonite*'s reference to criticisms from expert government "agencies entrusted with preserving historic resources and organizations with subject-matter expertise," 916 F.3d at 1086, extends to tribal departments which relied almost entirely on non-government consultants and have no documented expertise themselves in oil spill modeling. *See* D.E. 496, at 16-17.

**2.** Even giving Plaintiffs the benefit of the doubt on the merits of the controversies this Court discussed, *Semonite* still does not support summary judgment in their favor. As noted above, the expert agencies in *Semonite* concluded that the criticisms should bar the project altogether.

27

Here, though, none of the controversies calls into question the Corps' undisputed determination that the *likelihood* of a large spill near Lake Oahe is small enough to allow an easement.

The Corps has determined that risk to be not only "low," but "extremely low." USACE_DAPL 71272; USACE_DAPL 71316; USACE_DAPL 71311; *see also*, *e.g.*, RAR 1; RAR 19; RAR 119.  The Court has upheld this "top-line conclusion" as reasonable.  *SRST III*, 255 F. Supp. 3d at 127; *see SRST IV*, 282 F. Supp. 3d at 96; *id.* at 101 (describing spill risk as "minimal").  On remand, the Corps bolstered this conclusion with extensive historical data from PHMSA.  Of 156 reported hazardous-liquid accidents since 2010 involving pipelines with diameters of 16 inches or more, 53% involved less than 4 barrels, 75% were below 105 barrels, 90% were below 3,000 barrels, and 95% were below 7,600 barrels.  RAR 18.  The Corps thus supported its conclusion that "most pipeline spills are small" and releases of 10,000 barrels or more are "extremely uncommon."  RAR 18-19.  The risk of a spill at an HDD crossing like Lake Oahe is lower still—with only a single, 1.7-barrel leak reported between 2010 and 2018 on *any* crude oil pipeline installed using HDD.  RAR 19.  And the chances of oil actually "reaching Lake Oahe itself" are "even lower," RAR 58, because "[i]nstallation of the pipeline at a depth of 92 feet below the bottom of Lake Oahe 'virtually eliminat[es] the ability of a spill to interact with the surface water,'" RAR 13-19.  The Corps thus acted well within its discretion in foregoing an EIS after "discount[ing]" the "'significance of possible adverse consequences . . . by the improbability of their occurrence.'"  *New York v. NRC*, 681 F.3d 471, 478-79 (D.C. Cir. 2012).

The controversies the Court identified do not affect that conclusion.  Three of the topics— the pipeline's ability to detect slow leaks, Dakota Access's ability to respond to a spill in winter, and the premises of the Corps' WCD analysis, D.E. 496, at 19-22, 24-26, 30-32—do not address the *likelihood* of a large spill, only its potential magnitude and duration.  In addition, many of these

concerns pertain to the potential magnitude of *even lower-probability* perfect storm events like a major spill going undetected for a period of time due to a combination of human errors and the pipeline's leak-detection system or safety valves failing.  *Id.* at 19-20, 33.  Particularly in light of evidence about the sensitivity of DAPL's leak-detection system and the fact that a full-bore rupture would be detected almost instantaneously and trigger an automatic shutdown, D.E. 509-5 ¶ 8, nothing in NEPA required the Corps to quantify these extremely low probability events given its top-line view that they were too unlikely to alter its decision, RAR 255; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 354 (1989) (NEPA has not required a "worst case analysis" since 1986).  And, in any event, the Corps' statistics already account for these risks.  RAR 18. That is, to the extent leak detection, valve failures, or winter conditions affect spill sizes, those effects are captured by the PHMSA data.

The fourth topic—the safety record of DAPL's operator, Sunoco—also does not alter the reasonableness of the Corps' conclusion to rest its FONSI on the very low likelihood of a large consequence event.  *See New York*, 681 F.3d at 478-79.  First, Plaintiffs and their consultants never showed that Sunoco's past record of spills—especially high-consequence spills—differed materially from the industry average.  Plaintiffs pointed to the absolute *number* of spills and leaks that one witness attributed to Sunoco from 2010 to 2016, D.E. 496, at 23, but did not show that the *frequency* of spills *per mile* of pipelines operated—the relevant metric for spill likelihood—was any different, *see* RAR 14.  Second, the Corps properly relied on both key DAPL safety features that distinguish its risk level from that of other, older pipelines under different management (as confirmed by DAPL's track record of no mainline spills at all), and recent improvements in Sunoco's safety practices since Energy Transfer acquired it.  RAR 239; D.E. 509-5 ¶ 27; D.E. 538-4 ¶¶ 7, 22.  Finally, even a safety record well outside the norm would align with the Corps' FONSI

given the once-in-200,000-years likelihood of a high-consequence spill at Lake Oahe using PHMSA data that includes much older pipelines with many fewer safety features.

