IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,<br><br>   Plaintiffs,<br><br>and<br><br>CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL.,<br><br>   Plaintiff-Intervenors,<br><br>   v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>   Defendant-Cross Defendant,<br><br>and<br><br>DAKOTA ACCESS, LLC,<br><br>   Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

### DAKOTA ACCESS, LLC'S NOTICE OF FILING ON THE PUBLIC DOCKET A DOCUMENT PREVIOUSLY FILED UNDER SEAL

On July 8, 2020, Dakota Access, LLC ("Dakota Access") filed a declaration attached to its Motion for Stay Pending Appeal, D.E. 551-1, as an attachment to its sealed Motion for Leave to File Under Seal, D.E. 551. That Motion for Leave contemplated a review and conferral process for identifying particular information appropriate for sealing that tracks the approach to which all parties agreed. By Minute Order dated July 9, 2020, the Court granted the Motion.

Dakota Access seeks protection of certain material in the referenced declaration under the Protective Order. All parties have agreed that Dakota Access will file it publicly with the redactions that Dakota Access proposes, leaving for a later date the possibility of another party

challenging the redactions as overbroad.  Under the parties' agreement, until further order of the Court no party will include the information that Dakota Access has redacted in the declaration in any future public filing.  Until an order resolving any disagreement as to the scope of the redacted information, a party wishing to reference or quote the redacted information must do so in a separate, sealed filing.

Pursuant to that agreement, Dakota Access hereby files the public version of the Declaration of Todd Stamm in Support of Dakota Access, LLC's Motion for Stay, D.E. 551-2. With today's filing, Dakota Access has completed the review and conferral process described in its July 8, 2020 Motion for Leave to File Under Seal because a public version of the sole attachment to that Motion is now available on the docket.

Dated:  July 9, 2020                                          Respectfully submitted,

                                                               /s/ William S. Scherman
                                                              William S. Scherman
                                                              David Debold
                                                              GIBSON, DUNN & CRUTCHER LLP
                                                              1050 Connecticut Avenue, N.W.
                                                              Washington, D.C.  20036
                                                              (202) 955-8500
                                                              wscherman@gibsondunn.com
                                                              *Counsel for Dakota Access, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of July, 2020, I electronically filed the foregoing document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

 /s/ William S. Scherman
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STANDING ROCK SIOUX TRIBE;
YANKTON SIOUX TRIBE; ROBERT
FLYING HAWK; OGLALA SIOUX
TRIBE,

                    Plaintiffs,

and

CHEYENNE RIVER SIOUX TRIBE;
SARA JUMPING EAGLE, ET AL.,

                      Plaintiff-Intervenors,

      v.

U.S. ARMY CORPS OF ENGINEERS,

                    Defendant-Cross Defendant,

and

DAKOTA ACCESS, LLC,

                      Defendant-Intervenor-Cross Claimant.

Case No. 1:16-cv-01534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

## DECLARATION OF TODD STAMM IN SUPPORT OF
## DAKOTA ACCESS, LLC'S MOTION FOR STAY

1. My name is Todd Stamm. I am the Vice President, Crude and Liquid Pipeline Operations, for Energy Transfer LP ("Energy Transfer"). My business address is 1300 Main Street, Houston, Texas 77002.

2. I have over 29 years of experience with Sunoco Logistics, L.P. and Energy Transfer. I have held various roles throughout the company, with a focus on operations, engineering and construction, project management, and crude trucking. I hold a B.S. in Civil Engineering and a B.S. in Architectural Engineering from Drexel University and an MBA in Management from Wayne

State University.

3. I want to make clear from the outset, that I am not addressing the legality or validity of the Court's order. That is not my role. Rather, this declaration assumes the legality of the Court's order and goes on to discuss the steps that would need to be taken to safely take the Dakota Access Pipeline ("DAPL") offline and empty it of oil. I explained this process and the basic steps it entails in my previous declarations filed in this Court in support of Dakota Access's remedy briefing. D.E. 260-1 at 273-74 (¶ 8) ("First Stamm Dec.") and D.E. 509-5 ¶¶ 43-47 ("Second Stamm Dec.," also in redacted form at D.E. 520-3). It is covered in greater detail here.

4. The Court's July 6, 2020 remedy order states that "Dakota Access shall shut down the pipeline and empty it of oil by August 5, 2020." D.E. 545 at 2. Dakota Access can shut DAPL down by August 5, 2020 by turning off the equipment that causes oil to flow through the pipeline; however, it is not physically possible to "empty it of oil" in the thirty days provided by the order. It would take far longer than 30 days to prepare for and carry out emptying the pipeline.

