# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel 202.955.8500
www.gibsondunn.com

William S. Scherman
Direct: +1 202.887.3510
Fax: +1 202.530.9557
WScherman@gibsondunn.com

David Debold
Direct: +1 202.955.8551
Fax: +1 202.530.9682
DDebold@gibsondunn.com

September 4, 2020

VIA E-MAIL

Jan E. Hasselman,
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
jhasselman@earthjustice.org

Michael L. Roy
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
mroy@hobbsstraus.com

Nicole E. Ducheneaux
Big Fire Law & Policy Group LLP
1404 South Fort Crook Road
Bellevue, NE 68005
nducheneaux@bigfirelaw.com

Jennifer S. Baker
Jeffrey S. Rasmussen
Patterson Earnhart Real Bird & Wilson LLP
357 S. McCaslin Blvd., Suite 200
Louisville, CO 80027
jbaker@nativelawgroup.com
jrasmussen@nativelawgroup.com

Re:   **Response to Tribes' Refusal to Discuss Additional Safety Measures at the Lake Oahe Crossing**

Dear Counsel:

We have reviewed your letter of August 28, 2020 responding to our letter inviting you to discuss any proposed operational safety measures at the Lake Oahe crossing pursuant to the District Court's August 10, 2020 order.  Minute Order of August 10, 2020, *Standing Rock Sioux Tribe et al. v. U.S. Army Corps of Eng'rs*, Case No. 1:16-cv-01534-JEB (D.D.C.) ("August 10 Minute Order") (directing the parties to undertake good faith discussions of potential "mitigation measures that could lessen the likelihood and severity of any oil leak in or around Lake Oahe").

We intend to proceed in good faith in discussing potential mitigation measures, but we have good reason to doubt that you are prepared to do the same.

*First*, you refuse to consider the comprehensive safety measures already in place, and the data that indisputably show that DAPL is one of the safest oil pipelines in the world.  Tribes' August 28, 2020 Letter at 1 ("[W]e will not engage further in that discussion.").  If we are to discuss

**GIBSON DUNN**

Jan E. Hasselman
Nicole E. Ducheneaux
Michael L. Roy
Jennifer S. Baker
Jeffrey S. Rasmussen
September 4, 2020
Page 2

proposed *additional* safety measures to reduce even further the risk or impact of a spill or incident, we obviously must first consider how they could potentially add value given the safety measures *already* built into DAPL's design, construction, and operation to reduce the risk and impact of a spill or incident at the Lake Oahe Crossing. Among other things, and as we explained in greater detail in our August 20, 2020 letter and in our many filings in this case, it is important to understand that the likelihood of a potential leak as large as (or larger than) those modeled is just once in every 200,000 years; that DAPL was constructed to exceed pipeline safety regulations; that DAPL's comprehensive leak monitoring system can detect and respond to even "pinhole" leaks in short order, reducing the volume of any potential spill or incident, no matter how unlikely; and that the Lake Oahe crossing was installed via HDD, virtually eliminating the possibility that a spill, in the highly unlikely event one should occur, could reach the waters of the Lake.

*Second*, we disagree that "in order to have any meaningful discussion about additional safety measures," you "need access to additional technical information." Tribes' August 28, 2020 Letter at 1-2.

    **A. You have already been provided much of this information**.[1]

Your second request seeks "Dakota Access LLC, Dakota Access Pipeline, North Dakota Spill Model Discussion Lake Oahe Crossing, Wood Group Mustang, Document No.: DAPL-WGM-GN000-PPL-STY-0019, Issued for Use 5-3-16." This document is in the record of this proceeding at RAR 14959.

Your third request seeks an un-redacted version of "Dakota Access Pipeline, Facility Response Plan, Dakota Access Pipeline North Response Zone, April 2017." An un-redacted copy of the most recent Facility Response Plan is Exhibit 8 to the Declaration of Todd Stamm In Support of Dakota Access LLC's Brief on the Question of Remedy, D.E. 509-5 in this proceeding.

