IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,<br><br>    Plaintiffs,<br><br> and<br><br>CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL.,<br><br>    Plaintiff-Intervenors,<br><br>    v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>    Defendant-Cross Defendant,<br><br> and<br><br>DAKOTA ACCESS, LLC,<br><br>    Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

## DAKOTA ACCESS, LLC'S REPLY TO PLAINTIFFS' STATUS REPORT

Dakota Access, LLC writes for the limited purpose of correcting the record on Plaintiffs' assertions in their September 8, 2020 status report that Dakota Access is "stonewall[ing]" Plaintiffs' requests for information. D.E. 565, at 4. The corrections below confirm that Plaintiffs are using information demands as an improper excuse for refusing to propose a single mitigation measure under this Court's August 10, 2020 Minute Order.

- Plaintiffs have demanded an unredacted Facility Response Plan ("FRP") before they will propose any mitigation measures. But they now concede they have the current, complete, and unredacted FRP. In their status report they inform Dakota Access for the first time why they still demand an unredacted outdated version (from 2017): because it supposedly "may reveal

a significant change from later versions." D.E. 564, at 4. (Plaintiffs have a redacted 2017 version. RAR 6439-564.) Plaintiffs do not explain why they need to see any changes. All mitigation measures would be in response to the currently effective FRP. Regardless, had Plaintiffs raised this reason with Dakota Access, the company would have confirmed that nothing material to mitigation measures has changed since the 2017 FRP. Dakota Access is willing to discuss with Plaintiffs details on the immateriality of these changes, which include different worst case calculations for a location far from Lake Oahe.

- Plaintiffs complain that the maintenance and integrity management plans they request—which are already in the record, at RAR 4499 and D.E. 538-4, at Exhibit 1, respectively—are "company-wide" and not "facility-specific." D.E. 565, at 4. But Plaintiffs know that "facility-specific" plans do not exist, because Dakota Access has explained that its "company-wide" plans are the "best practice." D.E. 538-4 ¶ 14. Rather than a demand for existing documents, this is merely a reprise of Plaintiffs' merits arguments from the summary judgment briefing.

- Plaintiffs complain that Dakota Access cited "its executives' litigation declarations" to demonstrate compliance with industry standards. D.E. 565, at 4. Plaintiffs are wrong. John Godfrey is *not* an Energy Transfer executive. Mr. Godfrey is a Senior Principal Consultant with the Integrity Solutions group within the Pipeline Services Department of DNV GL USA, Inc. with more than 30 years of experience in pipeline safety issues. He is a former Chairman of the American Petroleum Institute ("API") Pipeline Integrity Committee and a former member of the API Operations Technical Committee. The substantial evidence cited in and attached to Mr. Godfrey's declaration documents DAPL's compliance with API standards. D.E. 538-4, at Ex. 1, Ex. 2; RAR 126, 206, 273-74. And his testimony in other proceedings further confirms the company's compliance with the applicable API standards. *See* Hearing Transcript at 329-31, Dakota Access, LLC, Dakota Access Pipeline Pump Station—Emmons Cty., Siting Application, Case No. 19-204 (N.D. Pub. Serv. Comm'n Dec. 30, 2019), https://psc.nd.gov/database/documents/19-0204/093-010.pdf.

- Plaintiffs fault Dakota Access for "wav[ing] away as irrelevant" "information related to the doubling of pipeline capacity." D.E. 565, at 4. But they never dispute that this information is *in fact* irrelevant to the pipeline's *current*, continued operation during remand because no increase in the pipeline's capacity has been approved, nor would it take effect in the near future. For the same reason, many of the requested materials regarding the increased capacity do not even exist yet. Neither PHMSA regulations nor the easement require updates to the FRP or WCD until the optimization of the pipeline's capacity (or any material change) goes into effect.

Plaintiffs do not want the relevant correspondence in the record, D.E. 565, at 4, because it shows they are not complying in good faith with the Court's directive to confer with Dakota Access about possible additional mitigation measures. Plaintiffs used this same approach: (1) during the original permitting process, D.E. 39, at 48 ("Suffice it to say that the Tribe largely refused to engage in consultations."); (2) when they delayed responding to the Corps during the last remand,

2

*see, e.g.*, D.E. 337, at 9-14 (explaining that the Corps' consultation efforts were rebuffed); and (3) when they refused to coordinate on response planning as this Court ordered, *see, e.g.*, D.E. 339, at 2, 12-21 (providing a "timeline of events showing that each Tribe has outright refused to participate in emergency response planning meetings").

Dakota Access confirms what it stated in its prior letter to Plaintiffs: they "already have in [their] possession or available to [them] information related to *seven* of the ten items [they] say are needed for such discussion, and other items that [they] requested have no bearing on this discussion." D.E. 564-1, at 4. Nonetheless, Dakota Access remains willing to engage with Plaintiffs on additional mitigation measures despite Plaintiffs' decision not to propose any since the Minute Order a month ago.

Respectfully submitted this 9th day of September, 2020.

By: */s/ William S. Scherman*
William S. Scherman
Miguel A. Estrada
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*