IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | Case No. 1:16-cv-1534-JEB |
| Plaintiff, | (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

**MOTION BY STANDING ROCK SIOUX TRIBE, CHEYENNE RIVER SIOUX TRIBE, OGLALA SIOUX TRIBE, AND YANKTON SIOUX TRIBE FOR CLARIFICATION AND A PERMANENT INJUNCTION**

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB)

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

BACKGROUND ......................................................................................................2

STANDARD OF REVIEW ........................................................................................2

ARGUMENT ..........................................................................................................3

    I.     AN INJUNCTION IS NOT NEEDED TO SUSPEND PIPELINE
          OPERATIONS......................................................................................3

    II.    THE TRIBES HAVE PREVAILED ON THE MERITS. ......................................7

    III.   THE TRIBES ARE IRREPARABLY HARMED BY CONTINUED
          OPERATION OF THE PIPELINE..........................................................9

          A.     Operation of an Unsafe Pipeline Constitutes Irreparable Harm. .................9

          B.     The Tribes are Irreparably Harmed by the Trauma of Continued
                 Government Violations of Law. ...............................................................14

          C.     Irreparable Harm to Tribal Self-Governance............................................16

    IV.   THE TRIBES' HARMS CANNOT BE REMEDIED WITH MONETARY
          DAMAGES........................................................................................18

    V.    THE BALANCE OF EQUITIES SUPPORTS AN INJUNCTION. ....................20

    VI.   THE PUBLIC INTEREST SUPPORTS AN INJUNCTION. ..............................21

CONCLUSION.........................................................................................................24

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - i

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
  988 F.2d (D.C. Cir. 1993) ...................................................................................4

*Am. Bioscience v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ...........................................................................4

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
  271 F. Supp. 2d 230 (D.D.C. 2003) ...................................................................21

*Amoco Prod. Co. v. Village of Gambell*,
  480 U.S. 531 (1987)......................................................................................18, 21

*Apache Corp. v. FERC*,
  627 F.3d 1220 (D.C. Cir. 2010) ...........................................................................4

*Archdiocese of Washington v. Washington Met. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) ..............................................................................3

*Banks v. Booth*,
  2020 WL 1914896 (D.D.C. April 19, 2020)........................................................12

*Brady Campaign to Prevent Gun Violence v. Salazar*,
  612 F. Supp. 2d 1 (D.D.C. 2009) ................................................................ *passim*

*Center for Biological Diversity v. Ross*,
  2020 WL 4816458 (D.D.C. 2020) .................................................................11, 12

*Center for Food Safety v. Vilsack*,
  2010 WL 1148449 (N.D. Cal. Nov. 30, 2010) ...................................13, 20, 21, 22

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ............................................................................18

*City of Oberlin v. FERC*,
  937 F.3d 599 (D.C. Cir. 2019) ..............................................................................4

*Confederated Tribes and Bands of Yakama Nation v. U.S.*,
  2010 WL 3434091 (E.D. Wa. Aug. 30, 2010) .....................................................13

*Davis v. Pension Ben. Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) .......................................................................3, 7

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - ii

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*Diné Citizens Against Ruining the Environment v. Bernhardt*,
   923 F.3d 831 (10th Cir. 2019) ........................................................................5

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006).................................................................................2, 3

*Equal Employment Opportunity Comm'n v. Chrysler*,
   733 F.2d 1183 (6th Cir. 1984) ....................................................................14

*Found. on Econ. Trends v. Heckler*,
   756 F.2d 143 (D.C. Cir. 1985)....................................................................22

*Fund for Animals v. Clark*,
   27 F. Supp. 2d 8 (D.D.C. 1998)............................................................15, 21

*Fund for Animals v. Norton*,
   281 F. Supp. 2d 209 (D.D.C. 2003)................................................15, 16, 21

*Government of Province of Manitoba v. Norton*,
   398 F. Supp. 2d 41 (D.D.C. 2005) ................................................................3

*Greater Yellowstone Coalition v. Flowers*,
   321 F.3d 1250 (10th Cir. 2003) ..................................................................11

*Helling v. McKinney*,
   509 U.S. 25 (1993).......................................................................................13

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2017)...................................................................16, 17

*Mashpee Wampanoag Tribe v. Bernhardt*,
   2020 WL 3034854 (D.D.C. June 5, 2020)...................................................17

*Massachusetts v. E.P.A.*,
   549 U.S. 497 (2007).....................................................................................17

*Menominee Tribe of Indians v. U.S*,
   391 U.S. 404 (1968).......................................................................................8

*Michigan v. U.S. Army Corps of Eng'rs*,
   667 F.3d 765 (7th Cir. 2011) .................................................................11, 12

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)................................................................................3, 5, 6

*Muckleshoot Indian Tribe v. Hall*,
   698 F. Supp. 1504 (W.D. Wash. 1988).......................................................23

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - iii

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*Nat'l Ass'n of the Deaf v. Trump*,
    2020 WL 5411171 (D.D.C. Sept. 9, 2020) ......................................................................12, 15

*Nat'l Parks Conservation Ass'n v. Semonite*,
    422 F. Supp. 3d 92 (D.D.C. 2019) ..............................................................................................5

*Nat'l Parks Conservation Ass'n v. Semonite*,
    916 F.3d 1075 (D.C. Cir. 2019) .................................................................................................2

*Nat'l Parks Conservation Ass'n v. Semonite*,
    925 F.3d 500 (D.C. Cir. 2019) ...................................................................................................5

*Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*,
    896 F.3d 520 (D.C. Cir. 2018) .........................................................................................6, 7, 23

*Prairie Band of Potawatomi Indians v. Pierce*,
    253 F.3d 1234 (10th Cir. 2001) ...............................................................................................17

*Pub. Emps. for Envtl. Responsibility v. U.S. Fish and Wildlife Service*,
    189 F. Supp. 3d 1 (D.D.C. 2016) ..............................................................................................4

*Realty Income Trust v. Eckerd*,
    564 F.2d 447 (D.C. Cir. 1977) .................................................................................................21

*Seminole Nation v. U.S.*,
    316 U.S. 286 (1942) ....................................................................................................................8

*Sierra Club v. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) .............................................................................................21

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ................................................................................................4

*Sierra Club v. Marsh*,
    872 F.2d 497 (1st Cir. 1989) ...................................................................................................22

*Sierra Club v. Van Antwerp*,
    719 F. Supp. 2d 77 (D.D.C. 2010) ............................................................................................4

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    255 F. Supp. 3d 101 (D.D.C. 2017) ..........................................................................................8

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    282 F. Supp. 3d 91 (D.D.C. 2017) ............................................................................................9

*Treasury Emps. Union v. U.S.*,
    101 F.3d 1423 (D.C. Cir. 1996) ..............................................................................................17

