UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Standing Rock Sioux Tribe,<br><br>　　　　Plaintiff,<br><br>and<br><br>Cheyenne River Sioux Tribe,<br><br>　　　　Plaintiff-Intervenor,<br><br>　　vs.<br><br>U.S. Army Corps of Engineers,<br><br>　　　　Defendant-Cross-<br>　　　　Defendant,<br><br>and<br><br>Dakota Access, LLP,<br><br>　　　　Defendant-Intervenor-<br>　　　　Cross-Claimant. | **Civil No. 1:16-cv-01534-JEB<br>(Consolidated with 1:16-cv-01796<br>and 1:17-cv-00267)** |

**AMICUS BRIEF OF THE STATE OF NORTH DAKOTA
IN SUPPORT OF DEFENDANTS AND OPPOSING
PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION**

Wayne Stenehjem
Attorney General of North Dakota
Matthew A. Sagsveen
Solicitor General
OFFICE OF THE ATTORNEY GENERAL
500 North 9th Street
Bismarck, ND 58501-4509
701-328-3640
Attorneys for the State of North Dakota

## CORPORATE DISCLOSURE STATEMENT

The State of North Dakota is a state government, not a corporation, and therefore no corporate disclosure statement is required under LCvR 7(o)(5) or Fed. R. App. P. 29(a)(4)(A).

## TABLE OF CONTENTS

**Page(s)**

Table of Authorities ................................................................................................. ii

Statement of Amicus Curiae and Introduction ................................................. 1

Argument ..................................................................................................................... 2

I.      Shutting Down DAPL Would Cause Immediate, Severe Harm To
        North Dakota, Third Parties, And The Public Interest ...................................... 2

        A.      North Dakota Citizens Will Suffer Immediate And Severe
                Harms From Reduced Tax Revenue ........................................................ 2

        B.      Innocent Third Parties Will Suffer Immediate And Severe
                Harms .......................................................................................................... 7

II.     These Definite Harms Far Outweigh Any Speculative Harm To
        Plaintiffs ...................................................................................................................... 11

Conclusion ..................................................................................................................... 13

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

Henke v. Dep't of the Interior,
    842 F. Supp. 2d 54 (D.D.C. 2012) .................................................................... 11

Winter v. Nat. Res. Def. Council, Inc.,
    555 U.S. 7 (2008) ................................................................................................ 2


**Statutes**

LCvR 7(o)(1) ................................................................................................................ 1


**Other**:

Fed. judge orders Dakota Access Pipeline shut down, Bismarck Tribune
(July 6, 2020)............................................................................................................ 11

News Release, PSC Approves Permit for Dakota Access Pipeline Pump
Station in Emmons Cty., N.D. Pub. Serv. Comm'n (Feb. 19, 2020)...................... 12-13

N.D. Legislative Council, Oil & Gas Tax Revenues Monthly Update
(Oct. 2020) ............................................................................................................... 5

N.D. Office of Mgmt. & Budget, Legislative Appropriations 2019-2021
Biennium, 2 (2019) .................................................................................................. 6

N.D. State Water Comm'n, Today's Missouri River: A N.D. Perspective
(2011)........................................................................................................................ 12

N.D. State Water Comm'n, A Reference Guide to N.D. Waters
(2014)........................................................................................................................ 12

N.D. Water Comm'n & State Eng'r, Missouri River Basin and James
River Basin ............................................................................................................... 11-12

## STATEMENT OF AMICUS CURIAE AND INTRODUCTION

The State of North Dakota (the "State" or "North Dakota") submits its third amicus brief before this Court in support of the United States Army Corps of Engineers (the "Corps") and Dakota Access, LLC ("Dakota Access").[1]   The Court should deny Plaintiffs' Motion for a Permanent Injunction.   Shutting down the Dakota Access Pipeline ("DAPL") would cause significant and immediate irreparable harm to the State and its citizens.   It would result in literally billions of dollars in losses to North Dakota's oil industry and cause drastic reductions in North Dakota's tax revenue.   Budgets for State programs critical to the well-being of North Dakotans would be slashed, impairing the State and its residents.   Further, thousands of North Dakotans would lose employment that DAPL makes possible.   The State's economy, and its economic recovery, would be stymied so long as DAPL remains idle.   Rather than dismiss these definite, negative consequences, this Court should carefully weigh them against the entirely speculative potential harm of a spill or leak posited by Plaintiffs.   Because the harm to North Dakota and other third-parties vastly outweighs the speculative harm to Plaintiffs, the factors of harm to others and the public interest weigh sharply against an injunction.   This Court should deny Plaintiffs' motion.

