## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,        ) | |
|        ) | |
|        Plaintiff,        ) | |
|        ) | |
| and        ) | |
|        ) | |
| CHEYENNE RIVER SIOUX TRIBE,        ) | |
|        ) | |
|        Plaintiff-Intervenor,        ) | |
|        ) | |
| v.        ) | Case No. 1:16-cv-01534 (JEB) |
|        ) | (consolidated with Cases No. |
| UNITED STATES ARMY CORPS OF        ) | 1:16-cv-01796 & 1:17-cv-00267) |
| ENGINEERS,        ) | |
|        ) | |
|        Defendant,        ) | |
|        ) | |
| and        ) | |
|        ) | |
| DAKOTA ACCESS, LLC,        ) | |
|        ) | |
|        Defendant-Intervenor.        ) | |

## UNITED STATES ARMY CORPS' BRIEF IN OPPOSITION
## TO PLAINTIFFS' REQUEST FOR INJUNCTION

## TABLE OF CONTENTS

I.      Introduction ...................................................................................................... 1

II.     It is law of the case that Plaintiffs must prevail on the injunction factors to obtain
        injunctive relief .............................................................................................. 2

III.    Plaintiffs have not demonstrated the four elements required to obtain injunctive
        relief ................................................................................................................ 5

        A.      Plaintiffs have not demonstrated certain, or even likely, irreparable harm.......... 5

                1.      An oil spill at Lake Oahe is neither "likely" nor "certain"...................... 7

                2.      Subjective apprehension about a potential spill does not support a
                        finding of irreparable harm.................................................................. 9

                3.      Tribal governance is not irreparably harmed by the Pipeline................11

        B.      Plaintiffs have not established impacts of an unlikely spill could not be at
                least partially remediated....................................................................................14

        C.      The balance of equities weighs against an injunction .......................................15

                1.      An injunction would cause economic disruption .................................16

                2.      The Pipeline minimizes risks associated with oil transportation ...........17

                3.      An injunction is not necessary to ensure NEPA compliance .................21

                4.      Plaintiffs' treaty arguments are irrelevant and the Corps has not
                        violated any trust duties owed to Plaintiffs. ...........................................22

IV.     The Court was clear that it set aside the easement not the Rivers and Harbors Act
        Permission and that ruling should not be revisited .......................................................24

V.      CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Air Transp. Ass'n of Am., Inc. v. Exp. Imp. Bank of the U.S.*,
  840 F. Supp. 2d 327 (D.D.C. 2012) ....................................................................10

*Am. Trucking Ass'ns v. EPA*,
  283 F.3d 355 (D.C. Cir. 2002) ..........................................................................19

*Banks v. Booth*,
  459 F. Supp. 3d 143 (D.D.C. 2020) ..................................................................... 7

*Beck v. Test Masters Educ. Servs. Inc.*,
  994 F. Supp. 2d 98 (D.D.C. 2014) ....................................................................... 5

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ............................................................................10

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ............................................................................ 5

*Cheyenne River Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  No. CV 16-1534 (JEB), 2020 WL 3634426 (D.D.C. July 6, 2020) ........................24

*Colorado Wild Horse v. Jewell*,
  130 F. Supp. 3d 205 (D.D.C. 2015) ...................................................................10

*Comm. in Solidarity With People of El Salvador (CISPES) v. Sessions*,
  929 F.2d 742 (D.C. Cir. 1991) ........................................................................6, 7

*Crow Creek Sioux Tribe v. United States*,
  900 F.3d 1350 (Fed. Cir. 2018) ........................................................................23

*Ctr. for Biological Diversity v. Ross*,
  No. CV 18-112 (JEB), 2020 WL 4816458 (D.D.C. Aug. 19, 2020)................................3, 5, 7

*Dep't of Transportation v. Public Citizen*,
  541 U.S. 752 (2004)........................................................................................... 4

*Envtl. Def. Fund, Inc. v. Costle*,
  657 F.2d 275 (D.C. Cir. 1981) ..........................................................................25

*Found. on Econ. Trends v. Heckler*,
  756 F.2d 143 (D.C. Cir. 1985) .......................................................................3, 5

*Fund for Animals v. Norton*,
  281 F. Supp. 2d 209 (D.D.C. 2003) ...................................................................10

*Gros Ventre Tribe v. United States*,
  469 F.3d 801 (9th Cir. 2006) ............................................................................23

*In the Matter of Fed. Bureau of Prisons' Execution Protocol Cases*,
  No. 19-MC-145, 2020 WL 5594118 (D.D.C. Sept. 20, 2020) ............................... 6

*Koller v. Brown*,
 224 F. Supp. 3d 871 (N.D. Cal. 2016) ....................................................................10

*League of Women Voters of the U.S. v. Newby*,
 838 F.3d 1 (D.C. Cir. 2016) ...........................................................................12, 15

*Lee v. Christian Coal. of Am., Inc.*,
 160 F. Supp. 2d 14 (D.D.C. 2001) ........................................................................12

*Lower Brule Sioux Tribe v. South Dakota*,
 711 F.2d 809 (8th Cir. 1983) ................................................................................23

*Macht v. Skinner*,
 715 F. Supp. 1131 (D.D.C. 1989) .........................................................................14

*Manzanita Band of Kumeyaay Nation v. Wolf*,
 No. 1:20-CV-02712 (TNM), 2020 WL 6118182 (D.D.C. Oct. 16, 2020) ..............14

*Mashpee Wampanoag Tribe v. Bernhardt*,
 No. 18-2242 (PLF), 2020 U.S. Dist. LEXIS 99024 (D.D.C. June 5, 2020) ............11

*Michigan v. U.S. Army Corps of Eng'rs*,
 758 F.3d 892 (7th Cir. 2014) ..................................................................................7

*Michigan v. U.S. Army Corps of Engineers*
 667 F.3d 765 (7th Cir. 2011) .....................................................................7, 16, 17

*\*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010)......................................................................2, 5, 21, 22

*Nat'l Treasury Emps. Union v. U.S.*,
 101 F.3d 1423 (D.C. Cir. 1996) .............................................................................12

*Nken v. Holder*,
 556 U.S. 418 (2009)..............................................................................................15

*Pennsylvania v. New Jersey*,
 426 U.S. 660 (1976) ..............................................................................................12

*Pub. Employees for Envtl. Responsibility v. U.S. Fish & Wildlife Serv. (PEER)*,
 189 F. Supp. 3d 1 (D.D.C. 2016) ............................................................................3

*Pueblo of Pojoaque v. New Mexico*,
 233 F. Supp. 3d 1021 (D.N.M. 2017).....................................................................11

*Sierra Club v. Bosworth*,
 510 F.3d 1016 (9th Cir. 2007) ...............................................................................22

*Sierra Club v. FERC*,
 867 F.3d 1357 (D.C. Cir. 2017) ...............................................................................3

*Sierra Club v. U.S. Army Corps of Eng'rs*,
 990 F. Supp. 2d 9 (D.D.C. 2013) .........................................................................6, 9

*Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*,
  841 F. Supp. 2d 349 (D.D.C. 2012) ...................................................................... 4

\**Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  205 F. Supp. 3d 4 (D.D.C. 2016) ..............................................................4, 6, 12

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  239 F. Supp. 3d 77 (D.D.C. 2017) .....................................................................23

\**Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  255 F. Supp. 3d 101 (D.D.C. 2017) ......................................... 12, 13, 20, 21, 23, 24

\**Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  440 F. Supp. 3d 1 (D.D.C. 2020) ...........................................8, 9, 13, 20, 23, 24

\**Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  No. 16-1534 (JEB), 2020 U.S. Dist. LEXIS 117866 (D.D.C. July 6, 2020) ..................18, 19

\**Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  No. 20-5197, 2020 WL 4548123 (D.C. Cir. Aug. 5, 2020)................................... 2

