**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | |
| Plaintiff, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| and | |
| CHEYENNE RIVER SIOUX TRIBE, | |
| Plaintiff-Intervenor, | |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor. | |

---

**MOTION OF WESTERN DAKOTA ENERGY ASSOCIATION, ON BEHALF OF ITS NORTH DAKOTA MEMBER COUNTIES, CITIES, AND SCHOOL DISTRICTS, FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANT-CROSS DEFENDANT U.S. ARMY CORPS OF ENGINEERS AND DEFENDANT-INTERVENOR-CROSS CLAIMANT DAKOTA ACCESS, LLC**

---

Western Dakota Energy Association (WDEA) respectfully requests that this Court grant it leave to file the accompanying *amicus curiae* brief in the above-captioned action. The proposed *amicus curiae* brief is attached as Exhibit A to this Motion. A proposed order granting this Motion is attached as Exhibit B.

In accordance with Local Rule 7(m), counsel for WDEA has contacted counsel for the parties in this case, and is authorized to represent that Plaintiff Standing Rock Sioux Tribe does

not oppose the motion; Plaintiff Oglala Sioux Tribe reserves its position on the motion; Plaintiff Yankton Sioux Tribe does not oppose the motion; Plaintiff Robert Flying Hawk does not oppose the motion; Plaintiff-Intervenor Cheyenne River Sioux Tribe does not oppose the motion; Plaintiff-Intervenor Steve Vance does not oppose the motion; Defendant-Cross Defendant U.S. Army Corps of Engineers takes no position on the motion; Defendant-Intervenor-Cross Claimant Dakota Access, LLC does not oppose the motion.

## WDEA'S INTEREST

The WDEA is a longstanding association of counties, cities, and school districts in the oil-, gas-, and coal-producing regions of North Dakota. These governmental entities rely heavily on revenues from resource development in the Bakken Formation in Western North Dakota to carry out their functions and provide services to their citizens. Without the Dakota Access Pipeline ("DAPL") to transport oil out of the Bakken, the economic activity that this development infrastructure stimulates will be severely impaired. Any relief that impedes the operation of the pipeline will inflict irreparable harm upon these local governmental entities, and the tens of thousands of people and families that they serve. The WDEA seeks to participate as *amicus curiae* to represent these vital interests before this Court.

## DESIRABILITY AND RELEVANCE OF
## WDEA'S AMICUS CURIAE BRIEF

The Court has broad discretion regarding whether to allow non-parties to participate as *amici*. *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 846 (D.D.C. 1996). Generally, the court will permit an amicus brief "if the information offered is timely and useful" or "the non-party movants have a special interest in th[e] litigation as well as a familiarity and knowledge of the issues raised therein that could aid in the resolution of th[e] case." *Id.* (quotations omitted). "An amicus brief should normally be allowed when … the amicus has

unique information or perspective that can help the court beyond the help that lawyers of the parties are able to provide." *Ryan v. Commodity Futures Trading Commission*, 125 F.3d 1062, 1063 (7th Cir. 1997); *accord*, *Mashpee Wampanoag Tribe v. Bernhardt*, No. 18-2242, 2020 WL 2615523, at *1 (D.D.C. May 22, 2020) (quoting *Ryan* and granting motion for leave to file *amicus* brief).

The WDEA as *amicus curiae* proposes to concisely argue that this Court should deny Plaintiffs' request for a permanent injunction or other relief that would shut down DAPL (ECF No. 569) because, in addition to the reasons provided by other parties and *amici* to this action, the harm from cessation of DAPL operations to WDEA's county, city, and school district members and their citizens, will be immediate, irreparable, and devastating. The public interest would therefore *not* be served by an order preventing DAPL from continuing to provide safe transport for the State's mineral resources. WDEA's membership is well-positioned to provide this Court with information regarding the public interest served by DAPL beyond the reasons that the parties have addressed, rendering its participation as *amicus* both desirable and relevant.

## CONCLUSION

For the foregoing reasons, WDEA hereby requests that the Court grant leave to file an *amicus curiae* brief in support of the U.S. Army Corps of Engineers and Dakota Access, LLC.

