**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,<br><br>        Plaintiffs,<br><br>  and<br><br>CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL.,<br><br>        Plaintiff-Intervenors,<br><br>    v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>        Defendant-Cross Defendant,<br><br>  and<br><br>DAKOTA ACCESS, LLC,<br><br>        Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

———————————————

**RESPONSE OF DAKOTA ACCESS, LLC IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLARIFICATION AND A PERMANENT INJUNCTION**

———————————————

William S. Scherman
Miguel A. Estrada
David Debold
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

*Counsel for Dakota Access, LLC*

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

ARGUMENT .................................................................................................................... 4

    I.      Plaintiffs Are Not Entitled To Injunctive Relief ...................................................... 4

           A.     Plaintiffs Have Not Succeeded On The Merits Of A Claim Warranting
                    Injunctive Relief Shutting Down The Pipeline ............................................ 4

           B.     Plaintiffs Have Not Established Irreparable Harm ...................................... 8

           C.     The Balance Of Equities And Public Interest Weigh Against A
                    Shutdown .................................................................................................. 19

    II.     Plaintiffs' Requests For Alternative Relief Are Meritless .................................... 23

           A.     There Is No Basis To "Clarify" The Vacatur Order ................................. 23

           B.     Vacatur Of Dakota Access's Section 408 Permit Is Unwarranted ........... 25

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................................................................. 24

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ..................................................................................................... 6

*Ayuda, Inc. v. Thornburgh*,
    919 F.2d 153 (D.C. Cir. 1990) ................................................................................................. 24

*Baltimore Gas & Elec. Co. v. FERC*,
    252 F.3d 456 (D.C. Cir. 2001) ................................................................................................... 6

*Banks v. Booth*,
    459 F. Supp. 3d 143 (D.D.C. 2020) ......................................................................................... 17

*Base One Techs., Inc. v. Ali*,
    78 F. Supp. 3d 186 (D.D.C. 2015) ........................................................................................ 4, 5

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................................................... 6

*Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*,
    2011 WL 221823 (N.D. Ill. Jan. 24, 2011) ............................................................................. 18

*Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................................ 17

*Buchholz v. Meyer Njus Tanick, PA*,
    946 F.3d 855 (6th Cir. 2020) ................................................................................................... 19

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
    344 F. Supp. 3d 158 (D.D.C. 2018) .................................................................................... 12, 13

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................................................................... 9

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................................................. 9, 18

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................................. 19

*Colo. Wild Horse v. Jewell*,
    130 F. Supp. 3d 205 (D.D.C. 2015) ......................................................................................... 18

*Confederated Tribes & Bands of Yakama Nation v. DOA*,
    2010 WL 3434091 (E.D. Wash. Aug. 30, 2010) ...................................................17

*Ctr. for Biological Diversity v. Ross*,
    2020 WL 4816458 (D.D.C. Aug. 19, 2020) ...................................................10, 12

*Ctr. for Food Safety v. Vilsack*,
    2010 WL 11484449 (N.D. Cal. Nov. 30, 2010) ...................................................17

*Doe v. Mattis*,
    928 F.3d 1 (D.C. Cir. 2019)...................................................4, 9

*Eco Tour Adventures, Inc. v. Zinke*,
    249 F. Supp. 3d 360 (D.D.C. 2017)...................................................14

*Fang v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    2016 WL 9275454 (N.D. Cal. Dec. 10, 2016)...................................................8

*Gill v. Whitford*,
    138 S. Ct. 1918 (2018)...................................................8

*Heckler v. Chaney*,
    470 U.S. 821 (1985)...................................................6

*Helling v. McKinney*,
    509 U.S. 25 (1993)...................................................17

*Henke v. Dep't of Interior*,
    842 F. Supp. 2d 54 (D.D.C. 2012)...................................................9, 10, 12, 13

*Karst Envtl. Educ. & Prot., Inc. v. EPA*,
    475 F.3d 1291 (D.C. Cir. 2007)...................................................5

*Kelso v. U.S. Dep't of State*,
    13 F. Supp. 2d 12 (D.D.C. 1998)...................................................24

*Kimberlin v. Quinllan*,
    199 F.3d 496 (D.C. Cir. 1999)...................................................11

*Memphis Cmty. Sch. Dist. v. Stachura*,
    477 U.S. 299 (1986)...................................................18

*Michigan v. U.S. Army Corps of Engineers*,
    667 F.3d 765 (7th Cir. 2011)...................................................16, 17

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)...................................................3, 4, 8, 9, 12, 13, 22, 23, 24

iii

*Naartex Consulting Corp. v. Watt,*
  722 F.2d 779 (D.C. Cir. 1983) ................................................................5

*Nat'l Archives & Records Admin. v. Favish,*
  541 U.S. 157 (2004)...................................................................8, 21

*Nat'l Ass'n of the Deaf v. Trump,*
  2020 WL 5411171 (D.D.C. Sept. 9, 2020) ...................................10, 17

*Nat'l Parks Conservation Ass'n v. Semonite,*
  422 F. Supp. 3d 92 (D.D.C. 2019) ...........................................24

*Newdow v. Bush,*
  355 F. Supp. 2d 265 (D.D.C. 2005) ...........................................13

*Norton v. S. Utah Wilderness All.,*
  542 U.S. 55 (2004)...........................................................................7

*NRDC v. EPA,*
  383 F. Supp. 3d 1 (D.D.C. 2019) ...............................................18

*O'Shea v. Littleton,*
  414 U.S. 488 (1974)...........................................................................18

*Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n,*
  896 F.3d 520 (D.C. Cir. 2018) ...................................................9, 10, 22

*Puntenney v. Iowa Utils. Bd.,*
  928 N.W.2d 829 (Iowa 2019) .......................................................22, 23

*RB Jai Alai v. Fla. Dep't of Transp.,*
  2014 WL 12617779 (M.D. Fla. Sept. 30, 2014)...........................12, 13

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
  324 F.3d 726 (D.C. Cir. 2003) ...................................................6

*S. Dakota v. Ubbelohde,*
  330 F.3d 1014 (8th Cir. 2003) ...................................................7

*Save Jobs USA v. DHS,*
  105 F. Supp. 3d 108 (D.D.C. 2015) ...........................................10

*Sherley v. Sebelius,*
  644 F.3d 388 (D.C. Cir. 2011)...................................................20

*Sierra Club v. FERC,*
  867 F.3d 1357 (D.C. Cir. 2017)...................................................24

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   990 F. Supp. 2d 9 (D.D.C. 2013)..................................................................9, 10, 12, 16, 18

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   2020 WL 3634426 (D.D.C. July 6, 2020)...........................................6, 7, 14, 19, 20, 21, 22, 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   205 F. Supp. 3d 4 (D.D.C. 2016) ..............................................................................18, 24, 25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   255 F. Supp. 3d 101 (D.D.C. 2017)...........................................................................2, 8, 10, 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   282 F. Supp. 3d 91 (D.D.C. 2017).................................................................................3, 10, 14

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   440 F. Supp. 3d 1 (D.D.C. 2020) .............................................................................3, 8, 10,  25

*Stoltz v. Kretschmar*,
   24 Wis. 283 (1869) ........................................................................................................5

*United States v. Fokker Servs. B.V.*,
   818 F.3d 733 (D.C. Cir. 2016)....................................................................................24

*United States v. Kittredge*,
   445 F.2d 1117 (5th Cir. 1971) ...................................................................................5

*Warth v. Seldin*,
   422 U.S. 490 (1975)....................................................................................................5

*West v. Holder*,
   60 F. Supp. 3d 197 (D.D.C. 2015) ............................................................................6

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)...............................................................................................4, 20, 23

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985)............................................................9, 11, 13, 14, 18, 19, 22

**Statutes**

5 U.S.C. § 701(a)(2)..........................................................................................................6

5 U.S.C. § 704...................................................................................................................6

42 U.S.C. § 4332(C) .........................................................................................................7

**Other Authorities**

Karen Clay, *et al.*, *External Costs of Transporting Petroleum Products: Evidence
    from Shipments of Crude Oil from North Dakota by Pipelines and Rail,* 40
    Energy J. (2019).................................................................................................................23

Strata, *Pipelines, Rail & Trucks: Economic, Environmental, and Safety Impacts of
    Transporting Oil and Gas in the U.S.* (2017) ........................................................23

**INTRODUCTION**

Plaintiffs seek to enjoin the operation of the Dakota Access Pipeline while the Army Corps of Engineers prepares an environmental impact statement, but they have failed to meet their burden on any of the requirements for an injunction.

