**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE, YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE,<br><br>              Plaintiffs,<br><br>  and<br><br>CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL.,<br><br>           Plaintiff-Intervenors,<br><br>      v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>        Defendant-Cross Defendant,<br><br>  and<br><br>DAKOTA ACCESS, LLC,<br><br>        Defendant-Intervenor-Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |

**AMICI CURIAE BRIEF OF NORTH DAKOTA FARM BUREAU, NORTH DAKOTA GRAIN DEALERS ASSOCIATION, NORTH DAKOTA GRAIN GROWERS ASSOCIATION, SOUTH DAKOTA CORN GROWERS ASSOCIATION, SOUTH DAKOTA FARM BUREAU FEDERATION, SOUTH DAKOTA SOYBEAN ASSOCIATION, AND SOUTH DAKOTA GRAIN AND FEED ASSOCIATION IN SUPPORT OF DEFENDANT-INTERVENOR-CROSS CLAIMANT DAKOTA ACCESS, LLC**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to LCvR 7(o)(5), counsel for Amici hereby affirms that Amici do not have a

parent corporation and no publicly held companies own 10% or more of Amici's stock.

Dated:  November 20, 2020.

 /s/   Stephen R. Hanson II
Stephen R. Hanson II, (ND Bar No. 08585,
signing per LCvR 83.2(c))
Andrew D. Cook, (ND Bar No. 06278)
*Counsel for North Dakota Farm Bureau,*
*North Dakota Grain Dealers Association,*
*North Dakota Grain Growers Association,*
*South Dakota Corn Growers Association,*
*South Dakota Farm Bureau Federation, and*
*South Dakota Soybean Association*

OHNSTAD TWICHELL, P.C.
444 Sheyenne St., Ste. 102
P.O. Box 458
West Fargo, ND 58078-0458
Phone: (701) 282-3249
shanson@ohnstadlaw.com
acook@ohnstadlaw.com

 /s/ Jared R. Wigginton
BAKER BOTTS L.L.P.
Jared R. Wigginton (D.C. Bar No. 1033684)
(joining with non-members per LCvR 83.2(c))
Kent Mayo (D.C. Bar No. 452842)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
kent.mayo@bakerbotts.com
jared.wigginton@bakerbotts.com

J. Scott Janoe (TX Bar No. 24012897)
910 Louisiana Street
Houston, TX 77002-4995
scott.janoe@bakerbotts.com

Paulina Williams (TX Bar No. 24066295)
98 San Jacinto Blvd., Suite 1500
Austin, TX 78701-4078
paulina.williams@bakerbotts.com

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................1

STATEMENT OF INTEREST OF AMICI CURIAE.................................1

BACKGROUND ................................................................................3

ARGUMENT .....................................................................................5

      I.      The Court should decline to issue an injunction because a DAPL
            shutdown would cause irreparable harm to the agricultural industry. ................... 5

            A.      Legal Standard for an Injunction .................................................5

            B.      The Four-Factor Test Weighs Against Granting an Injunction .................6

CONCLUSION ................................................................................10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Black Oak Energy, LLC v. F.E.R.C.*,
  725 F.3d 230 (D.C. Cir. 2013) ............................................................................... 9

*City of Oberlin, Ohio v. Fed. Energy Reg. Comm'n*,
  937 F.3d 599 (D.C. Cir. 2019) ............................................................................... 7

*Committee of 100 on Federal City v. Foxx*,
  87 F.Supp.3d 191 (D.D.C. 2015) ........................................................................... 6

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................................................... 5

*National Parks Conservation Association v. Semonite*,
  422 F.Supp.3d 92 (D.D.C. 2019) ........................................................................... 8

*Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*,
  896 F.3d 520 (D.C. Cir. 2018) ............................................................................... 8

*Sierra Club v. U.S. Army Corps of Engineers*,
  990 F.Supp.2d 9 (D.D.C. 2013) ............................................................................. 6

*Winter v. Natural Res. Defense Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................... 5, 6

**Other Authorities**

"Ag bracing for railroad delays as record harvest looms," ARGUS LEADER, Sept. 15,
  2014, https://www.argusleader.com/story/news/2014/09/15/ag-bracing-railroad-
  delays-record-harvest-looms/15653623/ ......................................................... 4, 5, 9

"Food or Fuel? The Rail Car Shortage Conundrum," NBC NEWS, May 9, 2014,
  https://www.nbcnews.com/business/ economy/food-or-fuel-rail-car-shortage-
  conundrum-n209781 ........................................................................................... 5, 9

