UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STANDING ROCK SIOUX TRIBE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:16-cv-01534-JEB |
| U.S. ARMY CORPS OF ENGINEERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**AMICUS BRIEF FOR THE STATES OF INDIANA, MONTANA,
AND 12 OTHER STATES IN SUPPORT OF THE U.S. ARMY
CORPS OF ENGINEERS AND DAKOTA ACCESS, L.L.C.**

TIM FOX
Attorney General of Montana

ROB CAMERON
Deputy Attorney General

Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Tel: (406) 444-2026
Email: Rob.Cameron@mt.gov

CURTIS T. HILL, Jr.
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

JULIA C. PAYNE
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov
       Julia.Payne@atg.in.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTEREST OF AMICI AND SUMMARY OF THE ARGUMENT .............................................. 1

ARGUMENT ................................................................................................................ 2

I.     The Interests of Parties Not Before the Court Are Critical to this Analysis ........................ 3

II.    Shutting Down DAPL Would Both Disrupt the Flow of Oil and Tie Up Transportation
       for Other Commodities, Especially Grain ........................................................................ 4

       A.  DAPL alleviated otherwise intractable logistical problems that arose for the
           nation's farmers and food supply when Bakken oil displaced grain commodities
           on critical railway corridors  ........................................................................ 4

       B.  Shutting down the pipeline would return to pre-DAPL railroad congestion ................ 9

III.   Shutting Down the Pipeline Will Increase the Threat of Safety and Environmental
       Hazards .............................................................................................................. 14

       A.  Enjoining the operation of DAPL will create potential for greater safety hazards ...... 14

       B.  An injunction would threaten negative environmental impact .................................... 16

CONCLUSION ............................................................................................................. 20

ADDITIONAL COUNSEL .............................................................................................. 21

CERTIFICATE OF SERVICE ......................................................................................... 22

# TABLE OF AUTHORITIES

**CASES**

*A.L. Pharma, Inc. v. Shalala*,
    62 F.3d 1484 (D.C. Cir. 1995) ........................................................................................4

*American Motorcyclist Ass'n v. Watt*,
    714 F.2d 962 (9th Cir. 1983) ..........................................................................................4

*Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*,
    622 F.3d 1094 (9th Cir. 2010) ......................................................................................16

*Citizens Against Burlington, Inc. v. Busey*,
    938 F.2d 190 (D.C. Cir. 1991) ........................................................................................2

*City of Seattle v. Burlington N. R.R. Co.*,
    41 P.3d 1169 (Wash. 2002) ..........................................................................................16

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993) ......................................................................................................16

*Delaware v. Surface Transp. Bd.*,
    859 F.3d 16 (D.C. Cir. 2017) ........................................................................................16

*Elam v. Kansas City Southern Ry. Co.*,
    635 F.3d 796 (5th Cir. 2011) ........................................................................................16

*Maynard v. CSX Transp., Inc.*,
    360 F. Supp. 2d 836 (E.D. Ky. 2004) ..........................................................................16

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ........................................................................................................2

*Mont. Envtl. Info. Ctr. v. Dep't of Envtl. Quality*,
    988 P.2d 1236 (Mont. 1999) ...................................................................................18, 19

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
    No. 20-5197, 2020 WL 4548123 (D.C. Cir. Aug. 5, 2020) ............................................2

*State v. Norfolk S. Ry. Co.*,
    107 N.E.3d 468 (Ind. 2018) ..........................................................................................16

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................................3, 4

**STATUTES**

49 U.S.C. § 10501(b) ..........................................................................................................16

OTHER AUTHORITIES

Andrea Edwards, *Mitigating the Risks of Crude Oil Transport by Rail*, Zurich
Services Corporation (2015), https://www.zurichna.com/-
/media/project/zwp/zna/docs/kh/energy/mitigating-risks-oil-transport-by-
rail.pdf ....................................................................................................................15, 16, 17

Bob Costello & Alan Karickhoff, *Truck Driver Shortage Analysis 2019*, Am.
Trucking Ass'n (July 2019), https://www.trucking.org/sites/default/files/2020-
01/ATAs%20Driver%20Shortage%20Report%202019%20with%20cover.pdf ....................10

*COVID-19 Update—Tourism Industry for Montana*, Voices of Mont. Tourism,
http://www.voicesoftourism.com/ ..........................................................................................17

*Freight Commodity Statistics*, Ass'n of Am. R.R. (2013) ..............................................................6

*Freight Quick Facts Report*, U.S. Dep't of Transp., Fed. High. Admin. (2016),
https://ops.fhwa.dot.gov/publications/fhwahop16083/fhwahop16083.pdf ..............................14

*G20 Extraordinary Agriculture Ministers Meeting Ministerial Statement on
COVID-19 Virtual Meeting*, April 21, 2020,
https://reliefweb.int/sites/reliefweb.int/files/resources/G20_Agriculture%20Mi
nisters%20Meeting_Statement_EN.pdf ..............................................................................12, 13

*Grain Transportation Report*, U.S. Dep't of Agriculture (Apr. 23, 2020),
https://apps.ams.usda.gov/SearchReports/Documents/stelprdc5109140.pdf .........................11

*Grain Transportation Report*, U.S. Dep't of Agriculture (Oct. 2, 2014),
https://apps.ams.usda.gov/SearchReports/Documents/stelprdc5109140.pdf ................6, 7, 11

