IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE,<br><br>                Plaintiff,<br><br>   and<br><br>CHEYENNE RIVER SIOUX TRIBE,<br><br>                Plaintiff-Intervenor,<br><br>   v.<br><br>U.S. ARMY CORPS OF ENGINEERS,<br><br>                Defendant-Cross<br>                Defendant,<br><br>   and<br><br>DAKOTA ACCESS, LLC,<br><br>                Defendant-Intervenor-<br>                Cross Claimant. | Case No. 1:16-cv-1534-JEB<br>(and Consolidated Case Nos. 16-cv-1796<br>and 17-cv-267) |

**STANDING ROCK SIOUX TRIBE, CHEYENNE RIVER SIOUX TRIBE, OGLALA SIOUX TRIBE, AND YANKTON SIOUX TRIBES' REPLY IN SUPPORT OF MOTION FOR CLARIFICATION AND A PERMANENT INJUNCTION**

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

I.   AN INJUNCTION IS NOT NEEDED TO SUSPEND PIPELINE
     OPERATIONS..........................................................................................2

     A.   The Law of the Case Doctrine Does Not Preclude Clarification.................2

     B.   It is Unlawful to Build or Operate a Pipeline Without a MLA
          Easement. ........................................................................................3

     C.   The Court Should Clarify its Vacatur Order and Vacate the § 408
          Permit. .............................................................................................6

II.  THIS COURT HAS EQUITABLE POWER TO ISSUE AN ORDER
     THAT WOULD REQUIRE DAPL TO SHUT DOWN THE PIPELINE..............9

III. THE TRIBES ARE IRREPARABLY HARMED BY OPERATION OF
     THE PIPELINE ......................................................................................13

     A.   Operation of an Unsafe Pipeline. ............................................................13

     B.   Trauma of Continued Government Violations of Law. .............................16

     C.   Tribal Self-Governance..........................................................................18

IV.  THE BALANCE OF HARMS WEIGHS IN FAVOR OF AN
     INJUNCTION.........................................................................................20

V.   THE PUBLIC INTEREST SUPPORTS AN INJUNCTION ...............................23

CONCLUSION..................................................................................................25

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - ii -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987)........................................................................................20, 23

*Belbacha v. Bush*,
    520 F.3d 452 (D.C. Cir. 2008) ...............................................................................3

*Berrigan v. Sigler*,
    499 F.2d 514 (D.C. Cir. 1974).................................................................................3

*Biderman v. Morton*,
    497 F.2d 1141 (2d Cir. 1974)..................................................................................9

*Brady Campaign to Prevent Gun Violence v. Salazar*,
    612 F. Supp. 2d 1 (D.D.C. 2009) ....................................................11, 14, 15, 17

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps. of Eng'rs*,
    466 F. Supp. 3d 1217 (W.D. Wash. 2020)............................................................10

*Confederated Tribes and Bands of Yakama Nation v. U.S. Dep't of Agric.*,
    2010 WL 3434091 (E.D. Wash. Aug. 30, 2010) ..................................................11

*Cowpasture River Pres. Ass'n v. U. S. Forest Service*,
    911 F.3d 150 (4th Cir. 2018) ..................................................................................4

*Ctr. for Biological Diversity v. Ross*,
    2020 WL 4816458 (D.D.C. Aug. 19, 2020) .........................................................16

*Ctr. for Food Safety v. Vilsack*,
    2010 WL 11484449 (N.D. Cal. Nov. 30, 2010) ...................................................10

*Found. on Econ. Trends v. Heckler*,
    756 F.2d 143 (D.C. Cir. 1985).........................................................................9, 10

*Fund for Animals, Inc. v. Lujan*,
    962 F.2d 1391 (9th Cir. 1992) .................................................................................9

*Fund For Animals v. Clark*,
    27 F. Supp. 2d 8 (D.D.C. 1998).............................................................................11

*Fund For Animals v. Norton*,
    281 F. Supp. 2d 209 (D.D.C. 2003) ......................................................................10

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - iii -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*Greater Yellowstone Coal. v. Bosworth,*
  209 F. Supp. 2d 156 (D.D.C. 2002) ...................................................................10

*Hammond v. Norton,*
  370 F. Supp. 2d 226 (D.D.C. 2005) ...................................................................4

*Indigenous Env't Network v. U.S. Dep't of State,*
  347 F. Supp. 3d 561 (D. Mont. 2018) ................................................................10

*League of Women Voters v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ..............................................................................23

*Messenger v. Anderson,*
  225 U.S. 436 (1912) ...........................................................................................3

*Michigan v. U.S. Army Corps of Eng'rs,*
  667 F.3d 765 (7th Cir. 2011) .............................................................................14

*Mondakota Gas Co. v. Fed. Power Comm'n,*
  232 F.2d 358 (D.C. Cir. 1956) ...........................................................................5

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) .......................................................................................2, 11

*Northern Alaska Env't Ctr. v. Hodel,*
  803 F.2d 466 (9th Cir. 1986) .............................................................................10

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
  402 F.3d 846 (9th Cir. 2005) .............................................................................11

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n,*
  896 F.3d 520 (D.C. Cir. 2018) .......................................................................2, 11

*Open Cmty. All. v. Carson,*
  286 F. Supp. 3d 148 (D.D.C. 2017) ...................................................................20

*Pub. Emp. for Env'l Resp. v. U.S. Fish & Wildlife Serv.,*
  189 F. Supp. 3d 1 (D.D.C. 2016) ...................................................................12, 13

*Randolph Civic Ass'n v. Washington Metro. Area Transit Auth.,*
  469 F. Supp. 968 (D.D.C. 1979) .........................................................................9

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989)...........................................................................................16

*Save Greers Ferry Lake, Inc v. Dep't of Def.,*
  255 F.3d 498 (8th Cir. 2001) .............................................................................10

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104*
*(206) 343-7340*

*Sierra Club v. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015) ......................................................................10

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ..................................................................12

*Sierra Club v. Rural Utilities Serv.*,
    841 F. Supp. 2d 349 (D.D.C. 2012) .........................................................6, 11

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) ................................................................15

*Sierra Club v. U.S. Dep't of the Interior*,
    899 F.3d 260 (4th Cir. 2018) ...................................................................4, 17

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    255 F. Supp. 3d 101 (D.D.C. 2017) .................................................7, 8, 9, 24

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    282 F. Supp. 3d 91 (D.D.C. 2017) ....................................................20, 22, 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    No. 20-5197 (D.C. Cir. Aug. 5, 2020) ..........................................................3

*Taylor v. FDIC*,
    132 F.3d 753 (D.C. Cir. 1997) .....................................................................3

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ...................................................................................16

*Vencor Nursing Centers, L.P. v. Shalala*,
    63 F. Supp. 2d 1 (D.D.C. 1999) ..................................................................16

*Western Watersheds Project v. Zinke*,
    336 F. Supp. 3d 1204 (D. Idaho 2018) ........................................................11

*Williamsburg Wax Museum v. Historic Figures, Inc.*,
    810 F.2d 243 (D.C. Cir. 1987) ......................................................................2

