UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Standing Rock Sioux Tribe; Yankton Sioux Tribe; Robert Flying Hawk; Oglala Sioux Tribe, | |
| Plaintiffs, | Civil No. 1:16-cv-01534-JEB (Consolidated Case Nos. 1:16-cv-01796 and 1:17-cv-00267) |
| and | |
| Cheyenne River Sioux Tribe; Sara Jumping Eagle et al., | |
| Plaintiff-Intervenors, | |
| vs. | |
| U.S. Army Corps of Engineers, | |
| Defendant-Cross-Defendant, | |
| and | |
| Dakota Access, LLP, | |
| Defendant-Intervenor-Cross-Claimant. | |

## MEMORANDUM IN SUPPORT OF STATE OF NORTH DAKOTA'S OPPOSED MOTION TO INTERVENE AS A DEFENDANT

The State of North Dakota ("North Dakota" or "State") submits this memorandum in support of its motion to intervene as a defendant-intervenor pursuant to Federal Rule of Civil Procedure 24(a)(2) and Local Rule 7(j) of this Court. North Dakota respectfully requests that the Court grant North Dakota's motion for leave to intervene as a defendant-intervenor as of right pursuant to Fed. R. Civ. P. 24(a)(2), or alternatively for permissive intervention under Fed. R. Civ. P.

24(b)(1)(B).[1]   North Dakota seeks this intervention to protect its significant sovereign rights in this matter that, based on events that have taken place in the last ten days, are no longer adequately represented by the Defendant.   North Dakota seeks no additional or special briefing privileges and granting this motion will in no way delay or impede the progress of this matter.

## I.   INTRODUCTION

Ten days ago, on April 9, this Court held a status conference to provide the United States Army Corps of Engineers ("Corps" or "Federal Defendant") with an opportunity to state its current position in this litigation, in light of the change in Presidential administrations.

At the status conference, the Federal Defendant made it clear that its was abandoning its previously vigorous defense of the permitting and ongoing operation of the Dakota Access Pipeline ("DAPL"), including in the event of any appeals.   The Corps informed the Court that it did not intend to seek *en banc* review of the decision of the United States Court of Appeals for the District of Columbia, while Dakota Access is seeking such further review.   Transcript of Teleconference before the

---

[1] In accordance with Local Rule 7(m), undersigned counsel for prospective Intervener-Defendant North Dakota has conferred with counsel for Plaintiffs and Counsel for Defendant.  Counsel for Dakota Access LLC supports this Motion and counsel for Tribal Plaintiffs and Plaintiff Intervenors oppose.  Counsel for the Defendant reserved a position until after reviewing the instant motion.

Honorable James E. Boasberg, United States District Judge, *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, (April 9, 2021) at 5.  The Corps indicated that although the Federal Defendant was not yet taking any action against the pipeline, it stated that this decision "is a matter of essentially the continuing of discretion between the Corps and the Department of Justice" and that the Federal Defendant could and might change positions at any time.  *Id*. at 8-10.  "[T]he Corps is essentially in a continuous process of evaluating the encroachment and what steps there are to take."  *Id*. at 10.   The Corps admitted it was under political pressure from both sides, *id*. at 10, and preferred that the Court, not the Corps, decide the question of DAPL's continued operation, implicitly abandoning its lead role in defending its decision to grant the easement for DAPL's crossing under the Missouri River at Lake Oahe.  *Id*. at 15.

The change in the Federal Defendant's willingness to defend the operation of DAPL is of particular concern to North Dakota, whose sovereign interests and those of its residents hang in the balance.  In light of these recent developments, North Dakota can no longer rely on the Federal Defendant to "adequately represent" (Fed. R. Civ. P. 24(a)), North Dakota's interests in this matter, including in any appeals of this Court's forthcoming ruling on the pending injunction motion.  North Dakota cannot be confident that the Federal Defendant will continue to be a zealous advocate for the continued and safe operation of DAPL which, directly and indirectly, is the

source of almost a quarter of the State's revenues and thousands of jobs in the State. Nor are the State's interests fully represented by Dakota Access LLC, which has a necessarily more limited and commercial perspective. North Dakota is a sovereign state and acts pursuant to its state constitution and laws, on behalf of its citizens, and cannot rely on a private company such as Dakota Access to adequately represent those interests, particularly when Dakota Access and DAPL are regulated by North Dakota. North Dakota has unique interests to be represented, such that the change in the Federal Defendant's position is reason to allow North Dakota to participate as a defendant to adequately represent those interests.

