UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Standing Rock Sioux Tribe; Yankton Sioux Tribe; Robert Flying Hawk; Oglala Sioux Tribe, <br><br> Plaintiffs, <br><br> and <br><br> Cheyenne River Sioux Tribe; Sara Jumping Eagle et al., <br><br> Plaintiff-Intervenors, <br><br> vs. <br><br> U.S. Army Corps of Engineers, <br><br> Defendant-Cross-Defendant, <br><br> and <br><br> Dakota Access, LLP, <br><br> Defendant-Intervenor-Cross-Claimant. | Civil No. 1:16-cv-01534-JEB (Consolidated Case Nos. 1:16-cv-01796 and 1:17-cv-00267) |

**DECLARATION OF JULIE FEDORCHAK
IN SUPPORT OF MOTION TO INTERVENE**

I, Julie Fedorchak, state and declare as follows:

1.      My name is Julie Fedorchak.  I am over 21 years of age and am fully competent and duly authorized to make this Declaration.  The facts contained in this Declaration are based on my personal knowledge and are true and correct.

2.      I am the current Chair of the North Dakota Public Service Commission (the "Commission"). I have not previously submitted declarations in this matter discussing the role of the Commission's extensive environmental and regulatory review of the Dakota Access Pipeline ("DAPL') on behalf of the Commission and my duties therein.

1

3.      The Commission is a constitutional agency statutorily charged with the siting of transmission facilities under the North Dakota Siting Act, which is codified in Chapter 49-22 and 49-22.1 of the North Dakota Century Code.  The purpose of the Siting Act is to ensure that the location, construction, and operation of transmission facilities will produce minimal adverse effects on the environment and upon the welfare of the citizens of this state by providing that no transmission facility shall be located, constructed, and operated within this state without a certificate of site compatibility or a route permit issued by the Commission.  Projects such as DAPL fall under the jurisdiction of the Commission's statutory duties regarding the siting of transmission facilities.

4.      In my capacity as Chair of the Commission, my responsibilities include utility rate regulation; utility resource adequacy; regional transmission organization engagement; energy generation, refinement, and transmission infrastructure siting; railroad safety oversite; gas pipeline safety on behalf of the Pipeline and Hazardous Materials Safety Administration ("PHMSA"); coal mine permitting and reclamation; restoration of abandoned mine lands; and various other compliance programs. While all Commissioners exercise equal authority and share equal responsibility for every decision, my portfolio assignments include, among other things, overseeing the permitting processes of transmission pipelines.  More specifically, I was the portfolio holder for pipeline siting during the permitting of Dakota Access pipeline.

5.      I attest that the Commission, exercised its statutory and regulatory authority in reviewing and certifying DAPL in accordance with the North Dakota Constitution and statutes that establish the public purposes and duties of the Commission on behalf of the citizens of North Dakota.  From the initial filing of the application through the Commission's issuance of its second supplemental order, the siting procedure extended 18 months and the Commission has had

continuing jurisdiction over the construction process (including any post-construction restoration or remediation) for more than 6 years.

6.      On December 22, 2014, Dakota Access, LLC filed applications with the Commission requesting a certificate of corridor compatibility and a route permit concerning approximately 358 miles of 12-, 20-, 24-, and 30-inch diameter crude oil pipeline and associated facilities within the State for the project ultimately known as the Dakota Access Pipeline or DAPL. The Dakota Access Pipeline would carry half a million barrels of North Dakota oil daily through the Dakotas and Iowa to a distribution point in Illinois.  The proposed (and ultimately Commission approved) route avoided the Standing Rock Sioux Tribe's reservation and crossed under Lake Oahe, a Missouri River reservoir in North Dakota.   On March 25, 2015, the Commission deemed Dakota Access' applications for a certificate of corridor compatibility and a route permit complete, conditioned upon receiving additional environmental reports including a wetlands and waterbody field survey report, the wildlife field survey report, the habitat assessment field survey report, and the tree and shrub inventory report.

