**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STANDING ROCK SIOUX TRIBE; YANKTON SIOUX TRIBE; ROBERT FLYING HAWK; OGLALA SIOUX TRIBE, | |
| Plaintiffs, | |
| and | |
| CHEYENNE RIVER SIOUX TRIBE; SARA JUMPING EAGLE ET AL., | |
| Plaintiff-Intervenors, | Case No. 1:16-cv-1534-JEB (and Consolidated Case Nos. 16-cv-1796 and 17-cv-267) |
| v. | |
| U.S. ARMY CORPS OF ENGINEERS, | |
| Defendant-Cross Defendant, | |
| and | |
| DAKOTA ACCESS, LLC, | |
| Defendant-Intervenor-Cross Claimant. | |

**DAKOTA ACCESS, LLC'S SURREPLY IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR CLARIFICATION AND A PERMANENT INJUNCTION**

Dakota Access, LLC, submits this surreply to update the record with current information, which demonstrates in an even more compelling fashion why Plaintiffs are not entitled to their requested injunction. This updated information is detailed in the six attached declarations, including from Mike Fox, Chairman of the Mandan, Hidatsa & Arikara (MHA) Nation (also known as the Three Affiliated Tribes). Chairman Fox explains that "[i]f the Dakota Access Pipeline ('DAPL') is shut down, the MHA Nation will suffer significant financial, environmental and safety harms that will add further injury to the MHA Nation's economy already suffering monumental losses as a result of the COVID-19 pandemic," including losses "exceed[ing] $160 million over a

one-year period" and five additional fatalities on their roads annually.  Ex. 1 ¶¶ 4, 10, 12 (Fox

Dec.).  Chairman Fox's declaration and the others thus confirm and update the severe economic,

environmental, and safety harms that a shutdown of the Dakota Access Pipeline (DAPL) would

inflict on numerous third parties, including members of the MHA Nation.

The Oppositions filed by Dakota Access, D.E. 576-1 (sealed version); D.E. 577 (public

version), and the Army Corps of Engineers, D.E. 573, provide multiple reasons for denying Plain-

tiffs' motion for a permanent injunction and for additional relief, *see* D.E. 569.  Not only have

Plaintiffs failed to prevail on a claim for which injunctive relief is available, they fall far short of

the demanding standard for irreparable harm.  These failures are reason alone to deny their motion.

Although the Court therefore need not reach the equities and the public interest, this filing focuses

on bringing the record current as to those factors in the event the Court chooses to address them.

Dakota Access's Opposition documented how those equities and the public interest weigh

strongly against Plaintiffs.  The declarations it filed in November, from subject-matter experts,

along with declarations and briefing from amici at that time, established how shutting down DAPL

would cause enormous, unavoidable, irreparable harm to thousands of workers, several States and

localities, the industry, Dakota Access, and Indian Tribes—collectively *billions* of dollars and

*thousands* of jobs lost, on top of environmental and safety harms that other transportation methods

are certain to cause—whereas preserving the status quo would be exceedingly unlikely to cause

any harm at all.

At the April 9, 2021 status conference, Dakota Access requested permission to update this

record with current information.  Because of extension requests granted to the other parties, five

months have passed since Dakota Access was able to make a record on these consequences rele-

vant to the equities and public interest factors.  New data and other information available today

show that the effects of a shutdown would be as bad as, and in a number of ways even *more* detrimental than, previously anticipated.  The adverse effects that these new declarations extensively document—effects that would be especially devastating to members of other Native American Tribes and other third parties—make even more clear than before why Plaintiffs' motion should be denied.

Attached to this filing are new declarations from the following six persons: Chairman Mike Fox of the MHA Nation, Kenneth H. Ditzel, Glenn Emery, Elaine Kub, William J. Rennicke, and John F. Godfrey.  Some of their key conclusions in these new declarations are summarized here.

