UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Standing Rock Sioux Tribe; Yankton Sioux Tribe; Robert Flying Hawk; Oglala Sioux Tribe, <br><br>        Plaintiffs, <br><br> and <br><br> Cheyenne River Sioux Tribe; Sara Jumping Eagle et al., <br><br>        Plaintiff-Intervenors, <br><br>   vs. <br><br> U.S. Army Corps of Engineers, <br><br>        Defendant-Cross-Defendant, <br><br> and <br><br> Dakota Access, LLP, <br><br>        Defendant-Intervenor-Cross-Claimant. | Civil No. 1:16-cv-01534-JEB <br> (Consolidated Case Nos. 1:16-cv-01796 and 1:17-cv-00267) |

## THE STATE OF NORTH DAKOTA'S REPLY IN SUPPORT OF ITS OPPOSED MOTION TO INTERVENE

The State of North Dakota ("North Dakota" or the "State") submits this Reply in support of its Opposed Motion to Intervene as a Defendant-Intervenor. North Dakota meets the standard both for intervention as of right pursuant to Rule 24(a)(2), or alternatively for permissive intervention pursuant to Rule 4(b)(1)(B).

## I.    INTRODUCTION

Nowhere in their fifteen-page memorandum do Plaintiffs and Plaintiff-Intervenors ("Plaintiffs")[1] assert any prejudice to their interests that would result from North Dakota's participation in this matter as an Intervenor-Defendant.  Indeed, the word "prejudice" does not even appear in Plaintiffs' Memorandum.  Plaintiffs also do not argue that North Dakota's participation would in any way delay or interfere with this Court's resolution of this matter. Instead Plaintiffs argue that North Dakota's participation will not benefit North Dakota – something the State feels highly qualified to judge for itself.  *See* Opposition of Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe to State of North Dakota's Opposed Motion to Intervene, Dkt. 600 ("Opposition") at 6-13.

North Dakota has demonstrated that it has significant and unique sovereign and economic interests in this case that are no longer effectively represented by the U.S. Army Corps of Engineers ("Corps" or "Federal Defendant") and cannot be represented by a private party such as Dakota Access, LLC, and North Dakota has agreed to abide by all prior rulings and deadlines of this Court to ensure that it will not in any manner impede or delay these proceedings.  The Federal Defendant did not contest North Dakota's position that the Corps no longer adequately represents North Dakota's interests.   Further, even if this Court accepted every argument in the Plaintiffs' Opposition, North Dakota's participation as a party in this matter is, at the very least, completely innocuous, since it will cause no delays, impose no burdens and prejudice no party.  "[W]e do not require timeliness for its own sake," but "[r]ather, the requirement of timeliness is aimed primarily

---

[1] The Standing Rock Sioux Tribe, Cheyenne River Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe.

at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." *Amador Cnty. v. U.S. Dep't of the Interior*, 772 F.3d 901, 905 (D.C. Cir. 2014) (internal quotations omitted).  Since Plaintiffs are unable to identify any "undue disruption" to this litigation and have not specified any detriment to their interests that would result from North Dakota's intervention at this stage in the proceedings, there is no reason why this Court should not grant North Dakota's Motion to Intervene, either as of right or at the Court's discretion.

**II.      North Dakota's Motion to Intervene was Timely.**

"[T]he amount of time which has elapsed since the litigation began is not in itself the determinative test of timeliness."  *Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C. Cir. 1972).  "Rather, the court should also look to the related circumstances, including the purpose for which intervention is sought, the necessity for intervention as a means of preserving the applicant's rights, and the improbability of prejudice to those already parties in the case."  *Id*.

North Dakota filed its Motion to Intervene because the Federal Defendant has abandoned its vigorous defense of this litigation, and Dakota Access LLC, a private company, cannot defend North Dakota's sovereign and public interests at stake in this litigation.  It is well-established law that this is adequate grounds to intervene in litigation, even at the remedial and appellate stage. *Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001) ("Government's representation of the appellants' interests became potentially inadequate only when it equivocated about whether it would appeal the adverse ruling of the district court").  Plaintiffs' extensive discussion of the history of this litigation are beside the point.

North Dakota filed its Motion to Intervene promptly following a status conference which was called to provide the Corps with an opportunity to comment on the new administration's policies with regard to the Dakota Access Pipeline ("DAPL").  In that status conference, the Corps

adopted an equivocal approach, neither retracting nor endorsing its previous position.  Transcript

of Teleconference before the Honorable James E. Boasberg, United States District Judge, *Standing*

*Rock Sioux Tribe v. United States Army Corps of Engineers*, (April 9, 2021).