**3.** Not only do the topics of controversy fail to alter the reasonableness of the Corps' top-line, dispositive determination that the *likelihood* of a high-consequence event is extremely low, several conservative features of the spill modeling more than offset any supposed controversy over the *magnitude* of such a spill.

For example, on remand, RAR 251, the Corps modeled the effects of a spill using a "worst case discharge" of ███ barrels, which was the largest volume of oil that could be expected to flow from this pipeline segment in the event of a "full bore rupture" "guillotine" cut, RAR 229. The Court questioned whether the Corps should have factored in an additional 1 to 3 minutes of time for Dakota Access to detect the hypothesized complete severing of the pipeline. D.E. 496, at 30. Although the record shows that the Corps' analysis already correctly accounted for detection time, *see* D.E. 456, at 29-31, even adding 3 minutes, at the pipeline's pumping rate of 416 barrels per minute, *id.*, would at most increase the WCD by 1,248 barrels, or less than █ percent. On the other side of the ledger: (1) nowhere near that amount—if any at all—would reach the Lake because the pipeline is more than 90 feet below the lakebed, and oil would instead travel up the path of the pipe to land, *see* RAR 8068; (2) a full-guillotine cut—the type resulting from third-party damage such as a backhoe—is inconceivable for a pipeline buried so deep, *see* RAR 14971; and (3) the modeling overstates released oil amounts by not adjusting for (a) the slowing of the pumping rate as the pumps shut down, (b) *simultaneous* closing of valves while the pumps shut down, and (c) the anti-siphoning effect that will cause much of the oil to remain in the pipeline, RAR 144; *see also* RAR 8112.

Likewise, the Court took issue with the Corps' conclusion that the effect of "difficult winter

conditions" on cleanup efforts would be "counterbalanced by the slower movement of the oil beneath the ice." D.E. 496, at 25 (quoting RAR 151). Here too, even though the Corps' reasoning was correct, *see* D.E. 509-1, at 29-30, the dispute is once again rendered immaterial by offsetting, highly conservative assumptions. The Corps' spill modeling conservatively "assumes a plume of oil traveling unmitigated for 10 days" even though Dakota Access "committed to less than a 6 hour response time," RAR 219, and has responded even faster during drills, D.E. 509-3 ¶ 18; D.E. 509-5 ¶ 23. Thus, even if winter conditions slightly delayed this response, the conservative assumption of 10 full days to respond more than offsets it.

The D.C. Circuit has repeatedly refused under NEPA to permit the sort of "'flyspeck[ing]'" of "the agency's findings"—"in search of 'any deficiency no matter how minor'"—that Plaintiffs invited here. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322-23 (D.C. Cir. 2015). Given the context in which the criticisms were raised, they are precisely the sort of "minor" disputes that do not alter the application of NEPA. *SRST III*, 255 F. Supp. 3d at 122.

**B.    The Court's Decision To Order An EIS Raises Serious And Substantial Legal Questions Too**

Even if the court of appeals agrees with this Court's conclusion that certain discrete controversies required further analysis, Dakota Access is likely to prevail on appeal in challenging the decision to order an EIS rather than remanding to the Corps for further explanation of its EA and FONSI. D.E. 496, at 42. The Court's first remand order directed the Corps to address for the first time criticisms submitted by the Tribes in the interim period between the Final EA (July 25, 2016) and the Corps' decision on February 3, 2017 to deliver the Lake Oahe easement. *SRST III*, 255 F. Supp. 3d at 129. The Corps responded by addressing 339 discrete topics, even going beyond those from that interim time period. RAR 110; RAR 141-280. It also did so without the benefit of the "significant guidance" this Court drew from the D.C. Circuit's decision in *Semonite*, D.E. 496, at

31

2, which was decided months after the Corps completed its remand in August 2018.  The Court's post-remand summary judgment ruling questioned for the first time the merits of the Corps' analysis of any of these topics, applying significant guidance (from *Semonite*) that the Corps lacked the benefit of.  The Corps should have a chance to respond on remand, particularly in light of *Semonite*, with a defense of its decision not to prepare an EIS.