5. Within the 30-day time frame specified in the order, as stated above, the flow of oil could be suspended by turning off certain equipment but it is not possible within this time frame to completely empty the pipeline. In the event that the flow of oil through the pipeline is suspended but oil remains in the pipeline, there is a risk of corrosion and other damage to the pipeline, because water, corrosive components, and/or microbial bacteria entrained in the crude oil passing through the pipeline will begin to collect in the pipeline walls and equipment, rapidly accelerating corrosion and threatening its structural integrity if protective measures are not taken. *See* Second Stamm Dec. ¶ 44. Moreover, key elements of DAPL's corrosion-control program—such as its coupon monitoring stations and maintenance pigging—are conducted when oil is flowing through the pipeline. The repairs and corrosion-mitigation measures needed in the absence of such protective

measures are very costly.

6. In order to implement a longer-term shutdown of the pipeline and completely empty the pipeline of oil, the pipeline would need to be restarted and operated for a new period of approximately 86 to 101 days in order to completely empty it of oil (this includes preparatory time) and replace that oil with an inert gas like nitrogen.[1] The nitrogen purge process is a comprehensive, segment-by-segment and facility-by-facility process to de-inventory the crude oil and slowly fill the void with nitrogen. It requires comprehensive work plans, moving millions of barrels of crude inventory, the shut-in of shippers' gathering facilities and draining oil from terminal facilities that connect to the pipeline, requisition and delivery of equipment, and procurement and delivery of inert gas. All told, this process will take approximately 86 to 101 days and will cost more than $24 million. Critically, the pipeline must be restarted *and must operate* to complete this protective measure.

7. As explained in earlier declarations, shutting a pipeline down and emptying it for an extended period requires purging the line of crude oil and filling the entire system with an inert gas, such as nitrogen ("the purge-and-fill process"). *See* Second Stamm Dec. ¶ 46.

8. The purge-and-fill process involves two stages—a preparatory phase and implementation of the purge-and-fill process. The preparatory phase comprises a significant portion of the time needed to safely shut down the pipeline, approximately 30 to 45 days. This phase includes planning for the shutdown, initial draw down of crude oil inventories in terminal facilities that feed the pipeline, hiring and mobilizing contractors, sourcing the equipment and materials needed for the

---

[1] My second declaration estimated that this never-before-attempted process would take "approximately" 90 days. *See* Second Stamm Dec. ¶ 46. Further work on a plan for purging the DAPL system has demonstrated that approximately 86 to 101 days would be the minimum for the entire system, with the possibility of completing the process sooner for the segment that passes under Lake Oahe.

purge-and-fill process, and planning and coordination of the drainage of a number of tanks and feeder lines under customer control to prevent product loss and damage to their systems while DAPL is shut down.

9. Once the preparatory phase has been completed, the implementation phase of the purge-and-fill process can begin. It begins by closing off the valves upstream of a segment to prevent new oil from flowing in. Then, the segment is completely purged of oil by running a series of cleaning pistons, known as "pigs," through the pipeline. These pigs are propelled by nitrogen, which is injected into the pipeline through pig traps and launchers (predesigned insertion points for cleaning pigs and other equipment). As the nitrogen propels the pigs, it also fills the void left by the oil, leaving the buffer of inert gas in place to protect the pipeline. This process is repeated on each pipeline segment.

10. Because crude oil must continue to flow through the pipeline until shortly before it is replaced with nitrogen, the purge-and-fill process must be conducted one segment at a time *while the pipeline is operating*, beginning at DAPL's origin in Stanley, North Dakota and ending at its terminus in Patoka, Illinois. There are a total of 15 segments along DAPL as well as 6 terminals, 2 mainline pump stations, and 3 metering facilities. While each segment along the pipeline is a different length and will pose its own unique challenges, for purposes of this discussion, I have calculated that it will take, on average, approximately 1.5 days to purge and fill each segment with sufficient pressure of inert nitrogen gas to preserve the pipeline.

11. Additionally, the purge-and-fill process must be stopped each time one of the mainline terminals or mainline facilities (such as a pump station or meter facility) is reached, as the crude oil in each terminal or facility must be fully drained into the pipeline so it can be pushed through

4

the line during the purge-and-fill process. Five of the mainline terminals will each take approximately 4.5 days to de-inventory (the sixth terminal, located in Stanley, ND, will be drained as part of the preparatory phase), for a total of about 23 days. The 5 mainline facilities (pump stations and metering facilities) will each take approximately two days to de-inventory, for a total of 10 more days.

12. DAPL's Lake Oahe segment is approximately 183 miles from the pipeline's Stanley, North Dakota origin point, and there are six segments (including the Lake Oahe segment) between these points. Because the purge-and-fill process must be performed in linear order beginning with DAPL's origin segment, using the calculations above, I estimate that including the preparatory phase and the time needed to drain the terminal and mainline facilities attached to upstream segments, it will take approximately 60 to 75 days to reach and seal off the Lake Oahe segment. Up until this point, some crude oil would continue flowing through the Lake Oahe crossing, and would continue flowing downstream of the Lake Oahe segment to the Patoka, Illinois terminus throughout the remainder of the purge-and-fill process.