Your sixth request seeks Energy Transfer's "Integrity Management Plan," and your seventh request seeks Energy Transfer's "Operations and Maintenance Manual." The former is attached as Exhibit 1 to the Second Declaration of John Godfrey In Support of Dakota Access LLC's Brief on the Question of Remedy, D.E. 538-4 in this proceeding, and a version of the latter is in the record at RAR 4499 in this proceeding.

---

[1] We remind you that many of these documents are subject to the protective order, and any dissemination to your "technical team" or others must be in accordance thereto.

**GIBSON DUNN**

Jan E. Hasselman
Nicole E. Ducheneaux
Michael L. Roy
Jennifer S. Baker
Jeffrey S. Rasmussen
September 4, 2020
Page 3

And your fourth and fifth requests seek information related to Energy Transfer's implementation of the recommended practices in API 1173 and 1175. John Godfrey discussed this in his second declaration in this proceeding. *See* D.E. 538-4 at ¶¶17-18.

> B. **Some of the information you requested will not help in the discussion the Court contemplated.**

For instance, your first request seeks "[t]he environmental inspection report dated March 15, 2017 referenced on page 2 of the Independent Assessment of Dakota Access Pipeline U.S. Army Corps of Engineers Easement Special Conditions" [the "P-PIC report"]. As you should know from the P-PIC report, D.E. 347-2, the referenced environmental inspection report relates to a small upland spill of drilling mud during the HDD *construction* activities (which are completed). It has nothing to do with pipeline *operations*. *See* P-PIC report at 24. In any event, the P-PIC report comprehensively summarizes the environmental inspection report (these reports are typically only a single page), so you have any information from the report that might be relevant.

Likewise, you ask for the un-redacted copy of an out-of-date Facility Response Plan when you already have the operative version (discussed above).

> C. **You also seek information, particularly with respect to the Optimization, that does not yet exist and has nothing to do with mitigation measures for the pipeline as it will be operating during the EIS period.**

For example, your eighth and ninth requests seek, among other things, an updated "worst case discharge (WCD), and North Response Zone Facility Response Plan (FRP) produced as a result of the proposed DAPL capacity increase" and other information related to the Optimization. As you know, the proposed capacity increase has not been approved by the Illinois Commerce Commission and would take months to implement if it is approved. Neither PHMSA regulations nor the Corps' Easement conditions (which Dakota Access has voluntarily agreed to continue to comply with) require revision of the Facility Response Plan (and WCD calculation) months before a potential change is implemented. *See* 49 C.F.R. § 194.121(a) (requiring an updated response plan to be submitted every five years, or 30 days after a change to operating conditions that "would substantially affect the implementation of a response plan"); D.E. 172-11 (Corps Easement), at docket page no. 38 (requiring Dakota Access to submit any updated Facility Response Plan to the Corps "within one year after the update").

**GIBSON DUNN**

Jan E. Hasselman
Nicole E. Ducheneaux
Michael L. Roy
Jennifer S. Baker
Jeffrey S. Rasmussen
September 4, 2020
Page 4

Thus, it is hard to take at face value that you want to engage in "meaningful discussion about additional safety measures," when you already have in your possession or available to you information related to *seven* of the ten items you say are needed for such discussion, and other items that you requested have no bearing on this discussion.

With most of the relevant information you requested already in your possession or available to you, there is no reason you cannot engage in good-faith discussion now.

*Finally*, we note that you are not yet ready to discuss *any* additional measures, even though Standing Rock and the "#NoDAPL Technical Consulting Team" have previously claimed that specific additional measures are needed and would be beneficial. *See, e.g.*, RAR 7451; D.E. 433, at 21-23. We do not understand how you could need more information before defending measures that you already told the Court are appropriate and even necessary.

Your refusal to engage notwithstanding, Dakota Access reiterates its offer to discuss any legitimate proposals for additional mitigation measures at the Lake Oahe crossing. We remain willing to discuss any suggestions you may have regarding other mitigation measures as contemplated by the August 10 Minute Order.

Please do not hesitate to reach out if you have any questions.

Sincerely,


 /s/                                               /s/
William S. Scherman                    David Debold


cc:   Ben Schiffman, DOJ
      Matt Marinelli, DOJ