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - iv

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

*U.S. v. 2,005.32 Acres of Land*,
  160 F. Supp. 193 (D.S.D. 1958) ..........................................................................9

*U.S. v. Sioux Indians of Standing Rock Reservation*,
  259 F.2d 271 (8th Cir. 1958) ..............................................................................9

*U.S. v. Washington*,
  384 F. Supp. 312 (W.D. Wa. 1974) ...................................................................19

*U.S. v. Winans*,
  198 U.S. 371 (1905)..............................................................................................8

*Ute Indian Tribe v. Utah*,
  790 F.3d 1000 (10th Cir. 2015) .........................................................................17

*Van De Sande v. Van De Sande*,
  431 F.3d 567 (7th Cir. 2005) .............................................................................11

*Vencor Nursing Homes v. Shalala*,
  63 F. Supp. 2d 1 (D.D.C. 1999) ........................................................................14

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982)............................................................................................21

*Western Watersheds Project v. Zinke*,
  336 F. Supp. 2d 1204 (D. Id. 2018) ..................................................................22

*Whitaker By Whitaker v. Kenosha Unified School District No. 1*,
  858 F.3d 1034 (7th Cir. 2017) ...........................................................................14

*Winter v. NRDC*,
  555 U.S. 7 (2008)........................................................................................3, 9, 13

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985).....................................................................11, 20

*Wyandotte Nation v. Sebelius*,
  443 F.3d 1247 (10th Cir. 2006) .........................................................................17

**Federal Statutes**

Mineral Leasing Act,
  30 U.S.C. § 185.......................................................................................4, 5, 8, 21

**Regulations**

85 Fed. Reg. 55843 (Sept. 10, 2020) ........................................................................2

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - v

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

**Other Authorities**

Laila Kearney, *Dakota Access oil pipeline users downplay need for line to investors*, Reuters (Aug. 5, 2020) .............................................................................20

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.) .....................................................3

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - vi

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

INTRODUCTION

The Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Tribes") move for entry of a permanent injunction suspending operations of the Dakota Access Pipeline ("DAPL") under Lake Oahe pending completion of the court-ordered environmental impact statement ("EIS").   This Court has already found that both the law and the equities merit vacatur of the pipeline easement pending compliance with the National Environmental Policy Act ("NEPA").  With the pipeline now operating illegally, and the Corps poised to take no action, the case for suspending pipeline operations is even stronger. DAPL has operated for nearly four years, generating hundreds of millions of dollars for its owners, while exposing the Tribes to catastrophic risk and ongoing trauma that have never been subject to the scrutiny that NEPA requires.

While the Tribes do not concede that an injunction is necessary, they nonetheless meet the criteria for one.  Indeed, most of the injunction criteria have already been decided in the Court's previous orders.  The Tribes have prevailed on the merits, and the "seriousness" of the Corps' NEPA violation is well settled.  The Tribes are irreparably harmed by the ongoing operation of the pipeline, through the exposure to catastrophic risk, through the ongoing trauma of the government's refusal to comply with the law, and through undermining the Tribes' sovereign governmental role to protect their members and respond to potential disasters.  As to the balance of harms, this Court has already ruled that the economic and environmental impacts of closure—which the Tribes have shown to be seriously overstated—are outweighed by the risks and impacts of continued operations.  And the public interest is reflected in the enactment of NEPA as well as compliance with Treaties and protection of Tribal sovereignty.  Accordingly, this Court should enter an injunction suspending operation of the pipeline.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

BACKGROUND

In its March 2020 summary judgment decision, this Court ruled that the Corps violated NEPA by failing to prepare an EIS for authorizations allowing DAPL to cross under Lake Oahe. ECF 496 ("Merits Order"). The Court ordered the Corps to prepare an EIS, and that process has recently begun. 85 Fed. Reg. 55843 (Sept. 10, 2020). Following additional briefing, the Court ruled that the pipeline easement should be vacated, and the pipeline shut down and emptied, pending completion of the EIS. ECF 546 ("Vacatur Order"). The D.C. Circuit denied defendants' motion for a stay pending appeal as to this Court's merits and vacatur rulings, finding that appellants had not made a "strong showing of likely success on the merits." D.C. Cir. Doc. No. 1855206 (August 5, 2020) (*citing Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1087 (D.C. Cir. 2019)). However, "to the extent the district court issued an injunction," such injunction was stayed, as this Court "did not make the findings necessary for injunctive relief." *Id*. The Circuit further requested that the Corps "clarify" its position as to whether the pipeline would be able to continue operating "notwithstanding vacatur of the easement" and invited this Court to consider "additional relief if necessary." *Id*. While the Corps' position remains less than fully clarified, this Court has recognized that suspension of pipeline operations by the Corps is "unlikely," and entered a schedule for briefing on an injunction motion. ECF 567 at 1; ECF 568. Meanwhile, oral argument before the D.C. Circuit in the expedited appeal is scheduled for November 4, 2020.

STANDARD OF REVIEW

In *eBay Inc. v. MercExchange, L.L.C.*, the Supreme Court laid out the "four-factor test" for entry of a permanent injunction. A plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 2

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

warranted; and (4) that the public interest would not be disserved by a permanent
injunction.

547 U.S. 388, 391 (2006).  This test "applies when a plaintiff seeks a permanent injunction to

remedy a NEPA violation."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010);

*see also Winter v. NRDC*, 555 U.S. 7, 22 (2008) (plaintiffs must establish a "likelihood" of

irreparable harm).  These injunction factors are balanced such that a higher showing on one

factor can offset a lower showing on another factor.  *Davis v. Pension Ben. Guar. Corp.*, 571

F.3d 1288, 1292 (D.C. Cir. 2009).[1]  "Perhaps the most significant single component in the

judicial decision whether to exercise equity jurisdiction and grant permanent injunctive relief is

the court's discretion."  Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.).  An

injunction analysis in a NEPA case "should consider the rationale for injunctions, including the

need to prevent irreversible effect on the environment, until the possible adverse consequences

are known, and the need to preserve for the agency the widest freedom of choice when it

reconsiders its action after coming into compliance with NEPA." *Government of Province of*

*Manitoba v. Norton*, 398 F. Supp. 2d 41, 66-67 (D.D.C. 2005) (internal quotations omitted).