---

[1] The State of North Dakota is authorized by LCvR 7(o)(1) to file an amicus brief without consent of the parties and without leave of Court.

## ARGUMENT

Injunctive relief is an "extraordinary remedy" and Plaintiffs do not meet the necessary requirements to obtain it. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The standard for a permanent injunction requires a movant to show (1) actual success on the merits; (2) that they are "likely to suffer irreparable harm" absent injunctive relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Id.* at 20. The State's brief focuses on the latter two requirements. For the reasons set forth below, the balance of the equities are sharply against the Plaintiffs' and a shutdown would not be in the public interest. Taking DAPL offline will harm thousands of North Dakota citizens through the reduction of oil and gas tax revenues that fund critical government services. And independent from cuts to tax revenue, innocent third parties that have reasonably relied on DAPL's availability would be harmed if DAPL is shutdown. These immediate, severe and definite harms outweigh the speculative harms that form the basis of Plaintiffs' request. Thus, the Court should rule in favor of the Corps and Dakota Access.

I.    **Shutting Down DAPL Would Cause Immediate, Severe Harm To North Dakota, Third Parties, And The Public Interest**

   A.    **North Dakota Citizens Will Suffer Immediate And Severe Harms From Reduced Tax Revenue.**

As previously explained, North Dakota is a small state in terms of population and overall economic output, and it relies extensively on oil and gas production to support its economy. In fact, North Dakota ranks 48th in population size and 46th for gross domestic product, but 2nd in oil and gas production in the United States.

ECF Nos. 504-1 ("First Morrissette Decl."), ¶ 4; 537-2 ("Second Morrissette Decl."), ¶ 4.  Because there is limited in-state capacity to refine oil, continued oil production in the State depends on reasonable methods of transporting crude oil produced in-state to out-of-state refining facilities.  First Morrissette Decl., ¶ 9.  The transportation of crude oil by pipeline is the most cost-effective method of transporting crude oil in North Dakota, and DAPL transports approximately 40% of the crude oil produced in North Dakota.  *Id.*; *see also* Second Morrissette Decl., ¶ 5.  Without DAPL to transport oil out-of-state, in-state oil production will be severely compromised, hampering the State's economy.

Taking DAPL offline will result in serious harm to North Dakota's citizens.  Ex. A, Third Declaration of Joe Morrissette, Jr. ("Third Morrissette Decl."), ¶ 7.  As explained previously, North Dakota's economy is extremely dependent on revenues from the extraction and production of oil and natural gas.  *Id.*; ECF Nos. 504 ("North Dakota Amicus Br."), at 6; First Morrissette Decl., ¶ 9; 537 ("North Dakota Reply Amicus Br."), at 5-7; Second Morrissette Decl., ¶ 6.  The State derives twenty percent of general fund revenues directly from oil and gas taxes, and almost fifty percent of general fund revenues from sources closely tied to, and dependent upon, oil and gas extraction and production.  *See* Third Morrissette Decl., ¶ 7; North Dakota Amicus Br., at 6; First Morrissette Decl., ¶ 9; Second Morrissette Decl., ¶ 6.  Put another way, extraction and production of oil and natural gas results in direct revenue of $4.9 billion over a two-year budget period based on the official forecast for the State's current two-year budget period (July 1, 2019 to June 30, 2021).  First Morrissette

Decl., ¶ 4.  For context, the State expects to collect general fund revenues of only $3.7 billion from all other sources.  *Id.*

The State has insulated the general fund from fluctuations in oil and gas tax revenue by allocating that revenue through a series of special funds dedicated to specific purposes or programs.  *See* North Dakota Amicus Br., at 5-6.  Through these special funds derived from oil and gas tax revenues, the State finances critical government services, including but not limited to supporting cities and counties in areas where oil and gas are produced, tribal governments, public schools, water supply and flood control projects, social services programs, and county, city, township, and airport infrastructure.  *Id.*  Moreover, a portion of the oil and gas tax revenue is diverted back to the general fund to further support government operations and essential programs.  *Id.*

Revenue from DAPL itself comprises an outsized portion of these tax proceeds. The first thirty-two months of DAPL's operation yielded North Dakota an estimated $317 million in additional oil and gas gross production tax revenue.  ECF No. 504-4 ("Rauschenberger Decl."), ¶ 10.  If DAPL is shut down, production would be shut in because of the increased costs of alternative transportation methods, and this tax revenue would vanish.  *Id.* (explaining that oil producers deduct transportation costs from the value of oil when determining the taxable basis for the State's extraction and production taxes).  Indeed, the State estimates that shutting down the pipeline would reduce North Dakota tax revenues by as much as *$2 billion* during a two-year

budget period.  First Morrissette Decl., ¶ 10.  That is a 20 percent reduction of the State's general fund revenues.