*Taylor v. FDIC*,
  132 F.3d 753 (D.C. Cir. 1997) .............................................................................. 2

*Thomas v. Hoehne*,
  No. 1:05-CV-343, 2005 WL 2487947 (W.D. Mich. Oct. 7, 2005)........................10

*U.S. Envtl. Prot. Agency*,
  804 F.2d 710 (D.C. Cir. 1986) .............................................................................19

*Ute Indian Tribe v. Utah*
  790 F.3d 1000 (10th Cir. 2015) ..........................................................................11

*Vencor Nursing Ctrs, L.P. v. Shalala*,
  63 F. Supp. 2d 1 (D.D.C. 1999) ..........................................................................15

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
  749 F.2d 788 (1984).............................................................................................25

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...........................................................................................15, 21

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .........................................................................5, 10

*Wyandotte Nation v. Sebelius*
  443 F.3d 1247 (10th Cir. 2006) ......................................................................11, 12

**Statutes**

15 U.S.C. § 717f...................................................................................................... 3

16 U.S.C. § 703 ....................................................................................................... 3

42 U.S.C. § 2092 ..................................................................................................... 3

**Regulations**

7 C.F.R. §§ 340.3-340.6............................................................................................. 4

# I.     INTRODUCTION

In order to obtain injunctive relief, Plaintiffs must show that they are "certain"—or at the very least "likely"—to suffer an irreparable injury that cannot be remedied and that the balance of hardships tips in their favor. Plaintiffs have not met this high bar.

First, Plaintiffs' argument that the Court need not even evaluate the injunction factors conflicts with the law of the case, as set out in the D.C. Circuit order that led to the instant motion, as well as Supreme Court precedent. Moreover, Plaintiffs overlook that the easement at issue did not authorize the Pipeline but merely granted it permission to cross federal property.

Next, Plaintiffs have not demonstrated that they are entitled to injunctive relief. The Corps has shown, and this Court has agreed, that the asserted harm—an oil spill at Lake Oahe—is far from likely. Rather, the "possibility of a future spill . . . is low." ECF No. 496 at 29. Plaintiffs' retained experts have surely not proven that an oil spill is likely—let alone certain. Plaintiffs therefore retreat to reliance on their apprehension over a highly unlikely spill. But courts have rejected exactly this asserted harm as too abstract to support a finding of irreparable harm. Nor is alleged harm concerning tribal governance supportable, as the Pipeline has no impact on the Tribes' governance and any lack of participation in response planning is attributable to the Tribes themselves.

Ultimately, this Court must weigh the potential harms advanced by the Plaintiffs—the "low" risk of an oil spill (particularly a high consequence spill) and tribal members' subjective apprehension regarding such a spill—against the near certain economic disruption and elevated risk of environmental harm from rail transport that would result from enjoining the Pipeline. The scales are not close to evenly balanced. The Tribes' harms are speculative and abstract, whereas

shutting down a Pipeline that has been operating safely for years is certain to cause economic harm and shift oil transport to more risky methods. Plaintiffs are not entitled to injunctive relief.

## II.   IT IS LAW OF THE CASE THAT PLAINTIFFS MUST PREVAIL ON THE INJUNCTION FACTORS TO OBTAIN INJUNCTIVE RELIEF

Plaintiffs first argue that they need not demonstrate that they meet the four-factor test required for injunctive relief, asking the Court to "clarify that its shutdown order is not an injunction but a component of its vacatur order." ECF No. 569 at 4. This argument is inconsistent with Supreme Court precedent; moreover, the D.C. Circuit has already rejected it and its ruling is "law of the case." This is not a case where setting aside the easement necessarily renders the Pipeline's operation illegal; all the cases Plaintiffs cite are thus irrelevant.

On August 5, 2020, the D.C. Circuit stayed this Court's injunction requiring Dakota Access to shut the pipeline down and empty it of oil and held that "[t]he district court did not make the findings necessary for injunctive relief." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 20-5197, 2020 WL 4548123, at *1 (D.C. Cir. Aug. 5, 2020).[1] The D.C. Circuit then directed this Court to "consider additional relief if necessary." *Id*. The D.C. Circuit implicitly rejected the Plaintiffs' argument that "vacatur" somehow includes an injunction against the operation of the Pipeline, and its ruling is now binding law of the case, "preclusive of all matters decided expressly or by necessary implication." *See, e.g., Taylor v. FDIC*, 132 F.3d 753, 761 (D.C. Cir. 1997). The law here is straightforward: the Plaintiffs have asked this Court for an injunction and "a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156

---

[1] Unlike the D.C. Circuit's ruling on the appellants' motions to stay, this aspect of its order was not preliminary and not based on that Court's initial assessment of the parties' likelihood of success on the merits.

(2010).  In other words, where a plaintiff's "request seeks more than mere vacatur, the Court must look to the standards for a permanent injunction." *Ctr. for Biological Diversity v. Ross*, No. CV 18-112 (JEB), 2020 WL 4816458, at *9 (D.D.C. Aug. 19, 2020) (Boasberg, J.).

Plaintiffs cite cases where vacatur of an agency's action automatically renders the non-federal action unlawful, ECF No. 569 at 4-5, but those cases concern "non-federal action [that] cannot lawfully begin or continue without the prior approval of a federal agency." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 155 (D.C. Cir. 1985).  While Plaintiffs seem to believe this is such a case, the cases they rely on demonstrate that it is not.  For instance, Plaintiffs cite a case concerning the Migratory Bird Treaty Act (MBTA), which makes it unlawful to kill migratory birds "[u]nless and except as permitted by regulations" issued under the Act.  16 U.S.C.A. § 703; *Pub. Employees for Envtl. Responsibility v. U.S. Fish & Wildlife Serv. (PEER)*, 189 F. Supp. 3d 1, 2 (D.D.C. 2016).  The Order at issue in *PEER* authorized killing of migratory birds; when it was set aside, this activity necessarily became illegal.  *PEER*, 189 F. Supp. 3d at 2.

Similarly, Plaintiffs cite cases involving natural gas pipelines, which are illegal to construct or operate without authorization by FERC.  *See* 15 U.S.C. § 717f.  As a result, if FERC's authorization is set aside, then it is illegal for a natural gas pipeline to be constructed or operate.  It is thus unsurprising that Plaintiffs can find cases where setting aside a FERC authorization halts a pipeline without a separate injunction.  *See* ECF No. 569 at 4 (citing, *e.g.*, *Sierra Club v. FERC*, 867 F.3d 1357, 1379 (D.C. Cir. 2017)).[2]

---

[2] Operating a nuclear facility is also prohibited unless authorized by license, 42 U.S.C. § 2092, so Plaintiffs' citation to cases involving nuclear facilities suffer from the same flaw.  *E.g.*, *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 523 (D.C. Cir. 2018).  So, too, with *Monsanto*, 994 F. Supp. 2d 98, which concerned regulations that prohibited certain genetically modified plants from being transported or "released into the environment" absent a permit or determination that the plant does not present a pest risk.  *See* 7 C.F.R. § 340.3-340.6.

Unlike the cases Plaintiffs cite, including those under the Natural Gas Act, this case does not concern a pipeline that requires a federal permit to operate, and the Corps does not "regulate or oversee the construction of pipelines." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 22 (D.D.C. 2016) (citation omitted). Indeed, there is no federal permit required to operate a crude oil pipeline. *See generally* Brandon J. Murrill, Pipeline Transp. of Natural Gas and Crude Oil: Fed. and State Regulatory Auth., Cong. Research Serv. pg. 7 (2016) (explaining that, in contrast to "natural gas pipelines under the NGA, no federal law establishes a specific approval process for the siting of pipelines that would transport crude oil. . . ."). Plaintiffs are simply incorrect that "[w]ithout an easement that meets the standards of NEPA, a pipeline cannot lawfully operate." ECF 569 at 5. NEPA is purely procedural and does not authorize the Pipeline's operation. *See Dep't of Transportation v. Public Citizen*, 541 U.S. 752, 756 (2004). Nor does the Mineral Leasing Act easement, which by its text does not authorize operation of the Pipeline, but rather authorizes the use of federal property. *See* USACE_ESMT000005.