Dated:  November 20, 2020                Respectfully submitted,


                                          /s/ R. Timothy McCrum
                                          R. Timothy McCrum (DC #389061)
                                          Elizabeth B. Dawson (DC #230818)
                                          CROWELL & MORING LLP
                                          1001 Pennsylvania Avenue, N.W.
                                          Washington, D.C. 20004
                                          rmccrum@crowell.com
                                          Telephone: (202) 624-2500

Fax: (202) 628-5116

*Counsel for Movant-Amicus Curiae*
*Western Dakota Energy Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on this day of November 20, 2020, I electronically filed the foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF system.

/s/ R. Timothy McCrum
R. Timothy McCrum (DC #389061)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STANDING ROCK SIOUX TRIBE,

        Plaintiff,

  and

CHEYENNE RIVER SIOUX TRIBE,

        Plaintiff-Intervenor,

        v.

U.S. ARMY CORPS OF ENGINEERS,

               Defendant,

  and

DAKOTA ACCESS, LLC,

        Defendant.

Case No. 1:16-cv-1534-JEB
(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267)

***AMICUS CURIAE* BRIEF OF THE WESTERN DAKOTA ENERGY ASSOCIATION, ON BEHALF OF ITS NORTH DAKOTA MEMBER COUNTIES, CITIES, AND SCHOOL DISTRICTS, IN SUPPORT OF DEFENDANT-CROSS DEFENDANT U.S. ARMY CORPS OF ENGINEERS AND DEFENDANT-INTERVENOR-CROSS CLAIMANT DAKOTA ACCESS, LLC**

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to LCvR 7(o)(5), counsel for the Western Dakota Energy Association (WDEA) hereby affirms that WDEA is a non-profit membership organization established in 1978, comprising counties, cities and school districts in the oil-, gas-, and coal-producing regions of North Dakota. The Western Dakota Energy Association has no parent corporations, and no publicly held company has 10% or greater ownership interest in it.

Dated: November 20, 2020                                    /s/ R. Timothy McCrum
                                                           R. Timothy McCrum (DC #389061)

i

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ........................................................................i

STATEMENT OF INTEREST OF *AMICUS CURIAE* ...............................................1

SUMMARY OF ARGUMENT ..................................................................................3

ARGUMENT ........................................................................................................4

I.     A DAPL Shutdown Will Devastate North Dakota Counties, Cities, and School Districts. ...............................................................................................4

     A.     Oil-and-Gas Revenue Is Directly Linked to the Wellbeing of North Dakota Families. .................................................................................4

     B.     A DAPL Shutdown Would Prevent WDEA's Member Counties, Municipalities, and School Districts from Recovering from the Covid-19 Pandemic. ........................................................................6

     C.     Plaintiffs Have Failed to Demonstrate that a DAPL Shutdown Would Serve the Public Interest, Requiring Denial of Their Motion. ..............................................................................................8

          1.     The Court May Only Award the Relief Plaintiffs Seek If Plaintiffs Satisfy the Requirements for Both Vacatur *and* Injunctive Relief. .........................................................................8

          2.     The Public Interest Favors Continued Operation of DAPL. .......................9

CONCLUSION ......................................................................................................11

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures*,
 422 U.S. 289 (1975)............................................................................................................8

*Allied-Signal, Inc. v. NRC*,
 988 F.2d 146 (D.C. Cir. 1993)...........................................................................................8

*Amoco Prod. Co. v. Vill. of Gambell*,
 480 U.S. 531 (1987)...........................................................................................................9

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*,
 No. CV-12-9861-GW(SSX), 2016 WL 4445770 (C.D. Cal. Aug. 12, 2016)...................8

*Defenders of Wildlife v. Jackson*,
 791 F. Supp. 2d 96 (D.D.C. 2011).....................................................................................9

*Eco Tour Adventures, Inc. v. Zinke*,
 249 F. Supp. 3d 360 (D.D.C. 2017)...................................................................................4

*Minard Run Oil Co. v. U.S. Forest Serv.*,
 670 F.3d 236 (3d Cir. 2011)..............................................................................................9

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010).......................................................................................................8, 9

*PGBA, LLC v. United States*,
 389 F.3d 1219 (Fed. Cir. 2004).........................................................................................8

*Samuels v. Mackell*,
 401 U.S. 66 (1971).............................................................................................................8

**Statutes**

N.D.C.C. § 57-51-01.................................................................................................................2

N.D.C.C. § 57-51.1-07..............................................................................................................4

## STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]

The Western Dakota Energy Association (WDEA) is a non-profit membership

organization established in 1978, comprising counties, cities, and school districts in the oil-, gas-,

and coal-producing regions of North Dakota. WDEA supports sustainable energy development

and responsible revenue-sharing for its members which are primarily, but not entirely, within the

Bakken Formation. *See generally* ECF 512-3 at 7.[2] As the local governmental units hosting

within their borders the vital energy development at issue in this case,[3] WDEA's members

(including the following) have consistently emphasized the importance of the Dakota Access

Pipeline ("DAPL") to the financial wellbeing and livelihoods of approximately 200,000 hard-

working citizens[4]:

- **Billings County**, home to the Theodore Roosevelt National Park (including President

  Roosevelt's Elkhorn Ranch) and the Little Missouri National Grasslands,[5] and where

  Theodore Roosevelt's principles of responsible resource conservation took shape in

  the late 1800s;[6]

---

[1] Counsel for WDEA hereby certifies that no person or entity other than WDEA and its counsel authored this brief in whole or in part, and no other person or entity other than WDEA funded the preparation of the brief.

[2] When citing to documents in this Court's docket, the page numbers referenced are those that are file-stamped at the top of the document.

[3] WDEA, "North Dakota Crude Oil Pipelines," https://ndenergy.org/usrfiles/news/images/Crude_Oil_Pipelines.JPG.

[4] *E.g.*, WDEA, Press Release, "WDEA Issues Plea to Rescind Order to Shut Down DAPL Pipeline" (July 9, 2020), https://ndenergy.org/usrfiles/news/WDEA_Issues_Plea_to_Rescind_DAPL_Shutdown_Order.pdf.

[5] https://www.fs.usda.gov/recarea/dpg/recarea/?recid=79469.

[6] National Park Service, "In Honor of a President," https://www.nps.gov/thro/index.htm.

- **City of Bowman**, in Bowman County, founded in 1907 when the railroad arrived;[7]

- **City of Dickinson**, in Stark County, home to critical service providers supporting the 21st century oil-and-gas resurgence;[8]

- **Dunn County**, with a history dating back to the late 1880s and the Dakota Territory;[9]

- **Emmons County**, through which DAPL passes on predominantly private lands, and bordering the east shore of Lake Oahe;[10]

- **McKenzie County**, home to a large part of the Theodore Roosevelt National Park and the Little Missouri National Grasslands;[11]

- **City of Minot**, the largest of three "hub" cities in oil-and-gas producing counties in North Dakota, with 35% population growth between 2007 and 2016, and home to the North Dakota headquarters of Hess Oil;[12]

- **Morton County**, through which DAPL passes on predominantly private lands, and which borders the western shore of Lake Oahe.[13]

- **Mountrail County**, which borders the Missouri River and likewise benefits from DAPL;[14]

---

[7] Pioneer Trails Regional Museum, "Local History," http://ptrm.org/programs/local-history/.

[8] Fed. Reserve Bank of Minneapolis, FEDGAZETTE, "Desperately seeking workers in the oil patch" 3, April 2012, https://www.ag.ndsu.edu/lead/oil-and-gas-resources-1/fedgazette-newsletter.

[9] https://www.dunncountynd.org/.

[10] ECF 239 at 48.

[11] https://www.mckenziecounty.net/About; https://www.visitwatfordcity.com/.

[12] *See* N.D.C.C. § 57-51-01 (defining "hub city"); City of Minot, "Gateway to the Bakken" 4, 25 (2018), https://www.ndenergy.org/usrfiles/news/Minot-HubCityRecap.pdf

[13] ECF 239 at 48.

[14] ECF 504-4 at 2.

- **City of Stanley**, deemed a "boomtown" after oil-and-gas development surged in North Dakota;[15]

- **Stark County**, which is home to dozens of oilfield service companies that support operations on the south side of the Bakken;[16]

- **City of Watford City**, in McKenzie County, which grew substantially between 2010 and 2018 due to the oil-and-gas boom, with a corresponding increase in demand for its school system;[17]

- **Williams County**, one of the fastest-growing counties in the country,[18] which received over $34 million from oil and gas production in 2019;[19] and

- **City of Williston**, the county seat of Williams County, which saw its population triple in the last ten years, spurred by development of the Bakken.[20]

These counties and municipalities, and their citizens, will experience severe and irreparable harm should the Court not grant Federal Appellant's request for a stay pending appeal.