First, Plaintiffs have not prevailed on a claim for which injunctive relief is available. They have no cause of action to proceed against the pipeline operator directly, nor to demand that the Corps enforce the federal government's property rights against Dakota Access. This Court's order vacating the Lake Oahe easement instead triggers the Corps' process for addressing an "encroachment" on Corps property. Plaintiffs speculate whether, when, or how the Corps may enforce those federal property rights, but there is no final agency action to review at this time, nor have Plaintiffs explained how such future action would be reviewable given that an agency's decision whether to bring an enforcement action is committed to its unreviewable discretion. The claim that Plaintiffs *did* bring alleged that the Corps violated the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") by granting the easement without preparing an environmental impact statement ("EIS"). This Court vacated the easement and ordered the Corps to prepare an EIS. No other remedy is available or necessary to vindicate that claim.

Second, Plaintiffs fall far short of the demanding standard for irreparable harm. Plaintiffs must set forth affirmative evidence establishing that imminent irreparable injury is *probable* absent injunctive relief. But Plaintiffs concede that the best they have is the remote possibility of a spill. The Court has already recognized that the likelihood of a spill capable of causing irremediable harm at Lake Oahe is exceedingly low. That finding was an essential predicate for earlier rulings that have not been disturbed. Plaintiffs provide no legal basis to revisit that conclusion, nor any new factual basis for likelihood in any event. Instead, undisputed government data shows that the likelihood of a spill of *any* size at Lake Oahe during the remand is far less than 1 percent, and that

1

is before adjusting for this pipeline's inherently lower risks.  No court ever has entered injunctive relief with chances of injury so remote.  The case closest to this one—a within-District decision also addressing oil spill risks—denied an injunction for that very reason.  Because Plaintiffs' asserted injuries all derive from a possible oil spill, they fail on this prong.

Plaintiffs' arguments on the final prong—equities and public interest—fare no better.  They principally rely on the Court's vacatur opinion, ignoring that *they* now carry the burden of proving that a shutdown will *not* harm the public.  They cannot do so because shutting down DAPL would cause thousands of workers, numerous States, the industry, and Dakota Access certain and enormous irreparable harm—collectively *billions* of dollars and *thousands* of jobs lost—whereas preserving the status quo would be exceedingly unlikely to cause any harm at all.

Plaintiffs cannot avoid these requirements with an opinion purportedly "clarifying" that vacatur alone compels a DAPL shutdown.  In opposing a stay pending appeal, Plaintiffs made this same argument that injunctive relief was unnecessary after all, but the D.C. Circuit rejected it.  And Plaintiffs are wrong in any event:  Vacatur deprives the easement of legal force without compelling private persons to act or an agency to enforce its own property rights.  Finally, vacating the Corps' Section 408 construction permit would have no effect on pipeline operations, and Plaintiffs have waited too long to seek that relief even if it could make a difference.

## BACKGROUND

The Corps issued two authorizations before Dakota Access completed the pipeline segment below Lake Oahe:  (1) a construction permit under § 408 of the Rivers and Harbors Act; and (2) an easement under the Mineral Leasing Act ("MLA").  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 114, 116, 120 (D.D.C. 2017) ("*SRST III*").  This Court upheld the § 408 permit in June 2017.  *Id.* at 148-52.  After completion of a remand of the easement decision for the Corps to consider comments post-dating the § 408 permit, *id.* at 124-25, Plaintiffs

made no challenge to that permit.  D.E. 433-2 at 50; D.E. 434-2 at 28; D.E. 435-1 at 24; D.E. 436-1 at 18.  The Court's summary judgment ruling was accordingly limited to whether the Corps' "easement approval remains 'highly controversial' under NEPA."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 8 (D.D.C. 2020) ("*SRST VI*").

As for the issue of vacating the easement, Defendants have consistently maintained that more would be needed to compel a DAPL shutdown.  Dakota Access argued from the beginning that "an order stopping the flow of oil" would "go beyond mere vacatur" and would require Plaintiffs to meet "the traditional (and demanding) test for injunctive relief."  D.E. 277 at 1-2 n.1 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)).  The Corps likewise noted Plaintiffs' failure to seek injunctive relief under *Monsanto*, D.E. 276 at 9 n.8, and accordingly opposed conditions on pipeline operations during remand, D.E. 287 at 2.  This Court acknowledged that the parties "dispute[d] what, precisely, vacatur would entail."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 96 (D.D.C. 2017) ("*SRST IV*").

In the latest remedy briefing, Defendants followed this Court's instruction to address "vacat[ur]" of the easement.  *SRST VI*, 440 F. Supp. 3d at 30.  Plaintiffs went further, though.  They added a request for "vacatur" of the § 408 permit, D.E. 527 at 2 & n.1, and they submitted a proposed remedy order with language that would enjoin Dakota Access, D.E. 527-1.  Their brief made no attempt, though, to meet the stringent requirements for an injunction.  The Corps, joined by Dakota Access, responded that the Court should "decline to order the additional injunctive relief," because "decommission[ing]"—*i.e.*, a court-ordered shutdown—would both violate *Monsanto* and "intrud[e] upon" the Corps' authority to decide what follows from vacatur.  D.E. 536 at 2, 19; D.E. 539 at 25 (Dakota Access expressly adopts this argument and contends that injunctive language would "invad[e] the Corps' prerogative to determine how to deal with an encroachment").

This Court ordered that "Dakota Access shall shut down the pipeline and empty it of oil by August 5, 2020." D.E. 545. The D.C. Circuit stayed that part of the order because this Court "did not make the findings necessary for injunctive relief." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 20-5197 (D.C. Cir. Aug. 5, 2020), Doc. 1855206 ("Stay Order"), at 1. The order allows this Court to "consider additional relief if necessary." *Id.* at 2. This motion followed.

## ARGUMENT

### I.    Plaintiffs Have Not Met Their Burden For Obtaining Injunctive Relief

Injunctive relief is an "extraordinary remedy" that "may only be awarded" upon a "clear showing" that relief is warranted. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs must show: (1) "'actual success'" on a relevant claim, *Doe v. Mattis*, 928 F.3d 1, 7 (D.C. Cir. 2019); (2) "'an irreparable injury'"; and (3) that the "'balance of hardships'" and "'public interest'" favor a stay, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

Plaintiffs fail to satisfy any of these requirements. They have not succeeded on the merits of a claim for which injunctive relief is an available remedy; they have established no more than an infinitesimal chance of injury absent injunctive relief; and both the equities and the public interest weigh decisively against an injunction. The Court should deny the motion.

### A.    Plaintiffs Have Not Succeeded On The Merits Of A Claim For Which Injunctive Relief Is An Available Remedy

Plaintiffs fail at the start. They have not succeeded on the merits of any claim that allows the injunctive relief they now seek. Plaintiffs' NEPA claims challenge the agency action of issuing an easement. They prevailed with an order vacating that action. Plaintiffs do not have an additional claim against Dakota Access for continued operation without an easement, or against the Corps for its response to that continued operation. Nor could they. "Injunctive relief … is not a freestanding cause of action," *Base One Techs., Inc. v. Ali*, 78 F. Supp. 3d 186, 199 (D.D.C. 2015)

(Boasberg, J.), and private parties have no cause of action to enforce the Corps' property rights.