"National Ag Week Being Celebrated in South Dakota," RAPID CITY JOURNAL, Mar.
  20, 2017, https://rapidcityjournal.com/news/local/communities/sturgis/national-
  ag-week-being-celebrated-in-south-dakota/article_075f2bc1-9240-5653-8cce-
  3a23bdb35629.html ................................................................................................ 3

**TABLE OF AUTHORITIES**
**(continued)**

Page(s)

2040 North Dakota State Rail Plan, NORTH DAKOTA DEPARTMENT OF
   TRANSPORTATION, Nov. 2017,
   https://www.dot.nd.gov/divisions/planning/railplan/FINALNorth%20Dakota%20
   State%20Rail%20Plan%20December%202017.pdf.............................................................. 4, 7

Liz Hampton, "With Dakota Access in limbo, more Bakken crude to move on trains,"
   REUTERS, Dec. 22, 2016, https://www.reuters.com/article/us-north-dakota-
   pipeline-rail/with-dakota-access-in-limbo-more-bakken-crude-to-move-on-trains-
   idUSKBN14B240 ................................................................................................................. 8

Renee Jean, "North Dakota agriculture continues to play essential role amid
   coronavirus outbreak," WILLISTON HERALD, Mar. 25, 2020,
   https://www.willistonherald.com/news/farm_and_ranch/north-dakota-agriculture-
   continues-to-play-essential-role-amid-coronavirus-outbreak/article_6068edfe-
   6eb8-11ea-baa7-0ff43aad1f15. html ...................................................................................... 3

Ron Nixon, "Grain Piles Up, Waiting for a Ride, as Trains Move North Dakota Oil,"
   THE NEW YORK TIMES, Aug. 25, 2014,
   https://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-
   trains-move-north-dakota-oil.html ................................................................................... 4, 8, 9

Tom Meersman, "Farmers seek more rail capacity for grain," Star Tribune, April 8,
   2014, https://www.startribune.com/farmers-seek-more-rail-capacity-for-
   grain/254467091/?refresh=true ............................................................................................. 7

## INTRODUCTION

The issue before the Court is whether to grant the extraordinary remedy of an injunction to cease operation of the Dakota Access Pipeline ("DAPL") pending the completion of an Environmental Impact Statement ("EIS") by the U.S. Army Corps of Engineers (the "Corps"). The North Dakota Farm Bureau, North Dakota Grain Dealers Association, North Dakota Grain Growers Association, South Dakota Corn Growers Association, South Dakota Farm Bureau Federation, and South Dakota Soybean Association (collectively "Amici") submit this Amici Brief to address the harm that would result from an injunction to farmers, grain elevators, and others in the agriculture industry if the Court granted an injunction. Based on this harm and the public's interest in the agriculture industry, which would be subverted through an injunction, Amici respectfully submit the Court should deny the request for an injunction.

## STATEMENT OF INTEREST OF AMICI CURIAE

The North Dakota Farm Bureau is a grassroots, member-driven general farm organization representing farmers, ranchers, and landowners throughout the state. The North Dakota Farm Bureau was organized in 1942 and has grown to more than 27,000 members today. The North Dakota Farm Bureau advocates through lobbying and community outreach to support agricultural interests throughout the state.

The North Dakota Grain Dealers Association is a 109-year-old voluntary membership trade organization representing the interests of country grain elevators in North Dakota. These elevators are the primary point of sale for grain raised by North Dakota farmers. The elevators receive, clean, condition, segregate by quality, and ship these grains to domestic and international markets.

The North Dakota Grain Growers Association has represented North Dakota wheat and barley farmers in domestic policy issues on the local, state and national levels for more than 50 years. The North Dakota Grain Growers Association's mission is to serve North Dakota wheat

and barley producers with education, leadership, information, and representation to increase profitability and enhance value added opportunities.

The South Dakota Corn Growers Association is comprised of 1,060 dues-paying members and represents more than 12,000 corn farmers.  The association works to promote corn, improve producer profitability, and increase corn use through livestock feeding, production of ethanol and byproducts, and other uses.

The South Dakota Farm Bureau Federation is a grassroots general agriculture organization with nearly 16,000 member families across the state.  Formed in 1917, the South Dakota Farm Bureau Federation represents farming and ranching interests by focusing on advocacy, education and policy development.  The organization's vision is to create a robust agriculture industry in South Dakota, which contributes to a strong economy, healthy environment, thriving communities and nutritious food.  The South Dakota Farm Bureau Federation participates in state and federal policy and regulatory efforts relating to the protection of private property rights and enhancing its members' livelihoods.