Ivan Atanassov & C. Tyler Dick, *Capacity of Single-Track Railway Lines with
Short Sidings to Support Operation of Long Freight Trains*, 2475 Transp. Res.
R. 95 (2015), https://railtec.illinois.edu/wp/wp-
content/uploads/2019/01/Atanassov-et-al-2015-TRB-15-6026-TRR-final.pdf........................5

Karen Clay *et al.*, *The External Costs of Transporting Petroleum Products by
Pipelines and Rail: Evidence from Shipments of Crude Oil from North
Dakota*, National Bureau of Economic Research (Sept. 2017),
https://www.nber.org/papers/w23852.pdf ..............................................................................15

Kenneth P. Green & Taylor Jackson, *Safety in the Transportation of Oil and Gas:
Pipelines or Rail?*, Fraser Institute (Aug. 2015), at 5,
https://www.fraserinstitute.org/sites/default/files/safety-in-the-transportation-
of-oil-and-gas-pipelines-or-rail-rev2.pdf ..........................................................................14, 15

Megan E. Hansen & Ethan Dursteler, *Pipelines, Rail & Trucks*, Strata (2017),
https://www.strata.org/pdf/2017/pipelines.pdf ...................................................................9, 14

OTHER AUTHORITIES [CONT'D]

Mont. Const. art. II, § 3 ................................................................................................................18

Mont. Const. art. IX, § 1 ..............................................................................................................18

Montana Constitutional Convention, Vol. V, March 7, 1972 ......................................................18

National Grain and Feed Association, *Expanding Access to Rate Relief*,
    STB Docket No. EP. 665 (Sub-No.2) (Nov. 14, 2016),
    https://www.ngfa.org/wp-content/uploads/NGFA-and-Other-Interested-
    Agricultural-Parties-Statement-to-STB-on-Rail-Rate-Proceeding-EP-665-
    2Nov.-14-2016.pdf .................................................................................................................10

*The Positive Environmental Effects of Increased Freight by Rail Movements in
    America*, Ass'n of Am. R.R. (2020), https://www.aar.org/wp-
    content/uploads/2020/06/AAR-Positive-Environmental-Effects-of-Freight-
    Rail-White-Paper-62020.pdf ...................................................................................................5

### INTEREST OF AMICI AND SUMMARY OF THE ARGUMENT

The States of Indiana, Montana, Iowa, Kansas, Kentucky, Louisiana, Missouri, Nebraska, Ohio, South Carolina, South Dakota, Utah, West Virginia, and Wyoming respectfully submit this brief as amici curiae in support of the U.S. Army Corps of Engineers and Dakota Access, L.L.C. Amici States previously participated at the vacatur-stage, ECF No. 514, and in the D.C. Circuit appeal. On remand, this Court will once again consider whether to enjoin the flow of oil through the Dakota Access Pipeline (DAPL). ECF No. 567. All Amici States—both States the Pipeline passes through and others—stand to suffer potentially disastrous consequences in the event of a DAPL shutdown. In its previous vacatur order, this Court largely dismissed these public-interest issues. Amici States participate again at this stage of the case to urge the Court to take a hard look at the public harms an injunction is likely to cause.

First, many Amici States produce large amounts of grain currently shipped by rail—grain that will suffer displacement, owing to competition with higher-revenue oil for access rail transport, if the Dakota Access Pipeline is shut down. Such competition is likely to revisit the market conditions that obtained before the pipeline became operational in 2017, namely intractable railroad congestion, rotting grain, higher food prices and, ultimately, a potential for food shortages.

Second, crude oil shipments by rail or truck pose greater safety hazards than shipments by pipeline. Despite extensive safety measures undertaken by railway and trucking companies, data show that pipeline transport of crude has yielded fewer accidents, injuries and deaths than rail and truck shipments, such that pipeline transport is both cheaper and less likely to cause widespread destruction. Moreover, shipment by rail or truck threatens greater environmental impact because such vehicles emit more greenhouse gases than pipelines.

Accordingly, Amici States have a strong interest in urging this Court to permit the Dakota Access Pipeline to remain operational pending remedy of any NEPA violations.

## ARGUMENT

The D.C. Circuit's remand order asked parties to "clarify their positions before the district court as to whether the Corps intends to allow the continued operation of the pipeline notwithstanding vacatur of the easement and for the district court to consider additional relief if necessary." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, No. 20-5197, 2020 WL 4548123, at *1 (D.C. Cir. Aug. 5, 2020). Plaintiff now urges this Court to "clarify that pipeline operations must be suspended pursuant to its vacatur order even without an injunction" or to issue a permanent injunction against use of the pipeline. ECF No. 569 at 3, 24. Therefore, the four-factor test from *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010), once again applies, and the same critical public interest considerations set forth earlier by the Amici States continue to weigh heavily against shutting down the pipeline.

The widespread economic and safety disruptions that will arise from an injunction will far outweigh any actual harm caused by the short-term lack of an environmental impact statement, which is a procedural agency obligation designed to provide more public information, but which does not itself hold the prospect of changing the substantive outcome of the Corps' ultimate decision about the easement. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991) (holding that the National Environmental Policy Act mandates certain *procedures* for agency action that may impact the environment, but not certain *results*). The Dakota Access Pipeline has already been constructed, the oil is flowing, and the American economy has come to rely on its benefits as an alternative to rail or truck transport. The dire *public* consequences of disrupting

the flow of oil through the pipeline outweigh the alleged harm to Plaintiffs pending remedy of a NEPA violation, and that alone is enough to defeat the injunction.