**Statutes**

30 U.S.C. § 185 .............................................................................................4, 5

30 U.S.C. § 195 ................................................................................................4

33 U.S.C. § 408 .......................................................................................*passim*

42 U.S.C. § 4331 .............................................................................................16

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - v -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

**Regulations**

36 C.F.R. § 327.14 ...............................................................................................................4

36 C.F.R. § 327.20 ...............................................................................................................4

43 C.F.R. § 2885.11 .............................................................................................................5

43 C.F.R. § 2886.16 .............................................................................................................5

43 C.F.R. § 2886.19 .............................................................................................................5

**Other Authorities**

Amy Sisk, *Construction to Start on Dakota Access Pipeline pump station in Emmons County*, Bismarck Tribune (Oct. 2, 2020) ...............................................19

18B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 4478 (2d ed.) ........................................................................................................2, 3

Myles McCormick, *North Dakota's shale prospects look bleak after the gold rush*, Financial Times (Dec. 27, 2020) ...................................................21

Pomeroy, *A Treatise on Equity Jurisprudence and Equitable Remedies*, Vol. 5 § 523 (1919)....................................................................................................14

Restatement (Second) of Torts § 933,.............................................................................14

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - vi -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

## INTRODUCTION

Plaintiffs Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe ("Tribes") respectfully file this reply in support of their motion for clarification and permanent injunction.  This Court should clarify its previous vacatur order to: a) confirm that closure of the pipeline is a component of vacatur and does not require a separate injunction; and b) vacate the Rivers and Harbor Act § 408 permit that relies on the same flawed NEPA analysis as the vacated Mineral Leasing Act ("MLA") easement, which would also trigger closure of the pipeline.  As to the injunction, the Tribes have satisfied the requisite legal standards.  Defendants propose a rigid and unworkable interpretation of the "irreparable harm" requirement under which catastrophic risks that do not necessarily meet a "more likely than not" probability standard can never be enjoined.  Fortunately, that is not the law.  Rather, this Court retains equitable power to fashion an injunction in light of the risks of ongoing pipeline operations in the overall context of the case.  As to the other injunction factors, including the balance of harms and the public interest, defendants offer no grounds to revisit this Court's previous rulings finding that they weigh in favor of a shutdown.  To the contrary, with construction on the dangerous proposal to double the pipeline's capacity without the Corps' authorization well underway, the equities tip in the Tribes' favor more than before.

DAPL has generated profits for over three years with a pipeline that was never lawfully authorized, exposing the Tribes to risks and harms that they have steadfastly opposed from the beginning.  The Corps has made clear its intent to allow continued illegal operations, perpetuating a pattern of government-sponsored mistreatment of the Tribes that dates back two centuries.  With oil production in North Dakota significantly reduced, the impacts of shutting down the pipeline will be manageable.  The Court should grant the injunction.

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 1 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

I.      AN INJUNCTION IS NOT NEEDED TO SUSPEND PIPELINE OPERATIONS

The Tribes' opening brief (ECF 569) ("Motion") explained that an injunction was not

needed because vacatur of the MLA easement by itself requires that the pipeline it authorizes

must cease operations.  Motion at 3–7.  This is the core premise of the D.C. Circuit's long-

standing *Allied-Signal* jurisprudence, which weighs the "disruptive consequences" of vacatur

when stopping private activities authorized by federal agencies.  *Id*.  Defendants' position would

upend this precedent by rendering disruptive consequences meaningless.  The Corps and DAPL

make little attempt to justify this departure from precedent, nor do they even address the

controlling cases that vacatur by itself would "independently prohibit" continued operation of the

pipeline.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010); *Oglala Sioux Tribe

v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 523 (D.C. Cir. 2018).  Indeed, the Corps appears

to accept the premise that vacatur of a regulatory permit requires the suspension of the regulated

activity.  Corps' Brief in Opp. at 3 (ECF 573) ("Corps Opp.").  Instead, defendants offer a series

of arguments as to why this Court should decline to reach this issue.  These arguments should

fail.

        A.      The Law of the Case Doctrine Does Not Preclude Clarification.

The Corps first argues that this Court should not reach the issue because the D.C.

Circuit's stay order allowing the pipeline to continue operating constitutes the "law of the case."

The argument should be rejected.  Unless and until the Circuit finalizes its decision, there is no

barrier to reaching this issue.

The "law of the case" doctrine  precludes relitigation of issues decided expressly or "by

necessary implication."  *Williamsburg Wax Museum v. Historic Figures, Inc*., 810 F.2d 243, 250

(D.C. Cir. 1987); 18B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 4478

(2d ed.) ("Actual decision of an issue is required to establish the law of the case.").  It is a

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 2 -

discretionary rather than mandatory doctrine.  *Id*.; *Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power").  A decision on a stay motion—which analyzes whether a party is *likely* to succeed on the merits in its appeal—does not create binding law of the case.  *Belbacha v. Bush*, 520 F.3d 452, 458 (D.C. Cir. 2008).  Similarly, a decision on a preliminary injunction, which applies a similar standard to a stay pending appeal, "does not constitute the law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits." *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974).  The case defendants rely on, *Taylor v. FDIC*, 132 F.3d 753 (D.C. Cir. 1997), is inapposite because it did not address a motion to stay.

The Circuit did not resolve the question of whether an injunction was needed.  Instead, ruling on an emergency motion to stay without full briefing or argument, the D.C. Circuit ruled that "*to the extent* the district court issued an injunction by ordering Dakota Access LLC to shut down the Dakota Access Pipeline and empty it of oil by August 5, 2020, the injunction be stayed."  Order at 1, *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. 20-5197 (D.C. Cir. Aug. 5, 2020). The Circuit also "expect[ed]" that this Court would "consider additional relief if necessary." *Id.* at 2. This preliminary ruling left open key questions.  For example, the shut down order was only stayed "to the extent" that it *was* an injunction, which invites clarification that it was not an injunction, but the outcome of vacatur.  The Circuit's direction to "consider additional relief" further invites clarification of the scope of the vacatur order.  In short, there is no "law of the case" barrier to resolution of this issue.

   B.      It is Unlawful to Build or Operate a Pipeline Without a MLA Easement.

Next, the Corps seeks to differentiate an MLA easement from other types of agency authorizations.  Implicitly conceding that vacatur of a regulatory permit requires cessation of the

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 3 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

permitted activity, it tries to distinguish the easement here from such a regulatory permit, arguing

that "this case does not concern a pipeline that requires a federal permit to operate" and that the

"Corps does not regulate or oversee the construction of pipelines."  Corps Opp. at 4.  The

argument is unmoored from both the statute and the record in this case.