North Dakota respectfully requests that this Court permit it to intervene in this matter as a defendant, in a manner that will not adjust or disrupt the Court's schedule for this litigation or in any way prejudice the other parties in the case.

## II.    FACTS

1.     North Dakota's interests in this litigation are substantial and encompass both its sovereign and economic interests. While the Federal Defendant issued a permit and an easement for the 1.73 miles of pipeline which crossed under Lake Oahe, it was the North Dakota Public Service Commission ("Commission") that issued permits for 358 miles of the remaining 1,172 miles of underground pipeline. Declaration of Commissioner Julie Fedorchak, attached to this Memorandum as Exhibit 1, at ¶¶ 5-6.

2.     The Commission, a constitutional agency, is statutorily charged with the siting of energy transmission facilities under the North Dakota Siting Act. Chapter 49-22 and 49-22.1 of the North Dakota Century Code. *Id.* at ¶ 3. The Commission's role under the Siting Act is to ensure that the location, construction, and operation of transmission facilities, like DAPL, will cause minimal adverse effects on the environment and the welfare of the citizens of North Dakota. No transmission facility can be located, constructed, and operated in North Dakota without a certificate of site compatibility or a route permit issued by the Commission based on an extensive public review process. *Id.*

3.     The Commission was the primary permitting authority for DAPL in North Dakota. The Commission's permitting process for DAPL spanned more than eighteen months and included extensive evaluations of numerous alternative routes across the state as well as alternative transportation technologies. *Id.* at ¶ 5.

4.     North Dakota's environmental review was comprehensive. It began on December 22, 2014, when Dakota Access filed applications with the Commission requesting a certificate of corridor compatibility and a route permit concerning approximately 358 miles of 12-, 20-, 24-, and 30-inch diameter crude oil pipeline. and associated facilities. *Id.* at ¶ 6. The Commission deemed Dakota Access's applications for a certificate of corridor compatibility and a route permit complete on March 25, 2015 – conditioned upon receipt of additional environmental reports

including  the wetlands and waterbody field survey report, the wildlife inventory field survey report, the habitat assessment field survey report, and the tree and shrub inventory report – and issued a Notice of Filings and Notice of Hearings.  *Id*. at ¶¶ 5-6.  After three long and well-attended public hearings and extensive public and expert comment, including numerous State and federal agencies and intervening parties, the Commission issued its Order Granting Dakota Access its Certificate of Corridor Compatibility and Route Permit ("Certificate Order") on January 20, 2016, pursuant to the North Dakota Century Code Chapter 49-22.  *Id*. at ¶¶ 9-11.  The Commission found that the location, construction, and operation of DAPL would best minimize adverse human and environmental impacts and that the proposed route was acceptable because it followed the route of existing utility lines and pipelines, thus minimizing the amount of ground that would be newly disturbed.  *Id*. at ¶ 11.

5.      Pursuant to the State's Administrative Practices Act, N.D. Cent. Code. § 28-32-01, the Commission's Certificate Order and subsequent orders were subject to judicial review if, among other things, the Order was issued not in accordance with the law, did not afford a fair hearing; was not supported by the evidence and findings, and did not sufficiently address the evidence presented by a party. Tellingly, no party sought judicial review of the Commission's Certificate Order. *Id*. at ¶ 14.

6.     The Commission's decision has been affirmed by subsequent events. DAPL has transported more than half a billion barrels of oil without a single spill anywhere on its nearly 1200-mile mainline.   Before DAPL, North Dakota producers were forced to rely primarily on truck and rail transport (with their attendant risks) to bring its crude oil to market and will be forced to try to turn to those modes once more if DAPL is shut down.   The completion of DAPL also noticeably reduced both rail and road congestion in the upper Midwest, and this congestion and the associated air pollution and greenhouse gas emissions would necessarily return if the pipeline were to cease operations.   July 2016 EA at 7, 106; State Coalition Amicus Br. 13-20, 23-24.   These are issues of material concern to North Dakota as the sovereign responsible for the protection of its citizens and their environment.