7.      Also, on March 25, 2015, the Commission issued a Notice of Filings and Notice of Hearings, scheduling hearings regarding the applications for a certificate of corridor compatibility and route permit for May 28, 2015, June 15, 2015, and June 26, 2015.

8.      The Notice identified three issues be considered: (1) Will the location, construction, and operation of the proposed facilities produce minimal adverse effects on the environment and upon the welfare of the citizens of North Dakota?; (2) Are the proposed facilities compatible with the environmental preservation and the efficient use of resources?; and (3) Will the proposed facility locations minimize adverse human and environmental impact while ensuring continuing

system reliability and integrity and ensuring that energy needs are met and fulfilled in an orderly and timely fashion?

9.      The three public hearings on Dakota Access' applications for certificate of corridor compatibility and route permit were held as scheduled.   Hundreds of interested persons participated.  Everyone who wished to testify was allowed to do so with no time restrictions. More than 30 hours of testimony was received during the public hearings.

10.      The Commission heard and evaluated expert and citizen testimony regarding the environmental, health, recreation, soil, water resources, wildlife, and cultural and historic preservation consequences of DAPL.  The Commission evaluated the Lake Oahe crossing under the Missouri River, as well as other possible alternative routes through the state.  Among the alternatives, the Commission considered the use of third-party infrastructure, other forms of transporting oil, and alternative routes of operation.  DAPL's approved route was based upon the opportunity to locate with proximity to existing infrastructure, minimize safety concerns, avoid environmentally sensitive areas, avoid indigenous and federally owned lands, and other high-consequence areas as defined by the PHMSA and State law, to minimize disruptive construction, and enhance efficient operation.

11.      With respect to the chosen Lake Oahe crossing, the Commission heavily evaluated the route and considered its location relative to existing utility lines and pipelines.  Paralleling DAPL with existing utility lines and pipelines throughout the route including in an existing crossing under the Missouri River minimized the amount of ground and area that would be newly disturbed, thereby reducing the risk of disturbing sites of historic and cultural significance or causing adverse environmental impacts. Other major points of discussion on the crossing were the depth of the crossing 64 feet below the reservoir bottom, the location of automatic block valves,

4

worst-case spill scenarios and emergency response plans including the staging of equipment near the river crossing.

12.     On January 20, 2016, having allowed all interested persons an opportunity to be heard and having heard, reviewed, and considered all testimony and evidence presented during the State's extensive siting evaluation, the Commission issued its order granting Dakota Access its Certificate of Corridor Compatibility and Route Permit ("Certificate Order") pursuant to the North Dakota Century Code Chapter 49-22.  Based upon the evidence and comments provided from numerous State and federal agencies, intervening parties, and the interested public, the Commission determined that the location, construction, and operation of DAPL would best minimize adverse human and environmental impacts.  Commission's Finding of Fact Number 17 in the Certificate Order states that the Corps was specifically notified about the project and given the opportunity to confer with the State and the Commission on the justifications for the pipeline.

13.     In addition to the initial published notices and Certificate Order, the Commission published additional notice of opportunities for hearing regarding requested corridor and route adjustments on September 16, 2015 and April 20, 2016 and issued a supplemental order on May 24, 2016.  The Commission did not receive a request for reconsideration or rehearing of the Certificate Order or subsequent orders.  The Commission monitored the construction and locational siting of the pipeline and currently continues to monitor revegetation and remediation of the DAPL construction.

14.     Pursuant to the State's Administrative Practices Act, the Commission's Certificate Order and subsequent orders were subject to judicial review if, among other things, it was issued not in accordance with the law, did not afford a fair hearing, was not supported by the evidence

and findings, and did not sufficiently address the evidence presented by a party.   However, no party challenged the Certificate Order.

15.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 16, 2021.

Julie Fedorchak
Chair of the North Dakota Public
Service Commission