**1.  The MHA Nation (Three Affiliated Tribes) opposes a shutdown of DAPL, which the Tribes rely on to transport more than 60% of their oil production and would add five new traffic fatalities a year for those Tribes**.

Mike Fox, Chairman of the Three Affiliated Tribes (or MHA Nation) in North Dakota, confirms the severe hardships that a DAPL shutdown would impose on the MHA Nation's nearly 17,000 members.  Ex. 1 ¶ 2 (Fox Dec.).  The MHA Nation relies on DAPL to transport *more that 60%* of its oil production.  *Id.* ¶ 9.  That oil production is critical to the MHA Nation, whose oil and gas reserves on its Fort Berthold Indian Reservation account for fully 25% of North Dakota's oil production.  *Id.* ¶ 5.  And over *80%* of the MHA Nation's budget is made up of oil and gas royalties and tax revenues.  *Id.* ¶ 6.  A DAPL shutdown would lead to substantial shut-ins of wells, significant financial hardship, and serious environmental and safety harms from increased use of other modes of transportation to move oil production that would not be shut-in.  *Id.* ¶¶ 4, 11–12. All told, the MHA Nation estimates that its losses will exceed $160 million over a one-year period and more than $250 million in two years.  *Id.* ¶ 10.

In addition, the MHA Nation estimates, based on its own experience with DAPL, that five more members would be killed each year on its roads if oil transportation shifts to increased use

3

of rail and truck.  *Id.* ¶ 12.  These tangible economic and safety harms that Native Americans are *certain* to suffer contrast with Plaintiffs' asserted apprehension of an oil spill that has a near-zero chance of occurring.  *See* Plaintiffs' Reply, D.E. 586 at 17–18.  The Court should not allow these impacts to be dismissed as effects that would be "lost in the noise" or that simply amount to "re-distribut[ing] benefits and burdens" among markets.  *See id.* at 21.

> **2.  Oil producers would lose between $3.0 billion and $5.4 billion in 2021 alone**.

Other oil producers would also suffer serious harms from a shutdown.  In November 2020, Kenneth Ditzel of FTI projected that losses to North Dakota's oil producers from the lack of feasible alternatives for transporting their oil would be between $290 million and $565 million per month in 2021.  Ditzel Dec., D.E. 576-6 (sealed version); D.E. 585-5 (public version) ¶ 6(d) (using annual figures of $3.5 billion to $6.8 billion).  Mr. Ditzel now estimates, based on April 2021 data, that North Dakota's oil producers could lose between $378 million and $676 million in revenue per month between May and December 2021 from shut-in oil production, and between $4.3 and $9.9 billion in 2022.  Ex. 5 ¶¶ 5(d) & 6 tbl. 1 (Ditzel Supp. Dec.).

> **3.  In 2021, for North Dakota alone, a shutdown would cost employees between 14,540 and 24,090 jobs.**

In November 2020, the projected loss of oil industry jobs due to increased production costs was 4,500 to 7,200 jobs.  D.E. 576-1, at 20 (citing D.E. 504-2 ¶ 14 (Helms Dec.); D.E. 509-11 ¶¶ 7, 22 (Makholm April 29, 2020 Dec.); D.E. 538-7 ¶¶ 43–46 (Makholm June 8, 2020 Dec.)).  The estimate as of April 2021 is much higher, at 14,540 to 24,090 lost jobs in North Dakota alone from May to December 2021 alone, which would mean a loss of between 2.5% and 4.1% of *all* jobs in North Dakota. Ex. 5 ¶ 5(d)(viii) (Ditzel Supp. Dec.).

**4.   North Dakota would lose between $770 million and $1.4 billion in tax revenue from oil production in 2021.**

In November 2020, the projected loss of tax revenue to North Dakota was at least "hundreds of millions."  D.E. 576-1, at 20 (citing D.E. 537 at 4 (North Dakota Reply Br.)).  The estimate as of April 2021 is that the projection remains the same, if not higher.  *Compare* Ex. 6 ¶¶ 26–27 & n.13 (Emery Supp. Dec.), *with* Ex. 5 ¶ 5(d)(iii) (Ditzel Supp. Dec.) (between $770 million and $1.4 billion from May to December 2021 alone, and between $1.1 billion and $2.5 billion in 2022).