 The status report filed by the Corps on May 3, 2021 was similarly circumspect.  United

States Army Corps of Engineers Status Report, *Standing Rock Sioux Tribe v. United States Army*

*Corps of Engineers* (May 3, 2021), Dkt 601.  The Corps stated "its position, if it has one, on

whether an injunction should issue," is that "the Corps filed an opposition to Plaintiffs' request for

an injunction, …[and] [t]his question now rests in the 'sound discretion' of the Court."  *Id*. at 2.

The Corps went on to equivocate its prior position, stating that as "to whether an injunction should

issue, the EIS process in which the Corps is currently engaged examines many factors including

some that may be relevant to the permanent injunction standard," although that "to date the Corps

is not aware of information that would cause it to evaluate the injunction factors differently than

in its previously filing."  *Id*. (emphasis in original).  The Corps declined to clearly and explicitly

state that it opposed an injunction and indicates it could change its mind at any time.  See Hearing

Transcript at 10.  A further indication of the Corps' shift in position is its decision to not join

Dakota Access LLC's recent effort to seek *en banc* review of the D.C. Circuit's decision in this

matter.  Thus the Corps is no longer vigorously defending North Dakota's interests in this

litigation.  Notably, the Federal Defendant has not filed an opposition to North Dakota's motion

and has not contested North Dakota's characterization of the change in the Corps' position.

 When this Court's forthcoming order is appealed, as it almost certainly will be by one party

or the other regardless of the decision, or when it gives rise to subsequent motions practice or a

consent decree, North Dakota cannot rely, as it has  earlier in the litigation, on the Corps to

represent North Dakota's  sovereign and public interests at stake in this litigation.  Plaintiffs have

identified no prejudice that would result to their interests as a result of this participation.

None of the cases Plaintiffs cite contradict the plain holding of *Smoke v. Norton*, that a change in the government's position, even an "equivocat[ion]," is sufficient to support a timely motion to intervene at a late stage in the litigation, especially when there is no prejudice to the other parties, when those parties were relying on the government to adequately represent their interests. *Smoke*, 252 F.3d at 471.  For example, Plaintiffs cite *Roeder v. Islamic Republic of Iran*, which allowed a last minute intervention despite the obvious prejudice to the parties, for the uncontroversial proposition that generally "[t]imeliness is measured from when the prospective intervenor knew or should have known that any of its rights would be directly affected by the litigation."  Opposition at 7, quoting *Roeder*, 333 F.3d 228, 233 (D.C. Cir. 2003).[2]  This quotation was lifted from a paragraph that summarized the generic legal principles governing timeliness, and the case itself did not raise or address changed circumstance or adequacy of representation.  *See id*.  And *National Wildlife Federation v. Burford*, similarly quoted by Plaintiffs, found that intervention was timely three years after the commencement of a suit when the intervenor obtained new information about the nature of the claims.  878 F.2d 422, 428, 434 (D.C. Cir. 1989) *rev'd on other grounds sub nom. Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871 (1990).  Neither of these cases considered issues of adequate representation, they both predate *Smoke v. Norton,* the case most directly on point, and in any event both cases granted the motions to intervene.

---

[2] *Roeder* concerned a suit by victims of the Iranian hostage crisis.  *Id*. at 230.  As part of the agreement that resulted in the release of the hostages, the State Department promised Iran that the hostages would not be able to sue Iran for damages, an agreement that was later confirmed by act of Congress.  When the litigation began, the State Department waited until hundreds of people had traveled at great expense and inconvenience to the court to testify and only then intervened at the last possible moment.  *Id*. at 231.  In spite of the obvious prejudice to the parties, the *Roeder* court concluded that "is clear to us that the court properly granted the United States leave to intervene as of right."  *Id*. at 233.

Further, Plaintiffs' claim that North Dakota should have known "its rights were implicated at least as early as April last year following this Court's summary judgment ruling" fails to consider the key impetus which catalyzed North Dakota to now intervene – the Corps changed its position as demonstrated in the April 9, 2021 status conference.  Opposition, at 7 (emphasis in original). North Dakota, of course, has been aware that the validity of the DAPL easement has been at issue throughout this litigation.  However, until recently, the Corps was vigorously defending the validity of the easement.  It was only after the Corps' February 8, 2021 request to continue the Status Conference in order "to brief the new administration officials" on this litigation, and the subsequent equivocation at the rescheduled April 9, 2021 status conference, that it became clear that North Dakota's interests in this litigation were no longer adequately represented.  Thus, North Dakota's intervention is timely based on the Corps recently changed positions.