On remand, the Corps could address each topic of controversy that the Court identified without preparing an EIS.  For example, the Corps can use empirical data and request additional information from Dakota Access, *e.g.*, D.E. 509-5 ¶¶ 5-13, 41, to assess the likelihood that DAPL's leak-detection system would fail to detect a large, slow leak, D.E. 496, at 19-22, or the potential spill volume that could result if the pipeline's safety valves fail to close following a rupture in the pipeline, *id.* at 32.  Because NEPA "imposes only procedural requirements," *DOT v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004), the Corps should have had a chance to support its low-likelihood, significant-consequence assessment with further analysis of the likelihood and consequences of the scenarios that prompted the remand.

### C.    The Court Erred In Vacating The Easement Pending Completion Of The Remand

Even assuming the need for an EIS, Dakota Access is likely to succeed in challenging the Court's decision to vacate the Lake Oahe easement pending remand.  Under *Allied-Signal, Inc. v. NRC*, 988 F.2d 146 (D.C. Cir. 1993), the decision whether to vacate an agency's order depends on (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) "the disruptive consequences of an interim change that may itself be changed."  *Id.* at 150-51.  "A strong showing of one factor may obviate the need to find a similar showing of the other."  *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019).  Each factor should have prevented vacatur here.

**1.** The district court wrongly dismissed the "serious possibility" that the Corps will be able to substantiate its decision to grant the Lake Oahe easement after preparing an EIS. *Allied-Signal*, 988 F.2d at 151; *see, e.g.*, D.E. 507, at 10-14; D.E. 538-1, at 11-16.  The more than 1,000 pages of EA, appendices, and remand analysis the Corps prepared already properly address nearly all of the issues required in an EIS, and the Court's remedy opinion ignores the procedural background of this case.  Much of the Corps' analysis with respect to the easement was tested through litigation and has already been upheld by the Court, such that the remaining *disputed* issues have been significantly narrowed.  *SRST III*, 255 F. Supp. 3d at 160; *see also SRST IV*, 282 F. Supp. 3d at 94 (same).  Neither NEPA nor this Court's summary judgment rulings require the Corps to "'start from scratch'" and "reconsider everything" on remand.  *Oceana, Inc. v. Ross*, 275 F. Supp. 3d 270, 288 (D.D.C. 2017) (alteration omitted), *aff'd*, 920 F.3d 855 (D.C. Cir. 2019).  To the contrary, NEPA encourages agencies to rely on prior analysis to "[f]acilitate preparation of [an EIS] when one is necessary." 40 C.F.R. § 1508.9(a)(1), (3).  While the Corps must still "fil[l] the analytical gap identified [by the court]," by otherwise preparing a complete EIS, that is its "only obligation." *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005).

Here, the Corps can address the discrete controversies that the Court identified through an EIS for the reasons addressed—*i.e.*, because none of those controversies undermines the Corps' top-line "low-likelihood but significant-consequences" reasoning.  *See supra*, at 28-30.  Indeed, the Corps' task in addressing these issues on remand, through an EIS, will be even simpler than the task it faced the first time around of defending its decision *not* to prepare an EIS.  The import of the Court's determination that the action's effects are "'highly controversial'" under *Semonite* is that the Corps cannot make a FONSI and thus must prepare an EIS. D.E. 496, at 35-36.  Now that the Court has required an EIS, the Corps does not need to *succeed* in resolving controversy

resulting from Plaintiffs' "'consistent and strenuous opposition'" to the project. *Id.* at 14-15.  In

particular, the Corps need not "do away with [any] controversy" to the Tribes' satisfaction, *id.* at

34, or disprove that a "'dispute exists,'" *id.* at 13.  It need only *decide* any remaining disputes, with

the "choice of . . . methodology"—even if controversial—left to the Corps' "wisdom and experi-

ence," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 200-01 (D.C. Cir. 1991), and

"dispute[s] . . . of fact" left to its "'informed discretion,'" *Marsh v. Or. Nat. Res. Council*, 490 U.S.

360, 377 (1989).  So long as the Corps "'adequately consider[s] and disclose[s] the environmental

impact'" of an easement and that "'decision is not arbitrary or capricious,'" the decision will be

sustained.  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013).

 In ruling to the contrary, the Court "focus[ed] on the Corps' decision not to prepare an EIS"

rather than on "whether 'the Corps will likely substantiate its substantive *easement* decision.'"

D.E. 546, at 11-12.  This approach—floated by Plaintiffs only in passing and supported by only a

single district court decision, *see* D.E. 527, at 6-7 (citing *Semonite*, 422 F. Supp. 3d at 92)—focuses

on the wrong agency decision as a matter of law, and is foreclosed by "caselaw in this Circuit."