13. In sum, the purge-and-fill stage of the process will take approximately 56 days. This includes 23 days to drain 5 terminal facilities, 10 days to de-inventory each mainline facility, and 23 days to purge and fill each mainline segment. Together with the preparatory process, I estimate a total shutdown time of approximately 86 to 101 days.

14. I estimate that the total cost of the purge-and-fill process will reach approximately $24 million, with much of that being contracted for within the first 14 days. To obtain these estimates, I have contacted a nitrogen supplier, suppliers of the needed equipment, and qualified contractors. These costs include contracts to procure the equipment needed to purge and fill the lines, hire specialized contractors to perform the work, and treat and drain terminal facilities. Additionally,

approximately 825 million cubic feet of nitrogen is needed to increase pressure to the level required to propel the pigs through the line and fill it (400 psi). It will cost approximately $6 million to obtain this volume. Dakota Access will likely not be able to return some or all of the nitrogen gas after it has been acquired without significant additional expense. The table below breaks down these costs by category.

| Cost Center | Estimated Cost |
| --- | --- |
| Nitrogen Gas to Purge and Fill Pipeline | $6 million |
| Equipment Costs | $2 million |
| Labor costs (contractors and employees) | $2 million |
| Transportation (materials, equipment, and personnel) | $8 million |
| Other general expenses (e.g., [examples]) | $4 million |
| De-inventorying terminal facilities | $2 million |
| Total: | $24 million |

15. For each day that DAPL is not allowed to flow crude oil, Dakota Access, the Energy Transfer Crude Oil Co. ("ETCO"), and many third parties will suffer unrecoverable losses. As Glenn

Emery explained in his first declaration, Dakota Access and ETCO will lose between $2.8 million and $3.5 million in unrecoverable revenue *every day* that DAPL is shut down. First Emery Dec., D.E. 509-9 ¶ 10. Third party customers will lose access to approximately $225 million in oil stranded in the pipeline until the pipeline is either restarted or purged. The *daily* revenue loss to these third-parties will be more than $16 million.[2] Third-party Bakken producers who rely on DAPL to deliver their production to market will be forced to switch to more expensive and less desirable alternatives (i.e. rail at $5 to $10 more per barrel than pipeline, or truck at even higher rates) and shut-in the rest of their production, causing a variety of immediate economic, environmental, and safety effects on the larger crude oil industry and the states through which DAPL pass. These economic losses have been extensively discussed and quantified by Mr. Emery, Dr. Jeff Makholm, and North Dakota witnesses Lynn Helms, Joe Morrissette, Jr., Justin Kringstad, and Ryan Rauschenberger. *See* First Emery Dec., D.E. 509-9 ¶¶ 14-22; First Makholm Dec., D.E. 509-11 ¶¶ 15-42; First Helms Dec., D.E. 504-2 ¶¶ 8-15; First Morrissette Dec., D.E. 504-1 ¶¶ 10-11; Kringstad Dec., D.E. 504-3 ¶¶ 8-10; Rauschenberger Dec., D.E. 504-4 ¶ 11. The environmental and safety effects to the states and surrounding communities (including the Tribes) have been extensively discussed by Mr. Aubele and Mr. Rennicke. *See* First Aubele Dec., D.E. 509-3 ¶¶ 28-39; Second Aubele Dec., D.E. 538-3 ¶¶ 32-44; First Rennicke Dec., D.E. 509-6 ¶¶ 85-95; Second Rennicke Dec., D.E. 538-5 ¶¶ 62-70.

16. Dakota Access and ETCO will continue to suffer losses even after normal operations are

---

[2] When the parties briefed the question of remedy starting in late April, flows for July 2020 and beyond were expected to be more than ▊▊▊ barrels per day. First Emery Dec., D.E. 509-9 ¶ 10. As of the time of this filing, the price of WTI oil has increased to more than $40 per barrel. *See* https://oilprice.com/oil-price-charts/45. At ▊▊▊ barrels per day and $40 per barrel, the loss to customers would be approximately $▊▊ million per day. But because the recovery in North Dakota has accelerated, with expected flows for July 2020 now at approximately ▊▊▊ barrels per day, third-party losses will be more than $▊▊ million per day at $40 per barrel.

allowed to resume. It will take at least 30 days to inspect and fill the pipeline following the shut-down before operations can resume, at an unrecoverable cost of $2.8 million and $3.5 million each day. First Emery Dec. ¶ 10. Producers who rely on DAPL also will continue to lose revenue from the production that cannot be shifted to alternate transportation methods (up to $19.1 million per day).

Pursuant to 28 U.S.C. § 2746, I declare under penalty of perjury that the foregoing is true and correct.

Executed: July 8, 2020

Todd Stamm