ARGUMENT

I.      AN INJUNCTION IS NOT NEEDED TO SUSPEND PIPELINE OPERATIONS.

As a threshold matter, this Court should clarify that pipeline operations must be

suspended pursuant to its vacatur order even without an injunction.  That is because allowing the

---

[1] While the D.C. Circuit has questioned the "sliding scale," cases applying it remain good law.
*Archdiocese of Washington v. Washington Met. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir.
2018); *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 12 (D.D.C.
2009) ("the Court finds that the D.C. Circuit's sliding scale standard remains viable even in light
of the decision in *Winter*").  The late Justice Ginsburg, in her dissent in *Winter*, observed without
objection that the majority did not limit a court's equitable discretion to balance the injunction
factors.  *Winter*, 555 U.S. at 51 (Ginsburg, dissenting)

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 3

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

pipeline to continue to operate without an easement, in violation of both NEPA and the Mineral Leasing Act, violates the law.  *Am. Bioscience v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) ("whether or not appellant has suffered irreparable injury, if it makes out its case under the APA it is entitled to a remedy").  Such a clarification is within the scope of the Circuit's stay order, which only stayed that portion of the order "to the extent" that it was, in fact, an injunction, and invited this Court to "consider additional relief" as needed.  Accordingly, this Court can clarify that its shutdown order is not an injunction but a component of its vacatur order.  Such a clarification is warranted because defendants' argument that a separate injunction is needed to give effect to vacatur was never presented below.

The vacatur analysis has always been premised on an assumption that the activity authorized by unlawful governmental action must cease.  This is the entire point of *Allied-Signal's* "disruptive consequences" inquiry, making vacatur hinge, in part, on what would happen if agency-authorized activity cannot proceed.  *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n,* 988 F.2d 146, 151 (D.C. Cir. 1993); *Pub. Emps. for Envtl. Responsibility v. U.S. Fish and Wildlife Service*, 189 F. Supp. 3d 1, 4 (D.D.C. 2016) ("Obviously the effect of vacatur is to stop these activities."); *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 79–80 (D.D.C. 2010) (issuing "partial vacatur" to block construction, with limited exceptions).  Thus, when the D.C. Circuit vacated a pipeline authorization due to a NEPA violation, surely it did not contemplate that the project would continue to be built.  *Sierra Club v. FERC,* 867 F.3d 1357, 1379 (D.C. Cir. 2017); *see also Apache Corp. v. FERC*, 627 F.3d 1220, 1223 (D.C. Cir. 2010) (refusing to vacate pipeline permit due to "disruptive consequences" of shutting it down); *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019) (declining to vacate pipeline authorization for "operational" pipeline due to disruption).  This point was particularly clear in the *Semonite* case: there was

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 4

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

never any dispute that the "disruptive consequences" of vacatur would stem from either stopping construction of the electrical towers or tearing them down. *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 502 (D.C. Cir. 2019). The district court in *Semonite* understood "disruptive consequences" the same way. *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 101 (D.D.C. 2019). Nowhere did these opinions hint that the project would be able to continue to operate despite vacated permits.

The Mineral Leasing Act requires a right of way for pipelines to cross federal lands. 30 U.S.C. § 185. The statute expressly preserves NEPA, *id.* § 185(h)(1), and requires appropriate plans "prior to granting" any authorization. *Id.* § 185(h)(2). Without an easement that meets the standards of NEPA, a pipeline cannot lawfully operate. The Corps acknowledges it cannot authorize the trespass during the remand without undertaking environmental review in accordance with NEPA, underscoring that vacatur means the trespass must cease. ECF 562 at 6. But now defendants seek judicial imprimatur on the ongoing operation of the pipeline without any authorization. Accepting this view would eviscerate the Mineral Leasing Act, NEPA, and the entire concept of vacatur. *See Diné Citizens Against Ruining the Environment v. Bernhardt*, 923 F.3d 831, 859 (10th Cir. 2019) ("Once the [permits] are vacated, drilling operations will have to stop because no drilling operations, nor surface disturbance preliminary thereto, may be commenced prior to APD approval") (internal quotations omitted).

In its stay order, the D.C. Circuit cited *Monsanto,* but that case supports the Tribes. *Monsanto* concerned a government authorization to deregulate (and thereby allow) the planting of genetically modified seeds without an EIS. The District Court in *Monsanto* vacated the deregulation decision, but also enjoined any partial deregulation and most private planting until the EIS was complete. *Id.* at 148. Notably, no party challenged vacatur, nor questioned whether

it operated to prevent the private action authorized by the deregulation decision.  Indeed, the

Court emphasized that an injunction was *not* needed because vacatur would by itself

"independently prohibit[] the growth and sale" of genetically modified seeds.  *Id*. at 165.

Issuance of an injunction was unnecessary in that case because vacatur alone afforded the relief

plaintiffs sought—stopping the action authorized by a vacated permit.  The same is true here.

       The D.C. Circuit's decision in *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*,

896 F.3d 520, 523 (D.C. Cir. 2018), also confirms that vacatur is sufficient to suspend pipeline

operations without an additional injunction.  There, the Nuclear Regulatory Commission found a

"significant deficiency" in the agency's NEPA compliance for a mining project, but nonetheless

left the license in place—allowing the project to proceed—because the Tribe did not show

"irreparable harm."  *Id*. at 531 ("The Agency thus conditioned enforcement of NEPA on a

showing of irreparable harm by the Tribe" despite a "significant deficiency" in the NEPA

review).  This Court rejected this approach.  "Nothing in NEPA's text suggests that the required

environmental analysis of a 'proposed' action is optional if a party does not prove that

'irreparable harm' would result from going forward before the agency completed a valid EIS."

*Id*. at 532.  Moreover, in defining a remedy, the *Oglala Sioux* court, like literally every other

court to ever consider the issue, assumed that "vacatur" of the license meant that the project

would not go forward.  *Id*. at 538.  Accordingly, this Court should clarify that the effect of its

vacatur order is suspension of pipeline operations, consistent with this longstanding law, even

without a separate injunction.

       The Tribes respectfully request an additional clarification of the vacatur order.  In its

vacatur motion, the Tribes requested that this Court vacate not just the easement but also the

§ 408 regulatory permit.  ECF 527 at 2 n. 1.  Vacatur of the § 408 permit is warranted because it

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 6

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

also indisputably relied on the invalidated environmental assessment.  USACE_DAPL 71185

("A decision on a Section 408 request is a federal action, and therefore subject to the National

Environmental Policy Act (NEPA) and other environmental compliance requirements.  An

Environmental Assessment was conducted and is attached.").  The Corps had nothing to say

about this request, while DAPL conceded that the "EIS standard and environmental impacts for

[the § 408 and Clean Water Act] authorizations would be the same" as the easement.  ECF 539 at

9 n.6.  This Court did not address this issue in its vacatur opinion.  In its argument to the Court of

Appeals, the Corps has argued that vacatur of a *regulatory* permit operates differently than a

*property* easement.  *See* Doc. No. 1864202 (filed Sept. 30, 2020) at 15 ("if the permit or license

is vacated, it necessarily followed that the project could not continue").  While the Tribes do not

agree that there is a difference between an easement and a regulatory permit in terms of the

impact of vacatur, under the Corps' argument, vacatur of the § 408 regulatory authorization

would mean the pipeline could not continue operations.  This would provide the relief that the

Tribes seek—without an injunction.  Such clarification is warranted in light of the D.C. Circuit's

invitation to consider "additional relief."