Losing 20 percent of the State's general fund revenues would significantly reduce the funding that the State allocates to cities, counties, tribal governments, public schools, social services, and essential infrastructure.  Third Morrissette Decl., ¶ 7.  As this Court has acknowledged, "[l]osing jobs and revenue, particularly in a highly uncertain economic environment, is no small burden" and that burden resulting from a shutdown will be "immediate."  ECF No. 546, at 17.  These harms would be particularly acute in the current economic environment where state unemployment insurance claims during the eight-month period of mid-March through mid-November were nearly 96,000, nearly a ten-fold increase over the most recent annual period of 2018 and 2019.  Third Morrissette Decl., ¶ 8.  The pandemic has already produced revenue shortfalls.  *Id.*  North Dakota witnessed a $133 million year-over-year tax revenue shortfall from February to May 2020.  Second Morrissette Decl., ¶ 7.  And in August 2020, the State allocated $116.54 million in oil and gas tax revenues, a 44% shortfall against the $207.85 million projected allocation.  Third Morrissette Decl., ¶ 5; *see* N.D. Legislative Council, *Oil & Gas Tax Revenues Monthly Update* (Oct. 2020), https://www.legis.nd.gov/files/fiscal/2019-21/docs/21_9005_15000.pdf.  This included only $13 million allocated to the Three Affiliated Tribes, a 42% shortfall against the $22 million forecasted.  *Id.*

Shutting down DAPL would magnify these economic harms, adding greater revenue losses and further straining the State's ability to cover its financial

obligations.  Third Morrissette Decl., ¶¶ 7, 8.  These obligations, which must be paid from the general fund, include critical government services benefitting *all* state residents such as healthcare, law enforcement, road construction and maintenance, and parks and recreation.  *Id.*; *see also* North Dakota Reply Amicus Br., at 7; Second Morrissette Decl., ¶ 10.  Any reduction in these essential services threatens the health, safety, and public welfare of North Dakota's citizens.  *Id.*  For example, approximately 80% of the general fund budget is spent on K-12 education, higher education, and health and human services.  N.D. Office of Mgmt. & Budget, *Legislative Appropriations 2019-2021 Biennium*, 2 (2019), https://www.nd.gov/omb/sites/omb/files/documents/agency/financial/state-budgets/docs/budget/appropbook2019-21.pdf.  This includes $1.46 billion for 2019-2021 to the Department of Human Services, whose services help maintain quality of life for the most vulnerable North Dakotans.  *Id.*  It also includes $36.4 million to the Department of Health, which oversees medical emergency preparedness and regulates food, lodging, and healthcare facilities.  *Id.* at 70.  Without DAPL, these essential services and others will see heavy funding shortfalls on top of those already experienced as a result of the pandemic.  Third Morrissette Decl., ¶ 7.  Indeed, expenditures on critical services and public-health have sharply increased, North Dakota Reply Amicus Br., at 6, right at the time that revenue from the State's largest industry sector has fallen precipitously.

The Corps also recently acknowledged that an EIS will take more than 13 months and that it has not settled on a revised timeline.  ECF No. 570, ¶ 4.  Thus,

shutting down DAPL all but guarantees that North Dakota citizens will endure severe, immediate harm for an extended period of time if DAPL is shutdown during remand.

**B.    Innocent Third Parties Will Suffer Immediate And Severe Harms.**

Separate from tax-revenue shortfalls, shutting down DAPL would further inflict unrecoverable losses on a crucial industry for North Dakota that would radiate outward to third parties who were uninvolved in the decision to build and operate DAPL.  Ex. B, Third Declaration of Lynn Helms, ("Third Helms Decl."), ¶ 8.