Therefore, setting aside the easement does not have the necessary effect of rendering the Pipeline's operation illegal. Instead, setting aside the easement has the effect of rendering the Pipeline an "encroachment" on federal property—that is, a use of federal property without the necessary permission from the federal government. But not every encroachment on Corps property results in an immediate trespass action by the Corps—indeed, the Corps encroachment regulations would be largely superfluous if this were the case. *See* ECF No. 562. Ultimately, Plaintiffs' position fails because they have "not shown that all of the non-federal action it seeks to enjoin [the operation of the Pipeline] '*cannot* lawfully begin or continue without the prior approval of a federal agency.'" *Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, 841 F.

Supp. 2d 349, 361 (D.D.C. 2012) (quoting *Foundation on Economic Trends,* 756 F.2d at 155).

## III.   PLAINTIFFS HAVE NOT DEMONSTRATED THE FOUR ELEMENTS REQUIRED TO OBTAIN INJUNCTIVE RELIEF

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it [will] suffer[][3] an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto*, 561 U.S. at 156–57. Plaintiffs bear the burden of demonstrating irreparable harm, and this presents a "very high bar." *Beck v. Test Masters Educ. Servs. Inc.*, 994 F. Supp. 2d 98, 101 (D.D.C. 2014)).

Plaintiffs have not cleared the high bar; they have not demonstrated certain, or even likely, irreparable harm, and the equities tip in favor of maintaining the status quo.

### A.   Plaintiffs have not demonstrated certain, or even likely, irreparable harm

The Supreme Court has stated that plaintiffs cannot obtain injunctive relief if they "cannot show that they *will suffer* irreparable injury. . . ." *Monsanto*, 561 U.S. at 162 (emphasis added). This Circuit has required that the claimed injury "must be both *certain* and great; it must be *actual* and not theoretical." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (emphasis added); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). However, the Supreme Court has also declined to grant an injunction absent "imminent risk of *likely* irreparable harm." *Monsanto*, 561 U.S. at 162 (emphasis added); *see also Ctr. for*

---

[3] While the first element is often stated in the past tense, it may be satisfied if a movant can show "they will suffer irreparable injury." *Monsanto*, 561 U.S. at 162.

*Biological Diversity*, 2020 WL 4816458, at *10 ("To give Plaintiffs the benefit of the doubt here, the Court will use a less demanding standard requiring only a likelihood, not a certainty, of future irreparable harm."); *In the Matter of Fed. Bureau of Prisons' Execution Protocol Cases*, No. 19-MC-145 (TSC), 2020 WL 5594118, at *17 (D.D.C. Sept. 20, 2020) (denying relief where "Plaintiffs have not established that [injury] is 'certain' or even 'likely' to occur."). Plaintiffs fall short under either formulation of the test because the harm they fear is unlikely to occur.

Plaintiffs do not argue that a high magnitude oil spill, and associated impacts to Tribal lands, rights, or resources is "certain" or even "likely." Instead, Plaintiffs cite non-binding cases for the proposition that "[e]vents with a lower probability of occurring, but catastrophic consequences if they do, occupy a special place in the law." ECF No. 569 at 11. This is not the law in this Circuit. Rather, irreparable harm must be, at the very least, "likely" even if the harm is potentially high magnitude. *See Standing Rock*, 205 F. Supp. at 34 (The Court must "faithfully and fairly apply" the standard for injunctive relief "in all cases, regardless of how high the stakes. . . ."). This Court has held as much with regard to the very harm at issue here—an oil spill. In *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013), the Court considered Plaintiffs' argument that operating an oil pipeline "risks a devastating oil spill that would be damaging to nearby communities, and that *that* harm is sufficient to warrant an injunction." *Id*. The Court rejected this argument, finding "Plaintiffs have not shown that a damaging oil spill is likely to occur, and it is bedrock law that injunctions 'will not issue to prevent injuries neither extant nor presently threatened, but only merely feared.'" *Id*. (quoting *Comm. in Solidarity With People of El Salvador (CISPES) v. Sessions*, 929 F.2d 742, 745–46 (D.C. Cir. 1991)). The Court reiterated that "the harms that an oil spill might potentially someday cause—however fearsome—are not *certain*, and therefore are not sufficient to satisfy

the 'irreparable harm' standard." *Id.* (emphasis added).

The cases Plaintiffs cite are not to the contrary. *Ctr. for Biological Diversity* does not support Plaintiffs' position that "catastrophic" harms need not be "likely" or "certain" to warrant injunctive relief. 2020 WL 4816458, at *10. In *Biological Diversity*, the Court parsed the evidence to determine, using "probabilistic reasoning," whether the allegedly irreparable harm was "likely to occur in the next nine months." *Id.* Similarly, *Banks v. Booth*, 459 F. Supp. 3d 143, 159 (D.D.C. 2020), concerned prison inmates' high likelihood of experiencing serious health impacts or even death from COVID-19 infection. Though the Court did not expressly conduct a probabilistic analysis, it recognized COVID-19 "is widespread among the inmate population" and that "the number of inmates testing positive…is growing daily." *Id.* The Court's findings thus implied that COVID-19 was likely to harm inmates. Finally, contrary to Plaintiffs' characterization, ECF No. 569 at 11, the court in *Michigan v. U.S. Army Corps of Engineers* did not grant but *rejected* a proposed injunction requiring the Corps to make changes to Corps-managed waterways to protect against invasive Asian Carp. 667 F.3d 765, 795, 800 (7th Cir. 2011). The Seventh Circuit's subsequent decision upholding dismissal of the case is instructive as well, as the decision focused on the plaintiffs' failure to allege "facts showing that the Corps and the District are operating the [waterway] in a manner that is *likely* to allow the Asian carp to reach Lake Michigan." *Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 896 (7th Cir. 2014) (emphasis added). In sum, to obtain injunctive relief Plaintiffs must demonstrate they "will suffer" irreparable harm, and as explained below they have not done so.

### 1.    An oil spill at Lake Oahe is neither "likely" nor "certain"

Plaintiffs have not demonstrated that an oil spill at Lake Oahe or any harms resulting therefrom is "likely," much less "certain." This Court has repeatedly agreed with the Corps'

conclusion that the "possibility of a future spill . . . is low." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 29 (D.D.C. 2020). Nothing in the Plaintiffs' experts' declarations change this conclusion; indeed, not one of Plaintiffs' retained experts claim an oil spill is "likely," much less "certain." Plaintiffs' retained experts' critiques are not sufficient to demonstrate that Plaintiffs have met the high bar for injunctive relief.

Plaintiffs rely on the Holmstrom and Flanders declarations to critique DAPL's safety record and alleged "lack of surge relief systems." ECF No. 569 at 11. Neither argument is persuasive. First, Plaintiffs' retained experts point to the absolute number of spills of the Pipeline operator. But this number, standing alone, is meaningless for at least two reasons. One, the number does not account for the severity of the spills. Two, the number fails to show that this operator's safety record is outside the industry standard of care. Moreover, as the Corps has previously demonstrated, in making this argument Mr. Holmstrom misconstrues PHMSA data by blending together two different time periods in a misleading way. ECF No. 536 at 11.