## SUMMARY OF ARGUMENT

The Court should deny Plaintiffs' request to halt the operation of DAPL. Specifically, Plaintiffs have failed to demonstrate that the balance of the equities favors cessation of operations of Dakota Access, LLC's pipeline traversing the sub-strata far below the Lake Oahe

---

[15] Nat'l Pub. Radio, "Oil Boom Underway in North Dakota" (Aug. 25, 2010), https://www.npr.org/templates/story/story.php?storyId=129431225.

[16] *See generally* Fed. Reserve, *supra* n.7, at 3.

[17] https://voicesofwatford.com/continued-enrollment-growth-projected/.

[18] https://www.williamsnd.com/.

[19] N. Dak. Off. of State Treas., "Historical Revenue Distributions," https://www.treasurer.nd.gov/historical-revenue-distributions.

[20] https://cityofwilliston.com/.

reservoir in North Dakota, or that the public interest would be served by such cessation. Rather than repeat arguments made by the United States, Dakota Access, LLC, or other *amici*, *amicus curiae* WDEA seeks only to emphasize the following points unique to WDEA and its member counties, municipalities, and school districts: (1) the extraordinary harm a DAPL shutdown would inflict on approximately 200,000 people and myriad small businesses in western North Dakota; and (2) this harm must be considered as part of the required inquiries and equitable balancing the Court undertakes when considering the relief Plaintiffs seek, *i.e.* the shutdown of an already operational, safe, and vitally important artery of the North Dakota economy.

## ARGUMENT

### I.     A DAPL SHUTDOWN WILL DEVASTATE NORTH DAKOTA COUNTIES, CITIES, AND SCHOOL DISTRICTS.

Shutting down DAPL will cause widespread and likely long-lasting economic and social damage to the communities and people of western North Dakota.

### A.     Oil-and-Gas Revenue Is Directly Linked to the Wellbeing of North Dakota Families.

North Dakota supports its schools and local governments through distribution of oil-and-gas tax dollars—comprising nearly one-fifth of the State's general fund revenues, ECF 504-1 at 4, even without counting the additional enormous indirect economic activity the oil-and-gas industry creates. The State has a formula that provides for the distribution of oil-and-gas extraction and gross production taxes (GPT) to multiple "buckets."[21] Many of the buckets provide tax revenue to the cities, counties, school districts, and township governments impacted

---

[21] *See generally* N.D.C.C. § 57-51.1-07; Office of State Treasurer, North Dakota Oil Extraction and Gross Production Distribution Fiscal Years 2020 and 2021, https://www.treasurer.nd.gov/sites/www/files/documents/O%26G%20Flow%20Charts%20(19-21%20Biennium).pdf. The Court may consider extra-record facts such as those provided in this *amicus* brief because remedy is at issue. *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 369 n.7 (D.D.C. 2017).

by energy development, directly or indirectly. *Id.* at 3. The seven counties through which DAPL passes received a total of more than $7.5 million in property tax revenue from DAPL alone in 2018. ECF 504-4 at 2. However, because the State develops—and can alter—the allocation formula, local governments and school districts, especially those in oil-and-gas producing counties, are reliant on, but unable to control, one of their largest sources of revenue.

Local governments and school districts also benefit indirectly—though not insignificantly—from other allocations of oil-and-gas extraction taxes, such as the Resources Trust Fund, which traditionally has been used to provide funding for vital water development and flood control projects, and the Common Schools Trust Fund. ECF 504-1 at 3. Oil-and-gas tax revenue also supports energy research projects, many of which are aimed at enhancing the environmental performance of the State's energy-producing assets. *Id.* North Dakota's Outdoor Heritage Fund, which supports conservation practices, restores wildlife habitat, and enhances outdoor recreational opportunities, also benefits from these revenues. *See id.* WDEA produced a study that documents this wise and widespread use of the State's oil-tax dollars, on a county-by-county basis.[22] Many local government entities (*e.g.,* Billings and McKenzie Counties) and individual landowners also benefit from substantial royalty payments for the use of their mineral rights, with resulting benefits to their local economies. *See* ECF 512-6 at 13.