    **1.** Plaintiffs now seek to support relief against *Dakota Access*—an order directing it to "cease all operations of the pipeline." D.E. 569-1 at 2. But Plaintiffs have never brought a claim against Dakota Access, which is here only as an intervenor, and no such claim is available.

    NEPA creates "no private right of action," so any "challeng[e] to agency compliance with the statute must be brought pursuant to the Administrative Procedure Act." *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1295, 1298 (D.C. Cir. 2007). And "nothing in the APA authorizes claims against nonfederal entities." *Id.* at 1298. The MLA also "does not create an implied right of action against the private defendants." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 789-90 (D.C. Cir. 1983). Congress intended each relevant federal agency—"not the citizenry at large"—"to oversee the proper allocation and development of the public lands." *Id*. at 790.

    The property rights relevant here belong to the Corps, not Plaintiffs, and a "plaintiff generally must assert his *own* legal rights and interests"—not "the legal rights or interests of" others. *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added). Indeed, an "elementary" principle of property law—dating back centuries— is that only "a person … in possession of real estate" can challenge a property trespass. *Stoltz v. Kretschmar,* 24 Wis. 283, 284 (1869). Lacking any "right to posses[s]" the federal lands abutting Lake Oahe, Plaintiffs have no "standing to sue for a claimed trespass." *United States v. Kittredge*, 445 F.2d 1117, 1119-20 (5th Cir. 1971).

    **2.** Nor do Plaintiffs have a claim against the Corps challenging how it exercises its property rights near Lake Oahe. This Court's vacatur order triggered the Corps' "procedures for addressing encroachments" on its property. D.E. 507 at 6, 14. As the remedy briefs explained, under this process *the Corps* "consider[s] whether corrective action is necessary to cure the pipeline's encroachment on federal property," including whether to "halt … oil flow within the Pipeline." *Id.*

at 14-15 (Corps' remedy brief).  This Court has recognized that whether, when, or how to respond to such encroachments is fully within "the Corps' discretion."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 2020 WL 3634426, at *10 (D.D.C. July 6, 2020) ("*SRST VII*").

There is nothing for the Court to review in these circumstances.  First, the APA limits review to "final agency action."  5 U.S.C. § 704.  And action is not "final" unless it "consummate[s]" the agency's "'decisionmaking process,'" and "'determine[s]'" "'rights or obligations'" or otherwise imposes "'legal consequences.'"  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  The Corps' "mer[e] investigatory" steps here toward a decision whether to enforce its property rights are nonfinal and unreviewable.  *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003).

Second, Plaintiffs have failed to show that even a final decision by the Corps on the encroachment issue would be reviewable.  The APA expressly precludes review of any action that is "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  The paradigmatic example— under Supreme Court precedent reflecting longstanding "tradition," *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)—is "an agency's decision not to exercise its enforcement authority, or to exercise it in a particular way."  *Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456, 459 (D.C. Cir. 2001).  An exercise of the Corps' prosecutorial discretion to defer or abstain from enforcement in a particular case is committed to its "absolute discretion" and is "not subject to judicial review."  *Baltimore Gas & Elec.*, 252 F.3d at 459; *see also Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (decisions "whether to grant relief from deportation"); *West v. Holder*, 60 F. Supp. 3d 197, 204 (D.D.C. 2015) (drug-enforcement priorities).

That is particularly so for the *two* layers of unreviewable enforcement discretion here:  the Corps' choice whether to order a pipeline shutdown, and the U.S. Attorney's decision whether to

bring a civil action upon the Corps' referral.  USACE_ESMT 6606.[1]  Nor would it help Plaintiffs

if they were to bring a claim challenging agency "inaction."  Agency inaction is reviewable only

if the agency refuses or "'unreasonably'" delays a "*discrete* agency action that it is *required to*

*take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61-62, 64 (2004).  As explained above, no

law or regulation *requires* the Corps to bring an enforcement action in response to an encroach-

ment, nor have Plaintiffs even tried to address the need to show unreasonable delay when an

agency does have a duty to take discrete action after making certain determinations.

No statute or regulation allows a different outcome.  NEPA applies only when agencies

take "major Federal actions," 42 U.S.C. § 4332(C); it does not compel any agency to act on a

private party's encroachment.  And even if NEPA applied here, it would require the Corps to

complete an EA or EIS *before* shutting down DAPL, because no "major Federal actio[n] signifi-

cantly affecting the quality of the human environment" should proceed without understanding its

significant effects on the environment.  *Id*.  The Corps identified legitimate concerns—backed by

record evidence—that "even temporar[ily] decommissioning" DAPL could have environmental

effects, including "oil being transported by truck or rail—transportation methods that entail both

greater risk of spills and greater air pollution than pipeline transport."  D.E. 507 at 2.  To the extent

the Court was correct that studies are "inconclusive" on the environmental impacts of shifting oil

transport from pipeline to rail, *SRST VII*, 2020 WL 3634426, at *10, the need for the Corps to

study those environmental effects first would be even stronger.

---

[1]   The relevant statutes also contain no standard for addressing encroachments on Corps-
managed land.  Congress instead "laid out broad goals" for management of federal lands, leaving
it to the Corps "to work out a specific management plan."  *S. Dakota v. Ubbelohde*, 330 F.3d 1014,
1020 (8th Cir. 2003).  The Corps has "general procedures" for addressing encroachments on
Corps-supervised land, USACE_ESMT 6593, with "[e]xceptions" that allow the Corps to tolerate
an encroachment in appropriate circumstances, USACE_ESMT 6605.  So, even if exercises of
enforcement discretion *could* be reviewed, nothing requires the Corps to shut down DAPL before
considering the economic and environmental costs of doing so.

**3.** The law specific to NEPA reinforces this conclusion.  The "additional and extraordinary relief of an injunction" is inappropriate when the "less drastic remedy" of vacatur is "sufficient to redress" a NEPA violation.  *Monsanto*, 561 U.S. at 165-66.  Here, the Court agreed with Plaintiffs that the Corps violated NEPA by failing to prepare an EIS before granting the easement.  The Court's remedy redressed the claimed violation by vacating the easement and remanding to prepare the EIS.  Plaintiffs' alleged irreparable injuries—all tied to a hypothetical future spill—arise from DAPL's alleged encroachment on Corps' property, *not* any NEPA "'inadequacy.'"  *Gill v. Whitford*, 138 S. Ct. 1918, 1930 (2018).  There is thus "no link between the injunctive relief sought and … success" on the NEPA claim.  *Fang v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2016 WL 9275454, at *2 (N.D. Cal. Dec. 10, 2016), *aff'd*, 694 F. App'x 561 (9th Cir. 2017).

Plaintiffs' success in vacating "a particular agency order" under NEPA does not allow them to "pre-emp[t]" separate agency processes that "possib[ly]" remain lawful.  *Monsanto*, 561 U.S. at 159-66.  Consistent with the "presumption of legitimacy accorded to the Government's official conduct," *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004), it must be left to "the *agency* to decide whether and to what extent it w[ill] pursue" other unchallenged measures, *Monsanto*, 561 U.S. at 159.  *Monsanto*'s reasoning applies with even greater force here.  Not only is the Corps' exercise of its enforcement discretion for encroachments "possib[ly]" lawful, 561 U.S. at 164, it is unreviewable absent final agency action, and indeed it is entirely committed to the agency's discretion.[2]  Plaintiffs fail on the first prong.