The South Dakota Soybean Association is a 501(c)(5) membership organization that was organized in 1982.  The mission of the organization is to improve the competitiveness and profitability for South Dakota soybean farmers through education and policies.

The South Dakota Grain and Feed Association was established in 1927 and is a statewide, non-profit trade association composed of grain elevator firms and other agribusinesses involved in the grain, feed, and supply business.  The association's mission is to serve South Dakota grain elevator firms and the supply chain in the field of agribusiness.

Amici have an interest in the outcome of the Court's decision because an injunction could have far-reaching implications on the agricultural industry, including unduly burdening grain

growers with increased transportation costs by forcing the agricultural industry to compete with the oil industry for railroad transportation to transport its commodities.  In a time when farmers and ranchers are already facing financial stress, such increased transportation costs could have a crippling effect on the agricultural industry.  The Court's decision on this issue will directly affect the industry of Amici.

Counsel for Amici hereby certifies that no party's counsel authored this brief in whole or part; no party or party's counsel—or anyone other than Amici, their members, and their counsel— contributed money intended to fund preparing or submitting this brief.

## BACKGROUND

Today, just as in generations past, "agriculture remains an essential part of the fabric of American life" and the economies of North Dakota and South Dakota.  Renee Jean, "North Dakota agriculture continues to play essential role amid coronavirus outbreak," WILLISTON HERALD, Mar. 25, 2020, https://www.willistonherald.com/news/farm_and_ranch/north-dakota-agriculture-continues-to-play-essential-role-amid-coronavirus-outbreak/article_6068edfe-6eb8-11ea-baa7-0ff43aad1f15. html.  More than 26,000 farms call North Dakota home, while production agriculture and related industries support almost a quarter of the State's workforce.  *Id.*  Together, these farms produce more than 50 different commodities, and North Dakota is the top producer in 10 of those commodities.  *Id.*

Similarly, agriculture is the number one industry in South Dakota, generating more than 30 percent of the State's economic activity.  "National Ag Week Being Celebrated in South Dakota," RAPID CITY JOURNAL, Mar. 20, 2017, https://rapidcityjournal.com/news/local/communities/sturgis/national-ag-week-being-celebrated-in-south-dakota/article_075f2bc1-9240-5653-8cce-3a23bdb35629.html.   More   than   twenty

percent of South Dakotans work on South Dakota's 31,000 farms and agriculture-related industries. *Id.*

A thriving agriculture industry is vital to the economies of North Dakota and South Dakota, and the agriculture industry's success relies heavily on the availability of rail service. "The competitive cost of rail transport for long-distance high-volume shipments makes rail transportation attractive for the movement of North Dakota grain to the ports and domestic markets." 2040 North Dakota State Rail Plan, NORTH DAKOTA DEPARTMENT OF TRANSPORTATION, Nov. 2017, https://www.dot.nd.gov/divisions/planning/railplan/FINALNorth%20Dakota%20State%20Rail%20Plan%20December%202017.pdf at 1-5. "Railroads have long been the backbone of North Dakota's transportation system and the most dependable way for farmers to move crops – to ports in Portland, Ore., Seattle and Vancouver, from which the bulk of the grain is shipped across the Pacific to Asia; and to East Coast ports like Albany, from which it is shipped to Europe." Ron Nixon, "Grain Piles Up, Waiting for a Ride, as Trains Move North Dakota Oil," THE NEW YORK TIMES, Aug. 25, 2014, https://www.nytimes.com/2014/08/26/us/grain-piles-up-waiting-for-a-ride-as-trains-move-north-dakota-oil.html. In a typical year, railroads transport 72 to 82 percent of North Dakota's crop output. 2040 North Dakota State Rail Plan, *supra* at 2-89. The total amount of crop rail shipments has vastly increased in recent history; overall agricultural shipments by rail doubled between 2000 and 2014. *Id.*

"In South Dakota, farmers are dependent on trains to move their corn, soybeans, wheat and other commodities hundreds of miles to coastal ports such as Seattle and New Orleans or livestock operations in the Southwest at a greater cost than farmers in neighboring states who are closer to rivers or have more rail options." "Ag bracing for railroad delays as record harvest looms," ARGUS