## I.     The Interests of Parties Not Before the Court Are Critical to this Analysis

Though Amici States submitted a detailed brief in this Court explaining in detail multi-faceted national dependence on DAPL, the Court did not fully consider the harms that an injunction would cause to third parties, including Amici States, their citizens, and indeed all who depend on Midwest grain for food security. This Court acknowledged that "[s]everal states also argue that their grain farmers would be harmed by having to pay a premium for railroad cars once oil, which is more valuable by volume, enters the market and drives up prices." ECF No. 546 at 15. But, it determined that these concerns were mere "economic disruption" and decided that they were "not necessarily . . . determinative." *Id.* at 18.

The disruption that will result from vacating the easement, however, is not merely "economic." As detailed earlier and summarized again below, it will not be isolated to a single industry or sector of the economy and will have far-reaching effects on the most vulnerable populations, potentially threatening the food security of all who rely on Midwestern grain producers to ship affordable food through rail transport. Shutting down the pipeline also threatens greater environmental damage that permitting oil to continue flowing.

Such concerns affecting the public interest constitute a critical part of the test for issuing a permanent injunction. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 23 (2008) (holding that, notwithstanding a NEPA violation, the public interest against an injunction outweighed the alleged harm to plaintiffs). *Winter* makes it clear that, "even if plaintiffs have shown irreparable injury" from activity that proceeds without a legally required EIS, an injunction is impermissible where "any such injury is outweighed by the public interest." *Id.* Indeed, "a proper

consideration of these [public interest] factors alone" can "require[] denial of the requested injunctive relief." *Id. See also American Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 966 (9th Cir. 1983) (holding that "a showing of NEPA violation should not automatically lead to an injunction where other public interests may be adversely affected");

This Court, in other words, must heed the public interests that weigh against plaintiffs' position. And, ultimately, the inevitable harm to the public of shutting down DAPL precludes an order requiring that outcome.

## II.   Shutting Down DAPL Would Both Disrupt the Flow of Oil and Tie Up Transportation for Other Commodities, Especially Grain

Shutting down DAPL would prove enormously disruptive to producers and consumers who have "relied on it in good faith" for years. *See A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (denying vacatur where private party had relied on FDA approval in good faith for over thirteen years). This disruption is sufficient to deny the injunction.

### A.   DAPL alleviated otherwise intractable logistical problems that arose for the nation's farmers and food supply when Bakken oil displaced grain commodities on critical railway corridors

The agriculture economy already once before sustained substantial congestion and attendant losses when the Bakken fields began pumping crude—*before* DAPL opened. Shutting down the pipeline would at the very least revisit those unsustainable market conditions by diverting hundreds of thousands of barrels of crude oil to rail transport, displacing grain commodities and, ultimately, threatening the food supply chain. Particularly amidst a global pandemic, the risk of creating conditions for food insecurity in various pockets of the country—and of bankrupting farmers—makes an injunction inappropriate.

1.   Agricultural products are grown in remote, highly distributed fields, requiring farmers and dealers to aggregate grain from multiple sources for shipping to far-away food-processing

4

purchasers. ECF No. 512-4, Declaration of Elaine Kub ¶ 8. Truck and rail provide the principal means of transporting grain, but trucks require far more labor: While every truck needs a driver, a small team can drive a train carrying large amounts of grain in multiple cars. Trains also use less fuel than a large fleet of trucks. *The Positive Environmental Effects of Increased Freight by Rail Movements in America*, Ass'n of Am. R.R. (2020) at 1–4, https://www.aar.org/wp-content/up-loads/2020/06/AAR-Positive-Environmental-Effects-of-Freight-Rail-White-Paper-62020.pdf.

As a result, grain farmers have grown to rely substantially on rail for long-haul shipping; rail is "the primary source of transportation for moving the region's bulk products, such as grain, crude oil, and ores," and in turn "agricultural products in aggregate represent 42 percent of rail loadings, with cereal grains accounting for nearly 24 percent of rail tonnage originating in the region in 2018." ECF No. 512-2 (Rennicke) ¶ 52. Overall, "the states of Illinois, North Dakota, Minnesota, Wisconsin, and Montana rank 1, 5, 8, 11, and 15, respectively in the US for transported grain originations (all modes), accounting for 29 percent of all domestic originations in the United States." *Id*.

2.      As the volume of oil from the Bakken region increased over the past decade, limited pipeline capacity meant that producers had to rely on rail tankers for transportation. But, owing to the standard length of available railroad sidings, trains have a practical limit of just over 100 cars, and the railroads, already stretched to capacity with grain shipments, struggled to handle both crude oil and grain. Ivan Atanassov & C. Tyler Dick, *Capacity of Single-Track Railway Lines with Short Sidings to Support Operation of Long Freight Trains*, 2475 Transp. Res. R. 95, 95–96 (2015), https://railtec.illinois.edu/wp/wp-content/uploads/2019/01/Atanassov-et-al-2015-TRB-15-6026-TRR-final.pdf.