It is unlawful to build or operate a pipeline across federal property without authorization

under the MLA.  30 U.S.C. § 185(q) (no right-of-way granted "except under and subject to the

provisions, limitations, and conditions of" MLA); *id*. § 195 ("It shall be unlawful" for any person

to "circumvent" the requirements of MLA); *Hammond v. Norton*, 370 F. Supp. 2d 226, 233

(D.D.C. 2005) (MLA requires authorization before party "can construct, operate, or maintain a

pipeline on federal lands").  This statutory limitation is further expressed in controlling

regulations.  36 C.F.R. § 327.20 ("construction, placement, or existence of any structure … of

any kind under, upon, in or over the project lands, or waters *is prohibited* unless a permit, lease,

license or other appropriate written authorization has been issued by the District Commander");

36 C.F.R. § 327.14 (prohibiting any alteration of public property managed by Corps).  The

Fourth Circuit recognized that a pipeline that has not been properly authorized under the MLA

cannot be built—a view accepted by the U.S. Supreme Court.  *Cowpasture River Pres. Ass'n v.*

*U. S. Forest Service*, 911 F.3d 150, 181 (4th Cir. 2018), *rev'd on other grounds*, 140 S. Ct. 1837,

1842 (2020) ("To construct the pipeline, Atlantic needed to obtain special use permits from the

United States Forest Service for the portions of the pipeline that would pass through lands under

the Forest Service's jurisdiction."); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284

(4th Cir. 2018) ("without NPS's grant of a right-of-way, the pipeline could not have been

authorized in its currently proposed form. … if this Court were to invalidate the [National Park

Service] permit as requested, *the pipeline cannot exist* in its proposed form with its current

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 4 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

authorizations and would have to be re-authorized with a new permit or possibly a new route to proceed") (emphasis added).  The Corps itself previously recognized as much in this very case. For example, in opposing DAPL's 2016 summary judgment motion claiming that it had sufficient authorization to construct the pipeline, the Corps cited its own guidance requiring authorization before a pipeline could be built or "operated" on Corps land.  ECF 73-1 at 3–4, *citing* Army Policy 405-80; ECF 73-3 (Policy Guidance No. 27) at 3 (authorizing "operational requirements" for fuel pipelines on Corps lands).

An MLA grant of permission to cross federal land must consider not just the construction of the pipeline, but also its "present and future operation."  *Mondakota Gas Co. v. Fed. Power Comm'n*, 232 F.2d 358, 362 (D.C. Cir. 1956).  The statute itself provides that the permitting agency "shall impose requirements for the *operation* of the pipeline and related facilities in a manner that will protect the safety of workers and protect the public from sudden ruptures and slow degradation of the pipeline." 30 U.S.C. § 185(g); § 185(h)(2) (agency "shall" require a plan of operations to protect the environment).  Permits are subject to " such terms and conditions as the Secretary or agency head may prescribe regarding extent, duration, survey, location, construction, operation, maintenance, use, and termination." *Id*. § 185(f).  Similarly, the proponent must reimburse the agency's costs for monitoring the "construction, operation, maintenance, and termination" of the facility *Id*. § 185(l); *id*. § 185(v) (agency should comply with state standards for operation).[1]  Of course, pipeline easements are also subject to NEPA.  *Id.* § 185(h)(1).  Given the Corps' authority under the MLA over pipeline operations, its NEPA

---

[1] While the Corps does not have regulations implementing the MLA, regulations of other agencies are instructive and reflect a high degree of regulatory oversight and control over pipeline operations. *See, e.g.,* 43 C.F.R. § 2886.16 (Bureau of Land Management) (pipeline operations can be suspended "to protect public health or safety or the environment"); § 2885.11 (governing operating conditions); § 2886.19 (pipelines must be removed when permit expires).

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 5 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98101*
*(206) 343-7340*

compliance has focused extensively on the ongoing operations of the pipeline.  And the easement itself imposes numerous conditions that explicitly regulate the operation of the pipeline.  ESMT 669 (requiring compliance with operations plan); ESMT 697 (operational safety conditions).  The Corps' argument that the MLA "does not authorize operation of the pipeline" is nonsensical.  Corps Opp. at 4.[2]

In short, there is no distinction between the MLA and other regulatory regimes requiring permits for the discharge of pollution, construction of gas pipelines, or taking of protected wildlife.  Corps Opp. at 3.  While the Corps continues to insist that it does not "regulate" the operation of the pipeline, it lost that battle long ago: this entire case has revolved around the adequacy of the Corps' consideration of the operational impacts of this pipeline.  This Court should clarify that vacatur of the MLA easement, like vacatur of regulatory permits, requires cessation of the permitted activity.

    C.    <u>The Court Should Clarify its Vacatur Order and Vacate the § 408 Permit.</u>

Even if there were a distinction between a regulatory permit and an MLA easement—and there is not—the Corps also issued such a regulatory permit based on the same unlawful NEPA analysis: the § 408 permit.  As the Tribes have repeatedly requested, this permit should be vacated too, which under the Corps' own arguments should trigger the shutdown of the pipeline even if vacatur of the easement alone did not.  Again, neither defendant expressly denies that

---

[2] The Corps' citation to *Sierra Club v. Rural Utilities Serv.*, 841 F. Supp. 2d 349 (D.D.C. 2012) is inapposite.  There, plaintiffs did not seek vacatur but instead sought an injunction.  The Court issued a more limited injunction than the one plaintiffs requested, finding that the requested injunction was overbroad because not all of the private activities were subject to federal oversight.  This case is entirely different, as the construction and operation of the pipeline are illegal without a valid MLA easement.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

vacatur of the § 408 permit would result in the closure of the pipeline.  Instead, they offer reasons why the Court should not reach the § 408 issue.  These arguments must also be rejected.

First, the Corps fixates on the fact that the § 408 approval occurred earlier than the MLA easement. Corps Opp. at 24.  But this is a distinction without a difference, since both documents are based on the same NEPA assessment that this Court has found unlawful.  Contrary to the Corps' argument, this Court's 2017 ruling found the EA inadequate as the underpinning for both the easement as well as the § 408 permit.  While the Court's holdings as to the "highly controversial" factor relied on evidence developed after the § 408 was issued, the Court's holdings regarding the EA's analysis of Tribal Treaty rights and environmental justice factors relied on evidence that preceded the § 408 permit.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 131–140 (D.D.C. 2017) ("*Standing Rock III*")   Moreover, this Court has already rejected the argument that the fact that the decisions were not contemporaneous meant that they were based on separate administrative records or subject to different standards.  *Id*. at 123–25.  In short, this Court has never upheld the Corps' NEPA compliance as to the § 408 permit; its NEPA rulings condemn the EA underlying that permit, which should be vacated for the same reasons that the easement was.[3]

Second, DAPL (not joined by the Corps) insists that the § 408 permit only addresses pipeline construction, but not its operations; and hence the Tribes' lack "standing" to challenge it at this point.  DAPL Opp. at 25 (ECF 577).  Again, that argument is belied by both the statute and the § 408 permit itself.  *Standing Rock III,* 255 F.Supp.3d at 148 (citing Corps guidance for §

---

[3] DAPL's argues that this Court' "upheld" the § 408 permit, citing the Court's rejection of a separate, substantive challenge to the § 408 permit.  But that claim was separate from the NEPA claims in this case.  *Standing Rock III*, 255 F. Supp. 3d at 148.  This Court found the NEPA review for the § 408 permit unlawful, *id*., and vacatur of such permit is the "standard remedy."  Vacatur Order at 7 (ECF 546).