7.     North Dakota also has substantial economic and environmental interests in the continued operation of DAPL.   North Dakota is a small state in terms of both population and economic output, but ranks second out of the fifty states in terms of oil production.   Declaration of Office and Management Director Joe R. Morrisette, attached to this Memorandum as Exhibit 2, at ¶ 4.   On March 11, 2021, the North Dakota Industrial Commission Department of Mineral Resources reported that 1,191,429 barrels of oil per day ("bpd") were produced in North Dakota in December 2020 and 1,147,374 bpd in January 2021.   Declaration of Director Lynn D. Helms, attached to this Memorandum as Exhibit 3, at ¶¶ 6-8.   While projections

of oil and gas production and related tax revenue are necessarily imprecise, especially this year, both supply and demand have been rebounding strongly from their early pandemic lows and are currently on track to reach their pre-pandemic levels sometime next year.  Helms Declaration at ¶¶ 4-6.  Speculation by Plaintiffs that the production of oil from North Dakota would be permanently decreased by the pandemic has been shown to be false.

8.     As a result, North Dakota is extremely dependent upon revenues from taxes on the extraction and production of oil and natural gas to fund government operations and provide essential services to its citizens.  Morrisette Declaration at ¶ 4.  Over twenty percent of the North Dakota's general fund revenues are derived directly from oil and gas taxes and almost fifty percent of the total of all tax and fee revenue received by the state comes from oil and gas extraction and production.  *Id*. The March 2021 North Dakota legislative revenue forecast assumes that oil and gas tax revenue collections during 2021 - 2023 will total $3.7 billion.  *Id.*   These revenues support programs from which all State residents benefit, including education, healthcare, law enforcement, and parks and recreation.  *Id.*

9.     North Dakota's revenues derived from oil and gas production rely on the operation of DAPL.  Over 40% of North Dakota's crude oil production flows through DAPL, and the oil and gas tax revenue collected by the State increased because of DAPL's comparatively low transportation costs.  *Id*. at ¶ 5.

10.    Oil and gas severance taxes in North Dakota are calculated under a formula that subtracts transportation costs from revenue, N.D. Cent. Code. § 57-51-02.3, so any increase in transportation costs results in lost tax revenue to the State. *Id.* at ¶ 6.  For the twelve-month period prior to the operation of DAPL (2016), the "transportation discount" averaged $7.04 per barrel.  *Id.* at ¶ 7.  Once DAPL  began operations, the price savings for the hundreds of thousands of barrels a day transported by DAPL, as opposed to more expensive transportation by rail or truck, caused the average transportation discount for all barrels in the state to fall by 33 percent: for the twelve-month period after DAPL opening in 2017, the transportation discount averaged only $4.71 per barrel.  *Id*.  Thus, DAPL immediately increased taxable revenues from oil and gas production by approximately $2.33 per barrel State-wide, in a State that produces more than 1 million barrels per day.  *Id.*

11.    Closing DAPL will result in the loss of the tax revenue gained through DAPL's efficient operations because the increased costs of the non-pipeline transportation alternatives will reduce the revenue subject to taxes.  The March 2021 legislative revenue forecast for the State of North Dakota assumes oil production will average 1.05 million barrels per day over the next two-year budget period.  *Id.* at ¶ 8.  Under that scenario (which is a conservative projection), and even using the earlier 2016/2017 cost differential for oil transport modes, the increased transportation costs alone from a closure of DAPL would reduce the State's revenues

by approximately $245,000 per day or $179 million over the July 1, 2021 through June 30, 2023 (2021-23 biennium) budget period (assuming oil production of 1.05 million barrels per day and an increase in transportation costs of $2.33 per barrel). *Id*. Those total reductions in tax revenue are likely to be much greater because, as others have established in earlier declarations, the added cost of moving oil by rail (versus DAPL) has been estimated to much greater than the 2016/2017 differential.