**5.   Dakota Access's daily revenue losses would be 10% higher than previously projected:  between $3.44 million and $4.28 million per day.**

All of the harms discussed so far would be to third parties—not Dakota Access.  (These third-party harms also have been extensively documented by third parties, including Chairman Fox, subject-matter experts for the State of North Dakota, and data from oil producers and refineries.)  In addition to these third parties, Dakota Access would suffer significantly from a shutdown.  In November 2020, the projected daily revenue loss to Dakota Access of a shutdown was between $2.8 and $3.5 million per day in 2020, and a total of $1 to $1.4 billion for 2021.  D.E. 576-1, at 20–21 (citing D.E. 509-9 ¶¶ 9–10 (Emery April 29, 2020 Dec.); D.E. 509-11 ¶¶ 12–14 (Makholm April 29, 2020 Dec.)).  The estimate as of April 2021 is that the daily revenue loss would be 10% higher, between $3.44 million and $4.28 million per day, and a total of between $633 million and $787 million for the second half of 2021.  Ex. 6 ¶ 11 (Emery Supp. Dec.).

**6.   Higher gasoline, diesel, and oil demand far exceed the erroneous projections that Plaintiffs' sole economic-effects witness made.**

In November 2020, consumer demand for gasoline and diesel had begun rebounding from historic pandemic-induced lows earlier that year.  D.E. 576-1, at 21 (citing D.E. 576-6, Ex. D ¶ 34 & fig. 7 (Ditzel Dec.)), and projections showed increasing oil prices to between $45 and $50 per barrel in 2021 (citing *id.* ¶ 35).  Gasoline demand has now mostly recovered, and projected oil

prices for 2021 are now between $56 and $62 per barrel in 2021.  Ex. 5 ¶ 24 (Ditzel Supp. Dec.).

**7.   Higher oil production levels in North Dakota again contradict Plaintiffs' projections.**

In November 2020, growing demand for gasoline and diesel had already driven North Dakota oil production up from its May 2020 low-point, significantly outpacing the gloomy predictions of Plaintiffs' expert.  D.E. 576-1, at 21 (citing D.E. 576-6, Ex. D ¶¶ 51–55 & fig. 12 (Ditzel Dec.); D.E. 569-3 at 3–4).  Demand has since continued to outpace those predictions.  Ex. 6 ¶¶ 4(b), 9, 17 (Emery Supp. Dec.).  Indeed, at this point, the possibility of a court-ordered shutdown, rather than COVID-19, is the major uncertainty impacting market demand.  *Id.* ¶¶ 9, 17.

**8.   Current data confirms severe rail congestion from a DAPL shutdown.**

Subsequent developments have confirmed Dakota Access's predictions that congestion and shipping costs for other rail users, including Midwest farmers, would increase.  *See* Ex. 3 ¶¶ 9–13 (Kub. Supp. Dec.); Ex. 2 ¶¶ 4, 7–10 (Rennicke Supp. Dec.); *see also* D.E. 576-1, at 20 (citing D.E. 509-6 ¶¶ 17–27, 60-84 (Rennicke April 29, 2020 Dec.); D.E. 538-7 ¶¶ 4, 29–41 (Makholm June 8, 2020 Dec.); D.E. 538-5 ¶¶ 64–65 (Rennicke June 8, 2020 Dec.)).