Most importantly, Plaintiffs have not been able to identify any concrete prejudice to their (or any parties') interests that will result from North Dakota's intervention.  "[T]he requirement of timeliness is aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties."  *Amador Cnty. v. U.S. Dep't of the Interior*, 772 F.3d 901, 905 (D.C. Cir. 2014) (internal quotations omitted).  Without a showing (or even a claim) of prejudice, delay or disruption of any sort, Plaintiffs' arguments are fundamentally academic, and "we do not require timeliness for its own sake."  *Id*.

### III. The State of North Dakota's Sovereign Interests Cannot be Adequately Represented By Dakota Access LLC.

North Dakota's burden of showing that the representation by the existing parties "may be inadequate" is "minimal." *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (quotation marks omitted).  "A government entity such as [the State] is charged by law with representing the public interest of its citizens[,] [but] [a private company] … is seeking to protect

6

a more narrow and 'parochial' financial interest not shared by the citizens of the [State]." *Dimond v. District of Columbia*, 792 F.2d 179, 192-93 (D.C. Cir. 1986).   Contrary to the Plaintiffs' contention, North Dakota's *sovereign* interests cannot be adequately represented by Dakota Access LLC.

Dakota Access LLC cannot adequately represent the State because North Dakota "has a mandate to design and enforce an entire regulatory system in the public interest" while Dakota Access LLC's "livelihood may rest on the revocation of a single permit."   *People for Ethical Treatment of Animals v. Babbitt*, 151 F.R.D. 6, 8 (D.D.C. 1993).   While North Dakota and Dakota Access LLC are aligned on the general question of whether the pipeline should be permitted to operate, North Dakota also regulates Dakota Access LLC and  its interests in DAPL as a regulator are not the same as those of Dakota Access LLC's interests as an operator.   North Dakota cannot rely on Dakota Access LLC, the private operator of DAPL, to represent the State's interests as a regulator of DAPL in the context of responding to or shaping any injunctive relief that may result from this litigation, which could include issues related to the appropriate and necessary conditions for either continued or cessation of DAPL's operations.   North Dakota's interests in the Corps' EIS ordered by this Court that is bound up with this litigation will also be different and broader than those of Dakota Access LLC.

Plaintiffs do not cite to any cases where a private party has been found to adequately represent a sovereign state.   *See* Opposition at 10-12.[3]   The situation where a private party was

---

[3] Plaintiffs cite two cases regarding adequacy of representation, one of which finds that a private advocacy group is adequately represented by a government agency, *Victim Rts. L. Ctr. v. Rosenfelt*, 988 F.3d 556, (1st Cir. 2021), and the other which finds that the Army and Government Printing Office are adequately represented by the General Services Administration, another federal agency, *Elec. Data System Fed. v. Gen. Serv. Admin.*, 629 F. Supp. 350, 353 (D.D.C. 1986).

alleged to adequately represent the interests of a government entity has arisen only rarely in the past, and courts have made short shrift of such arguments.  For example, in 2014 the U.S. Virgin Islands intervened in a tax dispute between a taxpayer and the United States over whether this taxpayer ought to be classified as a resident of the Virgin Islands for tax purposes, *Huff v. Comm'r*, 743 F.3d 790, 796 (11th Cir. 2014).  The United States tried to argue that the Virgin Islands was adequately represented by the taxpayer, but the Court rejecting this argument finding that in addition to the Virgin Island's direct interest in "the disputed tax revenue" it also had an interest in "preserving the integrity of its tax system."  *Id*. at 799.  "This type of sovereign interest is precisely the type of legally protectable interest that has long formed the basis for intervention of right under Rule 24(a)(2)."  *Id*.  Similarly, back in 1967 this Court found that a private bank did not adequately represent Wisconsin in a challenge to the implementation of branch banking. *Nuesse v. Camp*, 385 F.2d 694, 703 (D.C. Cir. 1967).  "The interest that the state bank is suing to protect is its own commercial integrity, while the interest sought to be promoted by the Commissioner is the 'competitive equality' of national and state banks in general."  *Id*.