D.E. 546, at 12.  Binding precedent establishes that the order the agency must "'be able to justify'"

is the order that the court is considering "whether to vacate"—here, the easement.  *Heartland Reg'l*

*Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (quotation marks omitted); *accord Com-*

*cast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009) (when evaluating whether an "'inadequately

supported [agency] rule'" should be vacated, a court should examine "'the seriousness of *the rule's*

deficiencies'" (emphasis added; quotation marks and brackets omitted)).  Focusing on the Corps'

initial decision to proceed without an EIS thus relies on an incorrect rule of law that would read

factor one out of *Allied-Signal* in *every* case, not only cases involving a "failure to produce an EIS

under NEPA."  D.E. 546, at 12.  *Every* application of *Allied-Signal* involves *some* error in the

agency's decisionmaking process.  *Allied-Signal* asks whether the agency can "[c]orrec[t] th[e] flaw," *SRST IV*, 282 F. Supp. 3d at 98, not, as the Court has held, whether the agency can justify the flawed process that the court has *already rejected*—an impossible task.  The D.C. Circuit in *Oglala*, for example, did not evaluate whether the agency could substantiate its initial "decision to leave [a] license in effect pending [the agency's] effort to cure . . . NEPA deficiencies."  *Oglala Sioux Tribe v. NRC*, 896 F.3d 520, 526 (D.C. Cir. 2018).  The court analyzed whether the agency could "correct those deficiencies."  *Id.* at 538.  Similarly, this Court's prior remedy decision considered the Corps' ability to respond to certain expert critiques on remand—not the likelihood that the Corps could justify its decision not to address those critiques.  *SRST IV*, 282 F. Supp. 3d at 99.

Here, too, the question is whether the Corps can substantiate the easement by correcting its failure to prepare an EIS, not whether it can substantiate its decision not to prepare an EIS.  The only difference from the prior remedy briefing is that the Corps no longer has the *option* of substantiating the easement by "'justify[ing] its prior decision to issue an EA and FONSI, rather than preparing a full EIS.'"  D.E. 527, at 6 (quoting *SRST IV*, 282 F. Supp. 3d at 98).  But that is not the only way to substantiate the easement.  Given the absence of any meaningful dispute that the Corps can substantiate the easement, a stay is warranted.

The Court also leaned heavily on the fact that Dakota Access only cited two cases applying *Allied-Signal* where there was no vacatur in the unique context of an order directing an agency to prepare an EIS.  D.E. 546, at 11.  That ignores *Sierra Club v. U.S. Department of Agriculture*, 841 F. Supp. 2d 349 (D.D.C. 2012), which held that an agency's failure to prepare any EIS or environmental analysis whatsoever was not a serious error warranting vacatur under *Allied-Signal* factor one, and that existing approvals could remain in place while the agency completed an EIS.  *Id.* at 357.  In any event, the Court cites no other cases that awarded vacatur in this posture.  The dearth

of case law simply reflects the extraordinariness of the Court's summary judgment ruling ordering an agency to complete an EIS rather than leaving the choice to the agency whether to attempt to correct the purported flaws in its EA.  And in the more common scenario where an agency is given an opportunity to fix deficiencies in an EIS or EA, Dakota Access cited numerous cases holding that *Allied-Signal* factor one weighs against vacatur.  *See* D.E. 538-1, at 7 & n.3 (citing *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 84 (D.D.C. 2019); *Friends of Animals v. Bureau of Land Mgmt.*, 2018 WL 3795222 (D. Or. Aug. 9, 2018); *Backcountry Against Dumps v. Perry*, 2017 WL 3712487, at *3 (S.D. Cal. Aug. 29, 2017); *Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, 2016 WL 4445770, at *7 (C.D. Cal. Aug. 12, 2016); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1108-09 (E.D. Cal. 2013); *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1018-19 (E.D. Cal. 2013)).  More fundamentally, it remains the case that no court has stopped an already operational pipeline after its safe operation for more than three years.

The Court also suggests that without vacatur the Corps and Dakota Access would have little incentive to finish the EIS in a timely manner.  There is no support for that suggestion.  In fact, the Court recognized in an earlier opinion that Dakota Access has a strong interest in putting this litigation behind it.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 2019 WL 161950, at *2 (D.D.C. Jan. 10, 2019) (denying a motion to amend Oglala's complaint after remand).  If any party has been guilty of delay in this litigation, it is Plaintiffs, who delayed the first remand even when they had an incentive to act more diligently.  *See* D.E. 456, at 58-62.