## II.    THE TRIBES HAVE PREVAILED ON THE MERITS.

It bears emphasis that the Tribes have not only prevailed on the merits, but that this Court

has already held that defendants' NEPA violations are so "serious" that vacatur of the easement

is warranted.  In fact, the Corps violated NEPA a second time after being given a year-long

opportunity to come into compliance along with a detailed roadmap on how to do so.  The fact

that the Tribes have so comprehensively prevailed on the merits weighs strongly in their favor in

the injunction analysis.  *Davis*, 571 F.3d at 1292.

The Corps' violations are even more consequential than acknowledged in this Court's

vacatur order.  In its 2017 summary judgment decision, this Court concluded that the Corps

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 7

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

discharges its trust obligations to the Tribes (the existence of which is undisputed) via compliance with NEPA and the Mineral Leasing Act. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 144–45 (D.D.C. 2017) ("*Standing Rock III*"). But now the Corps is in violation of these statutes. To the extent that compliance with these statutes served as a surrogate for the Corps' trust duty, its current non-compliance means that the Corps is also violating its trust obligations to the Tribes. The Corps' actions must be held to the "most exacting fiduciary standards," Solicitor Memo at 16, and its failure to meet such standards weighs in favor of an injunction.

In *U.S. v. Winans*, 198 U.S. 371 (1905), the U.S. Supreme Court recognized that the exercise of Treaty rights was "not much less necessary to the existence of the Indians than the atmosphere they breathed." The Tribes' rights to use and rely on the waters of Lake Oahe was not a right granted to them: it was a reservation of a right they already held and did not cede to the United States. *Id.* The United States has a fiduciary duty and "moral obligations of the highest responsibility and trust" to protect these waters. *Seminole Nation v. U.S.*, 316 U.S. 286, 297 (1942). Such rights cannot be abrogated without specific and express Congressional authority. *Menominee Tribe of Indians v. U.S*, 391 U.S. 404, 411–12 (1968). This case arises against the backdrop of the U.S. government's violations of the Treaties establishing the reservation through which this pipeline crosses, as well as its authorization of the Oahe dam, which flooded the best land on the Standing Rock and Cheyenne River Reservations only a few decades ago. 2nd Archambault Decl. ¶ 5 (ECF 107-1) (creation of Lake Oahe "was a devastating event in the life of the Tribe, causing vast economic and social hardship that continues to this day."); 3rd Archambault Decl. ¶¶ 12-16 (ECF 272-3) (discussing history of government oppression and dispossession). The Corps was a particularly "bad actor in the sordid history" of

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

the Missouri projects.  ECF 533 at 5.  Not only did it alter the project without authorization to

benefit non-Indians at the expense of the Tribes, it sought to condemn Standing Rock land

without any authority.  A court rejected such effort as "wholly repugnant to the entire history of

Congressional and judicial treatment of the Indians."  *U.S. v. 2,005.32 Acres of Land*, 160 F.

Supp. 193, 202 (D.S.D. 1958), *vacated as moot*, *U.S. v. Sioux Indians of Standing Rock*

*Reservation*, 259 F.2d 271, 271 (8th Cir. 1958).  The siting of DAPL, without adequate

disclosure and consideration of the potential impacts on the Tribes, on stolen land immediately

upstream of the Standing Rock Reservation, was what led to this controversy in the first place.

Solicitor Memo at 33 (DAPL permitting "did not comply with either the Corps' own Tribal

consultation policy or that of the United States Department of Defense.").  The Corps' violation

of NEPA, its chosen mechanism for discharging its trust responsibility, weighs strongly in favor

of an injunction.

III.   **THE TRIBES ARE IRREPARABLY HARMED BY CONTINUED OPERATION OF
       THE PIPELINE.**

      A.     Operation of an Unsafe Pipeline Constitutes Irreparable Harm.

      Since the inception of this case, this Court has understood that an oil spill would be

"devastating" to the Tribes, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F.

Supp. 3d 91, 105 (D.D.C. 2017), and that allowing the pipeline to continue despite the serious

violations of law offends the solemn obligations of the U.S. government to protect Tribal Treaty

rights and the integrity and safety of the Tribes' homelands.  *Id*.  Insofar as "the impact of such a

spill has been one of the Court's central concerns throughout the case," Vacatur Order at 20, it is

a critical consideration in evaluating the irreparable harm in this motion.

      This Court has already rejected the claim that concerns of accidents are merely

"speculative."  *Winter*, 555 U.S. at 22.  In its merits decision, this Court found that Tribal experts

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 9

raised "serious doubts" about the Corps' worst-case discharge calculation.  Merits Order, at 27.

The Corps "plainly [did] not succeed" in responding to "serious" concerns about leak detection

capacity.  *Id*. at 20.  The Corps failed to consider an operator safety record that "did not inspire

confidence." *Id*. at 23.  The district court identified "serious gaps in crucial parts of the Corps'

analysis" of spill risk.  *Id*. at 35.  In the remedy briefing, these claims were rejected anew.  The

Tribes presented evidence that the claims of safety "simply repeated, or expanded upon, the same

contested claims that the Tribe has been debunking throughout the process."  3rd Holmstrom

Decl. ¶ 9 (ECF 527-5).  The Tribe's expert Donald Holmstrom, a former federal safety regulator

who this Court has credited multiple times, concluded that "it is my expert opinion that

continued operation of DAPL, while an EIS is being prepared, presents untenable risks to the

Standing Rock Sioux Tribe and others who rely on Lake Oahe."  *Id*. ¶ 71.  Holmstrom described

DAPL's safety culture as "broken," and concluded that allowing it to continue operating "poses a

serious threat to people, property, and the environment."  *Id*. at ¶¶ 9-10 ("DAPL is an unusually

unsafe pipeline, managed by a corporate entity with an unusually troubled safety record"); *id*. at

¶ 23 (describing spill and integrity management record as "extremely troubling").  The Tribes

also documented violations of the Corps' easement and underlying regulations due to the lack of

location-specific operations and maintenance plans and integrity plans.  *Id*. ¶ 49-51; *see also id*. ¶

66 (documenting how lack of backup power at valves violates easement).

> These are serious breaches of the Corps' Lake Oahe DAPL easement conditions.  Safety
> critical equipment that may not be capable of closure, lack of essential procedures that
> are necessary to operate and maintain the pipeline, lack of plans that prevent mechanical
> integrity failures, all are necessary for the prevention of spills into the Lake Oahe high
> consequence area.

*Id*.