*First*, as North Dakota has previously explained, if DAPL is shut down, a number of oil and gas operators in North Dakota will likely reduce their planned drilling activities in North Dakota.  *Id.*; First Helms Decl., ¶¶ 11-12; North Dakota Amicus Br., at 9.  Ten of the top twenty operators in North Dakota have significant positions and activity in other locations that are closer to markets and have more stable pipeline capacity.  First Helms Decl., ¶ 12.  Those ten operators currently operate 14 drilling rigs that generate approximately 2,100 full time jobs.  *Id.*  In 2017 when DAPL started up, the operators increased North Dakota drilling activity 20%. *Id.*  Shutting down DAPL is expected to result in loss of at least four to five drilling rigs and the associated loss of 600-750 full time jobs.  *Id.*  In addition, loss of those

drilling rigs will result in seven to nine fewer new wells drilled per month and the associated loss of 11-14 new full-time jobs per drill per month.  *Id.*[2]

*Second*, it is unlikely that a significant portion of DAPL's flows could be diverted to rail due to insufficient rail capacity and low oil prices resulting from the COVID-19 pandemic.  Third Helms Decl., ¶ 8; First Helms Decl., ¶ 14.  But even if production representing more than half of DAPL's capacity could be diverted to rail or other modes of transportation, oil production in North Dakota would still decrease, and *thousands* of jobs would be lost.  First Helms Decl., ¶ 14.  For example, assuming *arguendo* that 300,000 barrels per day of DAPL's daily flows could be diverted to rail transport, shutting down DAPL would result in the shut in of an estimated 270,000 barrels or 5,600 active oil and gas wells.  *Id.*  This would mean temporary loss of around 8,950 full time jobs and permanent loss of 4,475 to 7,175 full time jobs.  *Id.*

Furthermore, rail was estimated to carry around 300,000 barrels of oil per day from North Dakota to coastal markets, during the middle of 2020.  First Helms Decl., ¶ 10.  In 2014, railroads could transport a maximum of about 800,000 barrels per day. *Id.*  Based on historical data it could take two years to divert 500,000 to 600,000 barrels of DAPL's daily flows to rail transport, resulting initially in the shut-in of an estimated 8,700 active oil and gas wells decreasing over time to a final loss of 70,000 barrels per day and an estimated 1,450 oil wells shut in.  *Id.*  Each of those wells

---

[2] The job loss estimates discussed herein were derived from a study done by the North Dakota Department of Mineral Resources in conjunction with North Dakota State University Department of Agribusiness and Applied Economics, and the Vision West project. First Helms Decl., ¶ 13. This study looked at the average number of jobs per drilling rig and producing well in North Dakota. *Id.*

represents 1.6 full time jobs. *Id.* In addition, the estimated cost to return each well to production is $25,000 to $50,000 and can be as much as $400,000 in some circumstances. *Id.* Returning wells to production also requires three to six months planning and scheduling, and history shows that 50-80% of the wells that are shut down are permanently abandoned. *Id.*

In addition to shutting in production and causing extensive job losses, a significant number of additional rail tank cars would be needed if DAPL shipments are shifted over to rail. ECF No. 504-3 ("Kringstad Decl."), ¶ 8. Putting aside whether enough rail tank cars exist, the majority of rail-car leases are long-term, typically five to seven years. *See e.g.* ECF No. 542-2 ("Second Rennicke Decl."), ¶ 14. A shutdown would therefore force market participants to upend transport modes that have taken years to establish. Further, the increased use of rail cars could mean increased rail traffic as well as traffic congestion and potential delays. *See e.g.* ECF Nos. 512-2 ("First Rennicke Decl."), ¶¶ 86-94; 514 ("States Amicus Br."), at 15-17; 520-1 ("First Aubele Decl.") ¶ 30.

*Third*, lower oil production from the shut-in of wells in North Dakota would have an immediate negative financial and operational impact on third party oil gathering companies and local natural gas gathering, processing, and transmission providers. Kringstad Decl. ¶ 9. Natural gas from the Bakken formation cannot be produced independently if oil transportation options are constrained. *Id.* Attracting the necessary infrastructure investments to expand natural gas capture in North Dakota would become increasingly difficult if third party providers had additional

uncertainty surrounding the ability of a producer to keep wells operating in the event of DAPL being required to cease operations. *Id.*

While the potential impacts of the COVID-19 pandemic are impossible to quantify with precision due to fluctuations in oil prices, employment numbers, and capital investment plans, it is certain that a Court ordered shutdown of DAPL would greatly increase destabilization now and cause even more destabilization as the oil and gas markets continue to recover, which is consistent with the State's earlier projections. *See* First Helms Decl., ¶ 15; Second Helms Decl., ¶ 4. On November 17, 2020, the North Dakota Department of Mineral Resources reported that at least 1,165,371 bpd were produced in North Dakota in August 2020 and 1,221,667 bpd in September 2020, figures that are nearly 300,000 bpd higher than Dr. Fagan's forecasts.   Third Helms Decl., ¶ 7.