Second, the surge analysis report Plaintiffs rely on did not find that the Pipeline lacked surge relief systems—to the contrary, it actually concluded that the Pipeline is "protected against excessive surge pressures" as long as its safety systems are in place. RAR 17288. The segment of the Pipeline under Lake Oahe—the only segment at issue here—is designed to withstand nearly double the maximum allowable operating pressure. DAPL 71314. PHMSA's historical data shows that, for all the pipelines of 16″ diameter or greater in the United States, only one pipeline spill was caused by incorrect operations between 2002 and 2012. RAR 150-160. After over three years of operations, there have been no spills at the Lake Oahe crossing or anywhere on the Pipeline's mainline. As discussed below Plaintiffs experts argued spills were most likely during commissioning (which occurred years ago) and decommissioning. Plaintiffs' retained

experts are also critical of the Pipeline's valves, but they were tested before the Pipeline began operations. *See id.* They are motor-operated, but if there is a power failure, they can also be closed manually. RAR 157. The valves have been specifically designed to meet industry standards and to withstand North Dakota's harsh winters. RAR 156-57.

Plaintiffs' own effort to identify large spills makes clear that they are unlikely. And they are even more unlikely under Lake Oahe because there is no way that the section of Pipeline can be damaged by construction activities, the cause of most pipeline spills. *Id.* As this Court has found and as Plaintiffs retained experts have not disproven, the risk of a spill is "low."

### 2. Subjective apprehension about a potential spill does not support a finding of irreparable harm

Having essentially conceded that the primary harm they are concerned about, an oil spill, is neither "certain" nor "likely," Plaintiffs seek to rely on subjective concern about a spill as a basis for finding irreparable harm. ECF No. 569 at 14. While such subjective harms have occasionally been a basis for a finding of irreparable harm, there is no basis for so finding here. If subjective concern over a harm that is not "likely" or "certain" to occur were sufficient to clear the "high bar" for injunctive relief, then the bar would not be high at all.

Plaintiffs have alleged mental distress resulting from the concern of a potential spill at Lake Oahe. *Id.* But where the risk of the ultimate harm that forms the basis of the mental distress is low, courts have declined to find irreparable harm sufficient to justify injunctive relief. For instance, in *Sierra Club*, this Court stated that it "acknowledges and accepts that some of the people who live in areas near the pipeline project are sincerely worried about the harm that an oil spill might cause," but nonetheless found that this was insufficient to warrant an injunction because a spill was unlikely. 990 F. Supp. 2d at 41. Similarly, in cases concerning mental harm from observing animals' death or injury, courts have drawn a distinction between cases where

9

this death or injury is certain to occur—and thus distress will certainly follow—from cases where plaintiffs are merely concerned about such harm occurring. For instance, Plaintiffs cite *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003), in which the court found the killing of hundreds of mute swans, "some of which may be those with which [plaintiffs] have developed relationships" to be irreparable harm. *Id.*; ECF No. 569. In contrast, in *Colorado Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220 (D.D.C. 2015), the Court drew a distinction between cases such as *Norton* where the government "*kill[s]* large numbers of animals" from the circumstance presented in that case where the government did not plan to kill the horses in question "[a]nd to the extent that BLM's actions do endanger wild horses, the risk of death or serious injury to the gathered horses appears to be quite low." In *Colorado Wild Horse*, the Court accepted "the sincerity or depth" of the emotional concern plaintiffs alleged, but ultimately found that in light of the "low" risk of the harm plaintiffs were concerned about that "Plaintiffs' reliance on emotional distress as a form of irreparable injury . . . is misplaced." *Id.*

Similarly, here, though Plaintiffs express concerns about the "threat of seepage, leak, and rupture" at Lake Oahe, ECF No. 569 at 15, given the evidence that the risk of such a spill is low, Plaintiffs subjective apprehensions do not constitute irreparable harm sufficient to sustain extraordinary injunctive relief. *See Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675–76 (9th Cir. 1988) ("Subjective apprehensions and unsupported predictions . . . are not sufficient" to show irreparable harm.); *Koller v. Brown*, 224 F. Supp. 3d 871, 879 (N.D. Cal. 2016); *Thomas v. Hoehne*, 2005 WL 2487947, at *2 (W.D. Mich. 2005) ("Speculative injury is not sufficient" nor is "fear on the part of the applicant."); *Air Transp. Ass'n of Am., Inc. v. Exp.- Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 334 (D.D.C. 2012) (quoting *Wisconsin Gas*, 758 F.2d at 674)) (Courts "need not grant injunctive relief 'against something merely feared as liable

to occur at some indefinite  time.'"").

### 3. Tribal governance is not irreparably harmed by the Pipeline

Plaintiffs  similarly  have identified  no harm, much less an irreparable harm, to their Tribal Self-Governance.  ECF No. 569 at 16-18.  The cases Plaintiffs  rely upon highlight  that the Corps has not harmed Tribal sovereignty.  And the facts belie  Plaintiffs'  claim that the Corps has undermined  tribal efforts to plan for the unlikely  event of a spill.

In contrast to the cases Plaintiffs cite where States undermined  tribal sovereignty  by asserting criminal  jurisdiction  on tribal lands, ECF No. 569 at 16-17,  this case involves  no intrusion  onto tribal lands, much less the total loss of tribal authority  over tribal land.  In *Wyandotte Nation v. Sebelius*, the Tenth Circuit found irreparable harm where a State raid seized money and property from tribal trust land.  443 F.3d 1247, 1255 (10th Cir. 2006).  In *Ute Indian Tribe v. Utah*, the Tenth Circuit held that prosecution of a Tribal  member for a crime on tribal land injured tribal sovereignty.  790 F.3d 1000 (10th Cir. 2015).  And in *Mashpee Wampanoag Tribe v. Bernhardt*, taking land out of trust status would have irreparably  harmed the tribe by causing "[t]he total loss of sovereign authority,  self-government, and jurisdiction"  on land.  No. 18-2242 (PLF), 2020 U.S. Dist. LEXIS 99024, at *10 (D.D.C. June 5, 2020) (also noting  impacts to funding  and taxes).  But no such harm to sovereignty  exists where a state "is not enforcing its laws on tribal lands," and "off-reservation  regulation  of non-tribal  entities  does not implicate [tribal] authority."  *Pueblo of Pojoaque v. New Mexico*, 233 F. Supp. 3d 1021, 1147 (D.N.M. 2017) (citing  *Wyandotte*, 443 F.3d at 1251-52, 1255).  Plaintiffs'  cases therefore highlight  that the Corps' off-reservation  management  of its own property does not injure tribal sovereignty.

Similarly,  Plaintiffs'  assertion that their government  functions  have been impaired, ECF No. 569 at 17, only illustrates  that they have suffered no injury  from a Pipeline  that has not had a

leak into Lake Oahe in over three years of operation.  The cases cited by Plaintiffs, *see id.*, make clear that Plaintiffs: (1) must prove they have suffered actual harm, such as a 70% to 85% actual reduction in voter registration numbers; and (2) "cannot engage in activities simply to create an injury."  *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016); *Nat'l Treasury Emps. Union v. U.S.*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (no injury where organization did not allege that bill was actually vetoed or modified by threat of line item veto, despite organization expending funds on lobbying based on speculation about harms).  Plaintiffs here have suffered no actual harm, and any impairment of emergency preparedness is not attributable to the Corps.

Plaintiffs' refusal to participate in emergency response planning meetings is fatal to their assertions, ECF No. 569 at 9, 17-18, that consultation was inadequate and that harms to tribal self-government supports an injunction.  Any impairment to potential tribal efforts to respond to a hypothetical oil spill have been occasioned, if at all, by Plaintiffs' refusal to participate in planning meetings.  *See Pennsylvania v. New Jersey,* 426 U.S. 660, 664, (1976) (per curiam) (holding that litigant cannot "be heard to complain about damage inflicted by its own hand"); *Lee v. Christian Coal. of Am., Inc.,* 160 F. Supp. 2d 14, 33 (D.D.C. 2001) (holding that a "preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted") (citations omitted).