In 2019, the North Dakota Legislature forecast oil prices to average $48.50 per barrel in the first year of the 2019-2021 biennium, and $48.00 per barrel in the second year.[23] Oil production was anticipated to increase from 1.4 million barrels per day in the first year to 1.44

---

[22] WDEA, "How the Oil Industry and Region Benefit and Support the State," https://taxstudy.ndenergy.org/usrfiles/TaxStudy/HiResNDPC-WDEA-OGTaxStudy-Handout2.pdf.

[23] North Dakota Legislative Counsel, Budget Status – Motion for Proposed March 2019 Forecast 2 (March 2019), https://www.legis.nd.gov/files/fiscal/2019-21/docs/19.9507.02000.pdf.

million barrels per day in the second.[24] However, due to the COVID-19 pandemic and the
associated shocks to financial markets and energy demand, as of May 2020, North Dakota crude
oil production had fallen to an estimated average of just 858,395 barrels per day, and producers
realized a catastrophically-low average price of only *$14.27 per barrel*.[25] A DAPL shutdown
would only exacerbate these already-dire circumstances.

North Dakota has a "part-time citizen legislature that meets on a biennial basis," with
"few options available to deal with [] a sudden, drastic change in the state's revenue." ECF 504-1
at 5-6. While the State's executive branch can implement an "across-the-board" budget reduction
without the legislature's approval, *id.*, the State cannot so easily adjust the buckets of revenue
distribution to account for extreme, long-term impacts such as those from a global pandemic—or
the shutdown of a pipeline that is a central artery delivering not only oil to market, but also State
revenue to local governments and school districts.

**B.    A DAPL Shutdown Would Prevent WDEA's Member Counties,
Municipalities, and School Districts from Recovering from the Covid-19
Pandemic.**

As a result of the extraordinary collapse in oil prices and demand destruction from the
COVID-19 pandemic, oil-and-gas tax revenue fell off a cliff—from approximately $225M in
February 2020 to less than $50M in June 2020.[26] Political subdivisions have been forced to
reduce workforces and delay infrastructure projects. The people of western North Dakota are
beginning to recover from these ruinous market conditions, but the consequences were severe: in
Williams County, for example, unemployment spiked to 15% in May 2020, and remained close

---

[24]  *Id.*

[25] North Dakota Dep't of Mineral Resources, Director's Cut: May 2020 Production 1 (July 17,
2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-07-17.pdf.

[26] North Dakota Legislative Council, "Oil and Gas Tax Revenues Monthly Update" (June 2020),
https://www.legis.nd.gov/files/fiscal/2019-21/docs/21_9005_11000.pdf.

to 9% as of September 2020.[27] The Director of North Dakota's Department of Mineral Resources estimates that over 11,000 layoffs resulted from the pandemic in the oil and gas sector *alone*.[28] In a State with approximately 800,000 people, that 11,000 families saw income disappear virtually overnight is incredibly significant. Companies have been restarting producing wells slowly and gradually bringing more people back to work, but with recurring pandemic surges, progress is likely to be slow. The shutdown of DAPL would halt efforts to bring many oil and gas wells back online, especially since the pipeline is the most economical means of transporting product. *See, e.g.*, ECF 517 at 24. Indeed, producers would likely start shutting in wells again and laying off people who had *just* returned to work. Put plain, should the Court shut down DAPL, it would also shut down a key driver of this recovery and add insult to injury.

The devastating economic effects of shutting down the pipeline will ripple through the entire State's economy, extending far beyond the pipeline company and its customers, into every segment of North Dakota's economy. To put a finer point on it, the loss of DAPL's 570,000 barrel-per-day takeaway capacity will likely add *at least* $5.00 per barrel to the cost of shipping North Dakota crude—*i.e.*, an additional *one billion dollars per year*. ECF 542-2 at 35. That additional cost would make it nearly impossible for North Dakota to compete with other oil-producing regions in the country, thereby stopping our communities' recovery in its tracks.

The long-term effect of a DAPL shutdown would be even more disastrous. State regulators fear the impacts on pricing could lead to an exodus from the Bakken, as producers are compelled to focus on other shale plays closer to the markets. Some experts anticipate that in a

---

[27] "Unemployment Rate in Williams County, ND," Fed. Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/NDWILL5URN (updated Oct. 28, 2020).