### B.    Plaintiffs Have Not Established Irreparable Harm

Plaintiffs also fall short of the requirement to establish "irreparable injury."  *Monsanto*,

---

[2]    Plaintiffs also invoke the Corps' trust obligations, Mot. 7-8, but Plaintiffs have not prevailed on a trust claim.  This Court held that Plaintiffs lacked any actionable trust claim because SRST and CRST alleged no "specific fiduciary duties," *SRST III*, 255 F. Supp. 3d at 144, and "the Corps has not breached [its] duty" as to OST, *SRST VI*, 440 F. Supp. 3d at 29.  And any trust rights will be vindicated through preparation of the EIS that this Court ordered.

561 U.S. at 162.  Another case from this District is directly on point.  The plaintiffs there failed to establish irreparable harm from *either* construction *or* operation of an oil pipeline because, as relevant here, they "ha[d] not shown that a damaging oil spill is likely to occur."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013).  Plaintiffs cite this case for a different point, ignoring this fatal ruling on the irreparable-harm prong.  Mot. 21.  Moreover, the full record before this Court, not just the administrative record, affirmatively establishes that a large spill (*i.e.*, one that might reach Lake Oahe) is extraordinarily unlikely and even less likely to injure Plaintiffs, let alone irreparably.  And Plaintiffs' other alleged injury theories all fail because they derive from the same remote spill threat.  Injunctive relief is therefore inappropriate.

1.   **Plaintiffs Fail To Meet Their Burden Of Showing A Harm That Is "Certain, Great, Actual, Imminent," And "Beyond Remediation"**

The D.C. Circuit "has set a high standard for irreparable injury," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006), applying to preliminary and permanent injunctions, *Mattis*, 928 F.3d at 7.  First, an alleged injury "'must be both certain and great; it must be actual and not theoretical'"; *i.e.*, the plaintiff "'must show the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *Chaplaincy*, 454 F.3d at 297 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *accord Monsanto*, 561 U.S. at 162; *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).  Second, that injury "must be beyond remediation," as even "'substantial'" injuries can often be remediated through "'compensatory or other corrective relief.'"  *Chaplaincy*, 454 F.3d at 297 (quoting *Wis. Gas*, 758 F.2d at 674); *accord Monsanto*, 561 U.S. at 156; *Lyons*, 461 U.S. at 111.

This Court has recognized that the irreparable-injury requirement thus "'erects a very high bar for a movant,'" *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012)—"substantially higher" than the standard required for vacatur, *Oglala Sioux Tribe v. U.S. Nuclear Regulatory*

*Comm'n*, 896 F.3d 520, 535 (D.C. Cir. 2018).  "[A] plaintiff must, at a minimum, 'demonstrate that irreparable injury is *likely* in the absence of an injunction,' not just that injury is a 'possibility.'"  *Nat'l Ass'n of the Deaf v. Trump*, — F. Supp. 3d —, 2020 WL 5411171, at *4 (D.D.C. Sept. 9, 2020).  Thus, an injury that is "just as likely" *not* to occur "is not actual and certain" and cannot support injunctive relief.  *Save Jobs USA v. DHS*, 105 F. Supp. 3d 108, 113 (D.D.C. 2015).  It is not enough to show that an injunction would make an unlikely harm less likely; "a reduction in risk" is not the same as "establish[ing] that irreparable harm is likely in the absence of an injunction."  *Ctr. for Biological Diversity v. Ross*, — F. Supp. 3d —, 2020 WL 4816458, at *10 (D.D.C. Aug. 19, 2020) (emphasis removed).  To obtain an injunction based on the risk of a "'devastating'" "oil spill" at Lake Oahe, Mot. 9, Plaintiffs must prove that such an irremediable spill is "'certain, great, actual, and imminent,'" *Henke*, 842 F. Supp. 2d at 59.  Out-of-circuit cases cannot override this Circuit's precedent.  *See* Mot. 11 (citing Seventh and Tenth Circuit cases).  And in the case with most analogous facts—from this District—the possibility of a pipeline oil spill did not satisfy the requirement of "likely" harm.  *Sierra Club*, 990 F. Supp. 2d at 41.

Plaintiffs have not come close to showing that it is "likely" that a spill large enough to reach Lake Oahe and cause irreparable injury will occur during the remand.  In fact, this Court has repeatedly affirmed the Corps' ultimate "conclusion that the risk of a spill is low."  *SRST III*, 255 F. Supp. 3d at 127; *see also SRST IV*, 282 F. Supp. 3d at 96 (summarizing the Court's affirmance of the Corps' "'top-line conclusion' that the risk of an oil spill was sufficiently low so as to not require an EIS"); *id.* at 101 (finding "minimal risk of an oil spill under Lake Oahe reduces the likelihood that the project will have a significant impact"); *SRST VI*, 440 F. Supp. 3d at 29 ("[T]his Court has accepted" that "[t]he possibility of a future spill" is "low").  This Court's low-likelihood finding was an essential predicate of its earlier rulings, and Plaintiffs offer no basis for this Court

to depart from it.  Rather, all Plaintiffs do is present "the *same* issue . . . in the *same* case in the *same* court." *Kimberlin v. Quinllan*, 199 F.3d 496, 500 (D.C. Cir. 1999).  As a result, this Court should reach "the *same* result," *id.*, rather than contradict its prior rulings.

Even if the issue remained open, Plaintiffs merely gloss over the multiple steps necessary to make the requisite showing.  The closest DAPL ever comes to the bottom of Lake Oahe is 92 feet—about as deep as an NBA basketball court is long.  *See* D.E. 509-3 ¶¶ 8-10.  Thus, Plaintiffs would need to show that *all* of the following are likely:  DAPL will leak or rupture at Lake Oahe, *and* this leak or rupture will go undetected long enough to produce a large oil spill, *and* a sizeable volume of oil from this spill will rise 92 feet through low-permeability material and reach the waters of Lake Oahe, *and* Dakota Access will fail to mitigate this spill or recover the oil, *and* this unmitigated spill will injure Plaintiffs in a way that cannot be remediated or adequately compensated, *and* this all will occur before an EIS can be completed within the next year or so.

Plaintiffs have not even remotely carried their burden to show that this "purely hypothetical chain of events" is likely to occur.  *Wis. Gas*, 758 F.2d at 675.  Rather than affirmatively demonstrate the likelihood or imminence of a large spill, they focus on purported deficiencies in *the Corps'* analysis and of DAPL's safety features, including criticisms of the Corps' "worst-case discharge calculation," DAPL's "leak detection capacity," Sunoco's "operator safety record," the structure of Energy Transfer's "plan[ning]" documents, "backup power at valves," and the advisability of "surge relief systems."  Mot. 10-11.  Dakota Access and its experts fully rebutted these critiques in the recent remedy briefing and have updated those responses.  *See* D.E. 509-4 ¶¶ 9-22, 24-26, 28-38 (Godfrey Dec.); D.E. 509-5 ¶¶ 5-28, 32-42 (Stamm Dec.); D.E. 538-4 ¶¶ 4-18, 22-47 (2nd Godfrey Dec.); Ex. A ¶¶ 10-20 (Third Godfrey Dec.).  But even were Plaintiffs correct on these points, they still would fail to show that a large spill at Lake Oahe is *likely* or *imminent*.

These criticisms either *assume* that a sizeable spill will occur, with disagreement over *how large or consequential* one would be, or they raise ways to *further reduce* spill likelihood or impact. None comes close to showing that a large spill at Lake Oahe is *likely and imminent*. *See Ctr. for Biological Diversity*, 2020 WL 4816458, at *10 (distinguishing between arguments about "a reduction in *risk*" and arguments "establish[ing] that irreparable harm is likely").