4

LEADER, Sept. 15, 2014, https://www.argusleader.com/story/news/2014/09/15/ag-bracing-railroad-delays-record-harvest-looms/15653623/. "Unlike Iowa, for example, where the state's burgeoning ethanol industry and livestock producers consume millions of bushels of corn that don't need to be moved long distances, South Dakota grows more than it needs," as about 50 percent of grain is transported out of the State. *Id.*

Given the interdependence of the agricultural and railroad industries, "[t]he farmers and grain elevator operators are at the mercy of the railroads." "Food or Fuel? The Rail Car Shortage Conundrum," NBC NEWS, May 9, 2014, https://www.nbcnews.com/business/ economy/food-or-fuel-rail-car-shortage-conundrum-n209781. As a result, the continued operation of DAPL is essential to the agriculture industry because DAPL eases transportation shortages by freeing up rail cars to move grain and other agricultural products. Amici thus respectfully request the Court deny an injunction shutting down DAPL as the Corps completes the EIS.

## ARGUMENT

I.    **The Court should decline to issue an injunction because a DAPL shutdown would cause irreparable harm to the agricultural industry.**

A.    **Legal Standard for an Injunction**

A plaintiff seeking a permanent injunction to remedy a NEPA violation must satisfy a four-factor test. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). Specifically, the plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* at 156-57.

In deciding whether to grant the extraordinary remedy of an injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting

or withholding of the requested relief." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008). Moreover, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 22 (internal quotation marks and citation omitted).

**B.     The Four-Factor Test Weighs Against Granting an Injunction**

The four-factor test applied in this Circuit favors denial of the Plaintiffs' request for a permanent injunction. First, the Plaintiffs must demonstrate irreparable injury is likely to occur without an injunction. *Id*. Amici respectfully submit the Plaintiffs have not satisfied this high burden because they have not shown the alleged harm is likely, certain, and great. *Id.*; *see also Sierra Club v. U.S. Army Corps of Engineers*, 990 F.Supp.2d 9, 41 (D.D.C. 2013) ("As genuine as these concerns [of a potential oil spill from a pipeline] may be, Plaintiffs have not shown that a damaging oil spill is *likely* to occur, and it is bedrock law that injunctions will not issue to prevent injuries neither extant nor presently threatened, but only merely feared.").

More importantly, even assuming the Plaintiffs satisfy their showing of irreparable harm, such harm is outweighed by the harm to others, including Amici, as well as the detriment to the public interest. "Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue." *Sierra Club*, 990 F.Supp.2d at 41. Thus, even when a plaintiff makes a strong showing of irreparable harm, courts refuse to grant injunctive relief if the public's interest outweighs the harm to the plaintiff. *See, e.g.*, *Committee of 100 on Federal City v. Foxx*, 87 F.Supp.3d 191, 220 (D.D.C. 2015) (noting the broader public interest may outweigh even a "near certainty" of irreparable harm suffered by the plaintiff). For instance, in *Sierra Club*, the Court rejected the plaintiff's argument that the environmental harms and potential for a devastating oil spill from a pipeline outweighed the economic consequences and harm to the public

interest that would be occasioned by granting the requested injunction. *Sierra Club*, 990 F.Supp.2d at 42.

In this case, an injunction would cause harm to Amici and the public interest because DAPL is currently in operation. *See, e.g.*, *City of Oberlin, Ohio v. Fed. Energy Reg. Comm'n*, 937 F.3d 599, 611 (D.C. Cir. 2019) (recognizing the shutdown of a pipeline "would be quite disruptive, as the [natural gas] pipeline is currently operational"). DAPL was constructed to alleviate problems with infrastructure demand. Since coming online, DAPL carries in excess of 550,000 barrels of oil per day out of North Dakota. Thus, DAPL has become a crucial component of the transportation infrastructure utilized by the State's energy industry.

In the event DAPL can no longer operate, the crude oil currently transported by DAPL would need to be shipped through alternate means. As the North Dakota Department of Transportation explained in its 2040 North Dakota State Rail Plan, there is a direct correlation between pipeline capacity and rail shipments of crude oil. *See* 2040 North Dakota State Rail Plan, *supra*. As pipeline capacity increases, crude oil shipments by rail generally decline, since pipelines are a less expensive option for moving oil. *Id.* at 1-5, 2-84. Conversely, when pipeline capacity decreases, which would occur if the Court orders a shutdown of DAPL, there would be a corresponding increase in the need for rail service to transport crude oil.