Consequently, railroads scrambled to obtain sufficient oil tanker rail cars. Oil, as it happens, provides railroads substantially greater revenue than grain. In 2013—before the pipeline became operational—railroads were receiving average revenue of over $56 per originated ton for shipping crude petroleum, but only $38.45 per originated ton for shipping field crops. *Freight Commodity Statistics*, Ass'n of Am. R.R. (2013), A.1, A.3 (dividing revenue for field crops (011) and crude petroleum/natural gas (131) by originated tons for each); *see also* ECF No. 512-4 (Kub) ¶ 30 (reciting similar data for 2018).

So, from 2013 through 2015, unprecedented volumes of crude oil tankers clogged rail lines. ECF No. 512-4 (Kub) Figure 3. "In 2010, Class I railroads carried an average of 2 million barrels of crude oil per month; by 2014, this had increased to an average of 31.8 million barrels per month, representing growth of more than 1,500 percent in four years." ECF No. 512-2 (Rennicke) ¶ 19 (internal citations omitted). "This run-up over several years was the result of domestic crude oil production outpacing the development of pipeline capacity." *Id.* (footnotes omitted).

The predictable result was less rail capacity for the coal and grain that the trains had previously pulled. Shippers of grain and other agricultural products also saw significant increases in rates along oil-shipment corridors, as well as historically high prices in the secondary grain railcar market (sublease prices bid among grain shippers for committed space on railcars). ECF No. 512-4 (Kub) ¶ 14. Average bids just to get car space—above the tariff rate and fuel surcharges paid directly to railroads—reached a record high of $4,625 per car at the start of October 2014, equivalent to $1.03 per bushel paid by a grain shipper. *Grain Transportation Report*, U.S. Dep't of Agriculture (Oct. 2, 2014), at 7, https://apps.ams.usda.gov/SearchReports/Documents/stelprdc 5109140.pdf. These higher freight costs yielded lower revenues for farmers, not only in areas

where grain shipments were dependent on rail transportation, but all across America where the secondary freight prices were inflated by competition between crude oil and grain. *Id.*

Westward rail routes proved especially vulnerable to freight congestion, as the few rail passages across the Rocky Mountains meant that a bottleneck on any route left all the grain behind it stranded. ECF No. 512-2 (Rennicke) ¶ 47. In January 2014, "grain unit trains from Minnesota to the Pacific Northwest were taking up to 22 days, compared to a normal transit time of 12 days," with grain carloads lagging behind normal levels in the tens (and hundreds) of thousands compared with prior years. *Id.* ¶ 63. Observers traced the problem back to Bakken crude. "The executive director of the Minnesota Grain and Feed Association blamed crude oil shipments for increasing congestion in regional rail yards (such as St. Paul and Chicago)." *Id.*

Moreover, congestion in rail shipments also posed problems for other industries. Ethanol refineries experienced a spike in transportation rates that mirrored the increase in crude-by-rail shipments, prompting them to scale back production when they were unable to obtain rail cars for transport. *Id.* ¶ 79. In 2014, a grain ship was held up for nearly a month in the Port of Duluth waiting for rail shipments. *Id.* ¶ 72. And Mosaic, a Minneapolis-based fertilizer company, saw a 43% decline in earnings due to its inability to make spring fertilizer shipments. *Id.* ¶ 77. Congestion problems also caused disruption for auto manufacturers unable to ship new cars. *Id.* ¶ 81.

All of this congestion and delay in rail service led to higher food prices for consumers and lower profits for farmers. In 2014, North Dakota farmers experienced depressed corn basis prices, $1.20 less than the benchmark futures price, nearly double the usual $0.65 discount off the futures price. ECF No. 512-4 (Kub) ¶ 22. Similarly during the 2014 freight congestion, in the central Corn Belt, where local corn basis prices tend to be around $0.05 less than the benchmark futures price, local corn prices dropped by a factor of *eight*, to $0.40 less than the benchmark futures price. *Id.*

To be sure, these depressed basis prices were the result of many factors (including competitive forces between rail shippers and domestic processors that do not rely on rail service). Yet the data make clear that transportation costs are the primary influence on grain basis-price differentials. In 2015, USDA's Office of the Chief Economist and the Agricultural Marketing Service concluded that, even accounting for all the variables, Upper Midwest farmers may have received $570 million less for their crops in 2014 than they would have earned in a regular seasonal transport cost environment. ECF No. 512-4 (Kub) ¶ 13.

3.    When DAPL opened in 2017, it provided much-needed transportation relief for the Bakken region. In 2014, the volume of crude oil shipped by rail hit a peak of 31.8 million barrels per month. ECF No. 512-2 (Rennicke) ¶ 19. In 2017, the volume of crude shipped by rail declined to a low of less than 10 million barrels per month, and by 2019 remained at a mere 70% of the volume shipped by rail in 2014. *Id.* ¶ 19 & Ex. 6. As a percentage of Bakken crude, "at the end of 2014, rail accounted for about 60 percent of North Dakota crude oil production, dropping to 17 percent of production in 2019; at the same time, pipeline share grew from about 31 percent in 2014 to 72 percent in 2019." *Id.* ¶ 20.