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 7 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

408 permits that look at "operations and maintenance" among many other factors).  Before

authorizing any construction that affects federal projects, the Corps must find that that doing so

would not be "injurious to the public interest." 33 U.S.C. § 408.  The analysis required under

this section has always looked to the future operations of the project.  USACE_DAPL 75452

("Section 408 review should include consideration of physical *and operational* impacts to the

project."); USACE_DAPL 75438 (requiring submission of information on the "operation and

maintenance" of any alteration to a federal project, which will be "subject to environmental

compliance in the same manner as the requested alteration.").  In keeping with its authority, the

Corps EA supporting the § 408 permit considered both construction and operations.

USACE_DAPL 71185; USACE_DAPL 71177 (FONSI for § 408 permit includes directives on

how pipeline must be operated).  This Court obviously understands that the NEPA review for the

§ 408 permit looked at the impacts of both constructing and operating the pipeline.  *Standing

Rock III*, 255 F. Supp. 3d at 130.  The notion that § 408 looks only narrowly at construction is

incorrect.

Finally, DAPL's accusation that the Tribes "forfeited" their argument that the § 408

permit should be vacated is baseless.  The Standing Rock Sioux Tribe specifically requested such

relief in its original complaint, amended complaint, supplemental complaint, and its 2017

summary judgment motion.  ECF 01 at 47; ECF 106-1 at 69; ECF 371-1 at 3 (seeking vacatur of

all Court permits); ECF 117-1 at 20 ("In making its July 25 § 408 decision, and again when it

issued the easement, the Corps concluded that the Oahe crossing did not involve 'significant'

environmental impacts, but that conclusion cannot withstand scrutiny"); ECF 117-26 (proposed

order).  Standing Rock repeated this request in the 2017 vacatur motion, ECF 280 at 20, after this

Court recognized that vacatur of the "permits and easement" would require it to shut down.

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 8 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

*Standing Rock III*, 255 F. Supp. 3d at 147.  It renewed that request in its 2020 summary judgment motion, ECF 433-2 at 54, and vacatur brief,  ECF 527 at 2 n.1.  The Court never ruled on these requests, and the Tribes now seek clarification as warranted by the Circuit's directive to consider "additional relief."

While this Court may have primarily focused on the easement to date, the new arguments that seek to differentiate between regulatory permits and the MLA require clarification.  The Court should decline defendants' invitation to sidestep this key issue and clarify that: a) the pipeline must be shut down even without an injunction; and b) the § 408 permit is also vacated.

II.     THIS COURT HAS EQUITABLE POWER TO ISSUE AN ORDER THAT WOULD
        REQUIRE DAPL TO SHUT DOWN THE PIPELINE

Next, DAPL makes the surprising claim that this Court is powerless to shut down the pipeline.  DAPL Opp. at § I.A.  The Corps notably declines to join this overreaching argument, which flies in the face of decades of NEPA and injunction jurisprudence.  In fact, the D.C. Circuit explicitly rejected this argument decades ago:

> The University claims that the District Court "had no power to enjoin the University, as a private party," because NEPA applies only to federal agencies. However, as the University recognizes, it is well established that judicial power to enforce NEPA extends to private parties where "non-federal action cannot lawfully begin or continue without the prior approval of a federal agency."

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 155 (D.C. Cir. 1985) (citations omitted).  The same standard applies in other circuits too.  *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1397 (9th Cir. 1992) ("Nonfederal actors may also be enjoined under NEPA if their proposed action cannot proceed without the prior approval of a federal agency."); *Biderman v. Morton*, 497 F.2d 1141, 1147 (2d Cir. 1974) ("[W]ere such non-federal entities to act without the necessary federal approval [under NEPA], they obviously would be acting unlawfully and subject to injunction."); *Randolph Civic Ass'n v. Washington Metro. Area Transit Auth.*, 469 F. Supp. 968, 970 (D.D.C.

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 9 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

1979) ("it is well established that non-federal parties may be enjoined pending completion of an EIS").  DAPL's failure to mention controlling black-letter law diminishes its already strained credibility.

Injunctions against private and non-federal entities to whom agency permits were issued in violation of NEPA are commonplace.  *See, e.g., Heckler*, 756 F.2d at 160; *Save Greers Ferry Lake, Inc v. Dep't of Def.*,  255 F.3d 498, 501 (8th Cir. 2001) (enjoining private use of docks where Corps permits were illegal; ordering removal within one year if Corps does not come into compliance); *Northern Alaska Env't Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986) (injunction against private mining operations); *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163 (D.D.C. 2002) ("prohibiting any livestock grazing on the Horse Butte allotment until the NEPA process is completed");  *Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 237 (D.D.C. 2003) (issuing injunction "prohibiting the state of Maryland from acting on" permit issued in violation of NEPA); *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps. of Eng'rs*, 466 F. Supp. 3d 1217, 1227 (W.D. Wash. 2020) (enjoining private shellfish growing under invalidated Corps permits); *Ctr. for Food Safety v. Vilsack*, 2010 WL 11484449, at *8 (N.D. Cal. Nov. 30, 2010) (enjoining private farmers to remove genetically modified seeds that had already been planted).  It is even true of crude oil pipelines.  *Indigenous Env't Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 591 (D. Mont. 2018), *appeal dismissed as moot*, 2019 WL 2542756 (9th Cir. 2019) (enjoining private pipeline company "from engaging in any activity in furtherance of the construction or operation of Keystone" pipeline pending compliance with NEPA). Moreover, the fact that this pipeline is already operating is no barrier to a remedy, as this Circuit has emphasized its authority to "close" or "impose restrictions" on completed pipelines whose permits were issued in violation of NEPA.  *Sierra Club v. Army Corps of Eng'rs*, 803 F.3d 31,

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 10 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7300*

43 (D.C. Cir. 2015); *see also Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 872

(9th Cir. 2005) (Court has authority to impose injunction on use of oil terminal issued in

violation of NEPA).  Accordingly, this Court can enjoin DAPL from continuing to operate a

pipeline that is in violation of federal law without a separate cause of action.  DAPL Opp. at 4.

Moreover, courts routinely enjoin federal agencies to implement (or not implement)

regulations, standards, or plans which, in turn, direct the conduct of private parties.  *See, e.g.,*

*Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 29 (D.D.C. 2009)

(enjoining agency from allowing guns in parks);  *Rural Util. Serv.*, 841 F. Supp. 2d at 363

(enjoining agency from issuing approvals for construction of coal plant); *Fund For Animals v.*

*Clark*, 27 F. Supp. 2d 8, 15 (D.D.C. 1998) (enjoining federal agency "from killing or otherwise

allowing the destruction of bison pursuant to the bison management plan"); *Western Watersheds*

*Project v. Zinke*, 336 F. Supp. 3d 1204, 1247–48 (D. Idaho 2018) (enjoining agency from

authorizing private oil and gas leases); *Confederated Tribes and Bands of Yakama Nation v. U.S.*

*Dep't of Agric.*, 2010 WL 3434091, at *5 (E.D. Wash. Aug. 30, 2010) (enjoining Corps from

"permitting, authorizing, allowing, or otherwise granting permission" for private trash-hauling

activities).  This approach is available here too: the Court could enjoin the Corps from allowing

the pipeline to operate on federal lands until its permit has been properly issued.  That is not an

intrusion into an agency's "enforcement discretion," but a garden-variety NEPA remedy.