12. Another reason for even greater adverse impacts is a loss in production if DAPL is shut down. For example, 75% - 90% of North Dakota's Bakken crude oil production is based on contracts with binding provisions requiring transportation using the efficient DAPL, and must be transported using DAPL or shut-in (i.e., not produced). Helms Declaration at ¶ 8. If DAPL is shut down, approximately 427,000 – 513,000 barrels per day of production may have to be shut down for 6 – 9 months, or even longer, while alternative means of transportation are identified and secured. *Id*. This could decrease North Dakota's tax revenues during this period by by at least $245,000 per day, or $179 million over the course of the July 1, 2021 through June 30, 2023 (2021-23 biennium) budget period. Morrisette Declaration, at ¶ 8. None of these estimates include the additional impacts to North Dakota's citizens and its economy caused by the jobs lost if DAPL is shut down.

## III.   ARGUMENT

### A.   North Dakota is Entitled to Intervene as a Matter of Right.

Federal Rule of Civil Procedure 24(a) states in relevant part:

> On timely motion, the court must permit anyone to intervene who . . . (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

A party seeking intervention of right must demonstrate that (1) its application is timely; (2) it has a cognizable interest in the property or transaction; (3) its interest would be impaired by disposition of the action; and (4) its interests are not adequately represented by existing parties. *Jones v. Prince George's County, Md.*, 348 F.3d 1014, 1017 (D.C. Cir. 2003); *Fund for Animals*, 322 F.3d at 731 (citation omitted). A party requesting intervention as of right must also demonstrate Article III standing. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998). North Dakota meets these requirements and should be permitted to intervene as of right.

### B.   North Dakota's Motion is Timely in Light of the Changes in the Federal Government's Litigation Posture, and North Dakota is no Longer Adequately Represented by the Existing Parties in this Litigation.

Although this litigation has been ongoing since 2016, until the April 9 status conference, North Dakota was reasonably confident that its interests were being adequately represented by the existing parties. Rather than clutter the already

complicated docket with additional parties, North Dakota elected to participate as an *amicus* and present its unique concerns to the Court in that capacity. However, after the status conference, this position is no longer tenable.

When the Federal Defendant filed its Motion to Continue, Dkt. 581, so that the new administration could consider its options, North Dakota began to explore a menu of litigation options that it could pursue if the Federal Defendant changed its position. While the status conference did not provide the clarity that many had hoped, it is obvious to North Dakota that under the new administration the Federal Defendant will not provide a fulsome defense of the environmental review conducted principally under the Obama administration, or of the continued operation of the pipeline. *See* Transcript at ¶ 5-15. With its interests no longer adequately represented, North Dakota must now intervene to vigorously advocate for its own interests and the interests of its citizens, while respecting the advanced stage of this litigation.

Timeliness is "judged in consideration of all the circumstances, especially weighing the factors of time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *Karsner v. Lothian, 532 F.3d 876, 886 (D.C. Cir. 2008)*, quoting *United States v. British Am. Tobacco Austl. Servs., Ltd*., 437 F.3d 1235, 1238 (D.C. Cir.

2006).  "[T]he amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness."  *Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972).

A motion to intervene is timely at the point when the United States ceases to be an adequate representative of a party's interest.  *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001).  "[C]ourts measure elapsed time from when the 'potential inadequacy of representation [comes] into existence'" – not from commencement of the suit.  *Amador Cnty. v. U.S. Dep't of the Interior*, 772 F.3d 901, 904 (D.C. Cir. 2014).  In *Smoke* the intervenors intervened after an entry of judgment, "prompted by the post-judgment prospect that the Government might not appeal." *Smoke*, 252 F.3d at 471.  "Prior to the entry of judgment . . . they had no reason to intervene; their interests were fully consonant with those of the Government, and those interests were adequately represented by the Government's litigation of the case."  *Id.*

The burden of demonstrating inadequacy of representation for the purposes of Rule 24(a)(2) is "not onerous."  *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 321 (D.C. Cir. 2015).  "Merely because parties share a general interest in the legality of a program or regulation does not mean that their particular interests coincide so that representation by the agency alone is justified."  *Am. Horse Prot. Ass'n v*, 200 F.R.D. at 159; *see also Fund for Animals*, 322 F.3d at 735-36.  Intervention is proper even when "the federal agency and

prospective intervenor undisputedly agreed that the agency's current rules and practices were lawful." *Crossroads*, 788 F.3d at 321.