**9.   DAPL continues a spill-free record for its nearly 1,200 mile mainline.**

As for the safety of DAPL, November 2020 marked more than three years of DAPL operating spill-free along its entire mainline of nearly 1,200 miles.  D.E. 576-1, at 14 (citing D.E. 509-4 ¶ 16 (Godfrey April 28, 2020 Dec.); D.E. 509-5 ¶ 24 (Stamm Dec.); D.E. 538-4 ¶ 20 (Godfrey June 8, 2020 Dec.)).  This unblemished record has continued to the present, with nearly four years of operations.  Ex. 4 ¶ 3 (Godfrey Supp. Dec.).

**10. Updated data confirms Energy Transfer's better-than-industry spill record.**

As John Godfrey explains, the D.C. Circuit misapprehended Pipeline and Hazardous Materials Safety Administration ("PHMSA") data to assert that Energy Transfer (including Sunoco)

has a worse oil-spill record than the industry average.  Ex. 4 ¶¶ 4–10 (Godfrey Supp. Dec.).  For all of the other reasons stated above and in the Oppositions by Dakota Access and the Corps, the Court should deny the motion even if that error, which Dakota Access pointed out in its Petition for Rehearing En Banc to the D.C. Circuit (No. 20-5197, Doc. #1894179, at 11 (April 12, 2021)), goes uncorrected.  But correcting that error further undermines Plaintiff's position.  Under a correct apples-to-apples comparison, Energy Transfer consistently outperforms the industry on spill-risk metrics.  Ex. 4 ¶¶ 6, 10 (Godfrey Supp. Dec.).

*   *   *

To maintain consistency with the declarations prepared in November 2020, the new declarations addressing economic effects again project monthly levels of impacts through the end of 2022.  The Corps has stated, though, that the environmental impact statement process could be completed much earlier:  by the end of this year.  D.E. 573 at 22.  The passage of five months since Dakota Access filed its Opposition has shortened the potential shutdown time from that contemplated when the Court scheduled briefing for Plaintiff's motion.  That shorter duration *strengthens* the case for denying the motion.  An immediate economic shock would still occur, followed by even *less* market incentive to invest the time and capital that would be needed to move DAPL volumes to rail transport.  Ex. 2 ¶ 4(d) (Rennicke Supp. Dec.) (explaining it would take eight to twelve months, or longer, to make the changes needed to shift large portions of the DAPL volumes to rail).

In the interest of minimizing delay, Dakota Access has confined the scope of this filing to updates in data and other information newly available since Dakota Access filed its Opposition in November.  If Plaintiffs nonetheless file a responsive pleading that goes beyond the limited scope of this filing, Dakota Access reserves the right to seek leave to address those additional points.

7

The Court should deny Plaintiffs' Motion.

Respectfully submitted this 19th day of April, 2021.

By: */s/ William S. Scherman*
    William S. Scherman
    Miguel A. Estrada
    David Debold
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, N.W.
    Washington, D.C.  20036
    (202) 955-8500
    wscherman@gibsondunn.com

    *Counsel for Dakota Access, LLC*

**CERTIFICATE OF SERVICE**

I certify that on April 19, 2021, the foregoing document was filed via the Court's CM/ECF

system and served upon ECF-registered counsel for all parties to this proceeding.

*/s/ William S. Scherman*
William S. Scherman
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
wscherman@gibsondunn.com

## Exhibit List

**Exhibit 1:**    Declaration of Mark N. Fox, Chairman of the Mandan, Hidatsa & Arikara Nation, also known as the Three Affiliated Tribes

**Exhibit 2:**    Supplemental Declaration of William J. Rennicke, Partner, Oliver Wyman

**Exhibit 3:**    Supplemental Declaration of Elaine Kub, Market Economist

**Exhibit 4:**    Supplemental Declaration of John F. Godfrey, Senior Principal Consultant, DNV GL USA, Inc.

**Exhibit 5:**    Supplemental Declaration of Kenneth H. Ditzel, Senior Managing Director, FTI Consulting, Inc.

**Exhibit 6:**    Supplemental Declaration of Glenn Emery, Vice President, Commercial Operations, Energy Transfer LP