Indeed, North Dakota's sovereign interests cannot be represented by other parties, particularly by private companies.  *WildEarth Gaurdians v. Jewell,* 320 F.R.D. 1 (D.D.C. 2018) ("While the Federal Defendants' duty runs to the interests of the American people as a whole, the state-intervenors will primarily consider the interests of their own citizens. Furthermore, [the state-intervenors] may have unique sovereign interests not shared by the federal government.").  A State may intervene in litigation between a private party and the federal government to protect its own sovereign interest in governing the land within its borders.  *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6 (D.D.C. 2008) (holding that "the existing defendants, the DOI and the Secretary, have no clear interest in protecting [the State's] sovereignty or [the State's]

interest").  "States have a legally protected sovereign interest in the exercise of sovereign power over individuals and entities within the relevant jurisdiction, which involves the power to create and enforce a legal code." *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (citation and internal quotations omitted).  Unlike Dakota Access LLC, North Dakota is a sovereign State and acts pursuant to its State constitution and laws, on behalf of its citizens. North Dakota cannot rely on a private company, such as Dakota Access LLC, to adequately represent those interests, particularly when Dakota Access LLC and DAPL are regulated by the State of North Dakota itself.  A private entity like Dakota Access LCC that is regulated by North Dakota cannot be entrusted to ensure North Dakota's unique interests, including its interests in regulating DAPL, are adequately represented.

As described in detail in the Declaration of Julie Fedorchak, the Chair of the North Dakota Public Service Commission ("Commission"), the Commission exercised its statutory and regulatory authority in reviewing and certifying, in a public and multi-stakeholder process whose results were not challenged, the siting and route of DAPL in accordance with the North Dakota Constitution and statutes that establish the public purposes and duties of the Commission on behalf of the citizens of North Dakota.  Fedorchak Dec. ¶ 5 Dkt.592-2.  Through the siting process and continuing through construction, the Commission has had continuing jurisdiction over DAPL for more than 6 years.  *Id*.  North Dakota has a vital sovereign interest in ensuring the integrity of its own permitting and regulatory process and a duty to its citizens in the safe, environmentally sound and efficient development of its oil and gas resources.  North Dakota must protect these several legally cognizable interests in this litigation.

### IV.    Continued Amicus Participation is No Longer Sufficient to Protect North Dakota's Interests

It is unlikely that the current motion for injunctive relief before the Court will bring a final end to this matter.  At the very least, there will be an appeal by either Plaintiffs or Dakota Access LLC. The Plaintiffs contend North Dakota "does not claim that it should be granted intervention in order to be able to appeal if the Defendants do not appeal an injunction."  Opposition at 9.  To be clear, if granted intervention, the State of North Dakota fully intends to appeal any injunction issued against Dakota Access LLC, DAPL, or the Federal Defendant.  If the Court decides to not issue an injunction, North Dakota would defend that decision on appeal.  In an appeal, neither Dakota Access LLC nor the Federal Defendant could speak to and would not have standing to represent the State of North Dakota's unique sovereign interests.  North Dakota can no longer rely, as it has relied throughout the litigation, on the Federal Defendant to represent the broader sovereign and public interests at stake in defending this litigation.

Further, other motions practice is also likely.  If the injunction is denied Plaintiffs may request some other form of preliminary or permanent relief or try to negotiate a settlement.  As the Plaintiffs themselves suggest, there may be litigation regarding the EIS that the Federal Defendant has been directed to conduct by this Court and thus would likely become part of this case. Opposition at 10.  Or, if the EIS process drags on there may be changed factual circumstances that give rise to further disputes about the appropriate relief, if any, in this matter.  Only as a party can the State of North Dakota directly and fully represent its sovereign interests and those of its citizens in the motion practice, negotiations, and appeals of this ongoing litigation.

Once again, the failure of Plaintiffs to allege or show any prejudice to their interests is crucial. If there were real, concrete, and immediate adverse costs to allowing North Dakota to intervene, then the uncertainty regarding future proceedings might weigh in favor of delay, but without any

showing of prejudice there are no harms to weigh against the benefits of intervention.  And, of course, North Dakota cannot adopt a wait and see approach because it must comply with the timeliness requirements of Rule 24(a).

## CONCLUSION

For the foregoing reasons, and those stated in its Motion to Intervene, the State of North Dakota respectfully requests that this Court: (i) grant the State's Motion to Intervene as of right under Rule 24(a); or (ii) in the alternative, permit the State to intervene under Rule 24(b)(1)(B).

Dated:  May 10, 2021

WAYNE STENEHJEM
ATTORNEY GENERAL

/s/ *Paul M. Seby*
Paul M. Seby
Special Assistant Attorney General
Greenberg Traurig, LLP
1144 15th St, Suite 3300
Denver, CO 80202
Phone: (303) 572-6584
Email: sebyp@gtlaw.com

Matthew Sagsveen
Solicitor General
500 N. 9th Street Bismarck, ND 58501
Phone: (701) 328-2595
Email: masagsve@nd.gov

COUNSEL FOR THE
STATE OF NORTH DAKOTA

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 10th day of May 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Paul Seby* _____