**2.**  Remand without vacatur was independently warranted by the same "disruptive consequences" that support this stay motion.  *Allied-Signal*, 988 F.2d at 151; *see supra*, at 10-21.  The Court "readily acknowledge[d] that, even with the currently low demand for oil, shutting down the pipeline will cause significant disruption to DAPL, the North Dakota oil industry, and potentially

other states." D.E. 546, at 23.  The Court nonetheless vacated the easement, reasoning that remand without vacatur would somehow subvert NEPA.  *Id.* at 18-19.  The Court's analysis, which deliberately declines to "pick apart the various positions," is hardly any solace to the thousands who would be out of work or to North Dakota and the other state, local, and tribal governments who would lose billions of dollars in tax revenue and royalties if the pipeline is shut down.  *Id.* at 17; *see also supra*, at 15-17.  In any event, here too, the procedural history forecloses the Court's concern.  Plaintiffs repeatedly used this litigation to try to stop the project, and each time the Court ruled that there was no lawful basis to do so.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 7 (D.D.C. 2016) (denying SRST's motion for preliminary injunction); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 80 (D.D.C. 2017) (denying Cheyenne River's motion for preliminary injunction); *SRST IV*, 282 F. Supp. 3d at 94 (remanding without vacatur).  Indeed, Dakota Access only moved forward with construction and operations at Lake Oahe after receiving the requisite final agency action in its favor.  Dakota Access asked for and repeatedly received "permission."  D.E. 546, at 18.  It did not act hoping instead for "forgiveness."  *Id.* at 19.

The Court also cited the "potentially disruptive effects that could flow from remand without vacatur" in the event of a leak or spill, noting that the EA had little discussion of such effects.  D.E. 546, at 19-20 (quotation marks and emphasis omitted).  But the Court recognized that the risk of a high-consequence spill is low, *id.* at 20, while failing to account for the Corps' extensive analysis of spill effects on remand and Dakota Access's explanations how it can detect slow leaks and respond appropriately to a spill in winter.  *See* D.E. 509-1, at 20-21, 23-25; D.E. 538-1, at 13-14.

**3.**  At a minimum, Dakota Access is likely to prevail on appeal because the Court's remedy

order goes beyond mere vacatur. "[V]acatur" would merely have "deprive[d]" the easement of "'any legal consequences,'" *Kelso v. U.S. Dep't of State*, 13 F. Supp. 2d 12, 17 (D.D.C. 1998) (quoting *United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950)), leaving the Corps—not this Court—to determine the remedy for any resulting encroachment on Corps property, D.E. 536, at 19-20. Instead, the Court went further, providing that "Dakota Access shall shut down the pipeline and empty it of oil by August 5, 2020." D.E. 545, at 2. Such an order—one "'directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint'"—is an "injunction," *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 749 (D.C. Cir. 2016), not mere vacatur, and must meet the exacting standard for injunctive relief, *see*, *e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 148, 156-57, 160 (2010) (leaving in place vacatur, under NEPA, of decision authorizing planting of genetically modified crop, but reversing order "*enjoining* [*the agency*] from allowing" such activities pending completion of EIS).

This Court never addressed the requirements for an injunction, and they are not satisfied here. Clear Supreme Court precedent precludes "recourse to the additional and extraordinary relief of an injunction" when the "less drastic remedy" of vacatur is "sufficient to redress" a NEPA violation. *Monsanto*, 561 U.S. at 165-66. To assume "that an injunction is generally the appropriate remedy for a NEPA violation"—without addressing the requirements for injunctive relief—is "erroneous" and reversible. *Id.* at 157. Even relief labeled "vacatur" is disfavored under *Monsanto* if it "ha[s] the effect of injunctive relief." *Beverly Hills*, 2016 WL 4445770, at *6. This error is compounded by the breadth of the injunction, which requires Dakota Access to shut the pipeline down and "empty it of oil" even though the easement at issue is limited to the segment between two valves at Lake Oahe. Because Plaintiffs never attempted to satisfy the requirements for injunctive relief, Dakota Access is likely to succeed in challenging the portion of the order that

38

directs it to shut down the pipeline, and at the very least, that portion of the order should therefore be stayed pending appeal.

## CONCLUSION

For the foregoing reasons, the Court should grant Dakota Access's motion for a stay pending appeal.

DATED this 8th day of July, 2020.

By: */s/ William S. Scherman*
    Miguel A. Estrada
    William S. Scherman
    David Debold
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    (202) 955-8500
    wscherman@gibsondunn.com

    *Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I certify that on July 8, 2020, the foregoing document was filed via the Court's CM/ECF

system and served upon ECF-registered counsel for all parties to this proceeding.

*/s/ William S. Scherman*
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com