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 10

A different Tribal pipeline expert similarly concluded that the pipeline presents "unacceptable risk" and "should not be operating" due to the documented lack of surge relief systems to protect the Oahe crossing. Flanders Decl. ¶¶ 8-9 (ECF 527-9). DAPL's own documentation found an "unacceptable" deficiency in surge protections that was inconsistent with regulatory requirements. *Id*. ¶ 16. This expert likewise concluded that "the Dakota Access pipeline poses an unacceptable risk to the Standing Rock Sioux Tribe…" *Id*. ¶ 20; *see also* 2nd Flanders Declaration (filed herewith) (responding to DAPL critiques of testimony).

Events with a lower probability of occurring, but catastrophic consequences if they do, occupy a special place in the law. *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (holding that a "plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative"); *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005) ("The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes."). Courts must "not merely apply the four-factor test in a rote fashion," but exercise their equitable discretion to balance the probability and the consequences of harm on the facts of each case. *Center for Biological Diversity v. Ross*, 2020 WL 4816458, at *10 (D.D.C. 2020); *see also Wis. Gas Co.*, 758 F.2d at 674 (D.C. Cir. 1985) (irreparable harm standard "does not readily lend itself to definition"). For example, in *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 781 (7th Cir. 2011), the court granted an injunction enjoining the Corps to take measures to prevent the migration of exotic species into Lake Michigan. "We need not wait to see fish being pulled from the mouth of the Chicago River every day before concluding that a threat of a nuisance exists. It is enough that the threat is substantial and that it may be increasing with each day that passes." While the Court understood that "no one knows whether this irreparable harm will come to pass," it properly

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 11

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

focused on the severity of the impacts and the impossibility of remedying them if they happened.
*Id*. at 789.  It was sufficient that there was a "presently existing actual threat" of a serious and
irreparable harm, rather than "some remote future injury."

This Court's recent analysis in *Nat'l Ass'n of the Deaf v. Trump*, 2020 WL 5411171, at
*10 (D.D.C. Sept. 9, 2020) reinforces the point.  This Court found that hearing-impaired
plaintiffs had shown a likelihood of harm from the absence of sign-language interpreters at
White House briefings on the pandemic.  Due to their inability to understand the briefings, "they
will suffer irreparable harm because they will be 'denied timely access to ... critical information,
leaving them less able to comply with current orders and advice, less able to prepare for the
future, and more anxious about current conditions and the future.'"  *Id*.  The Court did not
engage in, or need to engage in, a statistical analysis to calculate the precise likelihood that any
individual would suffer an actual injury.  Instead, it understood that the violation of the law,
coupled with the exposure to an increased risk of harm, was sufficient for purposes of an
injunction.

Injunctions are issued under these kinds of facts all the time.  For example, in *Banks v.
Booth*, 2020 WL 1914896, at *11 (D.D.C. April 19, 2020), this Court issued an injunction
against the D.C. prison system for failing to adequately protect prisoners against the coronavirus,
finding that the risk of contracting COVID-19 was "the prototypical irreparable harm."  Again,
the Court made no findings about the actual probability that any specific prisoner would catch
the disease, but just found the harm serious and unreasonable.  *Id*.; *see also Brady Campaign*,
612 F. Supp. 2d at 26 (finding "irreparable harm" in NEPA case from increased risk of gun use
in national parks even though "precise scope" of harm is not known); *Center for Biological
Diversity*, 2020 WL 4816458, at *10-11 ("essentially probabilistic reasoning" of potential harm

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 12

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

to right whales sufficient for finding of irreparable harm); *Center for Food Safety v. Vilsack*, 2010 WL 1148449 at *3 (N.D. Cal. Nov. 30, 2010) (finding irreparable harm from approval of genetically modified seeds because there were sufficient examples of contamination of other seeds: "These incidents are too numerous for this Court to declare confidently that these permits provide sufficient containment to protect the environment"); *Confederated Tribes and Bands of Yakama Nation v. U.S.*, 2010 WL 3434091 (E.D. Wa. Aug. 30, 2010) (permit for disposal of garbage near Indian reservation enjoined because of unquantified risk of introduction of exotic species); *accord Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.  The Courts of Appeals have plainly recognized that *a remedy for unsafe conditions need not await a tragic event*.") (emphasis added).

Moreover, to the extent that the precise probability, timing, and location of a potential incident is unknown, this is in part due to the Corps' violations of NEPA.  As this Court found, the Corps has never conducted a legally sufficient and independent evaluation to assess risk.  A "plaintiff's injuries are not minimized or eliminated simply because the precise effects of the [agency action] are unknown."  *Brady Campaign* 612 F. Supp. 2d at 25.  "This lack of precision is the result of [the agency's] failure to conduct an environmental evaluation prior to promulgating the Final Rule, and it does not constitute an impediment to Plaintiffs' showing of irreparable harm."  *Id*., *citing Winter*, 555 U.S. at 23 ("[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures"); *Center for Food Safety*, 2010 WL 1148449 at *3 (harm to defendants caused by failure to comply with NEPA).

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-01534-JEB) - 13

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

As the Solicitor confirmed, pipelines leak and spill all the time.  Solicitor Memo at 28-30 ("With hundreds of 'significant' pipeline incidents per year, and with even comparatively 'insignificant' spills still able to affect tribal treaty rights, it is difficult to assume that the risk of such incidents in the DAPL context would not be reasonably foreseeable.").  As this Court has recognized, the Corps has not and cannot assure that such an incident will not occur.  Merits Order, at 33 (citing *RMS Titanic* and Chernobyl disasters).  The pipeline that DAPL is part of has suffered from twelve spills, totaling six thousand gallons and $200,000 in property damage, in its short lifespan.  3rd Holmstrom Decl., ¶ 18.  It is not possible to predict where or when the next pipeline spill will occur—just as it is not possible to predict where and when any specific defective airplane of a mismanaged airline will crash.  This inability to make such granular predictions does not deprive this Court of its equitable powers to prevent a serious threat of a catastrophe.

      B.    <u>The Tribes are Irreparably Harmed by the Trauma of Continued Government Violations of Law.</u>

Courts routinely weigh the "irreparable harm" of psychological damage, emotional distress, or trauma in evaluating requests for injunctions.  *See, e.g., Equal Employment Opportunity Comm'n v. Chrysler*, 733 F.2d 1183 (6th Cir. 1984) (enjoining "involuntary retirement" because it caused "emotional distress, depression, increased drug use, decrease in feelings of a useful life, a contracted social life…and reduced sense of well-being"); *Whitaker By Whitaker v. Kenosha Unified School District No. 1*, 858 F.3d 1034, 1045 (7th Cir. 2017) (injunction warranted where plaintiff faced "diminished well-being and life-functioning" through "psychological stress"); *Vencor Nursing Homes v. Shalala*, 63 F. Supp. 2d 1, 12 (D.D.C. 1999) (a "court may consider subjective, psychological harm in its irreparable-harm analysis"); *Brady Campaign*, 612 F. Supp. 2d at 25 (crediting the declarants' concern for "personal safety in parks

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 14

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

and refuges" due to the presence of guns allowed by a rule change, leaving them unable to "fully

enjoy their visits"); *see also Nat'l Ass'n of the Deaf*, 2020 WL 5411171, at *10 (plaintiffs

irreparably harmed because they would be "more anxious" about pandemic).  Injunctions against

animal hunts have been issued based on the harm that would be caused by viewing or even

contemplating the killing of animals.  *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 221-22

(D.D.C. 2003); *Fund for Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (plaintiffs "would

suffer an aesthetic injury" from "seeing or contemplating" bison deaths).