Shutting down DAPL, therefore, would harm North Dakota residents and companies who relied on their reasonable belief that DAPL was permitted lawfully. North Dakota residents, whose well-being depends on essential services and a healthy State budget, did not assume any economic risk. Nor did the thousands who would be forced into unemployment. Nor did the oil industry, which followed the dictates of the market in making use of the most efficient and safest mode of transporting oil from the Bakken region. The same is true for other industries, including third-party oil and natural gas gatherers, processors, transmission providers, vendors, and the many supporting local industries such as restaurants and hotels. Nor did other industries such as farming assume the risk of serious disruption

from rail congestion if DAPL were shut down. *See* North Dakota Amicus Br., at 11-12; Amy R. Sisk, *Fed. judge orders Dakota Access Pipeline shut down*, Bismarck Tribune (July 6, 2020), bismarcktribune.com/bakken/federal-judge-orders-dakota-access-pipeline-shut-down/article_2cc387a3-f003-5557-b356-4063123a62ad.html. Shutting down DAPL would seriously disrupt the lives of hundreds of thousands for whom Plaintiffs' assumption-of-risk argument is inapplicable.

## II.   These Definite Harms Far Outweigh Any Speculative Harm To Plaintiffs.

Plaintiffs carry the burden of establishing that irreparable injury is "*probable*" absent injunctive relief. *Henke v. Dep't of the Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012). But, like the Corps, North Dakota has concluded that DAPL is extremely unlikely to harm Plaintiffs. Before the North Dakota Public Service Commission (an expert agency) granted its permit to Dakota Access, it determined that DAPL would "produce minimal adverse effects on the environment and upon the welfare of the citizens of North Dakota." Findings of Fact, Conclusions of Law and Order, *Dakota Access, LLC, Dakota Access Pipeline Project, Siting Application*, No. PU-14-842, at 10 (N.D. Pub. Serv. Comm'n Jan. 20, 2016) ("Public Service Commission Findings").

North Dakota takes seriously the safety and environmental rights of all its residents. It also fully recognizes the importance of the Missouri River and Lake Oahe to the Tribes. Those same resources are enjoyed by the State's other residents too. Indeed, the "Missouri River is the state's most valuable and readily available water source, and it is needed for a broad spectrum of beneficial uses, such as irrigation, drinking water supplies, and industry." *See* N.D. Water Comm'n & State

Eng'r, *Missouri    River    Basin    and    James    River    Basin*, www.swc.nd.gov/basins/missouri_river/missouri_river.html (last visited Nov. 19, 2020). North Dakota has spent decades working diligently to protect and develop its interests in the Missouri River, and the State seeks to use it for the beneficial use of *all* its citizens. *See id.* Due in part to this longstanding commitment, the Missouri River has the best water quality of any river in the State. N.D. State Water Comm'n, *A Reference Guide to N.D. Waters,* at 17 (2014); N.D. State Water Comm'n, *Today's Missouri River: A N.D. Perspective, at* 8 (2011). As it has for decades, North Dakota remains committed at all levels of government to protecting this vital natural resource.[3]

Against this backdrop, the Public Service Commission carefully reviewed DAPL's design, construction, and operational plans and determined that the pipeline "is compatible with the environmental preservation and the efficient use of resources" and "will minimize adverse human and environmental impact." Public Service Commission Findings, at 10. An applicant for a permit to construct a pipeline in North Dakota must prove all of these elements to the Commission in order to proceed, and Dakota Access did so. Moreover, the Public Service Commission re-reviewed DAPL's safety as part of an amendment to DAPL's permits, and after what one Commissioner called "one of the most extensive public hearings in Commission history" the Commission again concluded that the pipeline is safe. *See* News Release,

---

[3] In addition to harms from a spill, Plaintiffs discuss (at 16) historical wrongs the United States has committed against them. But DAPL is not the source of those wrongs, nor would an injunction remedy them.

*PSC Approves Permit for Dakota Access Pipeline Pump Station in Emmons Cty.*, N.D. Pub. Serv. Comm'n (Feb. 19, 2020), www.psc.nd.gov/public/newsroom/2020/2-19-20Approval-DAPL-Emmons-County-Pump-Station.pdf.  During that process, the Commission "fully vetted" all the evidence that Plaintiffs and *amici* have filed in North Dakota proceedings related to safety of the pipeline.  *Id.*

Because the State is satisfied DAPL poses no risk to Lake Oahe, and because a shutdown would cause a multitude of certain, immediate, severe, and irreparable harms to North Dakota, its residents, and others, the Court should not enjoin DAPL's operation.

## CONCLUSION

For the reasons stated, the Court should deny Plaintiffs' motion.