First, Plaintiffs' suggestion, ECF No. 569 at 8-9, that an Interior Department Solicitor Opinion identified a consultation deficiency was incorrect even before remand.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 156 (D.D.C. 2017) ("Corps did endeavor to consult early with the Tribe and gave it the opportunity to offer meaningful comments"); *Standing Rock Sioux*, 205 F. Supp. 3d at 32 ("Tribe largely refused to engage in

consultations."); *Standing Rock Sioux*, 440 F. Supp. 3d at 11 ("In June 2017, the Court largely upheld the Corps' decision, including on the ground that it had fulfilled any consultation duties.").[4] And the record is clear that the Corps fully complied with any consultation requirement on remand.  ECF No. 446 at 2–10, 15–24 (Oct. 9, 2019); ECF No. 448 at 2–9, 10–27 (Oct. 9, 2019); ECF No. 450 at 2–4, 12–16 (Oct. 9, 2019); ECF No. 458 at 8-11, 38-42 (Oct. 17, 2019).  Standing Rock, for example, declined to participate in numerous meetings, including ones where Dakota Access was "prepared to show and explain . . . the results of the recent spill modeling and discuss how those results are informing the response planning."  Email from C. Borkland, ETP (Mar. 1, 2018), RAR6565 (also discussing provision of Bakken crude data). Rather than engage in emergency response planning, Standing Rock canceled a planning meeting and refused to allow the inspection of potential clean-up sites on its Reservation.  Letter from Chairman Faith to ETP (Feb. 28, 2018), RAR6588-89; Res. No. 80-18 (Mar. 6, 2018), RAR6429.  Contrary to the Tribe's suggestion, ECF No. 569 at 18, Standing Rock's refusal to productively engage hinders what should be joint efforts to protect the Tribe's sacred sites.

In sum, while Standing Rock may be correct that its own "emergency management department never had any substantial involvement in spill planning," ECF No. 569 at 18, that is not an injury attributable to the Corps.  Standing Rock could have attempted to remedy any injury to its emergency preparedness by participating in planning meetings.  The Tribe's refusal to consult on emergency preparedness cannot be held against the Corps and any injury caused by Standing Rock's failure to participate does not support an injunction.

---

[4] Plaintiffs' reliance on a 2016 Solicitor's Opinion is also misplaced because "as set out in the EA and Cooper Memo, the risk of a spill was low and was further mitigated by the easement conditions."  *Standing Rock Sioux*, 255 F. Supp. 3d at 143.

### B.    Plaintiffs have not established impacts of an unlikely spill could not be at least partially remediated

Plaintiffs argue that a spill at Lake Oahe could not be remedied by money damages as it would "involve the loss of a Treaty-protected right—like the use of the waters of Lake Oahe for ceremonial, subsistence, or economic purposes." ECF No. 569 at 19. However, at least as to the use of the lake for "economic purposes," Plaintiffs have failed to establish that they could not recover money damages against the Pipeline operator.

Moreover, even in the unlikely event of a spill, impacts of that spill would be temporary in time and limited in their geographic impact. *See, e.g.*, RAR114. Additionally, at least some of the impact would be lessened by the mitigation. *See Macht v. Skinner*, 715 F. Supp. 1131, 1137 (D.D.C.), *aff'd*, 889 F.2d 291 (D.C. Cir. 1989) (In considering injunctive relief, it is "appropriate for the Court to consider the attempts at mitigation[.]"); *Manzanita Band of Kumeyaay Nation v. Wolf*, No. 1:20-CV-02712 (TNM), 2020 WL 6118182, at *5 (D.D.C. Oct. 16, 2020) (irreparable harm theory is "undermined by Government measures in place to avoid and mitigate any harm to their religion and culture"). Here, the Corps imposed thirty-six conditions that are specifically tailored to further mitigate risk of rupture at the Lake Oahe crossing. *See* Dep't of the Army Easement for Fuel Carrying Pipeline Right-of-way Located on Lake Oahe Project, USACE_ESMT000005; EA at 71314; ECF Nos. 520-1 and 520-2 (describing safety features and record in greater detail).[5] And the spill response plan is robust and would immediately respond to an mitigate any spill. *E.g.,* RAR 229. Spill risk has been mitigated, and, if such a spill occurred, any subsistence or other economic loss could be

---

[5] Although this Court vacated the easement for the Pipeline to cross under Lake Oahe, the operator agreed to abide by its terms nevertheless pending the Corps' encroachment analysis.

remedied through money damages.

### C.   The balance of equities weighs against an injunction

A party seeking injunctive relief must demonstrate both "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). "These factors merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009). Plaintiffs have not established that the certain harms of stopping the pipeline and switching to more risky and environmentally problematic forms of oil transport are outweighed by the low probability of an oil spill or individuals' subjective apprehensions about such a spill.

Rather than establish that a tribal member's subjective feeling that a "[S]word of Damocles" hangs over her head is sufficient to justify injunctive relief, ECF No. 569 at 15, the cases Plaintiffs cite establish that the Plaintiffs must prove that the harm they will suffer outweighs the harm others will suffer. *League of Women Voters*, 838 F.3d at 12 ("Appellants have also demonstrated that the balance of the equities tips in their favor because a preliminary injunction will 'not substantially injure other interested parties.'"). For instance, in *Vencor Nursing Ctrs, L.P. v. Shalala*, 63 F. Supp. 2d 1, 13 (D.D.C. 1999), the court found that Plaintiffs had demonstrated that moving individuals from their nursing home would create irreparable harm. However, the Court looked at both sides of the scale. It found that the "trauma and the harm" from moving, alone, "do not warrant issuance" of injunctive relief. Those harms must be "balanced against the harm to residents that would result if they were allowed to remain" in a deficient facility. *Id.* The court ultimately weighed the harms and denied the request for injunctive relief. *Id.* at 13-14.

Similarly, Plaintiffs misapply the *Michigan* court's discussion of several States'

likelihood of succeeding on the merits of public nuisance claims. ECF No. 569 at 11. The Seventh Circuit in *Michigan* upheld the District Court's denial of an injunction, in part, because it weighed whether the proposed relief would "reduce by a significant amount the risk" at issue and, "on the other side, that the requested measures would impose substantial costs on the defendants and the public interests they represent, as well as added expenses for commerce, recreation, and tourism." *Michigan*, 667 F.3d at 789-90. In other words, *Michigan* stands for the proposition that Plaintiffs must establish a likelihood that any increased risk they experience outweighs the public interest and commercial harms that their proposed injunction would cause.

As demonstrated below, the certain harms that would result from granting an injunction—economic disruption and increased environmental risks—do not outweigh the subjective and speculative harms on Plaintiffs' side of the ledger.

> ### 1.    An injunction would cause economic disruption

As the Corps explained in its EA, the Pipeline has "tremendous secondary and sustainable economic benefits to the United States by supporting energy independence, increasing employment opportunities, and adding to demand in many manufacturing sectors, which would be a boost to the overall economy." ECF No. 172-1 at 71305. The Corps found these benefits accrue throughout the United States, as well as in the area surrounding the Pipeline. *See id.* ("[I]n summary, the economic impact to the U.S. as well as the immediate region where the pipeline is located is considerable.").

While the effects of any injunction would be felt by Dakota Access first, the damage would not be limited to the operator. An injunction would be immediately harmful to North Dakota's oil and gas industry: without any practical way to ship the vast bulk of their oil, crude oil prices in North Dakota will collapse. Ex. 1, Bennett Decl. ¶ 14. That will harm the State,

which has drawn as much as 45% of its tax revenue from oil and gas taxes in recent years. *Id.* ¶ 9. The damage will spread quickly to Midwest refineries that otherwise would have processed this crude oil. *Id.* ¶ 14-16. The refineries' costs will go up, and they will pass some of those costs along to consumers through higher retail gasoline prices. *Id.* ¶ 6. Eventually, the effects from the injunction will be felt even on the West Coast, where refiners will have to turn to other sources of crude oil for blending. *Id.* ¶ 15.