[28] North Dakota Dep't of Mineral Resources, Director's Cut: August 2020 Production 2 (Oct. 16, 2020), https://www.dmr.nd.gov/oilgas/directorscut/directorscut-2020-10-16.pdf.

time when oil supply is abundant, the shift in investment capital could become practically

permanent and the State's robust oil industry would never fully recover. *See, e.g.*, ECF 512-3 at

13; ECF 520-4 at 8-9. That threat is of major concern to the cities, counties, and school districts

that WDEA represents, and the tens of thousands who live in those communities.

C. **Plaintiffs Have Failed to Demonstrate that a DAPL Shutdown Would Serve the Public Interest, Requiring Denial of Their Motion.**

1. **The Court May Only Award the Relief Plaintiffs Seek If Plaintiffs Satisfy the Requirements for Both Vacatur *and* Injunctive Relief.**

Whether the relief Plaintiffs seek could be accomplished by vacating the agency action or

would require a formal injunction, where, as here, the relief Plaintiffs seek would have the *effect*

of an injunction, the Court is bound to apply the traditional four-factor test for injunctive relief.

*See PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004) (citing *Samuels v.*

*Mackell*, 401 U.S. 66, 71-73 (1971)). Because Plaintiffs also seek vacatur of an agency's action,

the *Allied-Signal* balancing test of course applies. *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150–

51 (D.C. Cir. 1993) (requiring court to weigh the seriousness of the error against the disruptive

consequences of vacatur).

The Supreme Court has instructed repeatedly that injunction is *not* to be the presumptive

relief to remedy a NEPA violation; rather, the party seeking injunctive relief must satisfy the

traditional four-factor injunction test. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157–

58 (2010) (ruling that presumptive injunctions "invert the proper mode of analysis"). When *both*

vacatur and injunctive relief are in play, therefore, a court must be satisfied that both tests have

been met. *See Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, No. CV-12-9861-

GW(SSX), 2016 WL 4445770, at *6-7 (C.D. Cal. Aug. 12, 2016) (finding vacatur "debunked" as

"presumptive remedy," and that "the traditional four part test" for injunctive relief controls

where vacatur of agency action would halt project already underway); *Aberdeen & Rockfish R.R.*

*Co. v. Students Challenging Regulatory Agency Procedures*, 422 U.S. 289, 308-09 (1975) (equating injunctions to orders that "interfere with the operative effect of [an agency's] order"). Particularly where, as here, injunctive relief would not return the parties to the *status quo ante*—DAPL has been built and operational for years—courts should be wary of awarding relief that would only serve to "punish" third parties that have done nothing wrong. *See Defenders of Wildlife v. Jackson*, 791 F. Supp. 2d 96, 118 (D.D.C. 2011).

### 2.    The Public Interest Favors Continued Operation of DAPL.

Properly applied, the public interest unequivocally tilts against the relief requested here. Indeed, the Supreme Court not long ago explained the public interest prong as requiring a conclusion "that the public interest would not be disserved by a permanent injunction." *Monsanto*, 561 U.S. at 2748. So the relevant question is, would enjoining DAPL do a disservice to the public interest? The answer is a resounding "yes."

The Supreme Court has recognized in the preliminary injunction context the strong public interest in "development of energy resources," and that such interest is not automatically outweighed by other concerns. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 (1987) (acknowledging lower court's finding that oil-and-gas "exploration activities would not significantly restrict subsistence resources," the competing public interest); *id.* at 546 n.12; *see also Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, (3d Cir. 2011) (recognizing in a NEPA case "the public's interests in aiding the local economy" in enjoining Forest Service from implementing policy that would have harmed oil-and-gas producers and mineral rights owners). Here, the Court has already concluded that the likelihood of a spill *at all* was low, ECF 158 at 15; that likelihood is even smaller when considering the relatively short remand period. The public interest in the continued availability of energy resources and the financial benefits those resources would produce therefore far outweighs the low risk of a spill in the time it will take for

the U.S. Army Corps of Engineers to conduct its NEPA review. Lower even than the risk of a spill is the risk that a spill would harm the water supply of the Standing Rock Sioux Tribe, since in 2017 the intake was moved from 20 miles from the pipeline's water crossing to *70 miles away*.[29] Tribal Chairman Archambault explained that the new system, including "many miles of pipe, ensures safe, clean and reliable drinking water for the people of Standing Rock."[30] And as others have explained, shutting the pipeline down would *not* decrease risks to the environment. ECF 520-1 at 17-22.