Plaintiffs' declarants call DAPL "'unusually unsafe'" with an "'untenable'" or "'unacceptable risk,'" Mot. 10-11, but "such 'broad conclusory statements about the likelihood of harm' will not suffice"—a plaintiff must "*substantiate* the claim that irreparable injury is 'likely' to occur." *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 171 (D.D.C. 2018); *see Sierra Club*, 990 F. Supp. 2d at 39 ("sound and fury" is not sufficient to show irreparable harm). Because "none of [Plaintiff's] declarations says anything about when, if at all," a catastrophic spill at Lake Oahe "is likely to occur," they cannot support a finding of irreparable injury. *Cal. Ass'n*, 344 F. Supp. 3d at 171.

Plaintiffs, who admit that a catastrophic spill at Lake Oahe is a "lower probability" event, Mot. 11, instead distract by saying that "the precise probability, timing, and location of a potential incident is unknown" to Plaintiffs, *id.* at 13, and "[i]t is not possible to predict where or when the next pipeline spill will occur," *id.* at 14. But this prong does not turn on whether "*the Corps*" can "assure that [a leak or spill] *will not* occur" or the "precise" probability of a large spill. *Id.* (emphasis added). "*[P]laintiffs* must demonstrate" that the risk of an irremediable spill at Lake Oahe is "'certain, great, actual, and imminent.'" *Henke*, 842 F. Supp. 2d at 59 (emphasis added); *accord Monsanto*, 561 U.S. at 156, 162-63. And the "absence of … data in the administrative records" or the "failure to conduct … an EIS" is "not affirmative evidence" of a "real—as opposed to a theoretical—irreparable harm." *RB Jai Alai v. Fla. Dep't of Transp.*, 2014 WL 12617779, at *5 (M.D.

Fla. Sept. 30, 2014). "By definition," such "uncertainty falls short of the type of actual and immi-nent threat needed to show irreparable injury." *Cal. Ass'n*, 344 F. Supp. 3d at 172.

Plaintiffs' own conduct confirms that irreparable harm is unlikely. They never sought a *preliminary* injunction under NEPA, nor did they appeal this Court's October 2017 remand deci-sion, which rejected their request to vacate the easement and enjoin pipeline operations. And during the remand itself, Plaintiffs repeatedly delayed—missing by six months a deadline to pro-vide routine information about hunting and fishing licenses, *compare* RAR 13325, 13330, 13328, 13323 (letters from Corps), *with* RAR 6433 (Standing Rock response); refusing to respond to cor-respondence from the Corps on account of typographical errors; refusing to consult until they re-ceived technical information that the Corps and Dakota Access had already provided; ignoring meeting requests; and bombarding the Corps with duplicative submissions late in the process. *See* D.E. 456 at 58-62 (cataloguing ways in which Plaintiffs dragged out the remand). The end result was an eight-month delay (from December 31, 2017 to August 31, 2018) in the remand. These actions "impl[y] a lack of" both "urgency and irreparable harm" and are themselves "grounds for den[ying]" relief. *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005).

### 2. The Full Record Before This Court Proves That The Risk Of A Spill Adversely Affecting Lake Oahe During The Remand Is Near Zero

Plaintiffs' Motion must be denied for utterly failing to "'provide proof'" that a large spill at Lake Oahe—or any comparable horizontal directional drilling ("HDD") crossing—"'has oc-curred in the past and is *likely* to occur again, or proof indicating that the harm is *certain* to occur in the near future.'" *Henke*, 842 F. Supp. 2d at 59. Yet Plaintiffs' argument is weaker still. The record—most of it uncontested—affirmatively and conclusively undermines each link in Plain-tiffs' "hypothetical chain of events" necessary for a spill at Lake Oahe capable of causing irrepa-rable harm. *Wis. Gas*, 758 F.2d at 675.

*First,* because this Court has rejected Plaintiff's challenges to the Corps' reasonable finding that the risk of *any* spill occurring at Lake Oahe is "low," USACE_DAPL 71316; *see SRST III*, 255 F. Supp. 3d at 127, any claim of irreparable harm is entirely speculative. *See also SRST IV*, 282 F. Supp. 3d at 101 ("minimal risk"); *SRST VII*, 2020 WL 3634426, at *9 ("unlikely"). When the complete record, including evidence submitted during the remedy briefing, is considered to "'fully evaluate' [Plaintiffs'] claims 'of irreparable harm,'" *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 369 n.7 (D.D.C. 2017), it overwhelmingly confirms that the risk of a spill at Lake Oahe is "near-zero." D.E. 538-4 ¶ 41 (2nd Godfrey Dec.). Specifically:

- Historical Statistics: PHMSA data shows an accident frequency for all onshore crude-oil pipelines of 0.848 per 1,000 miles in 2017. RAR 16. For a 1.73-mile section of pipeline, this translates to one spill every 682 years. Assuming a long EIS process (two years), the chance of a spill of *any* size at Lake Oahe during remand would be 0.29% (less than 1 in 300). For spills having any effect on people or the environment, the odds are even lower: 1 every 963 years or a 0.2% chance during remand (1 in 500). RAR 16; D.E. 509-5 ¶ 6.

- HDD Installation Method: PHMSA data also show that HDD pipelines "appear to experience lower risk of release," meaning that "the likelihood of failure at an HDD crossing is extremely low." RAR 19; D.E. 538-4 ¶ 40 (2nd Godfrey Dec.). Just a single, 1.7-barrel leak was reported between 2010 and 2018 on any crude-oil pipelines installed using HDD. D.E. 509-3 ¶ 13 (Aubele Dec.); RAR 19.

- Spill-Free Operational History: DAPL has operated more than three years with *no* spills on its nearly 1,200-mile mainline—including the Lake Oahe crossing—and only seven small incidents at company facilities, all fully remediated and none exceeding two barrels. D.E. 509-4 ¶ 16 (Godfrey Dec.); D.E. 509-5 ¶ 24 (Stamm Dec.); D.E. 538-4 ¶ 20 (2nd Godfrey Dec.). Plaintiffs exaggerate DAPL's track record 20-fold by including a *different* pipeline's spill data, Mot. 14, which would still yield fewer than 150 barrels, of which all but about 7 were recovered, D.E. 538-4 ¶ 6 (2nd Godfrey Dec.).

- Bathtub-Shaped Curve: According to Plaintiffs' own expert, DAPL is even *less* likely to

14

leak now that it has completed its start-up phase.  D.E. 272-2 ¶¶ 9-10 (3d Kuprewicz Dec.).

- <u>Safety Record and Culture</u>:  Plaintiffs attack Sunoco's safety record, but after Energy Transfer assumed ownership, Sunoco's incident rate decreased by 50% in just two years.  D.E. 509-5 ¶ 27 (Stamm Dec.).   Energy Transfer controls DAPL operations and has adopted a rigorous safety-management standard (API 1173), D.E. 509-5 ¶ 26 (Stamm Dec.)—the very one that Plaintiffs prefer, D.E. 433-2 at 31.

*Second*, the risk of a *large* spill at Lake Oahe is even lower:

- <u>Historical Statistics</u>:

  - The Corps found that "most pipeline spills are small"—below 105 barrels 75% of the time.  RAR 18-19.

  - Applying PHMSA's data, expert John Godfrey concluded that a spill materially *larger* than the ███-barrel spill considered by the Corps would occur at Lake Oahe once every 193,971.4 years—a once-in-human-history event.  D.E. 509-4 ¶ 21.

- <u>Risk Evaluation</u>:  A detailed risk analysis of the Lake Oahe crossing—measuring 11 spill-likelihood and consequence variables—concluded that the overall risk-consequence rating was an extremely low 1.27 out of a possible 100.  RAR 130, 14924; *see* RAR 15777-902.

- <u>Leak-Detection System</u>:  DAPL's leak-detection system effectively detects both large ruptures and small pinhole leaks, and would do so well before the leak could cause irreparable injury.  D.E. 509-5 ¶ 9 (Stamm Dec.).