Given this interdependence, a sudden shutdown of DAPL would drastically decrease the available pipeline capacity, thereby increasing the demand on rail service for transporting oil. *Id.* at 2-83; *see also* Doc. #279-1 (discussing the impact of a loss of DAPL capacity). Many farmers view pipelines such as DAPL as the long-term solution to ease rail congestion for the agriculture industry, and a shutdown of an active pipeline would give rise to the very problems the pipeline was meant to address. Tom Meersman, "Farmers seek more rail capacity for grain," Star Tribune,

April      8,      2014,         https://www.startribune.com/farmers-seek-more-rail-capacity-for-grain/254467091/?refresh=true; Liz Hampton, "With Dakota Access in limbo, more Bakken crude to move on trains," REUTERS, Dec. 22, 2016, https://www.reuters.com/article/us-north-dakota-pipeline-rail/with-dakota-access-in-limbo-more-bakken-crude-to-move-on-trains-idUSKBN14B240 (noting energy companies would turn to rail to ship crude after the Corps denied an easement in December 2016).  Accordingly, multiple industries have reasonably relied upon the continued operation of DAPL, including not just the energy industry, but also the railroad industry and the agriculture industry.  *See Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018) (acknowledging the disruptive consequences to an entity who "reasonably relied on the [agency's] ruling and settled practice").

In short, a sudden shutdown of DAPL could trigger a chain reaction of events renewing the very problems DAPL was constructed to alleviate.  *See National Parks Conservation Association v. Semonite*, 422 F.Supp.3d 92, 100 (D.D.C. 2019) (concluding the Court might set in motion a chain of events leading to serious, disruptive real-world consequences by revoking a permit for an infrastructure project).  The rail car shortages encountered in the years prior to DAPL's operation may still return if DAPL operations cease.  Moreover, the harm posed by a DAPL shut down would be felt not just by the energy industry, but also by thousands in the agriculture industry who depend on having affordable, available rail cars to transport and receive grain, ethanol, fertilizer, and other agricultural products.

Amici respectfully submit this scenario is not mere conjecture, but a real-world consequence the agriculture industry was forced to confront just a few years ago.  In 2014, rail shipments of crude oil surged as there were few existing pipelines available to ship oil.  Nixon, *supra*.  Given the finite amount of rail cars available, the increased demand for oil shipments

resulted in a shortage of cars that could be allocated for agricultural purposes. *Id.* Consequently, grain elevators reached capacity, but they could not ship crops to market due to a shortage of rail cars. "Food or Fuel? The Rail Car Shortage Conundrum," *supra*. This, in turn, meant the elevators could not make room for new grains. *Id.* Without a viable means for transporting their product, farmers were faced with arranging for alternate, more expensive means of transportation or, even worse, simply letting their crop rot. Nixon, *supra*.

On the other end of the transaction, food processors reluctantly halted production when they could not obtain their shipments. *Id.* For instance, breakfast cereal giant General Mills lost dozens of days of production due to logistics problems, including rail car congestion. *Id.* While some producers obtained product from other sources to fulfill their needs, this meant the original farmer was unable to sell his or her product to complete the transaction as had been originally intended. *Id.*

Making matters worse, there are often financial penalties imposed for late or nondeliveries to processors. "Food or Fuel? The Rail Car Shortage Conundrum," *supra*. On top of the late fees imposed when shipments fail to arrive on time, grain companies often pay less for commodities because of the higher transportation costs, the risks involved, and the delays factored into the price. "Ag bracing for railroad delays as record harvest looms," *supra*. "Ultimately, that means farmers receive a lower price for their crop." *Id.*

Presently, the agriculture industry is already facing challenging times because of the pandemic and current low crop prices. A DAPL shutdown would worsen the outlook for farmers because it almost certainly would increase the costs of transporting grain due to the enhanced demand it would place on rail service. These consequences to the uninvolved market participants in the agriculture industry warrant the denial of an injunction. *See Black Oak Energy, LLC v.*

*F.E.R.C.*, 725 F.3d 230, 244 (D.C. Cir. 2013) (highlighting the increased costs imposed on "uninvolved market participants").

Finally, Amici highlight this Court's previous determination that some immediate harm would be expected from a DAPL shutdown. *See* Doc. #546 at 17. The Court concluded this harm was mitigated by the expedited thirteen-month timeframe estimated by the Corps to complete the EIS. *Id.* Unfortunately, the latest update from the Corps indicates the EIS will likely take longer than the thirteen months the Corps initially projected. *See* Doc. #570. Thus, the mitigating factor the Court previously relied upon is no longer present, which increases the severity of the harm to Amici and others. This factor further justifies the denial of an injunction pending the Corps' completion of the EIS.