That relief benefitted grain farmers and shippers as well, for transporting crude oil by pipeline frees up rail capacity for agricultural products, plain and simple. The ultra-depressed North Dakota corn basis, seen at $1.20 less than the benchmark futures contract during the peak of the freight congestion in 2014, has once again settled in its normal seasonal basis of $0.65 less than the benchmark futures contract price. ECF No. 512-4 (Kub) ¶ 22. Nationwide, rail service to the grain industry has returned to normal train speeds and dwell times. *Id.* Table 2.

### B.  Shutting down the pipeline would return to pre-DAPL railroad congestion

The United States' energy needs are vast, and Amici support supplying those needs from domestic sources. But producing energy also requires the means of transporting it across the country. Amici support rail as a means of transporting oil, but not to the exclusion of, or as a substitute for, pipelines. Vacating the DAPL easement would force oil producers to find alternative means of transporting their output, with a likely return to pre-DAPL depression on corn basis prices, and worse. While three non-DAPL pipelines also transport oil from the Bakken, they have capacity for at most 12–18 percent of the oil that would be displaced as result of an injunction. *See* ECF No. 512-2 (Rennicke) ¶ 5.a. For the balance, rail is the only economically viable alternative, as shipping crude by truck can be twice as expensive as rail. Megan E. Hansen & Ethan Dursteler, *Pipelines, Rail & Trucks*, Strata (2017) at 3, https://www.strata.org/pdf/2017/pipelines.pdf. At trucking transport rates, the price advantage Bakken crude generally enjoys over other sources of crude evaporates. *See* ECF No. 512-2 (Rennicke) ¶ 5.a (stating that Bakken crude that cannot be transported by pipeline or rail "would have no immediate viable transportation outlet").

If the pipeline is shut down, it will displace 208.1 million barrels of crude oil per year. Even if only one-third of the displaced crude were transported by rail, the result would still be crude volumes exceeding the average amount of crude on railways in 2014—and even approaching the maximum volume of that year. *Id.* ¶¶ 20, 22 & Ex. 7. And now, amplifying the congestion, regulatory changes since 2014 will push crude oil trains onto the hazardous materials network, a more limited set of tracks featuring "positive train control," or PTC. It happens, however, that "PTC corridors are *also* rail main lines, which already have among the highest overall traffic densities . . . ." *Id.* ¶ 25. Consequently, "[d]iverting DAPL's volume to rail could create a higher level of congestion on the region's rail lines than that which was experienced during the last peak in rail shipments of crude oil, in 2014." *Id.* ¶ 27.

Yet railroads are already operating near full capacity, so even small, unexpected changes in the supply or demand for rail services may cause significant problems. *Id.* ¶ 5.c. If the DAPL oil is shipped by rail rather than by pipeline, the effects will be largely felt in corridors where the oil is shipped, and many of these corridors already carry high density shipments of other goods. *Id.* ¶ 59. Because Bakken producers must ship crude oil to refineries in Patoka, Illinois, or transportation hubs in Chicago, rail lines in the upper Midwest would experience the worst of the congestion. *Id.* ¶ 32. And since Patoka does not currently have rail access, facilities will need to be built to accommodate multiple loads of crude oil per day. *Id.*

Moreover, grain shippers are especially vulnerable to price spikes because they do not enter into long-term transportation contracts with railroads due to varying shipment volumes and changing routes. *See* National Grain and Feed Association, *Expanding Access to Rate Relief*, STB Docket No. EP. 665 (Sub-No.2) (Nov. 14, 2016), at 4–6, https://www.ngfa.org/wp-content/uploads/NGFA-and-Other-Interested-Agricultural-Parties-Statement-to-STB-on-Rail-Rate-Proceeding-EP-665-2Nov.-14-2016.pdf. For this reason, agricultural producers require reliable, on-demand rail service to move products quickly and meet favorable price windows. ECF No. 512-2 (Rennicke) ¶ 55. Added competition from crude oil producers will likely reduce the competitiveness of farmers reliant on rail lines that are already near or above capacity. *Id.*

Switching the bulk of America's long-haul grain movement from rail to truck would likely be impossible. The trucking industry, already struggling to find sufficient drivers, Bob Costello & Alan Karickhoff, *Truck Driver Shortage Analysis 2019*, Am. Trucking Ass'n (July 2019) at 2, https://www.trucking.org/sites/default/files/2020-01/ATAs%20Driver%20Shortage%20Report%202019%20with%20cover.pdf, is not equipped to move grain efficiently over the long-distance routes currently served by the rail system. Given the standard limit of 900 bushels per semi-truck

load, the lost carrying capacity from a single 110-car grain shuttle train would require 544 truck-loads to haul an equivalent volume.

For those volumes, hauling a bushel of corn 1,730 miles from Minneapolis to Portland, Oregon routinely costs about $1.31 by rail. *See Grain Transportation Report*, U.S. Dep't of Agriculture (Oct. 2, 2014), at 9, https://apps.ams.usda.gov/SearchReports/Documents/stelprdc5109140.pdf. But at the standard rate of $1.00 per truckload mile, those 900 bushels would cost $3.84 each for the same 3,460 mile round-trip by semi. Truck transportation alone would thus very likely exceed the arbitrage value of the corn itself—roughly $3.00 per bushel. *See Grain Transportation Report*, U.S. Dep't of Agriculture (Apr. 23, 2020), at 14, https://www.ams.usda.gov/sites/default/files/media/GTR04232020.pdf. The result: Without rail service, billions of bushels of grain would be effectively stranded in the center of the continent, unable to reach coastal export facilities or the central domestic processing facilities and collection points which underpin America's food supply chain.