Furthermore, DAPL's position is hard to square with defendants' apparent concession

that even vacatur operates to prevent private conduct from going forward.  *Monsanto Co.*, 561

U.S. at 165 (vacatur of deregulation order precluded private party plantings of genetically

engineered seeds); Corps Brief at 3 n.2 (acknowledging prohibitory effect of *Monsanto* vacatur);

*Oglala Sioux Tribe*, 896 F.3d at 523 (nuclear power plant cannot operate without federal

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 11 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

license); *Sierra Club v. FERC*, 867 F.3d 1357, 1379 (D.C. Cir. 2017) (natural gas pipeline cannot

be constructed or operated if FERC authorization vacated); *Pub. Emp. for Env'l Resp. v. U.S.*

*Fish & Wildlife Serv.*, 189 F. Supp. 3d 1, 5 (D.D.C. 2016) (killing of migratory birds unlawful

unless authorized by regulation).  If vacatur can prevent private actions from proceeding under a

vacated permit without a separate cause of action against the private party, surely an injunction

can too.  DAPL never explains this anomaly.

Instead of addressing the caselaw, DAPL falls back on the false distinction between

permits involving "property rights" and conventional regulatory permits.  As discussed above,

that distinction is baseless, as the MLA is a regulatory statute that governs the construction and

operation of pipelines over federal land to ensure their safety and the protection of the

environment.  *See supra* § 1.B.  DAPL fails to identify even a single case distinguishing between

a permit arising under the MLA and one arising under other regulatory statutes, nor can one be

found.  *Id*.  Moreover, even if there were a theoretical difference between "regulatory" and

"property" authorizations, it would be meaningless here because the Corps issued both kinds of

permits based on the same flawed EA.  *See supra* § I.C (discussing RHA § 408 permit).

Finally, DAPL contends that it is the purview of the Corps—not this Court—to decide

whether any consequences should flow from the fact that DAPL is now in a state of

encroachment.  The Corps has made clear that it does not intend to take any action to suspend

pipeline operations, consistent with the 2017 Presidential directive to authorize DAPL.  ECF 562

at 2–3.  That is so even though authorizing future operations would require the very EIS that this

Court has already required.  *Id*. at 6, 8.  But the Corps' enforcement policies apply to situations

in which private parties violate the law, and the Corps must decide how to address that violation.

*See* ECF 562-1 at 5 (Policy 405–80).  Of course, such policies include some discretion to address

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 12 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

trivial or accidental trespasses.  *Id*.  But here, it is the Corps that violated the law by granting the

§ 408 permit and easement in violation of NEPA.  There is no precedent—in any court, from any

time—that *the agency that violated the law* has unreviewable authority to decide its own remedy.

That is the province of the courts.

In DAPL's view, this state of play places the pipeline out of the Court's reach because

the Corps has taken no final agency action on the encroachment, and its enforcement decisions

are not reviewable under the APA.  But the Tribes do not seek to challenge the Corps' failure to

bring an enforcement action.  They seek a court remedy for the Corps' NEPA violations in the

case already before the Court.  Such a remedy is plainly available.

III.     THE TRIBES ARE IRREPARABLY HARMED BY OPERATION OF THE PIPELINE

Even if this Court finds that an injunction is necessary, the Tribes have satisfied all the

requirements for one.  The primary point of dispute is whether the Tribes have met their burden

of establishing irreparable harm.  The answer to that question is yes.

A.      Operation of an Unsafe Pipeline.

The Tribes' opening brief explained in detail why the potential harm from a catastrophic

oil spill is sufficient to warrant an injunction under longstanding precedent.  Defendants mostly

sidestep this showing, and revert to repeating boilerplate language from other cases that harm

must be "likely."  The Tribes have never disputed that a plaintiff must demonstrate a

"likelihood" of harm to warrant an injunction.  But defendants ignore the key question: whether

establishing a "likelihood" of harm in all cases means showing that harm *is more likely than not*,

i.e., 51% or greater, without any consideration of its severity or other context.  That is not and

has never been the law, and defendants fail to offer any case holding that injunctions must be

withheld unless this arbitrary numerical threshold is established.  To the contrary, it has always

been within a Court's equitable powers to balance the probability of harm with the potential

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-01534-JEB) - 13 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

consequences should it occur.  *See, e.g.,* Pomeroy, *A Treatise on Equity Jurisprudence and Equitable Remedies*, Vol. 5 § 523 (1919) (proof of harm diminishes as "greatness of apprehended damage increases"); Restatement (Second) of Torts § 933, cmt. b, p. 561 (1977) ("The more serious the impending harm, the less justification there is for taking the chances that are involved in pronouncing it too remote.")

The Tribes offered many examples where courts—including this one—have issued injunctions without any specific finding that the threatened harm was more likely than not. Motion at 12–14.  While defendants try to parse these cases, none of the cases apply the standard that they insist is required here.  Instead, these cases balance the severity of harm, the chances that it could come to pass, and the seriousness of the underlying legal violation to craft an equitable remedy.  *See, e.g., Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 800 (7th Cir. 2011) ("the district judge should bear in mind that the risk of harm here depends upon both the probability of the harm and the magnitude of the problem that would result").[4]  For example, the courts in *Brady Campaign* and *Center for Food Safety* did not find that the threatened harm met any particular threshold of probability.  Instead, the Courts found a sufficient basis that harm could occur and was sufficiently serious, and hence an injunction was warranted.  Motion at 12. The same is true here: the Tribes have offered abundant evidence that oil pipelines leak and spill with regularity and with catastrophic consequences, even if the precise probability of a release at any one time or location is unknowable.  Nothing more is required.

---

[4] Although the *Michigan* Court found that plaintiffs' had satisfied the requirement of showing irreparable harm, it upheld the denial of a preliminary injunction on other grounds.  *Id*.

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 14 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7370*

Defendants also challenge the factual sufficiency of the proof of harm offered by the

Tribes.[5]  But the Corps mostly reverts to relying on its own environmental analysis that has been

found wanting by this Court for understating risks and impacts.  Corps Opp. at 8–9.  This

tautological defense cannot be credited to circumvent a remedy for its NEPA violation.  *Brady*

*Campaign*, 612 F. Supp. 2d at 25.  DAPL tries to make a more extensive showing that the risk of

a spill is low, but it too for the most part merely restates the self-interested conclusions about the

pipeline's leak detection systems and safety record that this Court has found unsupported.  This

Court has already considered all this evidence, and nonetheless found that shutting down the

pipeline was warranted under a vacatur standard.  Vacatur Order at 24.  It is irrefutable that

pipeline spills are predictable, foreseeable outcomes. Compliance with NEPA ensures that

agencies take a "hard look" at the risks, tradeoffs, alternatives, and mitigation for pipelines

before they are authorized and built.  Merits Order at 33 (ECF 496).  While experts dispute the

precise extent of such risks, the Tribes have made the requisite showing that DAPL has cut

corners on safety, thereby exacerbating the risks of a dangerous enterprise, which supports

injunctive relief here.  *See, e.g.,* 3rd Holmstrom Decl. ¶ 10 (ECF 527-5) (discussing multiple

aspects of "broken" safety culture and violations of standards); Flanders Decl. ¶ 9 (ECF 527-8)

(documenting "unacceptable risk" of ongoing operations).[6]

---

[5] The Tribes' showing of potential harm differentiates this case from another case in this District
that denied a preliminary injunction against pipeline operations.  There, plaintiffs had both failed
to establish a likelihood of success on the merits and had offered "little proof" of irreparable
harm.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 39–40 (D.D.C. 2013)
(impacts of pipeline will be "both minimal and fleeting").  This case arises in a very significant
posture, as the Tribes have prevailed on the merits of a "serious" NEPA violation, and have
introduced additional extrinsic evidence that the pipeline presents unacceptable risks.