Moreover, it is not necessary for the federal government to actually inadequately represent the intervenor. For example, in *Smoke*, "[t]he Government's representation of the appellants' interests became potentially inadequate only when it ***equivocated*** about whether it would appeal the adverse ruling of the district court." *Smoke*, 252 F.3d at 471 (emphasis added). By "equivocating" about its plans, the government demonstrated that it had become "potentially inadequate," and this was sufficient grounds for a finding of inadequate representation that supported intervention even after an entry of judgment. *Id*.

The assertion by the Federal Defendant that the Corps is engaged "essentially in a continuous process of evaluating," Transcript at 10, is a prime example of equivocating about the Corps' intentions, and counsel also stated that they would not pursue an *en banc* rehearing, *id*. at ¶ 5. At a minimum, the status conference demonstrated that the Federal Defendant is no longer unequivocally and aggressively defending the legality of its previous decisions or the continued operations of DAPL.

The likelihood of an appeal on the injunction issue is another reason North Dakota should be allowed to intervene. Regardless of this Court's decision on the injunctive relief issue, it will almost certainly be appealed and North Dakota needs

to be able to protect and vindicate its rights.  If North Dakota waited to file this Motion until after a ruling by this Court and after a decision by the Federal Defendant not to appeal, Plaintiffs would likely assert that North Dakota had waited too long. The uncertainty over whether the Federal Defendant will advocate for continued operation of the pipeline in the face of an adverse ruling (or, for that matter, defend a denial of the injunction motion) on the pending injunction motion should not be used to whipsaw North Dakota, and it is reason alone to allow intervention.

"[W]e do not require timeliness for its own sake," but "[r]ather, the requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." *Amador Cnty. v. U.S. Dep't of the Interior*, 772 F.3d 901, 905 (D.C. Cir. 2014) (internal quotations omitted).  Here there is no risk of prejudice to the parties in allowing North Dakota to intervene in this case: it seeks no special or additional briefing privileges that could disrupt the trajectory of the case.  Further, the fact that North Dakota will vigorously defend its sovereign interests and oppose other parties does not "prejudice" North Dakota's opponents: strong advocacy is not prejudicial.

## C.   North Dakota has Significant Legally Cognizable Interests that are Affected by this Litigation, and Disposition of this Litigation May Impair those Interests.

"On timely motion, the court must permit anyone to intervene who … claims an interest relating to the property or transaction that is the subject of the action, and

is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24.  North Dakota has significant, direct and cognizable interests in this litigation because a permanent injunction shutting down DAPL will cause substantial economic hardship for its citizens and wreak havoc on the State's economy.  Moreover, the State has direct and legally cognizable interests as a sovereign state seeking to protect the integrity of its own permitting and regulatory process.  The decision whether to allow DAPL to continue to operate or shut it down directly implicates North Dakota's sovereignty, its interest in protecting the health and safety of its citizens and determination the proper utilization of its natural resources and public trust lands, as well as the North Dakota Public Service Commission's extensive environmental and regulatory review and authorization of DAPL.

The D.C. Circuit determines whether a party has a legally cognizable interest by "looking to the practical consequences of denying intervention." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (quotation omitted). This is identical to the test for constitutional standing, and any party that has standing also has a legally cognizable interest.  *Crossroads Grassroots Policy Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 320 (D.C. Cir. 2015).  "Whether a proposed intervenor is 'so situated that the disposition of an action may as a practical matter

impair or impede [its] ability to protect [its] interest,' Fed.R.Civ.P. 24(a), is determined by 'looking to the practical consequences of denying intervention, even where the possibility of future challenge to the regulation remains available.'" *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6-7 (D.D.C. 2008) (*quoting Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003)).