There is undisputed evidence before this Court that the impacts of living under the

existential threat of a pipeline incident are not just harmful, they are uniquely serious in Tribal

communities.  Faith Spotted Eagle is a Yankton Sioux Tribal member and post-traumatic stress

disorder counselor who specializes in this issue.  Spotted Eagle Decl. (ECF 292-1) ¶ 2.  As she

explains, "the single biggest element that assists Native people in healing from government-

inflicted historical trauma is a sense of safety and well-being.  This is well documented in all

trauma research…"  *Id*. at 5.  However, this sense of safety is compromised by the operation of

the pipeline.  Tribal communities along the river are already deeply stressed by a combination of

poverty, ill health, environmental contamination, and loss of culture.  "Adding an additional

stress to our communities, through even perceived contamination of our water resources, can be

a tipping point for the success, sustainability, and way of life of our people."  *Id*. at 8.

Other undisputed evidence supports the anxiety, trauma, and stress of living under a

"sword of Damocles."  For example, the Cheyenne River Sioux Tribal Historic Preservation

Officer Steve Vance explained how "the pipeline's ongoing presence, and the looming threat of

seepage, leak, and rupture that necessarily accompanies it, inflicts ceaseless anxiety upon us that

will not end until the pipeline is removed."  Vance Decl. ¶ 17 (ECF 527-10); Eagle Decl. ¶ 7

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-01534-JEB) - 15

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

(ECF 6-2) (describing the "deep, spiritual hurt" arising from the loss of culturally significant

sites).  Former Standing Rock Chairman Archambault described in detail how the shameful

history of government dispossession in his community "takes a significant toll on our physical

and mental health."  "Many of the health challenges that we face today have been linked, in

significant scientific studies, to the historic traumas that we have faced."  2nd Archambault Decl.

¶ 17-18 ("The traumas of our ancestors are passed down across the generations and impact us

today").  Allowing the pipeline to operate "would reinforce the deeply held understanding that

the historic wrongs committed by the United States against us will continue and that our voices

will not be heard in ways that matter by those who have the power to stop the harm to our

people.  In my view, that would be a terrible blow to our people, and it would have major and

lasting physical and emotional consequences."  *Id.*; *see also* 3rd Archambault Decl. ¶ 18 ("The

Tribe has faced terrible mistreatment at the hands of the federal government across many

generations.  This history impacts our people today – as the traumas our ancestors faced

contribute to significant social problems today."); *see also* ECF 533 (Tribal amicus brief) at 4-6;

4th Eagle Decl. ¶ 13.

     "Damocles's sword does not have to actually fall on all appellants before the court will

issue an injunction."  *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2017).  If the

"mere contemplation" of killing swans constitutes irreparable harm for purposes of an injunction,

*Fund for Animals*, 281 F. Supp. 2d at 221, surely the stress of living under an existential

catastrophe and the trauma of another instance of the U.S. government prioritizing profit over

Tribal Treaty rights should too.

     C.    <u>Irreparable Harm to Tribal Self-Governance.</u>

     Finally, the Tribes are irreparably harmed because the Corps' NEPA violations have

undermined the Tribes' sovereign governmental role to protect their citizens, respond to

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 16

disasters, and mitigate harm.  Sovereigns, like Tribes and states, are entitled to "special

solicitude" in the enforcement of procedural rights guaranteed under federal law.  *Massachusetts*

*v. E.P.A.*, 549 U.S. 497, 520 (2007).  Courts frequently find that an intrusion onto Tribal

sovereignty qualifies as irreparable injury for purposes of an injunction.  *See, e.g., Wyandotte*

*Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006); *Ute Indian Tribe v. Utah*, 790 F.3d

1000, 1005 (10th Cir. 2015) (rejecting argument that state's disrespect for Tribal sovereignty was

"speculative") (Gorsuch, J.).  Injuries to Tribal sovereignty are irreparable because they are not

easily subject to valuation and cannot be compensated with money damages.  *Prairie Band of*

*Potawatomi Indians v. Pierce,* 253 F.3d 1234, 1252 (10th Cir. 2001).  For example, the loss of

sovereignty over Tribal land is unquestionably an irreparable harm.  *Mashpee Wampanoag Tribe*

*v. Bernhardt*, 2020 WL 3034854 (D.D.C. June 5, 2020), at *3.  Similarly, this Circuit has also

recognized that an organization is irreparably harmed if defendants' actions have "perceptibly

impaired" the organization's functioning and programs.  *League of Women Voters*, 838 F.3d at

8; *Treasury Emps. Union v. U.S.*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (question is whether

defendant "has made the organization's activities more difficult").

    These precedents support an additional basis for finding harm here.  The plaintiff Tribes

are sovereign governments, responsible for the well-being of Tribal citizens and the preservation

of Tribal culture.  2nd Archambault Decl. ¶¶ 6-9.  The Standing Rock Sioux Tribe, for example,

runs an emergency management department that must prepare for and would be on the front lines

of responding to any spill in Lake Oahe.  Ward Decl. (ECF 312), ¶¶ 2-3.  But the Corps' NEPA

violations have undermined the Tribe's ability to perform this critical function.  As this Court has

documented, "serious gaps in crucial parts of the Corps' analysis" remain unfilled, leaving major

questions around the likelihood of a spill, its size, and the severity of its impacts unanswered.

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 17

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Merits Order, at 35.  The inadequately calculated worst-case discharge makes spill response planning more difficult and "places emergency responders at risk."  2nd Ward Decl. ¶ 6 (ECF 527-9).  The Tribe's emergency management department never had any substantial involvement in spill planning.  *Id*. ¶ 3.[2]  These concerns are even greater in light of DAPL's plans to double capacity of the pipeline, which will render existing spill plans invalid and increase both the risks and impacts for the Tribe.  *Id*. ¶ 5.  The Tribe still has never received adequate information about the specific chemical composition of the crude being carried in the pipeline, despite years of asking.  *Id*.  Such information is critical to mounting a safe and effective response.  *Id*. ¶¶ 7-8.  The Tribe is also hindered from protecting the "thousands" of sacred and ceremonial sites that would be at risk in a spill, the loss of which would "decimate" the Tribe's culture.  *Id*. ¶ 10-12.  Such interference with Tribal operations—which are at the very core of their governmental role to protect Tribal citizens—supports an injunction too.