Dated this 20th day of November, 2020.

Respectfully Submitted,
Wayne Stenehjem
Attorney General of North Dakota

/s/ Matthew A. Sagsveen
Matthew A. Sagsveen
Solicitor General
State Bar ID No. 05613
OFFICE OF THE ATTORNEY GENERAL
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
Email: masagsve@nd.gov

Counsel for the State of North Dakota

13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Standing Rock Sioux Tribe; Yankton
Sioux Tribe; Robert Flying Hawk;
Oglala Sioux Tribe,

        Plaintiffs,

and

Cheyenne River Sioux Tribe; Sara
Jumping Eagle et al.,

        Plaintiff-Intervenors,

   vs.

U.S. Army Corps of Engineers,

        Defendant-Cross-
        Defendant,

and

Dakota Access, LLP,

        Defendant-Intervenor-
        Cross-Claimant.

Civil No. 1:16-cv-01534-JEB
(Consolidated Case Nos.
1:16-cv-01796 and 1:17-cv-00267)

---

## THIRD DECLARATION OF JOE R. MORRISETTE

---

I, Joe R. Morrisette, state and declare as follows:

    1.    My name is Joe R. Morrisette.  I am over 21 years of age and am fully competent and duly authorized to make this Declaration.  The facts contained in this Declaration are based on my personal knowledge and are true and correct.

    2.    I am the Director of the North Dakota Office of Management and Budget (the "OMB") and I have previously submitted declarations in this matter discussing the role of OMB and my duties there.  *See* ECF Nos. 504-1 ("First Morrissette Decl."); 537-2 ("Second Morrissette Decl.").



EXHIBIT
A

3.     This declaration reiterates my previous submissions and responds to assertions made in the brief and declarations filed by Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Plaintiffs" or "the Tribes") on October, 16, 2020. ECF No. 569 ("Plaintiffs' Br."). Specifically, Plaintiffs claim that the balance of the equities weigh against keeping DAPL online and they rely on this Court's observation that "'Dakota Access did assume much of its economic risk knowingly.'" Plaintiffs' Br., at 20 (quoting ECF No. 546, at 23).  Respectfully, that observation fails to meaningfully confront the extensive, immediate harm that will befall North Dakota and its citizens who did not assume any economic risk when the U.S. Army Corps of Engineers (the "Corps") approved DAPL.

4.     As I previously have explained, North Dakota is a small state in terms of both population and economic output that is extremely dependent upon revenues from taxes on the extraction and production of oil and natural gas.  Second Morrissette Decl., ¶ 4.  Specifically, twenty percent of the State's general fund revenues are derived directly from oil and gas taxes and almost fifty percent of general fund revenues come from sources closely tied to, and dependent upon, oil and gas extraction and production. *Id.* ¶ 4. The general fund supports multiple public programs from which all state residents benefit including healthcare, law enforcement, road construction and maintenance, and parks and recreation. *Id.* ¶ 10.

5.     Due to the pandemic, North Dakota's economy has suffered tremendously as multiple industries face historic volatility. *See* Second Morrissette

Decl., ¶ 7.  In June, the State had asked agencies to reduce budgets between 5% and 15% to weather the economic devastation caused by the pandemic and the energy slowdown.[1]  In recent months, however, the State has seen positive signs, including increases in crude oil demand and production that, in turn, have increased oil and gas tax revenues.  For example, in June 2020, the State was able to allocate only $38.05 million in oil and gas tax revenues, an 81% shortfall against the $197.59 million allocation that had been projected before the pandemic.  N.D. Legislative Council, *Oil & Gas Tax Revenues Monthly Update* (June 2020), https://www.legis.nd.gov/files/fiscal/2019-21/docs/21_9005_11000.pdf.  By August 2020, things had improved significantly.  The State allocated $116.54 million in oil and gas tax revenues, a much smaller 44% shortfall against the $207.85 million projected allocation. See N.D. Legislative Council, *Oil & Gas Tax Revenues Monthly Update* (Oct. 2020), https://www.legis.nd.gov/files/fiscal/2019-21/docs/21_9005_15000.pdf.  A rebound in oil and gas tax revenues in recent months cut the shortfall in half, but still leaves a significant gap in funding compared to the official forecast.  The state continues to see a significant shortfall in both oil and gas taxes and general fund revenues used to fund essential government services during the pandemic.  For example, sales tax collections, the state's primary source of general fund revenue, fell short of the budget forecast by over 25 percent for the

---

[1]  *See* Laila Kearney & Karl Plume, *What rebound? North Dakota in economic crunch as virus battles oil, agriculture*, Reuters (June 12, 2020, 5:06 AM) https://www.reuters.com/article/us-health-coronavirus-usa-states-insight/what-rebound-north-dakota-in-economic-crunch-as-virus-batters-oil-agriculture-idUSKBN23J1I9.

month of October due to the impact of the pandemic on business activity and consumer spending.