Last, an injunction would harm the public and economy by eroding regulatory predictability and public confidence. The Pipeline operator in good faith sought a property interest from the government, it followed the process, and provided all the information the government needed. It did not start construction on federal property until it had obtained the easement and then reasonably relied on that real estate interest to implement its commercial interests. An injunction causing the Pipeline to be drained of oil years later would erode confidence in the regulatory process.

Yet any injunction will not eliminate all risk of an oil spill; to the contrary it will shift oil to more risky modes of transportation. As discussed below, the Corps has shown (and this Court has agreed) that the risk of a catastrophic oil spill at Lake Oahe is low. By enjoining the operation of the Pipeline, the Court will avoid that small risk, but will force producers to ship their oil by rail or truck instead, which entails significant risks and certain environmental costs.

### 2.    The Pipeline minimizes risks associated with oil transportation

Plaintiffs' proposed injunction would likely increase the total risk associated with transporting oil from North Dakota. This Court previously found that it was unclear whether shutting down the Pipeline would cause oil to be transported by rail. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 16-1534 (JEB), 2020 U.S. Dist. LEXIS 117866, at *36-38

(D.D.C. July 6, 2020) . Plaintiffs now acknowledge that at least some of the oil currently carried by the Pipeline would be diverted to other modes of transportation. ECF No. 569 at 2 (asserting that "oil producers in North Dakota will easily work around a DAPL closure"). This oil would have to be transported by rail or truck. *See* DAPL 71230.

A 2018 PHMSA report supports the Corps' original conclusion that rail transport imposes more public safety risks than pipeline transport. The Corps respectfully disagrees with the Court, *Standing Rock Sioux*, 2020 U.S. Dist. LEXIS 117866, at *37, that PHMSA's responsible scientific caveats made its report nearly valueless in assessing the relative risks posed by pipeline and rail transport. While the 2018 PHMSA report stated that '[e]ach mode has its own unique safety risks, and more factors or different methodologies need to be considered to comprehensively answer the question of which mode is the safest,'" *id*., the metrics studied by PHMSA[6] strongly support the conclusion that pipelines are safer than railroads. PHMSA definitively found, based on data from 2007 to 2016, that:

> If percent spilled is used as a proxy for safety, shipping crude oil by water would be safer than by pipeline, by pipeline would be safer than by truck, and by truck would be safer than by rail. If incident rate is used as a proxy for safety, shipping crude by pipeline would be considered safer than by truck, and by truck would be considered safer than by rail."

ECF No. 507-2 at 9.

The 2018 PHMSA study indicated that rail might be safer than pipelines based on only one metric, the "human consequences" of death and serious injury within the United States. *Id.* at 8-9 (comparing 14 serious injuries and 3 fatalities from pipelines over 10 years to 0 injuries and

---

[6] PHMSA recommended, ECF No. 507-2 at 9, that future studies include more economic and environmental consequence factors. Plaintiffs cannot dispute that the economic factors, standing alone, militate against an injunction. ECF No. 527 at 18-19 (acknowledging financial impact).

fatalities from rail).  But PHMSA heavily caveated that conclusion by "caution[ing] that, despite these low domestic numbers, [rail] incidents . . . can be extremely dangerous as evidenced by the 47 deaths resulting from a crude oil derailment in Lac Megantic, Quebec." *Id.* at 8.  If the fatalities from the Lac Megantic disaster were included, the "human consequences" metric would also tip in favor of pipelines.  Moreover, because crude oil transport fatalities and serious injuries are "extremely rare" for all modes of transportation, *id.*, the Court should focus on the fact that enjoining the pipeline would statistically increase the percentage of oil spilled because of rail's higher incidence of spills relative to pipelines. ECF No. 507-2 at 9.  *See also* Charles F. Mason, *Analyzing the Risk of Transporting Crude Oil by Rail*, (Nat'l Bureau of Econ. Research, Working Paper No. 24299, Feb. 2018) (finding a positive relation between increased rail shipments of crude oil and spills).[7]

Science does not require complete certitude to make information actionable, and PHMSA forthrightly noting that it cannot guarantee absolute certainty does not undermine its conclusion that pipelines are safer in terms of percent spilled and incident rate. *See Am. Trucking Ass'ns v. EPA*, 283 F.3d 355, 370 (D.C. Cir. 2002); *Nat. Res. Def. Council, Inc. v. U.S. Envtl. Prot. Agency*, 804 F.2d 710, 716 (D.C. Cir. 1986) ("[W]e find it unthinkable that science may ever yield *absolute* certainty of safety in an area so complicated and replete with problems of measurement, modeling, . . . and the like.").  While PHMSA's 2018 report did not establish scientific certitude, its data support the conclusion that transporting oil by pipeline is safer than rail.  PHMSA's conclusions show that the equities weigh against an injunction.

Plaintiffs previously argued that generic comparisons of the relative safety of rail and

---

[7] Available at https://www.nber.org/papers/w24299.

pipeline transport do not contain information about the Oahe Crossing specifically.  ECF No. 527 at 25.  This is true, but it cuts against Plaintiffs.  There is substantial evidence in the record that the Pipeline segment under Lake Oahe is substantially *safer* than the average pipeline segment because, among other things, "spill risk due to third-party damage is low because the pipeline is positioned 92 feet below the lakebed."  *Standing Rock Sioux*, 255 F. Supp. 3d at 127; RAR000013.  Indeed, this Court has repeatedly agreed with the Corps' conclusion that for this Pipeline the "possibility of a future spill . . . is low."  *Standing Rock Sioux*, 440 F. Supp. 3d at 29.

Plaintiffs also previously argued that the risk of a spill was greater immediately after installation.   Kuprewicz Decl., ECF No. 272-2 at 5-6 ("likelihood of a leak or rupture is likely higher now [in August 2017] for DAPL than for pipelines that have been operating for years"). The report the Tribe's expert cited states that after instillation "there will [then] be a very low failure rate for long periods of time for a well-installed pipeline."  New Jersey Institute of Tech., "Final Rep. - Pipeline Industry Comparison of U.S. with Foreign Pipeline Land Use and Siting Standards, Maintenance, Rehabilitation and Retrofitting Policies and Practices," Apr. 1996, p.34;[8] ECF No. 272-2 at 5 (including the following graph):



Figure 4.6.1  Assumed failure rate function.

In other words, risk of spill today is lower than when the Court previously found that "the EA reasonably gives the necessary content to [the Corps'] top-line conclusion that the risk of a spill

---

[8]Available at: http://pstrust.org/docs/usdot_doc4.pdf

is low." *Standing Rock Sioux*, 255 F. Supp. 3d at 127.

Any balancing of equities must weigh the risks Plaintiffs fear against the countervailing risks and economic harm that an injunction would impose. On Plaintiffs' side of the scale, it is exceedingly unlikely that any oil, much less an amount approaching the worst case modeled values, will spill into Lake Oahe. On the other side of the balance is the near certainty that an injunction would cause oil currently transported by pipeline to be transported by other modes that increase spill risk, and the certainty that the injunction would cause economic disruption.

### 3. An injunction is not necessary to ensure NEPA compliance [9]

Plaintiffs argue that they prevailed on the merits of their NEPA claim, ECF No. 569 at 7-9, and that this bolsters their case for an injunction, *id.* at 29-30. First, whether Plaintiffs prevailed on the merits is not relevant under the four-factor test. *Monsanto*, 561 U.S. at 156–57. Moreover, as the Corps has undertaken considerable environmental review and is in the process of preparing the EIS the Court ordered, an injunction is not necessary to vindicate NEPA.