Moreover, proper application of the public interest prong requires considering not only the disruption a DAPL shutdown would cause "to DAPL, the North Dakota oil industry, and potentially other states," ECF 546 at 23, but also impacts to local governments, school districts, and citizens. DAPL is a state-of-the-art pipeline that has been operating safely for more than three years following completion of a thorough environmental assessment. ECF 520-2 at 10. "[M]ost pipelines cross regulated water bodies,"[31] and DAPL is among the newest, safest and most efficient of them all. Local government officials in Morton and Emmons Counties, between which the pipeline crosses the Missouri River and Lake Oahe, are confident in the safety performance and environmental protection afforded by the pipeline's state-of-the-art construction. That these counties trust the integrity of the pipeline is indicative of the work that has gone into making this project so safe and successful.

---

[29] Ernest Scheyder, "For Standing Rock Sioux, new water system may reduce oil leak risk," REUTERS (Nov. 22, 2016), https://www.reuters.com/article/us-north-dakota-pipeline-water/for-standing-rock-sioux-new-water-system-may-reduce-oil-leak-risk-idUSKBN13H27D.

[30] Patience Hurley, U.S. Bur. of Reclamation, "Standing Rock Rural Water Supply System Delivers" (Jan. 12, 2018), https://www.usbr.gov/newsroom/stories/detail.cfm?RecordID=61708.

[31] Cong. Research Serv., "Oil and Natural Gas Pipelines: Role of the U.S. Army Corps of Engineers" 2 (June 2017), https://www.everycrsreport.com/files/20170628_R44880_1105a52fd838d2e8d342c75e49199c8bcdeb6607.pdf.

In sum, the public interest in preventing the severe and widespread economic and social harm from DAPL's closure far outweighs the exceedingly low risk of an accident in the approximately 13 months it may take the Corps to correct the procedural error the court identified (which, through its appeal, the Corps will demonstrate was no error at all).

## CONCLUSION

This Court should deny Plaintiffs' request for clarification and injunctive relief, and should instead recognize that continued operation of DAPL is safe and in the public interest.

Dated:  November 20, 2020                    Respectfully submitted,


                                                         /s/ R. Timothy McCrum
                                                         R. Timothy McCrum (DC #389061)
                                                         Elizabeth B. Dawson (DC #230818)
                                                         CROWELL & MORING LLP
                                                         1001 Pennsylvania Avenue, N.W.
                                                         Washington, D.C. 20004
                                                         rmccrum@crowell.com
                                                         Telephone: (202) 624-2500
                                                         Fax: (202) 628-5116

                                                         *Counsel for Amicus*
                                                         *Western Dakota Energy Association*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with LCvR 7(o)(4) because it does

not exceed 25 pages.

/s/ R. Timothy McCrum
R. Timothy McCrum (DC #389061)

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of November, 2020, I electronically filed the

foregoing document using the CM/ECF system. Service was accomplished by the CM/ECF

system.


/s/ R. Timothy McCrum
R. Timothy McCrum (DC #389061)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, | |
|         Plaintiff, | Case No. 1:16-cv-1534-JEB |
|   and | (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| CHEYENNE RIVER SIOUX TRIBE, | |
|         Plaintiff-Intervenor, | |
|       v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
|             Defendant, | |
|   and | |
| DAKOTA ACCESS, LLC, | |
|         Defendant. | |

**[PROPOSED] ORDER GRANTING MOTION OF WESTERN DAKOTA ENERGY
ASSOCIATION FOR LEAVE TO FILE *AMICUS CURIAE* BRIEF IN SUPPORT OF
DEFENDANT-CROSS DEFENDANT U.S. ARMY CORPS OF ENGINEERS AND
DEFENDANT-INTERVENOR-CROSS CLAIMANT DAKOTA ACCESS, LLC**

HAVING CONSIDERED the Motion of Western Dakota Energy Association for Leave

to File an *Amicus Curiae* Brief in Support of Defendant-Cross Defendant U.S. Army Corps of

Engineers and Defendant-Intervenor-Cross Claimant Dakota Access, LLC ("the Motion"), and

HAVING REVIEWED the Motion and being otherwise fully advised,

IT IS ORDERED that the Motion is GRANTED.

IT IS FURTHER ORDERED that Western Dakota Energy Association shall file its

*amicus curiae* brief within five days of the entry of this Order.

DATED this _____ day of _____, 2020.


_____
Honorable James E. Boasberg
United States District Judge