  - Each DAPL valve—including those on either side of the Lake Oahe crossing—has built-in, state-of-the-art pressure sensors.  D.E. 509-5 ¶ 6 (Stamm Dec.).

  - DAPL's leak-detection system is rated to detect leaks down to 0.75% of flow rate within 45 minutes.  D.E. 509-5 ¶ 9 (Stamm Dec.).  During operations the system detected a removal of 4.7 barrels in less than 2 minutes.  *Id.*

  - By evaluating meter imbalances and "line pack," DAPL can detect a loss of just 100 barrels, even if the leak is smaller than 0.75%.  RAR 205-06.

  - Plaintiffs misuse a 2012 PHMSA study to allege an 80% *failure* rate in leak-detection

systems.  The study instead identified which system was reported as "the leak identi-fier":  SCADA, when functional, was the leak identifier 28% of the time, followed by CPM (20%).  Other systems (including the pipeline controller, local operating person-nel, and air patrols) accounted for the remainder.  USACE_ESMT 3711-12.

*Third*, even with a large spill, it is extraordinarily unlikely that oil would rise more than 90 feet through low-permeability materials to reach the waters of Lake Oahe.  D.E. 509-3 ¶ 15 (Aubele Dec.).  The HDD installation "*virtually eliminat[es]* the ability of a spill to interact with the surface water."  RAR 13 (emphasis added; quotation marks omitted).  "[T]he path of least resistance is typically the original HDD bore," which would lead the oil away from the water to non-tribal land on the sides of the Lake.  RAR 13; D.E. 509-5 ¶ 41 (Stamm Dec.).

*Fourth*, under a PHMSA-approved response plan Dakota Access can swiftly and effec-tively responding to a spill of up to ███████ barrels—far larger than even conservative modeling suggests is possible at Lake Oahe.  D.E. 509-5 ¶ 19; *see also* D.E. 538-3 ¶ 17 ($6.8 billion in insurance coverage and other resources to remediate any harm); RAR 60 (extensive modeling shows a worst-case spill would *never* reach the Tribes' water intakes); RAR 35 (in 95% of scenar-ios, *no* significant wildlife impact).  Plaintiffs have failed their burden to show that environmental effects would be "permanent or irreversible."  *Sierra Club*, 990 F. Supp. 2d at 39.

*Finally*, Dakota Access is voluntarily implementing *additional* safety measures that make likelihood and impact even more remote, including backup power to close valves.  Ex. E ¶¶ 6-9 (Fifth Stamm Dec.).

Notably, no case that Plaintiffs cite—including under less-stringent pre-*Winter* standards—even remotely supports injunctive relief based on a harm as unlikely as that asserted here.  In *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011), the Seventh Circuit held that States neighboring Lake Michigan had shown that irreparable harm would "likely … come to

pass" absent injunctive relief. *Id.* at 786, 789 (irreparable harm "likely" because "invasive carp" were already "knocking on the door to the Great Lakes"; the risk of harm was "substantial and … may be increasing with each day that passes"; and "it would be impossible to un-ring the bell").

Similarly, in *National Ass'n of the Deaf v. Trump*, there was "little debate on" the irreparable-harm "prong," because the plaintiffs were being denied critical health and other information during the COVID-19 pandemic.  2020 WL 5411171, at *10 (D.D.C. Sept. 9, 2020).  A near-zero chance of a future oil spill cannot seriously be analogized to being kept in the dark about the dangers of a virus during a pandemic that has infected millions, propagates nearly exponentially, and has already killed hundreds of thousands.  *See also Banks v. Booth*, 459 F. Supp. 3d 143, 159 (D.D.C. 2020) (COVID-19 in prisons); *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 25 (D.D.C. 2009) (although "extent" was "not fully known," environmental impacts "will" occur); *Ctr. for Food Safety v. Vilsack*, 2010 WL 11484449, at *3 (N.D. Cal. Nov. 30, 2010) ("likely" cross-contamination from genetic engineering); *Confederated Tribes & Bands of Yakama Nation v. DOA*, 2010 WL 3434091, at *4 (E.D. Wash. Aug. 30, 2010) ("likely" introduction of non-native invasive species into waterways governed by treaty rights); *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("life-threatening" degree of exposure to secondhand smoke).  Plaintiffs have failed to make an irreparable-harm showing based on a speculative oil-spill risk.

### 3. Plaintiffs' Other Theories Of Harm Are Derivative Of A Potential Spill And Do Not Establish Irreparable Harm

Plaintiffs raise a grab-bag of additional irreparable-harm arguments, but none is persuasive. To the extent these arguments apply to DAPL at all, they are derivative of Plaintiffs' arguments about an oil spill and fail for the same reasons.

*First*, Plaintiffs raise the specter of "psychological damage, emotional distress, or trauma." Mot. 14.  But even if "some of the people who live in areas near the pipeline project are sincerely

worried about the harm that an oil spill might cause," it does not suffice because "Plaintiffs have not shown that a damaging oil spill is *likely* to occur." *Sierra Club*, 990 F. Supp. 2d at 41. The plaintiffs in *Sierra Club* also submitted declarations asserting that the oil pipeline there presented an "'unacceptable risk'" and that an oil spill would "'threaten [the] community's survival'" and cause "'environmental disaster.'" *Id.* at 41 n.18. But because "the harms that an oil spill might potentially someday cause—however fearsome—[were] not certain," the plaintiffs' subjective anxiety was "not sufficient to satisfy the 'irreparable harm' standard." *Id.* at 41. This Court applied the same reasoning in this very litigation. Although preserving cultural sites was "a matter of unquestionable importance to the Standing Rock people," the Tribe still needed to prove that harm to these sites was "*probable*." *SRST I*, 205 F. Supp. 3d at 33.

These cases recognize that injunctive relief "'will not be granted against something merely feared as liable to occur at some indefinite time.'" *Wis. Gas Co.*, 758 F.2d at 674. "[S]ubjective apprehensions" about speculative future harms fail to establish Article III standing, *Lyons*, 461 U.S. at 107 n.8, and the irreparable-harm test for injunctions "requires more than … Article III standing," *NRDC v. EPA*, 383 F. Supp. 3d 1, 15 (D.D.C. 2019); *see also O'Shea v. Littleton*, 414 U.S. 488, 499 (1974) (standing doctrine "shade[s] into" determining whether equitable relief is warranted). It is the "*reality* of the threat" that matters for purposes of both standing and irreparable harm, not the level of subjective anxiety. *Lyons*, 461 U.S. at 107 n.8. Thus, where the "risk" posed by agency action is "low," a movant's "reliance on emotional distress as a form of irreparable injury … is misplaced." *Colo. Wild Horse v. Jewell*, 130 F. Supp. 3d 205, 220 (D.D.C. 2015).[3]

*Second*, Plaintiffs cite "'historical trauma'" at the hands of the U.S. government and "a

---

[3]   In any event, "emotional suffering is commonly compensated by cash" and therefore not irreparable. *Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 2011 WL 221823, at *4 (N.D. Ill. Jan. 24, 2011); *see, e.g.*, *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) ("compensatory damages may include … 'mental anguish and suffering'").

combination of poverty, ill health, environmental contamination, and loss of culture." Mot. 15. But these harms do not "directly result from the action which [Plaintiffs] see[k] to enjoin." *Wis. Gas*, 758 F.2d at 674. Nor do Plaintiffs attempt to disaggregate these alleged traumas to make the required showing that the requested injunction would restore a "'sense of safety and well-being,'" Mot. 15—particularly given that DAPL is co-located with other pipelines that lie much closer to Lake Oahe than DAPL, *see* D.E. 509-3 ¶ 8. And these harms, too, are compensable.