## CONCLUSION

Farmers are in the midst of challenging times, as the agricultural economy remains depressed, commodity prices are low, and the COVID-19 pandemic is making the situation worse. Additional pressures on rail transportation and availability would be devastating to North Dakota and South Dakota farmers.

Under this Circuit's guiding precedent, an injunction is inappropriate if the harm to the moving party is outweighed by the harm suffered by others or by the public interest. The public interest in this case, as well as the interests of Amici and others in the agricultural industry, strongly favors the continued operation of DAPL. If the Court were to order a shutdown of DAPL, farmers, grain elevators, and others in the agriculture industry and beyond would face long-lasting damage. As a result, the Court should deny the request for an injunction pending the Corps' completion of the EIS.

Dated:  November 20, 2020.

Respectfully submitted,

  /s/   *Stephen R. Hanson II*
Stephen R. Hanson II, (ND Bar No. 08585,
signing per LCvR 83.2(c))
Andrew D. Cook, (ND Bar No. 06278)
*Counsel for North Dakota Farm Bureau,*
*North Dakota Grain Dealers Association,*
*North Dakota Grain Growers Association,*
*South Dakota Corn Growers Association,*
*South Dakota Farm Bureau Federation, and*
*South Dakota Soybean Association*

OHNSTAD TWICHELL, P.C.
444 Sheyenne St., Ste. 102
P.O. Box 458
West Fargo, ND 58078-0458
Phone: (701) 282-3249
shanson@ohnstadlaw.com
acook@ohnstadlaw.com

*/s/ Jared R. Wigginton*
BAKER BOTTS L.L.P.
Jared R. Wigginton (D.C. Bar No. 1033684)
(joining with non-members per LCvR 83.2(c))
Kent Mayo (D.C. Bar No. 452842)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
kent.mayo@bakerbotts.com
jared.wigginton@bakerbotts.com

J. Scott Janoe (TX Bar No. 24012897)
910 Louisiana Street
Houston, TX 77002-4995
scott.janoe@bakerbotts.com

Paulina Williams (TX Bar No. 24066295)
98 San Jacinto Blvd., Suite 1500
Austin, TX 78701-4078
paulina.williams@bakerbotts.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with LCvR 7(o)(4) because it does not exceed 25 pages.

Respectfully submitted,

 /s/   *Stephen R. Hanson II*
Stephen R. Hanson II, (ND Bar No. 08585,
signing per LCvR 83.2(c))
Andrew D. Cook, (ND Bar No. 06278)
*Counsel for North Dakota Farm Bureau,*
*North Dakota Grain Dealers Association,*
*North Dakota Grain Growers Association,*
*South Dakota Corn Growers Association,*
*South Dakota Farm Bureau Federation, and*
*South Dakota Soybean Association*

OHNSTAD TWICHELL, P.C.
444 Sheyenne St., Ste. 102
P.O. Box 458
West Fargo, ND 58078-0458
Phone: (701) 282-3249
shanson@ohnstadlaw.com
acook@ohnstadlaw.com

*/s/ Jared R. Wigginton*
BAKER BOTTS L.L.P.
Jared R. Wigginton (D.C. Bar No. 1033684)
(joining with non-members per LCvR 83.2(c))
Kent Mayo (D.C. Bar No. 452842)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
kent.mayo@bakerbotts.com
jared.wigginton@bakerbotts.com

J. Scott Janoe (TX Bar No. 24012897)
910 Louisiana Street
Houston, TX 77002-4995
scott.janoe@bakerbotts.com

Paulina Williams (TX Bar No. 24066295)
98 San Jacinto Blvd., Suite 1500
Austin, TX 78701-4078
paulina.williams@bakerbotts.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November, 2020, I electronically filed the foregoing

document using the CM/ECF system.  Service was accomplished by the CM/ECF system.

*/s/ Jared R. Wigginton*
BAKER BOTTS L.L.P.
Jared R. Wigginton (D.C. Bar No. 1033684)
(joining with non-members per LCvR 83.2(c))
Kent Mayo (D.C. Bar No. 452842)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
kent.mayo@bakerbotts.com
jared.wigginton@bakerbotts.com

J. Scott Janoe (TX Bar No. 24012897)
910 Louisiana Street
Houston, TX 77002-4995
scott.janoe@bakerbotts.com

Paulina Williams (TX Bar No. 24066295)
98 San Jacinto Blvd., Suite 1500
Austin, TX 78701-4078
paulina.williams@bakerbotts.com