In addition, an influx of crude-by-rail traffic would almost certainly inflict substantial harm on the economies of ag-dependent States, as exemplified by the following estimated losses:

- Indiana: $24 to $59 million in revenue

- Minnesota: $98 to $243 million in revenue

- Montana: $41 to $104 million in revenue

- North Dakota: $127 to $317 million in revenue

- South Dakota: $55 to $137 million in revenue

ECF No. 512-4 (Kub) ¶ 39 & Table 3. In Indiana alone, those revenue losses would be the equivalent of 1,450 lost jobs. *Id.*

These estimates do not include losses to other segments of the agriculture industry, including ethanol plants, soybean processors, and other grain customers who must also transport their finished goods by rail. The grain processing industry, struggling during a short-term slow-down in demand during the COVID-19 pandemic, already faces challenging market conditions. When domestic demand slows for grain products (ethanol, distillers grains, soybean meal, and soybean oil), a higher proportion of total production must be directed toward foreign sales. Before being exported in ocean-going vessels, grain products must first be transported to an export facility either by barge or rail.

In January of 2020, the United States entered into a two-year trade pact where China agreed to purchase $40 billion of American agricultural products. In order to fulfill this trade deal, the United States will need to ship even higher volumes of grain by rail, compared to record-high 2017 volumes, to the Gulf of Mexico or the Pacific Northwest for loading on ocean vessels and shipping to China. These shipments will make the agriculture industry more dependent on timely rail service than ever before, and less able to withstand railroad congestion than ever before. If these shipments are not made, Chinese purchasers will likely turn to South American producers instead, which would cause U.S. farmers to lose billions of dollars along with their reputation as a reliable supplier. ECF No. 512-2 (Rennicke) ¶¶ 67–68.

Last spring, agricultural ministers from the G20 group of major developed and developing nations observed that, in view of the COVID-19 pandemic, while the global inventory of agricultural commodities is presently sufficient, governments should not create any "unnecessary . . . disruption to global food supply chains" and should avoid "food losses and waste caused by disruptions throughout food supply chains, which would exacerbate food insecurity and nutrition risks and economic loss." *G20 Extraordinary Agriculture Ministers Meeting Ministerial Statement on*

*COVID-19 Virtual Meeting*, April 21, 2020, https://reliefweb.int/sites/reliefweb.int/files/re-sources/G20_Agriculture%20Ministers%20Meeting_Statement_EN.pdf. Adding Bakken crude to the rail transport load would threaten to cause exactly the sort of disruption to the global food supply chain that the G20 ministers warned about.

On this point, it is worth observing that variations in the price of oil futures is unlikely to have any significant bearing on the market dynamics of shipping oil from the Bakken region. Even when crude oil futures head into negative territory, Bakken crude will still move as long as it represents a cheaper alternative to other sources of oil—and as long as it is worth more at the refinery at Patoka, Illinois than it is straight from the ground in Williston, North Dakota. As long as Americans still need fuel to operate their cars, haul their goods, and conduct the business of life, and as long as traders can make the oil worth more by transporting it to a higher-value location, arbitrage will take place, and oil will move, at the cost of pushing grain off the nation's railways.

With no substitute freight provider available to serve America's farmers, the implications of shutting down DAPL for the world's food supply become unthinkable. If grain cannot be shipped from its origins and is stranded across the Midwest, swaths of grain customers with time-critical needs—such as animal feedlots that demand grain each day—would quickly fail, with staggering implications for animal welfare and food security. The most food-secure nation on earth could well experience food shortages, to say nothing of the consequences for developing nations whose industries and food security also rely on American grain exports.

The mere delay in the Corps' preparation of an EIS does not merit such drastic consequences.

### III.    Shutting Down the Pipeline Will Increase the Threat of Safety and Environmental Hazards

Domestic energy needs will not change as a result of shutting down the pipeline; instead, as discussed, the means of supplying those needs would have to adapt, and that adaptation will bring its own safety and environmental consequences. Accidents are a possibility with any form of transportation. But the possibility of an oil spill caused by mass rail transport of crude oil would not only increase the cost of shipping crude oil, it would expand the risk of the very environmental consequences this Court sought to avoid by requiring an environmental impact statement.

#### A.  Enjoining the operation of DAPL will create potential for greater safety hazards

Pipelines have become the preferred means of moving crude oil for good reason: Transporting crude oil by pipeline is safer than transporting it by rail or truck owing to the volatility of the crude and the threat of collisions involving rail and truck shipments. A recent federal comparison of freight-related fatalities among various modes of transportation showed pipeline transportation to be far safer than any other feasible alternative on a per-billion ton-miles basis. *Freight Quick Facts Report*, U.S. Dep't of Transp., Fed. High. Admin. (2016), at 32, https://ops.fhwa.dot.gov/publications/fhwahop16083/fhwahop16083.pdf. Trucks are even less safe. Crude oil transportation by truck kills an average of 10.2 people per year, whereas rail transportation results in 2.4 fatalities per year and pipeline transportation results in 1.7 fatalities per year. Megan E. Hansen & Ethan Dursteler, *Pipelines, Rail & Trucks*, Strata (2017) at 4–5, https://www.strata.org/pdf/2017/pipelines.pdf.