[6] DAPL's separate point that the Tribes have not acted with sufficient "urgency" in this matter to
warrant an injunction barely merits response.  DAPL Opp. at 13.  The Tribes filed multiple
preliminary injunction requests to prevent the pipeline from starting operations, and have
diligently sought relief from this Court at every stage of the proceedings.

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 15 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Lastly, this Court should not use any uncertainties about the precise probability of a spill when that lack of information arises from the Corps' violation of NEPA itself.  Motion at 13. Indeed, setting a high bar for showing that a catastrophic spill is more likely than not frustrates Congress' intent in enacting NEPA, a statute that requires consideration of such risks *before* they are undertaken.  *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001) ("[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'") (citation omitted).  Indeed, such a standard would foreclose injunctive relief under any number of plausible scenarios where courts were asked to intervene to prevent catastrophic harm.  Moreover, while NEPA imposes procedural requirements, it is intended to implement substantive goals, including securing "for all Americans safe, healthful, productive, and esthetically … pleasing surroundings."  42 U.S.C. § 4331(b)(2); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989); *see also Ctr. for Biological Diversity v. Ross*, 2020 WL 4816458, at *11 (D.D.C. Aug. 19, 2020) (issuing injunction in light of purposes of Endangered Species Act, noting that "establishing irreparable injury should not be an onerous task for plaintiffs").  Defendants suggestion that an injunction is unwarranted because NEPA is procedural in nature must be vigorously rejected.

In sum, plaintiffs cannot state with certainty when, where, or how a catastrophic spill from this pipeline may occur.  Neither can the Corps nor DAPL, in no small part due to the agency's failure to address the issue seriously under NEPA.  It is not the law that plaintiffs need to prove that such a spill is more likely than not.  The Tribes have shown a sufficient likelihood of harm on these facts to warrant an injunction.

## B.   Trauma of Continued Government Violations of Law.

Defendants do not dispute that a "court may consider subjective, psychological harm in its irreparable-harm analysis." *Vencor Nursing Centers, L.P. v. Shalala*, 63 F. Supp. 2d 1, 12

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 16 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

(D.D.C. 1999); *Brady Campaign*, 612 F. Supp. 2d at 25 (reduced "enjoyment" of park visits due to presence of guns sufficient for injunction); Motion at 14–16 (citing cases).  Instead, the Corps denigrates the Tribes' concerns as "subjective apprehensions," citing another case where the fear of an uncertain oil spill was found insufficient to trigger a preliminary injunction.  Corps Opp. at 9–10.  The argument misses the crucial context here: this case is about more about than just someone's subjective fears of a pipeline spill.  That context, based on a history of repeated violations of Treaties and legal standards, is critical.

As Standing Rock Tribal Historic Preservation Officer Jon Eagle, Sr., explains, allowing the pipeline to continue operating despite a "serious" NEPA violation is part of a pattern:

> A pattern where the rules are changed to benefit non-Indians at our expense. The U.S. Government stole land promised to us in perpetuity, and the Supreme Court upheld that. Then the Corps built dams that flooded our best remaining lands, without our consent, and that was upheld too. Now the rules have been changed again, so that a pipeline that never should have been authorized gets to keep operating, exposing us to risk and stress of catastrophe. This pattern has caused so much trauma and pain among the people in my Tribe.  It signals to us that the Government sees us as less.  It signals that the Government will never keep its word to us or meet its obligations to us.  It signals that if we play by the rules of the U.S. legal system and win, the rules will be changed to our detriment.  I have previously discussed the historic trauma that every Tribal member carries with them. Allowing this pipeline to continue operating will compound this trauma yet again, causing untold harm.

4th Eagle Decl. ¶ 13 (ECF 569-5).  Thus, the harm at issue here is not only the "subjective apprehension" that the pipeline will spill, as defendants accuse.  DAPL Opp. at 9 (harm is "derivative" of spill risk).  It is the trauma of continued refusal to respect the rights of the Tribes throughout the nation's history, and the compounding impact of prioritizing non-Indians who privatize benefits but socialize risks on the backs of the Tribes.  These are not "speculative" fears but undisputed traumas that are both longstanding and ongoing.  The Tribes do not stand in the same position as the environmental groups in *Sierra Club*.  They have unique rights and are entitled to special consideration in light of the history of broken treaties and dispossession.  The

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Tribes have demonstrated an undisputed psychological trauma that is enough to warrant an injunction.

The Corps concedes that this Court has granted injunctions based on subjective psychic harms, like the trauma of knowing that a wild animal has been killed.  But it seeks to differentiate those cases because there, the trauma-triggering event was certain, while here, it is contingent.  The Corps misunderstands the testimony.  The issue is not only the stress from living under the threat of an existential catastrophe, although that is certainly a part of it.  Rather, as documented by Mr. Eagle, the trauma is already occurring simply by virtue of the pipeline's very existence and the government's willingness to sacrifice the Tribe's interests to ensure that the company's profits are uninterrupted.  The question of probability—a primary focus of defendants' brief—need not even enter the equation.  If courts can grant an injunction to a wildlife enthusiast based on the trauma of knowing an animal is killed, surely the documented trauma of allowing this illegal pipeline to continue operating warrants the same treatment.

C.    Tribal Self-Governance.

Nor do defendants meaningfully rebut the Tribes' showing that they have been harmed in another way, through a compromised functioning of essential government operations.  Motion at 14–16.  While the pipeline crosses federal lands, it does so literally yards upstream from Standing Rock Tribal lands, where a spill would immediately and indisputably interfere with the Tribe's sovereignty over its land.  Accordingly, just as in the cases cited in the Tribes' opening brief, the Corps' management of its land implicates Tribal authority, because any mistake by the Corps or DAPL immediately would become the Tribe's problem, impact its core functions, and threaten the citizens whom the Tribe is responsible for.  The Tribes must therefore devote scarce resources to planning for these events, the difficulty of which is increased due to the Corps'

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 18 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

failures to disclose key risks.  2nd Ward Decl. ¶ 6 (ECF 527-9).  Coupled with the Tribes'

success on the merits, this too is sufficient harm to warrant an injunction.