This Court has already acknowledged that an injunction will result in serious harm to North Dakota and its citizens in its Order dated July 6, 2020. "[I]t is clear that at least some immediate harm to the North Dakota oil industry should be expected from a DAPL shutdown, even if its effects are tempered by a decreased demand for oil." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 471 F.Supp.3d 71, 85 (D.D.C. 2020). "Losing jobs and revenue, particularly in a highly uncertain economic environment, is no small burden." *Id.* Although the Court ultimately decided against the Federal Defendant and DAPL, there is no doubt that North Dakota has a real and practical interest in this litigation sufficient to satisfy the low bar of Rule 24(a)(2). As set forth in Section II, *supra*, North Dakota is dependent on DAPL for hundreds of millions of dollars of tax revenue to fund vital services for its citizens. Contrary to speculation, the pandemic did not permanently decrease the economic importance of oil production and DAPL to North Dakota's economy, with oil production having returned to close to pre-pandemic levels and

continuing to increase.  Further, DAPL has operated safely and without incident for almost four years, and shutting it down would cause the transportation of hundreds of millions of barrels of oil per year by truck and train, with the environmental consequences attendant to those modes of transportation (including greenhouse gas emissions associated with climate change).

Equally important are the non-monetary potential harms to the North Dakota's sovereign interests.  A state may intervene in litigation between a private party and the federal government to protect its own sovereign interest in governing the land within its borders.  *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6 (D.D.C. 2008).  "States have a legally protected sovereign interest in the exercise of sovereign power over individuals and entities within the relevant jurisdiction, which involves the power to create and enforce a legal code." *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (citation and internal quotations omitted).  "Regulation of land use is a function traditionally performed by local governments." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 174 (2001).  Critically, when an action threatens to harm the sovereign interests of a State without affording the State "a full and fair opportunity an opportunity to be heard on the merits," that harm is considered irreparable.  *Kansas v. United States*, 249 F. 3d 1213, 1227 (10th Cir. 2001).  North Dakota has a vital sovereign interest and duty to its citizens in the safe,

environmentally sound and efficient development of its natural resources, particularly its oil and gas resources.  This is reflected in the Public Service Commission's in-depth, public, transparent and unchallenged review and approval of DAPL's route in North Dakota.  It has the right to represent and protect these interests in this litigation.

**D.    In the Alternative, the Court Should Grant North Dakota Permissive Intervention Pursuant to Federal Rule of Civil Procedure 24(b).**

Alternatively, this Court should allow North Dakota to intervene permissively in this action under Federal Rule of Civil Procedure 24(b), which provides in relevant part:  "Upon timely application, anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common."  Fed. R. Civ. P. 24(b)(1)(B).

The D.C. Circuit requires three showings for permissive intervention: "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).  A reviewing court "'shall consider whether the requested intervention will unduly delay or prejudice the adjudication of the rights of the original parties.'"  *Friends of Animals*, 452 F. Supp. 2d at 68 (quoting Fed. R. Civ. P. 24(b)).  The decision to allow intervention under Rule 24(b) is "inherently

discretionary." *Equal Employment Opportunity Comm'n*, 146 F.3d at 1046. The Motion is timely for the reasons stated above, and this Court has already determined that this action falls within its jurisdiction. As for a "common question of law or fact," the questions of law and fact before the Court are "irreparable injury," "the balance of hardships between the plaintiff[s] and defendant[s]," and whether "the public interest would . . . be disserved by a permanent injunction," *Monsanto Co*., 561 U.S. at 156-57, and these are precisely the issues North Dakota intends to address.

## IV.   CONCLUSION

For the reasons stated above, North Dakota respectfully requests permission from this Court to participate in the above captioned matter as a Defendant-Intervenor. The State will honor and respect all outstanding orders and deadlines to avoid prejudice to the other parties.

Respectfully submitted this 19th day of April, 2021,

WAYNE STENEHJEM
ATTORNEY GENERAL

/s/ *Paul M. Seby*
Paul M. Seby
Special Assistant Attorney General
Greenberg Traurig, LLP
1144 15th St, Suite 3300
Denver, CO 80202
Phone: (303) 572-6584
Email: sebyp@gtlaw.com

Matthew Sagsveen
Solicitor General
500 N. 9th Street Bismarck, ND 58501
Phone: (701) 328-2595
Email: masagsve@nd.gov

COUNSEL FOR APPLICANT IN
INTERVENTION  STATE OF
NORTH DAKOTA

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 19th day of April 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Paul Seby*