## IV.   THE TRIBES' HARMS CANNOT BE REMEDIED WITH MONETARY DAMAGES.

The proper focus of an injunction analysis is not the precise probability of harm, or even its scope.  Rather, the key question is its "irreparability," i.e., whether it can be remedied with monetary or other compensation.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  When it comes to harm to the environment, that question mostly answers itself.  "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor issuance of an

---

[2] In fact, when the Tribe's emergency managers first saw the spill response plan prepared by DAPL, they learned that the plan called for oil to be collected on the *Reservation* side of Lake Oahe—without any consideration of Tribal cultural or economic sites and without any coordination with the Tribe.  Ward Decl. ¶ 5-9.  The plan also contained major errors, such as mis-locating the nearest medical facility.  *Id*.  Proposed collection sites were near Tribal schools and economic enterprises.  *Id*. ¶ 13.

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 18

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

injunction to protect the environment." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). The irreparability of harm is further heightened when the environmental harm would involve the loss of a Treaty-protected right—like the use of the waters of Lake Oahe for ceremonial, subsistence, or economic purposes. *U.S. v. Washington*, 384 F. Supp. 312, 404 (W.D. Wa. 1974) (treaty rights are "unique," "and the damages that have been or will be sustained are not susceptible of definite monetary determination"). Similarly, the trauma, stress, and interference with Tribal sovereignty caused by ongoing pipeline operations cannot be remedied with money.

From the beginning of this litigation, the Tribes have sought to reinforce the centrality of Lake Oahe to their ceremonies, their economy, and their identity. 2nd Archambault Decl. ¶ 7-8. The Tribes' statement of water's importance—*Mni Wiconi*, Lakota for "water is life"—confirms that this case has never been about money, nor could money ever resolve the harm of an oil spill that disrupts Tribal ceremonies and cultural traditions, which anchor Tribal members in their identities and histories. The Interior Solicitor emphasized this in her 2016 opinion: the reservations alongside Oahe are "the permanent and irreplaceable homelands for the Tribes. Their core identity and livelihood depend upon their relationship to land and the environment— unlike a resident of Bismarck, who could simply relocate if the DAPL pipeline fouled their water supply, Tribal members do not have the luxury of moving away from an environmental disaster without also leaving their ancestral territory." Solicitor Memo at 30. Money could never compensate the Tribes for the harms imposed from ongoing operation of the pipeline.

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 19

V.      THE BALANCE OF EQUITIES SUPPORTS AN INJUNCTION.

The Tribes have already extensively discussed the economic and environmental impacts of shutting down the pipeline.[3]  In its 2020 vacatur decision, this Court agreed that the claimed economic impacts, while worthy of consideration, do not outweigh the other equitable factors. Vacatur Order, at 14-23; *see also Wis. Gas*, 758 F.2d at 674 ("It is also well settled that economic loss does not, in and of itself, constitute irreparable harm.").  The Court has twice rejected the claim that suspending pipeline operations would increase environmental risks. Vacatur Order, at 22-23.  Moreover, this Court has agreed, on two occasions, that "the fact that Dakota Access did assume much of its economic risk knowingly" shifts the equities against it. *Id*. at 23; *Center for Food Safety*, 2010 WL 1148449 at *4 (defendants' "advanced knowledge of Plaintiffs' position and likely litigation regarding the permits renders their assertions regarding potential economic harm less than convincing").

Nothing has changed to alter these findings.  The Tribes' predictions about the oil market and the limited impacts of suspending operations have proven accurate.  *See* Ex. 1 to 2nd Fagan Decl. (filed herewith).  The Tribes' showing that oil producers in North Dakota will easily work around a DAPL closure has been confirmed *by the companies themselves*: for example, the chief executive of Hess oil was quoted as telling investors that it "would not have a major impact on moving all of our production if DAPL were shut in, and the cost to us would be a few dollars per barrel."  Laila Kearney, *Dakota Access oil pipeline users downplay need for line to investors*,

---

[3] Rather than repeat this discussion, the Tribes incorporate by reference the briefing and supporting evidentiary materials submitted on the Tribes' 2017 and 2020 vacatur motions.  The Tribes also respectfully urge this Court to take into account the *amicus* declarations supporting vacatur.  *See, e.g.,* ECF 533 (Tribal governments and organizations); ECF 521-1 (Members of Congress).

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 20

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Reuters (Aug. 5, 2020).[4]  Moreover, the case for allowing the pipeline to operate is even weaker

than before, because the pipeline is operating illegally with the blessing of the Corps—without

the easement required by the Mineral Leasing Act, and without the EIS required by NEPA.

Defendants "have not cited to, and the Court [will not be able to] find, any authority directing the

Court to consider potential economic impacts from [an activity] that is not currently legal."

*Center for Food Safety,* 2010 WL 11484449 at *3.  The balance of harms weighs in favor of an

injunction.

## VI.   THE PUBLIC INTEREST SUPPORTS AN INJUNCTION.

The public interest also supports an injunction.  Here, the relevant "compelling public

interest" is reflected in Congress's enactment of NEPA.  *Realty Income Trust v. Eckerd*, 564

F.2d 447, 456 (D.C. Cir. 1977); *Brady Campaign*, 612 F. Supp. 2d at 26 ("there is no question

that the public has an interest in having Congress' mandates in NEPA carried out accurately and

completely"); *Fund for Animals*, 27 F. Supp. 2d at 8, 15.  Taking NEPA's purposes into account

when crafting a remedy is, in fact, mandatory.  *Amoco Prod. Co.*, 480 U.S. at 531, 545;

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 315 (1982).  Because the "public interest"

question is so closely intertwined with the merits in a NEPA case, *Sierra Club v. Army Corps of

Eng'rs*, 990 F. Supp. 2d 9, 43 (D.D.C. 2013), this factor also strongly tips in the Tribes' favor.

*Id.; see also Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 261 (D.D.C. 2003)

("Public interest weighs in favor of protecting ecosystems over avoiding economic harms.").

---

[4] That is a substantially different message than the one Hess's general manager offered in a
sworn declaration to this Court, which asserted that shutdown would "fundamentally and
detrimentally impact Hess's operations in North Dakota," that there is "no practical alternative or
efficient way to transport the volume of oil that is currently being produced there," and that a
shutdown "will likely require Hess to shut in a portion of its production in North Dakota."  *See*
Lohnes Decl. ¶ 13 (ECF 501-3).