6.     This is consistent with North Dakota witness Lynn Helms's description that an economic rebound for crude oil demand and production is already occurring and continues to recover toward 2019 levels.  Third Helms Declaration ¶¶ 5-8.

7.     Taking DAPL offline would devastate this recovery, depriving the State of as much as $2 billion in state oil and gas tax revenues during a two-year budget period.  *See* First Morrissette Decl., ¶ 22; Second Morrisette Decl., ¶ 11.  Although not all oil and gas tax revenue is deposited in the state general fund, more than 20 percent of current general fund revenues come directly from oil and gas taxes. Such a significant reduction in oil and gas tax revenues would likely mean a reduction in general fund revenues of at least 20 percent.  This would hamper the State's ability to cover the State's financial obligations, including expenditures on critical services and public health, which are at an all-time high due to the pandemic. For example, the biennial budget for the state Department of Health was initially $160 million for the 2019-21 biennium. Federal funding supported the unprecedented increase in public health expenditures being incurred by the state during the first ten months of the pandemic. Federal funds in the amount of $280 million, 175 percent of the department's typical two-year budget were received to cover the increased costs during the pandemic.  Many of these costs will continue for an unknown duration and will be a state responsibility once federal resources have been exhausted As a result, a shutdown will severely harm North Dakota residents—innocent third parties who

4

did not assume any of the economic risk that Plaintiffs mention when they try to minimize the economic impacts to Dakota Access from a DAPL shutdown.

8.  The pandemic adds to, rather than subtracting from, the reasons to avoid a DAPL shutdown.  Such an action would compound the economic devastation currently impacting the State.  The pandemic has depleted crucial revenue sources, such as sales, use, and motor vehicle excise tax revenue (*see* Second Morrisette Decl., ¶ 7) and citizens continue to file for unemployment claims. State unemployment insurance claims during the eight-month period of mid-March through mid-November were nearly 96,000.  This is nearly a ten-fold increase over the most recent annual periods of 2018 and 2019 which totaled 9,251 claims and 10,334 claims, respectively.  Altogether, shutting down DAPL at this point would unequivocally *add* losses to those already incurred and cause far-reaching impacts on North Dakotans who are turning to the State for assistance.

9.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November ___, 2020.

Joe R. Morrissette, Jr.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Standing Rock Sioux Tribe; Yankton
Sioux Tribe; Robert Flying Hawk;
Oglala Sioux Tribe,

        Plaintiffs,

and

Cheyenne River Sioux Tribe; Sara
Jumping Eagle et al.,

        Plaintiff-Intervenors,

    vs.

U.S. Army Corps of Engineers,

        Defendant-Cross-
        Defendant,

and

Dakota Access, LLP,

        Defendant-Intervenor-
        Cross-Claimant.

Civil No. 1:16-cv-01534-JEB
(Consolidated Case Nos.
1:16-cv-01796 and 1:17-cv-00267)

## THIRD DECLARATION OF LYNN D. HELMS

I, Lynn D. Helms, state and declare as follows:

    1.    My name is Lynn D. Helms.  I am over 21 years of age and am fully

competent and duly authorized to make this Declaration.  The facts contained in this

Declaration are based on my personal knowledge and are true and correct.

    2.    I am the Director of the North Dakota Industrial Commission ("NDIC")

Department of Mineral Resources ("DMR") and I previously have submitted

declarations in this matter discussing the role of the NDIC DMR and my duties there.

*See* ECF Nos. 504-2 ("First Helms Decl."), 537-1 ("Second Helms Decl.").

EXHIBIT

**B**

3.    This declaration responds to, and corrects inaccurate assertions made in, the brief and declarations filed by Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Plaintiffs" or "the Tribes") on October, 16, 2020 (ECF No. 569 ("Plaintiffs' Br.")), and in particular the declaration and report of Dr. Marie Fagan, (ECF Nos. 569-2, 569-3 ("Second Fagan Report")).

4.    Plaintiffs claim that their "predictions about the oil market and the limited impacts of suspending operations have proven accurate." Plaintiffs' Br., at 20. They rely on Dr. Fagan's repeated assertion that a "strong rebound in North Dakota production" is not expected and that an "ongoing loss of 500,000 b/d could last through most of the coming 12 months or more." Second Fagan Report, at 4. *See also* ECF No. 527-4 ("First Fagan Report") at 37, Fig. 21 (predicting maximum of North Dakota crude oil production to be 936,500 barrels per day ("bpd") through 2022).