Plaintiffs correctly state that "[p]art of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures." *Winter*, 555 U.S. 23; ECF No. 569 at 13. Though Plaintiffs invoke *Winter* for this proposition, they have not argued that the environmental review done to date in this case has yielded "little if any information" about harms or mitigation measures. In fact, the environmental impacts of the easement have been analyzed in significant depth in an EA that along with its appendices totaled over 1,200 pages. That analysis was

---

[9] The Corps contests Plaintiffs' view of the merits of their NEPA claim, which is the subject of an appeal; but in light of the Court's direction to focus the instant briefing on irreparable harm, ECF No. 567, the Corps will not repeat NEPA merits arguments in this briefing.

followed by a review of the easement that totaled 136 pages, and then an additional 280 pages of analysis on remand. Moreover, the Corps is undertaking additional environmental review in the form of the EIS ordered by this Court which is estimated to conclude in late 2021 or early 2022.

The Corps acknowledges the importance of NEPA and its goal of fostering informed decisionmaking. But not every NEPA violation requires an injunction. *Monsanto*, 561 U.S. at 156–57. Similarly, not every NEPA violation indicates that the agency acted without knowledge of the risk "of the likely effects of [its] decision on the environment." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1034 (9th Cir. 2007) (citation omitted). There can be little doubt that the Corps has considered potential impacts of the easement in significant detail, including impacts stemming from an unlikely oil spill. And with the EIS ordered by this Court, the Corps will continue to examine these impacts in greater depth. *See* ECF No. 570. That a NEPA violation occurred here is not enough to tip the equities in Plaintiffs' favor.

### 4. Plaintiffs' treaty arguments are irrelevant and the Corps has not violated any trust duties owed to Plaintiffs.

Plaintiffs assert, ECF No. 569 at 8-9, 23-24, that the United States has breached trust responsibilities to Plaintiffs and that alleged historical trust violations support an injunction. Plaintiffs' incorrect suggestion that the United States illegally took their interests in certain lands provides no support for an injunction because Congress took those interests in the 1950s and compensated Plaintiffs at that time. Plaintiffs' effort to expand the Corps' NEPA responsibilities with alleged violations of treaties and trust duties should be rejected.

Plaintiffs are incorrect that a deficiency in the Corps' NEPA analysis means that "the Corps is . . . violating its trust obligations." ECF No. 569 at 8. To the contrary, "because Standing Rock has not identified a specific provision creating fiduciary or trust duties that the Corps violated, its breach-of-trust argument—whether considered a separate count or part of its

larger APA cause of action—cannot survive." *Standing Rock Sioux*, 255 F. Supp. 3d at 143-45. Plaintiffs identify no trust duty that the Corps has violated. *Standing Rock Sioux*, 440 F. Supp. 3d at 29 (even where Oglala identified a trust duty in the Mni Wiconi Act, the Corps "adequately performed any fiduciary duty"). Plaintiffs' effort to revive their trust claims fails because they do not identify a relevant statute or regulation that the Corps breached.

Rather than supplying the necessary statute or regulation imposing a trust duty, Plaintiffs offer nothing more than a bare assertion that the Corps breached a right "to use and rely on the waters of Lake Oahe." ECF No. 569 at 8. Plaintiffs' trust claim hinges on the assertion that the land at issue was taken "without authorization" and "stolen." ECF No. 569 at 8-9. But the United States acted legally and compensated Plaintiffs when it took portions of their land to create Lake Oahe. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 98-99 (D.D.C. 2017) (Congress "clearly abrogated [Cheyenne River's] 'absolute and undisturbed use and occupation' of these tribal lands" through Acts providing $300,000,000 in compensation); *Standing Rock Sioux*, 255 F. Supp. 3d at 114 (citing Act of Sept. 2, 1958, Pub. L. No. 85-915, 72 Stat. 1762); *Lower Brule Sioux Tribe v. South Dakota*, 711 F.2d 809, 823 (8th Cir. 1983). Moreover, the Corps has not impaired Plaintiffs' use of any quantity of water from Lake Oahe. *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1357 (Fed. Cir. 2018) (Tribe's "right to use sufficient water to fulfill the purposes of the Reservation, simply cannot be injured by government action that does not affect the Tribe's ability to use sufficient water to fulfill the purposes of the Reservation."). And absent an unambiguous imposition to "manage off-Reservation resources for the benefit of the Tribes" the United States' duties are coterminous with NEPA. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 812 (9th Cir. 2006) (no trust duty to regulate upstream cyanide heap-leach gold mines). Plaintiffs' arguments regarding

alleged treaty and trust duties do not support an injunction here.

## IV.   THE COURT WAS CLEAR THAT IT SET ASIDE THE EASEMENT NOT THE RIVERS AND HARBORS ACT PERMISSION AND THAT RULING SHOULD NOT BE REVISITED

Plaintiffs argue that "Vacatur of the [Rivers and Harbors Act] § 408 permit is warranted because it also indisputably relied on the invalidated environmental assessment." ECF No. 569 at 6-7. Plaintiffs' argument glosses over the fact that the Rivers and Harbors Act decision and Mineral Leasing Act easement decisions were two separate decisions taken in different years based on different legal authority under different administrative records. Moreover, Plaintiffs argument is inconsistent with basic APA jurisprudence.

The Court's decision was clear that "expert critiques" rendered "the *easement approval . . . 'highly controversial'* under NEPA." *Standing Rock Sioux*, 440 F. Supp. 3d at 8 (emphasis added). The Court ordered "the parties to brief the issue of whether *the easement* should be vacated during the remand," *id*. at 29, and decided to "vacate the Corps' decision to grant Dakota Access *an easement*." *Cheyenne River Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. CV 16-1534 (JEB), 2020 WL 3634426, at *11 (D.D.C. July 6, 2020) (emphasis added). It is no mystery why the Court limited its consideration and orders to the easement and not the 408 permission. Plaintiffs' suit challenges "authorizations made at two different times: the RHA Section 408 authorization . . . on July 25, 2016, and the easement approval on February 8, 2017." *Standing Rock Sioux*, 255 F. Supp. 3d at 123. The reports at the heart of this Court's opinion setting aside the February 2017 easement post-dated the July 2016 RHA authorization, and thus were not before the agency when making the RHA decision. In evaluating the RHA authorization, the Court explained that "considering the record as of July 25, 2016, when the Corps issued the Section 408 permit, it <u>had</u> taken a hard look at the risk of an oil spill and provided sufficient explanation to support its conclusion that such a risk was low." *See id*. at 149.

24

Plaintiffs request that the Court vacate the July 2016 RHA authorization based on expert reports that post-date this authorization. This runs afoul of the fundamental principle of APA review—that a court reviews the agency action in question based on the record that was "before the agency at the time the decision was made . . . ." *Envtl. Def. Fund, Inc. v. Costle,* 657 F.2d 275, 284 (D.C. Cir. 1981); *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792-93 (1984) ("If a court is to review an agency's action fairly, it should have before it neither more nor less information than did the agency when it made its decision."). It is therefore inappropriate for the Court to accede to Plaintiffs' attempt to shoehorn the 408 permission into the Court's decision on a separate agency decision.

## V.   CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' requested injunctive relief and Plaintiffs' request to set aside the Rivers and Harbors Act Section 408 Permission. The risk of any spill at Lake Oahe is low; thus the Tribes' harms are speculative, whereas shutting down a Pipeline that has been operating safely for years is certain to cause economic disruption and shift oil transport to more risky methods.