*Third*, the alleged NEPA-based harms to tribal self-governance are also derivative of the speculative spill-risk claims. Mot. 16-17 (referencing Plaintiffs' responsibility for "protect[ing] their citizens, respond[ing] to disasters, and mitigat[ing] harm" from a possible spill). So too are concerns about "protecting … sacred and ceremonial sites that would be at risk in a spill." *Id.* at 18. Similarly, any "spill response planning" actions that Plaintiffs voluntarily undertake, Mot. 18, are "precautionary measures against a speculative fear" that would not even support standing, much less constitute irreparable injury, because the feared event is not "'certainly impending.'" *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 (6th Cir. 2020); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402, 407 (2013). Moreover, response planning is needed anyway due to the other pipelines beneath the Lake, and these costs, too, are compensable.[4] Finally, "loss of sovereignty over tribal land," Mot. 17, is not at issue; DAPL crosses "federally owned lands." USACE_DAPL 71225. None of Plaintiffs' arguments establishes irreparable harm.

## C.   The Balance Of Equities And The Public Interest Weigh Against A Shutdown

To obtain an injunction, rather than just vacatur, Plaintiffs face a higher burden of proof and a more demanding test for balancing the competing interests. *Cf. SRST VII*, 2020 WL

---

[4]   Concerns related to optimization of the "capacity of the pipeline," Mot. 18, are unripe. The Corps will "consider this optimization request as part of the EIS process." D.E. 570 at 2 (Nov. 2, 2020). Higher flow rates are thus irrelevant to alleged harms during the remand.

3634426, at *10 (assigning burden of proving disruption consequences to defendants); *Winter*, 555 U.S. at 20 (movant bears burden for injunction).  The "certain and substantial" harms of a shut-down far outweigh the "uncertain" and remote alleged risks of the status quo.  *Sherley v. Sebelius*, 644 F.3d 388, 398 (D.C. Cir. 2011).  Plaintiffs, who mostly rest on their vacatur briefing, Mot. 20 & n.3, fail to meet their burden here too.

### 1.    Shuttering DAPL Would Have Devastating Economic Consequences

This Court already acknowledged that shuttering DAPL would cause "serious" and "im-mediate harm[s]," "particularly in a highly uncertain economic environment."  *SRST VII*, 2020 WL 3634426, at *8.  Updated data proves that the harms will be at least as bad as already forecast.

North Dakota oil producers lacking alternative transport means would need to "shut in" thousands of wells, costing around $5 to $7.5 billion through 2021.  *See* D.E. 501-3 ¶¶ 13-27; D.E. 504-2 ¶¶ 8, 10; D.E. 520-6; D.E. 509-9 ¶¶ 14-22; D.E. 509-11 ¶¶ 2, 15-26; D.E. 538-6 ¶¶ 16-35; D.E. 538-7 ¶¶ 2-12.  Losses would surpass $2 billion per year even if more costly rail transport could pick up the slack.  D.E. 509-9 ¶ 36; D.E. 509-11 ¶¶ 18-19; D.E. 538-6 ¶ 19; D.E. 538-8. Production cuts would cost 4,500 to 7,200 oil industry workers their jobs, D.E. 504-2 ¶ 14; D.E. 509-11 ¶¶ 7, 22; D.E. 538-7 ¶¶ 43-46, and at least "hundreds of millions" in DAPL-generated tax revenues for North Dakota alone, D.E. 537 at 4 (emphasis omitted).  Other state and tribal govern-ments likewise would incur significant revenue losses, including reduced royalty payments and property tax revenues.  D.E. 537-2 ¶ 6; D.E. 509-9 ¶ 28; D.E. 509-11 ¶¶ 28-30.  Congestion and shipping costs for other rail users, including Midwest farmers, would increase.  D.E. 509-6 ¶¶ 17-27, 60-84; D.E. 538-7 ¶¶ 4, 29-41; D.E. 538-5 ¶¶ 64-65.  And the unprecedented shutdown of a vital oil artery would increase energy market volatility, distort investment decisions, and threaten the national economic recovery and energy security.  D.E. 509-10 ¶¶ 5, 15-21; D.E. 509-7 ¶¶ 16, 21-22.  Dakota Access also would suffer $2.8 to $3.5 million in revenue losses every day DAPL

is idle in 2020, and $1 to $1.4 billion for 2021.  D.E. 509-9 ¶¶ 9-10; D.E. 509-11 ¶¶ 12-14.

Subsequent developments have reinforced the seriousness of these effects:  Contrary to Plaintiffs' pessimistic predictions, D.E. 569 at 20, the national economy and oil market have already begun rebounding from this year's earlier lows.  Consumer demand for gasoline and diesel has begun returning to historic levels, Ex. D ¶ 34 & fig. 7 (Ditzel Dec.), and recent projections are for an increase in oil prices to between $45 to $50 per barrel in 2021, *id.* ¶ 35.  This growing demand has driven North Dakota oil production up from its May 2020 low-point, significantly outpacing the gloomy predictions of Plaintiffs' expert.  *Id.* ¶¶ 51-55 & fig. 12; *see* D.E. 569-3 at 3-4.  Higher transportation costs for rail, coupled with limited capacity, would result in between 178 and 270 million barrels of lost North Dakota oil production over the course of 2021 and 2022 if DAPL were shut down, Ex. D ¶ 61-62 & tbl.4 (Ditzel Dec.), directly causing the severe economic consequences discussed above.[5]

This Court previously dismissed economic considerations as "'economic myopia,'" reasoning that "accepting [these] arguments" would "subvert the structure of NEPA" by creating "'undesirable incentives'" for agencies to "build first and consider environmental consequences later."  *SRST VII*, 2020 WL 3634426, at *8-9.  But the notion that agencies cannot be trusted to follow the law in the face of "'undesirable incentives,'" *id*. at *9, flips on its head the presumption of regularity that this Court owes official government conduct, *Favish*, 541 U.S. at 174.  Regard-

---

[5]    In the face of this evidence, Plaintiffs have but a single oil executive's statement meant to reassure investors that Hess would survive a DAPL shutdown.  D.E. 569 at 20-21.  That company is better situated than other producers to weather one because it already owns 550 crude-oil railcars along with unique access to rail terminal facilities.  Ex. D ¶¶ 21-22 & fig. 4 (Ditzel Dec.).  Plaintiffs also ignore their *own expert's* prior testimony that transporting oil by rail would cost an additional $5 to $10 per barrel.  *See* D.E. 569-3 at 14; Ex. B ¶¶ 3.e, 28-31 (Third Rennicke Dec.).  That, alone, will devastate North Dakota with lost tax revenue.  *See* D.E. 504 at 4-8, 10; D.E. 537 at 7.

less of how this issue plays out as to *vacatur*—which this Court called the "'presumptively appro-priate remedy'" for NEPA violations, 2020 WL 3634426, at \*4—it fails to support the "extraordi-nary remedy" of injunctive relief, "which should not be granted as a matter of course," *Monsanto*, 561 U.S. at 165. *Monsanto* makes clear that the "less drastic remedy" of vacatur is ordinarily sufficient to vindicate NEPA's purposes, *id.*, and the "balance of hardships" must be weighed without any "thumb on the scales" in favor of injunctive relief, *id.* at 157.

Plaintiffs, relying on a discredited witness whose own data proves her wrong, *see* D.E. 538-5 ¶ 6 (2nd Rennicke Dec.); D.E. 538-7 ¶ 7 (2nd Makholm Dec.); Ex. C ¶¶ 3, 5-10 (Third Emery Dec.), offer no valid basis to discount economic effects. Weighing real, certain economic harms over extremely unlikely environmental effects simply reflects this Court's duty to "balance the probability and the consequences of harm." Mot. 11. Plaintiffs argue that economic loss is not "in and of itself," an "irreparable harm." Mot. 20 (quoting *Wis. Gas*, 758 F.3d at 674). But the losses here *are* irreparable, because they are *not* "recoverable," 758 F.3d at 674, and *Plaintiffs'* injuries—not DAPL's or the public's—must be "'irreparable'" to support an injunction. *Mon-santo*, 561 U.S. at 156-57. Finally, the suggestion that anyone "assume[d]" an "economic risk knowingly," Mot. 20, has no application to the severe harms to innocent third parties—including state residents and thousands of employees. Moreover, even regulated parties may "reasonably rel[y]" on duly issued agency licenses and permits, despite ongoing legal challenges, *Oglala*, 896 F.3d at 538.