Pipelines also are safer in terms of incident and accident rates. A 2015 report by the Fraser Institute showed that, for the decade 2003–13, rail transport of crude oil was 4.5 more times more likely to result in an accident than pipeline transport of crude oil. Kenneth P. Green & Taylor Jackson, *Safety in the Transportation of Oil and Gas: Pipelines or Rail?*, Fraser Institute (Aug.

2015), at 5, https://www.fraserinstitute.org/sites/default/files/safety-in-the-transportation-of-oil-and-gas-pipelines-or-rail-rev2.pdf. And a 2017 study by the National Bureau of Economic Research concluded that, on a normalized cost-per-million-barrel-mile basis, crude-by-rail accidents and spills cost roughly 600% more than pipeline accidents and spills. Karen Clay *et al.*, *The External Costs of Transporting Petroleum Products by Pipelines and Rail: Evidence from Shipments of Crude Oil from North Dakota*, National Bureau of Economic Research (Sept. 2017), at 20, https://www.nber.org/papers/w23852.pdf. Accordingly, absent the DAPL easement, Bakken oil shipments are likely to cause 11.4 more accidents each year, with attendant additional injuries and fatalities, than would occur if the oil continues to be transported by pipeline. ECF No. 512-2 (Rennicke) ¶ 90 & Ex. 36.

None of this is meant to criticize or diminish the value of the railroad and trucking industries. The higher frequency of accidents and fatalities in rail transport remains true despite safety measures they have undertaken, which has made accidents less frequent than in the past. *See* Andrea Edwards, *Mitigating the Risks of Crude Oil Transport by Rail*, Zurich Services Corporation (2015), at 2, https://www.zurichna.com/-/media/project/zwp/zna/docs/kh/energy/mitigating-risks-crude-oil-transport-by-rail.pdf. Amici support using all these modes of transportation as the means of supplying our country's food and energy needs. But greater safety risks compared to pipelines are endemic to railroad and trucking. Pipelines always occupy the same space and largely avoid interaction with vehicles, which minimizes the odds that mechanical or technological failure, or human error from any source, will cause an accident. In contrast, railroads and trucks frequently, but intermittently, intersect with the world at large, which leaves room for any number of mechanical, technological or human failures to cause accidents.

State and local governments have very few options to protect themselves from these costs owing to preemption by the Interstate Commerce Commission Termination Act, 49 U.S.C. § 10501(b). In light of ICCTA, States and localities may not, for example, regulate the air pollution created by trains, *Ass'n of Am. R.R. v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094 (9th Cir. 2010); prohibit railroad switching activities, *City of Seattle v. Burlington N. R.R. Co.*, 41 P.3d 1169 (Wash. 2002); set speed limits for trains, *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993); prohibit idling, *Delaware v. Surface Transp. Bd.*, 859 F.3d 16 (D.C. Cir. 2017); set negligence standards for trains, *Elam v. Kansas City Southern Ry. Co.*, 635 F.3d 796 (5th Cir. 2011); or regulate the use of sidings, *Maynard v. CSX Transp., Inc.*, 360 F. Supp. 2d 836 (E.D. Ky. 2004).

Indeed, courts have held that States and localities may not even prohibit trains from blocking intersections. *See State v. Norfolk S. Ry. Co.*, 107 N.E.3d 468 (Ind. 2018). When trains block intersections, they impose significant burdens on the economies and quality of life of rural (and sometimes urban) communities. "[S]uch blockages can impact public safety, because police and fire departments may be delayed or unable to reach emergency sites or hospitals in the many communities where rail crossings intersect main roads, which are often the only viable routes in smaller and/or older towns." ECF No. 512-2 (Rennicke) ¶ 91. Towns in the Upper Midwest suffered increased instances of blocked intersections during the 2014 peak congestion—a circumstance likely to repeat if DAPL is shut down and more crude is transported by rail. *Id.*

## B.  An injunction would threaten negative environmental impact

Although rail companies have stepped up to the task of taking additional precautions, there can be no doubt that shipping substantially more crude by train is also likely to increase the risk of more environmental damage compared with shipping by pipeline. *See* Andrea Edwards, *Mitigating the Risks of Crude Oil Transport by Rail*, Zurich Services Corporation (2015), at 7, https://www.zurichna.com/-/media/project/zwp/zna/docs/kh/energy/mitigating-risks-crude-oil-transport-

by-rail.pdf (explaining that "[r]ailroads have full-time employees dedicated to hazardous materials safety and emergency response, as well as personnel trained to assist with environmental issues"). The displaced DAPL crude would necessarily travel along main rail lines, which means introducing the hazardous cargo "near or through rivers, population centers, national parks, and many environmentally sensitive areas." ECF No. 512-2 (Rennicke) ¶ 95. These rail lines crisscross various branches and tributaries of the Mississippi and Missouri Rivers, for example. *Id.*

Environmental protection in western States is of particular importance for the people living, working, and recreating there. First, States such as Montana rely heavily on tourism revenues resulting from non-residents seeking to enjoy the pristine beauty of the environments of these States. Consequently, in Montana, for example, "non-resident tourism supports 59,380 local jobs, adds over $3.7 billion to the economy annually, and contributes to the preservation of historical, cultural and recreational treasures." *COVID-19 Update—Tourism Industry for Montana*, Voices of Mont. Tourism, http://www.voicesoftourism.com/. As western States have experienced in recent years with wildfires, environmental harms translate to lost tourism revenues. It is thus vital to the economies of western States that potential threats to the environment—such as oil spills caused by train derailments—be minimized to the greatest extent possible.