Defendants pivot to one of their favored tactics, trying to pin the blame on the Tribes for

the breakdown of spill response planning.  Corps Opp. at 12–13.  These are false and repeatedly

refuted accusations.  The Standing Rock Sioux Tribe's previous filings with this Court have

explained how the Corps failed to fulfill its obligation to share technical information during the

remand process, including information needed to participate in spill response planning.  ECF

433-2 at 42–45; ECF 465 at 32–35; ECF 336 at 13.  It is the Corps that has the consultation duty,

and it violated that duty by turning over the process to DAPL, which was not "willing to share"

key documents deemed critical by Tribal emergency response managers.  RAR 8403.  The Tribe

rightly refused to participate in "sham meetings" without key information.  ECF 465 at 34.

As to the planned doubling of pipeline capacity, DAPL seeks to brush it under the rug

while the Corps says nothing about it at all.  While the Corps has claimed that it will "consider"

the company's plans to expand during the EIS, all state permitting is now complete and

construction commenced months ago.[7]  DAPL is already operating the pipeline without a valid

permit and has never committed to not begin operating at an expanded capacity even if the Corps

is still "considering" the impacts of doing so as part of the EIS.  The increased risks and harm of

spill associated with expanded operations is certainly a "ripe" harm that can be considered by

this Court in crafting an injunction.  Finally, the only possible reaction to the Corps' argument

that an oil spill could be remedied with money damages, Corps Opp. at 14, is profound dismay.

After over four years of litigation, it is as if the Corps has learned nothing about the importance

---

[7] *See, e.g.,* Amy Sisk, *Construction to Start on Dakota Access Pipeline pump station in Emmons County*, Bismarck Tribune (Oct. 2, 2020).

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 19 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

of this waterway to the Tribes, and the cultural, spiritual, and economic havoc a spill would cause.  Motion at 18–19.  The fact that this point still needs even to be argued serves only to highlight the Corps' consistent failure to adequately consider the consequences of this project.

IV.   THE BALANCE OF HARMS WEIGHS IN FAVOR OF AN INJUNCTION

The Court has already carefully weighed the balance of harms, and concluded that the "serious effects" of shutting down the pipeline do not weigh in favor of keeping it open.  Vacatur Order at 17; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 106 (D.D.C. 2017) (*"Standing Rock IV"*) (economic harm does not "weigh heavily" against vacatur).  Although this Court directed the parties to focus their arguments on other issues, defendants resurrect the same exaggerated claims about the impacts of a shutdown that this Court has already rejected.  DAPL's resubmission of the same evidence does not require this Court to rebalance the scales anew.  Indeed, when it comes to the kind of permanent environmental and cultural destruction at issue here on one side, versus a loss of profits from an unlawful operation on the other, there is little balancing to be done at all.  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *Open Cmty. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) ("defendants, moreover, 'cannot suffer harm from an injunction that merely ends an unlawful practice'").  The issue having been already settled, the Tribes refer to the Court to its previous filings on this matter.  ECF 527 at 21–30 (Tribes' vacatur brief); ECF 527-2 (Fagan Decl. and expert economics report).

While DAPL seeks to reargue issues that it has already lost with evidence the Court has already seen, the Corps for the first time introduces evidence about the potential impacts of shutting down the pipeline, via a declaration from a Department of Energy official.  ECF 573-1.  But the opinions Mr. Bennett offers simply repeat arguments already made by DAPL, do not respond to the Tribes' evidence, and are not even current.  (The declaration is dated mid-July,

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 20 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

even though it was filed in late November.)  For example, Mr. Bennett relies on oil production

and price information from April 2020, mostly *before* prices and production in North Dakota had

collapsed, and well before the Tribes filed either their vacatur motion or this one.  Current

information reveals that production remains far below pre-pandemic peaks, and is unlikely to

improve anytime soon, if at all.[8]  ECF 569-3 (2nd Fagan Report) ("prospects for recovery of oil

production in the next one to two years are dim as oil prices remain low and the industry is

starved of capital").  Mr. Bennett's opinions are full of wild logical leaps, such as the suggestion

that closing the pipeline would constitute a nearly $9 billion "total loss of throughput value"

which would translate to billions of dollars in lost tax revenue.  Bennet Decl. ¶ 9–10.  As the

Tribes have previously explained, however, oil not transported on the pipeline will not be "lost,"

oil will be produced and sold based on market prices.  Fagan Decl. ¶ 5 (ECF 525-2).   And the

prediction that transitioning any volume to rail, should it be necessary at all, would be

prohibitively costly is disputed by the industry representatives themselves, who have gone on

record as saying closure of DAPL would "not have a major impact" and would at worst raise

transportation prices by "a few dollars per barrel."  2nd Fagan Rep. at 13 (ECF 569-3).[9]  The

bottom line is that any impacts to the industry from shutting down DAPL will be "lost in the

noise" of other factors impacting this industry and at worst "redistribute benefits and burdens

within the oil market" without disrupting the market as a whole.  Fagan Decl. ¶ 5–7.

---

[8] *See, e.g.,* Myles McCormick, *North Dakota's shale prospects look bleak after the gold rush*, Financial Times (Dec. 27, 2020) ("Production has begun to climb again as the Bakken's inventory of 'drilled but uncompleted' wells are brought online, supported by federal grants. But with minimal new drilling being carried out, output will slide next year.").

[9] DAPL falsely claims that Dr. Fagan estimated that rail would cost an additional $5 to $10/barrel. DAPL Opp. at 21 n.5.  Dr. Fagan specifically refuted that estimate, and offered a "conservative" (i.e., likely too high) estimate that rail would increase costs by $1.99 to $2.65 barrel at most.  Fagan Rep. at 37–38 (ECF 527-4).

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-01534-JEB) - 21 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Defendants also make a third attempt to "resurrect an unsuccessful argument" that transportation by rail would be less safe.  Vacatur Order at 22; *Standing Rock IV*, 282 F. Supp. 3d at 107 ("Defendants have failed to persuade the Court that transport by train is significantly more dangerous than allowing oil to continue to flow beneath Lake Oahe.").  But DAPL offers no new evidence, or any other reason, that this Court should reverse itself.  ECF 527 at 25.  As the Tribes have previously explained on several occasions, assessing the relative risks of each mode of transportation in a given location is nuanced.  Goodman Decl. ¶ 89 (ECF 272-5).  General comparisons of the safety of pipelines and rail are not helpful for assessing the relative safety of "*this* pipeline in *this* location," *Standing Rock IV*, 282 F. Supp. 3d at 107, a topic which DAPL ignores.  3rd Holmstrom Decl. ¶¶ 9–10 ("DAPL is an unusually unsafe pipeline…").  Most importantly, given the collapse in production in North Dakota, only some of the oil previously transported by DAPL—and potentially very little of it—would shift to rail.  Fagan Decl. ¶ 5.  There is no reason to revisit this issue a third time.

No party has anything to say about the company's unclean hands in rushing to build a controversial pipeline under a cloud of political and legal risk.  ECF 527 at 30–32; Vacatur Order at 23.  Instead, the Corps warns of the erosion of "regulatory predictability and public confidence," Corps Opp. at 17, while DAPL oddly calls for a "presumption of regularity" for actions already deemed illegal.  DAPL Opp. at 21.  What the Court should be concerned with is public confidence in the fair and equal application of the law.  The Corps has been found to have violated NEPA on two separate occasions, and yet DAPL still operates without the assessment of risks required by the law.  4th Eagle Decl. ¶ 13.  Rewarding the agency and company's efforts to circumvent NEPA would create incentives to "build first and consider environmental

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 22 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

consequences later."  Vacatur Order at 18–19; *Standing Rock IV*, 282 F. Supp. 3d at 106 (allowing project to continue despite NEPA violation "risks creating undesirable incentives").

      This case calls for the Court to balance the potential for an existential catastrophe to the Tribes, who have done nothing wrong, against "marginal and readily managed" economic impacts to entities who knowingly embraced risk and continue to profit from it.  Fagan Decl. ¶ 11.  The Court has balanced these factors and found that a shut down of the pipeline, until NEPA compliance was assured, was warranted.  There is no reason for the Court to reverse course.

## V.    THE PUBLIC INTEREST SUPPORTS AN INJUNCTION

      Defendants offer little response to the Tribes' showing that the public interest supports an injunction, primarily by securing compliance with the Congressionally-mandated review imposed by NEPA as well as adherence to federal trust obligations.  Motion at 21–24; *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").  First, the Corps oddly asserts the fact that the Tribes have prevailed on the merits is "not relevant" to the injunction analysis, when decades of settled law say the opposite.  *Amoco Production Co.*, 480 U.S. at 546 n.12.  Next, it falls back on its discredited environmental assessment, and the number of pages therein, to argued that the risks of the pipeline have been adequately studied: suggesting that NEPA's policies have been adequately served.  But this Court has found the assessment to be fundamentally flawed.  Merits Order 18–35; Vacatur Order at 18 (allowing DAPL to remain in operation would "subvert the structure of NEPA").  Moreover, while "not every NEPA violation requires an injunction," Corps Opp. at 22 (*citing Monsanto*), that is because vacatur alone should operate to suspend pipeline operations.  *See supra* § I.

      The Corps next claims that its trust responsibility is also "irrelevant," but fails to explain why this critical context should not be front and center in the public interest analysis.  Motion at

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 23 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

22–24.  The Tribes described the serious harms that they are suffering from the legacy of broken promises and the erosion of their safety caused by government neglect.  Declarations attested to the psychological harm to Tribal members from living under another looming threat of environmental disaster.  *E.g.,* Spotted Eagle Decl. ¶¶ 2, 5, 7–8 (ECF 292-1); Vance Decl. ¶ 17 (ECF 527-10); 2d Archambault Decl. ¶¶ 17–18 (ECF 107-1).  Continued operation of an unsafe pipeline also impairs the Tribes' ability to protect their members and Treaty fishing, hunting, gathering, and cultural rights from disasters.  *Id.* ¶¶ 6–9; Ward Decl. ¶¶ 2–3 (ECF 312); 2d Ward Decl. ¶ 3, 5–8 (ECF 527-9).  In effect, the Corps urges the Court to ignore the Tribal identities of the plaintiffs and how their unique legal status and histories affect their interests and the impacts of the violations found by the Court.  The Corps also seems to be claiming that this Court must ignore harms to the Tribes unless they have prevailed in a breach of trust claim.  *See also* DAPL Opp. at 8 n.2.  But it cites no precedent for the proposition that the Court must ignore the broader context in which this case arises or the very real harms to Tribes from its violations of the law. To the contrary, the Corps asserts that it can discharge its obligations to manage off-reservation resources to ensure compliance with trust responsibilities through its compliance with NEPA. Corps Opp. at 23; *Standing Rock III*, 255 F. Supp. 3d at 143–45.  Given that it has fallen far short of what NEPA requires, including in addressing the risks and impacts of oil spills on Treaty hunting, fishing, and cultural resources, the harms to the Tribes in their unique status *as* Tribes are very relevant and weigh in favor of an injunction.

While the Corps will have a duty to address the pipeline's impacts on the Tribes' rights through the EIS process, the question here is whether the pipeline should continue operating in violation of NEPA while that process is undertaken.  The public interest in securing compliance with NEPA and the government's Treaty obligations weighs in favor of an injunction.

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 24 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

CONCLUSION

For the foregoing reasons, the Tribes' motion for clarification and a permanent injunction should be granted.

Respectfully submitted this 8th day of January, 2020.

/s/ Jan E. Hasselman
Jan E. Hasselman, WSBA # 29107
(*Admitted Pro Hac Vice*)
Patti A. Goldman, DCBA # 398565
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
Telephone: (206) 343-7340
jhasselman@earthjustice.org
pgoldman@earthjustice.org
*Attorneys for Standing Rock Sioux Tribe*

/s/ Nicole e. Ducheneaux
Nicole E. Ducheneaux, DC Bar No. NE001
Big Fire Law & Policy Group LLP
1404 South Fort Crook Road
Bellevue, NE 68005
Telephone: (531) 466-8725
Facsimile: (531) 466-8792
nducheneaux@bigfirelaw.com
*Attorney for Cheyenne River Sioux Tribe*

/s/ Michael L. Roy
Michael L. Roy (DC Bar No. 411841)
mroy@hobbsstraus.com
Jennifer P. Hughes (DC Bar No. 458321)
jhughes@hobbsstraus.com
Elliott A. Milhollin (DC Bar No. 474322)
emilhollin@hobbsstraus.com
Hobbs, Straus, Dean & Walker, LLP
1899 L Street NW, Suite 1200
Washington, DC 20036
Telephone: (202) 822-8282
Facsimile: (202) 296-8834
*Attorneys for Oglala Sioux Tribe*

/s/ Mario Gonzalez
Mario Gonzalez

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 25 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*

Gonzalez Law Office
522 7th St. 202
Rapid City, SD 57701
Telephone: (605) 716-6355
*Of Counsel for Oglala Sioux Tribe*

/s/ Jeffrey S. Rasmussen
_____
 Jeffrey S. Rasmussen, WA #21121
(Pro Hac Vice)
Patterson Earnhart Real Bird & Wilson LLP
357 S. McCaslin Blvd., Suite 200
Louisville, CO 80027
Phone: (303) 926-5292
Facsimile: (303) 926-5293
Email: jrasmussen@nativelawgroup.com

/s/ Rollie E. Wilson
_____
Rollie E. Wilson (D.C. Bar No. 1008022)
Patterson Earnhart Real Bird & Wilson LLP
601 Pennsylvania Avenue, NW
South Building, Suite 900
Washington, D.C. 20004
Phone: (202) 434-8903
Facsimile: (202) 639-8238
Email: rwilson@nativelawgroup.com
*Attorneys for Yankton Sioux Tribe and Robert Flying Hawk*

REPLY IN SUPPORT OF MOTION FOR
CLARIFICATION AND A PERMANENT INJUNCTION
(No. 1:16-cv-1534-JEB) - 26 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104*
*(206) 343-7340*