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 21

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

The procedural "harm" of a NEPA violation "is certainly a relevant consideration" in the injunction analysis. *Brady Campaign*, 612 F. Supp. 2d at 24; *Fund for Animals v. Norton*, 281 F. Supp. 2d at 221 ("procedural harm" of NEPA violation "does bolster plaintiffs' case for" an injunction). As the D.C. Circuit has emphasized:

> The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency before major federal actions occur. *If plaintiffs succeed on the merits, then the lack of an adequate environmental consideration looms as a serious, immediate, and irreparable injury.* Although the balancing of this harm against other factors is necessarily particularized, the injury itself is clear.

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985) (citations omitted) (emphasis added); *Sierra Club v. Marsh*, 872 F.2d 497, 500-04 (1st Cir. 1989) (Breyer, J.) ("the harm consists of the added risk to the environment that takes place when governmental decision-makers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment…as time goes on, it will become ever more difficult to undo an improper decision"); *Center for Food Safety*, 2010 WL 1148449 at *4 ("Failing to conduct the required environmental review and depriving Plaintiffs and the public of the opportunity to participate in the NEPA process at a time when such participation is required and is calculated to matter constitutes irreparable harm."); *Western Watersheds Project v. Zinke*, 336 F. Supp. 2d 1204, 1241 (D. Id. 2018).

Here, the Tribes have been deprived of the full and independent disclosure of risks, careful consideration of Treaty impacts, and analysis of route alternatives that should have been provided in an EIS. Indeed, these are the exact issues that would have been assessed in the 2017 EIS process had the Trump administration not cancelled it. The Corps has "broad discretion" to grant or decline a pipeline easement. Solicitor Memo at 3. That discretion should have been informed by a clearer and more objective understanding for the risks and impacts on the Tribes'

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-01534-JEB) - 22

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

rights—but never was.  *Id.*  Because of that reversal, the Tribes remain exposed to risks that have

never been fully and fairly evaluated as the law requires.  The Solicitor Memo lays out specific

things that the Corps must provide in order to meet its legal obligations, from an "independent"

review of catastrophic impacts, to detailed assessments of Tribal hunting and fish consumption,

to route alternatives that do not burden the Tribe.  *Id.* at 19, 25, 30.  The Corps' failure to comply

with NEPA and its trust obligations allows DAPL to continue to make unchecked claims about

the pipeline's safety and the impacts of shutting it down.  *Id.* at 26 ("the rationale for putting the

pipeline at Lake Oahe is based on representations from the applicant with no input from the

Tribes").  These procedural harms bolster the Tribes' case for an injunction.

The public interest further weighs in favor of an injunction because of the Treaty rights

and Tribal sovereignty values at stake.  *Muckleshoot Indian Tribe v. Hall*, 698 F. Supp. 1504,

1516 (W.D. Wash. 1988) ("the enforcement of rights that are reserved by treaty to the Tribes is

an important public interest, and it is vital that the courts honor those rights.").  A public interest

analysis "should consider the undisputed facts that the Tribes lost aboriginal territory in the area

in question to homesteading and other uses, followed by flooding and alteration of their

environment for a massive federal reservoir and flood control project…"  Solicitor Memo at 32.

Allowing the pipeline to continue operating despite these legal violations would offend the

solemn obligations of the government to protect Tribal interests, and would unlawfully prioritize

economic interests over Treaty rights.  2nd Archambault Decl. ¶ 6 ("In every era, when the

United States responds to demands from those seeking to advance particular economic

interests—for gold in the Black Hills, for land for non-Indian homesteaders on our Reservation,

or for navigation or hydropower—it has always been the Tribe that has borne the heavy burdens,

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-01534-JEB) - 23

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

through the loss of our lands and harm to our way of life."). There is no public interest in the operation of an illegal pipeline, at the expense of the Tribes.

The public interest, embodied in NEPA and the government's trust duties, cannot be satisfied in this case by a remedy that allows the pipeline to continue operating without either an easement or an EIS. NEPA "does not permit an agency to act first and comply later." *Oglala Sioux*, 896 F.3d at 523, 536. This Court's previous vacatur order agreed that allowing the pipeline to continue operating despite a violation of NEPA would "subvert the structure of NEPA." Vacatur Order, at 18. This factor too weighs strongly in favor of an injunction.

CONCLUSION

For the foregoing reasons, the Court should: a) CLARIFY that the legal effect of vacatur is that pipeline operations must be suspended; b) CLARIFY that its previous vacatur order includes the § 408 permit; and c) GRANT the Tribes' motion for a permanent injunction.

Dated:  October 16, 2020

Respectfully submitted,

/s/Jan E. Hasselman
Jan E. Hasselman, WSBA # 29107
(*Admitted Pro Hac Vice*)
Patti A. Goldman, DCB # 398565
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Telephone: (206) 343-7340
jhasselman@earthjustice.org
pgoldman@earthjustice.org
*Attorneys for Standing Rock Sioux Tribe*

/s/ Nicole E. Ducheneaux
Nicole E. Ducheneaux, DC Bar No. NE001
Big Fire Law & Policy Group LLP
1404 South Fort Crook Road
Bellevue, NE 68005

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 24

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

Telephone: (531) 466-8725
Facsimile: (531) 466-8792
nducheneaux@bigfirelaw.com
*Attorney for Cheyenne River Sioux Tribe*


*/s/ Michael L. Roy*
Michael L. Roy (DC Bar No. 411841)
mroy@hobbsstraus.com
Jennifer P. Hughes (DC Bar No. 458321)
jhughes@hobbsstraus.com
Elliott A. Milhollin (DC Bar No. 474322)
emilhollin@hobbsstraus.com
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC  20036
Telephone: (202) 822-8282
Facsimile: (202) 296-8834
*Attorneys for Oglala Sioux Tribe*


*/s/ Jennifer S. Baker*
Jennifer S. Baker, OKBA #21938
(Pro Hac Vice)
Jeffrey S. Rasmussen, WA #21121
(Pro Hac Vice)
Patterson Earnhart Real Bird & Wilson LLP
357 S. McCaslin Blvd., Suite 200
Louisville, CO 80027
Phone:  (303) 926-5292
Facsimile:  (303) 926-5293
Email: jbaker@nativelawgroup.com
Email: jrasmussen@nativelawgroup.com


*/s/ Rollie E. Wilson*
Rollie E. Wilson  (D.C. Bar No. 1008022)
Patterson Earnhart Real Bird & Wilson LLP
601 Pennsylvania Avenue, NW
South Building, Suite 900
Washington, D.C. 20004
Phone: (202) 434-8903
Facsimile: (202) 639-8238
Email: rwilson@nativelawgroup.com
*Attorneys for Yankton Sioux Tribe and Robert
Flying Hawk*

MOTION AND MEMORANDUM FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 25

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 16, 2020, I electronically filed the foregoing MOTION
AND MEMORANDUM FOR CLARIFICATION AND A PERMANENT INJUNCTION with
the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the
attorneys of record and all registered participants.


*/s/ Jan E. Hasselman*
Jan E. Hasselman

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*