5.    Recent data proves these predictions and assertions wrong. Instead of flatlining, crude oil production is rebounding toward pre-pandemic levels. Furthermore, and also contrary to Plaintiffs' and Dr. Fagan's view, shutting down DAPL at a time when crude oil production is beginning to recover will only stall that recovery and worsen the harm that North Dakota and its citizens have already endured as a result of the pandemic and the initial, short-term collapse in crude oil demand.

6.    North Dakota crude oil production is recovering, showing that the reductions from earlier this year were only temporary. Data from the U.S. Energy

Information Administration's ("EIA"), for example, indicates that liquid fuel demand bottomed out in May 2020.[1] As a result, the EIA forecasts in the following graph that the balance of both global liquid fuels consumption and production will return to 2019 levels by the fourth quarter of 2021.[2]



Data from the U.S. Energy Information Administration's ("EIA"), also indicates that excess United States crude oil storage resulting from the pandemic is now gone indicating increasing production and transportation demand in the near future.[3]

---

[1] *See* Lynn Helms, *Dir.'s Cut: Aug. 2020 Prod.*, N.D. Dept. of Mineral Res., at 3 (Oct. 16, 2020), http://ndenergy.org/usrfiles/news/Directors_Cut_-_101620.pdf.

[2] *Id.* fig. 2.

[3] *Id.* fig.1.



7.    As I previously explained, North Dakota's crude oil production is consistent with global trends because it is transported to coastal markets where it competes with other domestic and international crude oil.  Second Helms Decl., ¶ 5. Accordingly, the State also estimates that the recovery of North Dakota oil production is already occurring and projects that North Dakota crude oil production will continue to increase in the coming months.[4]   Specifically, on November 17, 2020, the DMR reported that at least 1,165,371 bpd were produced in North Dakota in August 2020

---

[4] *Sept. 2020 Dir.'s Cut,* YouTube, N.D. Dep't of Mineral Res. (Sept. 15, 2020), youtube.com/watch?v=aRCeWnFIWDU.

and 1,221,667 bpd in September 2020[5], figures that are nearly 300,000 bpd higher than Dr. Fagan's forecasts. Indeed, the latest report from the State's Bakken Restart Task Force, which was established to "facilitate rapid recovery of the oil and gas industry,"[6] confirms these upward trends. As stated above, Dr. Fagan predicted that production would not rise above 936,000 bpd through the end of 2021, which equates to a shut-in of at least 500,000 bpd from the region's peak production. Second Fagan Report, at 4. Further undermining Dr. Fagan's predictions, the Bakken Restart Task Force has reported only 60,000 bpd remain shut-in as of November 14, 2020.[7]

8.    Finally, DAPL is still transporting roughly 40 percent of Bakken production volumes. Much of this crude oil transportation is subject to binding contracts, so it must be produced and transported in accordance with those commitments, or be shut-in. If DAPL is shut down, this production will likely be shut-in until alternate transportation can be secured and prices rebound to make that transportation economically viable. As I previously explained, this would lead a number of oil and gas operators in North Dakota to cease planned drilling activities in the State, which would cause extensive job losses. *See* First Helms Decl., ¶ 12. A

---

[5] *See* Lynn Helms, *Dir.'s Cut: Sept. 2020 Prod.*, N.D. Dept. of Mineral Res., at 3 (Nov. 17, 2020), at 1, https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-11-17.pdf.

[6] Press Release, *Bakken Restart Task Force established to outline plan forward to strengthen North Dakota's energy future*, N.D. Dept. of Mineral Res., at 1 (May 6, 2020), https://www.dmr.nd.gov/oilgas/pressreleases/Final.5.06.20_Bakken_Restart_Task_Force_Press_Release.pdf

[7] *Id.*; *Bakken Restart Task Force*, N.D. Dep't of Mineral Res., at 3 (Aug. 10, 2020), https://www.dmr.nd.gov/oilgas/FinalBakken_Restart_Task_Force_Action_Report.pdf (reporting 225,000 bpd of shut-in production in North Dakota).

shutdown would also increase costs for shippers.  Margins are already razor thin due to the pandemic's short-term effects on crude oil demand, and shippers cannot absorb additional costs resulting from more expensive transportation methods and supply chain disruption.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November _19_, 2020.

Lynn D. Helms