Dated: November 20, 2020                       Respectfully submitted,

                                               PAUL E. SALAMANCA
                                               Deputy Assistant Attorney General
                                               United States Department of Justice
                                               Environment & Natural Resources Division

                                               By: *Reuben S. Schifman*_____
                                               REUBEN SCHIFMAN, NY BAR
                                               MATTHEW MARINELLI, IL Bar 6277967
                                               U.S. Department of Justice
                                               Natural Resources Section
                                               P.O. Box 7611
                                               Benjamin Franklin Station

Phone: (202) 305-4224 (Schifman)
Phone: (202) 305-0293 (Marinelli)
Fax: (202) 305-0506
reuben.schifman@usdoj.gov
matthew.marinelli@usdoj.gov

*Attorneys for the United States Army Corps of Engineers*

OF COUNSEL:

MILTON BOYD
MELANIE CASNER
U.S. Army Corps of Engineers
Office of Chief Counsel
Washington, DC

## CERTIFICATE OF SERVICE

I, Reuben S. Schifman, hereby certify that on November 20, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and copies will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

*/s/ Reuben Schifman*___
REUBEN S. SCHIFMAN

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| CHEYENNE RIVER SIOUX TRIBE, | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-01534 (JEB) |
| | ) | (consolidated with Cases No. |
| UNITED STATES ARMY CORPS OF | ) | 1:16-cv-01796 & 1:17-cv-00267) |
| ENGINEERS, | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DAKOTA ACCESS, LLC, | ) | |
| Defendant-Intervenor. | ) | |

---

**DECLARATION OF SHAWN BENNETT**

---

I, Shawn Bennett, declare as follows:

1.      I am the Deputy Assistant Secretary for Oil and Natural Gas of the U.S.

Department of Energy.  I administer oil and gas programs, including research and development,

analysis, and natural gas regulation.

2.      The mission of the Department is to ensure America's security and prosperity by

addressing its energy, environmental, and nuclear challenges through transformative science and

technology solutions.   Among other things, the Department is responsible for overseeing the

United States' energy supply.

3.      I submit this declaration in support of the Appeal from the United States District

Court for the District of Columbia in No. 1:16-cv-1534.   This declaration is based on my

personal knowledge and information made available to me in the course of my official duties.

4.      The impacts from shutting down the Dakota Access Pipeline (DAPL) for any extended period are not only significant locally, but have a substantial impact on Midwest refineries and crude oil exports.  With a capacity of over 570,000 barrels a day, DAPL runs from the North Dakota to Patoka, Illinois.  DAPL is the largest pipeline running out of North Dakota, which is the second largest oil producing state after Texas and has the second largest crude oil reserves.[1]  The largest producing formation in North Dakota is the Bakken formation, located in western North Dakota and eastern Montana. The Bakken formation is the third largest tight oil producing region in the United States.

5.      DAPL terminates in Patoka, Illinois, which is a crude oil storage and pipeline hub and is the second largest oil storage site in Petroleum Administration for Defense District (PADD) 2.  From Patoka, crude oil is transported via multiple pipelines to 13 refineries in South-Eastern PADD 2.  Each of these refineries provides transportation fuels and other energy products for farms, fleets, and families in Indiana, Illinois, Michigan, Ohio, and Kentucky.

6.      With the closing of the DAPL, Midwest, Rocky Mountain, and Gulf Coast refineries that process Bakken crude oils will be forced to find alternatives, thereby incurring additional costs and raising prices for consumers of retail gasoline and other products.

7.      The DAPL is estimated to hold 5.4 million barrels of crude oil as line fill.  If the pipeline is emptied, 5.4 million barrels of crude oil storage capacity would need to be allocated in PADD 2.  The estimated current value of the 5.4 million barrels of line fill based on the June average for Bakken crude oil spot prices is between $197-$199 million, not accounting for storage costs. If the pipeline were to be refilled, the cost to refill the pipeline in 13 months is estimated to cost between $215-$217 million in crude oil supplies alone. This estimate is based

---

[1] https://www.eia.gov/naturalgas/crudeoilreserves/pdf/table_7.pdf

on the NYMEX West Texas Intermediate crude oil futures contract prices as of July 9, 2020 and crude oil price differentials between WTI and Bakken crude oil prices.

8.      The DAPL daily throughput is worth an estimated $21 million, given the pipeline's capacity of 570,000 barrels/day and at current prices for Bakken crude oil. If the pipeline were to shut for 13 months, the estimated total loss of throughput value would be $8.8 billion. This estimate is based on WTI futures prices as of July 9, 2020 for delivery between 1 and 13 months into the future, and average price differentials for Bakken crude oil.

9.      North Dakota crude oil production is 1.2 million barrels/day (as of April 2020), and averaged 1.4 million barrels/day in 2019.[2] Therefore, DAPL capacity would represent 40-47% of North Dakota's crude oil production. A lengthy shutdown could create a significant problem for the state of North Dakota's budget. Even accounting for the reduced production resulting from the COVID-19 pandemic, North Dakota tax revenue from the oil and gas industry between July 1, 2020, and June 30, 2021, is projected to be $4.9 billion.[3] If North Dakota's oil and gas industry declines by a similar 40-47%, state tax revenues would fall by an estimated $1.9 to $2.3 billion.

10.      The chart below represents: North Dakota crude oil production and the significance of DAPL pipeline capacity relative to that production. The availability of pipeline capacity is a major consideration for producers when planning to drill new wells. As a general matter, constrained take-away capacity results in lower prices and reduced production:

---

[2] https://www.dmr.nd.gov/oilgas/stats/historicaloilprodstats.pdf
[3] https://www.startribune.com/with-demand-in-the-dumps-north-dakota-oil-fields-grow-quiet/570515752/



11.    Crude oil prices in the Bakken are extremely sensitive to crude oil pipeline takeaway capacity. The last time Bakken crude oil pipeline takeaway capacity was full, from November 2018 to January 2019, Bakken crude oil price differentials fell $12-$20/barrel below West Texas Intermediate crude oil (WTI). Similar differentials now would result in Bakken crude oil prices between $18-$24/barrel, depending on crude by rail economics.

12.    The chart below reflects the differential between Bakken crude oil spot prices and WTI Cushing:



Bakken crude oil spot prices versus WTI Cushing
Source: Bloomberg L.P.

13.     With the announcement of the ruling in this matter, Bakken crude oil prices relative to WTI crude oil prices have decreased. In June, 2020, Bakken crude oil prices averaged between $1.73/b and $1.49/b below WTI, between July 1, 2020 and July 10, 2020 Bakken crude oil prices averaged $2.07/b and $2.57/b below WTI. Lower Bakken crude oil prices relative to WTI by several dollars creates even more downward pressure on North Dakota operators.

14.     Spare Bakken crude oil takeaway capacity is insufficient to make up for the loss of Dakota Access Pipeline. Bakken crude oil prices will plummet, ending up somewhere between operating costs and crude by rail economics. Over time, low crude oil prices result in accelerated crude oil production declines and shut-ins by regional producers, thereby, creating increasing financial stress on operators already suffering from depressed prices, and further reducing state revenues from oil and gas production.

15.     Deeply discounted Bakken crude oil prices versus Brent crude oil prices would likely attract increased buying interest from refineries on the U.S. East and West Coasts.[4] Without pipelines, these volumes would be transported via crude-by-rail.  However, deeply discounted Bakken crude oil prices would also result in falling crude oil production in the medium- to long-term.  Loss of Bakken crude oil supplies would be of greatest concern for refineries in Washington State.  These refineries are the largest recipients of Bakken crude oil by rail, blending Bakken Crude with Western Canada Select crude oil to create a replacement for declining supplies of Alaskan crude oils.  Alternative options for Bakken-like crude oils would be from more expensive imports, likely increasing the cost of transportation fuels these refineries supply.

16.     Outside of crude oil complications, the fall in oil drilling and production activities will result in a decrease in North Dakota natural gas production.  Natural gas production from North Dakota supplies industrial, commercial, and residential customers throughout the Midwest.  Falling natural gas production will raise regional prices and increase imports from Canada to maintain domestic demand in the region.

I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on July 13, 2020, in Washington, D.C.

Shawn Bennett
Deputy Assistant Secretary for
Oil and Natural Gas
Department of Energy

---

[4] https://www.spglobal.com/platts/en/market-insights/latest-news/oil/070620-us-judge-orders-dakota-access-crude-pipeline-shut-by-aug-5-vacates-permit