### 2.   A Shutdown Threatens The Environment And Public Safety

The standard for injunctive relief also compels reassessment of the environmental risks of shutting down DAPL. Dakota Access cited (*see* D.E. 509-1 at 41-42) multiple authorities finding that "pipeline transportation of oil is safer than rail transportation" on a "volume-distance basis (i.e., per barrel-mile)." *Puntenney v. Iowa Utils. Bd.*, 928 N.W.2d 829, 842 (Iowa 2019); *see also*

Strata, *Pipelines, Rail & Trucks: Economic, Environmental, and Safety Impacts of Transporting Oil and Gas in the U.S.*, at 6 (2017); Karen Clay, *et al.*, *External Costs of Transporting Petroleum Products: Evidence from Shipments of Crude Oil from North Dakota by Pipelines and Rail*, 40 Energy J. 55, 68 (2019).  The court dismissed rail risks without considering these studies.  *SRST VII*, 2020 WL 3634426, at *10 (only addressing a *separate* PHMSA study).

The demanding injunction standard requires even more from Plaintiffs this time.  They must *prove* that the harms of operating DAPL outweigh these impacts.  *Winter*, 555 U.S. at 20.  Uncertainty about environmental impacts thus weighs *against* injunctive relief.  Further, the PHMSA study the Court addressed found that pipelines were safer than rail on *every metric but one.*  D.E. 507-2 at 7-10.  And that one metric (slightly more annual injuries from one cause) is more than offset by the other metrics, including more rail injuries and fatalities *overall* when de-railments and traffic accidents are counted.  D.E. 538-3 ¶ 36.  The "'balance of hardships,'" *Monsanto*, 561 U.S. at 157, thus weighs decisively in favor of leaving DAPL in operation rather than switching to rail.  And that is not even accounting for the other undisputed environmental harms that the Court has yet to address:  Shuttering DAPL would cause methane emissions from closed wells, D.E. 509-3 ¶ 38 & n.13; purging DAPL of oil and filling it with an inert gas to avoid corro-sion while out of service would risk injury to those workers, D.E. 509-5 ¶ 46; and huge quantities of nitrogen would be released into the atmosphere when the pipeline comes back online, D.E. 538-3 ¶ 43.  An injunction thus presents far greater risks to the public interest than keeping it online.

## II.    Plaintiffs' Requests For Alternative Relief Are Meritless

### A.    There Is No Basis To "Clarify" The Vacatur Order

Plaintiffs cannot avoid the requirements for injunctive relief by asking this Court to "clar-ify" that the shutdown order "is not an injunction."  Mot. 4.  The D.C. Circuit already rejected that argument in its August 5, 2020 Stay Order.  *Standing Rock Sioux Tribe v. U.S. Army Corps of*

23

*Eng'rs*, No. 20-5197 (D.C. Cir. July 5, 2020), Doc. 1852488, at 18 (Plaintiffs' Stay Opposition) (contending in argument heading that "[a] separate injunction was not necessary to give effect to vacatur"); Stay Order at 1. This position also gained no traction at the November 4, 2020 oral argument. Ex. A ("Tr.") at 83:1-10. This Court has likewise recognized that "even an affirmance [of vacatur] would not halt pipeline operations." D.E. 567 at 2.

The D.C. Circuit was right to reject Plaintiffs' effort to avoid *Monsanto* by dressing up an injunction in vacatur garb. "[V]acatur" merely "deprive[d]" the easement of "'any legal consequences,'" *Kelso v. U.S. Dep't of State*, 13 F. Supp. 2d 12, 17 (D.D.C. 1998), leaving the Corps to determine the remedy for the resulting property encroachment. But any shutdown order "'enforceable by contempt'" is an "injunction." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 749 (D.C. Cir. 2016). A statement merely "clarifying" vacatur's effect *without ordering* operations to cease would be an impermissible (and ineffectual) advisory opinion.[6]

To be sure, in some cases vacatur can "set in motion" a "chain of events" that "lead to" the cessation of private conduct. *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 100 (D.D.C. 2019). But acknowledging these "disruptive consequences" as a practical matter— *e.g.*, in deciding whether to vacate under *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146 (D.C. Cir. 1993), or grant injunctive relief, *see* Mot. 4-6 (citing cases)—does not mean they are *legally* required or that courts can compel them without an injunction. That is particularly true here. Unlike natural-gas pipelines, *e.g.*, *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017), oil pipelines need no federal license to operate, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs ("SRST I")*, 205 F. Supp. 3d 4, 34 (D.D.C. 2016). And no statute or regulation mandates

---

[6]   Moreover, because the appeals divest this Court of jurisdiction, *Ayuda, Inc. v. Thornburgh*, 919 F.2d 153, 155 (D.C. Cir. 1990), the Court may only "consider additional relief if necessary" as directed by the D.C. Circuit's order, Stay Order at 2. An unenforceable advisory opinion "clarifying" the effect of vacatur is not "relief."

any consequence for encroachment on federal property.  *See supra* at 6.  Instead, the Corps has discretion as to the enforcement of its property rights, *id.*, and unlike when a construction permit is vacated, DAPL's continued operation merely maintains the status quo.  Without further action by the Corps, therefore, vacatur does *not* compel DAPL to immediately cease operations.

> **B.**     **Plaintiffs Have No Basis To Vacate Dakota Access's Section 408 Permit**

Plaintiffs ask the Court to reconsider rejection of their request, which Plaintiffs first made at the remedy stage, to vacate the Corps' § 408 permit.  Mot. 6-7.  As explained *supra*, at 2, only the easement was at issue during and following the remand.  *See also SRST VI*, 440 F. Supp. 3d at 7-8 (reaffirming June 2017 holding that an EIS is not needed for actions pre-dating easement). Plaintiffs forfeited that issue by not raising it earlier, including during the summary judgment briefing or a motion to reconsider the judgment.  And the pending appeals divest this Court of any authority to modify that judgment.

In any event, Plaintiffs lack standing to challenge the Section 408 permit, which authorized DAPL's *construction* at Lake Oahe, not its *operation*.  *See SRST I*, 205 F. Supp. 3d at 12 (the Rivers and Harbors Act forbids certain "construction" activities without Corps permission).  Because construction is complete, Plaintiffs would have no basis for challenging the Section 408 permit even if this Court could consider such a challenge.  And, for all of the reasons this Court explained in its June 2017 Opinion, that permit was lawfully issued.

## CONCLUSION

The Court should deny Plaintiffs' motion for a permanent injunction and additional relief.

DATED this 20th day of November, 2020.

By: */s/ William S. Scherman*
    William S. Scherman
    Miguel A. Estrada
    David Debold
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    (202) 955-8500
    wscherman@gibsondunn.com

    *Counsel for Dakota Access, LLC*

## CERTIFICATE OF SERVICE

I certify that on November 20, 2020, the foregoing document was filed via the Court's

CM/ECF system and served upon ECF-registered counsel for all parties to this proceeding.

*/s/ William S. Scherman*

William S. Scherman

GIBSON, DUNN & CRUTCHER LLP

1050 Connecticut Avenue, N.W.

Washington, D.C.  20036

(202) 955-8500

wscherman@gibsondunn.com