If DAPL ceases to be operational, to the extent a significant additional portion of Bakken oil is shipped westward by rail, it would pass through environmentally sensitive areas. Trains heading west from the Bakken skirt the banks of the upper Missouri River from Snowden, Montana, to east of Glasgow, Montana, nearly to Ft. Peck Lake. On the west side of Montana, the line climbs through the Rockies over Marias Pass and skirts the southern boundary of Glacier National Park from East Glacier to Columbia Falls. At Columbia Falls it crosses the Flathead River heading west to Whitefish and then along the shore of Whitefish Lake. East of Libby, Montana, the railroad

parallels the Kootenai River all the way to Bonner's Ferry, Idaho. These areas, including Glacier National Park, pristine wilderness, and blue-ribbon trout streams, are some of the most environmentally sensitive areas in the country. Oil spills from train derailments would not merely be disruptive; they would be devastating.

Indeed, the beauty of the mountains and the clear running mountain rivers and streams brought many people to make places like Montana their home. Thus, the importance of preservation and protection of the environment cannot be overstated. In 1972 Montana adopted a new Constitution reflecting this value, as the first enumerated, inalienable, fundamental constitutional right is "the right to a clean and healthful environment." Mont. Const. art. II, § 3. This is not a mere aspirational statement. On the contrary, Article 9, section 1 of the Constitution mandates:

(1) The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations.

(2) The legislature shall provide for the administration and enforcement of this duty.

(3) The legislature shall provide adequate remedies for the protection of the environmental life support system from degradation and provide adequate remedies to prevent unreasonable depletion and degradation of natural resources.

The right to a clean and healthy environment was deemed paramount by the delegates to Montana's 1972 Constitutional Convention and was, therefore, included as a fundamental right by a vote of 79 to 7. Montana Constitutional Convention, Vol. V at 1640, March 7, 1972.

Moreover, as the Montana Supreme Court has concluded, "the delegates' intention was to provide language and protections which are both anticipatory and preventative"—and not "merely prohibit that degree of environmental degradation which can be conclusively linked to ill health or physical endangerment." *Mont. Envtl. Info. Ctr. v. Dep't of Envtl. Quality*, 988 P.2d 1236, 1249 (Mont. 1999). Indeed, the Montana Constitution "does not require that dead fish float on the sur-

face of our state's rivers and streams before its farsighted environmental protections can be invoked." *Id.* Rather, the legislature has a textual obligation "to provide adequate remedies for degradation of the environmental life support system and to prevent unreasonable degradation of natural resources," period. *Id.* In short, a shut-down of DAPL would create an entirely avoidable set of dangers and risks to the values those in the West hold most dear.

***

This case is ostensibly about the Corps' failure to study the environmental impact of an oil pipeline, but an injunction would irrationally increase numerous risks while attending to that concern. If pipeline flow must cease while the environment is studied, it is not only oil producers who will suffer—so will grain farmers, the world food supply, public safety, and the environment itself (particularly in the West). Domestic energy needs do not adjust to a district court's injunction governing transportation of crude, so, one way or another, some oil will continue to be transported out of the Bakken oil fields. The questions for this Court are at what cost and whether, pending study of an oil pipeline's environmental impact, grain transport will also continue. Such considerations of the public interest must be central to the Court's equitable analysis.

## CONCLUSION

For these reasons, Amici States urge this Court not to issue an injunction against the continued operation of the Dakota Access Pipeline.

Respectfully submitted,

TIM FOX
Montana Attorney General

By: */s/Rob Cameron*
Rob Cameron
Deputy Attorney General

Office of the Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Tel: (406) 444-2026
Email: Rob.Cameron@mt.gov

CURTIS T. HILL, JR.
Indiana Attorney General

By: */s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Julia C. Payne
Deputy Attorney General

Office of the Indiana Attorney General
302 W. Washington St.
Indiana Government Center South, 5th Floor
Indianapolis, IN 46204-2770
Phone:  (317) 232-6255
Fax:  (317) 232-7979
Email: Tom.Fisher@atg.in.gov
Julia.Payne@atg.in.gov

## ADDITIONAL COUNSEL

TOM MILLER
Attorney General
State of Iowa

DEREK SCHMIDT
Attorney General
State of Kansas

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

ERIC SCHMITT
Attorney General
State of Missouri

DOUGLAS J. PETERSON
Attorney General
State of Nebraska

DAVE YOST
Attorney General
State of Ohio

ALAN WILSON
Attorney General
State of South Carolina

JASON R. RAVNSBORG
Attorney General
State of South Dakota

SEAN D. REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

BRIDGET HILL
Attorney General
State of Wyoming

**CERTIFICATE OF SERVICE**

I hereby certify that on November 25, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which shall send notification of such filing to any

CM/ECF participants.

*/s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General


Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov